UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PENNY T. COLLINS,

          Plaintiff,

   v.

THE STATE OF NEW YORK,
NEW YORK STATE DEPARTMENT
OF CORRECTIONAL SERVICES,
BRIAN FISCHER, AS COMMISSIONER OF THE
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES,
GLENN S. GOORD, INDIVIDUALLY AND
AS FORMER COMMISSIONER OF THE
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES,
JOHN BURGE, INDIVIDUALLY AND AS
SUPERINTENDENT OF AUBURN CORRECTIONAL
FACILITY, HAROLD GRAHAM, INDIVIDUALLY
AND AS SUPERINTENDENT OF
AUBURN CORRECTIONAL
FACILITY, TROY MITCHELL, INDIVIDUALLY
AND AS A CORRECTIONS OFFICER,

          Defendants.

JURY DEMANDED

AMENDED COMPLAINT

07-CV-493 (NAM/DEP)

       Plaintiff, Penny T. Collins, by and through her attorneys, Green & Seifter, Attorneys, PLLC, as and for her Verified Complaint against Defendants, the New York State Department of Correctional Services and Troy Mitchell, states as follows:

## THE PARTIES

      1.    Penny T. Collins ("Ms. Collins") is a resident of the State of New York, County of Onondaga.

2. Upon information and belief, the State of New York maintains offices throughout the State including within the Northern District of New York.

3. Upon information and belief, Defendant New York State Department of Correctional Services ("DOCS") is a department or agency of the State of New York.

4. Upon information and belief, Defendant Glenn S. Goord is the former Commissioner of the New York State Department of Correctional Services and is a resident of the State of New York.

5. Upon information and belief, Defendant Brian Fischer is the existing Commissioner of the New York State Department of Correctional Services and is a resident of the State of New York.

6. Upon information and belief, Defendant John Burge is the former Superintendent of Auburn Correctional Facility and is a resident of the State of New York.

7. Upon information and belief, Defendant Harold Graham is the existing Superintendent of Auburn Correctional Facility and is a resident of the State of New York.

8. Upon information and belief, Defendant Troy Mitchell ("Mitchell") is a resident of the State of New York, County of Cayuga.

## JURISDICTION AND VENUE

9. This is an action brought by Plaintiff against the Defendants for gender based discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and § 296 of the New York State Executive Law.

10. Upon information and belief, the Court has federal question jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1983. The Court also has jurisdiction over all of Plaintiff's state law claims pursuant to the doctrine of pendant jurisdiction.

11.     On or about January 3, 2006, Plaintiff filed a Verified Complaint with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC") (Federal Charge No. 16GA601158) against the New York State Department of Correctional Services and Troy Mitchell, as Aider and Abetteor ("Respondents"). On or about May 24, 2006, Plaintiff filed an Amended Complaint against the above Respondents with the New York State Division of Human Rights and the EEOC for the complaint with federal charge number 16GA601158.

12.     On June 1, 2007, the EEOC issued a "Dismissal and Notice of Rights" to Plaintiff for the above EEOC charge, attached as Exhibit A.

13.     Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in the Northern District of New York.

## BACKGROUND OF FACTS

14.     Ms. Collins is a Corrections Officer ("CO") and employee of DOCS. She began her career as a CO after graduating from the Academy for Corrections Officers in 2002. Her first assignment began on December 23, 2002, at the Sing Sing Correctional Facility ("Sing Sing").

15.     While at Sing Sing, Ms. Collins suffered her first incident of sexual harassment when a supervisor put his hand on her inner thigh and stated that "he would hook up with her before she left." Ms. Collins did not report this incident to her supervisors because she was a new employee and thought that it was an isolated incident. She was also in the process of transferring to the Sullivan Correctional Facility ("Sullivan") and did not want to cause a problem before she left Sing Sing.

16. On or about May 28, 2003, Ms. Collins transferred to Sullivan, a transfer she had requested to bring her work site closer to her home and family.

17. During the thirteen months that Ms. Collins worked at Sullivan, she experienced several incidents of sexual harassment.

18. For example, Ms. Collins' co-worker told her that she should not voluntarily seek additional training from her supervisors on her down time. When Ms. Collins did so, her co-worker's accused her of having sexual affairs with her supervisors in order to receive favorable duty assignments.

19. During working hours, Ms. Collins received phone calls from her co-workers who made obscene comments such as "are your knees dirty yet?", or "don't forget to clean the fucking floor, Hazel." Often, she would answer the phone and the caller would not identify himself and simply hang up.

20. Upon information and belief, these same unknown co-workers informed Ms. Collins' family that she had committed adultery. Ms. Collins received messages on her voice mail at home commenting about her alleged affairs with her supervisors.

21. Ms. Collins' co-workers placed inappropriate items in her lunch box, without her knowledge, such as unused prophylactics or drawings.

22. Hand written notes were posted at Sullivan for Ms. Collins' co-workers and supervisors to see. For example, while Ms. Collins worked with a supervisor named Sergeant John Hoefling, written notes were posted outside his office stating "Johnny's Love Shack" and "Honeymooners – Do Not Disturb".

23. Other offensive and harassing actions at Sullivan, committed by Ms. Collins' co-workers and supervisors, include the following:

    a. Certain co-workers purposely walked in front of Ms. Collins and passed flatulence in the presence of inmates. When she complained, they would laugh at her (again, in the presence of inmates) and would subsequently repeat the behavior.

    b. Ms. Collins learned from a co-worker that Lieutenant Keenan made wagers with other officers at Sullivan regarding which one of them would have sexual relations with Ms. Collins first.

24.    On one occasion in June, 2004, Lieutenant Riley witnessed Ms. Collins' failure to answer a phone in her work area and questioned her actions. Ms. Collins informed the Lieutenant that she was being harassed by co-workers with the phone calls, which often contained obscene messages or were simply hang ups. The Lieutenant directed Ms. Collins to put her experiences in a memo to him which he would pass on to the Superintendent of the facility, James J. Walsh.

25.    After providing Lieutenant Reilly with the memo requested, Ms. Collins subsequently met with Superintendent Walsh who encouraged her to file a formal complaint of harassment. Ms. Collins expressed concern regarding the possibility of suffering retaliation if she filed a complaint. Superintendent Walsh informed Ms. Collins that DOCS would protect her from retaliation.

26.    Based in part upon Superintendent Walsh's encouragement, Ms. Collins in fact submitted to Superintendent Walsh a harassment complaint on June 16, 2004. This complaint outlined many of the harassing actions Ms. Collins had endured while at Sullivan.

27.    After an investigation was completed concerning Ms. Collins' June 16, 2005 complaint, findings were made confirming Ms. Collins' claims. However, no meaningful action was taken on the alleged basis that Ms. Collins' harassers could not be identified.

28. In late June, 2004, Ms. Collins learned that she had received a transfer to the Auburn Correctional Facility ("Auburn"). She had previously applied for this transfer because Auburn was closer to her home and family.

29. Ms. Collins' co-workers learned of her transfer and warned her that she should not go to Auburn. Several co-workers informed Ms. Collins that Auburn was no place for a woman to work. Ms. Collins had previously heard these same comments from officers at the Academy and at Sing Sing. When Ms. Collins asked some of them why, they informed her that women were not treated right there and that it was a "good ol boy" jail.

30. On June 28, 2004, Ms. Collins began work at Auburn. She immediately faced harassment and retaliation from her co-workers and supervisors.

31. On her second day at Auburn, Ms. Collins found her photograph posted in the facility with the words "ADMIN TRANSFER" written in large print beneath the photograph. It is well accepted that an administrative transfer implies that the transferee was either forced to transfer to a new facility, or that the transferee had requested the transfer for some special reason. Of course, Ms. Collins' transfer to Auburn was not for administrative purposes, but it was a seniority based transfer made at Ms. Collins' request and pursuant to the Defendants' normal policies and procedures.

32. Also on her second day at Auburn, Ms. Collins was confronted by a co-worker, CO Wright, who questioned her about the reason for her transfer from Sullivan. Although Ms. Collins told CO Wright that she had sought the transfer to work closer to home, CO Wright indicated that he knew the "real reason". CO Wright stated to Ms. Collins that Sullivan staff had called and told him about her. He stated that he was informed by Sullivan that Ms. Collins' transfer was "administrative", and that he knew that she was "suing" her co-workers at Sullivan.

33. At about the same time, and shortly after beginning work at Auburn, Ms. Collins began to hear rumors from other COs who worked at Auburn that she was "trouble". She overheard other COs talking about "Teddy". These COs stated that "Teddy doesn't lie" and "Teddy was right". She was later told by a CO at Sullivan that Teddy had said he was "going to take care of her before she ever stepped into Auburn". Eventually, Ms. Collins discovered that Teddy was Sergeant Ted Connors, who had come to Sullivan just prior to Ms. Collins' transfer out of that facility.

34. Over the next several months, Ms. Collins regularly experienced harassing behavior that grew worse over time. She was shunned by co-workers and was the subject of inappropriate harassing behavior on numerous occasions.

35. In or about April, 2005, Ms. Collins was helping to organize teams from Auburn to participate in DOCS' Olympics. She learned that many of her co-workers would not join the Auburn team in DOCS' Olympics because they did not want to be associated with her. Ms. Collins discovered that some Auburn supervisors had instructed Ms. Collins' co-workers to stay away from her because she was "trouble" and was "suing other officers".

36. In or about June, 2005, Ms. Collins was humiliated and embarrassed by one of her supervisors, Sergeant Wright, in front of other security staff. His violent and hostile behavior frightened Ms. Collins enough to discuss the matter with Auburn Superintendent John Burge and CO Buelowicz. She separately informed the Superintendent and CO of her belief that she was being harassed at Auburn because of her prior complaints of harassment at Sullivan and because she was a woman. She also expressed her concerns that women were treated poorly at Auburn. Despite discussing these matters with Superintendent Burge and CO Buelowicz <u>and</u> after filing a grievance about the incident, <u>no action</u> was ever taken by DOCS.

37. The harassment and retaliation Ms. Collins experienced grew considerably worse in the late summer and fall of 2005.

38. On August 3, 2005, Ms. Collins participated in required weapons training. During the session, CO McFall compared the length of the firearms to the size of male genitalia and compared the bullets to an ejaculation. He also discussed his sex life with his spouse and made derogatory comments about women in general.

39. Also at this weapons training, Sergeant VanVleet made derogatory comments toward Jewish people and, among other things, stated that "Hitler should have killed all of the fucking Jews".

40. Although Ms. Collins would normally stay quiet and ignore such degrading comments, she was visibly shaken and disturbed by these comments. When the weapons training officer asked Ms. Collins if she was alright, she stated to the group that she was ok, but that she had been Jewish her whole life and was use to hearing these kinds of things. In fact, Ms. Collins is not Jewish. Following the training, Ms. Collins approached Sergeant VanVleet to inform him that she was not really Jewish, but that it was inappropriate for him to make such offensive remarks. Sergeant VanVleet said that he did not care if Ms. Collins was Jewish or not, and that it did not change the way he felt.

41. In September, 2005, Ms. Collins was told by another co-worker, CO Phlueger, that he would not work with her because she was "trouble". He also made a racially degrading remark about Ms. Collins, calling her a "nigger lover".

42. At about this time, Ms. Collins decided to proceed with a formal complaint of discrimination and retaliation. Ms. Collins filed a complaint in early October, 2005. She received a letter from the Office of Diversity Management dated October 11, 2005, informing her that her complaint had been received and that the matter would be investigated.

43. In late October, 2005, given that no action had been taken on her complaint, Ms. Collins decided to approach the new Superintendent, Harold Graham, and ask about the status of her complaint. Superintendent Graham was short and curt with Ms. Collins, telling her that he did not know where her complaint stood, and he informed her that nothing would happen with her complaint anyway. Superintendent Graham informed Ms. Collins that if she wanted action on her complaint, she should commence a law suit in Federal Court.

44. Over the next several weeks, Ms. Collins experienced extreme harassment and discrimination by her co-workers and supervisors. For example, on or about November 10, 2005, Ms. Collins was having her lunch in C Block when Defendant Mitchell stated to her that he needed to "take a shit" and that it would be a "watery one". He also informed Ms. Collins that he often had flatulence at the dinner table, and he liked to walk around naked at his home. He even told Ms. Collins that he had seen his mother naked and once told her "hey mom, nice tits". Ms. Collins told Defendant Mitchell to "stop it" and that she "didn't want to hear it". These incidents occurred in the presence of inmates.

45. Also in the presence of inmates, Defendant Mitchell made other inappropriate remarks to Ms. Collins. For example, he once stated to Ms. Collins that his wife had a ring similar to the one Ms. Collins was wearing and that the ring slipped off his wife's finger and "got lost in his ass". Ms. Collins immediately objected asking Defendant Mitchell to never speak that way to her again.

46. That same day, Ms. Collins left her eye glasses on her desk while making rounds. Upon her return to the block, she discovered that both of the lenses of her eye glasses had been taped over with scotch tape. In the block were Defendant Mitchell and other security staff. Ms. Collins stated that someone needed to clean her glasses. Defendant Mitchell threw a bottle of glass cleaner on her desk and laughed about the incident with other COs. Ms. Collins was

humiliated and disturbed by the events and asked Defendant Mitchell to be relieved. Defendant Mitchell laughed at Ms. Collins and ignored her request.

47. On or about November 10, 2005, again in the presence of inmates, several COs began throwing objects, such as bars of soap, from the upper floors of the C Block on to the plexiglass over Ms. Collins' desk.

48. On or about November 11, 2005, Ms. Collins made a written report to Defendant Mitchell objecting to the recent incidents of harassment. Upon information and belief, Defendant Mitchell circulated this report with other COs and supervisors at Auburn.

49. Also on or about November 11, 2005, Ms. Collins made a written request for DOCS to provide temporary locker room facilities for females. Auburn did not have locker room facilities for females while Ms. Collins was assigned to the facility. Female COs had to share the male locker room to prepare for their shifts. The male locker room was not segregated in any way. DOCS did not respond to Ms. Collins' request, nor did it provide separate locker room facilities for females, during Ms. Collins' tenure at Auburn.

50. On or about November 17, 2005, yet another male CO approached Ms. Collins from behind and made a very loud cat-like yowl. When she asked him what he was doing, this CO called her a "sick fucking bitch."

51. On or about November 25, 2005, Ms. Collins discovered that graffiti had been written in the COs bathroom. This is a facility accessible to inmates who regularly clean the restroom. The graffiti stated: "Penny gives shitty head" and "shitty head is better than no head" and "I wouldn't let that bitch touch me."

52. Ms. Collins reported the graffiti to Chart Sergeant Flynn and requested the opportunity to obtain paint to cover over the graffiti. The Chart Sergeant denied the request and

53. Also in late November, while Ms. Collins was working in a guard shack, another male CO verbally accosted her stating "get out of here." When Ms. Collins asked why, he replied, "you brought this on yourself." This CO was so belligerent that Ms. Collins left the shack and stood outside in the cold weather. This incident was witnessed by several inmates, one of which asked "Miss. C. Why they got to treat you like that?"

54. On or about November 29, 2005, Ms. Collins met with a representative from the Office of Diversity Management ("ODM") by the name of Mary Mayville. This was the first meeting Ms. Collins had with anyone from the ODM since Ms. Collins filed her original complaint in early October, 2005 (over 2 months earlier).

55. Ms. Collins explained much of the harassment and retaliation she had endured to Ms. Mayville. Ms. Mayville acknowledged to Ms. Collins that Auburn had a historical problem with harassment of females. However, no actions were taken by the DOC to protect Ms. Collins.

56. In or about December 2005, Ms. Collins began to see a counselor regarding the harassment and discrimination that she experienced at Auburn. The physical and psychological effects of the harassment and retaliation Ms. Collins had endured were taking a serious toll on Ms. Collins' health.

57. In or about December 7, 2005, Ms. Collins took an extended sick leave from her position at Auburn due to the harassment, discrimination and retaliation that she suffered.

58. On or about January 6, 2006, Ms. Collins filed a formal complaint against the Defendants with the New York State Division of Human Rights alleging gender based discrimination and retaliation

59. As part of its investigation, the DHR investigator, Jami Kaplan, went to Auburn to investigate Ms. Collins' claims. Upon information and belief, the female CO who was directed to accompany the investigator refused to escort her because this CO was herself afraid of retaliation.

60. While out on leave, but preparing to return to work, Ms. Collins felt compelled to seek a transfer to get away from Defendant Mitchell and the other co-workers and supervisors that were harassing her at Auburn. This transfer would actually move Ms. Collins further away from her home and family and create a financial burden as well.

61. In or about March 2006, Ms. Collins returned to work and was transferred to the Eastern Correctional Facility ("Eastern") in Napanoch, New York, which is over 150 miles from her residence. Due to the distance from her primary home, Ms. Collins was forced to rent a second residence in the Napanoch area.

62. Six months after her arrival at Eastern, Ms. Collins learned DOCS had transferred Defendant Mitchell to Eastern.

63. Ms. Collins then contacted the Chart Officer and inquired why DOCS would transfer Sergeant Mitchell to Eastern, given that she had transferred there to get away from him. She was told that Defendant Mitchell had every right to work there.

64. Ms. Collins approached Captain Coleman at Eastern about her internal and DHR complaints against Sergeant Mitchell. She also stated that she was afraid Defendant Mitchell would try to set her up on a false claim. Captain Coleman insisted that Defendant Mitchell would still have to supervise Ms. Collins and did not offer Ms. Collins any assistance or protection.

65. Shortly thereafter, Ms. Collins was required to take another extended leave due to the continued stress that she suffered as a result of Defendant Mitchell's transfer and harassment and the discrimination and retaliation that had occurred at DOCS.

## STATUS OF DHR COMPLAINT

66. In August, 2006, after concluding its investigation, the New York State Division of Human Rights determined that there was probable cause to believe that DOCS (and Defendant Mitchell, as an aidor and abettor) subjected Ms. Collins to unlawful sexual harassment and retaliation. The DHR also concluded that DOCS had failed to properly investigate and respond to Ms. Collins' complaints.

67. On February 14, 2007, Ms. Collins' attorneys, the undersigned, made a request to the DHR to dismiss Ms. Collins' complaint for administrative convenience. This request was made in order to permit Ms. Collins the opportunity to commence this proceeding in Federal Court.

## AS AND FOR A FIRST CAUSE OF ACTION
## (DISCRIMINATION UNDER TITLE VII
## AND SECTION 296 OF THE HUMAN RIGHTS LAW)

68. Plaintiff repeats and realleges paragraphs "1" through "67" of this Complaint as if fully set forth herein.

69. Ms. Collins is a female and a member of a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., ("Title VII") and § 296 of the New York State Executive Law.

70. Title VII and § 296 prohibit an employer from discriminating against any individual with respect to compensation, terms, conditions or privileges of employment on the basis of gender.

71. By the acts and conduct described herein, Defendants have discriminated against Ms. Collins in the terms, conditions of her employment and privileges of her employment in violation of Title VII and § 296.

72. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

AS AND FOR A SECOND CAUSE OF ACTION
(HOSTILE WORK ENVIRONMENT UNDER TITLE VII
AND SECTION 296 OF THE HUMAN RIGHTS LAW)

73. Plaintiff repeats and realleges paragraphs "1" through 72" of this Complaint as if fully set forth herein.

74. Title VII and § 296 require employers to provide a work environment that is free of sexual abuse or hostility.

75. By the acts and conduct described herein, an environment of discriminatory intimidation, ridicule and hostility towards women existed at DOCS. This environment was sufficiently severe and pervasive to alter the conditions of Ms. Collins' work environment.

76. Upon information and belief, Defendants had knowledge of the hostile and discriminatory work environment towards women that existed within these facilities and allowed this environment to exist. These defendants also had knowledge of the specific hostile and discriminatory work environment that Ms. Collins experienced.

77. Based upon the foregoing, the Defendants discriminated against Ms. Collins in the terms, conditions of her employment and privileges of her employment in violation of Title VII and § 296.

78. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

AS AND FOR A THIRD CAUSE OF ACTION
(DISPARATE TREATMENT UNDER TITLE VII
AND SECTION 296 OF THE HUMAN RIGHTS LAW)

79. Plaintiff repeats and realleges paragraphs "1" through "78" of this Complaint as if fully set forth herein.

80. By the acts and conduct described herein, DOCS treated its female employees, including Ms. Collins, less favorably than it treated similarly situated males employees in violation of Title VII and § 296.

81. Based upon the foregoing, the Defendants discriminated against Ms. Collins in the terms, conditions of her employment and privileges of her employment in violation of Title VII and § 296.

82. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

AS AND FOR A FOURTH CAUSE OF ACTION
(RETALIATION UNDER TITLE VII
AND SECTION 296 OF THE HUMAN RIGHTS LAW)

83. Plaintiff repeats and realleges paragraphs "1" through "82" of this Complaint as if fully set forth herein.

84. By the acts and conduct described herein, Ms. Collins engaged in protected activities when she filed her internal discrimination complaints and her complaint to the New York State Division of Human Rights.

85. Upon information and belief, Defendants were aware that Ms. Collins had engaged in these protected activities.

86. Ms. Collins suffered adverse employment actions as a result of having engaged in these protected activities.

87. Based upon the foregoing, the Defendants discriminated against Ms. Collins in the terms, conditions of her employment and privileges of her employment in violation of Title VII and § 296.

88. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(AIDING AND ABETTING UNDER**
**SECTION 296 OF THE HUMAN RIGHTS LAW)**

89. Plaintiff repeats and realleges paragraphs "1" through "88" of this Complaint as if fully set forth herein.

90. Upon information and belief, Defendant Mitchell directly participated and thereby aided and abetted in the unlawful discrimination and retaliation conduct described herein.

91. Based upon the foregoing, Defendant Mitchell discriminated against Ms. Collins in the terms, conditions of her employment and privileges of her employment violation of § 296(6).

92. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**
**UNDER 42 U.S.C § 1983)**

93. Plaintiff repeats and realleges paragraphs "1" through "92" of this Complaint as if fully set forth herein.

94. Upon information and belief, Defendants had knowledge of the hostile and discriminatory work environment towards Ms. Collins, and toward women in general, that existed within Defendant DOCS' correctional facilities.

95. Upon information and belief, Defendant Mitchell directly participated in the creation of the hostile and discriminatory work environment that Ms. Collins experienced at Auburn.

96. Upon information and belief, Defendants Burge and Graham were aware of the hostile and discriminatory environment that existed at Auburn and of Defendant Mitchell's hostile and discriminatory actions.

97. Despite this knowledge, Defendants failed to take appropriate action to correct the hostile and discriminatory work environment that Ms. Collins and other women experienced in Defendant DOCS' facilities, including Sullivan and Auburn.

98. Upon information and belief, Defendants' actions or failure to act were calculated to drive Ms. Collins, and women in general, from their positions as corrections officers.

99. Through their actions, Defendants materially altered the terms and conditions of Ms. Collins' employment, unreasonably interfered with her work performance, and created an intimidating, hostile and offensive working environment.

100. By the acts and conduct described herein, Defendants violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, which is actionable pursuant to 42 U.S.C. § 1983, by subjecting Ms. Collins to a hostile work environment, and by harassing, discriminating and retaliating against her due to her gender and sex.

101. As a result of the Defendants' unlawful acts, Ms. Collins has suffered and continues to suffer lost wages, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

WHEREFORE, Plaintiff, Penny Collins prays to this Court for the following relief:

(a) Plaintiff seeks a declaration that Defendants violated Plaintiff's rights as secured by Title VII, the Equal Protection Clause of the Fourteen Amendment of the United States Constitution, 42 U.S.C. § 1983, and § 296 of the New York States Human Rights Law;

(b) an award to Plaintiff of equitable relief for all back pay and benefits;

(c) an award to Plaintiff of all costs and disbursements in prosecuting this action;

(d) an award to Plaintiff of compensatory damages in the maximum amount allowed by law or a minimum of $1,000,000 for loss wages, salary and other benefits, emotional distress, humiliation, mental anguish, damage to reputation and career, and other damages suffered by Plaintiff as a result of Defendants' unlawful conduct; and

(e) such and further relief as allowed by law and as the Court may deem just and proper.

Dated: May 22, 2009                    LAW OFFICES OF MAIREAD E. CONNOR, PLLC

                                       By: s/ _____
                                           Mairead E. Connor, Esq.
                                           Bar Roll Number 101392
                                           Attorney for Plaintiff
                                           Office Address
                                           The Galleries of Syracuse, Suite 703
                                           440 S. Warren St.
                                           Syracuse, NY  13202
                                           Postal Address
                                           PO Box 939
                                           Syracuse, NY  13201-0939
                                           Tel  (315) 422-6225
                                           Fax (315) 422-6958

EEOC Form 161 (3/98)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Penny T. Collins<br>2210 Coon Hill Road<br>Skaneateles, NY 13152 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2006-01158 | Holly M. Woodyard, Investigator | (212) 336-3643 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other *(briefly state)*    **Charging Party to Pursue Matter in Federal Court.**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*[signature]*

Spencer H. Lewis, Jr.,
Director

6/1/07
*(Date Mailed)*

Enclosures(s)

cc:    New York State Dept. of Correctional Services      John L. Valentino Esq.
       Harriman State Campus Bldg. 2                   Green & Seifter, PLLC
       1220 Washington Ave.                             One Lincoln Center
       Albany, NY. 12226                                 Syracuse, NY. 13202
       Attn: Human Resource Director