UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
PENNY T. COLLINS,

                              Plaintiff,

vs.                                  5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                              Defendants.
--------------------------------------------x

        Transcript of a Jury Trial held on March 12,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiff:        MAIREAD E. CONNOR, ESQ.
                      Attorney at Law
                      440 South Warren Street
                      Suite 703
                      Syracuse, New York  13202

For Defendant:        SATTER, ANDREWS LAW FIRM
(Mitchell)            Attorneys at Law
                      217 South Salina Street
                      6th Floor
                      Syracuse, New York  13202
                         BY:  ROSS P. ANDREWS, ESQ.

For Defendants:       STATE OF NEW YORK
(All Remaining)       Office of Attorney General
                      The Capitol
                      Albany, New York  12224
                         BY:  CATHY Y. SHEEHAN, AAG
                              ROGER KINSEY, AAG

INDEX OF TESTIMONY

| Witness | D | C | RD | RC | FRD | FRC |
|---------|---|---|----|----|----|-----|
| Penny Collins | 178 | -- | -- | -- | -- | -- |

1          (Open Court, 9:14 a.m.)

2          THE CLERK:  Case number 5:07-CV-493, Penny T.

3   Collins versus the state of New York, et al.  Counsel, please

4   note your appearance for the record.

5          MS. CONNOR:  Mairead Connor, attorney for

6   plaintiff Penny Collins.

7          THE COURT:  Good morning.

8          MS. SHEEHAN:  Good morning, your Honor, Cathy

9   Sheehan, Assistant Attorney General, for defendants New York

10  State, Department of Corrections and Community Services,

11  defendant Burge, defendant Graham, and defendant Goord.

12         MR. KINSEY:  Sorry, Roger Kinsey with the

13  Attorney General's office, your Honor.

14         THE COURT:  Morning.

15         MR. ANDREWS:  Morning, your Honor.  Excuse me,

16  your Honor, Ross Andrews for defendant Troy Mitchell.

17         THE COURT:  Okay.  I understand there's some

18  preliminary matters before we bring a jury down or until we

19  get a jury that's ready to come down.  Before we get to that,

20  let me first say this.  I'm going to ask each of the

21  attorneys to introduce themselves to the jury, and a little

22  more than just the basic introduction, how long you've been

23  an attorney, your type of practice, you know, how long you've

24  been doing the current work that you're doing, that sort of

25  thing, just give them a little bit about yourself, and

1  anything at all that you want to say to them at this point,

2  because I'm going to be doing the questioning, so they really

3  should know a little bit about you, because they're going to

4  be listening to you and seeing you for the next week and a

5  half, okay.  All right.  That being said, my clerk advised me

6  that there was an issue that somebody wanted to address.

7          MS. SHEEHAN:  Yes, your Honor.  Two I believe

8  painless issues.

9          THE COURT:  I like painless.

10          MS. SHEEHAN:  One is, Ms. Connor and I

11  exchanged exhibits at the pretrial last Friday, I've had a

12  chance to review them.  One is, some of the exhibits contain

13  comments and complaints that Ms. Collins filed regarding

14  racial slurs, religion, ethnic comments.  I don't believe

15  they're part of this trial or the causes of action so I'd ask

16  that that be redacted and that testimony regarding those

17  issues not be permitted.

18          THE COURT:  Ms. Connors.

19          MS. CONNOR:  Your Honor, this is -- it's not,

20  I don't think this is painless, unfortunately.  This was part

21  of the plaintiff's complaint, this was the events that

22  occurred, I agree that it's not part of the trial, we don't

23  have a claim for retaliation based on any sort of

24  discrimination other than gender, but it's all part of the

25  evidence in this trial and what occurred in the particular

1    setting and when she filed the complaint and the responses,

2    so I think it's appropriate to keep in, with the proper

3    instruction from your Honor.

4                    THE COURT:  What's the nature of the racial

5    complaint?

6                    MS. CONNOR:  The plaintiff reported that in a

7    weapons training, there were comments made by people who were

8    at the training saying Hitler should have killed all the

9    Jews.  There were other comments related to the use of the

10   racial slur beginning with N, and that -- there's not a lot

11   of that but that was all part of the -- of what she reported

12   to her employer.  That is mixed in with what is related to

13   her gender.

14                   THE COURT:  That sounds highly inflammatory,

15   and I think it would be prejudicial.  It doesn't have

16   anything to do with her complaint.  I understand why you

17   would want it there, you know, to show some sort of a pattern

18   of behavior, but I think it's too prejudicial, especially

19   with the nature of the things that we're talking about, so

20   I'm going to ask you to redact those, and those particular

21   complaints, I'm going to stick with what she has alleged with

22   regard to her complaints and her claims.

23                   MS. CONNOR:  Your Honor, that will take some

24   time because I'm going to have to go through different

25   exhibits, and also there -- since there's so many copies,

1    we'd have to, I'd have to -- how would we handle those that

2    were given to the court already?  Because it's in the

3    complaints that have been filed as part of our exhibits, how

4    do you want to handle that, your Honor?

5                    THE COURT:  Well, we'll just -- Ms. Sheehan,

6    you've been through these, you know where they are?

7                    MS. SHEEHAN:  I have a pretty good idea, I'm

8    not going to say I've caught them all but as long as

9    Ms. Connor is only showing a redacted copy, we know what it

10    is, what's important is what the jury sees.

11                    THE COURT:  It's what's going to the jury, I

12    don't have a problem with what's submitted to me.

13                    MS. CONNOR:  Understood, your Honor.  But your

14    Honor, before we start putting in any proof, I would need

15    some time to go through my exhibits and make sure that I'm

16    complying with what you've directed.

17                    THE COURT:  Okay.  Well, can't we do it, you

18    know, witness by witness, if there's a particular exhibit

19    that you're going to use, let's do -- with your first witness

20    let's do that first and we'll go right along.

21                    MS. CONNOR:  Yes, the first witness is going

22    to be the plaintiff, your Honor, so that, I have to remember

23    where that is in the order of proof and I just would need a

24    little time from the court because she has the most exhibits.

25                    THE COURT:  Okay, well, we have a little time,

1   so Counsel, let's get together and just see if we can't get

2   that accomplished, okay.  And if there are any issues with

3   regard to it, let me know.  But I think it's appropriate that

4   we keep it concerning the plaintiff's complaints with regard

5   to her claims.  Okay.

6               MS. SHEEHAN:  Thank you, your Honor.  Second

7   is there's a number of exhibits regarding the New York State

8   Department of Human Rights, their internal memorandum, final

9   investigation, determination of probable cause, I'd like that

10  excluded.  I think the -- one is the investigation and its

11  result really takes, that, the ultimate determination is in

12  the province of the jury, all that testimony is going to come

13  into proof at the time of this case and I think a probable

14  cause determination is quite confusing to the jury, absent a

15  qualifying, you know, instruction from your Honor.  I'd ask

16  that the final investigative report and determination of the

17  Human Rights not be permitted.

18               THE COURT:  Ms. Connors.

19               MS. CONNOR:  Yes, your Honor.  Your Honor,

20  it's well established in many cases probable cause

21  determinations come in as having probative value.  Probable

22  cause is not the same as a final determination, your Honor,

23  and that that is often, routinely let in in discrimination

24  cases with an instruction from your Honor as to what probable

25  cause is, it's not a final determination.

1    THE COURT:  In what context do you --

2 Mr. Andrews, I'll get to you in just a second.  In what

3 context do you anticipate putting this in?

4    MS. CONNOR:  I have subpoenaed the

5 investigator for the New York State Division of Human Rights

6 to come testify that, about her investigation, and to

7 authenticate the probable cause finding.

8    MS. SHEEHAN:  Your Honor, the New York State

9 Human Rights investigation is really duplicative of the

10 office of diversity management within DOCS.

11    MS. CONNOR:  Your Honor, that's completely

12 incorrect.  That's an internal investigation by the employer,

13 it's completely different than -- it's probable cause, it's

14 not a formal finding of any liability, it's not a finding, a

15 final determination, it's just simply a probable cause which

16 is a lower level finding.

17    MR. ANDREWS:  Your Honor, may I add something,

18 please.

19    THE COURT:  You may.

20    MR. ANDREWS:  Thank you.  I think what the

21 cases say is it's within the court's discretion whether or

22 not to admit these findings, and I think this finding is

23 particularly troubling because it purports to make a

24 determination that certain things did happen, not simply that

25 is, you know, what happened during the investigation, but it

purports to make a determination, and in fact, at the
probable cause determination stage, you have to assume that
everything the complainant says is true, and there's case law
to that effect, so the fact that the investigator in this
case purported to make certain findings increases the
likelihood that it's going to confuse the jury.

THE COURT:  Okay.  What's this witness' name?

MS. CONNOR:  Jami Kaplan.

THE COURT:  And where do you anticipate
calling her in your --

MS. CONNOR:  I anticipated calling her --
she's my last witness, your Honor.

THE COURT:  Your last witness?

MS. CONNOR:  Yes.

THE COURT:  Okay, so we have some time.  I'm
going to have my law clerk take a look at this issue, I want
to pull up that case law and take a look at it.  My
inclination, though, is to say certainly she can testify
about what she did, what her investigation is but then to say
these are my findings, my initial inclination is there might
be an issue there but I'm going to take a look at it, and
we'll have some time and I'll give you a ruling so you know
what you're doing, okay.

MS. CONNOR:  Thank you.

MS. SHEEHAN:  Not an issue but I'd like to

1    advise the court I am waiting for an update from the damages

2    expert from Ms. Connor and she promises that will be at the

3    end of today, I just want to make sure I receive it in time

4    to prepare for the testimony.

5              THE COURT:  Okay.  You mean as far as

6    cross-examination goes?

7              MS. SHEEHAN:  Correct.

8              MS. CONNOR:  Your Honor, I've spoken with

9    Dr. Reagles several times over the weekend.  He originally

10   told me he was going to have it Friday, didn't happen so I'm

11   supposed to have it by the close of business today and he's

12   going to have a messenger bring it to the court and I assume

13   there will be no interruption, just going to hand it to me.

14             THE COURT:  Does he charge double rates for

15   working over the weekend or what?

16             MS. CONNOR:  I did not ask.

17             THE COURT:  Okay.  Anything else?

18   Mr. Andrews, go ahead, sir.

19             MR. ANDREWS:  I had one other brief issue,

20   your Honor.  I had requested that the Carter deposition

21   testimony, that's the witness who passed away, be excluded

22   and at the time what I said was she did not identify the

23   point in time at which these things allegedly occurred, and

24   so, you know, it was impossible to establish relevance.  In

25   speaking to my client, we've determined that it must have

1    happened in 2002, which is years before the allegations

2    against my client, so I just wanted to renew my request that

3    the Carter deposition testimony be excluded on the grounds

4    that given that it was removed in time, it's more prejudicial

5    than probative as to what happened to the plaintiff.

6                    THE COURT:  Ms. Connors, you want to respond?

7                    MS. CONNOR:  Well, your Honor, I don't know

8    exactly which parts of the deposition that counsel is

9    referring to.  However, your Honor's made -- excuse me, your

10   Honor's made a ruling on this, I thought we've been through

11   this before.  I -- his assertions are fairly bald here and

12   vague, but I think that your Honor's looked at the evidence,

13   looked at what's in the transcript, there was just one part

14   that your Honor had reserved for this morning, not going

15   through the whole thing again.

16                   THE COURT:  Well, I reserved on that part

17   basically because of Mr. Andrews' complaint with regard to

18   what he was going to ask be read if the deposition was

19   allowed, and certainly, you know, it's the court's position

20   that the deposition was taken as a part of this case, there

21   was an opportunity to object, the attorneys were present,

22   this is the first time that I'm hearing about, okay, now

23   we're going to say that whatever she's talking about is too

24   remote in time.  Where is that coming from?

25                   MR. ANDREWS:  That was in my argument motion

1   in limine, your Honor.  And it was based at that time on my

2   understanding that she -- well, on the fact that she simply

3   did not state in her deposition what had happened.  But to

4   add a little meat to the bones, your Honor, the only time

5   that the plaintiff and defendant Mitchell would have worked

6   in the same area would have been in 2002, before he got his

7   permanent position assignment at Auburn Correctional

8   Facility, so that does place it in time and it makes it

9   remote to when the incidents were, and as per the case law

10  cited in my motion in limine, your Honor, I believe that that

11  makes it more prejudicial than probative, something that

12  allegedly happened years before the allegations in this case.

13          THE COURT:  And you're saying the allegations

14  in this case, give me the times.

15          MR. ANDREWS:  Well, we're not quite sure

16  because plaintiff hasn't really placed in time when she says

17  the interactions with defendant Mitchell happened, wherein he

18  allegedly said obscene things.  I believe the record supports

19  that it was in 2005, which obviously is several years later.

20  And it can't be any earlier than June of 2004, when she

21  started working at Auburn Correctional Facility.

22          THE COURT:  Now I'm -- now you lost me.  How

23  could it be -- how could they have been working together in

24  2002 if they weren't --

25          MR. ANDREWS:  I'm sorry, the defendant

1  Mitchell worked with the witness Carter, passed-away witness.

2            THE COURT:  I see.  Before the plaintiff was

3  at the facility is what you're saying?

4            MR. ANDREWS:  Before the plaintiff was even at

5  the facility, so to suggest that that could somehow add to

6  the hostile work environment with regard to plaintiff's claim

7  just -- it doesn't hold water, your Honor, because she wasn't

8  even there yet.

9            MS. CONNOR:  Your Honor, the witness Carter

10  established in her deposition that she worked with defendant

11  Mitchell before plaintiff arrived, throughout the time

12  plaintiff worked there, and then even after plaintiff left,

13  so that her -- it's a span of time, and I don't understand

14  how counsel can baldly assert that it took place in 2002,

15  prior to plaintiff arriving in 2004.

16            THE COURT:  Well, I guess he's claiming that

17  the only time that Ms. Carter worked with Mr. Mitchell or had

18  any contact with him was in 2002, is what he's saying.

19            MR. ANDREWS:  Your Honor, I would challenge

20  counsel to show where it says they worked together throughout

21  her employment together, during the time that plaintiff

22  worked there given that she said she only worked twice with

23  defendant Mitchell, that it happened when he was the area

24  supervisor for an area called media south and that's an

25  assignment he only had before he had his permanent assignment

1   at Auburn, which happened, you know, not too long after his

2   arrival.

3             THE COURT:  When did you anticipate in your

4   proof wanting to have the deposition testimony read?

5             MS. CONNOR:  Wednesday, your Honor.

6             THE COURT:  Okay.  So we have some time on

7   this, too.  I'm going to give you an opportunity to submit

8   something which indicates that, you know, we can nail this

9   time period down somewhat.  If what counsel is saying is true

10   and it's only a period of 2002, that presents a problem, I

11   think, with regard to the references to Mr. Mitchell.  If you

12   can, you know, give me something that establishes that

13   Mr. Mitchell and Ms. Carter, the deposition witness, had some

14   sort of contact at Auburn Correctional Facility after that

15   time where they would have been working together, I'm happy

16   to listen to it, but as it stands right now, you know, what

17   I'm hearing I think presents a problem.  Not for the entire

18   deposition testimony, obviously, I think there's much of it

19   that is relevant and you can, you know, have it read but I

20   think if what counsel is representing is in fact true, then

21   we have an issue that we need to address.  And I'll give you

22   an opportunity to do that.  If it's not till Wednesday, we

23   have some time.  Okay.

24             MS. CONNOR:  Thank you, your Honor.

25             THE COURT:  All right.

1           MR. ANDREWS:  Thank you, your Honor.

2           MS. SHEEHAN:  Your Honor, one issue regarding

3    the Carter deposition, clarification of your text order from

4    March 7th.  Am I permitted to read in pages 49 and 50

5    regarding Ms. Carter's discipline?

6           THE COURT:  Was that part of your request?

7           MS. SHEEHAN:  It was, and I just couldn't tell

8    from the text order if I was permitted to read it in.  Where

9    she brought her cell phone into the facility.

10          THE COURT:  My notes indicate that I overruled

11   that objection.

12          MS. SHEEHAN:  Thank you, your Honor.

13          THE COURT:  Anything else?  Okay.  We're going

14   to wait for our jury panel, should be just a few minutes,

15   now.

16          THE CLERK:  Probably be less than five.

17          THE COURT:  Less than five minutes, so you've

18   got a couple minutes, and then we'll get started with jury

19   selection.  My clerk is asking me, have counsel stipulated to

20   any evidence?

21          MS. SHEEHAN:  Yes, we have, your Honor.

22          THE COURT:  Okay.  And --

23          MS. CONNOR:  Your Honor, we had joint pretrial

24   submissions.

25          THE COURT:  Okay.  If you would just get

1  together with my courtroom deputy here and highlight those

2  for her so that she has things set up in the book as to

3  what's in and what's not in, that will make things move

4  quicker, okay.  Thank you.

5              (Whereupon Jury Selection was conducted on the

6               record but not contained in this transcript.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Whereupon the jury was duly sworn.)

2                    THE COURT:  Okay, just a couple matters before

3      I let you go to lunch.  It's almost 12:30 so we're going to

4      go till 1:30, give you an hour for lunch, okay.  But some

5      things you need to know.  You shouldn't discuss this case.

6      You really haven't heard anything yet other than what we've

7      talked about for jury selection but don't discuss it with

8      anyone and don't let anyone talk to you about it.  If

9      somebody approaches you and tries to talk to you about this

10     case, I need to know about it immediately, okay.  And I'll

11     ask you to report that to me.  Please understand that these

12     attorneys and parties who are here in the courtroom may be in

13     the building, be walking around, may be in the same cafeteria

14     that you may decide to go have lunch up on 5, or you know,

15     anywhere in the building, they're not going to talk to you,

16     the lawyers aren't going to talk to you.  They can say hi,

17     beyond that, they're not going to say anything, because even

18     the appearance of them talking to you is inappropriate.

19     Okay.  Because they -- you know, somebody may say, oh,

20     they're trying to improperly influence a juror.  Now the

21     attorneys all know their roles and responsibility, they're

22     all good lawyers, good people, so don't hold it against them,

23     they're not rude, they just know what their responsibilities

24     are so they're not going to converse with you, okay.

25                    Same thing for the parties, you know, it

1    doesn't look appropriate if they're trying to talk to a

2    juror, okay, so understand that.

3                Those will be your assigned seats for the

4    trial.  You'll be there every time you come into the

5    courtroom, you may bring water into the courtroom with you,

6    we provide bottled water, that sort of thing if you like to

7    have water to sip on.  My courtroom deputy Lori will give you

8    her number so if there are any issues or anything like that,

9    you can reach out to her, and if there are any issues, if you

10   have any questions or if you need a bathroom or any problem,

11   please do not hesitate to let us know.  Let me know, raise

12   your hand, whatever, and we'll try and address whatever it

13   is.  Okay.  And there will be some preliminary charges that

14   I'll give to you but I'm going to do that after lunch.  We've

15   been here long enough this morning so we're going to let you

16   go have some lunch.  Please be back, Rita's going to show you

17   the jury room, some of you have been in there already and

18   that's going to be your home away from home during this case,

19   so get comfortable there and that's your space, and we'll ask

20   you to be back in that room by 1:30.  Okay.  Enjoy your

21   lunch.  Thank you, Rita.

22                (Jury Excused, 12:28 a.m.)

23                THE COURT:  They're getting belongings.

24   You're missing two.  Okay.  Counsel.  We have our jury.  I'm

25   going to do a preliminary instruction right after lunch and

1  then we'll start with opening statements.  Anything we need

2  to cover before we adjourn?  Ms. Connor, you all set?

3               MS. CONNOR:  I'm all set, thank you, your

4  Honor.

5               MS. SHEEHAN:  All set.

6               THE COURT:  Mrs. Sheehan, Mr. Andrews?

7               MR. ANDREWS:  All set, your Honor.

8               THE COURT:  All set.  Enjoy your lunch, we'll

9  see you at 1:30.

10               THE CLERK:  Court's in recess.

11               THE COURT:  Oh, I would ask you to return the

12  juror questionnaires, bring them back up to the desk and give

13  them to Lori, please.  They all have to be turned back in.

14               (Whereupon a luncheon recess was taken from

15                12:30 p.m. to 1:34 p.m.)

16               (Open Court, Jury Out.)

17               THE COURT:  Okay.  The record should reflect

18  we have plaintiff, plaintiff's counsel, defendants, and

19  defense counsel, we are ready to proceed with everybody?

20               MS. CONNOR:  Your Honor, based on your ruling

21  this morning about certain words and parts of the complaint

22  that the plaintiff made referring to Jews and other

23  minorities, I guess for lack of a better word, I've been

24  trying to use my time at lunch to go through to redact some

25  of these things from the exhibits but I'm not confident I've

1  had enough time to do it all.  And there's also something

2  that I would like to draw your Honor's attention and get a

3  ruling on so we don't have any misunderstandings when we're

4  putting evidence in.  So I just, do you want -- can you give

5  me a little more time to do this because it's not -- I expect

6  the plaintiff to testify this afternoon, so I want to make

7  sure we're not going to have a problem with your ruling,

8  using the exhibit during her testimony or that type of thing.

9          THE COURT:  Sure.  How much time are you

10  guessing here?

11          MS. CONNOR:  We're looking now, I mean I've

12  found four exhibits but I probably have to go through about

13  another 12.

14          THE COURT:  Well, we're going to take an

15  afternoon break, give this jury a break, and I'll extend it a

16  little longer than I usually do to give you some time.

17          MS. CONNOR:  Okay.

18          THE COURT:  And you know, certainly if we have

19  exhibits that you're planning on putting in evidence, I think

20  defense counsel can assist if she's been through and seen

21  these things to say, well, this one might have one, and we'll

22  just -- if we have a black Sharpie there, we'll just line it

23  out before we use it, that's all.

24          MS. CONNOR:  I do, your Honor, and I haven't

25  done that yet and there's actually one though, I would like

1  to draw to your attention and ask for a ruling on before we

2  get to that part of the testimony.  You want to do that now

3  or you want to wait?

4              THE COURT:  No, we can do it afterwards,

5  that's fine.  You mean some issue --

6              MS. CONNOR:  An issue about the use of a word,

7  yes.

8              THE COURT:  And what's the word?

9              MS. CONNOR:  The N word.

10             THE COURT:  Again --

11             MS. CONNOR:  Nigger, your Honor.

12             THE COURT:  I understand what word you're

13  suggesting.  Yeah, I don't see how that has any relevance to

14  this case.

15             MS. CONNOR:  Well, your Honor, in one of the

16  reports that the plaintiff gave to the office of diversity

17  management, she reported that an officer called her an N

18  lover.  That officer has been identified as a potential

19  witness for the defense and it goes to the reason why this

20  officer may not say the truth about what occurred with my

21  client because he has a certain opinion of her, and therefore

22  I wanted -- I want to have an understanding that she can

23  testify about that.

24             THE COURT:  I would think that that would be

25  testimony for cross-examination, if you're -- the way you've

1    just presented it to me, indicating that he may have an

2    opinion about her, the rest of it, reason why, something that

3    would affect his credibility, that would go to

4    cross-examination.  My concern is that that's highly

5    inflammatory, and it doesn't really relate to the claims in

6    this case, you know.  This is as close as I've heard it

7    coming because you've now brought your client into it and I

8    understand what you're saying, but without having more

9    context of the nature of the complaint, when it occurred and

10   all the rest of it, I'm not prepared to give you a ruling.

11   So if we get to that point in your client's testimony, you

12   want to offer that sort of thing, or before, if you can, with

13   our time constraints, we'll address it but I'm going to want

14   to hear more about timing, you know, the nature of it, and

15   further.

16              MS. CONNOR:  Your Honor, I agree with you,

17   what you said about the -- that would be appropriate for

18   cross-examination.  My question here is, it's part of a

19   report that my client gave to the office -- her employer.

20              THE COURT:  I understand what you're saying.

21              MS. CONNOR:  And that report I would want to

22   enter, so even if I don't end up -- even if this person

23   doesn't testify, you know, I -- it's in the report and I

24   don't want to have a problem with your ruling, that's why I

25   raised it here.

1          THE COURT:  I appreciate that.

2          MS. CONNOR:  Because it specifically was

3   something that my client would testify that she was called by

4   that individual.

5          THE COURT:  Well, I'm going to want to see

6   that document, I want to see the context of it, and I may

7   allow or I may not, but I'm going to have to see the document

8   in the context in which it's been used, when it occurred and

9   all that.

10         MS. CONNOR:  Do you want to see that now, your

11  Honor?

12         THE COURT:  We'll do it after, we'll do it

13  after, I think I want to get this jury out here right now.

14         MS. CONNOR:  Thank you.

15         THE COURT:  Okay.

16         MS. SHEEHAN:  One quick issue but let me, if

17  you don't mind me -- ask Ms. Connor.

18         THE COURT:  Go ahead.

19         (A discussion was held off the record between

20          counsel.)

21         MS. SHEEHAN:  Your Honor, Exhibit 1 is the

22  amended complaint which I stipulated to, did not realize that

23  the last page is dismissal and notice of rights to EEOC that

24  I'd ask not be a part of the amended complaint.

25         THE COURT:  The last page of?

1           MS. SHEEHAN:  The complaint.

2           THE COURT:  Is what?

3           MS. SHEEHAN:  The United States Equal

4    Opportunity Commission dismissal and notice of rights.  It

5    was filed, with the complaint.  So when I see the exhibits,

6    the last page --

7           THE COURT:  What's the exhibit?

8           MS. SHEEHAN:  The EEOC's dismissal, notice of

9    rights that it's been dismissed.  So the defendant stipulated

10   to the admission of the amended complaint but not that

11   document.

12          THE COURT:  Ms. Connor?

13          MS. CONNOR:  Your Honor, first of all this is

14   not the document she referred to earlier, this is from the

15   Equal Employment Opportunity Commission, I understand she was

16   referring to the New York State Division of Human Rights

17   which is a different document.  This is the document she

18   wants to talk about, we can talk about it but --

19          MS. SHEEHAN:  This is an additional document.

20          MS. CONNOR:  All right.  Well, this document

21   was filed with the complaint, you can see the ECF filing at

22   the top, Judge Mordue still had this, and this was -- it's

23   part of a jurisdictional statement of the complaint.

24          THE COURT:  All right.  You know, as far as it

25   having any value with the jury, though, I don't -- there's no

1    real reason for them to have this.

2                  MS. CONNOR:  There's no reason but it's also,

3    there is no --

4                  THE COURT:  Jurisdictional --

5                  MS. CONNOR:  Nothing on it that says anything

6    about an investigation, it simply checked other notice of

7    suit, charging party to pursue matter in federal court.

8    That's all it says.

9                  MS. SHEEHAN:  I think it would be prejudicial

10   she's filing -- shows she filed something with the United

11   States --

12                 THE COURT:  I anticipate we're going to hear

13   the complaint was filed, she's going to call a witness about

14   doing an investigation.

15                 MS. CONNOR:  Your Honor, this is a retaliation

16   case.

17                 THE COURT:  One at a time, please.  Go ahead.

18                 MS. SHEEHAN:  I believe that was for the Human

19   Rights portion of it.

20                 MS. CONNOR:  Your Honor, it's the same

21   complaint.  When you file a complaint with the Division of

22   Human Rights, you're dual filing with the Equal Opportunity

23   Commission, it's the same complaint, this is the federal

24   jurisdiction dismissal.

25                 THE COURT:  I understand that it is merely a

1  jurisdictional requirement, it really has no evidentiary

2  value whatsoever.  So I don't know why -- why would we want

3  to include it, why would you want to include it?

4          MS. CONNOR:  I just didn't want to have a

5  problem that it wasn't part of the evidence in the case, your

6  Honor.

7          THE COURT:  You're not going to have a

8  problem.

9          MS. CONNOR:  Thank you.

10          THE COURT:  All right.  We'll exclude it.

11  It's a jurisdictional requirement so it's there, it's been

12  filed appropriately.  It's on the record, but there's no

13  really evidentiary value of that for this jury so we'll just

14  not include it in the exhibit that goes to the jury, that's

15  all.  Okay.  We ready to proceed?  Mr. Andrews, you've been

16  nice and quiet back there, I appreciate that, are you all

17  good?

18          MR. ANDREWS:  I will remain nice and quiet,

19  your Honor.

20          THE COURT:  All right, you're ready to go.

21  Okay.  Let's bring the jury in, please.

22          (Jury Present, 1:42 p.m.)

23          THE COURT:  You don't have to remain standing,

24  you can sit down.  You can come right in and sit right down.

25  People in the courtroom stand up when you come in out of

1   respect for your service, okay.  That's an old and I think

2   very appropriate tradition, and you'll see happen in most

3   courtrooms, courthouses around this country, when jurors come

4   in the room, all the attorneys and litigants will stand up.

5   Doesn't always happen, in my opinion, it should happen, and

6   that's out of respect for your service.  You don't have to

7   feel like you need to remain standing, you come right in and

8   sit down, okay.  All right.

9           Before we begin the trial, I'd like to tell

10  you about what will be happening.  I'm going to describe how

11  the trial will be conducted, and explain to you what we'll be

12  doing, that includes you, the lawyers, and the court.  And at

13  the end of the trial, I'm going to give you more detailed

14  guidance on how you're to go about reaching a decision, but

15  now I'm going to explain how the trial will proceed and give

16  you just a brief description again of the claims.  All right.

17          First of all, in this case, plaintiff has

18  accused defendants of gender discrimination, sexual

19  harassment, and unlawful retaliation, while she was employed

20  as a corrections officer with the New York State Department

21  of Corrections from 2002 till 2007.  Some of the plaintiff's

22  claims are against New York State and the Department of

23  Corrections, while the others are against the individual

24  defendants in their personal capacities.

25          All the defendants deny that they have engaged

1 in any of the alleged unlawful acts and denied violating any

2 of the plaintiff's constitutional rights, and that's why

3 we're here. That's what makes up lawsuits. There is a

4 question of fact that needs to be determined between these

5 parties. Okay. And I'm going to give you detailed

6 instructions on the law at the end of the case, and those

7 instructions will control your deliberations and your

8 decision.

9 All right. What's your duty, what's the duty

10 of the jurors? It will be your duty to find from the

11 evidence what the facts are. You, and you alone, are the

12 judges of the facts. You will then have to apply those facts

13 to the law as I give it to you. You must follow the law

14 whether you agree with it or not. Nothing the court may say

15 or do during the course of this trial is intended to indicate

16 or should be taken by you as indicating what your verdict

17 should be. I'm going to be making various rulings during the

18 course of this trial, I'll be engaging in some sort of

19 conversation with these lawyers, and I might make rulings for

20 them, against them, there's no score keeping or anything like

21 that. I'm just here to make sure that this trial is

22 conducted according to the law, evidence comes in according

23 to law so I'm going to make those rulings but you should draw

24 no inference from any of that, all right, that I have any

25 opinion about this case, or that it indicates to you how you

1    should decide anything.  That's completely your province.

2    It's up to you to decide the facts.

3                The evidence from which you will find the

4    facts will consist of testimony of witnesses, documents, and

5    other things received into the record as exhibits and the

6    facts, and any facts the lawyers agree to stipulate to, or

7    that the court may instruct you to find.

8                Certain things are not evidence and must not

9    be considered by you, and I will list them for you now.

10   Statements, arguments, questions by the lawyers are not

11   evidence.  Objections to questions are not evidence.  Lawyers

12   have an obligation to their clients to make an objection when

13   they believe evidence being offered is improper under the

14   rules of evidence.  It should not be influenced -- you should

15   not be influenced, excuse me, by the objection or by the

16   court's rulings on it.  If the objection is sustained, that

17   means the witness does not have to answer the question.  In

18   that case, you must disregard the question and any response

19   that was given to the question.  If the objection is

20   overruled, that means the witness will then be required to

21   answer the question.  In that case you should treat the

22   answer like any other.  If you are instructed that some item

23   of evidence is received for a limited purpose only, you must

24   follow that instruction.

25                Testimony that the court has excluded or told

1  you to disregard is not evidence and must not be considered

2  by you.  Anything you may have seen or heard outside the

3  courtroom is not evidence and must be disregarded.  You are

4  to decide this case on the evidence presented here in this

5  courtroom, in this courtroom alone.

6            There are two kinds of evidence.  Direct and

7  circumstantial evidence.  Direct evidence is direct proof of

8  a fact such as testimony of an eyewitness.  Circumstantial

9  evidence is proof of facts from which you may infer or

10  conclude that other facts exist.  I will give you further

11  instructions on these as well as other matters at the end of

12  the case, but have in mind that you may consider both kinds

13  of evidence, okay.

14            Direct evidence is pretty straightforward, an

15  eyewitness, I was there, I saw this, this is what I observed,

16  this is what I smelled, this is what I saw.

17            Circumstantial evidence, an example that I

18  always use, everybody who works for me is tired of me using

19  this example, but I use it because I think it makes it pretty

20  clear, and I'm going to continue to use it.  Circumstantial

21  evidence, if we live here in Central New York, the grass is

22  visible right now, but there's a good chance that any day,

23  any night you may go to bed, wake up in the morning, and your

24  grass out there will be covered with that white stuff.  I

25  think we're all used to that, could happen any time.  Now,

you went to bed, you didn't see it snow.  All right.  You
have no firsthand knowledge that it snowed because you
weren't awake.  You got up and you saw it out there on your
lawn.  You can infer, conclude, draw the conclusion
circumstantially at some point while you were sleeping, it
snowed, if you went out there and you feel that cold stuff,
right.  So that's an example of circumstantial evidence.

And I'll take it one step further.  You may
have a paper boy, delivers your paper every day about 6:30 in
the morning.  You get up, you see the white stuff there, you
look out on your lawn, there's no footprints across your lawn
where they would usually be where that paper boy walks.  You
go, check your door, no paper.  Okay.  Go about your
business, making your breakfast, whatever you do, your
morning routine, come back 10 minutes later, look out the
window, you see footprints across your lawn.  You go to your
door, sure enough, there's your paper.  Now you didn't see
your paper boy deliver that paper, but circumstantially, you
know somebody delivered it.  You might not know it's your
paper boy unless you go a few steps further, taking boot
measurements and, you know, finding out what type of boots he
wears, all those sort of things.  So I hope you get what I'm
trying to tell you, that you can infer certain things
logically from certain evidence that's put in.  That's called
circumstantial evidence, okay.

1          Now, it will be up to you to decide which

2    witnesses to believe, which witnesses not to believe, and how

3    much of any witness' testimony to accept or reject.  I will

4    give you some guidelines for determining the credibility of

5    witnesses at the end of this case.

6          Burden of proof.  We talked a little bit about

7    that during jury selection.  This is a civil case.  The

8    plaintiff has the burden of proving her case by what is

9    called the preponderance of the evidence.  That means the

10    plaintiff has to produce evidence which, considered in the

11    light of all the facts, leads you to believe that what the

12    plaintiff claims is more likely true than not.  To put it

13    differently, if you were to put the plaintiff's and the

14    defendants' evidence on opposite sides of the scales,

15    plaintiff would have to make the scales tip somewhat on her

16    side.  If plaintiff fails to meet this burden, the verdict

17    must be for the defendants.

18          Those of you who have sat on criminal cases

19    will have heard the proof -- of proof beyond a reasonable

20    doubt.  That requirement does not apply in a civil case and

21    therefore should be put totally out of your mind.  Has no

22    application here.

23          Let's talk about the course of the trial.  The

24    trial is going to begin now, and first, each side may make an

25    opening statement.  An opening statement is neither evidence

1    nor argument, it is an outline of what the parties intend to

2    prove, offered to help you follow the evidence.  The

3    plaintiff wants to get up and tell you about their claims,

4    what those claims are and what they expect the proof is going

5    to show in this case; likewise, defense counsel are going to

6    get up and tell you what they believe the evidence will show

7    in this case and why they believe their client should not be

8    held accountable.  Okay.

9           So, next, plaintiff will present her

10   witnesses, and defendants may cross-examine the plaintiff's

11   witnesses.  Then defendants will present their witnesses and

12   plaintiff may cross-examine them, okay.  They call a witness,

13   they give direct testimony, and then opposing side is allowed

14   to cross-examine.  Excuse me.  After all the evidence is in,

15   the attorneys will present their closing arguments to

16   summarize and interpret the evidence for you as they see it,

17   and I will instruct you on the law.  After that, you will

18   then retire to deliberate on your verdict.

19          Our law requires jurors to follow certain

20   instructions in order to help assure a just and fair trial,

21   and I will now give you those instructions.

22          You've heard me say some of this already but

23   we're going to list it right out for you.  First of all, do

24   not converse either among yourselves or with anyone else

25   about anything related to this case.  You may tell the people

1    with whom you live and your employer that you are a juror and

2    give them information about when you will be required to be

3    in court, but you may not talk with them or anyone else about

4    anything related to this case.  Do not at any time during the

5    trial request, accept, agree to accept, or discuss with any

6    person the receipt or acceptance of any payment or benefit in

7    return for supplying any information concerning the trial.

8    Okay.  No book deals while you're sitting here, all right?

9                You must promptly report directly to me any

10   incident within your knowledge involving an attempt by any

11   person to improperly influence you or any member of this

12   jury.  Obviously that's very important.  I need to hear about

13   anybody trying to talk to you about this case, immediately.

14               Do not visit or view the premises or place

15   where the charged -- or alleged claims occurred, or any other

16   premises or place involved in this case.  And you must not

17   use internet maps, Google Earth, or any other program or

18   device to search for and view any location discussed in the

19   testimony.  Okay.  As I've indicated, we want you to make a

20   decision based on what you hear in here, not any other type

21   of research that's not allowed, okay.  Do not read, view,

22   listen to any accounts or discussions in the case reported by

23   newspapers, television, radio, the internet, or other news

24   media.  Do not attempt to research any fact, issue, or law

25   related to this case whether by discussion with others, by

research in a library or on the internet or by any other
means or source.

In this age of instant electronic
communication and research, I want to emphasize that in
addition to not conversing face-to-face with anyone about the
case, you must not communicate with anyone about the case by
any other means, including telephone, text message, e-mail,
internet chat or chat rooms, blog, social websites such as
Facebook, MySpace, or Twitter.  You must not provide any
information about the case to anyone, by any means
whatsoever, and that includes the posting of information
about the case or what you are doing in the case on any
device or internet site, including blogs, chat rooms, social
websites, or any other means.  You must also not use Google
or otherwise search for any information about the case, or
the law which applies to the case, or the people involved in
the case, including defendant, the witnesses, the lawyers, or
even me, the judge.

Now ladies and gentlemen, I want you to
understand why these rules are so important.  Our law does
not permit you to converse with anyone about the case or to
permit anyone to talk to you about the case because only
jurors are authorized to render a verdict.  Only you have
been found to be fair and only you have been -- have promised
to be fair, no one else has been so qualified.  Okay.  We

1    want your opinions, not anybody else's, they're not qualified

2    to give an opinion.  Only the jurors are.

3              Our law does not permit jurors to converse

4    among themselves about the case until the court tells them to

5    begin deliberations because premature discussions can lead to

6    premature final decisions.  In other words, we want you to

7    hear everything.  When everything's concluded, that's when

8    you start the process of conversing with your fellow jurors

9    and rendering a decision.  Not before.

10             Our law also does not permit you to visit a

11   place discussed in the testimony, excuse me.  First, you

12   cannot always be sure that the place is in the same condition

13   as it was on the date or days in question.  Second, even if

14   they were in the same condition, once you go to a place

15   discussed in the testimony to evaluate the evidence in the

16   light of what you see, you become a witness and not a juror.

17   As a witness, you may now have an erroneous view of the scene

18   that may not be subject to correction by either party and

19   that is not fair.

20             Finally, our law requires that you not read or

21   listen to any news accounts of the case and that you not

22   attempt to research any fact, issue, or law related to the

23   case.  Your decision must be based solely on the testimony

24   and other evidence presented in this courtroom.  It would not

25   be fair to the parties for you to base your decision on some

1    reporter's view or opinion or upon information you acquire

2    outside this court.  Okay.  Everything you will need to

3    decide this case will be given to you here in this court.

4                     These rules are designed to help guarantee a

5    fair trial and our law accordingly sets forth serious

6    consequences if the rules are not followed.  I trust you

7    understand and appreciate the importance of following these

8    rules in accordance with your oath and promise, and I know

9    you will do so.

10                    Finally, do not form any opinion until the

11   evidence is in.  Keep an open mind until you start your

12   deliberations at the end of the case.

13                    If you wish, you may take notes, but if you

14   do, please leave them in the jury room when you leave at

15   night, and remember that they are for your own personal use,

16   they are not to be given or read to anyone else.  If you do

17   take notes, please do not let note taking distract you so

18   that you do not hear other answers by witnesses.  Notes are

19   not entitled to any greater weight than the memory or

20   impression of each juror as to what the testimony may have

21   been.  Whether you take notes or not, each of you must form

22   and express your own opinion as to the facts of the case.  If

23   you do not take notes, you should rely upon your own memory

24   of what was said and not be overly influenced by the notes of

25   other jurors.

1          Now, let me say this.  Note taking is
2    something, well, fairly recent for me.  I'm pretty ancient so
3    it's probably not that recent.  When I was trying cases,
4    jurors were never allowed to take notes, and I think there
5    were good reasons for it.  We want to make sure you're paying
6    attention to the witnesses.  It's not only what they say,
7    it's how they say it, their demeanor, their presentation, all
8    the things that you would look for in your personal lives in
9    evaluating whether someone's being straight with you, whether
10   you can believe them or not, we want you to do here.  That's
11   part of the process.  And sometimes if you're doing this, you
12   don't get that.  You're not paying attention to the witnesses
13   and, you know, the way they may be testifying.

14          The other thing is, we have Jodi here, a court
15   reporter who takes everything down, she's very good at her
16   job.  If there's any question about testimony and what
17   somebody said, we can always have it read back for you.  But
18   she's not going to read it back in the same tone or the same
19   inflection or way that a witness may have testified, you're
20   going to get the basic transcript of what was said, okay.
21   And that stuff is important.

22          Now, that being said, we also recognize that
23   some people just remember better or it helps them hang onto
24   information to jot down a note every now and then or this or
25   that.  If that's you, that's fine, you can do it.  I just ask

1    that you don't let it become a distraction.  Try and pay

2    attention to the witnesses, but if you want to take notes,

3    that's perfectly fine.  You can do that.  That's your choice,

4    but they're your notes, only for you, and they'll be kept

5    here at night as court exhibits, they'll stay in that jury

6    room, they don't go home, they don't leave this courtroom, or

7    this courthouse, they stay right there.  Our CSOs make sure

8    everything's locked up at night and they're secured, they'll

9    be there for you the next day, but that's a personal choice

10   that you can make.

11            Questions about anything?  As I indicated,

12   that jury room is your home away from home, be comfortable in

13   there.  I told you about the hours and that's the way we're

14   going to proceed, okay.  All right.  If you don't have

15   questions, then we're going to proceed, we're going to start

16   this case with opening statements.  All right.  Ms. Connor,

17   when you're ready.

18            MS. CONNOR:  Thank you, your Honor.  Kind of

19   far away.  Let me try this.  Good afternoon.  I introduced

20   myself at the beginning of the jury selection but I'll do it

21   again because there's a lot that's happened between then and

22   now.  My name is Mairead Connor, I'm an attorney in Syracuse,

23   and I represent the plaintiff in this case Penny Collins who,

24   this is Penny Collins, here, that's my law assistant.

25            It's, as the judge has stated, this case is

about sexual harassment, gender discrimination, retaliation

on Penny Collins for opposing and filing complaints about the

sexual harassment and discrimination she faced in her

workplace.  The workplace that we're talking about, as the

judge has indicated, is the New York State Department of

Corrections.

Penny worked at several different prisons,

correctional facilities, you'll hear that term, between 2002

and 2008.  She was a corrections officer, a prison guard if

you will, who guarded the inmates.  The prisons that you're

going to hear about are Sing Sing, Sullivan prison in the

Catskills, Auburn, which is closer to where we live in

Central New York, and Eastern Correctional Facility, also in

the Catskills.

Now let me tell you just about the defendants

although you've heard who they are.  The employer in this

case is New York State, and the Department of Corrections.

There are individual defendants.  There's a defendant Goord

who's a former commissioner of corrections for the New York

State Department of Corrections.  There's defendant Burge,

former superintendent of Auburn Correctional Facility,

defendant Graham, another former superintendent of Auburn

Correctional Facility, and defendant Mitchell, who was a

sergeant and then a lieutenant at Auburn Correctional

Facility and also worked at Eastern Correctional Facility.

He now still works at Auburn Correctional Facility.

Now Penny has brought this lawsuit against her former employer and these individuals because she's seeking justice for discriminatory treatment and sexual harassment that she received for most of her time working as a corrections officer.

Now I want to say something up front to you. That you're going to hear language in this case, there's no way around it, that may be offensive, you might consider it obscene, profane, might make you uncomfortable. It might not be to your liking in some form or another. I first -- I just want to apologize to you right in the beginning for this language that you're going to hear. I have to say it, Penny has to say it, maybe others in the case have to say it, because we want you to have an accurate, clear, and vivid picture of what Penny had to deal with in her job. So the language in this case is the language, and I apologize to you right up front about it.

Now you're going to hear evidence that Penny planned to make a career out of corrections, to help provide for her family. She's married, she has two children. And a correction officer's job was a good job, pay, benefits, good benefits. And Penny entered corrections in her 40s because she was seeking to help her family and support her family. You will learn, however, that Penny's career in corrections

was not to be.  Why not?  Well, because she was sexually

harassed and abused throughout her employment at the

Department of Corrections.  And when she reported that

conduct and complained about her treatment as a female, the

department either ignored her, or took such ineffective

action that the harassment did not stop.

            The evidence will show that instead of

stopping harassment after she complained about it, it often

increased.  The evidence will show that Penny was sexually

harassed primarily at Sullivan Correctional Facility and

Auburn Correctional Facility, by officers and supervisors who

could not accept her as a female corrections officer and they

sought to deliberately humiliate her and sexually harass her

in order to try to make her quit or otherwise degrade her on

the job.

            You will hear evidence that the Department of

Corrections had a stereotype view of female corrections

officers in the workplace.  That view, you will see, was

embodied in a handbook, a special orientation handbook for

female officers that were given to female officers at the

training academy and at the facilities themselves.  The

handbook is very enlightening about how the Department of

Corrections views females in corrections.  The handbook, you

will have a chance to review it, hopefully will be in

evidence in your hand.  It presupposes females to be gossips

1    and jealous of each other on the job.  It counsels women not

2    to be flirtatious, it counsels women to be concerned about

3    their relationships outside of work because women have

4    primary responsibility for the care of their offspring.  It

5    counsels women to have outlets outside of work for

6    work-related stress.  The suggested outlets are playing

7    tennis, reading, and eating ice cream.  The handbook even

8    recommends that women limit their overtime so that they have

9    more time to maintain their personal lives outside of the

10   job.  There are many, many more stereotypes in this book, and

11   the book as a whole portrays women to be weaker and needing

12   extra attention because they are presumed to be unable to

13   handle situations in a predominantly male environment of male

14   officers and male inmates.

15            You will learn that this handbook was

16   published by the office of diversity management in the

17   Department of Corrections which is part of the employer.

18   That department was supposed to promote diversity, cultural

19   diversity, but rather, with this handbook, the department

20   promoted discrimination and stereotyping.  You will hear

21   evidence about how Penny and other females in the department

22   were opposed to the handbook for years because of these

23   stereotypes.  They made their opposition known to the top

24   administration of the Department of Corrections but nothing

25   was done about the handbook for the entire time that Penny

1    worked there.

2              You will learn that Penny had separate

3    instructions for females at the training academy, and how

4    difficult, the instructions involved how difficult it was to

5    be a female corrections officer.  Instructors told her that

6    some of the men would never accept women in corrections and

7    that the women had an uphill battle until they proved

8    themselves.

9              You will hear evidence about sexual harassment

10   Penny endured from almost the outset of her employment.  She

11   first went to Sing Sing where a sergeant put his hand on her

12   inner thigh and squeezed her thigh and said that they would

13   hook up before she left there.  That same sergeant stood

14   behind her a few inches and blew in her ear in front of

15   inmates to degrade her.  You will hear much evidence about

16   how Penny was treated at Sullivan Correctional Facility,

17   where rumors were prevalent about her sleeping with

18   supervisors or superior officers in order to gain good

19   assignments.

20             Also at Sullivan you will learn about comments

21   a lieutenant made referring to his male anatomy as a sausage

22   to her openly and commenting in lineup that he had seen her

23   breasts.  You will hear that Penny found condoms in her lunch

24   box and received countless hangup calls which interfered with

25   her ability to do her job effectively.  Some of these calls

asked if her knees were dirty yet.  Another one asked, oh,

don't forget to clean the floor, F'ing Hazel.  The evidence

will show that Penny's departmental photo was posted and

defaced and signs suggesting she was having an affair with a

superior officer were posted on the walls.

Now after she left Sullivan she transferred to

Auburn Correctional Facility to be closer to her family.  The

evidence will show that on her second day of Auburn,

defendant Mitchell told her that women do not belong in

corrections.  The evidence will show that Penny's picture was

posted by the control room and was defaced and she again --

and she was subjected to numerous rumors that she transferred

from Sullivan to Auburn because she was causing trouble at

Sullivan and suing some of the officers there.  None of which

was true.

You will hear evidence that defendant Mitchell

spoke to Penny about an inmate's penis, asked her if she had

ever seen anything so big, and what would she do with

something that big.  The evidence will show that defendant

Mitchell made obscene comments to Penny, such as talking

about being naked in front of his children, telling his

mother she had nice tits, talking about his wife losing a

ring like Penny's up his ass, and numerous other offensive

comments.  You will hear how humiliating these rumors and

comments were to Penny, because they were said in front of

other officers, supervisors, superior officers, but sometimes
even in front of inmates.

Now this is something I want you to think
about when you hear the evidence, and I'd like you to pay
particular attention to this. Because Penny worked in a
maximum security prison. The inmates in these prisons we
know are felons, some of them violent felons, they are not
people we want in society. And in this environment, officers
need to trust each other, they need to work together, they
need to know they're on the same team, they need to know
somebody's going to back them up if there's a problem. They
have to work together to control the inmates, that's part of
their job. But if you're degraded like Penny was and
humiliated, she felt that that environment became very
hostile. You will hear about how stressful and upsetting
this harassment became because it placed her in jeopardy in
front of the inmates.

At Auburn, the evidence will show that Penny
was grabbed between her legs by an officer which she reported
and this was never investigated. The evidence will show that
Penny attended weapons training, where she was the only
female. The instructor compared the barrel of the weapon to
a penis and projectiles of the weapon to ejaculate. The
instructor made derogatory comments about females and their
inability to shoot.

1          The evidence will show that Auburn did not

2    have any private locker rooms for females to change so they

3    had to use bathroom facilities in front of male officers.

4    Penny complained to administration about these conditions and

5    harassment but it did not stop.  She filed grievances through

6    her union and wrote separate complaints to supervisors and

7    her superior officers and the administration.

8          After her complaints, the harassment continued

9    and escalated.  For example, obscene things were written

10   about her on the bathroom walls that remained up for months

11   after she reported it, such as, "Penny gives shitty head,"

12   "Shitty head is better than no head," and, "I wouldn't let

13   that bitch touch me."

14          You will hear evidence that the office of

15   diversity management conducted investigations of her

16   complaints at Sullivan and Auburn.  You will hear from the

17   defendants that the Department of Corrections had a

18   long-standing policy against sexual harassment, but you will

19   hear evidence that will show that this policy completely

20   failed.  The Department of Corrections was unable to enforce

21   its policy against harassment with respect to Penny, or

22   unwilling to do it.  The investigations did not stop the

23   harassment.  As result of the investigations, there was

24   practically no one disciplined.  The only action was merely a

25   generic memo placed in paycheck envelopes, that did not

1    address the problem.

2              You will hear evidence that Penny followed the

3    rules in reporting harassment, she followed her chain of

4    command, but after she complained, she was called a hooker.

5    New rumors emerged that she was suing people at Auburn.

6              The evidence will show that throughout 2005

7    and 2006, the stress of this work environment was very

8    wearing on Penny.  She began to have psychological problems.

9    She had anxiety, depression, panic attacks, she had

10   dizziness, she began to not be able to function or do her

11   job.  She took a medical leave of absence for about three

12   months, sought medical attention.

13             Now in an attempt to save her career at the

14   Department of Corrections, she requested a transfer from

15   Auburn to another facility hoping she could find a place with

16   a better environment for females.  She transferred to Eastern

17   Correctional Facility which is in Ulster County and did fine

18   there for about six months.  This was -- even though this was

19   more than three hours from her home, three hours from her

20   family, she had to rent an apartment, she had to be away from

21   her family, the job did have a better environment.  So what

22   happened to change that?

23             The evidence will show that the Department of

24   Corrections transferred defendant Mitchell from Auburn to

25   Eastern.  He was promoted to a lieutenant and transferred to

1    Eastern, becoming her superior officer and supervisor again.

2              Now at Eastern she tried to work away from him

3    in different areas but that was not successful.  The stress

4    of working with Mitchell became too much for Penny.  She had

5    a panic attack at work and had to leave in 2006.  You will

6    hear evidence from her doctor who will testify that

7    eventually she was diagnosed as having PTSD, which is

8    post-traumatic stress disorder, based on her work

9    environment.  She took an extended medical leave of absence

10   because she could not work in a corrections setting.  She was

11   treated by doctors and other mental health providers, she

12   took medications.

13             Eventually, in April 2008, she tried to save

14   her career in corrections again.  She tried to return to

15   Eastern after being cleared by her doctor and the state

16   psychologist.  However, after a few weeks, she became very

17   anxious on the job and had to leave again.  She could no

18   longer work in a corrections environment and she left

19   corrections in May 2008 for the last time.  The evidence will

20   show that she's still suffering from PTSD and its symptoms

21   and that's another reason why we're here today.

22             Now during our case, you will hear many more

23   incidents and details about what the defendants did to Penny.

24   My purpose now in my opening statement is just to give you

25   some highlights of what the evidence will show.  Penny is

1    seeking justice from you and compensation for what the

2    defendants did to her.  I want to thank you very much again

3    for your service today.  Thank the court.  Thank you.

4                    THE COURT:  Mr. Kinsey.

5                    MR. KINSEY:  We met earlier, not that you

6    probably took notes of the fact, but I am the Assistant

7    Attorney General for about the last 16 years representing the

8    state and its officers, its employees, mainly in federal

9    court, though I do some state court work, and Cathy Sheehan

10   joined us a few years ago, she's, as she said, a long-term

11   trial attorney as well.

12                   Evidence is a tricky thing.  And testimony's

13   even trickier.  Because the memory is even trickier.

14   Oftentimes what we think we remember has no possible

15   connection to reality.  When we start talking about evidence,

16   we're going to talk about a story that's every bit as

17   compelling and heartrending as the one we just heard.  But

18   it's a totally different story.  We're going to learn that

19   there was not harassment, there was not discrimination, and

20   there were extraordinary efforts to try and help Ms. Collins.

21   We're going to learn that she could not handle the military

22   because of the stress.  And we're going to learn about

23   facilities where 70 percent of the population of 1800 people

24   incarcerated are violent felons.  You're going to hear about

25   the work environment that correction officers sign on for.

1    And it's an environment that not very many people would rush

2    to.  There's violence, there are fights, there are assaults,

3    there are attacks, people throw body fluids, it is not a nice

4    place, and the stress is incredible.

5            Now one of the facts we're going to learn is

6    that as an individual, Superintendent Graham did not do

7    anything untoward or wrong toward Ms. Collins.  He didn't use

8    any bad words, didn't call her any bad things.  Likewise,

9    Superintendent Burge didn't say anything bad about her,

10   didn't do anything to her, that both of these men had a

11   facility that they were in charge of of some 1800 felons and

12   800 employees, and that they were in charge of a facility

13   that's one of the oldest in the United States, certainly one

14   of the oldest in New York, and it's falling apart.  So

15   they're contending with a lot of competing issues.  However,

16   you're going to learn that both of them had an open door

17   policy.  And when she came knocking, Ms. Collins could come

18   in and talk to the guy in charge.  And then we're going to

19   learn about what they did.

20           The first issue that Superintendent Burge

21   became aware of is she claimed that she'd been harassed by a

22   sergeant, because the sergeant was in charge of keeping time

23   and she wanted seven minutes of overtime and he wouldn't give

24   it to her and they had a knock-down, drag-out battle and so

25   she became so enraged she took her uniform shirt off, took it

out to the front gate, threw it in the garbage and stomped

off. Seven minutes. Well, an investigation ensued because

putting your shirt in the garbage is a security matter, we

don't want people wandering in wearing shirts, uniforms. And

at the end of the day, she got her seven minutes. The

individual she claimed was harassing her is not here, is not

a defendant, and was not sued. The guy who fixed it and gave

her the seven minutes of overtime got sued.

Now what about Sing Sing? This terrible event

where someone touched the inside of her thigh and said

terrible things to her. Well, she never reported it. He's

not here, he's not named, he's not a defendant, and no one

ever knew about it until we got to this stage, and the

department can't fix what it doesn't know about.

Sullivan. Terrible place. Well, Ms. Collins

is going to admit to you that she was part of the problem at

Sullivan. Because she didn't tell anybody. And this one

issue where there were these rumors about a supervisor, the

incident was a sign that went up on the door that said

"Johnny's Love Shack". Well, plaintiff says they're going to

bring Johnny and we'll get to meet him and we'll find out

what that was about. But again, the department couldn't fix

what they didn't know about. And guess what? None of the

people from Sullivan are being sued, and none of them are

here.

1          Then she transferred to Auburn.  Now she's

2     going to tell you that Auburn had a reputation for being

3     anti-women.  But as with all these transfers, they were

4     voluntary and you're going to find out she requested them.

5     DOCS wasn't persecuting her, they're giving her exactly what

6     she requested.  A transfer to these locations.

7          Now Auburn was a place that she wanted to come

8     because it was close to home.  The first indication of

9     trouble is this tirade over seven minutes.  Mr. Graham shows

10    up as a new superintendent and he's there about a month or

11    so, and there's a knock on the door and she wants to talk to

12    him because there's a litany of problems.  And halfway

13    through this discussion, you're going to learn she stands up

14    and says, this is going nowhere, I don't want to talk

15    anymore, and he sits at his desk wondering what was that

16    about because the only thing he knows about is this payroll

17    thing from the other superintendent, and guess what?  She got

18    her money and there was an investigation from diversity.

19         Next, diversity shows up and they have a whole

20    laundry list, and they indicate to Mr. Graham that, did you

21    know there's graffiti on a bathroom wall?  I don't know, if

22    you're the CEO of an 1800-person prison, 800 employees, I'm

23    not sure you would know that, but he said, if that's true,

24    we'll take care of it.  He picked up the phone, called, it

25    was painted over the day he found out about it.  Well, you

1    have a broken door down there.  Picked up the phone, he sent

2    the welder down there, and the next day the door was fixed.

3    And diversity was called in, and they conducted between 35

4    and 40 interviews of all the people named and all the

5    witnesses.  What more was a superintendent supposed to do?

6    Well, you're going to learn what the policy says.  He wasn't

7    supposed to do anything, but you're going to learn that this

8    superintendent did.  He put out a memo to the firing line,

9    the trainers, knock it off.  He put out a memo to every CO

10   reminding them of their diversity training and that he would

11   not tolerate it and would make life a misery for anyone he

12   found participating in this kind of nonsense.  And then he

13   called in an officer who'd been accused and laid the law

14   down.

15             Now we're also going to learn about these --

16   this final transfer that Ms. Collins talks about and we're

17   going to learn about bids, unions, and civil service.  And

18   due process.  We're going to learn that when someone makes

19   lieutenant, they have to move to a different facility until

20   they can get enough time to move back to their home facility

21   and you're going to learn that none of these men have any

22   input into that.  They didn't do it.

23             Now also defendant is ex-Commissioner Goord.

24   Ex-Commissioner Goord was running, he was CEO of the

25   Department of Correctional Services when there was 70,000

1  inmates, about 65 percent of them violent felons, 25,000

2  employees, 75 facilities, and a $3 billion budget, your tax

3  money.  And we're going to learn that in that environment,

4  there's a series of deputy commissioners, and a series of

5  different bureaus and one of the bureaus was diversity, and

6  is diversity management, that was committed to the

7  investigation of and the prevention of these kinds of things.

8  We're going to learn that Mr. Goord had no part in this, he

9  simply delegated that authority, and supervised the running

10  of those various bureaus.

11            Now the state of New York is still a defendant

12  in this thing, mainly because its involvement with and

13  supervision of the Department of Correctional Services.  But

14  both the state and DOCS are on record as having policies

15  against this conduct.  And when individuals are named,

16  they're investigated, and when they're investigated and

17  there's a finding, then action is taken.  But if there's no

18  name put to the action, or if the information is withheld,

19  how do they fix it?

20            Now we're going to hear some stuff, if my

21  grandkids heard this stuff, I would see that it didn't happen

22  again, but a lot of it, as gross as it may be, has nothing to

23  do with gender.  What we're going to learn is that it's equal

24  opportunity grossouts, that people using foul language are

25  not restricting the use of that language to a female.  And

they're not restricting it to Penny Collins.  That it is an
ugly, awful place and sometimes the people there make it
worse than it needs to be.  Not because she's a woman.  But
because they're idiots.

Now we heard also that, there's going to be a
lot of this talk that Penny Collins, when she went to
Eastern, was trying to save her career.  And I believe that.
But when she got to Eastern, which she self described as the
perfect run facility, she just didn't have panic attacks.
They put her in the tower with a high-power rifle, and when
she saw Lieutenant Mitchell in the yard, she drew down on
him, put him in the crosshairs and fantasized about shooting
him.  And then when she went back to try and salvage her
career, she told her doctor she couldn't go back to work
because she was fantasizing about killing people all over the
place.  Not a normal reaction.

Dr. Alley is going to come and testify.  He's
her treating physician, nice man, fairly good doctor.  He's a
general practitioner specializing in family, you're going to
learn that he had exactly three months of psychiatric
training when he was in med school in 1985.  He had one month
of training in how to do counseling when he was a resident.
That's it.  And you're going to learn that for years his
diagnosis was a disorder that she simply couldn't cope, there
was no PTSD, and then suddenly it appears in the record.

1          Now as part of this, we hired a doctor, you're

2     going to meet Dr. First.  He teaches psychiatry at Columbia

3     University down in New York City.  He spent six and a half

4     hours with Mrs. Collins.  He'll tell you that there's nothing

5     in the record to support a PTSD diagnosis, that she's a

6     person who just simply can't handle stress.  All of these

7     events, whether at Eastern, or at Sing Sing, or at Sullivan,

8     or at Auburn, you're going to learn have one thing in common.

9     State and DOCS could not fix what they didn't know about, and

10    when they tried to fix it based on their policies and

11    procedures, just like the seven minutes of overtime, fixing

12    it was not enough.  And the people who have been brought here

13    are the people who actually tried to aid in the solution, not

14    the people that she says are evil-doers, they're not here.

15         Now as heart breaking and as gross, as

16    uncalled for, as sophomoric as some of the testimony's going

17    to be, at the end of our trail, I'm going to ask you to come

18    back and find that these men did not do anything personally,

19    they did not find out about violations of her civil rights

20    and do nothing, and I'm going to ask that you find that the

21    state of New York and the Department of Correctional Services

22    did not turn a blank eye or a blind eye to Ms. Collins' many

23    complaints, that they worked hard, they worked tirelessly,

24    they worked effectively, to try and address these issues, and

25    ask that you find for defendants and that there's no cause.

1  Thank you very much.

2  THE COURT:  Mr. Andrews, when you're ready,

3  sir.

4  MR. ANDREWS:  Thank you, your Honor.  Your

5  Honor, ladies and gentlemen of the jury, I'm going to tell

6  you some more things that you haven't heard about yet this

7  afternoon.

8  On November 9th, 2005, Ms. Collins met with

9  the superintendent of Auburn Correctional Facility,

10  Superintendent Graham.  She was there to talk about some

11  complaints that she had made prior to that time, none of

12  which, by the way, had named Troy Mitchell.  Now

13  Superintendent Graham did his best to explain what the

14  process was, what the office of diversity management did, and

15  what he could do, but it became clear at some point that

16  Ms. Collins was not accepting of his response.  And it was

17  noted that, well, yeah, you have the right to go sue if

18  you're not happy about it.  Ms. Collins alleges that the very

19  next day, Troy Mitchell, who's sitting right back there in

20  the back, made several statements of a sexual nature that, lo

21  and behold, triggered her claim for sexual harassment.

22  My name is Ross Andrews as I told you earlier,

23  and I do represent Troy Mitchell.  We're going to be kind of

24  back benchers in this proceeding but don't forget we're back

25  there.  Eventually you will hear from Troy and Troy's side of

1  the story.

2          Let me tell you a little about Troy.  Troy has

3  served the state of New York in the Department of Corrections

4  for over 25 years.  Troy has risen from being a corrections

5  officer to being a sergeant to being a lieutenant which is

6  the post that he holds now.  During that time, he's been

7  disciplined once, and that was over 15 years ago, for falling

8  asleep at work.  That's one time in over 25 years.

9          When Ms. Collins started working at Auburn in

10  June of 2004, Troy Mitchell was already working there as a

11  sergeant.  Now, listening to plaintiff's counsel, you may

12  have got the impression that they worked together a lot, that

13  they crossed paths a lot, but the evidence will show that

14  that simply is not the case.  In fact the evidence will show

15  to the contrary, there were months at a time when they had no

16  contact whatsoever.

17          The evidence will show that in 2005, the

18  spring or early summer, they did have contact when

19  Ms. Collins was sent to work in then Sergeant Mitchell's area

20  of Auburn Correctional Facility.  Now, on that day, Troy

21  Mitchell saw a wallet with a badge sticking out of it coming

22  out of a lunch bag under the stairs in an area that inmates

23  pass through.  Now every corrections officer is told that you

24  have to keep your badge and your identification on your

25  person at all times.  And a badge and an identification lying

1    out could have been a very serious security issue.  So Troy

2    Mitchell secured the wallet and the badge, opened it up, saw

3    that it belonged to Ms. Collins, and took it to her.  Now he

4    had to go find her, it took a little bit of time, but he

5    found her and he said, don't ever let this happen again.

6             Now Ms. Collins was very concerned that

7    Sergeant Mitchell was going to discipline her, that he was

8    going to write her up and it might lead to discipline.  Now

9    she asked Sergeant Mitchell was he going to do that and he

10   said no.  Just make sure that it doesn't happen again.

11            Could Troy Mitchell have written up

12   Ms. Collins at that point in time?  Yes, he could of.  Might

13   she have been disciplined as a result?  Possibly.  Did he?

14   No, he did not.  He simply returned it to her.  Asked her not

15   to do it again, and that message was delivered to her very

16   clearly.

17            Now, after that incident, Troy Mitchell and

18   Ms. Collins had little or no contact for about the next five

19   months, and I say little or no because Ms. Collins says that

20   it was one time when they had a very routine interaction

21   having to do with an inmate having some contraband stuffed in

22   his pants, and Sergeant Mitchell doesn't even recall that

23   interaction, but it was one or no contacts in that five-month

24   period, up to November 10th, 2005, the day after that meeting

25   that Ms. Collins had with the superintendent that I talked

about earlier. There will be conflicting evidence about what
happened on November 10th, 2005, but there's one thing that
everybody agrees on, and that's that somebody taped
Ms. Collins' reading glasses.

Now you will hear testimony that among the
kind of outlandish things that happened in this very tense
environment is that there's a fair amount of practical joking
that goes on, and you'll hear from different people about
that and you'll hear from Troy Mitchell himself, but let me
make one thing clear at the beginning. Nobody's ever
suggested that Troy Mitchell put the tape on Ms. Collins'
glasses. What did happen was, Ms. Collins discovered the
tape on her glasses and she lost control, as she had on
previous occasions with situations with totally different
people involved. She started screaming and yelling, and
everybody was kind of taken aback by her conduct.

Now, when she calmed down once again, she was
concerned that she was going to be disciplined for her
display, for the temper tantrum that she threw. Once again,
Troy Mitchell assured her that she would not be disciplined.
But see, here's the difference from the last time with the
wallet incident. Ms. Collins had just been told that if you
didn't like how things were going and you had cause, you
could bring a lawsuit. And what Ms. Collins did was drafted
a memo that alleged that Sergeant Mitchell said several, you

1    know, foul things which you will hear about during the

2    testimony.

3          Now let me make a couple of points about this.

4    One, Troy Mitchell denies the statements that Ms. Collins

5    attributes to him.  Two, she's never produced any witness to

6    corroborate her story.  Three, Ms. Collins had made a lot of

7    complaints before November 10, 2005, she had spoken to the

8    superintendent the day before, she had written complaints,

9    she had made verbal complaints, she had submitted grievances,

10    she had never once mentioned Troy Mitchell's name.

11          There's one other thing about the memo that I

12    haven't told you about, and obviously this memo is going to

13    come into evidence and you'll be able to see it for yourself,

14    but the point of the memo is stated by Ms. Collins herself,

15    was that she was asking that Sergeant Mitchell never say foul

16    things to her again.  Now he denies that he said anything,

17    but again, there's one thing that I think all the parties

18    will agree on, which is that Ms. Collins does not allege that

19    Sergeant Mitchell or later Lieutenant Mitchell ever said

20    anything again to her that was the least bit inappropriate.

21          Now, we've come a long way, I appreciate your

22    patience, and I want to talk a little bit, though, about the

23    retaliation charge.  And for reasons that I can't completely

24    sort out, and hopefully we can during this trial, Troy

25    Mitchell has also been charged with retaliation by

Ms. Collins. Now here's what happened. In March of 2006 as
you heard earlier, Ms. Collins transferred to Eastern
Correctional Facility. In September of 2006, then Sergeant
Mitchell was offered a promotion, but to get the promotion,
he had to transfer to a facility with an opening for a
lieutenant. The places he was offered were either New York
City, a couple of different facilities in New York City, or
the facility in Eastern. And he had a strong preference for
the facility that was a hundred miles closer to his family
that offered better housing, so he selected Eastern. There
was no intent to retaliate against Penny Collins whatsoever.

Now during the course of this litigation,
there are two specific acts that have been alleged that
Lieutenant Mitchell allegedly did to retaliate against
Ms. Collins and I quickly want to tell you about those two
acts. One, Ms. Collins said that he sat near a gate that she
wanted to leave through with the purpose of forcing her to go
out a different exit. And I'll tell you, Lieutenant
Collins -- Lieutenant Mitchell, rather, is not a mind reader.
He had no reason to know that she would not walk past him,
and I would suggest that that allegation is as baseless as
the other ones made against him.

Now the second thing he allegedly did was
stare at her in the prison yard as she worked with other
corrections officers and inmates. And this caused her to

become ill, go to the bathroom and throw up. Again, although
you will hear that Sergeant Mitchell doesn't ever recall
staring out into the yard while Ms. Collins was out there,
the evidence will show that he had no intent to do anything
if he did by looking out there, he had no way of knowing this
horrendous effect that he supposedly had.

So, while now is not the time to discuss
whether Ms. Collins' allegations can even be considered
retaliation under the law, I would suggest to you that there
will be absolutely no evidence that Troy Mitchell had any
intent to retaliate against Ms. Collins. Thank you very
much.

THE COURT: Thank you, Mr. Andrews. Ladies
and gentlemen, that will conclude the opening remarks of
counsel. I'm going to give you a short break and then we're
going to start with testimony. Okay. So please don't
discuss it amongst yourselves, don't discuss it at all and if
anybody tries to talk to you about it, please let me know.
Okay, we'll get you back in here shortly.

(Jury Excused, 2:43 p.m.)

THE COURT: Ms. Connor and Ms. Sheehan, I
would ask if you haven't found something, and Ms. Sheehan,
you know where one of these particular comments are, if you
can get to that as quickly as possible to assist each other,
so we can start with our first witness. Okay?

1          MS. CONNOR:  Yes.

2          MS. SHEEHAN:  Yes, your Honor.

3          THE COURT:  We'll stand in recess, for 10

4 minutes or so.

5          (Whereupon a recess was taken from 2:43 p.m.

6           to 2:56 p.m.)

7          (Open Court, Jury Out.)

8          THE COURT:  Where in the course of the direct

9 examination would you be using that report?

10         MS. CONNOR:  Probably later on.  Unlikely to

11 get to it today, I thought.

12         THE COURT:  Then let's get started.

13         MS. CONNOR:  Okay.  But your Honor, I still

14 have not gone through all of the documents, not just the

15 exhibit I was referring to.

16         THE COURT:  Well, the way I'm going to handle

17 it, because I don't want to keep a jury sitting --

18         MS. CONNOR:  I understand.

19         THE COURT:  -- is if you go to use a document

20 that you're going to put in evidence or something like that,

21 counsel can object to any section that she believes should be

22 redacted and we'll deal with it that way before you present

23 it to a jury.

24         MS. CONNOR:  Okay, your Honor.

25         THE COURT:  That way we can at least keep

1    moving, or get moving.

2             MS. CONNOR:  I understand.  Thank you.

3             THE COURT:  All right.  Please bring in the

4    jury.

5             (Jury Present, 2:58 p.m.)

6             THE COURT:  Okay, ladies and gentlemen.

7    Hopefully you enjoyed your short break, sorry it was a little

8    longer than we'd like it to be, but there's going to be

9    points in time during trial we have issues we have to deal

10   with out here before we can get testimony for you, so legal

11   arguments and different things that I have to rule on,

12   whether evidence is admissible or not admissible before you

13   can hear about it.  So we try and get that stuff done, and

14   that's what sometimes takes a little longer.  We'll try to

15   keep it to a minimum, I want to keep things moving, okay.

16   So, Ms. Connor, if you're ready, call your first witness.

17            MS. CONNOR:  Yes, your Honor.  We call Penny

18   Collins to the stand.

19            THE CLERK:  Can you state your full name and

20   spell it for the record, please.

21            THE WITNESS:  Penny Collins, P-e-n-n-y,

22   C-o-l-l-i-n-s.

23

24            P E N N Y   C O L L I N S , called as a

25   witness and being duly sworn, testifies as follows:

1          MS. CONNOR:  Your Honor, would it be okay if I

2     moved this, at least the angle a little bit, is that all

3     right?

4          THE COURT:  Sure, go ahead.  It only goes so

5     far because it's attached to the power source underneath, but

6     you can turn it at any angle you would like.

7          MR. KINSEY:  Can I help since we moved it?

8          MS. CONNOR:  Well, I wanted it more like that.

9          THE COURT:  Thank you, Mr. Kinsey.

10          MS. CONNOR:  Is it all right if I leave my

11     water here, your Honor?

12          THE COURT:  That's fine.  I keep mine close,

13     too.

14          MS. CONNOR:  Thanks.

15          DIRECT EXAMINATION BY MS. CONNOR:

16     Q     Well, it's afternoon, good afternoon, Penny.

17     A     Good afternoon.

18     Q     Are you the plaintiff in this action?

19     A     Yes.

20     Q     And did you file the complaint in the action?

21     A     Yes.

22     Q     Okay.  I'm going to show you the Exhibit P1.

23     Now your Honor, how do you want to do this, will the deputy

24     give the witnesses the exhibits?

25          THE COURT:  No, you go ahead and give it to

1    her.

2                    MS. CONNOR:  Out of my notebook, your Honor,

3    or do you want to use --

4                    THE COURT:  No, out of yours.

5                    MS. SHEEHAN:  Your Honor, we have some

6    redactions on that document.

7                    THE COURT:  Have they been made?

8                    MS. SHEEHAN:  No.

9                    THE COURT:  Okay, she can testify up until the

10   point, won't be put before the jury until any requests for

11   redaction will be made.  And this is P1?

12                   MS. CONNOR:  This is Plaintiff's 1, yes.

13                   Would you look at that, please, and identify

14   it.

15        A    This is my complaint that I filed.

16        Q    Thank you.  We've already stipulated this,

17   your Honor, so I won't offer it.

18                   THE COURT:  It's been stipulated into

19   evidence?

20                   MS. CONNOR:  Yes, your Honor.

21        Q    Now, Penny, did you work for the New York

22   State Department of Corrections?

23        A    Yes, I did.

24        Q    And when did you work for the Department of

25   Corrections?

1        A    From October 28th, 2002 until May 2009.

2        Q    And what did you do for the Department of

3   Corrections?

4        A    I was a correction officer.

5        Q    And where were you assigned to work?

6        A    I was first assigned to the academy, then Sing

7   Sing, then Sullivan, then Auburn, then Eastern.

8        Q    And I'm going to ask you some questions about

9   your background.  How old are you now?

10       A    50.

11       Q    And where did you grow up?

12       A    In Fallsburg, New York.

13       Q    Where's that?

14       A    It's in Sullivan County.

15       Q    And did you go to high school?

16       A    Yes.

17       Q    Where did you go?

18       A    To Fallsburg High School.

19       Q    Did you go to college?

20       A    Yes.

21       Q    Do you have a college degree?

22       A    Yes.

23       Q    And what degree or degrees do you have from

24   college?

25       A    I have my associate's from Enterprise State

1    Junior College in Enterprise, Alabama, 1989; I have my BA in

2    theology from Florida Baptist Theological College, that would

3    have been in December of '95, and I have my master's in

4    marriage and family therapy from Liberty University, that was

5    in 2011.

6            Q    And did you receive any honors with these

7    degrees?

8            A    Yes, with my --

9            Q    What were they?

10           A    With my AS I received highest honors; with my

11   BA it was high honors; with my MA, it was high honors.

12           Q    Did you attend any other colleges?

13           A    Yes.

14           Q    What colleges were those?

15           A    I attended Rockefeller College in Albany,

16   New York in 1997, I attended College of St. Rose in Albany,

17   New York in '97 and '98, and I attended University of West

18   Georgia in Carollton, Georgia in -- would have been 1998.

19           Q    And what did you study at Rockefeller College?

20           A    Social work.

21           Q    And what about College of St. Rose?

22           A    Counseling.

23           Q    And what about the University of West Georgia,

24   what did you study?

25           A    Counseling.

1          Q     Now, why did you attend these different

2     colleges in different locations?

3          A     Because my husband's career took us to a

4     variety of different places.

5          Q     And what was his career?

6          A     He was nine years in the military, he was nine

7     years as a civilian flight instructor for the military, and

8     then he flew 14 years as an EMS pilot.

9          Q     You mention your husband, are you married?

10          A     Yes.

11          Q     And how long have you been married?

12          A     Thirty-one years.

13          Q     Do you have children?

14          A     Yes.

15          Q     How many?

16          A     I have two.

17          Q     And how old are they?

18          A     I have a son 25, and a daughter 27.

19          Q     Now, before you worked for the Department of

20     Corrections, where did you work?

21          A     I worked for Tremper-Hiatt Abstract in

22     Sullivan County.

23          Q     What is that?

24          A     It's a title insurance company.

25          Q     How long did you work there?

1          A     I worked there from 1999 until 2002.

2          Q     Now when you worked there, where did you live?

3          A     I started out living in Sullivan County and

4    when my husband was transferred to fly for mercy flight, I

5    moved up here and I commuted several times a week.

6          Q     When you say you moved up here, what town did

7    you live in?

8          A     We lived in Skaneateles.

9          Q     And when did you live in -- start living in

10   Skaneateles?

11         A     Would have been September of 2001.

12         Q     Now, before you worked for Tremper-Hiatt

13   Abstract, what did you do, if anything?

14         A     I worked for -- would have been during the

15   same time frame, I worked for Sullivan County youth advocate

16   program.

17         Q     What did you do for the youth advocate

18   program?

19         A     I was a youth advocate.

20         Q     What is that?

21         A     I -- I followed youth through the course of

22   their school, I made sure that things were okay in their home

23   environment, if they were on probation I made sure that they

24   fulfilled their probation requirements and I was like a

25   second mom to them.

1          Q      And did you work before that job?

2          A      Yes.

3          Q      What did you do?

4          A      I worked in Sullivan County Department of

5     Probation as a probation officer.

6          Q      Okay.  And briefly, what was your job as a

7     probation officer?

8          A      I was a PINS officer, I worked juvenile

9     probation.

10         Q      You say PINS, what does that mean?

11         A      Person in need of supervision, and I monitored

12    my clients to make sure they were in compliance with the

13    requirements to the court.

14         Q      And why did you leave that job?

15         A      I became familiar with the youth advocate

16    program while I was working for the Department of

17    Corrections, and I felt that I could have more of an impact

18    on the youth as an advocate.

19         Q      Now, before you worked for the Sullivan County

20    Probation, what did you do, if anything?

21         A      I was a youth and education director.

22         Q      And where was that?

23         A      At Calvary Baptist Church in Ozark, Alabama.

24         Q      And why were you in Alabama?

25         A      My husband was working for the military.

1          Q     And before that, did you work?

2          A     Yes.

3          Q     What did you do?

4          A     I -- right before that I managed a boutique,

5     I'm sorry, we -- we owned a store, a small gift shop right

6     before that.

7          Q     And where was that located?

8          A     In Enterprise, Alabama.

9          Q     Where do you currently live?

10         A     I live in Crossville, Tennessee.

11         Q     And when did you move there?

12         A     We moved there in September of 2010.

13         Q     Why did you move there?

14         A     Our children had relocated to Knoxville.

15         Q     And are you currently employed?

16         A     Yes.

17         Q     What do you do?

18         A     I'm a marriage and family therapist.

19         Q     Where do you work?

20         A     Christian Counseling Center in Crossville,

21     Tennessee.

22         Q     Is this a full-time job?

23         A     No.

24         Q     About how many hours a week do you work?

25         A     I work 20 to 25 hours.

1          Q     And when did you get that job?

2          A     In July of 2011.

3          Q     And are you a licensed therapist?

4          A     I'm working toward full licensure in Tennessee

5    right now.

6          Q     Penny, I'm going to ask you then, why did you

7    become a corrections officer in New York State?

8          A     I needed a job that would be steady with

9    benefits because my husband was getting older and we knew

10   that he wouldn't be flying forever, and the pay was good, and

11   the hours were good.

12         Q     When you say hours, what do you mean the hours

13   were good, could you explain that a little more, please?

14         A     Yes.  I needed a job where I could do -- work

15   a shift so that I could finish college.

16         Q     Did you need the job that you had in

17   corrections?

18         A     Yes.

19         Q     Why?

20         A     I had two children on their way to college and

21   I wanted to finish college myself.

22         Q     Now, how -- how did you go about becoming

23   employed by the Department of Corrections?

24         A     I took the correction officer test in 2000.

25         Q     And what did you score on that test?

1          A    I scored 98.

2          Q    And did you start working right away?

3          A    No.

4          Q    When did you start working for the department?

5          A    I started on October 28th, 2002.

6          Q    And did you attend a training academy?

7          A    Yes.

8          Q    And where was that academy?

9          A    In Albany.

10         Q    And when did you attend the academy?

11         A    From October 28th, 2002 to December 23rd,

12    2002.

13         Q    And what type of training or classes did you

14    receive at the academy?

15         A    We had classes in legals, unarmed defensive

16    tactics, weapons, sexual harassment, dealings with inmates,

17    keeping logbooks, writing reports.

18         Q    Was the academy in a classroom format?

19         A    Some of it, yes.

20         Q    And did you receive an employee manual at the

21    academy?

22         A    Yes.

23         Q    Penny, I'm going to show you an exhibit that

24    was marked previously as Plaintiff's Exhibit 2.  If you would

25    look at that, review it, and identify it for me, please.

1          A     This is a copy of the employee's manual that I

2     received at the academy.

3          Q     And is there a name on the front of the manual

4     as to who issued it?

5          A     There's a forward with Glenn Goord's picture

6     on it.

7          Q     And who is the -- what department, what manual

8     is this, what does it say on the cover?

9          A     Oh, this is "State of New York Department of

10    Corrections Manual."

11                MS. CONNOR:  And at this time I'd like to

12    offer Plaintiff's Exhibit 2, your Honor.

13                THE COURT:  Any objection?

14                MS. SHEEHAN:  No objections, your Honor.

15                THE COURT:  It will be received.

16         Q     Now, is there any description in this manual

17    about chain of command or title and rank?

18         A     Yes.

19         Q     And would you tell me what page that

20    description is on, please.

21         A     It's on page 48, in section 21.

22         Q     And what, are there -- does it describe the

23    different ranks in the Department of Corrections?

24         A     Yes.

25         Q     And would you say the ranks, please.

1          A      There's correction officer, sergeant,

2    lieutenant, captain, and deputy superintendent of security

3    services.

4          Q      Do you have an understanding from the manual

5    of who would be a supervisor of a correction officer?

6          A      Yes.

7          Q      And what's that understanding?

8          A      Any of the ranking officers that I just named.

9    So that would be sergeant and above.

10         Q      Would a lieutenant be a ranking officer above

11   a correction officer?

12         A      Yes.

13         Q      Would a sergeant likewise be a ranking

14   officer?

15         A      Yes.

16         Q      Would a captain?

17         A      Yes.

18         Q      Take that back.  Little exercise here.  Now,

19   did you receive any instruction at the academy that was for

20   females?

21         A      Yes.

22         Q      And would you describe that instruction for

23   the jury?

24         A      We had a captain come in who spoke to the

25   females in my section, there are approximately 20, 20 of us,

1    and the captain told us that it would be an uphill battle

2    because females were --

3                    MS. SHEEHAN:  Your Honor, objection, hearsay.

4                    THE COURT:  Yeah, I'll sustain the objection.

5    Go ahead.

6            Q     Did you receive any written material for

7    females at the academy?

8            A     Yes.

9            Q     And what was that?

10           A     I received an employee handbook for females.

11           Q     I'm going to show you a copy of what's been

12   marked as Plaintiff's Exhibit 4.  Would you look at that,

13   please, and tell me, identify it for me if you can.

14           A     This is the "Orientation Handbook for Female

15   Staff Working in an Institutional Setting."

16           Q     And have you seen that exhibit before?

17           A     Yes.

18           Q     Where did you first see it?

19           A     I first saw it at the academy.

20           Q     How did you come to see it?

21           A     It was part of the materials I received in my

22   training book.

23           Q     And was that material given to all of the

24   recruits at the academy?

25           A     I'm not sure, I received mine in my book.

1          Q    And did you read this handbook when you were

2     at the academy?

3          A    Yes.

4          Q    And what's the name of the handbook, please?

5          A    It's the "Orientation Handbook for Female

6     Staff Working in an Institutional Setting."

7          Q    And who put the handbook out?

8          A    The department's office of diversity

9     management.

10              MS. CONNOR:  And at this time, your Honor, I'd

11    like to offer Plaintiff's Exhibit 4.

12              THE COURT:  Any objection?

13              MS. SHEEHAN:  No objections, your Honor.

14              THE COURT:  It's received.

15         Q    Now, you testified that you read the handbook

16    at the academy.  Did you have any reaction to the handbook

17    when you read it?

18         A    Yes, I did.

19         Q    And what was that?

20         A    I was very offended by it.

21         Q    And why is that?

22         A    Because the entire handbook portrays a

23    separation of male and female officers.

24         Q    Is there any other reason you were offended by

25    it?

1         A    It was very stereotyping to women.

2         Q    And what are the nature of the stereotypes in

3    the handbook that offended you?

4         A    That women spread rumors, they were gossips,

5    they had problems with relationships between themselves, they

6    had issues with jealousy.

7         Q    Is there any particular section of the

8    handbook that you could point to us that contain some of

9    these stereotypes?

10        A    Relationships with staff.

11        Q    What section is that?

12        A    That is on page 9.

13        Q    And what's in there that is offensive to you?

14        A    It talks about women not having to use

15   profanity to be one of the boys, and don't discuss your

16   personal life or date coworkers, monitor your own flirtatious

17   behaviors.

18        Q    Is there any other section that contains

19   stereotypes that are offensive to you?

20        A    Yes.

21        Q    And what section would that be?

22        A    That would be relationships between female

23   staff on page 11.

24        Q    What about that section offended you?

25        A    This is a section that deals with rumor

1   spreading, jealousy.

2                   MS. SHEEHAN:  Your Honor, I ask that she read

3   the specific sections that she's -- she was offended by,

4   instead of summarizing.

5                   MS. CONNOR:  I have no objection to that.

6                   THE COURT:  Well, you -- you'll have an

7   opportunity to cross-examine if you want to have her read

8   parts of this.  Anybody can read it, okay, I'm going to let

9   her testify, go ahead.

10                  Q    Thank you.  And what about that section was

11  offensive to you?

12                  A    It told women basically how to destress, eat

13  ice cream, play tennis, it just -- the whole thing was

14  offensive because it dealt exclusively with women's issues

15  that were really non-gender specific.  It implied that women

16  spread the rumors, women gossipped, women were jealous, they

17  were flirtatious, would have a hard time with relationship

18  issues at work.

19                  Q    Was there any part in the handbook related to

20  overtime?

21                  A    Yes.

22                  Q    And did you have a reaction to that?

23                  A    I did.

24                  Q    And what was the part of it and what was your

25  reaction, please?

1          A    Said women should not voluntarily seek

2    overtime because they're generally responsible for the care

3    of their offspring.

4          Q    Were there any other parts of the handbook

5    that were offensive to you?

6          A    Well, just the fact that there were dos and

7    don'ts for females, females should do this and do this, and

8    don't do this, females always maintain a professional

9    demeanor, always carry your ID card, don't give out money at

10   work, all the things that were -- the dos and don'ts were

11   listed exclusively for females.  It also told that you're not

12   to take your personal needs into work.

13         Q    Where does it say that?

14         A    It says that under keeping yourself mentally

15   healthy.

16         Q    Now, did you experience any different

17   treatment at the academy for -- as a female than your -- than

18   the male recruits?

19         A    Yes.

20         Q    And what was that experience?

21         A    Females were not treated on the same level

22   that male correction officers were.

23         Q    Can you explain what you mean by that?

24         A    Yes.  In my own academy class, our instructor

25   made negative comments about females, officers were allowed

1    to make negative comments about females, an officer made a

2    comment that his father was a correction --

3                    MS. SHEEHAN:  Your Honor, hearsay.

4                    THE COURT:  Yeah.  But -- I understand it's

5    difficult, but if we can try and avoid the hearsay.

6                    MS. CONNOR:  Your Honor, I understand that,

7    but this is a case about a hostile environment so by its

8    nature, this is part of the proof of the environment.

9                    THE COURT:  Counsel, I understand but the

10   difficulty is the ability to cross-examine statements that,

11   made by somebody else when there's not going to be a witness

12   called, so if we could restrict it, that would be good.  If

13   you can identify these statements to a particular person that

14   you intend to call or that we can identify, that might be

15   different.

16               Q    Of the negative statements, you mentioned your

17   instructor.  Who was your instructor?

18               A    Officer Germain.

19               Q    And were any of the negative statements that

20   you just testified about made by Officer Germain?

21               A    Yes.

22               Q    Which ones?

23               A    I'm sorry, the ones when we were doing

24   physical education in the gym, there were comments made

25   there.

1          Q     What did Officer Germain, specifically asking

2     about this officer --

3                MS. SHEEHAN:  Your Honor.

4          Q     -- what did he say?

5                MS. SHEEHAN:  It's still hearsay.

6                THE COURT:  I'm going to give her a little

7     leeway because they are representatives of the state and if

8     we have a time and a location, and an individual, you know,

9     there's at least some sort of a suggestion of reliability and

10    credibility to it, that could be attributed to the state,

11    you're free to cross-examine about it, okay.  Go ahead.

12         A     Officer Germain.

13         Q     I want -- I'm sorry, I'm going to interrupt

14    your answer, we'll go back and lay a foundation.  You

15    mentioned physical education, when did you receive that

16    instruction in the academy?

17         A     It was in the afternoons.

18         Q     And what time period are we talking about?

19         A     Probably somewhere around 4, 4:00 in the

20    afternoons.

21         Q     About -- about what month and year are we

22    talking about?

23         A     Oh, from October, from the first week we

24    entered the academy until just a couple days before we left.

25         Q     And was Officer Germain your instructor in the

1    physical education portion of your training?

2              A    He was one of them, yes.

3              Q    And what specifically did Officer Germain say

4    to you about females?

5              A    To me as a member of the class who was doing

6    PE, I was there when he said that the women were hiding in

7    the back because they weren't able to keep up, couldn't

8    perform like the men could.

9              Q    Did he make any other statements in the class

10   about females?

11             A    It was just very routine that comments were

12   made about females and their ability to keep up physically.

13             Q    Were any of the negative statements, without

14   identifying the statements, made by fellow recruits in the

15   academy?

16             A    Yes.  Yes.

17             Q    And what, if any, reaction did Officer Germain

18   have to these statements?

19             A    Sometimes he joked along with them, he never

20   addressed them as being negative in any way.

21             Q    Now did you ever tell any instructor at the

22   academy that you had any objection to this type of -- these

23   statements or this conduct?

24             A    Yes.

25             Q    Who did you speak to?

1          A     I spoke to Officer Peterson about it.

2          Q     And what did you say to him or her?

3          A     Well, we spoke because he was very aware,

4    Officer Peterson was the co-instructor at the academy and he

5    was very aware of the tension between males and females.

6          Q     And what did you say to him and what did he

7    say to you?

8          A     We just discussed the issues that were going

9    on in the academy.

10          Q     What issues specifically?

11          A     Gender-related issues.

12          Q     What issues, can you be more specific?

13          A     Male officers would say that they weren't

14    gonna work with females.

15              MS. SHEEHAN:  Your Honor, hearsay.

16              THE COURT:  I'm going to sustain the

17    objection.  She can testify about what she said to him, that

18    direct conversation, but just generally talking about what

19    people said, we're not going to be able to have them in here

20    is an issue.

21          Q     Just directing your attention or focus to this

22    conversation with Officer Peterson, could you be more

23    specific about what you and Officer Peterson discussed

24    related to gender?

25          A     Officer Peterson and I discussed the way

1    females were treated at the academy.

2          Q    And specifically how were they treated if you

3    discussed that?

4          A    In a very demeaning way, they were -- they

5    just weren't looked upon as equal.

6          Q    And what did Officer Peterson say to you, if

7    anything, about this?

8          A    I cannot recollect right now.

9          THE COURT:  Mr. Andrews, while there's a

10   break, I apologize to you, don't be bashful if you have an

11   objection, stand up.

12         MR. ANDREWS:  I will not be, your Honor.

13         THE COURT:  I didn't think so.

14         MR. ANDREWS:  Thank you very much.

15         THE COURT:  You mentioned on the back bench

16   there and I looked up a couple times and I forgot to make

17   sure that you had no objection, but if you do, speak up,

18   please.

19         MR. ANDREWS:  I would have if I had had an

20   objection, your Honor.

21         THE COURT:  All right, thank you.

22         MR. ANDREWS:  Thank you very much.

23         Q    Now, Penny, are you familiar with the term rat

24   in corrections?

25         A    Yes.

1          Q     And what is a rat?

2          A     A rat is someone who squeals on their fellow

3     officer.

4          Q     And where did you first learn about that term

5     in corrections?

6          A     I learned about that at the academy.

7          Q     And how did you come to learn that?

8          A     There was an incident on the female dorm, the

9     female hallway and we were discussing it, the females were

10    discussing it the next morning and the officer who worked

11    behind front reception at the academy was down there and he

12    told us you never say anything --

13         MS. SHEEHAN:  Your Honor, hearsay.

14         THE COURT:  Yeah, I'm going to sustain the

15    objection.  She can talk about her knowledge but she's got to

16    stop attributing, talking about what other people told her.

17         Q     What was your understanding of that term when

18    you left the academy?

19         A     You did not squeal on your fellow officers.

20         Q     Now did there come a time that you left the

21    academy and began to work as a corrections officer?

22         A     Yes.

23         Q     And when was that?

24         A     That would have been -- I left the academy in

25    December of 2009 [sic], I did two weeks of on-the-job

1   training at Sing Sing, and then I went to work at Sing Sing

2   on January 9th of 2003.

3           Q    Now you say you left the academy in December

4   of 2009, is that what you meant to say?

5           A    No, I'm sorry, it was 2002.

6           Q    When did you start at Sing Sing?

7           A    On January 9th, 2003.

8           Q    Where's Sing Sing?

9           A    Sing Sing is close to New York City,

10  Westchester County.

11          Q    What type of facility is it?

12          A    It's a male maximum security.

13          Q    And what type of inmates are at Sing Sing?

14          A    Felons, murderers and rapists and ... just

15  convicted felons.

16          Q    And when you went to Sing Sing, what type of

17  job did you do?

18          A    I was in the resource pool.

19          Q    What does that mean?

20          A    That means I was assigned a position at the

21  discretion of the chart sergeant wherever I was needed.

22          Q    And because these terms are going to be new to

23  the jury, what's a chart sergeant?

24          A    The chart sergeant is someone who's in charge

25  of assigning officers to a post.

1      Q    And when, in the resource pool, is there any

2   particular job you did in that pool?

3      A    No.  I worked the blocks, I worked the

4   hospital, the chapel, the mess hall, I work construction, I

5   worked special housing unit, worked the honor block, escort,

6   yard.

7      Q    And were you on a probationary status at Sing

8   Sing?

9      A    Yes.

10     Q    And how long did the probationary status last

11  for you?

12     A    That was one year.

13     Q    And what's your understanding of being on a

14  probationary status?

15     A    That while you're on probation, your hire is

16  really dependent on your performance and the department can

17  terminate you at will.

18     Q    Now, you -- after you completed, did you

19  complete your probationary status?

20     A    Yes.

21     Q    And then what status did you have after one

22  year?

23     A    Then I was just a permanent correction

24  officer.

25     Q    Now, let's go back to Sing Sing.  It's -- who

1    was your supervisor at Sing Sing?

2            A    I had various supervising sergeants at Sing

3    Sing.

4            Q    Did you have a sergeant, an area sergeant?

5            A    Yes.

6            Q    And who was that?

7            A    I mostly worked under Sergeant Tenori

8    (phonetic).

9            Q    And while you were at Sing Sing, did anything

10   unusual occur with respect to Sergeant Tenori?

11           A    Yes.

12           Q    And what was that, please?

13           A    The first incident would have been several,

14   several weeks, maybe a month after I got there, I was working

15   a line in the mess hall, and it's where the inmates come

16   through and there's two officers, one works each side of the

17   line, and Sergeant Tenori came up behind me, and he came

18   about 3 or 4 inches from my neck and he blew in my ear.

19           Q    And who was present for this?

20           A    Inmates.

21           Q    How many inmates?

22           A    Oh, there were probably about 100 to 125 in

23   the mess hall at that time.

24           Q    What response if anything did you have to

25   this?

1          A     I moved away from him closer to the line.

2          Q     Did you say anything to him at the time?

3          A     No.

4          Q     Why not?

5          A     Because I was a brand new officer and he was

6     my supervisor.

7          Q     And did this have any effect on your work with

8     the inmates?

9          A     Well, inmates saw this, I had an inmate come

10    up to me and say, Ms. C, you and the sarge hooked up?

11              MS. SHEEHAN:  Your Honor, hearsay.

12              THE COURT:  I'm going to overrule it, go

13    ahead.

14          Q     Just repeat the last sentence.

15          A     An inmate came up to me and he said, Ms. C,

16    you and the sarge hooked up?

17          Q     Did you respond to this inmate?

18          A     I did, I told him it was an inappropriate

19    question.

20          Q     Now did you report this incident with Sergeant

21    Tenori to anybody higher up in the department at the time?

22          A     No.

23          Q     Why not?

24          A     Because I didn't want to be a rat.

25          Q     Now did you have any other incidents with

1    Sergeant Tenori?

2          A    Yes.

3          Q    And what, if anything, occurred in that

4    incident?

5          A    I was working a block and it was dinnertime

6    and I was --

7          Q    I'm sorry, I'm going to interrupt you.  When

8    you say a block, just because I'm so familiar with the facts

9    of your case, maybe if you just say what is a block just in

10   case the jury, we don't know.

11         A    Okay.  A block is a very large housing area,

12   there were several hundred people on the block, there's maybe

13   four, four stories high, there were two very large blocks at

14   Sing Sing.

15         Q    And when you say people on the block, you're

16   referring to inmates?

17         A    Yes, inmates on the block.

18         Q    Okay.  Sorry, then what -- the second incident

19   with Sergeant Tenori, what occurred?

20         A    I was working on a block and just -- I was

21   working on A block and just outside A block there was an

22   honor block, maybe 150 feet from the door, and there's an

23   officer who's in the control room outside the honor block, so

24   it was my lunch, or my dinnertime, and I'm not actually

25   assigned to be on the block, so I ask him if he would like a

1   break because he doesn't -- he doesn't get a lunch, and

2   that's permissible because I'm not actually assigned there on

3   the block.  So I gave the officer a break, and the officer

4   came back and I was sitting on a stool next to -- next to the

5   officer's post where I had sat on the stool while I was

6   manning the gate of the block and Sergeant Tenori came up and

7   he put his hand on my inner thigh and he said, we will hook

8   up before you leave here.

9            Q     Now did you respond to him?

10           A     I did.  I told him he was disgusting.

11           Q     And what did he do if anything?

12           A     He laughed at me.

13           Q     Now, how long did you stay at Sing Sing?

14           A     I was at Sing Sing six months.

15           Q     And did you report that incident with Sergeant

16   Tenori to anyone at the time at Sing Sing?

17           A     Well, I -- there was a female officer who,

18   when we orientated, we were assigned to an officer that if we

19   had any issues or anything, we could go to them and I had

20   told her about Sergeant Tenori and she just told me to stay

21   away from him.

22           Q     Now, did there come a time that you left Sing

23   Sing?

24           A     Yes.

25           Q     And when was that?

1          A     That would have been May of 2003.

2          Q     Where did you go at that time in the

3     Department of Corrections?

4          A     I went to Sullivan.

5          Q     Now, where is Sullivan?

6          A     Sullivan is in Sullivan County, it's down --

7     maybe an hour and 45 minutes this side of New York City.

8          Q     And what type of facility is Sullivan?

9          A     That's also a male maximum security.

10         Q     And how did it come about that you went to

11    Sullivan from Sing Sing?

12         A     Sullivan was on my -- it's kind of like a wish

13    list, you have 10 places, 8 or 10 places that you put in

14    where you would like to be reassigned, and since my first

15    preference was Auburn and it was a very long wait to get to

16    Auburn, I put facilities on my list that would get me closer

17    to Auburn and they had shorter lists to go there.  So my name

18    came up on the list and I went to Sullivan.

19         Q     And when did you transfer to Sullivan?

20         A     I went there in May of two thousand and --

21    2003.

22         Q     And what assignment did you have when you

23    first got to Sullivan?

24         A     I was in the resource pool again.

25         Q     And what's the resource pool there at

1   Sullivan?

2           A    It was the same as it was at Sing Sing, I was

3   assigned at the discretion of the chart sergeant, I worked

4   just basically the same jobs I worked at Sing Sing.

5           Q    And how long were you a resource officer at

6   Sullivan?

7           A    The entire time I was there, for 13 months.

8           Q    And did you have any training at Sullivan?

9           A    Only on different, different posts.

10          Q    Now, did you have any problems with officers

11  or supervisors at Sullivan?

12          A    Yes.

13          Q    And to the best of your recollection, what is

14  the first problem that you had there?

15          A    That would have been -- I gave my daughter my

16  car because hers was in the shop and I got a ride with

17  someone who worked at Sullivan, and I was accused of sleeping

18  with him immediately.

19          Q    Who did you get a ride from?

20          A    From Sergeant Hoefling.

21          Q    What's his first name, please?

22          A    John.

23          Q    When did this occur?

24          A    I rode with him day number two.

25          Q    And who accused you of sleeping with Sergeant

1    Hoefling?

2            A    That was just a general accusation, I couldn't

3    even count the number of officers who accused me of that.

4            Q    Approximately how many officers accused you of

5    that?

6            A    I would say no less than 20.

7            Q    And in what time period was this?

8            A    This started immediately when I got there when

9    I shared the ride and it did not end until -- well, it still

10   was not ended when I left.

11           Q    Now when you say you got a ride from Sergeant

12   Hoefling, did you know the sergeant outside of your

13   employment?

14           A    Yes.

15           Q    And how did you know him?

16           A    Because our children were approximately the

17   same age, our sons played on the same sports teams, my

18   husband and I would see him at -- he and his wife at sporting

19   events, and then -- well, he was just a friend.

20           Q    And did you have any other problems while you

21   were at Sullivan?

22           A    Yes.

23           Q    With officers or supervisors?

24           A    Yes.

25           Q    And what other problem did you have?

1          A     From the day I got there, it was -- it was a

2     problem but the next problem that I can recall, I was accused

3     of sleeping with another sergeant.

4          Q     What sergeant is that?

5          A     That would have been Sergeant Bennett.

6          Q     And who was he in relation to you in your work

7     environment?

8          A     He was my chart sergeant.

9          Q     And when did -- when were those accusations

10    made?

11         A     That would have been in the fall of 2003.

12         Q     And who said -- who accused you of sleeping

13    with Sergeant Bennett?

14         A     Just the same officers who accused me of

15    sleeping with Sergeant Hoefling.

16         Q     And about how many officers, over what span of

17    time was that accusation made?

18         A     Well, that -- I would say probably the same,

19    about 20 to 25 officers but that rumor didn't last more than

20    maybe a couple months.

21         Q     Now, did anything else occur with respect to

22    rumors at Sullivan?

23         A     Yes.

24         Q     And what was that?

25         A     I was working an outside post where -- there

1    are two gates to get outside the facility, I was working the

2    inside gate, and then an officer was working the outside

3    gate, and there was a sergeant from the annex -- I'm sorry, I

4    forgot to say that Sullivan also had a minimum security part,

5    there was an annex that was just down the road from the main

6    facility and so I actually did resource at the maximum

7    security and the minimum security and there was a sergeant

8    who came up from the minimum security, and I was going --

9              Q    What was his name?

10             A    His name was Sergeant Baker.  And I was going

11   to be working at the annex the next evening and I had never

12   worked the job before and part of it was to count the

13   facility vehicles.  And he was explaining to me where I

14   needed to go to count them, and -- because there were several

15   places, and he said he didn't want to stand there and talk to

16   me very long because he would be accused of sleeping with me

17   too.

18             Q    When did that take place?

19             A    That was in the fall of 2003.

20             Q    Now, when you were at Sullivan, were you

21   subjected to any other rumors?

22             A    Besides sleeping with officers?  Or with

23   sergeants?

24             Q    Yeah.  Any other rumors that you were the

25   subject of?

1        A    I'm -- I'm sorry, I'm thinking.

2        Q    Okay.

3        A    Because that was such an all-encompassing,

4    that was like an everyday, everyday thing.

5        Q    Now, okay then, we'll move on.  Did you have

6    any problems with any comments from officers at Sullivan?

7        A    Yes.

8        Q    And what, what officers, what -- let's talk

9    about the -- let me ask you about the first comment that you

10   recall other than what we've already -- what you've already

11   testified about.  Did you have any experience with any direct

12   comments to you from officers that were a problem?

13       A    Well, other than the comments I would hear

14   when I was going through the cross-gate area, the cross-gates

15   is, basically it's a T area, it takes you to the different

16   blocks and up to the mess hall and then the other part takes

17   you out and I would walk through the cross-gate area to get

18   to an assignment and officers always waited until I pass

19   through to say things --

20            MS. SHEEHAN:  Your Honor, hearsay.

21            THE COURT:  No, I'm going to overrule it, go

22   ahead.

23       A    To say things about who I would -- who I was

24   going home with, who I was sleeping with, and there were

25   other things.  I did have another problem, though.

1           Q       Okay.

2           A       I'm remembering now.

3           Q       Okay.  Before we go do that, the rumors that

4    you testified about, were they true?

5           A       No.

6           Q       Were you sleeping with Sergeant Hoefling?

7           A       No.

8           Q       Were you sleeping with Sergeant Bennett?

9           A       No.

10          Q       Were you sleeping with any of the other

11   sergeants at Sullivan?

12          A       No.

13          Q       Okay.  The problem you testified that you just

14   remembered, let me ask you about that problem.  When did that

15   take place?

16          A       I had a problem with an Officer Royce there.

17          Q       Okay.  About when did that take place?

18          A       That would have been sometime -- sometime in

19   the fall or winter of 2003.

20          Q       And what was the problem with Officer Royce?

21          A       Officer Royce, when I was going up toward the

22   mess hall from where the cross-gates area was, the inmates

23   were lined up on the left side, and Officer Royce walked in

24   front of me, and he got maybe two steps and he bent a little

25   and he passed gas, and I walked a little more and he did it

1  again.

2          Q    How far was he from you when this occurred?

3          A    I would say maybe 2 or 3 feet.

4          Q    What happened next?

5          A    With Officer Royce?

6          Q    Yeah, in the incident, if anything.

7          A    Well, he -- he had the inmates lined up and he

8  did it to the inmates.

9          Q    Okay.  And did you have any problem at

10  Sullivan with Lieutenant Keenan?

11         A    Yes.

12         Q    And what was the nature of that problem?  Or

13  describe the problem for us.

14         A    Okay.  Lieutenant Keenan sexually harassed me.

15         Q    Just -- I'm going to ask you not to conclude,

16  make a conclusion about that, all right?

17         A    I'm sorry.

18         Q    And I'm sorry if my question wasn't clear.

19  Would you first, would you -- I just want to ask you what

20  occurred, the specific events back and forth with you and

21  Lieutenant Keenan.

22              THE COURT:  The comment regarding sexual

23  harassment will be stricken, okay.  Go ahead.

24              MS. CONNOR:  Sorry, your Honor.

25              THE WITNESS:  I'm sorry.

1          THE COURT:  I know that you didn't solicit it.

2          MS. CONNOR:  I'm sorry.

3          THE COURT:  It will be stricken from the

4    record, go ahead.

5          Q    Just focusing on what actually occurred with

6    Lieutenant Keenan, about what time frame are we talking about

7    here?

8          A    I believe he got there in the fall or the

9    winter of '03.

10          Q    And what occurred with Lieutenant Keenan?

11          A    Lieutenant Keenan, well, I was still on the

12    outside post where the truck trap was and another officer was

13    on the other side because I was assigned there for a few

14    weeks, and when officers order dinner, it comes to the

15    outside of that truck trap area and then we notify the

16    officer and they come down and pick up their dinner.  So I

17    was waiting for my dinner and the officer on the outside

18    called me and he said, Collins, there's somebody here for

19    you.  So I went out and there was a car there and I went to

20    the car and it was Lieutenant Keenan's car, and I said, oh,

21    I'm sorry, sir, I thought my dinner was here and he said,

22    I've got your dinner, a nice Italian sausage, and --

23          Q    Had you ordered an Italian sausage?

24          A    No.

25          Q    Had you asked Lieutenant Keenan to bring you

1   dinner?

2           A    No.

3           Q    What, if anything, did you respond to the

4   lieutenant when he made that statement?

5           A    I don't believe I responded to him.

6           Q    Now did you report that comment that

7   Lieutenant Keenan made to anyone?

8           A    Yes.

9           Q    And who was that?

10          A    I told Sergeant Hoefling.

11          Q    And what, if any, response did he have to you

12  when you told him that?

13          A    He told me to stay away from him.

14          Q    Go ahead.

15          A    He told me about a bet that had been made at

16  the annex with Lieutenant Keenan.

17          Q    What did he say concerning the bet?

18               MS. SHEEHAN:  Your Honor, it's double hearsay.

19               MS. CONNOR:  Well, your Honor, this is -- this

20  is her sergeant that she's reporting an incident to, and this

21  is his response and I would also indicate he's going to be

22  testifying so he would be subject to counsel's

23  cross-examination.

24               MS. SHEEHAN:  He's reporting what somebody

25  else told him.

1          MS. CONNOR:  But it's part of the environment,

2     part of what -- when she reports an incident, this is what

3     she's told in return.

4          THE COURT:  Well, it's double hearsay, is what

5     it is.

6          MS. CONNOR:  Your Honor, it's not offered for

7     the truth of the matter in the sense that it's -- it's being

8     offered for the environment, the effect on the hearer.

9          THE COURT:  Counsel, I'm going to allow you

10    some leeway, go ahead.

11    Q     What, what did Sergeant Hoefling respond to

12    you?

13    A     Sergeant Hoefling told me that Lieutenant

14    Keenan had made a bet in the chart office at the annex who

15    could sleep with me first.

16    Q     Did he say anything else in that conversation,

17    Sergeant Hoefling?

18    A     I don't remember.

19    Q     Now after this incident --

20    A     I'm sorry, I do remember something else.

21    Q     Go ahead, finish your answer.

22    A     He told Sergeant Hoefling he must be sleeping

23    with me because he wasn't.

24    Q     Now I'm trying to understand, Sergeant

25    Hoefling told you what again?

1          MS. SHEEHAN:  Your Honor --

2          THE COURT:  No, that's -- the answer will

3     stand.  Let's move along.

4          Q    All right.  Thank you.  Did you have any other

5     problems with Lieutenant Keenan while you were at Sullivan?

6          A    Yes.

7          Q    And what -- would you describe the next

8     problem, please.

9          A    Just a day or two after the dinner incident, I

10    was standing lineup and he made a comment on my breasts in

11    front of officers.

12         Q    Now when you say standing lineup, what is

13    that?

14         A    Before shift begins, officers stand lineup to

15    hear about anything that's going on in the facility that day,

16    or anything that we need to know before our shift begins.

17         Q    And what -- specifically what did Lieutenant

18    Keenan say?

19         A    Lieutenant Keenan said that he had seen my

20    breasts in front of other officers.

21         Q    Had he?

22         A    No.

23         Q    And what did you say, if anything?

24         A    Well, it was -- it was a progression, the

25    conversation.

1          Q    Okay.  What's the next thing you said?

2          A    Well, it's -- may I back up so there's an

3    understanding?

4          Q    I just want to know what you said back to

5    Lieutenant Keenan.

6          A    I said -- okay.  I have to run through the

7    whole conversation in my mind.  The next thing was Lieutenant

8    Keenan said something to me.

9          Q    What was that?

10         A    He said my -- I had too many rings on my

11   fingers.

12         Q    And what rings were you wearing at the time?

13         A    I was wearing my wedding ring, my engagement

14   ring and one small ring which would be considered an heirloom

15   ring.

16         Q    And from your understanding of policy, was

17   that too many rings on your fingers?

18         A    No.  I told Lieutenant Keenan, I said

19   directive 3083, three rings, one wedding, one heirloom, and

20   one engagement and then he --

21         Q    What did he say, if anything, in return?

22         A    He got very angry, and he told me my

23   fingernails weren't in compliance.

24         Q    And what were your -- what did your

25   fingernails look like?

1          A     My fingernails were very much in compliance.

2          Q     What did they look like, so the jury

3     understands?

4          A     I'm sorry.  They were very short, you have to

5     keep them short because of the keys, I had a short, very thin

6     French on my fingernails.

7          Q     Now did you report this exchange with

8     Lieutenant Keenan to anyone?

9          A     Yes, I told Sergeant Hoefling.

10         Q     And what, if anything, did he say in return

11    when you reported this?

12         A     He told me again to stay away from him, and he

13    told me he would talk to him, I believe.

14         Q     Now, in this time frame when you worked at

15    Sullivan, were there any other unusual incidents that

16    occurred to you?

17         A     Yes, I had an incident with a female officer.

18         Q     And what was that incident?

19         A     I had lent another officer money, and she was

20    very angry with me.

21         Q     Who -- I don't want to ask you about that

22    incident, that's --

23         A     Okay.

24         Q     I'm not going to pursue that --

25         A     Okay.

1          Q     -- that incident.  Did you have any other

2     incidents after this lineup problem with Lieutenant Keenan,

3     after that, did you have any other incidents with officers

4     or -- that occurred to you at Sullivan that would be unusual?

5          A     Yes.  I found condoms in my lunch.

6          Q     And describe your lunch and where you found

7     this.

8          A     When officers stand lineup, they put their

9     lunch outside the lineup room, we just all place them

10    wherever we happen to come in, take the next spot.  I put my

11    lunchbox out of the lineup room and I picked it up and I went

12    to my post and when I opened it for dinner, there were three

13    condoms in packages, in my lunchbox.

14         Q     Now what was your reaction to this, if

15    anything?

16         A     I was very embarrassed.

17         Q     And did you report that to anybody?

18         A     No.

19         Q     And why not?

20         A     'Cause I didn't want anyone to know that

21    someone would do that to me.  Because every day, every day

22    that I was there, I lived with these rumors and anything I

23    could stay away from, or do, not to start another one, or not

24    to keep it going, I did.  If I told someone about them, then

25    the rumors would just -- they would increase, I would never

1    have any peace there.

2          Q    Did there come a time that you worked in the

3    tower at Sullivan?

4          A    Yes.

5          Q    What's the tower, for the jury?

6          A    The tower is several stories high, maybe -- I

7    think at Sullivan it was probably about five or six stories

8    high, and it had an outside walkway, and you -- you walk the

9    walkway while the inmates are in the yard to make sure that,

10   you know, you were just an extra set of eyes for the officers

11   in the yard.

12         Q    And did anything unusual happen to you in the

13   tower at Sullivan?

14         A    Yes.

15         Q    What was that?

16         A    I received repeated hangup calls in the tower.

17         Q    When you say repeated, at what frequency?

18         A    Maybe one would come, five minutes later

19   another, maybe be 20 minutes later, another, then three

20   minutes later, another, they just, just kept coming.

21         Q    And for -- when did this take place?

22         A    Well, I was there, it would have been

23   probably, I took the post there at 3:30 so probably somewhere

24   about 3:45.

25         Q    What days approximately?  Do you remember the

1    days approximately when this took place?

2           A     I know I worked the tower once in December,

3    and I believe I worked the tower again in the later winter,

4    it would have been maybe February or March.

5           Q     Now with these hangup calls, was there any

6    speaking or noise on the other end of the phone?

7           A     Sometimes there would be a growl, sometimes it

8    would be a hangup call, sometimes it would be a comment.

9           Q     What would the comments be?

10          A     Sometimes they would say, don't forget to

11   clean the fucking floor, Hazel.

12          Q     What did you understand that to mean?

13          A     That, Hazel was the maid on the TV program, I

14   just took it as a very, very derogatory comment.

15          Q     Any other comments that you recall?

16          A     I was working the chart office one night and

17   someone called me up and asked me if my knees were dirty yet.

18          Q     Now what did you understand that to mean?

19          A     I didn't catch onto that one right away.

20          Q     Did there come a time that you did?

21          A     Yes, the sergeant heard my end of the

22   conversation, and he wanted to know what it was about.

23          Q     And what sergeant are you talking about?

24          A     Sergeant Hoefling was the chart sergeant.

25          Q     Did you come to an understanding of what that

1    meant?

2              A    Yes.

3              Q    And what was that understanding?

4              A    The officer wanted to know if I was on my

5    knees in front of the sergeant.

6              Q    Doing what?

7              A    Having oral sex.

8              Q    Did you say anything back to that caller?

9              A    No.

10             Q    Now, this, the phones that we're talking

11   about, is that -- what type of phone system is it, internal

12   or external?

13             A    That's an internal phone system.

14             Q    And who has access to that phone system?

15             A    Just officers and supervisors.  It was pretty

16   much a regular thing for me to get calls.

17             Q    And what effect, if anything, did these calls

18   have on your ability to work?

19             A    Well, it took time away from what I was

20   supposed to be doing, and I -- I stopped using my radio so

21   officers wouldn't know where I was.  If I had, like radio

22   checks, there's a radio check when you start work every day,

23   they call your radio number, and you call in like, you know,

24   67, on, and then they know that your radio is working.  And

25   every time I called on my radio to say where I was, an

1    officer or officers would call, and so I stopped answering my

2    radio calls.  And when my name, or when my number came

3    through, I would let it run through and they would call my

4    number a couple times and then I would call the arsenal where

5    they initiate the calls and let them know that I did hear

6    the -- my radio call and that my radio was working and the

7    arsenal officer came to understand that I would be doing the

8    call-in instead of checking my radio.

9            Q    And why didn't you use your radio?

10           A    Because if officers knew where I was, when

11   they heard my voice on the radio, I would get phone calls.

12           Q    Now, did you report these calls to any

13   superior officer?

14           A    No, I didn't, but there was a lieutenant

15   standing there one night when I was in the arsenal working.

16           Q    What lieutenant is that?

17           A    That would be Lieutenant Reilly.

18           Q    And what occurred, if anything, with

19   Lieutenant Reilly and the calls?

20           A    He came to draw his keys to go into the back

21   from the arsenal, and while I was standing at the window and

22   I was pulling his keys from the board, he heard the phones

23   ringing, and I wasn't answering them, and he asked me why I

24   wasn't answering the phones and I said, because they're just

25   hangup calls, because that night from the time I got in the

1    arsenal, until practically he came to the door, that's what I

2    was receiving.  It was either a hangup or someone would growl

3    into the phone or make a comment and then hang up.  And so I

4    didn't answer, I didn't answer the phone, when it was going

5    from one to the other to the other.  And he asked me how long

6    it had been going on, and I said, since I came, since I came

7    to Sullivan, and he -- he did something about it.

8             Q    What did he do, if anything?

9             A    He went to the chart office, and he got a

10   tracer phone, and the chart sergeant brought the tracer phone

11   into the arsenal but they couldn't get it to work.

12            Q    Who's the chart sergeant?

13            A    That was Sergeant Hoefling.

14            Q    Do you recall whether you received any other

15   calls on this phone system at Sullivan that were not about

16   your work that you were supposed to do?

17            A    Well, I know if -- if I happened to check my

18   radio, before I stopped checking it, an officer I was working

19   with would get calls saying they were sorry that they had to

20   put up with me for the day.

21            Q    When did that occur?

22            A    I know specifically that occurred -- well, I

23   know the post I was on, I did make a report about that when I

24   filled out my report.

25            Q    When did you fill out your report?

1          A     That would have been after Lieutenant Reilly

2     heard the calls.

3          Q     Now did you have any other problems while

4     working at Sullivan?

5          A     I found a picture in my lunch that said

6     Mrs. Butterfield with pockmarks all over the face.

7          Q     What was the significance of that to you?

8          A     Officer Butterfield was an officer that people

9     didn't associate with, and he had something wrong with his

10    skin, and I didn't have a problem with him.

11         Q     Did you have any other problems while working

12    at Sullivan?

13         A     Well, I did have a problem with -- when I lent

14    money, but I don't know if --

15         Q     I'm not going to ask about that.

16         A     Okay.

17         Q     Did you have any problems with any signs at

18    Sullivan?

19         A     Oh, yes, I did.

20         Q     Would you, what -- can you give us a date

21    approximately when this was.

22         A     Yes, that would have been in June of 2004.

23         Q     And what problem did you experience?

24         A     I was working in the chart office, and

25    Sergeant Hoefling was the chart sergeant, and he had his desk

1    over here and my desk was over here and there was a large

2    window that the lineup room was outside the window, and there

3    was no glass or anything, it was just a very open window and

4    an officer came in and he punched out, he was an early out

5    officer, and he got to the front entry, and he called up

6    Sergeant Hoefling and he told Sergeant Hoefling he needed to

7    go take the signs down that were outside the chart office.

8    And Sergeant Hoefling got up and he went around and he saw

9    the signs and he got very angry and he called me to look at

10   the signs.

11           Q     And did you go look at the signs?

12           A     Yes.

13           Q     What did the signs say?

14           A     It said "Johnny's Love Shack" and

15   "Honeymooners."

16           Q     Penny, I'm going to show you what has been

17   previously marked as Plaintiff's Exhibit 20 and 21.  Would

18   you look at those, please, and identify it for me if you can.

19           A     Those were the signs that -- these are copies

20   of the signs that were hanging outside the chart office.

21               MS. CONNOR:  Okay.  At this time, your Honor,

22   I'd like to offer Plaintiff's 20 and 21.

23               THE CLERK:  They're --

24               MS. SHEEHAN:  They're stipulated.

25               MS. CONNOR:  They've already been stipulated.

1          THE COURT:  Okay, they're in evidence.

2          Q    Now, after you saw the signs, what, if

3     anything, did you do?

4          A    Sergeant Hoefling took them to the

5     superintendent.

6          Q    And who was the superintendent at that time?

7          A    Superintendent Walsh.

8          Q    And did you ever speak to Superintendent Walsh

9     concerning these?

10         A    Yes.

11         Q    And when did you do that?

12         A    I, I did that, I believe it was a day or two

13    after the signs, because the lieutenant, Lieutenant Reilly

14    when he, when he stood at the arsenal window and he heard the

15    calls, he told me that I had to write a report about that.

16    And so I wrote a report, and I gave it to Lieutenant Reilly.

17    And he had turned it in to the captain who I believe took it

18    to the superintendent.  But this came so close to that, that

19    I had already -- I had already been called to the

20    superintendent's office for the other thing when these things

21    were there as well.

22         Q    Okay.  And when did you speak to the

23    superintendent?

24         A    It would have been a day or two after these

25    signs were posted.

1          Q     And who was present for that conversation?

2          A     That would have been just myself and the

3    superintendent.

4          Q     What took place in the conversation?

5          A     I told him about the things that were

6    happening at Sullivan, and the harassment that I had gotten

7    there from day one.  I told him that the harassment came

8    outside the facility into my home, calls were made to my home

9    accusing me of sleeping with people at Sullivan, to my

10   husband received a call, my sister, I told them it was a

11   constant barrage of harassment from the day that I got there.

12   And we discussed some of the issues that were going on at

13   Sullivan and he told me he knew that these issues existed but

14   that no one was willing to make a report on them, so nothing

15   was going to happen.  They were not going to change.

16         Q     Now did you ever put your complaint about

17   these issues at Sullivan in writing to the superintendent?

18         A     Yes.

19               THE COURT:  Counsel, for planning purposes,

20   you have about 15 minutes to go, okay.

21               MS. CONNOR:  Thank you.

22               THE COURT:  Just so you gauge it.

23               MS. CONNOR:  Thank you.

24         Q     Penny, I'm going to show you a document that's

25   previously marked as Plaintiff's Exhibit 60 -- oops, sorry,

1    if you can look at that, identify it for me if you can.

2            A    This was a memorandum that I wrote to

3    Superintendent Walsh about harassment in the workplace.  He

4    requested that I write this.

5                    MS. SHEEHAN:  Your Honor.

6                    THE COURT:  An exhibit number?

7                    MS. CONNOR:  60.

8                    MS. SHEEHAN:  She's identified it.  I'd ask

9    that we stop there until we get it admitted if she's going to

10   state what's in the memo.

11                   THE COURT:  Do you have objections to the

12   content?

13                   MS. SHEEHAN:  Yes, it's hearsay, it's a

14   personal statement.  It's her personal statement.  If she

15   wants to use it to refresh --

16                   THE COURT:  Refresh, I understand.

17                   MS. SHEEHAN:  -- that's different.

18                   MS. CONNOR:  I don't understand the nature of

19   the objection, your Honor, I'm sorry.

20                   THE COURT:  At this point she's objecting to

21   the report as hearsay, the witness is on the stand.

22                   MS. CONNOR:  But your Honor, one of the

23   elements of a retaliation case is that the plaintiff --

24                   THE COURT:  Counsel, counsel, all right,

25   there's an objection, all right.  We're not going to offer

1   this until you can be heard outside the presence of this

2   jury.

3                MS. CONNOR:  All right.  Thank you.

4                THE COURT:  Go ahead, with your question.

5        Q    Now after you -- how did, did you -- how did

6   you get this document to the superintendent?

7        A    I hand carried this.

8        Q    And after that, did you have any additional

9   problems at Sullivan?

10       A    Yes.

11       Q    And what was the next problem that you had?

12       A    The next thing was my hostage photo was

13  defaced in the control room.

14       Q    What's a hostage photo?

15       A    I'm sorry, it's a photo they take in case

16  something happens and you're in the back of the facility,

17  they know when a response team goes in, they know what face

18  to look for.  All officers have hostage photos.

19       Q    And when you say it was defaced, what did it

20  look like?

21       A    Someone had drawn glasses on it, which I

22  generally only wear these for reading, and it -- they made me

23  really curly hair, they gave me a weird -- basically my

24  hostage photo was unrecognizable.

25       Q    Were there any other photos defaced?

1          A     No.

2          Q     Now, after you discovered your photo defaced,

3     what, if anything, did you do about that?

4          A     I told Lieutenant Reilly.

5          Q     And how did you go about doing that?

6          A     I went up to the chart office because he works

7     in the chart office when he's the watch commander, and I

8     showed him the photo, and I was very, very upset.

9          Q     And would you describe your demeanor, please.

10         A     I was crying.

11         Q     Anything else?

12         A     I -- I was totally stressed out.  I was

13     just -- I could not stop crying.  I told him I had had it, I

14     had had enough.

15         Q     And what else took place in that conversation

16     with Lieutenant Reilly?

17         A     Lieutenant Reilly asked me if I would like to

18     use some of my personal time because we had extras in the

19     facility that night.

20         Q     And did you do that?

21         A     I did, and there were days open in the book.

22     We had a book that when there were a lot of extra officers,

23     they put those time slots in the book and any officer who had

24     vacation time or sick time or personal time could sign up and

25     use those days.  They -- sometimes they were

1    spur-of-the-moment signups if it was available and I was on

2    my way to Auburn, and I was able to sign up for every day

3    except for one, the last day was, all the time slots were

4    already used up.  So I got vacation time.

5            Q    I'm going to show you what has been marked,

6    this is the third page of Plaintiff's Exhibit 61, only

7    page 3.  And if you would look at that and identify it for

8    me, if you can.

9            A    That is my hostage photo that was posted for a

10   transfer, when I got transferred in control room, that was

11   defaced.

12           MS. CONNOR:  At this time, your Honor, I'd

13   like to offer the third page of Plaintiff's 61.

14           THE COURT:  Counsel, any objection?

15           MS. SHEEHAN:  No, your Honor.

16           MR. ANDREWS:  No, your Honor.

17           THE COURT:  The third page of Exhibit 1 is

18   received.

19           MS. CONNOR:  61, your Honor.

20           THE COURT:  Didn't I say 61?  61 is received,

21   page 3, okay.  Go ahead.  Maybe I mumbled.

22           Q    Did you put anything in writing to Lieutenant

23   Reilly?

24           A    Yes.

25           Q    And what did you put in writing to him?

1          A     I put in writing what happened to my photo.

2          Q     Going to show you pages 1 and 2 of Plaintiff's

3    Exhibit 61.  I'd ask you to identify that for me, please.  If

4    you can.

5          A     This is the to-from that I wrote to Lieutenant

6    Reilly about ongoing harassment in the workplace.

7          Q     Now, you say to-from.  What is that?

8          A     This is a memorandum that you write to a

9    supervisor, it's a personal correspondence between an officer

10   and supervisor.

11         Q     And did you -- how did you give this to

12   Lieutenant Reilly?

13         A     I handed this to Lieutenant Reilly because I

14   didn't like to leave things for anyone anymore because I'd

15   been informed that eight weeks of my time cards were missing,

16   that I had put in a locked -- a locked box, time keeping had

17   called me and told me that I need to redo eight weeks of my

18   time cards.

19         Q     And is this the document you gave to

20   Lieutenant Reilly?

21         A     Yes.

22         MS. CONNOR:  At this time, your Honor, I'd

23   like to offer pages 1 and 2 of Plaintiff's 61.

24         MS. SHEEHAN:  I object, your Honor, she's

25   bolstering testimony, she just testified to everything, and

1    we have the picture in the evidence.

2                    THE COURT:  Okay.

3                    MS. CONNOR:  Your Honor, this is a complaint.

4                    THE COURT:  Again, I'm going to reserve and

5    we'll talk about it outside the presence of the jury.  Go

6    ahead.

7            Q    Now, Penny, you just testified that you had

8    time cards missing?

9            A    Yes.

10           Q    When did that take place?

11           A    That would have been just about this time in

12   late May or June of 2004.

13           Q    And describe for us what occurred with respect

14   to the time cards.

15           A    Well, when you finish a time card for a

16   two-week period, you place it in a locked box outside the

17   chart office window, and not that many people have the key to

18   the box and the time cards are supposed to go to the box, to

19   time keeping, and I received a call from time keeping,

20   telling me that eight weeks of my time cards were missing.

21           Q    And when did that take place?

22           A    That would have been late May or June of 2004.

23           Q    And what, if anything, did you do about that?

24           A    I redid my time cards.

25           Q    Had that ever happened to you before?

1          A    No.  Lieutenant -- I remembered something,

2    Lieutenant Reilly --

3               MS. SHEEHAN:  Your Honor --

4          Q    There's no question.

5          A    Sorry, this was from the last question.

6               THE COURT:  All right.

7          Q    Was it responsive to, did that ever happen to

8    you before?

9          A    No.

10              THE COURT:  Counsel, okay.  The objection is

11   sustained.  Don't offer testimony unless there's a question

12   pending, okay?

13              THE WITNESS:  Okay.

14              THE COURT:  Thank you.  Go ahead, Counsel.

15         Q    Now, did you ever speak to anyone from the

16   office of diversity management concerning any of the problems

17   that you testified about at Sullivan?

18         A    Yes.

19         Q    And when did that take place?

20         A    That would have been in July of 2004.

21         Q    And who did you speak to?

22         A    Mel Brown, an investigator.

23         Q    And did you -- what took place in that

24   conversation?

25         A    I detailed the incidents of harassment that --

1    that occurred at Sullivan, and I gave him the dates so that

2    the phones could be checked.

3            Q    And what else took place with Mel Brown, if

4    anything?

5            A    That's it, he did my investigation.

6            Q    And what happened next with respect to your

7    reports to Mr. Brown?

8            A    I received a letter in October.

9            Q    Who was that from?

10           A    That was from Charlie Harvey from the office

11   of diversity management.

12           Q    And what was the contents of the letter?

13           A    It said they had done an investigation at

14   Sullivan and my claims were substantiated and that they had

15   taken corrective action.

16           Q    I'm going to show you what's been marked as

17   Plaintiff's Exhibit 62.  Would you look at that and identify

18   it for me if you can.

19           A    That's the letter that I received from the

20   director of the office of diversity management saying that my

21   allegations of harassment were substantiated.

22           Q    And does it say the nature of the action, what

23   does it say concerning the action?

24           A    Says appropriate administrative action will be

25   taken to advise employees at Sullivan Correctional Facility

1   of the department's policy regarding discrimination in the

2   workplace and the consequences of such actions.

3           Q    Now, you worked at Sullivan after you received

4   this letter?

5           A    No.

6           Q    Were you ever made aware of the corrective

7   action that was taken?

8           A    No.

9           Q    Did you ever see any memorandum or any other

10  corrective action that would have been taken at Sullivan with

11  response to your complaint?

12          A    No.

13          Q    Now, I note that the letter is dated

14  October 12th, 2004?

15          A    Yes.

16          Q    And when did you speak to Mr. Brown?

17          A    I spoke to him in July.

18          Q    Were you ever told why it took three months to

19  receive the response from Mr. Harvey?

20          A    No.

21          MS. CONNOR:  At this time, your Honor, I'd

22  like to offer Plaintiff's 62.

23          MS. SHEEHAN:  No objections, your Honor.

24          MR. ANDREWS:  No objections.

25          THE COURT:  Received.

1          MS. CONNOR:  Your Honor, I'm looking at the

2     clock, and our timing, and I think this might be a spot

3     where, with your permission, we would stop.

4          THE COURT:  Okay.  We'll do that.  Ladies and

5     gentlemen, off to a fair start, we got a few things done

6     today, so it's 4:27, I'm going to let you head home, we'll

7     see you tomorrow morning at 9:00.  Please do not discuss

8     anything about the case with anybody, don't let anybody talk

9     to you about it.  I will be very surprised if there was

10    anything in the media but on the very rare chance that there

11    is, please don't listen, read anything.  If there's anything

12    on the radio or television, switch the station, anything in

13    the paper, you can put it aside and read it when this is all

14    over with.  I don't think I saw any reporters in here today,

15    but just in case, okay.

16         So we'll see you at 9:00.  Lori, is there

17    going to be -- they usually provide you with some breakfast

18    goodies in there, so if you don't have time to grab

19    breakfast, there will be stuff here for you, or in addition

20    to your breakfast, whatever you want to do.  If you want to

21    get here a little early, that's always available.  I'm going

22    to try to get started at 9:00.  Okay.  Thank you, have a good

23    night.

24         (Jury Excused, 4:29 p.m.)

25         THE COURT:  Ms. Collins, you can step down.

1    You can step down.

2                    THE WITNESS:  Oh, thank you.

3                    (Whereupon the witness was excused.)

4                    THE COURT:  Okay.  We're outside the presence

5    of the jury, still in session.  Counsel, can you estimate for

6    us how much longer with the plaintiff on the stand?  Just --

7    are you halfway done, are you a third of the way done?

8    Three-quarters of the way done?

9                    MS. CONNOR:  I am looking at this, your Honor.

10   I am a little more than a third done.

11                   THE COURT:  Little more than a third, okay.

12   So we've got at least the morning tomorrow.

13                   MS. CONNOR:  Definitely, at this pace, yes,

14   your Honor.

15                   THE COURT:  Okay.  All right.  Well, I'm all

16   for picking up the pace.  We have two exhibits that have been

17   offered where objections have been made to, first of all,

18   Plaintiff's Exhibit 60, memo written by this plaintiff to the

19   superintendent at Sullivan Correctional Facility which was

20   hand carried, we'll address that one first.

21                   And Counsel, so you know, I don't want to get

22   into lengthy legal arguments before this jury, I don't think

23   that's appropriate.  So if there's an objection, if it isn't

24   something minor that we can deal with immediately, we'll do

25   it outside their presence.  If it's something that's critical

1   to your examination and you need it right that moment, then

2   you can let me know that and I'll excuse them and we'll

3   handle it, but otherwise I don't -- I don't think extensive

4   legal argument in front of the jury is appropriate, so that's

5   why I cut you off at those points and this is the way we'll

6   handle them.  So Ms. Sheehan, your objection to Exhibit 60?

7               MS. SHEEHAN:  Hearsay.  Bolstering testimony,

8   it's --

9               THE COURT:  It's a document that she's written

10   that she's testifying about.

11               MS. SHEEHAN:  Allegedly.

12               THE COURT:  Well, allegedly, she's testified

13   that she did, okay.  She's able to be cross-examined, but

14   Ms. Connor, you want to respond to that objection?

15               MS. CONNOR:  I find this a very puzzling

16   objection, your Honor.  If I understand the defense, this is

17   the document that triggered an investigation that they're

18   going to use as a defense on these allegations, so they

19   don't -- it's like this is a retaliation case, in part, and

20   this is her report to the superintendent of what occurred to

21   her.  It's an essential element of my case.  In that sense,

22   it's her complaint, as you know --

23               THE COURT:  I guess the nature of the

24   objection, though, is she's on the stand, she's testified

25   about it, she can tell the jury all about that complaint, the

1   complaints that are in there, and it's, you know, bolstering.

2   Why do you need the report when she's able to testify about

3   it?

4                MS. CONNOR:  Because one of the -- one of the

5   elements of retaliation claim is that the plaintiff filed a

6   complaint.  So this is the complaint that the -- that she

7   filed.  That's -- she participated in the process, this is

8   their process, you file a complaint, you get an

9   investigation.  So this is -- she's following the rules,

10   she's doing what she's told to do.  And this is what she did.

11   So I find this actually quite puzzling.

12                 THE COURT:  And once again, she's testified to

13   the fact that she did it.  All right.  Is there a hearsay

14   exception that you want to offer that would give me a basis

15   to admit this?  Is there anything on the document indicating

16   that it was received by someone at DOCS?

17                 MS. CONNOR:  Not in this document, your Honor.

18                 THE COURT:  Anything in testimony which would

19   indicate that it was received by somebody other than, your

20   client says she hand delivered it to superintendent at

21   Sullivan, correct?

22                 MS. CONNOR:  She did testify to that, yes.

23                 THE COURT:  All right, okay.  So what I'm

24   looking for is something that would authenticate it as some

25   sort of business document to meet that exception.

1    MS. CONNOR:  Your Honor, no, there is nothing

2  on this document that would authenticate it as a business

3  document from the Department of Corrections because we don't

4  have a copy of the Department of Corrections document.

5    THE COURT:  And the superintendent at Sullivan

6  was who?

7    MS. CONNOR:  Walsh.

8    THE COURT:  And he's not going to be a witness

9  here.

10    MS. CONNOR:  No, not to my knowledge, your

11  Honor.

12    MS. SHEEHAN:  Not unless things turn south.

13  We were not intending to call him.  Your Honor, you know,

14  there's not going to be a dispute that, you know, unless I

15  impeach her that she didn't file a complaint, I don't see

16  that it should be admitted.  It should not be admitted.

17    THE COURT:  Well, there certainly is an

18  argument that it's bolstering but the nature of the claim is

19  that she needs to have filed some sort of complaint with her

20  supervisors, and she's testified to that and I agree, it's in

21  the record but the question is, was she instructed to do it,

22  was it part of the process, is it a business document that

23  could be an exception to a hearsay rule.  You know, the only

24  real legitimate objection is bolstering because she's

25  testified to it.

1          MS. SHEEHAN:  I don't see where this is a

2     business document.  If you look at -- on that note, if you

3     look at 61, as much as I want to make the bolstering

4     argument, this is a memorandum, a to-from that is a DOCS

5     document.

6          THE COURT:  Okay, well, we're talking about 60

7     right now.

8          MS. SHEEHAN:  I understand.  There's

9     nothing -- if she does have a copy of one, of Exhibit 60 with

10    a DOCS stamp, I would state that she didn't receive it, she

11    would have received it in discovery so I think there's, you

12    know, question as to whether this was really submitted to

13    Walsh.  I don't intend to put on testimony that she didn't

14    file a complaint and go through the proper procedures

15    regarding the complaint she's discussing here.

16         THE COURT:  Ms. Connor.

17         MS. CONNOR:  Your Honor, the document says in

18    the first paragraph, "As requested in our meeting on 15

19    June 2004, I'm providing you with the dates, times, et cetera

20    of these telephone calls."

21         THE COURT:  Which she's testified to, again.

22         MS. CONNOR:  Yes.  But that, counsel said, or

23    I can't remember now whether you said it, your Honor, but

24    that she was requested to do it.  The document embodies the

25    request.

1          THE COURT:  That doesn't address the

2     objection.  I'm going to reserve on that for now.  And we'll

3     see how things develop as to, you know, the testimony is in

4     the record, and I think the objection that's been made is,

5     you know, now you're just bolstering her testimony by

6     offering that.  If there's some legitimate hearsay objection,

7     business record to overcome that bolstering objection, I'll

8     certainly entertain it.  I understand why you want it in but

9     I'm looking for some authentication of the fact that it was

10    actually delivered and made part of the DOCS record that she

11    actually complained about these things beyond her testimony

12    before I want to just let that document in.  Okay.

13          Now, let's go on to 61, pages 1 and 2, which

14    was described as a to-from or a memo to Lieutenant Reilly

15    about harassment that she had been receiving at Sullivan

16    Correctional Facility, which she has again testified at great

17    length about, and the nature of your objection, Ms. Sheehan?

18          MS. SHEEHAN:  Bolstering, and bolstering.

19          THE COURT:  Okay.  Ms. Connor.

20          MS. CONNOR:  Well, your Honor, this is, this

21    document was written on letterhead from the Department of

22    Corrections.  It contains -- obviously it's the same thing as

23    before, only it's written on letterhead, it contains her

24    report of what the photo looked like, a copy of the photo.

25          THE COURT:  Isn't that on the third page that

1    we've already admitted?

2                    MS. CONNOR:  Yes, yes, it is, that's why I

3    offered that separately.

4                    THE COURT:  Okay.  But it's on page 2 as well,

5    same thing.

6                    MS. CONNOR:  Yes, your Honor, here's page 2

7    right here.

8                    THE COURT:  Same thing.

9                    MS. CONNOR:  Just a smaller version.

10                    THE COURT:  Version, all right.

11                    MS. CONNOR:  And she's reporting the

12    time-keeping problems that, I can, if your Honor's not going

13    to allow these in, I would have to then elicit more testimony

14    with respect to some of the contents of these things, which I

15    would do tomorrow.

16                    THE COURT:  Which I would certainly allow you

17    to do, she can testify about all this, it doesn't -- this one

18    may overcome the bolstering objection because the corrections

19    letterhead, the date, and there's testimony, are you

20    disputing in any way that this was not prepared at the

21    request of Lieutenant Reilly?

22                    MS. SHEEHAN:  I'm not going to dispute that

23    it's not letterhead of corrections --

24                    THE COURT:  That's not my question.  Are you

25    disputing that this was not prepared, are you disputing that

1   it was prepared, excuse me, at the request of Lieutenant

2   Reilly; is there any dispute as to that?

3                   MS. SHEEHAN:  That I can't answer right now.

4                   THE COURT:  Is it part of the Department of

5   Corrections record that it was delivered to Lieutenant

6   Reilly?

7                   MS. SHEEHAN:  I can't answer that today.

8                   THE COURT:  Well, let's find out the answers

9   to those questions.  I'm going to just bet that they are,

10  that three-page document was submitted to them and there's

11  some record that he received it.

12                  MS. SHEEHAN:  I can find out tonight.

13                  THE COURT:  Let's find out.  I don't really

14  understand the nature of the objection to this one.  I

15  understand the bolstering claim, she's testified to it, but

16  this appears to be easily authenticated as a Department of

17  Corrections record.  And if that's the case, it's coming in.

18                  MS. SHEEHAN:  Okay.

19                  THE COURT:  Same thing with the other one, if

20  you can establish that she actually delivered it beyond her

21  testimony, some sort of authentication, it then becomes a

22  record of the Department of Corrections, okay.

23                  MS. CONNOR:  Okay.

24                  THE COURT:  All right.  Anything else, before

25  we leave?

1           MS. SHEEHAN:  No, your Honor.

2           THE COURT:  You have a good night.

3           MS. CONNOR:  I'm all set, thank you.

4           THE COURT:  Have a good night.  Please

5   continue to work on these redactions so that we don't have to

6   wait on testimony.  I think I'd like to see that resolved

7   tomorrow morning so we could just fly through this stuff.

8   Okay?

9           MS. CONNOR:  Yes, your Honor, thank you.

10          THE COURT:  Thank you very much, we'll see you

11  in the morning.

12          THE CLERK:  Court's in recess.

13          THE COURT:  Mr. Andrews, you all set?

14          MR. ANDREWS:  I'm all set, your Honor.

15          THE COURT:  You're being quiet, okay.

16          MR. ANDREWS:  I'm being quiet still.

17          THE COURT:  Have a good night.

18          (Court Adjourned, 4:41 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4            I, JODI L. HIBBARD, RPR, CRR, CSR,

5    Official Court Reporter in and for the United States

6    District Court, Northern District of New York, DO

7    HEREBY CERTIFY that I attended the foregoing

8    proceedings, took stenographic notes of the same,

9    and that the foregoing is a true and correct

10   transcript thereof.

11

12

13

14

15

16

17

18                          _____

19                          JODI L. HIBBARD, RPR, CRR, CSR
                            Official U.S. Court Reporter
20

21

22

23

24

25