VOLUME II

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
PENNY T. COLLINS,

                        Plaintiff,

vs.                                5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                        Defendants.


-------------------------------------------x

       Transcript of a Jury Trial held on March 13,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                 A P P E A R A N C E S

For Plaintiff:        MAIREAD E. CONNOR, ESQ.
                      Attorney at Law
                      440 South Warren Street
                      Suite 703
                      Syracuse, New York  13202

For Defendant:        SATTER, ANDREWS LAW FIRM
(Mitchell)            Attorneys at Law
                      217 South Salina Street, 6th Floor
                      Syracuse, New York  13202
                        BY:  ROSS P. ANDREWS, ESQ.

For Defendants:       STATE OF NEW YORK
(All Remaining)       Office of Attorney General
                      The Capitol
                      Albany, New York  12224
                        BY:  CATHY Y. SHEEHAN, AAG
                             ROGER KINSEY, AAG

I N D E X   O F   T E S T I M O N Y

| Witness | D | C | RD | RC | FRD | FRC |
|---------|-----|-----|-----|-----|------|------|
| Penny Collins | 253 | 406 | -- | -- | -- | -- |

1          (Open Court, Jury Out, 8:56 a.m.)

2          THE COURT:  Okay, good morning.  Everyone had

3     a good night, we ready to go?

4          MS. CONNOR:  Yes.

5          THE COURT:  Okay.  Let's get Ms. Collins back

6     up on the stand.  Okay.  If everybody's ready, I'm going to

7     bring the jury in, okay?  All right.  Very well, bring them

8     in, Bruce.

9          MS. CONNOR:  Your Honor, my client's asking

10    for her eyeglasses.

11         THE COURT:  All right.  She's got plenty of

12    time, bring them up to her.

13         (Jury Present, 9:00 a.m.)

14         THE COURT:  Okay.  Good morning.  Had a nice

15    night?  Little gray today, but it's supposed to clear up this

16    afternoon so by the time you're going home, hopefully you'll

17    be in sunshine.

18         We finished yesterday with Ms. Collins on the

19    stand, we're going to pick up where we left off yesterday.

20    Ms. Collins, I remind you you're still under oath, okay.

21    Ms. Connor, when you're ready.

22         MS. CONNOR:  Thank you.

23

24         P E N N Y   C O L L I N S , recalled as a

25    witness and being previously duly sworn, testifies

1    as follows:

2              MS. CONNOR:  Good morning.  I have to approach

3    the witness and give her her eyeglasses, so she can see.

4              CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

5         Q    Good morning, Penny.

6         A    Morning.

7         Q    I wanted to continue some questions concerning

8    matters in your complaint.  Now, when you worked at Sullivan,

9    were there jokes in the workplace that did not offend you?

10        A    Yes.

11        Q    Could you give us some examples of those?

12        A    Sometimes officers would send me all the way

13   down in the front saying that someone else needed to see me

14   or I needed to go relieve someone at this post and it was

15   just a joke, I would get there and I really wasn't meant to

16   be there at all.  They would -- I had an officer one day, I

17   was looking all over for my coat and he was wearing my coat

18   around.

19        Q    He was wearing your coat?  I didn't hear you

20   exactly.

21        A    Yes.  Because the sleeves were like halfway up

22   his arms, and it took me awhile to catch on.

23        Q    And why did you not take offense at these

24   types of actions?

25        A    These were jokes played on all officers.  I

1  mean the environment, there's a lot of free time in

2  corrections, and officers joke around a lot.

3          Q    And were you able to take a joke?

4          A    Yes.

5          Q    Now, you testified yesterday that you wrote to

6  Superintendent Walsh concerning some of the issues you had

7  with the environment at Sullivan.  Did you ask the

8  superintendent in that correspondence to take any action to

9  prevent any future problems for you?

10         A    I did.

11         Q    And what action did you ask him to take?

12         A    I asked him to initiate training there in the

13  facility.

14         Q    What type of training, if there was -- did you

15  identify the type of training?

16         A    I really -- I really can't recollect right

17  now.

18         Q    Did you tell him the purpose of the training?

19         A    Yes.

20         Q    What did you say in that regard?

21         A    I wanted training on officers' abuse of other

22  officers.

23         Q    Did you ever hear back from Superintendent

24  Walsh with respect to that request?

25         A    No.

1          Q     Now, did you ever report to any superior

2    officer that your time cards were missing?

3          A     Yes.

4          Q     And how did -- to whom did you report it?

5          A     I reported in a to-from to Lieutenant Reilly.

6          Q     Again, what's a to-from?

7          A     That's a memorandum, a personal correspondence

8    between an officer and a supervisor.

9          Q     And did you -- I'll withdraw that.

10               Did you ever speak to Lieutenant Reilly about

11   that issue?

12         A     Yes.

13         Q     And when did that conversation take place?

14         A     That would have been in June of 2004.

15         Q     And what did you say to Lieutenant Reilly and

16   what did he say to you in the conversation?

17         A     I know we talked about the abuses there at

18   Sullivan, and we did talk about the phone calls because

19   they're internal calls and the state could very easily find

20   out where the calls were coming from to that particular

21   phone.

22         Q     And what is the basis for that statement, that

23   the state could find out?

24         A     Well, if they were looking for the people who

25   were making the harassing calls, all they really had to do

1   was have the number the calls were made to, and they can find

2   out, and the estimate of time, and they could find out who --

3   where the calls were coming from.

4           Q    And did you ever convey that information to

5   Superintendent Walsh?

6           A    Yes, I did.

7           Q    How did you convey that to him?

8           A    In a memorandum.

9           Q    And that's while you still worked at Sullivan?

10          A    Yes.

11          Q    And did you ever hear back from the

12  superintendent about who made these calls or any efforts that

13  were undertaken by the superintendent?

14          A    No.

15          Q    Now, did there come a time, Penny, that you

16  worked at Auburn Correctional Facility?

17          A    Yes.

18          Q    And when did you start working at Auburn?

19          A    June of 2004.

20          Q    And how did it come about that you transferred

21  to Auburn?

22          A    My name came up as number one on the list when

23  an opening came up at Auburn.

24          Q    And was this a normal transfer process in the

25  Department of Corrections?

1          A     Yes.

2          Q     And when did you request Auburn?

3          A     I requested Auburn at the academy, and every,

4    every facility I had gone to, I had to fill out a form, a new

5    form and Auburn was always my number one.

6          Q     And why was Auburn your number one pick?

7          A     Because it was 15 minutes from my home.

8          Q     Now, when you arrived at Auburn, what was your

9    first job there?

10         A     I was a resource officer.

11         Q     And what did a resource officer do at Auburn?

12         A     Just basically the same thing as the other

13   facilities, you were -- your jobs were assigned by the chart

14   sergeant.

15         Q     What types of jobs did you have?

16         A     I worked the blocks, the chapel, industry,

17   school, roof post, wall towers, gate control, package room,

18   visiting room.

19         Q     And how long were you a resource officer at

20   Auburn?

21         A     For the entire 18 months I was there.

22         Q     Now, did you have any interactions with

23   defendant Mitchell when you arrived at Auburn?

24         A     Yes.

25         Q     When was that?

1          A     That was on day two, in the afternoon.

2          Q     And what -- describe the interaction, please.

3          A     I was orientating for two days with another

4     officer who came in, we were being shown around the facility,

5     and part of the orientation was downstairs in the front

6     reception area.  Lieutenant Mitchell was sitting on a table

7     down there and he said to me, females don't belong at Auburn.

8          Q     And was anyone else present for this

9     conversation?

10         A     Yes.

11         Q     Who was there?

12         A     Officer Howell who was orientating with me,

13    the orientation officer, and maybe four or five other

14    officers down there assigned to the front reception area.

15         Q     Did you respond to defendant Mitchell when he

16    said this?

17         A     I did.

18         Q     What did you say, if anything?

19         A     I said something like, well, I'm here now.

20         Q     And did you get a response in return from

21    defendant Mitchell?

22         A     Yes.

23         Q     And what was that?

24         A     He laughed at me.

25         Q     Now did you have any other problems in your

1    first few days at Auburn?

2            A    Yes.

3            Q    And what was the next problem you had?

4            A    Right after Lieutenant Mitchell, we were

5    downstairs and I went into the control room, there's a lower

6    control where employees and visitors are processed through,

7    and in the lower control, there's your hostage photo again

8    because you're transferring in, and across the top of my

9    transfer photo it said admin. transfer.

10           Q    And what did you understand that to mean?

11           A    It was not a good thing, someone came

12   somewhere on an admin. transfer, generally meant they were

13   having problems in the facility they came from, or they were

14   the problem in the facility they came from.  It came with a

15   huge stigma attached to it.

16           Q    And is admin. short for anything?

17           A    Administrative transfer.

18           Q    And were any other photos similarly defaced?

19           A    No.

20           Q    Defaced at all?

21           A    No.

22           Q    Now were you an administrative transfer from

23   Sullivan?

24           A    No.

25           Q    Now what, if anything, did you do about this

1  picture?

2          A     I told the officer in the control room that I

3  was not an administrative transfer.

4          Q     And who was that officer?

5          A     I don't recall his name.

6          Q     And what, if anything, happened with respect

7  to the picture?

8          A     I really don't know.

9          Q     Was your picture removed?

10          A     I don't know.

11          Q     Did you see anybody remove your picture?

12          A     No.

13          Q     Now, at the time, did you report this incident

14  to anyone at Auburn?

15          A     No.

16          Q     And why not?

17          A     Because this was my home facility and I just

18  wanted to be there in peace, I didn't want to start out on a

19  bad foot, I didn't want to start out day number two as a rat.

20          Q     Now, did you ever report this to anyone?

21          A     Yes.

22          Q     And who was that?

23          A     I reported it in several memos, or I'm sorry,

24  several letters that I had written over the course of time

25  that I was at Auburn.

1          Q    Did you ever speak to anybody in

2    administration about this issue when you worked at Auburn?

3          A    Just Dep. McAnany, the following -- the

4    following winter.

5          Q    Now who's Dep. McAnany?

6          A    He was the superintendent of administration.

7          Q    When you say dep, is that short for someone?

8          A    I'm sorry, that's deputy superintendent of

9    administration.

10         Q    And what did you tell Dep. McAnany about this?

11         A    Well, Dep. McAnany and I discussed all the

12   things that were happening at Auburn up until that point.

13         Q    Now did he say anything in response to you

14   when you told him about the picture being defaced?

15              MS. SHEEHAN:  Your Honor, hearsay.  Does this

16   happen at a point in time, they had a discussion the

17   following fall, was the first time she brought it to

18   someone's attention?

19              MS. CONNOR:  Your Honor, that doesn't relate

20   to the hearsay issue, that is something else.

21              THE COURT:  No, it doesn't, that is something

22   else.  No, I'm going to allow her to go ahead and answer, go

23   ahead.

24         Q    Penny, what happened next with respect to this

25   administrative transfer issue?

1          A     The latter part of the second day, I was

2     orientating in the outside yard post and there was an officer

3     in the post with me, the other officer who was orientating

4     was outside, speaking to some other officers, and the officer

5     in the post, Officer Wright, said to me, sometimes we hear

6     about people when they get here, and sometimes we hear about

7     people before they get here.

8          Q     And did you speak to Officer Wright concerning

9     what he meant by that statement?

10         A     I did because it was a little confusing to me

11    because when he first said that, I was very excited because I

12    was a good officer at Sullivan, I had no issues there, I

13    responded well to things that happened on the block, and I

14    thought that's what he was talking about, I didn't understand

15    the comment at first.

16         Q     And did Officer Wright explain the comment to

17    you?

18         A     He did.

19         Q     What did he say concerning that?

20         A     He told me that he knew I came on an

21    administrative transfer, and that I -- and that I was having

22    problems at Sullivan.

23         Q     Now, did you speak to anybody else at Auburn

24    concerning this administrative transfer?

25         A     Yes.

1          Q    And who was that?

2          A    I also spoke to, I believe it was -- yes, it

3     was Sergeant Collins on E block.

4          Q    Now, is this Sergeant Collins any relation to

5     you?

6          A    No.

7          Q    And what occurred in that conversation with

8     Sergeant Collins?

9          A    I had an inmate when I was working on E block

10    who sent a note down through another inmate that he needed --

11    he needed a plunger in his cell, and I took the plunger up to

12    his cell and when I got to his cell, he had a picture

13    sticking out of the bar that was a female from the neck down,

14    no head on it, just a clothed body, and he said, Ms. C, this

15    is an officer from Green Haven, I took care of her when I was

16    there, I know that you came on an administrative transfer,

17    and I can take care of you, too.

18         Q    And did you report this to anybody?

19         A    Yes.

20         Q    To whom did you report that?

21         A    I reported that to Sergeant Collins, and I

22    wrote a misbehavior report on the inmate.

23         Q    And when did that incident take place?

24         A    That happened probably within the first month

25    to two that I was there.

1          Q    Did you have any other conversations with

2    individuals at Auburn concerning the administrative transfer

3    issue?

4          A    Oh, all the time, that was a very common

5    thing.

6          Q    When you say common, can you describe more

7    what you mean by that?

8          A    Well, when an officer spoke to me, they would

9    tell me they know how I got there, they know why I got there,

10   I caused problems where I came from.  It was pretty much just

11   as routine as the comments that I heard at Auburn -- at

12   Sullivan.

13         Q    How, in terms of frequency, how frequent would

14   these comments be made?

15         A    I would say every day that I was in the

16   facility.  I'm sorry, in the beginning, in the first several

17   months.

18         Q    Okay.  For how many months, approximately?

19         A    Probably, at least the first four to five

20   months, and then after that, that rumor never died down all

21   the way, that followed me all the way out the door.

22              MS. CONNOR:  Your Honor, may I get some water

23   for a moment, please?

24              THE COURT:  Sure.

25              (Pause in Proceedings.)

1                  MS. CONNOR:  Thank you.

2          Q     Did you come to an understanding of how this

3    rumor started?

4          A     Yes, I did.

5          Q     And what was your understanding?

6          A     Right after I got there, I had spoken to a

7    sergeant, probably within the first two weeks, about the

8    rumors.

9          Q     What sergeant is that?

10         A     I'm not sure of his name.

11         Q     Go ahead.

12         A     And I spoke to the sergeant and he told me,

13   yes, there are rumors.

14                MS. SHEEHAN:  Your Honor, again, objection,

15   she can't identify who she was speaking to.

16                THE COURT:  I'm going to allow it, as far as,

17   you know, background, as to how she came to her

18   understanding, but Counsel, I'm going to caution you again, a

19   lot of her -- a large percentage of her testimony is hearsay,

20   and if you can direct it, and I think there are ways to get

21   at some of this information without going through the

22   hearsay, I'm going to overrule it for now, go ahead.

23         Q     Can you finish your answer?

24         A     The sergeant told me that a lot of rumors had

25   followed me there, that there were a lot of phone calls made,

1    and I spoke to Lieutenant Estabrook about it when he was

2    making a round in the yard.

3              Q    Who's Lieutenant Estabrook?

4              A    He's a lieutenant at Auburn.

5              Q    And did you write any memorandums concerning

6    your understanding of the source of these rumors?

7              A    Yes.

8              Q    And to whom did you write memorandum?

9              A    I wrote that to Captain Gummerson.

10             Q    And who's Captain Gummerson?

11             A    He was -- he was a supervisor, he was right

12   under the dep. of security.

13             Q    And did you have any -- what did you say in

14   that memorandum to Captain Gummerson?

15             A    Well, by the time I wrote the memorandum, the

16   person who I believed, Sergeant Connors had already -- who

17   brought the rumors had already come back to Auburn.

18             Q    Okay.  In terms of -- just I'm asking you what

19   did you put in the memorandum to Captain Gummerson.

20             A    I told Captain Gummerson about the rumors that

21   had followed me there, that I was told by officers who

22   brought the rumors there, and -- and that's all I can

23   remember about what I put in there.

24             Q    Now you mentioned in your testimony a Sergeant

25   Connors?

1          A    Yes.

2          Q    Who is he?

3          A    Sergeant Connors was an officer from Auburn

4    who got promoted and he made sergeant and he was at Sullivan

5    as I was transferring to Auburn, he transferred in to

6    Sullivan.

7          Q    And did you ever have any interactions with

8    Sergeant Connors concerning the issue of your transfer to

9    Sullivan -- sorry, withdrawn.

10         Did you ever have any interaction with

11   Sergeant Connors concerning the issue of your transfer to

12   Auburn from Sullivan?

13         A    Yes.

14         Q    And when did that interaction take place?

15         A    When Sergeant Connors, when I understood that

16   it was Sergeant Connors who brought the rumors, he had

17   transferred back to Auburn, and I was working the front hall

18   one evening and I ask him if I could speak to him.

19         Q    And what took place in that conversation?

20         A    I told Sergeant Connors that I had been

21   through enough already, and that I knew that he brought the

22   rumors there, and I wasn't going to put up with them anymore.

23         Q    Now, did you ever have any other interactions

24   with Sergeant Connors concerning the rumors?

25         A    No.

1          Q     Now, did you ever work in the special housing

2     unit, law library?

3          A     Yes.

4          Q     And did you have any problems working in that

5     area?

6          A     Yes.

7          Q     And what problem did you have?

8          A     Well, this was just a routine thing, I had an

9     inmate exposure.

10         Q     What do you mean by that?

11         A     When an inmate, you go to their cell and they

12    expose their private areas to you.

13         Q     And what took place concerning this exposure?

14         A     I wrote a misbehavior report, and that's all I

15    was really required to do.

16         Q     And did you have any interaction with

17    defendant Mitchell concerning this?

18         A     Yes.

19         Q     And when did this take place?

20         A     This took place, it would have -- I can't give

21    you the exact date.

22         Q     Please give me your best estimate.

23         A     Maybe six to seven months after I'd gotten

24    there -- I'm sorry, it would have been closer to three to

25    four months, because I was working the law library.

1          Q      Which would make it about what month,

2     approximately?

3          A      Sometime in September, October of 2004.

4          Q      And what took place with defendant Mitchell

5     concerning this issue?

6          A      Sergeant Mitchell was outside, he was sitting

7     in the same place, he was in the front reception area sitting

8     in the same place he was sitting the first day when he made

9     the comment to me.  And I was coming down the stairs and

10    through the sallyport, there's -- the sallyport is, there's

11    two gates, one opens, they close you in, another opens, they

12    let you out, and so I was in the sallyport area when

13    Lieutenant Mitchell made a comment about --

14         Q      What did he say?

15         A      He said, did you ever see anything that large

16    before?

17         Q      What was he referring to?

18         A      He was referring to the inmate's penis.

19         Q      And what took place next?

20         A      He asked me what I would do with something

21    that large.

22         Q      And anything else happen after that?

23         A      Not on that day.

24         Q      Did you respond to him?

25         A      No, no, I was in a locked sallyport with other

1  officers.

2         Q    Did any of the other officers say anything to

3  him?

4         A    I really don't know.

5         Q    Now, after this incident, did you have any

6  other problems in your employment at Auburn?

7         A    Yes.

8         Q    What's the next one that you recall?

9         A    That would have been in February of 2005.

10        Q    And what took place then?

11        A    I was working front reception, and the

12 officers there were telling me about a female that they

13 harassed so badly that she ran out of the facility crying,

14 and she never came back, she quit her job.  And I thought

15 they were saying that for my benefit, I didn't understand at

16 that time that it was a true story.

17        Q    And what officers were there?

18        A    Officer Bellnier was there, Sergeant Connors

19 was there.

20        Q    Who's Officer Bellnier?

21        A    Officer Bellnier was just an officer who

22 worked front reception.

23        Q    Do you recall any other officers?

24        A    No, I don't remember that day, there were

25 other officers there, I don't remember their names.

1          Q     Now, at around this time, did you have any

2     other problems with any physical touching at the facility?

3          A     Yes.

4          Q     And what was that?

5          A     That would have been in February of 2005.

6          Q     And what took place with this -- in this

7     incident?

8          A     I was walking up the -- the stairway from the

9     lower locker room where I have my locker, and it's a co-ed

10    locker room, and there was an officer behind me on the step,

11    and I felt something brush against my back side, and I walked

12    a couple steps farther, and I felt him squeeze between my

13    legs.

14         Q     Now do you know who this officer was?

15         A     No.

16         Q     And why don't you know who it was?

17         A     Because I didn't know most of the officers at

18    Auburn.

19         Q     Did you report this to anyone at the time?

20         A     Yes.

21         Q     And whom did you report it to?

22         A     Well, when I first came up the steps, I told a

23    female officer that something, something had just happened

24    and I needed to go, and I went around the corner and I sat

25    for a minute, and then on the way out, I let everyone go out

1  before me and -- because I didn't want anyone to see that I

2  was very upset, and on the way out, I stopped -- my EAP

3  coordinator was working in the lower control room.

4          Q    What is EAP?

5          A    I'm sorry, that's employee assistance program.

6  And I stopped at the lower control room, I came through the

7  sallyport as a single officer, and he opened up and he let me

8  in, and he saw that I was upset and I banged on the door.

9  And he opened the door, and he let me in and I told him what

10 had happened.

11         Q    And who's the name of the EAP coordinator?

12         A    That was Officer Brad Smith.

13         Q    Now, did you report this to anyone else?

14         A    Not at that time.

15         Q    At another time did you report it to anyone?

16         A    Yes.

17         Q    And who was that?

18         A    I reported it to the office of diversity

19 management.

20         Q    And when did you make that report?

21         A    That would have been in November.

22         Q    Of what year?

23         A    Of '05.

24         Q    Did you ever talk to Captain Rourke about this

25 incident?

1          A    Yes, I did.

2          Q    And when did you speak to him?

3          A    I'm not exactly sure of the date that I spoke

4    to Captain Rourke.

5          Q    Can you give me your best estimate?

6          A    Probably sometime in -- maybe later summer or

7    early summer, late spring, I really don't, because everything

8    was continuing, it was a continuous thing, the harassment at

9    Auburn was continuous and so I don't really know when I spoke

10   to and outlined to him what was going on.  He was just one

11   step for me.

12         Q    Okay.  Now, what's -- in terms of, what's

13   Captain Rourke's first name, do you know?

14         A    I don't know.

15         Q    And how did it come about that you spoke to

16   him about this issue?

17         A    I was trying to get help, there at Auburn.

18         Q    Who initiated the conversation?

19         A    I did.

20         Q    And where did the conversation take place?

21         A    In Captain Rourke's office.

22         Q    And what did you tell him in the office?

23         A    I told Captain Rourke everything that had been

24   happening to me from the time I got there until that point.

25         Q    And could you be more specific about, when you

1    say everything, would you describe what you actually -- the

2    best of your recollection what you said to him?

3         A    I told him about the rumors, the harassment of

4    females there, I told him that -- about what happened to me

5    on the step, I told him ... I really don't know, because so

6    many things happened.  I told him everything that I could

7    remember right then that had happened.

8         Q    And did you tell him the effect of this

9    conduct toward you in the conversation, how it affected you?

10        A    Yes.

11        Q    And what did you say in that respect?

12        A    I told him that I believed that I was a

13   security hazard at the facility because of the way officers

14   treated me, and that they treated me that way a lot in front

15   of inmates.

16        Q    And what do you mean a security hazard?

17        A    Inmates see everything, I mean, and they

18   notice everything.  When officers treat another officer

19   poorly, it's an opening for an inmate.  They see an officer

20   out on their own, especially a female, inmates will play

21   officers, try to take advantage, it was just -- if I had an

22   issue with another officer, I was afraid if the other officer

23   was not well respected by the inmates, I believe that the

24   inmates might jump in because I was respected by the inmates.

25   I didn't play inmate games, I didn't harass them, I was -- I

1    was there as a correction officer and I did my job.  And so I

2    did have inmate respect, and that was -- that was a fear that

3    I had, because the harassment was so bad, and inmates saw it

4    all the time.

5              Q    Did you explain this to Captain Rourke?

6              A    I did.

7              Q    And did he ask you for a description or any

8    information concerning the officer who grabbed you?

9              A    No.

10             Q    Did you give Captain Rourke any information

11   concerning this officer?

12             A    Yes.

13             Q    And what information did you give Captain

14   Rourke?

15             A    That he worked an off shift.

16             Q    What do you mean by that?

17             A    Our shift I believe was from 7:30 to 3:30 at

18   Auburn and this was an officer who came in, some of the

19   shifts, depending on the place that you work, are off-shift

20   jobs, you might start at 8 in the morning, you might start at

21   1 in the afternoon, you might start at 2, and he was an

22   off-shift officer because he was just coming into the

23   facility at that time.

24             Q    And why did you think that was significant to

25   tell Captain Rourke?

1          A     Because there are not that many off shifts at

2    Auburn.

3          Q     Now, after this, did you have any other

4    problems with your employment at Auburn?

5          A     This was February.  Yes.

6          Q     And to the best of your recollection, what's

7    the next problem that took place?

8          A     The next thing that happened would be I -- in

9    April 2005, I went into the chart sergeant's office.

10         Q     What occurred on that day?

11         A     I came into the facility and it started from

12   the time I hit the door, by the time I hit the lineup room,

13   I'd already been harassed four times.

14         Q     What occurred?

15         A     Officer Neuser spoke to me when I first came

16   in and he -- I believe he told me about, oh, I'm not sure

17   what he told me that day, because he had spoken to me several

18   times about things, but I remember Officer Carpenter was one

19   of the officers who spoke to me and there was an issue

20   because the dep. had asked me, I played on a softball team

21   and the dep., Dep. McAnany had asked me if I would put a

22   notice up for the Department of Correctional Services

23   Olympics that were coming up because he wanted to be on the

24   softball team and I played on the team with some of the

25   civilian ladies from Auburn.  So I put the notice up and I

1    didn't realize that we were boycotting the Olympics, I didn't

2    know that at all, because we didn't have a contract.  And so

3    it was a huge, huge issue that I was going to go to the

4    Olympics and that I was helping to start a team.  And it was

5    just -- it was just one more thing to be harassed about.  And

6    so I went to Sergeant Flynn's office after, after lineup.

7            Q    And what took place in Sergeant Flynn's

8    office?

9            A    I told Sergeant Flynn that I was sick and

10   tired of coming to work every day to be abused by Auburn

11   officers.

12           Q    And did you receive any response to that from

13   Sergeant Flynn?

14           A    Yes.

15           Q    What, if anything, did he say?

16           A    Well, I told Sergeant Flynn that I didn't know

17   what I was going to do, and he said, you're not gonna use

18   that baton, are you?

19           Q    What did you respond, if anything?

20           A    I didn't respond at the time.  Well, he -- he

21   sent me to -- I was a resource officer that day, an extra, so

22   I didn't respond.

23           Q    Now, did you have an incident at Auburn

24   concerning overtime?

25           A    Yes.

1        Q     And when did this incident take place?

2        A     That happened in June.

3        Q     Of?

4        A     Of 2005.

5        Q     And what took place with this incident?

6        A     I was working at the commissary, and I had

7    never worked that post before, and I did not realize that we

8    were late getting out because I -- I was working the

9    commissary with civilian commissary officers, I was the only

10   officer there, so we were late getting out and as I crossed

11   the front hall, Officer Guyzlak, who was the front hall

12   officer, told me that I needed to go and put in for my

13   overtime.

14       Q     And then what took place?

15       A     I said I didn't need any overtime and he said,

16   yes, you do, you know, it matters to all of us.  And so --

17       Q     So what did you do, if anything?

18       A     I went into the chart office to put in for

19   overtime.

20       Q     And what took place in the chart office?

21       A     Sergeant Wright screamed at me.

22       Q     Now who's Sergeant Wright?

23       A     Sergeant Wright was the chart sergeant.

24       Q     And when you say screamed at you, what did he

25   say?

1        A    Well, I went in and I said, Sergeant Wright,

2   I'm getting out of the commissary late, and he said -- ask me

3   if I called someone, and I said, no, and he said

4   (indicating), so?

5        Q    And then what happened?

6        A    So I -- I believe I started out the door, and

7   then I turned around and I said, Sergeant Wright, I'm putting

8   in for my overtime.

9        Q    Now why did you do that?

10       A    Because if I didn't, they would have harassed

11  me about that.

12       Q    Who's they?

13       A    The other officers.

14       Q    So then what took place?

15       A    So he, he screamed at me, and I ask him --

16  well, before that I ask him what the proper protocol was, who

17  I was supposed to call if I was going to be getting out late,

18  and he said, you call someone, and he screamed at me to get

19  out of the office.

20       Q    And what did you do after that?

21       A    When he was screaming at me, Lieutenant

22  Ouimette (phonetic) was sitting to his left -- I'm sorry, to

23  his right, it was me looking, it was on the left of him, and

24  I said, Lieutenant Ouimette, may I speak to you?

25       Q    Then what took place?

1          A     He said not now, and I left.

2          Q     And what took place then, next?

3          A     I clocked out, and I went downstairs and I
4    went out to my car.  My husband was there to pick me up that
5    night, and I told my husband I couldn't take it anymore, I
6    was done, and I took off my shirt, and I took it back into
7    the facility, and Lieutenant Ouimette was coming down the
8    steps, and I said, Lieutenant Ouimette, this shirt is not
9    worth my dignity and self-respect.  And I put it in the
10   trash, there at the bottom of the stairs.

11         Q     And what shirt are you speaking about?

12         A     It was my correction officer shirt.

13         Q     Now, what took place next with respect to this
14   incident?

15         A     Lieutenant Ouimette -- I turned and I walked
16   away, and then I came back into the facility because I had
17   left the brass on my -- on my uniform, and I went to make
18   sure that there was nothing in the trash but Lieutenant
19   Ouimette had taken the shirt, and he took it -- well, he took
20   it away, there was nothing left in the trash.

21         Q     Now when you took your shirt off, did you have
22   anything on underneath it?

23         A     Yes, I had a T-shirt.

24         Q     Okay.  And did you have any other incidents
25   with Sergeant Wright?

1        A    Yes.

2        Q    And when was that?

3        A    That would have been in December of '04.

4        Q    What took place in that incident?

5        A    I was -- I was assigned to outside hospital

6   here at the SUNY unit where the inmates have their own unit

7   at Upstate, and we had a female who was assigned -- or who

8   came from one of the facilities downstate, which we usually

9   don't get, and so they needed female coverage for her, so I

10  did a lot of work at the outside hospital on my shift.

11       Q    And what took place with Sergeant Wright

12  concerning that?

13       A    There was a female officer who had a bid at

14  Auburn, she had a bid job on A block, and the night before

15  that, I had been taken off -- or she had been taken off her

16  bid and placed at outside hospital.  And the officers were

17  very angry with me because this was a female -- or this was

18  an officer who had a bid job, and you're not allowed to

19  use -- or not allowed to take an officer off her bid and

20  replace her with a resource officer because that's

21  backfilling and so they were very angry with me, this officer

22  carpooled from Utica, and she couldn't carpool.  They wanted

23  to know what I had done to get out of going to the outside

24  hospital.

25       Q    So what took place next, with Sergeant Wright?

1          A     So the second night, I -- when she was taken

2    off her bid job again, she was very upset and the officers

3    were very upset with me again, so I said to her, I have no

4    problem going to outside hospital because I'm -- you know,

5    it's halfway between my -- I mean it didn't matter, I was the

6    same distance.  And so she said, let's go see, and we went to

7    Sergeant Wright to see if we could swap so that I could go to

8    outside hospital and she could go to her bid job.

9          Q     And what took place with Sergeant Wright?

10         A     He was very nasty first to her, and then he

11   was -- he screamed at me again.  I ask him if there was a

12   reason that I wasn't going, he wasn't sending me to outside

13   hospital, and he beat his arm, he had sergeant chevrons on

14   his arm and he beat his arm and he screamed, you see these?

15   You see these?  This means I don't have to explain anything

16   to you.  And at that time, I did not know who Sergeant Wright

17   was because he was not my chart sergeant, he was the chart

18   sergeant that came in the shift after me, and I usually,

19   usually don't have any dealings, and I didn't have my glasses

20   on, and I glanced at his nametag, and he grabbed his nametag

21   and he pulled it out from his shirt and he said, Wright, and

22   spell it right, because it had a W-r-i-g-h-t.

23         Q     And what did you understand that to mean?

24         A     That he also believed I had been writing

25   people up for more -- he believed all the rumors that came

1    with me from Sullivan.

2         Q    Now, did you ever report how Sergeant Wright

3    treated you in these incidents?

4         A    Yes.

5         Q    To whom did you report that?

6         A    I reported that to ... I'm trying to remember,

7    I know that I did report it.  I don't remember who I reported

8    it to.

9         Q    Was there a time that you did remember?

10        A    Yes.

11        Q    And when was that time?

12        A    I would have written to someone about that

13   incident.

14        Q    Is there a document that would refresh your

15   recollection?

16        A    Possibly.  I filed a grievance, I believe, or

17   no, I'm sorry, I filed a grievance about the next issue.  I

18   don't really remember at this time.

19        Q    Did you -- is there a document that would

20   refresh your recollection?

21        A    I wrote several letters to Superintendent

22   Burge while I was there, so if I had written a letter.

23             MS. CONNOR:  Your Honor, may I show this

24   document to the witness.

25             THE COURT:  Is it marked?

1          MS. CONNOR:  Yes, Plaintiff's 15.

2          THE COURT:  Go ahead.

3          Q    I'm going to show you what's been previously

4    marked as Plaintiff's Exhibit 15, if you would take a moment

5    and review that.

6          A    (Witness complies.)

7          MS. SHEEHAN:  Your Honor, while the witness is

8    reading that, may we have a quick side bar.

9          THE COURT:  Come on up.

10          (At Side Bar.)

11          MS. SHEEHAN:  Your Honor, if the purpose of

12    the -- of giving her this memo is to refresh her

13    recollection, this is not the right way of doing it.  You

14    have counsel selecting the document, she asked her if she

15    could identify a document that would refresh her

16    recollection, and she said no.

17          MS. CONNOR:  Well, then --

18          THE COURT:  She said she had written several

19    letters to the superintendent and said if there's a letter,

20    that would be it, would refresh my recollection.  That's what

21    I heard in the testimony.

22          MS. SHEEHAN:  Okay.

23          THE COURT:  Okay.

24          (Open Court.)

25          THE COURT:  Ladies and gentlemen of the jury,

1    any time we take a side bar, which won't be a lot, I hope,

2    but we'll see, feel free to stand up, stretch, take advantage

3    of that time to make sure that you stay comfortable, okay?

4    Go ahead.

5            Q    Penny, have you had a chance to review that

6    document?

7            A    Yes.

8            Q    Is your recollection refreshed?

9            A    Yes.

10           Q    Now, did you ever report Sergeant Wright's

11   conduct to anyone at the facility?

12           A    Yes.

13           Q    And who was that?

14           A    After the second incident, I reported it to

15   Superintendent Burge.

16           Q    And what form did that report take?

17           A    I wrote a memorandum to him.

18           Q    And what did you report in the memorandum?

19           A    I reported the abuse in December of 2004, and

20   what had happened in the chart office with the overtime, and

21   the screaming at me.

22           Q    Did you ever receive a response from

23   Superintendent Burge?

24           A    No.

25           Q    Now, did you ever meet with Superintendent

1    Burge concerning this incident?

2          A    Yes.

3          Q    When did you meet with him?

4          A    I met with him, after I put my shirt in the

5    trash, I had two days off and so I met with him when I came

6    back, so that would have been in June of 2005.

7          Q    Was anyone else present for that meeting?

8          A    Yes.

9          Q    Who was there?

10         A    My union representative.

11         Q    What union is that?

12         A    It's NYSCOPBA.

13         Q    And what type of union is that?

14         A    That's the New York State Correction Officer

15   Police Benevolent Association.

16         Q    And were you a member of NYSCOPBA?

17         A    Yes.

18         Q    And what took place in that meeting?

19         A    We talked about everything that had been going

20   on since I -- I got to Auburn.  I talked about the female

21   harassment there, I talked about the abuse by Sergeant

22   Wright, and we talked about me putting my shirt in the trash.

23         Q    What took place concerning -- in the

24   conversation about your shirt?

25         A    The superintendent gave me my shirt back and

1    he told me it probably wasn't the best way to handle the

2    situation, and I -- and I agreed.

3            Q    Did anything else happen with respect to this,

4    the incident with Sergeant Wright?

5            A    Yes.

6            Q    And what happened?

7            A    I filed a grievance.

8            Q    And what's a grievance?

9            A    A grievance, I filed it with my union about

10   the treatment, can file a grievance for a variety of reasons,

11   if you think you -- you were deserving of a bid that you

12   didn't get or, you know, just anything, you grieve an issue,

13   and it goes to hearing.

14           Q    And are there -- how is a grievance processed

15   to the best of your knowledge?

16           A    You write a grievance and there's a hearing on

17   it.

18           Q    Are there different steps that are taken?

19           A    Yes.

20           Q    And what's the first step to your knowledge?

21           A    That would be your step 1 hearing.

22           Q    Did you have a step 1 hearing with respect to

23   this grievance?

24           A    Yes.

25           Q    What was the result of that?

1          A    Well, my grievance was two part.  I wanted to

2     put the grievance about Sergeant Wright's treatment of me,

3     and Officer Bielowicz who was my union rep told me that we

4     needed to include the overtime, and he wrote the grievance

5     for me, and so it went to a step 1 hearing, but by the time

6     it got to the hearing, they had separated the grievance into

7     two parts.  My grievance no longer contained the abuse.

8          Q    When you say they had separated my grievance

9     into two parts, can you describe what you mean by that?

10          A    The union had taken my grievance and they had

11     made it one issue about overtime, and they completely left

12     out the abuse issue.

13          Q    And do you know why that was done like that?

14          A    Yes, because they considered the abuse issue a

15     matter for diversity management.

16          Q    So with respect then to the overtime --

17          A    Yes.

18          Q    -- what, if anything, took place as the

19     outcome of the grievance?

20          A    There was a hearing, and I -- I was present at

21     the hearing, I was with my -- another union representative at

22     that time, and there were probably eight people in the room

23     hearing the grievances from the facility that day.

24          Q    And what was the outcome?

25          A    I was very upset in the meeting that they had

1    separated my grievance because it was not about the overtime

2    at all, that I filed the grievance, and I talked to them

3    about why I filed the grievance and they said, what will it

4    take to make this go away?

5            Q    Who's they?

6            A    Someone from the union, and I said, that

7    offended me.  It was not about money, it was about the issues

8    at Auburn.  And I left.

9            Q    Did you ever receive the overtime?

10           A    No, never.  I stopped the -- I could have gone

11   to a step 2 because the overtime was denied at step 1, and

12   then you have a step 2 process.  And I --

13           Q    Did you pursue it to step 2?

14           A    No, I did not, because the overtime was not an

15   issue to me.

16           Q    Now, did you ever have any weapons training at

17   Auburn?

18           A    Yes.

19           Q    Is that something that's done on a regular

20   basis?

21           A    Yes, that's yearly qualifications.

22           Q    And did you ever have any problems at weapons

23   training?

24           A    Yes.

25           Q    Now I'm going to just specifically ask you

1    about certain problems.  Who was your weapons training

2    instructor?

3            A    For the oral part, that was Officer Charette,

4    and for the actual weapons training, that was Officer McFall.

5            Q    And how many officers were in this training

6    with you?

7            A    There were approximately 12.

8            Q    And how many males and how many females?

9            A    There were 11 males, and myself.

10           Q    Where did the training take place?

11           A    Took place in a training facility about

12   5 miles from Auburn, an outdoor facility.

13           Q    Now, were there -- did you have any problems

14   with what took place at the training facility?

15           A    Yes, I did.

16           Q    And what problems did you have with respect to

17   you?

18           A    When Officer McFall was going over the

19   nomenclature, he was going over the parts of the shotgun, he

20   was comparing the barrel of the shotgun to his penis, and he

21   was stroking it while he was -- was talking about, you know,

22   it was long and hard, he compared the projectiles to his

23   ejaculation.  He talked about his sex life with his wife, how

24   his wife likes, and he was stroking the weapon, how his wife

25   likes him, and ...

1          Q    Did he -- what word did he use for ejaculate?

2          A    His come.

3          Q    Were there -- did you have any other problems

4    with respect to Officer McFall at that training, concerning

5    females?

6          A    At the weapons training?

7          Q    Yes.

8          A    I don't recall right now at the weapons

9    training.

10         Q    Do you recall other problems?

11         A    Yes.

12         Q    Concerning females, is the question.

13         A    Well, no, just the conversations at the range,

14   he didn't feel that females shot was as -- did as well with

15   weapons as men did.  He was just very opinionated.

16         Q    Did you complain about what occurred at the

17   weapons training?

18         A    Yes.

19         Q    And to whom did you complain to?

20         A    To the office of diversity management.

21         Q    Did you speak to anybody there in particular?

22         A    Yes.

23         Q    Who was that?

24         A    I spoke to Mary Mayville.

25         Q    And when did you speak to her about that?

1          A     I spoke to her, would have been November.

2          Q     Now, did you have any other problems at Auburn

3    with defendant Mitchell?

4          A     Yes.

5          Q     What is the next problem that you can recall?

6          A     He took my wallet.

7          Q     When did this take place?

8          A     That would have been sometime in the summer of

9    2004.

10         Q     And what occurred with your wallet and

11   defendant Mitchell?

12         A     I was a resource officer and I was assigned to

13   run a company, Sergeant Mitchell was the supervisor who ran

14   the inmates from two blocks to chow, and so I was assigned to

15   work -- or to go upstairs on C block to run a company.  And

16   because I was a resource officer and I had no fixed place, I

17   had my coat with me, I had my lunchbox with me from one

18   assignment to the next.  So on C block, there's an officer's

19   desk, and then there's a seat, and there's, underneath the

20   stairwell, there's an area where officers keep their lunchbox

21   and things.  When I came into the block, I asked the officer

22   at the desk if I could keep my lunchbox underneath the

23   stairwell while I ran my company to chow and because I knew

24   which company I was running, and it's hard sometimes to get

25   the door, the door shut, they're very, very large and it

1    takes a lot of strength sometimes to shut them and I have to

2    use my legs to lift up and push them.  And I generally carry

3    my wallet in my back pocket and if inmates are running behind

4    me, I put my wallet in my front pocket but I could not put my

5    wallet in my front pocket because I needed my front legs to

6    shut the door.  So I took my wallet out of my pocket and I

7    put it in my lunchbox, and I went upstairs to run my company.

8           Q     What took place then, next?

9           A     I came back downstairs, I was assigned to

10   another block, I picked up my lunchbox and I moved to the

11   next block.

12          Q     And what -- would you describe your lunchbox

13   before we go any further.

14          A     It's probably about 14 inches and it has

15   two -- on one side is a mesh thing that you put your drinks

16   in, on the other side is a thing with a drawstring that --

17   and it's solid, there's no mesh there, and you can close it

18   up by drawing a string.

19          Q     And where was your wallet in the lunchbox?

20          A     I put it in the side pocket and drew the

21   string.

22          Q     What did your wallet look like?

23          A     It was a tri-fold wallet.

24          Q     Was it folded in the lunchbox?

25          A     Yes.

1        Q    So what took place next?

2        A    I got to my new block and Sergeant Mitchell

3   called, and he told me that an inmate had found my wallet in

4   the trash.

5        Q    Then what took place?

6        A    I told him, no, he did not, and he told me

7   that he did, and I called him a liar.

8        Q    Then what happened?

9        A    He brought my wallet to me on B block.

10       Q    What happened there?

11       A    He gave me my wallet, he told me that an

12   inmate found it in the trash, again, I told him he did not

13   and again, I called him a liar.

14       Q    What happened after that?

15       A    I wanted to write a to-from to the watch

16   commander saying that my wallet was out of my possession.

17       Q    And what happened?

18       A    The officers on B block told me that

19   Lieutenant Mitchell was not going to report it and that I

20   would get him in trouble if I reported it and he did not

21   because he was in possession of my ID card and my badge.

22       Q    Did you report it then?

23       A    No, I did not.

24       Q    Now, when you called defendant Mitchell a

25   liar, did he say anything or do anything in response?

1          A    No, he just -- he usually laughs whenever I

2     tried to say something to him, he laughs at me.

3          Q    Now, did -- what happened next with respect to

4     your wallet?

5          A    The next day, I was called to Lieutenant

6     Quinn's office.

7          Q    And who's Lieutenant Quinn?

8          A    He's just a lieutenant at the facility, I

9     believe he was doing disciplinary that day.

10         Q    What took place in the lieutenant's office?

11         A    Sergeant Mitchell was there, and lieutenant,

12    and we talked about the wallet incident.

13         Q    What was the conversation?

14         A    I admitted that I should not have left my

15    wallet there, and that Sergeant Mitchell had lied about it

16    and he had gone into my lunchbox and taken the wallet out,

17    and I believe my lunchbox -- I believed it to be in a secured

18    area because inmates were locked in and running chow to the

19    time -- at the time and there was an officer sitting right at

20    the desk right outside the area where my lunchbox was.

21         Q    Were you ever disciplined with respect to your

22    wallet?

23         A    No, Lieutenant Quinn just told me not to do

24    that again.

25         Q    Now, did you ever receive any sort of

1    diversity training while you worked at Auburn?

2              A    Yes.

3              Q    How did that come about?

4              A    There was an announcement at lineup, maybe

5    early January, February, maybe, of 2005, saying that anyone

6    who would like to be a cultural diversity trainer could write

7    a letter to -- or submit to the -- I believe it was to the

8    training lieutenant.

9              Q    And what is a cultural diversity trainer?

10             A    They go into the facilities and they train the

11   officers for their yearly training on issues of cultural

12   diversity.

13             Q    What is cultural diversity?

14             A    It's -- the training is on how you get along

15   with people who are different than you are.  It's, you know,

16   it's minorities, it's gender, it's just basically, you know,

17   learning to work together.

18             Q    Who does a cultural diversity trainer train?

19             A    They train officers.

20             Q    Did you want to be a cultural diversity

21   trainer?

22             A    Yes.

23             Q    Why?

24             A    Because I really thought I could make a

25   difference, because I saw what was going on in our facility,

1    I saw what went on in Sullivan when I was there and I

2    thought, this is a way that, that I could somehow get

3    contacts and not just train but at least have some open doors

4    to see how we can fix some of the problems.

5            Q    Did you attend the cultural diversity trainers

6    training?

7            A    Yes.

8            Q    When did you do that?

9            A    In September of 2005.

10           Q    Where did that training take place?

11           A    In Albany.

12           Q    Who conducted the training?

13           A    The office of diversity management.

14           Q    Was there a particular instructor or trainer

15   that you had there?

16           A    There were several, several instructors, four

17   or five, I believe.

18           Q    Did you receive any written material at that

19   training?

20           A    Yes.

21           Q    What material was that?

22           A    We received training in the prevention of

23   sexual harassment, we received workbooks, directives, how to

24   report, information on how to report incidents, a lot of

25   training materials on how to train.

1          Q    And with respect to sexual harassment, what is

2     the nature of the written material that you received?

3          A    I received a handbook.

4          Q    I'm going to show you what was marked as

5     Plaintiff's Exhibit 3 and ask that you look at it for a

6     moment and identify it for me if you can.

7          A    This is the handbook that I received with the

8     exception that the directives have been updated.

9          Q    What directive is updated, was updated,

10    rather?

11         A    That's sexual harassment in the workplace.

12         Q    What's the date of that?

13         A    This date is November 8th, 2006.

14         Q    What was the date on your directive?

15         A    I believe it was 2002.  The next directive is

16    nondiscrimination in employment based on sexual orientation.

17    This is dated 2007, and we did not have this in our handbook,

18    ours was a memorandum.

19         Q    Now with respect to the directive in there

20    dated November 8th, 2006, is the contents of that directive

21    the same as the contents in your handbook?

22              MS. SHEEHAN:  Your Honor, objection.  She's

23    reading from the document, it's not in evidence, and if you

24    could please identify directive number.

25              THE COURT:  Well, I think we can get there.  I

1    haven't heard her read from the document at this point, but

2    she's attempting to identify it.  The objection is overruled,

3    go ahead, Counsel.

4              Q    With respect to the directive dated

5    November 8th, 2006, were the contents of that directive the

6    same as the one that was in your handbook?

7              A    Yes.

8              MS. CONNOR:  At this time, your Honor, we

9    would offer Plaintiff's Exhibit 3 with the exception of the

10   removal of the 2007 directive related to sexual orientation.

11             MS. SHEEHAN:  Brief voir dire?

12             THE COURT:  Sure.

13             VOIR DIRE EXAMINATION BY MS. SHEEHAN:

14             Q    Ms. Collins, Exhibit 3 as your attorney handed

15   to you, is that the exact document that you received for your

16   diversity training, in September 2005?

17             A    The contents of this document --

18             Q    It's a yes-or-no question.  Is that the

19   document that you received to become a trainer for diversity

20   management in September of 2005?

21             A    This particular -- these particular pages

22   right here, no.

23             MS. SHEEHAN:  Yes, your Honor.  I object.

24             THE COURT:  And the nature of your objection?

25             MS. SHEEHAN:  Is lack of proper foundation.

1    These are not the documents she received at her training.

2                    THE COURT:  Counsel, you want to be heard?

3                    MS. CONNOR:  Yes, your Honor.  The witness has

4    testified that the document is otherwise identical to what

5    she received in her training with the exception of the two

6    directives that she testified about.  I'm offering it without

7    the one directive that she testified was not there.

8                    THE COURT:  Okay.  Counsel, come on up to the

9    bench, please.

10                   (At Side Bar.)

11                   THE COURT:  Okay.  You don't have the

12   original?

13                   MS. CONNOR:  I don't.  This is the one they

14   gave us in discovery.  I don't have the exact one.

15                   THE COURT:  Is there any -- hold on, Counsel,

16   is there any question that this is Department of Corrections

17   handbook or training manual?

18                   MS. SHEEHAN:  I don't know, I see GOER, I

19   didn't realize this is what she received while attempting to

20   become a trainer, so I do not know if this was given to her

21   at the time.  She doesn't have the book that was given to her

22   at the time, so --

23                   THE COURT:  That's not my question.  This

24   document, which counsel says was turned over to them through

25   discovery, is there any question that is a Department of

1    Corrections training document on sexual harassment?

2                    MS. SHEEHAN:  Yes, because GOER, it starts off

3    with documents from GOER, which is the Government Office

4    Employee Relations.

5                    MS. CONNOR:  GOER trained them.

6                    MS. SHEEHAN:  I thought Mary Mayville trained

7    her and she's with diversity management.

8                    MS. CONNOR:  But the cover is right on top of

9    the GOER material, because the GOER material was within the

10   handbook, they don't, they don't reproduce, they use the GOER

11   material with the Department of Corrections cover.

12                   THE COURT:  Can I see the exhibit, please, you

13   want to get it for me.

14                   MS. CONNOR:  Do you want your copy?

15                   THE COURT:  No, I want to see that copy.  What

16   section are you removing?

17                   MS. CONNOR:  It's in the back, it's about

18   sexual orientation.

19                   THE COURT:  Because that wasn't part of it.

20                   MS. CONNOR:  That wasn't part of it.

21                   MR. ANDREWS:  She said there was something

22   else.

23                   MS. CONNOR:  She said the date on the

24   directive was different, the date in here is 2006, and her

25   date was 2002.

1          MR. ANDREWS:  But she said there was something

2     else about sexual orientation, didn't she?

3          MS. SHEEHAN:  There were two sections.  This

4     is a reprint from General Electric.

5          THE COURT:  Counsel, I'm looking through this

6     document and there's no question that it's a Department of

7     Corrections training manual, it's all through it, all over

8     it, and you know, I don't understand the nature of your

9     objection, other than that the -- I mean, the material would

10    come in anyway as a part of training that occurred and with

11    the fact that parts that she didn't receive at the time being

12    removed, I don't see why it would be objectionable.

13          MS. SHEEHAN:  General Electric?

14          MS. CONNOR:  That's what was in it.  She

15    testified it was identical.

16          THE COURT:  Do you question that this is --

17          MS. SHEEHAN:  The top page, no.

18          THE COURT:  Are you suggesting that they put

19    this other material into the document?

20          MS. SHEEHAN:  I don't know, but I think I can

21    handle it when I put Mary Mayville on the stand.

22          THE COURT:  The document will be received with

23    the exclusions that we talked about.

24          MS. SHEEHAN:  The two directives?

25          MS. CONNOR:  Your Honor, there was one

1    exclusion and the date on the other directive was different,

2    otherwise she said that the contents of the directive were

3    the same.

4                    THE COURT:  We'll get her testimony, I think

5    she said two sections were different.  We'll get her

6    testimony.

7                    (Open Court.)

8                    (The requested portion of testimony was read.)

9                    THE COURT:  Okay, Counsel, so your offer is

10   what part of this document?

11                   MS. CONNOR:  Your Honor, we request admission

12   of this document without the directive on sexual orientation

13   that she testified was not in hers, and with the

14   understanding that the date on the directive of sexual

15   harassment was 2002, rather than 2006.

16                   THE COURT:  And Ms. Collins, the best of your

17   recollection, other than the date, was the content identical?

18                   THE WITNESS:  Yes.

19                   THE COURT:  Okay.  The document will be

20   received with the exception of the new section that was not

21   part of her --

22                   THE CLERK:  There's no page number, can you

23   identify exactly what is coming out?

24                   THE COURT:  What page numbers?

25                   MS. CONNOR:  May I show it to the witness.

1          THE COURT:  Yes, please.

2          CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

3          Q    Would you identify the memorandum on the

4    sexual orientation and then the one on sexual harassment.

5    The page numbers.  The pages aren't numbered in the document.

6          THE CLERK:  No, I know, I just got to figure

7    out what to take out.

8          THE WITNESS:  The directive number is 2608,

9    that's the one for nondiscrimination in employment based --

10   based on sexual --

11         THE CLERK:  The one before it's okay?

12         THE WITNESS:  That one is 2605, that's sexual

13   harassment in the workplace.

14         THE COURT:  Identify the section that was not

15   in your handbook, please.

16         THE WITNESS:  The directive that was not in

17   mine was 2608, the nondiscrimination in employment based on

18   sexual orientation.

19         THE COURT:  Thank you.

20         THE CLERK:  Just that one page?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay, go ahead, Counsel.

23         MS. CONNOR:  Thank you.

24         Q    How long was the training in Albany?

25         A    It was five days.

1          Q     During this training in Albany, were you

2    taught a definition of sexual harassment?

3          A     Yes.

4          Q     What was that definition?

5          A     Sexual harassment was any unwanted verbal or

6    physical advance, sexually explicit comments, sexually

7    derogatory comments that were objectionable or offensive to

8    the recipient, that caused humiliation to the recipient, or

9    that interfered with their job performance in any way.

10         Q     After this training, did you return to Auburn?

11         A     Yes.

12         Q     And as a cultural -- were you a cultural

13   diversity trainer at that time?

14         A     Yes.

15         Q     And as a cultural diversity trainer, did you

16   belong to any committees in that capacity?

17         A     Well, I was actually on the cultural diversity

18   committee before I went to training.

19         Q     What is the cultural diversity committee?

20         A     It was a committee within the facility that

21   dealt with cultural diversity issues.

22         Q     In Auburn, when you were on the committee, who

23   else was on the committee?

24         A     There were a lot of civilian employees.

25         Q     What do you mean by civilian employees?

1      A     There were teachers, there were counselors,

2  I'm not sure what else, there was someone from administration

3  upstairs, an administrative secretary upstairs, and there

4  were both male and female.

5      Q     About how many males and females were on the

6  committee when you worked on this committee at Auburn?

7      A     There were probably about equal, when I went

8  to the meetings there were 12, maybe 12 to 15 people there,

9  maybe sometimes 8 to 10.

10     Q     What was the purpose of the committee?

11     A     The purpose was supposed to be to deal with

12  issues within the facility.

13     Q     What types of issues?

14     A     Issues dealing with cultural diversity.

15     Q     Did the committee do investigations?

16     A     No.

17     Q     Did it write policy?

18     A     No.

19     Q     How was the committee supposed to deal with

20  issues, to your understanding?

21     A     Well, after -- after I went to a couple

22  committee meetings I realized the committee really had no

23  power or anything, the committee was there to, just to throw

24  the issues out there.

25     Q     Did the committee have any role or function

1    with respect to cultural diversity at Auburn?

2            A    None that I could see.

3            Q    When you served on the committee, how many

4    officers were there and how many civilians were there?

5            A    I never went to a committee meeting where

6    there was any other officers but myself.

7            Q    Did you ever attend a meeting of the cultural

8    diversity committee where the female orientation handbook was

9    discussed?

10           A    Yes.

11           Q    What was the purpose of that meeting?

12           A    That was a hub meeting, a hub -- the

13   department is divided into geographical areas, and our hub

14   was the Elmira hub, and they're, you know, have several

15   facilities in there and so I went to a hub cultural diversity

16   meeting.

17           Q    And what was discussed concerning the female

18   orientation handbook?

19           A    That there needed to be a revision of the

20   handbook.

21           Q    Was there any discussion as to why?

22           A    Yes, because it was very offensive to females,

23   it separated males from females.

24           Q    The female orientation handbook, when did you

25   receive a copy of it in the first instance?

1          A     I received my first copy at the academy.

2          Q     And did you receive or see any other copies of

3    that up to this point?

4          A     Yes.

5          Q     In your employment for the Department of

6    Corrections?

7          A     Yes.

8          Q     Where was that?

9          A     The second time I saw it, I received another

10   copy when I was at Sing Sing, in a manila envelope, every

11   female who went to Sing Sing from my class got it.

12         Q     And did you see any other copies of the

13   handbook during your employment at the Department of

14   Corrections?

15         A     Yes.

16         Q     Where?

17         A     Two boxes were delivered to Auburn and they

18   were stacked below in the front reception area, and I had a

19   post down there one day and the officers were laughing about

20   the contents of it.

21         Q     Did you ever participate in any effort to

22   revise the female orientation handbook?

23         A     No.

24         Q     Why not?

25         A     Because I had transferred to Eastern by the

1    time it was being revised in our hub.

2              MS. CONNOR:  Your Honor, I'm sorry, did you

3    want to take a morning break, because I would suggest this

4    might be a time, just in terms of the testimony, but I'm

5    happy to go on, it's up to you.

6              THE COURT:  Why don't we keep moving ahead for

7    a little bit and we'll take a break shortly.

8         Q    All right.  Now turning to your employment

9    still at Auburn, did -- what happened next to the best of

10   your recollection concerning any issues you had as a female?

11        A    That would have been on September 30th of

12   2005.

13        Q    What happened on that day?

14        A    It was the last day of the month, I was on a

15   post in the front reception and I had to count up the

16   inmates' visitors for the month, and I didn't have a

17   calculator so I was using -- I was counting in my head and I

18   was like, 46, and I was very quietly adding them because

19   there was a lot of noise going on around me, and Officer

20   McFall came in, and he said, I had the same problem today, I

21   had Bobbie Head at the range and she wouldn't shut up either.

22        Q    Who's Bobbie Head?

23        A    Bobbie Head was a female officer at Auburn.

24        Q    Did you respond to him?

25        A    No, I don't believe that I did.

1          Q     Did you complain about this type of conduct?

2          A     I don't remember who I spoke to about that.

3     I'm not sure that I did.

4          Q     Did you write to anybody concerning this

5     conduct?

6          A     This was probably in one of my letters because

7     when I -- I detailed the things that went on several times, I

8     detailed everything that I could remember about what

9     happened, it would have been in my cultural diversity

10     investigation as well.

11          Q     Did you ever write to Superintendent Burge

12     concerning the -- your treatment at Auburn?

13          A     Yes.

14          Q     When did you do that?

15          A     I wrote him in October, beginning of October

16     in 2005, second time.

17          Q     And what did you say to Superintendent Burge

18     in that writing?

19          A     I -- I believe I addressed the female issues

20     at Auburn.

21          Q     Could you be more specific?

22          A     The harassment of females, I told him that

23     changes needed to be made.

24          Q     What types of changes, if any, did you

25     request?

1          A      Well, I requested the abuse to stop.

2          Q      Anything else?

3          A      I don't recollect right now what else I wrote

4    in that, in that letter.

5          Q      Did you describe your environment at Auburn to

6    the superintendent?

7          A      Yes.

8          Q      What did you say in that regard?

9          A      I -- I believe I also told the superintendent

10   that it was -- there were security hazards at the facility.

11         Q      What were the nature of those hazards that you

12   advised the superintendent?

13         A      It was officer-on-officer abuse, it was the

14   way females were treated in Auburn, left the facility very

15   unsafe.

16         Q      Did you ever receive a response from

17   Superintendent Burge?

18         A      No.

19         Q      Now, did you ever have a conversation at any

20   time with Superintendent Burge concerning the way female

21   officers were treated at Auburn?

22         A      Yes.

23         Q      When did that conversation take place?

24         A      I had a conversation with him when my union

25   representative was there.

1          Q     Any other conversations?

2          A     And I had a conversation with him in October

3     of 2005.

4          Q     What took place in that conversation?

5          A     I just reinforced my stand on the issues that,

6     at Auburn, what I see.  As a superintendent, he, he doesn't

7     really have access to the things that the officers see,

8     because when -- when the superintendent goes around the

9     facility, there's a thing called trip calls, no supervisor

10    gets through the facility without officers dialing ahead and

11    letting them know every step that the supervisor is going to

12    take.  So as the supervisor passes through the facility,

13    everything's cleaned up, comments are cleaned up, there's no

14    harassing, there's no anything, they walk through a facility

15    that is -- has been designed for them to walk through by the

16    officers.  It's not the real facility.

17         Q     Did you tell that to Superintendent Burge?

18         A     Yes.

19         Q     Did you ever have a conversation with

20    Superintendent Burge after your employment with the

21    Department of Corrections was over?

22         A     Yes.

23         Q     And when was that?

24         A     That would have been March of 2009.

25         Q     Where was that conversation?

1          A     That was in my lawyer's reception area.

2          Q     What took place in that conversation?

3          A     I thanked Superintendent Burge for his time,

4     he came to do a deposition, and we talked about Auburn.

5               MS. SHEEHAN:  Your Honor.

6          Q     What took place --

7               MS. SHEEHAN:  Objection, relevance.

8     Conversation prior to a deposition.

9               MS. CONNOR:  No, she said it was in the

10     reception area of the lawyer's office, after the deposition,

11     she didn't say it was part of the deposition.

12               THE COURT:  Good time to take our morning

13     break, I'm going to talk to the lawyers.  I'm going to give

14     you about 10 minutes or so, then we'll get you back out here,

15     okay.  Don't talk about it, don't let anybody else talk to

16     you about it.

17               (Jury Excused, 10:33 a.m.)

18               THE COURT:  Okay, Counsel, your objection?

19               MS. SHEEHAN:  Relevance.  Superintendent Burge

20     retired in 2007, she's now testifying to a conversation she

21     had with him in 2009.  The appearance is that he would have

22     had some kind of power to do something about her complaints

23     even in 2009.

24               THE COURT:  Yeah, I'm troubled by the time of

25     this conversation after his employment is done and after the

1    time period of these claims, Counsel.

2                    MS. CONNOR:  Your Honor, can I make an offer

3    of proof with respect to this?

4                    THE COURT:  Sure.

5                    MS. CONNOR:  That the conversation took place

6    in her attorney's waiting area after his deposition, and that

7    the conversation was between the witness and the defendant

8    Burge, and defendant Burge said to the witness that things

9    were always gonna be that way for females at Auburn, they had

10   always been and always would be like that.  Now that reflects

11   on the time that the witness was at Auburn.  And it's a

12   statement against interest.

13                   THE COURT:  Now you're getting somewhere,

14   Counsel.

15                   MS. SHEEHAN:  He's retired.

16                   THE COURT:  Well, regardless of whether he's

17   retired, it's a statement against the interest of what he's

18   representing at the time.  So when he's referring to what was

19   going on at Auburn at the time.

20                   MS. SHEEHAN:  Can I have one minute.

21                   THE COURT:  You may.

22                   (Pause in Proceedings.)

23                   MS. SHEEHAN:  Could you please, Ms. Connor,

24   can I ask her to please read back the statement that

25   Mr. Burge made to Ms. Connor.

1           MS. CONNOR:  What I said?  It wasn't to me,

2      Counsel.

3           MS. SHEEHAN:  Could you just read back the

4      statement that you read to us just now.

5           MS. CONNOR:  I can ask the reporter to read

6      it, or do you want me to paraphrase?  I'm not sure what

7      you're asking.

8           THE COURT:  We'll have the court reporter read

9      back the offer of proof.

10           (The requested portion of the record was

11            read.)

12           THE COURT:  And counsel just indicated that it

13      should come in as a party admission.

14           MS. SHEEHAN:  Statement against.

15           THE COURT:  Statement against interest.

16           MS. SHEEHAN:  I'll withdraw my objection.

17           THE COURT:  Okay.  When we get the jury back

18      out here, we'll let you elicit that testimony.

19           MS. CONNOR:  Thank you, your Honor.

20           THE COURT:  Objection's been withdrawn.

21           THE CLERK:  Court's in recess.

22           (Whereupon a recess was taken from 10:36 a.m.

23            to 10:51 a.m.)

24           (Open Court, Jury Out.)

25           THE COURT:  Okay.  We all set to proceed?

1            MS. CONNOR:  Yes, your Honor.

2            THE COURT:  Come on up, we'll be all set to

3    go.  Bring them in, Bruce, please.

4            (Jury Present.)

5            THE COURT:  Okay.  I'm getting reports that

6    the jurors are all a bunch of health nuts and that we're

7    going to have to order out for fruit and yogurts, the goodies

8    aren't being touched in there.  I hope you're relaxed enough

9    to take advantage of whatever we give you.

10           A JUROR:  I had a muffin this morning.

11           THE COURT:  There you go, okay, thank you.

12   Just because you -- you can't talk about the case, you don't

13   have to be uptight in there, just relax, like you're home,

14   like I told you, okay.  All right.  Ms. Connor, go ahead.

15           Q    Penny, with respect to -- did you have a

16   conversation with Superintendent Burge concerning issues

17   regarding females at Auburn?

18           A    Yes.

19           Q    And when did that conversation take place?

20           A    It was March of 2009.

21           Q    Where did it take place?

22           A    In my lawyer's reception area.

23           Q    And what did Superintendent Burge say in that

24   conversation?

25           A    After I thanked him for his time, he told me

1   that things were always gonna be that way for females at

2   Auburn, they had always been that way, and they always would

3   be that way.

4           Q    Now, during your employment at Auburn back

5   into the time that you were employed, in the fall of 2005,

6   did you speak to anybody else concerning the issues regarding

7   females at Auburn?

8           A    Yes.

9           Q    Who was that?

10          A    I spoke to the deputy superintendent of

11  security, Dep. Bellnier.

12          Q    Where did that conversation take place?

13          A    In his office.

14          Q    When did it take place?

15          A    It was maybe four or five days after I had the

16  conversation with Superintendent Burge.

17          Q    Who initiated the conversation?

18          A    I did.

19          Q    Why?

20          A    I -- I was reaching a point where I had

21  exhausted almost everything, every channel, I went to him

22  because I didn't feel like anything was started yet to make

23  these changes.

24          Q    What took place in the conversation?

25          A    I told him about the female harassment at

1  Auburn, what was going on in Auburn.

2          Q    Can you be more specific, please?

3          A    I told him a little bit about my situation and

4  I told him that it was not exclusive to me, that it was

5  females in general, and that I was tired of hearing that

6  Auburn is Auburn and that's the way it is, because that's not

7  the way it should be.

8          Q    Did he respond to you?

9          A    Not really.  He nodded a lot and he smiled a

10 lot.

11         Q    Did he say anything to you in response to your

12 comments?

13         A    Not that I can remember, I believe he thanked

14 me for coming to talk to him.

15         Q    To your knowledge, did he undertake any

16 efforts to make any of the changes that you -- to address the

17 issues you spoke about?

18         A    Not to my knowledge.

19         Q    After this conversation with Dep. Bellnier,

20 did you have any other problems in your employment at Auburn?

21         A    I did have something else happen in October, I

22 can't remember exactly what it was.

23         Q    We can move on then.

24         A    Okay.

25         Q    After your conversation with Deputy

1    Superintendent Bellnier, did you have any other conversations

2    with any administration at Auburn concerning your issues with

3    females?

4            A    Yes.

5            Q    To whom did you speak?

6            A    We had just gotten a new superintendent.

7            Q    Who was that?

8            A    That was Superintendent Graham.

9            Q    Is he a defendant in this case?

10           A    Yes.

11           Q    Did you speak to him?

12           A    I did.

13           Q    When did that conversation take place?

14           A    That would have been in November of 2005.

15           Q    Who initiated the conversation?

16           A    I did.

17           Q    Where did it take place?

18           A    Took place in the superintendent's office.

19           Q    Who was present?

20           A    The superintendent and I.

21           Q    To the best of your recollection, what took

22   place in that conversation?

23           A    I started addressing the female issues at

24   Auburn and the superintendent became very defensive, and he

25   told me that he had been in the Department of Corrections for

1    29 years, and that he had been through more than I had been

2    through, he told me he had crossed a picket line, that I

3    needed to get tougher.  And I was very frustrated and I told

4    him that I was thinking of seeing a lawyer.  And he said,

5    sue, in federal court.  We have 15 females here and not one

6    will stand behind you, because they all need their jobs.

7           Q    Did you respond to him?

8           A    I did.

9           Q    What did you say?

10          A    I told him that I would start a letter writing

11   campaign to Albany and if I had to, I would go to the media.

12          Q    Did he respond to you?

13          A    He did.

14          Q    What did he say?

15          A    He said watch your employee handbook.

16          Q    What did you understand that to mean?

17          A    That, um, I understood that as kind of a

18   threat, like if I go to the media, what's gonna happen to me.

19          Q    What happened next?  What happened after that,

20   with respect to your employment at Auburn?

21          A    The next day, I was assigned to work first

22   officer of C block.

23          Q    What is the first officer?

24          A    That's the officer who mans the desk and

25   answers the phone to make sure that the inmates who are

1    called out gets to where they need to be, hands out the keys

2    to the officers who come in to let the -- let the inmates in

3    and out for movement.

4              Q    And what happened that day?

5              A    Lieutenant Mitchell was the supervisor on the

6    block that day, and he came in to where I was sitting around

7    lunchtime, I was eating my lunch, and he sat down, there was

8    like a van seat, my desk was here and the van seat was here,

9    he sat on the van seat, it was maybe 4 or 5 feet from where I

10   was sitting.  And he leaned back and he rubbed his stomach

11   and he said, he said, I gotta take a shit and it's gonna be a

12   watery one.

13             Q    Did he say anything else?

14             A    Well, he went to chow and came back and he sat

15   down again, and he said -- he rubbed his stomach again and he

16   said, I still gotta take a shit, I can hear it rumbling in

17   here.  And then he sat there and he told me how, how he

18   farted at the table in front of his children and their

19   friends, how he walked around naked in front of his family.

20   He told me that his mom lived next door, and he could see her

21   backyard over the fence, and he saw her outside and one day,

22   he looked over and he said, hey, Mom, nice tits.  And then,

23   an officer made a comment about my engagement ring, he said,

24   nice ring, and Lieutenant Mitchell said, my wife had a ring

25   like that once, and it slipped off her finger and she lost it

1    in my ass.

2         Q    What did you say, if anything, in response to

3    these comments?

4         A    I told him he was disgusting and to get out of

5    my area.  I was on an assigned post and I could not leave

6    that desk but he did not have to be there at that time.

7         Q    Did he leave?

8         A    No, he did not.

9         Q    How long did he stay there?

10        A    He stayed there for quite awhile, our movement

11   was complete, I would say at a minimum, 30 to 45 minutes

12   after that, he was still there.

13        Q    Were there any inmates present during this

14   time?

15        A    Yes.

16        Q    Approximately how many?

17        A    There were five inmates just on the other side

18   of my desk behind the bars, they were preparing the meals for

19   the inmates who were locked in.

20        Q    Now, after defendant Mitchell made these

21   statements, what was your demeanor?

22        A    I was very upset.

23        Q    And did defendant Mitchell make any comments

24   back to you when you said you're disgusting?

25        A    He told me that he lived in reality and I

1    didn't.

2         Q    Did you have any other problems at your job

3    that day?

4         A    Yes.

5         Q    What was that problem?

6         A    After lunches run the first officer is

7    responsible for going up on the blocks and making a round on

8    the blocks, that means you check every cell to see which

9    inmates are left back in the cell, and make sure that

10   everything is secure, and I -- when I left, I lay my glasses

11   by the logbook, because I only need them to read, and so I

12   went up and I did my rounds and I came back, and I went to

13   put my glasses on to log back into the logbook, and they were

14   Scotch taped on both sides.

15        Q    Where was the tape located on your glasses?

16        A    They were across the front and across the back

17   of the lens.

18        Q    What took place next?

19        A    I got very upset.  I told Sergeant Mitchell

20   that he needed to clean my glasses, and he had -- he got a

21   bottle of cleaning spray, and he put it very hard on my desk

22   and I said, no, I will not clean those glasses, you will.

23        Q    Then what happened?

24        A    Then I went into -- I went into the bathroom

25   on the block because I was very upset and I didn't want the

1    inmates to see that I was very upset.  And when I came back

2    out, my glasses were mostly clean, most of the tape was off

3    them, but I had told Sergeant Mitchell that he needed to

4    relieve me.  He saw how visibly upset I was, but I told him,

5    you now have a first officer incapable of doing their job

6    because I can't see without my glasses.  I couldn't see the

7    board, I couldn't see the logbook, anything, and I ask him to

8    relieve me.

9            Q    What did he say, if anything?

10           A    He laughed at me.

11           Q    When you returned from the bathroom, what

12   condition were your glasses in?

13           A    They were mostly cleaned off, there were still

14   some -- little tiny bit of tape here and there that they

15   couldn't get off, and the left side of my glasses was bent

16   down.

17           Q    Were your -- were your glasses damaged?

18           A    Yes.

19           Q    Were you able to wear them?

20           A    Yes, I wore them, but the following Monday, I

21   got new ones.

22           Q    Why did you get new ones?

23           A    Because they went on my face like sideways.

24           Q    Now, when your glasses were taped, were there

25   other officers present other than you and defendant Mitchell?

1          A     Yes.

2          Q     Approximately how many officers?

3          A     There were two officers present.

4          Q     Did any of those officers say anything to you

5     with respect to what was happening?

6          A     Yes.  Officer Wise told me don't leave my

7     stuff laying around because they will mess with it.

8          Q     What happened next that day, with respect to

9     any problems you may have had?

10         A     Well, I was receiving hangup calls.

11         Q     Where were you posted when you received those

12    calls?

13         A     I was the first officer.

14         Q     And where were you, where were you working in

15    first when the calls came?

16         A     I was at the desk in C block.

17         Q     And approximately how many calls did you get?

18         A     There were probably about 10.  Maybe, maybe

19    more.

20         Q     When did the calls come?

21         A     They started after I got back to my desk.

22         Q     Was -- was there any voice or noise on the

23    other end of the phone?

24         A     No, just hangup calls.

25         Q     Is this an internal or external phone system?

1          A      That's an internal phone system, and there are

2    phones on the upper -- on the upper galleries of the block.

3    Each floor has its own phone.

4          Q      Where was defendant Mitchell when these calls

5    came?

6          A      He was sitting on the seat next to my desk.

7          Q      Did he do anything about these calls?

8          A      No.

9          Q      Did anything else occur in your employment

10   that day?

11         A      Yes.

12         Q      What was that?

13         A      There's a plexiglass over the officer's desk

14   so inmates don't throw things down on them, and the inmates

15   were locked in, and the rest were out at programs, and I was

16   having things thrown down from the upper levels onto the

17   plexiglass and there was a little hole in the side of the

18   plexiglass over behind the officer's desk and a bar of soap

19   came down through the hole.

20         Q      Did you have any understanding of the meaning

21   of a bar of soap?

22         A      No, I didn't.

23         Q      What was your demeanor after these incidents

24   at work?

25         A      I -- I was very upset.  I raised my voice at

1    Lieutenant Mitchell.  I raised my voice very loud at

2    Lieutenant Mitchell.  I told him he would relieve me, because

3    I was incapable of doing my job at that point.

4           Q    And would you describe what you were doing

5    more?

6           A    I was crying, I was sick, and I just needed to

7    get off the block.

8           Q    You say sick, how did you feel?

9           A    I was sick to my stomach, I could not stop

10   crying, I went into the bathroom several times to wipe my

11   eyes, and when I came back again, I cried again.

12          Q    Now did you do anything about these incidents?

13          A    Yes.

14          Q    What's the first thing you did?

15          A    I did stay on the block all day because I

16   couldn't be relieved, and so -- because if you leave your

17   post, it's a crime.  So I stayed there, because he wouldn't

18   relieve me and when I left that afternoon, I was not in a

19   very good state of mind.  So my union representative was down

20   in the front entryway and he stayed with me for 45 minutes

21   until I could drive home.

22          Q    Who was that?

23          A    That was Officer Bielowicz.

24          Q    And the next day did you do anything about

25   these incidents?

1           A     Yes.

2           Q     What was that?

3           A     I put a letter, a to-from in Sergeant

4    Mitchell's box, and I gave a copy to the watch commander.

5           Q     Who was that watch commander?

6           A     It was Lieutenant Vasquez.

7           Q     I'm going to show you what's been marked as

8    Plaintiff's Exhibit 11 and would you review that and identify

9    it for me, if you can.

10          A     This is my to-from to Sergeant Mitchell.

11                MS. CONNOR:  At this time, plaintiff offers

12   Plaintiff's Exhibit 11.

13                MR. ANDREWS:  No objection, your Honor.

14                MS. SHEEHAN:  No objection, your Honor.

15                THE COURT:  Okay.  It will be received.

16          Q     Why did you give a copy of it to Lieutenant

17   Vasquez?

18          A     Because when I tried to address my issue with

19   Sergeant Connors about the rumors, he said that I threatened

20   him and so when I went to talk to Captain Gummerson, he said

21   if anything like this ever happens again, put it in writing,

22   and bring a copy to him.  And Captain Gummerson was not there

23   that day.

24          Q     Did you ever hear back from defendant Mitchell

25   about this memorandum?

1          A     No.

2          Q     Did you ever hear back from anybody else in

3     the administration about this memorandum?

4          A     The administration, no.

5          Q     Did you consider defendant Mitchell your

6     supervisor while you were at Auburn?

7          A     Yes.

8          Q     And how -- why did you consider him that --

9     withdrawn.

10               Why did you consider him your supervisor?

11         A     Because I was an officer and he was a

12    sergeant.

13         Q     And in what way would he supervise you in his

14    capacity as sergeant?

15         A     Any area he happened to be in or I happened to

16    be in, even if it wasn't his assigned area, if he happened to

17    be there, he outranks me and so I have to do what he says.

18         Q     How common was it for defendant Mitchell to be

19    in your area?

20         A     Very common.  I was a resource area, and a lot

21    of days it took me to different areas of the facility.  I

22    might start out in industry one day, be sent to the hospital,

23    go to the chapel, go to the yard, and Lieutenant Mitchell was

24    often in the yard, he was often down in front reception, he

25    was on the blocks, he was in a variety of areas in the

1   facility.

2          Q    Now when you wrote this to-from, and the

3   other -- I'll withdraw that.

4          When you wrote this to-from to defendant

5   Mitchell, did you have an understanding of whether his

6   conduct was lawful or unlawful?

7          A    No, it was totally unlawful.

8          Q    And how did you have that understanding?

9          MR. ANDREWS:  Objection, your Honor.

10         THE COURT:  Yeah, that's asking for a legal

11  opinion, I'm going to sustain the objection.

12         MS. CONNOR:  Your Honor, may we have a side

13  bar, please.

14         THE COURT:  Come on up.

15         (At Side Bar.)

16         THE COURT:  Okay.  We have everybody, go

17  ahead.

18         MS. CONNOR:  Yes, your Honor, with respect to

19  your ruling, I'd like to speak to it and ask you to

20  reconsider your ruling, and that is that in a retaliation

21  case, in a Title VII case, 1983 retaliation case, that the --

22  one of the elements of a case is that the conduct was

23  unlawful, that is being opposed by the plaintiff, or that the

24  plaintiff has a reasonable good faith belief that the conduct

25  was unlawful.  The plaintiff can make a prima facie case

1   either way.  So in the event that the jury would find that

2   the conduct may not be unlawful, the other, the alternative

3   would be that the plaintiff had a reasonable good faith

4   belief that his conduct was unlawful and her activity was

5   then protected.  So that is an element of my case, and her

6   understanding of whether it's lawful or unlawful becomes part

7   of -- it's an element of our case.

8                  MR. ANDREWS:  Well, I think usually the real

9   part in dispute about that is whether it's a reasonable

10  belief, not whether it's a good faith belief, and I certainly

11  think that's an issue here, but, you know, the fact is, I let

12  one answer come through without objection, she said it, I

13  think following up on that is unnecessary.

14                 THE COURT:  Yeah, I understand what you're

15  trying to get at and why you're trying to do it but there's

16  been no foundation laid that this witness has the expertise

17  or basis to give an opinion as to whether or not his conduct

18  was lawful.

19                 MS. CONNOR:  But it's her belief, therefore,

20  her -- what I was going to elicit next, your Honor, is that

21  she gained this information through her training in the

22  Department of Corrections.

23                 THE COURT:  Not next, it has to be first.

24                 MS. CONNOR:  May I proceed asking those

25  questions?

1          THE COURT:  What her basis, her training is to

2  understand?

3          MS. CONNOR:  Well, I did ask questions earlier

4  in her testimony.

5          THE COURT:  But there's been nothing about,

6  you know, her ability to make a determination of what's

7  unlawful as a correction officer and not lawful conduct as a

8  correction officer other than, you know, she went through the

9  academy.

10          MR. ANDREWS:  And again, your Honor, her

11  belief is on the record now, and whether it's reasonable is

12  an issue to be argued, I think, as a matter of law.

13          THE COURT:  Invading the province of the jury.

14          MS. CONNOR:  I understand the difficulty of

15  this area, your Honor, actually been through this before in

16  other cases, but it -- she has testified to her training in

17  sexual harassment through the cultural diversity trainer

18  seminar where she gained information as to what would be

19  unlawful sexual harassment.  She's already testified to that.

20  So that would form the basis of her belief of whether this

21  conduct was lawful or not.

22          MR. ANDREWS:  And there was testimony about

23  that and I don't see why we further need to dwell on this

24  issue which does invade the province of the jury.  I think

25  she's got everything she needs to, you know, argue certainly

1   her belief.

2              THE COURT:  I think that's right.  I don't

3   think we need to have her explain why she finds it to be

4   unreasonable, she said she thought it was unlawful, all

5   right, and then you can argue based on the training she

6   received and the rest of it.  I don't think we need to go any

7   further into it.  Okay.

8              MR. ANDREWS:  Thanks, your Honor.

9              (Open Court.)

10      Q    Penny, where did women change their clothes at

11  Auburn, women, I should -- I'll withdraw that.

12              Where did women officers change their clothes

13  at Auburn?

14      A    In the locker -- in the co-ed locker room.

15      Q    Now when you say co-ed locker room, what do

16  you mean?

17      A    The locker room was both male and female.

18      Q    And did you ever enter this locker room and

19  see men in there?

20      A    Sometimes.

21      Q    And did you ever make any observations about

22  how they were dressed?

23      A    Yes.

24      Q    What was that?

25      A    Sometimes they were in their underclothing.

1    On one occasion, in the back area when I went into the

2    restroom, there was a man with no clothes on.

3              Q    Where was your locker in this locker room?

4              A    My locker was in the large area when you first

5    walk in.

6              Q    And did you contact anybody at Auburn

7    concerning the locker room situation?

8              A    Well, I was actually spoken to by a sergeant

9    first about that when I first got there.

10             Q    Which sergeant is this?

11             A    That was Sergeant Petrocino.

12             Q    What, if anything, did he say to you?

13             A    He told me that money had just been allotted

14   from Albany to make a separate facility for -- a separate

15   locker room for females.

16             Q    Did you ever get back to Sergeant Petrocino

17   about that issue?

18             A    Yes, I did.

19             Q    And how did you, when did you do that?

20             A    I did that on the day that I gave Sergeant

21   Mitchell this to-from, I wrote a to-from to Sergeant

22   Petrocino.

23             Q    And what did you say in that to-from to

24   Sergeant Petrocino?

25             A    I discussed that females needed their own

1    locker room, and a changing area.  I discussed the bathroom

2    downstairs that females had to change in.

3             Q    What was the problem, if anything, with the

4    bathroom?

5             A    You walk down the hall, well, probably from

6    about here to your desk, to get to it, and there were other

7    male locker, locker rooms, or lockers, little rooms around

8    the sides there, and around the corner in this room that I

9    was told used to be a female room, there was a bathroom, a

10   small bathroom, and it was a very dirty bathroom, but it was

11   the only area down there where the door locked and where you

12   could actually change your clothes if you -- I was a resource

13   officer, sometimes I went and I didn't know where I was going

14   to be that day, I kept long underwear in my locker, and if I

15   had to change my clothes, I went to that bathroom.

16            Q    And what was the problem with the bathroom?

17            A    It -- the bathroom was used by men and women,

18   it was filthy and there were writings all over the wall, um,

19   not very nice writings.

20            Q    What types of writings did you see there?

21            A    I saw, um, cartoon pictures of females, I saw

22   things written about females.

23            Q    Would you describe the cartoon pictures of

24   females in more detail, please.

25            A    There was a cartoon picture of Officer Carter

1    that someone had drawn very large breasts on.

2            Q    Officer Carter female?

3            A    Yes.  There was a stick figure of Officer

4    Cole, she's also female, and it just had a stick and it had

5    very large hips.  There were often things written about

6    females on the wall.

7            Q    Can you give some examples, please?

8            A    There were things about time abuse, how

9    females were basically time abusers, there was -- some things

10   were sexual in nature.

11           Q    Would you be -- can you give examples of those

12   things?

13           A    I can tell you what was written about me on

14   the wall.

15           Q    What was written about you?

16           A    There was a comment or a series of comments.

17   The first comment said, "Penny gives shitty head."  The

18   second comment said, "I wouldn't let that bitch touch me."

19   Someone else had written out, underneath, "Shitty head is

20   better than no head."

21           Q    What, if anything, did you do about those

22   comments?

23           A    Generally, if I -- if I could, I wiped them

24   off, or I would scratch off the name of the person it was

25   about.

1     Q    With respect to the comments related to you,

2 did you do anything?

3     A    Yes, I tried to wipe them off and I couldn't,

4 so I -- I was a resource officer the day I found them, and

5 that means I didn't have an assigned post, I was an extra,

6 actually, I didn't have anywhere specific to be.  And I ask

7 Sergeant Flynn in the chart office if I could just have a

8 little paint to paint over it.

9     Q    And when -- what, if anything, did Sergeant

10 Flynn say in response to you?

11     A    He told me he would take care of it.

12     Q    Do you know whether it was ever taken care of?

13     A    Yes, I do.

14     Q    What is your understanding of when it was

15 taken care of?

16     A    After diversity management's investigation

17 they went into Auburn months later and it was still there,

18 and then when they let Superintendent Graham know, he had to

19 paint it over.

20     Q    When did you see these comments about yourself

21 in the bathroom?

22     A    That was in November.

23     Q    Of what year?

24     A    2005.  That particular comment was in

25 November, I'd seen things periodically on the wall for

1    months, and months, I just scratched them out and --

2              Q    Did these things concern you?

3              A    Some of them did, some of them included me in

4    a group of female officers.

5              Q    Now, did you take any time off from work in

6    November of 2005?

7              A    I did.

8              Q    How much?

9              A    I couldn't take the day off after the incident

10   on C block.

11             Q    Which incident are you talking about?

12             A    With Sergeant Mitchell, because it was

13   November 11th, and you're disciplined if you take a holiday

14   off.

15             Q    So when did you take off?

16             A    I took the weekend off, which would have been

17   the 12th and the 13th.

18             MS. CONNOR:  May I have just a moment, please,

19   your Honor.

20             THE COURT:  Yes.

21             Q    Now after you took this time off, what, if

22   anything, did you do next concerning your problems with

23   female issues at Auburn?

24             A    After I took the time off -- well, there were

25   other incidents in between them and when I did something,

1   every day was another -- was another incident.  Every day.

2           Q    When you came back from the time that you took

3   off, did you make any complaints to anybody at Auburn?

4           A    I spoke to the office of diversity management.

5           Q    Before you spoke to the office of diversity

6   management, did you contact anybody in Auburn administration

7   about your concerns?

8           A    That was after, after the incident on C block?

9           Q    Or did you contact anybody in the Department

10  of Corrections upper administration?

11          A    I know that I wrote a letter to Commissioner

12  Goord but I'm not sure when I wrote that letter.

13          Q    Can you give me your best estimate of when it

14  was?

15          A    Well, all I can say is it would have been

16  after, after these incidents.

17          Q    Was it -- how close in time after?

18          A    I'm not exactly sure.

19          Q    Did you recall at one time when it was?

20          A    Yes.

21          Q    When was that, when did you recall, when would

22  you know?

23          A    When I wrote the letter.

24          Q    Is there a document that would refresh your

25  recollection?

1          A     The letter that I wrote.

2          Q     I'm going to show you what's been marked as

3    Plaintiff's 66, and if you would look at that, please.  Read

4    that.

5          A     (Witness complies.)

6          Q     Is your recollection refreshed?

7          A     Yes.

8          Q     After you returned from the time off you took

9    in November 2005, did you contact anybody in the upper

10   administration from the Department of Corrections about your

11   concerns?

12         A     Yes.

13         Q     Whom did you contact?

14         A     I wrote a letter to Commissioner Goord.

15         Q     And who was Commissioner Goord?

16         A     He was the head of the Department of

17   Corrections.

18         Q     When did you write that letter?

19         A     In November of 2005.

20         Q     And what did you tell Commissioner Goord in

21   the letter?

22         A     I told Commissioner Goord that I felt I had

23   exhausted every avenue that I could at that time, that I had

24   tried to work my way up the chain of command to have these

25   issues dealt with, I told him about what was happening at

1  Auburn, with females, I discussed the handbook and how hard

2  that was for females.

3          Q    Which handbook are you referring to?

4          A    That, the handbook for female staff working in

5  a correctional setting.  It was actually very harmful.  I

6  discussed the security of the facilities, I discussed -- I

7  believe I asked him for help.

8          Q    Did you ever receive any response from

9  Commissioner Goord?

10         A    No.  I apologize, I received a letter stating

11 that my letter had been received.

12         Q    Was there any other substance, content of that

13 letter?

14         A    No, just that he had received it.

15         Q    Now when you returned to work after taking a

16 couple of days off, did you have any additional problems at

17 your employment at Auburn?

18         A    Yes.  When I first came in the day after I got

19 back, I went to punch my time card, well, Officer Driscoll

20 who'd been on the block that day with Sergeant Mitchell when

21 those things happened was waiting at the top of the stairs.

22 And so when I was coming up the stairs I thought there was

23 probably something going on because I'd never seen him there

24 at the stairs before.  And my time card was missing.

25         Q    What did you do, if anything, about that?

1          A    I made a joke because I didn't -- I didn't

2    want him to know that he bothered me, I said, I guess they

3    pull your time card when you miss a day.

4          Q    Now after that, did you have any other

5    problems?

6          A    Yes, Officer Cochrane at the time clock again

7    punching out a couple days later, there were two lines

8    punching out, and there were a lot of civilians there, some

9    officers and he came up behind me and very, very close to me

10   and he growled in, like made a cat-like growl and I turned

11   and ask him if there was a problem, and there was another

12   officer standing there and he said, you're a sick fucking

13   bitch, and said something to the other officer and ...

14         Q    Did you respond to him?

15         A    No, I did not.

16         Q    Did you ever report that comment to anybody?

17         A    Yes.

18         Q    Whom did you report it to?

19         A    To Mary Mayville from the office of diversity

20   management.

21         Q    When did you report it?

22         A    November.

23         Q    Of what year?

24         A    Of 2005.

25         Q    Now did you have -- after that incident with

1    Officer Cochrane, did you have any other problems with your

2    employment at Auburn?

3         A    Yes.

4         Q    What was that?

5         A    Periodically, when I was there, if someone

6    wants you to know something, they'll, they cough a word, like

7    the word they coughed around me a lot was bitch.  And so I

8    got back from -- I had a vacation time and I got back and

9    officers were behind me coughing the word smoky bear, and so

10   I didn't pay any attention to it, and I heard it quite a bit.

11   And one day I was downstairs in the lower control room, I was

12   coming through the sallyport to go back up to another part of

13   the facility, and I was the only other officer in the

14   sallyport except for two officers who were going out the

15   other door.  And they coughed smoky bear.  And I knew that

16   somehow I owned that comment, but I didn't understand why at

17   that time.

18        Q    Did you come to an understanding of what that

19   comment meant?

20        A    Yes.

21        Q    And what was your understanding of that?

22        A    Officer Gilfus told me that officers had

23   reported that I -- I reported an officer for smoking in the

24   package room, and even though there was really no report made

25   and Sergeant Petrocino told me that, the rumor had gotten out

1    that I had reported someone for smoking.

2              Q    Did you report that problem to anyone?

3              A    Yes.

4              Q    Whom did you report it to?

5              A    To the office of diversity management.

6              Q    Anybody in particular?

7              A    Mary Mayville.

8              Q    When did you report that?

9              A    In the investigation in November of 2005.

10             Q    Now did you have any other problems at the end

11   of November while you worked at Auburn in front of inmates?

12             A    Yes.

13             Q    When did that take place?

14             A    That took place on November 25th of 2005.

15             Q    What took place that day?

16             A    That was the day that I started out and I

17   found the writing about me on the bathroom wall that I asked

18   Sergeant Flynn if I could paint over.  I was an extra that

19   day so I was sent all over and I was sent to the yard at the

20   end of the day.  And I manned a yard booth with another newer

21   officer.  And at shift change, an officer came across the

22   yard and I had been friends with this officer and he was

23   shouting get out of there, get out of there, and so I looked

24   at the officer next to me because I thought he had a problem

25   with him, and the officer stepped out, and Officer Butera

1    opened up the door and he threw his gloves in, and it was

2    obvious the problem was with me.  So I ask him, Bill, is

3    there a problem?  And he said, you brought this on yourself.

4    And so he -- that was his post for the next shift, and he

5    wouldn't come in the post so he stayed outside, and I had a

6    heavy coat and he didn't, so I told him I would get out of

7    the shed so that he could go in and I stood outside the shed

8    in the yard, and he went in.  And inmates had witnessed this

9    whole thing.

10            Q    Approximately how many inmates saw this?

11            A    I would say, I'm trying to ... maybe 30 to 50.

12            Q    Did an inmate ever speak to you about this?

13            A    Yes, two inmates.

14            Q    When did they speak to you?

15            A    Well, in the vicinity that he was, there were

16   maybe like 10 inmates, and the other inmates were over on the

17   other area so there was a small number of inmates where I was

18   and two of those spoke to me.  He said, Ms. C, why they gotta

19   treat you like this?  This was the second time an inmate used

20   that phrase with me.  And --

21            Q    Did this take place on that same day?

22            A    Yes.  And I told him it was an inappropriate

23   question.  And another inmate asked me why I was standing out

24   in the cold.  I said the cold is good for me.  Because they

25   had already witnessed what happened.

1      Q    Now you've mentioned in your testimony several

2  times that you made reports to Mary Mayville at the office of

3  diversity management.  How did it come about that you spoke

4  with Ms. Mayville?

5      A    Someone in the facility had to make a report.

6      Q    And what occurred when, how did you come to

7  speak to her?

8      A    She set up an appointment through work and I

9  was told when I needed to go and speak to her.

10     Q    When did you speak to her initially?

11     A    I spoke to her toward the end of November in

12 2005.

13     Q    And where did this conversation take place?

14     A    It was in a room somewhere on the second floor

15 administration building in Auburn.

16     Q    Was anyone else present for the conversation?

17     A    No.

18     Q    And did you give a statement to Ms. Mayville

19 that day?

20     A    I did.

21     Q    And what was the purpose of your statement?

22     A    I wanted things investigated at Auburn.  I

23 had -- I had tried since I'd been there and I couldn't get

24 anything going.

25     Q    What did you say in your statement to

1    Ms. Mayville?

2          A    I started at the beginning, as Ms. Mayville

3    requested, of when I got to Auburn, and I started with the

4    rumors and I went right through what had happened.  We didn't

5    complete it all in that day.

6          Q    Why not?

7          A    Because it was very lengthy.  She had to set

8    up an appointment to do it again.

9          Q    And about how long did you speak to her that

10   day?

11         A    Probably about a couple hours, maybe.

12         Q    Now, after you concluded your meeting with

13   her, did you have another problem with your employment at

14   Auburn?

15         A    Yes.

16         Q    When was that problem?

17         A    That was on -- it was the beginning of

18   December of 2005.

19         Q    And what was the problem that you had?

20         A    I took inmate, an inmate out on an outside

21   medical trip with another officer, and everything went well,

22   and I came back, and there was a new rumor going around that

23   I had dressed like a hooker, and that the officer I was with

24   commented on that to me, and I filed sexual harassment

25   charges on him.

1          Q    I'm sorry, the officer said what to you?

2          A    No, the officer I went with didn't say

3    anything to me.  Other officers were saying that he said

4    something about the way I was dressed.

5          Q    And did you file sexual harassment charges

6    against him?

7          A    No.

8          Q    Who, if anyone, said that to you?

9          A    Officer Bell told me first, and I ask Officer

10   Neuser in front reception if he had heard that rumor and he

11   said yes.  Well, I said, did you hear any rumors, and he told

12   me the same rumor that Officer Bell told me.

13         Q    And how were you dressed for that outside

14   trip?

15         A    I had a very professional suit on.

16         Q    Would you describe the suit for the jury?

17         A    It was black with a white collar, it had

18   buttons up the front, it was long sleeve, and it was maybe an

19   inch below my knee, and I had a white camisole on under it.

20   No lace, just plain white.  And I had two-inch open heels.

21         Q    Now what was your reaction when you heard this

22   rumor?

23         A    I -- I was at the end of ... I was at the end.

24   I ... I was an extra that day, and so I was actually all over

25   the facility.  When I got to the back area, I was very -- I

1    mean I was sick to my stomach, I was dizzy, I was upset, I

2    called Officer Neuser in the front, and I said, could you

3    please do me a favor and call my husband and see if he can

4    call our doctor and see if I can get an appointment for this

5    afternoon.  And after I called Officer Neuser, I was sent to

6    work at the outside, or the gate, the industry gate, and it

7    was at the end of the day, and Sergeant Leubner who works in

8    the -- he was the supervisor there in the post, Sergeant

9    Leubner and there was one other officer, Lieutenant Mitchell

10   called up Sergeant Leubner that day and ask that he send me

11   to C block so that I could do a cell search.

12              MR. ANDREWS:  Objection, your Honor.  There

13   was just testimony about someone calling someone else, I'm

14   not sure we're referring to my client Troy Mitchell because

15   she was referring to a Lieutenant Mitchell but to the extent

16   she's testifying about a conversation between two people that

17   did not involve her, I object.

18              THE COURT:  Sustained.  Go ahead.

19        Q    Would you describe your physical -- how you

20   felt physically that day?

21        A    I was not doing very well, I was tearful

22   again, actually I cried where inmates could see me.

23        Q    Did anything occur as a result of that with

24   the inmates?

25        A    No.

1          Q      And did you have any sort of other physical

2    symptoms?

3          A      Yes, I was very sick to my stomach, I just --

4    I kind of had panicky symptoms.  I just had to get out of

5    there.

6          Q      What do you mean panicky symptoms?

7          A      I just had to get out of the facility.  I was

8    just -- I was closed in, I was just -- I was ill, I felt like

9    I was gonna pass out, I had pains in my chest.

10         Q      Now did you go to the doctor?

11         A      I did.

12         Q      When, when did you first go to the doctor

13   about these symptoms?

14         A      I went that day after work.

15         Q      And what doctor did you see?

16         A      I saw Dr. Alley.

17         Q      What's his first name?

18         A      John.

19         Q      Now, at the doctor's office, did Dr. Alley

20   prescribe any treatment for you?

21         A      I don't really remember at that time.

22         Q      Do you know what day this was?

23         A      February 6th.

24         Q      Are you sure it's February?

25         A      Oh, I'm sorry, it was December 6th.

1          Q     Of what year?

2          A     Of 2005.

3          Q     Now after this occurred, you went to the

4    doctor, did you go back to work?

5          A     I did.

6          Q     When?

7          A     I went the next day.

8          Q     Did anything happen with your employment the

9    next day?

10         A     Yes.

11         Q     What happened?

12         A     I was assigned to the package room.

13         Q     And what occurred there?

14         A     I was processing in inmate packages, and there

15   was an officer to my right talking to me about rumors again,

16   the package room was filled with smoke, and I just, I felt

17   everything coming in on me, I couldn't breathe.  I couldn't

18   say anything because I'd already been accused of reporting

19   something that I hadn't reported, I couldn't say or do

20   anything that someone didn't turn into something.  And I was

21   not -- I was not able to stay there.

22         Q     How did you leave the facility, what occurred?

23         A     I asked the officer in the package room if he

24   saw Sergeant Petrocino because he was my area sergeant and he

25   said no, but he would call out in the front because I was

1  very physically upset and the officers in there were very

2  concerned.  And so another officer went to the back hallway

3  to see if he could see Sergeant Petrocino back there, but we

4  couldn't find where Sergeant Petrocino was so I went out the

5  back hallway and I saw Officer Kenny Charette and I said, did

6  you see Sergeant Petrocino?  And he said no, and so I went

7  upstairs.  There's -- the bathroom that we're allowed to use,

8  we're allowed to use two bathrooms when we're in the package

9  room, one is in the first visiting area and one is upstairs

10  by the chart office.  And so I went through the gates

11  upstairs, and the bathroom is just like from me to you away

12  from the chart office, and by the time I got there, I knew

13  that I could not work anymore.  So I went to the chart office

14  and Lieutenant, or I'm sorry, Sergeant Flynn was there, and I

15  told Sergeant Flynn that I was sick, I was very sick.  But

16  someone had already notified Sergeant Petrocino because he

17  came right in after me, and he took me to medical.  And they

18  checked my blood pressure and I generally have a normal, very

19  low and it was 160 over 92, and they told me that I couldn't

20  work, I had to go home.

21          So Sergeant Petrocino took me to his office,

22  and he called my husband to come and get me.  And I was in

23  the office and I said, I have to go back to the package room,

24  and he told me that, not to worry, he'd already relieved me.

25  And then Captain Rourke came in, and he said, Superintendent

1  Graham said, if you leave, he's going to consider that you

2  abandoned your post.  Sergeant Petrocino told him that he had

3  already replaced me in the package room.  My husband came,

4  and I left, and I never went back to work at Auburn again.

5  He took me to the doctor, actually.

6          Q    You went to the doctor after you left the

7  facility?

8          A    Yes, on the way home.

9          Q    Now did you file an accident or injury report

10  with respect to your leaving the facility ill?

11          A    I know that the nurse filed something, the

12  nurse who did my blood pressure, and I believe I did later on

13  file something.

14          Q    I'm going to show you what's been marked as

15  Plaintiff's Exhibit 28 and if you can look at that and

16  identify it for me, if you can.

17          A    This is an accident and injury report.

18          Q    Is your handwriting on that?

19          A    Yes, it is.

20          Q    Did you file that report?

21          A    I did.

22          MS. CONNOR:  At this time, I offer Plaintiff's

23  Exhibit 28, your Honor.

24          MS. SHEEHAN:  One minute, your Honor.  Your

25  Honor, Exhibit 28 is undated.

1           THE COURT:  Is that your objection?

2           MS. SHEEHAN:  No, I see a date of accident, no

3   objection.

4           MR. ANDREWS:  No objection, your Honor.

5           THE COURT:  It will be received.

6       Q    Now, in your testimony this morning, you've

7   referenced someone named Sergeant Mitchell and Lieutenant

8   Mitchell at various times.  Who are you referring, who have

9   you been referring to with respect to using those terms?

10          MR. ANDREWS:  Objection, your Honor.  I've

11  only heard her refer to Lieutenant Mitchell one time and it

12  was concerning testimony that was objected to and I

13  understood excluded so --

14          THE COURT:  No, I'm going to allow her to

15  answer, she has used the term lieutenant several times.

16          MR. ANDREWS:  Okay, maybe I missed some of it.

17          THE COURT:  Probably the whole time she was

18  there he was a sergeant, so I'd like to see it corrected for

19  the record.  Go ahead.

20      Q    Can you answer the question, do you remember

21  the question?

22      A    Yes, I -- sometimes I'll refer to him as

23  lieutenant because I also worked with him when he was a

24  lieutenant.

25      Q    Who is he?

1          A     I apologize.  Lieutenant, Sergeant Mitchell at

2   Auburn, Lieutenant Mitchell at Eastern.

3          Q     What is his first name?

4          A     Troy.

5          Q     Is he a defendant in this action?

6          A     Yes.

7          Q     Now you testified when you left the facility

8   in December 7th you went to the doctor.  Which doctor did you

9   see?

10         A     Thinking I believe I saw Eva Briggs.

11         Q     Who is she?

12         A     She is in the office with Dr. Alley.

13         Q     And after you saw Dr. Briggs, did you seek any

14   counseling from anyone?

15         A     Yes.

16         Q     Who was that?

17         A     From Ray Tartakoff in Ulster County.

18         Q     And why did you seek counseling from him?

19         A     Because while I was at Sullivan, I knew

20   several officers who went to him for counseling.

21         Q     And what type of credential does he have, if

22   any?

23         A     He's a licensed clinical social worker.

24         Q     And did there come a time that you saw

25   Dr. Alley again?

1          A    Yes.

2          Q    Do you recall about how long that was after

3    you saw Dr. Briggs?

4          A    It was a week.

5          Q    And what was the purpose of your visit to

6    Dr. Alley?

7          A    I was, um, I had suffered a break -- an

8    emotional breakdown.  I was not able to function.

9          Q    Now, did you ever speak to -- you okay?

10         A    (Witness gesturing affirmatively.)

11         Q    Okay.  Did you ever speak to Mary Mayville

12   again from the office of diversity management?

13         A    Yes.

14         Q    And when was that?

15         A    That was on -- in December, after I had left

16   the facility, probably was the 19th or the 20th of December.

17         Q    And did Ms. Mayville tell you anything

18   concerning her investigation?

19         A    Yes.

20         Q    What was that?

21         A    She told me it was the policy of the office of

22   diversity management to halt all investigations if the person

23   who was making the claims was out of work.

24         Q    Were you working at this time period?

25         A    No, I was on -- I was using my vacation and my

1   sick time.

2           Q    Now, when you spoke to Ms. Mayville about

3   this, did you speak to anybody else from the Department of

4   Corrections that day?

5           A    Yes.

6           Q    What office was that?

7           A    I'm not sure -- security transfers.

8           Q    And what was the nature of your contact with

9   the security transfers office?

10          A    I spoke to a Gus Agnostini (phonetic), and I

11  explained to him my situation at Auburn, I told him that I

12  really couldn't afford to be out of work, and I ask for him

13  to help me get a transfer, a quiet transfer somewhere.

14          Q    Did he respond to you?

15          A    Yes, he told me there were no quiet transfers.

16          Q    Did you ever file a grievance concerning the

17  problems in the fall of 2000 -- withdrawn.

18               Did you ever file another grievance with your

19  union concerning the problems at Auburn?

20          A    Yes, I did.

21          Q    Do you know when that was?

22          A    That was in December of 2005.

23          Q    What did you complain about in the grievance?

24          A    Treatment of females at Auburn.

25          Q    And anything else that you recall?

1          A    I would have had to have complained or made

2     the complaint about my treatment or the grievance wouldn't

3     have gone forward.

4          Q    Did you ask for any remedy?

5          A    Yes.

6          Q    What was the remedy that you requested?

7          A    I asked for the abuse of females at Auburn to

8     stop.

9          Q    Did you ask for any specific remedy regarding

10    yourself?

11         A    Yes, I -- I asked for a transfer, I believe.

12         Q    Penny, I'm going to show you what's been

13    marked as Plaintiff's Exhibit 25 and if you would look at

14    that, review it and identify it for me, if you can.

15         A    That is my grievance that I submitted, in

16    December of 2005.

17         Q    Who prepared the grievance?

18         A    I did this grievance.

19              MS. CONNOR:  At this time, we offer

20    Plaintiff's Exhibit 25, your Honor.

21              MS. SHEEHAN:  No objections.

22              MR. ANDREWS:  No objections, your Honor.

23              THE COURT:  It will be received.  Ms. Connor,

24    before you ask your next question, very shortly I'm going to

25    be looking for a time to break for lunch, so not now, but at

1    an appropriate time when you, in your examination, feel like

2    it's time to break, we'll break.

3                    MS. CONNOR:  Your Honor, if we can just cover

4    the grievance and that would probably be a good time.  I have

5    a few more questions to follow up.

6                    THE COURT:  Let's do that.

7            Q     Penny, what ever became of the grievance?

8            A     I don't know what happened to this grievance.

9            Q     Did you go to a step 1 hearing on the

10   grievance?

11           A     No.

12           Q     Did you ever receive anything from the

13   facility about the outcome of the grievance?

14           A     No.

15                   MS. CONNOR:  Your Honor, we can stop there.

16                   THE COURT:  Okay, very well.  Ladies and

17   gentlemen, we're going to take an hour for lunch, it's 12:00

18   on the dot, so we'll see you back in the jury room at 1:00 to

19   get started.  Enjoy your lunch, please don't talk about it,

20   anybody approaches you, tries to talk to you about it, please

21   let me know immediately.  Enjoy your lunch.  As promised, the

22   sun is out.

23                   (Jury Excused, 12:00 p.m.)

24                   THE COURT:  Ms. Collins, you may step down.

25   Counsel, before we go to lunch, there were some issues that

1   remained open yesterday with regard to a couple of exhibits.

2   I think it was Exhibit 60 and Exhibit 61, pages 1 and 2.

3   Have we gotten any more information with regard to those?

4                   MS. CONNOR:  Yes, I do, your Honor.  I have a

5   document that would demonstrate, a sworn statement that would

6   demonstrate that 60 was given to the Department of

7   Corrections.

8                   THE COURT:  And that was a memo written to

9   Superintendent --

10                  MS. CONNOR:  If I can go get the document.

11                  THE COURT:  Let's get this cleared up before

12  we go have our lunch.  I don't like to leave it dangling out

13  there.  Counsel, if your clients want to leave, that's

14  perfectly permissible.

15                  MS. CONNOR:  Your Honor, I have a statement

16  here signed by Penny Collins, and confirmed by Mel Brown of

17  the office of diversity management that references her

18  providing Plaintiff's Exhibit 60, which is the memorandum

19  from Penny Collins to Superintendent Walsh dated 16

20  June 2004, and this is on a -- this is a sworn statement

21  given to the office of diversity management by my client that

22  references this, and then it says in Mel Brown's handwriting,

23  see memo, and this is, the memo is referenced by date in

24  the --

25                  THE COURT:  When you say Mel Brown, is he

1    going to testify?

2                    MS. CONNOR:  I was not planning on calling

3    him, your Honor.

4                    THE COURT:  Who -- Mary Mayville from the

5    office of diversity management is going to testify?

6                    MS. CONNOR:  Yes, I've subpoenaed her.

7                    THE COURT:  And do you have any knowledge

8    whether she can verify Mr. Brown's signature, that it was

9    received by her office?

10                   MS. CONNOR:  I assume she can but I don't know

11   offhand right now.

12                   THE COURT:  Okay.  Well, then I'm going to --

13   what I'm going to do then is I will receive it subject to

14   connection or clearing up by Ms. Mayville that that was

15   actually something that was supplied to her office as a part

16   of what, a complaint?

17                   MS. CONNOR:  Yes, your Honor.  It was attached

18   to a statement that my client provided to the office.

19                   THE COURT:  I'm going to -- well, I won't,

20   I'll receive it when you connect that up, okay.

21                   MS. CONNOR:  Yes.

22                   MS. SHEEHAN:  Your Honor, yesterday the issue

23   was --

24                   THE COURT:  Bolstering.

25                   MS. SHEEHAN:  -- that Ms. Collins gave this

1    document to Superintendent Walsh.

2              THE COURT:  Correct.

3              MS. SHEEHAN:  So maybe --

4              THE COURT:  And I'm just looking for some sort

5    of verification or authenticity that it was indeed provided,

6    because it's about knowledge and notice here, all right, to

7    your clients.  And the reason your objection was bolstering,

8    which I agree with, it is bolstering, but there's also the

9    issue of knowledge and notification and if it was indeed

10   received, there's something to suggest that it was submitted

11   to Department of Corrections through the office of diversity

12   or through any part of the Department of Corrections, then

13   I'm going to receive it.  And that's why I'm going to

14   reserve, I'm going to let Ms. Connor try to connect that up

15   with her witness from the office of diversity.  If she's able

16   to do that, it will be received.  Okay.

17             Exhibit 61, pages 1 and 2.

18             MS. SHEEHAN:  I'm going to withdraw my

19   objection to that.

20             THE COURT:  You are.

21             MS. SHEEHAN:  To those two pages.

22             THE COURT:  Well, that one will be received.

23   Unless there's something else, let's go have some lunch.

24             MS. CONNOR:  No, your Honor.

25             THE COURT:  Very well.  Okay.

1          MS. CONNOR:  Thank you.

2          THE COURT:  All right.  Thank you.

3          (Whereupon a luncheon recess was taken from

4           12:05 p.m. to 1:01 p.m.)

5          (Open Court, Jury Out.)

6          THE COURT:  Okay.  Hope everybody enjoyed

7    their lunch.  Ms. Sheehan, are you going to proceed without

8    Mr. Kinsey or you want me to wait until he's here?  There he

9    is.  Okay, I'll wait till he's here.

10         MS. SHEEHAN:  Thank you for noticing he was

11   missing.

12         THE COURT:  Ready?

13         MS. SHEEHAN:  Yes.

14         THE COURT:  Okay.  Bring them in, Bruce.

15         MR. KINSEY:  Thank you, your Honor.

16         (Jury Present, 1:01 p.m.)

17         THE COURT:  Okay.  Hope you enjoyed your

18   lunch, and Ms. Collins is still on the stand, still under

19   oath.  Ms. Connor, go ahead.

20         MS. CONNOR:  Thank you, your Honor.

21         Q    Penny, I want to direct your attention to the

22   time, back to the time that you worked at Auburn.  When you

23   were at Auburn, did you observe any joking among the officers

24   that was not female based?

25         A    Yes.

1          Q     What types of things did you observe?

2          A     I saw, um, people putting Vaseline on the ear

3    phone of a ear and then calling someone so when they picked

4    up the phone, the Vaseline would get on their ear or their

5    hair.

6          Q     Did that happen to you?

7          A     Yes.

8          Q     Did you take that as an incident of

9    discrimination?

10         A     No.

11         Q     Why not?

12         A     Because it was something that they would have

13   done to anyone, male or female.

14         Q     Can you recall any other types of jokes?

15         A     Yes, I had my lunchbox down in B block, and

16   when I brought it upstairs, someone had taken all my lunch

17   out and replaced it with someone else's lunch.

18         Q     And did you think that was an incident of

19   discrimination?

20         A     No, not at all.

21         Q     Why not?

22         A     I actually thought it was funny.  It's

23   something -- the other officer was a male who they replaced

24   my lunch with his.

25         Q     Can you recall any other instances?

1          A      Like Sullivan, people would send you to find

2    people, I was sent to find an officer who was looking for me

3    that wasn't even there that day.  I was given the wrong keys,

4    four stories up in a block is the female bathroom, give me

5    the keys to something else so that I had to walk back down

6    again.

7          Q      Did you take that as instances of harassment

8    or discrimination?

9          A      No.

10         Q      How did you take that type of conduct?

11         A      Jokes happened all the time at Auburn and

12   Sullivan and Sing Sing as well.  Officers, you know, it's a

13   long day, and some officers have, you know, not a lot of

14   duties.

15         Q      Now, turning your attention back to the time

16   period of December 2005, did there come a time that you took

17   a leave of absence from work?

18         A      Yes.

19         Q      When was that?

20         A      That would have been December 7th of 2005.

21         Q      And did you receive a leave of absence from

22   your employer?

23         A      Yes.

24         Q      And was that an unpaid or paid leave?

25         A      No, that was my own vacation, my own sick

1    time, and my own personal time.

2              Q    And how long did your leave of absence last?

3              A    Until March.

4              Q    Of what year?

5              A    Of 2006.

6              Q    Now, did there come a time that you filed a

7    complaint related to discrimination outside of the Department

8    of Corrections?

9              A    Yes.

10             Q    And where did you file that complaint?

11             A    I filed that complaint with the Division of

12   Human Rights.

13             Q    And what is the Division of Human Rights?

14             A    It's -- that's a good one.  It's -- I can't

15   think of a good answer for that one.

16             Q    Is the Division of Human Rights part of the

17   Department of Corrections?

18             A    Oh, no.  No.

19             Q    Is it a government agency?

20             A    Yes, it's a state agency.

21             MS. CONNOR:  May I have just a moment to talk

22   to counsel, your Honor.

23             THE COURT:  Yes.

24             MR. ANDREWS:  Your Honor, can we discuss this

25   exhibit at side bar, please.

1          THE COURT:  Come on up.

2          (At Side Bar.)

3          THE COURT:  Go ahead.

4          MR. ANDREWS:  This complaint includes a

5    statement that Mr. Mitchell, it's a verified complaint so,

6    you know, I understand it was supposed to have been made on

7    personal knowledge but I think we've established that

8    Ms. Collins has no personal knowledge that Sergeant, then

9    Sergeant Mitchell distributed her memo to him to other

10   people, and that's stated very clearly in this complaint,

11   pretty prominent way so I would ask that that be redacted

12   also.  Do you know -- am I being clear?  You look --

13         THE COURT:  I think I'm following you.

14   There's a memo that she sent directly to him that there's

15   been testimony about.

16         MR. ANDREWS:  Yeah, there's been testimony

17   what we talked about at the beginning of the trial or

18   actually in motion in limine was this -- I should have

19   refreshed your recollection about this, that Ms. Collins had

20   alleged that Mr. Mitchell had distributed the memo to

21   colleagues and it was based purely on hearsay, and although,

22   if it was identified, it's on hearsay and here again, maybe I

23   would not have the problem and I understand not being called

24   for the truth of it but this is a verified complaint, and so

25   it seems like it stands on a little different footing.

1          MS. CONNOR:  Your Honor, I believe -- I've

2    tried to figure out where counsel's talking about, I believe

3    he's talking about paragraph 4, "after Sergeant Mitchell

4    circulated my letter."

5          MR. ANDREWS:  In a retaliatory act, sergeant

6    shared my letter with individuals in the facility and a copy

7    was also forwarded to the office of diversity.  That may be

8    true, that second part, but there's, can't be any

9    testimony --

10          THE COURT:  No firsthand knowledge of the fact

11   that it was distributed?

12          MR. ANDREWS:  She had no firsthand knowledge.

13          MS. CONNOR:  I can redact it, your Honor.

14          THE COURT:  Let's redact just that section of

15   it, it should be fine.

16          MS. CONNOR:  All right.  Our Sharpies are

17   here, so we'll do it.

18          THE COURT:  Keep them available, I guess.

19          MS. CONNOR:  And that's the same, there's

20   actually two and they're identical so it will take me a

21   second.

22          THE COURT:  That's okay.

23          (Open Court.)

24          THE COURT:  Going to just be a second.

25   Counsel has to correct something in the document that we're

1    going to use.  Mr. Andrews, if you could just check, make

2    sure the part we're talking about has been satisfactorily

3    addressed before we get going.

4              MR. ANDREWS:  Yes, it is, thank you, your

5    Honor.

6              THE COURT:  All set, thank you.  Ms. Connor,

7    when you're ready.

8         Q    Penny, I'm going to show you a copy of

9    Plaintiff's Exhibit 12, and I'm going to ask you to look at

10   that and review it for me and identify it for me if you can.

11        A    This is my original complaint filed with the

12   Division of Human Rights.

13        Q    What's the date of that?

14        A    January 3rd, 2006.

15             MS. CONNOR:  At this time, we offer

16   Plaintiff's Exhibit 12, your Honor.

17             MS. SHEEHAN:  No objections with redactions in

18   paragraph 3 and 4.

19             THE COURT:  Mr. Andrews?

20             MR. ANDREWS:  Can I see that one more time,

21   please.  Oh, no objection, thank you.

22             THE COURT:  The date again of that?

23             THE WITNESS:  It was January 3rd, 2006.

24             THE COURT:  Okay.

25        Q    Penny, did there come a time that you filed

1   another complaint with the New York State Division of Human

2   Rights?

3            A    Yes.

4            Q    I'm going to show you what's been marked as

5   Plaintiff's Exhibit 13, ask you to review it, read it,

6   identify it for me if you can.

7            A    This is my revised complaint with the Division

8   of Human Rights.

9            Q    Now with -- Withdrawn.

10               Is that your signature on that?

11           A    Yes.

12           Q    And what's the date of that?

13           A    It's May 23rd, 2006.

14               MS. CONNOR:  Your Honor, we offer Plaintiff's

15   Exhibit 13.

16               THE COURT:  Any objection?

17               MS. SHEEHAN:  No objections with redactions at

18   paragraphs 3 and 4.

19               MR. ANDREWS:  Same here, your Honor.

20               THE COURT:  Okay, it will be received.

21           Q    Now, when you testified that it's revised, in

22   what way is the second complaint, Plaintiff's Exhibit 13,

23   different from Plaintiff's Exhibit 12, the first complaint?

24           A    In the original complaint, the -- when the

25   Division typed it up, they put the blame of halting the

1  investigation on the investigator, Mary Mayville, and not on

2  the division of -- I'm sorry, not on the office of diversity

3  management.  And I felt that that was not truthful because it

4  was not Ms. Mayville who halted the investigation, but the

5  office of diversity management.

6          Q     So did you revise your complaint?

7          A     Yes.

8          Q     Now, did you speak to Ms. Mayville again from

9  the office of diversity management about your problems with

10 working at the New York State Department of Corrections?

11         A     Yes.

12         Q     When's the next time you spoke to her?

13         A     I spoke to her in January of 2006.

14         Q     Where did -- did you speak to her in person or

15 on the phone?

16         A     In person.

17         Q     Where did that meeting take place?

18         A     At Applebee's in Camillus.

19         Q     Why was the meeting at Applebee's in Camillus?

20         A     Because I was out of work at Auburn and that

21 was -- that was a neutral place.

22         Q     And did -- how did the meeting come about?

23         A     Ms. Mayville told me originally that the

24 investigation was halted, and I tried to work through my

25 union to see if I could get the investigation continued and

1   when I could not, I informed the office of diversity

2   management that I was going to step outside the department

3   and Miss Mayville called me up and said that they had decided

4   to reopen my investigation.

5          Q    And how long did you meet with Ms. Mayville at

6   Applebee's?

7          A    We met all afternoon, three, four hours,

8   maybe.

9          Q    And did you -- what took place at the meeting?

10         A    I told her my statement as I was writing it.

11         Q    You made a statement at the meeting?

12         A    Yes.

13         Q    And what was contained in that statement?

14         A    It was just a timeline of all the harassment

15  and retaliation that I had suffered so far at Auburn.

16         Q    Now, was this Ms. Mayville's -- Withdrawn.

17              When you first made a complaint -- Withdrawn

18  again.

19              When you first made a statement with

20  Ms. Mayville, did she write the statement or did you?

21         A    Yes, she wrote the statement.

22         Q    And with the second statement with

23  Ms. Mayville, you testified you wrote it?

24         A    Yes.

25         Q    Why was that?

1         A    In the interest of time because when I said

2   something, I had to wait for Ms. Mayville to write it down,

3   but as I was speaking and I write very fast, I was writing

4   while I was talking to her, and it cut our time.

5         Q    Now, to the best of your recollection, can

6   you -- you said it was a timeline, can you be more specific

7   about what you put in the statement to Ms. Mayville?

8         A    The original investigation part back in

9   November had already began with when I arrived at Auburn and

10  started with the rumors and I'm not exactly sure when it

11  stopped, but wherever it stopped, I picked up at that time.

12  I think I may have picked up in February of 2005.

13        Q    And what types of things did you put in your

14  statement to Ms. Mayville?

15        A    I told her about the conversation in the front

16  entry, about harassing the female so badly that she left and

17  didn't return, I told her about Officer McFall, about being

18  touched on the steps by an officer, about Sergeant Mitchell's

19  interactions with me.

20        Q    Sergeant Mitchell, defendant in this case?

21        A    Yes.  I told her about my attempts, numerous

22  attempts to resolve these issues.  I told her about my

23  incidents with Sergeant Wright, my grievances, and my, my

24  smoky bear incident.  I detailed everything so that she would

25  have a clear understanding of exactly what was going on and

1    how I'd attempted to correct it.

2           Q     Did you make any reference to the bathrooms or

3    locker rooms at Auburn?

4           A     Yes, I did.

5           Q     What, if anything, did you say concerning them

6    in your statement?

7           A     I told her what was written on the bathroom

8    wall when I asked to paint it over.

9           Q     What, do you specifically -- what did you tell

10   her?  I have to ask you that again, specifically.

11          A     I told her on the bathroom wall it said,

12   "Penny gives shitty head.  I wouldn't let that bitch touch

13   me.  Any head is better than no head."

14          Q     Did you tell her anything else concerning the

15   locker rooms or bathrooms at Auburn?

16          A     Yes.

17          Q     What is that?

18          A     I told her that was -- it was very

19   inappropriate for men and women to be sharing the same

20   facilities, especially when the state had already ruled on

21   that, and I discussed the safety of the locker room.

22          Q     Can you explain what you mean by safety of the

23   locker room?

24          A     Yes, the locker room is down in the basement,

25   and it's -- it goes off in all different directions, the

1    lighting is very poor, very poor, if you have the light on

2    you can't see in the back areas, or anything.  I told

3    Ms. Mayville about the bathrooms in the facility.

4            Q    What did you say with -- regarding the

5    bathrooms?

6            A    I told her that, well, on one block, there was

7    no door on the bathroom, so if you had -- if you worked in

8    that block on a shift and you were female, well, there was no

9    outside door and there was an inside door and the inside door

10   was high up so that you could actually see the commode from

11   the bottom of the door so it's not a female bathroom.

12           Q    Did you tell Ms. Mayville that?

13           A    Yes, I did.

14           Q    Now, when you spoke with Ms. Mayville, were

15   you on your leave of absence?

16           A    Yes.

17           Q    And during this leave of absence, did you

18   continue to seek any medical help?

19           A    Yes.

20           Q    Whom did you see?

21           A    I saw, in addition to Dr. Alley, my medical

22   doctor, I continued to see Ray Tartakoff in Ulster County.  I

23   tried to transition to a psychologist in Auburn because it

24   was closer.

25           Q    What was that psychologist's name?

1          A      That would have been Dr. Humphreys.

2          Q      Did you ever receive a bill for services from

3    Dr. Humphreys?

4          A      Yes.

5          Q      I want to show you what's been marked as

6    Plaintiff's Exhibit 34.  Would you look at that and identify

7    it for me if you can.

8          A      This is my receipt from Dr. Humphrey.

9                 MS. CONNOR:  And I offer Plaintiff's

10   Exhibit 34, your Honor.

11                MS. SHEEHAN:  Your Honor, could I please have

12   a minute.  What exhibit was that, Ms. Connor?

13                THE COURT:  34.

14                MS. CONNOR:  34.

15                MS. SHEEHAN:  No objections, your Honor.

16                MR. ANDREWS:  No objections, your Honor.

17                THE COURT:  Thank you.  The document will be

18   received.

19         Q      After you saw -- how many times did you see

20   Dr. Humphrey?

21         A      Just twice.

22         Q      And after you saw Dr. Humphrey, did you seek

23   any other help from a psychological provider?

24         A      Yes.

25         Q      And who was that?

1          A     I believe I saw Dr. Coleman next.

2          Q     And when did you see him, to the best of your

3     recollection?

4          A     I'm not sure.

5          Q     What year was it?

6          A     It would have been 2006.

7          Q     And did you receive any sort of statement or

8     bill from Dr. Coleman?

9          A     Yes.

10         Q     And did you make a claim under health

11    insurance for Dr. Coleman?

12         A     No.

13         Q     Why not?

14         A     Because I was under my husband's medical

15    insurance and it doesn't have mental health counseling.

16         Q     Did you file a Workers' Compensation claim

17    against New York State?

18         A     Yes, I did.

19         Q     And as part of that claim, were you claiming

20    medical expenses?

21         A     Yes.

22         Q     And was Dr. Coleman's services billed through

23    New York State Workers' Compensation?

24         A     I -- I paid them and they reimbursed me.

25         Q     Did you make a claim for that reimbursement?

1          A     Well, no.  I didn't make a specific claim

2     because they -- they settled out on the medical.

3                    MS. SHEEHAN:  Your Honor, may we have a side

4     bar.

5                    THE COURT:  Come on up.

6                    MS. CONNOR:  I understand, your Honor.

7                    (At Side Bar.)

8                    MS. SHEEHAN:  Your Honor, you made a ruling

9     the Workers' Compensation determination, records were not to

10    come in.  Prejudicial to the jury.

11                   MS. CONNOR:  As I understood your ruling, and

12    if I misunderstood it, I apologize, I understood your ruling

13    was to Exhibit 24, which is what you -- that's the exhibit

14    you identified because it contained the ultimate

15    determination from New York State Workers' Compensation.

16                   MS. SHEEHAN:  I filed a motion in limine for

17    all Workers' Compensation documents.

18                   MS. CONNOR:  You identified Plaintiff's 24.

19                   MS. SHEEHAN:  I don't know if that is true

20    because I didn't have your document -- wait a minute, I

21    couldn't have identified Exhibit 24, I didn't have your

22    documents until Friday after I filed the motion in limine.  I

23    filed generally the -- for Workers' Compensation.

24                   THE COURT:  So why don't you state the exact

25    nature of your objection for the record.

1              MS. SHEEHAN:  Is that you ruled the

2    determination of Workers' Compensation and the records would

3    not be admissible in this proceeding, it would be

4    prejudicial, taking the province of the jury determination.

5    Now we have before the jury that state settled Workers'

6    Compensation claim.

7              MS. CONNOR:  Your Honor, I did not seek to

8    elicit that testimony, I was seeking to elicit a claim

9    through New York State Workers' Compensation for services

10   provided, not an ultimate determination.

11             THE COURT:  So where are you trying to go with

12   this?

13             MS. CONNOR:  I wanted to show that she had

14   sought medical assistance, psychological assistance.

15             THE COURT:  Okay, we can do that without

16   talking about Workers' Comp.

17             MR. KINSEY:  Your Honor, may I be heard for

18   just a second on the medical records.  We received no

19   treatment records for psychiatric, from the main -- from the

20   people that have just been mentioned.  So if they exist,

21   they've not been disclosed.

22             MS. CONNOR:  They're in the book, you've

23   had --

24             MS. SHEEHAN:  They are not, Coleman, that's

25   the first time we ever heard his name, Ray Tartakoff.

1              MS. CONNOR:  I'm not suggesting that was

2    through New York State Workers' Compensation, there was no

3    testimony elicited about that whatsoever.

4              THE COURT:  Okay.

5              MS. SHEEHAN:  Your Honor, also, as far as for

6    damages, she was reimbursed, it was a settlement, all of

7    these medical bills were paid if that's what she was seeking

8    while on Workers' Compensation.

9              MS. CONNOR:  But that is not --

10              THE COURT:  So then why are we talking about

11    receipts for payment?

12              MS. CONNOR:  Because it shows the dates that

13    she sought --

14              THE COURT:  She can testify as to the dates

15    that she was treated, you don't have to talk about

16    reimbursement or Workers' Compensation, if these have been

17    fully compensated, it shouldn't be mentioned, okay?

18              MS. CONNOR:  Yes.

19              THE COURT:  Let's focus and stay on the

20    treatment.  The objection will be sustained.  The answer with

21    regard to the Workers' Comp. is going to be stricken, okay.

22              MS. CONNOR:  Understood, thank you.

23              MR. KINSEY:  Can the court note a limiting

24    instruction?

25              MS. SHEEHAN:  I don't know if we want one,

1    it's just going to bring it to their attention again.

2                    THE COURT:  I think it will highlight it.  I

3    don't think there's been much damage done at this point.

4                    MR. KINSEY:  Okay.

5                    THE COURT:  You've done it, stopped it,

6    corrected it, we talked about Workers' Comp., we haven't

7    talked about what was covered by Workers' Comp. or she was

8    fully covered by any sort of expenses she had, none of that's

9    come out so we're going to stay away from it completely.

10                    MR. KINSEY:  Okay, very good.

11                    THE COURT:  And we're going to proceed, okay,

12    we'll strike that portion.

13                    MS. SHEEHAN:  Thank you, your Honor.

14                    (Open Court.)

15                    THE COURT:  Ms. Connor, when you're ready.

16                    MS. CONNOR:  Thank you.

17          Q    Penny, when you saw Dr. Coleman, where is he

18    located?

19          A    In Auburn.

20          Q    How many times approximately did you see him?

21          A    Twice.

22          Q    Did he give a diagnosis of you?

23          A    Yes.

24          Q    What was that diagnosis?

25          A    I don't remember, I think he diagnosed me

1    with --

2            Q    Okay, if you don't remember --

3            A    Okay.

4            Q    -- I don't want you to --

5            A    Okay.

6            Q    -- guess.  Thank you.  Other than Dr. Humphrey

7    and Dr. Coleman, did you seek any other assistance from a

8    medical provider for psychological issues?

9            A    Yes.

10            Q    Who was that?

11            A    I saw Dr. or Mr. Hones, he's a licensed social

12    worker.

13            Q    Where is he located?

14            A    In Syracuse.

15            Q    And what's your best recollection of when you

16    saw him?

17            A    I'm not sure, sometime in 2006.

18            Q    And did you seek, during this time, any other

19    treatment from Dr. Alley?

20            A    Yes.

21            Q    And how -- with what frequency did you see

22    Dr. Alley in 2006?

23            A    Sometimes I saw Dr. Alley twice a week,

24    sometimes four times a week, sometimes once a week.

25            Q    Now did there come a time that you worked at

1    Eastern Correctional Facility?

2              A    Yes.

3              Q    When was that, when did you begin?

4              A    March of 2006.

5              Q    Where is Eastern?

6              A    It's in Ulster County.

7              Q    What type of a facility is it?

8              A    It's a male maximum security.

9              Q    And how did it come about that you worked at

10   Eastern?

11             A    I requested a transfer.

12             Q    And then what happened?

13             A    My name came up for a transfer.

14             Q    Did you request Eastern?

15             A    It was -- I believe it was number two on my

16   list, yes.

17             Q    And why did you put that Eastern as number two

18   on your list?

19             A    Because I had family and friends back there in

20   that area, and I would have some support if I had to move

21   away for work.

22             Q    Now when you worked at Eastern, how would you

23   characterize the environment for females when you were there?

24             A    I think it would be along the same lines as

25   Sing Sing, females were treated just like the male officers,

1    there was no discrimination, no partiality on assignments,

2    no, I didn't find any harassment, nothing.

3              Q    And when you worked at Eastern, however, did

4    you -- did there come a time that you contacted the

5    administration of the Department of Corrections about any

6    issues you had with your employment at the department?

7              A    I wrote another letter to Albany.

8              Q    Who do you mean, is there a particular person?

9              A    To Glenn Goord.

10             Q    Who is Glenn Goord?

11             A    He was the commissioner of corrections.

12             Q    When did you write that letter?

13             A    I would have written that letter in June or

14   July of 2006.

15             Q    And what was in the letter to Mr. Goord?

16             A    I detailed issues of female harassment, I

17   addressed the safety of the facilities because of

18   officer-on-officer abuse, I addressed -- I can't remember

19   what else I addressed in that letter.

20             Q    Did you ask Commissioner Goord to do anything?

21             A    Yes.

22             Q    What is that?

23             A    I ask him to look into it, I ask him if I

24   could meet with him, and discuss this.

25             Q    And did you ever receive a response from

1    Commissioner Goord to this letter?

2              A    No.

3              Q    Now, did you like working at Eastern?

4              A    I did.

5              Q    Why is that?

6              A    Because I wasn't harassed there.

7              Q    Did there come a time when you had a problem

8    at Eastern?

9              A    Yes.

10             Q    When was that?

11             A    That would have been September of 2006.

12             Q    And what occurred then?

13             A    Sergeant Mitchell got promoted to lieutenant

14   and they transferred him to Eastern.

15             Q    Are you referring to Troy Mitchell, defendant

16   in this case?

17             A    Yes.

18             Q    When did he come to Eastern?

19             A    He came to Eastern in September of 2006.

20             Q    And what occurred when he came?

21             A    He started harassing me.

22             Q    Specifically what occurred?

23             A    Well, when he got there, I was a resource

24   officer, and I bid jobs that were off schedule so that I

25   would not see him at lineup and I bid jobs and there was a

1    minimum part, it was an annex and I bid jobs in the annex so

2    I could stay away from him.  And so I was on an off-schedule

3    job one day where I would have to leave the facility early,

4    and there's one way out of the facility, from the back from

5    the yard, and Lieutenant Mitchell sat in that -- in that

6    doorway with his feet propped up on an officer desk and I

7    came up from the yard and he was blocking the doorway and so

8    I waited for him to leave so that I could leave the facility.

9    And finally, an officer told me to go out the visiting door

10   and they opened the visitors' door for me to get out.

11        Q    Now did you contact anybody in Eastern

12   administration concerning problems with defendant Mitchell?

13        A    Yes.

14        Q    Whom did you contact?

15        A    When I first found out that Lieutenant

16   Mitchell had been transferred there, I was home on my days

17   off in Skaneateles, and I contacted the watch commander, and

18   I asked him did they realize that I have a human rights case

19   for sexual harassment against Lieutenant Mitchell and that I

20   had gone to Eastern to get away from him.

21        Q    Did you receive a response?

22        A    Yes.

23        Q    What was that?

24        A    The watch commander told me unless I had an

25   order of protection against him, that there was nothing that

1    they could do.

2            Q    Now did you have any other interactions with

3    defendant Mitchell while you were at Eastern?

4            A    Yes.

5            Q    What was that?

6            A    I was working an outside post and part of my

7    job was to process inmates into the yard, just go through

8    their bags and wand them, and Lieutenant Mitchell came out

9    and he stood, there's a -- an officer shed and then there's a

10   small walkway, a railing and a small place where inmates pass

11   through and then there's the tables where we process out, and

12   so I was standing, there's an officer counting, he's standing

13   by the shed and I was standing by the officer wanding people

14   when Lieutenant Mitchell came into the yard and he just stood

15   there.  And he -- and he was looking at me and there was a

16   female officer there and she asked me what was going on.

17   And ...

18           Q    Then what happened?

19           A    I went into the officer shed, the officer's

20   post, and I got sick.

21           Q    What occurred in the post, how did you get

22   sick?

23           A    I vomited.

24           Q    And what was your demeanor at this time?

25           A    I was very angry, I was very upset, I was -- I

1   was sick again, I was back to being sick to my stomach again,

2   and, just back to where -- basically where I had left off at

3   Auburn nine months before.

4           Q    Now what happened with your employment at

5   Eastern?

6           A    I went out.  Well, I tried before I left there

7   to see what I could do.

8           Q    How did you do that?

9           A    I talked to the captain, I talked to Captain

10  Coleman.

11          Q    And what, if anything, what did you say to

12  Captain Coleman?

13          A    I told Captain Coleman that I was afraid of

14  Lieutenant Mitchell, and I ask him what I could do.  He said

15  there's nothing that can be done, that he would be my

16  supervisor some days.

17          Q    After that, what happened with your employment

18  at Eastern?

19          A    I went out again, I used my own time.

20          Q    And did you seek any medical attention?

21          A    Yes.

22          Q    Whom did you see?

23          A    I went back to seeing Dr. Alley.

24          Q    And what types of symptoms did you have at

25  this time?

1          A    I -- I couldn't stop crying, I didn't want to

2     be alone, I didn't leave my house unless my husband or my son

3     came with me, I was -- I had stomach problems, I had just

4     stress, stress-related problems.

5          Q    Did you ever return to your employment at

6     Eastern?

7          A    Yes.

8          Q    When was that?

9          A    That would have been about April of 2007.

10         Q    How did it come that you went back to work at

11    Eastern?

12         A    I requested to go back, and the state ordered

13    a psychological evaluation because I had been out of work for

14    so long, and Dr. Alley said if the state psychologist passed

15    me, he would, he would let me go back to work.

16         Q    Were you cleared to go back to work?

17         A    Yes.

18         Q    And at the time that you were off of work, did

19    you take any medication?

20         A    Yes.

21         Q    What medication was that?

22         A    I attempted to take Lexapro.

23         Q    What was your understanding what that was for?

24         A    It was for my anxiety.

25         Q    And were you able to tolerate Lexapro?

1          A    No.

2          Q    Why not?

3          A    Because of the side effects.

4          Q    What effects were you experiencing?

5          A    I had very bad stomach issues, and actually I

6    was very angry when I was taking it, which is a side effect

7    of it also.

8          Q    Now, after you left Eastern, did you ever

9    contact anyone in the upper administration of the Department

10   of Corrections about any problems you had with your

11   employment?

12         A    Yes.

13         Q    Who did you contact?

14         A    When the new commissioner came in, I wrote a

15   letter to Commissioner Fischer.

16         Q    And what did you say in that letter?

17         A    I just rehashed again, I detailed the issues,

18   the security of the facilities were in jeopardy, I believed I

19   had another person who might take -- who might take an

20   interest, because I could not believe that they were aware of

21   what was going on, because I felt that, if I could make

22   someone aware of the issues, that someone would do something

23   about it.

24         Q    And when you say the issues, can you elaborate

25   on what those were?

1          A    Yes.  The female harassment issues, the

2    officer-on-officer abuse issues, and the safety and the

3    security of the facilities.

4          Q    To the best of your recollection, when did you

5    contact or write to Commissioner Fischer?

6          A    I wrote on March 17th.

7          Q    What year?

8          A    2007.

9          Q    Did you ever receive a response from him?

10         A    Yes.

11         Q    And what type of response was it?

12         A    I had requested to meet with him and I got a

13   response back from his office saying that Commissioner

14   Fischer could not meet with me because I had a lawsuit, was

15   my human rights case.

16              MS. CONNOR:  May I have just a moment, your

17   Honor.

18              THE COURT:  You may.

19         Q    Penny, when you worked at the Department of

20   Corrections, did you receive any performance reviews?

21         A    Yes.

22         Q    And do you recall approximately how many

23   reviews that you received?

24         A    Right after I left the academy, I received one

25   in the academy and then I believe I received one maybe every

1    three months and then they were yearly, I believe.

2           Q    Penny, I'm placing before you what's been

3    marked as Plaintiff's Exhibit 68 and if you will look at

4    that, review it, identify it for me if you can.

5           A    This is my officer evaluation from the

6    academy.

7                MS. CONNOR:  Your Honor, at this time we offer

8    Plaintiff's Exhibit 68.

9                THE COURT:  Any objection?

10               MS. SHEEHAN:  No objections, your Honor.

11               MR. ANDREWS:  No objections.

12               THE COURT:  They will be received.

13          Q    Penny, I'm going to show you what's been

14   marked as Plaintiff's Exhibit 69 and would you review that

15   and identify it for me if you can.

16          A    This is my officer evaluation from Sing Sing,

17   from December of '02 evaluation period to January of '03.

18               MS. CONNOR:  Your Honor, at this time we offer

19   Plaintiff's Exhibit 69.

20               MS. SHEEHAN:  No objections, your Honor.

21               MR. ANDREWS:  No objections.

22               THE COURT:  That will be received.

23          Q    I'm sorry, your Honor.  Penny, I'm going to

24   show you what's been marked as Plaintiff's Exhibit 70, if you

25   can review that, identify it for me if you can.

1          A     This is my evaluation report from Sullivan

2     from May of '03 to August of '03.

3                MS. CONNOR:  At this time, your Honor, we

4     offer Plaintiff's Exhibit 71 -- I'm sorry, 70, I misspoke.

5                MS. SHEEHAN:  No objections.

6                MR. ANDREWS:  No objections.

7                THE COURT:  Received.

8          Q     Do this a few more times.  Probably more

9     efficient ways but we'll do it this way.  Let me show you

10    what's been marked as Plaintiff's Exhibit 71, if you would

11    review it, identify it for me, please, if you can.

12         A     This is also an evaluation report from

13    Sullivan, it's from August of '03 to October of '03.

14                MS. CONNOR:  At this time, your Honor, we

15    offer Plaintiff's 71.

16                THE COURT:  Any objection?

17                MS. SHEEHAN:  No, your Honor.

18                MR. ANDREWS:  None.

19                THE COURT:  Received.

20         Q     Penny, I'm going to show you what's been

21    marked previously as Plaintiff's Exhibit 72.  Would you

22    review it and identify it for me if you can.

23         A     This is also from Sullivan, it's from October

24    of '03 to April of '04.

25         Q     What is it?

1          A      I'm sorry, this is my evaluation report.

2                 MS. CONNOR:  At this time, we offer

3     Plaintiff's Exhibit 72.

4                 THE COURT:  Any objection?

5                 MS. SHEEHAN:  No objections, your Honor.

6                 MR. ANDREWS:  No objections.

7                 THE COURT:  It's received.

8          Q      Penny -- sorry, your Honor.

9                 THE COURT:  That's all right.

10         Q      I'm going to -- withdrawn.  I'm going to show

11    you what's been marked as Plaintiff's Exhibit 73, if you

12    could review it and identify it for me if you can.

13         A      This is my officer evaluation report from

14    Auburn from June of '04 to October of '04.

15                MS. CONNOR:  At this time, we offer

16    Plaintiff's 73, your Honor.

17                MS. SHEEHAN:  No objections.

18                MR. ANDREWS:  No objections.

19                THE COURT:  Received.

20         Q      Penny, I'm going to show you what's been

21    marked Plaintiff's Exhibit 74, if you could review that,

22    please, and identify it for me if you can.

23                THE COURT:  How many more of these do we have?

24                MS. CONNOR:  One more, this is our last one.

25                THE COURT:  Any objection to these?  Can we

1   stipulate to these instead of going through this exercise?

2                   MS. SHEEHAN:  74, 75.

3                   MS. CONNOR:  That's it, 74 and 75.

4                   THE COURT:  Any objections?

5                   MS. SHEEHAN:  No objections.

6                   MR. ANDREWS:  No objections either, your

7   Honor.

8                   THE COURT:  74 and 75 are in.

9                   MS. CONNOR:  Thank you, your Honor.

10                  THE COURT:  Are they both from Auburn?

11          Q    74 and 75.

12          A    Yes.

13                  THE COURT:  Okay, thank you.

14          Q    Now, with respect to your review, your

15  reviews, what overall ranking did you receive first with

16  respect to your review at the academy which is

17  Plaintiff's 68?  It's the first one I gave you.

18          A    I got good at the academy.

19          Q    And with respect to Plaintiff's 69, what was

20  the overall review ranking you received?  Plaintiff's 69?

21          A    Yes, I got good for those two weeks, too.

22          Q    Now Plaintiff's Exhibit 70, what was your

23  overall ranking in the review?

24          A    Good.

25          Q    And with respect to Plaintiff's Exhibit 71,

1  Sullivan, what was your overall ranking?

2          A    Also good.

3          Q    Were there any comments made on that review

4  concerning any comments that praise you on Plaintiff's 71?

5          A    Yes.

6          Q    What was that comment?

7          A    It was a comment that I handled a recent

8  problem with an inmate on A South very well.

9          Q    And what was that problem about?

10         A    The inmate returned from the block from

11 medical and medical told him that his officer was going to

12 write a misbehavior report on him and he came back to the

13 block very upset, screaming, threatening to kill me and

14 crossing the officer's line.

15         Q    So what occurred, what did you do, if

16 anything?

17         A    I'm -- I raised my voice at him, I got the

18 other inmates back to their cells, the response team came and

19 took care of it.

20         Q    Directing your attention to Plaintiff's

21 Exhibit 72, what was your overall ranking in that performance

22 review?  That's also from Sullivan.

23         A    That was excellent.

24         Q    Now with respect to Plaintiff's Exhibit 73,

25 which spans a time in Auburn, what was your overall ranking?

1          A      That was excellent.

2          Q      And with respect to Plaintiff's Exhibit 74

3    from Auburn, what was your overall ranking?

4          A      Excellent.

5          Q      Did you have a problem with any other part of

6    that performance review?

7          A      Yes.

8          Q      What was that problem?

9          A      I had a problem because once I started

10   complaining, I had a comment on here about --

11         Q      What does the comment say, please?

12         A      It says, "Although CO Collins is a capable

13   staff member, there has been difficulties with numerous other

14   staff members which indicates a need to improve in this

15   area."

16         Q      And who made that comment on your review?

17         A      Lieutenant Ouimette.

18         Q      Did you sign that review?

19         A      No, I did not.

20         Q      Why not?

21         A      Because I didn't feel I had a need to improve

22   in this area, I felt because I had asked for improvements to

23   be made and because people were harassing me, this was

24   included on my report.

25         Q      Now with respect to all your previous reviews,

1    had you signed them?

2            A    Yes.

3            Q    Now directing your attention to Plaintiff's

4    Exhibit 75, which is also a period of time at Auburn, what

5    was your overall ranking on that review?

6            A    It went down to good.

7            Q    And are there any more comments on that

8    review?

9            A    Yes.

10           Q    What was that?

11           A    My time and attendance was marked as needs

12   improvement, and I had absolutely no issues at all with my

13   time and attendance, time and attendance, I was always in the

14   outstanding category, I was taken down to good in my

15   performance factor, my relationship with fellow employees, it

16   was needs improvement.

17           Q    Did you sign that review?

18           A    No, I did not.

19           Q    Why not?

20           A    Because I believed that my review was based on

21   the fact that I had made complaints about my treatment at

22   Auburn.

23           Q    Now, you testified earlier that you -- I'll

24   withdraw that.

25                Did there come a time that you attempted to

1  return again to employment with the Department of

2  Corrections?

3         A    Yes.

4         Q    When was that?

5         A    That was when I returned in 2007, April of

6  2007.

7         Q    And why did you want to return to your

8  employer?

9         A    I needed the money, and I liked my job.

10  Without the harassment, I really liked my job.

11         Q    And where were you assigned?

12         A    I was still assigned to Eastern.

13         Q    And was Lieutenant Mitchell, a defendant in

14  this case, still there?

15         A    No.

16         Q    Now, when you returned to Eastern, what, if

17  anything, occurred with respect to your ability to do your

18  job?

19         A    I realized that I was not the same officer

20  that I was before I left.

21         Q    In what way?

22         A    I didn't like to be enclosed in areas, I had a

23  hard time trusting, it, I was -- kind of separated myself,

24  I -- as soon as I got back, it was -- it was just stressful

25  to me.

1          Q     Did something occur at work that drew this to

2    your attention?

3          A     Yes.

4          Q     What was that?

5          A     I -- I was in a control room, and an officer

6    came and he was just talking to me, and he stood in the

7    doorway, and I had a panic attack at work.

8          Q     What's a panic attack -- Withdrawn.

9                What were the symptoms that you experienced?

10         A     I had a pain in my chest, my arm went numb, I

11   was having difficulty breathing, I was having just a problem

12   being there.  I had to get out of there.

13         Q     And how did you leave the facility?

14         A     I went to -- I went to the chart office.  I

15   was in the annex, the minimum part of the facility.

16         Q     And how did you actually leave the facility?

17         A     Sergeant Wise, Sergeant Wise was -- Officer

18   Wise who was on the block that day that Lieutenant Mitchell

19   harassed me so bad, had been promoted to sergeant and

20   transferred to Eastern, and he was the charge sergeant that

21   day and he arranged for an officer, I believe they were two

22   officers, to take me to the outside hospital.

23         Q     And after you left the facility, where did you

24   go?

25         A     Went to Ellenville Community Hospital.

1          Q     After you tried to return to work at

2    Eastern -- withdrawn.  After you returned to work at Eastern

3    and the time that you left to go to the hospital, about how

4    many weeks had passed?

5          A     About five weeks.

6          Q     Did you take a medical leave of absence from

7    the Department of Corrections at that time?

8          A     Yes.

9          Q     Now did there come a time that you -- when you

10   understood that you were separated from your employment with

11   the Department of Corrections?

12         A     Yes.

13         Q     And how did you become aware of that?

14         A     I received a letter in April of 2009 saying

15   that my termination was coming up because it had been a year

16   since -- since I was out on leave.

17         Q     Penny, I'm going to show you what's been

18   marked as Plaintiff's Exhibit 77, if you could review that

19   and identify it for me if you can.

20         A     This is my letter that I received from the

21   deputy superintendent of administration in Albany personnel

22   telling me that I would be terminated effective May 27th,

23   2009 from my position as a corrections officer.

24               MS. CONNOR:  At this time, we offer

25   Plaintiff's 77, your Honor.

1          MS. SHEEHAN:  No objections.

2          MR. ANDREWS:  No objection, your Honor.

3          THE COURT:  It's received.

4     Q    Now Penny, other than working for the

5 Department of Corrections at that last time that you went

6 back to Eastern, have you been employed since September 2006?

7     A    Yes.

8     Q    And where were you employed?

9     A    I worked a temporary job with the Census.

10    Q    When was that?

11    A    That was in 2010.

12    Q    How long did you work for the Census?

13    A    For approximately two months.

14    Q    Have you, since that time, other than that

15 time you went back to the Department of Corrections, from

16 2006 to now, have you been employed elsewhere?

17    A    Yes.

18    Q    Where is that?

19    A    I work at the Christian Counseling Center in

20 Crossville, Tennessee.

21    Q    Is this your current employment?

22    A    Yes.

23    Q    When did you start there?

24    A    That started there in July of 2011.

25    Q    Did Dr. Alley ever give you a diagnosis of

1   your psychological problems?

2              A    Yes.

3              Q    What was that diagnosis?

4              A    He diagnosed me with PTSD.

5              Q    What does that stand for?

6              A    Post-traumatic stress disorder.

7              Q    And do you still have problems, psychological

8   problems, presently?

9              A    Yes.

10             Q    Would you just briefly tell us what they are?

11             A    I still have panic attacks, I have a problem

12  being alone ... I sleep with the light on.  I have a fear of

13  meeting new people now.  I used to be very outgoing, and I

14  never knew, I never knew a stranger, and now I know -- I know

15  a lot of them.

16             Q    What other symptoms do you currently

17  experience.

18             A    (No response.)

19             Q    Do you need a break?

20             A    No, um ...

21             THE COURT:  Ladies and gentlemen, we're going

22  to take a very brief break, 5, 10 minutes, if you want to

23  head back in the jury room.  Please don't talk about it,

24  don't let anybody talk to you about it, we'll get you back

25  out here.

1                    (Jury Excused, 2:04 p.m.)

2                    THE COURT:  Ms. Collins, you can step down for

3     a minute.

4                    THE WITNESS:  I'm sorry.

5                    THE COURT:  It's okay, go ahead, step down for

6     a minute.

7                    MS. CONNOR:  Thank you, your Honor.

8                    (Whereupon a recess was taken from 2:04 p.m.

9                     to 2:10 p.m.)

10                   THE COURT:  Do we have everybody?  Missing

11    Mr. Kinsey.

12                   MS. SHEEHAN:  Mr. Kinsey, I think we're okay

13    to start.

14                   THE COURT:  We're going to start without him.

15    Good idea.  Bring them in, Rita.

16                   (Jury Present, 2:10 p.m.)

17                   THE COURT:  Okay.  We have the ladies and

18    gentlemen of the jury, plaintiff still on the stand,

19    plaintiff's counsel, defendants and defense counsel, go

20    ahead, Ms. Connor.

21                   MS. CONNOR:  Thank you, your Honor.

22          Q    Penny, I think before we took a break, we

23    were -- I had asked you about symptoms that you're currently

24    experiencing.  Would you continue with your answer, please.

25          A    I'm -- I have a fear of men when I first meet

1    them.  I have a job in a place where, when I do my initial

2    intake of my clients, if I have -- if I'm working with a

3    couple, my husband can come, I schedule them at night so my

4    husband can come and sit in the next room, or if I have a new

5    male client that I need to see alone, my husband comes and

6    stays there, if I have to have interaction with.  When I

7    report matters for my job, my husband comes so that I can

8    deal with the police.

9             Q     What do you mean you can deal with the police?

10            A     I have to -- sometimes I have to make reports,

11   adult protective service reports or something and I actually

12   have to file reports with the police at times.

13            Q     Do you have any fear of the police?

14            A     Very much.

15            Q     Now, with these symptoms, do you experience

16   these on a daily basis?

17            A     No.

18            Q     About with what frequency?

19            A     If I'm home in my house, I don't really have

20   any problem, it's when I go out, my panic attacks are doing

21   very well actually until, you know, I have definite triggers

22   that I try to stay away from.

23            Q     What are those triggers?

24            A     Policemen.  I don't like to be alone in a room

25   with a man, I don't like to feel closed in somewhere where I

1    can't get out.  If I -- if I start to feel sick to my stomach

2    or anything, I have to get out, I can't be in a store or

3    anything like that.

4              Q    Are you currently taking any medication for

5    these problems?

6              A    I take Ambien to sleep because I don't sleep.

7              Q    Anything else?

8              A    I have a prescription for Lorazepam if I need

9    it.

10             Q    What is that for to your understanding?

11             A    That's an anti-anxiety.

12             Q    Are you taking any other medications?

13             A    Yes.

14             Q    What's that?

15             A    I take atenolol for a rapid heartbeat.

16             MS. CONNOR:  Your Honor, at this time, I have

17   no further questions of the witness.

18             THE COURT:  Okay, Ms. Connor, thank you.  Are

19   we going to start with the state, I'm assuming, to do the

20   cross-examination, then we'll go to Mr. Andrews?

21             MS. SHEEHAN:  Yes, your Honor.

22             THE COURT:  Okay.

23             CROSS-EXAMINATION BY MS. SHEEHAN:

24             Q    Good afternoon, Ms. Collins.  Ms. Collins, you

25   told us about incidents at Sing Sing with Sergeant Tenori

1   where he blew in your ear; he's not a defendant in this case,

2   correct, you did not sue him?

3        A    No.

4        Q    At the academy, you testified that

5   inappropriate comments were made from Genevieve [sic] and an

6   Officer Peterman[sic]; neither one of them are defendants in

7   this case, correct?

8        A    Correct.

9        Q    You also testified that you reported many of

10  your incidents at Sullivan to Sergeant Hoefling and he never

11  reported them to the superiors; you're not suing him in this

12  case, are you?

13       A    No.

14       Q    Then we have Sergeant or Officer Baker who,

15  when he was teaching you how to count vehicles, and you were

16  telling him about the rumors about sleeping with Sergeant

17  Hoefling, he said, I don't want to stand next to you; you're

18  not suing him in this case, are you?

19       A    That isn't correct, what you're saying,

20  though.

21       Q    Okay.  Are you suing Sergeant Baker in this

22  case?

23       A    No.

24       Q    Sergeant Baker was the officer who was

25  teaching you to do the vehicle counts?

1          A    Correct.

2          Q    Okay.  Sergeant Bellman, he made comments

3    about chasing other females away from the facility; you're

4    not suing him in this case, are you?

5          A    I don't know Sergeant Bellman, I'm sorry.

6          Q    I apologize, I'll look that up, I probably

7    wrote down the wrong name.  We heard about a number of

8    incidents regarding Sergeant Wright; you're not suing him in

9    this case, are you?

10         A    No.

11         Q    We heard about Captain Rourke who you went to

12   speak to and didn't do anything about the complaints you made

13   to him; you're not suing him in this case, are you?

14         A    No.

15         Q    Officer McFall, the weapons officer,

16   inappropriate comments at the range, Bobbie Head comment,

17   you're not suing him in this case, are you?

18         A    No.

19         Q    Sergeant Flynn, he wouldn't give you paint to

20   paint over the -- no, you asked him for paint, he said he

21   would take care of painting over the inappropriate comments

22   in the bathroom and that wasn't done for months; you're not

23   suing him in this case, are you?

24         A    No.

25         Q    Sergeant -- or Officer Cochrane growled in

1    your ear -- blew in your ear, I'm sorry, growled in your ear,

2    called you a sick fucking bitch, you're not suing him in this

3    case, are you?

4              A    No.

5              Q    Walsh, Officer Walsh, he didn't do --

6    Superintendent Walsh, you made complaints to, he didn't do

7    anything to address your complaints; you're not suing him in

8    this case, are you?

9              A    No.

10             Q    Captain Coleman, when you went to Eastern,

11   when you complained about Sergeant Mitchell, Lieutenant

12   Mitchell at Eastern, told you, yeah, you're going to have to

13   answer to him, he's going to be your supervisor at times;

14   he's not sued in this case, is he?

15             A    No.

16             Q    You just finished testifying that your

17   continual psychological problems -- isn't it true that you

18   met with your treating physician Dr. Alley on May 10th, 2007,

19   and you reported that you were doing well but you didn't want

20   to go back to work because it would interfere with the

21   business you were running?

22             A    Absolutely not.

23             Q    Okay.  And the next time you saw Dr. Alley was

24   October 10th, 2007, and psychologically you were doing worse

25   because of your arrest?

1          A    No.

2          Q    The next time you saw Dr. Alley after

3    October 10th, 2007 was just last Thursday, March 7th, 2012,

4    correct?

5          A    Yes.

6          Q    So you did not see him from October 10th, 2007

7    to March 7th, 2012?

8          A    I didn't see Dr. Alley between those times?

9    That's not true.

10         Q    Okay.  October 23rd, you requested that he

11   speak to the arresting officer that arrested you in the

12   beginning of October, 2007?

13         A    Not at all.

14         Q    Okay.

15         A    I'm sorry, I don't know --

16         Q    I'm sorry, there's no question pending.  You

17   went back, you attempted to go back to work in April 2007 and

18   you were in a room, and an officer came to the doorway, and

19   you felt closed in, panic attack to use your term; did that

20   officer say anything inappropriate to you?

21         A    Not at all.

22         Q    Did he touch you in any inappropriate way?

23         A    No, he did not.

24         Q    Did he harass you in any way?

25         A    No.

1          Q    You testified that the state ordered you to

2    get a psychological evaluation on one of your medical leaves

3    from your job.  Isn't it true it was Department of

4    Corrections that ordered the psychological evaluation?

5          A    Yes.

6          Q    You testified that Brian Fischer, when you

7    contacted him in writing, you received a letter from his

8    office stating that he would not meet with you.  Isn't that

9    because you filed this federal lawsuit and he's a named

10   defendant in this lawsuit?

11         A    I'm sorry, that was in March of 2007?

12         Q    Correct.

13         A    I know that I had a Human Rights case and I

14   don't know the date that this lawsuit was filed, I apologize,

15   it was in 2007.

16         Q    You filed this lawsuit in 2007?

17         A    Yes.

18         Q    You also testified that your request to

19   Eastern was number two on your list because you had family

20   and friends and support there.  Do you remember that

21   testimony?

22         A    Yes.

23         Q    I'm going to show you a document and ask you

24   to identify it.  Your Honor, it has not been marked as an

25   exhibit.

1          THE COURT:  It needs to be.

2          MS. SHEEHAN:  D20.

3          THE CLERK:  I need to mark it.

4          MS. SHEEHAN:  I have stickers.

5      Q    Can you identify?

6      A    Yes, this is my security employment

7  reassignment request.

8      Q    And is that your signature down at the middle

9  of the page with the signature line?

10     A    Yes, it is.

11         MS. SHEEHAN:  May I approach, put a D20?

12         THE COURT:  Yes.

13         MS. SHEEHAN:  I'm going to ask that this

14  document be admitted into evidence.

15         THE COURT:  Any objection?

16         MS. CONNOR:  No, your Honor.

17         THE COURT:  It's received.

18         MS. SHEEHAN:  Mr. Andrews, I apologize, I

19  don't have a copy for you.

20         THE COURT:  Mr. Andrews, you okay, you know

21  what it is?

22         MR. ANDREWS:  I'm okay, your Honor, yes.

23         THE COURT:  Okay.

24         MS. SHEEHAN:  Your Honor, I'd like to publish

25  it for the jury.

1          THE COURT:  Okay.

2          MS. SHEEHAN:  And Ms. Collins will be able to

3     read it from the screen?

4          THE COURT:  That's right.

5          MS. SHEEHAN:  Thank you.  Can everybody see

6     that?  Is that clear on everybody's screen?

7          Okay.  Ms. Collins, your first choice on this

8     list is Willard, second choice is Five Points, your third

9     choice is Butler ASACTC, your fourth choice is Butler

10    Minimum, your fifth choice is Woodbourne, your sixth choice

11    is Eastern, and your seventh choice is Ulster.  Isn't it true

12    that Willard is an hour and 15 minutes from your home?

13         A    That's true.

14         Q    Isn't it true that Five Points is an hour and

15    five minutes from your home?

16         A    That's true.

17         Q    Isn't it true that both Butler locations are

18    at the same facility or same property and they're both 55

19    minutes away?

20         A    They're close.

21         Q    Woodbourne is three hours away, Eastern's

22    three hours away, and Ulster -- apologize, I don't have the

23    distance on that one.  You filed this, is this the transfer

24    request that you filed with Department of -- Department of

25    Corrections when you wanted to leave Auburn Correctional

1   Facility?

2           A    This is one of my requests, yes.

3           Q    And isn't it true that Camp Georgetown is 55

4   minutes from your home, and that's not on the list?  Isn't it

5   true that Monterey Shock is not on the list and that's an

6   hour and 55 minutes from your home?

7           A    Yes, and their numbers are very high and I

8   never would have got there with my seniority date.

9           Q    That's not what I asked you.

10          A    Yes, they are that close to my home.

11          Q    Rochester is an hour and 45 minutes away?

12          A    I'm not aware that we have a facility in

13  Rochester.

14          Q    Buffalo, two hours and 20 minutes away?

15               MS. CONNOR:  Is there a question?

16          A    I'm sorry.

17          Q    Yes.  Is the Buffalo facility two hours and 20

18  minutes away from your home, from Coon Hill Road?

19          A    Yes.

20          Q    And Camp, I'm going to mispronounce this,

21  Pharralia, P-h-a-r-r-a-l-i-a, is an hour and 10 minutes from

22  your home?

23          A    I'm not sure where that is.

24          Q    And Groveland is two hours from your home?

25          A    Yes.

1          Q     Is it true all these facilities are minimum

2    security facilities?

3          A     I'm not familiar with them.

4          Q     Isn't it true that all these facilities are

5    closer to your home than Eastern, your choice?

6          A     Yes.

7          Q     That was your -- closer than your fifth choice

8    of Woodbourne?

9          A     No, Woodbourne is about 10 minutes from

10   Eastern, maybe 15 at the most.

11         Q     But it's three hours from your home on Coon

12   Hill Road?

13         A     Yes, about two and a half hours.

14         Q     And isn't it true that you would never

15   consider a female facility, these were all male facilities?

16         A     The female facilities that I would have --

17         Q     I'm sorry, it's a yes-or-no question.

18         A     I'm sorry, could you repeat that question?

19         Q     None of these facilities are a female

20   facility?

21         A     That's correct.

22         Q     And you have never asked to transfer to a

23   female facility?

24         A     That's correct.

25         Q     I'm going to show you what has been marked as

1  D21 and ask you to please identify it.

2              MS. CONNOR:  Your Honor, may I see it, please.

3              MS. SHEEHAN:  Ms. Connor, I'm on my way.

4              THE COURT:  Mr. Andrews, are you with us?

5              MR. ANDREWS:  I'm okay, thank you, your Honor.

6              THE COURT:  You know what D21 is?

7              MS. CONNOR:  Your Honor, I do not, I'm sorry,

8  either, these are not marked.

9              THE COURT:  Well, is what you gave the witness

10  a copy of what you gave Ms. Connor?

11              MS. SHEEHAN:  Yes, your Honor.

12              THE COURT:  You can proceed.

13              MS. CONNOR:  I'm sorry, she's just given me

14  two documents, I believe the witness has one, I don't know

15  which is which.

16              MS. SHEEHAN:  I was making -- okay.

17  Completely my fault.

18         Q    D21, can you please identify the document in

19  front of you.

20         A    This is my security employment reassignment

21  request when I got to Auburn.

22              THE COURT:  Otherwise known as a transfer

23  request?

24              THE WITNESS:  Yes.

25              THE COURT:  Thank you.

1           MS. SHEEHAN:  Can I please have that back, I'm

2      going to mark this.  I move for D21 to be admitted into

3      evidence.

4           MS. CONNOR:  No objection.

5           THE COURT:  Mr. Andrews?

6           MR. ANDREWS:  No objection, your Honor.

7           MS. SHEEHAN:  May I post to the jury?

8           THE COURT:  It's received, you may.

9           Q    Ms. Collins, is that your signature in the

10      middle of the page?

11           A    Yes, it is.

12           Q    And this states you're asking to be

13      transferred to Auburn?

14           A    No, that is not correct.

15           Q    It's dated June -- okay, it says, security

16      employment reassignment request, and it asks for the title of

17      reassignment, correction officer, date of original

18      appointment to the above title, 10/28/02 which is when you

19      became a corrections officer, you were currently working at

20      Auburn, and that was on -- it was not a permanent basis,

21      correct, when you filed this, you were there, sort of a

22      temporary status?

23           A    I was not aware of that, I transferred into

24      Auburn on what I thought was a permanent status and wherever

25      you transfer, you fill out a security reassignment, this is

1   stating that I wanted to remain in Auburn and have no other

2   facilities considered.  This is my home facility and this is

3   where I wanted to stay.

4          Q    Perfect.  I'm going to then, going back to D20

5   on March 11th, 2006, you filed to leave, this is the document

6   you filed to leave Auburn, correct?

7          A    That's correct.

8          Q    And isn't it true you were reassigned to

9   Eastern on March 27th, 2006?

10         A    Correct.

11         Q    And you filed this request on March 11th,

12  2006, and it was granted three days later, March 14th, 2006?

13         A    No.  It was received on March 14th, that's

14  what that's telling me.  It was received on that date.

15         Q    And you agree that you -- your first day at

16  work at Eastern was March 27th, 2006?

17         A    Yes.

18         Q    I'm going to hand you what I'm going to mark

19  as D22, and ask you to please identify it.

20         A    This is also a transfer request.

21         Q    Is that your signature, middle of the page?

22         A    Yes, it is.

23         MS. SHEEHAN:  Your Honor, I'm going to ask

24  that be admitted into evidence.

25         THE COURT:  Any objection?

1                    MR. ANDREWS:  No objection.

2                    THE COURT:  Have you seen it, Mr. Andrews?

3     You're going on faith?

4                    MR. ANDREWS:  I'm trying to help keep the

5     process moving, your Honor.

6                    THE COURT:  I appreciate it, thank you.

7                    MS. CONNOR:  Your Honor, I have no objection

8     as to the authenticity of the document, I just object to its

9     relevance.

10                   THE COURT:  No, I'm going to admit it, it's

11    received.

12                   MS. SHEEHAN:  May I post to the jury, your

13    Honor.

14                   THE COURT:  You may.

15          Q    Ms. Collins, isn't it true you signed this

16    document the day after you arrived at Eastern asking that all

17    the prior choices that were higher than number six on your

18    last transfer no longer be considered?

19          A    That's true.

20          Q    So you -- isn't it true you wanted to stay in

21    Eastern, done?

22          A    For that time, yes.

23                   MS. SHEEHAN:  Last one, your Honor.  I'm going

24    to mark D -- what am I up to?

25                   THE CLERK:  23.

1          Q    D23.  I'm going to -- can you please identify

2    that document?

3          A    Yes, this is a transfer request, signed on

4    February 6, 2009.

5          Q    Is that your signature in the middle of the

6    page?

7          A    Yes, it is.

8               MS. SHEEHAN:  Your Honor, I'm going to ask

9    that D23 be admitted into evidence.

10              THE COURT:  Any objection?

11              MS. CONNOR:  No objection as to the

12   authenticity, just the relevance, your Honor.

13              THE COURT:  Okay, it's received.

14              MS. SHEEHAN:  Thank you.  May I post it, your

15   Honor?

16              THE COURT:  Yes, you may.

17         Q    Ms. Collins, you submitted this transfer

18   request on February 6th, 2009, correct?

19         A    Yes.

20         Q    And this is a request for you to be

21   transferred back to Sullivan, correct?

22         A    Well, I was out of work at the time, yes.

23         Q    I'm sorry?

24         A    Sullivan.

25         Q    All of the horrible things that you told us

1   about what went on in Sullivan, this, you were asking the

2   Department of Corrections to send you back there, correct?

3           A    That's correct.

4           Q    Thank you.  Ms. Collins, let me ask you, if

5   you -- are you on any medications that would affect your

6   ability to give truthful testimony today?

7           A    Not at all.

8           Q    Thank you.  You were in the Army for a short

9   period of time, March 1979 to November of 1980, correct?

10          A    That's correct.

11          Q    And isn't it true that during that time, you

12  had -- you were subjected to harassment and inappropriate

13  verbal commentary of a sexual nature, correct?

14          A    That's correct.

15          Q    One was when you were at Fort Gordon, your

16  roommates had someone sleeping with them each night and so

17  you had to sleep in your car, correct?

18          A    That is correct.

19          Q    And isn't it correct you never reported it to

20  anyone?

21          A    That is correct.

22          Q    Then you were at Fort Stewart and at Fort

23  Stewart, you had a supervisor that made you stay in one place

24  near a display that you had set up for a period of time,

25  correct?

1          A    Correct.

2          Q    And you took offense to that because you

3    considered him an alcoholic, correct?

4          A    No.  That's not correct.

5          Q    Well, isn't it true, you went to the company

6    chaplain and filed a complaint to that effect?

7          A    No, that's not correct.

8          MS. SHEEHAN:  Your Honor, I'm going to ask for

9    the court's indulgence while I pull out deposition

10   transcripts.

11         THE COURT:  Okay.  Everybody okay over there?

12   All right.  Breaks like this, again, I'm going to remind you,

13   feel free to stand up and stretch if you want.

14              (Pause in Proceedings.)

15         Q    Do you remember being deposed on

16   November 18th, 2008, where you gave testimony under oath to

17   Assistant Attorney General Timothy Mulvey?

18         A    Yes.

19         Q    Do you remember being asked the question, "In

20   addition to instructing you to remain seated to prevent

21   something in the display that you erected from falling, did

22   he give you any other additional instructions?"

23              You answered, "No, just to stay there until he

24   told me to get up."

25              You were then asked, "And did you infer from

that instruction that he wanted you to do something in addition that he did not overly -- overtly state to you?

"Answer: No.

"Question: Why do you believe at that time that his instructing you to remain seated and observe the display to be a violation of military rules or protocol?"

You answered, "The man was intoxicated on duty."

A That's correct. He was.

Q You were asked -- okay, let me continue. You were then asked, "Was that the first instance that you recall that Sergeant Norris was, as best as you could recall, intoxicated while you were assigned to work under his command?"

You replied, "No, I don't believe it was the first time."

The next question, "At the time, in what would be in the fall of 1980, were you continually under the supervision of Sergeant Norris while you worked at the post newspaper office?

"Answer: Yes."

The next question, "And after the first occasion, you observed him in a state you believed to be intoxication, did you feel that you had an obligation to make a report about that situation which you believed to violate

1    military rules or protocol?"

2                    And you answered:  "No."

3         A    That's correct.

4         Q    Isn't it true you took that complaint of

5    Sergeant Norris making you sit near the display that you

6    erected to the chaplain and asked to be terminated from the

7    Army?

8         A    No.  That is not a correct statement.

9         Q    Isn't it true the chaplain was a -- okay.

10   Isn't it true you were discharged with a general discharge

11   under honorable conditions?

12        A    That's true, yes.

13        Q    And doesn't that mean that given someone's

14   negative aspects of their -- given the negative aspects of

15   their conduct or performance of duty outweighs the positive

16   aspects of their duty; isn't that what a general discharge

17   means?

18        A    I'm sorry, could you explain that in another

19   way?

20        Q    The negative aspects of a member's conduct in

21   performance outweigh the positive aspects of their conduct or

22   performance?

23        A    No, I didn't believe that to be so.

24        Q    But you do admit you were discharged under a

25   general discharge under honorable conditions?

1      A    Yes.

2      Q    Did you also know being discharged under those

3  terms, that it jeopardizes your ability for any benefits

4  under the GI bill, did you know that?

5      A    I didn't have the GI bill.

6      Q    That's not what I asked you.

7      A    So I wouldn't -- I'm sorry, I wouldn't be

8  familiar with that.

9      Q    Do you also know members that were discharged

10  under the same conditions that you were will not normally be

11  allowed to re-enter the military service, any branch?

12      A    No, that's not true.  I had a two-year upgrade

13  with -- and I could go back in any time after two years.

14      Q    Don't you have to apply for that?

15      A    Yes, you --

16      Q    And did you apply for that?

17      A    Apply for?

18      Q    This alleged two-year upgrade.

19      A    No, that was supposed to be an automatic two

20  year because I had no disciplinary action.

21      Q    But you were discharged under a general

22  discharge that says your conduct, the negative aspects of

23  your conduct outweighed any positive aspects of your conduct;

24  isn't that what the general discharge under honorable

25  conditions means?

1          A    No.  There were no disciplinary action.

2          Q    That's a yes-or-no question, Ms. Collins.

3          A    No, and to me --

4          Q    Ms. Collins, there's no further question

5    pending.

6          A    Okay.

7          Q    Isn't it true that you've seen psychologists,

8    psychiatrists prior to any employment with DOCS?

9          A    Yes.

10         Q    The first time you saw a psychologist was in

11   December of 1981?

12         A    That's correct.

13         Q    You then saw a psychiatrist in 1994 while

14   going to school, you were overloaded and because your husband

15   was laid off?

16         A    That is not true.

17         Q    Okay.

18         A    I'm sorry, I did see him, that was not true

19   about the reason.

20         Q    It's a yes-or-no question and I'm going to ask

21   the judge to please --

22         A    He was a psychologist.

23         Q    -- to stick with --

24              THE COURT:  Okay.  One person has to talk at a

25   time, okay, we have a court reporter.  Counsel, you asked a

1  compound question, I'm going to ask you to rephrase the

2  question.  And please, wait until she's done asking the

3  question before you attempt to answer.  Okay.

4                    THE WITNESS:  Okay.

5                    THE COURT:  And if you can't answer a question

6  yes or no, just say so.

7                    THE WITNESS:  Okay.

8                    THE COURT:  Okay.  Thank you.

9          Q     Isn't it true you saw a psychologist,

10  psychiatrist, in 1994?

11         A     A psychologist, yes.

12         Q     And didn't you tell that individual that you

13  were having problems while you were going to school, you were

14  overloaded, and your husband was laid off?

15         A     Absolutely not.

16         Q     Deposition, November 19th, 2008, you gave

17  testimony under oath to Assistant Attorney General Timothy

18  Mulvey, do you remember doing that?

19         A     Oh, yes, I do.

20         Q     You were asked a question --

21                    THE COURT:  Where are you, what page?

22                    MS. SHEEHAN:  Page 242:21, would you like a

23  copy, your Honor?

24                    THE COURT:  No, thank you.

25         Q     "What were the circumstances that led to your

1   seeing the psychologist in August of 1994?

2                  "Answer:  I was asked to overload with nine

3   classes at school because my husband was laid off and I

4   wanted to hurry and graduate and they said in order to do

5   that, I had to see a psychologist and I saw him for three

6   visits."

7                  Do you remember giving that testimony?

8          A    I asked to overload, yes, I was not asked.

9                  THE COURT:  Was the testimony that she read

10  your testimony?  Do you remember that?

11                 THE WITNESS:  I do, your Honor, but the word,

12  she added another word.

13                 THE COURT:  Okay, I'm just asking, is that the

14  testimony you remember giving.

15                 THE WITNESS:  No, sir, not exactly that

16  testimony.

17                 THE COURT:  Okay.  Okay.

18                 MS. SHEEHAN:  May I approach?

19                 THE COURT:  You may.

20         Q    Here's a copy of your deposition, please turn

21  to page 242.

22                 THE COURT:  Counsel, are you going to draw her

23  attention to a particular line on that page that you want her

24  to look at?

25                 MS. SHEEHAN:  21.

1          THE COURT:  Okay, thank you.

2     A    Okay, I have that.

3     Q    Line 21.

4     A    Yes.

5     Q    Go up to 19, "Question:  What were the

6  circumstances that led to your seeing the psychologist in

7  August of 1994?"

8     A    Yes.

9     Q    "Answer:  I asked to overload with nine

10 classes at school because my husband was laid off and I

11 wanted to hurry and graduate and they said in order to do

12 that, I had to see a psychologist and I saw him for three

13 visits."  Did I read that accurately?

14    A    That time, yes.

15    Q    Thank you.  You can hold onto that --

16    A    Okay.

17    Q    -- for a second.  When you were at the

18 academy, and you were given the female orientation handbook,

19 let me -- I'm going to strike that question.

20          When you were at the academy and you received

21 instructions regarding females and females in the corrections

22 setting, weren't those classes taught by other female

23 officers?

24    A    Yes, there was one class that was taught by a

25 female captain.

1          MS. SHEEHAN:  Your Honor, I'm going to ask

2     that you instruct the witness to please just answer the

3     question yes or no.

4          THE COURT:  If she can, yes; if you can't

5     answer the question yes or no, just say so.

6          A     Okay.

7          THE COURT:  Okay.  But if it's a yes-or-no

8     question, please try to do that and if you feel you can't do

9     that, just let us know.

10         THE WITNESS:  Okay, thank you.

11         THE COURT:  Okay.

12         Q     And isn't it true that you don't have any

13    firsthand knowledge on whether that orientation handbook, if

14    you know, was also given to males, do you?

15         A     No, I don't know that.

16         Q     Do you recall meeting Sergeant Robert Pabis

17    while at Auburn?

18         A     No, I don't.

19         Q     You don't recall that he was part of a mobile

20    drug team that visited Auburn?

21         A     No, I don't.

22         Q     You don't recall telling him that he had a

23    great tan?

24         A     No, I do not.

25         Q     You don't recall telling him your husband flew

1    a medevac helicopter for the local hospital?

2              A    I could have told him that, if I met him and I

3    had a conversation.  I don't remember specifically who that

4    is, but that's what my husband does.

5              Q    Do you recall telling him your husband was

6    never home?

7              A    No.

8              Q    Do you recall telling him you were lonely

9    because your husband was never home?

10             A    Absolutely not.

11             Q    You took the sergeant's exam at one point,

12   isn't that correct?

13             A    Yes.

14             Q    And you scored an 85 on the exam?

15             A    Yes.

16             Q    And isn't it true that DOCS never reached

17   below the score of 90 to appoint a sergeant?

18             A    I'm not familiar with that at all.

19             Q    Isn't it true that you did not take the next

20   sergeant's exam which was May of 2009?

21             A    That's correct.

22             Q    Isn't it true that the top score in that test

23   was 102.5?

24             A    I would have no way of knowing this.

25             Q    And isn't it true that DOCS' first appointment

1    off of the May 2009 test was March 17th, 2010?

2            A    I would have no way of knowing that.

3            Q    Back to the female handbook a quick second.

4    You received it at the academy, did you file a complaint

5    about the handbook while you were at the academy?

6            A    No.

7            Q    Did you file a complaint about the handbook

8    when you were at Sing Sing?

9            A    No.

10            Q    Did you file a complaint about the handbook

11    while you were at Sullivan?

12            A    No.

13            Q    Did you file a complaint about the female

14    handbook while you were at Auburn?

15            A    No.

16            Q    Did you file a complaint against -- about the

17    handbook while you were at Eastern?

18            A    No.

19            Q    Ms. Collins, isn't it true that at one point,

20    you wanted to go back to corrections to work with your son?

21            A    That's true.

22            Q    Your son's a correction officer, correct?

23            A    He was.

24            Q    Isn't it true that the keys to the bathroom at

25    Sullivan, male or female bathrooms, are held by -- could be

1    held by either a female or a male officer?

2              A    This is true.

3              Q    And isn't it true Officer Sheila Ebert came

4    looking for you to get the keys to the bathroom and found you

5    making out with Sergeant Hoefling?

6                   MS. CONNOR:  Your Honor, may we approach?

7                   THE COURT:  Yes.

8                   (At Side Bar.)

9                   THE COURT:  Okay.  Go ahead.

10                  MS. CONNOR:  Yes, your Honor.  Under Rule 412

11   of the Federal Rules of Evidence, eliciting this testimony

12   without going through the proper procedure is improper.  That

13   under Rule 412, if counsel seeks to elicit testimony

14   concerning prior sexual activity or this type of on-the-job

15   activity, you have to go through the procedures of Rule 412

16   which requires written notice, 14 days ahead, it requires an

17   offer of proof as to what it would do, and it requires notice

18   to the complainant or the plaintiff and a private hearing in

19   camera.  Counsel has done none of that.  This is completely

20   improper under the Federal Rules.

21                  THE COURT:  You want to be heard?

22                  MS. SHEEHAN:  Your Honor, this is no surprise.

23   This is her testimony from the deposition, we have Sheila

24   Ebert on our witness list.  We have Sheila Ebert on our

25   witness list, they put Mr. Hoefling on their witness list, he

1   also mentions it in his deposition and they have put forth

2   testimony about harassment for "Johnny's Love Shack," "The

3   Honeymooners," why -- I have a right, I have a right to --

4   truth is --

5                   THE COURT:  You're alleging that this is

6   sexual activity?

7                   MS. CONNOR:  I am, she's going to deny it.

8                   THE COURT:  Okay.  Well, then she's going

9   to --

10                  MS. CONNOR:  My point is that counsel cannot

11  ask these types of questions, even on-the-job workplace, even

12  prior vulgar comments, prior workplace conduct, that is all

13  inadmissible under 412.

14                  MR. ANDREWS:  Prior vulgar comments?

15                  MS. CONNOR:  That's correct, I can give you

16  case law on that.

17                  THE COURT:  Take it down an octave, okay?

18                  MS. CONNOR:  I apologize, your Honor, but my

19  point is that counsel has a duty under the Federal Rules to

20  give prior notice to what is intended and there's a hearing

21  in camera.  And this is not to be raised in front of the jury

22  for the first time without your Honor having reviewed it all

23  with written -- and the burden is on you, not me.

24                  THE COURT:  Counsel.

25                  MS. SHEEHAN:  I disagree that this fits into

1   the category of sexual activity.

2                   THE COURT:  Under 412.

3                   MS. SHEEHAN:  Under 412.

4                   THE COURT:  You say it falls outside the --

5                   MS. SHEEHAN:  Yes.

6                   THE COURT:  -- ambit of 412?

7                   MS. CONNOR:  Your Honor.

8                   THE COURT:  Let her finish, please.

9                   MS. SHEEHAN:  She raised it, she brought it up

10  in her testimony, it's not something that I brought up out of

11  the blue.

12                  THE COURT:  Okay.  We're going to give this

13  jury an afternoon break, we're going to hash this out, and

14  we'll start up again, okay.

15                  MS. CONNOR:  Thank you.

16                  THE COURT:  All right.

17                  (Open Court.)

18                  THE COURT:  Okay, ladies and gentlemen, we

19  have some legal issues we need to square away here, I'm going

20  to give you a little afternoon break, it's going to be short,

21  I hope about 10 minutes, and we'll get back to work.  So

22  you're going to get up and stretch whether you want to or

23  not, I guess.

24                  (Jury Excused, 3:00 p.m.)

25                  THE COURT:  We're going to stand in recess for

1     about 5, 10 minutes.

2                     (Whereupon a recess was taken from 3:00 p.m.

3                      to 3:21 p.m.)

4                     (Open Court, Jury Out.)

5                     THE COURT:  Okay, we're in the courtroom with

6     counsel and their clients outside the presence of the jury.

7     Did your client leave the courtroom?

8                     MS. CONNOR:  I'm sorry, I was unaware of that,

9     your Honor.  Do you want me to go get her, your Honor?  She

10    must have gone to the ladies room.

11                    THE COURT:  She has a right to be here.

12                    MS. CONNOR:  I'll go get her.  May I leave?

13                    THE COURT:  Yes.

14                    (Pause in Proceedings.)

15                    (Plaintiff present.)

16                    THE COURT:  Well, no, you can stay with your

17    counsel at this point.  We're going to deal with this legal

18    issue before we go any further in testimony.  Okay.  We're

19    outside the presence of the jury, we have plaintiff,

20    plaintiff's counsel, defendants and defense counsel.  There's

21    been an objection to a question made by Ms. Sheehan during

22    cross-examination with regard to another employee observing

23    the plaintiff at work using the term make out with a Sergeant

24    Hoefling, and there was an objection interposed by

25    plaintiff's counsel before any answer was given.  Objection

1   was made at the bench pursuant to Rule 412 of the Federal

2   Rules of Evidence with regard to trying to elicit evidence of

3   alleged victim's sexual behavior or sexual predisposition

4   which is inadmissible.  And there is case law that asks

5   about -- or sets out the fact that the court can hold or

6   should hold a hearing should there be this type of evidence

7   to be offered in a case, including a sexual, civil sexual

8   harassment case.

9              Now, the first thing we're going to do is I'm

10  going to ask defense to give an offer of proof as to the

11  basis of the question, and we need to know what we're

12  referring to when we say make out, what exactly, according to

13  your witness, was occurring, and then we can make a ruling as

14  to whether or not I'm going to allow you to pursue this line

15  of questioning.

16             Now it's a little different in this situation

17  than the case law that's been provided to me by counsel in

18  that we're not talking about a sexual predisposition or

19  sexual conduct or somebody's sexual behavior that they're

20  trying to get into.  They're talking about an incident which

21  is allegedly occurring at work and was witnessed by other

22  employees allegedly at work which makes it -- brings it into

23  a different category.  We're not probing sexual

24  predisposition, asking about a specific incident, and

25  certainly plaintiff by the proof that she has offered in this

1    case to this point, part of her complaint is regarding

2    harassment about allegations with Sergeant Hoefling.  She

3    specifically, plaintiff counsel has entered into evidence

4    exhibits which were put up which plaintiff complained about

5    indicating Sergeant Hoefling's love shack and some other

6    drawing or writing that was put up outside of that sergeant's

7    office.  So it's certainly relevant, and it's certainly not

8    something that plaintiff's counsel was unaware of.  There is

9    no surprise here.  So those are two things that certainly the

10   court is going to consider in weighing whether this should be

11   pursued or not, and certainly, again, the fact that it's

12   allegedly something that occurred at work and plaintiff has

13   raised this issue as a part of her complaint about her

14   treatment at Sullivan, it's something that is clearly

15   relevant, question of whether or not it's prejudicial and

16   should have been reviewed by the court previously and that's

17   going to depend on what we're talking about, and that's why

18   I'm going to ask for an offer of proof, okay.  So

19   Ms. Sheehan.

20           MS. SHEEHAN:  Inappropriate behavior, and I

21   just want to check one deposition.  This topic came up in

22   both John Hoefling's deposition and Ms. Collins' deposition.

23           THE COURT:  Ms. Sheehan, what I'm asking you

24   to lay out for the court is the extent of what that testimony

25   is or potential testimony, what somebody allegedly witnessed.

1                    MS. SHEEHAN:  Inappropriate behavior, making

2      out, kissing.

3                    THE COURT:  So kissing is what we're talking

4      about?

5                    MS. SHEEHAN:  Yes.

6                    THE COURT:  Anything further than that?

7                    MS. SHEEHAN:  Not that I'm aware of.

8                    THE COURT:  Okay.  And the basis for this

9      information?

10                   MS. SHEEHAN:  Is speaking to Ms. Ebert.  We

11     got this information from John Hoefling's deposition and

12     Ms. Collins' deposition, she was asked, female officer Sheila

13     Ebert ever address any accusations directly to you that you

14     were having a sexual affair with a supervisor -- apologize,

15     she says no.  We asked John Hoefling and he said, yeah, a

16     female officer, we got Sheila Ebert's name from both

17     depositions.  We spoke to her.

18                   THE COURT:  Did she --

19                   MS. SHEEHAN:  And she said she went to get the

20     bathroom keys from Ms. Collins and walked in on them.

21                   THE COURT:  Kissing?

22                   MS. SHEEHAN:  She was between his legs, oops,

23     sorry, and walked back.

24                   THE COURT:  And Sergeant Hoefling's

25     deposition, what does he say about this?

1              MS. SHEEHAN:  I don't have Mr. Hoefling's

2    deposition.

3              MR. KINSEY:  Your Honor, I reviewed that

4    deposition, may I speak to that?

5              THE COURT:  You may.

6              MR. KINSEY:  Yes, the question was in the

7    context of these rumors and the sign that went up, the sign

8    was "Johnny's Love Shack" and "Do Not Disturb Honeymooners."

9    It went up after the Ebert interruption, and Hoefling,

10   Sergeant Hoefling was extremely angry about that, began an

11   investigation, wanted to find out what was going on.  I

12   believe that was the testimony of the plaintiff, and in

13   deposition the question was asked, who started those rumors.

14   He indicated it was a female correction officer and it was

15   Ms. Ebert.

16             THE COURT:  Okay.

17             MR. KINSEY:  Now in both depositions, both

18   parties denied that that happened.  But that's good faith

19   basis for the question.

20             THE COURT:  And is this Correction Officer

21   Ebert on a witness list?

22             MR. KINSEY:  She's on our witness list.

23             MS. SHEEHAN:  She's no longer a correction

24   officer.  Your Honor, may I add one more thing.  Ms. Connors

25   can't use the signs of "Johnny's Love Shack" and

1    "Honeymooners" as a sword and a shield.

2                    THE COURT:  I understand, Ms. Sheehan.

3    Ms. Connors, you want to be heard -- Ms. Connor?

4                    MS. CONNOR:  Yes, your Honor.  I believe that

5    the conduct being elicited is covered under 412, the case law

6    that I supplied to you, *Wolak v. Spucci*, Second Circuit case,

7    year 2000, does state unequivocally that 412 applies to

8    sexual harassment cases as your Honor knows, and then other

9    cases, *Sheffield v. Hilltop Sand & Gravel*, Eastern District

10   of Virginia, 895 F.Supp. 105, 1995, states clearly that

11   conduct at work is covered under 412 and is evidence of

12   sexual predisposition.  And also the *BKB v. Maui Police*

13   *Department*, Ninth Circuit case from 2002, 276 F.3d 1091 also

14   says that even conduct that's involving coworkers is covered

15   under 412.

16                   And your Honor, I understand that counsel is

17   saying that we're not surprised but I don't think that that

18   is the point of the rule, that the rule is to grant an

19   opportunity to respond and to do it in sufficient way so the

20   trial can proceed without any such interruptions such as

21   this, and that clearly if they allege that Ms. Collins

22   engaged in this type of conduct, I think this is sexual

23   conduct.  Counsel said she was between his legs, kissing is

24   involved, we all know that that's evidence that would be

25   covered under -- that's a conduct, rather, that would be

Penny Collins - Cross by Ms. Sheehan4421   covered under 412, and I think that I would ask the court to

2   sanction them to not elicit that testimony because they did

3   not follow the procedures under 412.

4              THE COURT:  Well, there aren't going to be any

5   sanctions, we'll make that clear.  I think this is a close

6   enough call with regard to Rule 412 that it's a matter of

7   interpretation, and certainly, in the case that you've cited

8   from the Second Circuit, *Wolak*, the District Court there

9   erroneously allowed testimony concerning sexual behavior

10  outside the workplace, but committed no error in excluding

11  testimony regarding, you know, sexual -- a doctor's testimony

12  with regard to this.  But, you know, the question is here,

13  it's different, we're not talking about sexual

14  predisposition, we're not talking about behavior, we're

15  talking about a specific act allegedly that occurred in the

16  workplace, and again, your client has put into contention as

17  a part of her complaint the fact that the signs were put up,

18  you've offered them into evidence, you've indicated that this

19  is part of the harassment that she was receiving, and, you

20  know, what we're talking about is not something that is

21  prejudicial, it's directly relevant to her claim.  It's not

22  about, you know, her sexual predisposition, or, you know, her

23  sexual behavior outside the workplace or even in the

24  workplace.  We're talking about response to a specific claim

25  and allegation that you put into contention here before this

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    jury.

2              So I think we're talking about something,

3    although I do agree with you that it should be considered

4    under 412, the prejudice that we're talking about trying to

5    protect against in Rule 412 I don't think applies to this

6    particular situation, given the facts of what's been

7    presented to this point.  So -- and you've indicated to me

8    that your client is going to deny this, or say that this

9    didn't happen, is that correct?

10             MS. CONNOR:  That's correct, your Honor.

11             THE COURT:  Okay.  Based on what I've heard to

12   this point, and what the plaintiff has offered, I think

13   counsel had a good faith basis to ask the question, based on

14   the prior deposition testimony and the followup of that

15   testimony that they did.  And again, while I may not disagree

16   with you that it's not about surprise, you certainly were

17   aware of it and were prepared for this going forward, and

18   given the fact of what your client's response is anticipated

19   to be, I think it's a fair question, based on the proof that

20   you've put in.  So I'm going to allow the question to be

21   asked, to stand, and we'll take your client's denial of that.

22   And we'll go from there.  Please bring the jury in.

23             MS. SHEEHAN:  Your Honor, can we wait one

24   second.  I didn't get a bathroom break.

25             THE COURT:  Make it a quick one, please.

1        MS. SHEEHAN:  Oh, yes.

2        THE COURT:  Ms. Connor, you didn't file any

3   motions in limine with regard to this 412 information, to my

4   recollection, did you?

5        MS. CONNOR:  No, I didn't, your Honor, because

6   the burden is on the defense.

7        THE COURT:  Okay.

8        (Pause in Proceedings.)

9        (Ms. Sheehan returned to the proceedings.)

10        THE COURT:  Please bring the jury in, Bruce.

11        (Jury Present, 3:39 p.m.)

12        THE COURT:  Okay, ladies and gentlemen, jury's

13   back in the courtroom, we have plaintiff still on the stand,

14   plaintiff's counsel, defense counsel, apologize for the

15   extended break, sometimes these things take a little longer

16   than I hope, so -- but I think we're prepared to proceed now.

17        Ms. Sheehan, if you could, the objection is

18   overruled, you may proceed.

19        MS. SHEEHAN:  Could you please read back the

20   last question.

21        (The last question was read.)

22   A    No, that is not true.

23   Q    Ms. Collins, run through for me, please, your

24   job locations and dates while with the Department of

25   Corrections.

1          A     That would be impossible.

2          Q     Why?

3          A     Oh, I'm sorry, just separate facilities?

4          Q     Correct.

5          A     Oh, I apologize.  I started at the academy in

6     October of 2002, left the academy and went to Sing Sing.

7          Q     I'm sorry, when did you go to Sing Sing?

8          A     I went to Sing Sing on the 23rd of December,

9     2002, where I did two weeks on-the-job training.  I went to

10    Sing Sing, I was officially assigned to Sing Sing on

11    January 9th of 2003.  I was sent to Sullivan on May 27th,

12    2003.  I was sent to Auburn on, I believe it was June 28th,

13    2004.  I went to Eastern on March 27th, 2006, and then I had

14    a paper transfer to Sullivan but I'm not sure of the day.

15         Q     Please give me the dates that you were out on

16    medical leave.

17         A     Okay.  I went out on medical leave on

18    December 7th, 2005, and then --

19         Q     When did you return?

20         A     I returned on March 27th, 2006.  I went out

21    again -- well, those were actually my vacation and personal

22    days so those weren't really considered medical days but is

23    that what you're looking for?

24         Q     Yes, every day from December 20th --

25    December 7th, 2005 to March 27th, 2006, you were paid,

1    correct?

2         A    I'm not sure if my leave and vacation and sick

3    time went all the way through that time.  I do not recall

4    right now.

5         Q    Did you use any category of pay other than

6    vacation or personal days during December 7th, 2005 and

7    March 27th, 2006?

8         A    And I used my sick time and there may have

9    been a period where I received half pay.

10        Q    May have been, you're not sure?

11        A    Not, not that it was during that time because

12   I was also out another time.

13        Q    So let's talk about the first time,

14   December 7th, 2005 to March 27, 2006.  Do you remember -- let

15   me, did you say you do not remember if you received half time

16   pay at all during that time period?

17        A    During that time period, I don't remember.

18        Q    And half pay is a union benefit in which

19   you're paid half your salary as a union benefit, correct?

20        A    Correct.

21        Q    And that is not an accrual?

22        A    That's correct.

23        Q    That does not go against your vacation time,

24   your sick time, or any personal leave?

25        A    No, because in order to get half pay you have

1    to use all the other up so it doesn't go against anything.

2              Q    Okay.  It's -- did you have to pay that money

3    back?

4              A    No.

5              Q    Were you out on medical leave a second time?

6              A    Yes.

7              Q    Can you please give me the dates.

8              A    Would have been either October or November of

9    2006.

10             Q    Until?

11             A    April of 2007.

12             Q    Did you receive any pay from the Department of

13   Corrections during that time period?

14             A    Yes, for part of that time I know that I

15   received half pay.

16             Q    Do you know how much half time you received?

17             A    No, I don't.

18             Q    During what time frame you received half pay?

19             A    I wouldn't know that.

20             Q    And is it true you did not have to pay that

21   money back to the union?

22             A    That's correct.

23             Q    Or to the Department of Corrections?

24             A    That's correct.

25             Q    Did you receive any other compensation from

1    the Department of Corrections during that time which, either

2    October or November 2006 through April 2007?

3                A       No pay.

4                Q       You received a termination letter, let me grab

5    it, it was offered into evidence as Exhibit 77.  Do you

6    remember that?  Your Honor, may I get Exhibit 77?  Do you

7    have the marked exhibit?  You have it up there?

8                A       I do.

9                Q       That works.  The letter you received in

10   April 27, 2009 states that in the second paragraph that you

11   would be -- you know what, your Honor, may I post --

12                THE COURT:  It's in evidence, yes.

13                MS. SHEEHAN:  Exhibit 77, thank you.  May I

14   approach, I'm going to post it so the jury can read along

15   with us.  May I please have the exhibit.  Thank you.

16                This letter advises you that you're going to

17   be terminated in May of 2009, correct?

18                A       Yes.

19                Q       Unless you come up with appropriate medical

20   documentation to prove to Department of Corrections that you

21   can return to work, correct?

22                A       Yes.

23                Q       Okay.  You were out on medical leave October,

24   November 2006 to April 2007 and this letter is dated

25   April 27th, 2009.  What transpired between April 2007 and

1    April 2009?

2         A    I went back to work for five weeks.

3         Q    Can you please tell us what five weeks?

4         A    That would have been -- I went back sometime

5    in April of 2007, and I left in May of 2007.

6         Q    Okay.  That takes us to May of 2007.  Then

7    what happened?

8         A    I'm sorry, the five weeks was in 2008.

9         Q    Okay.  What happened between April 2007 and

10   April 2008?

11        A    I apologize because I'm a little confused with

12   the times right now.

13        Q    So you can't answer that?  My last question?

14        A    I'm trying to remember when I worked the five

15   weeks, if I worked the five weeks in 2007, or if I worked

16   them in 2008.

17        Q    Okay.  Let me ask you another question.  You

18   testified that Sergeant Flynn made an inappropriate comment

19   to you about you're not gonna use that baton, are you?  Do

20   you remember testifying to that?

21        A    That was not an inappropriate comment.

22        Q    How did you take the comment?

23        A    I took it as a very -- a very appropriate way

24   to defuse a situation.

25        Q    So he helped you with your situation?

A Yes, he did.

Q Ms. Collins, you testified that you saw a Ray Tartakoff, have I pronounced that correctly?

A That's correct.

Q Because several officers had went to him, correct?

A That's correct.

Q And Tartakoff is a male?

A Yes.

Q And isn't it true that male and female officers sought out his services?

A Yes, it was.

Q You testified that you showed up for work under a stressful situation the day before a holiday, is that correct?

A No, I didn't show up for work stressed the day before a holiday, I was not stressed until I went to work.

Q Well, you testified that you had to go to work because if you didn't, you would be disciplined because the next day was a holiday?

A Oh, that day, I had to go to work the day of the holiday, I didn't show up the day before stressed, I did show up the holiday stressed, yes, I did.

Q Isn't it true that that -- you would not have been disciplined for that in the formal sense?

1          A    No, I don't think that's true.  I think I

2    would have been disciplined.

3          Q    What do you base that knowledge on?

4          A    That's just what we were taught in

5    corrections, you do not bang in on a holiday -- I'm sorry,

6    bang in means call in, call out for any reason.

7          Q    So you have no personal knowledge of people

8    getting disciplined?

9          A    Yes.

10         Q    You do?

11         A    Yes.  When I was in Sullivan, someone got

12   written up for, I believe, Easter.

13         Q    Do you know that firsthand?

14         A    I was at Sullivan, yes.

15         Q    Were you there when the person was disciplined

16   for not showing up on Easter?

17         A    Not disciplined, I was there on Easter when he

18   was supposed to be there.

19         Q    Were you there when he was disciplined for not

20   showing up for work?

21         A    No.

22         Q    Okay.  You also testified that Superintendent

23   Graham, you felt that he threatened you when you told him you

24   were considering going to the media; do you remember

25   testifying to that?

1          A     Yes, I do.

2          Q     And isn't it true you went to the media

3    numerous times?

4          A     Yes, I did, with permission.

5          Q     Permission from who?

6          A     I wrote to Linda Foglio from the Department of

7    Corrections and I asked permission to go to the media.

8          Q     Who's Linda Foglio?

9          A     I believe she works in the public affairs

10   office there.

11         Q     And you contacted her in writing?

12         A     Yes, I sent her an e-mail.

13         Q     An e-mail.  Do you have a copy of that e-mail

14   with you today?

15         A     Not today, no.

16         Q     When did you send that e-mail to her?

17         A     I'm not sure of the exact date.  It would have

18   been before I contacted any media.

19         Q     And when did you first contact the media?

20         A     I'm not exactly sure of the dates.

21         Q     2007 when you filed your federal complaint?

22         A     No, I went to the media after I filed my

23   complaint.

24         Q     Regarding derogatory comments on bathroom

25   walls?

1          A    Yes.

2          Q    Isn't it true there are derogatory comments on

3     the walls about male officers also?

4          A    Yes.

5          Q    Isn't it true there's a lot of derogatory

6     comments on the walls about Superintendent Graham?

7          A    I have never personally seen any about him.

8          Q    Isn't it true there were numerous comments,

9     derogatory comments on the wall about former Superintendent

10    Burge?

11         A    I have never seen any about him.

12         Q    You testified that someone made a negative

13    comment about your appearance when you were dressed in street

14    clothes to a medical visit, do you remember that?

15         A    Yes, I do.

16         Q    Did that incident occur when you were

17    escorting an inmate to a funeral?

18         A    Yes, it did.

19         Q    Isn't it true that corrections, to be a

20    corrections officer is a very difficult job for not just

21    females but for males, also?

22         A    No.  I find it -- the only thing I found

23    difficult was my relationship with other officers.

24         Q    Isn't it true there are male officers that

25    have problems with other male and female officers?

1          A    I'm sure there probably is.

2          Q    But you're not aware of any as you sit here

3    today?

4          A    Well, I do, I know about other officers who

5    have been harassed, male officers.

6          Q    Okay.  Isn't it true there -- you reported to

7    Department of Corrections Inspector General office about a

8    young male officer who committed suicide, and you reported

9    that he committed suicide because of the abuse of other

10   officers?

11         A    That that was part of the reason he committed

12   suicide, yes.

13         Q    You have no personal or firsthand knowledge of

14   why he committed suicide, do you?

15         A    I did speak to his mother, yes, I did.

16         Q    Are you aware, okay, isn't it true you made

17   the report, the complaint to the inspector general's office?

18         A    No, that was in a letter to superintendent, or

19   to Commissioner Goord, I believe.

20         Q    You didn't make a phone call to the inspector

21   general's office?

22         A    Anything that I had to the inspector general's

23   office was in writing.  I wrote that in a letter to

24   Commissioner Goord.

25         Q    Isn't it true that the investigation by the

1    county coroner reported to the inspector general's office was

2    that this young man's suicide had absolutely nothing to do

3    with his job as a corrections officer?

4              A    I would not know this.

5              Q    That he did not use his state-issued gun to

6    commit suicide?

7              A    I would not know anything about this

8    investigation.

9              Q    Or that his suicide note did not in any way

10   mention his job or the Department of Corrections?

11             A    I will repeat that answer.  I do not know

12   anything about that investigation.

13             Q    You testified about a meeting with

14   Superintendent Burge and your union representative.  Your

15   union is NYSCOPBA, is that correct?

16             A    That's correct.

17             Q    Are you a part of CSEA in any way?

18             A    No.

19             Q    PEF?

20             A    No.

21             Q    And isn't it true the reason your union

22   representative was there was because Superintendent Burge was

23   giving you an informal reprimand?

24             A    If he was, I was not aware of that.

25             Q    He was giving you an informal reprimand

1    because you put your shirt in an outside trash receptacle,

2    your uniform shirt?

3            A    In an inside trash receptacle and I was not

4    aware that that was an informal counseling session.  I

5    received nothing in writing about this, I was not aware.

6            Q    Informal, verbal.

7            A    I was not aware that this was considered a

8    counseling session.

9            Q    You testified that you went to -- you were

10   working at Auburn and you went, you asked to become a

11   diversity trainer?

12           A    Yes.

13           Q    And isn't it true you needed the

14   superintendent's approval to do that?

15           A    Yes.

16           Q    And isn't it true Superintendent Burge gave

17   you that approval?

18           A    Yes.

19           Q    You also attended meetings on the committee.

20   Can you remind me what that committee was?

21           A    That was the cultural diversity committee.

22           Q    And you attended two meetings, correct?

23           A    I attended two at the facility and one hub.

24           Q    Okay.  Let's just stick with -- but the hub

25   meeting was different, wasn't it?

1          A    Yes, it was in a different place.

2          Q    You needed Superintendent Burge's permission

3     to be on that committee, correct?

4          A    I do not remember that.

5          Q    If you did, he would have granted it to you,

6     correct?

7          A    Yes, he would have.

8          Q    Because you were on the committee.  And you

9     attended that committee twice and then decided that it had no

10    power?

11         A    That's correct.

12         Q    And you did not attend any further sessions?

13              THE COURT:  Was there an answer to that?

14         A    Oh, I'm sorry, no, I did not attend any more.

15              THE COURT:  Thank you.

16              MS. SHEEHAN:  Your Honor, one minute.

17         Q    You testified about walking up the stairs at

18    Auburn and, apologize if it was Sullivan, please correct me,

19    where an officer squeezed between your legs?

20         A    Yes.

21         Q    Was it Auburn or Sullivan?

22         A    That was at Auburn.

23         Q    At Auburn.  And you weren't able to identify

24    the officer, correct?

25         A    Not by name, no.

1    Q    But you made no effort to find that officer's

2  identity, did you?

3    A    No, I did not.

4    Q    And it would have been easy to do because you

5  testified he worked a split shift and there were only a few

6  people that did that, correct?

7    A    That's correct.

8    Q    Isn't it true you also had problems with

9  female officers at Auburn?

10    A    One female officer, yes.

11    Q    Well, when you first started working at

12  Auburn, didn't you claim that Susan Carter would not speak

13  with you?

14    A    Yes, no one would speak to me at Auburn.

15    Q    Male or female?

16    A    That's correct.

17    Q    And when you were asked to set up the softball

18  team, Officer Mattie refused to play for the Auburn facility?

19    A    Correct.

20    Q    And that's two female officers, three would be

21  you mentioned yesterday a couple times about a female officer

22  that was angry with you, you lent her money?

23    A    No, that was at Sullivan, and I lent a male

24  officer money and she got angry with me.

25    Q    So we had, okay, female officer at Sullivan

1    and two at Auburn?

2              A    Yes.

3              Q    Isn't it true defendant Superintendent Burge

4    never made a derogatory comment to you?

5              A    That's true.

6              Q    Sexually harassed you?

7              A    No, he did not.

8              Q    Inappropriately touched you?

9              A    No.

10             Q    Or personally created a hostile work

11   environment for you?

12             A    I believe his failure to do more than he did,

13   not created it, but added to it.

14             Q    So he did not create a hostile --

15             A    No, he did not create it.

16             Q    Defendant Graham, did he ever make a

17   derogatory comment to you?

18             A    I believe he did.

19             Q    What comment?

20             A    I believe his -- our whole interaction was

21   derogatory.

22             Q    A comment that would -- sexual in nature?

23             A    Sexual in nature?

24             Q    Yeah, start there.

25             A    No.

1          Q    Ever touch you inappropriately?

2          A    No.

3          Q    Ever make -- lost my train of thought for a

4    second.  Never touched you inappropriately, never made a

5    comment to you sexually oriented?

6          A    No.

7          Q    Never personally created a hostile work

8    environment for you?

9          A    Not created, no.

10         Q    Defendant Commissioner, former Commissioner

11   Goord.  You never met Commissioner Goord, did you?

12         A    No, I did not.

13         Q    So I think it's fair to say he never sexually

14   harassed you?

15         A    No.

16         Q    He never made an inappropriate comment to you?

17         A    That's true.

18         Q    And he never personally created a hostile work

19   environment for you?

20              THE COURT:  Is there a response to that

21   question, please?

22         A    No.  No.

23         Q    You testify about condoms in your lunchbox?

24         A    Yes.

25         Q    You have no personal knowledge of who put

1    those condoms in there?

2         A    No, I do not.

3         Q    You testified that you lost your time cards?

4         A    Yes.

5         Q    The time cards went missing?

6         A    Yes.

7         Q    You have no idea what happened to those time

8    cards, do you?

9         A    No, I don't.

10        Q    Isn't it true, it's not uncommon for time

11   cards to get lost?

12        A    I would not know that.  Sometimes officers who

13   are mad at other officers take the officer's time card and

14   rip it up and throw it in the trash, but other than that, I

15   don't know how many get lost.

16        Q    Have you ever done that to another officer?

17        A    No, but have I seen that done before?

18        Q    Did you do anything to stop it?

19        A    No, I did not, it was already in the process

20   of being done.

21        Q    Of being ripped?

22        A    Correct.

23        Q    Did you file a complaint?

24        A    No, I did not.

25        Q    Did you tell an officer or superior?

1          A    No, I did not.

2          Q    Isn't it true that you also, you witnessed

3    inmate abuse by officers and you never reported it?

4          A    That is true.

5          Q    And you never intervened?

6          A    That is also true.

7          Q    Just like many of the incidents that you

8    testified to, you never filed a complaint?

9          A    That is true.

10          Q    So isn't it true you're part of the problem?

11          A    At Sullivan, yes, I was part of the problem, I

12    have no problem admitting that I was.

13              MS. SHEEHAN:  One minute, your office -- your

14    office, your Honor.

15              MR. KINSEY:  Your Honor, may we approach.

16              THE COURT:  You may.

17              (At Side Bar.)

18              THE COURT:  Go ahead.

19              MS. SHEEHAN:  Your Honor, I have one topic

20    left and I'd like to be able to address it without a break.

21    Thirty minutes, maybe an hour.  I know you want to push this

22    along.

23              THE COURT:  I'm not going to stop now.

24              MR. KINSEY:  Evidence came in in the context

25    of psychiatric examinations late in this process where she

1   revealed while at Sing Sing, she'd been the victim of an

2   assault.  It was not at Sing Sing, it was at a military base,

3   she couldn't remember who, what, when, how, where, no memory

4   of anything, and it was proffered to her doctor, Alley, late

5   in treatment.

6            MS. SHEEHAN:  2009.

7            MR. KINSEY:  And at that point, the diagnosis

8   changed radically from adjustment disorder to PTSD.  So we

9   would like to inquire as to whether that was the stressor

10  that kicked off the new diagnosis.  So unless we can ask

11  about that event, it's going to put the medical testimony

12  back in an objectionable place because we're going to be

13  accused of ambushing the client, or the plaintiff because we

14  didn't reveal it, we're going to ask these questions of the

15  medical personnel.

16           MS. CONNOR:  Your Honor, I can respond to

17  that, or do you want to hear from Ms. Sheehan first?

18           THE COURT:  No, go ahead, you can respond.

19           MS. CONNOR:  Plaintiff was deposed about an

20  incident that occurred at Sing Sing that is not a part of

21  this complaint.  It is not alleged in the complaint and never

22  has been alleged as anything for which defendants would have

23  liability for.  And the incident that plaintiff testified

24  about in her deposition related to sexual contact.  Plaintiff

25  testified that she has no recollection of it, and that it

1    happened in some New Year's Eve, in housing that was off of

2    the premises of Sing Sing, and that she awoke and there

3    was -- she found semen on her.  I think this is very

4    inflammatory and prejudicial because this definitely relates

5    to prior sexual acts that this is --

6              THE COURT:  Hold on, let her finish, please.

7              MS. CONNOR:  This is definitely the exact type

8    of evidence that is covered under 412, squarely.  And it is

9    not a part of this complaint whatsoever.  There's never been

10   anything from the plaintiff's side that alleges that any of

11   the defendants have any liability for this complaint.  And

12   the fact that plaintiff testified that she has no memory of

13   it does not allow defense to say that it was an attack.  She

14   has no memory of it, they have no other evidence of it.

15             THE COURT:  Okay.

16             MS. CONNOR:  I think it's under 412.

17             THE COURT:  I guess what I should address

18   then, Ms. Connor, is what I'm hearing from defendant's

19   counsel saying, you know, she's claiming this post-traumatic

20   stress disorder is a result of what occurred to her during

21   corrections and I understand that you're saying that this has

22   nothing to do with her complaint about what happened at

23   corrections but what they're saying is, that her debilitating

24   condition may be as a result of this other incident,

25   therefore minimizing the damages that may be awarded, if at

1    all, as a result of her treatment at corrections.

2                   MS. CONNOR:  Your Honor, she's never made any

3    allegation that this incident that counsel refers to is the

4    cause of her PTSD.

5                   THE COURT:  She doesn't have to.  It's whether

6    or not it might be a cause.

7                   MR. KINSEY:  And that's the question to the

8    doctors.

9                   THE COURT:  I understand.  I understand where

10   you're going.

11                  MS. SHEEHAN:  So, you want to --

12                  THE COURT:  We're not going to get into that

13   today.  I would say this, and I'll tell you all this now on

14   the record.  That if you're anticipating calling this female

15   officer that you say walked in and saw this thing happening

16   with Sergeant Hoefling, we're going to do an offer of proof,

17   a little hearing outside the presence of the jury, I'm going

18   to hear what she has to say and we're going to make some

19   decisions.  My inclination at this point is, based on what I

20   heard so far it will probably come in, but I want to know the

21   extent of what she's alleging, and what she saw.  Similarly,

22   this is the type of information that we would do some sort of

23   a hearing outside the presence of the jury and hear about it.

24   I understand why you're asking, because it could affect

25   damages, the cause of her problems may be as a result of this

1    incident, but you want to ask the doctors about that is what

2    you're saying, could it be the cause of --

3                        MR. KINSEY:  Exactly.

4                        THE COURT:  -- what they're diagnosing with

5    her.

6                        MR. KINSEY:  There's no allegation that DOCS

7    is responsible for this, that's absolutely correct.  We have

8    no desire to delve into this and somehow link it to bad

9    conduct.  The only way it came up and the only reason that we

10   raise it with the court is that she brought it to the

11   attention of her doctor, and the doctor's diagnosis changed,

12   and if it changed to PTSD, did it change because of this or

13   did it change because of other stressors?

14                        MS. CONNOR:  That would be a question for the

15   doctor, not the plaintiff.

16                        THE COURT:  Yes, that's what they're saying,

17   that's what they're saying.

18                        MS. CONNOR:  Oh, I thought they were saying

19   both.

20                        THE COURT:  They're not going to ask her

21   questions about that, there's no basis for it, it's not in

22   her complaint.  My understanding, correct me if I'm wrong,

23   Counsel, if I'm wrong, getting to the damage, is the reason

24   for her health issues as a result of that incident, or in

25   combination with the harassment, alleged harassment with

1    corrections, or is it the exclusive cause of the problem?  I

2    don't know until we ask the doctor to find out.  Now there

3    may be ways to handle this, to say, you know, not identifying

4    what that incident was but just saying, you can talk to your

5    doctors ahead of time, you can prep them for the fact, now

6    were you informed of an incident that occurred to her in such

7    and such a year, could that incident have been, without

8    saying what it was, related to her diagnosis, and they're

9    going to say yes or no or whatever they're going to say.

10               MS. CONNOR:  Your Honor, if I can explain, the

11    reason I misunderstood is why we're standing here, I thought

12    she wanted to pursue this on cross-examination now with the

13    plaintiff, that's why we're here at this moment.

14               THE COURT:  What do you want, is that what

15    you're asking to do?

16               MS. SHEEHAN:  Yes.

17               THE COURT:  Well, I don't think I'm going to

18    allow that.

19               MS. SHEEHAN:  She didn't tell anybody about

20    this, she got through the expert.

21               THE COURT:  Yeah, but you can ask the doctor,

22    you want to ask about this as a result of potential limiting

23    damages, if at all, or saying that this is the exclusive

24    cause of any diagnosis this doctor may have had, is this

25    prior incident.  She hasn't complained about that, there's no

1    reason to ask her about this.

2                    MR. KINSEY:  All I was going to say is that

3    that works unless there's at some point a denial that there

4    was an event.  If there's a denial of this event, then --

5                    THE COURT:  By who, by the doctor?

6                    MR. KINSEY:  By plaintiff.

7                    MS. SHEEHAN:  Dr. Alley -- well, he's not

8    going to let me ask.

9                    MR. KINSEY:  I mean it goes directly to

10   damages and we're going to hear from plaintiff that all of

11   the damages are caused by her treatment at DOCS, then --

12                   THE COURT:  I understand.  I understand.

13                   MR. KINSEY:  As with the court's first ruling,

14   you can't have it both ways.

15                   MS. CONNOR:  Plaintiff is not trying to have

16   it both ways, we are not.  I think it's defense trying to

17   have it both ways.  They're trying to circumvent the

18   requirements of 412 here.  This is exactly the type of thing

19   that 412 is supposed to do, they completely disregarded this,

20   and now they want to ask the plaintiff at this hour, at this

21   point about this incident, and I think that's completely

22   improper.  The way your Honor approached it I think is a

23   much, you know, better approach, than to go to the plaintiff,

24   ask whether she denies it is very highly prejudicial.

25                   THE COURT:  I'll tell you what we're going to

1    do.  You're going to ask your client and you're going to tell

2    me whether she denies that this incident happened, and then I

3    want you to talk to the doctors, all right, and I need to

4    know was it reported.  To them.

5                    MS. CONNOR:  To the doctors?

6                    THE COURT:  Yes.  Okay.  And if it was, then

7    it's fair grounds for cross-examination for them to ask about

8    the diagnosis without identifying what the incident was, the

9    nature of the incident, okay, was there another incident

10   which occurred which was reported to you by the plaintiff

11   that affected your diagnosis, and was it possibly -- and it's

12   possibly the cause of some of these problems she's

13   experiencing, I think that's fair.  And I think that's a good

14   way to handle it.  I don't want you getting into it with this

15   plaintiff on the stand because it's not anything in her

16   complaint.  I understand why you want to ask her about it,

17   but if she's not going to deny this thing occurred, and that

18   it was reported to her doctors, then there's no reason to

19   ask.

20                    MR. KINSEY:  What about that it was not

21   reported to anyone else?

22                    MS. SHEEHAN:  It was not reported to anyone.

23                    THE COURT:  What does that have to do with

24   anything?

25                    MS. SHEEHAN:  Our expert.

1          MR. KINSEY:  She never told our expert.  She

2     spent six and a half hours with him, it didn't come up.

3          THE COURT:  Well, I mean, I don't know what he

4     asked her.  Did he ask her about it?

5          MR. KINSEY:  He didn't know he was supposed to

6     ask her about it, he spent six and a half hours with a mental

7     examination and she played hide the ball.

8          MS. CONNOR:  Well, Counsel, the Attorney

9     General's office was aware, they deposed the plaintiff about

10    this --

11         THE COURT:  Hold on, everybody hold on a

12    second, all right.  We can handle that one, too.  When you

13    get your doctor on the stand, if, you know -- he's aware of

14    it now?

15         MR. KINSEY:  Yes, he is.

16         THE COURT:  All right.  Would that affect his

17    assessment in some different way, I'm sure he's told you.

18         MR. KINSEY:  Yes.

19         THE COURT:  There's no reason why he can't

20    testify about the fact that this prior incident which

21    occurred to her such and such a date allegedly would affect

22    his diagnosis, or his medical opinion as to what's causing

23    the problem, without getting into what that incident was.

24         MR. KINSEY:  Understood.

25         THE COURT:  Ms. Connor.  Satisfactory way to

1   handle it?

2                  MS. CONNOR:  I understand, thank you, yes.

3                  THE COURT:  I think that's an appropriate way

4   to handle it.  I don't want to get into the fact that maybe

5   she was, what -- this is an alleged rape?

6                  MS. SHEEHAN:  Yes.

7                  MS. CONNOR:  Possibly, she has no memory of

8   it.

9                  MS. SHEEHAN:  The deposition --

10                  THE COURT:  Why does she have no memory of it?

11                  MS. CONNOR:  I don't know, your Honor.

12                  THE COURT:  But she acknowledges that it

13   happened?

14                  MS. CONNOR:  Yes, your Honor.

15                  MS. SHEEHAN:  Would you like a copy of the

16   deposition, your Honor?

17                  THE COURT:  You can leave it with me tonight

18   and I'll take a look at it.  But for now, that's the way

19   we're going to proceed.

20                  MR. KINSEY:  Okay.

21                  MS. SHEEHAN:  Can we revisit it in the morning

22   after you look at the deposition?

23                  THE COURT:  Have an opportunity, be here

24   early, though, I want to start at 9:00.

25                  MS. SHEEHAN:  Yes, your Honor.

1                    THE COURT:  You have any other questions other

2       than this?  You have nothing else, you ready to go?

3                    MR. ANDREWS:  Nothing, your Honor, I have

4       nothing.

5                    THE COURT:  Oh, questions.

6                    MR. ANDREWS:  For her?  God, yes.

7                    THE COURT:  You ready to start?

8                    MR. ANDREWS:  I am ready to start.

9                    THE COURT:  We've got 10 minutes we're going

10      to use, all right?

11                   MR. ANDREWS:  That's fine.

12                   THE COURT:  All right.

13                   (Open Court.)

14                   THE COURT:  Okay, I think we're ready to

15      proceed again.  Ms. Sheehan, do you have any more questions

16      for Ms. Collins?

17                   MS. SHEEHAN:  No, your Honor.

18                   THE COURT:  Mr. Andrews, are you ready to

19      proceed?

20                   MR. ANDREWS:  I am, your Honor.

21                   THE COURT:  I'm going to tell you now, we're

22      going to go for 10 minutes, okay, and then I'm going to let

23      the ladies and gentlemen of the jury go home.  Go ahead.

24                   MR. ANDREWS:  Tell me when to stop.

25                   CROSS-EXAMINATION BY MR. ANDREWS:

1          Q    Ms. Collins, you probably heard me introduce

2     myself before but we've never met, my name is Ross Andrews.

3     As I'm sure you're aware, I represent Troy Mitchell and I

4     have some questions for you, okay?

5          A    Okay.

6          Q    I'd like to first kind of try to make sure I

7     understand everything you testified about my client this

8     afternoon, okay, or today.

9          A    Okay.

10         Q    You understand?  You testified that on your

11    second day at Auburn, Troy Mitchell said to you, women do not

12    belong here, or words to that effect, is that correct?

13         A    That's correct.

14         Q    Now, that statement obviously refers to

15    gender, right?

16         A    Yes, it does.

17         Q    It's -- would be inappropriate if it was said,

18    you would agree with that?

19         A    Yes.

20         Q    But there's no sexual content to it, correct?

21         A    That's correct.

22         Q    Okay.  As I understand your testimony, the

23    next thing that you testified about with regard to Troy

24    Mitchell was about three to four months later, when there was

25    a comment about an inmate who had flashed you during the

1    course of your duties, is that correct?

2            A    That's correct.

3            Q    And in fact you allege that Troy Mitchell made

4    two statements to you at that time, correct?

5            A    That is correct.

6            Q    And that you did not respond, correct?

7            A    Yes.

8            Q    Okay.  And then your testimony about the next

9    contact was something approximately eight or nine months

10   later which was the wallet incident, is that correct?

11           A    Those were the highlights of my contact with

12   Sergeant Mitchell.

13           Q    I'm asking about what you testified about my

14   client today.

15           A    Oh, yes.

16           Q    The next thing that you testified about was

17   the incident with your wallet, correct?

18           A    Yes.

19           Q    And again, that's an incident with no sexual

20   content to it?

21           A    That's correct.

22           Q    And that's an incident where you did something

23   wrong?

24           A    Yes, I did.

25           Q    Now the next thing that you testified about as

1    I understand it was November 10th, 2005?

2           A    That's correct.

3           Q    Let me step back for a second and clarify

4    something.  I actually think you may have said that the

5    wallet incident happened in 2004 when you testified, that was

6    2005, correct?

7           A    I'm not sure of the exact date of the wallet

8    incident.

9           Q    Well, you -- it was subsequent to what you say

10   was said about the inmate -- strike that.

11               You don't recall at this time when the wallet

12   incident occurred?

13          A    No, it was sometime either in the spring or

14   the summer because I had no coat and there were short sleeves

15   being worn so --

16          Q    Do you recall testifying in your deposition

17   that it was the spring or summer of 2005?

18          A    No, I don't.

19          Q    Okay, well, we'll come back to that.

20          A    Okay.

21          Q    You gave some testimony about some things said

22   on November 10, correct?

23          A    Yes.

24          Q    And some had to do with topics that related to

25   Mr. Mitchell's gastrointestinal system, is that a fair

1   statement?

2            A    Yes.

3            Q    And those were not sexual in nature, correct?

4            A    Correct.

5            Q    And then you said that he said that he walked

6   around naked in front of his children, that he made a comment

7   about his mother's breasts, and he made a comment about his

8   wife losing her ring up his rear end or words to that effect,

9   is that correct?

10           A    That's correct.

11           Q    Okay.  And on that day, there was an incident

12  where your glasses were taped, correct?

13           A    Yes.

14           Q    And that's something that you don't -- you

15  haven't accused Troy Mitchell of having taped your glasses,

16  correct?

17           A    No.

18           Q    You don't have any reason to believe he did

19  that, correct?

20           A    I don't know who did that.

21           Q    Well, but you don't have any reason to believe

22  that Troy Mitchell did that, correct?

23           A    I really can't say that I don't have any

24  reason to believe.

25           Q    Well, at the time didn't you accuse someone

1   else of doing it?

2          A    No, I did not.  There were three people, two

3   officers and a sergeant downstairs at the time, that was who

4   I said one of them had to do it.

5          Q    Didn't you scream out at least one of their

6   names accusing them of having done it?

7          A    No, I don't remember that.

8          Q    Okay.  Well, in any event, that happened on

9   November 10th, 2005, correct?

10         A    That's correct.

11         Q    And then you didn't testify about anything

12  further that happened up to the point that you left on

13  December 7th, 2005, correct?

14         A    That's correct.

15         Q    With regard to Sergeant Mitchell, correct?

16         A    That's correct.

17         Q    Okay.  Then you left work at Auburn and you

18  eventually in March of 2006 started working at Eastern,

19  correct?

20         A    Yes.

21         Q    And again, I want to make sure that I heard

22  and properly registered all of the testimony that you gave

23  today about Sergeant Mitchell at Eastern, okay.  You

24  testified that he accepted, I mean obviously he accepted a

25  transfer to Eastern, correct?

1          A    Yes.

2          Q    Do you allege that that was retaliatory on his

3     part, to accept that transfer there?

4          A    I cannot say, I don't know what he was

5     offered.

6          Q    Okay.  You gave some testimony about then

7     Lieutenant Mitchell sitting next to an exit so that you could

8     not leave?

9          A    That's correct.

10         Q    Okay.  Then you testified that he walked into

11    the yard and looked at you?

12         A    He stood at the yard post, yes.

13         Q    And looked at you?

14         A    Yes.

15         Q    And that was the sum and substance of your

16    testimony as to what Lieutenant Mitchell did to you at

17    Eastern?

18         A    That's correct.

19              MR. ANDREWS:  Your Honor, at this point I

20    would be going into the specifics of some of these

21    circumstances.

22              THE COURT:  Go ahead.

23              MR. ANDREWS:  Okay.

24              THE COURT:  Maybe we can get one.

25         Q    Now you gave testimony regarding the day that

1    then Sergeant Mitchell took your wallet from your lunchbox,

2    do you recall that?

3            A    Yes, I do.

4            Q    Now, you -- I would be referring to some

5    deposition testimony in the natural course of events here, if

6    that's okay, your Honor?

7                 THE COURT:  That's fine.

8            Q    Okay, thank you.  Ms. Collins, you gave

9    several days of deposition testimony, is that correct?

10           A    Yes.

11           Q    Do you recall that you gave a third day of

12   deposition testimony on December 5th, 2008?

13           A    Yes.

14                MR. ANDREWS:  Okay.  I'd like to read some

15   testimony if that's okay, your Honor, see if I can refresh

16   the witness' recollection about when the wallet incident

17   occurred.

18                THE COURT:  That's fine.

19           Q    Thank you.  I'm referring to page 467,

20   specifically line 7 to 8, now actually, this is leading into

21   your testimony about the wallet incident, okay.  And it says

22   there was an attempt to find out when this happened and the

23   question was, "Can you give me an approximate month?"

24                Your answer was, "I can't do that, I don't

25   remember.

1              "Question:  How about the time of year?

2        Holiday time?  February?  Use a holiday as sort of a

3        reference point if you could.

4              "Answer:  It was summer sometime, either

5        spring or summer because we were wearing short sleeve shirts.

6              "Question:  And you believe that this occurred

7        in or about --

8              "Answer:  The spring or early summer of '05."

9        A     Yes.

10       Q     Does that help refresh your recollection?

11       A     Yes, it does, thank you.

12       Q     Sure.  And this was sometime before the

13       overtime issue with Sergeant Wright occurred, correct?

14       A     I really can't narrow it down to that.

15       Q     Well, let me see if I can help you out with

16       that a little bit.  I would refer to pages 466, line 17 to

17       25.  And the question that led into the testimony that you

18       just gave leading into the wallet testimony is, "Can you

19       recall any other incidents concerning inappropriate harassing

20       behavior other than what you've already told me about at

21       Auburn at any time before the problem with Sergeant Wright

22       and the overtime in June of 2005?

23             "Answer:  Okay.  Yes.

24             "Question:  Please describe that for me.

25             "Answer:  This was Sergeant Mitchell," and

1    again, it goes into the discussion of the wallet testimony.

2    Does that help refresh your recollection?

3             A    Yes.

4             Q    Okay.  Are you not recalling that the issue

5    with Sergeant Wright and the overtime was on -- on June 24,

6    2005?

7             A    Yes, that's correct.

8             Q    It was, that's correct that you're not

9    recalling or that --

10            A    No, I'm sorry, I do recall that was the date.

11            Q    Okay.  So this event with the wallet and

12   Sergeant Mitchell happened before June 24th, 2005, correct?

13            A    That would be correct.

14            Q    Okay.

15            THE COURT:  Good place to break?

16            MR. ANDREWS:  Fine with me, your Honor, I'm

17   just -- my clock has a couple minutes past, and --

18            THE COURT:  Mine has 4:31 so we'll go with

19   mine.  All right.  Ladies and gentlemen, we're going to stop

20   for today, let you go home.  Please don't talk about it,

21   don't let anybody else approach you and talk to you about it,

22   if anybody tries to do that, I need to know about it

23   immediately.  I'm going to send Lori in there right as you're

24   breaking here to find out what sort of breakfast food is more

25   agreeable, all right.  I'm going to make the CSOs and the

1    blue coats very disappointed because they were going to eat

2    your leftover doughnuts I'm sure.

3                    THE CLERK:  They did end up eating them.

4                    THE COURT:  They're gone.  So if there's

5    something you would prefer, please let us know and we'll try

6    to get it for you, all right.  Have a good night.  If you'll

7    be in there ready to go at 9:00, we'll endeavor to start on

8    time.  Okay.  Thank you.

9                    (Jury Excused, 4:32 p.m.)

10                   THE COURT:  You may step down.

11                   THE WITNESS:  Thank you.

12                   THE COURT:  You're welcome.

13                   (Whereupon the witness was excused.)

14                   THE COURT:  Okay, Counsel, you have some

15   homework to do.  I just want to have some verification of

16   this issue that we talked about at the bench and the way that

17   I propose to deal with it, Ms. Connor, if that's going to be

18   agreeable in the sense that the witnesses that may be called

19   will appreciate the question being asked in that vague nature

20   without getting into specifics, and whatever the response is

21   going to be is going to be their response, but we need to

22   know that they will acknowledge that that was, you know, told

23   to them, and whether or not it was a part of their diagnosis,

24   okay?

25                   MS. CONNOR:  Yes.

1          THE COURT:  And I think that's the right way
2   to handle it, okay.
3          MS. CONNOR:  Yes.
4          THE COURT:  Anything for plaintiff,
5   Ms. Connor?
6          MS. CONNOR:  No, your Honor.
7          THE COURT:  Okay.
8          MS. SHEEHAN:  No, your Honor.
9          THE COURT:  Mr. Andrews, okay, you're going to
10  continue with your cross-examination in the morning, and if
11  you'll be here ready to go at 9:00, everybody, that would be
12  great.  Have a good night.
13         MS. SHEEHAN:  You too, your Honor.
14         (Court Adjourned, 4:33 p.m.)
15
16
17
18
19
20
21
22
23
24
25

```
 1                    C E R T I F I C A T I O N

 2

 3

 4            I, JODI L. HIBBARD, RPR, CRR, CSR,

 5   Official Court Reporter in and for the United States

 6   District Court, Northern District of New York, DO

 7   HEREBY CERTIFY that I attended the foregoing

 8   proceedings, took stenographic notes of the same,

 9   and that the foregoing is a true and correct

10   transcript thereof.

11

12

13

14

15

16

17

18                      _____

19                      JODI L. HIBBARD, RPR, CRR, CSR
                         Official U.S. Court Reporter
20

21

22

23

24

25
```