VOLUME III

UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
PENNY T. COLLINS,

                              Plaintiff,

vs.                            5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                              Defendants.

-------------------------------------------x

        Transcript of a Jury Trial held on March 14,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiff:          MAIREAD E. CONNOR, ESQ.
                        Attorney at Law
                        440 South Warren Street
                        Suite 703
                        Syracuse, New York  13202

For Defendant:          SATTER, ANDREWS LAW FIRM
(Mitchell)              Attorneys at Law
                        217 South Salina Street, 6th Floor
                        Syracuse, New York  13202
                          BY:  ROSS P. ANDREWS, ESQ.

For Defendants:         STATE OF NEW YORK
(All Remaining)         Office of Attorney General
                        The Capitol
                        Albany, New York  12224
                          BY:  CATHY Y. SHEEHAN, AAG
                               ROGER KINSEY, AAG

INDEX   OF   TESTIMONY

| Witness | D | C | RD | RC | FRD | FRC |
|---|---|---|---|---|---|---|
| Penny Collins | -- | 497 | 527 | 539 | -- | -- |
| John Hoefling | 542 | 569 | 607 | 611 | -- | -- |
| Susan Carter Deposition | 636 | -- | -- | -- | -- | -- |
| Kenneth Reagles | 667 | -- | -- | -- | -- | -- |

1          (Open Court, Jury Out, 9:06 a.m.)

2          THE COURT:  Okay, good morning.  We're outside

3    the presence of the jury, Counsel, are we ready to proceed

4    this morning?

5          MR. KINSEY:  I have some matters to discuss

6    with the court if I may.  Before I do I would request that

7    all third parties are removed from the courtroom, since this

8    is a matter that the court found to be most delicate.

9          THE COURT:  Okay.  Bruce, can I ask you to

10   clear the back of the courtroom for a minute.

11         (Courtroom closed.)

12         MR. KINSEY:  Thank you, your Honor.  At the

13   close yesterday, or just before the close, we had a

14   discussion about entering into evidence concerning the rape

15   that was down near Sing Sing at the beginning of this time

16   frame, and overnight, I reviewed Dr. First who's going to be

17   our expert, his notes, and his followup notes after we

18   received the deposition, brief deposition of plaintiff.  His

19   testimony is going to include testimony about what PTSD is,

20   and those stressors that alert a clinician to PTSD.

21         Now, the linkage is going to come as plaintiff

22   testified that she's afraid of the dark, afraid of men,

23   afraid to be alone, afraid of all of that, and that's

24   directly linked to the symptomology following a rape and

25   following PTSD as a result of that.  So we're back, and if

the court, we're a ways from the doctor and we have no desire

to victimize plaintiff by asking her this on

cross-examination, but we're sort of at a place where we

can't show causation and we can't address damages because we

can't talk about the symptomology in light of the event.  And

the jury is going to be left in a position of thinking that

taped glasses and bathroom talk led to that symptomology, and

led to such a fear and hatred specifically of Lieutenant

Mitchell that it just caused a complete meltdown and

homicidal thoughts.

So we have no desire to victimize the

plaintiff but at the same time, as counsel said, the rape has

nothing to do with the claims, but it's the giant gorilla in

the room which really causes the PTSD for which DOCS is being

blamed.  And without talking about it, we're unable to

discuss how much of that first cause and how much

subsequently was responsible for her condition, and for her

ongoing claims that she's damaged.

THE COURT:  Ms. Connor.

MS. CONNOR:  Excuse me, thank you, your Honor.

I thought we talked about this yesterday.  I think this is a

rehashing of what we had at the side bar, I don't really hear

anything different from counsel.  Overnight, your Honor, you

asked me to ask whether my client was going to deny that it

happened and the answer is no, she's not going to deny it.

1    And that you were ruling that counsel could talk, could

2    examine medical providers including her doctor and Dr. First

3    concerning this. So I don't understand what is any different

4    about what counsel says this morning as to what we talked

5    about yesterday.

6              THE COURT: Well, I understand what he's

7    saying. I reviewed the deposition last night, which I hadn't

8    seen before, and have given it some additional thought, and

9    the problem is, Ms. Connor, is that you have an issue where

10   you, your client is claiming all sorts of damage as a result

11   of symptomology that she is claiming as a result of sexual

12   harassment at corrections by the defendants, all right, when

13   there is another causation possible here. And I don't

14   disagree with counsel when you look at what she describes,

15   fear of men, fear of strangers, fear of being alone, not

16   wanting to be in the dark, are classic symptoms of a victim

17   of a sexual attack. So those things are now being attributed

18   to the actions of these defendants when it may not be the

19   causation or it may be only part of the causation. That's

20   for the fact finders to determine. So then I'm left with a

21   situation, how do we deal with this. To just, you know, I

22   thought quite a bit about this overnight, to just allow them

23   to ask the doctors leaves the jury in a vacuum as to where is

24   this coming from, what are they talking about, some incident

25   that occurred in January of -- what was the year?

1          MS. CONNOR:  2003.

2          THE COURT:  2003.  January 1st, 2003.  And it

3   doesn't give them the full picture.  Now I'm very sensitive

4   to your client, plaintiff in this case.  You made the

5   argument of 412.  412 applies in civil cases but this is not

6   a classic 412 situation, Rule 412, because it's not asking

7   her about her sexual habits or behavior, to try and suggest

8   that she somehow welcomed this behavior from the defendants

9   in corrections.  This is an attack, this is an assault,

10  unwelcomed, has nothing to do with her sexual behavior.  She,

11  you know, this isn't something she sought out, she's a

12  victim, and the question is how do we deal with that?

13          Now, I think that defense has a right to at

14  least ask was she assaulted, was she assaulted in January

15  that had nothing to do with her employment or any of these

16  defendants, and certainly, you know, there's a link there to

17  say, could that be the cause of some of these symptoms that

18  you are suffering.  I'm open to hear your argument, but I

19  think I have to at least let them do that, to be fair.  I

20  don't see any way around it.

21          MS. CONNOR:  Well, we would stipulate to the

22  fact that she was sexually assaulted, January 1st, 2003.

23  We'd stipulate to that.

24          THE COURT:  Without having to ask her.

25          MS. CONNOR:  That's correct.

1          THE COURT:  Okay.

2          MS. CONNOR:  And I thought that was part of

3    what we -- that's what part of the purpose of the side bar

4    was yesterday.

5          THE COURT:  Okay.  Well, I'm just trying to

6    get this clear.  See, it has to get before the jury some way,

7    it has to, because it can be an explanation for her symptoms.

8          MS. CONNOR:  Well, asking her, she's not a

9    medical person, she's regular, she's not a trained medical

10   person.  So I thought that what -- the framework that we

11   discussed yesterday was the more appropriate framework, that,

12   and that's why you asked me to discuss this with my client to

13   see whether she would deny it.  She would not deny it, we

14   will stipulate to it.  After that, I thought that the

15   questions would be properly presented to either the medical

16   provider, medical, you know, the psychiatric expert which --

17   and go from there.  And I thought that was the framework with

18   which we were going to approach it.

19         THE COURT:  That's fair.  So Ms. Connor,

20   you're going to stipulate on the record that your client was

21   sexually assaulted on January 1st, 2003?

22         MS. CONNOR:  Yes.

23         THE COURT:  And then the questions can go to

24   the medical doctors and there's a framework for that, those

25   questions.

1          MR. KINSEY:  Can we use that terminology with

2     the doctors?

3          MS. CONNOR:  Sexually assaulted?

4          THE COURT:  Absolutely.

5          MR. KINSEY:  Now the second leg of that, your

6     Honor, with the stipulation, we would also like it stipulated

7     that none of our defendants were involved in any way.

8          THE COURT:  Had anything to do with it.

9          MS. CONNOR:  Your Honor, it's not part of the

10    complaint.  We stipulate to that.  There's no allegation

11    whatsoever that any of these defendants have liability or

12    connection to that matter.

13         THE COURT:  I understand, but they want that

14    to be clear and I understand where he's coming from.

15         MS. CONNOR:  That's fine.

16         THE COURT:  It has to be clear there was a

17    sexual assault that has nothing to do with any of these

18    defendants.  Separate and apart from any claim in this case,

19    that should be part of the stipulation so it's clear for the

20    jury and then the medical doctors can be questioned

21    appropriately as to the plaintiff's symptoms and her issues

22    after that time frame, but it certainly can be a part of

23    what's going on.

24         MS. CONNOR:  Understood, and I thought that

25    was the framework that we had discussed and more or less

1  moved toward yesterday with just confirming it this morning.

2  THE COURT:  I think that's an appropriate way

3  to handle it.  Counsel, is that acceptable to you and your

4  clients?

5  MR. KINSEY:  Absolutely.  We have no desire to

6  victimize the plaintiff, but this whole idea of causation and

7  the involvement and the root cause of the PTSD is essential.

8  THE COURT:  I understand.

9  MR. KINSEY:  Thank you.

10  THE COURT:  I understand completely.

11  Mr. Andrews, is that acceptable to you and your client as

12  well?

13  MR. ANDREWS:  Absolutely, your Honor.

14  THE COURT:  So the stipulation will be that

15  the plaintiff was sexually assaulted on January 1st, 2003,

16  and none of these defendants, Department of Corrections or

17  Mr. Mitchell, any of the named defendants had anything to do

18  with it, separate and apart from her employment with New York

19  State Department of Corrections, okay.

20  MS. CONNOR:  Your Honor, may I have one moment

21  to confer with my client about one follow-up matter to that.

22  THE COURT:  You may.

23  MS. CONNOR:  Thank you.

24  (Pause in Proceedings.)

25  MS. CONNOR:  Your Honor, may I have a moment,

1  please, I'd like to confer with my client in the attorney

2  conference room.

3                    THE COURT:  Go ahead.

4                    (Whereupon a recess was taken from 9:17 a.m.

5                     to 9:20 a.m.)

6                    (Open Court, Jury Out.)

7                    THE COURT:  Okay.

8                    MS. CONNOR:  Thank you very much, your Honor.

9                    THE COURT:  Not a problem.

10                   MS. CONNOR:  Your Honor, I have an additional

11  request.

12                   THE COURT:  Okay.

13                   MS. CONNOR:  And that is when the stipulation

14  is made on the record in front of the jury, if we can ask the

15  courtroom to be cleared and not have extraneous persons, you

16  know, like now, without any third parties in the courtroom, I

17  would ask the court for that, please.

18                   THE COURT:  Okay.

19                   MR. KINSEY:  No objection.

20                   THE COURT:  Any objection to that?

21                   MS. SHEEHAN:  No, your Honor.

22                   MR. ANDREWS:  No.

23                   MS. SHEEHAN:  We do have counsel from one of

24  the defendants here, he reports back each night to -- DOCS

25  general counsel.

1          THE COURT:  Okay.  If he's an attorney as part

2    of the suit, that's fine.

3          MS. SHEEHAN:  Thank you, your Honor.

4          MS. CONNOR:  Additionally, your Honor, second,

5    ancillary to that, would be when the doctors are questioned

6    about this, can we likewise have the same courtesies,

7    request?

8          THE COURT:  I'm very reluctant to keep closing

9    the courtroom.  I think you are all aware of my

10   responsibilities in that regard for keeping the courtroom

11   open.  We'll have to make a record, you know, maybe we'll

12   just close it for that limited part.

13         MS. CONNOR:  That's -- I'm not asking for the

14   entire testimony.

15         THE COURT:  It's, you know, I start treading

16   on very thin ice when I, you know, start considering closing

17   courtrooms, and we'll have to make a good record, and you

18   know, we'll consider it at that time, but then you get into

19   the issue of closing arguments and on and on and on, so I

20   can't --

21         MS. CONNOR:  I understand.

22         THE COURT:  -- close the courtroom in all

23   those situations, so I'll just warn you to that.  I'll

24   certainly listen to you and I'll consider it, and I

25   understand the sensitivities, but it's -- it's something

1   that's a difficult decision to make, okay.  Anything else
2   before we bring the jury in?
3                   MR. ANDREWS:  No, your Honor.
4                   MR. KINSEY:  Nothing, your Honor, thank you.
5                   THE COURT:  Okay.  Ms. Connor, Ms. Collins, if
6   you're ready to retake the stand.  Are you okay, in a
7   situation where you're going to be composed enough to get
8   through this?
9                   THE WITNESS:  Yes.
10                  MR. ANDREWS:  Should I come forward, your
11  Honor?
12                  THE COURT:  Yes, come on up.  The courtroom
13  should be open at this point.
14                  MR. KINSEY:  Your Honor, as the jury's coming
15  in and the courtroom being reopened, I believe there are
16  potential witnesses that have been subpoenaed by plaintiff,
17  we would like them excluded from the courtroom during
18  testimony.
19                  THE COURT:  That are in the courtroom?
20                  MR. KINSEY:  They were in the courtroom this
21  morning.
22                  THE COURT:  Ms. Connor, if you have any
23  witnesses here, just ask them to wait outside, okay.
24                  MS. CONNOR:  I believe there are two, your
25  Honor.

1          THE COURT:  Can you ask them to wait outside.

2          MS. CONNOR:  Would you like me to do it now?

3          THE COURT:  Yes, please, until they're called,

4     they shouldn't be in the courtroom during other testimony.

5          MS. SHEEHAN:  Your Honor, at lunchtime, can we

6     get a lineup of the witnesses to follow?  We have a couple

7     people traveling, making arrangements.

8          THE COURT:  We'll try and get a barometer of

9     where we are here.

10          MS. SHEEHAN:  Getting phone calls.

11          THE COURT:  Understand.  Hopefully the pace is

12     going to pick up.  Bring the jury in, please.

13          (Jury Present, 9:24 a.m.)

14          THE COURT:  Okay.  Good morning, ladies and

15     gentlemen, hope you had a good night.  Sorry for the late

16     start, hopefully we had some food that was more to your

17     liking in there this morning.  I don't know if that's

18     accurate or not, but I hope so.

19          THE CLERK:  Not yet.

20          THE COURT:  Not yet, huh?  Well, as you may

21     remember, Ms. Collins was still on the stand, Mr. Andrews is

22     on cross-examination, going to pick up where we left off.  Go

23     ahead, sir.

24          MR. ANDREWS:  Thank you, your Honor.

25

1          P E N N Y   C O L L I N S , recalled as a

2   witness and being previously duly sworn, testifies

3   as follows:

4                   CONTINUED CROSS-EXAMINATION BY MR. ANDREWS:

5          Q    Good morning.  Ms. Collins, I think yesterday

6   we managed to establish a timeline relative to your testimony

7   from yesterday about Troy Mitchell and I'd like to follow up

8   on that a little bit, okay?

9          A    Yes.

10         Q    Okay.  You testified yesterday that

11  Mr. Mitchell told you that women did not belong at Auburn;

12  you recall that testimony?

13         A    Yes.

14         Q    And you said several people witnessed it?

15         A    Yes.

16         Q    And you named an individual Officer Howell, do

17  you recall that?

18         A    Yes.

19         Q    Do you recall that in your deposition, you

20  were asked about this alleged statement by Sergeant Mitchell,

21  and you were asked who the witnesses were?

22         A    Yes.

23         Q    And do you recall that the only one you could

24  identify was an Officer Neuser, Neuser?

25         A    Yes.

1          Q    And that officer died some years ago, is that

2     correct, if you're aware?

3          A    No.

4          Q    Okay.  Do you believe he didn't die or you

5     don't know?

6          A    I don't know.

7          Q    Okay.  Now, other than Officer Neuser, you

8     were asked who else was there, and you said you didn't know

9     any of the other officers' names; do you recall that

10    testimony?

11         A    Yes, I do.

12         Q    So did you learn Officer Howell's name at some

13    later point in time?

14         A    No, I was orientating with Officer Howell.

15         Q    But do you recall being asked who witnessed

16    that statement, that alleged statement by Sergeant Mitchell?

17         A    Yes.

18         Q    And at that time you didn't identify Officer

19    Howell, correct?

20         A    If it's not in my deposition that I did, then

21    I didn't.

22         Q    So you're not sure?

23         A    I'm sure that Officer Howell was there.

24         Q    Well, we can continue.  You gave testimony

25    about an occasion when an inmate flashed you, do you recall

1    that?

2              A    Yes.

3              Q    Okay.  And you say this occurred in the fall

4    of 2004?

5              A    I'm not sure of the date, but that happened.

6              Q    You said it was several months after you

7    started at Auburn?

8              A    Yes.

9              Q    And you said that day or the next day Sergeant

10   Mitchell made comments about that incident?

11             A    Yes.

12             Q    You didn't give any response when Sergeant

13   Mitchell made that -- made those two statements, correct?

14             A    No.

15             Q    None at all?

16             A    No.

17             Q    I'd like to talk to you about the wallet

18   incident.

19                  THE COURT:  Ms. Connor, do you need a break?

20                  THE WITNESS:  Yes, sir, I do.

21                  THE COURT:  Okay.  Ladies and gentlemen of the

22   jury, I apologize, we're going to just take a short break,

23   I'm going to ask you to step out for a minute, please don't

24   talk about it, discuss it.

25                  (Jury Excused, 9:28 a.m.)

1            THE COURT:  Go ahead, step down.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  Go ahead.

4            (Whereupon a recess was taken from 9:29 a.m.

5             to 9:35 a.m.)

6            (Open Court, Jury Out.)

7            THE COURT:  Ms. Connor, Mr. Andrews requested

8    to put something on the record before the jury comes back so

9    if you're prepared to deal with that right now?

10           MS. CONNOR:  Put something on the record about

11   what, your Honor?

12           THE COURT:  I don't know.  He's just asked for

13   an opportunity to be heard.

14           MS. CONNOR:  I'm sorry, I thought you were

15   referring to something I'm supposed to know what it is, okay.

16           THE COURT:  No, I'm just --

17           MS. CONNOR:  Yes.

18           THE COURT:  Mr. Andrews, go ahead, sir.

19           MR. ANDREWS:  Your Honor, I'm very concerned

20   that what just happened is going to give the appearance that

21   my questions about my client caused the witness to cry, when

22   in fact I think it's events leading up to it, and I would ask

23   for a curative instruction just to note to the jury that she,

24   you know, that there was an upsetting topic before she

25   started testifying, that, you know, didn't have anything to

1    do with the questioning that I was doing.

2                    THE COURT:  Ms. Connor.

3                    MS. CONNOR:  Your Honor, I would be opposed to

4    that.  The witness has cried before on the stand, we've taken

5    another break, and a curative instruction just with respect

6    to this, I think would, an upsetting topic, that adds to the

7    topic, it adds a certain judgment, value judgment to the

8    topic and I don't think that's appropriate.

9                    THE COURT:  Well, part of the problem is, the

10   appearance to this jury is that the questions that

11   Mr. Andrews has had about defendant Mitchell, you know, their

12   impression is, I would imagine, that has caused her, your

13   client to be so upset, and I think anybody who's been in this

14   courtroom this morning knows that that's not the case, it's a

15   different topic that has caused her to be upset and not able

16   to compose herself, so it's either I give curative

17   instructions or I can have Mr. Andrews ask questions, are my

18   questions upsetting you or is there something else, however

19   you want to deal with it, but I think it's only right and

20   fair to let it get corrected for this jury so they understand

21   that it's not his questioning, I don't believe, unless you

22   want your client to answer that.

23                    MS. CONNOR:  I would prefer it from your

24   Honor.  And I would -- he said upsetting topic, a more

25   neutral description of the topic would be better, your Honor.

1          THE COURT:  Okay.  Okay.  Well, what I would

2     propose to say to this jury is that we had to deal with some

3     issues before they came in, and the subject matter was

4     upsetting to the plaintiff and that's what she's been upset

5     about and having difficulty composing herself, not the

6     cross-examination of Mr. Andrews or the content of his

7     questions.  So it's clear to them, and that's why we took

8     another break and let her compose herself so we can get

9     started again, okay.

10          MS. CONNOR:  Okay, your Honor.

11          THE COURT:  Okay.  Do you have a suggestion of

12     other wording that you would like?

13          MS. CONNOR:  I would just take the word

14     upsetting and substitute different.  Different topic.

15          THE COURT:  What word would you use?

16          MS. CONNOR:  A different topic that upset the

17     plaintiff.

18          THE COURT:  Okay.  I'll do it that way.

19          MS. CONNOR:  Try to neutralize it a little.

20          THE COURT:  Something -- they need to know

21     that something else upset her and not the examination of

22     Mr. Andrews.

23          MS. CONNOR:  I understand that point, your

24     Honor.

25          THE COURT:  Okay.

1              MS. CONNOR:  Your Honor, before we bring the

2     jury back in, I have another problem that I'd like to draw to

3     the court's attention.  I subpoenaed a witness for this

4     morning who's not here, not complied with my subpoena.  I'd

5     like to draw that to the court's attention and I need -- I'm

6     going to need some assistance to enforce the subpoena.

7              THE COURT:  Okay.  And who is that witness?

8              MS. CONNOR:  It's Mary Mayville, and I have an

9     affidavit of service, personal affidavit of service with me,

10    personal service on Ms. Mayville.

11             THE COURT:  Have you had any contact with

12    Ms. Mayville?

13             MS. CONNOR:  No, your Honor, I have tried

14    repeatedly.  I have mailed her letters, I have phone calls,

15    and I -- she is not responsive.

16             THE COURT:  Is she still an employee of DOCS,

17    do we know that?

18             MS. CONNOR:  No, your Honor, she's a retiree,

19    she's retired from DOCS.

20             THE COURT:  She's retired?

21             MS. CONNOR:  Yes.

22             THE COURT:  And do we know where she's living?

23             MS. CONNOR:  Yes, your Honor, my process

24    server personally served her residence.

25             THE COURT:  She was personally served?

1          MS. CONNOR:  Yes, your Honor, I have an

2    affidavit of service with me.

3          THE COURT:  Okay.  Well, I want to get going

4    with the examination again and we'll get back to this.

5          MS. CONNOR:  Yeah.  I understand, I just

6    wanted to draw it to the court's attention as soon as I felt

7    it was appropriate.

8          THE COURT:  I understand.  If you could

9    provide me a copy of the affidavit of service, I'd appreciate

10    that.

11          MS. CONNOR:  Yes, your Honor.

12          THE COURT:  Okay.  Are you ready?

13          THE WITNESS:  Yes.

14          THE COURT:  Ms. Collins, will you please take

15    the stand again.

16          THE CLERK:  Ms. Connor, I can make a copy of

17    that if you need it.

18          MS. CONNOR:  Thank you.

19          THE COURT:  Bruce, please bring the jury in.

20          (Jury Present, 9:39 a.m.)

21          THE COURT:  Okay, ladies and gentlemen.  Thank

22    you for your patience.  Before we started this morning, we

23    had legal issues to deal with, which was the delay in getting

24    started and we didn't start right at 9:00, and in discussing

25    those issues, you know, this is a case that, of some

1    sensitivity, and Ms. Collins got upset before we even

2    started, and nobody wants you to have the impression that

3    Mr. Andrews' questioning was the thing that caused her to be

4    upset, Ms. Collins was upset before you even came into this

5    courtroom.  So I apologize for having to take another break,

6    but I thought it was appropriate so that Ms. Collins could

7    compose herself and Mr. Andrews could have an opportunity to

8    cross-examine her when she was a little more composed.  So

9    thank you for your patience, and Mr. Andrews, go ahead.

10                   MR. ANDREWS:  Thank you, your Honor.

11            Q    Ms. Collins.  We were talking about -- we were

12   starting to talk about the wallet incident.  You know what

13   I'm referring to generally, your testimony yesterday about

14   when you left your wallet in your lunch bag?

15            A    Yes.

16            Q    Okay.  And I think yesterday we established

17   that the wallet incident happened late spring or early summer

18   2005, before June 24, 2005; would you agree with that?

19            A    Yes.

20            Q    Okay.  And on that day, whatever the specific

21   day was, you were assigned to go to C block and take inmates

22   to lunch, correct?

23            A    Yes.

24            Q    And you asked an officer sitting behind the

25   desk on C block if you could leave your bag under the stairs

1   nearby?

2           A    That's correct.

3           Q    Okay.  You didn't tell the officer at the desk

4   that you were leaving your ID and your badge in the bag,

5   correct?

6           A    I did not tell him but I was talking to him

7   when I placed it in the side of my bag, yes.

8           Q    So he saw you placing it in your bag?

9           A    I cannot say if he saw that, I was talking to

10  him when I was putting my bag under the step.

11          Q    Okay.  So you're not sure if he saw that or

12  not?

13          A    No, I'm not.

14          Q    Okay.  And you went ahead and you put your

15  lunch bag or box under the stairs on C block, correct?

16          A    Yes.

17          Q    And your wallet with your ID and your badge

18  were in the pocket of the lunch container?

19          A    That's correct.

20          Q    Okay.  You took inmates to lunch, correct?

21          A    Yes.

22          Q    And that would have taken roughly half an

23  hour?

24          A    Probably a half hour to 45 minutes, yes.

25          Q    Half hour to 45 minutes, okay.  You returned

1    to C block, correct?

2              A    Yes.

3              Q    You retrieved your lunch container?

4              A    Yes.

5              Q    And you moved on to your next assignment?

6              A    Yes.

7              Q    And at that point, you didn't realize your

8    wallet was missing from the bag?

9              A    No, I did not.

10             Q    Okay.  Now you understand that your ID and

11   your badge were supposed to be on your person at all times,

12   correct?

13             A    Yes, your ID is, yes.

14             Q    Are you supposed to -- is it okay to leave

15   your badge in your lunch bag?

16             A    No, some people don't carry their badges.

17             Q    I'm asking what you're supposed to do or not

18   supposed to do.

19             A    Oh, no.

20             Q    You're supposed to have that on your person

21   also, correct?

22             A    If you bring it into the facility, yes.

23             Q    And you had brought it into the facility on

24   that day?

25             A    Yes.

1          Q    Okay.  Now, you understand that if Sergeant

2    Mitchell discovered that you had left your ID and your badge

3    not on your person, that it would be appropriate for him to

4    secure it and to bring it to you, correct?

5          A    Yes.

6          Q    Okay.  Now, you testified yesterday that

7    Officer Mitchell called you, is that correct?

8          A    He did.

9          Q    And at that point in time, you still didn't

10   know that your wallet and your badge were missing?

11         A    That's correct.

12         Q    And he told you that an inmate had found your

13   wallet in the trash?

14         A    That's what he said, yes.

15         Q    And this was the first time that you knew that

16   your wallet was out of your possession?

17         A    Correct.

18         Q    And this, you know, you had left it under the

19   stairs for a half hour or 45 minutes?

20         A    Yes.

21         Q    Okay.  You called your -- you called Sergeant

22   Mitchell a liar when he told you that an inmate -- when you

23   say he told you that an inmate found the wallet in the trash,

24   correct?

25         A    Yes, I did.

1          Q    Well, isn't that a serious thing, to call a

2    superior officer a liar?

3          A    Sergeant Mitchell lied to me.  I told him --

4          Q    Isn't it a serious thing to call your superior

5    officer a liar?

6          A    If my superior officer lied to me, I would say

7    no, I would point out that he was a liar.

8          Q    But Ms. Collins, you didn't know where your

9    wallet and your -- with your badge and your ID were, correct?

10         A    I had my lunch box with me at all times after

11   I picked it up from under the step, I had no reason to assume

12   that it wasn't in the bag.

13         Q    So you called him a liar because you thought

14   it was still in your bag?

15         A    No, I called him a liar because he said an

16   inmate found it in the trash.

17         Q    You didn't know what had happened to your

18   wallet with your badge and your ID at that point in time, did

19   you?

20         A    There was no way an inmate could have --

21         Q    Listen, these are yes-or-no questions, if you

22   can't answer it yes or no, then let me know but at that point

23   in time you did not know what had happened to your wallet

24   with your ID and your badge, correct?

25         A    Correct.

1          Q     So you couldn't know, you knew Sergeant

2     Mitchell said he had the wallet, correct?

3          A     Yes.

4          Q     But you didn't see him come into possession of

5     the wallet, correct?

6          A     That's correct.

7          Q     So you couldn't know how he came into

8     possession of the wallet, could you?

9          A     That's correct.

10         Q     So you couldn't know whether an inmate had

11    handed it to him, having found it in the trash?

12         A     No, that's not correct.

13         Q     Well, the officer who saw you putting it in

14    your bag could have taken it out and thrown it in the trash,

15    couldn't he have?

16         A     No.

17         Q     Why not?

18         A     Because that would assume that an officer

19    would have stolen my wallet.

20         Q     Well, you've accused Sergeant Mitchell of

21    having stolen your wallet so why couldn't an officer have

22    done it?  In fact, you have no idea other than what Sergeant

23    Mitchell actually told you as to how he came into possession

24    of your wallet, correct?

25         A     Yes, I do.

1          Q     How do you know?

2          A     Because Sergeant Mitchell told the lieutenant

3    when we met that he took the wallet out of my bag.

4          Q     Did you -- oh, you heard him say that?

5          A     Yes.

6          Q     Okay.  So at that point he was saying he took

7    it out of his bag, out of your bag, correct?

8          A     No, sir, that's not correct.  At that point he

9    told me an inmate found it in the trash.

10         Q     Well, that's what you say he told you,

11   correct?

12         A     Yes, that's correct.

13         Q     He's consistently denied that, isn't that

14   true?

15         A     No.

16         Q     Were you at Sergeant Mitchell's deposition?

17         A     Yes, I was.

18         Q     And did he say that he told you that he found

19   it in the trash?

20         A     I don't remember what he said at his

21   deposition.

22         Q     Okay, well, we'll get to his testimony

23   eventually.  At the moment that he called you, you didn't

24   know how he had come into possession of the wallet with the

25   badge and the ID, correct?

1        A      That's correct.

2        Q      So you had no idea?

3        A      That's correct.

4        Q      Okay.  So when you called him a liar, you

5    couldn't really know he was a liar?

6        A      Yes, because there was no inmates out at the

7    time my wallet was under the steps.

8        Q      You were gone for a half hour to 45 minutes,

9    correct?

10       A      Correct.

11       Q      So you don't know what happened during that

12   half hour to 45 minutes, correct?

13       A      That area is manned by an officer at the desk.

14       Q      And again, the officer at the desk who saw you

15   perhaps put your wallet into your bag could have taken it out

16   and thrown it into the trash where an inmate was, couldn't he

17   have?

18       A      Possibly.

19       Q      Okay.  So for all you knew at that point in

20   time, it may have happened the way Sergeant Mitchell said it

21   happened, you say he said it happened?

22       A      Yes.

23       Q      Okay.  Now again, there was no sexual content

24   to this incident, correct?

25       A      No.

1          Q     No, there was not any sexual content?

2          A     No, there was not.

3          Q     Do you know if Sergeant Mitchell ever caught a

4     male officer without his badge and ID on that officer's

5     person?

6          A     No, I do not.

7          Q     Okay.  Now I'd like to move to November 2005,

8     okay?

9          A     Okay.

10         Q     You met with the superintendent of Auburn

11    Correctional Facility on November 9, 2005, correct?

12         A     Correct.

13         Q     And you talked about some complaints that you

14    had?

15         A     That's correct.

16         Q     And the superintendent told you that some of

17    them had to be handled by the office of diversity?

18         A     No, I do not believe he told me that at that

19    time.

20         Q     You don't believe he did, okay?

21         A     No.

22         Q     Well, let me ask you this.  You were not fully

23    satisfied with his response, were you?

24         A     That's correct.

25         Q     And somebody said that in fact you had the

1  right to sue if you weren't satisfied, correct?

2          A    I brought up seeing a lawyer, yes.

3          Q    And as you -- you testified yesterday that the

4  superintendent then said that you had the right to sue in

5  court?

6          A    Correct.

7          Q    The next day you were assigned to work on C

8  block where Sergeant Mitchell was the sergeant, correct?

9          A    That's correct.

10         Q    And your job was at first, as first officer?

11         A    That's correct.

12         Q    And so you mostly stayed at the desk but you

13  did rounds once or twice, is that correct?

14         A    One round in the afternoon.

15         Q    Okay.  And as sergeant for that block,

16  Sergeant Mitchell had responsibility in different places

17  around the correctional facility, isn't that correct?

18         A    Correct.

19         Q    Okay.  So he wasn't there all day long,

20  correct?

21         A    No, when -- he did run the inmates to chow.

22         Q    Okay.  So you allege that Sergeant Mitchell

23  made several obscene statements to you, correct?

24         A    Yes.

25         Q    And a couple that were just kind of gross,

1   that really didn't have sexual content; is that a fair

2   statement?

3           A    Yes, that's fair.

4           Q    And again, Sergeant Mitchell has consistently

5   denied making those statements, correct?

6           A    That's correct.

7           Q    You've never produced a witness who supported

8   your claims as to what Sergeant Mitchell allegedly said on

9   November 10, 2005, have you?

10          A    That's correct.

11          Q    Okay.  Now on that day, someone put tape on

12  your reading glasses, correct?

13          A    Yes.

14          Q    And is it accurate that those reading glasses

15  only had one arm on them?

16          A    That is not true.

17          Q    Okay.  Now, again, you've never suggested that

18  Sergeant Mitchell taped your glasses, correct?

19          A    No, I did not.

20          Q    And there's nothing gender specific about

21  taping someone's glasses, correct?

22          A    No.

23          Q    There's no sexual content to that act?

24  Correct?

25          A    That's correct.

1    Q    Now you became very upset when you found that

2  your glasses had been taped, isn't that accurate?

3    A    I had been upset.

4    Q    You became -- you lost control of yourself

5  when you found that your glasses had been taped, correct?

6    A    I became more upset, yes, that's correct.

7    Q    You became extremely upset?

8    A    Yes, I did.

9    Q    You screamed?

10    A    I did raise my voice.

11    Q    You cried?

12    A    Yes, I did.

13    Q    Okay.  And you were really angry about it?

14    A    I was very angry about it.

15    Q    Okay.  And you were angry that Sergeant

16  Mitchell would not relieve you?

17    A    Yes.

18    Q    And at some point, and it wasn't clear to me

19  whether it was that day or the next day but you prepared a

20  to-from to Sergeant Mitchell?

21    A    Yes, I did.

22    Q    Was it that day or the next day?  I wasn't

23  clear.

24    A    That would have been that evening when I got

25  home.

1          Q    Okay.  So it was still on November 10th but

2     after your shift had ended?

3          A    Yes.

4          Q    Now yesterday, you testified twice that a

5     to-from is personal correspondence from an officer to another

6     officer or a supervisor, correct?

7          A    That's correct.

8          Q    Okay.  And you addressed the to-from just to

9     Troy Mitchell?

10         A    Yes.

11         Q    But you also gave it to his supervisor?

12         A    Yes.

13         Q    So it really wasn't personal correspondence

14     from you to Sergeant Mitchell, was it?

15         A    Yes, it was.

16         Q    Well, when you shared it with someone else, it

17     really wasn't personal correspondence to Sergeant Mitchell,

18     was it?

19         A    I believe the correspondence to Sergeant

20     Mitchell was a personal correspondence, yes, I do.

21         Q    Okay.  Even though you gave it to somebody

22     else?

23         A    Yes.

24         Q    Okay.  You're now complaining about some items

25     being thrown on the plexiglass over the desk at C block,

1  correct?

2          A    Yes.

3          Q    And you believe that was harassment or that's

4  what you're testifying now?

5          A    Yes.

6          Q    Okay.  Now, not only have you never suggested

7  that Sergeant Mitchell threw any of those items, you don't

8  believe he did, correct?

9          A    That is correct, I don't believe he did.

10         Q    Okay.  And you can't say why any of those

11  items were thrown?

12         A    No.

13         Q    Okay.  Now you testified that male officers

14  were sometimes also harassed, correct?

15         A    Correct.

16         Q    Would you agree that sometimes people bring

17  torment on themselves because of their reaction to things?

18         A    Yes.

19         Q    Okay.  It doesn't necessarily relate to their

20  gender when that happens?

21         A    Correct.

22         Q    Okay.  Do you recall attending an

23  investigatory conference with the New York State Division of

24  Human Rights?

25         A    Yes.

1          Q    And questions were asked of various people,

2    including yourself?

3          A    Yes.

4          Q    And you talked about the items being thrown on

5    the plexiglass?

6          A    Yes.

7          Q    And you said that you didn't take it

8    personally?

9          A    Yes, you will have to refresh my memory with

10    that because I've never seen anything to do with that

11    investigation.

12          Q    So you don't recall?

13          A    No.  I recall telling them, but I don't recall

14    the details of it.

15          Q    You don't recall, that's fair enough.

16          A    Yeah.

17          Q    We can cover that later.  Now you testified

18    that on November 10, you received about 10 hangup calls?

19          A    Well, I would say more than 10 because they

20    were continuing through the afternoon, yes.

21          Q    Well, yesterday you said 10, correct?

22          A    Yes, okay.

23          Q    And now you're complaining that the hangup

24    calls you received on November 10th was also harassment, is

25    that correct?

1          A    Yes.

2          Q    You were told at the time that the hangup

3    calls happened regularly, correct?

4          A    I don't know if I was told at that time or I

5    heard that at deposition.

6          Q    Well, does your November 10th memorandum make

7    reference to the fact that you were told that that happens

8    all the time?

9          A    I -- I don't remember, but I was told that, I

10   don't remember when I was told it.

11         Q    I'm going to --

12              THE COURT:  Yes, go ahead, that's fine.

13         Q    You're talking about -- your memorandum is

14   talking about the hangup calls, okay?

15         A    Okay.

16         Q    And it says, "I'm told this is an everyday

17   occurrence.  If it is, maybe something should be done about

18   this."  Does that refresh your recollection?

19         A    Yes, it does.

20         Q    Okay.  So you had been told by the time you

21   wrote your memorandum that that happened often?

22         A    Yes.

23         Q    And you accepted that?

24         A    Yes.

25         Q    Okay.  Now in the same memo, you asked

1    Sergeant Mitchell that he never again say the things that you

2    accuse him of saying, isn't that true?

3              A    That's correct.

4              Q    Okay.  Now, after November 10th, you continued

5    to work at Auburn until December 7th, 2010 [sic], correct?

6              A    Yes.

7              Q    And that was roughly a month, little less than

8    a month?

9              A    Yes.

10             Q    You're not alleging that Sergeant Mitchell

11   made any inappropriate remarks to you during that time,

12   correct?

13             A    That's correct.

14             Q    In fact, you and Sergeant Mitchell never spoke

15   again at Auburn prison or at Eastern prison where you both

16   worked later, correct?

17             A    That's not correct.

18             Q    You had a personal conversation at some point?

19             A    Yes, in the mess hall, I believe that happened

20   after, about an inmate.

21             Q    The inmate with the bulge in his pants?

22             A    Yes.

23             Q    And I think your testimony was that that was

24   before November 10th?

25             A    Okay.

1          Q     But let's just cover that quickly so everybody
2     knows what we're talking about, okay?

3          A     Okay.

4          Q     There was an incident in the mess hall where
5     you observed an inmate with a bulge in the front of his
6     pants?

7          A     Correct.

8          Q     And you reported that to someone else,
9     correct?

10         A     That's correct.

11         Q     And that was reported to Sergeant Mitchell?

12         A     That's correct.

13         Q     And Sergeant Mitchell and perhaps someone else
14    took the inmate out, searched him and possibly prevented
15    something bad from happening?

16         A     That's correct.

17         Q     Okay.  There was no joke about the bulge in
18    his pants, correct?

19         A     By other officers, yes.

20         Q     Not by Sergeant Mitchell?

21         A     No.

22         Q     So there's nothing that Sergeant Mitchell does
23    during that event, regardless of when it occurred, that you
24    allege was harassing, correct?

25         A     That's correct.

1          Q    Okay.  Now you transferred to Eastern and

2     started work in March of 2006, correct?

3          A    Yes.

4          Q    Okay.  And at some point, you learned that

5     Sergeant Mitchell was gonna be transferred to Eastern?

6          A    That he was transferred there, yes.

7          Q    So you didn't learn about it until after the

8     transfer had occurred?

9          A    That's correct.

10         Q    Okay.  But you had no knowledge as to the

11    circumstances that resulted in the transfer?

12         A    Yes, I did.

13         Q    I thought you said yesterday that you really

14    didn't know.

15         A    Well, I knew that he was promoted to

16    lieutenant and he came on a promotion.

17         Q    Okay.  And in fact when you're promoted, you

18    generally switch facilities, correct?

19         A    That's correct.

20         Q    Okay.  But you didn't know whether he was

21    offered other facilities at that time, correct?

22         A    No, I did not.

23         Q    Okay.  But you knew he was at Eastern.  And

24    you believe that the transfer itself was retaliatory,

25    correct?

1           A    I believe that on Sergeant Mitchell's part,

2    yes.

3           Q    Why do you believe that on Sergeant

4    Mitchell -- let me ask you this.  You never spoke to Sergeant

5    Mitchell about his reasons for transferring to Eastern?

6           A    No, I did not.

7           Q    You never asked him where he was offered other

8    choices or if he was offered other choices?

9           A    I did not ask Sergeant Mitchell.

10          Q    Okay.  So your federal complaint alleges that

11   his transfer was retaliatory, isn't that correct?

12          A    Yes.

13          Q    Your federal complaint doesn't mention

14   anything about then Lieutenant Mitchell blocking your exit

15   from Eastern by sitting next to a gate, correct?

16          A    I'm not sure what my federal complaint ...

17               MR. ANDREWS:  Can I grab the document, your

18   Honor, Plaintiff's Exhibit 1?

19               THE COURT:  Yes, you may.

20               MR. ANDREWS:  May I approach the witness, your

21   Honor?

22               THE COURT:  You may.

23          A    Thank you.

24          Q    Sure.  If I could direct your attention to

25   paragraph 62.  Do you see that's where it starts talking

1   about Sergeant Mitchell being transferred to Eastern,

2   correct?

3          A    Yes.

4          Q    And if you can read on, do you see anything

5   about Sergeant Mitchell blocking an exit by sitting next to a

6   gate?

7          A    No.

8          Q    And it doesn't say anything about, I'm sorry,

9   Lieutenant Mitchell staring at you in the yard at Eastern,

10  correct?

11         A    That's correct.

12         Q    You never spoke to Lieutenant Mitchell at

13  Eastern?

14         A    That's correct.

15         Q    Okay.  He never spoke to you?

16         A    That is correct.

17         Q    So as of the time that you left Eastern on

18  medical leave, the two of you had not spoken since you were

19  at Auburn?

20         A    That's correct.

21         Q    And unless the incident with the inmate with

22  the bulge in his pants happened after November 10th, then the

23  last time you had spoken was on November 10th?

24         A    That's correct.

25         Q    Okay.  Now, Troy Mitchell never disciplined

1      you, correct?

2              A    That's correct.

3              Q    He never wrote you up?

4              A    That's correct.

5              Q    You have no reason to believe he taped your

6      glasses?

7              A    I'm not sure who taped my glasses.

8              Q    Troy Mitchell never asked you to have sex with

9      him?

10             A    No.

11             Q    He never put his hands on you?

12             A    No.

13             Q    He never threatened you with any type of harm?

14             A    No.

15             Q    After you gave him the to-from dated

16     November 10th asking that he not say anything inappropriate

17     to you, the two of you never spoke again except possibly the

18     incident with the inmate with the bulge in his pants,

19     correct?

20             A    That's correct.

21             Q    But at Eastern, you pointed a rifle at him,

22     put him in the crosshairs and fantasized about shooting him?

23             A    That's correct.

24                  MR. ANDREWS:  No further questions, your

25     Honor.

1              THE COURT:  Mr. Andrews.

2              MR. ANDREWS:  Can I approach for the exhibit,

3     your Honor?

4              THE COURT:  Sure, absolutely.  You have

5     redirect, Ms. Connor?

6              MS. CONNOR:  Yes.

7              REDIRECT EXAMINATION BY MS. CONNOR:

8         Q    I have some questions to follow up on the

9     questions that defense counsel has asked you, Penny.  In the

10    beginning of your cross-examination by Ms. Sheehan for the

11    state defendants, you were asked quite a few questions

12    concerning different institutions that you requested on

13    transfer requests, and of the institutions that you

14    requested; were any of those co-ed?

15        A    Yes, my number one request was to a co-ed.

16        Q    Which one was that?

17        A    That was to Willard.

18        Q    And were any of the institutions that you

19    requested a transfer to not maximum security?

20        A    Yes.

21        Q    And which ones were those?

22        A    Butler, Butler ASACTC, Woodbourne was not a

23    max, and I think that's all that wasn't a max.

24        Q    Did you only want to work in maximum security

25    institutions?

1         A    No.

2         Q    I want to show you what's been Exhibit D23.

3    You testified that that's a transfer request of yours?

4         A    Yes.

5         Q    And what facility is on that request?

6         A    That's Sullivan.

7         Q    And why did you request Sullivan -- I'm sorry,

8    withdraw the question first.  What's the date on the request?

9         A    That is February 6, 2009.

10        Q    And why did you -- why did you request

11   Sullivan?

12        A    Because my son was there.

13        Q    And why was that important to you?

14        A    Because all along we had talked about working

15   together.

16        Q    Now, also on cross-examination, you were asked

17   some questions concerning your service in the military; what

18   branch was that?

19        A    It was the Army.

20        Q    And what were the dates of your service, do

21   you recall?

22        A    From July of '79 to November of '80.

23        Q    And you were asked questions concerning the

24   conditions of your discharge?

25        A    Yes.

1          Q     And what's your understanding of what your

2     discharge was?

3          A     I had a general discharge under honorable

4     conditions.  It's, um, a separation with no disciplinary

5     action at all, it's just a separation that's mutually

6     agreeable for the benefit of both parties.

7          Q     And how old were you at the time when you

8     entered the Army?

9          A     I was 17 when I signed up, 18 when I went in.

10         Q     And when you were discharged, how old were

11    you?

12         A     19.

13         Q     Now, you were also asked some questions about

14    a former treatment with psychologists or providers related to

15    psychology.  Prior to the information that we've already

16    provided, were you ever treated in the past by a

17    psychologist?

18         A     Yes.

19         Q     When was that?

20         A     The first time was in December of 1981.

21         Q     And what was the purpose of that treatment?

22         A     My husband and I had had a recent fetal death

23    and I believed I was pregnant again, and the doctor thought

24    that I -- I was not pregnant, I just wanted to be pregnant

25    and he sent me to a psychologist.

1          Q     And in fact, were you pregnant again?

2          A     Yes, I was.

3          Q     And were you treated again by a psychologist

4    after that?

5          A     Yes.

6          Q     When was that?

7          A     That would have been in 1994.

8          Q     And what was the purpose of that treatment?

9          A     My husband had gotten laid off from his job

10   and I was finishing school and I asked to take nine classes

11   in one --

12         Q     What school was this?

13         A     That was at Florida Baptist Theological

14   College.

15         Q     I'm sorry, go ahead.

16         A     I asked to take nine classes in a semester so

17   that I could graduate earlier than I wanted to, and my dean

18   told me if I saw the psychologist and I could keep up and

19   still maintain my family life, that I would be allowed to do

20   that, and I saw a psychologist three times so that he could

21   monitor and then he released me.

22         Q     And what's the normal class load in a semester

23   at that school?

24         A     That was four to five classes.

25         Q     I'd like to direct your attention to your

1    testimony about an incident concerning when an officer

2    squeezed between your legs, and you were asked some questions

3    concerning your efforts to identify the officer.

4           A    Yes.

5           Q    What efforts, if any, did you make to

6    determine who this officer was?

7           A    I reported to the office of diversity

8    management that it was an off-shift officer and I gave a

9    description of him, and I also told Captain Rourke when I

10   spoke to him.

11          Q    And at what facility did this take place?

12          A    That took place at Auburn.

13          Q    And what did you tell Captain Rourke?

14          A    I told Captain Rourke what had happened and

15   that it was an off-shift officer.

16          Q    And why was it significant that it was an

17   off-shift officer?

18          A    Because --

19          Q    To you?

20          A    There's not that many off shifts at Auburn,

21   everybody comes and goes at the same time and there's very

22   few jobs where an officer comes at a different time.

23          Q    To your knowledge, did Captain Rourke or

24   anyone from Auburn administration make any efforts to

25   identify that individual?

1          A    No.

2          Q    Now, you were also asked some questions

3    concerning an arrest?

4          A    Yes.

5          Q    And would -- were you arrested at any point?

6               MS. SHEEHAN:  Your Honor, I object, beyond the

7    scope of direct.  There were no questions regarding the

8    arrest, it was -- I did not ask --

9               THE COURT:  Hold on, please.  Come on up to

10   the bench.

11              (At Side Bar.)

12              THE COURT:  Okay.  The nature of your

13   objection, please.

14              MS. SHEEHAN:  It's beyond the scope of direct,

15   regarding the arrest.

16              THE COURT:  She's on redirect, so, you know,

17   beyond the scope of cross.

18              MS. SHEEHAN:  Cross, thank you.

19              MS. CONNOR:  Got that straight.  At least.

20              MS. SHEEHAN:  The testimony that I solicited

21   was that her physician, that she was arrested and that she

22   asked her physician if he would speak with the sheriff.  I

23   did not ask any details about the arrest.

24              THE COURT:  But the fact that you asked about

25   the arrest, that's fair that she will now ask what the arrest

1    was.  You can't just leave it dangling out there, that's the

2    purpose of redirect, for her to get up and clarify some of

3    these things.

4                    MS. SHEEHAN:  Fair enough.

5                    THE COURT:  Okay.

6                    (Open Court.)

7                    THE COURT:  Okay, Ms. Connor, go ahead,

8    please.

9                    MS. CONNOR:  Thank you, your Honor.

10        Q    Do you have water up there?  You okay?

11        A    I do, thank you.

12                    THE COURT:  That pitcher should be full if you

13    need more.

14                    THE WITNESS:  Thank you.

15                    THE COURT:  Asking about an arrest.

16        Q    Were you ever arrested?

17        A    Yes.

18        Q    When did that take place?

19        A    That was in September of 2008.

20        Q    And what took place concerning this arrest?

21        A    I was driving alone in my car, going up a hill

22    by my home and a sheriff's deputy came up behind me and put

23    the lights on to pull me over.

24        Q    Then what happened?

25        A    I was on a windy road with no end so I rolled

1   down my window and I moved my hand letting him know that I

2   would go to the top of the hill because the road went like

3   this (indicating), and I went to the top of the hill, and I

4   pulled over to the side.  And I was very anxious because I

5   hadn't done anything, I wasn't speeding, my car was okay, and

6   so I pulled over and he got out and I had a panic attack.

7        Q    Go ahead.

8        A    So I -- I said to him, I need to get home, I

9   live just around the corner, because the top of the hill was

10  here and all I had to do was go like that to get in my

11  driveway.  And I said, I need to get home, please, I'm very

12  sick, and he stepped back and he screamed at me, he put his

13  hand on his weapon and he screamed at me to get out of the

14  car.  And I had a flashback and I rolled -- I rolled up the

15  window, and I drove very slowly, I drove 5 miles an hour

16  until I got in my driveway, and he -- I was starting to get

17  out of the car, he told me to turn around, put my hands

18  behind my back and kneel down, and when I -- I had gotten

19  turned around, and I was starting to put my hands behind my

20  back and he, um, was already on top of me on the ground.  But

21  I was in my driveway, and so ...

22       Q    And were you arrested at that point?

23       A    Well, no, we stayed in the driveway for a long

24  time.  I was taken, later on, I was taken to the court in

25  Marcellus.

1          Q    And were you ever convicted of anything as a

2    result of that incident?

3          A    No.

4          Q    You know what you were charged with?

5          A    I don't even know that because after they

6    found out the circumstances, it just disappeared.

7          Q    Now, on cross-examination, you were asked some

8    questions concerning defendant Mitchell at Eastern.

9          A    Yes.

10         Q    And you were asked some questions concerning

11   his conduct at the gate one day.

12         A    Yes.

13         Q    Please describe what defendant Mitchell did at

14   the gate.

15         A    I was an off-shift officer because as soon as

16   he got there, I bid -- or I put in for jobs that were off the

17   regular hours so that I would not pass him in the lineup

18   room.  And so I was coming out of the facility from my early

19   shift at an earlier time and Lieutenant Mitchell was sitting

20   in front of the only door that I had to get out, that

21   officers had to get out of the facility.

22         Q    What was that door called?

23         A    Ooh, I'm not sure, it was just the door from

24   the yard, the back of the facility to the front.

25         Q    And how was he positioned with respect to the

1    door?

2           A    He was sitting, leaned back with his feet up

3    on the officer's desk there.  His legs were crossed and he

4    was leaning back like this and he was in the doorway.  You

5    could get around if you went to him and walked around his

6    seat.

7           Q    Where were his feet?

8           A    They were up on the officer's desk.

9           Q    And where was his back?

10          A    His back was actually leaning back in a chair

11   that pushed back.

12          Q    And when you were trying to leave the

13   facility, was this a time that many officers were leaving?

14          A    No, I was the only officer leaving.

15          Q    Why was that?

16          A    Because my job required me to leave at a

17   different time.

18          Q    Now, you also testified concerning defendant

19   Mitchell looking at you in the yard on cross-examination.

20          A    Yes.

21          Q    Would you please describe what he did in the

22   yard.

23          A    I was in the yard processing inmates into the

24   yard, and I was, I was wanding.  I had -- it's like a hand

25   scanner, and I was posted by the -- when he first came out I

1    was posted by the gate on the right side, there were officers

2    on the right side and officers on the left side, and I was

3    standing here, and Lieutenant Mitchell came out and he stood

4    there at the side and we'd never had a lieutenant come and

5    stand there before while we were processing in the yard.  And

6    he stood there, and he leered.  And I -- there are other ways

7    to intimidate people than physical intimidation, this was

8    pretty constant with first Sergeant Mitchell and then

9    Lieutenant Mitchell.  He looks at you, and he just --

10              MR. ANDREWS:  Well, objection, your Honor.

11              THE COURT:  Yeah, I'll sustain the objection,

12   that will be stricken.

13        Q    Okay.  I just want to direct your attention to

14   what he did in the yard.

15        A    Okay.  He watched me wanding, and I moved to

16   the other side, another officer wand and I moved to the other

17   side.  I was away from him and he was watching me, what I was

18   doing over there.

19        Q    And how was he watching you?

20        A    Just (indicating).

21        Q    You have to speak words.

22        A    I'm trying to get these words.

23        Q    The record can't reflect the --

24        A    Trying to get these words out.  He was just

25   leering.  And laughing.

1          Q     Now you testified on cross-examination

2    concerning an incident where you noticed a bulge in an

3    inmate's -- where was the bulge?

4          A     It was in the front of his pants.

5          Q     And you testified that Officer Mitchell and

6    you interacted with respect to this incident with the inmate.

7    And you testified that officers had made comments concerning

8    the bulge as jokes, do you recall that?

9          A     Yes, I do.

10         Q     And was Lieutenant -- withdrawn.  Was Sergeant

11   Mitchell at the time --

12               MR. ANDREWS:  Objection.

13         Q     -- the defendant in this case, present during

14   those comments?

15         A     No, he was not.

16               THE COURT:  You withdraw your objection?

17               MR. ANDREWS:  I do withdraw my objection, your

18   Honor.

19               THE COURT:  Okay.

20               MS. CONNOR:  Your Honor, may I have just a

21   moment, please.

22               THE COURT:  You may.

23               MS. CONNOR:  Thank you.

24               (Pause in Proceedings.)

25               MS. CONNOR:  I have no further questions for

1    the witness, thank you, your Honor.

2                    THE COURT:  Thank you, Ms. Connor.  Is there

3    any recross?

4                    MS. SHEEHAN:  There is, your Honor, very

5    short.

6                    THE COURT:  Okay.  Be careful when you say

7    those things, I've been known to hold people to it.  Go

8    ahead.

9                    RECROSS-EXAMINATION BY MS. SHEEHAN:

10        Q    Ms. Connor, your arrest on September 13th --

11                   MS. CONNOR:  Excuse me, I'm Ms. Connor, she's

12   Ms. Collins.  I just want the record to be clear who's who at

13   least in this.  Thank you.

14        Q    Ms. Collins, your arrest of September 13th,

15   2007, you were no longer working at Auburn, correct?

16        A    That's correct.

17        Q    And the state of New York had nothing to do

18   with your arrest, is that correct?

19        A    That's correct.

20        Q    The Department of Corrections had nothing to

21   do with your arrest?

22        A    With the arrest, no.

23        Q    Okay.  Former Commissioner Goord had nothing

24   to do with your arrest?

25        A    No.

1           Q     Defendant Burge had nothing to do with your

2      arrest?

3                 MS. CONNOR:  Your Honor, we'll stipulate to

4      this.

5                 THE COURT:  Thank you, Counsel.  It's

6      cross-examination, go ahead.

7           Q     Regarding the incident where an officer

8      squeezed between your legs, did you go to the hostage photos

9      to try to identify the officer?

10          A     No, I did not.

11                MS. SHEEHAN:  Thank you, your Honor, no

12     further questions.

13                THE COURT:  Thank you.  Mr. Andrews, any

14     recross?

15                MR. ANDREWS:  I have no further questions,

16     your Honor.

17                THE COURT:  Ms. Collins, you may step down.

18                THE WITNESS:  Thank you.

19                (Whereupon the witness was excused.)

20                THE COURT:  All right.  Ms. Connor, would you

21     call your next witness, please.

22                MS. CONNOR:  May I have one moment, please,

23     your Honor.

24                THE COURT:  You may.

25                MS. CONNOR:  Because he's not in the

1    courtroom.

2                    THE COURT:  That's fine.  You can have

3    somebody go get him.

4                    MS. SHEEHAN:  Your Honor, may we get the name

5    of the next witness.

6                    MS. CONNOR:  John Hoefling.

7                    MS. SHEEHAN:  Thank you.

8                    MS. CONNOR:  Your Honor, with your permission,

9    I may be able to expedite it if I go out there.

10                    THE COURT:  All right.  Why don't both counsel

11   go out and come back.  Anybody need a bathroom break over

12   there?  Go ahead, please don't talk about it, don't let

13   anybody else talk about it, go ahead, just go out and use the

14   facilities and you can come back.  Everybody can feel free to

15   go, if you want to stand up, walk around a little bit, it's

16   up to you, or you can stay put.  I don't want to take another

17   break, not at this point, because we got started late, and

18   I'd like to try and keep going.

19                    (Pause in Proceedings.)

20                    THE COURT:  Ms. Connor, you have your witness?

21                    MS. CONNOR:  Yes.

22                    THE COURT:  Ready to go?

23                    MS. CONNOR:  Yes.

24                    THE COURT:  Rita, would you bring them in,

25   please.

1           (Jury Present, 10:25 a.m.)

2                MR. ANDREWS:  Your Honor, Ms. Sheehan I think

3      was running down the hall.

4                MR. KINSEY:  We can start without her.

5                THE COURT:  Okay, we have the ladies and

6      gentlemen of the jury, plaintiff, plaintiff's counsel,

7      defendant, defense counsel, Ms. Connor, please call your next

8      witness.  Wait a minute, I don't have my courtroom deputy.

9      Like herding cats here.  Why don't you call your witness.

10               MS. CONNOR:  The plaintiff calls John

11     Hoefling.

12

13          J O H N   H O E F L I N G , called as a

14     witness and being duly sworn, testifies as follows:

15               THE COURT:  Go ahead.

16               DIRECT EXAMINATION BY MS. CONNOR:

17          Q    Good morning.  Would you please tell the jury

18     your name.

19          A    John Hoefling.

20          Q    And are you currently employed?

21          A    Yes.

22          Q    Where are you employed?

23          A    Sullivan Correctional Facility.

24          Q    And who is your employer?

25          A    New York State Department of Corrections.

1              Q      And what do you do at Sullivan Correctional

2      Facility?

3              A      Presently I'm a lieutenant, 3-to-11 watch

4      commander.

5              Q      And how long have you worked for the New York

6      State Department of Corrections?

7              A      Twenty-five years.

8              Q      And how long have you worked at Sullivan

9      Correctional Facility?

10             A      Since 2002, so about 10 years, give or take a

11     year.

12             Q      And at the time that you've worked at

13     Sullivan, were you always a lieutenant?

14             A      No, I was a sergeant from 2002 to 2007.

15             Q      And then after, from 2007 through the present,

16     you're a lieutenant?

17             A      Yes.

18             Q      Now with the rank of lieutenant, what does a

19     lieutenant do in corrections?

20             A      Depending on what your job is.

21             Q      What is your current job?

22             A      Current job is 3-to-11 watch commander.

23             Q      What does a watch commander do?

24             A      Basically 3-to-11 watch commander, you're in

25     charge of the facility.

1          Q     And how long have you been the 3-to-11 watch

2    commander?

3          A     About three years, two, three years.

4          Q     And prior to that time, what job did you have

5    at Sullivan Correctional Facility?

6          A     As a lieutenant?

7          Q     We'll start there, yeah.

8          A     I worked -- I had a resource job which was

9    midnight relief, day shift relief, I had resource job on

10   days, vacation relief, various jobs over -- before I got the

11   bid I have now.

12         Q     You bid on your current job?

13         A     Yes, I did.

14         Q     And then prior to being a lieutenant, what

15   rank did you hold?

16         A     I was a sergeant.

17         Q     How long did you hold the rank of sergeant?

18         A     From 2002 to 2007.

19         Q     And were you -- withdrawn.  As a sergeant,

20   what first -- what was your first job at Sullivan as a

21   sergeant?

22         A     My first job I was resource, they put me where

23   they needed you, any shift, any job.

24         Q     And after that, what did you do?

25         A     I took a bid on afternoon which was a relief

1    job.

2              Q    When did you take that bid?

3              A    Sometime in 2003, maybe.

4              Q    And how long did you hold that bid?

5              A    Two years.

6              Q    And after that, what did you do as a sergeant?

7              A    I took a bid for BHU which was new housing

8    units that they opened up in the facility.

9              Q    Now, when you started out working for the

10   Department of Corrections, what was your rank?

11             A    When I first started in '86, I was an officer.

12             Q    Is that a correction officer?

13             A    Yes, correction officer.

14             Q    Is it commonly known as a CO?

15             A    CO, yes.

16             Q    Where did you work?

17             A    I worked Shawagunk, started at Eastern and

18   went to Shawagunk.

19             Q    After Shawagunk, where did you go?

20             A    I made sergeant in Bedford Hills, then I went

21   to Sullivan after that.

22             Q    Now, are you familiar with the employee manual

23   for the New York State Department of Corrections?

24             A    Yes, ma'am.

25             Q    I'd like to show you what's been marked as

1    Plaintiff's Exhibit 6, and if you would please look at that

2    and identify it for me, if you can.

3           A      This is the New York State Department of

4    Corrections employee manual that they give you, you sign for

5    when you start with the department.

6           Q      And what's the date on that manual, please,

7    Lieutenant?

8           A      Revised in 9/7 is the revision date.

9           Q      That's September 2007?

10          A      9, yes, 9 of '07, yes, ma'am.

11                 MS. CONNOR:  At this time we offer Plaintiff's

12   Exhibit 6.

13                 THE COURT:  Any objection?

14                 MR. KINSEY:  Your Honor, we object because

15   this is remote in time both to his entrance and reception of

16   this, and also remote in time to when Ms. Collins came into

17   DOCS.  If we're going to ask about specifics of the manual we

18   need to know if this manual is different than the original

19   manual.

20                 THE COURT:  Ms. Connor, do you have the manual

21   from the time in question?

22                 MS. CONNOR:  We have a manual that plaintiff

23   identified that had redactions in it, and this manual is a

24   complete manual from September '07 which does cover part of

25   the time that plaintiff worked for the New York State

1    Department of Corrections because she was not discharged

2    until -- or let go until sometime in 2009.

3                    THE COURT:  The issue would be are you going

4    to restrict your questions to '07 and forward, as far as

5    questions regarding this manual.  In other words, we have no

6    idea of knowing at this time what the changes are.

7                    MS. CONNOR:  Your Honor, the purpose of this

8    identification is so that we can have a complete manual from

9    '07 on, without the redactions that were provided to

10   plaintiff.  And I had not planned on asking the witness any

11   further questions about it.

12                   MR. KINSEY:  Your Honor, if we're going to

13   continue to argue this, can we do it either out of the

14   presence of the jury or side bar.

15                   THE COURT:  Come on up, please.

16                   (At Side Bar.)

17                   THE COURT:  Okay.  The objection is that the

18   manual that you're offering is not covered as far as the

19   dates in question of the claims in this lawsuit.  Go ahead.

20                   MS. CONNOR:  Well, your Honor, the manual has

21   wide spread of policies concerning employee benefits,

22   concerning different offerings, compensation, like, rules

23   that apply to all employees in the Department of Corrections.

24   This witness is able to authenticate it because he's familiar

25   with this manual from 9/07.  Its sole purpose is to have the

1    rules of the -- the rules and the benefits and the

2    compensation types of packages that are offered to the

3    employees in the record.

4                    MR. KINSEY:  Well, the manual also contains

5    security information, I mean, contains all sorts of

6    information that doesn't speak to this.  So I'm at a loss to

7    know why we need the entire thing.  We can either redact out

8    the stuff that's not responsive, or they can simply pull

9    those pages that they think they need in the record to show

10   compensation.

11                   THE COURT:  Certainly a document of your

12   client, right, that you recognize.

13                   MR. KINSEY:  From 2007 forward, exactly.

14                   THE COURT:  Correct.

15                   MR. KINSEY:  And this individual's being asked

16   about a period in 2002 and 2003.

17                   THE COURT:  Do we have the manual from 2002,

18   2003?

19                   MS. CONNOR:  The plaintiff authenticated and

20   had the manual in evidence, we put the manual in evidence

21   from the time that she -- that she recognized when she worked

22   there, but this is the updated version that the plaintiff

23   could not authenticate so I wanted -- because it does cover a

24   period of time, may cover matters with respect to witnesses

25   that the defense wants to call, and I want to make sure that

1    the manual is in evidence so the jury gets the continuous

2    picture.

3                    THE COURT:  Yeah, but the point is, then we

4    need the manual from 2002 forward during the time periods

5    that she's working if that's what you're trying to do, to be

6    fair, so that everything's covered.

7                    MS. CONNOR:  The plaintiff has authenticated,

8    there is a manual already been admitted, your Honor.

9                    MR. KINSEY:  Exactly, and we redacted that.

10                   MS. CONNOR:  But there's redactions in it.

11                   THE COURT:  Okay.

12                   MS. CONNOR:  And this manual does not have

13   redactions.

14                   MR. KINSEY:  And they were redacted for a

15   purpose.

16                   THE COURT:  The purpose was because she

17   couldn't recognize them.

18                   MR. KINSEY:  Exactly.

19                   THE COURT:  This officer does apparently.

20                   MR. KINSEY:  No, they were taken out because

21   they were not in effect, they had to do with sexual

22   harassment and same sex.

23                   THE COURT:  They're not in there.

24                   MS. CONNOR:  No, you're talking about a

25   completely different manual, Counsel, that's not the manual

1    that we're talking about here, you're talking about the

2    sexual harassment training manual, this is the employee

3    manual.

4                    MR. KINSEY:  And you redacted that?

5                    MS. CONNOR:  No, you did.

6                    THE COURT:  One at a time, please.

7                    MS. CONNOR:  When you gave, when -- through

8    discovery, when you gave us the manual, there were

9    redactions.  You gave this manual, also, there were no

10   redactions.

11                   MR. KINSEY:  Exactly.

12                   MS. CONNOR:  So you're talking about a

13   different manual.

14                   MR. KINSEY:  I stand corrected, Counselor,

15   thank you.  If we redact this in the same way I'll withdraw

16   my objection but it needs to be redacted before it's publicly

17   available.

18                   MS. CONNOR:  You don't know what it is.

19   You're saying that without even knowing if it needs

20   redactions.

21                   MR. KINSEY:  I know it has security

22   information in it, that's why DOCS sent you a manual that had

23   been redacted.

24                   MS. CONNOR:  How do you know that?

25                   THE COURT:  Where did this manual come from?

1           MS. CONNOR:  Department of Corrections.

2           THE COURT:  It was supplied in discovery.

3           MS. CONNOR:  Yes.

4           THE COURT:  If it was supplied in discovery,

5    what is it that you're concerned about redacting?

6           MR. KINSEY:  Well, first of all, your Honor,

7    and I'm not trying to give you a sob story, we picked this

8    case up well after discovery closed and there are boxes --

9           THE COURT:  But if it was provided in

10   discovery --

11          MR. KINSEY:  I understand it, but as the court

12   is aware, there are things provided in discovery oftentimes

13   that should have been redacted.

14          THE COURT:  Have you seen this document?

15          MR. KINSEY:  Not until it was presented.

16          MS. CONNOR:  No, your Honor, it was provided

17   to them as part of our --

18          THE COURT:  Ms. Connor, would you please get

19   the document, let Mr. Kinsey take a look at it, and I'm going

20   to receive it subject to any objection that he may have

21   concerning this document.  I don't know what it would be

22   because it was provided by corrections.

23          MR. KINSEY:  I understand.

24          MS. CONNOR:  Your Honor, it was provided to

25   them as part of our pretrial disclosures as well.

1          MR. KINSEY:  And we don't have any objection

2     as to authenticity, just whether or not it's relevant to the

3     time period she worked and whether or not this individual is

4     the most competent to say yes, this binds DOCS.

5          THE COURT:  Okay.

6          MR. KINSEY:  All right.

7          (Open Court.)

8          THE COURT:  All right.  I'm going to reserve

9     on the offer of Plaintiff's Exhibit 6 and you may continue.

10          MS. CONNOR:  Thank you.

11          Q     Are you familiar with the term chain of

12    command in the Department of Corrections?

13          A     Yes, ma'am.

14          Q     What does that term mean?

15          A     That means you need to -- anything you need to

16    address that you're having issues with at the facility, you

17    need to go to your, the direct immediate supervisor.

18          Q     And what is the chain of command in the

19    Department of Corrections?

20          A     In the facility, it would be officer,

21    sergeant, lieutenant, captain, deputy superintendent, and

22    then the superintendent.

23          Q     And to a person holding the job of corrections

24    officers, correction officer, rather, who would be that

25    individual's supervisors?

1          A     Sergeants.

2          Q     And would lieutenants also supervise

3     corrections officers?

4          A     They do, but the immediate supervisor for an

5     officer would be a sergeant.

6          Q     Could a lieutenant give a direct order to a

7     correction officer?

8          A     Yes.

9          Q     And would the correction officer be duty bound

10    to comply with that order?

11         A     With a lawful order, yes.

12         Q     Likewise could a sergeant give a direct order

13    to a correction officer?

14         A     Yes.

15         Q     And would the correction officer be duty bound

16    to comply with that order?

17         A     A lawful order, yes.

18         Q     Now, do you know the plaintiff Penny Collins?

19         A     Yes, I do.

20         Q     And how long have you known her?

21         A     Probably around 20 years.

22         Q     How did you first meet her?

23         A     Our children went to school together.

24         Q     Now, did you -- did there come a time when you

25    worked with Penny Collins?

1          A    When she transferred into Sullivan

2     Correctional Facility as an officer, yes.

3          Q    And how long did you work with her there?

4          A    Probably around a year, I think she was at the

5     facility about a year.

6          Q    Approximately how many security personnel are

7     there at Sullivan, to the best of your recollection?

8          A    Right now?

9          Q    Withdrawn.  When you worked with Penny Collins

10    at Sullivan, approximately how many security personnel were

11    there at Sullivan?

12         A    300, 325, somewhere around there.

13         Q    And do you know how many civilian employees

14    there were?

15         A    No, I don't.

16         Q    Now, when the plaintiff first started working

17    at Sullivan Correctional Facility, where did you work at

18    Sullivan?

19         A    I believe at the time I had the relief bid.

20         Q    What is a relief bid?

21         A    Relief bid is, you assume the job of people,

22    of other supervisors on their days off.

23         Q    What rank did you hold at the time?

24         A    I was a sergeant.

25         Q    Were there particular areas in the facility

1    that you worked at that time?

2              A    Yes, I worked down at the annex which was

3    considered a separate facility, worked in the main -- both in

4    the kitchen and as the assistant watch commander.

5              Q    What does an assistant watch commander do?

6              A    He does all the staffing for the shift, he

7    does, checks officers when they come in, when they assign

8    them jobs, do assignments for the next day, and you make all

9    assignments throughout the shift.

10             Q    Is that any different role than a chart

11   sergeant?

12             A    That's what a chart sergeant does, ma'am.

13             Q    So what's the difference between a chart

14   sergeant and assistant watch commander?

15             A    Just the name, basically the same job, there

16   are other duties you have in a facility you're in charge of

17   as a supervisor besides the watch commander, assistant watch

18   commander.

19             Q    Okay.  I'm sorry, can you repeat that answer?

20   I don't understand what you said.

21             A    You have other duties besides being just

22   assistant watch commander, there are other duties within the

23   facility that you have to perform.

24             Q    That may be different than a chart sergeant?

25             A    No, it's the same thing, they're not just

1    doing staffing, they have other facilities they're in charge

2    of -- other areas of the facility you're in charge of.

3              Q    Now did there come a time when you worked at

4    Sullivan, when you worked at Sullivan with Penny Collins, did

5    you become aware of any rumors concerning the plaintiff when

6    she worked there?

7              A    There was rumors that we were sleeping

8    together, and she was sleeping with other supervisors.

9              Q    And how did you become aware of that, the

10   rumor?

11             A    I couldn't give you a specific name, just

12   stuff you hear.

13             Q    Now, was she sleeping with you at the time?

14             A    No, ma'am.

15             Q    At any time?

16             A    No, ma'am.

17             Q    What were these rumors that you heard?

18             A    That she would get favorable jobs because she

19   knew -- knew me, that I would take care of her in the

20   facility, and that we were sleeping together, and that's why

21   she got good jobs.

22             Q    Did you hear any rumors that she was sleeping

23   with any other personnel of Sullivan Correctional Facility?

24             A    I think there was a rumor that she was

25   sleeping with another sergeant, Sergeant Bennett I think his

1    name -- yeah, Sergeant Bennett.  Excuse me.

2              Q    Help yourself to water.

3              A    I'm good.

4              Q    Now, were there any ranked officers who

5    participated in these rumors, concerning the plaintiff and

6    yourself?

7              A    As far as -- you mean sergeants, lieutenants?

8              Q    Yes.

9              A    I -- I don't remember anybody specific,

10   anybody specific making allegations.

11             Q    Now did you ever discuss the plaintiff with

12   Lieutenant Keenan?

13             A    Her name come up in a discussion with

14   Lieutenant Keenan, he made a comment to me about Officer

15   Collins.

16             Q    What was that comment, please?

17             A    That she must be sleeping with me because he

18   wasn't sleeping with her.

19             Q    When did he say that?

20             A    Just in a conversation, we were walking,

21   whether we were walking on rounds or just walking, and he

22   made the comment.

23             Q    Did you respond to him?

24             A    Yes, I did.

25             Q    And can you paraphrase what you said?

1          A    Um, I told him to go fuck himself.

2          Q    Now, did you ever ride to work with the

3    plaintiff?

4          A    At times, yes.

5          Q    When was that?

6          A    She needed a car, the car she was using,

7    something happened to it, was having some work done on it,

8    she didn't have a vehicle.

9          Q    And was that near the beginning of her

10   employment at Sullivan?

11         A    It might have been, it wasn't too long after

12   she got there that it happened.

13         Q    Now did you ever talk to Ms. Collins

14   concerning any phone calls at the facility that she had been

15   receiving?

16         A    When I was -- when I was a watch commander, I

17   mean assistant watch commander?

18         Q    At any time.

19         A    She had worked the job, I think it might have

20   been the tower where she was receiving hangup phone calls,

21   people making derogatory comments to her, just hanging up,

22   not identifying themselves.

23         Q    And did you discuss this with Officer Collins?

24         A    I think there was two separate incidents that

25   it happened.  One time in the tower and one time when she was

1    working in I think the arsenal.

2          Q    Let's -- with respect to the tower, let's

3    start there.  Did Officer Collins report anything to you

4    concerning these phone calls?

5          A    They were stopping her from doing her job

6    because she kept having to answer the phone, she couldn't

7    perform her duties.

8          Q    Did she tell you the nature of the calls?

9          A    One of the comments she made was one of the

10   officers told her that, asked her if her knees were dirty.

11         Q    Did she tell you anything else concerning the

12   nature of the calls?

13         A    I don't remember specifics.

14         Q    Did she tell you that, how frequently the

15   calls came in?

16         A    They were enough that they were keeping her

17   from doing her other jobs, doing the observations for which

18   she's supposed to be doing in the tower, yes.

19         Q    And what, if anything, did you do concerning

20   Officer Collins' report to you?

21         A    I believe I reported it to the watch commander

22   at the time, what was going on.

23         Q    Who was that, please?

24         A    I think at the time it was Lieutenant Reilly.

25         Q    And what, if anything, happened concerning

1    these calls?

2          A    I'm not sure, I don't think that's the time I

3    was going to try to -- was told to put the identification

4    phone in there.  That was when she worked the arsenal, that

5    was a different time.

6          Q    I'll direct your attention then to the calls

7    at the arsenal.  What, if anything, did Officer Collins tell

8    you concerning calls she received at the arsenal?

9          A    That, again, they were calling up, doing

10   hangups, making derogatory comments.

11         Q    Did she say who they were?

12         A    Who the officers were?  No, nobody identified

13   themselves.

14         Q    This phone system that these calls were made

15   on, is that an internal or external phone system?

16         A    It's an internal system, ma'am.

17         Q    And what else, if anything, did she tell you

18   about the calls at the arsenal?

19         A    Once again, just they were derogatory in

20   nature, people asking her if she was, you know, she had dirty

21   knees, she was getting good jobs and just hanging up, making

22   her so she couldn't perform her duties.

23         Q    Now you mentioned something concerning a

24   tracer phone?

25         A    Certain phones in the facility, the watch

1   commander has, assistant watch commander, as the phone calls

2   come in, they're identified on a little LED screen.

3           Q     Like a caller ID more or less?

4           A     Like a caller ID, yes.

5           Q     What if anything occurred with respect to the

6   tracer phone and these calls that Officer Collins reported to

7   you?

8           A     I was told to see if the phone would work, ask

9   if they could identify where the phone calls were coming from

10  by the lieutenant.

11          Q     Did you do that?

12          A     I tried it, didn't work, there was only

13  certain phones that will accept the ID phone.

14          Q     Now, did you ever see any signage material at

15  the facility concerning yourself and Officer Collins?

16          A     There was a night when Officer Collins was

17  working PMS which is prisoner movement service in the watch

18  commander's office, assistant watch commander's area, and

19  somebody had called or stopped down and said that there was

20  some signs hanging outside the office.

21          Q     And what occurred next?

22          A     Officer Collins I believe went out and tore

23  them down and brought them in, was visibly upset.  Angry,

24  crying.

25          Q     Lieutenant, I'm going to show you what's been

1    marked as Plaintiff's Exhibit 20 and 21, if you would look at

2    those, please.

3              A    Yes, ma'am.

4              Q    Do you recognize those?

5              A    Yes, those are the signs that were taken off

6    the wall.

7              Q    And with respect to -- what is Plaintiff's 20,

8    Lieutenant, the one marked 20?

9              A    "Johnny's Love Shack."

10             Q    And then the other one says what?

11             A    "Honeymooners, Do Not Disturb."

12             Q    And did you have an understanding of who

13   Johnny was?

14             A    That would be me.

15             Q    Now, after Officer Collins showed you these

16   signs, what, if anything, did you do?

17             A    I reported it to the watch commander, and

18   trying to remember who I had seen in the area at the time.

19             Q    And did you report that to the watch

20   commander?

21             A    Yes, I did.

22             Q    And what, what -- what did you report

23   concerning who you saw in the area at the time to the watch

24   commander?

25             A    I told him the only officer, there was only

1   one specific officer that I remember seeing in the area, but

2   you know, my attention wasn't there at all times.  And I

3   reported who it was.

4           Q    Who was that?

5           A    Officer Royce.

6           Q    Now what happened next with respect to the

7   signs?

8           A    I don't know what happened to the signs, I

9   know I made a phone call to Officer Royce.

10          Q    What did you say to Officer Royce in that

11  call?

12          A    I told him that he crossed a line.

13          Q    Did you say anything else?

14          A    I don't remember what else I said, I was a

15  little upset, it was a little disrespectful to me, and

16  Officer Collins.

17          Q    Did Officer Collins ever talk to you

18  concerning any other problems with Officer Royce?

19          A    She told me Officer Royce would -- found out

20  she had a problem with flatulence or people farting in her

21  presence and he thought that was funny so every chance he

22  got, he made sure he -- or improvised, he made sure he did

23  it.

24          Q    Now you've worked in corrections how long,

25  Lieutenant, again?

1          A     Little over 25 years.

2          Q     Now at the time Officer Collins was in

3     Sullivan, that was several years ago but up to that point,

4     how would you characterize the role of rumors in corrections?

5               MR. KINSEY:  Objection, your Honor, in

6     corrections, it's so broad.

7               THE COURT:  I'll sustain the objection, if you

8     can rephrase your question, please.

9          Q     Lieutenant, are rumors common in corrections?

10              MR. KINSEY:  Same objection, your Honor.

11              THE COURT:  I'll overrule that one, go ahead.

12         Q     Lieutenant, are rumors common in corrections?

13         A     Yes, they are.

14         Q     And are rumors, are rumors common with respect

15    to females in corrections?

16         A     They're common, yes.

17         Q     How common?

18         A     It depends on how many females are working at

19    the facility, I would imagine.

20         Q     Why do you say that?

21         A     Different jails have different ratios of

22    females and male officers so if you work in Bedford Hills,

23    there's more rumors about male officers than females.

24         Q     If you're a female working in a predominantly

25    male facility such as Sullivan, how common are rumors?

1          A     You're asking me for percentage?

2          Q     Your -- your description of that.

3          A     Most of the time they're derogatory.

4          Q     In what respect?

5          A     That if you're not sleeping with somebody,

6    then there's something wrong with you, is probably the most

7    common.

8          Q     Did Officer Collins ever talk to you about any

9    problems she had with Lieutenant Keenan?

10         A     Yeah, she had told me she had an issue with

11   him, some of the comments he had made to her.

12         Q     What did Officer Collins report to you about

13   that?

14         A     One time he had grabbed his crotch and said

15   that he had a nice sausage for her, if she needed something.

16         Q     And Lieutenant Keenan was your superior

17   officer at the time?

18         A     Yes.

19         Q     Do you recall anything else that Officer

20   Collins reported to you about Lieutenant Keenan?

21         A     I don't remember specifics, there was ...

22         Q     In general, what types of things did she

23   report to you about Lieutenant Keenan?

24         A     Most of it was sexual in nature.  Basically

25   wanted to date her, go out with her, take her out.

1          Q    Did Officer Collins -- what was her reaction

2    to that?

3          A    Um, she wasn't happy about it, I mean it's a

4    workplace.

5          Q    Now, you worked as a chart sergeant you

6    testified at Sullivan?

7          A    Yes.

8          Q    And as a chart sergeant, did you have any

9    control or say about where and when Officer Collins worked?

10          A    Very rarely.  I mean I had the relief job so I

11    was only there one or two days a week so I really didn't get

12    to assign Officer Collins on a regular basis, no.

13          Q    Did Officer Collins ever talk to you

14    concerning any reports that she made to other ranking

15    officers at Sullivan?

16          A    I don't remember at this time, I don't -- I

17    don't remember.

18          Q    Now when you worked with Officer Collins, did

19    she -- how did she conduct herself?

20          A    As far as work?

21          Q    Yes.

22          A    I didn't have -- as far as I know she did a

23    good job.  I mean I don't -- I didn't directly supervise her,

24    very rarely.

25          Q    How often did you supervise her?

1          A      Possibly once a week, if that.

2          Q      And in the times that you supervised her, how

3    would you characterize her work?

4          A      She did a good job.

5          Q      Was there a perception among the officers of

6    Sullivan concerning Ms. Collins' femininity?

7                 MR. KINSEY:  Objection, your Honor.

8                 THE COURT:  Yeah, I'll sustain that.

9          Q      Lieutenant, if one officer is disrespectful to

10   another officer in front of inmates, does that raise any

11   concerns to you as -- as an officer in the correction system?

12         A      Yes.

13         Q      And what are those concerns?

14         A      There should be nothing like that discussed in

15   front of inmates, if you have a problem with other officers,

16   it's dealt with out of their presence.

17         Q      If an officer is disrespectful to another

18   officer in front of inmates, does that raise any concerns?

19         A      Yes, it does.

20         Q      What concerns?

21         A      Inmates use that type of information to -- to

22   their benefit, where they can -- they're very manipulative.

23         Q      Did there come a time that you became aware of

24   whether Officer Collins was going to -- was seeking a

25   transfer from Sullivan?

1          A    I believe she put a transfer in the day she

2     arrived at Sullivan.

3          Q    And where was that to?  I'm sorry, withdrawn.

4     Where was the request to?

5          A    It was to Auburn.

6          Q    And did you have any conversations with

7     Officer Collins concerning her working at Auburn?

8          A    I told her it might not be a good place for

9     her to go.

10         Q    Did you say why?

11         A    Rumors more that it wasn't a female friendly

12    jail.

13         Q    Why, where did you acquire that information?

14         A    Corrections rumors, that's just -- you hear

15    through the grapevine.

16         Q    What, if anything, did Officer Collins say to

17    you in response to that?

18         A    She just wanted to go home, and Auburn would

19    be home for her.

20         Q    Lieutenant, was there ever a time that you and

21    Officer Collins kissed at Sullivan?

22         A    Absolutely not.

23         Q    Was there ever a time that you and Officer

24    Collins engaged in some sort of romantic embrace at Sullivan?

25         A    No, no.

1          Q    Or at any time?

2          A    Never.

3               MS. CONNOR:  No further questions at this time

4    for the witness, your Honor.

5               THE COURT:  Thank you.  Cross-examination.

6    Mr. Kinsey.

7               MR. KINSEY:  Thank you, your Honor.

8               CROSS-EXAMINATION BY MR. KINSEY:

9          Q    Morning.  You prefer Lieutenant, Mr. Hoefling?

10         A    Doesn't matter.

11         Q    Going with our theme, I'll call you Lieutenant

12   if that's all right?

13         A    Fine.

14         Q    Thank you.  Now let me try to understand, when

15   you were watch commander, you control the facility, isn't

16   that right?

17         A    As a lieutenant?

18         Q    Yes.

19         A    Yes.

20         Q    And as a watch commander, you're aware that

21   any conduct where an officer is threatened or harassed should

22   be reported to the watch commander?

23         A    Immediately, yes.

24         Q    In fact, a sergeant for instance would have

25   the obligation to report that?

1          A    Yes.

2          Q    And if an individual learned that a lieutenant

3     had said something overtly sexual to a CO, there's an

4     absolute requirement that that sergeant report it to the

5     superintendent, isn't that correct?

6          A    Yes.

7          Q    Okay.  So all of these events, whether you

8     witness them or they were reported to you, you had an

9     affirmative obligation to report them to the superintendent?

10         A    Yes.

11         Q    And sir, you didn't do that?

12         A    Most of the time I was asked not to.

13         Q    Well, sir, you have an affirmative obligation

14    to do that, don't you?

15         A    Yes, I do.

16         Q    And who asked you not to do that?

17         A    Um, Officer Collins.

18         Q    Well, why as her supervisor would you not

19    report it even if she said I don't want to report it?

20         A    Because not only was I her supervisor, I was a

21    friend and she asked me not to do something as a friend.

22         Q    So if you have a friend, you're willing to

23    violate the directives of the Department of Correctional

24    Services, is that right?  Well, let me put it this way.

25    Lieutenant, your friendship was more important than doing

1    what DOCS expected you to do?

2           A    I did report stuff that happened with Officer

3    Collins to my area supervisor, to my supervisor at times,

4    yes.

5           Q    But your obligation is to report that stuff

6    like that you told us about with Lieutenant Keenan directly

7    to the superintendent; that's DOCS directive, isn't it?

8           A    Well, to my immediate supervisor would have

9    been watch commander at the time.  I wasn't a watch commander

10   at the time, I was a sergeant.

11          Q    So you -- it's your testimony that you had no

12   obligation to go to Walsh?

13          A    Did I have --

14          Q    Who was superintendent?

15          A    My obligation was to report it to my area

16   supervisor, to my supervisor watch commander at the time,

17   which is what I did.

18          Q    Did you put it in writing?

19          A    No, I didn't, I wasn't asked to.

20          Q    Well, were you trained as a lieutenant that

21   these things should be in writing?

22          A    We're talking about two different things.

23   When I was a lieutenant, she wasn't working when I was a

24   lieutenant.

25          Q    Okay.  When you were a sergeant, weren't you

1    aware that these things had to be put in writing and sent up

2    the chain of command so they could be investigated?

3         A    If I had firsthand knowledge or I had proof of

4    something, yes, I would of.

5         Q    Well, did you see Lieutenant Keenan say

6    anything to her?

7         A    No, I wasn't present.

8         Q    Never?

9         A    No.  Just what he said to me.

10        Q    And what he said to you should have been

11   reported directly to the superintendent, isn't that right?  I

12   mean maybe an appropriate response is, "Go fuck yourself,"

13   but the obligation is to then report it?

14        A    Yes.

15        Q    And so for all you know, these complaints

16   never went any further up the chain of command, did they, you

17   don't know?

18        A    Further from?

19        Q    From the watch commander, they never went to

20   the superintendent?

21        A    There was an occasion when I had told Officer

22   Collins that she needs to go talk to the superintendent

23   herself.

24        Q    We're talking about you.  You have any

25   knowledge about whether or not these went up the higher

1    command --

2         A    I don't know.  The ones I reported to my watch

3    commander, I don't know what happened with them.

4         Q    Now, Lieutenant, this morning as you arrived,

5    you had quite an animated conversation with Ms. Collins and

6    have you remained good friends?

7         A    She moved away, but, no, we don't -- I mean I

8    haven't really conversed with her for quite awhile.

9         Q    When was the last time you conversed with her?

10        A    Last week when she called me and asked me if I

11   would still testify -- two weeks ago.

12        Q    I'm sorry?

13        A    It was within the past few weeks, I'm not sure

14   of the exact date.

15        Q    How long was that phone call?

16        A    Ten minutes maybe.

17        Q    Did you discuss your testimony?

18        A    No.

19        Q    Did you rehash what had happened?

20        A    Her -- the lawyer had sent me a copy of my

21   deposition that I had given when I testified, I don't even

22   know when that was, maybe a year, two years ago.

23        Q    Prior to two weeks ago when was the last time

24   you talked to Ms. Collins, or her family?

25        A    Well, I see her family from time to time

1    because they still live where I live.

2              Q    That would be her extended family?

3              A    Extended?

4              Q    I'm talking about her husband, immediate

5    family.

6              A    They don't live in the area anymore, they

7    moved down south.

8              Q    When did they move?

9              A    I don't know the exact date, haven't kept in

10   touch with her since she left.

11             Q    Since she left the area or left Sullivan?

12             A    Kind of lost touch after she left Sullivan, I

13   mean we kept in contact once in a while but, you know, we

14   went our separate ways.

15             Q    Were you aware of her allegations against the

16   Department of Correctional Services?

17             A    Yes.

18             Q    Did you discuss those with her?

19             A    She called me at times and told me things that

20   were going on in her life, but I mean, nothing ... I don't

21   know what you're asking me.

22             Q    I'm asking if she called and talked to you

23   about this case.

24             A    That it was going forward and that she wanted

25   me to testify.  I did my deposition, I really kind of lost

1    track with her after that.

2         Q    Did she discuss the allegations of this case

3    with you prior to your deposition?

4         A    I had known what was going on in her life, I

5    mean she had told me stuff that had happened to her up in

6    Auburn, I mean I don't know ... I mean I couldn't give you

7    specific times when she called and told me what was going on.

8         Q    Now, you don't have to give me the address but

9    what town do you reside in?

10        A    Fallsburg.

11        Q    And how far is that from Sullivan?

12        A    Within 7 miles.

13        Q    And at the time when Ms. Collins was at

14   Sullivan, do you know where she lived?

15        A    She had stayed in her mother's house and she

16   had also stayed at my house from time to time when she was

17   working doubles.

18        Q    I'm sorry, forgive me for interrupting, where

19   was her mother's house?

20        A    Mother's house was the opposite side of

21   Sullivan, about 3 miles the other way.

22        Q    So her commute at that point was?

23        A    Minimal.

24        Q    Minimal, 3 miles?

25        A    Yes.

1            Q    No stop signs?

2            A    Stop light, couple stop signs, yeah.

3            Q    So for you to give her a ride was not a

4    problem because you were within 10 miles of each other?

5            A    Yes.

6            Q    Did you go to high school with Ms. Collins?

7            A    No.

8            Q    Now, you indicated that your -- that your job

9    as a sergeant was relief bid?

10           A    Yes.

11           Q    Now when you say bid, that means seniority is

12   what constitutes getting a job?

13           A    Yes, you bid on a job and you're awarded the

14   job by seniority, yes.

15           Q    That's a union thing?

16           A    Yes.

17           Q    Okay.  Now, when Ms. Collins arrived, she was

18   a resource officer, is that right?

19           A    Yes.

20           Q    Do you know how much time she had in DOCS?

21           A    Couple of months, maybe.

22           Q    Okay.  And in your experience where does a new

23   officer with a couple months service usually get assigned in

24   the facility?

25           A    Usually on the blocks, I mean they could get,

1    wherever you got, wherever you have a necessity, wherever

2    there's a hole in the charts is where they get put.

3            Q    Now, you've been a chart sergeant, is that

4    considered -- working in charts, is that considered a good

5    job?

6            A    Depends on who you ask.

7            Q    I'm asking you, is it a good job?

8            A    I don't think so.

9            Q    Why is that?

10           A    Because you get ridiculed by the rest, by

11   other officers in the facility.

12           Q    Why do you get ridiculed as a chart sergeant?

13           A    As a chart sergeant, chart officer?

14           Q    Or chart officer, whatever.

15           A    Because you're working up front with the

16   supervisors.

17           Q    And why would that cause people to ridicule

18   you?

19           A    Because you're not working down back with

20   inmates.

21           Q    And down back with inmates is not a nice

22   place, is it?

23           A    There's really not a nice place in the

24   facility, no.

25           Q    And so if you have someone that you've known

1  for quite awhile who is a new correction officer and when you

2  get to assign, you assign her to the chart office, that would

3  engender jealousy, wouldn't it?

4             MS. CONNOR:  Objection, he's calling for

5  speculation.

6             THE COURT:  No, if he knows, it's all right.

7  He's given a lot of opinions both for you and throughout, so

8  we're going to let him continue at this point.

9         A    Ask the question again.

10        Q    Yes.  If the new person came there, and they

11 were friends of yours and when you were on your relief as the

12 chart sergeant and you let them work in the chart office,

13 that would create jealousy among the officers?

14        A    Depends on who you asked, whether it --

15        Q    Well, the ridicule that you talk about, would

16 you expect that if you had a new officer with almost zero

17 time and she was getting this plum job --

18        A    They would be ridiculed, not me.

19        Q    Okay.  So the person would be ridiculed?

20        A    Yes.

21        Q    The person that you assigned there.  So it

22 would not surprise you that Ms. Collins was ridiculed because

23 she got this plum job from you?

24        A    I didn't do the assignment.

25        Q    You were in the chart office with her, right?

1          A    Yes, the assignments are made the day before.

2          Q    I see.  Can you reassign her as a chart

3    sergeant?

4          A    Yes I can.

5          Q    You can send her anywhere?

6          A    Needs of the facility, yes.

7          Q    You didn't?

8          A    I had nobody else to work the job that was

9    familiar with the way the job worked.  I didn't train her,

10   somebody else did, I knew she knew how to do the job and

11   there was nobody else that I could use.

12         Q    Do you recall in your deposition testimony you

13   were asked about giving her special training, that you

14   thought it would be good if she knew more about more things,

15   it would help her career?

16         A    That's for any officer that's coming in that's

17   new, I would do that for anybody.

18         Q    Do you do that for each and every officer?

19         A    Absolutely, as much as I can, I still do it as

20   lieutenant.

21         Q    Male or female?

22         A    Male or female, doesn't matter.

23         Q    Do you expect them to get ridiculed if they

24   get special treatment?

25         A    No, I don't.

1          Q     Does it happen?

2          A     I don't think some jobs are special treatment,

3     some jails you can work in the tower and consider it's a

4     great job; in my facility, nobody wants to work it.

5          Q     Okay.  And what about down back, do people

6     like working down in the blocks?

7          A     Some guys do, they enjoy it, they know what

8     they're doing every day, doing the same job.

9          Q     How about new people who are resource

10    officers, do they like working down back?

11         A     Some do, some don't.

12         Q     It's a tough place, isn't it?

13         A     Yes, sometimes, yes.

14         Q     Now when you heard these rumors that you and

15    Ms. Collins were sleeping together, what did you do?

16         A     I try not to pay attention to them.  What are

17    you supposed to do?  I mean you try denying allegations and

18    rumors in jail, they just get bigger and bigger, they just --

19    let it roll off your back, just -- I been doing this a long

20    time.

21         Q     Did you tell her to let it roll off her back?

22         A     They're gonna talk, people are gonna talk.

23         Q     Did you tell her that?

24         A     Yes, I did.

25         Q     And what was her response?

1          A     She didn't feel that she should be ridiculed

2     just because she's friends with me, she didn't think she

3     should have to put up with that.

4          Q     So she identified the ridicule was because you

5     were friends, not particularly because she was a female,

6     right?

7          A     Well, rumors were that we were sleeping

8     together so that -- I mean, that's a male/female thing.

9          Q     Okay.  You indicated that at Bedford Hills

10    which is a female facility there are rumors about the male

11    officers?

12         A     Yes.

13         Q     So these rumors are sort of equal opportunity,

14    males get blamed for sleeping with people and the females as

15    well, right?

16               MS. CONNOR:  Objection, it calls for

17    speculation.

18               THE COURT:  No, overruled.

19               MS. CONNOR:  Which -- object.

20               THE COURT:  Overruled.  Go ahead.

21         A     Yes.

22         Q     Now, as far as you are aware, are you the

23    source of the information when Ms. Collins found out about

24    Lieutenant Keenan's comment; did she hear it from anyone

25    else?

 1          A    Which comment?

 2          Q    That I'm not sleeping with her so you must be,

 3    did he say that to her?

 4          A    No, he said it to me.

 5          Q    So how would Ms. Collins find out about that

 6    comment --

 7          A    I told her.

 8          Q    -- if you know?

 9          A    I told her.

10          Q    Why would you tell her that?

11          A    Because I thought it was kind of crummy.

12          Q    Why wouldn't you tell the superintendent but

13    you'd tell an officer?

14          A    Because she was my friend.

15          Q    Now was your comment back to him appropriate

16    to a supervisor?

17          A    No, it wasn't.  I don't think his comment to

18    me was appropriate, either.

19          Q    Okay.  So one inappropriate comment deserves

20    another?

21          A    No, it doesn't.  Just that's what came out of

22    my mouth at the time when he said it to me, just caught me

23    off guard, I didn't expect it.

24          Q    Did you report that conversation to higher

25    authority?

1          A    No.

2          Q    Now, these hangup calls that you were talking

3     about, hangup calls to the tower?

4          A    Yes.

5          Q    In your experience, are there times in the

6     facility when there are hangup calls, generally hangup calls?

7          A    It doesn't happen very often, no.

8          Q    You're familiar with walking calls, the shirts

9     up front are walking?

10         A    Our facility used the radio.

11         Q    Okay.  Are there radio calls where you simply

12    click when somebody's going to walk?

13         A    Yeah, they'll make a comment over the radio,

14    how do you read, and they know the supervisor's walking.

15         Q    Now you indicated that she couldn't perform

16    her duties in the tower answering the phone; could you tell

17    me why that's so?

18         A    We only had one tower in Sullivan, it's in the

19    center of the jail, oversees all of the rooftops and also the

20    yards, when there's inmates out.  The officer's supposed to

21    be aware of what's going on at all time in the yards and also

22    what's going on in the rest of the facility.  That's the only

23    high point in the jail that can see every place.

24         Q    So if a problem starts in the jail, you want

25    the tower to know about it?

1      A    They're the ones that supposed to know about

2  it before us if there's something going on, yes, especially

3  in the yards.

4      Q    And would you agree as a sergeant and now a

5  lieutenant that if an individual quit answering the phone, it

6  would be dangerous in the facility?

7      A    Yeah, you have to answer the phones,

8  absolutely.

9      Q    Because it could be -- someone could be in

10  trouble, right?

11      A    Yes.  Well, somebody trying to get ahold of

12  you for whatever reason, yes.

13      Q    Now, what about an officer who simply quits

14  answering their radio, is that dangerous?

15      A    Yeah, we'd start looking for the officer if

16  they stopped answering their radio.

17      Q    Why would you start looking for them?

18      A    Because it's a jail and stuff happens.

19      Q    Do you -- are you aware of a -- of a CO by the

20  name of Donna Payon (phonetic)?

21      A    Green Haven, yes, I know the story of Donna

22  Payon, yes.

23      Q    Were you in DOCS during that time?

24      A    No, but I -- I know who she was and who the

25  perpetrator was, Smith, yes.

1          Q     It shook DOCS to its core, didn't it?

2          A     Yes, it did.

3          Q     And wasn't --

4                MS. CONNOR:  Objection, your Honor, this is

5    beyond the scope of direct, way beyond, we're talking about

6    something at Green Haven.

7                THE COURT:  You are, Counsel.

8                MR. KINSEY:  I'm getting back to the

9    telephones if I can, if you'll indulge me with two questions.

10               THE COURT:  Give you two.

11         Q     Are you aware that Ms. Payon was lured to a

12   place within the facility by a telephone call from within the

13   facility?

14               MS. CONNOR:  Objection, your Honor, what's the

15   relevance?  This is something that occurred remote in time,

16   at a different facility.

17               THE COURT:  Well, the relevance is he's

18   getting back to the hangup calls and the importance of the

19   phone calls.  Go ahead, Counsel.

20         Q     Do you recall that?

21         A     Yes.

22         Q     And part of the problem in that was a delay

23   because she didn't answer her radio, do you recall that?

24         A     I don't remember the actual specifics, I know

25   what happened.

1            Q    Fair enough.  So the mentality within the

2    facility is if that radio's not being answered and the

3    phone's not being answered, there's a problem?

4            A    It would indicate there might be a problem,

5    yes.

6            Q    Can you tell me, Lieutenant, you're on watch

7    command and someone doesn't answer their radio, what's the

8    first thing you would do?

9            A    I would send somebody to check it out.

10           Q    And that would be someone who would be taken

11   from somewhere?

12           A    I would probably have the supervisor go and

13   find out what was going on, yes.

14           Q    And if that happened repeatedly, what steps

15   would you take?

16           A    If the phone --

17           Q    If someone doesn't answer their radio

18   repeatedly, same person, what action should be taken?

19           A    I would have the officer moved to -- brought

20   up front and ask what's going on.  I mean I would have the

21   supervisor -- as a lieutenant I'd have the supervisor find

22   out what was going on, have the officer relieved and try to

23   find out what was going on.

24           Q    Now at your jail in the arsenal, does the

25   phone have an identifier routinely in the arsenal?

1          A    I don't -- no, it doesn't, no.

2          Q    Now, tell me -- I'm sorry, I was writing like

3    crazy and I don't write very well, it looks like a

4    prescription, what is PMS?

5          A    Prisoner movement service.

6          Q    And what is that?

7          A    They're trained in making all the moves within

8    the facility from cell to cell, trips going out, all the

9    paperwork has to be done for -- you know, itineraries have to

10   be set up, most of it's just internal moves.  On afternoons

11   we have guys that move from blocks, you know, we have --

12   Sullivan has a big mental health element to the inmates so

13   they're constantly moving from mental health to different

14   blocks.  So we move inmates around quite a bit.

15         Q    And Officer Collins worked as a PMS officer?

16         A    She had been trained previous, I don't know

17   who gave her the training but she had previous training.

18         Q    Previous to what?

19         A    To the night that I asked her to come, have

20   her come down and work it because I had nobody else in there.

21         Q    Did you ask her where she'd received her

22   training?

23         A    We usually have a list of people who have been

24   trained in certain jobs, whether it's arsenal or, arsenal

25   tour job, PMS, there's certain jobs, the central control

1   which operates all the doors in the jail, there's certain

2   jobs that you get very specific training for because it's

3   more entailed than other jails -- other jobs.

4          Q    Did you ever ask her where she got the

5   training?

6          A    No, her name was on the list.

7          Q    And do you know who put her name on the list?

8          A    One, the regular chart sergeant which would

9   have been I think Terry Bennett.

10         Q    Was that the same sergeant that there were

11  rumors about as well?

12         A    Yes.

13         Q    And would this be a case where a new CO was

14  being given a really good administrative job instead of being

15  down back on the blocks?

16         A    You asking me about -- our specific jail, the

17  PMS job is not considered a good job, most guys don't want

18  it.

19         Q    Why is that?

20         A    Because they have to actually work, you have

21  to do computer work and you gotta -- you're working for the

22  night.

23         Q    But they don't have to be around inmates, do

24  they?

25         A    Some would rather be around inmates.

1          Q    But in PMS you don't have to be around

2     inmates?

3          A    No, not specifically, no.

4          Q    It's an administrative job?

5          A    Yeah.

6          Q    Now when you -- you saw this sign, "Johnny's

7     Love Shack," what was your first thought?

8          A    Some idiot hung them up.

9          Q    Well, what did you think their motivation

10    might be?

11         A    Sometimes it's just high school stuff, I mean

12    I don't know how to explain it.  I mean guys are bored.

13         Q    So you didn't -- you didn't take any special

14    meaning to it?

15         A    Well, I knew what it was about, I knew it was

16    there because Officer Collins was working in the chart office

17    and it was meant to be derogatory to her.

18         Q    Well, how about you?

19         A    I ... I been doing this awhile, it -- it

20    really doesn't affect me anymore, I don't bother with rumors,

21    you can't effectively do your job.

22         Q    So if you obsess about all these rumors,

23    you're worthless inside, isn't that right?

24         A    I don't know about being worthless, but yeah,

25    you can obsess over it, I mean --

1          Q     You have to go on?

2          A     You have to go on.

3          Q     Now you indicated that you were really angry

4     about this, in direct testimony, you recall that?

5          A     Because the guy, the officer who I believe did

6     it, and I don't know for a fact he did do it, he likes to

7     stir the pot, so yeah, I was a little bit ticked off because

8     he was told to stop.

9          Q     When was he told to stop?

10         A     When Officer Collins had brought to me the

11    comments that he was doing his farting around the facility

12    when she was around, told him to stop.

13         Q     So I mean, farting in front of her is not

14    terribly sexual, is it?

15         A     No, but doing it when there's inmates around,

16    that's an issue.

17         Q     Well, it's a security issue?

18         A     Yes.

19         Q     But is it a sexual issue?

20         A     I don't believe it's a sexual issue, no.

21         Q     And he did it around inmates so clearly it

22    wasn't meant just for women, right, don't have any women

23    inmates?

24         A     Well, according to --

25               MS. CONNOR:  Objection, this calls for

1    speculation on the part of what was intended by somebody when

2    the witness wasn't even there.

3                    MR. KINSEY:  I'll withdraw the question.

4                    THE COURT:  Sustained.

5            Q    So you had warned him?

6            A    I told him to knock it off.

7            Q    Did you write him up?

8            A    No.

9            Q    Did you send it to the superintendent?

10           A    I wasn't there when it happened, but he didn't

11   deny it and I told him to stop.

12           Q    Did you write it up and send it up the chain

13   of command?

14           A    No, I didn't think it warranted it.

15           Q    Why didn't it warrant it?

16           A    Because I wasn't there, I couldn't prove that

17   he was doing it.

18           Q    Did he deny doing it?

19           A    No, but he didn't admit to it, either.

20           Q    Should there have been an investigation of it?

21           A    For that?  No.

22           Q    Should there have been an investigation of the

23   love shack sign?

24           A    I don't know if there was or not.  I don't

25   know what happened after I turned him over to the watch

1    commander.

2              Q    Did you put anything in writing?

3              A    I don't believe I did, and I wasn't asked to,

4    I mean I would have if I was asked to, I don't know what the

5    lieutenant did with them.  I got to assume he did what he was

6    supposed to, he was a really good lieutenant.

7              Q    Was he disciplined?

8              A    Was who disciplined?

9              Q    Mr. Royce, I'm sorry.

10             A    I couldn't prove -- nobody could prove who did

11   it, I don't know who did it.  I said he was the one I thought

12   did it.

13             Q    Did you go to him and talk to him about it?

14             A    That night I had told him stop, that he

15   crossed a line, that he needs to --

16             Q    Yeah.

17             A    I did say that already.

18             Q    Now, what does it mean, you crossed the line?

19             A    He was inappropriate, and it was meant that I

20   couldn't prove that he did it but if he did do it, it was

21   wrong, he shouldn't have done it.

22             Q    What should have happened to him if you could

23   prove that he did it?

24             A    Whatever the department would deem necessary,

25   would deem fit.  I don't know, it wouldn't be up to me.

1          Q     You're the watch commander now as a

2    lieutenant, what would you do if you got a person who walked

3    in, handed you "Johnny's Love Shack" and said it's him?

4          A     What would I do?

5          Q     Yes.

6          A     I would go to the superintendent with it.

7          Q     Do you know if that happened?

8          A     With this, I don't know that.

9          Q     Did you follow up?

10          A     No, I didn't.

11          Q     Has Ms. Collins ever asked you to follow up?

12          A     Not that I can recall.

13          Q     Did Ms. Collins ever follow up and tell you

14    that she had followed up?

15          A     Not that I recall.

16          Q     Now you indicated on direct testimony that

17    rumors are usually derogatory.  What do you mean by that if I

18    can ask?

19          A     What the nature of them are or -- I don't know

20    what you're asking me.

21          Q     Well, you said that the rumors are usually

22    derogatory in nature, and then the questioning moved on.  I'm

23    asking you, what does that mean to you, derogatory?

24          A     Who's screwing around with who, who's doing

25    what with who, it's -- I mean it's just the problem, not the

1    problem with corrections but there's a lot of down time,

2    you're sitting around waiting for stuff to happen, there's an

3    awful lot of down time.  People are bored, what they don't

4    know, they make up.

5           Q     You indicated that was corrections wide.  That

6    was generally true in corrections, is that right?

7           A     Yes.  To my experience, it's generally true.

8           Q     Okay.  And let's go over what your experience

9    is.  What facility did you hear these kinds of rumors in,

10   Bedford Hills, you were there?

11          A     Yeah.

12          Q     Heard them there?

13          A     Yes, I did.

14          Q     But that was in reference to men, right?

15          A     And female, and women, there was men and

16   women.

17          Q     There would have to be two but the men were

18   the officers, right?

19          A     Yes, but there was also rumors about females

20   and females too, rumors were rampant down there and you're

21   new down there so everybody wants to give you all the gossip.

22          Q     Dish the dirt?

23          A     Dish the dirt.

24          Q     And then you go from there to Sullivan?

25          A     Yes.

 1              Q     And you stayed almost your entire career at

 2     Sullivan, right?

 3              A     No, most of my career was at Shawagunk as an

 4     officer, I was there 15 years.

 5              Q     At Shawagunk?

 6              A     Yes.

 7              Q     Were there rumors in Shawagunk?

 8              A     Yes.

 9              Q     Now when you started back in, I'm sorry, I

10     lost --

11              A     '86.

12              Q     Huh?

13              A     '86.

14              Q     Back in '86, how many female officers were in

15     your class?  Approximation is okay, I won't hold you.

16              A     Four maybe.

17              Q     And when you got to Shawagunk, how many female

18     officers were there?

19              A     Maybe 10.

20              Q     And how many officers at Shawagunk?

21              A     There were 250 -- 275 I think at the time.

22              Q     And is it fair to say there were not a lot of

23     women in the Department of Corrections when you entered?

24              A     Yes.

25              Q     When you got to Sullivan, how many females

 1    were at Sullivan, approximately?

 2          A    Ten, fifteen, I'm not sure.

 3          Q    Out of how many officers?

 4          A    I think it was three and a quarter with the

 5    annex.

 6          Q    So three and a quarter, 10 female officers,

 7    right?

 8          A    Maybe 15, yeah, I'm not sure.

 9          Q    And rumors swirled about women and their

10    relationships with COs?

11          A    Pretty much, COs, officers, sergeants, I mean

12    just ...

13          Q    Now when you heard these, did you file any

14    report with the watch commander, the superintendent saying

15    this is inappropriate and has to stop?

16          A    No.

17          Q    Well, you had been trained as a sergeant to

18    know that there was a zero tolerance policy in DOCS with

19    regard to sexual harassment, you aware of that?

20          A    Yes.

21          Q    And wouldn't you say if these rumors were

22    constantly swirling at Sullivan, that that was unacceptable

23    and DOCS needed to intervene?

24          A    How do you prove a rumor?  I mean what do you

25    do with it?  I mean you propagate the rumor by spreading it

1    or you just let it lie.  I mean, it's a rumor.

2         Q    What if you write it and you send it up the

3    chain of command; couldn't they come do something?

4         A    What are you gonna do, people gonna deny that

5    they said it or it was true, what do you do with a rumor?

6    You can't prove a rumor, something somebody's saying you're

7    not witnessing --

8         Q    That is, as a supervisor, be virtually

9    impossible for you to do anything?

10        A    Unless you have firsthand knowledge, no, I

11   mean, yeah, kind of, unless you're there and somebody does it

12   in front of you, unless you got firsthand proof, yeah,

13   it's --

14        Q    And if you investigated one of these incidents

15   and you couldn't find any proof, what would your conclusion

16   be?

17        A    That it was a rumor that didn't happen.

18        Q    Now, would you call Sullivan a female friendly

19   facility?

20        A    It's okay, I mean --

21        Q    All these rumors, it's still okay?

22        A    It's all right, it's not a bad place to work.

23        Q    Do women feel the same way, if you know?

24        A    I'm not a woman.

25             MS. CONNOR:  Objection, he's calling for

1    speculation.

2              THE COURT:  He asked him if he knew, and

3    I'll -- he answered, says he doesn't know, so we'll move on.

4         Q    Now you indicated that you knew that Auburn

5    was a terrible place for women to go, is that right, it's not

6    female friendly?

7         A    I didn't say it was a terrible place to work,

8    I don't have any firsthand knowledge but I was told it's not

9    a female friendly place.

10        Q    Would that be a rumor, that it was not a

11   female friendly place?

12        A    That would be a rumor, yes.

13        Q    Had you ever been to Auburn?

14        A    No.

15        Q    Did you ever talk to Superintendent Burge?

16        A    No, I didn't.

17        Q    Did you ever talk to anyone in supervision at

18   Auburn, during the Penny Collins time?

19        A    No.

20        Q    Did you ever meet Superintendent Graham?

21        A    No, I didn't.

22        Q    Other than this rumor, did you have any

23   knowledge that Auburn was any different with regard to rumors

24   than Sullivan?

25        A    No.

1          Q     So for all you knew, it was the same?

2          A     It was the same, yes.

3          Q     Are you familiar with a CO Sheila Ebert?

4                MS. CONNOR:  Objection, this is beyond the

5      scope of direct.

6                MR. KINSEY:  She raised --

7                THE COURT:  No, it's overruled, go ahead.

8          A     Yes.

9          Q     And how do you know her?

10         A     She worked at Sullivan.

11         Q     How long did she work there?

12         A     I don't know, she was there maybe a year, I'm

13     not sure.

14         Q     Was she there when Ms. Collins was there?

15         A     Yes.

16         Q     Did you come to understand that she was the

17     person spreading the rumor about the embrace?

18         A     I was told that she was the one that was,

19     yeah, made allegations, starting rumor that she walked in on

20     Officer Collins and myself, yes.

21         Q     Did you ever talk to her about that?

22         A     No.

23         Q     Did you ever confront her?

24         A     Nope.

25         Q     Did you ever write her up?

1          A    No.

2          Q    Did you ever send a report to the watch

3     commander?

4          A    (Witness gesturing negatively.)

5          Q    I mean that's quite an allegation, isn't it,

6     that she walked in on the two of you in an embrace in a room

7     that was cut off from the rest of the facility; I mean why

8     didn't you write her up?

9          A    She never said it to me, I have no idea that

10    it was absolutely true that she was the one that said it was

11    rumors.

12         Q    Did you ever ask her if it was true?

13         A    No.

14         Q    Were you interested if what -- that she was

15    the one saying this?

16         A    No, I didn't care.  It didn't happen.  Why am

17    I gonna just put any credence to it?  That's like trying to

18    defend something that didn't happen.

19         Q    Now if that -- was that close in time to the

20    "Johnny's Love Shack"?

21         A    I don't remember when, when the allegations

22    were made, when she started the rumor, I don't know.

23         Q    But you don't know if she started --

24         A    I was told she was, that she was the one that

25    said it.

 1          Q    Who told you?

 2          A    Officers.

 3          Q    Can't name them.  Can you name them?

 4          A    No.

 5               MR. KINSEY:  May I have a moment, your Honor.

 6               THE COURT:  You may.

 7          Q    Sergeant, in your prior -- in your prior

 8     testimony, did you describe Officer Collins as soft spoken

 9     and emotional?

10               THE COURT:  Lieutenant.

11               MR. KINSEY:  I'm sorry.  I can't keep it all

12     straight.

13               THE COURT:  I understand.

14          Q    Did you describe Officer Collins as soft

15     spoken and emotional?

16          A    Yes.

17          Q    Is that a fair assessment?

18          A    Yes.

19          Q    Do you recall indicating that in DOCS, that's

20     viewed as weakness?

21          A    Yes.

22          Q    Now the best of your knowledge, was

23     Ms. Collins ever extorted or manipulated by an inmate?

24          A    No.

25          Q    She ever report that to you?

1          A    No.

2          Q    None of these problems then created problems

3    for her as far as you know, none of these rumors harmed her

4    ability to function in any way?

5          A    Just the incidents that I'm aware of when she

6    was working at Sullivan with the phone calls and --

7          Q    Except for the tower incident?

8          A    Tower, yes.

9          Q    Did any of these rumors affect her ability to

10   interact with inmates that you're aware of?

11         A    Not that I know of.

12         Q    She ever assaulted?

13         A    No.

14         Q    Ever have anything thrown on her?

15         A    Not that I know of.

16         Q    While she was at Sullivan, was she ever in a

17   fight?

18         A    I don't believe so.

19         Q    While she was at Sullivan did she have

20   anything thrown on her?

21         A    No.

22         Q    While she was at Sullivan, did she conduct --

23   if you know, did she conduct frisks?

24         A    I believe she did, she would have to.

25         Q    That would be part of her job?

1          A    Yes.

2          Q    And there was no indication that that had been

3     a problem, was there, that her duties were somehow affected

4     by rumors?

5          A    Not that I know of.

6          Q    Now, you were also asked I believe about

7     condoms in her lunchbox.  Did -- was there an allegation that

8     Lieutenant Keenan put condoms in her lunch box, do you recall

9     that?

10         A    I vaguely remember it, I don't remember who

11    did it, or when it was done.

12         Q    Well, do you remember if Lieutenant Keenan was

13    identified?

14         A    I don't remember.

15         Q    Did you do a memo that he had done this?

16         A    Did I do a memo that Keenan had done what?

17         Q    Placed condoms in a lunchbox.  Did you make

18    any report?

19         A    I don't remember.

20         Q    You don't even remember being involved in

21    that, do you?

22         A    No, I don't.

23         Q    Now, there came a time when Ms. Collins called

24    you at home and complained that people were beating on her

25    walls, do you recall that?

1          A     Yes.

2          Q     Was that before or after she left Sullivan?

3          A     I believe it was after.

4          Q     And that was at her home, wasn't it?

5          A     Yes.

6          Q     And that --

7                MS. CONNOR:  Your Honor, object that this is

8    beyond the scope, way beyond the scope of direct.

9                MR. KINSEY:  Deals with the relationship, your

10   Honor.

11               THE COURT:  Come on up here for a minute.

12               (At Side Bar.)

13               THE COURT:  Okay.  The objection is beyond the

14   scope of direct examination.  Mr. Kinsey.

15               MR. KINSEY:  Yes, your Honor, the part of the

16   scenario here is that there was a special relationship

17   between Ms. Collins and the witness, and that that

18   relationship extended not just to his responsibilities as a

19   supervisor, but also a personal relationship.

20               THE COURT:  As a friend.

21               MR. KINSEY:  Those would have been the source

22   of many of the rumors and comments and that, if that

23   relationship persisted after she left Sullivan, then that

24   relationship becomes important as to how it's being perceived

25   within DOCS.

1          THE COURT:  I'm going to overrule the

2    objection, I'm going to allow you a little leeway but not a

3    lot.

4          MR. KINSEY:  I'm wrapping it up.

5          THE COURT:  Okay.

6          (Open Court.)

7          THE COURT:  Go ahead, Mr. Kinsey.

8          MR. KINSEY:  Thank you, your Honor.  Can we

9    have the court reporter read back the question, I'm sorry.

10          (The last question was read.)

11      Q    Did she indicate why she had called you

12    instead of someone else?

13      A    Um, her husband works, worked as a pilot,

14    helicopter pilot, he was probably out on a flight and she was

15    looking to tell somebody.

16      Q    If you know, was her husband living at that

17    same location, near Sullivan, at that time?

18      A    Her home was up in Auburn, wasn't it?  You're

19    asking me when she was up in Auburn is when it happened, not

20    when she was living --

21      Q    Oh, she called you from Auburn, is that right?

22      A    Yes.  I believe it was when she was home at

23    Auburn, yes.

24      Q    And if you know, did she call the police?

25      A    I told her to call the police.

1          Q    Do you know if she called the police?

2          A    I don't know.

3          Q    Did that have anything to do with DOCS as far

4    as you could see?

5          A    I have no idea.

6          Q    Are you aware of any time that a sergeant

7    called Auburn to warn them about Ms. Collins?

8          A    Again, that was a rumor I heard, that there

9    was a sergeant that made a call up to Auburn saying that they

10   were getting Officer Collins.

11         Q    Did you try to find that sergeant?

12         A    No.

13         Q    Did you write that sergeant up?

14         A    No, because I wasn't -- I wasn't there, I

15   didn't hear the conversation, I didn't know about -- I wasn't

16   privy to the phone call, if it was made, I don't know.

17         Q    You don't have any idea if it was ever made,

18   do you?

19         A    Just a rumor.

20         Q    Same question, you don't have any idea whether

21   or not a phone call was ever made?

22         A    No.

23              MR. KINSEY:  Thank you, your Honor.

24              THE COURT:  Okay.  Ms. Connor, any redirect?

25              MS. CONNOR:  Yes, your Honor, just a moment,

 1   please.

 2                 THE COURT:  Oh, I'm sorry.

 3                 MR. ANDREWS:  Just standing to say no

 4   questions.

 5                 THE COURT:  And I'm glad you did.  Thank you,

 6   Mr. Andrews, I apologize.  I didn't figure you would.  We're

 7   going to endeavor to finish this witness before we break for

 8   lunch, so I can feel like we accomplished something this

 9   morning.  We got a witness on and off the stand, all in the

10   same time before we break, okay.  So if you'll hang in there

11   with me, please.

12                 REDIRECT EXAMINATION BY MS. CONNOR:

13        Q    Lieutenant, I have a few questions to follow

14   up on some of the areas that you were asked about on

15   cross-examination.  Are you familiar with the office of

16   diversity management in Department of Corrections?

17        A    Yes.

18        Q    And did there come a time that you were

19   requested to speak to the office of diversity management

20   concerning Penny Collins?

21        A    Yes.

22        Q    And did you cooperate in that investigation?

23        A    Yes.

24        Q    And did you provide a statement to the office?

25                 MR. KINSEY:  Your Honor, I'm going to object

1     and move to strike.  We didn't -- did not talk about the

2     office of diversity management.

3                     THE COURT:  That's right, we didn't.  It's

4     outside the scope of the cross-exam.

5                     MS. CONNOR:  May I, may we approach, your

6     Honor.

7                     THE COURT:  Yes, you may.

8                     (At Side Bar.)

9                     THE COURT:  Okay.  We have everybody,

10    Ms. Connor, go ahead.

11                    MS. CONNOR:  Yes, your Honor.  The purpose of

12    this line of questioning is that counsel on cross asked

13    repeatedly about who he reported various incidents to and

14    didn't report various incidents to.  The point of this line

15    of questioning is that he reported it to the office of

16    diversity management, participated fully in that

17    investigation, answered all questions, and reported incidents

18    to that office, which is part of the Department of

19    Corrections.

20                    MR. KINSEY:  That wasn't the question.  The

21    question was not did he report to the office of diversity

22    management, it was did they start an investigation, and did

23    he fill out a statement.  If he reported it is a fair

24    question, beyond that, we're in a whole new country.

25                    THE COURT:  I don't disagree.  So why don't

1   you go right to the heart of it so to speak, ask him, did you

2   do reports, did you cooperate, you know.

3                    MR. KINSEY:  More specifically I'd like to

4   know if he initiated.

5                    MS. CONNOR:  Well, he's --

6                    THE COURT:  Well, you can recross.  Okay.

7                    MR. KINSEY:  Okay.

8                    THE COURT:  All right.

9                    MS. CONNOR:  Thank you.

10                    (Open Court.)

11                    THE COURT:  Go ahead, Ms. Connor.

12           Q     Lieutenant, did you make any reports of the

13   harassment that Officer Collins reported to you to the office

14   of diversity management?

15           A     I believe I did, yes.

16           Q     And did you do a statement to that office of

17   diversity management?

18           A     Yes, an investigator come down, yes.

19           Q     Was that in the form of a written statement?

20           A     Yes, that he wrote up and I signed, yes.

21           Q     Now when you say he wrote up, how did he come

22   about to write that up?

23           A     Well, during their interview process they ask

24   questions and write down the questions and also my answers.

25           Q     And is that what you signed?

1          A    Yes.

2          Q    Now, if you -- are you familiar with the term

3    rat, in corrections?

4          A    Yes.

5          Q    What is a rat?

6               MR. KINSEY:  Objection, your Honor.  Beyond

7    the scope.

8               THE COURT:  Sustained.

9          Q    Now on cross-examination, you were asked

10   several questions about whether or not you made reports

11   concerning certain incidents.  Why did you not report the

12   incidents you did not report, Lieutenant?

13         A    Officer Collins asked me not to, on a few

14   occasions.

15         Q    Did she say why she didn't want you to report?

16         A    She didn't want to be considered that she was

17   telling on fellow officers.

18         Q    Would that have been a problem for her at

19   Sullivan if she was perceived that way?

20         A    Yes, it would.

21              MR. KINSEY:  Objection, your Honor, calls for

22   a conclusion.

23              THE COURT:  Well, it does, but he's given lots

24   of them this morning, based on his experience.  I'll let the

25   answer stand.  Go ahead.

1              Q     Why would that have been a problem for Officer

2     Collins at Sullivan?

3              A     Because officers don't like working with other

4     people that tell on other officers.

5              Q     Why would that be a problem for the officer

6     who told --

7              A     It becomes a lack of trust.

8              Q     Why is that a problem?

9              A     In a correctional facility?

10             Q     Yes.

11             A     Want to make sure people are there if

12    something's going on.

13             Q     That's very important to an officer in a

14    correctional facility?

15             A     To anybody in a correctional facility, yes.

16             Q     That would include Officer Collins as well?

17             A     Yes.

18             MS. CONNOR:  I have no further questions of

19    the witness, thank you, your Honor.

20             THE COURT:  Thank you, Ms. Connor.  Any

21    recross?

22             RECROSS-EXAMINATION BY MR. KINSEY:

23             Q     Did you begin the investigation with diversity

24    management over the incident that you were just questioned

25    about?

1          A     I don't remember who initiated it.

2          Q     Did you write to diversity management?

3          A     No.

4          Q     Did you call diversity management?

5          A     No.

6          Q     Did you institute an investigation by

7   diversity management, you?

8          A     No, I did not.

9          Q     So this was -- they came to you and said we

10  want a statement about this incident?

11         A     Reported to them by -- I don't remember who it

12  was.

13         Q     Not by you?

14         A     No.

15         Q     Now, you indicated that Ms. Collins asked you

16  not to report this, is that correct?

17         A     Couple incidents, yes.

18         Q     Were you aware that during that same period,

19  Officer Collins was still on probation?

20         A     I don't remember if she was or not.  I guess

21  she would have been, you're on probation for a year, the

22  first year you're on probation, yes.

23         Q     Do first year officers lodge a lot of

24  complaints, as a general rule?

25         A     No.

1          Q     Why is that?

2          A     They're still learning the system.

3          Q     So an officer in the first year or two years,

4    would they have the experience to advise the superintendent

5    on how to run the facility?

6                MS. CONNOR:  Objection, this is beyond the

7    scope of redirect.

8                THE COURT:  Counsel.

9                MR. KINSEY:  I'll rephrase, your Honor.

10               THE COURT:  All right.

11         Q     Would complaining about these incidents in

12   your experience in any way affect Officer Collins' ability to

13   transfer?

14         A     Complaining about the incidents in Sullivan,

15   whether it would affect a transfer?

16         Q     Yes.

17         A     No.

18         Q     The one she asked you not to talk about?

19         A     No.

20         Q     They would have no effect on her transfer,

21   would they?

22         A     No.

23         Q     And this idea of not wanting to work with

24   someone who made complaints, that has nothing to do with her

25   gender, does it?

1          A     Not that specific, no.

2          Q     So if a male was talking, making complaints

3     about a male officer, that lack of trust would begin to grow

4     with a male officer as well, wouldn't they?

5          A     Yes.

6          Q     That has nothing to do with her being a woman?

7                MS. CONNOR:  Asked and answered, your Honor.

8                THE COURT:  I'll overrule it.  Go ahead, you

9     can answer.

10         A     No.

11               MR. KINSEY:  Thank you, your Honor.

12               MS. CONNOR:  I have no further questions.

13               THE COURT:  Mr. Andrews, you have any

14    questions?

15               MR. ANDREWS:  No questions, your Honor.

16               THE COURT:  Okay, good enough.  Sir, you can

17    step down, thank you very much.

18               (Whereupon the witness was excused.)

19               THE COURT:  Ladies and gentlemen, well, my

20    clock says 11:57, we didn't have to go over, and we finished

21    this witness, so I'm going to let you break for lunch now, an

22    hour, if you could be back in the jury room, 1:00, we're

23    going to try to start right at 1:00.  Okay.  Enjoy your

24    lunch.  Please don't talk about it, don't let anybody

25    approach you, talk about it; if they do, I need to hear about

1  it.  Thank you.

2                      (Jury Excused, 11:58 a.m.)

3                      THE COURT:  Okay.  Is there anything before we

4  break for lunch?

5                      MS. CONNOR:  Yes, your Honor.  That -- I have,

6  my witness that I had scheduled for this afternoon is not

7  here, has not responded to the subpoena.  So therefore, I

8  don't have -- she's not here.

9                      THE COURT:  Well, we need to go to the next

10  witness then.

11                      MS. CONNOR:  We have placed a phone call to

12  her with a message that she needs to come sooner.  I,

13  she's -- it's the reader for Sue Carter's, Susan Carter's

14  testimony.  After that, your Honor, I expect to have the

15  plaintiff's doctor.  That doctor is scheduled for tomorrow

16  because I had the afternoon slotted for this witness.  And

17  then I have my expert after that.

18                      THE COURT:  Can we -- well, I'm going to ask

19  you to try to get somebody here.  I don't want to send this

20  jury home early, I don't want to waste time.  So do your

21  best, we have drafted an order, or an order's been drafted

22  for me to sign for the marshals to go pick up Ms. Mayville,

23  if they can find her, we're going to do that.  But I'm going

24  to ask you to do everything you can to get witnesses here so

25  we can continue.  Okay.

1          MS. CONNOR:  Your Honor, I just say right now,

2    Dr. Reagles is testifying in another matter out of town

3    today.

4          THE COURT:  But I thought you had a medical

5    doctor.

6          MS. CONNOR:  Yeah.  I can call his office and

7    see, but, you know, I don't know how I'm going to get him

8    here earlier, your Honor.  I will try my best.

9          THE COURT:  Ms. Connor, I can appreciate the

10   problems, but, you know, you tell me the morning of, you have

11   a witness that you haven't talked to, you haven't, you know,

12   had any kind of contact with, the day she's supposed to show

13   up.  That's a problem, because we have a jury here who's

14   waiting to hear this case, and has been very patient with us.

15   And again, I'm going to emphasize that that's not the way to

16   conduct business.  You've got to have your witnesses here and

17   ready to go.  I appreciate expert witnesses are more

18   difficult.  Are you saying that you don't have any other

19   witnesses beyond these experts?

20         MS. CONNOR:  I have one other witness in

21   Rochester, I will also call her and see if she can come to

22   the court this afternoon.

23         THE COURT:  That would be great.  Do what you

24   can, please.

25         MS. CONNOR:  I am very sorry, your Honor.  I

1  never -- I did not expect this witness not to show, because
2  she came to her deposition as well.  And I did not expect her
3  not to show.
4          THE COURT:  But she never communicated with
5  you, in all your attempts, you said you tried to contact her,
6  you never heard from her?
7          MS. CONNOR:  That's correct, your Honor, but I
8  did not expect her not to show because people who know her
9  told me that they thought, it's no problem, she's going to
10  show.
11          THE COURT:  All right.  Well, do what you can,
12  please.  And we're going to sign that order, so if you hear
13  back from her, please let the court know, let my courtroom
14  deputy know, whatever, okay.
15          MS. CONNOR:  Yes, and I'm very sorry, your
16  Honor.
17          THE COURT:  All right.
18          MR. ANDREWS:  Your Honor, if I could briefly,
19  in terms of a reader coming in this afternoon, as I
20  understood it, pending demonstration of temporal proximity,
21  we would not be hearing about Mr. Mitchell from the reader,
22  pertaining to Ms. Carter's testimony.  We haven't heard any,
23  and so I just want to confirm that that's where we stand.
24          THE COURT:  Ms. Connor.
25          MS. CONNOR:  May I have one moment, your

1    Honor, please.

2              THE COURT:  Yes.

3              (Pause in Proceedings.)

4              MS. CONNOR:  Your Honor, with respect to

5    Officer Carter, it's my understanding that her testimony

6    reflects that she was a resource officer, and a resource

7    officer goes all over the facility at any given time.

8    Therefore, I don't think there's sufficient grounds to

9    conclude that she did not have -- there was not temporal

10   proximity with respect to, at that time Sergeant Mitchell.

11   Her job was -- we've heard testimony about jobs of resource

12   officers in this hearing, in this trial, rather, and that

13   there's been a lot of testimony how they're sent here and

14   there, where they go everywhere and that was her testimony as

15   to what her job was.

16             THE COURT:  I don't think that's the crux of

17   Mr. Andrews' argument.  I don't want to speak for him so I'm

18   going to let him speak, but my understanding was there was a

19   timing issue as to when she was working, now Lieutenant

20   Mitchell was working.  Go ahead, Mr. Andrews.

21             MR. ANDREWS:  It has to do with where then

22   Sergeant Mitchell was working.  I know he jumped around a

23   little bit but Ms. Carter testifies very clearly that it was

24   once or twice that she worked for him, that it was when she

25   worked in media south, and that those are the only times that

1    she heard him say anything inappropriate.  And it's Sergeant

2    Mitchell who got a permanent assignment that carried him away

3    from that, ever getting assigned to that job, not long after

4    he arrived at Auburn.

5              THE COURT:  And this was before Ms. Collins

6    was at Auburn?

7              MR. ANDREWS:  Well, maybe two years, a year

8    and a half, two years.

9              THE COURT:  Ms. Connor, unless there's

10   something -- Ms. Connor, unless there's something in the

11   testimony which demonstrates that the witness, now deceased,

12   had some contact with defendant Mitchell during the time

13   period in question of this lawsuit, I'm going to have to

14   sustain the objection.  There needs to be something

15   indicating that during the time period of Ms. Collins' claim,

16   that there was contact.  So that there's, you know, a basis

17   to make it relevant.  I just don't think it's appropriate to

18   have testimony about things that occurred before Ms. Collins

19   was even in the facility, that's just not going to work.

20             MS. CONNOR:  Your Honor.

21             THE COURT:  Go ahead.

22             MS. CONNOR:  I believe that even if there is

23   not evidence that, in Sue Carter's testimony that she worked

24   with then Sergeant Mitchell, that that would be admissible

25   under Rule 803(21), it's concerning his reputation, history

1   and character, and under that rule, I would request that the

2   testimony be admitted because it goes to his reputation in

3   the facility, and how he spoke in the facility.

4            THE COURT:  Go ahead.

5            MR. ANDREWS:  First of all, your Honor, once

6   or twice does not establish a reputation, having heard

7   something once or twice.  Second of all, we haven't presented

8   any character testimony, so I don't see how they get to

9   present character testimony.

10           THE COURT:  That's right, you don't.

11           MS. CONNOR:  Well, your Honor --

12           THE COURT:  And you still have the time period

13   issue.  I mean his reputation during the time that she's

14   working there is relevant.  His reputation two years before

15   she even shows up is not relevant, because she'd have no way

16   of knowing anything about his reputation at that point in

17   time, it's when she's there and he's there.  And if

18   Ms. Carter had some testimony regarding that time period with

19   regard to this defendant, then absolutely I'm going to allow

20   it in.  But you need to establish that that's what it is,

21   that she's talking about.  Okay.  Anything else?

22           MR. ANDREWS:  Nothing, your Honor.

23           MR. KINSEY:  Nothing, your Honor, thank you.

24           THE COURT:  Ms. Connor?

25           MS. CONNOR:  Thank you, your Honor.

1          THE COURT:  All right.

2          THE CLERK:  Court's in recess.

3          (Whereupon a luncheon recess was taken from

4           12:06 p.m. to 1:04 p.m.)

5          (Open Court, Jury Out.)

6          THE COURT:  Okay, we're in session outside the

7   presence of the jury.  Ms. Connor, were you able to locate a

8   witness so we can continue.

9          MS. CONNOR:  Yes, I have two.  First I have

10  the deposition testimony of Officer Susan Carter.

11         THE COURT:  Okay.

12         MS. CONNOR:  Then I plan on calling

13  Dr. Kenneth Reagles this afternoon.

14         THE COURT:  Perfect, okay.

15         MS. CONNOR:  And your Honor, before we go on

16  any further, your Honor, I'd like to ask you to reconsider

17  your ruling with respect to excluding certain deposition

18  testimony regarding Officer -- or withdrawn, Sergeant Troy

19  Mitchell.  There is a portion of the transcript which counsel

20  for defendant Mitchell has asked to be read that links

21  conduct to Officer Collins and Ms. Carter.  And I can cite

22  that and show it to your Honor, and I would ask that that,

23  minimally, that be read.

24         MR. ANDREWS:  Your Honor.

25         THE COURT:  I don't believe defense counsel's

1    asked for anything to be read.

2            MR. ANDREWS:  I think I was clear in my letter

3    to the court that I filed that I only wanted to read anything

4    in if the parts were allowed as to defendant Mitchell.  I

5    will be reading nothing into the record, your Honor.

6            MS. CONNOR:  Your Honor, then you asked for

7    evidence that would make a link between the defendant and the

8    witness and defendant Mitchell, and the plaintiff, and there

9    is on page 59, and page 60, an exact connection.  Based on

10   that I'd ask you to reconsider your ruling.

11           THE COURT:  And what is that connection?

12           MS. CONNOR:  "Question:  Do you recall

13   anything else she said about the sergeants?"  She is in

14   reference to the plaintiff.

15           "Answer:  I think it had mostly to do with

16   Sergeant Mitchell.

17           "Question:  Okay.  Now you said that

18   Ms. Collins mentioned that he had a problem with foul

19   language?

20           "Answer:  Yes, ma'am.

21           "Did you perceive that problem -- did you

22   perceive whether he had a problem with foul language?

23           "Answer:  He had that straight across the

24   board, ma'am, whether you were male or female.

25           "Question:  What type of language did he use

1    that was foul?

2              "Answer:  Just that, just about every other

3    word out of his mouth had to do with sex, whether you wore

4    clothing or not.

5              "Question:  Anything else?

6              "Answer:  The size of a male organ.

7              "Question:  Do you recall anything else?

8              "Answer:  Well, it was a full eight hours of

9    it."

10             MR. ANDREWS:  Your Honor, that does nothing to

11   establish the time period when they saw each other and the

12   fact is the transcript does establish that time period, and

13   that it was years before.  And there's something I forgot to

14   mention this morning, which is that Officer Carter, Susan

15   Carter, when asked whether she had ever witnessed any

16   interaction between Mitchell and the plaintiff, said no, they

17   worked on a different shift.

18             MS. CONNOR:  Your Honor, I'm not claiming that

19   this establishes that the witness did see an interaction

20   between defendant and the plaintiff; however, it establishes

21   the time frame that your Honor asked about.

22             THE COURT:  Yeah, my concern is that the

23   passage that you've just read from would be double hearsay.

24   She's talking about what did Ms. Collins ever tell you, so I

25   wouldn't have allowed it anyway.

1    MS. CONNOR:  Well, your Honor, but after that,

2  it says, what type of language did he use that was foul and

3  it's in reference to her, when she -- the time she spoke to

4  Ms. Collins, and then she describes the language.

5    THE COURT:  Well, no, what type of language

6  did he use doesn't give me a time period.

7    MR. ANDREWS:  Your Honor --

8    MS. CONNOR:  But your Honor, if I may.

9    THE COURT:  You may.

10    MS. CONNOR:  But the problem that's asked

11  about is the problem that she talked about with Penny

12  Collins, therefore it's not for the truth of the matter in

13  terms of that hearsay, I understand, but it identifies the

14  problem and places it at a point in time.

15    MR. ANDREWS:  Your Honor, there's no point in

16  time offered.  To the extent it is something that came from

17  Ms. Collins to Ms. Carter, it is double hearsay.

18    THE COURT:  Ms. Connor, I'm having difficulty

19  with this because there is no -- you're talking about double

20  hearsay and there's no clear establishment of when we're

21  talking about from Ms. Carter, the deposition witness.

22  There's a question that you've suggested is that they -- was

23  she, did Ms. Collins tell you of some problems, right, with

24  Mr. Mitchell and his language?  Is that what you're --

25    MS. CONNOR:  About the sergeants and then yes,

1    it was narrowed to defendant Mitchell.

2                 THE COURT:  Defendant Mitchell.

3                 MR. ANDREWS:  But the question, your Honor,

4    was did you perceive and it doesn't say did you perceive

5    based on your conversation with Ms. Collins, with

6    Ms. Collins, doesn't say did you perceive based on your own

7    experience, just said did you perceive.

8                 MS. CONNOR:  But the answer clearly indicates

9    her personal experience.  "He had that straight across the

10   board, ma'am, whether you were male or female.

11               "What type of language did he use that was

12   foul?"

13               Then just that, and then she describes the

14   language.  That's her experience, your Honor.

15               MR. ANDREWS:  And your Honor, if it is her

16   experience, then it's out of time because we have her

17   elsewhere in the transcript saying the only time she heard

18   him say something offensive was those one or two times they

19   worked together in media south.

20               THE COURT:  Which would have been before

21   plaintiff was in the facility.

22               MR. ANDREWS:  Long before, your Honor.

23               MS. CONNOR:  Your Honor, I don't think that it

24   establishes that's the only time she heard him say something

25   offensive.  It established when he was her direct supervisor,

1    doesn't mean she didn't hear him at other times, Counsel

2    is --

3                 THE COURT:  Yeah, but we're guessing, we're

4    guessing.  It doesn't mean she didn't, doesn't mean this,

5    doesn't mean that, there's nothing in that deposition that

6    clearly establishes that I've heard that what she's talking

7    about is a time period when Ms. Collins was present in the

8    facility.

9                 Now there's been lots of testimony from

10   Ms. Collins about what her interactions with Mr. Mitchell

11   were, but I think it's inappropriate to allow this without --

12   you know, it may be clearly different if she was here, but to

13   just have this read without any parameters of time period and

14   when it was, I think is just unacceptable.

15                MR. ANDREWS:  And if I could say, the

16   transcript really does establish that it was the one or two

17   times they worked together, it really does, and I'm happy to

18   read it to you, if you like.

19                THE COURT:  Well, you can read it into the

20   record if you'd like for purposes of the record.

21                MR. ANDREWS:  If it's necessary for your

22   ruling, that's fine, it's up to you, your Honor, I have no --

23                THE COURT:  Well, why don't you put it in the

24   record.

25                MR. ANDREWS:  Okay.  So the question is on

1  page 97, "So approximately how many times total did you work

2  directly under Sergeant Mitchell at Auburn Correctional

3  Facility?

4                    "Answer:  Just about once or twice.

5                    "Question:  Did he ever direct any

6  inappropriate or offensive comments to you, state them

7  directly to you?

8                    "Answer:  As a part of conversations he was

9  carrying on, is that what you meant?

10                   "Question:  I'm interested in anything he

11 directed to you.

12                   "Answer:  He was not talking directly to me.

13                   "Question:  Did he make offensive comments to

14 a group of people that you were one?

15                   "Answer:  Yes.

16                   "Question:  And how often did that occur?

17                   "Answer:  The times that I worked with him."

18                   THE COURT:  Okay.  Ms. Connor, do you have

19 anything further?

20                   MS. CONNOR:  No, your Honor.

21                   THE COURT:  Okay.  My ruling's going to stand.

22 I don't think there's been sufficient foundation laid that

23 would make this deposition testimony admissible based on the

24 fact that we don't have a time period.  The only time period

25 we're aware of is the time period that Sergeant Mitchell

1    worked with the deponent prior to Ms. Collins coming to the

2    facility.  So that's my ruling.

3               MR. ANDREWS:  Thank you, your Honor.

4               MS. SHEEHAN:  Your Honor, may I just confirm

5    that regarding the Carter deposition, that the state, none of

6    the state defendants opposed sections reading, none of the

7    objections by plaintiff's counsel were sustained, correct?

8               THE COURT:  I believe there was one sustained,

9    I'd have to get my notes.

10              MS. SHEEHAN:  I have the text message.

11              MS. CONNOR:  I have it here, your Honor.

12              THE COURT:  Okay, Counsel, what's your

13    question?

14              MS. SHEEHAN:  Were there any objections of

15    plaintiff to what I proposed, what state defendants proposed

16    to read in, were any of them sustained?

17              THE COURT:  Well, she had objections to

18    defendants' designations to read portions of deposition

19    transcript of Susan Carter, 56:13 through 56:19, 57:4 through

20    57:13, and 68:10 through 68:13 are overruled and defendants

21    will be permitted to read those portions at trial and the

22    court reserve as to plaintiff's request to read pages 60 to

23    80, 68 -- or 60:8 and through 60:16, and defendants'

24    objection thereto and will make a determination at trial.

25              MS. SHEEHAN:  There was another objection by

1    plaintiff to 49:12 to 25, and then it was just 5:3 and then I
2    believe you advised me that the objection was overruled.
3                    MS. CONNOR:  Counsel, can you say those
4    citations again?
5                    MS. SHEEHAN:  49:12 to 25 and then it's just a
6    5 and it should have been a 50.
7                    THE COURT:  I don't have anything with regard
8    to 49:12.
9                    MS. SHEEHAN:  I'm sorry, page 49, lines 12.
10                    THE CLERK:  Those were in her written
11   objections?
12                    MS. SHEEHAN:  Regarding Ms. Carter being
13   disciplined at Auburn.  I believe Ms. Connor objected to
14   that.
15                    MS. CONNOR:  Yes, I did, your Honor.
16                    THE COURT:  No, I overruled that objection.
17   It wasn't included in the text order, but I did overrule it.
18                    MS. SHEEHAN:  Ms. Connor, I just want to
19   confirm, they're the four objections you made, correct?  I
20   don't want to read anything in that --
21                    MS. CONNOR:  Yes.
22                    THE COURT:  I appreciate that.
23                    MS. SHEEHAN:  Okay.
24                    MS. CONNOR:  Your Honor, I -- to clarify in
25   order to comply with your order, on page 87 of the

1   transcript, there's questions concerning Sergeant Mitchell

2   that go through, after she's asked about sergeants' language,

3   and counsel hasn't exactly identified to my recollection the

4   exact lines so I'm trying to comply with your order.  And it

5   follows up a string of questions that relate to female body

6   parts, and --

7           THE COURT:  You're starting over on page 86

8   through 87?

9           MS. CONNOR:  Yes, sir.

10          MR. ANDREWS:  All the way at the bottom of 87,

11   your Honor, and I think it's really a new section in

12   questioning, I can't see how it wouldn't be included.

13          THE COURT:  I think that that presents the

14   same problem.

15          MS. CONNOR:  Okay, so I'm just -- we're not --

16   we're to stop above that?

17          THE COURT:  Yes.

18          MS. CONNOR:  Okay.  I just want to make sure.

19          THE COURT:  Any reference to Sergeant

20   Mitchell, again, unless there's some clear language which

21   indicates when it occurred and time period that's within the

22   parameters of your client's complaint, we're not going to get

23   into it.  Okay.  Are we ready to proceed?

24          MS. SHEEHAN:  One more item.

25          THE COURT:  Almost a clean getaway.  All

1  right.  Go ahead.

2            MS. SHEEHAN:  I just found out Dr. Reagles is

3  testifying this afternoon and I have a couple problems but I

4  have a solution.  One is, I received an update to his report

5  on Monday, that was unexpected, yesterday I received two more

6  updates.  No, I'm sorry, I received an update yesterday

7  morning and one at lunchtime.  It is now out for somebody to

8  analyze it.  I was pretty confident the witness was going to

9  testify Thursday, it would be Reagles and that was confirmed

10 at lunchtime so I didn't even think about Reagles during

11 lunch.  One, I'm going to ask that I be permitted to call

12 rebuttal witness when we put on our case regarding this new

13 information.  We just received it, it wasn't presented in

14 discovery, it wasn't even presented on the eve of trial.

15            THE COURT:  You would be able to do that

16 regardless.

17            MS. SHEEHAN:  Okay.

18            THE COURT:  No matter when he's called, if you

19 have a rebuttal witness, you call a rebuttal witness.

20            MS. SHEEHAN:  Next is in order for me to

21 proceed this afternoon, of course it's in a folder on my

22 hotel desk, I just need one document, two pages printed, and

23 then if I ask if I could cross him in the morning.  I haven't

24 had a chance to analyze the report, I have someone doing that

25 for me from DOCS, I'm not prepared.

1          THE COURT:  Well, how long is this --

2          MS. SHEEHAN:  Information I received yesterday

3    at lunch.

4          THE COURT:  How long is this testimony going

5    to be, you anticipate?

6          MS. CONNOR:  Dr. Reagles?

7          THE COURT:  Yeah.

8          MS. CONNOR:  Probably about an hour.

9          THE COURT:  Okay.  And the reading of the

10   deposition testimony is going to be?

11         MS. CONNOR:  Significantly shorter than that,

12   probably a half an hour.

13         THE COURT:  Okay, and then you're going to

14   have some?

15         MS. SHEEHAN:  Reading.  15, 20 minutes.

16         THE COURT:  Is it something where, Mr. Kinsey

17   can cover the deposition stuff while you go and prep?

18         MS. SHEEHAN:  I haven't had the new

19   information analyzed yet, I still have to talk to the person

20   tonight, so if he comes back tomorrow for cross, I just

21   received, your Honor, I just received this information

22   yesterday at lunch.

23         MS. CONNOR:  Your Honor, she was given an

24   update on Monday and there were just some typographical

25   corrections made, what she was given yesterday.

1          MS. SHEEHAN:  You did not give us the update

2    on Monday, you gave it to us yesterday.

3          MS. CONNOR:  Correct, she's right, sorry.

4          THE COURT:  Yesterday.  Okay.

5          MS. SHEEHAN:  And your Honor --

6          THE COURT:  Let's see where we -- maybe you

7    can at least get started.

8          MS. SHEEHAN:  Everything's back at the hotel.

9    I have one document here, I'll ask if it can be printed here,

10   if I can get through voir dire.

11         THE COURT:  Do you have somebody that can go

12   get it for you?

13         MS. SHEEHAN:  Sure, I'll have to send

14   Mr. Kinsey.

15         THE COURT:  All right.  Mr. Kinsey can go get

16   it because I'd like you to at least get started.

17         MS. SHEEHAN:  Problem is --

18         THE COURT:  I don't want to waste this jury's

19   time, and I've tried to be clear about that at pretrial and I

20   understand that things are getting juggled here a little bit,

21   but you know, it's counsel's responsibility to come here

22   prepared.  When we say ready for trial, we mean ready for

23   trial, so I appreciate what you're saying, but I'm going to

24   ask you to do your best to get ready.

25         MS. SHEEHAN:  Can plaintiff's counsel see if

1   there's another witness she can call in between?

2                   THE COURT:  I think she's juggled because

3   Ms. Mayville didn't show up and we have the marshals out

4   looking for Ms. Mayville, so you know, we might find her,

5   we'll see.

6                   MS. CONNOR:  Your Honor, I did try to call

7   other witnesses and was unsuccessful reaching the doctor, and

8   my other witness was unavailable.

9                   THE COURT:  Okay.  Let's get the jury in here

10  and let's get started, please.

11                  MS. SHEEHAN:  Your Honor, can I get a copy of

12  this two-page document for the voir dire for Dr. Reagles?

13                  THE COURT:  I'm sorry, I don't know what

14  you're asking.

15                  MS. SHEEHAN:  Can one of your staff make a

16  copy of a two-page document for me?

17                  THE COURT:  Absolutely, we can do that for

18  you.  Okay.  Are we ready now?

19                  MS. CONNOR:  Yes.

20                  THE COURT:  All right.  Please bring the jury

21  in, Rita.

22                  (Jury Present, 1:24 p.m.)

23                  THE COURT:  Okay, ladies and gentlemen,

24  welcome back.  Hopefully you enjoyed your lunch, got a chance

25  to get outside.  Beautiful day out.  I think we're ready to

1   start.  Ms. Connor.

2                    MS. CONNOR:  Yes, your Honor.  At this time,

3   we would like to have the deposition testimony of Susan

4   Carter that your Honor permits to be read into the record.

5                    THE COURT:  Go ahead.

6                    MS. CONNOR:  I have somebody who's a reader,

7   your Honor, who I would like to do it in question and answer,

8   following the transcript of the deposition testimony.

9                    THE COURT:  That's fine.  Would you like her

10  to take the witness stand to do this?

11                   MS. CONNOR:  I thought so.  Is that --

12                   THE COURT:  That's fine.

13                   MS. CONNOR:  It's up to your Honor.

14                   THE COURT:  That's fine.  Come on up.  I don't

15  think we need to swear you in, we can swear you in to read it

16  accurately.

17                   THE CLERK:  State your name, spell it for the

18  record, please.

19                   MS. BETELAK:  Victoria Betelak, B-e-t-e-l-a-k.

20                   MS. CONNOR:  Your Honor, would, in terms of

21  the preliminary matters of the transcript, would I start

22  above -- would I start on page 4, line 21, which reflects

23  the -- my first question?

24                   THE COURT:  That's fine.  And ladies and

25  gentlemen, so it's clear to you what's going on, Susan Carter

1   was a witness who was deposed who has since passed away,

2   she's deceased, and our rules of evidence permit the sworn

3   testimony that was taken at a deposition to be read, parts of

4   it that are admissible which I've already ruled on, okay.  So

5   what you're going to hear now are those portions of her

6   deposition that plaintiff's counsel wants to have in the

7   record before you and that I've allowed to be read to you,

8   okay.  So that's what we're doing.  Go ahead, Ms. Connor.

9              MS. CONNOR:  It's a lot of reading is what it

10  is.

11             Q     Good morning.  I'm Mairead Connor, I'm the

12  attorney representing Penny Collins in her action against the

13  state of New York and other people concerning some of the

14  events that she experienced in Auburn prison and elsewhere in

15  the Department of Corrections.  I appreciate you coming in

16  today.  Are you employed?

17             A     Yes, I am.

18             Q     Where are you employed?

19             A     Auburn Correctional Facility.

20             Q     What do you do there?

21             A     I'm a corrections officer.

22             Q     How long have you worked at Auburn?

23             A     Since January of 2001.

24             Q     And before that, did you have a job with the

25  Department of Corrections?

1          A     I came in in 2000, and I worked at another

2     facility.

3          Q     Which facility was that?

4          A     I worked at Butler, the minimum.

5          Q     Okay.

6          A     I worked at Cayuga, which was a medium, and

7     Fishkill, which is a medium.

8          Q     And when did you start working in 2001 at

9     Auburn?

10         A     January.  I'm not quite sure of the date of

11    January, of 2001.

12         Q     During the entire time that you were at

13    Auburn, have you been a corrections officer?

14         A     Yes, ma'am.

15         Q     Now did there come a time when you were

16    contacted by an investigator for the State Division of Human

17    Rights named Jami Kaplan?

18         A     I was contacted, yes, ma'am.

19         Q     And did you speak with her?

20         A     Yes, ma'am, I did.

21         Q     Was that over the telephone or --

22         A     Yes, ma'am, it was over the telephone at my

23    personal residence.

24         Q     Did she initiate that call?

25         A     Yes, ma'am, she did.

1          Q      Do you recall when that call took place?

2          A      It took place shortly after Ms. Collins left

3     our facility.

4          Q      Now did Ms. Kaplan ask you questions

5     concerning Auburn Correctional Facility in that call?

6          A      Yes, she did, in reference to an incident that

7     Ms. Collins had reported.

8          Q      Now Ms. Kaplan actually made some notes of

9     that call?

10         A      Okay.

11         Q      And did Ms. Kaplan ask you about how female

12    officers were treated in relation to male officers, officer

13    at Auburn?

14         A      Yes, she did.

15         Q      And what did you answer to the question?

16         A      That there was a difference in treatment.

17         Q      Now I'm going to ask you on my own now what

18    she asked you, what do you mean by a difference in treatment?

19         A      What do I mean by a difference in treatment?

20    In one respect, we were equal, because the reason I started

21    there is the fact that they are very good about your time

22    off, you are assigned a vacation group, it will be the same

23    vacation group your entire life, they are equal about giving

24    you your PL days.

25         Q      You mean personal days?

1            A     Personal days, bids on the holiday draw.

2            Q     In what respect is the treatment different?

3            A      In respect to the treatment is different, it

4      has to do with information you may or may not receive,

5      treatment by the individual COs.

6            Q     And by CO do you mean correction officers?

7            A     Correction officers, yes, ma'am.

8            Q     What do you mean information that you may or

9      may not receive?

10           A     How soon you get information about what your

11     job may pertain to during the day, information, say like

12     where a bathroom is located, when you may or may not get

13     reliefs.

14           Q     Okay.  Did you tell Ms. Kaplan that female

15     officers were treated in a hostile manner as compared to male

16     officers?

17           A     You are treated, I don't know if you can say

18     hostile, but you are treated with -- oh, how shall I put

19     this?  They don't trust you because of being female.

20           Q     Who is they?

21           A     Your officers, the officers that you are

22     working with.

23           Q     Now did you ever receive different treatment

24     than -- as a female from supervisors?

25           A     Yes, ma'am.

1          Q     Can you give me an example of that, please?

2          A     Job assignments, whether I was allowed to work

3     in an area if they had a particular disagreement with a

4     female working in their area.

5          Q     Were there other things written on that wall

6     about other females than yourself?

7          A     Yes, ma'am.

8          Q     What was written on the wall?

9          A     It had to do with Ms. Collins.

10         Q     What did you see?

11         A     Just that she was included in the whole thing.

12         Q     Can you be more specific?

13         A     Just incidents that had happened.

14         Q     What happened just in terms of -- what I want

15    to know, what I'm asking you is when you looked at the wall,

16    what did you see about Ms. Collins?

17         A     Writing, it reminded you of a wall that you

18    would see in a bar or something else where people had a

19    chance to put graffiti up on the wall.

20         Q     Now you said pictures and writing, what type

21    of pictures?

22         A     Cartoons, ma'am.

23         Q     Such as, could you be more specific?

24         A     Caricatures of females, caricatures of cats.

25         Q     Was it about any particular part of a female's

1    anatomy?

2            A    Well, it all had to do with the female

3    anatomy, ma'am.

4            Q    Can you be more specific, please, I'm trying

5    to get a picture, I wasn't there and I would like to know if

6    you can just tell me what it is you saw when you looked at

7    the wall about Ms. Collins now.

8            A    Bust line.

9            Q    Pardon?

10           A    Bust line.  Yes, that's generally where the

11   COs' eyesight went.

12           Q    Can you be more specific about that, were they

13   clothed or unclothed?

14           A    Oh, it was kind of hard to tell whether they

15   were clothed or unclothed, because it wasn't filled in, it

16   was just an outline drawing, ma'am.

17           Q    Anything else about Ms. Collins?

18           A    I remember there were a few things written on

19   the wall, I don't remember what they were.

20           Q    Do you remember the nature of those things?

21           A    Just the fact that they were derogatory and

22   the fact that I remember in talking to the supervisor before

23   I left that day and requested that we have it painted and as

24   far as I know it was done by the time I got back.

25           Q    Okay.  In terms of what was derogatory about

1   Ms. Collins, was it sexually derogatory?

2           A    Yes, ma'am.

3           Q    What?

4           A    Like I said it was.

5           Q    What type of thing was there?

6           A    I don't remember what was there, I'm being

7   very honest with you.  I remember being infuriated about the

8   fact that I went down and discovered it, and the fact that I

9   did report it, it was taken care of.

10          Q    Was there profanity there?

11          A    Yes, ma'am.

12          Q    Was it about Ms. Collins?

13          A    About both of us.

14          Q    Okay.  What words were profane, what profane

15  words were there to your recollection?

16          A    What was used constantly within the facility,

17  within the speech, which was any word that pertained to a

18  female, and you would not consider it in a regular

19  conversation.

20          Q    What word are you referring to?

21          A    We're referring to bitch, fuck, anything else

22  that pertained to sex and the female.

23          Q    Was the word cunt there?  You can still answer

24  the question.

25          A    Yes, ma'am.

1          Q     Was that in reference to Ms. Collins?

2          A     I don't remember if it was in reference to her

3     or myself, but it was there.

4          Q     Now, this bathroom is located?

5          A     Both bathrooms are in the locker room area.

6     If you went down the stairs from the upper hall, you would

7     make a right as you got down to the bottom of the stairs, and

8     then you would make another immediate right, and that was

9     right off what was then the lineup room.  To get to the other

10    bathroom you had to go through to the next locker room area

11    and make a right.

12         Q     Okay.  Was this bathroom --

13         A     Utilized by both sexes.

14         Q     It was accessed by both male and female?

15         A     Yes, ma'am.

16         Q     And did corrections, correction officers use

17    the bathrooms?

18         A     That's usually who used the bathrooms because

19    it was below stairs where our lockers were.

20         Q     Now other than this bathroom's graffiti on the

21    incident that you just testified about, did you see other

22    graffiti about female employees in other bathrooms of the

23    facility?

24         A     Basically, the other bathrooms used in the

25    facility were out in the blocks.  I tried to get in and out

1    as quickly as possible.

2                Q    Why is that?

3                A    Because you shared the bathroom with all the

4    rest of the COs, so it was a matter of you had to get back to

5    your duty post.  Some bathrooms don't have a stall door that

6    would lock so it just wasn't conductive to staying in there.

7                Q    So you went to the 4-to-12 shift in 2005?

8                A    Yes.

9                Q    When did you first notice that bathroom door

10   didn't have a latch on it?

11               A    When I worked there, ma'am.

12               Q    Which was when?

13               A    2001.

14               Q    Now to your knowledge, were there other

15   bathrooms at Auburn that could not be latched or locked for

16   privacy for females?

17               A    Yes, ma'am.

18               Q    Which ones?

19               A    Baker block.

20               Q    Is that Baker you said?

21               A    Yes.

22               Q    Is that B block?

23               A    Yes, ma'am.

24               Q    Were these bathrooms on the block shared by

25   both male and female COs?

1          A    Yes, ma'am.

2               MS. CONNOR:  Sorry, I just dropped my page and

3     lost my place, excuse me.

4          Q    Did you talk to Ms. Kaplan concerning the

5     female uniforms having buttons in certain locations?

6          A    Yes, ma'am.

7          Q    What did you say to Ms. Kaplan concerning the

8     female uniforms?

9          A    Just that -- the fact that I had inquired once

10    that after having inmates staring repeatedly at the buttons

11    to a female officer, about removing buttons from my pockets.

12         Q    And why did you want to move buttons from your

13    pockets?

14         A    Because I was tired to have it -- it was place

15    where the pockets fell, which was directly over the bust

16    line.  They were small pockets and they had a button directly

17    there, and the inmates looked directly at the buttons.

18         Q    Now this rumor that you heard, aside from that

19    CO Collins told you, did you hear any detail or --

20         A    No details, but most of the guys weren't

21    giving me details about anything.  I was almost the only

22    female on the shift, so we really didn't talk.  So they

23    weren't giving me anything.

24         Q    Why weren't they giving you anything?

25         A    We weren't talking, ma'am.

1      Q      Why was that?

2      A      They didn't want to talk.

3      Q      You mean males didn't want to speak?

4      A      Yes, ma'am.

5      Q      In your view, why didn't the men want to speak

6  with you, speak to you?

7      A      They didn't want to speak because they would

8  be ribbed by their fellow officers if caught talking to a

9  female officer at that point, and they didn't want to take

10  the ribbing.

11      Q      Did you make any effort to get any certain

12  assignments at Auburn where you would work more or less by

13  yourself?

14      A      When I bid my last post.

15      Q      And that post is what?

16      A      That post is the sallyport.

17      Q      And why did you bid the sallyport?

18      A      For starters, it was the first one that came

19  up on midnights and I had been trying to get on midnights so

20  that my husband and I would have an easier schedule, and the

21  fact that it suited me.  It was a solitary post, I didn't

22  have to deal with rumors, rumor mill, and the whole rest that

23  went with it.

24      Q      Okay.  Did you tell Ms. Kaplan that you

25  survived at Auburn by trying to get assignments to work in

1    areas where you could work by yourself?

2         A    Yes, ma'am.

3         Q    Did you ever speak to Penny Collins about

4    that?

5         A    She and I talked about a lot of things,

6    various conversations.

7         Q    Did you ever speak to her about that, trying

8    to get assignments where she can work by herself?

9         A    Yes, ma'am.

10        Q    What took place in that conversation?

11        A    Just the fact that I told her what I did and

12   suggested that it might be one way to go.

13        Q    Where did you first meet Penny Collins?

14        A    At work, ma'am.

15        Q    And about when was that?

16        A    Shortly after she arrived.

17        Q    And did you ever work with her?

18        A    Not really, in the same area, ma'am, because

19   they don't usually assign women to the same area.  Just

20   because they consider it something they don't do.  But we

21   would see each other in between times, say if we were out in

22   the yard, you would have different positions that you hold

23   within the yard, I'd see her maybe after shift if she was

24   getting out.

25        Q    Are you aware of whether Mary Mayville works

1    for diversity management?

2              A    Yes.

3              Q    Did you ever speak to her about any questions

4    concerning females at Auburn?

5              A    No, ma'am.

6              Q    Did you ever attend any training at the

7    facility or elsewhere in the Department of Corrections

8    concerning how female officers should treat --

9              MS. CONNOR:  I'm sorry, may I start that

10   again, your Honor.

11             THE COURT:  Yes, you may.

12             Q    Did you ever attend any training at the

13   facility or elsewhere in the Department of Corrections

14   concerning how male officers should treat female officers?

15             A    Everybody at the academy gets training, you

16   sign a piece of paper about the sexual harassment training

17   that you get and when I was at the academy, they had separate

18   sessions, I think it was at least twice for the female

19   officers at the academy, the cadets, if you want to call it

20   that.

21             Q    That they, that the females had separate

22   sessions, is that what you are saying?

23             A    Yes, ma'am.

24             Q    And you attended those sessions?

25             A    It was required.

1          Q    Who conducted those sessions?

2          A    We had two other female officers that did the

3    sessions, ma'am.

4          Q    And what material was covered in the sessions?

5          A    How to deal with specifics, some of the

6    specific problems.

7          Q    Such as?

8          A    How to deal with an inmate that is

9    masturbating, that type of thing.

10         Q    Any other problems that were discussed or what

11   other material was discussed?

12         A    What you should and shouldn't do with the

13   other male officers, that was considered appropriate.

14         Q    And along that line, what were you taught that

15   you should and shouldn't do with male officers?

16         A    Basically the fact that you're working in a

17   male environment, they consider it, oh, paramilitary type

18   training that you were getting and basically not to expect

19   any preferential type of treatment, and in fact to expect a

20   bit of hostility.

21         Q    The source of that hostility was what?

22         A    Just the fact that women coming in hadn't been

23   there, hadn't been a -- there weren't a lot of females in a

24   lot of the facilities, so it was the fact that they had the

25   environment to themselves and they didn't have females

1    working in the facility, was a new introduction.

2          Q    Was there any other material covered in the

3    sessions concerning relations with male and female officers?

4          A    Just that it was suggested that you don't get

5    involved with another officer.

6          Q    Did you ever see a manual for female

7    corrections officers published by the department?

8          A    I think I did when I went to my first

9    assignment, which was Fishkill, I remember seeing one and

10   that was part of the OJT.

11         Q    What is the OJT?

12         A    On-the-job training.

13         Q    Where did you go to the academy?

14         A    Albany, ma'am.

15         Q    And when were you there?

16         A    I was there in 2000, I was there in 2000,

17   April 24th was the starting date.

18         Q    Now you testified earlier concerning

19   conversation you had with the supervisor about the buttons on

20   your uniform?

21         A    Yes, ma'am.

22         Q    And you testified that that supervisor at the

23   time was an area sergeant and he is now a captain?

24         A    Yes, ma'am.

25         Q    Is this captain assigned at Auburn?

1              A     Yes, ma'am.

2              Q     What is the captain's name?

3              A     Do I really have to give you names, ma'am?

4              Q     I'm going to ask you on this one for the name,

5     please.

6              A     Captain Chuddy (phonetic).

7              Q     Did you ever hear any other derogatory terms

8     used by males in reference to female employees?

9              A     Not that was derogatory, that I would consider

10    a foul word, I mean stupid blond, the usual type thing.

11             Q     Okay.  References that aren't foul but

12    otherwise derogatory, did you ever hear male employees refer

13    to females with any of those types of references?

14             A     Just as far as our intelligence and things

15    like that, yes.

16             Q     What reference did you hear about our

17    intelligence?

18             A     That it just wasn't level, we didn't know what

19    we were talking about, about being blond, or you should be

20    blond.

21             Q     And you testified the word stupid a minute

22    ago, did you ever hear females referred to with that word?

23             A     Yes.

24             Q     Who made those references, what types of

25    employees?

1          A     Correction officers.

2          Q     Did you ever hear the correction officers

3     refer to any female body parts?

4          A     If you caught them at the right moment in one

5     of their conversations, you could hear just about anything.

6          Q     Can you remember some of the references that

7     you've heard?

8          A     Discussing their wives, their girlfriends,

9     visitors that came in.

10          Q     What words were used for female body parts?

11          A     Just the normal, just the normal words that

12     I've heard discussed, just about anywhere.

13          Q     What words are you referring to?

14          A     Breast, boob.

15          Q     Anything else?

16          A     Oh, Jeez, they were mostly breast oriented,

17     so -- or occasional remarks about the buttocks.

18          Q     And how often would you hear those types of

19     references?

20          A     Depending on the conversation that you

21     overheard, it could be on a daily basis, or more than once in

22     a shift, I mean ...

23          Q     Did you ever hear supervisors participating in

24     those conversations?

25          A     As in sergeants?  You could occasionally hear

1    them.

2                   MS. CONNOR:  Now we're going to go to

3    page 109.

4          Q    Did you take offense to any of the material

5    that was related to you at the academy in the separate

6    sessions for female cadets only concerning the male

7    environment and inmate behavior that was directed exclusively

8    to women?

9          A    I thought it should have been something that

10   males should have had to have sat through, also.

11         Q    Other than the comment about the buttons on

12   your uniform, did you ever have occasion to be subjected to

13   inappropriate or offensive conduct from an individual who was

14   now a captain last name Cuddy?

15         A    Chuddy.

16         Q    Chuddy, excuse me.

17         A    I don't think he remembers me as being the

18   female that was on a sergeant's post where they had a contest

19   about who had the hairiest posterior as far as the male seals

20   were --

21         Q    I didn't follow that answer, could you maybe

22   either expand or I'll ask you the question again, what would

23   you prefer?

24         A    I think he was a sergeant, and questioned on

25   the post where the COs decided that there was a contest that

1   they were having as to who had the most hair on a male

2   buttocks.

3            Q     My question is, were you ever subjected to

4   inappropriate or offensive contact?

5            A     That --

6            Q     Let me finish that.  You were subjected to

7   inappropriate or offensive conduct by Captain Chuddy other

8   than the incident about the buttons?

9            A     The fact that he allowed it to go on in a post

10  with me present.

11           MS. CONNOR:  We've concluded, your Honor.

12           THE COURT:  Thank you, Ms. Connor.  Thank you.

13  Okay.  Ladies and gentlemen of the jury, as a part of this

14  process, now defense has an opportunity to read sections of

15  the deposition testimony of Ms. Carter that they would like

16  to have in the record.  So we're going to do that.

17           MS. SHEEHAN:  "Question:  Okay.  Did you ever

18  write to a superintendent of Auburn concerning how females

19  were treated at Auburn for any purpose?

20           "No, ma'am.

21           "Question:  Have you written to anyone else in

22  supervision or management in the facility?

23           "No, ma'am.

24           "Did you ever speak to Penny Collins about

25  that?

1                "She and I talked about a lot of things,

2    various conversations.

3                "Did you ever speak to her about trying to get

4    assignments where she can work by herself?

5                "Yes, ma'am.

6                "What took place in that conversation?

7                "Just the fact that I told her what I did and

8    suggested that it may be one way to go.

9                "Did you ever speak to her about that, trying

10   to get assignments where she can work by herself?"

11               Probably repeated.

12               "Yes, ma'am.

13               "What took place in that conversation?

14               "Just the fact that I told her what I did, I

15   suggested it might be one way to go.

16               "What, if anything, did she say in response to

17   you?

18               "Answer:  That she wasn't ready to go on to

19   say a shift where you had the single assignments, that she

20   wanted to work the shift that she was on.

21               "At the time your husband worked at Auburn?

22               "Yes, ma'am.

23               "At the time your husband worked at Auburn?

24               "Yes, ma'am.

25               "Was he a corrections officer also?

1                    "Yes, ma'am.

2                    "Were you ever disciplined at Auburn?

3                    "Yes, ma'am.

4                    "What type of discipline did you receive?

5                    "I received a writeup and it was put in my

6       file.

7                    "When was that?

8                    "Oh, years ago.

9                    "Was that -- what was the -- why were you

10      written up?

11                    "That was my fault, I actually brought

12      something into the facility, my cell phone, and I didn't

13      realize that I had it, the battery was dead.

14                    "And that's the only discipline that you

15      received?

16                    "No, ma'am.

17                    "What other discipline did you receive?

18                    "When they realized that I had cats and the

19      cat had been rubbing up against my lunch bag, I was told I

20      needed to take a shower.

21                    "Why would you call that discipline?

22                    "Because I was called up to the lieutenant's

23      office.

24                    "When did that take place?

25                    "Oh, while Ms. Collins was at the facility.

1                 "Was union there?

2                 "No, ma'am.  That happened before they put the

3       stuff on the wall in the bathroom.

4                 "Were you sent home that day?

5                 "No, ma'am, I was not.  I did get rid of my

6       lunch bag.

7                 "Okay.  When you were called up to the

8       lieutenant's office, what did the lieutenant say to you?

9                 "He showed me a copy of a page from the

10      employee's manual about being neatly groomed and that's what

11      he showed me and that it was a violation of employee's

12      manual.

13                "Okay.  Are you familiar with an individual

14      named Mary Mayville?

15                "I heard of her, but I'm not really familiar

16      with her, no, ma'am.

17                "Were you ever asked to escort her around the

18      facility?

19                "The only thing I've done specifically with a

20      female is that I have been on a watch with a female so I had

21      to do escorts for a female.

22                "Do you recall the time where Ms. Mayville was

23      in the facility and interviewing certain COs or sergeants or

24      lieutenants, captains?

25                "Okay.  I know there was some interviewing

1    being done, but I was not told who was doing the

2    interviewing, just that interviews were being done.

3                    "Okay.  Were you aware of whether any female

4    CO were asked to escort Ms. Mayville around the facility?

5                    "No, I was not.  It would have been done on

6    the day shift and I wasn't on days.

7                    "Do you know -- okay.  So who else would work

8    on days?

9                    "Oh, I forgot, just before Ms. Collins left

10   there was another CO that came in, Lisa Cole.

11                   "Lisa Cole?

12                   "Mm-hmm.

13                   "Did she work on days?

14                   "She does now, but I'm trying to remember what

15   shift she actually worked on when she got there.

16                   "Okay.

17                   "Oh, and Bridget, I'm sorry, Bridget Smith,

18   she was on a 3 to 11.

19                   "So the best of your recollection, the only

20   female that you knew of that worked on days when -- aside

21   from Ms. Collins?

22                   "Yes, aside from Ms. Collins when Ms. Collins

23   was there, was CO Mattie.  Yes, and oh, CO Galinski

24   (phonetic), came back, too.

25                   "Can you say that name again, please?

1              "It was Galinski (phonetic) and now it's

2     Gasparilla.  Galinski, Galinski.

3              "And it's now what?

4              "Gasparilla, I'm not sure how to spell it.

5              "Did she work on days when Ms. Collins was

6     there?

7              "I think so.

8              "And in the last year or so, have there been

9     any new females?

10             "Female correction officers?  Yes.  To be

11    honest with you, I don't remember their names, but we have

12    quite a few female officers.

13             "Was there any other material covered in

14    sessions concerning relations with male and female officers?

15             "Just that it was suggested that you don't get

16    involved with another officer.

17             "Anything else?

18             "They reiterated that being on special

19    precautions about male inmates and the fact that they came on

20    to other female COs, and do not fall into that trap.  It was

21    really how to report certain incidents that happened to you,

22    happened that you were supposed to follow in a specific order

23    that you reported it.

24             "Did you have written material for other

25    sessions?

1                    "No.  It was at least verbal or at least my

2     session, what we call my specific group which was a session

3     they did not provide any written materials.  The only thing

4     that you had written materials on was your sexual harassment

5     class.

6                    "Was that a separate class than what you

7     described?

8                    "Yes, ma'am.  The sexual harassment was

9     attended by both male and female, and it was given during

10    regular time.

11                   "Okay.  Debbie Lamb, does she still work

12    there?

13                   "Yes, ma'am.

14                   "Is she a CO?

15                   "Yes, ma'am.

16                   "Are there any females who earn supervision in

17    Auburn?

18                   "We now have Deputy Superintendent O'Mara, she

19    is a female.

20                   "When did she come to Auburn?

21                   "Within say the past year.

22                   "Anyone else?

23                   "Sergeant Hart was there when I first got

24    there, and then she went to the outside hospital 7 SU.

25                   "7 SU?

1                    "Yes, ma'am.  That's the hospital.  That's the

2      hospital annex for the prison unit over at SUNY.

3                    "And Sergeant Harp, did you say?

4                    "Hart.

5                    "She was a CO before she was a sergeant?

6                    "Yes, ma'am, as far as I know.

7                    "Do you know if the deputy was a CO?

8                    "I don't think so.  Deputy Superintendent

9      O'Mara?

10                    "Yes.

11                    "I don't think so, and I know there were

12     several female sergeants that passed through here, but I

13     don't recall their names.

14                    "Okay.  Now Deputy Superintendent O'Mara,

15     where was her former assignment if you know?

16                    "I just know that it was up north.

17                    "Have you ever been present or directly --

18     have you ever been present or directly observed Mr. Goord's

19     interaction with the plaintiff Ms. Collins?

20                    "Not that I know of, sir.

21                    "Did Ms. Collins ever recall to you that she

22     was being treated unfairly, what regard, or treated in any

23     inappropriate fashion by Mr. Goord?

24                    "That, I didn't hear mention about him in

25     person, no.

1              "Did Ms. Collins ever convey any sentiment to

2      you of a negative nature concerning Mr. Goord that you can

3      recall?

4              "No.

5              "Who is John Burge?

6              "He was our former superintendent.

7              "Did you ever have occasion to interact with

8      him while he was superintendent at Auburn Correctional

9      Facility?

10             "Only on tour through.

11             "Explain what you mean, please.

12             "When you first arrive at a facility, you are

13     given two days as a day to get acclimated, day to fill out

14     paperwork and tour the facility and if you were present, you

15     meet other people, you may meet your steward or your

16     superintendent if he was present, you go down and you find

17     out where personnel is, on that order.

18             "And from the time you came to Auburn until

19     the time he retired, Mr. Burge, did you have any direct

20     interaction with him as an employee of the department?

21             "Not personal per se.  I knew he made tours of

22     the facility occasionally like everybody does, as far as the

23     officers are concerned.

24             "Is there any occasion that you can recall

25     that you engaged in a conversation with him or the like?

1          "No.  No.

2          "Okay.  Were you ever subjected to any

3  inappropriate physical contact by Mr. Burge?

4          "No.

5          "Were you ever harassed or annoyed in an

6  inappropriate fashion by Mr. Burge?

7          "No.

8          "Other than what Ms. Collins has told you, do

9  you have any personal knowledge of Mr. Burge's interaction

10  with the plaintiff?

11          "No.

12          "Were you ever present when Mr. Burge was also

13  present together with Ms. Collins at the same time and in the

14  same place?

15          "No.

16          "Do you have any knowledge about any

17  interaction between Ms. Collins and Mr. Burge other than that

18  that Ms. Collins has provided to you?

19          "No.

20          "Are you familiar with Harold Graham?

21          "Yes, sir, he is our present superintendent.

22          "Have you had any occasion to interact with

23  Superintendent Graham since he took over for Mr. Burge as

24  superintendent of Auburn?

25          "Yes, sir, because I let him in every day.

1          "What does that entail?

2          "I usually greet him and say hello to him and

3     that's -- I open the gate for him, I locate his ID, and

4     highlight things for the day.

5          "Is that part of your security responsibility,

6     to verify his identity as he is passing through?

7          "Yes, sir.

8          "And in that respect, he is no different than

9     any other employee or visitor or the like?

10         "No.  He has to show like everyone else.  And

11    during the interaction, you're behind some sort of a

12    bulletproof, we call it a bubble.

13         "You're looking through a transparent material

14    at him, is that correct?

15         "Yes.

16         "Okay.  In the course of that interaction,

17    what kind of conversation do you have, if any, with

18    Superintendent Graham as he arrives at the facility?

19         "Usually just hello.  Occasionally, if he's

20    been on vacation, I have asked if he had a nice time, when he

21    came back, if I know he's been only out for that reason.

22         "Have you ever been subjected to any

23    inappropriate physical contact by Superintendent Graham?

24         "No.

25         "Have you ever been subjected to any

1    inappropriate verbal comments, statements, directed at you by

2    Superintendent Graham?

3              "No.

4              "Other than what Ms. Collins has told you, do

5    you have any direct personal knowledge of any interaction

6    that Ms. Collins has had with Superintendent Graham?

7              "No.

8              "Do you have any knowledge of any interaction

9    between Superintendent Graham and Ms. Collins other than what

10   she herself has told you?

11             "No.

12             "Have you ever observed Brian Fischer, Glenn

13   Goord, John Burge, or Harold Graham address any female

14   employee, CO, or otherwise, inappropriately for using

15   offensive language or conduct?

16             "No, sir.

17             "Did you take offense to any of the material

18   that was related to you at the academy in the separate

19   session for female cadets only concerning the male

20   environment and inmate behavior that was directed exclusively

21   to women?

22             "I thought it should have been something that

23   males should have had to sat through, also.

24             "My question is, did you take any offense to

25   any of the material that was presented at the time?

1              "Not personal offense.  I just thought it was

2      ridiculous.

3              "Okay.  Why?

4              "They suggested that one of -- well, one of

5      them suggested that underneath your uniform that you go ahead

6      and wear Spandex shorts and Spandex pants and then wear a

7      sports bra over it, and to work an eight-hour shift in that

8      condition of a building would have been sheer torture.

9              "What about that offended you?

10             "Just the fact that they thought that would

11     prevent someone from getting raped.

12             "When you say they, who are you referring to?

13             "The people instructing the course.

14             "Were there any males given the instructions?

15             "No.

16             "Have you ever had occasion to directly submit

17     any complaints about offensive or inappropriate conduct by

18     male employees to John Burge?

19             "No.

20             "Did you ever do the same to Harold Graham?

21             "No.

22             "I believe I asked you this and then I should

23     be done.  You didn't have interaction either by

24     correspondence or by telephone to either Glenn Goord or Brian

25     Fischer either?

1                    "No."

2                    THE COURT:  Okay.  Does that complete the

3      reading of the deposition testimony?

4                    MS. CONNOR:  As far as I know, yes, your

5      Honor.

6                    THE COURT:  Ms. Connor, Ms. Sheehan for the

7      state?

8                    MS. SHEEHAN:  Yes, your Honor.

9                    THE COURT:  And Mr. Andrews?

10                   MR. ANDREWS:  Nothing, your Honor.

11                   THE COURT:  Nothing, okay.  Very well.

12     Ms. Connor, your next witness, please.

13                   MS. CONNOR:  The plaintiff calls Dr. Kenneth

14     Reagles.

15                   THE CLERK:  Can you state your full name,

16     spell it for the record, please.

17                   THE WITNESS:  My name is Kenneth Reagles,

18     R-e-a-g-l-e-s.

19

20           K E N N E T H   R E A G L E S , called as

21     a witness and being duly sworn, testifies as

22     follows:

23                   THE COURT:  Good afternoon.

24                   DIRECT EXAMINATION BY MS. CONNOR:

25           Q    Good afternoon, Dr. Reagles.

1          A     Good afternoon.

2          Q     Would you give us your full name, please.

3          A     Sure.  My name is Kenneth, middle initial W

4    for William, Reagles.  Last name is spelled R-e-a-g-l-e-s.

5          Q     Where do you reside?

6          A     I reside in Manlius, New York.

7          Q     Do you have a professional address as well?

8          A     Yes, actually I have two.  My business address

9    is 500 Plum Street, Suite 600, I have an office at Syracuse

10   University, 258 Huntington Hall.

11         Q     And the Plum Street address, what city or town

12   is that located in?

13         A     That's Syracuse, it's down in the Franklin

14   Square area.

15         Q     What is your profession, Dr. Reagles?

16         A     I'm a rehabilitation psychologist, professor

17   of rehabilitation services, specialist in vocational

18   rehabilitation, and the economic consequences of disability.

19         Q     Are you presently employed?

20         A     Yes, I am self-employed as the owner of a

21   business enterprise known as K.W. Reagles & Associates, and

22   I'm professor emeritus at Syracuse University which is a

23   semi-retired status.

24         Q     And you're professor emeritus, in what

25   department is that?

1          A     The department of rehabilitation services at

2     Syracuse University.

3          Q     Would you please tell us what your previous

4     work experience is.

5          A     Yes.  Well, I got my doctorate degree in 1969

6     from the University of Wisconsin at Madison, and I spent the

7     first year as a visiting professor of a university in Israel

8     where my major professor and I and an Israeli colleague began

9     the first rehabilitation counseling program outside of the

10    United States.

11          I returned to University of Wisconsin in the

12    fall of 1970 and spent the next five years as the research

13    director of a federally funded rehabilitation research

14    institute there.

15          In 1975 I learned of a position vacancy at

16    Syracuse University, had friends who were on the faculty here

17    so I applied for the position, and I was a successful

18    applicant.  So in the fall of 1975 my wife, daughter, and I

19    moved to Syracuse.  I joined the faculty, eventually became

20    chairman of the department of rehabilitation services, and I

21    was a professor there for, what, 21 years, and became

22    professor emeritus in 1996.

23          In 1980, a physician, Dr. Ronald Dougherty and

24    I, established an outpatient clinic called Pelion and that

25    clinic provided both medical and rehabilitation services to a

1    variety of patient populations, including individuals who

2    were misusing prescription drugs.  The program was eventually

3    expanded to include individuals who were abusing alcohol and

4    illicit drugs.  But I sold my half interest in that clinic in

5    1998.

6          But in 1969, I began doing what I'm doing

7    today, what is called forensic rehabilitation, and that is

8    essentially expressing my opinions regarding the consequence

9    of injury or impairment on an individual's capacity to work,

10   not only in the labor market, but also at home.  And then the

11   other thing that I do is to determine the cost of the

12   anticipated future health-related goods and services that

13   individuals will require as a result of their disablement,

14   it's what's called a life care plan.  And so essentially

15   that's what I've been doing for these past 40 years, if you

16   will.

17        Q    Sounds like you're very busy, to me.  Now, in

18   your previous answer, did you provide us with all of your

19   educational background or is there anything in addition to

20   that?

21        A    Actually, I didn't.  I have an undergraduate

22   degree in education from the University of Wisconsin at

23   Lacrosse, that was achieved in 1962.  I have a master's

24   degree in counseling and guidance from San Diego State

25   University, that was achieved in 1966, and then the PhD, the

1  doctorate of philosophy and rehabilitation counseling

2  psychology from University of Wisconsin at Madison, that was

3  achieved in 1969.

4       Q    Thank you.  What subject matter is included in

5  the course of study leading to a degree in rehabilitation

6  counseling psychology?

7       A    Well, we deal with individuals who have

8  impairments, they can be physical, mental, emotional, and so

9  there's a great deal of study of disability, how people

10 become disabled, the nature of disability, how disability is

11 dealt with, not only in terms of treatment, but also we're

12 concerned about getting people back to work so there's a

13 great deal of study, what's called vocational psychology,

14 where people work, how they do their work, what it takes to

15 do a job, what happens to people who become impaired, to the

16 extent that they may not be able to do the work that they

17 once did.  Then if that's true, then there is the process

18 called vocational rehabilitation, where individuals that we

19 trained at Syracuse University and who are trained in 90

20 other institutions across the country assist those

21 individuals in trying to become productive members of society

22 again.  Training, job placement, modifying jobs, modifying

23 equipment, that sort of thing so people can compete once

24 again even though they may have a disabling condition.  We do

25 what we do within the context of a counseling relationship so

1    there's a great deal of study of personalities, counseling

2    theory and techniques, job placement techniques, and more

3    recently, rehabilitation counselors become specialists in

4    using technology to minimize the consequences of disability.

5    Use of computers, use of sensory devices, mobility equipment,

6    all kinds of adaptive and assistive devices that can be used

7    by people to help them do work that they might not be able to

8    do otherwise.  So those are the essential areas of study.

9              My particular area of inquiry and professional

10   interest from the date of my doctoral studies at Wisconsin

11   has been about the economic consequences of disability.  We

12   know that when people are unable to work as a result of their

13   disability, there is an economic consequence, their lost

14   wages, the lost fringe benefits, their lost capacity to do

15   work around the house, all those little jobs we do around the

16   house have economic value, so that has always been an

17   interest of mine, and that has been part of my professional

18   research, my scholarly writing.

19             Q    And Dr. Reagles, in your work at the

20   University of Wisconsin and then more recently Syracuse

21   University, have you completed any research in your field?

22             A    Yes, I have.

23             Q    What is that, please?

24             A    Well, the first five years was exclusively

25   doing research, we did program research, program evaluations

1    for six states in the Midwestern region as well as agencies

2    of the federal government, the Rehabilitation Services

3    Administration, the Office of Management and Budget, we

4    looked at how rehabilitation services can be delivered more

5    effectively and more efficiently.  My research continued here

6    at Syracuse University.  I have conducted research projects

7    for what used to be called the Office of Vocational

8    Rehabilitation, eventually became VESID, now it's called

9    Access VR but it's essentially our state vocational

10   rehabilitation program.  I work with the agency there to

11   develop measures of effectiveness and efficiency.

12              So research is, you know, part of what you do

13   as a professor, and when you do research, then you write

14   reports and you publish those reports and that's -- that's

15   one of the ways in which people who are professors become

16   evaluated for tenure.

17        Q    Now have you been involved in publishing any

18   of your research or written any books in your field?

19        A    Yes, I've been the author or the coauthor of

20   five books, 12 chapters that have appeared in books that

21   others have edited, 18 monographs, the monographs are

22   essentially short books, they're usually the final project

23   reports of research projects that I was involved in, and then

24   I have nearly 60 articles that have appeared in professional

25   journals.

1          Q      And the articles that have appeared, that

2   appear in professional journals, do they relate to your field

3   of expertise?

4          A      Exclusively, yes.

5          Q      Now, could you share with us the professional

6   organizations that you belong to?

7          A      Surely.  I belong to the International

8   Association of Rehabilitation Professionals, the American

9   Counseling Association, the National Rehabilitation

10  Association, the National Council of Rehabilitation

11  Educators, the National Association of Forensic Economists.

12         Q      And in these organizations, have you had any

13  experience being a leader of any of them?

14         A      Yes, I've been the national president of the

15  American Rehabilitation Counseling Association, as well as

16  the national president of the National Council of

17  Rehabilitation Educators.  Rehabilitation educators are

18  essentially college professors who have an association that

19  is concerned with how rehabilitation counselors can be

20  educated and in more effective ways.

21         Q      And have you ever served as a consultant for

22  any international rehabilitation services?

23         A      Yes, I have.  I've been a site visitor and

24  project evaluator for our federal government in going abroad

25  to Israel, to Egypt, to Yugoslavia, what used to be

1    Yugoslavia, India, Pakistan, England, and the Virgin Islands.

2          Q     Now have you ever offered your services to

3    attorneys and their clients?

4          A     Yes.

5          Q     And what is the nature of this service that

6    you provide to these attorneys, and clients?

7          A     Essentially what I'm asked to do is to

8    evaluate individuals who have become impaired in some way.  I

9    would say more frequently than not, the impairment is

10   physical in nature.  Individuals who are involved in serious

11   motor vehicle crashes, work-related incidents, incidents of

12   medical malpractice where a surgery went wrong, for example.

13   Children who have cerebral palsy, individuals with severe

14   burns, multiple trauma including amputations, and so what I'm

15   asked to do is to evaluate the individual, make a

16   determination of first of all whether or not they could go

17   back to the work that they once did, with -- even with

18   accommodations.  If not, is there other work that they might

19   be able to do.  And then usually when you have that situation

20   where a person was working in one capacity and now is not

21   able to work to the same extents as before, there's an

22   economic difference.

23          And another economic issue is the value of the

24   work that people used to be able to do at home, and now are

25   unable to do.  Some of the people I evaluate are not employed

1    in the labor market, their work is at home.  More -- that's

2    most commonly of course a housewife who, when she becomes

3    physically impaired, may not be able to do the work that she

4    once did and so there is an economic consequence.  And then,

5    the last element of economic damage that I'm asked to look at

6    is the cost of future health care, and that would be all of

7    the doctor's visits, medications, therapies, surgeries,

8    whatever it is.  And so what I do is to evaluate the person,

9    form my opinions, prepare a report, and usually submit that

10   to attorneys.  And I work for both plaintiffs and defendants,

11   so I work both sides of the street if you will.

12        Q    Now, have you ever conducted any training for

13   legal professionals such as attorneys or judges?

14        A    Yes, I do.

15        Q    What training is that, please?

16        A    Well, I'm a guest lecturer at the Syracuse

17   University Law School, about how to assess damages in

18   personal injury and wrongful death cases.  Judge Cherundolo,

19   who is a New York State Supreme Court judge, is the

20   instructor of that program.  And I also have conducted

21   training for attorneys about rehabilitation issues related to

22   specific disabilities, spinal cord injuries, traumatic brain

23   injuries, that sort of thing.  Some of the training has been

24   for judges about a particular law in New York State.  I was

25   not there as a legal expert but more to facilitate the

1    discussion about how this law was implemented because it was

2    somewhat controversial.

3         Q    And how many times have you testified in

4    matters of this sort?

5         A    Well, this is my 42nd year of doing this type

6    of work so it is in excess of 500 times.

7         Q    What courts have you testified in?

8         A    Courts like this, U.S. federal court, not only

9    in Syracuse but across the state, and in other states as

10   well.  Testified in New York State Supreme Courts, again,

11   from Buffalo to Albany to Malone down to Binghamton and

12   places in between, other states.  I've also testified in

13   Canada.

14        Q    Now in your testimony, do you, have you

15   testified for both plaintiffs and defendants?

16        A    Yes.

17        Q    And are you paid for your services?

18        A    Yes, I am.

19        Q    And do your fees depend on the outcome in any

20   manner, or in this matter?

21        A    No, they don't, I'm paid for my time.

22             MS. CONNOR:  At this time, your Honor, I'd ask

23   for a ruling that Dr. Reagles is an expert under the Federal

24   Rules of Evidence.

25             THE COURT:  Any voir dire?

1          MS. SHEEHAN:  Voir dire, your Honor?

2          THE COURT:  Okay, go ahead.

3          VOIR DIRE EXAMINATION BY MS. SHEEHAN:

4     Q    Good afternoon, Dr. Reagles, my name is Cathy

5  Sheehan, Assistant Attorney General.  My co-counsel Roger

6  Kinsey is picking up some documents for me, we represent the

7  state of New York --

8     A    Surely.

9     Q    -- the Department of Corrections and Community

10 Services, former Superintendent Goord, former Commissioner

11 Glenn Goord --

12    A    Okay.

13    Q    -- former Superintendent John Burge,

14 Superintendent Harold Graham, okay?

15    A    Surely.

16    Q    Doctor, do you hold any current professional

17 licenses in New York?

18    A    No, I do not.

19    Q    Do you hold any current certifications from

20 any professional society or organization?

21    A    No, I've written --

22    Q    Just --

23    A    I've helped write the exams for those

24 certification exams but I'm not certified myself.

25    Q    Which exams?

1          A      The certification of rehabilitation

2     counselors.

3          Q      Rehabilitation counselors?

4          A      Yes.

5          Q      When you received certification, passing that

6     test, what are you certified to do?

7          A      It's essentially, it's a certification for the

8     rehabilitation counselors, it's a certification that you have

9     fulfilled minimal educational requirements and that you have

10    a sufficient body of knowledge to practice as a

11    rehabilitation counselor.  It's a nationwide examination.

12         Q      Do you think current certifications from

13    professional societies or organizations are important in

14    assessing qualifications, knowledge, experience, and skills

15    of a professional in your field?

16         A      Absolutely.  If -- if I were a younger person,

17    that would be one of the first things I would do, is become

18    certified.

19         Q      You'd get certified?

20         A      Right.

21         MS. CONNOR:  Your Honor, I'm very sorry to

22    interrupt but I cannot hear counsel.  I've been trying, I've

23    tried to let it go, I thought she'd raise her voice but I

24    can't.

25         THE COURT:  Counsel, can I ask you to step

1    back to the podium so you can use the microphone.

2         Q    Do you think continuing education requirements

3    for professional education -- do you think continuing

4    education requirements for professional certifications are an

5    important part of assuring that people in your field are

6    current in their discipline and that their opinions are

7    reliable?

8         A    Absolutely, that's why I conduct continuing

9    education seminars for rehabilitation counselors, forensic

10   economists and others.

11        Q    Why did you decide never to obtain a license

12   for any discipline in New York?

13        A    Well, first of all, there isn't a licensure

14   for rehabilitation psychologist in New York State.  The

15   certification, as I said, I helped write the exam so I

16   thought it was hardly fair if I were to take the test and

17   become certified as a rehabilitation counselor.  It was --

18   the certification was initially for individuals with a

19   master's degree.  In more recent years, individuals with

20   doctorate degrees have gotten certified.  I chose not to.

21        Q    So the only certification you would consider

22   is rehabilitation certification?

23        A    I'm sorry, what?

24        Q    Rehabilitation services certification, that's

25   the only certification you would consider important to your

1    line of business?

2              A    No.  If I were in another state, I'd be

3    licensed as a psychologist.  If I had remained in Wisconsin I

4    could be licensed as a psychologist.  New York State doesn't

5    have a category for rehabilitation psychologist.

6              Q    Okay.  Do you have any degree in accounting?

7              A    In accounting, no.

8              Q    Do you have any degree in economics?

9              A    I don't have a degree in economics, no.

10             Q    Do you have a degree in finance?

11             A    No.

12             Q    Do you have a degree in actuarial science?

13             A    Can you define that, please.

14             Q    Actuarial science as a discipline.  Do you

15   have any science degree?

16             A    No, I just -- I just wanted to make it clear

17   that actuarial scientist is a rather -- it's a very small

18   group of professionals and it's -- I don't have a degree in

19   actuarial science, no.

20             Q    Thank you.  Do you have any professional

21   certifications in accounting?

22             A    In none of those disciplines.

23             Q    Finance?  Okay.

24             A    Okay.

25             Q    Do you believe that somebody with a degree or

1   professional certification in accounting, finance, economics,

2   or actuarial science is qualified to present an opinion about

3   future income and wages?

4          A     Not necessarily.  Depends on what they study.

5          Q     Do you believe that you're qualified to be a

6   forensic economist?

7          A     Well, regardless of what I think, I have been

8   found to be qualified by courts such as this one, and so --

9          Q     I'm asking you if you believe you're qualified

10  to be --

11         A     Absolutely.

12         Q     Would you agree with me that there are no

13  credentials apart from a $165 fee to become a member of the

14  National Association of Forensic Economists?

15         A     I don't know what the annual membership fee

16  is, but I would agree with you that that summarizes the

17  eligibility criteria, yes.

18         Q     Have you ever published an article in the

19  Journal of National Association of Forensic Economists?

20         A     No, I have not.

21         Q     Does anyone in K.W. Reagles & Associates have

22  a degree or certification in accounting?

23         A     No, they do not.

24         Q     Finance?

25         A     No.

1          Q     Economics?

2          A     No.

3          Q     Actuarial science?

4          A     No.

5          Q     Have you ever treated or cared for any

6     patients who require vocational rehabilitation services in

7     the last 10 years?  Let me rephrase that.  Have you testified

8     over the last 10 years for somebody similarly situated as

9     Ms. Collins?

10          A     Have I testified?

11          Q     Correct.

12          A     If you include depositions, yes.

13          Q     Have you treated or cared for any patient in

14    the last 10 years that has been similarly situated to

15    Ms. Collins?

16          A     Well, the last 10 years, I have not provided

17    therapeutic services, my role has been as I described it, as

18    evaluating individuals to determine the consequences of their

19    impairment.

20          Q     Isn't it true that you've never treated any

21    patient about whom you have rendered an opinion as to their

22    future employability over the last 10 years?

23          A     I think I just answered that with my previous

24    answer.

25          Q     Isn't it true you've never treated plaintiff?

1          A     That's not my role.  I was not retained to

2     treat Ms. Collins.  I'm aware of the treatment that she has

3     received but I was not asked to become involved to treat her.

4          Q     Are you able to explain the concept of

5     discounting the present value according to New York law?

6          A     Of course.

7          Q     Have you obtained what in your professional

8     opinion is essential information in order to present your

9     opinions on the issues in this litigation according to the

10    checklist on your firm website?

11         A     Very definitely.

12               MS. SHEEHAN:  Okay, one minute, your Honor.

13         Q     You have in this case a signed letter of

14    agreement?

15         A     Yes, I do.

16         Q     Retaining check?

17         A     Yes.

18         Q     Complaint?

19         A     I believe I do, yes.

20         Q     Accident/incident report?

21         A     Yes.

22         Q     EBTs of the plaintiff?

23         A     I don't have them in my file, I'm aware of

24    them.

25         Q     Did you review them?

1      A    Some of them, not all of them.

2      Q    Do you know which ones you've reviewed?

3      A    Not off the top of my head, no.

4      Q    Medical records?

5      A    Yes.

6      Q    To present date.  ER hospital records?

7      A    Yes.

8      Q    Physician records from plaintiff?

9      A    Yes.

10     Q    Psychologist/psychiatrist reports?

11     A    Yes.

12     Q    Psychiatrist/psychologist reports from

13  defendants?

14     A    Yes, Dr. First.

15     Q    Allied health provider reports?

16     A    Yes.

17     Q    Functional capacity evaluation?

18     A    There was none given in this particular

19  instance, so there was not one available.

20     Q    Why was one not given?

21     A    Well, functional capacity evaluations are

22  primarily for physical impairments, what individuals are able

23  to do and can't do as a result of physical disability.

24     Q    School records?

25     A    I had -- I had some school records.

1          Q    Which ones did you have?

2          A    I don't have transcripts, I have the --

3     Ms. Collins' recitation of what degrees she had, what schools

4     she attended, that sort of thing but I do not actually have

5     the transcripts of her attendance at various institutions.

6          Q    Did you ever have it in your possession?

7          A    I don't recall ever having seen them, no.

8          Q    Any other school records in addition to the

9     transcripts?

10         A    No.

11         Q    Any current records?

12         A    Could you be more --

13         Q    I understand you just met with her a few days

14    ago?

15         A    Yes.  I have Dr. Alley's most recent medical

16    office note.  I believe that's the most recent medical report

17    that I have.

18         Q    What else was provided to you during that

19    meeting?

20         A    When I met with Ms. Collins, I was principally

21    a -- oh, I know, the actual documents were the -- her wage

22    statements for the past five years.

23         Q    What document are you referring to, you say

24    wage statements?

25         A    They are the federal 1099s.

1      MS. CONNOR:  Your Honor, I'm going to object,

2   this is beyond voir dire in terms of his expert

3   qualifications.  This may go into cross, it may be completely

4   improper.  I didn't want to interrupt counsel but at this

5   point it's -- I think it's way beyond voir dire.

6      THE COURT:  I'd have to agree, you're getting

7   into areas that -- regarding him getting into an opinion and

8   we haven't gotten there yet, we want to talk about his

9   qualifications.

10     MS. SHEEHAN:  Your Honor, I object to this, to

11  Dr. Reagles being qualified as an expert in the area of

12  evaluating the loss of expected earnings, valuation of past

13  wages lost, past benefits lost, future benefits lost.  I

14  mean, he has no economic background.  I don't object to his

15  being qualified as an expert regarding Ms. Collins' future

16  health care needs, what he calls life care plan.  Other than

17  that, he has presented no qualifications to give a sort of

18  damages, money, economist type opinion.  You know, also, your

19  Honor, also pension.  He's evaluated the loss of New York

20  State pension.

21     THE COURT:  Okay, Counsel.  Ms. Connor.

22     MS. CONNOR:  Yes, your Honor, I could do some

23  followup with the witness.

24     THE COURT:  That's fine, go ahead.

25     CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

1          Q      Dr. Reagles, you testified that you -- pardon

2     me, that you wrote books?

3          A      Yes.

4          Q      And what is the title of your latest book?

5          A      It has to do with the assessment of the value

6     of household services, how the methods by which the lost

7     capacity to perform household work is quantified.  It's

8     essentially an economic analysis of a person's diminished

9     capacity to perform household work.

10          Q      And what do you mean by an economic analysis?

11          A      It's essentially, there are essentially two

12     methods used to determine the value of household work.  One

13     is what we call the replacement method, in other words if we

14     had to hire somebody to provide the services that someone

15     might have provided but now can't because of their

16     disability, what would you have to pay them.  Turns out that

17     on the average, it's about $11 an hour.  But then the other

18     is to look at the various occupational roles that people

19     perform within the home, and determine what is the market

20     value of that kind of work.  If you take somebody who is --

21     does a lot of work around the house, they do handyman kinds

22     of things, may chauffeur their kids to ball games and school,

23     they may do painting, they may do wallpapering, well, what is

24     the market value of that and that's another way of

25     determining what the value of household work is.  So that's

1    what that book was about.

2              Q    When did you write that book?

3              A    That was about five or six years ago, as I

4    recall.

5              Q    And how many -- Withdrawn.

6                   You testified that you had qualified as an

7    expert in other courts, and how many of those qualifications

8    were related to economic analyses of loss?

9              A    I would estimate about three-quarters of them.

10             Q    Approximately what -- how many would that be?

11             A    Might be 400 times.

12             Q    And have you had experience in doing those

13   analyses with respect to valuing future pension values and

14   loss with respect to disability related to somebody's

15   pension?

16             A    Commonly that is done.  Not as commonly as

17   determining the individual's lost wages and their fringe

18   benefits, taken collectively, but yes, pension benefits are

19   included in fringe benefits.

20             Q    And is it common in your analysis to -- in

21   these approximately 400 times that you've done this, is it

22   common that you would analyze the future loss of earnings

23   with respect to any particular individual who had suffered a

24   disability and was -- had a lawsuit, and income as a result

25   of that?

1          A     That's what I do day in and day out.  We -- my

2     firm handles approximately 150 to 175 individuals a year who

3     have been seriously disabled, and as a result of their

4     disability, are unable to work or unable to work to the

5     extent that they once were, in a competitive labor market.

6               MS. CONNOR:  Thank you, your Honor.  I renew

7     the motion to qualify Dr. Reagles.

8               MS. SHEEHAN:  Your Honor, his recent

9     publication was loss of household work, that's not the

10    evaluation he's going to offer here according to the report I

11    received.  He testified he does an analysis of loss, loss of

12    what?  Can I ask him a few more questions regarding pension?

13              THE COURT:  Very limited, Counsel, go ahead.

14              <u>VOIR DIRE EXAMINATION BY MS. SHEEHAN:</u>

15         Q     Doctor, when was the last time you predicted

16    loss of a state pension?

17         A     I'm not sure.  Might have been ... trying to

18    think.  I had two Department of Correction employees from the

19    Rochester area approximately two years ago where I did this

20    similar analysis.

21         Q     And did you testify in court on those two

22    cases?

23         A     No, those were depositions.

24         Q     Okay.  When was the last time you testified in

25    court and you were qualified to testify under similar

1   circumstances here?

2          A    Oh, my.  Maybe like three weeks ago, four

3   weeks ago.

4          Q    Can you give me the name of the case?  Was it

5   a Department of Corrections employee?

6          A    No, it was not.  No.

7          Q    And did it involve a union contract?

8          A    It did.  It was before Judge Miday, Court of

9   Claims case.

10          Q    Court of Claims case?

11          A    Yes.

12          Q    Was it --

13          A    When New York State was being sued similar to

14   this situation.

15          Q    Was it a NYSCOPBA contract?

16          A    It was CSEA contract.

17          MS. SHEEHAN:  Your Honor, I object to this, to

18   this doctor being qualified.

19          THE COURT:  Okay, Counsel.

20          MS. SHEEHAN:  Only in the economic areas.

21          THE COURT:  Dr. Reagles is going to be

22   qualified, he's going to be allowed to testify.  Ladies and

23   gentlemen of the jury, it's important that you understand

24   that it's up to you to decide the weight and credibility to

25   give any witness, including a so-called expert witness.  Just

1    because someone has degrees and has testified previously,

2    it's up to you to analyze what you've heard from both

3    counsel, and the responses that Dr. Reagles has given as a

4    witness, and it's up to you to judge what weight and

5    credibility to give his evidence, or his testimony, excuse

6    me, the evidence that he'll be offering to you, okay.

7    Ms. Connor, go ahead.

8              MS. SHEEHAN:  Your Honor, before we begin, I'd

9    like -- I see Dr. Reagles has demonstrative exhibits with him

10   which I have not seen yet.  So I'd like an opportunity to

11   review them.

12             THE COURT:  Ladies and gentlemen, I'm going to

13   give you a short break, so we can get this cued up and ready

14   to go so there won't be any interruptions I hope, okay.  Go

15   ahead.  Don't speak about it, don't let anybody talk to you

16   about it, let me know if they do.

17             (Jury Excused, 1:34 p.m.)

18             THE COURT:  Okay.  Ms. Connor, if you could,

19   I'm assuming that the blowup exhibits that Dr. Reagles has

20   brought with him are part of some discovery that has already

21   been provided but if you could allow counsel, go over that

22   with her, that would be helpful.

23             MS. CONNOR:  Absolutely.

24             THE COURT:  Dr. Reagles, if you'd like to step

25   down, you can, sir.

1          THE WITNESS:  Very good, thank you.

2          THE COURT:  You don't have to stay there.  And

3    thank you for scrambling to get here, I appreciate it.

4          THE WITNESS:  That's quite all right.

5          (Whereupon a recess was taken from 2:35 p.m.

6           to  2:55 p.m.)

7          (Open Court, Jury Out.)

8          THE COURT:  Okay, Ms. Sheehan, did you have an

9    opportunity to go through all the exhibits?

10         MS. SHEEHAN:  I did, your Honor.

11         THE COURT:  Very well.

12         MS. SHEEHAN:  Thank you.

13         THE COURT:  For the record, Dr. Reagles is

14   going to be qualified as an expert to testify, and we're

15   going to proceed, we're going to bring this jury out here,

16   okay.

17         MS. CONNOR:  Your Honor, just before we bring

18   the jury, we took the liberty of moving the podium to here.

19         THE COURT:  You mean the easel?

20         MS. CONNOR:  Easel, rather.  And we thought

21   that it would be easier than have the jury turned looking at

22   the exhibits and we have a microphone available if

23   Dr. Reagles needs it which we don't think he will, but there

24   is one.

25         THE COURT:  You project well.

1          THE WITNESS:  I try.

2          THE COURT:  All right.

3          MS. SHEEHAN:  Your Honor, I won't be able to

4     see it.

5          THE COURT:  That's true, but you can go over

6     and stand by the door over there and watch everything she's

7     doing.  Okay?  That works.  Just bring your notepad with you

8     if you need to or have the young guy over there keep notes

9     for you.  Okay.  Are we ready?  All right.  Please bring the

10    jury in.

11          (Jury Present, 2:56 p.m.)

12          THE COURT:  Okay, ladies and gentlemen, we're

13    ready to proceed, Ms. Connor's direct examination of

14    Dr. Reagles, go ahead.

15          MS. CONNOR:  Thank you, your Honor.

16          CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

17          Q    Dr. Reagles, did there come a time when you

18    were asked to evaluate the matter of Ms. Penny Collins?

19          A    Yes.

20          Q    And what were you asked to do, please?

21          A    I was asked to become familiar with who is

22    Penny Collins, her family background, her educational

23    history, her work history, her health history, I was asked to

24    become familiar with her eventual employment with the

25    New York State Department of Correctional Services, I was

1  asked to become familiar with the incidents that eventually

2  precipitated the diagnosis of either adjustment disorder with

3  depressed mood or as it eventually became known as

4  post-traumatic stress disorder.  I was asked to become

5  familiar with the manifestations of that disorder, and what

6  provoked those manifestations, and that as related to her

7  repeated efforts to attempt to return to work as a

8  corrections officer.  Once she no longer worked as a

9  corrections officer, which would have been approximately

10  May 28th of 2008, I was asked to become familiar with the --

11  her efforts to find other employment which is essentially a

12  requirement under the law that she do what she can to get

13  back into employment, so I looked at that whole process.  And

14  essentially, on the basis of that process, was I able to form

15  opinions related to the objectives that I was given when I

16  was retained.

17          Q     Now in this process that, of evaluating

18  Ms. Collins, what information did you consider?

19          A     What I considered, her family background, just

20  as a context for who she was and where she developed, she

21  grew up down in Sullivan County, Monticello, if you know

22  Monticello has a beautiful racetrack down there, lovely

23  community, that, then I also considered her educational

24  background, that she graduated from high school in 1979 from

25  Fallsburg High School with a Regents degree, Regents degree

1    suggests a higher level of academic achievement of course as

2    contrasted with a local diploma.  Continuing on with

3    educational history, she completed a two-year associate's

4    degree, and also eventually completed a Baccalaureate degree

5    in theology in 1995, and then more recently, she has

6    completed a master's degree in marriage and family counseling

7    from Liberty University.

8                    MS. SHEEHAN:  Your Honor, it appears that the

9    witness is reading from something.

10                   THE COURT:  Okay.

11                   MS. SHEEHAN:  And it's not in evidence.

12                   THE COURT:  Dr. Reagles, do you have something

13   in front of you?

14                   THE WITNESS:  Yes, this is essentially my

15   file, my notes.

16                   THE COURT:  Report?

17                   THE WITNESS:  The report is part of this file.

18   Part of this binder, I should say.

19                   THE COURT:  Is that something you've received?

20                   MS. CONNOR:  She's received a copy of the

21   report, your Honor.

22                   THE COURT:  Okay.  And Dr. Reagles, is it

23   going to assist you in your testimony to refer to the -- your

24   documents that you have there?

25                   THE WITNESS:  Surely, yes.

1          MS. SHEEHAN:  He said notes, is the report the

2  one that was updated yesterday afternoon?

3          MS. CONNOR:  Yes, your Honor.

4          MS. SHEEHAN:  I'm asking Dr. Reagles if that's

5  what he has in front of him.

6          THE WITNESS:  It is.

7          MS. SHEEHAN:  I won't object to the report but

8  the notes.  I won't object to the report, but I object to the

9  notes.

10          THE COURT:  Have the notes been turned over?

11          MS. SHEEHAN:  No, your Honor.

12          MS. CONNOR:  No, they were not requested, your

13  Honor.

14          THE COURT:  Okay.

15          THE WITNESS:  Why don't we mark my file.

16          THE COURT:  Go ahead and mark it.

17          MS. CONNOR:  We can do that.

18          THE COURT:  We'll take it, go ahead.  Lay the

19  foundation.  We'll get it into evidence and then you can have

20  a look at it.

21          MS. SHEEHAN:  Get a copy?

22          THE COURT:  Have a look at it.  I'm not going

23  to wait for a copy to be made, okay.

24          MS. CONNOR:  This would be Plaintiff's 82, I

25  believe.

1          THE COURT:  What's the exhibit number?

2          MS. CONNOR:  82, your Honor.

3          THE COURT:  Thank you.  Ms. Connor, please

4   start there and ask the doctor to identify Exhibit 82, its

5   contents.

6          Q    Yes.  Dr. Reagles, you have in front of you

7   what has been marked as Plaintiff's Exhibit 82, would you

8   please identify that for me if you can?

9          A    Yes, this is essentially my file on the Penny

10  Collins matter.  It includes my interview notes, it includes

11  the documents that I responded to earlier from defense

12  counsel with regard to what documents I had.  There are

13  certain legal documents, there are medical records, there are

14  some salary schedules, there are contracts, pertaining to

15  Ms. Collins' employment with the -- I'm going to call it the

16  Department of Corrections, but I know it's Correctional

17  Services but just for shorthand.  And then there's

18  information in there about the retirement fund.  There's some

19  other documents, Workers' Compensation, that sort of thing.

20          MS. CONNOR:  I wasn't going to offer it, your

21  Honor.

22          THE COURT:  I don't think that you need to

23  offer it at this point, but Dr. Reagles, is it going to

24  assist you in your testimony to refer to that binder?

25          THE WITNESS:  Yes.

1              THE COURT:  Your notes and reports?

2              THE WITNESS:  Yes, I think there are

3    sufficient number of details in this matter that I would be

4    uncomfortable relying on my memory.

5              MS. CONNOR:  Your Honor, I ask that the

6    witness be allowed to use Plaintiff's 82 in his testimony.

7              THE COURT:  It's going to be granted.  Would

8    you please take the binder and have counsel flip through it

9    so she can verify what's there.

10              I know I sound like a broken record, but if

11   anybody wants to stand up and stretch, please, I want you to

12   be comfortable.  Take advantage of these opportunities.

13              (Pause in Proceedings.)

14              THE COURT:  Ladies and gentlemen of the jury,

15   feel free if anybody wants to go in the jury room, use the

16   facilities or anything else, that jury room in back is fine,

17   okay.  While we're waiting here.  I'm going to try and keep

18   as many of you here as I can so we can try and keep moving.

19              Ms. Sheehan and Mr. Andrews, if you could,

20   just make a quick preliminary view of that binder, I will

21   give you an opportunity before cross-examination to get it

22   back again, if you want to examine anything more closely

23   before cross-examination.

24              MS. SHEEHAN:  Your Honor, may we approach side

25   bar.

1              THE COURT:  You may.

2              (At Side Bar.)

3              MS. SHEEHAN:  Your Honor, what we were hung up

4    on is there's a whole list of medical records that we never

5    received, and it goes beyond range, which this goes back to

6    the 2001.

7              MS. CONNOR:  It's in the binder you have, it's

8    the --

9              MS. SHEEHAN:  Never received the medical

10   records.

11             MS. CONNOR:  The document --

12             MS. SHEEHAN:  We never received the medical

13   records, except for Dr. Alley, Dr. First, who was our

14   witness.

15             MS. CONNOR:  You didn't request the records.

16             MS. SHEEHAN:  Oh, I disagree.  I'm sure we --

17             MS. CONNOR:  You didn't.

18             MS. SHEEHAN:  We only asked for one set of

19   medical.

20             MS. CONNOR:  You didn't request them.  I --

21             THE COURT:  Okay.  You're going to have a full

22   opportunity to examine them before you have to do

23   cross-examination.  Okay.  And you know, discovery at this

24   point is closed, this case has been ready for trial for some

25   period of time, so if there isn't -- you make a catalog of

1    what you don't have, and Ms. Connor can tell us what was

2    supplied and we'll go from there.

3                    MS. SHEEHAN:  And your Honor, we didn't even

4    know this when we received the report before we deposed him.

5    We didn't have these medical records at the time we deposed

6    him, we aren't aware of them.

7                    MS. CONNOR:  Where are they in the binder?

8                    MS. SHEEHAN:  It's not my binder.  He said he

9    reviewed --

10                   MS. CONNOR:  He said everything.

11                   THE COURT:  One at a time, please, one at a

12   time.

13                   MS. CONNOR:  What isn't in the binder you're

14   talking about?

15                   MS. SHEEHAN:  All the medical records for

16   everyone except Dr. Alley and Dr. First.

17                   MR. ANDREWS:  Dr. Alley, the date range is

18   different than what we have, I think.

19                   MS. SHEEHAN:  It is, this goes back to 2001.

20                   MS. CONNOR:  You had that, I sat in the office

21   with Tim Mulvey, all those were on his lap, he did an

22   extensive deposition of Dr. Alley.  There's no way you

23   didn't -- you can say you did not have that.

24                   MS. SHEEHAN:  Going back to 2001?

25                   MS. CONNOR:  Absolutely.

1          THE COURT:  All right.  Well, we're not going

2     to argue about this now.  If you have some records that

3     indicate what was turned over that you can show me either at

4     the end of the day or first thing tomorrow morning, that

5     would be good.  Meantime, you'll have an opportunity to

6     review this stuff before you have to cross-examine, okay.

7     We're going to proceed with the direct examination now.  And

8     you can, you know, ask to see whatever is in this binder at

9     any point, okay.

10          MS. SHEEHAN:  Can we please see it right after

11    he finishes his direct, we'll --

12          MS. CONNOR:  I don't have them with me, I mean

13    obviously, I don't, I don't have anything other than what's

14    in this binder with me.  I am not carrying around my

15    discovery material to court.

16          MR. ANDREWS:  So this is yours or this is his?

17          MS. CONNOR:  This is his.  But I had no idea

18    that there was an issue so I'm not carrying discovery

19    material.

20          THE COURT:  Okay, we'll get it addressed.

21          MS. SHEEHAN:  Thank you, your Honor.

22          THE COURT:  Okay.

23          MS. SHEEHAN:  We're going to hand this back to

24    you, look at it after.

25          (Open Court.)

1             THE COURT:  Okay.  We're going to proceed with

2     the direct examination of Dr. Reagles.  Ms. Connor, if you

3     could.

4             MS. CONNOR:  Before -- could you read the last

5     question back, please.  Before the binder was marked.

6                     (The requested portion of the testimony was

7                      read.)

8         Q     Did you consider any other information?

9         A     That was the principal information.  I did

10    look at her prior medical history, but I did not find any

11    medical conditions that prevented her from working fully and

12    completely in the competitive labor market including as a

13    corrections officer.

14        Q     Now, what did you learn about Ms. Collins'

15    work history?

16        A     Well, I learned that she's always been very

17    enterprising, worked in high school, from very early age,

18    after graduating from high school, she joined the U.S. Army,

19    and was in the Army for two years, achieved the rank of E3,

20    she was a public information specialist, she -- they trained

21    her, had a short course in journalism and wrote for military

22    publications.  In 1981 after she left the service she worked

23    as an office clerk for a temporary agency, she has worked as

24    a retail manager, she worked for a time up at Kutshers

25    Country Club up in the Adirondacks as a valet.  1981 to '93,

1    she worked as owner, manager of a retail gift establishment.

2    '95 to '96, she worked as a youth education director for a

3    church in Alabama.  And then late 1996 she returned to

4    New York, she studied at Rockefeller College, College of

5    St. Rose in Albany, University of West Virginia.  1999, she

6    became a probation officer in Sullivan County, working with

7    troubled youth, PINS, persons in need of supervision.  And

8    then in 1999 to 2002, she worked as a title clerk for an

9    abstract company in Monticello.  And then in 2002, she went

10   to the Department of Correctional Services training academy

11   in Albany, and in October of 2002, she received her first

12   assignment as a corrections officer at Sing Sing prison in

13   Ossining, New York.  And then I looked at the various

14   assignments that she had as a correctional officer, up until

15   the date of her last employment in May of 2008.

16            Q    Now, Dr. Reagles, did I ask you to become

17   familiar in the preparation of your report with Ms. Collins'

18   work as a correction officer?

19            A    Yes, you did.

20            Q    And did I also ask you to become familiar with

21   the incidents with respect to Ms. Collins being subjected to

22   sexual harassment in her work as a corrections officer?

23            A    Yes, you did.

24            Q    And what did you learn about these incidents?

25            A    Well, I read that they were rather crude,

1   graphic examples of people behaving badly, if you will.  But

2   more importantly, to me, was the manifestations for

3   Ms. Collins, the development of anxiety, depression, sleep

4   disorder, that those symptoms were brought to the attention

5   of Dr. Alley who eventually treated her for the symptoms of

6   what he initially diagnosed as an adjustment disorder with

7   depressed mood, but subsequently changed his diagnosis to

8   post-traumatic stress disorder.  And I learned of the

9   psychotropic medications that he gave, prescribed for

10  Ms. Collins, including benzodiazepine, also, almost always

11  was Ambien for the sleep disorder.  I learned about the,

12  essentially the -- from his office notes and from her account

13  of what had happened, that the events at work, the incidents

14  at work, were of sufficient severity that they eventually

15  caused her to take a leave from work.  She made several

16  attempts to go back to work but every time she did, as is

17  characteristic of this phenomenon of post-traumatic stress

18  disorder, an individual goes back into the environment in

19  which the disorder was provoked, do the symptoms become more

20  intensified.

21          Now, I should tell you that Dr. Dougherty and

22  I, the clinic, we had contracts with the Veterans

23  Administration and treated veterans from the Vietnam-era

24  conflict as well as more contemporary conflicts, all of them

25  were there for post-traumatic stress disorder and I know that

1    of this phenomenon, the flashbacks, the hypervigilance, the

2    exposure to events or circumstances that are similar to the

3    events in which the trauma occurred, that provokes this

4    post-traumatic stress disorder reaction, and the descriptions

5    that I read about in Dr. Alley's reports and that I got from

6    Ms. Collins were certainly consistent with that phenomenon as

7    I had come to understand it from the Vietnam-era veterans and

8    others.

9            And so what -- what I learned eventually was

10   that the symptoms were provoked each time she went back to

11   the correctional institution, and that eventually Dr. Alley

12   concluded that it was no longer in her best interest to

13   continue working as a corrections officer, and in late May of

14   2008, her employment ceased with the New York State

15   Department of Correctional Services.

16           Q    Now, in the course of preparing your report on

17   her damages, did I ask you to become familiar with how her

18   post-traumatic stress disorder was treated?

19           A    Yes.

20           Q    And what did you learn about that treatment?

21           A    Well, I've already mentioned that she'd been

22   seen by Dr. Alley, he was the primary care physician and he

23   dealt with it, not only with some education and brief

24   counseling like office visits, but also the medications.  He

25   referred her for counseling.  I am aware that she did go for

1   counseling on at least two if not three occasions.

2   Unfortunately the counselors were men, and they -- the

3   perpetrators of these incidents of sexual harassment were

4   also men, and so she was very uncomfortable.

5                   MR. ANDREWS:  Objection, your Honor.  If you

6   could ask the witness to characterize them as allegations of

7   sexual harassment, he doesn't know what happened.

8                   THE COURT:  I think that's a reasonable

9   request.

10                   THE WITNESS:  Surely.

11                   THE COURT:  Counsel, if we could keep it in

12   that --

13                   THE WITNESS:  Absolutely.

14                   THE COURT:  -- framework, please.

15          A     Right.  That she did seek counseling on two

16   occasions but they were, they were very brief counsel.  One

17   was for only two sessions, the other was only one session but

18   Dr. Alley kept recommending counseling services to her.  And

19   so essentially that's how the -- how the post-traumatic

20   stress disorder was dealt with from the records that I

21   reviewed and from Ms. Collins' accounts of what happened.

22          Q     Now Dr. Reagles, based on your review of all

23   this information, do you have an opinion of whether

24   Ms. Collins' PTSD precluded her from working as a corrections

25   officer?

1          A     I do.

2          Q     And what is that opinion?

3          A     It's my opinion that the -- the circumstances
4    were such that whether she attempted to return to work in the
5    correctional institution, the symptoms of post-traumatic
6    stress disorder were provoked to the point that she needed
7    more intensive medical services, and I'm in agreement with
8    Dr. Alley that the post-traumatic stress disorder precludes
9    her from working presently or ever as a correctional officer.

10         Q     Now Dr. Reagles, did I also ask you to study
11   the nature of the earnings and benefits that Ms. Collins
12   would have enjoyed had she continued to be employed by the
13   New York State Department of Corrections?

14         A     Yes.

15         Q     And do you have an opinion of whether
16   Ms. Collins experienced a loss of earnings and benefits as a
17   result of being unable to work as a corrections officer?

18         A     I do.

19         Q     And what information did you consider in
20   arriving at that opinion?

21         A     What I considered was the -- the earnings that
22   she would have been entitled to as if she had continued to
23   work as a corrections officer.  I also considered eventually
24   what her capacity to work in some other setting, some other
25   occupation, some other profession than as a corrections

1   officer.  And essentially looked at the difference between

2   the two to make a determination of an estimate of the

3   economic consequences of her lost capacity to work as it

4   pertains to wages and lost retirement benefits.  I assumed

5   that the health insurance benefits that she enjoyed as

6   corrections officer would be offset by health insurance that

7   she would have gotten from some employment in the future or

8   from her being on her husband's health insurance policy when

9   he was working.  Now I eventually learned that he was -- he

10  used to be the helicopter pilot for the Air 1 rescue in this

11  county and -- but eventually had an injury that prevented him

12  from doing that so he lost that job, lost those benefits.

13  But the point is that I did not take into consideration any

14  loss of health insurance.  But I did consider the difference

15  in the contributions to the retirement fund or -- by virtue

16  of her employment with New York State Department of

17  Correctional Services, versus what might be provided in some

18  future employment, not for the state.

19           Q    Now, in arriving at this, at your professional

20  opinion, did you make any assumptions?

21           A    Well, one which was if I -- the assumption was

22  that the health insurance benefits would be offset, and so

23  that was the other assumption that I made.

24           Q    And the others, yes?

25           A    The other assumption I made is that if these

1    incidents had not occurred, or as alleged to have occurred,

2    and if the post-traumatic stress disorder had not been the

3    diagnostic manifestation of these alleged incidents, that

4    Ms. Collins would have continued to work for the Department

5    of Corrections for her career which she aspired to and

6    ostensibly was an entirely satisfactory worker until these

7    incidents, these alleged incidents began to occur.

8         Q    Now as part of your study, did you examine

9    Ms. Collins' earnings before and at the time of her

10   unemployment as a corrections officer?

11        A    Yes, I did.

12        Q    And what did you learn about her earnings

13   prior to her employment as a corrections officer?

14        A    This might be a time when I could use my first

15   chart to explain that.

16        Q    Did you bring any visual aids with you today?

17        A    Yes, I did.

18        Q    Great.  Okay.

19             MS. CONNOR:  Your Honor, with your permission,

20   may he?

21             THE COURT:  He may step down, go ahead.

22             THE WITNESS:  Thank you.

23             MS. CONNOR:  Your Honor, do we want to mark

24   these?

25             THE COURT:  Yes.  We do.  They're being used

1    and shown to the jury, we're going to mark them.  Mark them

2    as like whatever the corresponding exhibit number is, as that

3    same number A.

4                    MS. CONNOR:  Okay.  Yes.

5                    THE CLERK:  No, no, no, he means that's

6    contained within 81, isn't it?

7                    MS. CONNOR:  Yes, this is -- well, he'll

8    testify.

9                    THE COURT:  It's 81A then.

10                    MS. CONNOR:  I understand.

11                    THE COURT:  So there's corresponding numbers

12    so they can match them up easily.

13                    MS. CONNOR:  How many are there?

14                    THE WITNESS:  There are 11.

15                    THE COURT:  Why don't we do one at a time so

16    we can keep moving.

17                    MS. CONNOR:  I'm going to put Plaintiff's --

18    what's been marked as Plaintiff's Exhibit 81A on the easel

19    for the witness.

20             Q    Now I think the question was, what did you

21    learn about her earnings prior to her becoming a correction

22    officer?  And if you can answer that, please.

23             A    Not prior to her becoming a corrections

24    officer.

25             Q    I'm sorry.

1          A     Her earnings as a corrections officer.

2          Q     Yes, prior to becoming unemployed as a

3    corrections officer, I left a word out and I apologize.

4          A     So recall that Ms. Collins became a

5    corrections officer in late 2002.  So her earnings in that

6    year, this is partial year, slightly more than $4,000.  Now,

7    2003, '4, '5, '6, '7, and into 2008, recall that I said that

8    in late May of 2008 was when she last worked as a corrections

9    officer.  Well, here we have -- we have four years of full

10   earnings, almost 38,000 in 2003, 42 and a half thousand in

11   '04, 44,000 in '05, 46,000 in '06, but now we have these

12   periods of some unpaid medical leave, interspersed with her

13   attempts to go back to work for brief periods of time and so

14   that's why even though she was still employed in 2007 and

15   2008, as a corrections officer, her earnings were

16   substantially less than they were during these full years.

17          Now I also included on this chart, even though

18   it says earnings history as a corrections officer, of what

19   happened to her once she became unemployed by the Department

20   of Corrections.  And recall that I said that she was -- that

21   she completed a master's degree in marriage and family

22   counseling.  Well, one of the things she was doing during

23   this period of time was working on that degree.  So her

24   earnings in 2009, this is actually again some leftover

25   Department of Corrections entitlement of some sort, I wasn't

1    able to identify what it was, might have been unused sick

2    leave or vacation leave or something like that.  In 2010,

3    2010, the year of the Census, and she worked as a Census

4    worker for a brief period of time, earned slightly more than

5    $1,800.  And in 2011, this is after her -- she and her

6    husband relocated to Crossville, Tennessee, where she was

7    fulfilling the requirements, the internship requirements,

8    supervised work experience as a marriage and family counselor

9    which is necessary for her to become licensed as a marriage

10   and family counselor in Tennessee.  She receives $30 per

11   individual visit with a client, but even though she works

12   about 25 or 30 hours a week, she earns about $300, so she has

13   about 10 patients a week so she's earning about $300 a week.

14   So for 2011 up until about today, I estimate her earnings at

15   slightly more than $2,900.  And so this is, this is the

16   earnings history, if you will, that we're going to use --

17   actually I misspoke.  This -- these were her actual earnings

18   in 2011.  You will see another, another chart in 2012 that

19   estimated earnings in 2012.

20          Q    So these are based on actual numbers up

21   through 2011?

22          A    Yes, these are actual numbers supported by

23   the -- either the tax returns, 1099s, W-2s, that sort of

24   thing.

25          Q    Thank you.  Probably -- might ask you to walk

1    a little bit but if you go back and have a seat, we'll do

2    that.

3                    THE COURT:  I want you to at least put it down

4    so everybody can see the witness, okay.

5            Q    Now Dr. Reagles, are you familiar with the

6    term earnings capacity?

7            A    Yes.

8            Q    And what is that term?

9            A    Well, earnings capacity is distinct from

10   earnings history.  Earnings capacity is the potential to work

11   and to earn.  So you know, and it may be different than an

12   individual's actual earnings history.  I'll give you an

13   example.  Let's suppose that a college student is about to

14   graduate from college, and before their graduation they have

15   a horrible accident and are maybe unable to work ever again.

16   Well, it wouldn't be fair to make a determination of their

17   lost earnings capacity on the basis of the work that they've

18   done up until that point, in other words, as a -- almost a

19   college graduate that had a lot of potential, had a lot of

20   capacity, and so that's the distinction between earnings

21   capacity and actual earnings history.

22           Q    Okay.  And do you have an opinion of

23   Ms. Collins' earning capacity at the time of her unemployment

24   beginning in May 2008?

25           A    Yes, I do.

1          Q    And what information did you consider in

2    arriving at your opinion concerning that?

3          A    Okay.  That information is contained on chart

4    number 2, and it is essentially the salary schedule

5    pertaining to the -- essentially the union contracts that

6    determine how much individuals who work for the Department of

7    Corrections would be paid under the terms of that contract.

8          MS. CONNOR:  Okay.  Ask the reporter to mark

9    this exhibit, please.  The clerk, I should say.

10          THE COURT:  How's it been marked, what's the

11    number?

12          MS. CONNOR:  It's marked as Plaintiff's 81B,

13    your Honor.

14          THE COURT:  Thank you.

15          Q    Dr. Reagles, I'm putting up on the easel

16    exhibit that was marked as Plaintiff's 81B and can you

17    identify this, go through it for us, please.

18          A    Yes.  These are essentially the salaries that

19    correspond to the various grades and in step that pertain to

20    Ms. Collins by virtue of her employment with the Department

21    of Corrections.  Now, let's just take a look at the

22    dimensions of this chart.  First of all they go from

23    October 2002 up until March 2012, essentially today, as close

24    to today as I could get it.  Recall that she went to work for

25    the Department of Corrections back in October of 2002, the

1    contract has what is called a hiring rate and that rate was

2    $34,742.  And then for each year of experience they go

3    through various steps until they get to what is called a job

4    rate, and that's where they essentially run out of steps and

5    what they do is they simply use a percentage factor to

6    increase the salary from one year to the next.

7              And so what we see here is a -- if you look at

8    this, you can see that the salaries increase and increase and

9    so on, up until, if she were employed by the Department of

10   Corrections today, at the grade 14, and the appropriate step

11   would be in excess of $62,000, and so you could see that the

12   earnings have -- would have increased if she had remained

13   employed by the Department of Corrections.

14             So this, in my opinion, is a reflection of her

15   earnings capacity as a Department of Corrections worker had

16   she not become disemployed by the alleged incidents that

17   precipitated the post-traumatic stress disorder.

18        Q    Thank you.  And Dr. Reagles, then what is your

19   opinion of Ms. Collins' earning capacity at the time of her

20   unemployment, May 2008 to the present?

21        A    Sure.  In 2008, we see that the salary that

22   corresponds to her grade and level of experience is $53,677.

23   Now, today, in 2012, that equivalent amount with the

24   appropriate experience would be in excess of $62,000.

25        Q    Thank you.  Now Dr. Reagles, is there a method

1    used by members in your profession to determine the dollar

2    value of Ms. Collins' lost income attributable to her

3    unemployment as an employee of the New York State Department

4    of Corrections?

5              A    Yes, there is such a method.

6              Q    And what is that method?

7              A    Well, it's essentially a taking the salary

8    schedule that pertains to corrections officer with her level

9    of -- with her grade and level of experience, and making

10   projections into the future of what she would have earned had

11   the alleged incidents of sexual harassment not precipitated

12   the post-traumatic stress disorder that has prevented her

13   from working as a corrections officer.  That is --

14             Q    I'm sorry?

15             A    That's part of the equation, part of it, so

16   now we have the expected earnings and benefits as a

17   corrections officer, but from that we're going to subtract

18   what she is still able to do, and what she is still able to

19   earn, and that will -- that difference is essentially called

20   the net loss of earnings capacity.  So it's the difference

21   between what she was capable of earning versus what she's now

22   capable of earning, and that difference being the --

23   essentially one of the economic consequences of her inability

24   to work as a corrections officer.

25             Q    Now, Dr. Reagles, did you arrive at an opinion

1    of Ms. Collins' lost earnings from the date of her

2    unemployment starting in May 2008 to the present?

3          A    Yes, I did.

4          Q    And in arriving at this opinion, what

5    information did you consider?

6          A    Well, I considered in addition to the salaries

7    that are associated with the grade and step, I also took into

8    consideration the fact that she had earned overtime benefits

9    of $2,386 per year, consistently during the period of time

10   she was employed as a full-time corrections officer.  So I

11   added, I also added in the $2,386 per year as representative

12   of her capacity to work overtime that had been available to

13   her at the time she was employed as a corrections officer.

14         Q    And after considering this information, what

15   is your opinion?

16         A    Well, there was one other element of the

17   opinion, and that is, I subtracted from her expected earnings

18   what her actual earnings were for the period of time, from

19   her -- the beginning of her disemployment as a corrections

20   officer, that is when the post-traumatic stress disorder

21   began to take her out of work, and for periods of time for

22   which she was not paid and that goes back to 2007.  And so

23   looking at her expected earnings and her actual earnings, I

24   was able to make a calculation of the net loss of earnings

25   for the period from 2007 until today.

1          Q    Okay.  All right.  And --

2          A    I think it will become clear once you see the

3    chart.

4          Q    And what is your opinion, please?

5          A    The opinion is expressed on table 3.

6          Q    All right.

7               THE COURT:  Let me just guess, 81C.

8               MS. CONNOR:  That's correct.

9               THE COURT:  Very good.

10         Q    Dr. Reagles, I'm showing you what has been

11   marked as Plaintiff's Exhibit 81C, putting it on the easel,

12   and would you please explain your opinion.

13         A    Yes.  Let's take again, take a look at the

14   dimensions of this table.  We have four columns, the first is

15   the year, recall that in 2007, that's when she began to

16   experience an economic loss because she was out of work for

17   periods of time for which she did not get paid.  If you

18   remember that table that I showed you earlier, actually the

19   very first one, we see in 2007, earnings of only $4,339 and

20   about $5,200 in 2008.

21              MS. CONNOR:  Can the record reflect that the

22   witness was referring to Plaintiff's Exhibit P81A.

23         A    Fine.  So here we see those same actual

24   earnings as reflected in table number 1.  Whereas her

25   expected earnings are reflected in this column, and keep in

1    mind again that this column does include that $2,300 and

2    change in overtime payments.  And so the difference between

3    her expected earnings and her actual earnings is the net loss

4    of earnings for each of those years from the date when she

5    began to experience an economic loss up until approximately

6    today.  And that total, and this is my opinion, is $285,255

7    as being the economic consequence of her incapacity to work

8    as a corrections officer versus what she actually earned as a

9    correction officer, as a Census taker and here as the

10   part-time marriage and family counselor while she's

11   fulfilling the work, the supervised work experience to become

12   licensed as a marriage and family counselor in Tennessee.

13           Q      Thank you.  Now Dr. Reagles, is there a method

14   used by members of your profession by which expected future

15   earnings and benefits of an individual may be determined?

16           A      Yes.

17           Q      And please describe that method.

18           A      Sure.  Essentially in a situation like this,

19   where we have a -- we have union contracts for lots of years,

20   so we're able to look at those and so see the kinds of

21   changes that have occurred in wages for people with various

22   grades and at various levels of experience, that becomes a

23   very solid foundation to build upon as contrasted say for

24   somebody who is self-employed where their earnings go up and

25   down from year to year, they may have extraordinary expenses

1    one year and not so many in another year so here we have an,

2    almost an enviable base of information from which to make

3    projections of what the individual would have earned had the

4    alleged incidents of sexual harassment not produced

5    post-traumatic stress disorder to the extent that she

6    couldn't work.  Now, from -- again, from that, we're going to

7    subtract what she is capable of doing, capable of earning,

8    going forward into the future so that's the model, if you

9    will.

10             Q    And do you have an opinion based on that model

11   of Ms. Collins' expected future earnings had she remained an

12   employee as a corrections officer with the New York State

13   Department of Corrections?

14             A    Yes, I do.

15             Q    And have you made any assumptions in reaching

16   this opinion?

17             A    Yes.

18             Q    And what are those assumptions?

19             A    Well, one is that these correctional officers

20   will continue to be covered under the contracts between the

21   Civil Service Employees Association and the New York State

22   Department of Corrections.  The other assumption that I made

23   is that after 10 years of experience, there was -- there

24   would have been an opportunity for Ms. Collins to have been

25   promoted to the rank of sergeant.  She, after only four years

1    of experience, she had passed the qualifying test to be

2    considered for the rank of sergeant.  She -- because there

3    weren't any openings, she did not get promoted to the rank of

4    sergeant, but I assumed that as one scenario, she might have

5    been promoted to the rank of sergeant and if she did, her

6    earnings capacity would have changed.  It would have

7    increased.  And that -- I think that was the only other

8    assumption that I made.  So essentially I made the assumption

9    that she would have continued to work as a correctional

10   officer but under another scenario, I made the assumption

11   that she would have been promoted to the rank of sergeant in

12   approximately January of this year, and from that point on,

13   there would have been a different earnings stream to take

14   into consideration.

15        Q    Now, in addition to these assumptions, did you

16   consider any additional information?

17        A    One other thing I learned was that the

18   contract between CSEA and Department of Corrections,

19   correctional services includes what is called a longevity

20   increase.  After individuals have been there for 10 years,

21   they receive an increase in their salary of almost $9,000.

22   It's $8,931.  And that results in a substantial higher wage

23   than if, than if they did not have that longevity increase.

24   And so that was another piece of information that I took into

25   consideration.

1          Q      Any other information that you took into

2    consideration?

3          A      Well, the other is the, what we call work life

4    expectancy.  In other words, we're making a projection into

5    the future, how long do we make the projection.  Some

6    individuals who do these economic calculations will use what

7    is called the full Social Security retirement age, which in

8    her instance would be to age 67.  But the Department of Labor

9    publishes tables of work life expectancy, which is comparable

10   to life expectancy in the sense that they tell us how long on

11   the average individuals are likely to remain in the

12   workforce, whereas life expectancy is obviously, if based on

13   gender and age, you can look at that table and see how long

14   on the average an individual would be expected to live.  And

15   so that was the other thing that I took into consideration, I

16   had to know how long into the future to make that projection.

17   And what I determined was that for individuals like

18   Ms. Collins, a merely 51-year-old female who at the time she

19   became disemployed from the Department of Corrections had a

20   substantial amount of college education, but less than the

21   Baccalaureate degree at that time, had 12.7 years of work

22   life expectancy.  So if you think of it, she's now 50.8

23   years, another 12.7 years takes her to 63.5 years, and

24   that's, in my mind, that was a reasonable expectation of how

25   long she would have worked had the alleged incidents not

1    precipitated PTSD that prevented her from working as a

2    correctional officer.

3            Q     Now, are you familiar with the term present

4    value?

5            A     Present value, yes, I am.

6            Q     And would you please explain to us what that

7    means?

8            A     Well, yes.  Present value is essentially the

9    answer to the question, how much money do I have to have

10   today, if it can be invested in a relatively secure

11   investment vehicle, will produce a flow of income that, when

12   you take into consideration how, in this instance, wages

13   would also be expected to grow, how much money do I have to

14   have right now that will produce that flow of income if you

15   will.  And so that's what present value is.  Now why is that

16   important?  Well --

17           Q     That was my question, I was going to ask you

18   that question.  I was going to ask you why is that important

19   in this matter and did you take that into consideration?

20           A     You can see it's hard for me to get away from

21   being a professor.

22           Q     That's my question.

23           A     Ask that rhetorical question.

24           Q     That's okay.  So what, why, why is that

25   important, the determination of present value, why is that

1   important?

2           A    Well, you'll see in the charts that I have, I

3   have both the future value and the present value.  And the

4   future value was calculated because under New York State law,

5   if I were presenting this testimony in a New York Supreme

6   Court, the values would be presented as future values and the

7   judge would have the responsibility of reducing them to

8   present value after the trial was over.  In federal court,

9   the opposite is true.  The testimony is given as present

10  value, it's the answer to the question, what is the estimated

11  sum that would have to be set aside that would approximate

12  the economic consequence of Ms. Collins' incapacity to work

13  as a corrections officer.  And so that's what we're going to

14  see on this next chart.

15          Q    Now, is there a method by which members of

16  your profession use to determine the present value of future

17  sum?

18          A    Yes.

19          Q    And what is that method?

20          A    Well, it's a method that involves two forces.

21  One is, we know that the -- that the wages are going to

22  increase in their nominal value by such factors as

23  productivity increases, the reflection of a cost of goods and

24  services of the Consumer Price Index.  So those, from year to

25  year we're going to see those increases just as you saw in

1    the wage chart that I put up there.  Those wages increase in

2    anticipation that it's going to cost more money to buy things

3    in the future.  Coupled with that is what is called the

4    discount rate.  If you have a sum of money that can be

5    invested, it will return a rate of return which we call the

6    interest rate, but in this particular instance, it's called

7    the discount rate.  So one force is going up, another force

8    is coming down, drawing it down, and the net result is the

9    present value of the future estimated loss of earnings

10   capacity.

11          Q    And did you use that method to determine the

12   present value of Ms. Collins' expected future earnings?

13          A    Yes.

14          Q    And do you have an opinion on what -- using

15   that method and what you've described, do you have an opinion

16   on what her future earnings would be?

17          A    What her earnings capacity would be?

18          Q    Would have been, yes.

19          A    Yes, I do.

20          Q    And what is that opinion, please?

21          A    Well, that's reflected in table number 4.  If

22   we could take a look at that.

23               THE COURT:  81D.

24          Q    Dr. Reagles, I'm showing you what has been

25   marked as Plaintiff's 81D, placing it on the podium, and

1    would you please explain your opinion?

2            A    Let's take a look at the dimensions of this.

3    The period over here is the number of years, and recall that

4    the estimate, the work life expectancy was 12.7 years.  The

5    first scenario is under the assumption that she would not

6    have been promoted to a corrections sergeant and all, what

7    she would have done was continued to work as a corrections

8    officer.  Had she done that, these would have been the

9    expected salary increases over the duration of the 12.7 years

10   of work life expectancy.  Well, notice in the 12th year, the

11   annual salary is slightly more than $106,000, now we have

12   only 7/10ths of the next year and that's why this figure is

13   77,000 and something.  If we added those up, that would come

14   to slightly more than a million dollars.  But the present

15   value of that is $798,026.  So what essentially again, what

16   that means is that if this sum of money were invested, it

17   would return these salary amounts over that 12.7-year period

18   of time.

19           The second scenario was that assuming that

20   since she had already passed a qualifying test to become a

21   sergeant, that in approximately January of this year, she

22   would have been promoted to a corrections sergeant, and here

23   are the salary levels that correspond to what sergeants earn.

24   And you can see that they are starting out at approximately

25   $12,000 more per year.  And those total, if I added those up

1    over the 12.7 years, $1,252,010, the present value of that

2    being $917,710.  So my opinion is that the present value of

3    her future earnings capacity is reflected by either the

4    scenario in which she remains a corrections officer,

5    $798,026, or the alternative, in the event that she had been

6    promoted to sergeant, $917,710.

7         Q    Thank you.  Dr. Reagles, are you familiar with

8    the term residual earnings capacity?

9         A    Yes, I am.

10        Q    And what does that mean?

11        A    Well, residual, if you think of the word

12   residual, it's what's left, and in vocational rehabilitation,

13   we work with residual functional capacity.  In other words,

14   if someone has a disability, there are certain things they

15   can't do but there are other things that they can do, and

16   what they can still do is called residual functional

17   capacity.  Individuals who still are able to work in the

18   competitive labor market even though they have some

19   limitations have what we call residual earnings capacity.

20   And so what I did in this instance was to look at what

21   Ms. Collins' residual earnings capacity is, as a marriage and

22   family counselor.  Now that's not all she can do, but that's

23   what she's going to become licensed to do and that is the

24   avenue that probably has the greatest chance of success.  I

25   determined that she could have been a mental health

1  counselor, she could have been like a social service worker,

2  a child and family caseworker, human services assistant,

3  community and social services worker, she could -- she also

4  could have become director of religious activities or

5  education as she had done in the past.  Those were some of

6  the other occupations that I was able to identify that were

7  commensurate with her interests and her academic preparation.

8  So essentially, on the basis of those occupational titles was

9  I able to form an estimate of what her residual earnings

10  capacity was and is.

11         Q    And did you form an opinion of the present

12  value of her future residual earnings capacity?

13         A    Yes, I did.

14         Q    Okay.  And what is that opinion?

15         A    That is reflected in table number 5.

16         Q    Dr. Reagles, I'm showing you what has been

17  marked as Plaintiff's 81E, chart, placing it on the podium

18  and would you please explain your opinion.

19         A    Yes.  If you recall, I said that Ms. Collins

20  is presently working as a part-time marriage and family

21  counselor being paid $300 a week.  She has another 14 months

22  to go to become licensed as a marriage and family counselor.

23  So for the next 12 months her annual income is estimated at

24  $15,600.  Upon becoming licensed and going to work as a

25  marriage and family counselor in the Crossville, Tennessee

1   area, the starting salaries average approximately $27,121.

2   These -- this starting salary is expected to grow at

3   approximately 3 percent per year and if we do that, then we

4   find that over the 12.7 years of future work life expectancy,

5   the future value is almost $400,000 but the present value of

6   her residual earnings capacity is $283,770.

7          Q    And now why, briefly, okay, why is the present

8   value lower than the -- than the subtotal above it?

9          A    Well, again, this is the amount of money that

10  you would have to invest that would produce this flow of

11  earnings over the 12.7 years of work life expectancy.

12         Q    Thank you.  And Dr. Reagles, are you familiar

13  with the term net loss of earnings capacity?

14         A    Yes, I am.

15         Q    And what does that mean?

16         A    Well, it's essentially the difference between

17  one's unimpaired earnings capacity and their impaired

18  earnings capacity.  It's essentially the difference between

19  her expected earnings as a corrections officer and her

20  earnings capacity as a marriage and family counselor.

21         Q    And did I ask you to calculate an estimate of

22  the present value of Ms. Collins' net loss of earnings

23  capacity?

24         A    Yes, you did.

25         Q    And did you form an opinion as a result of

1    that of the present value of her net loss of earnings

2    capacity?

3              A     Yes.

4              Q     And what is your opinion?

5              A     That is reflected on table number 6.

6              Q     Dr. Reagles, I'm placing before you

7    Plaintiff's Exhibit 81F, and I'd ask you to look at that and

8    explain --

9              A     Sure.

10             Q     -- what your opinion is, please.

11             A     Okay.  Again, the dimensions of this, her

12   predisability or her unimpaired earnings capacity, and what

13   I'm going to do is just take my marker and I'm going to mark

14   right through this row, because we're not concerned about

15   future values here, we're only concerned about present

16   values.  So we have the difference between her unimpaired or

17   predisability expected earnings, and her residual earnings

18   capacity, that's essentially the difference between table 4

19   and table 5.

20                   Now notice that I have a range here, $798,026

21   to $917,710.  And you'll recall the reason for that is,

22   scenario number one, almost 800,000, is if she continued to

23   work as a corrections officer, scenario number two is in the

24   event she got promoted to a sergeant, then we have this

25   higher value.  Her residual earnings capacity as I just

1    showed you on table number 5 was calculated at $283,770 so

2    the difference between the two ranges from $514,256, assuming

3    she would have continued to work as a corrections officer, to

4    $633,940, in the event that she had been promoted to

5    sergeant.  Okay.  So that's my opinion of the economic

6    consequence of her lost capacity to work as a corrections

7    officer.

8         Q    Thank you.  Now Dr. Reagles, in describing the

9    method and determining the loss of earnings capacity, you

10   included the value of fringe benefits as an element of loss

11   but at this point so far you've not discussed fringe

12   benefits.  Is there a reason for that?

13        A    Well, again, there is, and again, keep in mind

14   I said that I assume that any health benefits would have been

15   offset by other alternatives, other alternatives that she

16   might have had to have those health insurance benefits

17   covered by some other source, either her husband's employment

18   or her future employment.  And essentially what that left us

19   with then was the difference between the anticipated

20   contributions to retirement fund, the retirement fund in the

21   instance of which she had been -- remained a corrections

22   officer, or what the anticipated retirement benefits would be

23   from future employment as a marriage and family counselor or

24   in some other similar capacity.

25        Q    Thank you.  And did I ask you to examine the

1    retirement fund contributions that would have been made by

2    the New York State Department of Corrections as her employer

3    and compare them with any actual or anticipated retirement

4    fund contributions from any employer subsequent to her

5    unemployment from the Department of Corrections?

6          A    Yes.

7          Q    And do you have an opinion of the present

8    value of the dollar difference if any between the New York

9    State Department of Corrections retirement fund

10   contributions, and such contributions from other employers

11   after her unemployment from the New York State Department of

12   Corrections?

13         A    Yes, I do.

14         Q    Thought you would.

15         A    Long question.

16         Q    And what information did you consider in

17   forming that opinion?

18         A    Well, what I considered was the mandatory

19   contribution to the New York State retirement fund by virtue

20   of her being a member of CSEA, and the contracts that pertain

21   to such employment, versus the anticipated contributions from

22   a private employer to some other retirement fund of some

23   sort.  Certainly not the New York State retirement fund.

24         Q    And what is your opinion of that?

25         A    Well, that opinion is reflected in two tables,

1    table 7, and table number 8.

2              Q    Let's start with 7.  Do you need them posted

3    simultaneously?

4              A    No.

5              Q    Okay.  We'll start with 7 then.

6              A    No, I think it's more appropriate that they're

7    not.

8              Q    Okay.  Dr. Reagles, I'm showing you what's

9    been marked as Plaintiff's Exhibit 81G and would you look at

10   it, please, and explain what your opinion is.

11             A    Yes.  This is the period of time when she

12   began to be restricted in her capacity to work as a

13   corrections officer back in 2007 up until the date of the

14   present.  The only potential contribution to retirement fund

15   would have been under the circumstances where she had

16   continued to work as a corrections officer.  She has not

17   worked in any other capacity from that date in 2007 until

18   today where she is receiving any kind of contributions to a

19   retirement fund.  I anticipate that in the future, once she

20   becomes licensed in marriage, family counselor, her

21   employment will include contribution towards some sort of

22   retirement fund, an IRA, a SEP, whatever.  The annual amounts

23   for the respective years, you can see in 2007 would have been

24   $4,233, slightly more in '08 and so on.  The total here being

25   $24,259.

1            Now, one of the things that I did to make this

2    as conservative as possible, I did not assume that these

3    funds could have been invested and return some interest, if

4    you will, on the -- whatever investment vehicle might have

5    been chosen, perhaps even a variety of investment

6    alternatives.  If I had done that, this number would have

7    been quite a bit larger, wouldn't it of?

8            Q    What did you do instead?

9            A    All I did was to determine the estimated

10   amount of the actual contribution to the fund.  We know that

11   that's what would have been lost, we can have confidence in

12   that.  We can have less confidence if I had made some sort of

13   an estimate of how much rate of return there would have been

14   on some investment alternatives during that period of time.

15           What happened in 2008, 2009?  I don't know

16   about you, but I had a small retirement package from

17   Wisconsin when I worked there, my benefits actually went

18   down.  So I thought it was unfair to try to discern what the

19   rate of return on investment of this sum of money would have

20   been during this period of time.  So -- but this is

21   essentially an estimate of the contributions, not the

22   contributions plus rate of return.

23           Q    Now you mentioned table 8 as well.

24           A    Yes.

25           Q    Let's do this.

1          A     Marked?

2          Q     Yes, I marked it.  Dr. Reagles, I'm showing

3    you what's been marked as Plaintiff's Exhibit P81H, and would

4    you explain your opinion using this as well.

5          A     Yes.  Here we have again the two scenarios,

6    one if she'd continued to work as a corrections officer,

7    these would be the future sums, the future annual sums that

8    would have been contributed to the New York State retirement

9    fund based upon the formula in the contract.  And you can see

10   that if she'd continued to work as a corrections officer, the

11   present value of those sums would be $63,842.  If she had

12   been promoted to a sergeant, salary would have been higher,

13   therefore the contribution would have been higher, the

14   present value of that is $73,412.  I assume that as a

15   marriage and family counselor, her employer, some future

16   employer, would have been making contributions to a

17   retirement fund of some sort, and based upon the Department

18   of Labor and Statistics and the survey conducted by the U.S.

19   Chamber of Commerce, that amount is estimated at 8 percent

20   per year, so that the employer's contribution to some

21   investment, or some retirement fund is estimated at 8 percent

22   of the gross salary.  And you can see what that amount is for

23   each of the respective years going forward, that total, the

24   present value of that is $22,702.  So the present value of

25   the future loss contributions to the retirement fund range

1  from $41,140 to $50,715.

2          Q    Okay.  Now, Dr. Reagles, were there any other

3  economic consequences of Ms. Collins' unemployment from the

4  New York State Department of Corrections that you considered?

5          A    Yes.

6          Q    And what were they?

7          A    This is a provision of the CSEA contracts of

8  what is called terminal leave benefits, and individuals who

9  have 15 or more years of service, and certainly at the

10  anticipated date of retirement, that age, approximately 63,

11  she would have had more than 15 years of experience, that

12  individuals receive a, what's called a terminal leave benefit

13  that is based upon the daily value of their work times 21

14  days, all right.  So at the time of retirement, there would

15  be a contribution to the individual called a terminal leave

16  benefit that is 21 times the daily rate of their employment.

17          Now how do you determine daily rate of

18  employment?  The CSEA and Department of Corrections uses 260

19  workdays per year.  So you take the annual salary, divide it

20  by 260 days, that gives you the daily rate.  You multiply

21  that by 21, which is 21 days, then that gives you the amount

22  of the terminal leave benefit.  Not a big sum, but it is part

23  of the contract.

24          Q    And did you make a determination of the

25  economic value of that terminal leave benefit had Ms. Collins

1   been able to continue working for the New York State

2   Department of Corrections?

3            A     Yes, I did.

4            Q     And what is that, what is your opinion of

5   that?

6            A     That is on chart number 9.

7            Q     I'm showing you what's been marked as

8   Plaintiff's Exhibit P81I.  And please explain your opinion.

9            A     Let me move over here, please.  We have two

10  scenarios again.  Scenario one is if she had continued to

11  work as a corrections officer, not been promoted to sergeant.

12  At the time of her retirement, at the end of her work life

13  expectancy, the daily value of her salary would be $426.04,

14  times 21 days gives us $8,947, the present value of which is

15  slightly less than $5,000.  $4,842.  In the event that she

16  had been promoted to a sergeant, the present value of those

17  21 days of terminal leave benefit would be $5,505.

18           Q     Thank you very much.  Now, did I also ask you,

19  Dr. Reagles, to conduct an investigation into the nature,

20  extent and present annual cost of the health-related services

21  Penny Collins will require in the future?

22           A     Yes, you did.

23           Q     And what did I ask you specifically to do?

24           A     Essentially to make a determination from the

25  medical records that were provided to me, based upon

1    standards of care within the industry, to determine the

2    estimated cost of the future health-related goods and

3    services that are related to the post-traumatic stress

4    disorder that was allegedly incurred as a result of the

5    alleged incidents that we've offered up.

6              Q    Okay.  And are you familiar with the term life

7    care plan, Dr. Reagles?

8              A    Yes, I am.

9              Q    What is that, please?

10             A    Well, life care plan is a term that is used by

11   individuals in the medical profession and in my profession to

12   essentially designate an array of services that comprise the

13   anticipated future health care of an individual.  It includes

14   such things as periodic visits to the doctor, medications,

15   therapies, surgeries, that sort of thing, and if we obviously

16   have someone who is a severely disabled individual, spinal

17   cord injury, traumatic brain injury, a life care plan can be

18   very extensive.  So that's what I was asked to do in the

19   instance of Penny Collins, was to determine the cost of the

20   anticipated future health care that she will require as a

21   result of her impairment.

22             Q    And is there a generally-accepted method used

23   by members of your profession to prepare these life care

24   plans?

25             A    Yes, there is.

1        Q     And would you describe that method, please?

2        A     Sure.  Essentially what a life care planner

3    does is to first of all review the medical records,

4    especially the most contemporary medical records because

5    those are the ones that are going to be most pertinent to

6    what's going to come in the future, also to know on the basis

7    of research evidence and standards of care what services are

8    related to one another.  In other words, if the person is

9    receiving a certain type of medication, there's a requirement

10   that they be seen periodically to monitor such things as the

11   blood level of that medication, make a determination of any

12   side effects, and make any changes to the medication that may

13   be warranted.  And then, whether or not an individual

14   requires any kind of intervention, any kind of therapy, and

15   so that is, once that process is done, then there is

16   essentially a rough graft of the life care plan that is

17   formulated.

18        It is then used as a basis of communication

19   between the life care planner and the treating physicians or

20   allied health professionals such as psychologist or social

21   worker, occupational therapist, physical therapist and so on.

22   And through that process, then the life care plan becomes

23   firmer, it's always recognized that life care plan can change

24   going forward, but it's -- the one that we will present, the

25   one that I will present today is our best estimate of what's

1    going to happen in the future.  Circumstances change, we

2    recognize that, but I can't predict what those are going to

3    be.  And so what you have here is the estimate of what

4    Ms. Collins will need going forward based upon Dr. Alley's

5    recommendations.  My role is to determine the cost of these

6    goods and services.

7         Q    Now the method that you describe, generally,

8    did you use that method for analyzing a life care plan for

9    Ms. Collins?

10        A    Yes.

11        Q    And did you confer or ask Dr. Alley to review

12   this life care plan?

13        A    Yes, I did ask him.

14        Q    And who is Dr. Alley in relation to

15   Ms. Collins so we can follow this?

16        A    He is Ms. Collins' primary care physician, he

17   is the one who has for more than a decade managed her medical

18   care, not only the symptoms, manifestations of the

19   post-traumatic stress disorder, but other medical issues as

20   well, for which any of us might go to our primary care

21   physician.

22        Q    And did you include that doctor's input into

23   your formulation of a life care plan for Ms. Collins?

24        A    Yes, I did.

25        Q    And to be clear, Dr. Reagles, are you

1    recommending or prescribing the goods and services in this

2    plan for Ms. Collins?

3            A    No, just as I'm not an actuarial scientist,

4    I'm not a physician either, okay, so again, my role is to

5    determine the cost of these goods and services.  I can't

6    prescribe these goods and services, that's Dr. Alley's job.

7            Q    So Dr. Reagles, do you have an opinion

8    regarding the present annual cost and the future cost of the

9    periodic evaluations consistent with the life care plan that

10   Penny Collins will require in the future?

11           A    Yes, I do.

12           Q    We have a chart here?

13           A    That is chart number 10.  And you heard me say

14   there were 11 so we're getting close.

15           Q    Dr. Reagles, I'm putting before you what's

16   been marked as Plaintiff's P81J and would you explain your

17   opinion, please.

18           A    Yes, let's take a look at, this is a typical

19   life care, typical elements of a life care plan.  They begin

20   with what's called periodic evaluations, evaluations to,

21   essentially to monitor the individual's condition, make any

22   changes to the treatment plan that may be warranted on the

23   basis of that evaluation, may order diagnostic tests, that

24   sort of thing.  So here we have a psychiatric evaluation to

25   assess the nature and severity of Ms. Collins' emotional

1     response to her disablement, in this instance post-traumatic

2     stress disorder, and to evaluate the potential utility of

3     personal counseling and psychopharmacological intervention

4     such as antidepressants and others.

5                    Now why a psychiatric evaluation?  Well, that

6     is the standard of care for individuals who are using

7     substances such as lorazepam which is a benzodiazepine, it is

8     a -- essentially a sedative to, for anxiety symptoms, as well

9     as Ambien, which is a -- what's called a hypnotic which is --

10    essentially induces sleep, or promotes sleep.  So when

11    individuals have these kinds of medications, the standard of

12    care is that they be seen four times a year to monitor those

13    medications, make any changes in the regimen, prescribe any

14    new medications that might come on the market, that sort of

15    thing.  The cost of such an evaluation is $113.  Four of them

16    would be $452.  And over the course of her lifetime -- and

17    incidentally, her life expectancy is 32.1 years.  So 450 --

18    $452, going forward, for 32.1 years, appreciated at the

19    estimated increase for such services of slightly more than

20    4 percent is $24,185.  And the present value of that is

21    $10,690.  So you can see, you can see essentially the power

22    of compound interest.  If you invested this $10,690 today, it

23    would yield over the course of these 32.1 years an estimated

24    $24,185.

25                    The medications, the lorazepam which is a

1    relatively inexpensive medication, over the course of her

2    lifetime would be $1,359, the present value of that is $587.

3    The Ambien is more expensive, you see slightly less than $200

4    a month or $2,265 a year.  The future cost of that is

5    $123,873.  But the present value of that is $57,802.

6                    And then the last element of the life care

7    plan is personal adjustment counseling, the recommended by

8    Dr. Alley, she has had some but he's recommending more, and

9    education, estimated that on the average she will have six to

10   eight counseling sessions per year.  Some years she may have

11   none, some years she may have more, estimated at about seven

12   per year.  So 7 times 129 gives us $903.  The future cost of

13   that is $48,398, the present value of which is $21,100, and

14   so the subtotal here of these two elements is $79,489.  And

15   the sum of the present values is $90,179.  So here's --

16   here's the number that's important right here.  This is the

17   present value of the anticipated future cost of these three

18   elements of the life care plan.

19              Q    Now Dr. Reagles, do you have an opinion

20   regarding the present annual cost and the future cost of the

21   therapeutic modalities that Penny Collins will require in the

22   future?

23              A    Just gave it to you.

24              Q    That was contained in 10, all right.  Very

25   good then.  Now, you've given a lot here, lot of numbers, lot

1    of opinion.  And did I ask you to prepare a summary of this,

2    a chart that summarizes your opinions regarding the economic

3    losses resulting from Penny Collins' disablement?

4              A    Yes.

5              Q    And do you have that chart here?

6              A    Yes, I do.  That's the chart number 11, the

7    last one.

8              Q    I have to mark this one.  Dr. Reagles, I'm

9    putting before you what's been marked as Plaintiff's

10   Exhibit P81K.  And I'd ask you to explain your summary,

11   please.

12             A    Sure.  As you can see, these are blanks but if

13   you recall my testimony that her past loss of earnings

14   capacity was estimated at $285,255, and the loss of

15   retirement contributions for that period of time was $24,259.

16   And so the subtotal of the past losses was calculated to be

17   $309,514.  Now the future losses, again we're going to be

18   talking about present values here, because that's where

19   present values relate to estimated loss sums going into the

20   future.  And we have -- notice that we're going to have a

21   range, and once again, why is there a range?  Because one

22   assumption is that she would have continued to work as a

23   corrections officer, the second assumption was that she would

24   have been promoted to a sergeant and so that's where we're

25   going to have some differences here.

1            Net loss of future earnings capacity, that is

2      what she might have earned as a corrections officer or as a

3      corrections sergeant less the amount of money that she's

4      capable of working as, for example, a marriage and family

5      counselor, was $514,256, and if she'd become a sergeant, that

6      amount goes up to $633,940.  The net loss of retirement

7      benefits, $41,140, assuming that she continued to work as a

8      corrections officer; slightly more, $50,715 if she had been

9      promoted to a sergeant.  The loss of terminal benefits,

10     $4,842, versus $5,505 had she been promoted to a sergeant.

11     And then the future health-related goods and services is not

12     a range, it's only one value, and that was $90,179.  And so

13     the subtotal of these is $650,417, up to $780,339.  So this

14     is the future, this is the past, so if I add this to these

15     two numbers, it's going to give me the total, $959,931.  Or

16     if she'd been promoted to a sergeant, $1,089,853.

17              Q    Thank you, Dr. Reagles.

18              A    Thank you.

19              Q    Now, did you prepare a report other than in

20     chart form of your -- what you were requested to do and your

21     opinions?

22              A    Yes, I did.

23              THE COURT:  Counsel, could you please take

24     down the last chart so we can see.

25              MS. CONNOR:  Sorry.

1        THE COURT:  I just want everybody to see the

2   witness.

3        MS. CONNOR:  No, I'm sorry.

4        Q    Dr. Reagles, I'm showing you what's been

5   marked as Plaintiff's Exhibit 81, and would you look at that,

6   review it and identify it for me if you can.

7        A    Yes, this is a copy of my report including

8   three appendices.

9        MS. CONNOR:  At this time, your Honor,

10   plaintiff offers Plaintiff's Exhibit 81.

11        THE COURT:  Could you identify the three

12   appendices before you make your offer, please, so we know

13   what they are.

14        Q    Would you identify those, please, Dr. Reagles.

15        A    Appendix A is a list of the provider vendor

16   service description and cost basis of each of the three

17   elements of the life care plan.  The appendix B is a list of

18   documents reviewed and the references that I used in

19   preparing my report.  So there are -- I'm sorry, there are

20   only two appendices, A and B.  A has three tabs.

21        MS. CONNOR:  Okay.  At this time, your Honor,

22   we offer Plaintiff's Exhibit 81.

23        THE COURT:  Any objection?

24        MS. SHEEHAN:  I'd like to see the document for

25   a minute.

1          THE COURT:  Was it provided to you, Counsel?

2          MS. SHEEHAN:  The one I have, I have a copy

3    that's not signed, I'd like to make sure this one is signed,

4    certification.

5          THE COURT:  Okay.

6     A     Is that one signed?

7     Q     Dr. Reagles, I would ask you to sign this.

8    Sign this, please, and will you also make sure I put the

9    appendix back correctly.  I think I did.

10    A     Where is that binder when we need it?

11    Q     It's full is what it is.  Okay.  Thank you

12    very much.

13    A     This is fine, it's in order.

14          THE COURT:  Mr. Andrews, are you going to

15    avail yourself of the opportunity to look at that document as

16    well?

17          MR. ANDREWS:  I'm just rising, your Honor.

18          THE COURT:  Okay.

19          MS. SHEEHAN:  No objections, your Honor.

20          MR. ANDREWS:  No objections, your Honor.

21          THE COURT:  This document will be received.

22    Q     And Dr. Reagles, did you prepare what's known

23    as a curriculum vitae?

24    A     Well, I do, not specifically for this

25    appearance, it's just prepared in the standard course of

 1    business, yes.

 2             Q     What is a curriculum vitae?

 3             A     Essentially a curriculum vitae is a record of

 4    scholarly accomplishments, degrees, positions held, the names

 5    and titles of publications, offices held in professional

 6    associations, that sort of thing.

 7             Q     I'm going to place before you what's been

 8    marked as Plaintiff's Exhibit 76 and I would ask if you could

 9    review that and identify it for me if you can.

10             A     Yes, this is actually an older one, this is

11    back in January of 2008, there is one December 2011 that's

12    more contemporaneous.  If you wish, I could bring that

13    tomorrow.

14             Q     Okay, then I'll hold and not offer that --

15             A     Okay.

16             Q     -- at this time.

17             A     Actually I think I have one in my briefcase.

18             Q     Oh, okay.

19             THE COURT:  I am glad to hear you're

20    anticipating being here tomorrow.  That's good.

21                  THE WITNESS:  I figured that was coming.

22                  MS. CONNOR:  Other than --

23                  THE WITNESS:  As long as it's just for the

24    morning.

25                  THE COURT:  We'll see.

1          MS. CONNOR:  Your Honor, other than the offer

2     of the updated curriculum vitae of Dr. Reagles, I have

3     nothing further for this witness at this time.

4          THE COURT:  Thank you, Ms. Connor.  We will

5     get the updated one and we'll have you offer it first thing

6     tomorrow morning, okay.  We're going to stop here, ladies and

7     gentlemen.  I think maybe sufficient numbers are dancing in

8     your head like sugarplums on Christmas.  So we're going to

9     stop and give everybody an opportunity to have a nice restful

10    night.  Dr. Reagles, we'll appreciate you being here tomorrow

11    morning.

12         THE WITNESS:  By all means.

13         THE COURT:  We're going to try to get started

14    at 9:00 sharp, we'll do our best to do that.  Going to keep

15    these lawyers after you go home so we can try and clear up

16    any issues before we have to be here tomorrow morning, get

17    started so that hopefully that will ensure a prompt and

18    timely start.  Please don't talk about it, if anybody

19    approaches you, tries to talk about it, I need to know about

20    it immediately.  Any media, anything like that, please

21    disregard, do not listen, change the channel, change the

22    station, do not read anything that may be printed anywhere,

23    okay.  And we'll see you tomorrow morning, have a nice night.

24         (Jury Excused, 4:32 p.m.)

25         THE COURT:  Okay, Dr. Reagles, you may step

1  down, sir, thank you.

2              (Whereupon the witness was excused.)

3              THE COURT:  Okay.  Some housekeeping.

4  Ms. Connor, when Dr. Reagles' testimony is complete, you're

5  going to be down to three, potentially two witnesses,

6  depending on what kind of luck the marshals had in finding

7  Ms. Mayville.

8              THE CLERK:  She wasn't there.  No one's home,

9  no vehicles in the driveway, no neighbors were around.

10             THE COURT:  Okay.  So that doesn't sound

11  promising.  We'll have them continue to check later this

12  evening and maybe she's just away for the day, but we'll do

13  what we can for you, but if they don't find her, they don't

14  find her, okay.

15             MS. CONNOR:  Yes.

16             THE COURT:  So your other two witnesses should

17  be prepared to testify as soon as Dr. Reagles' testimony is

18  completed.

19             MS. CONNOR:  Yes, thank you.

20             THE COURT:  Okay.  Now, with regard to issues

21  with the remaining witnesses, we have Jami Kaplan from

22  Division of Human Rights, and Dr. John Alley.  There was an

23  application made by defense counsel with regard to Jami

24  Kaplan's testimony, and rendering an opinion or giving

25  testimony regarding an EEOC determination as a part of her

1  testimony.  And it's the court's intention to allow

2  Ms. Kaplan to testify fully about her investigation, but that

3  I'm not going to allow her to testify with regard to any

4  determination that was made by her or her office with regard

5  to probable cause for essentially what would be this lawsuit

6  going forward.  The court finds that's a jurisdictional

7  requirement, and I do believe that she has relevant testimony

8  with regard to what she did with regard to her investigation,

9  but I think that any determination or decision made by that

10  office invades the province of this jury.  It's up to them to

11  decide whether or not there is cause to believe that any type

12  of sexual discrimination or harassment occurred.

13          Now I recognize that probable cause

14  determination, and a fact finding of harassment or sexual

15  discrimination are two different things, but I think that

16  it's close enough and there's case law to support the fact

17  that it's within the court's discretion to make this

18  determination, and based on what I've heard to this point, I

19  think it's appropriate that she only be allowed to testify

20  about her investigation and not about any determination she

21  may have made.  Okay.  Anything further on that?  Ms. Connor?

22          MS. CONNOR:  No, your Honor.

23          THE COURT:  From the defense?

24          MS. SHEEHAN:  No, your Honor.

25          THE COURT:  Ms. Sheehan, no, Mr. Andrews?

1          MR. ANDREWS:  I did have a brief issue with

2     regard to her testimony but not with regard to the probable

3     cause determination.

4          THE COURT:  What is that issue, sir?

5          MR. ANDREWS:  Included in interview notes are

6     notes of a discussion with the deceased witness Ms. Carter.

7     It's hearsay anyway so I'm not sure, you know, that it would

8     come in in any event but I didn't want to wait and have to

9     slow down the proceeding in order to object to there being

10    any discussion of that conversation.

11         THE COURT:  Ms. Connor.

12         MS. CONNOR:  Your Honor, her investigation

13    consisted of many interviews with employees or former

14    employees of the Department of Corrections, and she has

15    interview notes which I was not planning on introducing as

16    hearsay, that was not part of the plan.  So I don't believe

17    that counsel would have any problem with the nature of the

18    testimony I would seek to elicit from her with respect to Sue

19    Carter.

20         MR. ANDREWS:  I certainly accept that

21    representation, your Honor.

22         THE COURT:  And you're certainly free to

23    object at any point during the time of her testimony.  Now,

24    with regard to --

25         MS. SHEEHAN:  Your Honor, may I interrupt you

1   a second.  Regarding Ms. Kaplan's testimony, can we also make

2   sure she is advised that she can't comment on the racial and

3   religious -- racial and religious derogatory comments that

4   were made?

5          THE COURT:  Yeah, that's already been -- I've

6   already ruled on that.

7          MS. CONNOR:  I fully intended to advise her of

8   that, your Honor.

9          THE COURT:  Very well, thank you.  Anything

10   further with regard to Ms. Kaplan?

11          MS. SHEEHAN:  No, your Honor.

12          MR. ANDREWS:  No, your Honor.

13          THE COURT:  And I just want to complete the

14   record with regard to my ruling on Ms. Carter and the request

15   by plaintiff to have certain portions regarding Sergeant

16   Mitchell read, and I'm referring to pages 101 of Ms. Carter's

17   deposition, over into 102 where there were questions

18   regarding -- to Ms. Carter regarding Ms. Collins, and I'm

19   going to read from the transcript.  It says, "Other than what

20   Ms. Collins has told you, do you have any direct personal

21   knowledge of any interaction that she had with then Sergeant

22   Mitchell, the defendant in this action?"

23          And her answer was, "It happened on a

24   different shift.

25          "Question:  Were you ever present when

1    Ms. Collins interacted with then Sergeant Mitchell?

2              "Answer:  Not present when she interacted with

3    him, no.

4              "Question:  So you didn't see or hear anything

5    that transpired between the two, did you?

6              "Answer:  No, sir.

7              "In other words -- Question:  In other

8    words -- I'll rephrase it.  Other than Ms. Collins, what

9    Ms. Collins told you, do you know anything that transpired

10   between her and Sergeant Mitchell?

11             "No."

12             And again, the only other parts of this

13   record, of this deposition that have been read in by defense

14   counsel strongly suggests that the interaction that

15   Ms. Carter had with Sergeant Mitchell that she was able to

16   testify about occurred prior to a time that Ms. Collins was

17   working at Auburn Correctional Facility.  That was the basis

18   of my ruling, I want to make sure it was clear for the

19   record.

20             Now, are there any issues with regard to

21   Dr. Alley that we need to address?  Ms. Connor, from your

22   perspective?

23             MS. CONNOR:  May I have one moment, please.

24             THE COURT:  Yes.

25             (Pause in Proceedings.)

1          MS. CONNOR:  Your Honor, to my knowledge we've

2   already addressed the issues and I don't think there are any

3   more.  I don't want to rehash the ones we've addressed,

4   please, but I believe that covers it from my perspective.

5          THE COURT:  Okay, defense counsel, Dr. Alley?

6          MR. KINSEY:  No, we have no issues with him.

7          THE COURT:  Okay.  Mr. Andrews?

8          MR. ANDREWS:  No issues, your Honor.

9          THE COURT:  Now the next issue.  And we're

10  going to need to get this accomplished tonight so that we can

11  finish with Dr. Reagles' testimony in the morning.  That is

12  Dr. Reagles' binder, and what's contained therein.  I'm going

13  to ask counsel to stay here for a bit so that we can review

14  this binder with plaintiff's counsel and defense counsel here

15  so that if there's anything in the binder that defense

16  counsel does not have, copies can be made so they can take it

17  with them tonight and prepare for cross-examination tomorrow

18  morning.  So we're going to accomplish that now, I'm going to

19  ask that counsel start that process.

20          There was a question of whether or not medical

21  records were provided to the defense.  Counsel Connor has

22  represented that those items were turned over.  The court's

23  familiar that this case has been transferred from some

24  assistant, one Assistant Attorney General or maybe more, I

25  don't know how many before it gets to counsel so I'm going to

1    ask that there be a review of discovery materials that were

2    provided, and make sure that anything that Dr. Reagles

3    indicated that he relied upon to -- as a basis to form his

4    opinion be provided to defense counsel, be provided again,

5    today, before they leave here tonight.  Okay.  So that's part

6    of this review, to make sure if those records aren't in the

7    doctor's binder, that they're provided.  Anything further?

8    And I'm going stay here until this is completed so it's

9    available, all right?

10              MS. CONNOR:  Your Honor, my understanding that

11   Dr. Reagles is gone and I believe he took his binder with

12   him.  My assistant has -- my assistant has my phone right

13   now, she's calling him on his cell phone to ask him to

14   immediately turn around and return.

15              THE COURT:  Yeah, we need that binder.

16              MS. CONNOR:  I understand.  I was unaware of

17   that, I'm sorry, your Honor.

18              THE COURT:  Okay.

19              MS. SHEEHAN:  Your Honor.

20              THE COURT:  Yes.

21              MS. SHEEHAN:  Another issue.  We were work --

22   where do we stand with Exhibit 6 and the employee's manual?

23   There was an issue regarding whether we produced it, is it in

24   evidence?

25              THE COURT:  No, I reserved.

1            MS. CONNOR:  It's reserved.

2            THE COURT:  With regard to 6.

3            MS. SHEEHAN:  We can probably clear that up

4   now.

5            THE COURT:  Let's address it.  What's your

6   position with regard to Plaintiff's Exhibit 6?  Were you able

7   to catch him?

8            MS. CONNOR:  Yes, he's still in the building

9   and my assistant's asked him to stop and wait, she's going

10  down to retrieve it.

11           THE COURT:  Good, because we can get the

12  guards to chase after him.

13           MS. CONNOR:  I'm sorry, your Honor, I didn't

14  quite hear your question.

15           THE COURT:  We're going to address Plaintiff's

16  Exhibit 6.  Ms. Sheehan has indicated that, and I think she's

17  right, we should clear that up now, she says they think

18  they're prepared to get it cleared up.

19           MS. SHEEHAN:  We do not object to Exhibit 6

20  being admitted as long as it is redacted in the same way

21  Exhibit 2 is.  Exhibit 2 is redacted for security reasons.

22  There's sections that relate to security of the gate, inmate

23  security, and as long as Exhibit 6 is redacted the same way,

24  we will not object to its admission.

25           THE COURT:  Ms. Connor?

1          MS. CONNOR:  That's agreeable, your Honor.

2          THE COURT:  Well, then Plaintiff's Exhibit 6

3    will be received into evidence with the redactions as noted

4    being made, okay.  And Counsel, it's another task I'm going

5    to ask you to complete tonight before you leave so that it's

6    done, and we have a redacted copy that can be put into

7    evidence.  Anything else?  Okay.  I would indicate that your

8    clients and everyone else can leave and I'll expect counsel

9    to be here working diligently until we get these tasks

10   completed and I'm going to stay here, so I expect to hear

11   from you as to any issues or problems, we'll have our court

12   reporter available here for a few minutes, in case we need to

13   put anything on the record.  Okay.  Thank you.

14          THE CLERK:  Court's in recess.

15          (Whereupon a recess was taken from

16          4:45 p.m. to 4:52 p.m.)

17          (Open Court, Jury Out, 4:52 p.m.)

18          THE COURT:  Counsel, Counsel, if I could get

19   everybody's attention, I do want to cover one more thing

20   while you're working there, or interrupt your work.  And

21   that's the issue of closing the courtroom for the

22   stipulation, with regard to the sexual assault, and then

23   examinations thereafter.  Case law is pretty clear that

24   closing the courtroom should be done as a last resort, and if

25   I do, it's a fact-finding matter where I need to have facts

1  on the record sufficient for me to find that there's reasons

2  or sufficient cause to close the courtroom and exclude the

3  public from these proceedings.  And I'm going to ask

4  Ms. Connor to make that application, which is why I'm telling

5  you now, of the sensitive nature of the information, and a

6  request as to why you want the courtroom closed and give me

7  as much of a factual basis for the record to consider that.

8  Okay.  I'll tell you now that any closing that I would order

9  would be a limited closing, in other words, it wouldn't be

10  for an entire witness' testimony, you would have to indicate

11  to me, counsel on both sides, point in time when you are

12  going to get into the subject matter that's of concern, and,

13  you know, I would close the courtroom for that limited period

14  of examination, and then have it reopened.

15          I'm telling you this now, because I want you

16  to be prepared to make your application, and from what I

17  heard earlier today, I don't think there will be any

18  objection from defense counsel representing any of the

19  parties on the defendants' side, which makes the burden a

20  little less.  There being no objection registered with the

21  court, you know, I can't -- I can imagine that maybe we can

22  do a limited closing provided there's sufficient facts laid

23  out on the record.

24          The other issue is when the application is

25  made, because it seems silly to make that application in open

1    court because then the issue you're concerned about and the

2    sensitive nature of it would be out there for the public.  So

3    I want you to anticipate when you want to make this

4    application, and we want to do it at a time where it's

5    convenient to stop the proceedings and close the court,

6    courtroom, or I can have you come to the bench and make the

7    application at the bench with all counsel present, okay, and

8    if you want your clients to be present for the application,

9    we can have them come to the bench, but it would seem to me

10   easier if we can pick a point in time, either at the very

11   beginning of proceedings where I can have the courtroom

12   closed for just a few minutes while we handle that matter,

13   but I can do it either way.  Okay.  Any requests, comments

14   with regard to that?

15                  MR. ANDREWS:  No, your Honor.

16                  MS. SHEEHAN:  Not at this time, your Honor.

17                  MS. CONNOR:  No.

18                  THE COURT:  Okay.  And I'm right in

19   anticipating that defense counsel is going to -- how many

20   witnesses do you anticipate that you'll be cross-examining or

21   asking questions about that particular subject matter?

22   Sexual assault of the plaintiff.

23                  MS. SHEEHAN:  Two.

24                  THE COURT:  Two.  Dr. Alley.

25                  MS. SHEEHAN:  And possibly Dr. Reagles.

1               THE COURT:  And what about your doctor?

2               MS. SHEEHAN:  Yes, but you asked all cross, he

3      would be direct.

4               THE COURT:  Yeah, okay, part of any

5      examination.  Your doctor as well.  You don't anticipate any

6      cross-examination of Dr. Reagles in this area?

7               MS. SHEEHAN:  Yes.

8               THE COURT:  Oh, I'm sorry, I didn't hear the

9      name, you did say?

10              MS. SHEEHAN:  Dr. Reagles, Dr. Alley.

11              THE COURT:  It's Reagles.

12              MS. SHEEHAN:  Reagles.  It's my Philadelphia

13     accent.

14              THE COURT:  So possibly tomorrow afternoon, or

15     tomorrow morning then.

16              MS. SHEEHAN:  Possibly, yeah, it depends on

17     how long Ms. Connor's direct is.

18              MS. CONNOR:  My direct should be --

19              THE COURT:  She's done.

20              MS. CONNOR:  -- less than one minute, it's

21     solely for the purpose of the updated CV, then I'm done.

22              THE COURT:  CV, otherwise she's done.

23              MS. CONNOR:  It should take about a minute.

24              THE COURT:  So then you want to be prepared,

25     Ms. Connor, to make your application first thing in the

1  morning.  Matter of fact let's get here a little early, let's

2  do that at 8:45 so that we're prepared for the jury right

3  afterwards.  And it's easier to close the courtroom at that

4  point because there might not be as many people around.

5  Okay.  Is that agreeable to everybody?

6           MR. ANDREWS:  Yes, your Honor.

7           MS. SHEEHAN:  Yes, your Honor.

8           MS. CONNOR:  Yes.

9           THE COURT:  Okay.  Thank you.

10          THE CLERK:  Court's in recess.

11          (Whereupon a recess was taken from 4:57 p.m.

12           to 5:20 p.m.)

13          MS. SHEEHAN:  Your Honor, the good news is the

14  medical records are here.

15          THE COURT:  Okay.

16          MS. SHEEHAN:  And I'm this close.  There's not

17  a whole lot of copying.

18          THE COURT:  Ms. Connor?

19          MS. CONNOR:  Yes, your Honor.

20          THE COURT:  Do you want a copy or not?

21          MS. CONNOR:  No, thank you.  Thank you for the

22  offer, but no thank you.  Had enough paper.

23          This is good news for many of us, I'm going to

24  withdraw my request to close the courtroom with respect to

25  the matters that we discussed earlier.  Therefore I will not

1    be making an application tomorrow to do that.

2                    THE COURT:  Okay.  Your client's okay with

3    that?

4                    MS. CONNOR:  Absolutely.

5                    THE COURT:  All right.  Very well.

6                    (Court Adjourned, 5:27 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR,

5   Official Court Reporter in and for the United States

6   District Court, Northern District of New York, DO

7   HEREBY CERTIFY that I attended the foregoing

8   proceedings, took stenographic notes of the same,

9   and that the foregoing is a true and correct

10  transcript thereof.

11

12

13

14

15

16

17

18                          _____

19                          JODI L. HIBBARD, RPR, CRR, CSR
                            Official U.S. Court Reporter
20

21

22

23

24

25