VOLUME IV

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
PENNY T. COLLINS,

                                Plaintiff,

vs.                              5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                                Defendants.

-------------------------------------------x

        Transcript of a Jury Trial held on March 15,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiff:          MAIREAD E. CONNOR, ESQ.
                        Attorney at Law
                        440 South Warren Street
                        Suite 703
                        Syracuse, New York  13202

For Defendant:          SATTER, ANDREWS LAW FIRM
(Mitchell)              Attorneys at Law
                        217 South Salina Street, 6th Floor
                        Syracuse, New York  13202
                          BY:  ROSS P. ANDREWS, ESQ.

For Defendants:         STATE OF NEW YORK
(All Remaining)         Office of Attorney General
                        The Capitol
                        Albany, New York  12224
                          BY:  CATHY Y. SHEEHAN, AAG
                               ROGER KINSEY, AAG

1

2                I N D E X   O F   T E S T I M O N Y

3

4   <u>Witness</u>              <u>D</u>    <u>C</u>    <u>RD</u>    <u>RC</u>    <u>FRD</u>    <u>FRC</u>

5   Kenneth Reagles,      773  773   814   816    --     --
    cont'd

6

7   John Alley            818  880   955   957    --     --

    Mary Mayville         960  999   --    --     --     --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Open Court, Jury Out, 8:53 a.m.)

2                    THE COURT:  Okay.  Good morning, everybody.

3    Hope everybody had a good night.  We ready to go, we have any

4    issues?

5                    MS. SHEEHAN:  One issue, your Honor.

6                    THE COURT:  Okay.

7                    MS. SHEEHAN:  May we approach.

8                    THE COURT:  You may.

9                    MS. SHEEHAN:  It's a delicate issue.

10                   (At Side Bar.)

11                   THE COURT:  Go ahead.

12                   MS. SHEEHAN:  Your Honor, in reviewing

13   Dr. Reagles' notes, there's another trigger for PTSD which is

14   a history of childhood sex abuse, and I don't want to explore

15   the details, but I'd like to explore it in the same way we're

16   exploring the sexual assault for the same reasons, causation,

17   we now have two triggers for PTSD.  We knew this would

18   possibly come up with our expert, but we did not realize that

19   it was going to be an issue for Dr. Reagles.

20                   THE COURT:  Okay.  Ms. Connor.

21                   MS. CONNOR:  I have no problem with that.

22                   THE COURT:  Do we have a stipulation?

23                   MS. CONNOR:  I have one here.

24                   MR. ANDREWS:  Say participation,

25   responsibility.

1                    MS. SHEEHAN:  Okay.

2                    THE COURT:  Acceptable to everybody?

3                    MR. ANDREWS:  Just with one minor addition.

4                    MS. SHEEHAN:  Responsibility, liability, or?

5                    MR. ANDREWS:  Participation.

6                    MS. SHEEHAN:  Participation.

7                    MR. ANDREWS:  Something like that, it says no

8     responsibility or liability.

9                    MR. KINSEY:  Involvement.

10                    MR. ANDREWS:  Involvement is a better word.

11                    MS. SHEEHAN:  We knew we'd want you around.

12                    MS. CONNOR:  That's fine, we can add it.

13                    THE COURT:  So, okay.  The parties stipulate

14    that plaintiff was sexually assaulted on January 1st, 2003

15    and that plaintiff is not claiming that any defendant had any

16    responsibility or liability for that, or involvement, all

17    right.

18                    MS. CONNOR:  That's fine.

19                    THE COURT:  Had any responsibility,

20    involvement, or liability for that act.  Okay.

21                    MR. ANDREWS:  That works.

22                    MR. KINSEY:  Yes.

23                    THE COURT:  That's what it will be.  Anything

24    else this morning?

25                    MS. SHEEHAN:  Not from the defendants this

1  morning.

2  THE COURT:  Ms. Connor?

3  MS. CONNOR:  I have one thing.  I would like

4  to know if there were any additional efforts made to locate

5  my witness, and if you know, and if anything, would anything

6  be done today in that regard?

7  THE COURT:  Yeah, well, the additional efforts

8  that were going to be made is they were going to go by her

9  house last night after hours.

10  MS. CONNOR:  Okay.

11  THE COURT:  As we reported yesterday, they

12  were there and there were no cars, there were no signs of

13  anybody being there, so in case she was just out for the day,

14  they were supposed to go back last night and try and find her

15  and if they didn't find her, they were going to go back by

16  this morning because we noticed in your affidavit of service

17  she was served at approximately 9:00 in the morning.  So

18  they're doing what they're supposed to do, and we just

19  haven't heard anything yet.

20  MS. CONNOR:  Okay.

21  THE COURT:  We'll check with them very

22  shortly.

23  MS. CONNOR:  How long would these efforts be

24  kept up by the marshals?

25  THE COURT:  Well, not too much longer, if

1    she's not home.

2                MS. CONNOR:  Okay.  Because I was going to ask

3    then if they are unable to locate her, to compel her to come

4    in here, that I would like to have her deposition, I'd have

5    her declared unavailable, and she, there's a deposition that

6    was taken of her, and there are portions of that deposition

7    that I would like to have read into the record under

8    Rule 804.

9                THE COURT:  Counsel.

10               MS. SHEEHAN:  Go through the same process I

11   assume that we did with the Carter deposition.

12               MR. ANDREWS:  Same way I feel.

13               THE COURT:  Okay.

14               MS. CONNOR:  So I was trying to plan our time

15   if I'm going to go through that and start redacting and doing

16   this type of thing, or not, depending on how long their

17   efforts were going --

18               THE COURT:  We should have a good idea this

19   morning.  If she wasn't home last night, there's no sign of

20   life there today, presumably, she's, you know, out of state

21   or someplace, so we'll have a better idea this morning.

22               MS. CONNOR:  Okay.

23               THE COURT:  Okay.

24               MS. CONNOR:  Okay.

25               THE COURT:  All right.  Go from there.

1          MR. ANDREWS:  Thank you, your Honor.

2          THE COURT:  I'm going to read this stipulation

3    first thing.

4          MS. SHEEHAN:  Thank you.

5          MS. CONNOR:  Okay.

6          (Pause in Proceedings.)

7          THE COURT:  Okay, Counsel, are we ready to go?

8          MS. SHEEHAN:  Yes, your Honor.

9          MR. ANDREWS:  Yes, your Honor.

10         MS. CONNOR:  Your Honor, do you want the

11   witness on the stand before the jury comes in?

12         THE COURT:  No, I think we're going to do the

13   stipulation and then we'll have Dr. Reagles come up.  Okay,

14   Rita, let's bring them in, please.

15         (Jury Present, 9:03 a.m.)

16         THE COURT:  Okay, the record should reflect we

17   have the ladies and gentlemen of the jury, plaintiff,

18   plaintiff's counsel, defendants and defense counsel.  Hope

19   you had a good night.  I like this color scheme in the front

20   row, you guys planned that, but Syracuse is the home team, as

21   the number one seed, so we have the blue, white, and orange.

22   Okay.  And I've heard that there might be some fans on that

23   jury, so I'm going to keep that in mind, and we'll see where

24   we are in proceedings and we'll make sure you see at least

25   the best part of the game, okay.  Yesterday, we were on

1    the -- had just finished the direct examination of

2    Dr. Reagles, but before we have Dr. Reagles back on the stand

3    for cross-examination, I'm going to read to you a stipulation

4    of the parties.  You'll remember, during my preliminary

5    instructions I explained to you that one of the things of

6    evidence are any facts that the lawyers stipulate to, or

7    agree that is true, that could be put in front of you.  And

8    I'm going to read you the stipulation that's been entered

9    into by the parties.  The parties stipulate that the

10   plaintiff was sexually assaulted on January 1st, 2003, and

11   that the plaintiff is not claiming that any of the defendants

12   had any responsibility, involvement, or liability for that

13   act, and that the act is not part of plaintiff's complaint in

14   any manner, and is, and was not ever included as an

15   allegation in this lawsuit.  Completely separate thing.

16   Okay.  So you can accept that as something that both parties

17   agree is true.  All right.  Dr. Reagles, if you would come

18   up, please.

19                   THE WITNESS:  Morning.

20

21          K E N N E T H   R E A G L E S , recalled

22   as a witness and being previously duly sworn,

23   testifies as follows:

24                   THE COURT:  Ms. Connor.

25                   MS. CONNOR:  Thank you.

1                    CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

2          Q    Good morning, Dr. Reagles.

3          A    Morning.

4          Q    I'm going to show you what's been marked as

5    Plaintiff's Exhibit 83 and ask if you would identify it for

6    me, if you can.

7          A    Yes.  This is a more current curriculum vitae

8    than we had yesterday.

9          Q    And I won't repeat what that is, we'll let

10   that testimony stand.

11         A    Sure.

12              MS. CONNOR:  And at this point, plaintiff

13   offers Plaintiff Exhibit 83.

14              THE COURT:  Any objection?

15              MS. SHEEHAN:  No objections, your Honor.

16              MR. ANDREWS:  No objections, your Honor.

17              THE COURT:  Okay.  It's received.

18              MS. CONNOR:  Thank you, your Honor.  That

19   concludes my direct of Dr. Reagles.

20              THE COURT:  Ms. Sheehan.

21              CROSS-EXAMINATION BY MS. SHEEHAN:

22         Q    Good morning, Dr. Reagles, how are you this

23   morning?

24         A    Morning.  I'm fine, thank you.

25         Q    Great.  Doctor, in order for someone to be

1    diagnosed as having PTSD, isn't it true there has to be an

2    event, a trigger?

3          A    Yes, that's true, there has to be an event, or

4    events.

5          Q    Isn't a sexual assault more likely to be a

6    trigger for PTSD than graffiti on a bathroom wall?

7          A    Quite frankly, I feel that we are going beyond

8    the bounds of the areas of which I was asked to address in

9    this matter.  That is an issue of causation in my mind.  I

10   was not asked to address any issues of causation, but more

11   the consequences of what has happened.

12         Q    Were you aware of the sexual assault?

13         A    I don't know what sexual assault you're

14   referring to.

15         Q    Okay.

16         A    I mean, I guess what I'm saying is --

17         Q    You heard the stipulation that your Honor just

18   read to the jury, correct?

19         A    Yes.

20         Q    Okay.  But is it your testimony you are not

21   aware of any details?

22         A    That is correct.

23         Q    Were you aware that a sexual assault took

24   place?

25         A    When?  When did I become aware?

1          Q     No, I asked, okay, when did you become aware?

2          A     Just a few days ago.

3          Q     And how did you become aware?

4          A     I was informed by plaintiff's attorney.

5          Q     What -- did she tell you why she was informing

6     you of this?

7          A     My recollection is that that was something

8     that she had recently learned about.  I don't -- quite

9     frankly, I don't recall the circumstances of why she was

10     telling me that.  But essentially, I understood it to be new

11     information.

12          Q     Now that you know a sexual assault occurred,

13     does that change your report in any way?

14          A     No, it does not.

15          Q     Does it change any of the assumptions that you

16     would make in your report?

17          A     I don't have enough details about the nature

18     of the sexual assault, it was not anything that I was aware

19     of when I did my report, it does not change my opinions.

20          Q     You're a trained psychiatrist?

21          A     No.

22          Q     Psychologist?

23          A     Psychologist.

24          Q     Psychologist?

25          A     Yes.

1     Q     Are you -- in your professional experience,

2   would a sexual assault of any kind be more likely to be a

3   trigger for PTSD than graffiti on a bathroom wall?

4     A     The statement is so general that I don't

5   believe that I can answer it in -- with the professional

6   certainty that I would feel comfortable giving.

7     Q     Let me ask you the same question regarding

8   someone blowing in an individual's ear.

9     A     The same comparison?

10    Q     Correct.

11    A     I think reasonable people would agree that a

12  sexual assault could be more potent than someone blowing in

13  their ear, depends upon the circumstances of someone blowing

14  in one's ear.

15    Q     Have you ever experienced having someone

16  blowing -- having someone having blown in their ear to be a

17  trigger for PTSD?

18    A     I'm just imagining the times when someone blew

19  in my ear, and no, it did not trigger any PTSD.

20    Q     How about -- have you seen graffiti on a

21  bathroom wall?

22    A     Of course.

23    Q     Did that create any PTSD?

24    A     Not in and of itself, no.  I mean, certainly

25  there are lots of times I've seen graffiti that I find

1   particularly offensive, but --

2           Q    Sure.

3           A    -- not beyond the bounds of usual human

4   experiences.

5           Q    Would you agree that reasonable people would

6   believe that a sexual assault would be more likely to be a

7   trigger for PTSD than bathroom jokes?

8           A    I would stand by the answer that I gave

9   earlier, yes.  Again, without -- if you take each one of

10  those incidences that you're giving, the blowing of the ear,

11  the graffiti, the jokes, that sort of thing, one by one, I

12  think that most reasonable people would conclude that the

13  potency of the two is markedly in favor of the sexual

14  assault.  But in terms of the cumulative impact of all of the

15  separate incidents, then I think we begin to have some

16  competing explanations of why PTSD may have occurred.

17          Q    You heard the stipulation, and if none of the

18  defendants -- well, it says the defendants are not liable,

19  responsible, or had any involvement for the PTSD, for the

20  sexual assault.  If the sexual assault was the trigger, how

21  would that change your report?

22          A    Well, again, without knowing details about it,

23  it doesn't change my report.  The fact is that, and again,

24  that's an issue of causation, and I feel very uncomfortable

25  discussing issues of causation, because that's not asked, not

1  what I was asked to do.  What I was asked to do was to

2  determine the consequences of the manifestations of symptoms

3  that were diagnosed as PTSD or adjustment reaction with

4  depressed mood, and how all of that -- all of those things

5  taken collectively, have resulted in the incapacity of

6  Ms. Collins to work as a correctional officer.  So again, how

7  that came about, how the PTSD occurred, the potency of any

8  one event is not important to me relative to my role in

9  determining the economic consequences of her incapacity to

10  work as a correctional officer.  It is for other people to

11  sort out and to offer opinions about the relative potency of

12  any one act or cumulative acts in precipitating the symptom

13  spectrum that has been diagnosed as PTSD.

14         Q    Okay.  I'm going to paraphrase what I believe

15  you just said, so please correct me if I have this wrong.

16  Your report is an analysis of the economic damages for

17  Ms. Collins having PTSD and not being able to work as a

18  corrections officer, not that the Department of Corrections

19  is responsible for the PTSD, correct?

20         A    In other words, I would agree with you, that

21  causation is not an issue that I was asked to address.  I was

22  asked to address the consequences of her incapacity to work

23  as a corrections officer.

24         Q    You keep using the legal term causation.

25  Maybe for the jury, let's clear that up.  Causation meaning

1    who caused, in this case the PTSD?

2            A    Who or what, yes.

3            Q    Who or what caused the PTSD?

4            A    Correct.

5            Q    Do you have an opinion what caused

6    Ms. Collins' PTSD?

7            A    I don't have a dog in that fight.  Causation

8    is not an issue I was asked to address, that is an issue for

9    the jury to decide from the testimony of others, not from me.

10           Q    Do you have any formal training diagnosing

11   mental illnesses?

12           A    Yes, I do.  As part of my training as a

13   rehabilitation psychologist, we certainly looked at clinical

14   presentations in the diagnostic labels, familiar with the

15   Diagnostic and Statistical Manual of the American Psychiatric

16   Association, but it is not, it is not something that I do on

17   a daily basis, it's not something that I would offer myself

18   as having the expertise of doing day in and day out because

19   that's not what I typically do.

20           Q    Do you remember being deposed on April 20th,

21   2009, by Assistant Attorney General Tim Mulvey --

22           A    Yes.

23           Q    -- regarding this matter?

24           A    Yes, I do.

25           Q    I'm on page 6, line 10.  Do you remember being

1  asked the question, "I'm particularly interested in whether

2  or not you received any formal training in diagnosing mental

3  illness and from a forensic psychiatrist or psychological --"

4  and you answered, "Yeah, that's not what I do."

5          A    That's essentially what I just said.  Yes, I

6  had the training but that's not what I do.

7          Q    You have no patient-counselor relationship

8  with Ms. Collins, is that correct?

9          A    That is correct, as I have testified

10  yesterday, my role was to do an evaluation of the economic

11  consequences of her impairment and incapacity to work as a

12  corrections officer.

13          Q    Mr. Reagles, I'm really keeping these

14  questions pretty short, we could probably get through this

15  quicker if you please, I'll just ask you to answer the

16  question I asked you.  If you're not able to, just let me

17  know and I'll rephrase it, okay?

18          A    I'll do my best.

19          Q    Thank you.  You testified that you have

20  appeared and given testimony in depositions and court

21  appearances hundreds of times?

22          A    That is correct.

23          Q    And that you work for plaintiffs and

24  defendants, is that correct?

25          A    That is correct.

1          Q    Isn't it true that two-thirds of the work that
2     you do are for plaintiffs?
3          A    Say that again.
4          Q    Isn't it true that two-thirds of that
5     testimony has been for plaintiffs?
6          A    Approximately, yes.
7          Q    Do you ask clients when -- a new client when
8     you're interviewing them, I'm sorry, do you interview
9     clients?
10         A    Well, we don't call them clients, that would
11    indicate a client-counselor relationship.  They are, in the
12    terminology of my profession they're called evaluees.  I know
13    it's awkward language but it is a distinction between -- that
14    is made to distinguish the fact that the person is not a
15    client of mine.
16         Q    Okay, that's not what I asked.  I appreciate
17    the information.
18         A    Perhaps you could restate the question.
19              MS. CONNOR:  Could you please read it back.
20              (The last question was read.)
21         A    Do I interview clients?  I interview evaluees.
22         Q    During that interview process, do you ask them
23    if they have any medical conditions that would compete with
24    the events that are precipitated in the lawsuit that you're
25    being asked to testify in?

1          A     Not in -- not in words such as you phrase

2     them, but I do ask about prior medical conditions.

3          Q     Any medical conditions that would cause

4     diminished capacity to work or earn money?

5          A     In my direct testimony I said that I satisfied

6     myself that there were none and that she was fully capable of

7     working as a corrections officer when she began to work as a

8     corrections officer in 2002.

9          Q     Did you -- when was the first time you met

10    Ms. Collins?

11         A     October 15th of 2008.

12         Q     Can you please explain to the jury how you

13    came to the conclusion that she was fit and able to work as a

14    corrections officer in 2002?

15         A     She was found fit and capable of working as a

16    corrections officer by the Department of Correction Services.

17    I mean I didn't know her in 2002, so I'm going on the basis

18    of the information that was presented to me regarding her

19    work history.

20         Q     Did the Department of Corrections know about a

21    sexual assault?

22         A     I have no idea.

23         Q     Okay.  During your evaluation, interview or

24    evaluation, what term would you like me to use, of

25    Ms. Collins, interview?

1          A     Just call her Ms. Collins.

2          Q     Did you interview her or evaluate her, what

3     term would you like me to use?

4          A     Both.

5          Q     When you interviewed Ms. Collins, did you ask

6     her if there were any competing psychological conditions

7     regarding to diminished capacity or her ability, for the

8     incidents that she's alleged in her lawsuit?

9          A     I think I answered that previously.  Not words

10    to that effect, no, I asked about prior medical history,

11    talked about, you know, her growing up, that sort of thing,

12    but I did not ask specifically whether in her opinion there

13    were any incidents or events that would have competed as a

14    reasonable explanation for the PTSD that manifested itself

15    when I saw her.

16         Q     You did not ask that?

17         A     I don't recall asking her that, no.

18         Q     You testified during your deposition to

19    Mr. Mulvey that you assume the medical reports that you

20    review for an evaluee are accurate, is that correct?

21         A     Yes, I think I usually do, unless, until I

22    find information that is contrary to the contents of a

23    medical report.

24         Q     So if -- okay.  Did you review medical reports

25    in this case?

1          A    Yes, I did.

2          Q    Could you please give me the names of the

3    medical experts, the health care providers whose medical

4    records you reviewed?

5          A    The physicians, Dr. John Alley, who I

6    testified yesterday is a primary care physician.  I also had

7    notes from -- see what I got here.  From a Dr. William

8    Foresman, F-o-r-e-s-m-a-n, but that was about an unrelated

9    urinary tract infection.  I had radiological studies from

10   Community-General Hospital, then I had -- those were the --

11   what I would call the treating physician records.  I had

12   record also from Dr. Michael First who is a psychiatrist who

13   is retained on behalf of the defendants.

14         Q    Any other records?

15         A    Any -- not from physicians.  I had some allied

16   medical professionals, Paul Honnes, H-o-n-n-e-s, who is a

17   licensed clinical social worker, and Craig Humphrey, PhD, I

18   believe that he is a psychologist.

19         Q    Did you review the records of the individuals

20   that you just listed for us?

21         A    Whatever was provided to me, I did review,

22   yes.

23         Q    And the individuals you just listed, the

24   health care providers, they're all males, correct?

25         A    Yes, they are.

1          Q     Would you consider child sexual abuse as a
2     trigger for PTSD?

3          A     Professionally, I would say yes, it could
4     potentially be, but again, we're in the issues of causation
5     and I was not asked to address issues of causation in this
6     case.

7          Q     Were you aware of Ms. Collins' history of
8     childhood abuse?

9          A     Yes.

10         Q     And you did not take that into consideration
11    when preparing your report?

12         A     Well, that's not accurate.  I was -- if I had
13    knowledge of it, how could I not take it into consideration?
14    Again, I was not asked to deal with the issues of causations,
15    only the manifestations that, for which she was being treated
16    at the time I saw her, diagnostically labeled as either
17    post-traumatic stress disorder or as adjustment disorder with
18    depressed mood, rose by any other name, whatever those
19    symptoms were, kept her from working as a corrections
20    officer.  I was asked to address the economic consequences of
21    her incapacity to work as a corrections officer.

22         Q     You answered my question that yes, you took it
23    into consideration.  How did you take the childhood sex abuse
24    into consideration?

25         A     It was information that was made known to me,

1   and so I, again, again, my role was not to establish or form

2   an opinion about causality, but it was information that I had

3   available to me.

4        Q    In your notes, is it true that this

5   information from Paul Honnes was forwarded to Dr. Alley,

6   Ms. Collins' treating physician?

7        A    I believe it was, but I don't have an accurate

8   recollection of that.

9        Q    Okay.  I'm going to ask you to please refer to

10  your notes on that.

11       A    Okay.

12       Q    If you could please look at Mr. Honnes' notes.

13  Your notes of Dr. Honnes, Mr. Honnes.

14       A    Okay.  I have the -- it's a one-page note, I

15  have it in front of me.

16       Q    Does that refresh your recollection whether or

17  not that was forwarded to Dr. Alley?

18       A    I can't tell.  I can say that at the top of

19  this note, it says attention, Dr. Alley, and then it has

20  numbers that I believe to be are phone numbers.

21       Q    You -- Mr. Honnes says in his report that,

22  regarding the childhood sex abuse, "We'll discuss this

23  further."  Did you ever follow up with him?

24       A    No, I did not.

25       Q    You have no additional records from

1    Mr. Honnes?

2         A    We made a request of plaintiff's attorney for

3    all medical and allied health records that were pertinent to

4    this matter.  My understanding is he only saw her this one

5    time back in 2006.

6         Q    Maybe your notes will refresh your

7    recollection that he had an appointment to meet five days

8    later before she left on a two-week cruise?

9         A    Does say that, yes, I'll see her in five days.

10        Q    Mr. Honnes is a licensed social worker,

11   correct?

12        A    Licensed clinical social worker, that is

13   correct.

14        Q    Are you aware that Ms. Collins also saw

15   another male licensed social worker, Ray Tartakoff?

16        A    I'm not aware of that, I don't have a

17   recollection of it.

18        Q    If you were aware that she saw another

19   licensed social worker and she testified here during this

20   trial she saw him a number of times --

21        A    Correct.

22        Q    -- would you have requested those records?

23        A    Well, obviously from my previous answer, I

24   didn't know that he had been involved in that so -- but we do

25   make a request for records of treating physicians and allied

1   health professionals, and I would assume that under that

2   general request, the request for his records would have been

3   made.

4          Q    Could you -- would you be able to review your

5   notes and tell me if you requested those records?

6          A    Well, we do send a checklist, in fact it's the

7   one that you began to ask me whether I followed in your voir

8   dire of me, and that checklist does include a request for the

9   records of physicians, psychologists, psychiatrists, social

10  workers, anyone whose -- occupational therapist, physical

11  therapist.

12         Q    And you did that in this case?

13         A    I did.

14         Q    Could you please find it and tell me what

15  physicians you ask, and medical health care providers you

16  requested records for?

17         A    It's a general statement, it's not about, at

18  that time, at the time I'm requesting it, I don't even know

19  who they are, how can I give the specific names?

20         Q    So you -- how do you find out who her health

21  care providers are?

22         A    Well, eventually through the records, and

23  sometimes in reviewing the record, there's a reference made

24  to someone else who was involved in the treatment, and so one

25  of my assistants will call the attorney's office and request

1    those records, that's just common course of business.

2            Q    You don't ask the evaluees for a list of their

3    health care providers?

4            A    Actually the current ones, we do, yes.

5            Q    Did you ask Ms. Collins in this case for a

6    list of her health care providers?

7            A    Let me just see.  Yes, during my first

8    interview I asked -- talked about her treating physician, and

9    what medications she was taking, and at that time, she was

10   seeing Dr. Alley and she was taking an antianxiety

11   medication.

12           Q    You say at that time, what is the date?

13           A    That's when I first -- that was on

14   October 23rd, that was the second interview, 2008.

15           Q    Okay.  The question was, did you ask

16   Ms. Collins for a list of her health care providers when you

17   interviewed her, and you had, isn't it true you had a number

18   of interviews with her?

19           A    Yes, three.

20           Q    Did you, during any of those interviews did

21   you ask her for a list of her health care providers?

22           A    I'm confident I did because I have information

23   about the fact that she was receiving counseling from her

24   medical physician, and I asked her about medications.  I'm

25   confident that if there had been other treatment providers at

1  that time, she would have told me about that.  I did not ask

2  her for, quote, a list.

3          Q    Can you please review your notes and tell me

4  if she mentioned seeing Ray Tartakoff?

5          A    I'm already -- I'm aware that she did not,

6  I've never heard that name until this morning.  I don't

7  recall ever hearing that name.

8          Q    Isn't it true at one time Ms. Collins

9  expressed a desire to return to corrections, because her son

10  had become a corrections officer and she wanted to work with

11  him?

12         A    Yes.

13         Q    And you admitted during your deposition that

14  this conflicts with everything in your report?

15         A    It does.

16         Q    During your damages evaluation --

17         A    Yes.

18         Q    -- you gave two sets of numbers in many cases,

19  one is if she was a corrections officer, continued as a

20  corrections officer, two if she were to be promoted to

21  sergeant?

22         A    Yes.

23         Q    You also stated she received an 85 on the

24  sergeant's exam that she took which I believe was 2007, does

25  that -- are you aware of the date?

1      A    I actually thought it was 2004.

2      Q    Okay, you could be right.

3      A    The first one she got an 85 on, she would have

4  taken it a second time, she was confident she could have

5  gotten a higher score, that's what she told me.

6      Q    The first one, are you aware of the fact that

7  the lowest score that the state of New York reached for

8  sergeants was a 90?

9      A    I'm not aware of that.

10      Q    And the next sergeant's exam was offered while

11  Ms. Collins was still employed, were you aware of that?

12      A    I -- I am just trying to put the dates

13  together here in my mind, and yes, I think I was aware of

14  that.

15      Q    And you're aware that she did not take the

16  test?

17      A    Right.  That's -- right.

18      Q    And you're aware that it would be impossible

19  for her to become a sergeant unless she took the test?

20      A    Well, what were the circumstances that were

21  going on when it was offered the second --

22      Q    That's not what I asked you.

23      A    I just want to refresh our memory here that

24  this is just not -- the circumstances were not quite the same

25  as they were when she first took the exam.

1    Q    And Ms. Connor can elicit that if that's what

2    you'd like to do when she's asking you questions.

3    A    Very good.

4    Q    Are you aware that on the test that

5    Ms. Collins did not take, the highest score was 102.5?

6    A    How would I know that?  I'm not aware of that.

7    Q    Okay.  During your interview with Ms. Collins

8    on October 23rd, 2008, isn't it true that she told you, and

9    this is October 23rd, 2008, she doesn't want to live in

10   New York, that she wants to relocate to North Carolina or

11   Tennessee?

12   A    She did tell me that.

13   Q    You then interviewed her, okay, that interview

14   was October 23rd, 2008, and you had not interviewed her again

15   until last week, March 9th, 2012, correct?

16   A    That is correct.

17   Q    And that you note, medical condition, no

18   change since last interview?

19   A    Medical condition, that's correct.

20   Q    Okay.  Where did you get that, where did you

21   obtain that information?

22   A    What I -- what I start almost every interview

23   with saying, I haven't seen you since such and such a date,

24   have there been any significant changes in your medical

25   condition since I last saw you.

1          Q      So this information was solicited from

2    Ms. Collins?

3          A      That is correct.

4          Q      How did it come about that you produced a

5    damages report based on Ms. Collins having PTSD; who

6    determined PTSD and not brain injury?

7          A      Well, as far as I know, brain injury was never

8    a consideration.

9          Q      Agreed.  Agreed.  That's not the question.

10         A      Right.

11         Q      How is it that you made the analysis for

12   damages based on PTSD and not another condition?

13         A      Actually, I don't think that's accurate.  I

14   think that it has been -- and first of all, I relied on

15   Dr. Alley's representation of what it was.  And if you

16   recall, I testified that initially, his diagnosis was

17   adjustment disorder with depressed mood, and eventually he

18   changed his diagnosis to post-traumatic stress disorder, and

19   so it was on the basis of that information, as well as the

20   content of his reports, not just the diagnostic labels but

21   the symptom manifestation of the condition that led me to

22   conclude that it was -- that it was impossible for her to

23   return to work as a corrections officer.

24         Q      Based on Dr. Alley's diagnosis of PTSD?

25         A      In part, and also there were other records

1  indicating -- well, I think one was a severe depression,

2  another was adjustment disorder, so it was not just his, but

3  his was, I would certainly say that his was the principal

4  source of information that I relied upon because his records

5  were the most extensive, he was the treating physician.

6          Q    Do you have an opinion whether or not

7  Ms. Collins has PTSD?

8          A    I can say that, I was not asked to diagnose

9  her because that's not what I do, but I can say that from my

10 experience of working with Dr. Dougherty and working with the

11 Vietnam veterans with post-traumatic stress disorder, that

12 the spectrum of symptoms recorded in Dr. Alley's notes are

13 consistent with a diagnosis of post-traumatic stress

14 disorder.

15         Q    Do you know what triggered the PTSD?

16         A    Again, that's an issue of causation, I was not

17 asked to address that.  I have essentially an understanding

18 of the incidents that have been alleged as producing the

19 PTSD.

20         Q    Okay.  But didn't you testify you weren't

21 aware of a sexual assault?

22         A    I did testify to that, yes.

23         Q    And you were aware of the childhood sex abuse,

24 but that didn't change your opinion --

25         A    Well, let's take the childhood sex abuse.

1   Unfortunately in our society, that is a phenomenon that

2   occurs, and let me just answer the question, okay.

3           Q     Just the question, please.

4           A     Okay, well, you asked earlier did I take it

5   into consideration, and I think I said that I was aware of

6   it, but let me tell you how I took it into consideration.  Is

7   that she was able to function as a capable member of society

8   despite whatever incidents occurred to her as a child.  And

9   so that's how I took it into consideration, is that that was

10  not intervening in her life to the extent that she could not

11  complete educational experiences, she could not work in the

12  competitive labor market, she passed whatever qualifying

13  tests there were to become a correctional officer, she

14  successfully completed the training to become a correctional

15  officer.  She worked effectively as a correctional officer

16  until, as I understand it, a number of events occurred that

17  eventually precipitated a series of symptoms that became

18  diagnosed as either adjustment reaction with depressed mood

19  or post-traumatic stress disorder which in my opinion

20  precluded her from working as a corrections officer.  That's

21  how I took that information into consideration.

22          Q     Did you ever review any childhood records?

23          A     I did not.

24          Q     Teenage records?

25          A     No.

1          Q     Records when Ms. Collins was in her 20s?

2          A     No.

3          Q     When she was in her 30s?

4          A     No, she was in her 40s by the time she went to

5     work as a corrections officer.

6          Q     She was 41 when the Department of Corrections

7     hired her, correct?

8          A     Consistent with my answer.

9          Q     Is it safe to say your damages report is

10    for -- is for the PTSD working as a corrections officer and

11    has nothing to do with who's responsible, who has the

12    liability to pay those damages, correct?

13         A     Well, I thought you were going somewhere else.

14    I'm -- who's going to pay them?  That's not an issue for me,

15    just as --

16         Q     Who's responsible.

17         A     Just as causation was not an issue for me.

18         Q     Okay.

19         A     The fact that she can't work as a corrections

20    officer, that's what was important.

21         Q     She was out on sick leave twice?

22         A     Yes.

23         Q     Where she received union benefit of half pay,

24    sick pay.  Was -- were those numbers of what she received in

25    salary included in your evaluation for your damages?

1          A     As far as I know, they were.

2          Q     As far as you know, they were?

3          A     Yes.

4          Q     Do you have a reason to believe they wouldn't

5     be?

6          A     Sick leave is income, and income is

7     reportable, and --

8          Q     Well --

9          A     And to my knowledge, because I did not see the

10    individual records of sick leave pay, my understanding is

11    that that would be reportable by the Department of

12    Corrections.  I did have the W-2s and the 1099s that

13    pertained to her employment both with the Department of

14    Corrections and subsequent to it.

15         Q     Do you know if they contain the half time pay

16    union benefit?

17         A     I do not know as I sit here.  I presume that

18    that was reported accurately.

19         Q     I think that's a different comment.  Do you

20    know whether or not the benefit of half pay, how it's paid?

21         A     How it's paid?  What do you mean?

22         Q     It's a benefit.  Does it come through her

23    paycheck?

24         A     It comes to her as a check from -- quite

25    frankly, I don't know.

1        Q    You don't know?

2        A    No, I don't know.

3             MS. SHEEHAN:  We're not much longer, your

4    Honor, court's indulgence.

5        Q    Mr. Reagles, how much have you been paid for

6    your work to date?

7        A    I don't know.

8        Q    You don't know?

9        A    I don't know exactly.

10       Q    How many hours have you worked on this case?

11       A    I don't know.

12       Q    What's your hourly rate, Doctor?

13       A    The hourly rate is $380 an hour.

14       Q    Does that include travel time?

15       A    Yes.

16       Q    Are you going to get paid extra for an

17   unexpected appearance yesterday?

18       A    No.

19       Q    I'm going to review some of your charts with

20   you.

21       A    Very good.

22       Q    Let's start with table number 1.  Do I

23   understand your testimony that you do not know if these

24   numbers include the half pay sick benefit?

25       A    I do not know, as I sit here.  It is my

1    understanding is that it is reportable income and I would

2    presume that it would be reflected in the earnings and tax

3    statements that I was given.

4                    THE COURT:  Ms. Sheehan, for the record, it's

5    81A, is that correct?

6                    MS. SHEEHAN:  Thank you, yes, your Honor,

7    P81A.

8                    THE COURT:  Thank you.

9            Q    In your report, you state that CSEA employees

10   receive salary increases April and October, correct?

11           A    Yes.

12           Q    If Ms. Collins was a member of a different

13   union like PEF or another -- let's make an assumption she's a

14   member of another union.

15           A    Yeah.

16           Q    Would that change --

17           A    Well, and I'm glad you said that because I

18   said CSEA yesterday and that's not -- that was a

19   misstatement, she was a member of NYSCOPBA, or -- CSEA is a

20   lot easier to say, she's a member of -- let me get you the

21   actual.  It is the New York State Correctional Officers and

22   Police Benevolent Association, NYSCOPBA, that is the data

23   that I used.

24           Q    That is the data you used?

25           A    Yeah.

1          Q      But your whole report refers to the CSEA

2     contract?

3          A      I think there is an inaccurate reference to

4     CSEA, and quite frankly, the salary schedules are very, very

5     similar.

6          Q      Similar.

7          A      Very similar.

8          Q      But they're not the same?

9          A      If -- well, no, I used the one that was

10    pertinent to her employment as NYSCOPBA.

11         Q      Okay.  Yesterday you made a lot of

12    assumptions, when -- in making up these numbers.  I'm going

13    to ask you to make another assumption.

14         A      Okay.

15         Q      If Ms. Collins was not hired at the hiring

16    rate, these numbers would not be accurate, is that correct?

17         A      That's not true, because -- that's not

18    accurate because you can see in my report if you looked at my

19    report and looked at the appendices, you can see where

20    these -- where the numbers in that chart come from, they come

21    from the actual salary schedules.

22         Q      That's not what I asked you.  I asked you --

23         A      But I answered your question.

24         Q      No, you didn't.

25         A      I said the answer is no.

1          Q    If we make the assumption that she was not

2    hired at the hiring rate, isn't it true these numbers would

3    be inaccurate?

4          A    Without knowing what you mean, I can't say yes

5    or no.  I'm confident that the numbers correspond to the

6    salary schedule for the grade and step that is indicated on

7    that chart.

8          Q    That's not what I asked you.

9          A    I understand it's not --

10         Q    If you make the assumption that she was not

11   hired at the hiring rate, at 34,742, if she was not hired at

12   the hiring rate, 34,742, wouldn't that mean the rest of the

13   numbers would be inaccurate?

14         A    No.

15         Q    And they would remain the same if this

16   changed (indicating)?

17         A    Those numbers are -- the numbers that follow

18   that are independent of whatever she earned in 2002.  They

19   come from the salary schedules that are in existence today.

20         Q    So they would still match up okay, so your

21   testimony is if she was not hired at the hiring rate, at

22   34,742, all of these numbers would remain the same?

23         A    The hiring rate that is on that table is the

24   present hiring rate, it is not the hiring rate at which she

25   was -- that she entered the Department of Corrections back in

1    2002.

2            Q    If she was not hired, it's an assumption, at

3    the hiring rate of 34,742, is it your testimony that the rest

4    of the numbers through 2012 would not change?

5            A    That is my testimony and the reason is that --

6            Q    There's not a question, Doctor.

7            A    Very good, very good.

8            Q    The C -- when you calculated the raises?

9            A    Yes.

10           Q    For NYSCOPBA?

11           A    Yes.

12           Q    You used a 3.95 percent increase --

13           A    Per year.

14           Q    Per year?

15           A    Yes.

16           Q    Which is what NYSCOPBA employees were

17    receiving because they don't have a contract?

18           A    That is correct.

19           Q    And you assumed it would remain that way until

20    Ms. Collins was how old?

21           A    I believe it was 63.5 years or something,

22    pretty close to that.

23           Q    Do you think that was appropriate knowing the

24    circumstances of the economics of the state and the recent

25    negotiations for state workers for CSEA and PEF negotiations?

1          A     I think that was a reasonable -- the time I

2     did my report, it was a reasonable assumption to make,

3     because that was the historical data.

4          Q     When you made your report, the report I have

5     in my hand, isn't this the report that you drafted, that you

6     presented to me on Tuesday of this week?

7          A     I was asked to update it to make it as

8     contemporaneous with the date of the trial as possible.

9          Q     So the report that is in evidence is accurate

10    and up to date as of this Tuesday?

11         A     I would agree with that, yes.

12         Q     And if you know, CSEA employees were given

13    zero increases over the next number of years, and -- I'm

14    sorry, you'll have -- you can't nod your head, you have to --

15         A     I'm sorry, I was aware of that, yes.

16         Q     The same with PEF employees?

17         A     Yes.

18         Q     And they were -- PEF employees and CSEA

19    employees were also deferred for seven days, a week and a

20    half?

21         A     Yes.

22         Q     You're aware?

23         A     Yes.

24         Q     Table 3, when calculating these numbers, you

25    used average assumed overtime wages of 2,386 per year.

1          A     That is correct.

2          Q     Which -- what years of Ms. Collins' earnings

3     do you base that on?

4          A     I want to answer it accurately.

5          Q     Take your time.

6          A     Yes, thank you.  The years 2004 through 2006,

7     three years.

8          Q     Would you agree with me the economy in the

9     state of New York has changed drastically for the state

10    budget since 2006?

11         A     The economy has, yes.

12         Q     And how about for the state of New York's

13    budget?

14         A     Definitely.

15         Q     And you're aware that the cuts in state

16    workers' overtime due to budget crisis, fiscal crisis of the

17    state?

18         A     I'm not -- that, I'm not familiar with.

19         Q     Did you make any efforts to look into that or

20    update that for your report of this Tuesday?

21         A     What I assumed was that since the state is,

22    the state's economy, like the nation's economy, was depressed

23    during 2000 -- late 2008, '9, into 2010, that there was a

24    hiring freeze, which in fact would place a greater demand on

25    the workers who were currently employed, therefore, creating

1    opportunities for overtime that were probably as great as, if

2    not greater than they were before.

3            Q    What do you base that on?

4            A    My answer, that I just said.  That was an

5    assumption that I made.

6            Q    Assumption?

7            A    Sure.

8            Q    Did you take into consideration with that

9    assumption the number of facilities that were closed making a

10   number of correction officers available to go to other

11   facilities to cut back on the overtime?

12           A    Actually, I didn't.

13           Q    If we make the assumption that overtime no

14   longer exists for the Department of Corrections, would you

15   agree with me these numbers are no longer accurate?

16           A    Well, that's correct, they would be, have to

17   be reduced by the amount of overtime that I included in those

18   numbers, which was about $2,300 a year.

19           Q    Table 4, Exhibit P81D, estimated future and

20   present values of expected earnings.  If we -- I'm going to

21   ask you to make the same assumptions on here as I did in the

22   other charts.  One is, if Ms. Collins was not hired at the

23   hiring rate, would these numbers be inaccurate?

24           A    No, they would not be, because again, the

25   hiring rate reflected in that other chart is the hiring rate

1    today, not what she was hired at.

2          Q    And if the NYSCOPBA negotiations result in

3    zero increases for officers and sergeants, their contract,

4    would you take -- does this take into consideration --

5    wouldn't you admit, that assumption, these numbers are no

6    longer accurate?

7          A    Well, it might be for a year or two, but what

8    we see is we see, over time, we see fluctuations in the

9    economy and therefore the raises that are available to

10   people, but over time, I would -- be my opinion that the

11   reasonable expectation of somewhere between 3 and 4 percent

12   annual pay increase has been the historical picture of what

13   has happened to wages, although there are annual

14   fluctuations.

15         Q    Doctor, wouldn't you admit, we are -- the

16   state is in extraordinary economic depression?

17         A    I would disagree.  I think --

18         Q    Economic --

19         A    I think the economic climate in New York is

20   excellent.

21         Q    We have CSEA state employees that have been --

22   are being furloughed and are not receiving raises, correct?

23         A    But that is in my opinion a very temporary

24   situation.

25         Q    What do you base that on?

1          A     On the basis of the fact that the economy

2     is -- has been revived, it's growing, and that the

3     opportunities for those individuals will be much more robust

4     in the next few years.

5          Q     When was the last time New York State faced

6     the economic problems, economic conditions that we reached,

7     that we are dealing with today?

8          A     Which ones are we talking -- which economic

9     climate, or conditions are we talking about?

10          Q     The state budget and cutbacks in state

11     salaries.

12          A     It's been quite some time.

13          Q     Give me an estimate.

14          A     Actually, I don't know.

15          Q     PEF employees, they're not receiving raises

16     and they've been furloughed, correct?

17          A     Some have, that's right.

18          Q     Are you aware that management confidential,

19     large portion, not the largest of state workers, have not had

20     a raise since 2007 and are also being deferred?

21          A     I'm not aware of that.  I'm not sure of the

22     pertinence of that for corrections officers.

23          Q     Would you agree that the relationship might

24     be, there's only so much in the pot of money to be

25     distributed and there's a likelihood it's going to affect all

1    state workers?

2          A    I think that's accurate.

3          Q    Your estimates of future earnings, these are

4    based on Tennessee salary?

5          A    That's correct, that's where she lives.

6               THE COURT:  Exhibit, please?

7               MS. SHEEHAN:  P81C.

8               THE COURT:  Thank you.

9               MS. SHEEHAN:  Thank you.

10         Q    Let me make sure that's a C and not a E.  It's

11   an E.

12              THE COURT:  E?

13              MS. SHEEHAN:  E.

14              THE COURT:  Thank you.

15         Q    For the type of work that Ms. Collins

16   currently does in Tennessee and you have, expect, assume

17   she's going to continue doing, are the salaries for that line

18   of work higher in New York?

19         A    Yes.

20         Q    By how much?

21         A    I don't know exactly but I would estimate them

22   to be 10 to 15 percent higher.

23         Q    So if Ms. Collins lived in New York, this

24   chart would be higher, these numbers would be incorrect?

25         A    Yes.  Well, they would be higher, yes.

1      Q    Explain to the jury again how you calculated

2   estimated past loss of pension benefits.

3      A    Well, it was actually more accurately the past

4   loss of contributions to the pension program.

5      Q    Well, is that table 7 labeled estimated past

6   loss of pension benefits?

7      A    Yes.  It is, you're accurate, but it really is

8   the actual contributions as I explained yesterday, I didn't

9   appreciate them by any expected return on the investment

10   potential of those moneys.

11      Q    This is -- these numbers simply relate to what

12   Ms. Collins would have contributed to the pension plan?

13      A    No.  That is the contribution to the state,

14   the employer made on behalf of Ms. Collins.  Ms. Collins was

15   obligated to contribute 4 percent of her salary to the

16   pension program but the state contributed 8 percent of her

17   gross salary towards the pension program, and that's what is

18   reflected here.

19      Q    How many years until Ms. Collins was eligible

20   to retire full benefits pension?

21      A    I believe they have to have -- let me just,

22   let me -- I actually looked at that.

23      Q    Sure.

24      A    Actually, I said 4 percent required, it's a

25   3 percent contribution.  I don't see it, I'm not finding it

1   quickly, but these are -- it's either 10 or 15 years that

2   they have to have before they would be eligible to actually

3   receive the benefits.

4            Q    How about full retirement?

5            A    Well, here's what it says.  May I read?

6            Q    Please identify what you're reading from.

7            A    Yes, this is page 14 of the -- it's called

8   your retirement plan, state correction officers and security

9   hospital treatment assistance plan, for tier 3 members which

10  she was.

11           Q    Okay.  I'm going to ask you to read it to

12  yourself.  Does that document tell you how many years for

13  actual retirement?

14           A    Yes.

15           Q    How many years?

16           A    Twenty-five years.

17           Q    Thank you.  Next and last area that I believe

18  you discussed the damages was your life care plan?

19           A    Yes.

20           Q    I believe you testified that you made -- you

21  created the plan and then you asked Dr. Alley whether this

22  was an appropriate plan, being Ms. Collins' treating

23  physician?

24           A    I did request him to review it, yes.

25           Q    And you did that in writing, correct?

 1          A    Yes, I did.

 2          Q    And you sent him a form with a check-off list?

 3          A    Yes.

 4          Q    Did you receive that form back from Dr. Alley?

 5          A    I did not.

 6          Q    You did not?

 7          A    No.

 8          Q    Do you know whether or not Dr. Alley agrees

 9    with your life care plan?

10          A    I do not.

11          Q    Do you know if Ms. Collins is receiving any of

12    the services currently that are listed in your life care

13    plan?

14          A    Yes, she is.

15          Q    Which ones?

16          A    She's -- she is seeing Dr. Alley, or another

17    primary care physician at approximately the rate of four

18    times per year.  She is taking the medications that are

19    included in there, and she is involved to some extent in

20    personal adjustment counseling.  The extent of that I'm not

21    aware of.

22          Q    Then how do you know she's involved in

23    personal adjustment counseling?

24          A    From her report to me.

25          Q    What did she report to you?

1          A     She -- let me just get my notes here.

2     Actually, I didn't make a note of her involvement in any

3     counseling but I have a recollection from my conversation

4     with her that she was seeing a counselor when she had the

5     financial resources to do so.

6          Q     How often did she see a counselor?

7          A     I don't recall.

8          Q     Did you ask her?

9          A     Not a specific question but in a general way

10    ask her about whether or not she was involved in counseling

11    and I knew that economic issues prevented her from seeing a

12    counselor as much as she would want to.

13         Q     Regarding your calculations for her

14    medications, are those prices for generics or brand drugs?

15         A     They are for the brand drugs.

16         Q     Did you take into consideration when they come

17    off patent and the generics are available?

18         A     No, I did not.

19         Q     Dr. Reagles, how often did you visit Auburn

20    prison while doing your damages report and evaluation of

21    Ms. Collins?

22         A     I didn't.

23         Q     How often did you visit Sullivan prison?

24         A     I didn't, wasn't pertinent to my

25    determination.

1          Q    Have you ever visited a New York State

2     corrections facility?

3          A    Yes.

4          Q    Which one?

5          A    Dannemora, I've been to Auburn prison, I've

6     been to -- those are the ones that I remember.

7          Q    You've been doing this for 40 years, correct?

8          A    42.

9          Q    42.

10         A    Yes.

11              MS. SHEEHAN:  Thank you for your testimony.

12              THE WITNESS:  Surely, thank you.

13              MR. ANDREWS:  I have no questions, your Honor.

14              THE COURT:  Okay, Mr. Andrews, thank you.

15    Ms. Connor, do you have any redirect?

16              MS. CONNOR:  May I have just a moment, please,

17    your Honor.

18              THE COURT:  You may.

19              MS. CONNOR:  Very brief.

20              THE COURT:  Briefly, if you want to stand up

21    and stretch over there, good time.

22              (Pause in Proceedings.)

23              THE COURT:  Anybody need water or anything?

24    You okay?  All right.  Dr. Reagles, you have water up there?

25              THE WITNESS:  I do indeed, yes.

1          MS. CONNOR:  Very briefly.

2          THE COURT:  Okay.

3          <u>REDIRECT EXAMINATION BY MS. CONNOR</u>:

4          Q    Dr. Reagles, you were asked on your

5    cross-examination, I'm trying to understand some of this,

6    reason why I went to law school and I don't do what you do.

7    You were asked on your cross-examination some questions about

8    table 2 which is Plaintiff's 81B?

9          A    Yes.

10          Q    And you were asked about if the hiring rate

11    were different, would these numbers change?

12          A    I was asked that question, yes.

13          Q    Yeah.  And would you explain your answer,

14    please.

15          A    Sure.  They -- remember that this involves the

16    issue of what is Ms. Collins -- what was her earnings

17    capacity as a corrections officer.  And so what I used to

18    determine that earnings capacity were the most

19    contemporaneous salary data that were available to me.

20          Q    What do you mean by contemporaneous?

21          A    That is reflected in the most recent contract

22    or salary schedule that is published by New York State.  Now,

23    when she was hired, she was not hired at $34,742, she was

24    hired at something less than that, but the earnings capacity

25    of someone who's a correctional officer today as reflected in

1    this most recent salary schedule and that is what is on that

2    particular table.

3              Q    Thank you.

4              A    Surely.

5              Q    On your cross-examination, Dr. Reagles, you

6    were asked several questions about the state of the economy

7    in New York State?

8              A    Yes.

9              Q    And different events that may happen to state

10   workers, wage freezes, furloughs and that.

11             A    Yes.

12             Q    To your knowledge, are state workers

13   furloughed equally by seniority?

14             A    I don't -- quite frankly, I don't know the

15   answer to that question.  Obviously I think the intuitive

16   answer would be that those who have more seniority are less

17   likely to be furloughed but I don't know the exact policy.

18             Q    If state workers -- when was Ms. Collins

19   hired?

20             A    2002.

21             Q    2002.  So she continued to work, she would be

22   at 10 years if my math --

23             A    Ten years of seniority, yes.

24             Q    -- is correct there.  Yeah.

25                  No further questions for the witness.  Thank

1    you, your Honor.

2                    THE COURT:  Ms. Sheehan, any recross?

3                    MS. SHEEHAN:  One question, your Honor.

4                    RECROSS-EXAMINATION BY MS. SHEEHAN:

5         Q    Dr. Reagles, do you know the -- whether or not

6    the CSEA and PEF employees were all furloughed equally

7    without regard to seniority?

8         A    I do not know that.

9         Q    Do you know that the management confidential

10   employees were all furloughed without regard to seniority?

11        A    I don't know that.

12        Q    Did you know that any past attempts to lay

13   people off was done by seniority?

14        A    Again, I don't know that.

15                   MS. SHEEHAN:  Thank you for your testimony.

16                   THE WITNESS:  Sure, thank you.

17                   MS. SHEEHAN:  I have no further questions.

18                   THE COURT:  Mr. Andrews?

19                   MR. ANDREWS:  No thank you.

20                   THE COURT:  You're holding?  Thank you.

21   Dr. Reagles, you may step down.

22                   THE WITNESS:  Thank you.

23                   (Whereupon the witness was excused.)

24                   THE COURT:  Ms. Connor, do you have a witness?

25                   MS. CONNOR:  I do, your Honor.  I was

1   wondering, I expect my next -- it's Dr. Alley, I expect him

2   to be quite long, and I know your Honor likes to take a

3   morning break, I was going to ask permission of the court if

4   we could do that before we start the doctor.  He is here.

5              THE COURT:  Okay.  He's here.  Anybody need a

6   break over there?  Not yet.  I think we're going to start.

7   We're going to start.

8              MS. CONNOR:  Your Honor, I need a break.

9              THE COURT:  You need a break?

10            MS. CONNOR:  Yeah, I'm sorry.  I tried to do

11   it a little diplomatically there, but --

12            THE COURT:  You were very diplomatic.

13            MS. CONNOR:  Maybe it was too subtle.

14            THE COURT:  Sometimes the direct path is --

15            MS. CONNOR:  I will heed that advice.

16            THE COURT:  We're going to go five minutes.

17            MS. CONNOR:  Thank you.

18            THE COURT:  Going to get you right back out

19   here, so be ready.

20            (Whereupon a recess was taken.)

21            (Open Court, Jury Out.)

22            THE COURT:  Ms. Connor, so you know before we

23   go on the record, your witness Ms. Mayville, the house was

24   checked last night, no one was home, notice that was left

25   during the day yesterday on the house was not removed, and

1    they are attempting to find some relatives and they'll have

2    some more information soon.  But it certainly appears that

3    she's -- has not been home.

4                    MS. CONNOR:  Okay, thank you.

5                    THE COURT:  Please bring the jury in.

6                    (Jury Present.)

7                    THE CLERK:  Please state your full name and

8    spell it for the record, please.

9                    THE WITNESS:  John, J-o-h-n, Adams,

10   A-d-a-m-s --

11                   THE CLERK:  You can be seated --

12                   THE WITNESS:  -- Alley, A-l-l-e-y.  That's my

13   middle name.

14                   THE CLERK:  I'm sorry, I apologize.

15

16        J O H N   A .   A L L E Y , called as a

17   witness and being duly sworn, testifies as follows:

18                   MS. CONNOR:  Your Honor, may I remove the

19   podium?  It's a little bit in the way.

20                   THE COURT:  Certainly, put it off to the side

21   somewhere.

22                   DIRECT EXAMINATION BY MS. CONNOR:

23        Q    Good morning, Doctor.

24        A    Good morning.

25        Q    Dr. Alley, I'm going to be asking you some

1   questions about your treatment and diagnosis of the plaintiff

2   in this case, Penny Collins.  Why don't we start first so

3   that we can learn a little about you, would you tell me your

4   educational background, please?

5           A    I went to University of Rochester

6   undergraduate and got a bachelor of arts in chemistry.  I

7   went to University of Vermont for medical school, graduated

8   in 1991 with an MD, and I went to Lancaster General Hospital

9   for a family medicine residency and finished that up in '94,

10  Board certified in family medicine in 1994, recertified in

11  2001 and 2008.

12          Q    You mentioned Lancaster.  Where is that

13  located?

14          A    Lancaster, Pennsylvania.

15          Q    And do you have any training in psychiatry,

16  Doctor?

17          A    In family medicine, we treat the whole

18  spectrum of disorders including psychiatry so it's a routine

19  part of my training, yes.

20          Q    And do you currently practice medicine?

21          A    Yes, ma'am.

22          Q    Where do you practice?

23          A    In Marcellus, New York, Marcellus Family

24  Medicine.

25          Q    How long have you been in Marcellus in that

1   practice?

2           A     Since 2004.

3           Q     Prior to that, did you practice medicine?

4           A     Yes, ma'am, I was in Hamilton, New York, I

5   worked for Community Memorial Hospital there in the Family

6   Health Center from 1994 when I left residency, until 2004

7   when we moved.

8           Q     And what was the nature of your practice in

9   Hamilton?

10          A     Again, it was full range of family medicine, I

11  do inpatient medicine, obstetrics, nursing home medicine,

12  anything from prenatal visits to well child visits to adult

13  care, to geriatrics, end-of-life care.

14          Q     And in Marcellus, would you describe your --

15  the nature of your medical practice for us, please?

16          A     It is still the same thing with the exception,

17  at this point I don't do a lot of inpatient medicine, we have

18  turned over most of our inpatients to hospitalists, but I

19  still practice obstetrics at St. Joseph's Hospital, and

20  deliver babies there.

21          Q     So you have privileges at St. Joseph's?

22          A     And Community which is now part of Upstate.

23          Q     Now in your practice in Marcellus, do you

24  treat mental health problems?

25          A     Yes, ma'am, every day.

1        Q    And how would you characterize the level of

2   your care in treating mental health problems?

3        A    It certainly is a lot higher than when I left

4   residency.  I think the burden of psychiatric illness has

5   increased with the stress in society as one thing.  The other

6   part of the equation is that we have a lack of psychiatrists

7   in Onondaga County, making it very hard to get patients in to

8   a psychiatrist for medication management.  Most psychiatrists

9   nowdays primarily do medication management.  Some still do

10  psychotherapy, but most counseling is done by a psychologist,

11  and so we end up doing a lot of medication management.

12            When I came out, I said that I hated

13  psychiatry, had a very bad experience in medical school, and

14  with a bad attitude, but my patients needed it.  I said when

15  I came out of residency, I'll never take care of bipolar

16  patients, they're crazy, but I found I didn't have enough

17  psychiatrists to be able to take care of them.  The only

18  limitations now that I have in terms of treating psychiatry

19  is people that need to be inpatient, so if they're acutely

20  psychotic, suicidal or homicidal, then we have to hospitalize

21  them for their safety, the safety of others.  But other than

22  that, I pretty much treat the full range of psychiatric

23  problems.

24       Q    Now, treating this full range of psychiatric

25  problems, do you have occasion to offer therapy to your

1    patients?

2           A    In the course of seeing them and taking their

3    history and finding out where they're at, we will discuss

4    strategies for stress reduction and what other stressors that

5    they have that we can improve, and what coping strategies

6    that they can utilize.  Again, sometimes with insurance, and

7    for a lot of folks unfortunately, economic issues, they can't

8    afford counseling, and so I have to offer my advice in that

9    regard.

10          Q    And could you tell us what the ranges of

11   psychiatric disorders that you have occasion to treat in your

12   practice?

13          A    Anxiety, depression.  Frequently with stress

14   we have something called adjustment disorder and adjustment

15   disorders are -- you have a stressor, a parent dies, a spouse

16   dies, and you have anxiety or depression, and we will treat

17   that during that time frame.  Insomnia can be a psychiatric

18   issue.  Again, post-traumatic stress disorder, I have about

19   five active patients with post-traumatic stress disorder and

20   we're finding a lot more bipolar disorder so I'm treating a

21   lot of bipolar disorder where frequently we just said they

22   were depressed and find out that it's more than that.  I

23   don't really treat schizophrenia, most of those people are so

24   severe that they end up hospitalized and they do follow up

25   with psychiatrists.  The only schizophrenics that I treated

1    are in my nursing home population.

2         Q    Are you familiar with the plaintiff Penny

3    Collins in the action?

4         A    Yes, ma'am.

5         Q    And is she a patient of yours?

6         A    Yes.

7         Q    When did you begin treating her?

8         A    The first time I saw her, I believe was in

9    February of 2005.

10        Q    And at that time, do you recall how she

11   presented, what did she come to see you for?

12        A    I believe -- I don't have the record right in

13   front of me, it was for just a cold and she presented the way

14   she is now, very well put together and professional, kind,

15   and we had a nice interaction.

16        Q    Doctor, would it assist your testimony to have

17   your medical records of Ms. Collins with you during your

18   testimony?

19        A    Yes, please.

20             MS. CONNOR:  Your Honor, with your permission,

21   I would like to have the doctor refer to the following

22   exhibits during his testimony:  Plaintiff's Exhibit 79,

23   Plaintiff's Exhibit 57, Plaintiff's Exhibit 58, and

24   Plaintiff's Exhibit 80, and Plaintiff's Exhibit 56.

25             THE COURT:  Okay, are any or all of these in

1    evidence?

2                    MS. CONNOR:  They're his notes and they're not

3    in evidence but they've all been previously identified to

4    defendants and disclosed to them.

5                    MR. KINSEY:  One moment, your Honor, while we

6    find it, please.

7                    THE COURT:  Okay.

8                    MR. KINSEY:  Your Honor, we have no objection

9    with exception of Plaintiff's Exhibit 56, 56 is not a record.

10                   THE COURT:  What is Plaintiff's 56?

11                   MS. CONNOR:  It's DSM-IV criteria for PTSD and

12   I believe the doctor's handwriting is on it as one of the

13   plaintiff's medical records.  I would use that as an offer of

14   proof.

15                   THE COURT:  Well, we'll let the doctor refer

16   to 79, 57, 58, and 80, and we'll cross the bridge with 56

17   when and if we get to it.

18        Q    Doctor, I'm going to place before you exhibits

19   that have been previously marked, and first is Plaintiff's

20   79, Plaintiff's 57, Plaintiff's 58, and Plaintiff's 80.

21        A    Okay.  Thank you.

22        Q    You're welcome.  Doctor, looking at those

23   exhibits, 79, 57, 58, and 80, would you identify those,

24   please.  If you can.

25                   MR. KINSEY:  Your Honor, if it would help, we

1   have no objection to these being the doctor's treatment

2   notes, they were provided to us and we stipulate to their

3   admission without exception.

4                   MR. ANDREWS:  Same, your Honor.

5                   THE COURT:  Okay, thank you, Mr. Andrews.

6                   MS. CONNOR:  Thank you.

7                   THE COURT:  Okay.  Let's proceed then.

8                   THE CLERK:  All but 56?

9                   THE COURT:  Correct.

10          Q    I was asking you, Doctor, about the time you

11  first treated with the plaintiff, and you testified that that

12  was sometime in February 2005, I believe?

13          A    Yes.

14          Q    At what, if you need to look at your notes,

15  please feel free to do so.  Why did she come to see you?

16          A    She had upper respiratory illness with

17  conjunctivitis.

18          Q    And at that time -- well, actually I'll back

19  up a minute, a step, how did it come about that she became

20  your patient, if you know?

21          A    On that date specifically, the treating doctor

22  for her, Dr. Briggs, was not in the office, and so I covered

23  Dr. Briggs' patients when she was not in the office so I saw

24  her on that day.

25          Q    And on that day, did she present with any

1    mental health issues?

2          A     No, ma'am.

3          Q     And did you review the records prior to her

4    visiting you from Dr. Briggs at any time?

5          A     No, ma'am, I just -- we have a -- on our

6    charts we just have a front sheet which lists their medical

7    problems and so I just look at that quickly to see what her

8    medications are, but this was just an acute visit.

9          Q     And did there come a time when you began

10   treating the plaintiff for complaints of some psychiatric or

11   mental illness?

12         A     On December 6th, 2005, she came in complaining

13   of upper abdominal pain, and this had been going on over the

14   past month.  She had some pain also in the chest, complaining

15   of some shortness of breath.  She noted that she was having

16   increased stress at work, complaining of sexual harassment at

17   work, and she did note that she had problems with reflux.

18         Q     What's reflux?

19         A     Sorry, acid reflux, from the stomach up in the

20   esophagus.

21         Q     And do you recall that visit, Doctor?

22         A     Not specifically.  At that time, it was -- I

23   felt that, yes, with stress at work, she was having increased

24   acid secretion related to the stress, and I put her on acid

25   blocking medicine and advised her to exercise which is one of

1    my frequent prescriptions for stress reduction.

2           Q    And did you have a diagnosis of gastritis at

3    that time?

4           A    Yes, ma'am.

5           Q    What is that?

6           A    Gastritis means there's inflammation of the

7    stomach because on exam she was tender over the stomach, and

8    that would be different than simple acid reflux into the

9    esophagus wherein you would not have any stomach tenderness,

10   and stomach tenderness implied that there was actually

11   inflammation there.

12          Q    Do you have an opinion of whether or not the

13   stress at work was a contributing factor to the plaintiff's

14   gastritis?

15          A    Yes, I do believe that that was directly

16   related.

17          Q    Now, when was the next time that she visited

18   your office?

19          A    She was seen the following day by Dr. Briggs.

20          Q    The following day?

21          A    Yes, ma'am.

22          Q    And in the records, what, is there a note

23   concerning what plaintiff reported?

24          A    The nurse reported increased stress and

25   crying, that she quit work, she was complaining of pain to

1    her shoulders and chest pain.  Dr. Briggs noted, "I just left

2    my job 35 minutes, they sent me home, and I'm never going

3    back.  She reported it was something every day since June of

4    2003.  She changed to a different location, the rumor mill

5    was very destructive, she tried not to complain, the

6    supervisor sexually harassed me.  She was depressed once

7    before when her father died, she was planning to hook up for

8    counseling."

9         Q    Now, was there a diagnosis on that day --

10        A    Yes.

11        Q    -- for Ms. Collins?

12        A    Dr. Briggs diagnosed her as having an

13   adjustment disorder with depressed mood.

14        Q    And was there any treatment that was

15   prescribed to her that day?

16        A    She simply recommended counseling, follow up

17   in one week, she already had a complete physical planned in

18   one week, and she stated that she was unable to return to

19   work until further notice.

20        Q    Doctor, would you explain to us what an

21   adjustment disorder is.  Let's just start generally with an

22   adjustment disorder, what is that?

23        A    An adjustment disorder is when you have a

24   certain stressor in life, as I said, if you have a parent or

25   a spouse dies, most of us will cope and will be able to

1    continue on with our jobs and our life.  We'll need to take,

2    frequently take some time off at that time, but other than a

3    week or two out of work or that, what's allowed by law,

4    you're able to go back to work and resume interactions.

5    You're not the same and you're sad, but it does not inhibit

6    you from your work and it does not inhibit your social

7    interactions.  An adjustment disorder is when that stress

8    leads to specific issues at work or with relationships at

9    home, social relationships, and that you otherwise would

10   normally be able to do.

11            Q     And what is an adjustment disorder with

12   depressed mood?

13            A     You can simply have an adjustment disorder,

14   you're not coping and you just don't want to go out.  Most

15   the time that is associated with depressed mood where people

16   are sad, they're depressed, they feel down, they may have the

17   symptoms of depression with helplessness and hopelessness,

18   they may have other symptoms of depression including insomnia

19   or excessive sleepiness, they can have overeating or lack of

20   appetite.  Adjustment disorder can also be associated with

21   anxiety, and that would be typically with stressors that are

22   more threatening to the patient, or if they have an anxiety

23   disorder to begin with, that they just are excessive worrying

24   and their worrying prevents them from going places or doing

25   things or interacting with people.

1          Q    Now, did there come a time shortly after this

2     office visit on December 7th where you saw Ms. Collins again

3     in your office?

4          A    Yes, ma'am, I saw her December 14th for

5     complete physical exam with the -- sorry, with the exception

6     of her gynecologic and breast exam which were performed by

7     Dr. Alexander, gynecologist.

8          Q    And what were the results of the plaintiff's

9     physical examination on December 14th, 2005?

10         A    At that point, she still had some residual

11    tenderness in her abdomen, in her belly, and I did not

12    notice, I did not note any emotional distress.

13         Q    Now, when is the next time you saw the

14    plaintiff at your office?

15         A    I saw her again a month later, January 20th,

16    2006.

17         Q    And what occurred on that visit?

18         A    We discussed how she was doing in terms of

19    dealing with the stress that she was experiencing.

20         Q    Would you describe that discussion, what took

21    place?

22         A    She said that she was doing well without

23    thinking about work.  If she thought about work, she became

24    angry and anxious, she was not sleeping well, her appetite

25    was okay, and she was working on forming her own support

1    group.  She was concerned about the possibility of depression

2    because she was having fits of crying easily and she related

3    that her stomach was doing better, and so that her appetite

4    was better.

5         Q    And did you make any observations of her on

6    that day?

7         A    On that date, she was tearful, and she hates

8    crying, so when she is -- this is something that I only

9    learned over time in terms of dealing with her is she's a

10   very private person and she hates to show emotion, she hates

11   to cry, and so I came to find out that when she cried that

12   things were actually very bad.  On that date, I again felt

13   that she had an adjustment disorder with depressed mood and

14   with increased depression, and advised her to continue with

15   the counseling and that we were going to have a short-term

16   followup in just two weeks.

17        Q    Now did she report any symptoms to you on

18   January 20th, other than what you've testified about?

19        A    No, ma'am.

20        Q    Now you said you were going to follow up in

21   two weeks, I believe was your testimony?

22        A    Yes.

23        Q    Did you do that?

24        A    Yes, I saw Mrs. Collins again on February 3rd,

25   2006.

1          Q     And what took place in that visit?

2          A     She related she was feeling nauseated with

3     eating and that she was tearful, thinking about the incidents

4     that had happened.  She was trying to exercise, and she

5     related she was having significant conflict with her husband.

6          Q     And did you make any observations about her

7     that day?

8          A     Again, yes, ma'am, I noted that she was

9     tearful, in terms of her mental status, her thought processes

10    were normal and she denied any suicidal ideation.

11         Q     What does that mean?

12         A     Suicidal ideation means thinking or

13    considering suicide.

14         Q     And she denied that?

15         A     Yes, ma'am.

16         Q     And did you have a diagnosis of her that day?

17         A     Yes.  We again diagnosed her as having

18    adjustment disorder with depressed mood, depressive symptoms

19    initiated with abuse at work.  Marital discord worsened with

20    leaving her job, and on that date, the depression was severe

21    enough that I initiated antidepressant medication therapy.

22         Q     And what medication was that, Doctor?

23         A     Lexapro.

24         Q     What is that, please?

25         A     Lexapro is a -- one of the class of selective

1    serotonin reuptake inhibitors including Prozac, Zoloft,

2    Paxil.  It's one of the more potent ones and it tends to be

3    activating for folks that are depressed and not feeling good

4    and it does tend to work a little faster.

5              Q    And you prescribed that for Ms. Collins that

6    day?

7              A    Yes, ma'am.

8              Q    And did you plan some followup from that

9    visit?

10             A    We planned followup in three weeks.

11             Q    And did that take place?

12             A    Yes, ma'am.  On February 24th, 2006, she

13   related that she was feeling good on that day, and I noted

14   that her affect was much brighter, that again, her thinking

15   was fine, and my conclusion that her adjustment disorder with

16   depressed mood was significantly better.  I recommended that

17   she continue the Lexapro and follow up in one month.

18             Q    Now, what is the next time you heard from the

19   patient?

20             A    She called back about two weeks, and related

21   that she was having problems sleeping with insomnia.  She was

22   having nausea and that had been going on over the past month.

23   I was concerned potentially that could be due to the Lexapro,

24   so we --

25             Q    Why were you concerned about that?

1          A     Those are some common side effects from

2     Lexapro.

3          Q     What is?

4          A     Insomnia and stomach upset.

5          Q     Okay.

6          A     So at that point, we tapered down, that's

7     medication that we need to slowly decrease, and had her

8     change to fluoxetine which is generic for Prozac.

9          Q     What is -- when you say it's a generic for

10    Prozac, I just want to ask you, what, the fluoxetine or

11    Prozac, what type of medication is that?

12         A     That is similar to the Lexapro, and while it

13    doesn't seem sensible to do that, most of the serotonin

14    medications have very different side effect profiles and we

15    try to match the side effect profile to the patient.  Some of

16    them are more sedating, some are more activating, some have

17    more problems with nausea, and being that Lexapro is one of

18    the stronger medications, I elected to try to switch to

19    another one since she did have an initial positive response.

20         Q     Now with these types of medications, Doctor,

21    is there a way you can tell ahead of time before you

22    prescribe a medication what's going to be the precise

23    medication to prescribe for a patient for adjustment disorder

24    with depressed mood?

25         A     Unfortunately, no.

1          Q     Why not?

2          A     We don't have the technology yet.  Hopefully

3   as we get further along, we'll get genetic testing that will

4   tell us that someone's receptors for serotonin will respond

5   to this medication.  Hopefully that's not in the too far

6   distant future.  If there's a strong family history for

7   people, and they do have serotonin medications frequently, I

8   will use those medications because genetics being what they

9   are, they're more likely to work.

10         Q     So how do you go about, how do you go about --

11  physicians, I should say, or yourself, I'll withdraw that.

12  How do physicians go about figuring out the right medication

13  for a patient that has an adjustment disorder with depressed

14  mood?

15         A     It is, again, has to do with your experience,

16  and trying to match the side effect profile and almost

17  universally, we will use the serotonin medications first

18  because they're extraordinarily safe.  You can take them in

19  overdose and they're not lethal.  The problem with the early

20  antidepressants is that they were lethal in overdose so

21  you're giving a depressed person a way of killing themselves,

22  that was not good.  So when serotonin medications came along,

23  when Prozac came along, it was a revolution in terms of

24  making it much easier for primary care doctors like myself to

25  be able to safely treat depression in our patients.

1          Q     Very good.

2          A     So just to get back, it's -- it really has to

3     do with your experience, and again, trying to match the

4     medication to the patient and if possible, if they're able to

5     relate that one medication works well in the family, then

6     we'll definitely use that one first.

7          Q     Now with respect to Penny Collins, how did you

8     go about, excuse me, how did you go about figuring out the

9     right medication for her?

10         A     Well, almost all of them, it is a trial, and

11    so you will put them on medication and you see them back in

12    three weeks and see how they're doing, are they having any

13    side effects, are they starting to show improvement.  Because

14    the antidepressant medications will change their serotonin

15    immediately, it doesn't mean that their mood changes

16    immediately.  There's other changes that have to happen in

17    the brain to the receptors and that takes anywhere from two

18    to four weeks to start happening.  And so you see someone

19    back in that time frame to see, are you starting to feel a

20    little bit better, and are you having any bad side effects,

21    do we need to look elsewhere or is this making you worse.

22         Q     So is it a monitoring process?

23         A     Yes, ma'am.

24         Q     Now after the visit that you just testified

25    about, when is the next time you visited, or had an office

1    visit with Ms. Collins?

2          A    I saw her on March 22nd, 2006.

3          Q    And what took place in that office visit?

4          A    She had been able to stop taking the Prozac as

5    well, she was feeling much better, she related she was

6    getting a divorce, she was able to secure a transfer to a

7    different facility, to work, and she was exercising.

8          Q    Did you have a diagnosis on that day?

9          A    Yes, and it was, again, adjustment disorder

10   with depressed mood.

11         Q    Now, what is the next time that she visited

12   your office?

13         A    I didn't see her again until September 1st of

14   2006.

15         Q    I see a note from July, do you see that,

16   Doctor?

17         A    Sorry, yes.

18         Q    Would that be the next time?

19         A    Yes, I did see her then.

20         Q    And in that, in that time, when was that?

21         A    July 11th, 2006, she presented.

22         Q    What took place then?

23         A    She presented with upper respiratory illness

24   with sinus infection and bronchitis with conjunctivitis.

25         Q    Did she report any differences in her mental

1   health?

2            A    No.

3            Q    Now, you testified you saw her in

4   September 2006?

5            A    Yes.

6            Q    What was the purpose of that visit?

7            A    She returned back following up on her

8   adjustment disorder.

9            Q    And what was the nature of the followup?

10           A    She had had worsening in symptoms again, she

11  was crying easily and reported increased anxiety.

12           Q    Doctor, what -- you've mentioned anxiety

13  and -- from a physician's perspective, what is anxiety?

14           A    Anxiety is worry, you're worried about

15  something, and it's anything.  And typically when we label it

16  anxiety, more likely it tends to be at that point

17  dysfunctional, that the worries are maybe getting in the way

18  of your functioning.

19           Q    And what did the plaintiff report to you about

20  her anxiety in that visit?

21           A    We just had a note that she was reporting

22  increased anxiety and we did not characterize it other than

23  that.

24           Q    Now, you -- you're familiar with the DSM?

25           A    Yes, ma'am.

1        Q     What is that, please?

2        A     DSM is the Diagnostic and Statistical Manual,

3   it's now in its fourth edition, it is used by psychiatry and

4   all physicians, actually, as a way of diagnosing certain

5   psychiatric conditions, where it's a syndrome, it's a

6   collection of symptoms, and you have to go through that set

7   of symptoms to arrive at a diagnosis.

8        Q     And are the diagnoses given any sort of

9   numerical nomenclature, labels in the DSM?

10       A     Yes.

11       Q     And what is the DSM-IV and adjustment order

12  with depressed mood?

13       A     That one, I don't have, I don't have my ICD9

14  codes, those are the codes.

15       Q     What's ICD9?

16       A     Sorry.  ICD9 are the numerical codes that are

17  assigned to all diagnoses, and for common diagnoses, I know

18  those ones off the top of my head.  Depression is 311, I

19  think plain anxiety not associated with adjustment disorder

20  is 300.00.

21       Q     All right, I just was trying to understand

22  what you were referring to.

23       A     Adjustment disorder, I can't remember what the

24  exact one is.

25       Q     All right, thank you.  Now did you continue to

1     see the plaintiff throughout 2006 as a patient?

2             A     Yes, ma'am.

3             Q     How many more times did she come to your

4     office in 2006?

5             A     Six more times.

6             Q     And about how frequent were these visits?

7             A     It was about every two weeks.

8             Q     Now you saw the plaintiff on September 29th,

9     2006?

10            A     September 8th.

11            Q     Yeah, I'm referring to September 29th, the

12    visit, sorry, 2006.

13            A     Yes, ma'am.

14            Q     And what was the purpose of that visit?

15            A     She came back in because she was feeling

16    significantly worse.

17            Q     Did she report why she was feeling worse?

18            A     She was -- she reported that the sergeant who

19    was responsible for the majority of the sexual harassment,

20    sexual abuse at Auburn had been transferred to her new

21    facility as a lieutenant so, again, he was her superior, and

22    she reported that she felt that he would destroy her, were my

23    notes.

24            Q     Did she say the word destroy to you?

25            A     Yes, ma'am.

1          Q     Now what was her demeanor during this visit?

2          A     She was crying and very upset.

3          Q     And did you treat her, undertake any treatment

4    as a result of this visit?

5          A     She again had problems when we restarted the

6    Lexapro earlier in the month and she had to taper it off and

7    discontinue it.  So at that point, I just recommended

8    counseling be initiated.

9          Q     And how -- why did she, why did you take her

10   off Lexapro?

11         A     She was having problems again with nausea,

12   upsetting her stomach.

13         Q     Now do your notes reflect that plaintiff

14   undertook any efforts to receive counseling?

15         A     Yes.  She was set up with an appointment to

16   see a counselor, Wednesday, October 4th, 2006.

17         Q     What was that counselor's name, please?

18         A     Dr. Paul Honnes, H-o-n-n-e-s.

19         Q     After that did you have follow up with

20   Ms. Collins?

21         A     Yes, ma'am.

22         Q     And after that October -- I'm sorry,

23   withdrawn.  After that September 29th, 2006 office visit,

24   what's the next time you saw her?

25         A     I saw her again on October 12th, 2006, two

1     weeks later.

2              Q     And did you have a diagnosis on that date?

3              A     Yes, ma'am, she was diagnosed again with

4     adjustment disorder with depressed mood.  I felt that she was

5     not ready to go back to work.  She definitely needed ongoing

6     counseling, she was still feeling on the edge, she was

7     feeling good because she and her husband were going on a

8     cruise, so that part was good, and I recommended that we have

9     followup in three weeks.

10             Q     And did you follow up with her?

11             A     Yes, I saw her again on September 2nd, 2006,

12     and --

13             Q     Is that September?

14             A     Sorry.  November 2nd, 2006.

15             Q     What took place in that visit?

16             A     She related that in terms of her depressed

17     mood, she felt great if she was not thinking about work.  She

18     was not planning on going back to work, she was having

19     problems with insomnia, and had had Ambien to try and that

20     helped with sleep issues.

21             Q     What is Ambien?

22             A     Ambien is a medication that we use for

23     insomnia, it's very safe, you can take it, last about six

24     hours, excuse me, doesn't have any hangover effect for most

25     people, and in general just for short term use does not -- is

1  not addictive.

2          Q    And did you have a diagnosis on November 2nd,

3  2006 of Ms. Collins?

4          A    Yes.  Again, adjustment disorder with

5  depressed mood, but because of the issues with anxiety with

6  thinking about work, I added situational anxiety diagnosis

7  where the anxiety was predominantly related to certain

8  situations where she felt threatened.

9          Q    What were those situations?

10         A    Anything involving being touched by a man or

11  being alone with a man, and also issues with any policemen.

12         Q    What do you mean issues with policemen?

13         A    If she was passing by a stopped policeman, she

14  had significant anxiety about that.  I don't know the exact

15  date but she ended up being arrested for failing to stop from

16  an officer who was trying to pull her over on a back country

17  road and she was by herself and did not feel safe, and ended

18  up being arrested for that.

19         Q    Did she report to you why she did not feel

20  safe in that situation?

21         A    Anyone in -- a male in a uniform to her was

22  perceived as a threat, after her workplace experience.

23         Q    Now, did there come a time, Doctor, where you

24  changed your diagnosis of the plaintiff from an adjustment

25  disorder with depressed mood to something else?

1          A     Yes, ma'am.

2          Q     When was that?

3          A     The first time that I mention that was

4    January 16th, 2007, and unfortunately I noted that I thought

5    she had post-traumatic stress disorder, but I think that was

6    more of a gut feeling in that my notes don't necessarily

7    reflect that until we got to April, and April --

8          Q     April of 2007?

9          A     Correct.

10         Q     And what, about your notes -- withdrawn.  In

11   April 2007, did you change your diagnosis of the plaintiff?

12         A     Yes, I felt that she probably had

13   post-traumatic stress disorder, relative to the severity of

14   her symptoms and relative to the ongoing symptoms.  For an

15   adjustment disorder, you typically -- I don't want to say

16   this, but you get over it, you go on and eventually time

17   heals most wounds.  Post-traumatic stress disorder is

18   something where it keeps coming back at you, you keep

19   reliving the event, and so that anxiety, that depression and

20   the stress of that event doesn't go away.  And the severity

21   of her ongoing symptoms pointed definitely to PTSD as opposed

22   to an adjustment disorder, because it just wasn't going away.

23         Q     Now, I want to just back up a step and ask

24   you, what is post-traumatic stress disorder?

25         A     Post-traumatic stress disorder -- I'm sorry, I

1    don't have the DSM-IV criteria but it involves --

2            Q    Would it assist your testimony if I gave that

3    to you?

4            A    Yes, if you could.

5            MS. CONNOR:  Your Honor, with permission I'd

6    like to show the witness Plaintiff's Exhibit 56.

7            MR. KINSEY:  Same objection we made before,

8    your Honor.

9            THE COURT:  It's not part of his records?

10           MR. KINSEY:  It's not part of the record, it's

11   not dated.  It's been altered, it's not simply the criteria,

12   it's been altered.

13           MS. CONNOR:  I can establish a foundation if I

14   can show it to the witness.

15           THE COURT:  Go ahead.

16           Q    Doctor, I've placed before you what's been

17   previously marked as Plaintiff's Exhibit 56.  Do you

18   recognize this?

19           A    Yes, ma'am.

20           Q    What is it?

21           A    It is a printout that I made of the DSM-IV

22   criteria for post-traumatic stress disorder from the National

23   Center for PTSD.

24           Q    Is your handwriting on this exhibit?

25           A    Yes, ma'am.

1          Q     And where is your handwriting?

2          A     I placed the -- Ms. Collins' name in the upper

3    box with her birth date because, in fact, did have it in her

4    chart, which is why I put her birth date on it, and then I

5    have placed positive boxes around symptoms that she had that

6    fulfill the criteria over the four different criteria for

7    post-traumatic stress disorder.

8          Q     And with respect to the different criteria you

9    mentioned, there are how many?

10              THE COURT:  Do you have an objection?

11              MR. KINSEY:  Yes, objection, we haven't had

12   this admitted yet so reading from the document is improper.

13   May I voir dire?

14              THE COURT:  You may.

15              VOIR DIRE EXAMINATION BY MR. KINSEY:

16         Q     Doctor is that a two-page document?

17         A     Yes, sir.

18         Q     Would you look at the second page, please.

19   Bottom right-hand corner?

20         A     Yes.

21         Q     That has a date and a time, does it not?

22         A     Yes, sir.

23         Q     Can you tell me what the date and time is?

24         A     It was printed out on March 6th -- sorry,

25   April 6, 2009.

1          Q    So it would be unlikely that this is a

2    document you reviewed in April of 2007?

3          A    I did not review it in April of 2007, correct.

4               MR. KINSEY:  Therefore, your Honor, I still

5    object to its entrance, if there's some criteria that he

6    identified at the time, it would be a different matter.

7               THE COURT:  Ms. Connor.

8               MS. CONNOR:  Yes, your Honor, the witness has

9    testified that this is part of the plaintiff's chart, that's

10   why he had the birth date on it, and therefore I think it's

11   completely proper as part of plaintiff's medical records at

12   her physician's.

13              THE COURT:  I guess the objection is he's

14   referencing his diagnosis and treatment of her in April of

15   2007, he didn't print this out until 2009.  I don't want to

16   argue with you that he made it and used it as part of her

17   chart, but I think you need to be clear about when.

18              CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

19         Q    Doctor, when you diagnosed the plaintiff in

20   April of 2007, did you consult any DSM criteria?

21         A    No, at that point that was a clinical

22   diagnosis.  Printing out the DSM-IV criteria was when the

23   state brought up a objection to a diagnosis of PTSD, so I

24   just went through that to make sure that I was correct.

25         Q    And when you say clinical diagnosis --

1       A    Yes, ma'am.

2       Q    -- what is that?

3       A    A clinical diagnosis is when you look at

4  someone and you do your history, you do your physical exam,

5  and you don't do any tests, it is simply your clinical

6  opinion.  If you come to me and you have a sore throat and a

7  runny nose and a cough, I'm going to tell you that you have

8  an upper respiratory virus and that's a clinical diagnosis.

9  I can't do any testing to test for whatever hundreds of

10  rhinoviruses that we have to make a laboratory diagnosis,

11  it's a clinical diagnosis that you have a cold.

12      Q    So, in April of 2007 --

13      A    Yes, ma'am.

14      Q    -- when you changed your diagnosis of the

15  plaintiff, did you -- what, what caused -- withdrawn.

16           What criterion did you use to change the

17  diagnosis from adjustment disorder with depressed mood to

18  PTSD?

19      A    It was the understanding of the avoidance that

20  she was undertaking as we talked about, not all of this is

21  documented in my notes but that she wouldn't leave her house,

22  she would not go grocery shopping.  She couldn't -- she

23  didn't want to leave the house alone without her husband for

24  fear that if she got stopped by the police, that something

25  very bad would happen to her.  And it was that avoidance of

1  those situations and the severity of her symptoms that led me

2  to that diagnosis.

3           Q    Now, for PTSD, is one of the criterions a

4  stressor?

5           A    Yes, ma'am.

6           Q    And what is a stressor?

7           A    A stressor is any event outside of normal life

8  that we experience that causes us stress.

9           Q    Now what would a stressor be for -- for PTSD?

10          A    The most common PTSD stressors we're seeing

11  now are veterans coming back from combat.  We have PTSD

12  diagnoses for, I have a patient who witnessed a murder where

13  a man was shot twice in the back right in front of him and

14  then right in the head.

15          Q    Okay.  Doctor, what, in a general sense, what

16  is the -- an initial stressor for PTSD?

17          A    Any event that gives you a sense of immediate

18  harm or that you may be in danger even if no harm occurs.  If

19  you have an impression that you might be in danger, that

20  would be a stressor that could initiate post-traumatic stress

21  disorder.

22          Q    And what sort of danger would qualify as an

23  initial stressor for PTSD?

24          A    It can be anything, again, from witnessing

25  violence to simple emotional intimidation, bullying, anything

1    like that.  Certainly assault, sexual assault, physical

2    assault, if you witness any of those events, those are things

3    that even though it did not happen to you, could initiate

4    PTSD.

5            Q    And does everyone who witnesses these events

6    eventually get PTSD?

7            A    Certainly not.

8            Q    Then what would be the next thing you would

9    look for in diagnosing PTSD?

10           A    It's the intensity of the reaction, and --

11           Q    What type of reaction would qualify for PTSD

12   diagnosis?

13           A    You can have anxiety, you can have nightmares,

14   you can have flashbacks, deja vu where you keep revisiting

15   it, you can have avoidance behaviors where you just simply

16   will not go places or do things for the fear that this will

17   recur.

18           Q    Now, what other criterion do -- what is

19   another criterion that you would look for in diagnosing PTSD?

20           A    One of the things would be what we call

21   hyperarousal, that's where a person is on very high alert,

22   certainly an issue with veterans with PTSD coming back, where

23   they're reacting like they're in a war zone to a normal daily

24   thing.  So the hyperarousal is you're jumpy, you just -- you

25   can't rest, that plays into problems with sleep ...

1          Q     Now you also mentioned flashbacks, Doctor.

2     What is a flashback?

3          A     A flashback is a recollection of being there,

4     at the incident that initiated the PTSD, and emotionally

5     physically feeling it.

6          Q     As though you were there?

7          A     Correct.

8          Q     Now, with respect to Penny Collins, what

9     stressor did you rely on initially as an initial stressor to

10    diagnose PTSD in her?

11         A     She related that the stress of the sexual

12    harassment at work involving touching, involving explicit

13    sexual jokes, and implicit sexual suggestions in the

14    workplace by her superiors made her feel very unsafe.

15         Q     And what reaction did that -- what reaction to

16    that did you note in Ms. Collins?

17         A     She had extreme avoidance behavior, that was

18    the biggest thing is she just would not go out.  She was at

19    home, she was not going out with friends, she -- again, was

20    having problems even just going shopping without her husband,

21    for fear that, you know, someone might touch her, and she

22    might, you know, react in a violent manner.  That was her

23    fear, is that she was on such high alert, that she would

24    react instinctively with her training and might hurt someone,

25    when they were innocently touching her.

1          Q    And did you note whether or not she had any

2    flashbacks or intrusive recollections concerning her

3    stressors?

4          A    I don't believe she had specifically

5    flashbacks, but the recurrent memories and if she thought

6    about work, these were the first thoughts that came up is the

7    recurrences of how she was treated.  I don't specifically

8    have flashbacks in my record, but again, she related as she

9    was discussing work at all, if she thought about work at all,

10   that these memories came back.

11              MR. KINSEY:  Excuse me, your Honor, can we

12   know where in the record the doctor is referencing at this

13   point?

14              MS. CONNOR:  Your Honor, I think he's free to

15   ask him that on cross.

16              MR. KINSEY:  For the record, he's referring to

17   a document as he's testifying, the record has to reflect what

18   it is.

19              THE COURT:  What document?

20         Q    What document are you looking at?

21         A    As I just said, I'm actually not referencing a

22   document and I did not note that she specifically had

23   flashbacks, and excuse me.  Just because I have this in front

24   of me, I'm not reading it.  So this is in the course of our

25   discussions and certainly when you're in the room for 20 to

1    30 minutes with a patient, I cannot put down on paper

2    everything that we discussed.  And some of the things Penny

3    asked me not to put down, she said this is private, and I

4    respected her privacy that way, as part of the medical

5    record.  So the medical record does not always completely

6    reflect what the experience of the doctor is because

7    sometimes patient confidentiality in terms of they don't want

8    this in the record.

9              Q     Now, did you see Ms. Collins in March of 2007?

10             A     Yes, I initially saw her on March 7th.

11             Q     And what -- your diagnosis at that time was

12   what, Doctor?

13             A     Again, adjustment disorder, at that point with

14   anxiety, she had presented with chest pain and she related

15   she had returned to work and she broke down after two days.

16   She related officers were unable to accept her and she felt

17   isolated and she felt like she was on the edge.  On

18   discussion, she was tearful, she was unable to stop crying,

19   but as always, she was well groomed, well put together.

20             Q     What -- with respect to the chest pain, did

21   you attribute that to any particular cause, what caused it?

22             A     Yes, I felt that that was due to anxiety.

23   That's a common anxiety system, chest pain, you can get

24   stomach upset, any number of different body complaints

25   relative to anxiety.

1          Q     Did you make any observations of her that day

2    on her demeanor?

3          A     Yes, simply that she was unable to stop

4    crying.

5          Q     Now when did you see her next after that day?

6          A     I saw her the next day.

7          Q     And what observations, if any, did you make of

8    her that day?

9          A     I had prescribed Ativan the previous day for

10   the anxiety, it is a benzodiazepine medicine similar to

11   Valium so it is something that does a very good job of

12   calming anxiety.  It's a little better than Valium, it

13   doesn't -- Valium can have different metabolisms so it

14   doesn't have a straightforward effect over a time frame and

15   it acts differently for different people so I prefer the

16   Ativan to that.  On the next day, she related that she was

17   feeling better and she was not tearful and not anxious on her

18   physical exam.

19         Q     And did you make a determination around this

20   time period of March 2007 of whether you believed that

21   Ms. Collins could return to work as a corrections officer?

22         A     Yes.

23         Q     And what was that, what was that observation

24   or belief on your part?

25         A     After this second failure of trying to return

1    to work, I did not feel that it was in her best interest to

2    try to return to work as a corrections officer.

3          Q    Now Doctor, did there come a time where you

4    had a diagnosis of Ms. Collins' symptoms to a reasonable

5    medical certainty that she had post-traumatic stress

6    disorder?

7          A    Again, initially, in January was the first

8    time that I mention that I thought it might be PTSD.  In

9    March 15th visit, I related I thought it was probably PTSD,

10   the first time in my notes that I marked it simply as

11   post-traumatic stress disorder was July 9th of 2007, which

12   was about 18 months after her initial presentation.

13         Q    And why did you mark that solely in your notes

14   in July of 2007?

15         A    Again, because of the time frame, simply for

16   post-traumatic stress disorder it only has to be going on for

17   a month for it to be PTSD, but you have to see the range, the

18   constellation of symptoms, and in her case, what happened

19   with reexposure to the stressor and then the subsequent

20   deterioration, if that's what made the diagnosis clear at

21   that point by July.

22         Q    When you say reexposure to the stressor, what

23   stressor are you referring to?

24         A    Specifically in September of 2006, when she

25   had been working at the other facility down, I believe the

1    Hudson Valley, she'd been doing fine, until Lieutenant

2    Mitchell was reassigned there, and that's when she totally,

3    completely broke down, lost it, and has not been able to go

4    back to work since then, as a corrections officer.

5           Q    Now, Doctor, in your professional medical

6    opinion, can you say what caused the plaintiff's

7    post-traumatic stress disorder?

8           A    The primary stressor was the sexual harassment

9    by her superiors, someone that she had no control over who

10   had complete control over her as her superior, and the sexual

11   harassment involving -- including physical touching and

12   explicit sexual jokes and the implicit sexual comments.  She

13   felt fear because he was her superior, but also these

14   comments were made in front of prisoners and she worked in a

15   prison where if the prisoners do not respect you, that is a

16   personal danger and so for her to be in that situation, not

17   feeling that if a prisoner jumps on her, that the other

18   officers have her back, that they're going to take care of

19   her because she's that outcast, and I don't know why she's

20   the one that got picked on.  This is something, you know,

21   from her talking to me that other officers, female officers

22   are sexually harassed, and that's part of this, part of the

23   climate there in the prison system with female officers.  But

24   for her, it was intolerable.

25           Q    Now in the time period of July 2007, did you

1    have an opinion, excuse me, whether it would be appropriate

2    for Ms. Collins to return to work as a correction officer?

3            A    Yes, I felt that it was entirely inappropriate

4    for her to return to work.

5            Q    Why was that?

6            A    She related to me about that time that she had

7    had homicidal ideation which means that she thought about

8    killing someone, and the specific incident was that she was

9    on the guard tower at the new prison where Lieutenant

10   Mitchell was there, she was on watch with a rifle, and

11   actually had him in her sights with the safety off and her

12   finger on the trigger, considering pulling the trigger.  And

13   again, with homicidal ideation, if I put her back in the same

14   situation, I'm liable because I would be just as guilty of

15   pulling the trigger as she was, knowing that she was not fit

16   to do that.

17           Q    Now despite this that you just reported, did

18   there come a time where you believed that it would be

19   appropriate for the plaintiff, Ms. Collins, to try to return

20   to work in corrections?

21           A    In February of 2008, I did feel that

22   potentially she could return to corrections as long as she

23   did not carry a firearm and felt that potentially she could

24   be involved in administration or teaching.  She specifically

25   approached the corrections department about a sexual

1    harassment course to help the officers with that, and yes,

2    but I did not feel that she should be carrying a firearm at

3    that point.

4            Q    Now, in this time period of February 2008 that

5    you just referred to, Doctor, had you -- did you have office

6    visit or visits with Ms. Collins?

7            A    Yes, I saw her February 6, 2008, and

8    March 10th, 2008.

9            Q    Is there anything about these visits that led

10   you to conclude that it may be appropriate for her to return

11   to work if she didn't carry a firearm?

12           A    Our discussion, she felt that she would like

13   to try to return to work.  I felt that it potentially was

14   worth a try, given that sometimes the treatment for -- for

15   any anxiety is an exposure to what you're afraid of.  And if

16   you can find out that what you're afraid of is not going to

17   kill you, that can be therapeutic.  So she felt she was ready

18   to try to return to work and I concurred, but it was

19   definitely on a trial basis.  It was something that was not,

20   um, without concern from my perspective, and we discussed

21   that if, if it didn't work out, then that was three strikes.

22           Q    Now, you mentioned, going to refer you back to

23   a little earlier time frame, where Ms. Collins first came to

24   your office in December 2005.

25           A    Yes, ma'am.

1          Q    And when she first came to your office and you

2     first got to know her and had office visits with her in this

3     time period, did you -- did she present any symptomatic

4     history that would support a diagnosis of adjustment disorder

5     or PTSD prior to December 2005?

6          A    No.  The only psychiatric symptoms that she

7     ever related was some depression around the time of her dad's

8     death which again would fulfill the criteria for adjustment

9     disorder with depressed mood and not pure depression.

10         Q    But you didn't -- did you treat her or see her

11    in that time period?

12         A    No.  That resolved and she dealt with that.

13         Q    When she -- prior to the time that she came to

14    your office in December 2005, did you have any reason to

15    believe that she was not a functional person in society?

16         A    No, ma'am.

17         Q    And did you have any reason or medical history

18    from any other doctors in your office that she had any

19    trouble working in corrections?

20         A    No.

21         Q    Now, jumping ahead to that 2008 time period,

22    again.  Did you prescribe any medications for the plaintiff

23    in 2008?

24         A    Excuse me, is there a specific date you're

25    referencing?

1          Q    Well, I was looking in the earlier part of

2     2008, I don't have a specific date.

3               THE COURT:  And the question is regarding

4     medication?

5               MS. CONNOR:  Yes.

6          A    The only medication that she would have

7     continued to take at that time would have been the Ativan on

8     an as-needed basis.

9          Q    Did you prescribe Lorazepam for Ms. Collins?

10         A    That's the generic form of Ativan.

11         Q    Okay.

12         A    So they are the same medication.

13         Q    Now, in June of 2008, I can refer you to time

14    period there, June 11th, 2008, did you see Ms. Collins at

15    your office?

16         A    Yes, ma'am.

17         Q    And what was the purpose of that visit?

18         A    She came back in with worsening of her

19    symptoms after attempting to return to corrections.

20         Q    What did she report to you?

21         A    That she was having panic attacks, she was

22    still having instinctual panic is what I documented, with

23    male touch, and so that was a hyperarousal.

24         Q    What does that mean?

25         A    Instinctual panic means that somebody would

1    touch her and she would just react (indicating), without,

2    without knowing what she was doing.

3              Q    What's a panic attack?

4              A    Panic attack is a situation, symptoms

5    typically involve chest pain, shortness of breath, and most

6    notably feeling that you are going to die, and if you asked

7    someone that has true panic attacks in different situations,

8    there is definitely a sense of I'm going to die.  That's one

9    of the real questions you have to ask someone if they're

10   having true panic attacks.

11             Q    How intense can the chest pain be during a

12   panic attack?

13             A    Well, you think you're going to die, so ...

14             Q    From the pain?

15             A    From the pain, shortness of breath and you

16   just, it's -- you know, it's as bad or worse than a heart

17   attack.

18             Q    Do you feel like you're having a heart attack?

19             A    Yes, ma'am.

20             Q    Now, would it -- is a panic attack rational?

21             A    No.  Absolutely not.

22             Q    And when Ms. Collins reported panic attacks to

23   you, what symptoms did she report that led you to conclude

24   that she had panic attacks?

25             A    That was just documented as panic attacks,

1    didn't specifically document her symptoms.

2         Q    Now, is it possible, Doctor, to have

3    post-traumatic stress disorder and anxiety at the same time

4    or does post-traumatic stress disorder encompass all of that?

5         A    Post-traumatic stress disorder will encompass

6    all of the anxieties disorders so the panic attacks and the

7    anxiety are a component of the post-traumatic stress

8    disorder.

9         Q    Now, have you treated Ms. Collins from 2008

10   through the present?

11        A    Yes, ma'am, until she moved away.

12        Q    And when was that?

13        A    I believe the last time I saw her in the

14   office was -- before this year was March of 2010.

15        Q    In the, between 2000 --

16        A    Sorry, April of 2010.

17        Q    And from the point that you diagnosed her with

18   PTSD in 2007 through the time you saw her in 2010, did she

19   continue to manifest symptoms of PTSD?

20        A    Yes, ma'am, she continues to do that now.

21        Q    My next question.  And when's the last time

22   you saw Penny Collins in your office?

23        A    I just saw Mrs. Collins, I believe last week,

24   week before.

25        Q    And did you note any symptoms of PTSD in your

1    visit?

2            A    It was more of a social visit, getting

3    acquainted and less of a medical visit.

4            Q    But you just testified that she continues to

5    manifest symptoms to this day?

6            A    Yes, ma'am, I'm watching her from the stand

7    and as I testify to different things --

8                    MR. KINSEY:  Objection, your Honor.

9                    THE COURT:  What's the nature of your

10   objection?

11                   MR. KINSEY:  She's not an exhibit.  He's

12   testifying about her courtroom demeanor, how is that

13   appropriate when he's testifying about his medical records

14   and something that happened in an examination?

15                   THE COURT:  Sounds like he's talking about

16   some observations he's made today.  You're going to be free

17   to cross-examine.

18                   MR. KINSEY:  Okay, thank you, your Honor.

19                   MS. CONNOR:  Would you read the doctor's

20   answer back up to the point of the interruption, please.

21                   (The requested portion of testimony was read.)

22           Q    Would you complete your answer, please,

23   Doctor?

24           A    Her emotional reactions as she has to cover

25   her head, I'm suspecting she's trying to not cry, it's

1   just -- it's not a normal reaction when I'm talking about

2   things that were years ago, and just bringing these up are

3   bringing back her visceral, her gut emotional reaction that

4   is not comfortable.  She is still not comfortable.  In my

5   office note when I did see her on the 7th, the nurse --

6            Q    The 7th of what, please?

7            A    I'm sorry, March 7th, 2012.  The nurse noted

8   that she was still having problems falling asleep and

9   difficulty staying asleep.  And that she was having increased

10  anxiety with the beginning of the trial and having to see

11  Lieutenant Mitchell.  She still -- she related that she still

12  had fears with police officers.  I did forget this, we talked

13  that she was extremely proud that she had been stopped by a

14  police officer and was thrilled that she did not freak out

15  and kind of freak the officer out, that she was so happy that

16  she wasn't a mess with the car locked waiting for her

17  husband.  So that was some progress in that matter, but it

18  still is -- is still symptomatic for her when she has to

19  really guard her reactions when she got stopped.

20           Q    Doctor, in your professional medical opinion,

21  how susceptible is Ms. Collins to continuing problems with

22  post-traumatic stress disorder?

23           A    That's the problem with PTSD is that it can be

24  potentially a lifelong illness, if you want to term it that

25  way, a lifelong condition.  Never getting back to having a

1    normal reaction to driving by a police officer or being alone

2    in a room with a man.  And so those are things potentially

3    that may continue for the rest of her life.  At this point

4    she still is -- yeah, I'm sorry, I was looking back at my

5    note from March 7th, 2012, and yes, she still exhibits those

6    fear symptoms.

7            Q    Now, if Ms. Collins was subjected to a sexual

8    attack in the beginning of 2003, would that change your

9    professional medical opinion about what caused her PTSD?

10           A    No, ma'am.

11           Q    Why not?

12           A    Because if that was the instigating situation

13   in terms of the PTSD, that would be where she would have any

14   remembrances, that would be the situations that would cause

15   her symptoms, and that's not.  Her symptoms are related to

16   her work situation where the sexual harassment and sexual

17   abuse occurred.

18           Q    And if Ms. Collins was victimized by childhood

19   sexual abuse, would that change your diagnosis of what caused

20   her PTSD?

21           A    No, ma'am.

22           Q    Why not?

23           A    I do have patients with childhood sexual PTSD,

24   and their flashbacks, their deja vus are going right back to

25   when they were victimized as a child, and so this is

1    distinctly different for Mrs. Collins.

2         Q    Doctor, I'm going to -- I have some documents

3    that I want to show you, and have you identify for me.  I'm

4    going to start with Plaintiff's Exhibit 33.  I've placed

5    before you what's been marked as Plaintiff's Exhibit 33,

6    Doctor, do you recognize that document?

7         A    Yes, ma'am.

8         Q    What is it?

9         A    It is a document to certify leave of absence

10   per the Family and Medical Leave Act.

11        Q    Is your signature on that document?

12        A    Yes, ma'am.

13        Q    And where is that?

14        A    On the third page, dated December 29th, 2005.

15        Q    Is your handwriting elsewhere on the document?

16        A    Yes, ma'am.

17        Q    Where is that?

18        A    On pages 1 and 2, I'm documenting the medical

19   findings which support the certification, basically

20   describing her demeanor, being tearful and her abdominal exam

21   consistent with the gastritis, and the tearfulness indicative

22   of the depressed mood from the adjustment disorder.

23        Q    And direct your attention to the bottom of the

24   first page, 5C.

25        A    Yes, ma'am.

1          Q     What did you write there, please?

2          A     I wrote, "Patient is currently" --

3                MR. KINSEY:  May we have this admitted before

4     we read from the document, your Honor.

5                THE COURT:  Are you going to offer the

6     document?

7                MS. CONNOR:  Yes, I am, I'll offer it now.

8                THE COURT:  Thank you.  Any objection?

9                MR. KINSEY:  No objection.

10               MR. ANDREWS:  No objection, your Honor.

11               THE COURT:  It's received.

12         Q     With 5C, Doctor --

13         A     I wrote, "The patient is currently

14    incapacitated from her current job and this will probably

15    last approximately 12 months."  The question requires me to

16    make a guess in terms of the duration of the illness and I

17    tend to try to go on the high side in case it does last

18    longer.

19         Q     Doctor, if you look at the next page.

20         A     Yes, ma'am.

21         Q     Item 7B?

22         A     Yes.

23         Q     What did you write there?  You actually have

24    pretty good writing for a doctor, I can say, but I'd ask you

25    to read it because --

1              A    I try.

2              Q    -- sometimes it's difficult.

3              A    "She is unable to perform any function of a

4    corrections officer in Auburn facility due to work

5    environment."

6                   MS. CONNOR:  Now, to save time, your Honor, I

7    would like to show the witness a group of documents and I

8    will name them off so hopefully we can follow rather than go

9    back and forth for each one.

10                   THE COURT:  Just give him the packet.

11              Q    Doctor, I'm showing you a group of documents

12   that were previously marked and I'm going to read off the

13   numbers of those exhibits for the record.  The first is

14   Plaintiff's Exhibit 39.  Next, Plaintiff's Exhibit 40, 41,

15   42, 44, 45, 46, 47, 48, 49, 51, 52, 53, and 54.  Do you have

16   those documents in front of you?

17              A    Yes, ma'am.

18              Q    And would you identify those documents,

19   please.

20              A    These are the Department of Correctional

21   Services certification of whether the patient is disabled

22   from their work or not, and when they might return to duty.

23              Q    Is your signature on each of those documents?

24              A    Yes, ma'am.

25                   MS. CONNOR:  At this time, we offer

1    Plaintiff's 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 51, 52,

2    53, and 54.

3                    MR. KINSEY:  May we have a moment, your Honor.

4                    THE COURT:  You may.

5                    MR. KINSEY:  Counsel, 39, 40?

6                    MS. CONNOR:  39, 40, 41, 42, 44, do you want

7    me to keep going?

8                    MR. KINSEY:  Please.

9                    MS. CONNOR:  45, 46, 47, 48, 49, 51, 52, 53,

10   54.

11                   MR. KINSEY:  Without objection, your Honor.

12                   MR. ANDREWS:  No objection.

13                   THE COURT:  No objection, they'll be received.

14        Q    Doctor, at this time I'm going to show you an

15   exhibit that has been marked as Plaintiff's Exhibit 84.  And

16   I'd ask for you to look at that and identify it for me if you

17   can.

18        A    Yes, ma'am.

19        Q    What is that, please, Doctor?

20        A    That is a letter Mrs. Collins requested to the

21   superintendent of the Auburn Correctional Facility about the

22   reason for her leave of absence.

23        Q    Did you write this letter?

24        A    Yes, ma'am.

25        Q    And I note there's some handwriting at the

1    top, do you see that?

2              A    Yes, ma'am.

3              Q    What does that say, please?

4              A    That is mailed February 10th, 2006, and the

5    initials is one of the secretaries in the office.

6              Q    You recognize her initials?

7              A    No, it's scribbled.

8              Q    Did you provide this as part of Ms. Collins'

9    materials from your office?

10             A    Yes, ma'am.

11             Q    And who's the letter addressed to?

12             A    Superintendent Graham from the Auburn

13   Correctional Facility.

14                  MS. CONNOR:  At this time, we offer

15   Plaintiff's Exhibit 84.

16                  MR. KINSEY:  We would object, your Honor, it's

17   not signed.  There's no indication it was ever received, he's

18   on the stand and can testify about the letter.

19                  THE COURT:  Ms. Connor.

20             Q    Doctor, before -- at one point did you sign a

21   copy of this letter?

22                  MR. KINSEY:  Your Honor, I have an objection

23   pending.

24                  MS. CONNOR:  You objected --

25                  THE COURT:  What is it?

1            MR. KINSEY:  I object that it's not signed,

2     it's bolstering, there's no indication it was ever received

3     by anyone, he's on the stand and can testify about the letter

4     but we object to the entrance of this into evidence.

5            THE COURT:  Okay, and she's asked him if he's

6     ever signed it, do you have an objection to that?  That was

7     the next question.

8            MR. KINSEY:  So I'm --

9            THE COURT:  I have not received or sustained

10     or overruled your objection at this point, she's asked

11     another question.

12            MR. KINSEY:  All right.

13            THE COURT:  Thank you.  Go ahead.

14        A    Yes, I do have a signed original copy.  I

15     believe I have a signed original copy or a copy in the

16     original medical record.

17            THE COURT:  I'm going to sustain the

18     objection.

19            MS. CONNOR:  At this time I have no further

20     questions for the witness.  Thank you.

21            THE COURT:  Doctor, your schedule today?

22            THE WITNESS:  I am off for the whole day for

23     you, sir.

24            THE COURT:  Good.  I'm reading that people may

25     need a break for lunch.  You too?

1          THE WITNESS:  Or the potty.  Yes, sir.

2          THE COURT:  Okay.  Want to make sure that

3   you're not otherwise engaged this afternoon so you can't be

4   back here.

5          THE WITNESS:  No, I planned on the whole day

6   off in case testimony went long.

7          THE COURT:  I appreciate that, thank you, sir.

8          THE WITNESS:  Realize I'm kind of key.

9          THE COURT:  Okay.  Ms. Connor has finished her

10  direct examination, we're going to go to lunch before we

11  start cross-examination.  Ladies and gentlemen, it's about

12  four minutes to 12, if you could be back ready to go at 1:00

13  in the jury room, enjoy your lunch, don't talk about it,

14  don't read about it, don't let anybody talk about it, anybody

15  approaches you I need to know immediately.  Enjoy your lunch.

16          (Jury Excused, 11:57 a.m.)

17          THE COURT:  Doctor, you can step down.

18          THE WITNESS:  Thank you, sir.

19          MS. CONNOR:  Your Honor, may I raise a

20  question about our schedule.

21          THE COURT:  You may.

22          MS. CONNOR:  Thank you.  Your Honor, I'm

23  trying to juggle witnesses because of the absence of one of

24  my witnesses, and I have requested Ms. Kaplan to come from

25  Rochester today, she was originally scheduled for tomorrow.

1    She is going to try to get here sometime between 3 and 3:30.

2    And that's the earliest that -- I've talked to her several

3    times, between last night and today.  Because she has other

4    investigations and things, obligations, I guess.

5                    THE COURT:  Let me help you.  It sounds like

6    that the cross-examination of the doctor is going to be

7    awhile, why don't you tell her to come tomorrow morning.

8                    MS. CONNOR:  That was it, because I also

9    remembered your remark about the basketball game and I

10   thought, gee, I don't want to inconvenience her to come that

11   way if we're not going to have her on.

12                   THE COURT:  If she's not going to get here

13   until 3 or 3:30, tell her to come tomorrow morning.

14                   MS. CONNOR:  Thank you very much, your Honor,

15   I will call her.

16                   THE COURT:  Because how long do you anticipate

17   her testimony?

18                   MS. CONNOR:  Not very long, your Honor,

19   really, I mean, an hour or so.  But I don't know how long

20   Dr. Alley's going to be, and --

21                   THE COURT:  I assume you're going to be

22   awhile, Mr. Kinsey.

23                   MR. KINSEY:  It will be awhile.

24                   THE COURT:  And Mr. Andrews, you're going to

25   have some cross-examination this time, right?

1          MR. ANDREWS:  I certainly expect to, your

2    Honor, yes.

3          THE COURT:  I certainly expect you to, too.

4          MS. CONNOR:  I'll call her and tell her

5    tomorrow morning, 9:00.

6          THE COURT:  Can I see counsel at the bench,

7    please.

8          (At Side Bar.)

9          THE COURT:  Ms. Connor, sounds like you may

10   have another witness today.  She might be in handcuffs but

11   she's gonna be here.

12         MS. CONNOR:  Oh, my gosh.  Serious?

13         THE COURT:  So we'll see.

14         MR. KINSEY:  Did she fight them?

15         THE COURT:  Well, she's been ducking them.  I

16   don't know what you did to her, but --

17         MS. CONNOR:  Please, maybe they did something

18   to her.

19         MS. SHEEHAN:  Excuse me?

20         MS. CONNOR:  It's a joke.

21         MS. SHEEHAN:  We've had no contact with her

22   whatsoever.

23         MS. CONNOR:  In the same way the judge made a

24   joke to me.

25         THE COURT:  Counsel, I've asked you up here,

1    and it's more for future reference because I'm very

2    disappointed in the way this case is proceeding.  Not in the

3    way that you're acting, but in the way that the documents

4    have not been stipulated to when there's no objection.  This

5    is not state court, this is federal court.  The only thing we

6    ask you to do when you come here is be prepared.  You know,

7    as you can tell, I would like to try to keep things moving,

8    these people are performing a service for us.  And I got to

9    tell you, and this is for future reference, don't ever come

10   back here without, you know, sitting down, we ask you to sit

11   down, counsel get together and stipulate to documents where

12   there isn't going to be an objection.  And it has happened

13   repeatedly in this case where there's no question that these

14   documents should be coming in, and it's a waste of

15   everybody's time.  I am so irritated by it, that I wanted to

16   let you know, and that, you know, I'm not going to do

17   anything about it in this particular case, it's a case that I

18   picked up from another judge, but certainly, you should know,

19   and I know all my colleagues feel the same way, we don't take

20   the time -- we want to know what the witnesses are going to

21   be, what the documents are going to be, and if there is no

22   objection, they should be stipulated to.  And that needs to

23   happen.

24                    And we're wasting entirely too much time with

25   all the documents and searching for documents and whatever.

1    It should be -- they should have all gone through, it should

2    have been done.  That's the way we try cases here, and I just

3    wanted you all to hear that, so you know for future

4    reference, okay.

5              Other than that, we're going to get through

6    this, we're getting there and we're doing fine.  You know, I

7    don't like to interfere with attorneys and what they're

8    doing.  You know, I want to see lawyers try their cases

9    without interference from the court, and I try very hard to

10   do that.  But you need to know this.  Okay.  For future

11   reference.

12             MR. ANDREWS:  Your Honor, can I raise one

13   issue with regard to the Mayville testimony that, again, may

14   not be an issue but I just want to confirm that it's not an

15   issue.  She gave deposition testimony about a EEO class in

16   2008, so we're talking again a period of some three years

17   after the last allegation against defendant Mitchell where

18   she had some allegations that he allegedly made like a

19   statement that she interpreted as homophobic and --

20             THE COURT:  Does it have to do with this case?

21             MR. ANDREWS:  Nothing.  She also said that he

22   seemed disdainful of the case although didn't describe how

23   that was.

24             MS. CONNOR:  I think that's mischaracterizing

25   the testimony.  She specifically, he -- according to her

1    testimony, he specifically approached her and asked if she

2    remembered him from the Collins case and then he proceeded to

3    make comments about the Collins case to her.

4              MR. ANDREWS:  She didn't say what those

5    comments were.

6              MS. CONNOR:  Yes, she did.  She stated that in

7    the deposition, his comments on the Collins case.  And the

8    class took place in 2008, there's no dispute there, but it

9    was directly about the Collins case.

10              THE COURT:  So your position would be that

11    it's a party admission.

12              MS. CONNOR:  Yes.

13              THE COURT:  Statement against interest.

14              MS. CONNOR:  Statement against interest, yes.

15              MR. ANDREWS:  What was the admission?  There

16    was no admission.

17              MS. CONNOR:  You can have admissions from

18    inferences.

19              THE COURT:  What?

20              MS. CONNOR:  He commented about the Collins

21    case to her and she commented back.

22              THE COURT:  So this is her impression of what

23    he was --

24              MS. CONNOR:  No.

25              MR. ANDREWS:  Absolutely.

1            MS. CONNOR:  It's a quote from what he said.

2            MR. ANDREWS:  What's the quote?

3            THE COURT:  What's the quote?

4            MS. CONNOR:  I can get the transcript, I

5    mean --

6            THE COURT:  Yeah, I think -- well, no, we can

7    deal with this when we get there if Ms. Mayville is here to

8    testify, we can deal with it, and you object.

9            MR. ANDREWS:  Absolutely, your Honor.

10           THE COURT:  And what I'm hearing, there isn't

11   going to be any statement of her impression of how he

12   reacted, you know, she can state, you know, some physical

13   observation of him but beyond that, no.  Not her impression.

14           MS. CONNOR:  And I was not planning on

15   questioning her about the homophobic comment.  That's not

16   part of my plan.

17           THE COURT:  Okay.  Well --

18           MR. ANDREWS:  There was a homophobic comment.

19           THE COURT:  So you know, all right, going

20   forward, you object, okay.

21           MR. KINSEY:  Thank you.

22           MS. SHEEHAN:  Thank you, your Honor.

23           MR. ANDREWS:  Thank you, your Honor.

24           THE COURT:  Enjoy your lunch.

25           (Whereupon a luncheon recess was taken from

1                    12:06 p.m. to 1:05 p.m.)

2                    (Open Court, Jury Out.)

3              THE COURT:  Everybody ready?

4              MR. KINSEY:  Yes, your Honor.

5              MS. CONNOR:  Your Honor, I have a scheduling

6    issue to raise before the jury comes in, please.

7              THE COURT:  Okay.

8              MS. CONNOR:  Okay.  I understand that the

9    marshals have located my missing witness.

10             THE COURT:  Yes.

11             MS. CONNOR:  And --

12             THE COURT:  She's here.

13             MR. KINSEY:  I have my witness coming from

14   Rochester and she -- the problem is they have now rearranged

15   State Division of Human Rights, they have rearranged their

16   entire schedule to accommodate her coming today rather than

17   tomorrow.  So I -- after Dr. Alley I would like to proceed

18   with my Rochester witness, and I don't know what would occur,

19   you know, this afternoon with respect to the witness that is

20   here.  I just -- kind of asking for your Honor's direction.

21             THE COURT:  Well, it sounds like you're going

22   to have to keep the testimony of Ms. Kaplan very short.

23             MS. CONNOR:  I was not expecting it to be very

24   long, frankly, but I just feel like they have gone to

25   considerable expense, actually rented a car to get her here,

1    and they are, you know, so --

2                    THE COURT:  We'll just proceed and see where

3    we get.

4                    MS. CONNOR:  Okay, thank you.

5                    THE COURT:  I'm not going to tell you what

6    order to call your witnesses in.

7                    MS. CONNOR:  But let me -- I'm not asking

8    that, your Honor, but if we don't get to Ms. Mayville today,

9    what will happen with Ms. Mayville?

10                   THE COURT:  I'll ask her if she brought her

11   toothbrush.  Okay.  We'll see.

12                   MS. CONNOR:  The inference there that I would

13   get from that, you're saying that she would be held here?

14                   THE COURT:  We'll see.  We're going to have to

15   talk to her.  Okay.

16                   MS. CONNOR:  Thank you.

17                   THE COURT:  Bring the jury in, please.

18                   (Jury Present, 1:07 p.m.)

19                   THE COURT:  Okay, the record should reflect we

20   have the ladies and gentlemen of the jury, hope you enjoyed

21   your lunch, Dr. Alley is still on the stand,

22   cross-examination.  Mr. Kinsey, go ahead, sir.

23                   MR. KINSEY:  Thank you, your Honor.

24                   CROSS-EXAMINATION BY MR. KINSEY:

25        Q    Doctor, my name is Roger Kinsey, I'm an

1    Assistant Attorney General, represent the state of New York,

2    Department of Correctional Services, Mr. Graham, Mr. Burge

3    and Mr. Goord.  So I'm going to ask you some questions about

4    your testimony this morning.

5              A    Yes, sir.

6              Q    As a preliminary matter, did you spend lunch

7    with plaintiff?

8              A    Yes, sir.

9              Q    And did you discuss the case with plaintiff?

10             A    We really discussed, actually I used to take

11   care of her son, and he had --

12             Q    Don't want to know about anything that was

13   said about her son.

14             A    That's -- yeah.

15             Q    That's privileged.  Did you talk to her about

16   testimony this morning?

17             A    I asked her how I did, she replied that she

18   thought I did great.

19             Q    And when you arrived at the courthouse this

20   morning, you -- did you spend some time with plaintiff and

21   her husband?

22             A    No.

23             Q    Did you greet them?

24             A    When I first came in, I came in just as the

25   other gentleman's testimony was completing so it was just as

1    I came in.

2            Q    So had you testified in federal court before?

3            A    No, sir.

4            Q    Did anyone tell you that as a witness, you

5    should not enter the courtroom prior to your testimony?

6            A    No, sir.

7            Q    Did you find anything that Dr. Reagles had to

8    say on PTSD or damages helpful to your testimony?

9            A    No, sir.

10           Q    When was the last time you talked with

11   plaintiff's counsel either by telephone or in person?

12           A    This morning.

13           Q    Can you tell me what the --

14           A    Sorry, we spoke last night, on the phone last

15   night.

16           Q    About how long?

17           A    Ten minutes.

18           Q    What was the sum and substance of that

19   conversation?

20           A    She was just asking me if I was ready, if I

21   had reviewed my deposition, make sure that, you know, didn't

22   have to look too long in terms of finding my answers, and

23   potentially what questions you might be asking.

24           Q    Did she go over a list of questions?

25           A    No, sir.

1          Q     Well, you indicated that there was some

2     discussion about what questions she might be asking.  What

3     questions might she be asking based on that conversation?

4          A     It was more on the general substance that you

5     might be trying to infer as she previously asked that the --

6     that Mrs. Collins' childhood sexual abuse and previous sexual

7     assault were responsible for the PTSD, and thought I was

8     pretty clear that that was not the case.

9          Q     Well, you discussed that as potential

10    testimony?

11         A     Yes, sir.

12         Q     Did you discuss it in depth?

13         A     No, sir.

14         Q     Did you discuss your knowledge of those

15    events?

16         A     No, sir.

17         Q     Did she suggest that -- did she suggest any of

18    your testimony about those events?

19         A     No, sir.

20         Q     Did you volunteer any testimony about those

21    events?

22         A     No, sir, I think most of what I said was in my

23    deposition and that was hopefully pretty clear.

24         Q     Now, when you gave your deposition, that was

25    in 2009, is that correct?

1          A     I believe so.

2                MR. KINSEY:  Excuse me just a minute, your

3    Honor.

4                Would that have been in February 2006?  I was

5    trying to get the exact date for you, help you recall.

6          A     Deposition?

7          Q     When did you do your deposition, do you

8    recall?  How about April 6, 2009?

9          A     That would be it.

10         Q     Okay.  On April 6, 2009, did you know that

11   Ms. Collins had been molested as a child?

12         A     I think I'd received information from a

13   psychologist who had been treating her that that was history

14   for her.

15         Q     When did you receive that history?

16         A     I'm sorry, I don't have that piece of paper

17   and it's not in this courtroom.

18         Q     Would it have been close, it's not in this

19   courtroom?

20         A     I don't have it here with me, thank you.

21         Q     Was it part of the medical record?

22         A     I believe so, yes, sir.

23         Q     Did you contact that particular individual and

24   talk about this?

25         A     No, sir.

1          Q     Do you recall the individual's name?

2          A     I believe that was the person that I mentioned

3    that we initially referred her to.

4          Q     Would that be Dr. Honnes?

5          A     Yes, sir.

6          Q     And your initial referral would have been in

7    2007, does that sound right?

8          A     No, that was 2000 -- that was 2006, October.

9          Q     So October 2006, you already knew that she had

10   a history of being molested as a child?

11         A     If that was the case, the main thing that

12   brought it back to my mind, I did not note that on any of my

13   records.

14         Q     That was not in any record at any time created

15   by you, isn't that correct?

16         A     I believe so.  And just, it was -- I believe

17   that that came out at deposition in 2009.

18         Q     Was that your deposition you're referring to?

19         A     No.  No.

20         Q     Well, let's talk about your deposition and

21   what you knew.  Did you -- you knew then from 2006 that there

22   was this history?

23         A     I -- no, actually not sure about that.

24   That's -- as I looked back at that record, as I was reviewing

25   the record to do that, I saw that piece of paper and I was

1  like, wow, because --

2       Q    Now when did you look back and go, wow?  Give

3  me a time frame.

4       A    Actually last -- two nights ago.

5       Q    So up until two nights ago you had not

6  reviewed Dr. Honnes' diagnosis or treatment notes shall we

7  say, interview notes, relating to that?

8       A    I had not, I want to say this.  It hadn't

9  really entered into my brain and that's a different state

10 rather than just looking at a piece of paper and saying, yes,

11 he got the review, most the time I skipped down to the bottom

12 to see what the recommendations are, for him, it was

13 counseling, in the body of -- in the body of the statement

14 was the statement about the childhood sexual abuse.

15      Q    Now, wouldn't you agree, sir, that if someone

16 is molested as a child, they might be afraid of men?

17      A    Not necessarily, no, sir.

18      Q    Is it possible they could be afraid of men?

19      A    It is possible of anything, yes, sir.

20      Q    Well, possibly wouldn't want to be in a room

21 with a man?

22      A    For most victims of childhood sexual abuse,

23 both male and female, I have male patients that have been

24 sexually abused as children as well and the answer is for the

25 vast majority of them, including Mrs. Collins, the answer is

1   no.

2              Q    How do you determine that about Mrs. Collins

3   if you didn't consider that in the course of your treatment?

4              A    Well, because, as you're inferring, that she

5   does not want to be in a room with men.

6              Q    You --

7              A    And sorry, your inference was that she didn't

8   want to be in a room with men because of her childhood sexual

9   abuse.

10             Q    That's correct.

11             A    Thank you.  And I can tell you that my

12  interaction with her changed drastically after December of

13  2005.  When I --

14             Q    Is that noted in there?

15             A    This is my personal experience of being with

16  Mrs. Collins.  When I saw her previously, when she had

17  gastritis, okay, and I was concerned about the possibility

18  that she had a bleeding ulcer, I had to do a rectal exam.

19  After she had where she left work, I sat literally on the

20  opposite side of the examination table and made my notes on

21  the examination table so that I had something physical

22  between herself and myself.

23             Q    Is that recorded in any of your notes?

24             A    No, sir, and there's a lot of things that are

25  not recorded in my notes because --

1          Q    We'll talk about those in just a second.

2          A    It's a long time in terms of talking with

3     people and you can't put verbatim everything that's in there.

4     And my impressions in terms of how a person looks and how a

5     person is reacting is -- doesn't necessarily translate to

6     paper.

7          Q    Isn't that exactly what another doctor

8     examining a patient would need to know in order to have an

9     examination, in order to confirm your diagnosis?

10         A    If that patient was being --

11         Q    That's yes or no, wouldn't the doctor need to

12    know that?

13         A    For a diagnosis, in terms -- I'm sorry, if

14    someone else is examining her to confirm a diagnosis, they're

15    not doing it from paper.  If they want to diagnose from

16    paper, that's a different matter.

17         Q    So the records are absolutely useless when

18    Dr. First examined her, is that your testimony?

19         A    No, sir.  It's just that the record does not

20    fully encompass my experience with Mrs. Collins.

21         Q    That's true.  Did you ever talk with

22    Dr. Honnes?

23         A    No, sir.

24         Q    How about with -- is it Dr. Humphrey?

25         A    I don't know.  I never talked with any other

1    providers about her.

2              Q    Do you know a Kate Kellson (phonetic)?

3              A    Yes.

4              Q    Did you get a report from her?

5              A    Not that I'm aware of.

6              Q    You referred plaintiff to her?

7              A    I tried to, I do not think that she went

8    because I don't think she had any money at the time to afford

9    it.

10             Q    How about Ray Tartakoff or Tartakoff, did you

11   ever hear of him?

12             A    Don't recall the name.

13             Q    So you never spoke to any of those people

14   about plaintiff?

15             A    No, sir.

16             Q    You have no idea what their impressions were

17   that they didn't write down?

18             A    No, sir, other than --

19             MS. CONNOR:  Objection, he's assuming.

20             A    Yes.

21             MS. CONNOR:  Question assumes.  It assumes

22   facts that are not in evidence that there were impressions

23   they didn't write down, they wrote down anything, it's

24   assuming a lot.

25             THE COURT:  Okay, I'm going to overrule it.

1    The witness answered the question so we're going to move

2    ahead.

3              Q    Now plaintiff currently lives in Tennessee, is

4    that right?

5              A    I understand that, yes.

6              Q    Until March 7th, when was the last time you

7    spoke with plaintiff, of this year, when you did your

8    examination?

9              A    As far as I would recall it was the last time

10   I saw her in 2010.

11             Q    Did you get any records from her current care

12   providers in Tennessee?

13             A    No, sir.

14             Q    Wouldn't those records be of help to figure

15   out how she had been progressing?

16             A    In terms of my testimony here today, I do not

17   believe so, no, sir.

18             Q    It wouldn't, for instance, be of value if you

19   knew that she was asymptomatic, that she didn't have symptoms

20   when she was in Tennessee?

21             A    In terms of what I'm trying to bring to the

22   courtroom today, I don't believe so, no.

23             Q    It wouldn't be important to know that she was

24   cured?

25             A    No, sir.

 1          Q    Do you know who her treating physician is in

 2   Tennessee?

 3          A    No, sir, but you do have in evidence my visit

 4   from March 7th.

 5          Q    I'm not interested, the question was do you

 6   have -- do you know who the doctor in Tennessee is?

 7          A    No, sir.

 8          Q    Do you know who her counselor in Tennessee is?

 9          A    No, sir, it's not relevant.

10          Q    Do you know if she has a counselor?

11          A    I have to assume that she does.

12          Q    Why?

13          A    Because she is in training as a counselor or

14   she may have gotten her counseling degree, and usually as

15   part of that they do undergo counseling.  I do anticipate for

16   her after my visit on March 7th that she needs continued

17   counseling given her ongoing symptoms.

18          Q    Do you know that she's getting that or has

19   been getting that?

20          A    Not relevant, I'm no longer her primary

21   treating physician.

22          Q    Yet you saw her a couple of weeks ago in

23   preparation for trial, is it your testimony you did not see

24   her as a patient then?

25          A    I saw her as a patient but it was not as, any

1    longer as her primary treating physician.

2         Q    So as you sit here today, sir, are you aware

3    of -- that she has a physician in Tennessee?

4         A    No, I'm not aware but I would assume it.  Most

5    people do.

6         Q    You've not seen those records, have you?

7         A    No, sir.

8         Q    Now, initially, you indicated to plaintiff

9    that she should get counseling when you first saw her back in

10   2006, is that right?  Is it '6 or '7, I'm sorry?

11        A    It was 2005.

12        Q    2005, you indicated that she should get

13   treatment?

14        A    Yes, sir.

15        Q    And counsel elicited testimony from you that

16   when you indicated to her that she should get counseling, it

17   was up to her then to find a counselor, is that correct?

18        A    Normally, we will help an individual with

19   finding counseling, and because of her training and at that

20   point she was in school to become a counselor, and at that

21   point, she indicated that she had a support group that she

22   was utilizing and that she did not feel that she needed

23   professional counseling at that time.

24        Q    This was in 2005, she was in school studying

25   to be a counselor and had a support group?  Don't look at

1    her, she's not going to help you.

2              A    Yes, sir.

3              Q    And it was also your testimony that you didn't

4    put stuff in the record because she wanted privacy, you

5    recall telling us that?

6              A    Oh, yes, sir.

7              Q    Now, Doctor, you're familiar with HIPPA,

8    aren't you?

9              A    Absolutely.

10             Q    And for someone to get her records is

11   virtually impossible unless there's a legal proceeding, isn't

12   that correct?

13             A    Yes, sir.

14             Q    So her fear was that those details would come

15   out here, isn't that right?

16             A    Yes, sir.

17             Q    And did she ever say to you, I'm not getting

18   counseling because I don't want anything discovered that I

19   say?

20             A    No.

21             Q    Or words in sum and substance like that?

22             A    Absolutely not, no.

23             Q    She ever tell you that if she went to

24   counseling and she had to give up those records, it might

25   hurt her case?

1          A     No.

2          Q     Are you aware that that's what she told

3     Dr. First?

4          A     No.

5          Q     Did you read Dr. First's report?

6          A     I don't know as I had that in my record.

7          Q     He would be the expert in this case, were you

8     given his report?

9          A     No, sir.

10         Q     You've never seen it?

11         A     No, sir.

12         Q     Now you didn't, back in February of 2003, you

13    were not seeing her as a patient, were you?

14         A     Correct.

15         Q     But your practice was at that point?

16         A     Yes, sir.

17         Q     Can you go to Plaintiff's Exhibit 79.

18         A     Yes, sir.

19         Q     Did you review those records prior to you

20    treating her, prior to treating her?  When she -- let me ask

21    it a better way.  When she became your patient, did you

22    review those records of her prior experience with your

23    practice?

24         A     Yes.

25         Q     And you'll see that she's complaining,

1  starting in February of 2004, of stress, stomach problems due

2  to stress, do you see that?

3          A    Yes, sir.

4          Q    And you see that she indicates she had this

5  same sort of stress back when she was in college?

6          A    Yes, sir.

7          Q    And she identifies the stressors.  Before we

8  go further, everything written down here that comes from

9  patient is self reported, isn't it?

10         A    Yes, sir.

11         Q    She's your only source of information, isn't

12 she?

13         A    Yes, sir.

14         Q    You don't investigate to see if what she's

15 telling you is true?

16         A    I am unable to do that.

17         Q    You didn't?

18         A    HIPPA prevents me from talking to anyone else

19 about her health care matters.

20         Q    So when she says this is the cause of stress,

21 you have no way to verify that?

22         A    That is correct.

23         Q    In this case she indicated that her new job

24 was stressful, see that note?

25         A    Absolutely.

 1          Q     And that her dog was sick?

 2          A     Mm-hmm.

 3          Q     That her daughter left for college?

 4          A     Yes, sir.

 5          Q     You see any notation there that she was having

 6    problems with sexual discrimination or hostile work

 7    environment during that period?

 8          A     No, she did not report that at that time to

 9    Dr. Briggs.

10          Q     She didn't tell Dr. Briggs that she was at

11    Sullivan Correctional Facility and she was having problems

12    there?

13          A     The only problems that she mentioned in work

14    was that her schedule was constantly changing.

15          Q     Now did you -- do you know if Dr. Briggs asked

16    her about that?

17          A     No, sir.

18          Q     Did you ever ask her about that?

19          A     About what?

20          Q     Her schedule constantly changing.

21          A     No.

22          Q     Were you aware that she was a new officer?

23          A     When I met her in 2005, she had been an

24    officer for a number of years so I was not under the

25    impression that she was a new officer.

1          Q     Did she ever tell you that she was a resource

2    officer her entire career?

3          A     No, sir.

4          Q     She ever tell you that a resource officer has

5    a different job every day?

6          A     No, sir.

7          Q     So that was not targeted at her, I mean that

8    was part of the job but she didn't tell you that?

9          A     No, sir.

10         Q     Now, next, it's been cut off on my copy but

11   it's the next page, it's 09/04 and I can't read the month.

12         A     That would be continuation of the

13   February 9th, 2004 note.

14         Q     I see.  And part of the history of that, if I

15   read it properly, is that she had had an ulcer 15 years

16   before?

17         A     Yes, sir.

18         Q     So she had a history of stress and

19   stress-related problems, isn't that true?

20         A     Yes, sir.

21         Q     Then we get down to 4/28/04, you're not seeing

22   her yet, are you?

23         A     No.

24         Q     The record reflects that she's there for a

25   UTI, what is that?

1          A    Urinary tract infection.

2          Q    So that would have nothing to do with her job,

3    would it?

4          A    Correct.

5          Q    Continuing on, sir, on 9/15/04, you see that?

6    She's back in?

7          A    Yes, sir.

8          Q    This would be for the same UTI, did I say that

9    right?

10         A    Yes, sir.

11         Q    Okay.  That's not related to her work, is it,

12   sir?

13         A    No.

14         Q    Do you know where she was working in September

15   of 2004?

16         A    No, sir.

17         Q    Now we continue on with that until we get to

18   February 25th, 2005, you see that?  These pages aren't

19   numbered, they're just dated?

20         A    Yes, sir.

21         Q    What is she complaining of at that time?

22         A    She came in complaining that her right eye was

23   red and junky, crusted over in the morning, she was

24   complaining of congestion but did not have -- was not

25   complaining of a headache.  She had had the flu symptoms for

1    four days, nonproductive cough, body aches, pain in the left

2    ear and neck, she had a sore throat.

3              Q    None of these were work related, were they?

4              A    Not unless she caught the cold at work.

5              Q    Understood.  Now, on 9/7, she was referred to

6    a Dr. Alexander; what does Dr. Alexander do?

7              A    He is an obstetrician gynecologist.

8              Q    And her complaints then were not related in

9    any way to her work, were they?

10             A    No, sir.

11             Q    Then if you could turn the page, on 12/2/05

12   and you -- I believe that's your signature, if you look at

13   the entrance, or at the entry and see that signature, is that

14   your signature?

15             A    Yes, sir.

16             Q    Was that the first time you saw her?

17             A    No, sir.

18             Q    When was the first time?

19             A    Back in February of 2005.

20             Q    Okay.  And that was the one you told us about

21   you were filling in?

22             A    Correct, Dr. Briggs was not in the office that

23   day.

24             Q    And we agreed that had nothing to do with her

25   work?

1          A     Yes, sir.

2          Q     What is she being seen for on 12/2/05?

3          A     That's simply a fasting blood draw that we do

4     prior to physical exams so we will have the patient come in

5     fasting a week or two prior to the physical exam and if they

6     have any specific complaints, then we will note them so that

7     we might draw other blood work other than screening blood

8     work like your chemistries, your cholesterol, your sugar,

9     blood counts, and she was complaining of fatigue,

10    palpitations and that she was having a change in her

11    menstrual cycle.

12         Q     And the first entry is?

13         A     Hot flashes.

14         Q     Now what does that indicate, sir?

15         A     Potentially that she was perimenopausal.

16         Q     That means beginning?

17         A     Sorry, that she might have been starting to

18    have her menopause, yes, sir.

19         Q     In your experience, that's a fairly stressful

20    situation, isn't it?

21         A     Not for most women.

22         Q     Can it be?  Let me ask it this way.  Are there

23    changes in mood?

24         A     There can be, yes, sir.

25         Q     Change in behavior?

1          A     Not most, not usually.  There can be, yes,

2     sir, and your question is can there be, yes, there can be.

3          Q     Then on 12/6/05, she was back, you see that?

4          A     Yes, sir.

5          Q     And this is the first time, isn't it, that

6     there's any reference to her work?

7          A     Yes, sir.

8          Q     And it simply says sexual harassment at work,

9     you see that?

10         A     Yes, sir.

11         Q     Did you ask about what that meant?

12         A     I did not get into specifics as far as I can

13    recall.  I mean this is -- I'm sorry, this is seven years

14    later but I don't remember the exact specifics of the

15    conversation.

16         Q     Wouldn't that be important to know in

17    diagnosing what she meant when she said that?

18         A     Sexual harassment, like most things, is how

19    someone perceives things, and so if she was feeling that she

20    was being harassed, the specific details are not as important

21    to me as how she was feeling and what her physical symptoms

22    were relative to trying to help her feel better.

23         Q     What if the situation she described didn't

24    constitute sexual harassment; wouldn't that be important to

25    know?

1          A    That would imply what is the definition of

2    sexual harassment and that again in the most part is in the

3    interpretation of the person who is sitting there, what may

4    be an innocent comment on my part could be highly offensive

5    if you're Irish and I call you a Mick, that's very offensive.

6          Q    That's not sexual, is it?

7          A    It's an offense, and that's -- you may feel

8    offended, and sexual harassment is any comment that has an

9    offensive component to it, having to do with your sexual

10   orientation, or your gender.

11         Q    Well, did you ask her if that had occurred?

12         A    She reported that, and I'm sorry, I have a

13   busy practice, and in the process of going through that, that

14   is where when we get down to when she came back, and

15   Dr. Briggs saw her and recommended counseling, that is

16   something that, again, I don't go into specifics.  The

17   specifics are not my job.  So knowing exactly what went on in

18   terms of a sexual assault or sexual harassment, or any of

19   those details, that is a job for a counselor who is going to

20   be going into those details to work through them and to bring

21   those out.  In my practice, that is not something that I do.

22         Q    Well, and she asked you not to write them down

23   because she was getting ready to sue, isn't that correct?

24         A    No.

25         Q    So then on 12/7, that's when she came in and

1    the notes from Dr. Briggs talk about a rumor mill and

2    destructive, bottom of that page, right?

3              A    Yes, sir.

4              Q    And supervisors sexually harass me, Dr. Briggs

5    likewise is not interested in the details, is that correct?

6              A    I cannot speak for Dr. Briggs.

7              Q    There are no details listed?

8              A    That is correct.

9              Q    And up in the right-hand corner of that entry,

10   it says, "I'm never going back"?

11             A    Yes, sir.

12             Q    So at least on 12/7/05 as plaintiff stated her

13   motive, she was never going to go back to DOCS, is that

14   right?

15             A    That's how she felt that day, yes.

16             Q    You see there that she tried not to complain?

17             A    Yes, sir.

18             Q    Now she also indicated that she had been

19   depressed when her father died?

20             A    Yes, sir.

21             Q    Did you -- did anyone ask about the linkage

22   between her job and her father?

23             A    When it says depressed once before when father

24   died, I'm sorry but the implication is generally that that

25   was a past event and is no longer active.

1          Q    Well, that was in May of '05.  Were you aware

2     of that?

3          A    Yes, sir.

4          Q    And she did not come in for treatment during

5     that period, did she?  Your notes indicate that from 2/25/05

6     to 9/2/05 she did not come in?

7          A    Correct.

8          Q    Would you agree with me that that event of

9     losing a parent is a very traumatic event?

10         A    It is always a traumatic event.  Well, unless

11    you were sexually abused and you no longer had close feelings

12    for your father.

13         Q    Do you know if her father sexually abused her?

14         A    I have no idea.

15         Q    Then why would you make that statement?

16         A    Because I have other patients that have had

17    that issue.

18         Q    Why would you make that statement about her?

19         A    I didn't, I made the generalized statement.

20         Q    Now, I call your attention to the next page.

21    It's a physical exam sheet, 12/14/05, you see down in

22    occupational history?

23         A    Yes, sir.

24         Q    It says, "Suing state for sexual harassment,"

25    do you see that?

1          A    Yes, sir.

2          Q    So your practice was on notice from December

3    of '05 that she was going to sue, isn't that correct?

4          A    Yes, sir.

5          Q    Think it would be important if she was going

6    to do a lawsuit that you have the most complete notes

7    possible, if they were going to be subpoenaed for this kind

8    of proceeding?

9          A    In general, I try to treat everyone the same

10   way and if I was to treat everyone like my notes were going

11   to show up in court, it would take two hours for every single

12   patient.

13         Q    Well, how many of your patients specifically

14   ask you not to put things in the record because they're going

15   to sue?

16         A    She did not state because they were going to

17   sue, she stated because she did not want other people seeing

18   it.

19         Q    Well, then you're on notice she's going to

20   sue --

21         A    No, sir, that's not the implication to me.

22         Q    So when she tells your practice on 12/05 that

23   she's going to sue the state, that didn't alert you that she

24   was going to sue?

25         A    No, that told me she was going to initiate a

1    lawsuit.  But that does not change necessarily how I practice

2    medicine.  I try to look at everyone the same way, and if I

3    treated her any differently, then that definitely would

4    affect how I'm able to interact with her and whether to

5    therapeutic relationship or not.

6            Q    So which is more important, the accuracy of

7    the record or the therapeutic relationship?

8            A    Depends upon if you're the patient or not.  If

9    you're the patient, you would want a therapeutic

10   relationship, and the record to reflect the overall progress

11   and situation and -- but I can't provide every single detail

12   on every single visit, no, sir.

13           Q    How would you know that about the patient?

14           A    Know what?

15           Q    What they wanted.

16           A    No, I'm making a general inference in terms of

17   your general asked question.

18           Q    Now, on 2/3/06, if you can find that page, at

19   the top, tearful over incidents, minor incidents, you see

20   that?

21           A    Yes.

22           Q    And again, we have no idea what that means

23   because nothing was written down, is that correct?

24           A    Correct.

25           Q    And there's a note, "Still significant

1    conflict with husband," you see that?

2           A    Yes, sir.

3           Q    There's nothing noted in your records prior to

4    this date about any conflict with the husband, is there?

5           A    No, sir.

6           Q    And would you agree, Doctor, that having

7    conflict with one's spouse is a stressful occurrence?

8           A    Or it can occur because of stress.

9           Q    I'm sorry?

10          A    Conflict with someone else can be a stressor

11   or it can be because you are under stress.

12          Q    Well, if it's still significant conflict, can

13   you tell me when it began?

14          A    I don't have that in the record, no, sir.

15          Q    But you spoke with her and you have a good

16   memory of what you spoke about; do you recall when that was?

17          A    I know when we first talked about all of her

18   stressors and that -- is that she did relate that, although,

19   sorry, my record doesn't show everything we talked about, but

20   that she and her husband were not getting along well.

21          Q    Now, when was that, do you recall?  That's

22   what I'm asking you.

23          A    I believe that's from some of the early

24   December visits.

25          Q    Would that have been when we talked about the

1    stress of the new job, the sick dog and the daughter who left

2    for college?

3              A    That was Dr. Briggs' note, so no.

4              Q    Nothing in Dr. Briggs' note about --

5              A    Did you see it?

6              Q    And nothing in your notes about when it

7    started?

8              A    No, sir.

9              Q    Now there's also a note about continuing

10   counseling on that page, find that for me.  Before you put

11   your finger on that, Doctor, let me ask you a follow-up

12   question on that, 2/3/06, do you have that right in front of

13   you, 2/3/06?

14             A    Yes, sir.

15             Q    You have adjustment disorder with depressed

16   mood, see that?

17             A    Yes, sir.

18             Q    Depressive SX?

19             A    Sorry, symptoms.

20             Q    Symptoms, initiated with abuse at work, you

21   see that?

22             A    Yes, sir.

23             Q    Marital discord worsens with leaving job?

24             A    Yes, sir.

25             Q    Now, wouldn't that indicate that there was

1    marital discord before she left the job?

2           A    Yes, sir.

3           Q    And how was it that you could make the

4    determination that this depression was a result of abuse at

5    work?

6           A    Because that was the most significant

7    stressor.  Almost all marriages, mine included, have issues

8    and we have discord, we have problems and we have conflict.

9    And in her case, she did not come in after having a fight

10   with her husband, she came in after going to work and feeling

11   threatened and had to leave work.  So that was the acute

12   situation that brought her into my office and not after she

13   had had a fight with her husband.

14          Q    And that was self reported, though?

15          A    On the day that she left work, yes.

16          Q    Yes.  And at that point, you didn't consider

17   her father's death to be a stressor?

18          A    No, sir.

19          Q    Didn't consider marital discord to be a

20   stressor?

21          A    Not as the root cause of that reaction, no,

22   sir.

23          Q    Didn't have any idea that she'd already had

24   problems at Sullivan, her first correctional facility?

25          A    No, sir.

1          Q    And at that point, you had no idea that she'd

2    been sexually assaulted January 1st, 2003?

3          A    No, sir.

4          Q    Would any of those matter to you?

5          A    No.

6          Q    None of those would matter?

7          A    They are other stressors that would be

8    addressed with the psychologist.  My immediate concern is

9    assessing her safety, assessing her mental state, her

10   diagnosis and whether or not I have to treat her.  I'm a

11   treating physician.  That's my job.

12         Q    So the cause of her problems would not be of

13   great concern?

14         A    I assessed the cause of her problems, sir.

15         Q    But you didn't know about most of those, did

16   you?

17         A    I am -- you're making an assumption that I

18   would consider those other problems as the primary cause of

19   her ultimate psychological break and they're not.

20         Q    Have you worked with Vietnam veterans or with

21   war veterans?

22         A    Yes, sir.

23         Q    And have you found that oftentimes these

24   symptoms don't manifest themselves for some time?

25              MS. CONNOR:  Objection, what symptoms?

1          Q      Any symptoms.

2                 THE COURT:  The objection will be overruled.

3          A      What symptoms are you talking about, sir?

4          Q      Any symptoms that you would -- being afraid,

5   someone who comes from combat, rotates back to the states, it

6   might take them months to manifest that kind of fear, isn't

7   that right?

8          A      I'm sorry, I don't see your point relative to

9   Mrs. Collins.

10         Q      I asked you a question, expect an answer.

11         A      Okay.  Sure.  Absolutely.

12         Q      And someone could rotate back from combat and

13  it might take months before they got angry?

14         A      Most the times, no, sir.

15         Q      And some could rotate back from Vietnam and

16  walk down a street and encounter a smell and go into PTSD and

17  never know they had it before, isn't that true?

18         A      I have not encountered anyone like that or

19  heard any stories like that but if you have that information,

20  I'd be more than willing to look at it.

21         Q      We can talk after you're finished.

22         A      Sure.

23         Q      Would you compare what happened to her with

24  someone rotating out of combat?

25         A      No.

1          Q     Would you compare what had happened to her

2     with someone who had been in the pit at 9/11?

3          A     No.

4          Q     Would you compare what happened to her to

5     someone who had been sexually assaulted?

6          A     No.

7          Q     Well, Doctor, wouldn't you agree that the

8     onset of these symptoms -- you haven't even heard the

9     question, you've already decided the answer.  The onset of

10    these symptoms within a year of some traumatic event is

11    reasonable?

12         A     In the course -- no, I'm going to disagree,

13    no, sir.

14         Q     And the onset of these symptoms might at first

15    be very, very slight, isn't that true?

16         A     In terms of what you're asking, you're asking

17    me to say that her father's death in May for which she

18    grieved for however long it was, by the time I saw her in

19    September, that was not -- she no longer felt that that was

20    an issue.  In terms of, is that the primary cause of what

21    made a ticking time bomb that made her absolutely, sorry, but

22    a blithering mess, crying and unable to function and unable

23    to stay at work, I do not believe that her father's death in

24    May had anything to do with that.

25         Q     How about her sexual assault?

1          A    No, sir.

2          Q    Even though she began to have problems within

3    less than a year at Sullivan, wouldn't tip you off that she

4    had a problem?

5          A    I did not know about any problems at Sullivan,

6    so no, I cannot make that determination.

7          Q    Well, if you knew about it, would that --

8          A    No.

9          Q    Wouldn't have tipped you off?

10         A    No, sir.

11         Q    Were you aware that there was a history of

12   bipolar disorder in her family?

13         A    Yes, sir, I obtained that history.

14         Q    Was that of concern?

15         A    Yes, sir.

16         Q    Perhaps her symptoms, one day she was happy,

17   one day she was sad could be related to a bipolar condition

18   rather than PTSD, rather than AD?

19         A    AD?

20         Q    Adjustment disorder.

21         A    Okay.  Sorry, I didn't know that was a

22   shorthand for that.

23         Q    My apologies.

24         A    The -- sorry, I got lost in your question.

25   Could you repeat the question please.

1          (The last question was read.)

2          A    The answer is, no, that there's very clear

3    symptoms that you get with bipolar disorder and PTSD looks

4    nothing like bipolar disorder.  As I stated earlier, I take

5    care of a lot of bipolar patients, and PTSD symptoms do not

6    manifest in bipolar disorder, so no, they are completely

7    different animals.

8          Q    Can you have PTSD and bipolar disorder?

9          A    Absolutely.

10          Q    Can you have --

11          A    They're not mutually exclusive, no.

12          Q    How about having adjustment disorder and PTSD

13    at the same time?

14          A    At this point, then I say no, because the

15    adjustment disorder symptoms are an assumption that there's

16    no other underlying cause.  If you look at adjustment

17    disorder, you have to make sure that they do not have major

18    depressive disorder that's not an adjustment disorder.  In

19    other words they have depression that is not based upon their

20    situation, and so in the case of adjustment disorder with

21    depressed mood and anxiety, if you have a superseding

22    diagnosis, if you have something that explains your

23    adjustment disorder and in this case the post-traumatic

24    stress disorder, clearly explains her symptoms that persisted

25    beyond the normal adjustment pattern.  If her dad dies, most

1    of us will be able to function after a month or two months,

2    we get back to work and we kind of get on with our lives,

3    we're sad but we can still function, so there was no

4    dysfunctional depression from that.

5         Q    How about if she'd been sexually assaulted and

6    began to show symptoms that were not reported; would that

7    explain that it was not adjustment disorder but was in fact

8    something else?

9         A    No.  Her demeanor clearly changed, from my

10   interaction with her before and afterwards, her demeanor was

11   distinctly different, and if that sexual assault back in 2003

12   had been the cause of her PTSD, then she would have likely

13   had manifested those symptoms much earlier, and she would not

14   have had the situational anxiety that she had, in terms of

15   police officers, in terms of being touched.  She would not

16   have had those symptoms if it was simply due to a sexual

17   assault.

18        Q    Sexual assault would not create a person to

19   not want to be touched, is that your testimony?  Is that your

20   testimony?

21        A    My testimony is yes, there are a lot of women

22   who have been sexually assaulted who have no problems

23   resuming normal relations.

24        Q    She was complaining about being touched by

25   third parties.  She'd been sexually assaulted, wouldn't you

1    expect she would -- she would react when touched in an

2    unwanted touching from a third party?

3             A    No, I don't believe that's a usual reaction

4    for most people.

5             Q    Did you find her reactions usual?

6             A    No, sir.

7             Q    I mean how many patients have you had who've

8    been in a tower and drew down on a coworker with a

9    high-powered rifle?

10            A    One.

11            Q    And that's because there was graffiti on the

12   wall, is that your testimony?

13            A    I don't know anything about graffiti, sir.  So

14   no, that is not my testimony.

15            Q    Now, on September 29th, 2006, if you would

16   jump forward to that.  Oh, I'm sorry, please forgive me,

17   let's go back to 3/22/06.  You see that, sir?

18            A    Yes, sir.

19            Q    She comes in and it's a followup for

20   adjustment disorder with depressed mood, you see that?

21            A    Yes, sir.

22            Q    Feeling much better, see that?

23            A    Yes, sir.

24            Q    She's getting a divorce?

25            A    Yes, sir.

1          Q     Why did you link feeling better with getting a

2    divorce?

3          A     No, sir, they're just two different

4    statements.

5          Q     Were they connected?

6          A     No, sir.

7          Q     Well, wouldn't the lessening of tension at

8    home be of help?

9          A     Most people that I know that consider going

10   through divorce consider it an extraordinarily traumatic

11   situation and not something that offers them any relief at

12   all.

13         Q     Could that contribute to her anxiety disorder,

14   or I'm sorry, her -- I lost the word.  I'm having a senior

15   moment.  Her adjustment disorder.

16         A     In terms of a contribution to it, any

17   additional stress, yes, that's going to play a role.  So if

18   things are hard at home, then that can play a role, but if

19   it's hard at home, because she doesn't want to be alone in a

20   room with a man, even her husband, because of what happened

21   at work, that's an entirely different matter.

22         Q     Well, do you know that to be the case?

23         A     She told me that she does not want to be in

24   the room with men, unfortunately her husband happens to be a

25   man.

1          Q     Is that reflected at all in your notes?

2          A     No, sir.

3          Q     Wouldn't that be a pretty important thing to

4    put in your notes?  She doesn't want to be in a room with a

5    man and unfortunately her husband is a man; wouldn't that be

6    significant?

7          A     I'm going to say, in terms of my medical

8    documentation, no, in terms of legal documentation for you,

9    yes.

10         Q     How about in terms of having another doctor

11   confirm your diagnosis; wouldn't that be important, that

12   he --

13         A     If someone wants to confirm my diagnosis by my

14   records, they really need to see the patient and if you have

15   a consultation with a patient to confirm my diagnosis, that's

16   going to be another, and if she had other providers see her

17   and confirm that diagnosis, they certainly did not need my

18   notes.

19         Q     Well, what if she didn't tell them about not

20   wanting to be in the room with her husband, wouldn't it be

21   helpful if your notes reflected what you actually learned so

22   they could start treating her?

23         A     No, because I will not communicate with a

24   counselor in terms of specifics.  When I send someone out to

25   a counselor, they know what the diagnosis is, and then they

1    will start and form their own opinion.  In terms of

2    communication, if they feel that they need to talk to me,

3    then at that point, after they have seen the patient, they

4    will sign a HIPPA so that I can talk to the psychologist or

5    social worker about what's going on, if they feel that they

6    need to talk to me.  Sometimes they'll call and say, this

7    person needs to be on medication, we've been doing counseling

8    and their major depression is not improving and we think they

9    need medicine, that's more the type of interactions that I'll

10   have with psychologists or social work -- counselors.

11            Q    Amazing.  You turn to 10/12/06, please.

12   Excuse me, may I get a glass of water.

13            THE COURT:  Certainly.

14            Q    Ready, Doctor?

15            A    Yes, sir.

16            Q    Now, on 10/27/06 -- I'm sorry, 10/12/06, it's

17   under that, you indicated that she has an adjustment disorder

18   with depressed mood but she's happy today?

19            A    Yes, sir.

20            Q    Does that mean that she's now cured?

21            A    No, sir.

22            Q    How can you tell she's not cured?

23            A    If you have a significant psychological

24   problem, because you have a good day does not mean that

25   you're cured.  If I had had a very stressful time at work and

1    I got to go on a cruise, I would be happy, too, even though

2    at the same time I've still got a lot of stuff that I have to

3    work through.

4          Q    Well, if she's afraid of her husband and he's

5    a man and doesn't want to be in the same room with him, it

6    doesn't appear that she's afraid to be on a ship with him,

7    does it, indicates she's going on the cruise with her

8    husband?

9          A    Right.

10          Q    So the symptom has disappeared, hasn't it,

11   Doctor?

12          A    No, sir.  Just because she's going on a

13   cruise, I don't know how long you plan before you go on a

14   cruise, haven't done one, but she was still feeling on the

15   edge, and needing a psychologist.  That is also in my note.

16          Q    Does she have a psychologist at this point?

17          A    No, but she related that she needed one.

18          Q    Did she ever get one?  Did she ever see a

19   psychologist or a counselor more than twice?

20          A    No, I don't think so.

21          Q    So even though she needed one she refused to

22   get one, is that right?

23          A    As far as I know, and when we talked about the

24   counseling, when I tried to send her to Ms. Kellson, she

25   related that because she wasn't working, money was an issue

1    and she could not afford counseling.

2              Q    But she could afford the Love Boat?

3              A    That had already -- I would assume most

4    cruises I see you pay for them six months in advance.

5              Q    Did you know that?

6              A    Absolutely not.

7              Q    And six months in advance, she needed a

8    counselor, isn't that right?

9              A    But at that point, she had gone back to work.

10             Q    Wasn't my question.  Six months before this

11   date, she needed a counselor, you were talking to her about

12   sending her to a psychologist?

13             A    No, sir.

14             Q    You didn't think she needed to go to

15   psychology?

16             A    Six months previously?

17             Q    Yes.

18             A    Was April of 2006.

19             Q    Yes.

20             A    She returned to work in March of 2006 at the

21   new facility where I understand that she did well up until

22   she came back in September of '06, so in six months

23   previously, in May of '06, as long as she was not in the

24   precipitating situation, she was doing okay.

25             Q    She didn't have adjustment disorder in April,

1    did she?

2          A    By the time that she got to a different

3    situation, that point, yes, the adjustment disorder was

4    probably --

5          Q    Gone?

6          A    Gone.

7          Q    Cured?

8          A    Resolved.

9          Q    So anything that had happened prior to that

10   has now been dealt with and resolved and we're finished,

11   isn't that right?

12         A    No.  I think most likely knowing Mrs. Collins,

13   is that she tends to, if she's okay, she'll say she's okay

14   and she'll go on.  And -- but in terms of -- because she did

15   not see a psychologist, because she did not work out her

16   conflict and the way that things had worked out because she

17   didn't work it out, that no, she was not cured of everything

18   that had happened previously.

19         Q    So she didn't go to a counselor, and she

20   didn't work it out.  It was incumbent upon her to see a

21   counselor, wasn't it?

22         A    That, yes, she needed to get counseling.

23         Q    And in April, as you theorize she prepaid a

24   cruise, she chose between a counselor and the Love Boat,

25   isn't that true?

 1              MS. CONNOR:  Calls for speculation, your

 2     Honor, object.

 3              MR. KINSEY:  He brought up the prepayment,

 4     your Honor.

 5          A    Sorry, I did.

 6              THE COURT:  I'm going to overrule the

 7     objection, go ahead.

 8          A    I have no idea, sir.  In terms of finances, I

 9     did make a couple of notations, later on I think that there

10     was finance issues.  I knew when, going back, I think when

11     she first stopped working, that there was concern about their

12     finances with her not working.  So in terms of her deciding

13     at that point in time was it between going on a cruise and

14     getting counseling, I'm sorry, but I can't speak to their

15     finances at that time.

16          Q    Well, would you agree, sir, that finances or

17     financial problems in a family is a tremendous stressor?

18          A    Always.  Yes, sir.

19          Q    It's one of the biggies, isn't it?

20          A    Oh, absolutely, yes, sir.

21          Q    And so as she has more problems, did you think

22     that perhaps those problems had their roots in this financial

23     problem?

24          A    No, sir.

25          Q    You just discounted that out of hand?

1        A    No, all of us have to deal with financial

2    problems unless we're independently wealthy, and that's not

3    me, but the stress that you have from not having money to

4    take care of the things that you need to take care of when

5    your kids are going to college and trying to do other things,

6    that's extremely stressful.  But at the same point, no,

7    that's not the underlying cause of her post-traumatic stress

8    disorder.

9        Q    How can you possibly know that?  She lost her

10   house, didn't she?

11       A    Because, sir, I talked to her almost every

12   month for two to three years.

13       Q    And it's not in the notes, is it?

14       A    It's not always in the notes.

15       Q    It's almost never in the notes, because she

16   asked you not to put it in the notes, isn't that true?

17       A    No, and I don't have -- I'm sorry, but

18   unfortunately with handwritten notes, even with the

19   electronic medical record we have right now, it is impossible

20   to capture the whole essence of a conversation that I have

21   when someone is extraordinarily stressed out and I'm taking

22   20 to 30 minutes to talk with that patient about what's going

23   on in their life.  I cannot in that time frame put that all

24   on paper.

25       Q    You only put the important stuff in, right?

1          A    I put more my impression and my diagnoses and

2     if I do medications, those are the most important things from

3     my perspective is if there's new history, things that come

4     into it that I need to note, like the family history for

5     bipolar disorder.

6          Q    Now once she got back from the cruise, you

7     told her that it was -- that she could go back to work, isn't

8     that right?

9          A    No, sir.

10         Q    Well, she went back to work on 3 -- in March,

11    didn't she, of '07?

12         A    Yeah, but that was not when she came back from

13    the cruise.

14         Q    Well, your note on 2, and I'm sorry, I don't

15    have the date because there's a hole there, the note above

16    3/7/07, can you see that?  What's that date, can you tell

17    from your paper?  Mine's got a hole punched in it.

18         A    Yeah, mine too, yeah, sometime in February.

19         Q    It would be before the 7th, right?

20         A    No, that was March 7th so it would be

21    February 20th, there's a zero there so -- might have been the

22    20th.

23         Q    Okay, February 20th, she talks about her

24    experience on the cruise, isn't that right?

25         A    Yes.

1          Q     And you indicate at that time she's stable for

2     return to work?

3          A     At that point.

4          Q     Is that -- did I read it right?

5          A     Yes, sir.  Yes, sir, that is what I reported.

6          Q     Now, on 3/7/07 you indicate now that she's

7     returned to work, broke down, is that correct?

8          A     Yes, sir.

9          Q     And it's because the officers are unable to

10    accept her, she feels isolated, you see that?

11         A     Yes, sir.

12         Q     There's not a thing there about sexual

13    discrimination, sexual harassment, is there?

14         A     No, sir.

15         Q     They didn't talk to her and she felt bad, they

16    didn't accept her, is that what your note says, sir?

17         A     No, sir.

18         Q     Says officers?

19         A     Unable to accept her.

20         Q     Unable to accept her?

21         A     And she felt isolated, I cannot speak to the

22    exact manner with which they treated her.

23         Q     So to try and link this somehow with sexual

24    harassment, it would not be possible from your notes, would

25    it, sir?

1          A    No, that was the instigating.

2          Q    That would be what?

3          A    That was the instigating complaint in 2005.

4          Q    And in fact, since 2005, you don't really list

5     any sexual component to this harassment, do you?

6          A    She was only back at work I believe from March

7     to September of 2006.  She tried to go back in 2007 and could

8     not do so because of post-traumatic stress disorder, not

9     because --

10         Q    That's not my question, I understand the

11    script, sir.

12         A    Not because of ongoing sexual harassment at

13    that point, as far as I know.

14         Q    So the only sexual harassment you know about

15    is what was reported in December when she first came to you,

16    isn't that correct?

17         A    She reported that in December that had been

18    ongoing previous, not exactly dates but she said, from 2003.

19         Q    That would be Sullivan, wouldn't it?

20         A    That was, if she was in Sullivan at that time,

21    that's possible, yes, sir.

22         Q    And that would be the same year of the sexual

23    assault, wouldn't it?

24         A    Yes, sir.

25         Q    And you made no linkage between those two?

1           A    No, sir.

2           Q    Now, you indicated in your testimony on direct

3   that this would, PTSD would be triggered by events outside of

4   normal life, you see that, or do you remember that?  I'm

5   sorry, you remember testifying to counsel that PTSD started

6   by events outside of normal life?

7           A    I don't know if that's the exact verbiage that

8   I used.

9           Q    Would you agree with that statement?

10          A    No, it can be in the course of normal life,

11  normal life can involve very severe things like, you know,

12  being in car accidents or having other things and fires and

13  other normal "events" that happen frequently.  Nothing is

14  normal, normal is a -- is not normal.

15          Q    Vets in combat, that wouldn't be normal, would

16  it?

17          A    No, sir.

18          Q    That's not everybody's experience?

19          A    No.

20          Q    Witnessing a murder like you described, that's

21  not a normal experience, is it?

22          A    But unfortunately it's a common one.

23          Q    Is that a yes to my question, Doctor?  You

24  think witnessing murder is a normal event?

25          A    They're -- you're asking what is normal and in

1    terms of life, there is no normal.  Normal is something that

2    we say things are going perfectly and it's never perfect.  We

3    always have bad things going on.

4            Q    Doctor, these were your words.  You indicated

5    that these things cause PTSD.

6            A    Oh, yes, sir, yes.

7            Q    Does everyone who sees a murder get PTSD?

8            A    Absolutely not.

9            Q    How many murders, do you have any idea how

10   many murders a child sees between the ages of 5 and 15 on

11   television?

12           A    That's a different reality, sir.

13           Q    That's a different reality.  Because the real

14   murderer being up close and personal is the thing that causes

15   the PTSD, isn't it?

16           A    Yes, sir.

17           Q    Sexual assault is one of those because it's up

18   front and personal, isn't it?

19           A    Yes, sir.

20           Q    And you mentioned bullying.  You're not

21   talking about routine schoolyard bullying, you're talking

22   about severe, pervasive, life-threatening bullying, aren't

23   you, sir?

24           A    Where someone feels threatened, yes, physical

25   harm, maybe not mortal harm but physical harm.

1        Q    Physical.  And usually PTSD follows an event

2   wherein there was physical aspect, either proximity or you

3   experienced one of those physical manifestations like combat

4   or a car wreck?

5        A    No, actually the definition because I have it

6   right here in front of me, is it only has to involve a

7   threat, it does not have to involve actual harm, it doesn't

8   have to involve, it can just be simply a threat.

9        Q    That threat has to be real, doesn't it, sir?

10       A    Perceived by the person.  It is always from

11  the person's perspective.

12       Q    And can you point me to one incident related

13  to you -- I'll wait till you're finished reading, sir.

14       A    No, go ahead.

15       Q    You ready?

16       A    I'm listening.

17       Q    Can you point to one event that Penny Collins

18  experienced that was life threatening?

19       A    I am missing the relevance.

20       Q    Well, I'm missing an answer.

21       A    Okay.  No, we did not talk about specific life

22  threatening events for her.

23       Q    Because you didn't want to talk about

24  specifics?

25       A    No, I need to know how she was doing.

1          Q    Well, in order to make the diagnosis, wasn't

2     it important you found out what it was that she perceived as

3     a threat to her life?

4          A    Yes.  But in not specifics.  For her, it was

5     an ongoing situation and it was a situation where she felt

6     that being isolated as a corrections officer, that

7     potentially her life would be in jeopardy, and this is a

8     perceived threat.  That's the difference of what we're

9     talking about, you want to talk about an actual event, and it

10    is in perception and if someone perceives that their life is

11    in jeopardy, that is all it takes for PTSD to occur.

12         Q    But without knowing what that event was, how

13    could you evaluate whether or not she really believed that

14    that event was a threat?

15         A    Because she believed it enough to come into my

16    office and break down in a way that she was totally

17    uncomfortable doing.

18         Q    Well, she also came into your office and told

19    you in December of 2005 that she was going to sue the state

20    of New York?

21         A    Right.

22         Q    Doctor, do you need a break, are you okay?

23         A    I'm good.

24         Q    Now, we talked about an arrest.  Do you recall

25    that?

1          A     Yes, sir.

2          Q     Prior to that arrest, Ms. Collins had been

3    doing just fine, hadn't she?

4          A     No, sir.

5          Q     Hadn't her symptoms been improving?

6          A     At no time -- well, I don't know the exact

7    timeline, that's the problem I'm having, but no, I didn't

8    have her ready to go back to work yet.

9          Q     That wasn't my question, I asked you if she

10   was doing a lot better.

11         A     As long as she avoided any triggers, anything

12   that made her go back to the situation where she felt

13   threatened, then yeah, she did okay as long as she didn't

14   have to think about those things.  When it came time for her

15   deposition, she fell apart.  She ended up in my office that

16   day just unable to -- she was crying, it was not a good day,

17   the day that she had to do her deposition.

18         Q     Whose fault was that?

19         A     Whoever gave her PTSD.

20         Q     Well, if she had never filed a suit, she

21   wouldn't have done a deposition, call that an intervening

22   act?

23         A     No, I call that blaming the victim.

24         Q     Well, do you know she's a victim?

25         A     Yes, sir.

1          Q     Have you been inside a prison?

2          A     Thankfully, no, sir.

3          Q     Have you ever visited a prison?

4          A     No, sir.

5          Q     Are you aware of what the conditions are like

6     for an officer inside a maximum security prison?

7          A     I can only imagine from TV.  That's my only

8     exposure would be things that are fictional and I know how

9     the doctors fictional things turn out so I have to assume

10    that prison fictional things are not like real life either.

11         Q     You didn't take any steps to determine what

12    her daily stressors were as a correction officer?

13         A     No, sir, I was trying to have her deal with

14    daily life, going back into the prison to have her relive

15    things and trigger her PTSD was not therapeutic.

16         Q     For instance, it's not important that you know

17    that assaults take place in prison on guards and on inmates?

18         A     Yes, I know that is a fact, yes, sir.

19         Q     Would that create stress?

20         A     Absolutely.

21         Q     And that people have body fluids thrown on

22    them in prison?

23         A     Yes, sir.

24         Q     That would create stress?

25         A     Yes, sir.

1            Q    And being locked up with 1800 male convicted

2    violent felons, that would be a stress?

3            A    Yes, sir.

4            Q    Being locked inside of a gallery with several

5    hundred inmates would be a stress?

6            A    Especially if you felt that your fellow

7    officers would not back you up.

8            Q    I'm not asking you that, I know the script,

9    I'm asking you if you think that's a stress.

10           A    Yes, sir.

11           Q    Did you ever discuss the normal stresses

12   incurred in her job with her?

13           A    I had to assume based upon everything going on

14   that being a corrections officer is an extremely stressful

15   job, in day-to-day life, not a job I would want to do.

16           Q    Now you spoke earlier about an arrest, recall

17   that?

18           A    Yes.

19           Q    She didn't stop, the sheriff chased her down?

20           A    Yes, sir.

21           Q    Put her on the ground, handcuffed her?

22           A    Yes.

23           Q    Now, would you agree that that in and by

24   itself could cause PTSD?

25           A    No, sir.

1          Q    That wouldn't cause it?

2          A    No, that was a reaction to the PTSD that she

3    didn't stop and --

4          Q    I didn't ask you about the stop, I asked you

5    about the whole scenario.

6          A    You asked me if that was the cause of the PTSD

7    and I said no.

8          Q    How about being thrown to the ground

9    handcuffed by policemen?

10         A    No, sir.

11         Q    That would never cause PTSD?

12         A    That was not the cause of her PTSD.

13         Q    Isn't it true, sir, that in May of '08, that

14   she wanted to go back to work?

15         A    Yes, sir.

16         Q    And she wanted to go back to work because she

17   was out of money, wasn't she?

18         A    I believe so, yes.

19         Q    So in spite of her PTSD, she was willing to go

20   back to work because she was not being paid for staying home,

21   is that correct?

22         A    I believe so.

23         Q    I call your attention to September 22nd of

24   '08.  Middle of the page, is that your handwriting still?

25         A    Yes, sir.

1          Q    PTSD, excellent healing, not able to previous

2    work situation?

3          A    Return.

4          Q    Return, sorry.  Due to risk of relapse.  You

5    see that?

6          A    Correct.

7          Q    So you thought that she had excellent healing

8    of PTSD so long as she didn't return to prison?

9          A    I thought she was doing better and healing

10   does not mean healed, it means it's an ongoing process.

11         Q    Well, she's having an excellent ongoing

12   process?

13         A    Yes, sir.

14         Q    And down, a little lower it says continue, and

15   I can't read the word, sorry, counseling?

16         A    That was scratched out, that's crossed off.

17         Q    So she should continue counseling?

18         A    Yes, sir.

19         Q    Best of your knowledge, in September of '08

20   was she seeing a counselor?

21         A    I'm not sure.

22         Q    Did you receive reports from counselors?

23         A    Not at that point, I don't believe so.

24         Q    So what was your basis for continuing

25   counseling?

1          A    I'm not sure if that's at the point where she

2    had gone to visit a PTSD expert down in Virginia who was

3    helping her out.

4          Q    And did she go to a PTSD expert in Virginia?

5          A    I believe so, yes.

6          Q    Are you aware of her name?

7          A    No, sir.

8          Q    Were you curious about that?

9          A    Yes, sir.

10          Q    Were you curious about her credentials?

11          A    Ms. Collins, Mrs. Collins did the -- did the

12    research for that and she felt comfortable with this person,

13    had been in contact with her and I know we discussed it

14    briefly, I don't recall what the woman's name was.

15          Q    Well, did you -- my question was, did you

16    check on her credentials?

17          A    No, sir.

18          Q    So you're unaware that she's not licensed?

19          A    Yes, sir.

20          Q    You're unaware that by her own sworn

21    testimony, she could not treat or diagnose Ms. Collins?

22          A    If she's not licensed, then she can do

23    neither, correct.

24          Q    But you don't know as you sit here today?

25          A    No, sir.

1          Q    Now beginning in January of 2010, you

2    continued to see Ms. Collins?

3          A    Yes, sir.

4          Q    And during that time, there was, during

5    January, for instance, there was nothing about ongoing

6    treatment of her psychological problems, was there?

7          A    No.  She came in because of -- she didn't come

8    in because of the PTSD, she came in complaining of pain to

9    her arms and legs and pain to her mid to upper back in the

10   past week and then two days ago and her hands going numb.

11         Q    And also in April of 2010, same thing, she was

12   not being treated for PTSD, she was being treated for medical

13   conditions?

14         A    Yes, sir.

15              MR. KINSEY:  A moment, your Honor, while I

16   change notes.  Should we have the jury stand for a moment,

17   it's been long.

18              THE COURT:  If they want to.  Okay.

19              (Pause in Proceedings.)

20              THE COURT:  We have all the ladies and

21   gentlemen of the jury, Mr. Kinsey, you're going to continue

22   your cross-examination?

23              MR. KINSEY:  Yes, your Honor, thank you.

24         Q    Now Doctor, isn't it true that the sum and

25   substance of your psychological, or I'm sorry, psychiatric

1    training was three months during law school -- or during

2    medical school?  That's where I got mine.

3              A    Actually I had two months in medical school,

4    and then when I was in residency, we do one month with the

5    psychiatrist and that includes meetings with psychologists

6    and ongoing counseling.  But throughout the course of my

7    residency over those three years, we take care of our

8    patients that have the various psychiatric issues.  So that

9    the course of '91 to '94, I'm taking care of my own patients

10   with psychiatric issues.  And then subsequently, we have 50

11   hours of continuing medical education to do a year and always

12   some of that is involved in psychiatric issues.

13             Q    That's for family medicine, isn't it?

14             A    Yes, sir.

15             Q    And what -- how much of that 50 hours is spent

16   training in psychiatry?

17             A    Well, just for instance, I just went to a

18   conference and out of the 20 hours that I was there, there

19   were three hours that were on psychiatry.

20             Q    You indicated I believe in your testimony

21   earlier this morning that the psychiatry rounds that you did

22   in med school did not have a happy ending for you?

23             A    No, sir.

24             Q    Didn't want to do it?

25             A    No, I had an unhappy experience with the

1  department chairman.

2       Q    How often do you take this 50 hours of

3  training, sir?

4       A    What we have to do is we have to do at least

5  50 hours of continuing medical education a year, so this

6  is -- it's always on an ongoing basis.

7       Q    Well, this year, how much have you had?

8       A    In addition to the 20 hours that I just did

9  beginning of March, I get 20 hours for teaching medical

10  students who come into my office for a month, and I've done

11  another four hours of online continuing medical education.

12       Q    Now, do you recall in your deposition that was

13  taken on April 6, 2009, you indicated, you gave an opinion

14  that psychiatry is predominantly a medical -- or I'm sorry,

15  let me read it.  Medication management.  Did you repeat that

16  this morning, did I hear that correctly?

17       A    Yes.

18       Q    So psychiatry is all about giving drugs, is

19  that essentially what it means?

20       A    Not -- no, and that's -- I did put the caveat

21  in this morning that there are psychiatrists that do do

22  psychoanalysis, but psychiatric experiences, the

23  psychiatrists' training is really best utilized in medication

24  management and that's what I see with my patients who go to

25  see them is they're primarily adjusting medications, they're

1    not receiving any what you -- talk therapy.

2              Q    And you know this how, psychiatrists are --

3              A    Based upon my patients who go to see

4    psychiatrists.

5              Q    And how many of your patients go see

6    psychiatrists?

7              A    Oh, I don't know, sir, I'm sorry.

8              Q    Well, you didn't bother to read Dr. First's

9    report?

10             A    I was not given it, no.

11             Q    You don't know who Dr. First is?

12             A    No, sir.

13             Q    Now I just want to be sure that I understood

14   that you said that the details of these events are

15   unimportant to you, is that correct?

16             A    The details of the events are not unimportant

17   in terms of how they affected Penny, the details of the

18   events are unimportant of how I treat her.

19             Q    Well, are they unimportant for diagnosis?

20             A    Details, yes.

21             Q    And would it be -- we talked about this, I

22   apologize, but those details should go into your notes,

23   shouldn't they?

24             A    I would disagree.  If I feel that a detail is

25   necessary for another provider to know what exactly the

1    nature of the sexual harassment and sexual assaults were, I

2    don't think that's going to improve anything at all in terms

3    of what was said to her or where she was touched or anything

4    like that.  That is not going to help any other provider in

5    terms of making a diagnosis or continuing treatment for her.

6           Q    Isn't the purpose of part of your notes that

7    you take when you see a patient is that those details are in

8    there so that you can defend the diagnosis?

9           A    In terms of specific details for everyone, I'm

10   gonna say it is not, in terms of getting a diagnosis, a

11   diagnosis is in your DSM, and the diagnosis is based upon a

12   collection of symptoms, not a detailed recounting of what

13   happened.  The diagnosis is based upon the symptoms, not upon

14   the exact details.

15          Q    Well, if you're going to indicate that someone

16   is being sexually harassed, wouldn't it be important to know

17   if the event was sexual in nature?  Well, for instance,

18   Doctor, one of the allegations in this case is that an

19   individual stopped and passed gas in front of the plaintiff.

20   Now would you call that a sexual act?

21          A    No, I would call that rude.

22          Q    Well, if the person came to you and said I

23   left, they just keep doing all this sexual harassment,

24   wouldn't it be important to know that at least some of it was

25   just crude, stupid, and sophomoric?

1          A    The details that I obtained was that she was

2     touched physically, that she had explicit sexual -- that's in

3     my notes, explicit sexual comments and implied sexual

4     comments.  So that's all that my notes implied of the sexual

5     nature of it is that she was physically touched, that

6     explicit sexual comments were made to her.  I did not ask the

7     details of that, because the details aren't going to change

8     the fact that she is a mess.

9          Q    Did you ask her how many times she'd been

10    touched?

11         A    No, sir.

12         Q    Did you ask her how many explicit sexual

13    things were said to her?

14         A    No, sir.

15         Q    Well, is one enough, to create sexual

16    harassment?

17         A    In terms of harassment, no, if someone just

18    did something once and you said that was rude, please don't

19    do that again and you didn't do it again, then that would not

20    imply harassment.

21         Q    But if you don't know how many times, then

22    you'd have no way to judge that, do you?

23         A    It is always, sir, in the interpretation of

24    the person who is experiencing the harassment.  It is not

25    having to do with explicit details that I don't need to know.

1              THE COURT:  Mr. Kinsey, are we getting there?

2              MR. KINSEY:  We are, your Honor.

3              THE COURT:  I don't want to plow ground that

4    we've already plowed.

5              MR. KINSEY:  Exactly right.  If I can have

6    just a moment to review my notes.

7              THE COURT:  Okay.  Thank you.

8        Q    Did Ms. Collins ever tell you that she spent

9    six and a half hours with Dr. First?

10       A    I believe we covered that, I don't have any

11   knowledge of her interaction with Dr. First.

12       Q    She never told -- I'm asking you now if she

13   ever told you about that.

14       A    No, sir.

15       Q    That never came up?

16       A    No, sir.

17       Q    And are you aware, sir, that in this case the

18   complaint was filed in May of 2007; did you have that as part

19   of your file?

20       A    No, sir.

21       Q    Did you get a request from Dr. Reagles either

22   to approve or disapprove the life care plan for plaintiff?

23       A    Yes, sir.

24       Q    Did you respond to that?

25       A    Yes, sir.

1          Q    In writing?

2          A    Yes, sir.

3          Q    Did you approve it in writing?

4          A    Yes, I did.

5          Q    Did you retain a copy of that letter?

6          A    I believe I handed it back.

7          Q    Handed it back to?

8          A    Dr. Reagles.  I just saw him this morning.  As

9    he was leaving and I was coming in, and I had it in my

10   possession and I gave it to him.

11         Q    Oh, you gave the approval of the life plan

12   this morning?

13         A    Yes, sir.  I just received it last week.

14         Q    You hadn't seen it before that?

15         A    No.  Just reviewed it.

16         Q    So if his report contained a life care plan

17   prior to this week, would you have approved that care plan?

18         A    I can't speak to it because I hadn't seen it.

19         Q    You didn't see anything until today?

20         A    No, I saw it earlier, I received it, I'm

21   sorry, I don't know when I received it in my office, but

22   within the last week or two weeks.

23         Q    And that's the first you'd seen it?

24         A    Yes, sir.

25         Q    And you handed back a signed one to him this

1    morning?

2             A    Yes, sir.

3             MR. KINSEY:  Your Honor, if I could have just

4    a couple of seconds and then I think we're about done.

5             Doctor, if you could turn with me very quickly

6    to July 7th, 2007 in your notes.  You have it before I do?

7             A    No.

8             Q    That's in Plaintiff's 79, tabbed on the side.

9    That's where those notes are located.

10            A    I don't have a July 7th, do you have July 9th?

11            Q    Do you have what has been marked as

12   Plaintiff's 79?  It's one that we admitted.  Do you not have

13   that?

14            MR. KINSEY:  My apology, your Honor, I was

15   under the impression that that had been provided and gone

16   over.

17            A    It must be on a different page, I'm sorry, I

18   don't see it.

19            MR. KINSEY:  May I approach?

20            THE COURT:  You may.

21            A    Sorry, I had the wrong year.

22            MR. KINSEY:  Your Honor, to expedite things,

23   may I pull a page out of my notes so we can continue and then

24   we'll find that page.  It's not in his exhibit as it was

25   handed to him and introduced.

1          THE COURT:  Certainly.  This is part of 79?

2          MS. SHEEHAN:  Yes.

3          THE CLERK:  Do you want my copy of 79?

4      Q    I'll just pull this out, I know what, at the

5  top of it, it starts 6/19/07 -- I'm sorry, I'm to blame, it's

6  6/19/07, not '09, it's not, I apologize.

7      A    6/19/07.

8      Q    Do you have that?

9      A    Yes, sir.

10     Q    It's been a long day, Doctor.

11     A    I hear you.

12     Q    Would you look that over, please, the entry.

13     A    Yes.

14     Q    You see in the middle of the page it says,

15  "Sleep still poor"?

16     A    Yes, sir.

17     Q    Then it says, "Doing well with own business"?

18     A    Yes, sir.

19     Q    Can you tell me what that means?

20     A    I don't know.  That's my nurse's handwriting.

21     Q    Well, you're familiar with Ms. Collins on a

22  personal basis, aren't you?

23     A    No, we're patient and physician relationship,

24  I don't -- I have not at any point met with her outside of

25  work.

1          Q     You have any idea what business she was

2     running in July 9th, 2007?

3          A     I don't remember if she was doing jewelry or

4     so -- I don't know, no, I don't know, sir.

5          Q     No idea?

6          A     No, sir.

7          Q     Did you ever discuss business, that business

8     with her?

9          A     Obviously not in enough detail.

10         Q     Did you ever discuss that as a possible

11    stressor?

12         A     No, sir.

13         Q     Running a business could certainly be

14    stressful, couldn't it?

15         A     Yes.  Absolutely.

16         Q     We have no idea what that is?

17         A     No.

18               MR. KINSEY:  Thank you, your Honor.

19               THE COURT:  Mr. Andrews.

20               CROSS-EXAMINATION BY MR. ANDREWS:

21         Q     Dr. Alley, my name is Ross Andrews, I

22    represent Troy Mitchell in this proceeding.  I have a few

23    questions for you.

24         A     Yes, sir.

25         Q     You've been practicing medicine for over 20

1    years?

2         A    Almost.

3         Q    Almost 20 years.

4         A    After medical school, you're in residency.

5         Q    Just the amount of time is all I'm interested

6    in, Doctor, how long?

7         A    Since I've been out of residency, it is 17 and

8    a half years.

9         Q    You consider yourself to be a compassionate

10   doctor?

11        A    Yes, sir.

12        Q    You try to be supportive of your patients?

13        A    Yes, sir.

14        Q    And you try to form a bond with them?

15        A    Yes, sir.

16        Q    And you formed a bond with Ms. Collins?

17        A    Yes, sir.

18        Q    Now, you testified that in December of 2005,

19   Ms. Collins showed up at your office very upset, correct?

20        A    Yes, sir.

21        Q    And very soon after that you learned that she

22   was intending to sue the state of New York?

23        A    Yes.

24        Q    And you're familiar with the fact that she

25   initiated legal action the following month, in January of

1    2006?

2         A    I don't know the exact timeline on any legal

3    proceedings, aside from --

4         Q    Just --

5         A    So the answer is no.

6         Q    I'm going to try to keep this moving, thank

7    you.

8         A    So the answer's no.

9         Q    Do you know that she initiated a legal

10   proceeding in 2006?

11        A    No.

12        Q    Okay.  So she talked to you many times without

13   revealing that to you?

14        A    Yes, sir.

15        Q    You talked about a visit on September 29,

16   2006.  And that's the only page I'm going to need to look at.

17        A    Yes, sir.

18        Q    You found that record?

19        A    Yes, sir.

20        Q    And this is the visit where Ms. Collins

21   revealed that Troy Mitchell had transferred to Eastern

22   Correctional Facility, correct?

23        A    Yes, sir.

24        Q    Do you have a specific recollection of that

25   visit?

1          A     No, sir.

2          Q     So you're pretty much limited to what you see

3     in your notes?

4          A     For that one, yes, sir.

5          Q     Okay.  Well, you testified, and I was

6     listening very carefully, that Ms. Collins told you that the

7     sergeant responsible for the majority of the sexual

8     harassment had transferred to Eastern, do you recall that

9     testimony?

10         A     Yes, sir.

11         Q     Okay.  It doesn't say the majority of the

12    harassment anywhere in your notes there, does it?

13         A     No, it doesn't.

14         Q     Was that your understanding from Ms. Collins?

15         A     That was the only person that she specifically

16    mentioned.

17         Q     So Ms. Collins had suggested to you at that

18    point or over time that Troy Mitchell had sexually harassed

19    her on numerous occasions?

20         A     Yes, sir.

21         Q     Okay.  And she was fearful of Lieutenant

22    Mitchell's very presence at Eastern, is that correct?

23         A     Yes, sir.

24         Q     But she didn't talk about anything in

25    particular that he did wrong at Eastern?  There's nothing in

1    your notes, right?

2              A    No, sir, I don't recall any specifics.

3              Q    You discuss Ms. Collins' stressors for PTSD,

4    do you recall that?

5              A    Yes, sir.

6              Q    You said that initially you had identified

7    sexual touching, explicit sexual jokes and implicit sexual

8    statements by supervisors?

9              A    Yes, sir.

10             Q    And again, she identified Sergeant Mitchell to

11   you at some point as the primary harasser?

12             A    Yes, sir.

13             Q    Would you be surprised to hear, Doctor, that

14   Ms. Collins testified under oath at this proceeding to only

15   two episodes with Sergeant Mitchell that involved any

16   sexually-related content?  Would you be surprised to hear

17   that?

18             A    No, sir.

19             Q    Why wouldn't you be surprised to hear that?

20             A    Because, sir, in terms of sexual harassment,

21   someone can be sexually harassed without saying a word.  I

22   can look at someone --

23             Q    Listen, Doctor --

24             A    You asked me my opinion, sir, you asked me my

25   opinion, and someone --

1           THE COURT:  Hold on, hold on, everybody stop.

2     One person's going to talk at a time, we have a court

3     reporter.  Doc, I want you to try to answer the question.  If

4     you can't answer the question, tell the attorneys that you

5     can't answer it, and he'll rephrase it.  Okay.  Go ahead,

6     Mr. Andrews.

7           Q    Doctor, again, the stressors that you

8     identified were sexual touching, explicit jokes, implicit

9     sexual statements, correct?

10          A    Yes, sir.

11          Q    Was it your impression that Sergeant Mitchell

12    ever sexually touched Ms. Collins?

13          A    Yes.

14          Q    So you would be surprised to hear that she

15    confirmed under oath in this proceeding that he never touched

16    her?

17          A    Yes.

18          Q    In fact, that would be inconsistent with what

19    she indicated to you over time?

20          A    Just the once, that was only the one time that

21    we went into, that we discussed what the issues were

22    initially.

23          Q    And she said that Sergeant Mitchell sexually

24    touched her?

25          A    No.

1          Q    I think a second ago you said that she did.

2          A    She said a supervisor.  At that point she did

3    not identify Sergeant Mitchell.

4          Q    Okay.  You've identified Sergeant Mitchell as

5    the person responsible for the majority of the sexual

6    harassment, correct?

7          A    That was what she told me in terms of the

8    sexual touching.  She did not tell me any specific person.

9          Q    Wouldn't you think sexual touching is more

10   serious than explicit jokes or implicit sexual statements?

11         A    In that work situation, I don't -- I'm gonna

12   say no.

13         Q    Okay.  Let me ask you another question.  You

14   said that if someone made a sexually related comment and told

15   someone, the person who received that comment said don't do

16   that to me again and the person did it again, that would be

17   sexual harassment, correct?

18         A    No, you can have sex -- I'm sorry, no, the

19   answer's no.

20         Q    Well, what if someone made a sexual comment,

21   the other person didn't respond and then 13 or 14 months

22   later, the person made another alleged sexual comment?

23         A    I'm sorry, what's the question?

24         Q    I'll move on.

25              MR. ANDREWS:  I have no further questions,

1       your Honor.

2                       THE COURT:  Thank you, Mr. Andrews.

3       Ms. Connor, do you have any redirect?

4                       MS. CONNOR:  I have a few questions, very few,

5       your Honor.

6                       THE COURT:  Okay.

7                       REDIRECT EXAMINATION BY MS. CONNOR:

8               Q     Dr. Alley?

9               A     Yes, ma'am.

10              Q     I'm going to ask you about ulcers.

11              A     Okay.

12              Q     You testified on cross-examination about

13      ulcers.

14              A     Yes.

15              Q     Briefly.  Are all ulcers stress related or can

16      there be other causes?

17              A     There can be other causes.

18              Q     Such as what?

19              A     There is -- we now know that most ulcers are

20      related to an infection called Helicobacter pylori and

21      especially if that is associated with taking in

22      anti-inflammatories, aspirin, ibuprofen, Aleve, that tends to

23      definitely put you at higher risk of developing an ulcer.

24              Q     Is -- you named what I assume as a

25      micro-organism, is that it?

1          A    Yes.

2          Q    Is that a virus?

3          A    No, it's a bacteria, it's pretty neat how

4     someone demonstrated that it causes ulcers.

5          Q    Okay.  We don't need to go any further, I just

6     wanted to know that, okay.  Now, I would direct your

7     attention to your medical notes and there was -- you have a

8     note of an office visit on September 13th, 2007.  That's the

9     note where --

10         A    Yes.

11         Q    Made some -- that's the visit, rather, where

12    you made some notations about Ms. Collins reporting to you

13    she was arrested.

14         A    Yes.

15         Q    Do you have it?

16         A    Yes, ma'am.

17         Q    Now you made a note there, is this note in

18    your handwriting, this is your handwriting?

19         A    That's my handwriting, yes.

20         Q    Now, you made a note there that -- it says

21    sheriff screamed at her like Sergeant Wright at corrections,

22    corrections facility?

23         A    Yes, ma'am.

24         Q    Now does that have any significance to you

25    with respect to Ms. Collins' reported problems at work?

1          A     Obviously just that that was someone that she

2     felt threatened by.

3          Q     Who was?

4          A     Sergeant Wright.

5          Q     Would that be an example of someone reliving a

6     situation, or re -- flashing on a situation?

7          A     Yes, ma'am.

8                MS. CONNOR:  No further questions, thank you

9     very much, Dr. Alley.

10               THE WITNESS:  You're welcome.

11               THE COURT:  Any recross?

12               MR. KINSEY:  Very brief.

13               THE COURT:  Going to hold you to it.

14               RECROSS-EXAMINATION BY MR. KINSEY:

15         Q     You have any idea what the underlying event

16    was with Sergeant Wright?

17         A     No, sir.

18         Q     You have any idea if it was sexual in nature?

19         A     No, sir.

20         Q     If I told you that it was over seven minutes

21    of overtime and had nothing to do with sex or gender, would

22    you find that to be significant?

23               MS. CONNOR:  Your Honor, I'm going to object

24    to that question because --

25               THE COURT:  Overruled.

1          A    I'm gonna say no.

2          Q    Wouldn't be significant?

3          A    No.

4          Q    Would have nothing to do with sexual

5     harassment, would it?

6          A    No.

7               MR. KINSEY:  Thank you, Doctor.

8               THE COURT:  Mr. Andrews?

9               MR. ANDREWS:  Nothing further, your Honor.

10              THE COURT:  Okay.  Doctor, you can step down.

11              THE WITNESS:  Thank you so much, sir.

12              THE COURT:  Have a good afternoon.

13              THE WITNESS:  I shall.

14              (Whereupon the witness was excused.)

15              THE COURT:  Ladies and gentlemen, is everyone

16    okay?  You need a break or we're going to continue through?

17    My preference is to continue moving on, okay.  And if you

18    need anything at any point, I'm going to keep hustling here,

19    you let me know, all right, and I'll let you get a break.

20    Ms. Connor, please call your next witness.

21              MS. CONNOR:  Your Honor, I would ask the

22    court's indulgence for a minute.  I have two witnesses and I

23    need to know if they're both here or just one is here,

24    please.

25              THE COURT:  I know one's here.

1      MS. CONNOR:  I do, too, but I would like to

2  know if the other one is here as well, your Honor.

3      THE COURT:  Yep.  Hurry up.

4      MS. CONNOR:  I'm very sorry, thank you.

5      THE COURT:  No, that's all right.

6      (Pause in Proceedings.)

7      THE COURT:  Let's not wander too far here,

8  hopefully keep going here.

9      Ms. Connor, you have a witness?

10      MS. CONNOR:  I do.  She was right behind me.

11      THE COURT:  Going to be one or the other,

12  there's only two left.

13      THE CLERK:  Good afternoon.  Can you state

14  your full name, please.  Spell it for the record, please.

15      THE WITNESS:  Mary G. Mayville,

16  M-a-y-v-i-l-l-e.

17      THE CLERK:  Can you raise your right hand.

18

19      M A R Y   M A Y V I L L E , called as a

20  witness and being duly sworn, testifies as follows:

21      MR. ANDREWS:  Excuse me, your Honor, there was

22  an issue that we had not finished discussing yet with regard

23  to the testimony of this witness.

24      THE COURT:  We finished discussing it.  I told

25  you to object.  If you hear any of that.

1          MR. ANDREWS:  Thank you, your Honor, I

2  understand.

3          THE COURT:  Okay.

4          DIRECT EXAMINATION BY MS. CONNOR:

5     Q    Good afternoon, Ms. Mayville.

6     A    Good afternoon.

7     Q    Are you currently employed?

8     A    No, I am not.

9     Q    Were you formerly employed?

10    A    Yes, I was.

11    Q    Who was your employer?

12    A    Recent, the last one?

13    Q    Yes.

14    A    New York State Department of Corrections.

15    Q    And are you currently retired from the

16 department?

17    A    Yes, I am.

18    Q    When did you retire?

19    A    August 30th, 3:30 p.m., 2008.

20    Q    And how long had you worked for the Department

21 of Corrections?

22    A    Twenty-three years.

23    Q    When you retired, what was your position?

24    A    Affirmative action administrator.

25    Q    Did you work for a particular office or

1    department?

2              A     Department of diversity management.

3              Q     Is that also called the office of diversity

4    management?

5              A     Yes, it is.

6              Q     Where was that office located?

7              A     In Albany.  New York.

8              Q     Were there other offices in other parts of the

9    state of the office of diversity management?

10             A     My office was here in Syracuse.

11             Q     Where in Syracuse?

12             A     In the State Office Building.

13             Q     And what does -- or rather, what did an

14   affirmative action administrator do for the office of

15   diversity management?  When you worked there?

16             A     When -- well, there were a number of things

17   that we did but the major task was to follow through on

18   complaints that individuals had, employees had, whether they

19   were officers or civilians, and try to determine what the

20   issues were.

21             Q     Did the office of diversity management --

22   withdrawn.

23                   Did an affirmative action administrator have

24   any role in training of employees?

25             A     Yes.

1      Q      What role is that?

2      A      My role was extensive in training.  I probably

3  did three or four trainings a month on diverse --

4      Q      On what subjects?

5      A      Sexual harassment, on diversity management, on

6  hostile work environments.  ADA issues.

7      Q      Is that Americans with Disabilities Act?

8      A      Yes, yes.

9      Q      Go ahead.

10     A      That was it.

11     Q      How long were you an affirmative action

12  administrator?

13     A      From 2000 to 2008.

14     Q      And prior to being an affirmative action

15  administrator for the Department of Corrections, what did you

16  do for the Department of Corrections?

17     A      I worked at a number of facilities, mainly at

18  Auburn Correctional Facility, which was a maximum security,

19  and I was the supervisor of volunteer tutors and I worked at

20  Butler which was a minimum security prison.

21     Q      What did you do at Butler?

22     A      Supervisor, volunteer services.

23     Q      Now supervisor of volunteer services, is that

24  a civilian or a security job?

25     A      Civilian.

1          Q     Would you tell us what the office of --

2    Withdrawn.

3               Now, were you yourself ever trained to be a

4    sexual harassment investigator?

5          A     Yes, I was.

6          Q     When were you trained?

7          A     I don't know the exact dates but I worked also

8    with the department of human rights and I took a number of

9    their courses.  Approximately they were week-long courses.

10   This is before I got the position and then after I got the

11   position of affirmative action administrator, I was again

12   taking more courses.

13         Q     When you say taking courses, was this

14   formalized instruction?

15         A     Yes.

16         Q     Where did this instruction take place?

17         A     In Albany.

18         Q     Who were your instructors?

19         A     I don't -- I don't remember their names.

20         Q     Were they from any particular office of the

21   state?

22         A     Yes, they would be from our attorney's office

23   and from the diversity management office.

24         Q     Were you ever trained by GOER?

25         A     Yes.

1          Q     What is GOER?

2          A     Governors Office of Employee Relations.

3          Q     What training did you receive from GOER?

4          A     Sexual harassment training, diversity

5    management training, ADA issues.  Hostile work environment.

6          Q     Now, did you yourself do training?

7          A     Yes.

8          Q     And did you -- whom did you train for the

9    Department of Corrections?

10         A     Mostly the employees, civilians and officers,

11   but I also trained some of the affirmative action officers

12   that followed me, and I did extensive training for human

13   rights.

14         Q     And when you did the training, did you use a

15   manual or a handbook?

16         A     Yes.

17         Q     Ms. Mayville, I'm going to show you what is

18   previously in evidence as Plaintiff's Exhibit 3.  Would you

19   look at that for a moment, please.  Did you use that handbook

20   in your training?

21         A     The -- well, I did it for Human Rights but the

22   Department of Corrections had their own, which was similar,

23   it was based on this one, I believe, diversity management

24   made one that was similar to this.

25         Q     Now, how was the office of diversity

1    management organized, who -- can you explain the hierarchy

2    and structure of that office, please?

3              A    There was a deputy commissioner, the last one,

4    I think his name was Rivera.  Mr. Harvey, Charles Harvey was

5    my immediate supervisor, and then there were I believe seven

6    affirmative action administrators, we each were responsible

7    for a certain region of the New York State.

8              Q    Did you have a responsibility for a particular

9    region?

10             A    Yes.

11             Q    What region was that?

12             A    It was considered the western region and it

13   pertained to all the facilities west of Utica all the way

14   through to Buffalo.

15             Q    Now in your job as affirmative action

16   administrator, did you make any decisions concerning any

17   discipline of employees for -- who worked for the Department

18   of Corrections?

19             A    Not, not formal decisions, there were

20   discussions because as an affirmative action administrator

21   when I went out to speak to the individuals, I was closest to

22   the situation at that time.  So when I wrote my draft report,

23   my supervisor would discuss it with me and that's how a

24   decision was made, I didn't make the final decisions.

25             Q    Who did?

1          A      I believe Charlie Harvey did.

2          Q      Now did you conduct investigations of

3    complaints of discrimination?

4          A      Yes.

5          Q      And would that include complaints of sexual

6    harassment?

7          A      Yes.

8          Q      Typically how would you go about conducting

9    such an investigation when you worked as affirmative action

10   administrator?

11         A      When an individual had a complaint, they would

12   write to our office and then if it was in my region, I would

13   be assigned to go and discuss it and talk to the individual

14   that filed the complaint, that was my initial step.  And then

15   I would do followups on whoever that individual discussed in

16   my initial conversation, and I would try to get statements

17   from everybody.

18         Q      And what -- did you have any other role other

19   than getting statements?

20         A      I don't understand that question.

21         Q      In the investigatory process, did you do

22   anything else other than obtaining statements?

23         A      No, I -- I really don't understand what you

24   mean by that.  If I -- if I went to each of the individuals I

25   got their statements and I submitted a draft report, and

1    whatever findings to my supervisor and then that was the end

2    of my task for that case.

3              Q    Now, you're familiar with the plaintiff Penny

4    Collins in this case?

5              A    Yes.

6              Q    Did you ever attend a cultural diversity

7    training session with her in Albany?

8              A    Did I attend one?  I believe I --

9              Q    Or was she present at one where you were

10   present?

11             A    She was present at one that I was helping to

12   conduct.

13             Q    Approximately when was that?

14             A    Oh, God.  I have no idea.  Really couldn't

15   even say a time.  We usually did the training every three

16   years and it was for trainers that were going to conduct the

17   training for diversity management.

18             Q    So that training session that you were present

19   when Ms. Collins was present was to train a trainer, is that

20   correct?

21             A    Individuals, yes, that would be conducting

22   training in their facilities.

23             Q    And did you train Ms. Collins to do that?

24             A    Yes, she was in attendance at that training.

25             Q    Are these trainers called diversity

1    facilitator trainers?

2            A    Yes.

3            Q    What does a diversity facilitator trainer do

4    after you've trained them?

5            A    They train.  They're assigned specifically to

6    their own facility because there's a number of employees that

7    attend the facility, that work in the facility so we have

8    training on a regular basis.  And each employee has to take

9    that training every year, or every two years I believe now, I

10   don't know, and we had somebody in each facility, usually two

11   or three people that would conduct that training on a regular

12   basis.

13           Q    You've used the word diversity as have I.

14   Would you define what that meant in the Department of

15   Corrections?

16           A    It's individuals are individuals and we are

17   all different, and that's one of the things that is most

18   difficult for people in an environment, especially in

19   corrections, to be able to cope with.

20           Q    What are the types of differences that are

21   encompassed within the term diversity?

22           A    We have gender differences, you have

23   ethnicity, you have cultural differences, age differences,

24   which I believe that's about, and their work, their job

25   title, that's a complete difference also.

1          Q      Were there committees of cultural diversity in

2     institutions of the Department of Corrections throughout the

3     state?

4          A      Yes, there were.

5          Q      Was there one in Auburn Correctional Facility?

6          A      Yes.

7          Q      Now, did you ever work as -- at Auburn

8     Correctional Facility as your primary job location?

9          A      Yes.

10         Q      When was that?

11         A      From 1985 until 2000.

12         Q      What did you do in that time period?

13         A      I was the supervisor, volunteer tutors but I

14    was also a trainer, and I worked on the -- I was the

15    chairperson of the diversity management committee.  That was

16    a major role, too.

17         Q      Now, this committee you mentioned, the

18    diversity management committee, how did that committee relate

19    in structure to the office of diversity management if it did?

20         A      Well, they were really the first individuals

21    that would help any employee that would have an issue, so

22    they -- the employees knew that they could come to the

23    office, the committee in the facility and then they would

24    extend it to Albany, if necessary.

25         Q      In the class that you were the trainer when

1    Ms. Collins attended, did you train her in the law of

2    discrimination and sexual harassment?

3           A    Not me personally.  We had an individual that

4    was representing the counselor's office that would come in

5    and discuss whatever needed to be discussed on that level.

6           Q    Was that part -- was training in the law part

7    of the curriculum, if you will, of your training session?

8           A    Yes.

9           Q    When Ms. Collins attended this training

10   session, did she report any instances of sexual harassment

11   that she was subjected to in her view?

12          A    I do recall but I wasn't the initial one that

13   knew about it, I found out about it secondhand.  But I did

14   know about it.

15          Q    Do you recall when you first met Ms. Collins?

16          A    No.  I won't forget, though.

17          Q    Now, if I direct your attention to the time

18   period of 2005 in the fall.  Did you become aware at some

19   point of whether Ms. Collins filed a complaint with the

20   office of diversity management?

21          A    If that's the date you're say -- I don't

22   recall the dates, I'm really retired.  I do recall coming in

23   for another case and I do recall being stopped and there was

24   a discussion on some issues that she did have, that Penny

25   had.

1          Q    At some point, did you become aware in a more

2    formal sense that Penny Collins had filed a complaint?

3          A    Yes.

4          Q    How did that take place?

5          A    I believe there was another affirmative action

6    officer that was working with me under my -- if you want to

7    call it tutelage, in the Syracuse office, Pat Reardon, and I

8    believe he was assigned to come in and discuss the initial

9    case that Penny Collins had.

10         Q    And how did you become aware of the case then?

11         A    Well --

12         Q    From Mr. Reardon?

13         A    Yes.  And we discussed it because he was just

14   working on the new cases.

15         Q    Now did you ever take a statement from

16   Ms. Collins with respect to any complaints she had at Auburn

17   Correctional Facility?

18         A    Yes.

19         Q    Ms. Mayville, I'm going to show you an exhibit

20   that's been marked as Plaintiff's 22, and would you look at

21   that for a moment, please.  And identify it for me, if you

22   can.

23         A    It is a statement form that each of the

24   affirmative action administrators utilized when there was a

25   complaint filed, we would go in and speak to the individual

1   and write on this statement form.

2            Q    Now with respect to that one, did you write

3   that?

4            A    Yes, that's my handwriting.

5            Q    And who was that statement from?

6            A    Penny Collins.

7            Q    And is her signature on that statement?

8            A    Yes.

9            Q    And is your signature on that statement?

10           A    Yes.

11           Q    What's the date of the statement?

12           A    November 29th, 2005.

13                MS. CONNOR:  Okay, at this time we offer

14   Plaintiff's Exhibit 22.

15                MS. SHEEHAN:  Objection, your Honor, we will

16   stipulate that a complaint was filed on November 29, 2005 by

17   Ms. Collins, given to diversity management office, but this

18   is hearsay, Ms. Collins had an opportunity to testify on the

19   stand.

20                MS. CONNOR:  Your Honor, it goes to the notice

21   of the employer as to the -- the allegations in the form and

22   nature of those allegations.

23                MS. SHEEHAN:  We'll stipulate to the

24   allegations.  But the admission of this document, I'll object

25   to.

1          THE COURT:  Okay, Mr. Andrews, do you have any

2     objection?

3          MR. ANDREWS:  I don't have an objection, your

4     Honor, you know, if we're going to stipulate to the

5     allegations, I guess I'd want to make clear that Mr. Mitchell

6     is not mentioned in the three-page statement.

7          THE COURT:  It will become apparent once it's

8     in evidence, it will be part of the case.  I'm going to

9     receive the document, go ahead.

10         Q    When you took this statement from Ms. Collins,

11    where were you and she located?

12         A    I believe -- my memory has to really work hard

13    on this one.  I believe that I met with Penny at an outside

14    location, outside of the facility.

15         Q    What location was that?

16         A    I think it was Applebee's but I'm not -- I

17    know it was a restaurant.

18         Q    I'm going to show you what's been marked as

19    Plaintiff's Exhibit 23, Ms. Mayville, if you would look at

20    that and identify it for me if you can.

21         A    This is a statement, it says continuation of

22    the statement from the 11/29/05, and I did note in there that

23    because of the length of time, because this was written on

24    January, and I can't read the date because it's got the hole

25    there, January 2006, but I did put on that Penny was out on

1  stress.

2          Q    And what is the exhibit marked Plaintiff's 23?

3          A    It's a statement from Penny Collins.

4          Q    Is your signature on that statement?

5          A    Yes.

6          Q    And is Ms. Collins' signature on that

7  statement?

8          A    Yes.

9          Q    I believe you sign it on every page, is that

10  right?

11          A    Yes, I did.

12              MS. CONNOR:  At this time we offer Plaintiff's

13  Exhibit 23, your Honor.

14              MS. SHEEHAN:  Short voir dire, your Honor?

15              THE COURT:  Go ahead.

16              VOIR DIRE EXAMINATION BY MS. SHEEHAN:

17          Q    Ms. Mayville, is that your handwriting?

18          A    Where?

19          Q    On the statement.

20          A    My signature, yes.

21          Q    The body of the letter --

22          A    No.

23          Q    Did you not write that?

24          A    No.

25              MS. SHEEHAN:  Make the same objection, your

1    Honor, as to 22.

2              THE COURT:  Mr. Andrews?

3              MR. ANDREWS:  No objection, your Honor.

4              THE COURT:  It's going to be received.

5              THE WITNESS:  May I add something.

6              THE COURT:  Date of that document, please?

7              CONTINUED DIRECT EXAMINATION BY MS. CONNOR:

8         Q    The date of the document is?

9         A    January '06 but --

10             THE COURT:  January 25th, '06, is that what it

11   is?

12             MS. CONNOR:  Yeah, some have holes, some don't

13   but it's January 25th, 2006 if you go further into the

14   document.

15             THE COURT:  Okay.

16        A    May I clarify something on the handwriting?  I

17   don't always write the statements.  If an individual feels

18   that they're capable of writing it, I would rather have them

19   write it because it's more believable that they're -- it's

20   their statement, so in this case, that's what happened.

21        Q    Thank you.  Now, did there come a time in the

22   fall of 2005, fall or winter of 2005, that you learned that

23   Ms. Collins was not working at Auburn Correctional Facility

24   but was out of work?

25        A    Yes.

1          Q    And what was your understanding of why she was

2     out, if you had one?

3          A    I understood that it was due to the stress of

4     the workplace.

5          Q    Now, after she gave the first statement did

6     you begin to undertake an investigation?

7          A    I attempted to but because Ms. Collins wasn't

8     there to complete the statement, we don't usually follow

9     through on it until the individual returns back to work.

10         Q    Is that the normal procedure of the office of

11    diversity management?

12         A    Yes.

13         Q    When you received or took the statement, the

14    second one from January 25th, 2006, do you have a

15    recollection of what Ms. Collins' demeanor was in your

16    conversation concerning the statement?

17         A    Well, both times I believe that she was very

18    distraught and very emotional.

19         Q    Was she crying?

20         A    Yes.

21         Q    Now did you conduct an investigation at some

22    point concerning the statements Miss Collins gave you?

23         A    Yes.

24         Q    What -- do you know the time frame of that

25    investigation?

1          A    Usually within a week or so I try to contact

2     the individuals that are named in the statement, and I follow

3     through until I see as many as I can.  So I would believe

4     that it would have gone from January maybe to May or June,

5     I'm not sure.

6          Q    Of 2006?

7          A    Yes.

8          Q    In the course of investigating Ms. Collins'

9     complaint, did you have occasion to go into Auburn facility

10    and look at the bathrooms?

11         A    Yes.

12         Q    And what caused you to do that?

13         A    Well, first of all, some of the things were

14    mentioned, and I had worked at Auburn Correctional Facility,

15    so I knew some of the issues and so I had to follow up on

16    what some of the complaints were.

17         Q    And did you go to the bathrooms at Auburn

18    after reviewing Ms. Collins' complaint?

19         A    Yes, I did.

20         Q    And did you make any observations concerning

21    the bathroom and her complaint?

22         A    Yes.

23         Q    What were those observations?

24         A    Some of the -- some of the accessibilities for

25    females were absent, and if they had to go to the restroom,

1    they would have to go to the male restroom, knock on the door

2    and wait for anybody to exit.  If they had to use the

3    restroom, they had to get a relief and that sometimes took an

4    extended length of time.  They went into some of the

5    restrooms, there were no doors on the stalls, and the one in

6    particular and I don't remember the block, each of the -- in

7    the facility there's blocks where the inmates are, the

8    officer's desk was let's say right here, you had to go behind

9    the desk to get to the restroom, and there was no door on the

10   stall so the male officers were actually passing the female

11   if she was using the restroom at that time.  So that was no

12   privacy.

13           The next floor I went into, there was no lock

14   on the door so the female officer had, because they're male

15   inmates, the female officer had to have, if we call it an

16   escort or a guard stand outside the door so that she could

17   use the facility without any jeopardy to her.  And then the

18   next facility -- the next floor, she had to go to a specific

19   area to get the keys and sometime the keys were on an

20   individual that was at the other end of the block so they had

21   to get those keys so it was very difficult for a female

22   officer to utilize the restrooms when it was needed.

23           Q    In your viewing the restrooms, did you notice

24   any graffiti on the walls of any restroom?

25           A    No, the particular thing, the restroom in the

1    locker rooms, that's where the issue was, the major issue.

2              Q    What issue was that?

3              A    I went down into the basement where the

4    officers' lockers are, and there's a little room in there, if

5    you want to call it a restroom, on the walls were written, I

6    don't remember the exact statements but they were very

7    graphic, sexually graphic about what they would do to Penny

8    Collins, and I wrote them on my statement, on my draft report

9    and I put it in there, followed through on, to find out where

10   the female officers' lockers were and they were mixed in with

11   the male officers, so that there was no privacy for men or

12   women, and that's about basically in that basement area,

13   that's the one that I was really concerned about.

14             Q    Now, in your view of this locker room area,

15   were there -- was there other graffiti on the walls in

16   relation to women?

17             A    Yes, but I don't remember what it said.

18             Q    Was it -- could you characterize it in some

19   way, was it -- can you, could you describe more specific?

20             A    Well, terminology --

21             Q    Let me just finish the question for the

22   reporter because the reporter has to take both things down

23   and I kind of flubbed the question so I'm going to try to

24   make it better with her.  Would you describe in more detail

25   what the graffiti was that you saw on the walls concerning

1    women.

2             A    It had to do with how someone would get a head

3    on, how easy someone would be able to take, but that Penny

4    wasn't available, you know, it was pretty graphic.

5             Q    Were there any drawings on the walls?

6             A    Um, I only saw one, which showed the penis and

7    just there would be circles and kind of like doodling and

8    stuff like that.

9             Q    When you conducted this investigation, did you

10   speak to Superintendent Graham about this matter?

11            A    Yes, I did.

12            Q    When did you do that?

13            A    Immediately went upstairs and spoke to him

14   about it.

15            Q    And what did you tell him in that

16   conversation?

17            A    I explained what was written down there.  At

18   that time he was not available to go down and view it, but he

19   did send, and I believe it was either sergeant or a captain

20   from that area.  I advised the superintendent that I would be

21   returning to the facility and that had to be painted over

22   within a two-week period, that I would be returning, and that

23   the restrooms should be taken care of so that there would be

24   privacy and there would be availability for the female

25   officers.

1          Q    Now did you return to the facility in

2    approximately two weeks?

3          A    Yes.

4          Q    And did you -- how did you go about conducting

5    your investigation at that time?

6          A    I immediately went down to those areas that

7    were supposed to be corrected, and they were corrected.

8          Q    Were all the areas corrected?

9          A    The wall was painted over in the basement with

10   all the graffiti and whatever.  The restrooms had, you want

11   to call them doors, they have to be half doors, they can't be

12   a whole door.  And as to the keys in that other area, that

13   was the only way they could do that area so they couldn't

14   correct that.

15         Q    Did you -- were you escorted around the

16   facility?

17         A    Yes, I was.

18         Q    Who escorted you?

19         A    An officer.  I don't remember her name.

20         Q    Did you have any difficulty obtaining an

21   escort?

22         A    Yes.

23         Q    And what was that difficulty?

24         A    A female officer was assigned to escort me and

25   she refused and it wasn't -- I thought maybe it was because

1    she didn't like me but it was because of the environment,

2    that it's a difficult situation if you could understand it,

3    you're in a maximum security prison with males and you're

4    with male officers, you don't want to create waves, and this

5    officer was a new officer and didn't want to create any kind

6    of waves and cause problems, that would cause her problems so

7    she refused to go.  And so another officer stepped up who had

8    more seniority and was a little bit more capable of handling

9    a situation.  So she took us around.

10        Q    When you came back to the facility, did you

11   take any statements from any other individuals?

12        A    Yes.

13        Q    And approximately how many statements did you

14   take?

15        A    They're -- because there were so many to talk

16   to, there were three of us taking statements, Pat Reardon.

17        Q    Three of whom?

18        A    Three diversity administrative, diversity

19   management administrators.  Pat Reardon, I forgot who the

20   other female was, and myself, we were split up into different

21   rooms because there was so many to speak to.

22        Q    About how many statements total did your

23   office take?

24        A    I would say at least 30.

25        Q    Did you have any difficulties in obtaining

1     cooperation with respect to the statements?

2            A     Yes.

3            Q     And what were those difficulties?

4            A     Some of the officers refused to speak to us,

5     and they were advised by their supervisors that they would be

6     given a direct order to cooperate.  I -- I must say, though,

7     that the officers belonged to a union and their union was

8     part of the initial thing of them not responding.

9            Q     What do you mean part of the initial thing?

10           A     NYSCOPBA which is the officers' union did not

11    want them to speak to us, diversity management.

12           Q     Did you ever speak to Superintendent Graham

13    concerning your ability to obtain information from officers?

14           A     Yes.

15           Q     When did you speak to him?

16           A     When I had the problem.  I addressed it with

17    him and, because it's his facility, I can't go in and demand

18    certain things and give direct orders, I think it's

19    appropriate to go to the individual that's in charge.

20           Q     And what, if anything, did he say to you

21    concerning that?

22           A     He advised his deputy superintendent of

23    security to take care of the issue.

24           Q     Did he talk about -- withdrawn.

25                 Did he talk about the difficulty of obtaining

1    cooperation from officers with you?

2            A    I believe it was before he had the issues with

3    the officers not willing to speak, I did speak to

4    superintendent after discussing cleaning up the bathrooms and

5    taking care of the issues and some of the ideas that I

6    received from him, and some of the statements would be

7    similar to the fact that, it's difficult to work in

8    corrections, especially if you're a female because it's so

9    different and it is a hostile work environment.

10           Q    Now the statements you and other affirmative

11   action officers took, where did you take these statements?

12           A    We -- I compiled them all and submitted them

13   to Charlie Harvey, my supervisor.

14           Q    Okay.  My question was really more where you

15   physically were located when you took the statements.

16           A    I was in the deputy superintendent's office

17   next to the superintendent's office, Reardon was across the

18   hall in one of the counselor's offices, and Car -- Carline?

19   She was with me part of the time, and she went to do some of

20   them in one of the other rooms, so we split up.

21           Q    And when you took the statements, was it just

22   yourself and the person from whom you were taking the

23   statement in the room?

24           A    Most of the time, if they were officers, they

25   had representation from NYSCOPBA, which is their union.

1          Q      What type of representation?

2          A      I believe they were attorneys.

3          Q      Was that common to have a union attorney in

4     the room when you took statements?

5          A      It depends on the individuals.

6          Q      Did all of the officers sign their statements?

7          A      Some refused to, and if an individual refuses

8     to sign, that's what I write on the bottom of the statement,

9     right where it says subject signature, I put refused to sign.

10    And if it was per directive of their NYSCOPBA union person, I

11    would put that also, which that was the majority of the cases

12    in this instance.

13         Q      Now, is there a procedure in the Department of

14    Corrections by which someone who believes he or she's been --

15    has experienced sexual harassment will go about complaining?

16         A      Well, if they have someone in the facility

17    that they can discuss it with, especially the diversity

18    management committee individuals, or a supervisor, and if

19    they're not satisfied with that, they can -- I was in charge

20    of a certain area so they could call me, or they could call

21    diversity management office in Albany and speak to someone

22    there.

23         Q      Is there a procedure by which an officer

24    should report anything to a supervisor about sexual

25    harassment?

1          A     Yes.

2          Q     What is that procedure?

3          A     I believe that they should approach the

4    supervisor and make sure that it's addressed.  I always

5    advise individuals to put it in writing.

6          Q     Do you ever advise individuals to speak to the

7    person with whom they feel they've been harassed?

8          A     Again, that's a sensitive situation.  Very

9    often you become a victim again when you speak to an

10   individual that has victimized you initially so it's very

11   difficult sometimes to get individuals to speak to the one

12   that they feel is victimizing them.  So very often they

13   won't.

14         Q     I'm going to show you a page in an exhibit.

15   They're not numbered, so I'm going to open the exhibit.  I

16   cannot identify the page because they are not numbered but at

17   the top of it is entitled how to take action.

18                    THE COURT:  Of what exhibit?

19                    MS. CONNOR:  Oh, Plaintiff's Exhibit 3, excuse

20   me.

21                    THE CLERK:  3.

22                    MS. SHEEHAN:  Top of the page says --

23                    MS. CONNOR:  How to take action.

24                    THE COURT:  And Plaintiff's Exhibit 3 is what?

25                    MS. CONNOR:  It's the --

1          A     Training in prevention of sexual harassment

2     manual.

3          Q     Do you see that page, Ms. Mayville?

4          A     Yes, I do.

5          Q     And do you -- have you had a chance to look at

6     it and review it?

7          A     I know what it says, yeah.

8          Q     How do you know what it says?

9          A     I did the training.

10          Q     Okay.  All right.  Is that the procedure of

11    the Department of Corrections for when someone wants to

12    report a complaint about sexual harassment?

13          A     Yes.

14          Q     And based on your involvement with the

15    investigation of Penny Collins' complaint, did she follow

16    that procedure?

17          A     Well, the first procedure is to speak to the

18    individual doing the harassing, and I believe she attempted

19    to, and then I think it got more hostile.  Then they can

20    speak to -- the next step would be speaking to somebody like

21    me, or somebody on the diversity management committee in the

22    facility, and if that doesn't help resolve the problem, then

23    they can file a complaint in writing and submit it to our

24    office.

25          Q     Did Penny Collins do that?

1          A    Yes.

2          Q    Now, I'd like to direct your attention to a

3    training meeting -- withdrawn.

4               Did you ever conduct a sexual harassment

5    training meeting, training session, rather, where defendant

6    Troy Mitchell was present?

7                    MR. ANDREWS:  Objection, your Honor.

8                    THE COURT:  To that question?

9                    MR. ANDREWS:  We're getting into an area that

10   has no temporal proximity or relevance to the case before us,

11   your Honor.

12                   MS. CONNOR:  Well, I have to first --

13                   THE COURT:  You've got to establish the time

14   period and when.

15                   MS. CONNOR:  That was my next question, I just

16   have to first know if it occurred.

17                   THE COURT:  Okay, the objection's overruled.

18         Q    Did you -- do you remember the question?

19         A    I know I did --

20         Q    I'm sorry, do you just remember the question?

21         A    Yes.

22         Q    Okay.  Did you ever conduct that training when

23   the defendant was there?  That's the only question right now.

24                   THE COURT:  Yes or no, please.

25         Q    Have to go through this step by step,

1    that's --

2          A    But what I'm trying to say is I don't remember

3    what type of training, I know he was in my class a number of

4    times but I don't know what type of training.

5                MR. ANDREWS:  I'm going to object to the

6    relevance, your Honor.

7                THE COURT:  She doesn't know what type of

8    training, I'm going to sustain the objection.

9          Q    Did you ever have a conversation with

10   defendant Troy Mitchell concerning the Penny Collins case?

11         A    When I took his statement, yes.

12         Q    Did you ever have any other conversation with

13   defendant Mitchell concerning the Penny Collins case?

14         A    Um, when I did a training at Butler, I

15   believe, it was a culture diversity training but we had

16   instilled a little bit of hostile work environment in how to

17   handle sexual harassment cases.

18         Q    To the best of your recollection --

19                MR. ANDREWS:  Objection, your Honor, at this

20   point I'm going to object.  If this is at a time when Troy

21   Mitchell was at Butler, then it was not in the relevant time

22   period.

23                THE COURT:  Ms. Connor.

24                MS. CONNOR:  I was going to ask the witness,

25   to the best of her recollection when did it take place is my

1    next question which would establish time period.

2                    THE COURT:  Let's find out if she knows.

3            Q    To the best of your recollection, when did

4    this take place?

5            A    Had to be -- if I retired 2008, so would have

6    had to be in 2007 or 2008.

7                    MR. ANDREWS:  So again, your Honor, I'm going

8    to object.  That's at least two years and in fact I would

9    represent to the court it was 2008, not 2007, so three years

10   after the events at issue.

11                   MS. CONNOR:  Your Honor, I understand that, I

12   can do the math, but I'm asking the witness about

13   conversations she had with the defendant concerning the case.

14                   THE COURT:  Come on up here first.

15           (At Side Bar.)

16                   THE COURT:  Okay, your objection, sir?

17                   MR. ANDREWS:  My objection is that we're

18   talking about a period in 2008 that has no relevance to the

19   time period, no temporal proximity to the time period and

20   there's really no relevance.  I've reviewed the transcript of

21   Ms. Mayville's deposition testimony, and I just don't think

22   there's anything relevant to this proceeding.

23                   THE COURT:  Ms. Connor.

24                   MS. CONNOR:  Yes, I think that it's relevant

25   because it was a conversation directly concerning this case,

1    that contains admissions against the defendant's interest,

2    and the --

3                        THE COURT:  What's the nature of the

4    statements?

5                        MS. CONNOR:  The question is, "What, if

6    anything, do you remember about Lieutenant Mitchell's

7    participation in that class?"  I'm reading from the

8    deposition, page 123 beginning on line 16, "Answer:  Well,

9    the reason I remember him being in the class is because when

10   I was preparing and people were walking in he came up to me,

11   and I was bending over and he stuck his face in my face and

12   he goes, hello.  And he goes, do you remember me?  And I

13   said, I know your face but I don't know.  He goes, I'm

14   Mitchell.  I said, Mitchell who?  I thought it was his first

15   name.  And he said, Troy, he says, you know, the Collins

16   case.  And I says, oh.  He goes, so we won, didn't we?  And I

17   just said, you know, this isn't the appropriate time, place,

18   I'm not going to discuss anything."  These are in quotes.

19                       MR. ANDREWS:  There's no admission, I'm sorry,

20   your Honor.

21                       THE COURT:  Hold on, let her finish.

22                       MS. CONNOR:  "So during the class he was

23   bringing up -- he wasn't talking about the case as the case,

24   but he's bringing up issues that when we make comments in the

25   blocks, you know, it should stay, like being in Vegas, things

1    should stay in Vegas, he used comments like that."

2                    THE COURT:  I'm going to sustain the

3    objection.

4                    MR. ANDREWS:  Thank you, your Honor.

5                    THE COURT:  There's no connection to this

6    case.

7                    (Open Court, Jury not present.)

8                    (Pause in Proceedings.)

9                    THE COURT:  The record should reflect we have

10   the ladies and gentlemen of the jury back and I applaud them

11   for their assertiveness, I like that, just get up and go.

12   I'm sorry, I should have asked before I turned my back but

13   you did exactly what I've been telling you, when you need to

14   do it, go.  For those who care, it's 13-13.  Okay.  And we're

15   going to continue with the examination of Ms. Mayville, go

16   ahead.

17            Q    Ms. Mayville, are you aware of a handbook

18   that's entitled "Orientation Handbook for Female Staff

19   Working in an Institutional Setting"?

20            A    Yes.

21            Q    I'm going to show you Plaintiff's Exhibit 4.

22   Is that the handbook?

23            A    Yes.

24            Q    Was this handbook used by the Department of

25   Corrections in, when did -- I'll withdraw that.  When did the

1    Department of Corrections first start using this handbook?

2            A    It was before I started as affirmative action

3    administrator.

4            Q    And did you have any involvement in writing

5    the handbook?

6            A    No.

7            Q    Did you have any involvement in any work with

8    respect to this handbook?

9            A    I don't understand the question.

10           Q    Did you work -- do any work with respect,

11   sorry, with respect to the handbook?  Do you understand that

12   question?

13           A    I didn't personally use the handbook, if

14   that's what you're asking.

15           Q    Is there a reason?

16           A    I didn't like what the contents were.

17           Q    And when you worked at Auburn, the facility

18   itself, before becoming an affirmative action administrator,

19   did you -- you testified you worked on the diversity

20   committee?

21           A    Yes.

22           Q    Did that committee have any recommendations

23   with respect to this handbook?

24           A    Yes.

25           Q    And what were those?

1          A     Burn 'em.  We had a diversity management

2     committee, a, if you want to call it a facility wide where

3     all committee members from all of the facilities would meet

4     on a regular basis in my hub, and these manuals were brought

5     in as one of our issues because that's one of the things that

6     we would discuss, that was the purpose of our meetings.  And

7     I actually believe it was Lynn Anderson that brought the

8     pamphlets in.

9          Q     Who's Lynn Anderson?

10         A     She was the diversity management chairperson

11    at that time.

12         Q     And did you -- that committee make any

13    recommendations specifically with respect to the handbook?

14         A     Yes.

15         Q     What were those?

16         A     To change the wording on a number of pages.

17         Q     What pages are you referring to?  You can take

18    a moment and look.

19         A     I remember page 15.  First of all I think the

20    title.  For female staff working in an institutional setting.

21         Q     What was wrong with the title?

22         A     We felt that it should have included

23    everybody, not just designate it, you know, females.  Oh,

24    take an amount of time.  Such thing as, on page -- I can't

25    see with these glasses, page 4, the 17th statement said, and

1    this is for female staff, advising them not to do these

2    things, avoid making comments regarding an inmate's physique

3    and/or figure, they're always inappropriate and can be

4    dangerous.

5              MS. SHEEHAN:  Your Honor, can I ask what

6    number?

7              THE WITNESS:  Page 4, number 17.

8              MS. SHEEHAN:  Thank you.

9         Q    What was the committee's problem with that

10   item?

11        A    Well, it made it sound like the females are

12   the only ones that make comments, and that the females in the

13   facilities were the problem and the issue with the inmates or

14   with what was going on in the facilities.

15        Q    Were there any other recommendations by the

16   committee with respect to the handbook?

17        A    Basically it was to change the wording on a

18   number of pages and include it for all staff because a lot of

19   times female staff were singled out to be trained with this

20   manual, and we felt that everybody should be trained, been

21   trained using this manual because there's good pointers in

22   there but it appeared that it was just being steered towards

23   female staff.

24        Q    Other than the item that you mentioned, could

25   you specifically give some examples of other wording that you

1    suggested be changed, and you can use the handbook to refer.

2         A    I just remember one that females can be very

3    emotional and that they can be catty and they can resent

4    working with another female in their area and it may cause a

5    problem for a female.  I remember that one, I don't know what

6    page it's on, but I do remember that.  Expecting -- on page

7    11 where it says relationships between female staff, that's

8    the one I'm referring to, expecting all female staff to be

9    superstars, so it made it sound like, you know, we were

10   trying to be the ones that were in the limelight all the

11   time.  While it is true that women should be held to the same

12   standards of competence as their male counterparts, all

13   employees should strive to do their jobs to the best of their

14   abilities.  And that kind of struck me as -- and the women

15   participate in rumor spreading.  This is in this section

16   there.  They should avoid it.

17        MS. SHEEHAN:  Your Honor, may I ask where it

18   is in that section?

19        THE WITNESS:  Page 11, I'm reading from one,

20   two -- I'm going right in order.

21        MS. SHEEHAN:  Okay, thank you.

22        A    Number 3, jealousy, being the only woman

23   working in a given unit -- am I going too fast -- can result

24   in a good deal of special attention so the arrival of another

25   female may diminish that attention that one female would get

1   so she would resent that other female.  This is in this

2   handbook.

3                  Classification snobbery.  All females work in

4   the facility, especially those interacting with inmates, need

5   to support one another whether clerical, teacher,

6   correctional officer.  They do have common problems but don't

7   get trapped into thinking you're -- you have nothing in

8   common with them.

9                  So this is written -- and then a reminder of

10  dos and don'ts, and again, it should pertain to everybody, it

11  says always carry your ID, well, that should pertain to males

12  also, always alert other staff as to your location or

13  destination, do not ignore infractions of the rules, do not

14  spread rumors.  So I -- you know, there's a number of things

15  here.

16          Q    Now the committee that you worked on, did the

17  committee make -- to whom did the committee make any

18  recommendations to change this handbook?

19          A    We met a number of times in a number of

20  facilities and it wasn't just committee members, it was

21  anybody, that we spread the word out that anybody that wanted

22  to participate in change -- in editing this manual, they were

23  willing to do it, they could come and participate.  We had a

24  number of meetings in facilities, we had superintendents, we

25  had deputy superintendents, we had supervisors, male, female,

1    they were all -- clerics, we had every -- we had chaplains,

2    so we had a number of diverse group --

3              Q    But the committee that -- sorry, the question

4    is, did -- to who did you ask, who did you forward your

5    suggestions to to change?

6              A    After we compiled a new manual we submitted it

7    to the office of diversity management.

8              Q    The committee wrote a new manual?

9              A    Yes.

10             Q    And when did the committee first do that?

11             A    I have no idea.  I really -- I wouldn't know

12   the year.

13             Q    And --

14             A    I know it was before I became an

15   administrator.  We did it as part of our project but after I

16   became an administrator, I was pushing it even more.

17             Q    And was a new manual ever adopted?

18             A    I don't know.

19             Q    You left the employment of the Department of

20   Corrections on what year?

21             A    2008, in August.

22             Q    Was the manual still in effect when you left?

23             A    I believe it was withdrawn because there was a

24   training that was done in Albany using this manual, and a

25   number of us attended it, and I believe that some of the

1    individuals that attended that meeting filed a complaint

2    about the use --

3              Q    Approximately when was that?  In relation to

4    your retirement, if that would help you locate the date.

5              A    It would have had to have been in '06 or '07,

6    somewhere around there.

7              MS. CONNOR:  I have no further questions for

8    the witness at this time, thank you, your Honor.

9              THE COURT:  Thank you.

10             CROSS-EXAMINATION BY MS. SHEEHAN:

11             Q    Good afternoon, Ms. Mayville.

12             A    Good afternoon.

13             Q    My name is Cathy Sheehan, I'm an Assistant

14   Attorney General.  I have a few questions for you.  You just

15   talked about the female handbook.  Could you please tell me

16   of the comments in here that bothered you, are there any of

17   them that would not equally pertain to males?

18             A    I did state that at the end, that there's a

19   lot of statements here that would be just as appropriate for

20   men as for women.

21             Q    So the real -- so really it was the men who

22   were discriminated against by not receiving training in these

23   areas, correct?

24             A    That's not the way this was interpreted.

25             Q    Oh, I understand what you're saying but

1    shouldn't men -- didn't you testify men should have also

2    received the same information?

3              A    With the wording changed, yes.

4              Q    And because there's some really good points in

5    here?

6              A    Yes.

7              Q    Isn't that what you testified to?  You said

8    that the -- this book was in effect before you were employed

9    by the Department of Corrections, correct?

10             A    I don't think I said that, I think I said

11   before I became a diversity management administrator.

12             Q    When did you become a diversity management

13   trainer?

14             A    Administrator.

15             Q    Administrator.

16             A    Yep.  In 2000.

17             Q    And that's the first time you became aware of

18   this manual?

19             A    No.  When I worked at Auburn, our diversity

20   management committee learned that it was being used for new

21   employees and throughout the various facilities in the

22   region.

23             Q    When was that?

24             A    It would have been in the '90s.  The late

25   '90s, I would say '96, '97.

1          Q    And was that the first time you became aware

2    of this manual?

3          A    Yes.

4          Q    You never saw it prior to?

5          A    No.

6          Q    Remind me when you commenced your employment

7    with DOCS.

8          A    1985.

9          Q    When you worked at Auburn, were you civilian

10   or security?

11         A    Civilian.

12         Q    And what union were you a member of?

13         A    PEF.

14         Q    PEF.  When you testified that when you trained

15   the trainer, you did not use the female handbook, correct?

16         A    I don't know -- now our dates, I didn't start

17   training the trainers until I became an affirmative action

18   administrator.

19         Q    When you trained the trainers, you testified

20   you did not use this book?

21         A    No.

22         Q    And so that -- is it safe to say that DOCS did

23   not require you to use this book when you were training

24   diversity trainers?

25         A    We -- it wasn't used in the stipulation that

1    you had to use it, it was our judgment, so some individuals

2    used it and some did not.  I did not use it because I didn't

3    like the wording in it.

4         Q    So no trainers, it was not mandated that a

5    trainer use this manual?

6         A    Yes, it was, in Albany.  That's the class that

7    we took in Albany, that's the purpose of that training was to

8    stress this handbook.

9         Q    Okay.  But you testified when you train --

10   held the train the trainer courses, you did not use this

11   manual?

12        A    I personally did not, no.

13        Q    Were you ever disciplined for not using the

14   manual?

15        A    No.

16        Q    Okay.  You ever get in trouble?

17        A    Yes.

18        Q    Okay.  Disciplined, written up?

19        A    No.

20        Q    Union -- grievance filed against you,

21   complaint filed against you?

22        A    Nope.

23        Q    Okay.  Go -- let's discuss, let me go back to

24   where Ms. Connor started with you.  Talking about sexual

25   contact that Ms. Collins was a victim of.  You didn't hear it

1    firsthand but you heard something about it, do you remember

2    that conversation with Ms. Connors?

3           A    Yes.

4           Q    Wasn't she referring to an incident that while

5    Ms. Collins was attending the train the trainer course, she

6    made a complaint that somebody inappropriately touched her?

7           A    Yes.

8           Q    You testified that it's DOCS policy not to

9    contact people who have filed a complaint with your office if

10   they're out on medical leave?

11          A    Yes, medical leave or stress, yeah.

12          Q    Stress leave.  And so that's what happened in

13   Ms. Collins' case after she filed the complaint, correct?

14          A    I think we're talking about two different

15   things.

16          Q    Okay.  Ms. Collins filed a complaint, I

17   believe her statement is in evidence dated November of --

18          A    But the incident that happened during the

19   train the trainer class was in Albany.

20          Q    Agreed.  We're -- I'm moving on to the next

21   topic.

22          A    Oh, all right.

23          Q    The policy of DOCS was to not investigate a

24   complaint if somebody was out on stress leave, correct?

25          A    Yes.

1          Q    Okay.  Isn't it true that while Ms. Collins

2    was out on stress leave, she contacted you and asked you to

3    please continue with the investigation?

4          A    I don't recall that, but I have a number of

5    individuals that do that and ask you what the status is at

6    that time.

7          Q    Do you remember going to your boss Charlie

8    Harvey and said, she wants me to continue with investigation,

9    can I do that and he said, investigate?

10         A    I -- I don't remember what the circumstances

11   were, no.

12         Q    Do you remember that testifying during your

13   deposition, March 20th, 2009, that you met with

14   Ms. Connors [sic] at Applebee's?

15              MS. CONNOR:  Just to correct the record, it's

16   Collins.

17         Q    Collins.

18              MS. CONNOR:  Connor is the lawyer.

19         Q    Met with Ms. Collins at Applebee's because she

20   was not working at Auburn, she was on stress leave?

21         A    The initial meeting that I had, we met at

22   Applebee's and she was not at that time, it was out on stress

23   and that's what I put in that statement.  But in order to get

24   the statement for her complaint, I had to follow up on that

25   immediately.  And then that lapse time, the time frame from

1   November, let me check the dates, from November till January

2   of '06, that was the stress leave and that's why I didn't

3   contact her in between.

4           Q    Do you remember being deposed on March 20th,

5   2009 by Ms. Connors -- Ms. Connor?

6           A    I don't know the date but I remember being

7   there.  Being deposed.

8           Q    Do you remember being asked the question, "Did

9   you speak with Ms. Collins," answering, "Yes."  Then being

10  asked, "And where did you do that and when?"  You answering,

11  this is on page 33, starting at line 6, "Oh, I met, like I

12  said, at Applebee's and then I met her in the facility when

13  she returned and I believe -- I can't say for a fact but I

14  think it was the following January so it took a number of

15  months to get ahold of her and to get it started."

16          A    I think that's what I just said.

17          Q    So what was the delay?

18          A    She was out on stress.

19          Q    That's what you meant by, "So it took a number

20  of months to get ahold of her and get it started"?

21          A    Our policy is not to disturb an individual

22  that's out on stress or on medical leave.

23          Q    Why?

24          A    Because it probably would stress them out

25  more.  You know, it's -- they're not at work and they're out

1    for a reason and that basically is our policy, that we don't

2    follow through until they return.

3            Q    What's your opinion on that policy?

4            A    What's my what?

5            Q    Opinion of that policy.

6            A    I like it.  I agree with it.

7            Q    And you said you had people contact you while

8    they were out on leave?

9            A    Some individuals are on -- when I say out on

10   leave, I have to clarify that.  Some individuals are out on

11   vacation, or different, whatever it may be, so they will

12   contact me to find out the status of whatever, especially if

13   I'm at the stage where I'm taking statements from other

14   individuals or did I hand it in yet, to Charlie Harvey,

15   because Mr. Harvey makes his evaluation and then submits a

16   letter to that individual on what the status is.

17           Q    Did you ever receive a phone call from

18   somebody who was out on stress leave, had an investigation

19   pending and asked you to please continue with the

20   investigation even though they were out on stress leave?

21           A    I may have, but I don't remember any

22   individual in particular.

23           Q    Hypothetically if you had received that phone

24   call, how would you have handled that?

25           A    I would have talked to Charlie Harvey, my

1    supervisor.

2              Q    What would you have talked to him about?

3              A    To determine which direction I should take.  I

4    don't make those decisions on my own.  I mean I didn't at

5    that time.  I do now.

6              Q    You do now because you're retired.  Do you

7    ever remember Charlie Harvey telling you you could not

8    continue with an investigation when DOCS policy said not to?

9              A    I do.  On a number of cases, yes.

10             Q    And did you -- did you believe there was some

11   valid reasons?

12             A    That was his decision, I don't question it.

13             Q    With the affirmative action administrator, it

14   was your main purpose with the Department of Corrections was

15   to do extensive training throughout the state and to have

16   people trained in facilities that your office of diversity

17   management oversaw, correct?

18             A    Yes.

19             Q    How many training sessions would you hold a

20   year, a month, a week?  Give it to the jury any way that you

21   can remember it.

22             A    On a regular basis, every other week, to one

23   facility because it was a court order.

24             Q    Was it Auburn?

25             A    Elmira.

1          Q      Okay.

2          A      No, Auburn, no, that might be now, but at that

3     time, it was under court order and an affirmative action

4     administrator had to conduct training rather than the

5     trainers of that facility.  And regards the others, I

6     probably did extensive training throughout the state, not

7     just in my region, probably one or two a month.

8          Q      Is it fair to say that every facility in the

9     DOCS system receives diversity training?

10         A      Yes, it's a requirement.

11         Q      How's it a requirement?

12         A      I don't know what you mean by that.

13         Q      A directive?

14         A      Yes, there's a directive.

15         Q      And from the commissioner?

16         A      Yes.

17         Q      Regarding your -- okay.  Regarding your visit

18    to Auburn with two other individuals or three other

19    individuals to conduct interviews while investigating

20    Ms. Collins' complaint, okay, I'm going to talk about that

21    visit, or visits.  Did it take a number of visits?

22         A      Yes.

23         Q      How many?

24         A      Oh, God.  Until we completed.  It had to be

25    probably a month, month and a half.  Three of us conducting.

1    And by the way, that other individual was Earline Corbitt, it

2    just came to me.  Senior citizen.

3            Q    During that visit, you went down to a bathroom

4    to view graffiti on the wall?

5            A    Yes.

6            Q    Did you see any graffiti on the wall about

7    males?

8            A    No.

9            Q    Any graffiti on the wall about a

10   superintendent?

11           A    No.  I don't recall anything like that.

12           Q    Were you looking?

13           A    Yes.

14           Q    Or were you just looking for the comments that

15   were complained about?

16           A    I wrote everything on a tablet that was on the

17   wall and I submitted it with my draft report.

18           Q    Your complaints about the bathrooms, it was

19   one bathroom that the door, that was missing a door, correct?

20           A    I believe so, yes.

21           Q    How many bathrooms are in Auburn?

22           A    I have no idea.

23           Q    What's -- make a guess.  I asked you because

24   you've worked there.

25           A    In the blocks, I believe there has to be one

1    on every tier.

2            Q     How many tiers?

3            A     I don't know.  Is there an officer?  I really

4    don't know.  Maybe there's five tiers, four or five tiers.

5            Q     Times how many blocks?

6            A     Five.

7            Q     So that's 25?

8            A     If I'm right.  More?

9            Q     Thank you for giving me easy numbers.

10           A     I'm looking at the superintendent.

11           Q     Is he going like this?  He will be on the

12   stand to testify.

13           A     Yeah.  It's been so long, I can't picture it

14   any longer, I'm trying to get it out of my mind.

15           Q     You're doing great.  It won't be much longer.

16           A     Thanks.

17           Q     So we have the complaints about the bathroom

18   door, we had a complaint that the bathrooms, their locations

19   and there would be an officer nearby and, you know, if it was

20   a male officer, they would know that the female was using the

21   bathroom, correct, remember that testimony?

22           A     Yes.  Yes.

23           Q     Well, can't the same be said that if there was

24   a female officer outside, that a male officer had to come in

25   and he had to use the bathroom?

1        A      Absolutely, but he doesn't have to take his

2   pants down.

3        Q      Well, is that really true?

4        A      Not in all instances.

5        Q      But is that fair to men?

6        A      It's a different situation a number of times.

7   I do understand what you're saying.

8        Q      And this is a shared bathroom, isn't it?  I

9   mean men deserve the same?

10       A      Yes.

11       Q      Do you agree men deserve the same level of

12  privacy when bathrooming as women?

13       A      I would hope so.

14       Q      Thank you.  And the keys, and I know that's

15  one item that the Superintendent Graham told you he wasn't

16  able to fix was one officer held the keys, and the women,

17  female officers would feel uncomfortable or Ms. Collins'

18  complaint was female officers felt uncomfortable because they

19  had to go to a male officer to get the bathroom key?

20       A      That's part of it but I think the issue was to

21  go look for someone and by the time they found someone, you

22  know, you get desperate sometimes, you wait as long as you

23  can.

24       Q      I understand.

25       A      You got to run around looking for somebody.

1      Q    So that was the complaint, the running around

2  looking for the key for the bathroom?

3      A    Yeah, it would have been held true to anybody.

4      Q    And why were the bathrooms locked?

5      A    I think because of the area it was in.

6      Q    Inmates pass by?

7      A    Yes.

8      Q    Okay.  So when you arrived to review the

9  facility regarding the complaints that Ms. Collins made to

10  your office, Superintendent Graham made himself immediately

11  available to you, correct?

12      A    Yes.

13      Q    And he was not able to go down and view the

14  graffiti, the bathroom doors, but he sent a superior, one of

15  his officers down?

16      A    Yes.

17      Q    Deputy superintendent.  And you advised the

18  superintendent, Superintendent Graham that you wanted the

19  walls painted and the doors fixed on the bathroom?

20      A    I think we concurred together.

21      Q    Well, I think you testified you advised him?

22      A    Yes.

23      Q    And that you would be back in two weeks?

24      A    I advised him I would be back to make sure

25  that it was corrected.

1          Q     And you came back, and they were corrected

2    except for the keys situation that we just discussed?

3          A     Yes.

4          Q     You wield a lot of power?

5          A     No, I don't think that's the way it's looked

6    at.  I always respected the authority of the individual that

7    had control of the facility.  And I must say that

8    Superintendent Graham did act immediately and he wasn't in

9    that facility that long, so it wasn't on him, that issues

10   were developing.

11         Q     He was new?

12         A     He corrected everything immediately.

13         Q     Regarding the escort, now I personally would

14   find this hard to believe, but you worked at Auburn, so isn't

15   it possible that your reputation at Auburn, which is -- got

16   around and the person didn't want to escort you, not because

17   of a female sexual issue?

18         A     No, because she actually told me she didn't

19   want to go with me because it would create problems with her

20   fellow officers.

21         Q     Female officers?

22         A     She just said fellow officers.

23         Q     Okay.  So we don't know if it's female or

24   male?

25         A     Well, I assume if she used negative -- or the

1    gender term of fellow that she meant male, but I --

2              Q     Fellow officers?

3              A     Fellow officers.

4              Q     That's interesting.  Do all the women officers

5    usually get along with each other?

6              A     I -- depends on who it is.

7              Q     Exactly, just like maybe and the males don't

8    get along?

9              A     Exactly.

10             Q     You spent a month, month and a half in

11   Superintendent Graham's facility doing interviews.  Isn't it

12   true his secretary arranged all the interviews for you, you

13   gave him a list of who you wanted to speak --

14             A     I gave her a list of who I wanted to speak to

15   and the priorities, who came first, because that's how -- if

16   an individual files a complaint, I go by the way they name

17   the individual in their complaint, I try to do it that way,

18   follow through on that.

19             Q     So you gave his secretary a list of who you

20   wanted to interview and in what order?

21             A     Yes.

22             Q     And his secretary made arrangements for those

23   individuals to be there when you wanted them to be there, in

24   the order that you wanted them, and arranged so there was no

25   waiting when one interview ended and the next one started,

1    correct?

2           A    And I believe it was done because a lot of

3    them were on duty, on their post and they had to get relief

4    to go on that post.

5           Q    And this was done on DOCS time?

6           A    Yes.

7           Q    They were working, and he would have, one --

8    while somebody was being interviewed, there would be the next

9    interviewee waiting so there were always two people?

10          A    Yes.

11          Q    So there was no delay and you would not be

12   held up in your interviewing process?

13          A    Yes.

14          Q    To me, your testimony sounds like the one

15   problem you had was the interference with the union advising

16   their members not to cooperate, is that true?

17          A    That was my impression, yes.

18          Q    And you brought that to Superintendent

19   Graham's attention?

20          A    Yes.

21          Q    And he had his deputy contact the union and

22   tell them to knock it off?

23          A    I don't know what he did.

24          Q    But it stopped?

25          A    No, some of them still refused to give a

1   statement.  And they were advised to wait until somebody came

2   from Albany to represent them.

3          Q    When you say Albany, you mean from their

4   union?

5          A    Yes.

6          Q    Okay.  Their representation and the officer's

7   issues of not signing statements and not giving you a

8   statement, that was caused by the union, NYSCOPBA, correct?

9          A    I assumed that, yes.

10         Q    Do you have any reason to believe it was due

11  to DOCS, anyone from DOCS?

12         A    No.  Some of the individuals that were giving

13  the statements -- when you work together in a group like that

14  you don't want to get involved in somebody else's issue so a

15  lot of individuals were apprehensive about making a statement

16  that might somehow come back and cause problems for them, and

17  that's why sometimes individuals will not give a statement,

18  not necessarily because the union tells them not to.  Now

19  they do have union representatives in the facility, and it's

20  their coworkers that they elect as their union

21  representatives, so they had the choice to choose whoever

22  they wanted.

23         Q    And this is all mandated by their union

24  contract, correct?

25         A    Yes.

1          Q     And has nothing to do with Department of

2     Corrections?

3          A     Well, they made the contract so it has to do

4     with corrections also.

5          Q     Okay.  Would you agree Department of

6     Corrections has no authority over NYSCOPBA, the union?

7          A     Yes.

8          Q     NYSCOPBA's an independent entity?

9          A     Mm-hmm.

10         Q     Sometimes NYSCOPBA and DOCS, more times than

11    not, are really at odds?

12         A     Yes, and I was part of the corrections and

13    they were the opposite, so --

14         Q     I bet you never had that with PEF.

15         A     Yes, we did.

16              MS. SHEEHAN:  Ms. Mayville, I have no further

17    questions for you, thank you.

18              THE COURT:  Mr. Andrews.

19              MR. ANDREWS:  No questions, your Honor.

20              THE COURT:  You're still staying popular.

21              MS. CONNOR:  I have no questions, your Honor,

22    thank you.

23              THE COURT:  That's very good.  Okay.  It's

24    good for you, too, right?

25              THE WITNESS:  Yes.

1        THE COURT:  Okay.  All right.  Ladies and

2   gentlemen, we're going to stop for the day.  I'm going to

3   send you home, don't talk about it, don't let anybody talk to

4   you about it, don't read, listen, look at anything about it,

5   we'll see you here tomorrow morning, ready to go at 9:00.

6   Okay.  Have a good night.

7               (Jury Excused, 4:19 p.m.)

8        THE COURT:  Do any of the attorneys have any

9   issues we need to cover before you go?

10        MS. SHEEHAN:  Yes.  Yes, minor redaction

11   issues.

12        THE COURT:  Ms. Mayville, I have to ask you to

13   stay for a minute, we have to put something on the record

14   with regard to you.

15        MS. SHEEHAN:  We will work out the redactions.

16        MS. CONNOR:  Yeah, I understand it.

17        MS. SHEEHAN:  The other item is in Exhibit 6,

18   your Honor, there is a page that's titled, "What is Sexual

19   Harassment?"  And it goes, "Sexual harassment is verbal,

20   physical advances, it may include," I don't think that's

21   appropriate to go back to the jury considering that's an

22   issue that they're --

23        THE COURT:  Has that exhibit even been

24   offered?

25        THE CLERK:  It's in with redactions.

1             THE COURT:  With redactions.

2             MS. SHEEHAN:  Wait, could we revisit that.

3     Can the witness leave?

4             MS. CONNOR:  Witness is done actually.

5             MS. SHEEHAN:  Can the witness leave?

6             THE COURT:  No.

7             MS. SHEEHAN:  Oh, okay.  She testified that

8     this was not the training manual that she used.

9             THE COURT:  She did.

10            MS. SHEEHAN:  She did, and Ms. Collins, and

11    the testimony was this was what Ms. Collins received at train

12    the trainer.

13            THE COURT:  We'll deal with this in the

14    morning, okay.

15            MS. SHEEHAN:  Okay.

16            THE COURT:  Anything else?

17            MR. ANDREWS:  No, your Honor.

18            MS. CONNOR:  No.

19            THE COURT:  All right.  We'll see you in the

20    morning.  You have papers up here that you left with the

21    witness or somebody does.

22            (A discussion was held off the record.)

23            THE COURT:  Okay.  Ms. Mayville, I need to

24    talk with you about the situation, what it took to get you

25    here.  First of all, I'd like to know, did you receive the

1  subpoena?

2                     MS. MAYVILLE:  Yes.

3                     THE COURT:  Okay.  And were you aware of the

4  date and time that you needed to be here based on that

5  subpoena?

6                     MS. MAYVILLE:  Yes.

7                     THE COURT:  Okay.  And is there a reason why

8  you decided not to show up or contact anybody?

9                     MS. MAYVILLE:  I was in the hospital for three

10 days, and when I came out, my brother was taken to the

11 Veterans Administration and I got a call yesterday that they

12 were gonna take him to the hospice area because he's on his

13 last stages.

14                     THE COURT:  Let me ask you this, did you try

15 and contact anybody to let them know that that was going on?

16                     MS. MAYVILLE:  I tried to call Penny's lawyer,

17 because they were the ones that called me and then Penny left

18 a note on my door and I tried calling her, I didn't get any

19 answer.

20                     THE COURT:  Penny left a note on your door?

21                     MS. MAYVILLE:  Yeah, knows where I live.  I

22 don't know how, but --

23                     THE COURT:  When was this?

24                     MS. MAYVILLE:  It was -- was it last night?

25                     THE COURT:  That would have been the U.S.

1    Marshals leaving the note, U.S. Marshals leaving --

2                    MS. MAYVILLE:  Douglas Thomas came from the

3    base and he left a note on the door.

4                    THE COURT:  Okay.  And is there a reason why

5    you didn't contact the court, or contact somebody?

6                    MS. MAYVILLE:  No, there's no reason other

7    than those issues that I had.

8                    THE COURT:  Okay.

9                    MS. MAYVILLE:  I felt were very important to

10   handle.

11                   THE COURT:  And when the marshals were outside

12   your door, today, is there some reason why you didn't answer?

13                   MS. MAYVILLE:  I did not hear them because I

14   got home late last night from the Veterans, and I took

15   sleeping pills and I was out.  I didn't see them until they

16   walked in my bedroom door.  Which shocked me.

17                   THE COURT:  Well, ma'am, I'm trying to decide

18   whether I need to do a proceeding to decide what, you know,

19   whether I'm going to hold you in contempt or not of court.

20   I've listened to your testimony here today, and it seems to

21   me that you're a woman that's respectful of authority and the

22   law, based on your comments about how you tried to respect

23   the superintendents and their facilities and the facts that

24   you indicated, respect for people that you work with.  That's

25   why I'm at a loss as to why you would apparently purposely

1    evade a subpoena.

2            MS. MAYVILLE:  I think some of it was, too,

3    that I had in the back of my head that I -- I've cooperated

4    so many other times with this case, and I have thought that

5    they had my statement and with my other depositions, that it

6    was more important for me to be with my brother.

7            THE COURT:  Okay.  Well, I'll tell you

8    something.  You're talking about a subpoena to be in a United

9    States Federal District Court, okay.  And regardless of your

10   personal feelings, until somebody excuses you from that

11   responsibility, you have a legal responsibility to be here,

12   you understand that?

13           MS. MAYVILLE:  I do now.

14           THE COURT:  Okay.  Okay.  Based on the facts

15   that you've presented to me with regard to your brother, I'm

16   not going to proceed with any type of contempt inquiry, I'm

17   going to excuse your absence.  But I'm going to tell you, any

18   type of subpoena you receive, please understand, that that's

19   a legal document, you have a legal requirement, you were

20   personally served, and I'm a little more than disappointed,

21   as you can tell by me sending the marshals out looking for

22   you, that you weren't here.  Or that you didn't make sure

23   that you contacted somebody to let us know why you weren't

24   going to be here.

25           If you had called and said, my brother's taken

ill, I have some responsibilities, I'd be all ears, to make

whatever arrangements we could to assist you in the timing of

what your legal responsibilities were here.  But I'm

certainly never going to excuse somebody who's willfully

trying to avoid their responsibilities to appear.

So that being said, I'm glad that you made it

here, and I wish you all the luck with your brother, in the

future.  Should it happen again, you worked for corrections

for a long time, people who may have lawsuits may be looking

for you.

MS. MAYVILLE:  I know, still going.  Other

ones.

THE COURT:  So, you know, I'll ask you to keep

that in mind and take these responsibilities seriously.  I

know it's an inconvenience and you'd rather just ignore it, I

think most people would, but unfortunately, if you get

served, you need to be here.

MS. MAYVILLE:  Now I have a appointment for

EKG and ultrasound, I don't have to be here tomorrow, do I?

THE COURT:  You're done.  Your testimony is

complete, you're finished, you're free to leave.  I'm not

going to hold you in jail overnight or anything like that.  I

might have thought about it if we found you last night.

MS. MAYVILLE:  Oh, yeah?

THE COURT:  Yeah.

1          MS. MAYVILLE:  Well, I was in the VA right
2     here, you can ask them.
3          THE COURT:  I'm not going to do any
4     investigation or inquiry, but I'm just -- for the future.
5          MS. MAYVILLE:  Okay.
6          THE COURT:  Okay.
7          MS. MAYVILLE:  Thank you.
8          THE COURT:  All right.  Thank you, ma'am.
9          MS. MAYVILLE:  Sorry, it wasn't out of
10    disrespect, it was just my priorities.
11          (Court Adjourned, 4:31 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T I O N

2

3

4            I, JODI L. HIBBARD, RPR, CRR, CSR,

5   Official Court Reporter in and for the United States

6   District Court, Northern District of New York, DO

7   HEREBY CERTIFY that I attended the foregoing

8   proceedings, took stenographic notes of the same,

9   and that the foregoing is a true and correct

10  transcript thereof.

11

12

13

14

15

16

17

18                            _____

19                            JODI L. HIBBARD, RPR, CRR, CSR
                              Official U.S. Court Reporter
20

21

22

23

24

25