VOLUME V
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
PENNY T. COLLINS,

                         Plaintiff,

vs.                              5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                         Defendants.

-------------------------------------------x

        Transcript of a Jury Trial held on March 16,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                     A P P E A R A N C E S

For Plaintiff:       MAIREAD E. CONNOR, ESQ.
                     Attorney at Law
                     440 South Warren Street
                     Suite 703
                     Syracuse, New York  13202

For Defendant:       SATTER, ANDREWS LAW FIRM
(Mitchell)           Attorneys at Law
                     217 South Salina Street, 6th Floor
                     Syracuse, New York  13202
                        BY:  ROSS P. ANDREWS, ESQ.

For Defendants:      STATE OF NEW YORK
(All Remaining)      Office of Attorney General
                     The Capitol
                     Albany, New York  12224
                        BY:  CATHY Y. SHEEHAN, AAG
                             ROGER KINSEY, AAG

I N D E X   O F   T E S T I M O N Y

| Witness | D | C | RD | RC | FRD | FRC |
|---------|-----|------|------|------|------|------|
| Jami Kaplan | 1030 | 1048 | -- | -- | -- | -- |
| Robert Pabis | 1063 | 1080 | -- | -- | -- | -- |
| John Burge, Sr. | 1144 | 1182 | 1212 | 1217 | -- | -- |
| Harold Graham | 1221 | -- | -- | -- | -- | -- |

1          (Open Court, Jury Out, 9:03 a.m.)

2          THE COURT:  Okay, Ms. Connor, you have your

3     last witness?

4          MS. CONNOR:  Yes, sir.

5          THE COURT:  Okay.

6          MS. CONNOR:  Sorry, I didn't mean to

7     interrupt.

8          THE COURT:  All right.  Going to bring the

9     jury in, then.

10         MS. SHEEHAN:  Your Honor, I don't know if you

11    want to do it with the jury here or not, I'd like to object

12    to Ms. Kaplan being called.  In reviewing her likely

13    testimony in the light of Ms. Mayville's testimony last

14    night, I think it will be duplicative.  She investigated the

15    same issues, she had Ms. Mayville and Ms. Mayville's team

16    with her, she didn't uncover anything additional, anything

17    really different.  What different she can testify to that

18    Ms. Mayville didn't find was that she determined there was

19    sexual harassment and a hostile work environment and I'm

20    going to ask your Honor, if you permit her to testify, that

21    she's not permitted to opine on those areas, it would

22    undercut the province of the jury.

23         THE COURT:  I've already ruled on that.

24         MS. SHEEHAN:  But I thought the second part

25    you reserved.

1    THE COURT:  No, I didn't, I ruled yesterday

2  saying that she wouldn't be allowed -- neither witness would

3  be allowed to testify to any type of findings.

4    MS. SHEEHAN:  Okay, your Honor.

5    THE COURT:  That does invade the province of

6  the jury in my view.

7    MS. SHEEHAN:  Next, if Ms. Connor is calling

8  her to establish that the plaintiff has exhausted her

9  administrative remedies, the state will stipulate that

10  Ms. Collins exhausted her administrative remedies.

11    THE COURT:  Ms. Connor.

12    MS. CONNOR:  Yes, your Honor.  I appreciate

13  the stipulation, we'll accept it, obviously, and -- but I was

14  calling Ms. Kaplan for more reasons than that.  Your Honor

15  said in his ruling at the side bar that Ms. Kaplan would be

16  permitted to testify about her investigation, her

17  observations and that type of thing.  There are various

18  incidents, things that Ms. Kaplan observed as part of her

19  investigation and that's the purpose of her testimony.

20    THE COURT:  Separate and apart from what we

21  had Ms. Mayville testify about?

22    MS. CONNOR:  Yes, your Honor.  Ms. Mayville is

23  a representative of the employer.

24    THE COURT:  I understand that, but I'm talking

25  about is there going to be separate type of testimony and

1    findings regarding the investigation?  I don't want to rehash

2    stuff that's already been testified about.

3                     MS. CONNOR:  No, your Honor, it's not about

4    findings.

5                     THE COURT:  I mean about what she did.

6                     MS. CONNOR:  Yes, it's --

7                     THE COURT:  Go ahead.

8                     MS. CONNOR:  It's two separate investigations.

9    There was a separate conference that took place that

10   Ms. Kaplan conducted as part of her investigation and there's

11   things that occurred at that conference, part of her

12   observations.

13                    THE COURT:  Okay.  Well, I'm not going to

14   preclude you from calling a witness, and you can object at

15   any point as you know.  Okay.  If we're ready, we're going to

16   bring the jury in, please, Bruce.

17                    (Jury Present, 9:06 a.m.)

18                    THE COURT:  Good morning, ladies and

19   gentlemen.  Hopefully you had a good night.  Little rainy

20   today, but the good news for the fans is we didn't set any

21   records yesterday.  That's the best news about that game.  We

22   don't want to be the first first-seed to lose to a 16.  That

23   kind of record we don't need.  Okay.  We concluded with our

24   witness yesterday, and Ms. Connor is prepared to call another

25   witness, go ahead.

1          MS. CONNOR:  Thank you, your Honor.  The

2     plaintiff calls Jami Kaplan.

3          THE CLERK:  Just step right here, please.

4     Good morning.  Can you state your full name and spell it for

5     the record, please.

6          THE WITNESS:  Jami Kaplan, K-a-p-l-a-n.

7

8          J A M I   K A P L A N , called as a

9     witness and being duly sworn, testifies as follows:

10         <u>DIRECT EXAMINATION BY MS. CONNOR</u>:

11    Q    Good morning, Ms. Kaplan.

12    A    Good morning.

13    Q    Are you employed?

14    A    I am.

15    Q    Where are you employed?

16    A    New York State Division of Human Rights.

17    Q    What do you do for the New York State Division

18    of Human Rights?

19    A    I'm currently a human rights specialist 2

20    which is a supervising investigator.

21    Q    How long have you been employed by, I'll call

22    it the State Division of Human Rights?

23    A    Since August 16th, 2004.

24    Q    How long have you been in your position as a

25    human rights specialist 2?

1                 A     Since May 1st, 2008.

2                 Q     Prior to obtaining the position of human

3     rights specialist 2, what was your position with the State

4     Division of Human Rights?

5                 A     I was a human rights specialist 1.

6                 Q     Prior to working for the State Division of

7     Human Rights, were you employed?

8                 A     I was.

9                 Q     Where were you employed?

10                A     My last employer was the Elmira Water Board.

11                Q     How long did you work there?

12                A     Around six years.

13                Q     What did you do there?

14                A     I was the office and meter department manager.

15                Q     Now, would you tell us what a human rights

16    specialist 1 does, please?

17                A     The human rights specialist 1 investigates

18    cases of discrimination under the New York State Human Rights

19    Law.

20                Q     And what does a human rights specialist 2 do?

21                A     Basically the same thing, we still have our

22    regular caseload but in addition, we supervise personnel and

23    we review the cases for the human rights specialist 1.

24                Q     I want to ask you a few questions about your

25    educational background.  Did you go to college?

1          A     I did.

2          Q     Where?

3          A     I went to Elmira College, I went to Alfred,

4     and I went to UB Law.

5          Q     And did you graduate from any of those

6     schools?

7          A     All of them.

8          Q     When did you graduate from -- when you say UB

9     Law, what is that, for us?

10          A     It's State University of New York Law School

11     at Buffalo.

12          Q     And are you an attorney?

13          A     I am admitted, I am not a practicing attorney.

14          Q     Would you tell us, please, what is the State

15     Division of Human Rights?

16          A     We are the state agency that enforces the

17     New York State Human Rights Law which -- we handle

18     discrimination claims.

19          Q     And approximately over your period of years,

20     working for the State Division of Human Rights, approximately

21     how many cases have you investigated?

22          A     I personally have done about -- I'd say about

23     14, 1500, but I've also, since I've had my new position,

24     reviewed around 500 of other people's cases.

25          Q     Now have you had any training in the

1    investigation of discrimination and sexual harassment?

2              A    I have.

3              Q    What type of training is that?

4              A    I have had training when I first began my job

5    at the New York State Division of Human Rights, we had a

6    one-week training session in the Bronx, you know, regarding

7    how to investigate cases, and discrimination.  I've had

8    on-the-job training, I have had classes, you know, formal

9    classes at UB Law on employment discrimination and when I was

10   at the Elmira Water Board, I had to attend sexual harassment

11   training for supervisors.

12             Q    Now, did there come a time that you

13   investigated a complaint by -- that was filed by Penny

14   Collins?

15             A    I did.

16             Q    I'm going to show you what has been previously

17   admitted into evidence as Plaintiff's 12 and 13, if you could

18   just take a moment and look at that.  Is that the complaint

19   that you investigated by Penny Collins?

20             A    Yes.

21             THE COURT:  Which document, one or both?

22             THE WITNESS:  Both.

23             Q    Would you explain the difference between

24   Plaintiff's 12 and Plaintiff's 13 if you can, please,

25   Ms. Kaplan?

1       A    Okay.  The reason I know for one thing it's

2   the same complaint is it has the same case number so

3   basically when there's a change or an amendment, we have an

4   amended complaint which is Number 13.  And I can read for you

5   as soon as I find it.  In paragraph 2, the date is different

6   in number 13, and it looks like that's it.  I don't see

7   anything different and I don't recall specifically anything

8   different.

9       Q    Now, what did you do to investigate this

10  complaint?

11      A    Once I get the file, or got this file, I

12  scheduled what's called a two-party fact-finding conference

13  and that was my first step.  And Penny Collins was there, as

14  well as the respondent's representative and Troy Mitchell.

15      Q    Okay.  Let me stop you there, a little bit.

16  When you say respondent, who are you referring to?

17      A    The New York State Department of Corrections.

18      Q    And who was there representing the respondent?

19      A    Mary Mayville was the official representative

20  that I was dealing with, but she also brought with her

21  somebody named Earline Corbitt who I don't know if she was

22  assisting her or what but Mary Mayville was the official rep

23  that I worked with.

24      Q    Now, did you -- and when you call it a

25  two-party investigatory conference, I think, or what -- would

1    you tell me again what you --

2         A    I called it a two-party fact finding.

3         Q    Fact finding, okay.  And to the best of your

4    recollection, when did that take place?

5         A    Sometime in April of 2006.

6         Q    And what is the purpose of that fact-finding

7    conference?

8         A    That is so that the Division can get

9    additional information that we need to investigate the

10   complaint as well as give both of the parties, both the

11   complainant and the respondent the opportunity to tell us

12   their side of what happened.

13        Q    Now, in the conference, you mentioned

14   defendant Troy Mitchell, or he's a defendant in this case,

15   Troy Mitchell was there?

16        A    Yes.

17        Q    Was he there for the entire conference?

18        A    No.

19        Q    Why not?

20        A    Because partway through it, after I did some

21   initial questioning, Mary Mayville had requested that he be

22   excused because we would be talking about different

23   allegations and she was afraid that -- well, she told me that

24   she was afraid that discussing like other corrections

25   officers or anything else would get back to those other

1    officers, and so for confidentiality reasons, she requested

2    that he be excused.

3              Q    And was he excused?

4              A    He was.  I asked him the questions I needed to

5    by that point.

6              Q    What questions did you ask defendant Mitchell?

7              A    I -- I don't recall what questions I would

8    have asked him.

9              Q    Did defendant Mitchell respond to your

10   questions?

11             A    He -- he did.  Initially he told me he could

12   not answer any questions because his union had advised him

13   not to, and then I told him that he could not remain at the

14   conference if he was not going to participate because I

15   wasn't going to have somebody there who wasn't gonna

16   participate, who was just going to listen to what Penny had

17   to say.  So then he agreed to -- he agreed to answer my

18   questions.

19             Q    How long did the entire two-party fact-finding

20   conference last, approximately?

21             A    It was about, and I cannot say for sure but I

22   can tell you it was longer than one hour and shorter than

23   three hours.

24             Q    Okay.

25             A    I mean, that's the best I can give you.

1    Q    Now, after the two-party fact-finding

2  conference, did you undertake any other efforts in the

3  investigation?

4    A    I did.  I went to the Auburn facility to

5  interview two witnesses, and I also did some telephone

6  interviews with other witnesses that Penny Collins had

7  identified.

8    Q    And did you review any written materials or

9  handbook from the employer as part of your investigation?

10    A    I did.

11    Q    What materials or handbook did you review?

12    A    Penny Collins had submitted for the file

13  something, a handbook that she said that was given to female

14  corrections officers and it was basically just telling female

15  corrections officers how they should act.

16    Q    Now did you, in reviewing that handbook, did

17  you have any conclusions with regard to the handbook?

18    A    I did.

19    Q    What were those?

20    A    I actually was quite horrified that a state

21  agency was giving that out to employees in the year 2006 at

22  that time.  It had stereotypes about females in there, like

23  from, again, from what I recall, I haven't seen this document

24  since '06, but something about females gossiping, or

25  wanting, you know, to like spread rumors or their outside

1    activities.  I mean, it seemed to me like this was something

2    that was like out of a 1950s sit com.  I was looking at it, I

3    couldn't believe what I was looking at.

4         Q    Now in your investigation, did you interact at

5    all with the respondent's office of diversity management?

6         A    Yes, they're always the official

7    representative of the corrections department.

8         Q    And in your investigation, did you learn about

9    any policies of the office of diversity management with

10   respect to conducting its investigations when a person who

11   complained was out of work?

12        A    I learned that, I think it was actually during

13   the conference through Mary Mayville, one of the questions

14   that I ask is, when somebody files a complaint, we like to

15   see when the employer responds and, you know, to see if

16   there's prompt and effective action taken.  In this case,

17   Penny Collins was out for some type of medical reason, so

18   Mary Mayville had indicated to me that based on the policy of

19   the corrections department, the investigation stops while the

20   employee is out on like a medical or disability leave.  So

21   that could take months.

22        Q    And did you draw any conclusions with respect

23   to the policy?

24        A    It was one part of the overall conclusions,

25   but I drew, from my own personal observation, is that prompt

1    and effective action was not able to be taken because the

2    complaint that Ms. Collins had raised just sat there while

3    she wasn't at work.

4         Q    Now, you testified that you interviewed other

5    witnesses or people, I should say people who Penny Collins

6    identified?

7         A    I did.

8         Q    And did you have any difficulties in

9    conducting those interviews?

10        A    The -- I had difficulties in -- because some

11   of them did not want to talk to me, when I --

12        Q    Why is that?

13        A    They -- there was different reasons.  One of

14   the corrections officers would not speak to me, and his union

15   rep was actually with him based on the union's instructions

16   not to speak to me, and since I had the union rep there on

17   the phone, I asked the union rep if that was gonna be true of

18   every single corrections officer that I tried to interview,

19   and he said yes.  So I didn't even try to interview any more

20   through, you know, the union because they had already told me

21   that they, you know, told them not to speak to me.  So then I

22   also, in order to get ahold of the corrections officers, I

23   had, or the other witnesses, I did have to go through the

24   Department of Corrections and they did assist me in setting

25   up, you know, one of them, and then the others, I believe

1    there may have been one that I called just -- I had a home

2    number that Penny Collins had given me, I did speak to her,

3    and another one, I was able to reach but refused to speak to

4    me.

5              Q    Why did she refuse to speak to you?

6              A    I don't recall why this person specifically

7    refused to speak to me.

8              Q    Is there a document that would refresh your

9    recollection?

10             A    My chron or the event history would give me

11   what I recorded at that time.

12             Q    What is a chron?

13             A    A chron is the -- a report that is, the

14   investigators can generate and it's based on events that we

15   enter of what we deem to be important things, like two-party

16   conferences, witness interviews, any special notes that we

17   want to make, documents received, things like that.  So it's

18   like a timeline of the case history.

19             MS. CONNOR:  Your Honor, I ask that this be

20   marked to refresh the witness', excuse me, recollection.

21             Q    Ms. Kaplan, I'm going to show you what's been

22   marked as Plaintiff's Exhibit 85, and if you would look at

23   that, see if that refreshes your recollection.

24             MR. ANDREWS:  I'm sorry, your Honor, can we

25   repeat the number, I just --

1           THE COURT:  85.

2           MS. CONNOR:  85.

3           MR. ANDREWS:  85.

4       A   Okay.  Yes, I see why she did not speak to me.

5       Q   Okay.  Is your recollection refreshed?

6       A   Yes.

7       Q   Thank you.

8       A   She gave me a few different reasons.  She did

9   not want to -- she said she did not know Ms. Collins and did

10  not work with her directly, but she also said that she wanted

11  to keep her job so she was, you know, fearful of retaliation

12  if she spoke to me.

13      Q   Now, Ms. Kaplan, did you write a report

14  containing your observations and methods of conducting your

15  investigation?

16      A   I did.  That's required on all of our cases.

17      Q   I'm going to show you what's been previously

18  marked as Plaintiff's Exhibit 14.

19          MS. SHEEHAN:  Ms. Collins -- Ms. Connors, I

20  think there's some redaction that needs to be made.

21          MS. CONNOR:  Excuse me, your Honor.

22          THE COURT:  Okay.

23          MS. SHEEHAN:  Your Honor, may we have a side

24  bar.

25          THE COURT:  You may.

1          (At Side Bar.)

2          MS. SHEEHAN:  May I see the document.

3   Ms. Connor removed the last page which was the determination

4   but we start off with, that she determined that this showed

5   that the work environment was hostile towards women, goes

6   beyond the nature of the job, she was subjected to sexual

7   harassment by a supervisor.

8          THE COURT:  Hold on, hold on, one at a time.

9   What's your intentions with this document?

10          MS. CONNOR:  I was going to introduce it, your

11  Honor.

12          THE COURT:  For what purpose?

13          MS. CONNOR:  To show, as a summary of her

14  investigation.

15          MS. SHEEHAN:  You had said you were --

16          THE COURT:  And you're going to object to

17  that?

18          MS. SHEEHAN:  Yes.

19          THE COURT:  It sounds like there are

20  conclusions and findings in that document so I sustain.

21          MS. CONNOR:  If I remove the last page, your

22  Honor, it's the basis, this is her own personal observations,

23  what she did in the investigation, and that's her signature

24  here.

25          THE COURT:  She can testify about this stuff.

1   She can testify about it, as long as it's not conclusions.

2   There's no reason to admit the document.

3                  MS. CONNOR:  Okay.

4                  MS. SHEEHAN:  Thank you, your Honor.

5                  MS. CONNOR:  Thank you.

6                  (Open Court.)

7          Q    Ms. Kaplan, I think you testified that you're

8   required to write a summary of your investigation?  I'm

9   trying to remember your testimony correctly.

10         A    Yes, we call it a final investigative report

11  and basis of determination.

12         Q    And did you prepare one in the case of Penny

13  Collins' complaint?

14         A    I did.

15         Q    And what -- what is it, in general what is

16  included in this report?

17         A    There is a summary of who -- we call the

18  complainant's position, that's the person that filed the

19  charge, the respondent's position, that is who the charge is

20  against, so we do those summaries.  Then there's a section

21  for investigator's observations which is where the person

22  investigating the complaint will write their own observations

23  that they gleaned through the investigation, and then the

24  final -- well, there's another part, the bases for

25  determination which can be done either by the supervising

1    investigator, human rights specialist 2, or a combination of

2    the 1 and 2, and then there's a bottom section for a regional

3    director to issue the determination and to sign off on.

4            Q    Now in this case, with respect to the

5    complainant's position, which the complainant, I don't want

6    to use a legal term but that's what you just used?

7            A    Yes.

8            Q    The complainant was whom?

9            A    Penny Collins.

10           Q    With respect to Ms. Collins' position, what

11   did you include in your report with respect to her position?

12           A    I don't remember, you know, specifically in

13   that report, but what I generally do is to summarize the

14   allegations contained in the complaint.

15           Q    Okay.  Is there a time that you did remember

16   what you put in your report?

17           A    Yes, when I was actively investigating the

18   case, I was well aware of it.

19           Q    Is there a document that would refresh your

20   recollection?

21           A    Yes, my final investigative report.

22           Q    I'm going to show you what's been marked as

23   Plaintiff's Exhibit 14.

24           A    Okay.

25           Q    You can look at that, please.

1          A     Did you want me to look at the whole thing or

2     just the complainant's position?

3          Q     Let's -- to move things along, let's just

4     start with Ms. Collins' position.

5          A     Okay.

6          Q     Okay.  Now what did your report contain

7     concluding her position?

8          A     Basically that she was alleging that there was

9     a general atmosphere of hostility towards females at the

10    Auburn Correctional Facility.  She further alleged that she

11    was subjected to sexual harassment from Troy Mitchell.  Let's

12    see.  She said that she gave him a letter that -- complaining

13    about his behavior towards her, that he subsequently threw

14    away.

15         Q     Did she say that he subsequently threw it

16    away?

17         A     Oh, no, it says in here I noted at the time

18    that he subsequently circulated among --

19              MR. ANDREWS:  Objection, your Honor.

20         A     No, that the letter was --

21              MR. ANDREWS:  Objection, your Honor.

22              THE COURT:  Yes, please stop when there's an

23    objection.  What's your objection, sir?

24              MR. ANDREWS:  Can I approach, please, your

25    Honor.

1           THE COURT:  Come on up.

2           (At Side Bar.)

3           THE COURT:  I'm frustrated because of the

4  number of side bars and I know it's not you, I apologize,

5  okay.  So go ahead with your objection.

6           MR. ANDREWS:  She just solicited testimony

7  that's specifically been excluded by ruling of this court

8  about the allegation that Sergeant Mitchell circulated the

9  memorandum which there's no competent evidence of.

10          THE COURT:  Ms. Connor, I'm going to ask you

11  to be careful, all right.  She's now reading from the

12  document, you've just been up here to talk about, you know,

13  that she's not going to be able to get into findings or

14  conclusions, and I believe Mr. Andrews is right, we've talked

15  about this potential testimony before.  So, you know, while

16  she can talk about what she did in her investigation, start

17  talking about findings which is where you're going now with

18  this report, I've already ruled that it's not going to be

19  allowed.  So I would caution you, sustain the objection.

20          MR. ANDREWS:  I would ask that the testimony

21  be stricken, also.

22          THE COURT:  It will be.

23          MS. SHEEHAN:  Your Honor, I ask that

24  Ms. Connor take back the document.

25          THE COURT:  Yes.

1          MS. SHEEHAN:  Thank you.

2          MS. CONNOR:  Well, then before we do that, to

3    expedite this, I would ask her to be -- have a little more

4    time to review the entire document so I don't have to go back

5    and forth when I ask her questions, your Honor.

6          THE COURT:  Ask her to review it, finish

7    reviewing it, then you can ask her some questions.

8          MS. CONNOR:  Thank you.

9          THE COURT:  The last answer will be stricken.

10          (Open Court.)

11     Q    Ms. Kaplan, before I ask you any more

12    questions because I was going to be asking you some more

13    questions concerning your report, if you could take a few

14    moments and review the report to refresh your recollection

15    about it.

16     A    Okay.

17     Q    Okay.

18     A    (Witness Complies.)  Okay.

19     Q    Thank you.  Now, in your investigation, did

20    you ask questions of defendant Troy Mitchell concerning a

21    complaint or memorandum that Penny Collins wrote to him?

22     A    I did.

23     Q    And what did you ask Sergeant Mitchell?

24     A    I don't recall the exact question that I asked

25    him.

1          Q    Do you recall anything concerning your

2    investigation with respect to what he did with that report?

3          A    Yes, he stated that he threw it away.

4          Q    And did you include that in your

5    investigator's report?

6          A    I did.

7          MS. CONNOR:  I have no further questions of

8    the witness at this time, thank you, your Honor.

9          THE COURT:  Thank you, Ms. Connor.

10   Ms. Sheehan, go ahead.

11         CROSS-EXAMINATION BY MS. SHEEHAN:

12         Q    Good morning, Ms. Kaplan.

13         A    Good morning.

14         Q    My name is Cathy Sheehan, Assistant Attorney

15   General, I along with Assistant Attorney General Roger Kinsey

16   represent the state of New York, the Department of

17   Corrections and Community Services, former Commissioner Glenn

18   Goord, former Superintendent John Burge, and current

19   superintendent Howard Graham.

20         You testified that you spoke to a woman in the

21   investigation who said she didn't know Ms. Collins and she

22   didn't want to talk to you because she was concerned about

23   her job, is that correct?

24         A    Correct.  Yes.

25         Q    Was that individual Sue Ming?

1          A    Yes.

2          Q    Did she say she wanted to keep her job, did

3     you ask her if it's because she loved her job?

4          A    I did not.

5          Q    And you said she -- did you -- okay, so you

6     don't know why she said she wanted to keep her job?

7          A    No.

8          Q    You reviewed the female manual, the female

9     orientation handbook and you were appalled.  Did you, in your

10    opinion, do you think the book had any good points?

11         A    I -- I was focused on the issue of the

12    allegations in the complaint, so I wasn't reviewing it for

13    like a general personnel matter, and frankly, anything

14    positive would be overshadowed in my opinion by the -- those

15    stereotypes that I saw in several of those pages.

16         Q    And isn't the problem with those stereotypes,

17    we discussed this yesterday during Ms. Mayville's testimony,

18    is that --

19              MS. CONNOR:  Objection, your Honor, if she can

20    just ask the question without opining on what we did

21    yesterday.

22              THE COURT:  Objection sustained.

23         Q    Isn't it true that the problem with the female

24    orientation handbook is that it wasn't also given to men?

25         A    That's one of the problems.

1      Q     Okay.  And isn't it true that men engage in

2  gossip?

3      A     Yes.

4      Q     They can.  Men can engage in rumor spreading?

5      A     Yes.

6      Q     And isn't it true that DOCS should have also

7  advised male employees against gossipping, spreading rumors,

8  correct?

9      A     If they feel it's necessary to advise any

10  correction officer, then it should be all corrections

11  officers, regardless of gender.

12      Q     Okay.  And -- okay.  You testified that Mary

13  Mayville was at the original interview, as a representative

14  of DOCS, correct?

15      A     At the fact-finding conference, yes.

16      Q     She was not there as -- she was not there

17  representing the Department of Corrections, was she?

18      A     She was sent as the employer representative,

19  so she, in -- it was presented to me as the diversity office,

20  in that time it was Charlie Harvey was the actual, you know,

21  person who handled the complaint and everything, and they

22  usually send a representative from there to them, but that is

23  who we look at as the employer's representative to get

24  information.

25      Q     She wasn't there as a legal representative for

1   DOCS?

2        A    No.  No.

3        Q    Is it fair to say she was there to facilitate

4   the information about how DOCS handled Ms. Collins' complaint

5   to the office of diversity management?

6        A    She was there in my opinion to -- to provide

7   any information that I might need based on what she did

8   personally, as well as facilitate myself getting additional

9   information from DOCS.

10       Q    So she was there to help you obtain

11  information in your investigation?

12       A    She was there as the employer's representative

13  to allow me to obtain the information.

14       Q    Would you not be able to obtain information if

15  she didn't allow you?

16       A    In some cases, if the diversity management

17  doesn't give it to me, and the employer representative

18  doesn't give that to me, yes, I cannot get it.

19       Q    That didn't happen in this case, did it?

20       A    Actually it did, in --

21       Q    Are you saying you weren't able to conduct

22  your investigation?

23       A    I did my investigation, but there were some

24  documents that I believe that I requested that I never

25  received.

1          Q     Do you know for a fact you never received

2     them?

3          A     I don't know a hundred percent.

4          Q     Okay.  And you talked about employees,

5     officers that wouldn't speak to you, and wouldn't cooperate

6     because of the union.

7          A     Yes.

8          Q     And isn't it true that DOCS has absolutely no

9     control over what the union tells their members, how to act?

10          A     I don't know the answer to that.

11          Q     Do you believe that Department of Correction

12     advised the union not have their members speak to you?

13          A     If you're asking my personal opinion, I

14     believe it is in the realm of possibility.

15          Q     Do you have anything to support that basis,

16     that opinion?

17          A     No more than I have to support an opinion that

18     they didn't say anything.

19          Q     Did you ask Mary Mayville whether she had

20     problems interviewing people because of the union advising

21     the officers not to cooperate?

22          A     I don't know if I specifically asked her that

23     or not.

24          Q     Are you aware that she conducted between 26

25     and 30 interviews when she investigated the same allegations

1    that you did?

2         A    I know she said that she did investigations

3    and I know that she had issues being escorted through the

4    facility.

5         Q    Well, what I'm asking you is, do you know

6    that -- did she mention to you that she had problems, or did

7    you ask her if she also had problems with getting interviews

8    from officers because of the union?

9         A    I don't remember a discussion with her either

10   way about that.

11        Q    You don't remember.  Could one have taken

12   place?

13        A    Could have.

14        Q    And she told you -- could she have told you

15   that she brought to Superintendent Graham's attention that

16   the union was interfering with the investigation and he had

17   someone contact the union to please tell them, ask them to

18   stop?

19        A    I have no idea if she did that or not.

20        Q    You didn't ask her?

21        A    No.

22        Q    Could you please, I'm going to refer to

23   Exhibits 12 and 13.

24        A    Okay.

25        Q    I'd like you to please look at the caption in

1    number 12.  Well, let me start with number -- P12 is

2    Ms. Collins' original verified complaint, correct?

3              A    Yes.

4              Q    And I'm going to read paragraph 6, and I want

5    you to tell me if I read this correctly.  In her initial

6    complaint, paragraph 6, she alleges, "The respondent's

7    actions have caused me to suffer mental anguish and

8    humiliation.  The position taken by Ms. Mayville has caused

9    me to believe that the respondent has no intention of

10   eliminating gender bias from the workplace and has degraded

11   my contention that if I were to return to work at this time,

12   I will continue to be the target of retaliatory actions

13   perpetrated against me by my -- by employees of the

14   facility."  Is that correct?

15             A    Yes.

16             Q    And please go to number -- Exhibit --

17   Plaintiff's Exhibit 13.

18             A    Okay.

19             Q    And please go to paragraph 6.  And it's been

20   amended to now read, "The respondent's actions have caused me

21   to suffer mental anguish and humiliation," correct?

22             A    Yes.

23             Q    She removed Mary Mayville's name, correct?

24             A    Yes.

25             Q    I'd like you to go back to Exhibit 12 and look

1   at the caption.

2          A    Okay.

3          Q    Isn't it true that former Commissioner Goord

4   is not a respondent in this action?

5          A    Correct.

6          Q    Isn't it true that former Superintendent Burge

7   is not a respondent in this complaint?

8          A    Correct.

9          Q    Isn't it true that Superintendent Graham is

10  not a respondent in this complaint?

11         A    Yes.

12         Q    Okay.  Please go to Exhibit P12 -- 13.

13         A    Okay.

14         Q    Please look at the caption.

15         A    Mm-hmm.

16         Q    Isn't it true the former Commissioner Goord is

17  not a respondent in this complaint?

18         A    Correct.

19         Q    Nor former Superintendent Burge?

20         A    Correct.

21         Q    Or Superintendent Graham?

22         A    Correct.

23              MS. SHEEHAN:  Thank you.

24              MR. ANDREWS:  Just a few questions, your

25  Honor.

1          THE COURT:  You can have more than a few.

2          MR. ANDREWS:  I appreciate that.

3          THE COURT:  Go ahead.

4          CROSS-EXAMINATION BY MR. ANDREWS:

5      Q    Ms. Kaplan, we've met numerous occasions in

6  the past --

7      A    Yes.

8      Q    -- so I won't introduce myself, but you

9  understand that I represent the defendant Troy Mitchell in

10  this action, correct?

11      A    Yes.

12      Q    I have just a few follow-up questions about

13  your testimony, okay?

14      A    Okay.

15      Q    Okay.  Now you testified that you conducted an

16  investigation into Ms. Collins' allegations, correct?

17      A    Yes.

18      Q    And as a part of that, you had an

19  investigative conference where Mr. Mitchell attended part of

20  it, excuse me, and Ms. Collins attended, correct?

21      A    Correct.

22      Q    And one of the -- excuse me, one of the things

23  that she talked about during the course of that conference

24  were some hangup calls that were made on November 10, 2005,

25  the day she worked with Sergeant Mitchell; do you recall

1    that?

2              A    I don't specifically recall that conversation.

3              Q    Do you still have a copy of Defendant's

4    Exhibit 85 --

5              A    No.

6              Q    -- up there?  Well, let me provide you with a

7    copy.

8                   THE CLERK:  Do you mean Plaintiff's 85?

9                   MR. ANDREWS:  Yes, Plaintiff's, and I wrote D

10   and I meant P.  May I approach, your Honor?

11                  THE COURT:  Go ahead.

12                  MR. ANDREWS:  Thank you, your Honor.

13                  So if you can ignore the D and think P.

14             A    Okay.

15             Q    Thank you.  If you can turn to page 5 of the

16   event history, which again are your notes of the meeting, is

17   that correct?

18             A    Yes.

19             Q    And if you can look, there's a paragraph that

20   starts, "Ms. Collins stated," do you see that?

21             A    I do.

22             Q    And then if you go to the last sentence, if

23   you could review that, please.

24             A    You talking about the very last paragraph on

25   that page?

1          Q    No, the last -- I'm sorry, there's two of

2     those.  That's unfortunate.  No, I'm talking about the one

3     right in the middle of the page.

4          A    Okay.

5          Q    So Ms. Collins informed you that she had

6     received hangup calls on that date, correct?

7          A    Yes.

8          Q    But she said that that happened to everyone?

9          A    Yes.

10          Q    Okay.  Now, another thing that was discussed

11     were some items being thrown on plexiglass on November 10th,

12     2005, correct, if you --

13          A    Yes, I don't know the date, but there was a

14     discussion about plexiglass.

15          Q    Okay.  And she said that she didn't take it

16     personally, isn't that correct?

17          A    Yes.

18               MR. ANDREWS:  No further questions, your

19     Honor.

20               THE COURT:  Okay.

21               MR. ANDREWS:  May I approach to get the

22     document.

23               THE COURT:  You may.

24               MR. ANDREWS:  Thank you very much.

25               THE WITNESS:  You're welcome.

1          THE COURT:  Ms. Connor, do you have anything

2    further?

3          MS. CONNOR:  No, your Honor.  No further

4    questions.

5          THE COURT:  You may step down.  Thank you.

6          (Whereupon the witness was excused.)

7          THE COURT:  Ms. Connor, plaintiff have another

8    witness they want to call?

9          MS. CONNOR:  No, your Honor, the plaintiff

10   does not.

11         THE COURT:  Plaintiff's going to rest?

12         MS. CONNOR:  Yes, your Honor.

13         THE COURT:  Would you like an opportunity to

14   review exhibits that are in or not in evidence before you do

15   that?

16         MS. CONNOR:  Yes, your Honor.  Give me that,

17   thank you.

18         THE COURT:  Going to give you a short break

19   while we take care of that, make sure we know what's been

20   offered and received before the plaintiff rests, okay.

21         (Jury Excused, 9:51 a.m.)

22         THE CLERK:  If counsel want to come up, I can

23   go through it with you.

24         (A discussion was held off the record.)

25         THE COURT:  Okay, Counsel, do we have

1 agreement of all the exhibits that have been offered and
2 received?  Yes?
3                    MR. ANDREWS:  Yes, your Honor.
4                    MS. CONNOR:  I'm not sure yet, your Honor.
5 There's one here.
6                    (A discussion was held off the record.)
7                    MS. CONNOR:  I'm good now.
8                    THE COURT:  That concludes it?
9                    MS. CONNOR:  Yes.
10                   THE COURT:  So the only issues remaining are
11 the redaction issues, right?
12                   MS. CONNOR:  I believe so, and I think we have
13 conformed ours, we need to conform --
14                   THE COURT:  The clerk's?
15                   MS. CONNOR:  Yes.
16                   THE COURT:  Okay.  Okay, Counsel, the
17 plaintiff, I'm going to bring the jury in so plaintiff can
18 rest on the record, all of the exhibits have been conformed,
19 the ones that have been received, there is agreement on, so
20 we're going to proceed with defense case.  Bring the jury in,
21 please.
22                   (Jury Present, 10:00 a.m.)
23                   THE COURT:  Okay.  The record should reflect
24 we have the ladies and gentlemen of the jury, plaintiff,
25 plaintiff's counsel, defendants and defense counsel, thank

1    you for your patience.  Ms. Connor, with the review of the

2    exhibits, what's the plaintiff's desire?

3              MS. CONNOR:  The plaintiff rests, your Honor.

4              THE COURT:  Okay.  Ladies and gentlemen, that

5    concludes the plaintiff's side of the case, and we'll now

6    proceed with defense case.  You have any witnesses you'd like

7    to call?

8              MS. SHEEHAN:  Your Honor, I'd like to make a

9    motion under Rule 50.

10             THE COURT:  Okay.  I'm going to reserve.  I

11   wish you would have brought that up while the jury was out of

12   the room.  We'll handle that at our next break.  I'll let you

13   make whatever motion arguments you want to make, both you and

14   Mr. Andrews.

15             MR. ANDREWS:  Thank you, your Honor.

16             THE COURT:  We'll entertain them.  You know

17   what --

18             MR. KINSEY:  Your Honor, our next witness is a

19   nonparty, if you'd like to get that in.

20             THE COURT:  Yes, let's do that, before we

21   have -- we'll get one more witness in before I send you back

22   in there to play cards or whatever you're doing.  Let's start

23   with one witness.  Then I'll hear your motion argument.

24             MR. KINSEY:  State defendants call Mr. Robert

25   Pabis.

1    THE CLERK:  Good morning.  Can you please

2    state your full name, spell it for the record, please.

3    THE WITNESS:  Robert J. Pabis, P-a-b-i-s.

4

5    R O B E R T   J .   P A B I S , called as

6    a witness and being duly sworn, testifies as

7    follows:

8    MS. CONNOR:  Your Honor, plaintiff objects to

9    this witness and I wonder if we could have a side bar,

10   please, I'm sorry.

11   MS. SHEEHAN:  Your Honor, objection was

12   already made in motion in limine and you've already ruled.

13   MS. CONNOR:  That's not the basis of the

14   objection, your Honor.

15   THE COURT:  Come on up.

16   (At Side Bar.)

17   MS. CONNOR:  Your Honor, I understand in our

18   discussions and ruling on the motion in limine you ruled that

19   this witness could be called as rebuttal, rebuttal witness,

20   not part of the defense case in the sense of the defenses,

21   and there is nothing to my knowledge whatsoever that the

22   plaintiff or any other one of my witnesses testified to to

23   which this witness could possibly rebut.  There's nothing.

24   THE COURT:  What's the nature of this?

25   MS. CONNOR:  No fact at issue.

1    THE COURT:  What's the nature of this witness'

2 testimony?

3    MR. KINSEY:  Plaintiff was asked if she knew

4 Mr. Pabis, asked about an event where she commented on his

5 suntan, talked with him about her personal life, she denied

6 all of that.  It goes to the environment being created at

7 Auburn, she was part of the environment.  If you'd like for

8 us to wait and bring him later, we're trying to hurry this

9 along.

10    THE COURT:  I recall the testimony that you're

11 talking about, and certainly she did deny it, having made

12 statements so that it's permissible.

13    MS. CONNOR:  How is that relevant?  If she

14 asked somebody about a suntan, that's completely irrelevant

15 to the allegations at issue here.

16    THE COURT:  I will see.  He's going to be

17 allowed to testify.

18    (Open Court.)

19    THE COURT:  Go ahead, Mr. Kinsey.

20    DIRECT EXAMINATION BY MR. KINSEY:

21    Q    We've messed up pronunciations for a week, is

22 it Pabis or Pabis?

23    A    Pabis.

24    Q    Put the microphone up a little bit, I know it

25 looks intimidating but it will help the court reporter.  Are

1    you currently employed, sir?

2              A    Elmira Correctional Facility.

3              Q    How long have you been there, sir?

4              A    I been there since 1993.

5              Q    And prior to that, where were you located?

6              A    I started in '88, I was at Sing Sing for three

7    days, Fishkill for a year, and Cayuga approximately

8    three-and-a-half years.

9              Q    And what is your current rank, sir?

10             A    Correction officer.

11             Q    Okay.  And what is your current job

12   description?  You have a bid -- let me ask you first, do you

13   have a bid job?

14             A    Yes, I do.

15             Q    What is that bid job?

16             A    It's called the dressing room.

17             Q    What is that, sir?

18             A    I -- when inmates get paroled, I suit them up

19   to get paroled to go to -- go back into society and whatnot.

20             Q    And prior to that, what was your job?

21             A    At Elmira I was a vacation relief officer.

22             Q    Why do you say at Elmira, did you have some

23   other job as well?

24             A    Yes.

25             Q    What was that?

1          A     That was -- it was a specialized job, was

2     called ion scanning.

3          Q     What is that, sir?

4          A     That's where I go around to different prisons

5     within the hub system, Elmira hub and scan inmate visitors

6     for the presence of drugs.

7          Q     And were you by yourself or in a team?

8          A     It's a team.

9          Q     And how often do you go to each facility?

10          A     It's -- varies.

11          Q     What are the variables?

12          A     It's -- you go Monday through -- seven days a

13     week, usually it's about four days a week, different

14     facilities you go to.

15          Q     And was Auburn part of your hub?

16          A     Yes, it is.

17          Q     Did you go to Auburn as part of that, part of

18     those duties?

19          A     Yes, I did.

20          Q     And do you recall the time frame when you

21     visited Auburn with those duties?

22          A     I believe I been doing this approximately 10

23     years, so about '93 to present.

24          Q     Okay.  You still do this?

25          A     Yes, I do.

1          Q     Do you know the plaintiff in this case, Penny

2    Collins?

3          A     Yes, I recognize her.

4          Q     And how is it that you recognize her?

5          A     She was an officer at Auburn Correctional

6    Facility.

7          Q     Now, there are hundreds of officers at Auburn

8    Correctional Facility, are there not?

9          A     Yeah, I would imagine, yes.

10         Q     Do you recognize them all?

11         A     Do I recognize them all?  No.

12         Q     Okay.  What in particular causes you to

13   recognize Ms. Collins?

14         A     From the couple conversations we had.

15         Q     Okay.  And where were those conversations?

16         A     They're on the -- I'm not -- I'm not familiar

17   with Auburn that much, I believe the front obviously is a

18   lobby and then there's a second floor before you go into the

19   prison itself which we would call the -- at Elmira the cage

20   floor, I don't know what it would be called at Auburn, the

21   gate, the front entrance, I don't know, front entrance or

22   whatever.

23         Q     Do you know what year approximately or years?

24         A     It would be probably '94, maybe.

25         Q     Okay.  If I told you that she didn't start

1   DOCS till 2002, would you still recall you met her in '94?

2                    MS. CONNOR:  Objection, leading.

3                    THE COURT:  It is, but I'm going to overrule

4   it.  Go ahead.

5           A    Can you repeat that again.

6           Q    Well, if I told you that she started DOCS in

7   19 -- in 2002, would you still believe you met her in 1994?

8           A    Sorry, excuse me, 2004.

9           Q    And had you known her prior to your meeting at

10  Auburn?

11          A    No.

12          Q    And can you describe that meeting?

13          A    There's a couple times that I -- I mean the

14  first time was on the front entrance there, she was working

15  down there, where you process visitors in to go to visit

16  inmates, and you know, first time I ever met her and she's

17  like, she goes, wow, where do you work at?  And, I never seen

18  you before, you got such a nice tan and, you know, I was

19  like, well, I'm from Elmira Correctional Facility.  She's

20  like, oh, no wonder, I haven't seen you around.  And you

21  know, it was like smalltalk and whatnot.  And then we -- she

22  kept, throughout the day, you know, I was there to about

23  1:30, and she was, you know, smalltalking me and whatnot and

24  she was saying that, how she's trying to transition in the

25  life because her last son was just going off to college and

1    she would come home to an empty nest and whatnot and her

2    husband was -- he's I guess a pilot for like a mercy flight

3    helicopter service which goes out and picks up crash victims,

4    bring them to trauma centers around the state or up this way,

5    whatever.

6                Q      Now did she tell you that?

7                A      Yeah, she was telling me all this.

8                Q      Okay.

9                A      She was asking me if I was married, whatnot,

10   if I ever cheated on my wife or had an affair and I'm kind of

11   sitting there like I don't even know this woman, and then she

12   says, goes, how she would come home from work and whatnot to

13   her house wherever she lived at, out in, she said it was out

14   in the country somewhere, and she said, you know, she was

15   lonely at night she'd sit home and masturbate at night

16   because, you know, her husband was always gone a lot --

17                MS. CONNOR:  Your Honor, I object to this

18   testimony.  Under Rule 412.

19                THE COURT:  Come on up here, please.

20                (At Side Bar.)

21                THE COURT:  Go ahead.

22                MS. CONNOR:  Your Honor, previously drawing

23   the court's attention to Rule 412 of the Federal Rules of

24   Evidence and this testimony that's being elicited is

25   specifically covered by Rule 412.  It is very sexual, it --

1    it's offered to show plaintiff's prior sexual disposition.

2    Workplace comments of this sort are squarely covered under

3    Rule 412.  I had -- it is not actually at all in rebuttal to

4    anything that the plaintiff said --

5              THE COURT:  Well, it is in rebuttal to the

6    atmosphere that your client has complained about and sexual

7    hostility, it is a fair rebuttal in the sense that she may be

8    partly creating that atmosphere based on this testimony.

9    Mr. Kinsey.

10             MR. KINSEY:  I had -- I'm as surprised as

11   counsel.  In my conversations with the witness, that had

12   never come up.  Had it come up, I certainly would have given

13   everybody a heads up.

14             THE COURT:  Okay.

15             MR. KINSEY:  I maintained a poker face up at

16   the podium, I did not want to just blurt out, oh, my God.

17             THE COURT:  We're going to strike that part of

18   the testimony.

19             MR. KINSEY:  Yes, of course.

20             THE COURT:  And I'm going to give a curative

21   instruction, all right.  And we're going to continue.  I

22   think what I'm going to do is I'm going to excuse the jury.

23             MR. KINSEY:  Okay.

24             THE COURT:  All right.  Because I want you to

25   have an opportunity to talk with this witness and make sure

1    that we don't get into any type of sexual activity or

2    behavior that she indicates that she --

3                    MR. KINSEY:  Her comments would be of course

4    fair game?

5                    THE COURT:  Yeah, as long as it does not

6    relate, you know, the fact that -- you know, she liked him or

7    she wanted to date him, all that kind of stuff, that's I

8    think appropriate and relevant.

9                    MR. KINSEY:  Absolutely, thank you.

10                    THE COURT:  But any type of her sexual conduct

11    or sexual behavior, that's something different.  Okay.

12                    MR. KINSEY:  Well, in his defense, I had asked

13    him about conversations, not talking about anything observed

14    or -- so he --

15                    MS. CONNOR:  How this would not have come out

16    is un -- I cannot understand how this would not have come

17    out.  I'll accept you at your representation but --

18                    MR. KINSEY:  I would hope you would.

19                    MS. CONNOR:  I would, Counsel, but it's a

20    fairly startling fact.

21                    THE COURT:  Counsel, that's enough, okay.

22    This is not about personal attacks up here, all right.  This

23    has been going on on both sides in this case, which is why I

24    had the conversation with all of you yesterday.  The lack of

25    preparation and knowledge of both sides of documents,

1  everything else is just totally inappropriate, okay.  So I

2  don't want you standing up here lecturing because we've had

3  the same issue quite frankly with your case.  So we'll excuse

4  this jury for a few minutes, talk to this witness, we're

5  going to finish this witness, I'm going to give a curative

6  instruction and we're going to go from there.

7                    MR. KINSEY:  Very good, thank you.

8                    (Open Court.)

9                    THE COURT:  All right.  The last part of that

10  response is going to be stricken from the record, you're to

11  disregard it.  We're going to take a short break.  I'm going

12  to let you go back to the jury room just very briefly, and

13  then we're going to finish with this witness' testimony.

14  Okay.  Please don't talk about it, don't let anybody else

15  talk to you about it.  Thank you.

16                    (Jury Excused, 10:17 a.m.)

17                    THE COURT:  Okay, Mr. Kinsey, if you would

18  just take a minute with your witness, he can step down.

19                    MR. KINSEY:  Can I take him to a room?

20                    THE COURT:  Yes, you may, and explain the

21  issue to him and then we can go from there.

22                    MR. KINSEY:  All right.

23                    (Whereupon a recess was taken.)

24                    (Open Court, Jury Out.)

25                    MR. KINSEY:  Your Honor, before we bring the

1    jury back can we approach so we're straight on this.

2                    THE COURT:  Yes.

3                    (At Side Bar.)

4                    THE COURT:  Okay.

5                    MR. KINSEY:  There is no further explicit

6    sexual conduct, I warned him we can't talk about it, going to

7    give counsel a heads up now, she can make her objection if

8    she wishes.  There was a mention that she liked to lay in bed

9    naked and watch TV.

10                   MS. CONNOR:  It's the same thing.

11                   THE COURT:  It's the same thing.

12                   MR. KINSEY:  I will warn him not to talk about

13   it.

14                   THE COURT:  It's the same thing.

15                   MR. KINSEY:  Second event he's going to talk

16   about, and there's no sexual content in that except that she

17   invited him to come get a room at the Holiday Inn in Auburn

18   and hang out and party for the weekend.

19                   MS. CONNOR:  I think that's the --

20                   THE COURT:  No, that's not the same thing.

21   That's not the same thing.

22                   MS. CONNOR:  Well, I object to it also under

23   412, your Honor.

24                   THE COURT:  You can object.

25                   MR. ANDREWS:  If I could be heard briefly, I

1    think the comment about lying at home naked in bed goes

2    directly to welcomeness in terms of she accuses my client of

3    having said that he walks around naked at home in front of

4    his children and seems to me that what's good for the defense

5    is good for the plaintiff.

6              MS. CONNOR:  That's not the way 412 works,

7    your Honor, it has to be prior notice.

8              MR. ANDREWS:  Well --

9              THE COURT:  Please, one at a time, okay.

10   Mr. Andrews.

11             MR. ANDREWS:  I didn't get a 412 notice of

12   that material.  I mean I knew it was coming, I'm not saying

13   otherwise.  We didn't go through the procedures of 412 about

14   any of that material.  And I think when it comes to

15   welcomeness, and one of the cases --

16             THE COURT:  What material are you talking

17   about?

18             MS. SHEEHAN:  Mr. Mitchell walking around.

19             MR. ANDREWS:  Yeah, Mr. Mitchell walking

20   around naked in front of his family, his wife's

21   circumstantially finger going up his rear end, that type of

22   thing.  One of the cases that Ms. Connor passed on to us the

23   other day, discussion of Rule 412 and it prefaced itself by

24   saying, well, the parties agree that to the extent it was

25   discussed at work and it went to welcomeness, of course

1    that's admissible.  And I would suggest that this is a

2    conversation that happened in the workplace, just the same as

3    it did for my client and that it should be admissible on that

4    grounding, to go to welcomeness, not for the truth of, you

5    know, anything being said, but as to whether she welcomed the

6    conduct.

7              MS. CONNOR:  Your Honor, under 412, workplace

8    conduct is covered as protected, to show sexual

9    predisposition, even with respect to welcomeness, and that's

10   the point of 412, there should be a prior disclosure of this,

11   your Honor would hear this all, we'd have written, there's

12   written motion, written responses and preparation to do this.

13   Just to ambush plaintiff like this at the beginning of

14   defense case is exactly -- it violates all the procedures of

15   412, and it, I think it also does not, just because somebody

16   would -- doesn't go to welcomeness either because if somebody

17   would have a conversation about one thing doesn't mean that

18   they would welcome harassment about something else.

19             THE COURT:  Well, I guess what Mr. Andrews is

20   saying is that you never presented him with the 412

21   information, in regard to his client.

22             MS. CONNOR:  Your Honor, Rule 412 does not

23   protect his client.  His client is not the plaintiff and the

24   victim in a sexual harassment action.  It does not apply to

25   his client.  It applies to the victims and in a civil case it

1  applies to plaintiffs in sexual harassment cases, and *Wolak*

2  *v. Spucci*, Judge Pooler's decision --

3          THE COURT:  I've read Judge Pooler's decision.

4  Go ahead.

5          MR. ANDREWS:  Well, your Honor, I don't think

6  that's what the rule says precisely, although I don't have it

7  in front of me and I'm not going to make a representation

8  that I'm not certain about.  But it seems to me it so

9  directly relates to the allegations to suggest that she can

10 say that to someone else but that has nothing to do with

11 whether people can say things to her seems absurd, your

12 Honor.  It's in the workplace, they're both in the workplace.

13         THE COURT:  Here's what I'm going to do.  I'm

14 not going to allow any more testimony in this area, including

15 the fact that plaintiff likes to lie home in bed naked.  It's

16 my position based on hearing what's been offered as potential

17 testimony that it is covered by Rule 412 and should have been

18 disclosed previously, and discussed.  It may very well be a

19 situation where it, occurring at the workplace where it's

20 welcome but it should have been provided to me earlier so we

21 had an opportunity to look at it, review it, make some

22 decisions, and it was not provided to the court, therefore

23 I'm not going to allow the testimony.  But the rest of this

24 witness' testimony will be allowed.

25         Now, curative instructions.  Ms. Connor, do

1   you have any requests with regard to that?

2               MS. CONNOR:  Other than the jury be instructed

3   to disregard it and that it's stricken.

4               THE COURT:  I've done that.  And I can

5   reinforce that.  My worry is I don't want to say too much

6   because it highlights it.

7               MS. CONNOR:  I understand.

8               THE COURT:  So any other requests with regard

9   to it?  I will say that again, I want you -- I'll

10  emphatically tell them that that testimony has been stricken,

11  you're to disregard it, you're not to consider it in any way

12  and take it just as if it never happened.

13              MS. CONNOR:  As if it never happened, yes,

14  thank you.

15              THE COURT:  And that's acceptable?

16              MS. CONNOR:  Yes.

17              MR. KINSEY:  Before we bring the jury back I

18  want to be sure that he knows he can't talk about the bed and

19  he can't talk about any more, make sure he's --

20              THE COURT:  Yeah, I don't want any more, any

21  issues, so take your time with him and make sure that he

22  understands what he can testify, what he can't testify to.

23  Okay.

24              MR. KINSEY:  Thank you, your Honor.

25              MS. CONNOR:  Thank you.

1              (Pause in Proceedings.)

2              MR. KINSEY:  We're finished with the first

3     conversation, I will not refer to that conversation.

4              THE COURT:  All right.  If counsel's ready,

5     we're going to bring the ladies and gentlemen of the jury in,

6     please, Rita.

7              (Jury Present, 10:30 a.m.)

8              THE COURT:  Okay, ladies and gentlemen, right

9     before you left, I struck some testimony, I want to -- we've

10    talked about that in your preliminary instructions that I

11    gave you, I'm advising you that the last part of this

12    witness' response is going to be stricken, you're to

13    disregard it, it's just like it never happened, okay.  You

14    disregard it.  It didn't happen.  Mr. Kinsey, go ahead.

15             MR. KINSEY:  Thank you, your Honor.

16             Now, Officer, was there a subsequent

17    conversation with Ms. Collins?

18        A    Yes, there was.

19        Q    How long after the first if you recall?

20        A    Probably within the following month, 30 days,

21    I was assigned back to scan up there at Auburn.

22        Q    And where was -- where did this conversation

23    take place?

24        A    That had to be up top, whatever they call that

25    second floor area, I'm not sure the name of the area.

1          Q      What do they do up there?

2          A      They let the officers into the main prison,

3      there's a door that they have to go through that the officer

4      that works up there that opens up to get out I believe to the

5      main prison.  I don't work there but I believe it's that way.

6          Q      Is there anything else up there that relates

7      to your duties of scanning people?

8          A      No, no.

9          Q      And you encountered Ms. Collins once again, is

10     that right?

11         A      Yes.

12         Q      What was the sum and substance of the

13     conversation?

14         A      She mentioned about some kind of designer

15     glasses that she was selling, I don't remember, recall the

16     name of 'em, like Avon, not -- obviously it's not the name of

17     the sunglass -- the designer glasses but I mean they had

18     jewels and all sorts of stuff in them, she was wearing a blue

19     pair at the time.

20         Q      What did she say to you?

21         A      She stated, she goes, you know, I sell these

22     glasses on the side and, you know, you could buy some for

23     your girlfriend or your wife or whatever, and they come in

24     all different colors and whatnot, and the blue ones that I'm

25     wearing today match nice with my uniform because they're blue

1    and, you know, all fancy and she said that, you know, they

2    come in red, and she said, you know, red could be like if

3    she's in the mood or whatnot she'd wear them, before you come

4    home, waiting for you, she'd have them on.  Then they come in

5    like clear color, that, you know, if you're laying in bed or

6    something at night, you can wear them.  So you know, I kind

7    of -- I kind of just took all this in, I'm like, you know,

8    wondering what she's about, where she's going with it.

9          Q    Were you interested in buying sunglasses?

10         A    No, not at all.

11         Q    So once she finished talking about the

12   sunglasses, was there any other conversation?

13         A    No.

14         Q    Did she talk to you at all about Auburn?

15         A    Yeah, she talked -- I mean after, after the

16   fact because I'd have to go in this room and scan and

17   whatnot, come out, walk around and she come up to me one

18   other time, this same time, later on that day and asked, you

19   know, she goes, you oughta think about, you know, coming up

20   to -- there's a Holiday Inn up there in Auburn and, you know,

21   spending the weekend up there, getting a room, we can go out,

22   party, hang out together.

23         Q    Was there any subsequent meeting with

24   Ms. Collins?

25         A    No.

1    Q    Did you ever see her again?

2    A    No, never seen her again.

3    Q    And had you any contact with her until today?

4    A    None.

5    Q    Have you had any contact with Superintendent

6  Graham?

7    A    Contact?

8    Q    Yes.

9    A    No.

10   Q    Have you had any contact, any conversation

11  with Superintendent Burge about this case?

12   A    None.

13   Q    Anybody at DOCS?

14   A    None, except you.

15        MR. KINSEY:  Nothing further, your Honor.

16        THE COURT:  Cross-examination?

17        MR. ANDREWS:  No questions, your Honor.

18        THE COURT:  Ms. Connor.

19        CROSS-EXAMINATION BY MS. CONNOR:

20   Q    Mr. Pabis --

21   A    Yes.

22   Q    -- is that it?  I'm Mairead Connor, I'm an

23  attorney, and I represent Penny Collins in this action.

24  Going to ask you some questions about your testimony.  Now,

25  you -- how did you first learn about this lawsuit?

1          A    I was notified by inmate records at Elmira

2    Correctional Facility.

3          Q    What's inmate records?

4          A    It's a area in the prison where all lawsuits

5    come into, and then they look at 'em and then they call the

6    people that are named in the lawsuit.

7          Q    You're not named in this lawsuit, are you?

8          A    Well, not named in this lawsuit, no, I come up

9    through the Attorney General's office on a piece of paper.

10         Q    I'm a little confused about your answer.  You

11   learned about this lawsuit through a department in Elmira

12   called inmate records?

13         A    Yes.

14         Q    And all lawsuits come to that department, is

15   that your testimony?

16         A    I'm -- I don't work there but I believe that's

17   how it works, if there's a lawsuit, being an inmate or

18   anything, all the paperwork, if you're named in it or they

19   need you as a witness or whatnot, comes into inmate records.

20         Q    Mr. Pabis, are you aware of whether there's

21   any allegations in this case concerning inmates?

22         A    No, there's none.

23         Q    How do you know that?

24         A    Well, 'cuz I -- I don't know it then.

25   That's --

1      Q    There's no question.  You don't know.  And how

2  did you come to learn that there was this lawsuit in inmate

3  records in Elmira?

4           A    How I come to?

5           Q    Yes.

6           A    Repeat that again.

7           Q    How did you learn that this lawsuit was in

8  inmate records in Elmira?

9           A    Because they called me down, inmate records.

10          Q    Who's they?

11          A    The women in inmate records that work in

12  Elmira Correctional Facility, they said, you got to come to

13  inmate records because we have paperwork from the Attorney

14  General.  So I went over there, and um, they sent -- gave me

15  the paperwork, I read it, and it said to contact Mr. Kinsey.

16          Q    When did that take place?

17          A    That was, I -- about a week ago, give or take,

18  I'm not sure, two weeks ago.

19          Q    And what did the paperwork to contact

20  Mr. Kinsey say?

21          A    Gave a number and to call him when I get a

22  chance.

23          Q    Now, prior to this, looking at this paperwork

24  to contact Mr. Kinsey, did you have any knowledge of this

25  lawsuit whatsoever?

1          A     None, I had none at all.

2          Q     And you never heard anything in the grapevine,

3     the rumor mill of corrections that Penny Collins has a

4     lawsuit?

5          A     None.

6          Q     Nothing like that?

7          A     None.

8          Q     Now when you saw Mr. Kinsey, how many times

9     have you met with him?

10         A     None.

11         Q     You never met with Mr. Kinsey?

12         A     No, just -- well, Monday I did when I was here

13    Monday, that was the first time I ever met him.

14         Q     Prior to Monday, how many times have you

15    spoken with Mr. Kinsey?

16         A     One time.

17         Q     Was that on the telephone?

18         A     Yes, it was.

19         Q     And did Mr. Kinsey tell you -- withdrawn.

20               What -- did Mr. Kinsey tell you how he, why he

21    was contacting you?

22         A     Yes, he mentioned her name, Penny Collins.

23         Q     And did Mr. Kinsey say anything more about why

24    he was contacting you?

25         A     Yes, he did.

1           Q     What was that?

2           A     He said there's a lawsuit, being involved,

3     that he's involved in, and if I would like to testify.

4           Q     And did he tell you the matter for which he

5     wanted you to testify?

6           A     No.

7           Q     So he just picked you out of all the

8     correction officers in Elmira, he just picked you and said

9     would you like to testify?

10                MR. KINSEY:  Objection, your Honor.

11                THE COURT:  Yeah, I'll sustain the objection.

12          Q     Did Mr. Kinsey ever tell you how he came to

13    learn about these alleged conversations with Penny Collins

14    that you had?

15          A     No.  No, he didn't.

16          Q     So you don't know why Mr. Kinsey picked you,

17    you don't know how this information got there?

18          A     No, I just -- no, I don't.  He called me, I

19    got -- there's paperwork, inmate records, they contacted me,

20    and --

21          Q     The answer is no?

22          A     No.

23          Q     Now going back to these conversations, about

24    when did they take place?

25          A     From, I'd say 2004 on.  It's whenever she

 1    worked at Auburn Correctional Facility, I don't know when she

 2    was employed there, but she was there, I don't have exact

 3    dates.

 4            Q    How often did you go into Auburn, at that

 5    time?

 6            A    At that time, probably three times a week, two

 7    times a week, I'll say two times a week.

 8            Q    And when you first saw Penny Collins, what did

 9    her hair look like?

10            A    Ma'am, I can't recall that.  I have no clue.

11            Q    She have long hair, short hair?

12            A    Ma'am, I don't know.

13            Q    No idea?

14            A    No idea.

15            Q    What color was her hair?

16            A    Don't know.  No idea.

17            Q    Now, after you had these alleged conversations

18    with Penny Collins, did you tell anybody about it?

19            A    No.  No, I didn't.

20            Q    Kept this to yourself, the whole time until

21    you got this phone call from Mr. Kinsey out of the blue or

22    this notice from Mr. Kinsey, rather, out of the blue to come

23    testify in this case, is that your testimony?

24                MR. KINSEY:  Objection, your Honor.  He

25    answered the question.

```
 1              THE COURT:  I'll sustain the objection.
 2     Rephrase your question, please.
 3              Q    Is it your testimony that you didn't tell a
 4     single person after these alleged conversations happened
 5     before you spoke with Mr. Kinsey?
 6              A    Yes.
 7              Q    Now, in this conversation that you allege that
 8     took place, I think you said it was by the front entrance,
 9     where the visitors are processed?
10              A    Lobby, front entrance, lobby.
11              Q    Who else was present, if anyone?
12              A    There was other officers present, I can't
13     recall who they were.  Present in that area.
14              Q    Now, would you be surprised if I told you that
15     Ms. Collins' son was not going off to college at this time
16     when she worked in Auburn?
17              MR. KINSEY:  Objection, your Honor.
18              Q    That he had a medical problem?
19              MR. KINSEY:  We've had no testimony like that.
20              MS. CONNOR:  Your Honor, the witness did
21     testify that Ms. Collins told him her son was going off to
22     college.
23              MR. KINSEY:  We've had no testimony other than
24     that about the son.  No testimony about medical, we have no
25     testimony about anything else.
```

1          THE COURT:  Okay.  I'm going to overrule the

2   objection, I'm going to ask you to rephrase your question, go

3   ahead.

4          Q    Now at the time that you allege you spoke with

5   Ms. Collins, were you aware that her son was not going off to

6   college?

7          A    Not at all.

8          Q    Now, how many times did you see Ms. Collins

9   when you went to Auburn when she worked there?

10          A    Maybe, maybe four or five times total.

11          Q    And whether -- did you know whether it's

12   common knowledge that Ms. Collins' husband was a helicopter

13   pilot?

14          A    Common knowledge?

15          Q    Yes.

16          A    I don't -- I couldn't answer that.

17          Q    Now you still work for where?

18          A    Elmira Correctional Facility.

19          Q    Do you have any pending discipline against

20   you?

21          A    None.

22          Q    Have you recently been disciplined?

23          A    No.

24          MR. KINSEY:  Object, your Honor, he already

25   answered the question.

1          MS. CONNOR:  Two different questions, your
2     Honor.
3          THE COURT:  You have your answer, go ahead,
4     Counsel.
5          MS. CONNOR:  Your Honor, I have no further
6     questions for the witness.
7          THE COURT:  Mr. Kinsey, Mr. Andrews, anything
8     further?
9          MR. ANDREWS:  Nothing further for me.
10         MR. KINSEY:  Nothing on redirect, your Honor,
11    thank you.
12         THE COURT:  You may step down, sir, thank you.
13         (Whereupon the witness was excused.)
14         THE COURT:  Ladies and gentlemen, at this
15    point I'm going to give you another break so I can take care
16    of these legal motions that I have to consider and entertain
17    and then we'll get back to testimony, okay.  Thank you.
18    Don't talk about it.
19         (Jury Excused, 10:45 a.m.)
20         THE COURT:  Counsel, just one second, if you
21    want to prepare yourself, I'll be right back.
22         MS. SHEEHAN:  Thank you, your Honor.
23         (Pause in Proceedings.)
24         (Open Court, Jury Out.)
25         THE COURT:  Okay.  Ms. Sheehan, you're going

1   to go first?

2                   MS. SHEEHAN:  Yes, your Honor.

3                   THE COURT:  Go ahead.

4                   MS. SHEEHAN:  The state defendants would like

5   to make a motion under Rule 50(a), judgment for -- judgment

6   as a matter of law, for finding in favor of defendants in

7   this case.  Plaintiffs have failed to present legally

8   sufficient evidence for a reasonable jury to find that the

9   individual defendants violated any of plaintiff's

10  constitutional rights, or that the state of New York or the

11  Department of Corrections violated Title VII or the New York

12  State labor laws regarding retaliation, hostile -- creating a

13  hostile work environment, disparate treatment or gender

14  discrimination.

15                  I'm going to start with the 19 -- Section 1983

16  claims.  The claims are that defendant Goord, Burge, and

17  Graham violated plaintiff's constitutional right to equal

18  protection based on sexually harassing her, discriminating

19  against her because she's female, and creating a hostile work

20  environment.

21                  There are no material facts in dispute as to

22  the lack of personal involvement in plaintiff's allegations

23  that she was sexually harassed, she was discriminated against

24  because she was female, or that the -- the individual

25  defendants created a hostile work environment.

1          Defendant Goord, plaintiff testified that she

2    never met Mr. Goord and she never spoke to Mr. Goord.  The

3    only contact that she had was she sent one, maybe two letters

4    to Mr. Goord.  She testified she never received a response

5    from Mr. Goord.  The case law is settled that just sending a

6    letter to your supervisor does not constitute personal

7    involvement.

8          Defendant Burge.  Plaintiff testified that

9    former Superintendent Burge never sexually harassed her,

10   discriminated against her, or personally did anything to

11   create a hostile work environment.

12         Superintendent Graham.  Plaintiff testified

13   that he never sexually harassed her, discriminated against

14   her because she was female, or did anything to create a

15   hostile work environment.

16         Second, I'd like to make the defense of

17   qualified immunity.  Defendants Burge and Graham, there's

18   been no testimony that they had any knowledge that their

19   actions to address plaintiff's issues, the ones they knew

20   about, would cause a hostile work environment in violation of

21   her equal right -- her right to equal protection.  Defendant

22   Burge on at least two occasions contacted the diversity

23   management office to forward two complaints he received from

24   Ms. Collins to them for them to be investigated.  He -- there

25   was no evidence that he did not follow diversity management's

1    policies and procedures, Department of Corrections directives

2    in investigating or having said claims, complaints

3    investigated by the office of diversity management.  The

4    only -- there was no testimony that the policies violated

5    Ms. Collins' constitutional rights, except for the delay in,

6    if she was out, if an individual was out on stress, but there

7    was no evidence that the policy that a complaint not be

8    investigated while the complainant is out on stress caused a

9    violation of Ms. Collins' right to equal protection, nor that

10   if defendant Burge knew that DOCS policy violated

11   Ms. Collins' constitutional right, he did not knowingly

12   follow that directive.  He followed DOCS directive, believing

13   that it would not cause a hostile work environment, sexual

14   harassment, or gender discrimination.

15            I make the exact same argument for

16   Superintendent Graham.  We had a lot of testimony regarding

17   the last two witnesses, prior to -- witness Kaplan and

18   witness Mayville, to the extent that Superintendent Graham,

19   the efforts his office took to make sure Ms. Collins'

20   complaints, the ones that she actually brought to the

21   attention of supervisors, were investigated.  And there was

22   no evidence that he believed following DOCS directive in

23   accordance with diversity management, how these complaints

24   should be investigated, would violate Ms. Collins'

25   constitutional right to equal protection.  Shows that, I

1    think the testimony shows that DOCS' department of diversity

2    management works, and it works in accordance with the

3    policies.

4                    Regarding the state as a defendant, well, the

5    state as an employer is really a fiction.  The state isn't

6    Ms. Collins' employer, there's been no testimony that the

7    state is her employer.  The testimony has been the Department

8    of Corrections is her employer.  They're -- there's no

9    evidence whatsoever regarding the state of New York having a

10   policy or not having a -- that they don't have a policy to

11   address labor complaints, and there was also no evidence that

12   if they do, that Ms. Collins ever availed herself of it.

13                    Department of Corrections.  Department of

14   Corrections --

15                    THE COURT:  When you say there's no evidence

16   that she availed herself of any, how about New York State

17   department of Human Rights?

18                    MS. SHEEHAN:  That is fair, and there's no

19   evidence that their investigation nor policies and how they

20   follow through with their investigation violated Title VII,

21   violated New York State labor laws.  I think, in addition she

22   failed to -- well, okay, that's the state.

23                    Department of Corrections.  The evidence was

24   presented that DOCS has a zero tolerance for sexual

25   harassment, gender discrimination, and the people that report

1    it, the people, when they report it, it's followed through

2    with, certainly happened in this case for the complaints that

3    were reported to diversity management.

4                    We have allegations of a retaliatory transfer.

5    There's no dispute in the evidence that Ms. Collins was

6    transferred to facilities that she requested to be

7    transferred to.  There's no evidence that sexual harassment

8    was constant or pervasive.  She admitted many of the events

9    she complained about were not sexual in nature.  DOCS had a

10   system in place to address labor complaints, and Ms. Collins

11   did not always avail herself of that avenue.  She asked

12   Sergeant Hoefling not to report matters to diversity

13   management but the evidence every time she went to

14   Superintendent Burge or Superintendent Graham, it was

15   reported to diversity management and investigated.

16                    I think, I believe Sergeant Hoefling said it

17   best while responding to one of Ms. -- Mr. Kinsey's questions

18   when he responded with a question, how do you stop a rumor in

19   a prison?  Your Honor, I'm going to ask you to please enter a

20   judgment as a matter of law in favor of defendants and

21   dismiss this matter.

22                    THE COURT:  Mr. Andrews, I think what we're

23   going to do is we're going to let Ms. Connor respond to the

24   state so-called defendants, and then we'll let you make your

25   argument and let her respond to you, I think that's fair.

1        MR. ANDREWS:  I understand, your Honor.

2        THE COURT:  Okay.  Ms. Connor, if you could.

3        MS. CONNOR:  Yes, your Honor, thank you very

4    much.  The plaintiff asks that you deny this motion for

5    judgment as a matter of law under Rule 50(a).  With respect

6    to the arguments presented by counsel, I think she first

7    started with Section 1983 with respect to the individual

8    defendants Goord, Burge, and Graham, and there are in fact

9    material facts in dispute that the plaintiff was sexually

10   harassed, discriminated against, and exposed to a hostile

11   environment because of their failure to act, and I think I

12   disagree that the case law is clear on that.  I think it's a

13   matter of fact for the jury to decide --

14       THE COURT:  Personal involvement.  What facts

15   demonstrate personal involvement of Goord, Burge, or Graham?

16       MS. CONNOR:  That there were conversations,

17   let's start with defendant Goord.  That the plaintiff

18   testified that she contacted defendant Goord on two occasions

19   by letter, and that -- pleaded for his help to act, she asked

20   for certain things in those contacts and she received no

21   response, and that therefore there was a failure, there was

22   no -- there's no action by defendant Goord to assist the

23   plaintiff in any of her appeals to him.

24       THE COURT:  You're not alleging any other

25   contact with Commissioner Goord?

1          MS. CONNOR:  That's right, your Honor.

2          THE COURT:  Those two letters.

3          MS. CONNOR:  That's correct.  Now with respect

4    to defendant Burge, plaintiff testified to several contacts

5    with him, conversations and letters.  They took two forms.

6    With respect first to letters she wrote to defendant Burge on

7    multiple occasions, she testified about the contents of those

8    letters, delivered them to him, and asked for him, described

9    the environment, complained about the harassment, complained

10   about retaliation, and asked for his response and assistance

11   in ending the matter.

12         THE COURT:  Ms. Connor, can you list for me,

13   you say many times, list for me the contacts she had with

14   defendant Burge.

15         MS. CONNOR:  I'd have to get the exhibit list,

16   your Honor.

17         THE COURT:  Go ahead, go ahead.

18         MS. CONNOR:  With respect to defendant Burge,

19   your Honor, if I may continue, I'm sorry, I didn't see your

20   clerk was not here.

21         THE COURT:  No, it's fine, go ahead.

22         MS. CONNOR:  With respect to defendant Burge,

23   plaintiff testified that she wrote him a letter in

24   October 2nd, 2005, describing the discrimination and sexual

25   harassment at Auburn.  She also testified that she contacted

1    him by memorandum, New York State Department of Corrections

2    on June 26th, 2005 concerning abuse by one Sergeant Wright,

3    and each of those letters she gave detailed testimony about,

4    of what was contained in those letters.  She also testified

5    she had conversations with him, concerning these letters

6    where they had discussions about the contents --

7                    THE COURT:  When were those conversations?

8                    MS. CONNOR:  The conversations that she had

9    with defendant Burge, I believe that were followup to

10   conversations with respect to Sergeant Wright would be in I

11   believe the summer of 2005 and in the fall of 2005.  She also

12   had grievances that were discussed with her union

13   representative present along with Burge concerning these

14   matters.  So there was, again, discussions.

15                   THE COURT:  Okay, I'm trying to be specific.

16   How many conversations are you alleging that she had with

17   defendant Burge?

18                   MS. CONNOR:  To the best of my recollection,

19   your Honor, without having the transcript right in front of

20   me, I believe there were four conversations.  Also, though,

21   in addition, so there's another one.  That she had a

22   conversation with defendant Burge after his deposition and in

23   that conversation, they -- he exchanged views about that

24   things would be like that for females at Auburn, always would

25   be, paraphrasing.

 1                    THE COURT:  But that --

 2                    MS. CONNOR:  You asked about conversations,

 3      I'm trying to answer your question.

 4                    THE COURT:  I understand, but we're talking

 5      about apples and oranges there, okay.  I'm talking about

 6      notice, and conversations she had with him, you know,

 7      personal contact regarding her allegations in the facility,

 8      not something afterwards.  That came in because of statement

 9      against party interest.

10                    MS. CONNOR:  That's right, I understand.

11                    THE COURT:  As far as what we're talking

12      about, it's a different issue.

13                    MS. CONNOR:  I understand, your Honor, and I

14      was just trying to be --

15                    THE COURT:  Thorough.

16                    MS. CONNOR:  Answer your question completely.

17                    THE COURT:  Go ahead.

18                    MS. CONNOR:  Now with respect to defendant

19      Graham, your Honor.

20                    THE COURT:  Yes.

21                    MS. CONNOR:  The plaintiff sent him also

22      memorandums, I have to get -- I'd have to get the dates of

23      those but she addressed memorandums as well and she also

24      testified concerning those memorandum.  She also asked for

25      his assistance in stopping the harassment, stopping the

1    abuse.

2              THE COURT:  Let's -- I'm going to ask you for

3    specifics now, okay.

4              MS. CONNOR:  Yes, sir, may I have a moment.

5              THE COURT:  In the record.  Yes.  And while

6    you're looking through there, I'm going to give you a heads

7    up as you're finding these things or attempt to find these

8    things, and I'm going to ask you to address the action that

9    was taken immediately following the report from Ms. Mayville

10   which we know got to Superintendent Graham, and if you would

11   address that, also.

12             MS. CONNOR:  Yes.

13             THE COURT:  Okay.

14             MS. CONNOR:  Ms. Collins spoke to defendant

15   Graham concerning this memorandum about defendant Mitchell

16   dated November 10th, 2005, she also spoke to --

17             THE COURT:  When did she speak to him?

18             MS. CONNOR:  I'm sorry, I don't have the exact

19   date of that, your Honor.

20             THE COURT:  Can you point to me where in her

21   testimony she said she spoke to Superintendent Graham about

22   the memo from, that she gave to then Sergeant Mitchell?

23             MS. CONNOR:  Your Honor, I'm sorry, I cannot

24   recall at this moment but I recall that she testified that

25   she had conversations with him, with defendant Mitchell --

1    about defendant Mitchell, rather.

2                    THE COURT:  Okay.

3                    MS. CONNOR:  Your Honor, she also had a

4    conversation with defendant Graham concerning the -- her

5    frustration, and this is in the fall of 2005, after he

6    arrived, at the facility, she talked to him about a

7    conversation about what had occurred, she tried to describe

8    all the abuse and harassment before this, they had a meeting

9    about it and she gave very detailed testimony where he said,

10   well, you can sue in federal court, if you recall that

11   testimony, and that he -- she testified that he said that

12   there were approximately 15 females in the facility and she

13   could go ahead and do that but no one would back her up in

14   the complaint, that was her testimony, and that she asked him

15   for help in trying to end that type of -- the abuse and

16   harassment that she had been subjected to.  She described

17   that harassment to him in that conversation, and he told her

18   he did not see a problem or words to that effect, he had been

19   in corrections for many, many years and did not see the

20   problem that she saw.  She -- so she, in that sense, she had

21   asked for help, it was a personal plea in a personal meeting

22   and conversation with defendant Graham.

23                   THE COURT:  This is when he just arrived on

24   the job?

25                   MS. CONNOR:  It was shortly after.  I don't

1   have a date in her testimony.

2                   THE COURT:  But before any of the things that

3   she was alleging were going on, he was not present for.

4                   MS. CONNOR:  No, your Honor, he was not, he

5   transferred in, when Superintendent Burge left the facility.

6   We have a stipulation to this fact, Superintendent Graham

7   arrived at the facility and became the superintendent.

8                   THE COURT:  I understand that.  But what I'm

9   saying is, she goes to Superintendent Graham is my

10  recollection of the testimony, please correct me if I'm

11  wrong, when he first arrives, and then the first -- she has

12  this conversation with him about her complaints and concerns,

13  about the facility, and then shortly thereafter there's this

14  investigation by the office of diversity and Mary Mayville

15  comes to Superintendent Graham and there's some corrections

16  made.  Am I missing something?

17                  MS. CONNOR:  I think you generally have it

18  correct, your Honor, it's the time period shortly thereafter,

19  it was, there was -- that's a question of fact, there was a

20  dispute about -- there may be a dispute about how reasonable

21  that time period is.

22                  THE COURT:  That time period's important.  I

23  mean if he hasn't been there, and she comes to him about

24  complaints that he knows nothing about, I mean, I think

25  reasonably he has to be given an opportunity to see them, to

1    react to them, and to do something, and you know, my

2    understanding of the testimony to this point is the first

3    opportunity that something is brought to him other than her

4    initial allegations that this is the condition and these are

5    the things that are going on, the first thing he's presented

6    with is Ms. Mary Mayville, and he does something.

7              MS. CONNOR:  Well, he spoke with Ms. Mayville,

8    and took action according to Ms. Mayville's testimony

9    concerning some of the things that Ms. Collins brought but

10   not a complete set of things that she brought to his

11   attention.  So we would -- we would say that he failed to

12   take prompt effective remedial action after having notice.

13             THE COURT:  Well, what prompt immediate

14   remedial action did he fail to take as a result of notice?

15   What were those things?

16             MS. CONNOR:  Your Honor, he failed to stop the

17   harassment against Ms. Collins, he failed to stop the

18   retaliation that she was receiving from officers, he failed

19   to instruct them properly, he failed to conduct adequate

20   training concerning the officers.  He basically, basically

21   what it is is it's a hands-off approach by the

22   superintendents that they shove it all over into diversity

23   management and they don't do anything until, or if they're

24   instructed to do anything by diversity management.  And we

25   allege that that policy is not a policy that puts in place

1   that to have an employer take prompt effective remedial

2   action with respect to a complaint of harassment.  This is

3   ongoing harassment according to the plaintiff, and this

4   hands-off approach, just like I'm going to fax a memo to

5   diversity management, is insufficient.

6                   THE COURT:  Okay.  I understand that,

7   generally, that's what your argument is, there's a lot of

8   generally this happened or generally that happened.  I want,

9   if you could, the best you can, and you're doing fine, the

10  specifics of conversations, and certain incidents that they

11  failed to address, or that he failed to address.  We're on

12  Superintendent Graham.

13                  MS. CONNOR:  Well, Ms. Collins requested that

14  he stop the retaliation and harassment by defendant Mitchell,

15  for example.  And that did not occur.  The harassment

16  continued after she spoke with --

17                  THE COURT:  Give me testimony, what

18  retaliation and harassment of defendant Mitchell occurred

19  after Superintendent Graham arrived at the facility?  In the

20  record now.

21                  MS. CONNOR:  I'm trying to remember the

22  testimony accurately, your Honor.  And I --

23                  THE COURT:  Do you want an opportunity to

24  consult with your client or your associate?

25                  MS. CONNOR:  If you would permit that, your

1    Honor.

2                   THE COURT:  I'll give you a moment, because

3    this is important.

4                   MS. CONNOR:  Thank you.

5                   THE COURT:  All right.

6                   (Pause in Proceedings.)

7                   MS. CONNOR:  Thank you, your Honor, appreciate

8    the time.

9                   THE COURT:  When you're ready.

10                  MS. CONNOR:  That the testimony was that the

11   day after she spoke with Superintendent Graham, my client

12   spoke with Superintendent Graham was the day that Lieutenant

13   Mitchell made very serious sexual comments directed toward

14   her, such as, if you recall, I don't want to rehash them, but

15   it was comments about his mother's --

16                  THE COURT:  What he liked to do at home and

17   the rest of it.

18                  MS. CONNOR:  And his wife and those comments.

19                  THE COURT:  So that's the day after

20   Superintendent Graham arrives?

21                  MS. CONNOR:  No, no, no, your Honor, the day

22   after my client spoke with Superintendent Graham.

23                  THE COURT:  Okay.

24                  MS. CONNOR:  And I thought that was your

25   question about the time frame of that.  No, it's not the day

1    after he arrived, he arrived somewhat before that.

2                    THE COURT:  Okay.

3                    MS. CONNOR:  So therefore, we, that I -- we

4    allege that he failed to protect my client against that type

5    of harassment and retaliation from defendant Mitchell.  And

6    that was -- those were the biggest instances and the timing

7    of that is after she spoke with him, your Honor.

8                    THE COURT:  Okay.

9                    MS. CONNOR:  Now, you also asked me

10   concerning -- I'm sorry, what was the second part that you

11   asked me, you said you were going to ask me?

12                   THE COURT:  To the fact that he addressed what

13   was brought to him by Mary Mayville and from the office of

14   diversity.

15                   MS. CONNOR:  Yes.  Now, with respect to that,

16   your Honor, there is testimony that he addressed certain

17   matters concerning the locker rooms, for example, and certain

18   matters concerning painting and of this, of the graffiti, but

19   I would point out that my client brought that to his

20   attention in -- back in November, and Mary Mayville testified

21   that when she went into that facility, sometime after the end

22   of January, that she viewed the same things on the walls that

23   my client reported to him were there.  Therefore, that in our

24   view is not prompt action, it failed to protect my client

25   against harassment, in the time that -- after it was

1   reported, and she still was in the facility for a while

2   before she left on her medical leave.  And that that was

3   still there and posted by the time Mary Mayville went there

4   and it took Mary Mayville to go up and tell him to do it even

5   though my client had reported it.  So therefore we feel that

6   is not protecting my client and doing what an employer needs

7   to do to protect her against sexual harassment.  And also I

8   would remind your Honor inmates had access to that, so that

9   increases the security issue of that according to my client's

10  testimony, and the danger of that type of graffiti, it being

11  posted in an area accessed by inmates.

12              THE COURT:  So we're talking about two things

13  then with regard to Superintendent Graham according to what

14  you've put before me, the day after that, your client spoke

15  to Superintendent Graham, there's an alleged conversation

16  with then Sergeant Mitchell, and then the second thing is the

17  graffiti on the walls, is that it?

18              MS. CONNOR:  Well, the bathrooms, it took Mary

19  Mayville again, your Honor, to get that, so that gap in time.

20              THE COURT:  Tell me the time period.  That

21  gap.

22              MS. CONNOR:  The time period was from the

23  very -- the beginning of November, early, the first week or

24  so of November, 2005, to when Mary Mayville came in the

25  facility, you can see that she took my client's statement in

1   November 25th, 2006 and then visited the facility at some

2   point after that, some period of time that she was unable to

3   directly recall but it was after that.  Then she went back,

4   she told the defendant Graham about it, and then she said

5   she'd be back in about 10 days to two weeks.

6            THE COURT:  And it was corrected.

7            MS. CONNOR:  Yes.  So that's the period.

8            THE COURT:  So you're saying that the graffiti

9   in the bathroom was there for a year.

10           MS. CONNOR:  I'm saying that the defendant

11  Graham wasn't there for that year, but I can't -- it is what

12  it is.

13           THE COURT:  Yeah.  Well, when, that's the

14  point.  When was Superintendent Graham in the facility and

15  given notice of the graffiti?

16           MS. CONNOR:  November 2005, and the graffiti

17  according to the testimony was not removed till at least

18  February 2006.

19           THE COURT:  So you're alleging a period of --

20           MS. CONNOR:  Three months.

21           THE COURT:  Three months.  Okay.  Three months

22  to get the graffiti off the walls when -- after he arrived.

23           MS. CONNOR:  That's correct.

24           THE COURT:  Anything else with regard to

25  Superintendent Graham?  Or those two things?  Sergeant

1   Mitchell and the conversation the day after your client spoke

2   to the superintendent, and then the graffiti for three

3   months?

4           MS. CONNOR:  Well, your Honor, we also would

5   point out to the court that when my client spoke with

6   Superintendent Graham at the beginning of November 2005, she

7   advised him about the entire environment problem and hostile

8   environment that she was subjected to at Auburn.

9           THE COURT:  Such as?

10          MS. CONNOR:  Such as the comments she had

11  received, the disparate treatment she had received, the

12  matters with Sergeant Wright, she told him that she was told

13  women were not welcome in corrections, she -- she told him

14  about many different incidents that she had experienced.  And

15  he -- all he did was, he did refer to diversity management,

16  understood, that's how Mary Mayville got there, but it was

17  my -- my client who had to continue to request diversity

18  management to pursue this investigation.  That there was no

19  action on the part of Superintendent Graham to do anything

20  other than just refer.  It was like a paper pusher, he did

21  nothing when an employee is coming to him asking for this

22  matter, he took no affirmative action himself until told by

23  diversity management.

24          THE COURT:  Okay.  Further argument that you'd

25  like to make?  And thank you, I wanted to address those

1    specifics, but there's also other arguments that counsel has

2    made on behalf of the state, so go ahead.

3                    MS. CONNOR:  Yes.  Your Honor, to go back to

4    that other point, I had another point.  And that my client

5    testified about the conversations she had with Superintendent

6    Graham at the time, and she, in the course of that

7    conversation, she testified about discriminatory comments

8    that he made or comments that could be inferred to have a

9    discriminatory bias on his part.  So I just wanted to also

10   draw that to your attention.

11                   THE COURT:  Comments that the superintendent

12   made?

13                   MS. CONNOR:  Yes.  Well, that nobody would --

14   nobody, there's 15 females --

15                   THE COURT:  Okay.

16                   MS. CONNOR:  -- nobody will back you up, I

17   don't see there's a problem.

18                   THE COURT:  Go ahead.

19                   MS. CONNOR:  Now with respect to the state, as

20   a defendant, a separate defendant, it's our view that the

21   State and the New York State Department of Corrections are

22   one and the same entity, and so that we don't view that as

23   anything different and have no evidence to offer that there

24   is some different -- that it's a distinction.

25                   THE COURT:  So are you saying that it should

1    be just Department of Corrections as a defendant?

2                MS. CONNOR:  Well, we're saying it's the same

3    entity so it would be the New York State Department of

4    Corrections, that there is nothing -- we view that as one and

5    the same and always have throughout this lawsuit.

6                Now counsel argued that there has been no

7    evidence that the sexual harassment, I guess this would also,

8    sort of pled 1983 and Title VII that there's no evidence that

9    the sexual harassment was constant and pervasive.  I think

10   your Honor's heard ample testimony and seen ample evidence

11   that that is a question of fact and disputed and it is our

12   position that there is ample evidence that the sexual

13   harassment that my client suffered was pervasive.

14               And that also I would point out to your Honor

15   that just because harassment does not have an exact sexual

16   word contained in it doesn't mean it's not sexual harassment.

17   Any sort of harassment because of my client's gender of which

18   we have, there's a lot of testimony that that's, that type of

19   harassment, that gender-based harassment is also unlawful

20   discrimination and is sexual harassment under any analysis of

21   Title VII and Section 1983.

22               And as for the system that Department of

23   Corrections had in place, I think that that is a question of

24   how reasonable was that system, an employer has a duty under

25   the law to take prompt effective remedial action and it is

1    our allegation that that system completely failed to do so

2    with respect to my client due to all of the delays in the

3    system, and the paper pushing of the system, if you will,

4    that there is that -- it's all, any allegation of

5    discrimination harassment is investigated by one entity and

6    nobody else does anything about it, and we think that that

7    violates their own policy because their own policy imposes,

8    you see in the material, the documents, imposes a duty on

9    everyone to stop or prevent sexual harassment.  And

10   therefore, we feel that the -- there is ample evidence that

11   this employer failed to take prompt effective remedial action

12   with respect to preventing further harassment, retaliation of

13   my client, and addressing the concerns of what she had

14   already faced.

15                 THE COURT:  Thank you, Ms. Connor.

16   Mr. Andrews, as always, you've been waiting patiently, sir,

17   come on up.

18                 MS. SHEEHAN:  Your Honor, will I have a chance

19   to rebut?

20                 THE COURT:  You really want one?

21                 MS. SHEEHAN:  No, your Honor.

22                 THE COURT:  I'll give it to you.  If it's

23   brief.  I don't want to --

24                 MS. SHEEHAN:  It will be brief.

25                 THE COURT:  All right, be brief, please.

1          MS. SHEEHAN:  Your Honor, paper pushing, it's

2     sort of amusing that my clients are paper pushers, that they

3     took the complaints of Ms. Collins and gave them to someone

4     else to investigate.  If they had investigated themselves, we

5     can imagine what the conversation would be.  Ms. Mayville

6     wielded a lot of power, she controlled the superintendent.  I

7     mean, she said, I advised him I want him to do this, this,

8     and this, I don't think there's any doubt that Ms. Mayville

9     really wasn't -- she was out there looking out for the

10     complainant and I want to know what's going on, if there's a

11     problem, I want it fixed.

12          Regarding Superintendent Burge, Ms. Connors

13     brought up the Sergeant Wright issue, that was Sullivan, I

14     believe, and if I'm wrong, I'm sorry, under Superintendent

15     Graham's watch, Exhibit 25 is the union grievance, and he was

16     part of working on that, the testimony was that he attended a

17     meeting with Ms. Collins and her union representative, and it

18     got to step 1 and the overtime was handled, but the union

19     broke out the second part.  He did make efforts to resolve

20     that.  Number two --

21          THE COURT:  Where is that in the testimony

22     that he took steps to resolve?

23          MS. SHEEHAN:  Exhibit, would be Ms. Collins

24     when she spoke about the grievance, Exhibit 25.  He was there

25     during the --

1          THE COURT:  Yeah, but there's no testimony in

2     the record at this point that he did anything.

3          MS. SHEEHAN:  That's fair.

4          THE COURT:  Okay.

5          MS. SHEEHAN:  That's fair.  His -- we have

6     complaint that after arriving at the facility he made a

7     comment, Ms. Collins' testimony, she met with him, shortly

8     after his arrival.  Ms. Mayville, her complaint was already

9     being investigated by Ms. Mayville before he arrived at the

10    facility, and she claims that he said, oh, none of the women

11    will back you up.  How would he know?  He had just arrived at

12    the facility, I think it's incomprehensible to think that he

13    would have met all 500 plus employees at that time.

14         THE COURT:  But again, you acknowledge, it's

15    an allegation that's in the record with no rebuttal at this

16    point.

17         MS. SHEEHAN:  Correct.  Okay.  One day.  It

18    took -- the day after she brought to his attention her

19    complaints, the next day Sergeant Mitchell allegedly harassed

20    her.  Well, unless that -- it could be shown that that was,

21    you know, Superintendent Graham was grossly negligent in not

22    making sure all these issues were handled by the next day, I

23    don't believe it constitutes a violation of her

24    constitutional rights.

25         And I would say the same thing about the rest

1    of her complaints, because he was aware that Mary Mayville

2    was already investigating the issues and it was appropriate

3    for him to stay out of it and Ms. Mary Mayville testified

4    that everything she advised him he had to change, he did,

5    except one which was a security issue.

6                    THE COURT:  The keys.

7                    MS. SHEEHAN:  Thank you, your Honor.

8                    THE COURT:  Yeah.  Okay.

9                    MS. SHEEHAN:  Former Commissioner Goord,

10   failure to act, I'm not sure there's two letters in evidence,

11   but if there are, I don't think it changes the argument, she

12   still hasn't shown personal involvement for Goord.

13                    THE COURT:  Thank you.  Mr. Andrews.

14                    MR. ANDREWS:  Thank you, your Honor.

15   Defendant Mitchell asks that all causes of action be

16   dismissed as to him pursuant to Rule 50(a).  And I would

17   submit to you, your Honor, that if it's ever to have meaning,

18   then Rule 50(a) should be applied in this instance and I'd

19   like to start by reviewing the sum total of the testimony and

20   allegations against my client if that's okay, your Honor.

21                    THE COURT:  That would be perfect.

22                    MR. ANDREWS:  On June -- in June 2004, on, and

23   I'm assuming the truth of all this testimony as we must at

24   this stage.

25                    THE COURT:  Correct.

1            MR. ANDREWS:  Obviously, there will be

2     rebuttal to this should defendant Mitchell, you know, not be

3     excused today, but the allegations are that in June 2004,

4     Ms. Collins' second day, he said to her, women do not belong

5     here.  Now, that's rude, it's inappropriate, there's no

6     sexual content either objectively or as you heard from the

7     plaintiff herself subjectively, she agreed there's no sexual

8     content to that.  Some three or four months later,

9     Ms. Collins alleges that Troy Mitchell made two comments

10    about an inmate's penis.  Have you ever seen anything so

11    huge, and would you know what to do with that?  She herself

12    says she gave no reaction whatsoever, no reaction that it was

13    unwelcome, but obviously those are allegations with sexual

14    content.

15            THE COURT:  That would have been September or

16    October of 2004?

17            MR. ANDREWS:  Yes.  If I misspoke, I

18    apologize.

19            THE COURT:  No, I just want to get the time

20    frame.

21            MR. ANDREWS:  That's exactly what I have.

22            THE COURT:  Okay.

23            MR. ANDREWS:  The next incident about which

24    there was testimony was the spring or early summer of 2005.

25    Sometime prior to June 24.  And this was the wallet incident.

1    Your Honor, we heard extensive testimony about this.  Not

2    only is there no sexual content, there's no evidence

3    whatsoever of any relation to gender.  None.  At all.  In

4    fact, the plaintiff admitted that then Sergeant Collins [sic]

5    could have written her up and didn't, and if there was some

6    scheme or intent --

7                    THE COURT:  Sergeant Mitchell could have.

8                    MR. ANDREWS:  Sergeant Mitchell, I'm sorry.

9    My apologies, your Honor.  He could have written her up, he

10   didn't.  You would think that if there was some broad scheme

11   to discriminate which we didn't really hear in the evidence

12   about, but if there was, you know, there would have been some

13   kind of evidence and I think the case law is pretty clear

14   that if you're going to say something that's not overtly

15   gender related is alleged to be discriminatory or harassing,

16   you need to provide evidence that that's the case.  And there

17   simply is no evidence with regard to the wallet incident,

18   your Honor.

19                    Then we come to some five months later or

20   something in that time frame, the allegations of

21   November 10th, 2005.  Now, I think everybody would agree that

22   the comments alleged of then Sergeant Mitchell were gross and

23   rude, but the statutes we're talking about are not meant to

24   be a general civility code, and my trial brief contains a lot

25   of legal analysis on these very issues that I'm talking to

1   you about today and I'm prepared to talk about it today if

2   you would like to hear about it.  But the case law is very

3   clear in the Supreme Court about that.  And you know, there

4   are a couple references to defecating, farting in front of

5   his children.  Those comments are by themselves, they have

6   nothing to do with gender or sexuality.  Then there were

7   comments about walking around naked in front of his family

8   which to me doesn't have any sexual content either, it's in

9   the "too much information" category, but even being generous

10  and saying there's sexual content with regard to that, the

11  other comments were about, allegedly about his mother's

12  breasts, referring to them as tits.  And then referring to

13  him having said that his wife lost a ring that was similar to

14  a ring of plaintiff's up his rear end.

15          And again, these are allegations about him,

16  and his person, and his family, he and his wife.  And that's

17  important because one of the things you look at in judging

18  the severity of an alleged incident of sexual harassment is

19  whether it's personally humiliating, whether it's threatening

20  in any way and things like that, and there's a lot of case

21  law about that in my trial brief and I can talk about that in

22  a minute, but in any event, what we have is five incidents

23  over a period of 17 months, only two of which really have any

24  sexual content to them whatsoever.

25          And your Honor, I'm going to talk about each

1    of the statutes involved because there are some subtle

2    differences, but I would suggest that that's certainly not

3    severe, it's not pervasive, it's not enough to support an

4    allegation of sexual harassment against my client, and I also

5    believe it's not nearly enough to support an allegation of

6    aiding and abetting under the New York State Executive Law.

7    And with your indulgence, I would like to talk about the

8    individual statutes a little bit.

9              THE COURT:  Before you do that, can you

10   address the allegations of what occurred at Sullivan?

11             MR. ANDREWS:  Yeah, I can go into the

12   retaliation at Eastern actually, your Honor.

13             THE COURT:  Or Eastern, I'm sorry, or do you

14   want to do that after?

15             MR. ANDREWS:  I had it set up after, but let

16   me go ahead and talk about the facts.

17             THE COURT:  Do it the way you want, that's

18   all, I thought you were leaving it out but if you plan on

19   talking about it afterwards, go ahead, talk about your case

20   law.

21             MR. ANDREWS:  I like your way better, your

22   Honor, I'm going to reverse course and go ahead and talk

23   about the retaliation allegation.

24             THE COURT:  You weren't influenced by this

25   black dress at all, were you?

1           MR. ANDREWS:  No, your Honor.

2           THE COURT:  All right.  Go ahead.

3           MR. ANDREWS:  There's an allegation in the

4    complaint that, the only allegation in the complaint about

5    retaliation relative to Sergeant becoming Lieutenant Mitchell

6    and his transfer to Eastern is that his transfer was

7    retaliatory.  During the course of the litigation, and

8    obviously, you know, plaintiff has no idea what the

9    circumstances of the transfer were, and I'm not going to talk

10   about, you know, what happened, because that's not in

11   evidence yet, but there's no evidence of discriminate -- of

12   retaliatory intent on becoming Lieutenant Mitchell's part in

13   his transfer to Eastern.  Once he arrives at Eastern, there

14   are allegations of two specific incidents to support

15   plaintiff's claim of retaliation.  The first being that he

16   sat next to an exit apparently with the intent of preventing

17   Ms. Collins from leaving the facility.  There's no evidence

18   of any retaliatory intent whatsoever with that, your Honor.

19   If he was sitting next to a door, that she could go around,

20   if she wanted to leave, she could go around.  It's certainly

21   not any kind of an adverse change that the case law talks

22   about as being necessary to support a retaliation allegation.

23   The other allegation was --

24           THE COURT:  I believe the testimony was she

25   went out another door.

1          MR. ANDREWS:  She went out another door, there

2     was another exit available.

3          THE COURT:  Okay.

4          MR. ANDREWS:  Thank you, your Honor.  Now,

5     beyond that we have an allegation that grew a little bit

6     during the course of the trial here.  It started that

7     Sergeant Mitchell went outside and watched her doing

8     something with inmates along with other officers in the

9     prison yard.  And you know, again, there's no evidence of any

10    intent to retaliate in this action, there's no adverse action

11    available, you know, as required by the case law to support a

12    retaliation claim.  We did hear on redirect the suggestion,

13    you know, it grew to a leer and a laugh.  And I would suggest

14    that even if you credit that testimony, your Honor, it still

15    does not add up to anything remotely close to what is

16    required to sustain an allegation of retaliation.

17          If I can talk about the individual statutes as

18    they pertain to my client, your Honor, there is a 1983 equal

19    protection claim.  It seems to be that there's one stated for

20    discrimination.  I'm at a loss as to what the allegation is

21    against Troy Mitchell as to what change in terms and

22    conditions of employment he caused relative to her.  I don't

23    even understand what the allegation is frankly, your Honor.

24    But I would certainly suggest that there's no evidence of any

25    discriminatory conduct on his part.  In fact the only thing

1    really talked about were, you know, he had some discretion to

2    do something, was to write her up for leaving her

3    identification and her badge off her person and he didn't do

4    that.  So I would say not only is there no evidence of

5    discrimination, there is evidence against discrimination.

6              There's also a 1983 hostile work environment

7    claim.  These -- the case law is clear that this is to be

8    judged under the standards of Title VII, that requires severe

9    and pervasive conduct, your Honor, we have neither severe,

10   nor pervasive conduct.  Obviously it's not pervasive, you

11   have two incidents of an overtly sexual nature, over that

12   entire period, and neither one of them, you know, in neither

13   instance, was there any request for sexual favors, any

14   touching, any, you know, statement that suggested he was

15   interested or going to have sex with her, as she alleges

16   happened with other people.  There was nothing personal to

17   her like that beyond, you know, asking in a group of people,

18   have you ever seen something so large and would you know what

19   to do with that, and I would suggest, you know, nothing

20   severe, nothing pervasive.  You know, *Tomka v. Seiler* talks

21   about a few incidents or single instance being enough in the

22   example of a sexual assault as was involved in that case,

23   nothing like that, nothing close, your Honor.

24             With regard to 1983 retaliation, again, no

25   evidence of an intent to retaliate.  Simply no adverse action

1    whatsoever.  I would like to point out, I think counsel is

2    going to suggest that the statements on November 10th were

3    particularly harmful because they were in front of inmates,

4    and plaintiff did testify to that.  She didn't testify to

5    anything that happened as a result, and I would remind the

6    court that the testimony was that these statements were made

7    in front of male and a female CO, they generally involved

8    Lieutenant Mitchell himself, and if there was something for

9    inmates to see that was going to cause a problem, it was

10   plaintiff's reaction to these comments, not anything -- he

11   was not objectifying her, he was not doing something to her

12   that would suggest that he was being particularly

13   disrespectful to her as opposed to anybody there.  So there's

14   no gender element to that suggestion at all, your Honor.

15            1983 retaliation, no evidence of the intent to

16   retaliate, no adverse action.  With regard to both the

17   hostile work environment and retaliation, and I guess the

18   discrimination claim to the extent there is one, I think

19   there's also a locked solid qualified immunity defense in

20   each of those instances.  There's no evidence that Troy

21   Mitchell knew of some larger pattern or could know that these

22   very isolated incidents were somehow adding up to a violation

23   of plaintiff's rights.

24            So, you know, given that it was isolated,

25   given that it was very limited in nature, there's no way he

1  could have known, even if there was a finding that there was

2  a larger situation that added up to a hostile work

3  environment, that he knew that, and could have known it.

4  There's no evidence he knew about any other instance of

5  alleged discrimination, harassment, or retaliation.

6          I'd like to talk a little about the aiding and

7  abetting charge because the law is slightly different on

8  that.  And I think the case law supports a couple of ways to

9  get to aiding and abetting liability.  One would be if

10  Sergeant Mitchell did something that by itself added up to a

11  hostile work environment.  That's the situation in *Tomka*, the

12  Second Circuit case, and you know, that's basically the same

13  conduct that I think is necessary for a 1983 hostile work

14  environment cause of action to be successful and I talked

15  about that, and I don't think, you know, that there's any way

16  to establish liability as an aider and abettor based on the

17  suggestion that he himself alone caused a hostile work

18  environment.

19          That being the case, I think with the cases,

20  and again, this is all covered in my trial brief and I am

21  prepared to cite it now if you would like, but beyond that, I

22  think what the cases require is evidence of either

23  participation in a scheme, in other words you have a group of

24  people each of whom is doing some harassing act, they're

25  acting in concert, they should know that their actions

1    together cause this and that would be one way to get to

2    aiding and abetting liability.  And there's absolutely no

3    evidence whatsoever, your Honor, of any such type of

4    knowledge of scheme or of a larger situation on the part of

5    Troy Mitchell.

6                    The other thing that's required and I guess

7    this is not really a separate thing, but an additional

8    requirement that kind of goes along with that is the case law

9    suggests that there needs to be some intent on the part of an

10   aider and abettor, you know, some intent again to be

11   participating in something else.  And your Honor, when you

12   look at, you know, the aiding and abetting allegation, the

13   question that I would ask you to look at is what is he aiding

14   and abetting?  Is he aiding and abetting graffiti in the

15   bathroom?  Is he aiding and abetting Sergeant Wright turning

16   down an overtime request?  You know, there's just -- there's

17   not much there, and there's certainly no evidence to the

18   extent there's anything there of Sergeant Mitchell having

19   intent to participate in any scheme.

20                   And I would also say, your Honor, that

21   defendant Mitchell does believe there's not sufficient

22   evidence against the state, in giving another, you know, way

23   to fail an aiding and abetting claim is to find that there's

24   a lack of such liability against the principal, against the

25   employer, because there can't be liability against the

1    individual aider and abettor when there's nothing against the

2    employer.  And again, that's all set forth in the trial

3    brief.

4              The same thing just briefly, your Honor, with

5    regard to the aiding and abetting charge relative to the

6    retaliation, you know, what is he aiding and abetting?  What

7    is his act, participating in this scheme, where is the

8    evidence of an intent?  There is none and that's all I have

9    at this time, your Honor.

10             THE COURT:  Thank you, Mr. Andrews.

11             MR. ANDREWS:  Thank you.

12             THE COURT:  Go ahead.

13             MS. CONNOR:  Yes, thank you, your Honor.  The

14   plaintiff requests that you deny defendant Mitchell's motion

15   for judgment as a matter of law under Rule 50(a).  And with

16   respect to the arguments presented by counsel concerning

17   defendant Mitchell, I think that, first of all, he emphasized

18   quite a bit in his argument about how there's no "sexual"

19   content to some of the allegations that are against defendant

20   Mitchell and I would point to you, and again, this is in my

21   trial brief too at length, your Honor, that the harassment

22   has to be gender based.  It does not have to be sexual,

23   overtly sexual in nature.  So there are some allegations I

24   think we would agree that have overt sexual statements such

25   as the allegation about the ring and that type of -- the

1    allegation that, you know, the allegation about the ring, the

2    allegation about an inmate's penis, these types of things, I

3    think, we would agree, I would hope we would agree that these

4    do have sexual content to them.  However, the allegations are

5    broader than, I mean the case law supports an analysis that's

6    broader than sexual, that they have to be gender based.

7              And now with respect to specifically one of

8    the first things that defendant -- plaintiff alleges

9    defendant Mitchell said to plaintiff is that women do not

10   belong at Auburn.  Now, that is obviously a gender-based

11   statement.  It is a statement of his view, his -- and it goes

12   directly to what his intent is throughout his conduct toward

13   plaintiff.  And that there's evidence from plaintiff's

14   testimony that that occurred.  Also, comments in addition to

15   the comments about the inmate, the comments -- well, the

16   actions, rather, about the wallet.  Now counsel made a point

17   that there's no connection of this wallet to gender.  It is

18   our allegation that the plaintiff was subjected to that

19   conduct because of her gender, that because -- he picked on

20   her, because of her gender.  He did this to her because of

21   her gender, because of his view that women do not belong at

22   Auburn.

23             THE COURT:  And what's your view of the

24   testimony that's in the record with regard to that wallet and

25   Sergeant Mitchell's involvement other than he didn't write

1    her up for it?

2              MS. CONNOR:  That the plaintiff testified,

3    your Honor, that she placed the wallet in a lunchbox under

4    the stairs, and that that wallet was not visible, it was not

5    apparent and she spoke to an officer and asked can she put

6    that there and he said yes.

7              THE COURT:  And do you agree with me that your

8    client also testified that she has no knowledge as to who

9    removed that wallet or how it ended up in Sergeant Mitchell's

10   possession?  There's no way for her to know that.

11             MS. CONNOR:  I -- right.  I think that's

12   correct, your Honor.  I don't disagree.

13             THE COURT:  So then we're talking about a

14   situation where Sergeant Mitchell has her wallet, she doesn't

15   know how he got it, and he tells her that an inmate reported

16   finding it in the trash and she calls him a liar, and nothing

17   else happens, she gets her wallet and her badge back, is that

18   right?  Do I have it correctly or am I missing something?

19             MS. CONNOR:  No, that's correct, your Honor,

20   and that there was a period of time, I would remind you, that

21   between the time that she -- that he said he had the wallet

22   and when he reached her, about a half an hour.  But yes, I

23   think that you're correct.

24             THE COURT:  What does that have to do with

25   anything?

1            MS. CONNOR:  Well, I -- if an inmate found it

2     in the trash, he did not immediately return it to the

3     plaintiff and that's all, my point of that.  That if that

4     occurred --

5            THE COURT:  Yeah, well, okay.  We're making a

6     lot of assumptions about this wallet incident that I don't

7     think can be made based on what's in the record.  Okay.  All

8     right.  Go ahead.

9            MS. CONNOR:  Now, regarding the comments that

10    were alleged by the plaintiff with respect to defendant

11    Mitchell on that November 10th, the memorandum, that were

12    embodied in the memorandum, November 10th, I would remind

13    your Honor, and counsel is correct that many of these things

14    plaintiff alleges took place in front of inmates, and that

15    the gross nature of some of these comments were designed to

16    humiliate plaintiff and degrade her in front of the inmates

17    which places her safety in jeopardy in this type of

18    environment.  That what you have to know in this environment

19    that your fellow officers are going to stand with you, work

20    with you with respect to controlling the inmates and doing

21    the jobs you need to do and not endanger you in front of the

22    inmates.  And this -- these types of comments publicly in

23    front of inmates are deliberately designed to not just

24    humiliate the plaintiff but to place her in physical

25    jeopardy, her safety in physical jeopardy.  Because it will

1    expose her to more danger with respect to the inmates feeling

2    that she is a vulnerable correction officer and fellow

3    officers won't stand with her.  And that I think that that

4    point cannot be understated.  That the environment in this

5    place is inherently dangerous, we agree, and that there were

6    acts done by defendant Mitchell and others that would -- were

7    done deliberately to place the plaintiff in jeopardy or

8    degrade her in front of inmates.

9               THE COURT:  When you say that generally,

10    defendant Mitchell and others.

11               MS. CONNOR:  Well, your Honor, there was

12    testimony concerning the plaintiff's -- various comments that

13    were made in front of inmates, things were done to her in

14    front of inmates.

15               THE COURT:  And you're alleging that Sergeant,

16    then Sergeant Mitchell had some knowledge of that?

17               MS. CONNOR:  No, we're alleging solely with

18    respect -- I was pointing that out with respect to the

19    comments that we were -- we're discussing in that area, time.

20               Now, so therefore, I think, it goes to the

21    severity of these comments, your Honor, the comments have to

22    be seen in a context.

23               THE COURT:  The context of continuous and

24    pervasive.  Right?

25               MS. CONNOR:  Severe or pervasive, and

1   therefore, it goes to the severity of the comments because

2   they were done to deliberately place her in danger and in

3   jeopardy.

4           THE COURT:  Well, Counsel, Mr. Andrews has

5   listed one, two, three, four incidents in the record.  Do you

6   have any dispute with that?

7           MS. CONNOR:  The record at this point, what do

8   you mean four incidents?

9           THE COURT:  Four incidents where Sergeant

10  Mitchell, there has been testimony that, by your client that

11  there was some sort of interaction that she objected to,

12  either as sexually harassing or harassment in the workplace,

13  and that would be June of 2004 when she first came into the

14  facility, women don't belong here; September or October,

15  that's the size of the inmate penis comments; and then spring

16  and summer of 2005 is the wallet incident which is what it

17  is, I don't know how that plays into your argument; and then

18  November 10th is his gross, rude, and boorish remarks with

19  regard to himself and his family, which your client alleges

20  were said in front of other officers and inmates.

21          MS. CONNOR:  That's right, your Honor.

22          THE COURT:  Anything else?

23          MS. CONNOR:  No, your Honor.

24          THE COURT:  That's the full extent of what

25  we're talking about?

1          MS. CONNOR:  That's the extent of the proof at

2     this point, your Honor.

3          THE COURT:  Okay.

4          MS. CONNOR:  Now, moving on to Eastern, your

5     Honor, the incidents that the plaintiff testified about at

6     Eastern, counsel has mischaracterized the first instance.  It

7     wasn't that he was sitting next to the door, the plaintiff

8     testified he blocked the door, with the way he was sitting

9     blocked her exit is what she said, and therefore --

10         THE COURT:  I have -- Counsel, I'm going to

11    beg to differ with you there.  I don't recall any testimony

12    of anybody blocking the door.  There was testimony that he

13    was sitting at a desk with his feet up on the desk in the

14    proximity to the door, but nobody testified that he was

15    blocking the door to my recollection.

16         MS. CONNOR:  Respectfully, your Honor, the

17    plaintiff to my recollection testified that he was blocking

18    her exit.  By the door.  That's my honest recollection of the

19    testimony, your Honor.

20         THE COURT:  Okay.  We can find it.

21         MS. CONNOR:  And that that then was, to -- the

22    plaintiff interpreted that as physically threatening

23    therefore we would get that, it was her testimony.  And also

24    leering at her from -- in the yard.  Again, that would be

25    physically threatening to the plaintiff.  So that's, that's

1    the proof we have with --

2                      THE COURT:  And that goes to what, what

3    claims, aiding and abetting?

4                      MS. CONNOR:  Yes, your Honor.

5                      THE COURT:  And retaliation?

6                      MS. CONNOR:  Yes, your Honor.

7                      THE COURT:  And would you like to address

8    counsel's legal argument with aiding and abetting with intent

9    to participate in some scheme?  With regard to that, those

10   actions?

11                     MS. CONNOR:  Yes.  Your Honor, we are not

12   alleging that there is any evidence of a scheme, or some sort

13   of conspiracy on the part of defendant Mitchell with other

14   officers.  There is no, or -- there's no evidence in the

15   record of that, your Honor, that we would look at the aiding

16   and abetting as he did something to add to the environment

17   and that it was -- it aided and abetted creating a hostile

18   environment.

19                     THE COURT:  How about the retaliatory

20   transfer, what proof is there of that?

21                     MS. CONNOR:  Your Honor, the record at this

22   point was that it's on the part of the employer transferring

23   defendant Mitchell.  We don't have evidence in the record

24   that defendant Mitchell selected that location in order to

25   retaliate against the plaintiff.

1              THE COURT:  Okay.  So you have no claim

2    against defendant Mitchell for retaliation with regard to his

3    transfer?

4              MS. CONNOR:  After the transfer occurred is

5    the claim, what's in the record on the part of the plaintiff,

6    your Honor.

7              THE COURT:  I'm not --

8              MS. CONNOR:  The conduct that took place at

9    Eastern is what's on the record with respect to the

10   retaliation by defendant Mitchell.  We don't have -- there is

11   no evidence in the record that he transferred there, that

12   he -- that the transfer itself was retaliatory.

13             THE COURT:  How is his conduct once he's there

14   retaliatory?

15             MS. CONNOR:  Your Honor, the plaintiff

16   testified that he blocked the door and that he leered at her.

17             THE COURT:  I understand that, I understand

18   that, but how does that come into the legal definition of

19   retaliation?

20             MS. CONNOR:  Because it's harassment, and

21   retaliatory harassment under the *Richardson* case and in other

22   cases in the Second Circuit have held it's very clear that

23   harassment that is ret -- in retaliation.

24             THE COURT:  Retaliation for what?

25             MS. CONNOR:  For her complaining about him at

1   Auburn.  He well knew that she complained about him, and that

2   he -- that she was instituting proceedings against him, and

3   therefore he retaliated, he harassed her more.

4                    THE COURT:  Where in the record is it that he

5   had knowledge that she was instituting complaints against

6   him?

7                    MS. CONNOR:  She gave him the letter.

8                    THE COURT:  She gave him a letter.

9                    MS. CONNOR:  Yes.  And she also gave it to

10  Captain Gummerson.

11                   THE COURT:  Okay.  And what was the content of

12  the letter?

13                   MS. CONNOR:  That November 10th, 2005 to-from,

14  it told him that she would not tolerate that conduct anymore,

15  and that she considered that harassment, and she wanted that

16  to stop immediately.

17                   THE COURT:  And how does that advise him of

18  any type of investigation or that he's going to retaliate

19  against her?

20                   MS. CONNOR:  Well, it doesn't, no, I'm not --

21  it says what it says, your Honor, it doesn't say anything

22  about an investigation.

23                   THE COURT:  So again, what's he retaliating

24  for?

25                   MS. CONNOR:  For complaining about the

1   harassment to him.  He, at times he was her superior officer,

2   he was her supervisor on some occasions, and that she

3   complained about the harassment to him, and what we have in

4   the record is that he threw it away, and that indicates, I

5   think, that you can draw a reasonable inference that he, he

6   was going to do -- he threw it away.  He didn't --

7                   THE COURT:  What does that have to do with

8   anything?

9                   MS. CONNOR:  Well, it shows his attitude when

10  she complained and brought the information to him, he was

11  going to do nothing about it.  He didn't say, oh, I won't do

12  it anymore, his whole attitude was adverse to plaintiff.

13                  THE COURT:  Well, wait a minute, what

14  obligation did he have because a fellow employee gave him a

15  letter saying I don't like your conduct?

16                  MS. CONNOR:  He was the superior officer, he

17  had a duty to take action when that -- and that's in the

18  material that's in evidence.  He had a duty to take action,

19  report that, and take affirmative action about that and he

20  did not do that.

21                  THE COURT:  Anything else?

22                  MS. CONNOR:  Your Honor, just generally, that

23  when we think that questions of intent are questions that are

24  best left for the jury, that those -- that the facts, it's

25  inferential, that there's rarely direct evidence of

1    discrimination and harass -- gender-based harassment, that

2    it's all -- most of it is circumstantial, and we think that

3    the case law is very clear that those -- that that type of

4    determination is best left for the jury and does create

5    question of material fact.

6                    THE COURT:  When you're talking about intent

7    to participate in a scheme?

8                    MS. CONNOR:  No, I'm talking about intent to

9    discriminate, intention behind the harassment.

10                   THE COURT:  And again, is there any evidence

11   whatsoever in this record with regard to aiding and abetting

12   and intent to participate in a scheme?

13                   MS. CONNOR:  Not with respect to a scheme,

14   your Honor, but yes, with respect to aiding and abetting

15   because he contributed to that environment.

16                   THE COURT:  Okay.  Thank you, Ms. Connor.

17                   MS. CONNOR:  Thank you.

18                   THE COURT:  Mr. Andrews, did you want the

19   opportunity?

20                   MR. ANDREWS:  Just very briefly, your Honor.

21   Counsel spent a lot of time trying to make up for the fact

22   that there is just not severe and pervasive conduct here, by

23   talking about the possibility of gender-based harassment.

24   There still has to be some kind of evidence that it's gender

25   based and gender related, and here, if there was a series of

1    incidents close together that were, you know, not sexually

2    related but seemed to be treating a woman differently from a

3    man, then, you know, I get that, I understand that, but here,

4    plaintiff specifically testified that she knew of no other

5    instance where Sergeant Mitchell had found an officer without

6    their badge and ID on them.  There's absolutely no evidence

7    again, no, you know, real response to the fact that he could

8    have written her up but didn't.  You know, if he was going to

9    discriminate against her, if he was intent on driving her

10   away, then I think he would have written her up and tried to

11   get formal discipline done.  And to suggest that some comment

12   which we will accept for purposes of this proceeding he made

13   in June 2004 to support evidence of intent a year later with

14   regard to a situation where she was unquestionably at fault

15   is baseless.  Absolutely baseless, your Honor.

16               With regard -- Counsel continuously referred

17   to the November 10th statement as being designed to humiliate

18   or designed to drive away, or designed to compromise the

19   safety of the plaintiff.  No evidence whatsoever.  Zero

20   evidence.  None.  Absolutely no evidence of that.  She

21   concedes there's no evidence that he had any participation in

22   a larger scheme, said, no, you know, but his conduct

23   contributed to it even though he had no intent or knowledge,

24   and your Honor, that's just not enough for individual

25   liability.  It absolutely is not enough.  I would question

1      whether it adds to anything that, you know, makes liability

2      for anybody, but certainly not for him.

3                  Counsel talked about the concept of

4      retaliatory harassment, and cited the *Richardson* case.

5      There's -- that's something that's similar to sexual

6      harassment -- I'll finish up quickly, your Honor.

7                  THE COURT:  I'm looking at my watch because

8      I'm thinking about that jury, not you, I apologize.

9                  MR. ANDREWS:  That's okay, I don't blame you.

10     She talked about the concept of retaliatory harassment,

11     *Richardson* case, you know, that's something that requires

12     something in the nature of harassment that's sufficient that

13     it would prevent a reasonable employee from complaining about

14     something, from bringing a complaint of discrimination or

15     retaliation or harassment.  There's nothing reasonable about

16     what's alleged here, and your Honor, I kept very careful

17     notes during the direct examination.  Plaintiff was very

18     clear that she could have walked by defendant Mitchell as he

19     sat at the desk, she never said he blocked her exit before

20     she decided to go out the other door.

21                 And then, you know, she talked a lot about the

22     complaint on November 10th and how he had a duty to take

23     action, and I, you know, I'm not sure, this was a to-from

24     which she repeatedly described as personal correspondence

25     from an officer to her supervisor.  It wasn't a complaint, it

1   didn't say this is a complaint, it said, I'm not threatening

2   you, right in the memorandum, it asks for him to stop making

3   statements of a certain nature that she alleged he made and

4   she admits he never did again.

5              THE COURT:  From that point again he never

6   talked to her again.

7              MR. ANDREWS:  Never again, your Honor.  So

8   again, I would request that defendant Mitchell's Rule 50

9   motion be granted, that he be relieved of this proceeding

10  which frankly I don't think he ever should have been involved

11  with.

12             THE COURT:  Thank you, Counsel.

13             MR. ANDREWS:  Thank you, your Honor.

14             MS. SHEEHAN:  Your Honor, may I?  I missed one

15  important fact and that is regarding the paint, the graffiti

16  on the bathroom wall.  The testimony was that Ms. Collins

17  told Sergeant Flynn about it and asked him for a can of

18  paint.  Not that she told Superintendent Graham.

19             THE COURT:  Oh, with regard to notification

20  and knowledge?

21             MS. SHEEHAN:  Correct, your Honor.

22             THE COURT:  Okay.  I'm going to let this jury

23  go to lunch even though they've been on break, I'm going to

24  let you go to lunch, I'm going to ask that you be back at

25  1:00, ready to proceed, and I'm going to ask -- okay, I'm

1    going to tell the jury to be here a little after 1:00 so that

2    I can give you a decision on the Rule 50 motion.  Okay.

3    We're going to bring the jury in so I can excuse them and

4    send them to lunch.

5                        (Jury Present, 12:00 p.m.)

6                        THE COURT:  Okay.  The record should reflect

7    we have the ladies and gentlemen of the jury, we have

8    plaintiff and plaintiff's counsel, defendants and defense

9    counsel.  Ladies and gentlemen, I apologize for the down

10   time.  I don't want you to think that we're wasting time,

11   we're in here working, we haven't left, we've been through

12   some very important legal arguments that had to take place

13   and I wanted to get it out of the way so that we can continue

14   with this case.

15                    So, that being said, even though I know you've

16   been there waiting, I need to let these attorneys get some

17   lunch.  So I'm going to take a break so everybody can go to

18   lunch.  I'm going to ask that you be back, it's -- I have

19   about five after 12, I'm going to ask that you be back in the

20   jury room, we're going to get started at 1:15.  The lawyers

21   are going to be back at 1:00 with me because I have to give

22   them some rulings on the motions they just made, so we'll be

23   back at 1, and we're going to get you in here at 1:15.  So

24   enjoy your lunch and we'll see you then.  Please don't talk

25   about it, same instructions, okay, don't let anybody approach

1   you.  If they do, let me know.

2                      (Jury Excused, 12:04 p.m.)

3                      THE COURT:  Okay.  Thank you.  We'll see you

4   at 1:00.

5                      THE CLERK:  Court's in recess.

6                      (Whereupon a luncheon recess was taken from

7                       12:04 p.m. to 1:04 p.m.)

8                      (Open Court, Jury Out.)

9                      THE COURT:  You do enough sitting, standing up

10  a little longer won't hurt anybody.  Okay.  First thing I

11  want to do, cover the claims that I indicated to counsel at

12  our final pretrial that would be dismissed at the end of the

13  plaintiff's case, and this is just a formality.  I advised

14  counsel at that time that it was the court's view that those

15  claims should have probably been dismissed during motion

16  stage, but I think procedurally, it's the right thing to do

17  to dismiss them now.  And I'm going to dismiss the 1983

18  claims for damages against the state of New York and DOCS as

19  well as the 1983 claims for damages against defendants in

20  their official capacities.  I'm going to dismiss plaintiff's

21  claims of -- New York Human Rights Law claims against the

22  individually named defendants, and that was except for the

23  aiding and abetting claim against defendant Mitchell, which

24  stayed in, and the Title VII claims against the individually

25  named defendants which were dismissed.  Okay.

1          Now let's get to the Rule 50 motion by

2     defendants.  First of all, with regard to defendant

3     Commissioner Goord, the sum total of the proof in the record

4     with regard to Commissioner Goord is that the plaintiff

5     mailed him two letters of complaint regarding conditions and

6     what she perceived her treatment was with regard to her

7     employment with New York State Department of Corrections.

8     Case law is very clear, that that is not sufficient proof to

9     establish any type of personal involvement; therefore, the

10    claims, any and all claims against Commissioner Goord will be

11    dismissed.

12          With regard to this issue, state of New York

13    versus DOCS, as both being defendants in this case, based on

14    the representations of counsel that is the intention, that

15    New York State and the New York State Department of

16    Corrections are indeed one defendant, the court is going to

17    merge those two as one defendant, and they'll be charged in

18    the jury's -- in the charge to the jury as New York State

19    Department of Corrections as the defendant, and we're going

20    to remove the state of New York as a named defendant.

21          With regard to the retaliation claims against

22    all defendants, there are three prongs that need to be

23    established for a retaliation claim, and the court finds that

24    two of those prongs have not been satisfied.  There is no

25    causal connection between the transfer and any alleged

1    protected speech that this plaintiff has claimed, there's no

2    proof of any causal connection that's been submitted to this

3    court, and there is no proof of any adverse action which was

4    taken by any defendant which would chill an ordinary person,

5    and for that reason, those retaliation claims are dismissed.

6                    With regard to defendant Mitchell, aiding and

7    abetting claim, the court finds that there has been no

8    evidence of any intent to participate in a scheme or plan.

9    Court finds that this claim is duplicative of the 1983 action

10   claim brought by this plaintiff.  To the extent that this

11   claim is based on actual participation or conduct by

12   defendant Mitchell, it is duplicative of her 1983 action, and

13   it will be confusing to this jury to submit it as an

14   additional charge, therefore the aiding and abetting claim

15   for those reasons is going to be dismissed.

16                   Now, with regard to Superintendent Graham, the

17   court is going to reserve at this point on that motion to

18   dismiss the charges against Superintendent Graham.  I want to

19   hear whatever defense case that is going to be offered, but

20   I'm indicating to plaintiff and plaintiff's counsel at this

21   point I have very serious concerns about the proof that's

22   been put forward regarding Superintendent Graham and any

23   responsibility with regard to the claims made, and I'm going

24   to reserve at this point and ask that counsel can obviously,

25   you all know that you can re-move at the end of the defense

1    case.

2                    So all the other requests for Rule 50 motion

3    for dismissal are going to be denied at this point.  And

4    we're going to proceed with the defense case.

5                    Ms. Connor, anything you want to put on the

6    record?

7                    MS. CONNOR:  Yes, your Honor.

8                    THE COURT:  Go ahead.

9                    MS. CONNOR:  Okay.  Just that obviously we

10   disagree with your ruling on the dismissals of the Rule 50(a)

11   motion and that's what we want to put on the record.  Thank

12   you.

13                   THE COURT:  Okay.

14                   MS. SHEEHAN:  Nothing, your Honor, thank you.

15                   MR. ANDREWS:  Nothing, your Honor.

16                   THE COURT:  Okay.  We're going to get this

17   jury in here and we're going to continue.  You have a witness

18   prepared?

19                   MR. KINSEY:  Yes, your Honor, we do.

20                   THE COURT:  Okay.

21                   MS. SHEEHAN:  Your Honor, may I leave for just

22   a moment.

23                   THE COURT:  Yes, you may.  Counsel, there's

24   two of you here, you can feel free to move in and out.

25                   (Jury Present, 1:15 p.m.)

1          THE COURT:  Okay.  Record should reflect we

2   have the ladies and gentlemen of the jury, plaintiff,

3   plaintiff's counsel, defendants, and defense counsel.  I

4   appreciate you being ready early, I told you 1:15, my clock

5   says 1:14, and you were all there.  I want the record to

6   reflect me starting early, okay.  Mr. Kinsey, you have a

7   witness you want to call?

8          MR. KINSEY:  Yes.  Defense calls John Burge,

9   please.

10          THE CLERK:  Good afternoon.  Step up here

11   please.  State your full name, spell it for the record,

12   please.

13          THE WITNESS:  John William Burge, Sr.,

14   J-o-h-n, W-i-l-l-i-a-m, B-u-r-g-e.

15

16          J O H N   W .   B U R G E   S R . , called

17   as a witness and being duly sworn, testifies as

18   follows:

19          <u>DIRECT EXAMINATION BY MR. KINSEY:</u>

20          Q     You prefer Superintendent, retired

21   Superintendent, John, Sr., Mr. Burge?

22          A     This point in my life, call me anything you

23   want.

24          Q     How about just John?

25          A     That's good.

1          Q     Okay.  John, can you tell us currently are you

2    employed?

3          A     Yes, I am.

4          Q     And where are you employed?

5          A     I am co-owner of a construction fence company

6    in Elmira, New York, along with my son and my nephew.

7          Q     Now with regard to the Department of

8    Correctional Services, were you employed by that agency?

9          A     Yes, I was.

10         Q     When did you begin employment with them?

11         A     November 7th, 1970.

12         Q     Okay.  And when did you leave service?

13         A     I believe it was June 30th, 2007.

14         Q     And at that time, why did you leave service?

15         A     Because I was paying New York to go in and

16   work.

17         Q     Did you retire?

18         A     Yes.

19         Q     Okay.  Give us a little bit of your background

20   educationally, please.

21         A     I'm a high school graduate.  I attended no

22   college, attended numerous training courses throughout my

23   career with the Department of Correction.

24         Q     Now when you started in 1970, what -- what was

25   your designation then?

1          A     I was a correction officer and my first

2    assignment was at Bedford Hills male facility.

3          Q     Back in 1970, Bedford Hills had both male and

4    female?

5          A     Yes, they did.

6          Q     And you were -- how long were you at Bedford

7    Hills?

8          A     It was only a short period, probably, I'm

9    going to guesstimate two months, then I transferred to

10   Matteawan State Hospital for the Criminally Insane.

11         Q     Does that hospital still exist?

12         A     No, it doesn't.

13         Q     How long were you there?

14         A     I left Matteawan in 1972, I believe it was

15   June of 1972.

16         Q     Where did you go then?

17         A     I then transferred to Elmira Correctional

18   Facility where I remained a correction officer until December

19   of 1988.

20         Q     And what happened in December of 1988?

21         A     December -- or excuse, can I -- I made a

22   mistake there, until 1980.

23         Q     Okay.

24         A     Then I made sergeant, and I reported to Green

25   Haven Correctional Facility.  I remained there for

1  approximately eight months, and then transferred to Auburn

2  Correctional Facility as a sergeant where I remained for nine

3  months there.  I then transferred back to Elmira as a

4  correction sergeant, I remained a sergeant till 1988, and --

5          Q    Now when you did all that transferring, what

6  was the cause of those transfers of several months rather

7  than years?

8          A    It was when an opening existed, I had

9  requested to get back to my home facility.

10          Q    Did you live near Elmira, at that point?

11          A    I lived in Elmira.

12          Q    And where do you reside now?

13          A    I live in Elmira right now.

14          Q    Okay.  And so in 1988, what happened?

15          A    I made lieutenant, I went to Attica

16  Correctional Facility where I was lieutenant for

17  approximately 13 months.  From there, I transferred back to

18  Monterey Shock Correctional Facility.

19          Q    Where is that located?

20          A    That is approximately 30 miles from Elmira

21  Correctional Facility, up near Watkins Glen, New York, up

22  near the racetrack.

23          Q    Okay.  How long were you there?

24          A    I'm gonna say I was there approximately four

25  months.  Then I transferred from there to Southport

1    Correctional Facility, when it opened in I believe it was

2    1990.

3            Q    Now where is Southport?

4            A    Southport is approximately 4 miles from Elmira

5    right on the other side, right across the river from Elmira

6    Correctional Facility.

7            Q    When you transferred there, that was a new

8    facility?

9            A    Yes, it was brand new.

10           Q    What were your duties as a lieutenant at

11   Southport?

12           A    Originally, I was day-off relief, then I

13   obtained a position as training lieutenant.

14           Q    What sort of training did you do as a training

15   lieutenant?

16           A    I didn't do any training, I was -- my

17   responsibility was to coordinate and set up the training for

18   staff.

19           Q    What kind of training did you set up for

20   staff?

21           A    Weapons, diversity training, any type of

22   training that was mandated by the Department of Correction,

23   which there were numerous things.

24           Q    Okay.  How long did you do that?  I know, it's

25   a memory test, but to the best of your recollection.

1      A    Well, it's -- I did that till I got returned

2  back to the position of corrections sergeant because my

3  position to lieutenant was only temporary because I did not

4  score high enough on the lieutenant's test to be reached at

5  that point.  I had to go back to my hold item which was

6  sergeant.

7      Q    And where did you do that?

8      A    Back to Southport Correctional Facility, my

9  item was moved there.

10      Q    And what were your duties when you went back

11  to sergeant?

12      A    Very disgruntled sergeant.

13      Q    What were your duties as a very disgruntled

14  sergeant?

15      A    It was everything.  I was a resource sergeant

16  so I had numerous duties.

17      Q    How long did you stay then at Southport as a

18  sergeant?

19      A    I was a sergeant for approximately three

20  months till they reached me on the lieutenant's test, then I

21  went to Cape Vincent Correctional Facility, which is up by

22  the St. Lawrence Seaway.

23      Q    How long were you up there?  You went as a

24  lieutenant, is that right?

25      A    Yes, I went as a lieutenant there.  I was

1    approximately three months there, and I transferred back down

2    to Monterey -- no, excuse me, I transferred at that point to

3    Lakeview Shock Correctional Facility.

4            Q    Where is Lakeview?

5            A    That's in the area of Buffalo, New York.  I

6    was there for approximately six months and I was transferred

7    to Monterey Correctional Facility again.

8            Q    Now when was your next promotion?

9            A    Well, I went back, can I just --

10           Q    Sure.

11           A    I'll finish my sequence, it all falls into

12   place, hopefully.

13           Q    Go ahead.

14           A    From Monterey I was transferred back to

15   Southport Correctional Facility, there were a lot of security

16   issues and I was contacted to see if I would go there as an

17   extra lieutenant, I didn't really have an item there, but I

18   was sent there for security reasons.  From that point, I

19   remained there till 1994.  1994, I made captain, and I went

20   to Elmira Correctional Facility.  Eleven months after that, I

21   was promoted to the rank of deputy superintendent of

22   security, where I remained, I believe it was almost two

23   years.

24           Q    That was still at Elmira?

25           A    Still at Elmira.  At that point, approximately

1   two years later, I was promoted to the rank of first deputy

2   superintendent, which is a position that's underneath the

3   superintendent of a correctional facility.

4           Q    Which facility were you promoted at?

5           A    Mohawk Correctional Facility which is up by

6   Utica.

7           Q    And how long were you there as the first

8   deputy?

9           A    A year.

10          Q    And then what happened?

11          A    I was transferred laterally to Auburn

12  Correctional Facility as the first deputy superintendent,

13  that was in year 2000.  I believe it was the year 2001, I was

14  then promoted to superintendent at Elmira -- or at Auburn

15  Correctional Facility.  I remained there till the year 2005,

16  and I was transferred back to Elmira as a superintendent in

17  Elmira.

18          Q    Do you recall the month that you left Auburn?

19          A    I believe it was October of 2005.

20          Q    Now, John, would it be fair to say that

21  transfer is a way of life in DOCS?

22          A    Yes, especially in the promotional aspect of

23  it.

24          Q    Now, from 2000 to 2005 while you were at

25  Auburn, can you tell us how many complaints of sexual

1    harassment you received, if any?

2         A    To the best of my recollection, the only

3    complaint that I had received was from the plaintiff.

4         Q    Well, going back to when you were a sergeant,

5    you were a supervisor as a sergeant, correct?

6         A    Yes, sir.

7         Q    And as a sergeant, did you receive any

8    complaints for sexual harassment?

9         A    No, sir.

10        Q    How about as a lieutenant?

11        A    No, sir.

12        Q    How about as a captain?

13        A    No, sir.

14        Q    How about as a first deputy?

15        A    No, sir, not a direct complaint.  When I was a

16   first deputy superintendent at Auburn, the diversity program

17   fell under my duties as an overseer of that program.

18        Q    You're talking about the diversity program

19   inside the facility?

20        A    The facility, yes.

21        Q    Can you describe what that program is inside

22   the facility?

23        A    Excuse me.  The program is kind of like --

24   what do I want to say?  A mini, intermediate group that --

25   it's a group that's formed and their main function is to

1    address problems between employees within the facility, and a

2    lot of their, I want to say, it wasn't their duties, a lot of

3    their program was to bring the facility propers together,

4    male staff, female staff, and minorities, and so on, and so

5    forth.

6            Q    And did they have -- what was their function

7    as far as bringing them together?

8            A    It was in attempt to have a nice harmonious

9    relationship between everybody.

10           Q    Did they sit people down to discuss their

11   issues?

12           A    Yes, they did.

13           Q    Did -- I'm sorry, go ahead.

14           A    A lot of, in my capacity as first dep., I was

15   not privy to a lot of the issues that, you know, may have

16   been addressed in the facility, so if there was issues, I was

17   not appraised of them, and quite naturally if they were

18   serious, I probably would have been.

19           Q    Now why weren't you appraised of those issues?

20           A    Well, I was the first deputy superintendent,

21   there was a head of the diversity management program, and as

22   I said, if they felt that something was serious enough, they

23   would bring it to my attention.

24           Q    So fair to say you delegated to the head of

25   your -- what did you call him, I'm sorry, the title, the head

1    of diversity management?

2            A    Yeah, it was just the head, head person,

3    chairman of the diversity program.

4            Q    Now, when you were, with all the -- let me ask

5    you this:  In all these travels to different facilities, did

6    you personally ever hear a rumor that Auburn was not friendly

7    to females?

8            A    No, sir.

9            Q    Did you, when you got there, you got there

10   first as sergeant, right?

11           A    Yes, sir.

12           Q    Got there then as a first dep.?

13           A    Yes.

14           Q    And then you were the superintendent?

15           A    Correct.

16           Q    Were you ever made aware that Auburn was not

17   friendly to females?

18           A    Nobody made me aware of that, I did not know

19   that, no, sir.

20           Q    Well, you do rounds in all of those functions,

21   right?  You walk through the facility?

22           A    Yes, I made it a point to, in a week span, or

23   five-day workweek, I would make rounds through the facility

24   three to four times a day, I would be out there.

25           Q    Were people allowed to stop you and discuss

1    their problems?

2           A    Yes, anybody, I was an approachable

3    superintendent, anybody could talk to me.  And that was not

4    just limited, believe me, it wasn't just limited to staff, if

5    inmates had an issue and I was in the area, I had no problem

6    talking to people.

7           Q    Now if somebody came and talked to you, would

8    there be retaliation because they talked to the big guy?

9           A    Not that I'm aware of.  There might be --

10   there might be somebody joking, say, hey, what are you

11   talking to the superintendent for, things like that, you

12   know, but that's jail.

13          Q    When was the first time that you had reason to

14   either notice or meet Ms. Collins?

15          A    I believe I met with her as I did, or tried

16   to, if I was available, I made it a point to meet with every

17   new employee that came into Auburn Correctional Facility.

18          Q    Do you have a recollection that you did that

19   with Ms. Collins?

20          A    Yes, I believe she was in a group that came

21   through.

22          Q    And at that point, how many sergeants, if you

23   recall, how many sergeants were at Auburn?

24          A    I believe there was 30, or no, back then, it

25   was 29, I believe, best of my recollection.

1          Q     And how many officers?

2          A     I believe there was 432.

3          Q     I'm going to test you now, how many civilian

4     staff?

5          A     Well, there was a total of 840 some employees,

6     take away the lieutenants, the captains, there was probably

7     over 400 civilians in Auburn -- excuse me, about 350.

8          Q     How many lieutenants?

9          A     I believe at that time, there was 11

10    lieutenants in Auburn.

11         Q     How many captains?

12         A     Two captains, and a dep. of security over

13    them.

14         Q     And did you have a first deputy?

15         A     I had a first deputy, I'm gonna say

16    approximately two years, then he got promoted to

17    superintendent, and they did not put another person in that

18    position.

19         Q     Okay.  And was -- when, in the course of your

20    being there, do you remember when he was promoted and you no

21    longer had a first deputy?

22         A     I -- for the dates, no, unless I had it in

23    front of me, I do not.

24         Q     Would it be prior to 2004?

25         A     I would say yes.

1          Q    Okay.  How many inmates were there at that

2     point?

3          A    1818.

4          Q    And sorry to jump around but back to this idea

5     that the first deputy left, when the first deputy left, who

6     then was responsible for overseeing diversity management in

7     the facility?

8          A    It was Deputy Superintendent McAnany.

9          Q    Did you delegate that responsibility to Dep.

10    McAnany?

11         A    Yes, I did.

12         Q    And why did you do that?

13         A    Number one, it's to, you know, with the amount

14    of duties and responsibilities that a superintendent has,

15    it's just, you know, the workload is fantastic, so when

16    that -- soon as I could, I gave him that responsibility.

17         Q    Now, when Ms. Collins arrived at Auburn, prior

18    to her arrival, were you notified that specifically she was

19    coming?

20         A    No, sir.

21         Q    Are you notified when an officer --

22         A    Excuse me, what comes through is interfacility

23    communication transfer list on officers coming in, so you get

24    a list, yes, of who's coming in.

25         Q    Was there any other information about her

1    contained in that transfer memo?

2         A    The only other thing that I believe would have

3    been on there was the facility that they were transferring in

4    from, that was it.

5         Q    Is there some way that they were marked, for

6    instance administrative transfer?

7         A    No.

8         Q    Did anyone call you and say, I'm sending you

9    an administrative transfer?

10        A    No, sir.

11        Q    Write to you?

12        A    No, sir.

13        Q    Meet you in the supermarket and tell you that?

14        A    No, sir.

15        Q    Now when is the next time that you became

16   aware of Ms. Collins in your facility?

17        A    I believe was after an incident had transpired

18   with Sergeant Wright, and the issue was over overtime to the

19   best of my recollection, and the incident -- I believe that

20   was the same incident with the shirt, her shirt, uniform

21   shirt being tossed into the trash receptacle.

22        Q    Now why on earth would the superintendent of

23   that facility become involved in an overtime issue?

24        A    Well, number one, the union came to me.

25        Q    Okay.  And did you get involved initially in

1    what you call a shirt issue?

2              A    It was brought to my attention, yes.

3              Q    Who brought it to your attention?

4              A    I believe it was Captain Rourke or Captain

5    Gummerson but I -- best of my recollection, it was Captain

6    Rourke.

7              Q    Why would they, if you know, why would they

8    bring that to your attention?

9              A    Because of the seriousness of the incident.

10             Q    How would that be a serious incident, throwing

11   a shirt in a garbage can?

12             A    Well, the fact that it would be accessible to

13   an inmate to obtain at Auburn as in most correctional

14   facilities.  You have inmates that are assigned outside the

15   facility, given clearance and they work in these areas, they

16   pick up the garbage, so the feasibility of that shirt being

17   obtained by an inmate and then brought back into the facility

18   and to be used in attempt of an escape, was very feasible.

19             Q    Do you know if Officer Collins was ever

20   disciplined for throwing her shirt in the garbage?

21             A    No, she wasn't, and that decision was rendered

22   by me after discussion with, I believe it was Dep. Bellnier

23   and Captain Rourke and possibly Captain Gummerson.

24             Q    Why did you decide not to discipline her?

25             A    Over my career, there's been numerous

1    incidents involving staff being upset and decisions that they

2    didn't agree with, and they would do dumb things.  Case in

3    example, I had an officer when I -- at Monterey when I went

4    there as superintendent, got mad, kicked a big plate window

5    out.  And by all rights, I should have written that

6    individual, or brought disciplinary charges against him, but

7    as I said, with my -- what I consider my jail experience and

8    coming up through the ranks, I know how things go, so all I

9    did was call him in, tell him, hey, you're gonna make

10   restitution for the window, don't be so stupid in the future,

11   and that ended that situation.

12          Q    Did you apply -- excuse me, did you apply that

13   same standard to both male and female correction officers?

14          A    Yes, I did.

15          Q    Did it matter the gender of the officer?

16          A    No, I always considered myself a fair

17   individual.

18          Q    Now, do you recall if Ms. Collins put in a

19   written complaint about Sergeant Wright?

20          A    Yes, she did submit a complaint to me.

21          Q    She sent it to you?

22          A    I believe she brought it to me.

23          MR. KINSEY:  May I approach, your Honor?

24          THE COURT:  Yes, you may.

25          Q    Take a minute and review that.  When you're

1    finished, please look up.

2              MS. CONNOR:  Your Honor, would he identify the

3    exhibit that he put in front of the witness on the record.

4              THE COURT:  It's, what's --

5              MR. KINSEY:  Plaintiff's 15.

6              THE COURT:  Plaintiff's 15, okay.  Plaintiff's

7    or Defendant's?

8              MR. KINSEY:  It was Plaintiff's.

9              THE COURT:  Plaintiff's, okay.

10         A    (Witness Complies.)

11         Q    Have you reviewed that document?

12         A    Yes.

13         Q    Is that the document that Ms. Collins caused

14   to be sent to you?

15         A    To the best of my recollection, yes.

16         Q    Now, did -- there's a page, another page to

17   that exhibit, do you recall if that was included in the

18   exhibit, in the letter?

19         A    I do not recall whether it was or not, no.

20         Q    Does that incident sound at all familiar to

21   you?

22         A    I -- I cannot remember that, I really can't.

23         Q    Okay.  Now referring back to Plaintiff's 15,

24   what's the date on that?

25         A    June 26, 2005.

1          Q    And you received that on or near that date?

2          A    To the best of my knowledge, yes.

3          Q    And that letter is in substantially the same

4    form as when you received it?

5          A    To the best of my knowledge, yeah.

6               MR. KINSEY:  Your Honor, I'd move

7    Plaintiff's 15 into evidence.

8               MS. CONNOR:  No objection.

9               MR. ANDREWS:  No objection, your Honor.

10              THE COURT:  It's received.

11         Q    Now Mr. Burge, what did you do --

12              MS. CONNOR:  I'm sorry, Counsel, I -- is it,

13   just for the record, is it received without respect to the

14   final page or is that final page included?  I'm sorry, I

15   forgot to ask that.

16              MR. KINSEY:  Yeah, he can't identify the final

17   page.

18              MS. CONNOR:  So it's without the final page?

19              MR. KINSEY:  Without the final page.

20              MS. CONNOR:  Thank you.

21              THE COURT:  So how many pages?

22              MR. KINSEY:  Five pages.  There is a paper,

23   peach incident which is not part of the exhibit.  It's

24   unsigned and we're not going to offer that.

25              THE COURT:  What part is that?  Even though

1    the letter says look at the attached, did you see that?

2             THE WITNESS:  Pardon me, sir?

3             THE COURT:  You know what I'm talking about?

4             MR. KINSEY:  Yes.

5             THE COURT:  Ask him about that.

6             MR. KINSEY:  I asked him if he'd seen that, he

7    didn't.

8             THE COURT:  I'm talking about the thing in the

9    letter that says --

10             MR. KINSEY:  Withdrawn, we'll do the entire.

11             THE COURT:  Make it clear.

12             MR. KINSEY:  If you could hand it back to me.

13             THE COURT:  That might refresh someone's

14    recollection.

15             MR. KINSEY:  Ms. Connor, we'll include that

16    page.  The judge has indicated it should include the page.

17             MS. CONNOR:  I'd like to hear from his Honor.

18             THE COURT:  What I'd like you to do --

19             MR. KINSEY:  Is lay a foundation.

20             THE COURT:  Correct.  I believe within the

21    letter that I've received, there's a reference to an

22    attachment, and maybe that will refresh the witness'

23    recollection, okay.

24        Q   Mr. Burge, as you read that letter, did you

25    see the entry wherein it referred you to an attached letter?

1       A     That is in the first letter that you gave me?

2       Q     Yes.

3       A     Where would that be located?

4             MR. KINSEY:  May I approach, your Honor?

5             THE COURT:  You may.

6             (A discussion was held off the record between

7              Mr. Kinsey and the witness.)

8             MS. CONNOR:  Is that on the record?

9             THE COURT:  He's going to put it on the

10     record.

11      Q     Mr. Burge, having reviewed that letter, do you

12     see therein where I pointed to the request to review the

13     attached?

14      A     Yes, sir.

15      Q     And does that refresh your recollection that

16     the attached was indeed part of that letter?

17      A     I remember the first letter, I do not remember

18     the attachment.  Now I'm not saying it wasn't there, but I do

19     not recall it.

20      Q     The attachment that refers to is about a

21     separate and distinct event, is it not?

22      A     Yes, sir.

23      Q     And that has to do with a hospital unit?

24      A     Yes, sir.

25      Q     And the last page that is called the peach

1   incident, can you take a look at that?  That also refers to

2   an incident in the hospital?

3            A    Yes.

4                 MR. KINSEY:  Okay.  Your Honor, we would move

5   it in in its entirety in that case.

6                 THE COURT:  With the other page as well?

7                 MR. KINSEY:  With the other page as well.

8                 MS. CONNOR:  Your Honor, I would object.  I

9   have no objection to the first five but if the witness could

10  not authenticate the final page, that would be the extent.

11                THE COURT:  Well, there's an indication that

12  it's a part of the original letter, so I'm trying to

13  understand the nature of your objection.  This was something

14  submitted by your client, was it not?

15                MS. CONNOR:  Yes, your Honor.

16                THE COURT:  Okay, I'm going to receive the

17  document.

18           Q    Do you recall, sir, what you did with this

19  letter?

20           A    I believe that there was a grievance filed on

21  this overtime issue, which is -- or would have been a

22  correction officer's right to do, to file a grievance with

23  their union regarding this, not only the overtime, but the

24  alleged harassment by a sergeant is covered under the union

25  contract.

1           Q      Okay.

2           A      Which, you know, would have -- should have

3    required a grievance filed under that.

4           Q      Now, over and above the contract, are you

5    obligated to send something like this to the office of

6    diversity management?

7           A      This here?

8           Q      Yes.

9           A      I believe I did.  I can't recall, you know,

10   what letters I sent unless I see a documentation, I don't

11   know if I sent this up with the packet to Charlie Harvey.

12               MR. KINSEY:  May I approach, your Honor?

13               THE COURT:  You may.

14          Q      I have what's been marked as D24A, and I

15   marked it as A because the 24 packet had six pages.  Can you

16   just take a look at that.

17               MS. CONNOR:  Your Honor, I don't know what

18   document he's referring to.  D24 I don't have.

19               MR. KINSEY:  Well, A would be the top page.

20               THE CLERK:  Okay, but I don't have a D24, so

21   that's new?

22               MR. KINSEY:  My apologies, I thought I gave

23   you the packet.

24               THE CLERK:  Thank you.

25          Q      What's -- do you recognize that?

1        A    Yes, I recognize the letter.

2        Q    And does that now -- does that now refresh

3   your recollection on whether or not you sent this material to

4   diversity management?

5              MS. CONNOR:  Your Honor, I object to counsel

6   prompting the witness with this letter.  He didn't ask if

7   there was a document that would refresh, the witness didn't

8   identify the document.

9              THE COURT:  I'm going to overrule the

10  objection.  Go ahead, Counsel.

11       Q    Does that now refresh your recollection as to

12  whether or not you sent this up to diversity management?

13       A    I believe at that point I had Dep. McAnany get

14  involved with this issue and to the best of my recollection,

15  I told -- or directed him to get statements from the involved

16  employees and to forward them up to Charlie Harvey's office

17  at diversity management.

18       Q    Are you aware if he'd gathered statements?

19       A    That was the direction given, so yes, I'm sure

20  he gave them.

21       Q    Did you review the statements?  Once they

22  were --

23       A    I believe I did review the statements.  He

24  brought the packet over and then he, you know, I had

25  appraised Mr. Harvey of the situation and that letters would

1    be forthcoming on it, that I felt it should be investigated.

2            Q    Did you send the investigative interviews to

3    Mr. Harvey?

4            A    I do not think I did personally, I think Dep.

5    McAnany sent that packet up.

6            Q    Do you know how that was eventually resolved,

7    how her complaint was eventually resolved?

8            A    To the best of my recollection, I believe it

9    was found to be unfounded, the allegations.  Part of that

10   issue was the overtime, and you know, the direction that I

11   had given when I had met with Mrs. Collins and the union

12   official, Officer Bielowicz, was that the overtime would be

13   paid, and that was the direction that I gave.  Now whether it

14   was or it wasn't, I did not follow up on that.  I know --

15   whether it was, I don't know.

16           Q    Now why did you tell him to go ahead and pay

17   her?

18           A    Because of the -- after reading the incident,

19   statement from Mrs. Collins, I can, you know, going back to

20   being a correction officer, I can understand how things

21   happen, and I felt rather than compound the problem, that,

22   you know, that we would pay her the overtime, and that would

23   end the situation, and that was after discussion with Officer

24   Bielowicz.

25           Q    Now she -- within that letter also complains

1  about Sergeant Wright, is that correct?

2          A    Yes, sir.

3          Q    And what, if any, action did you take with

4  regard to Sergeant Wright?

5          A    I believe statements were obtained from him.

6          Q    Did you take any other action?

7          A    No.

8          Q    And why did you not take any other action?

9          A    Because nothing was found, you know, there was

10  no basis to take any action against.

11          Q    Well, if you had a sergeant screaming at a

12  subordinate, would you take action?

13          A    Would I take action?  That would depend upon

14  the situation, having been a sergeant for quite a few years

15  myself and in that capacity as the chart sergeant, no, I, you

16  know, I would have had to actually been there to see how both

17  sides reacted.  I mean, in my opinion, what should have

18  happened, rather than the argument going on, once she was

19  denied that overtime, then it become a grievance issue, and

20  that ended the situation right there.  There was no need to

21  continue going back and forth and that's what they did, it

22  was over with.

23          Q    So they both, would it be -- Withdrawn.

24               MR. KINSEY:  May I approach, your Honor.

25               THE COURT:  You may.

1           MR. KINSEY:  Counsel, this is 24F, I

2    apologize, I didn't put an F on it, it's the last page of

3    Exhibit 24.  This is a letter dated September 28th, 2005.

4    Your Honor, by way of explanation and apology, this came to

5    us as a packet.  My apologies for not breaking it out.

6           Q    You read that letter?

7           A    Yes, sir.

8           Q    You recognize that letter?

9           A    Yes, it's a letter I received back from

10   Charlie Harvey, director of office of diversity management.

11          Q    And what does it reference without reading

12   from the document?

13          A    It referenced the issue with Sergeant Wright

14   and the claims of harassment, they were found to be unfounded

15   by diversity management.

16          MR. KINSEY:  Your Honor, at this time we would

17   move 24F into evidence.

18          MS. CONNOR:  No objection.

19          THE COURT:  It's received.

20          Q    Now, what's the date on that?

21          A    September 28th, 2005.

22          Q    And this event happened in June?

23          A    Yes, sir.

24          Q    The end of June, is that --

25          A    June 26th.

1          Q    Can you, as a superintendent, can you explain

2     to me about why it took some three months to get a response?

3          A    That, I don't know.

4          Q    Did you have anything to do with this

5     response?

6          A    No, once the packet is sent up an

7     investigation is requested, then it's out of my hands.

8          Q    Do you have any way of hurrying up the

9     proceeding?

10         A    No, sir.

11         Q    Do you have any input in the final

12    determination?

13         A    No, sir.

14              MR. KINSEY:  Your Honor, may I approach.

15              THE COURT:  You may.

16              MR. KINSEY:  Thank you.

17         Q    I'm going to show you what's been marked as

18    Plaintiff's Exhibit 18.  Have you reviewed that letter,

19    sir -- sorry, don't mean to rush you, it's okay.

20              MR. ANDREWS:  Excuse me, I'm sorry, your

21    Honor, I didn't quite hear if the number was what I thought

22    it was.

23              MR. KINSEY:  It's Plaintiff's 18.

24              MR. ANDREWS:  Thank you.

25              THE CLERK:  I have P18 as a memorandum from

1    Burge to Penny Collins.

2                    MR. KINSEY:  It's a memo, marked as well?

3                    THE CLERK:  10/2/05.

4                    MR. KINSEY:  Yes.

5                    THE COURT:  Yes.

6          Q    Can you tell us the date of that letter, sir?

7          A    October 2nd, 2005.

8          Q    And who is it from?

9          A    Penny Collins, correction officer.

10         Q    And who is it to?

11         A    It is to me.

12         Q    Did you receive that letter?

13         A    To the best of my recollection, yes.

14                   MR. KINSEY:  Okay.  Your Honor, we'd move this

15   into evidence at this time.

16                   MS. CONNOR:  No objection.

17                   MR. ANDREWS:  No objection, your Honor.

18                   THE COURT:  It's received.

19         Q    Mr. Burge, what does that letter refer to?

20         A    Claims of discrimination and sexual harassment

21   which occur at Auburn Correctional Facility.

22         Q    Are there any individuals named as being

23   guilty of those infractions?

24         A    No, sir.

25         Q    Are there any events named that support those

1    allegations?

2           A    The only thing I seen in there is reference to

3    announcements made at lineup about certain ethnic holidays,

4    that's the only thing I see.

5           Q    And what action did you take, if any, with

6    regard to this letter?

7           A    I -- to the best of my recollection, unless I,

8    you know, seen a document, I would, but based upon my course

9    of action and everything, I would have forwarded this here

10   letter, I would have forwarded it over to Dep. McAnany and

11   requested that he send it up.

12          Q    In the body of that letter, is there any

13   indication about who you should interview?

14          A    No, sir.

15          Q    Is there any indication of who was doing this?

16          A    No, sir.

17          Q    Are there any dates included on when these

18   things happened?

19          A    No, sir.

20          Q    Sir, what date did you leave, if you recall,

21   what date in October did you leave as superintendent?

22          A    13th of October, 2005.

23          Q    Eleven days after this letter?

24          A    Correct.

25          Q    Did you follow up with Dep. McAnany and find

1    out what he did with this letter?

2           A    No, because once you get to your other

3    facility, you got a lot of things to worry about, and in

4    regards to the date that I left, to the best of my

5    recollection, I might even have went prior to that, by using

6    time off.

7           Q    Took a vacation before your new post?

8           A    New headache, yes.

9           MR. KINSEY:  May I approach, your Honor?

10          THE COURT:  Yes.

11          Q    Going to show you what's been marked as D27,

12    it's dated September 13th, 2005, and ask you to take a look

13    at that.  And who is that letter from?

14          A    It's from me to Patrick Reardon, office of

15    diversity management.

16          Q    Do you recall writing that letter?

17          A    Yes.

18          Q    Do you recall sending it?

19          A    Yes.

20          MR. KINSEY:  Your Honor, at this time I would

21    move the letter into evidence.

22          MS. CONNOR:  No objection, your Honor.

23          MR. ANDREWS:  No objections, your Honor.

24          THE COURT:  It's received.

25          Q    What does that letter refer to?

1          A     Refers to the complaint of CO Collins

2   regarding correction officer, or Corrections Sergeant Wright.

3          Q     And to whom is it sent again, I'm sorry?

4          A     To Mr. Patrick Reardon, office of diversity

5   management.

6          Q     And why are you writing to him?

7          A     Just informing him that I had directed Dep.

8   McAnany to follow up with the subsequent reports on the

9   incident and I also advised him of the fact that I had taken

10  care of the correction officer's shirt issue and being thrown

11  into the garbage and that we had had an informal discussion

12  in my office about it.

13         Q     Do you -- can you tell me why it took from

14  late June until September for that to be forwarded to the

15  office of diversity management?

16         A     That, I can't answer that.

17         Q     Were you involved in the delay of sending that

18  in?

19         A     No.

20         Q     To the best of your knowledge, having been in

21  all of these positions, would you send in a packet of

22  interviews before all the interviews were completed?

23         A     No, sir.

24               MS. CONNOR:  Objection, he's leading the

25  witness.

1          THE COURT:  Excuse me.  It is a leading

2   question but I'm going to overrule the objection, go ahead.

3          MR. KINSEY:  Thank you, your Honor.

4      Q    John, can you tell me what happens in most

5   places of employment between the months of -- during the

6   months of June, July, and August, is there some event that is

7   common to most businesses during those months?

8      A    Vacations.  I don't know what you're looking

9   for.

10     Q    That's fair.  That's all, I won't talk

11  anymore.  Now, with regard to this incident, did you take any

12  action against Ms. Collins at all?

13     A    No, sir.

14     Q    You mentioned an informal --

15     A    It was called an informal discussion, it's

16  something that you do not have to document, it's not a, per

17  se a formal counseling session, if it's a formal counseling

18  session, it's a written matter of record that goes into the

19  employee's file and is sent to employee relations.

20     Q    So no -- what you're saying is that there's no

21  record in her file of this informal counseling?

22     A    Not from me, no.

23     Q    Now after that meeting, did you change her

24  duty?

25     A    No, sir.

1          Q     Treat her any differently?

2          A     No, sir.

3          Q     Spread the word that she was a troublemaker?

4          A     No, sir.  In fact, I -- may be out of line but

5     I actually had a liking -- she had a nice personality and,

6     you know, I have no issues with her.

7          Q     Now prior to leaving your post in mid-October,

8     and the letter we discussed, did you have any other

9     conversations with Ms. Collins about any issues at Auburn?

10         A     The only thing that I can recall is Officer

11    Collins came to my office and wanting to discuss something

12    about starting a program, and I cannot -- I have tried to

13    remember what that was about.  She felt that her

14    qualifications, that she could start a program that would

15    benefit the facility, and so that's the only discussion, I

16    don't think we discussed it after that.

17         Q     Did you tell her she couldn't do that?

18         A     No.

19         Q     Did you tell her she could do that?

20         A     No.

21         Q     Do you know if she ever did that?

22         A     I have no idea.

23         Q     Now, we've heard a lot about graffiti and

24    writing on walls in this case.  Did you ever see in your 37

25    and a half years as working for corrections, you ever see

1    graffiti in bathrooms?

2            A    A library full.

3            Q    Were all of them about women?

4            A    No, definitely not.  In fact I used to enjoy

5    going down and reading about myself.

6            Q    You were a target as well?

7            A    Oh, I was a great target in a lot of

8    facilities.

9            Q    And were you offended?

10           A    No, that goes with the territory, it goes with

11   the environment that you're in.  You know, you gotta remember

12   one thing, you get into these max jails, you're not going to

13   church.  You got an element that is worse than anything that

14   is in society.  I mean you're dealing with people that would

15   kill you as soon as look at you.  You got people, I've seen

16   in my career, and you know, some of it is gross and I don't

17   mean to offend anybody, but there's been incidents in my

18   career where Auburn, an inmate had an altercation with

19   another inmate over sneakers, that inmate waited till

20   dinnertime in the mess -- facility mess hall with it full,

21   that inmate decapitated the inmate's head, took it by the

22   hair, came out, into the mess hall with all the inmates there

23   and all the staff there, and rolled it on the ground.

24                Cases of inmates cutting their penises off,

25   cutting their testicles off, riots.  I've -- in my career, I

1    was involved, in the early days they never called them riots,

2    it was always an altercation, but in the future times they

3    started calling them riots and I was probably involved in,

4    over my career in about, oh, 25 riots, where you see staff

5    members literally assaulted, stabbed, cut.  Southport riot,

6    1991, the inmates took over six correction officers hostage,

7    a half hour into the hostage situation, the inmates called me

8    over to the window, I was lieutenant at the time, they would

9    not talk to nobody but me, called me over to the window,

10   says, Lieutenant Burge, you can open the side door, we got

11   Officer White here, we think he's dead.

12        Q    Now how does that compare to reading about

13   yourself in the bathroom?

14        A    There's no comparison.

15        Q    Now, the locker rooms at Auburn, did you make

16   any attempts to have his and her locker rooms?

17        A    Did I make an attempt?

18        Q    Yes.

19        A    Numerous attempts.  When I got to Auburn as a

20   first dep., as I said, I made rounds.  In my rounds, I tried

21   to get down there at least once a week into that area, the

22   place was a filthy pigsty, and it was no different than most

23   maximum security facilities.  And I'm talking about my home

24   facility, Elmira, was as deplorable as worse, I mean

25   graffiti, garbage.  So when I got to Auburn as first dep., I

1    kind of took that on as a project to make sure that it was

2    swept daily, cleaned daily, or mopped daily, garbage taken

3    out, stuff on the walls removed.  That continued.  I did not

4    stop that.  The lockers were antiquated, half of them didn't

5    work.

6              Q    Why didn't you just fix them?

7              A    I attempted each year, you have what is

8    called, you know, you have a meeting with your facility

9    operations people from Albany, and I requested each year to

10   have the facility locker rooms remodeled.  Every time I had

11   somebody come in that I thought would listen to my complaint

12   about the locker room, along with the rest of the jail,

13   believe me, it wasn't just the locker room, Auburn is like

14   all maximum security jails in New York State, they were

15   falling apart.

16             Q    When was Auburn built?

17             A    Sorry you asked that.  It's the oldest

18   correctional facility in the country, I believe.  Goes back

19   to early 1800s.

20             Q    Wow.  Did you have any luck getting money to

21   fix it?

22             A    Just before I left, I hit pay dirt and I

23   believe I was given 80 lockers, brand new lockers, and I had

24   them put in.

25             Q    For 300, or 400 plus officers?

1          A     Four hundred officers.  But I made every

2     request to have it taken care of.  And you know, there's only

3     so much taxpayer money to go around and when you got security

4     issues, they're gonna have priority, and the jail had a ton

5     of security issues.

6                    MR. KINSEY:  Thank you, your Honor, no more

7     questions.

8                    THE COURT:  Because he's a defense witness,

9     Mr. Andrews, I'm going to ask you first if you have any

10    questions.

11                   MR. ANDREWS:  I have no questions, your Honor.

12                   THE COURT:  Okay, then Ms. Connor, would you

13    like to cross?

14                   MS. CONNOR:  Yes, I would, your Honor, I would

15    ask the court's indulgence, if we could take a very short

16    personal break.  I'm sorry.

17                   THE COURT:  Yeah.

18                   MS. CONNOR:  Thank you.

19                   THE COURT:  We'll -- five, ten minutes.

20                   MS. CONNOR:  Yes.

21                   THE COURT:  Okay.  Five, ten minutes, please

22    don't talk about it, discuss it.

23                   (Whereupon a recess was taken from 2:13 p.m.

24                    to 2:19 p.m.)

25                   (Open Court, Jury Out.)

1            THE COURT:  Ms. Connor, you all set?

2            MS. CONNOR:  I am, thank you, your Honor.

3            THE COURT:  We're going to bring the jury out

4    then, if everyone wants to get ready.

5            THE CLERK:  Mr. Kinsey, I just want to

6    confirm, you only put F in, D24.

7            MR. KINSEY:  Yes, of the 24 packet, A was

8    simply to refresh, did not enter it.

9            THE CLERK:  I just want to confirm because

10   that's all I've got and that's all Jodi had, so --

11           MR. KINSEY:  Yes.

12           (Jury Present, 2:20 p.m.)

13           THE COURT:  See, ladies and gentlemen, one way

14   or another, jury duty's good for you, just by the mere up and

15   down of exercise back and forth.

16           The record should reflect we have all the

17   ladies and gentlemen of the jury, plaintiff, plaintiff

18   counsel, defendants and defense counsel.  Ms. Connor,

19   cross-examination.

20           MS. CONNOR:  Thank you, your Honor.

21           CROSS-EXAMINATION BY MS. CONNOR:

22    Q    Mr. Burge, we've met previously in this case.

23    A    Yes, ma'am.

24    Q    Now, you testified that you -- when did you

25   first meet, rather than -- paraphrase, when did you first

1    meet Penny Collins?

2            A    I believe it was when she came into the

3    facility.

4            Q    And how?

5            A    As, you know, as a transferring officer.

6            Q    What type of meeting was that?

7            A    Meeting is very informal, all the new

8    employees are brought in, you know, they sit down, I shut the

9    door and I have a conversation with them.

10           Q    It was in a group then?

11           A    Yes.

12           Q    Of a lot of the new transfers, they had come

13   in; were they new transfers or transfers?

14           A    Transfer officers.

15           Q    About how many were in that group?

16           A    You're asking a lot.  I'll guess, seven or

17   eight and it's a guess, I can't recall.

18           Q    Were they all from the same facility?

19           A    Not to my recollection, no, different

20   facilities.

21           Q    It's a group of officers who are transferring

22   into Auburn from various facilities around the state, isn't

23   that right?

24           A    Yes, ma'am.

25           Q    Did you have any personal conversation with

1    Ms. Collins in that meeting?

2            A    No, I think all statements were with the

3    group, you know, I very seldom would, I don't think I've ever

4    knew people coming in unless they were somebody from my

5    hometown or something and I knew them personally, yeah, I'd

6    talk to them.

7            Q    But you don't remember any conversation with

8    Ms. Collins in that meeting, right?

9            A    No.

10           Q    Now, do you ever, did you -- isn't the next

11   time when you met Ms. Collins when she requested a meeting

12   with you concerning rumors spreading about her around Auburn?

13           A    She did come to me and -- about that, I

14   believe it was something to do with Sergeant --

15           Q    Sergeant Connors?

16           A    Sergeant Connors, I believe it was.

17           Q    And she initiated a meeting with you,

18   conversation because she had these concerns, isn't that

19   right?

20           A    I believe, yes.

21           Q    Yes.  And you met -- do you recall where you

22   met with her?

23           A    I believe it was my office.

24           Q    And in this meeting, didn't she voice her

25   concerns that she -- that there were rumors spreading around

1    Auburn that she had transferred from another facility and

2    that the rumor was that she was an administrative transfer,

3    isn't that right?

4            A    I do not recall that, no.

5            Q    Well, do you have any recollection about what

6    the nature of the rumors are that she sought to bring to your

7    attention?

8            A    The rumors, she told me there was rumors being

9    spread by Sergeant Connors, is it?

10           Q    Connors.  I remember that one because of my

11   name.

12           A    We're doing good.  All right.

13           Q    It's close enough, yes?

14           A    That Sergeant Connors was spreading rumors

15   about her in relationship to something at another facility

16   that they both were at.

17           Q    And didn't she tell you that the rumors

18   consisted of -- that she was suing people at her former

19   facility at Sullivan, isn't that right?

20           A    No, I do not recall that, no.

21           Q    Well, you have any recollection whatsoever

22   about what the nature -- any more detail about the nature of

23   these rumors?

24           A    The only recollection was Sergeant Connors was

25   spreading rumors about her.  I do not recall what the rumors

1    were.  I don't recall what she said.

2         Q    Would it be of concern to you if there was a

3    sergeant who was spreading rumors about a new officer coming

4    into a facility and that those rumors were that the officer

5    had an administrative transfer because she was suing people

6    at her old facility; would that be of any concern to you?

7         A    Would it be a concern?

8         Q    Yes.

9         A    Yeah, being the type of person I am, yes, it

10   would have been a concern and I -- yes.

11        Q    Did she tell you that she thought she was

12   being harassed by Sergeant Connors, in the rumor spreading?

13        A    I do not recall her telling me she's being

14   harassed.  As I stated, I do recall her telling me about the

15   rumors and she was upset because she felt Sergeant Collins --

16   or Connors was spreading these rumors.

17        Q    Now, for what you do remember of this meeting,

18   do you recall whether you did anything?

19        A    I believe I told her put it in writing.

20        Q    Did you take any other action with respect to

21   this?

22        A    I believe I had, after I -- I think I got, I

23   received the letter, best of my recollection, and we started

24   the process.

25        Q    Now what process are you referring to?

1      A     With the investigation or obtaining a letter

2  from Sergeant Connors and then her statement and I believe

3  contact was made with diversity management.

4      Q     But you're not sure of that?  You keep saying

5  you believe, so --

6      A     No, because I believe --

7      Q     You're not sure?

8            MR. KINSEY:  Please let him speak.

9      A     What date?  You know, it might help my

10  recollection if I knew what date you were talking about.

11     Q     I'm talking right after.

12     A     After she got there?

13     Q     She arrived at Auburn.

14           THE COURT:  Do you have a date?

15     Q     Shortly thereafter.

16           THE COURT:  Do you have a date?

17           MS. CONNOR:  Well, I'd like to see what the

18  witness -- you don't recall?

19     A     No, I don't recall.

20     Q     2004?

21     A     No.

22     Q     You don't recall.  Now, do you recall her

23  telling you about how her picture was defaced, photograph,

24  any recollection of that?

25     A     No, I don't.  Could I make a statement on

1    that?

2                    THE COURT:  You have to wait until she asks a

3    question, your counsel can redirect.

4         Q    Did she show you a picture of herself defaced,

5    any photocopy or anything like that of a picture?

6         A    No, I do not recall that, ma'am.

7         Q    Now, you testified that when you first came to

8    Auburn, you -- or at some point when you came to Auburn, I'll

9    put it that way, not exactly sure of the date, when you were

10   first deputy superintendent, you had some diversity program

11   under you, was that right?

12        A    Yeah, first deputy superintendent, you have

13   numerous areas of responsibility, assignments that you're

14   responsible for.  You don't sit in all the time with the

15   people --

16        Q    My question -- I understand, I'm not asking

17   you about sitting in, my question is just whether this

18   program was under you.  And did you have some -- is your

19   answer to that question yes?

20        A    Yes, ma'am.

21        Q    Did you have any occasion to interact with

22   that cultural diversity program?

23        A    The best of my recollection, I would

24   periodically, and I'm not saying I would go into every

25   meeting but when they had a meeting, I would drop by, yes.

1    It was not my responsibility, I wasn't directly responsible

2    to be in the meetings, no.

3            Q    Well, on your -- in direct examination you

4    said that the main function was to address problems with

5    employees, I think, said attempt to have a harmonious

6    relationship; was that of concern to you, that the officers

7    would have a harmonious relationship?

8            A    Of course.

9            Q    And is that a concern in part because of

10   security issues?

11           A    Is it -- yes, I mean people working together

12   makes the job easier.

13           Q    Absolutely right.

14           A    Simple.

15           Q    Not only easier but safer, isn't that right?

16           A    Correct.

17           Q    And isn't it -- would it be of concern to you

18   to know that an officer felt unsafe with her fellow officers

19   because she felt like they wouldn't back her up, would that

20   be of concern to you?

21           A    Let me state it this way.  In my 37 and a half

22   years experience, and most of it has been in maximum security

23   facilities, I have never witnessed any employee --

24           Q    That's not --

25           A    Excuse me, may I finish?

1      Q    Sir, I'm sorry, it's not my question.

2           THE COURT:  Let him finish his answer, please,

3      and then you can ask another question.  Let him finish.

4      A    I have never witnessed an employee, correction

5      employee, move away or not respond to another correction

6      officer or employee in trouble.  Never.

7      Q    My question, sir, is would there be concern to

8      you if someone had the fear that that would happen; wouldn't

9      that affect the security of the facility?

10     A    Would it affect it with me?

11     Q    Yeah, would -- if that were occurring among

12     the officers, or between any officers, wouldn't that be of

13     concern to you?

14     A    If that was a fear to someone, you know, yeah,

15     I would talk to them, I'd address it to them.

16     Q    Now, isn't it true that this cultural

17     diversity group that you supervised, their main function was

18     not to investigate, isn't that right?

19     A    Correct.

20     Q    Their function was more to train at the

21     facility, isn't that right?

22     A    It was to train and if there was an issue,

23     bring it, serious issue, bring it to the attention of

24     someone, yes.

25     Q    Now, you also testified concerning an incident

1    where Ms. Collins brought to your attention about verbal

2    abuse by Sergeant Wright on June 26th, 2005 in a memorandum

3    there, it's Plaintiff's 15; do you have that in front of you?

4            A    What was that date again, ma'am?

5            Q    It is June 26th, 2005.

6            A    Yes, I have it in front of me.

7            Q    You have that in front of you.  Now, there's a

8    lot of detail in this, wouldn't you agree?

9            A    Quite a bit of detail.

10           Q    Yeah.  And you testified that she was

11   concerned about overtime, isn't that right, that there was --

12           A    That was one of the issues, was the overtime.

13           Q    Now, if you look at this, Plaintiff's

14   Exhibit 15, is there anyplace in this exhibit where she

15   actually requests the overtime?

16           A    (Reviewing document.)

17           Q    She doesn't, does she?

18           A    (Reviewing document.)

19           Q    Isn't it true that the overtime was just

20   part -- one point of this overall interaction with Sergeant

21   Wright?

22           A    Yes, ma'am.

23           Q    That to her was discriminatory, embarrassing,

24   humiliating, isn't that right?

25           A    No.  To me --

1          Q     Isn't that what this raises?

2          A     Huh?  No, it's not discriminate -- you're

3    asking me whether it's discriminatory?

4          Q     I'm asking whether she told you it was

5    discriminatory.

6          A     I'd have to reread that, ma'am.  Yes, that was

7    part of it.

8          Q     That's right.  And the overtime really was not

9    Ms. Collins' issue, isn't that right, the issue was how she

10   was being treated, correct?

11         A     Well, to my understanding the issue was when

12   she went in, back into the chart office and requested the

13   overtime, that's when the alleged harassment or verbal

14   discussion between both parties --

15         Q     That's right.  And the issue to Ms. Collins in

16   her memo and discussions with you was not the overtime, it

17   was how she was being treated, isn't that right?  How a

18   sergeant treated her, correct?

19         A     No, I believe, you know, that I had received a

20   grievance from the union about -- and they had come to me

21   about the overtime issue.

22         Q     That's the union, I'm talking about the

23   plaintiff, Ms. Collins.

24         A     They represented her and she went to the

25   union.

1          Q    But I'm talking about Ms. Collins and

2     you're -- in this memorandum and when you met with

3     Ms. Collins, her concern was really about her treatment,

4     wasn't that correct?

5          A    That was one of the issues, yes.

6          Q    Now do you see -- I direct your attention to

7     the exhibit, Plaintiff's 15 which is June 26, 2005.  I direct

8     your attention to page 4 in that exhibit, second paragraph

9     from the bottom.  Do you see that?

10         A    Where it says Sergeant --

11         Q    I believe Sergeant Wright, do you see that?

12         A    Yes.

13         Q    Page 4, second paragraph from the bottom.

14         A    All right.

15         Q    Now that says, "I believe Sergeant Wright made

16    the comment about spelling his name right, because of the

17    rumors that were circulating that I had brought suit against

18    people in the department, all which of were false, at my old

19    facility."  Isn't that right?

20         A    That's what it reads, yes.

21         Q    So they did tell you what the rumors

22    concerned, right, isn't that correct, right here, you have it

23    in the memorandum in front of you?

24         A    That's what's written there, yes.

25         Q    Now, you testified on direct examination that

1    you believe you ordered the seven minutes of overtime to be

2    paid?

3            A    Yes, I believe I gave direction on that.

4            Q    And do you recall giving a deposition at my

5    office on March 13th, 2009 in this matter?

6            A    Yes, I did.

7            Q    And in that deposition, do you recall being

8    asked whether you did order the overtime with respect to

9    Sergeant Wright, that incident with Sergeant Wright, do you

10   recall being asked that question?

11           A    I don't recall, but if it's in my disposition,

12   then it was asked.

13           Q    Well on page 60, line 21, it's -- the question

14   was, begins, "Did you take any actions concerning the

15   plaintiff's complaint against Sergeant Wright?

16               "Answer:  I cannot recall what I did on that,

17   I really can't.  I don't remember if I directed the captain

18   to get a statement from Wright or not, I can't recall that."

19               Do you remember that?

20           A    If that's what it states, then that's what I

21   said at that time.

22           Q    And do you recall saying that you could not

23   recall whether you ordered the overtime with Sergeant Wright?

24           A    Once again, if that's what's in there, that's

25   what I said at the time, I'm not denying that I said it.

1          Q     So what made you recall it between then and

2    now?

3          A     Well, if I -- no disrespect, but if I could

4    explain why my mind acts the way it does and I remember

5    things at times, I don't know, you know, believe me, I have

6    or had at that time, you know, there's a lot of things on

7    your mind.

8          Q     And wasn't 2009 closer to the incident than

9    2012, when you had the deposition, wasn't that closer to the

10   incident than 2012 is?

11         A     No disrespect once again, but when you leave

12   the correctional field, and maybe it was only two years, but

13   the minute you walk out that door, you try to forget

14   everything that you know about corrections, and I did.

15         Q     Did you ever review any pay stubs, document,

16   payroll record, anything concerning that overtime to the

17   plaintiff?

18         A     No, ma'am.  As I told you, I directed that to

19   be taken care of.

20         Q     But since -- but you said no, but since this

21   lawsuit was filed, have you ever reviewed any such documents?

22         A     No, ma'am.

23         Q     Now you testified on direct examination that

24   you occasionally made rounds in the facilities, I'm just

25   going to refer to Auburn for the purposes of our questions.

1    Do you recall making rounds around Auburn?

2              A    Do I recall?

3              Q    Yeah.

4              A    Yeah, a lot.

5              Q    And you did it in different capacities, isn't

6    that right, according to your testimony?  As a deputy

7    superintendent and then a superintendent, did you do it when

8    you had those positions?

9              A    I did it as first deputy superintendent and

10   superintendent, yes.

11             Q    And are you familiar with the term trip call?

12             A    Yes, ma'am.

13             Q    What is that?

14             A    That is where in most cases a supervisor is

15   making a round, staff are alerted either by a phone call,

16   radio communication, things of that nature.

17             Q    And they're alerted to what, here comes the

18   brass, here comes a supervisor?

19             A    White shirt is walking, white shirt is

20   walking, the man is coming.  Even -- believe it or not the

21   inmates even holler it out.

22             Q    I believe it.  I believe that.  Most

23   definitely.  So you probably participated in that at some

24   point when you were a CO, isn't that right?

25             A    Did I?

1      Q    You probably did, right?

2      A    You want me to lie?

3      Q    No, I do not want that.

4      A    No.

5      Q    I do not want to elicit any lie from you.

6      A    Yes.

7      Q    It's common practice, isn't it?

8      A    It's common in a facility, yes.

9      Q    Don't you think that that would give white

10    shirt an inaccurate perception of what is really going on in

11    a facility, the trip calls?

12         A    Not -- I'd have to disagree.  Not if you're a

13    person of experience, and you're going into areas, no.

14         Q    A person of experience, you mean somebody who

15    came up through the security ranks?

16         A    Somebody that's come up through the ranks,

17    somebody that knows their job, knows their surroundings.

18         Q    Because they would be aware, they probably did

19    it too when they were young or back then?

20         A    They've done it but I used to have a trick for

21    them, I would double back the other way after I left and come

22    through another door.  They used to say, he's coming out of

23    the toilet next.

24         Q    Well, they were wise to you then, right, after

25    awhile, the trip call didn't work?

1          A     They knew I was coming, they knew I was

2    coming.

3          Q     They knew you were coming, that's right.  Now,

4    I'd like to direct your attention to this incident about the

5    shirt that you testified about.

6          A     Yes, ma'am.

7          Q     Now, did you come to learn from any source

8    that the shirt had been -- what shift was Ms. Collins on when

9    she discarded the shirt?

10         A     The best of my recollection was afternoon

11   shift.

12         Q     Afternoon shift gets out what time?

13         A     That depends.  It could be the 2 to 10, could

14   be the 3 to 11, there's, you know, 1 to 9 shifts.

15         Q     So it would be -- let's take your first

16   example, 2 to 10, it's 2 p.m. to 10 p.m., isn't that right?

17         A     Yes, ma'am.

18         Q     Now, you had an understanding that Ms. Collins

19   threw the shirt away at the end of her shift, isn't that

20   right?

21         A     Yes, that was my understanding.

22         Q     On her way out of the facility after the

23   shift?

24         A     Correct.

25         Q     There's no allegation she abandoned her post

1    or anything like that, it's after the shift?

2            A    No, ma'am.

3            Q    And that would be approximately 10 p.m., isn't

4    that right?

5            A    If that's the shift time she was working, yes.

6            Q    If she was working.  And you said, you

7    testified you thought she was working the afternoon shift?

8            A    That's all I have.

9            Q    So I said approximately, is that fair?

10           A    Yeah.

11           Q    Now at 10 p.m. there are not inmates wandering

12   around, are there?  There's no inmates, they're all locked in

13   for the night, isn't that true?

14           A    At that time period, yes.

15           Q    So there's no possibility that an inmate's

16   going to go take that out of the trash at 10 p.m., is there?

17           A    No, but there's a real reality that at --

18           Q    I just asked you that one question --

19           A    -- 9:00 --

20           Q    -- about whether at 10:00, there was a

21   possibility an inmate would remove that from the trash; your

22   answer to that is?

23               THE COURT:  Ms. Connor.  Ms. Connor, I can

24   appreciate what you're trying to do but I would ask you not

25   to talk at the time the witness is talking.  Let him finish

1    his answer, and then you can ask him another question.  I

2    don't want two people talking at once, please.

3                    MS. CONNOR:  Thank you, will do, your Honor.

4                    THE COURT:  All right.

5         A    The shirt being in there at 10:00 at night was

6    not the real security issue right at that time, no.

7         Q    And were you made aware of the fact that

8    Ms. Collins came back into the facility and, to be sure her

9    shirt was not in the trash, did you learn that at some point?

10        A    I believe that was part of the statement, that

11   she attempted to -- or came back in, I don't know for sure.

12        Q    You have no reason to doubt that, though, do

13   you?

14        A    No.

15        Q    Now, I would direct your attention, Mr. Burge,

16   to Defendant's Exhibit 27 which I believe you have in front

17   of you.  It's a memo from yourself to Patrick Reardon of the

18   office of diversity management?

19        A    Yes, ma'am.

20        Q    Dated September 13, 2005, are we there?  Okay.

21   And this memo says at the bottom -- would you first agree

22   that this memo is concerning Ms. Collins' shirt?

23        A    Yes.

24        Q    And you state in the memo that, middle, second

25   paragraph, Officer Collins stated in her memorandum that she

1    did do this so she was owning up to it, isn't that right?

2            A    Yes.

3            Q    And went back into the facility to retrieve

4    her shirt, see that, it's in there?

5            A    Yes, ma'am.

6            Q    And when she observed Lieutenant Ouimette

7    remove it from the can, do you see that?

8            A    Yes, ma'am.

9            Q    So there was no question there of that shirt

10   being unattended, isn't that right?

11           A    I don't know that, I wasn't there, ma'am.

12           Q    Now, the last paragraph talks about you

13   talking to CO Collins, in the presence of the union, isn't

14   that right, see that?

15           A    Yes, ma'am.

16           Q    Says informal counseling was given by me?

17           A    Yes, ma'am.

18           Q    Now a union representative would be there if

19   there's discipline, isn't that right?

20           A    No, not necessarily.

21           Q    Isn't it true that the union would be there to

22   represent her if you were giving her some sort of discipline?

23           A    The union was there because of the severity of

24   the shirt issue.

25           Q    Because discipline, and you -- that's why the

1    union was there, isn't that right?

2           A    Right.  Not discipline, I didn't -- there was

3    no discipline imposed, I can't impose discipline, that has to

4    be done by labor relations.

5           Q    You have no authority to impose any

6    discipline?

7           A    No, I can't impose discipline by myself.

8           Q    Can you -- can you recommend that to labor

9    relations?

10          A    Yes, I can recommend disciplinary action be

11   taken.

12          Q    And do they usually follow your

13   recommendation?

14          A    I wish they would of, but no.  Not all the

15   times, no.

16          Q    They don't listen to you?

17          A    No, lot of times they don't.  Lot of times you

18   send the material up, and then they make the determination up

19   there.  That's -- once I've done my job, that's the extent of

20   it.

21          Q    And then you said in this memorandum,

22   Defendant's 27, I felt this was done in her alleged

23   frustration and perception that she was being treated

24   unfairly because she's female; do you see that?

25          A    Yes, ma'am.

1      Q    So you acknowledge that she brought issues of

2  discrimination to you, isn't that right?

3      A    On this here issue?

4      Q    What she was complaining about was

5  discrimination, how she was being treated, isn't that

6  correct?

7      A    Could I look at that again?

8      Q    Yeah, go ahead, read it.

9      A    No.  That was part of the issue, which began

10 with the overtime and the confrontation with Sergeant Wright.

11     Q    But this memo says I felt this was done, and

12 that's referring to the shirt, isn't that right, in an

13 alleged frustration and perception that she was being treated

14 unfairly because she's female, isn't -- didn't you write

15 that?

16     A    Yes, but I'm also referring to what was

17 written up above, that it's all part of the incident, part of

18 her feeling like she was being dealt with unfairly by the

19 sergeant.

20     Q    Because she's female?

21     A    Because of the overtime issue which

22 necessitated the argument and the subsequent frustration and

23 throwing it in there.

24     Q    Well, I see there because she is female, do

25 you see that?

1          A     That's what she claimed, yes.

2          Q     No, it says if you look at the beginning --

3          A     I felt that this was done in alleged

4    frustration and perception -- and her perception that she was

5    being treated unfairly because she is a female.  But there

6    was no foundation to base that on, no, not by me.

7          Q     But you said, "I felt," in the beginning of

8    that sentence?

9          A     I felt that was her reasoning for throwing the

10   shirt in there, yes.

11         Q     That's it, thank you.  Now I would also direct

12   your attention, Mr. Burge, to the memo that's been received

13   into evidence, Plaintiff's Exhibit 18, which I think you have

14   in front of you.

15         A     Yes, ma'am.

16         Q     And that's dated October 2nd, 2005, it's from

17   Penny Collins to you, do you see that?

18         A     Yes, ma'am.

19         Q     Now you testified that this is about the time

20   you were leaving the facility and going to your next

21   assignment at Elmira, isn't that right?

22         A     Yes, ma'am.

23         Q     And did you leave this for Superintendent

24   Graham?

25         A     No, ma'am.  What I would have done -- you

1   know, if I receive that, I would have forwarded it over to

2   Dep. McAnany to take care of.

3           Q     Well, you didn't think it was incumbent upon

4   yourself as a superintendent departing to apprise a new

5   superintendent coming in of this issue?

6                 MR. KINSEY:  Objection, foundation.  There's

7   been no testimony about talking to an incoming

8   superintendent.

9                 MS. CONNOR:  Well, I'm asking if he did, if he

10  felt it was incumbent upon himself.

11                THE COURT:  I'll let him answer the question.

12          A     Personally, no.

13          Q     Now I direct your attention to the second

14  paragraph of this memorandum, Plaintiff's 18.  That paragraph

15  begins, the reputation that Auburn has, that of being -- that

16  of not being, rather, female friendly facility, reaches far

17  beyond the confines of the walls at Auburn.  Do you see that?

18          A     Yes, ma'am.

19          Q     So at some point you were apprised that Auburn

20  had that reputation at least by one corrections officer,

21  isn't that right?

22          A     From what this said, yes, it's what it states,

23  that she's claiming there's rumors.  I don't believe in

24  rumors and never did.

25          Q     Well, she said reputation in that sentence, do

1   you see that?

2           A    I have no knowledge of Auburn's reputation in

3   that sense, no knowledge.

4           Q    But you were at least apprised on this date by

5   one CO of that fact, is that right, of a reputation?

6           A    That's what she's claiming in her letter, yes,

7   a reputation.

8           Q    And then she says in the third sentence, "I've

9   been harassed, humiliated, physically touched in a sexual

10  way."  Do you see that?  "And I am reminded by my fellow

11  officers and on one occasion a supervisor," do you see that?

12  I'll finish it, "and I'm reminded by my fellow officers and

13  on one occasion a supervisor that women have no place at

14  Auburn," do you see that?

15          A    Yes, that's in the body of this.

16          Q    Now here you are, you're still the

17  superintendent of Auburn, and you received a memorandum from

18  a female CO that says she's been physically touched in a

19  sexual way; do you -- does that concern you?

20          A    Would it concern me?  Yes.

21          Q    And did it when you read it?

22          A    Yes, that's why I forwarded it over to Dep.

23  McAnany to start the investigation.

24          Q    And then she said, "I consider the environment

25  that I work in hostile, more so from those who wear blue

1    uniforms than from the potential hostility of those in

2    green."  Now who wears a blue uniform at Auburn?

3              A    Correction officers.

4              Q    And who wears the green uniform?

5              A    Inmates.

6              Q    Then the next paragraph she said, "I would

7    like to point out that it is not only female security staff

8    but civilians as well who deal with these problems," so

9    wouldn't you agree she's bringing to your attention that it's

10   more than just herself trying to apprise you of the problems,

11   isn't that right?

12             A    Can I address it?

13             THE COURT:  You can respond, yes, sir.

14             A    Yes.  Yes, any complaint by any staff I took

15   serious.  Excuse me, ma'am, now --

16             MS. CONNOR:  He answered the question, your

17   Honor.

18             THE COURT:  Let him finish his answer, you can

19   ask follow-up questions.  Let him finish, please.  Go ahead,

20   sir.

21             A    But an investigation has to be started.  You

22   have nothing to go on in this other than allegations by the

23   complainant.  There's no names in there, there's nothing to

24   go on.  You have to start an investigation.

25             Q    You were asked on direct examination about

1    this memorandum and you said it didn't cite specifics if I

2    recall.  You gave testimony to that effect.  But the few

3    specifics it did cite you recalled such as things that

4    happened on various parade days, lineup, that type of thing

5    but doesn't this tell you that she has been physically

6    touched in a sexual way?  You did not mention that, as a

7    specific incident, did you, in your direct examination?

8         A    Yeah, but --

9         Q    You left that out?

10        A    But I don't recall that being asked to me and

11   I didn't bring it up, no.

12        Q    Well, you were asked about what types of

13   incidents, what this informed you about and you said it was

14   general except you remembered a few specific incidents about

15   something that happened at lineup, and -- but you didn't

16   remember that a female corrections officer had told you she

17   had been physically touched in a sexual way and that she was

18   told that women have no place at Auburn; that just skipped

19   your mind, didn't it?

20        A    Did it slip my mind?  No, it didn't slip my

21   mind, ma'am, it was an oversight, and, you know, is it a

22   concern?  Yes, it's a great concern.

23        Q    And it should be, shouldn't it?

24        A    Any type of misconduct of any nature concerned

25   me.

1    Q    Now, you testified about all kinds of

2  interesting graffiti on the walls that you saw.  Now, most of

3  this graffiti, where was this graffiti located -- let me ask

4  you this.

5    A    Graffiti is located in a correctional

6  facility, especially a max facility, you could find it

7  anywhere.  Anywhere in the facility.  You'll find it in the

8  housing units of the inmates, in the back of the blocks, you

9  find it anywhere.  Anywhere there's a wall, anywhere somebody

10  can write.

11    Q    And you would also find it in bathrooms and

12  locker rooms used by corrections officers, isn't that right?

13    A    Yes, I think I stated that.

14    Q    And did you undertake any sort of campaign or

15  corrective action with regard to all this graffiti all over

16  the place or is that just how corrections is, that's jail?

17    A    No, no.

18    Q    You didn't do anything, did you?

19    A    Yes, I did, I had that place cleaned every

20  day, I had it mopped, garbage picked up, I had walls painted,

21  so yes, I did a lot, I tried.

22    Q    You had the walls painted daily, is that your

23  testimony?

24    A    Not daily.  Come on, we got to be realistic

25  here too.

1          Q     We do have to be realistic.

2          A     I had it when I went down there and

3     discovered -- I was not down there every day looking at the

4     walls.  When I made rounds, if I found graffiti, I found

5     graffiti in the upper area right where the supervisors set on

6     the walls about myself and the deputy superintendent.  And I

7     had that painted.  I had the cellar painted.

8          Q     Didn't you see graffiti about female officers

9     when you were making these inspections and rounds?

10         A     I did not stop and read whether it was female,

11    male, what, all I know there was graffiti on the walls, I

12    admit to that, and I took corrective action, what I could,

13    other than having a new locker room built and someone put

14    down there to guard everybody from writing on the walls.

15         Q     Yeah, how would a new locker room prevent

16    graffiti?  A wall is a wall, right?

17         A     Well, my feeling, and I addressed it to Albany

18    is maybe if they had something brand new, that they would

19    take care of it, it would be a different atmosphere.  Now you

20    know I come up here this morning on 81 and pulled into the

21    rest stop and went in, used the bathroom there, there's

22    graffiti all over the walls.

23              MS. CONNOR:  This is nonresponsive, your

24    Honor.

25              THE COURT:  He's trying to answer your

1    questions.

2              MS. CONNOR:  I understand that, but we're

3    trying to get through the cross-examination.

4              THE COURT:  Go ahead, ask your next question,

5    please.

6         Q    Now you say you didn't stop and look at it,

7    you only looked at the graffiti concerning yourself, you seem

8    to be very aware of that, but you didn't look at any graffiti

9    concerning females, is that your testimony?

10        A    I'm saying that I did not stop and look and

11   memorize, it's about everybody, graffiti, there's walls, is

12   about all employees, anything that anybody can write, which

13   they think they can get a reaction out of somebody, they're

14   gonna put it on the wall.

15        Q    Including females, isn't that right?

16        A    I just stated that, ma'am, male, female,

17   superintendent, don't matter.

18        Q    And some of that graffiti had sexual content

19   about female officers; would you agree with that?

20        A    Along with male officers.

21        Q    But would you agree that it had sexual content

22   about female officers?

23        A    Yes.

24        Q    And did that concern you, any sexual content

25   on the wall?

1          A    Yes, and also about male officers written on

2     there, that's why it was removed.

3          Q    Because of the males?

4          A    Because it was male and female.

5          Q    Now you testified on your direct examination

6     about a conversation you recall with Penny Collins when she

7     came to your office about starting up a program or something

8     like that is the best of your recollection at that time, is

9     that right?

10         A    Yes, ma'am.

11         Q    And wasn't it -- isn't it true that she came

12    to you to ask if there could -- she could be an EAP

13    coordinator or there could be an EAP program to help the

14    officers at Auburn?

15         A    I do not recall that, ma'am, because there is

16    an EAP program in Auburn.

17         Q    Didn't she ask you to be an EAP coordinator?

18         A    I do not recall that.

19         MS. CONNOR:  I have no further questions of

20    the witness at this time, your Honor, thank you.

21         THE COURT:  Thank you.

22         REDIRECT EXAMINATION BY MR. KINSEY:

23         Q    John, you were going to try and clarify your

24    answer with regard to her picture that was defaced.  Do you

25    recall that?  You started to answer it, did you ever see that

1    picture?

2         A    I do not recall seeing that picture.  What I

3    do recall is numerous times, employee, new employees

4    specifically, entering a facility, I periodic -- I would

5    check that area, too, you would find the pictures defaced,

6    and that was just not female, that was anyone.

7         Q    Why would -- do you have any idea why that was

8    done?

9         A    Why?  To have fun.  When I went back to Elmira

10   as a superintendent, my picture was defaced.  The only

11   problem with it, I didn't have a real problem with it but my

12   nose was about six inches longer than it was and twisted more

13   to the side.  You know, I mean, you know, this is, you know,

14   it's humor, and you know, to some people it's not humor,

15   other people it's humor.

16        Q    Now this whole shirt incident, was Ms. Collins

17   ever disciplined because of it?

18        A    No, sir.

19        Q    She ever suffer -- did you ever treat her

20   differently because of it?

21        A    No, sir.

22        Q    You indicated that you thought she was

23   frustrated and thought it was because she was a female, you

24   recall you talked about that letter where you'd written that?

25        A    Yes, ma'am -- or yes, sir.

1        Q    Thanks.

2        A    Sorry.

3        Q    That's okay.  Do you recall why you put that

4   in there, how you noticed that that was part of her

5   complaint?

6        A    I put it in there because I felt that, you

7   know, the issue started with the overtime, and the subsequent

8   alleged argument between the two of them, the discussion, led

9   to the frustration, the frustration led to her taking her

10  shirt off and throwing it in the garbage.

11       Q    Was there ever any allegation that Sergeant

12  Wright said anything about her gender?

13       A    No, not to my knowledge, no.

14       Q    Was there ever any indication that Sergeant

15  Wright said something sexual?

16       A    Not to my knowledge.

17       Q    Now, you were asked about the event with

18  Sergeant Collins [sic].  Were you involved in that, if you

19  recall?  I'm sorry, Connors, my apologies, Counselor, I

20  should have remembered the name.  Were you involved with the

21  incident with Sergeant Connors?

22       A    My only involvement was, you know, having,

23  giving direction that there be an investigation started.

24  Sergeant Connors did approach me about it, I told him that

25  there was an ongoing investigation, that he'd be contacted

1    for a statement.

2              Q    Did you ever find out if he gave a statement?

3              A    At that point, no.

4              Q    Did you ever find out that he gave a

5    statement?

6              A    No.  Once I turned that part of it over to --

7    I believe it was Dep. McAnany, no, I did not.

8              Q    Did you ever learn that Sergeant Collins [sic]

9    filed a complaint as well, did you ever learn that?

10             A    Sergeant Collins?

11             Q    Sergeant Connors filed any sort of complaint.

12             A    No, I'm not, I wasn't aware of that.

13             Q    What happens if you catch someone writing

14   graffiti, one of your officers?

15             A    You would probably, and I'm saying, you know,

16   you could do, you could bring them up on charges for it, or

17   you could just handle it informally, you know, address it

18   with him, tell them not to let it happen again, tell them get

19   a scrub brush, scrub it off, and so on and so forth, you

20   know.

21             Q    Was this at the top of your worries list as a

22   superintendent?

23             A    No.

24             Q    Why not?

25             A    No, not when you've got the amount of inmates

1    that are in a max jail and the amount of violence and

2    problems that you have going on, no, it's not the priority.

3    Your priority is the safety and security of not only the

4    staff but the inmates that are under your charge.

5            Q    Now did you, to the best of your recollection,

6    did you keep Ms. Collins from becoming the EPA -- what is it,

7    I'm sorry, EAP coordinator?

8            A    No.

9            Q    Did you have anything to do with whether or

10   not she could join the EAP?

11           A    No, I had no knowledge, I had no knowledge

12   there was even an opening in the EAP.

13           Q    You made trip calls when you were a CO, didn't

14   you?

15           A    You want to know the truth?

16           Q    Yeah.

17           A    No.

18           Q    You never made a trip call?

19           A    (Witness gesturing negatively.)

20           Q    Why?

21           A    Because I did my job, I wasn't worried about

22   being caught doing anything.

23           Q    And these trip calls are to tip -- well, if

24   you know, what's the purpose of these trip calls?

25           A    To alert staff that a supervisor is going to

1    be coming into the area.

2           Q    And why would they need to do that, if you

3    know?

4           A    Why would they know -- they may be doing

5    something they're not supposed to, like laying up in a room

6    reading a newspaper, there's a lot of reasons.

7           Q    Goofing off?

8           A    Yeah.

9           Q    And you never did that?

10          A    Goof off?

11          Q    No.

12          A    You didn't ask that.

13          Q    Make a trip call?

14          A    No, you said trip calls, the goof off --

15          Q    Did you ever goof off?

16          A    I was one of the best.

17               MR. KINSEY:  No further questions, your Honor.

18               THE COURT:  All right.

19               MR. ANDREWS:  Very briefly, your Honor.

20               THE COURT:  Go ahead, Mr. Andrews.

21               RECROSS-EXAMINATION BY MR. ANDREWS:

22          Q    Good afternoon.  You've testified about a

23   number of conversations or several conversations you had with

24   Ms. Collins, is that correct?

25          A    Yes, sir.

1      Q     And you've testified about some correspondence

2  that you received from her?

3      A     Yes, sir.

4      Q     She never raised Troy Mitchell's name to you,

5  did she?

6      A     No, sir.

7            MR. ANDREWS:  Thank you.  No more questions,

8  your Honor.

9            MS. CONNOR:  I have a couple follow-up

10 questions, your Honor.

11           THE COURT:  Go ahead.

12           RECROSS-EXAMINATION BY MS. CONNOR:

13     Q     Now, you were just asked by counsel some

14 questions about these pictures being defaced that we talked

15 about.  What's the purpose of those pictures?

16     A     The pictures of new employees coming in?

17     Q     Yes.

18     A     It's to let staff know that we have these

19 people coming in and, you know, it puts a name with them and,

20 you know, for identification purposes.

21     Q     And that's not the same as a hostage photo?

22     A     No.

23     Q     It's a different set of pictures?

24     A     Yes, it's a new employee.

25     Q     And these pictures are posted where?

1         A      In the case of --

2         Q      New employees' pictures.

3         A      They're located in what's called the upper

4    hall, or -- well, I think it's the upper hall at Auburn,

5    that's an area that's a rather large entry area that leads

6    down into the facility proper.

7         Q      And who goes through this upper hall area?

8         A      Who goes through there?

9         Q      Yes.

10        A      Anybody going down into the facility.

11        Q      Anybody meaning officers?

12        A      Officers, civilians.

13        Q      Anyone entering the facility from the outside,

14   is that right?

15        A      Yes.

16        Q      They would enter --

17        A      Well, it depends, you know, if you're talking

18   about inmate visitors or --

19        Q      Well, I'm asking you, is it -- who would pass

20   by those photos?

21        A      Anybody that had to go down through them

22   doors, but you had to have security clearance, you know, or

23   be an employee to get down through there.

24        Q      Now, you testified it was in fun, I believe.

25   Now what is an administrative transfer?

1          A     Administrative transfer.  It's a transfer that

2     is dictated to by Albany and it could be for numerous

3     reasons.

4          Q     Usually not good reasons, isn't that right?

5          A     No, that's not true.

6          Q     It's really not fun to see administrative

7     transfer written across your face when you go into a new

8     facility if that's not true, wouldn't you agree?  That's not

9     fun?

10          A     I do not believe that's per the criteria to

11     have it put on there, but administrative transfer does not

12     mean that you are being transferred for disciplinary reasons.

13          Q     Or because you're a problem, you could be

14     transferred -- administrative transfer could be because

15     you're a problem, correct?

16          A     No, because if you were a problem and they

17     could justify it, you'd be brought up on charges.

18          Q     If you entered a facility as a new employee

19     and you saw administrative transfer written across your photo

20     as a new employee in that facility, that wouldn't be fun,

21     would it?

22          A     I don't believe it would -- I mean I wouldn't,

23     myself, I wouldn't want that on my photo, I want nothing on

24     my photo.

25               MS. CONNOR:  No further questions, thank you.

1           MR. KINSEY:  Nothing further, your Honor,

2    thank you.

3           MR. ANDREWS:  Nothing further, your Honor.

4           THE COURT:  Sir, you may step down.

5           THE WITNESS:  Thank you.

6           THE COURT:  Thank you, sir.

7           (Whereupon the witness was excused.)

8           THE COURT:  You have another witness you'd

9    like to call?

10          MR. KINSEY:  Yes, call Harold Graham, please.

11          THE COURT:  Everyone okay over there?  Good?

12   Let me know.  I'll look for a break time that's reasonable if

13   you need it so just let me know.

14          THE CLERK:  Good afternoon.  Can you state

15   your full name, spell it for the record, please.

16          THE WITNESS:  Harold Daniel Graham,

17   G-r-a-h-a-m.

18

19          H A R O L D   G R A H A M , called as a

20   witness and being duly sworn, testifies as follows:

21          <u>DIRECT EXAMINATION BY MR. KINSEY</u>:

22       Q    Superintendent, I'm not going to give you a

23   choice, I'm going to call you superintendent because you

24   still are, is that all right?

25       A    How about preretired?

1          Q      Can you tell us how long you worked in --

2    where do you currently work?

3          A      Auburn Correctional Facility.

4          Q      Department of Correctional Services?

5          A      Yes, sir.

6          Q      How long have you worked for the Department of

7    Correctional Services?

8          A      Thirty-two years.

9          Q      And what year did you begin just so we don't

10   have to do the math?

11         A      April of 1979.

12         Q      And what was your first posting?

13         A      As correction officer, Green Haven

14   Correctional Facility.

15         Q      And how long were you there?

16         A      As a correction officer, from '79 to 1985,

17   which time in 1985, I was promoted to sergeant, I did a short

18   stay at Ogdensburg Correctional Facility, approximately maybe

19   two months.

20         Q      Where is that?

21         A      That's up near the Canadian border, you can

22   throw a rock across to Canada.  And then I went back to Green

23   Haven as a sergeant, I remained a sergeant at Green Haven

24   until I want to believe, I think it was June of 1989, which

25   time I made lieutenant, again, a very short stay at

 1    Ogdensburg, a shorter stay at Marcy, at which time I

 2    transferred to Great Meadow Correctional Facility as a

 3    lieutenant.

 4              Q    What year was that, I'm sorry?

 5              A    I would have went back to Great Meadow in

 6    1989.

 7              Q    How long were you at Great Meadow?

 8              A    I was at Great Meadow from 1989 to 1994 as a

 9    lieutenant.  1994, I was promoted to captain, and I remained

10    at Great Meadow as a captain.

11              Q    Is that common to remain at the same place as

12    a captain?

13              A    Well, I got a hundred on the exam so I was

14    offered any jail in the state, so that was the jail that was

15    open, so I stayed there at Great Meadow.

16              Q    How long did you remain at Great Meadow?

17              A    Remained at Great Meadow from '89 I believe to

18    '94 -- no, no, from '94 to '97.  In 1997 I was promoted to

19    deputy superintendent of security at Coxsackie Correctional

20    Facility.

21              Q    Where is Coxsackie?

22              A    Be located below Albany, couple exits below

23    Albany.

24              Q    Are all of those maximum securities we've

25    talked about?

1       A      Except for the short stays at Ogdensburg and

2  Marcy, that's correct.

3       Q      And what are Ogdensburg and Marcy?

4       A      They're medium security facilities.

5       Q      How do they differ from maximum, just briefly?

6       A      Maximum security facilities are, on the most

7  part they're all cells, single-celled, double-celled

8  facilities, mediums are more dormitory type, more of an open

9  setting facility than a max.

10      Q      And how long were you at Coxsackie?

11      A      I was at Coxsackie until October of 2005,

12 which time I was promoted to superintendent of Auburn

13 Correctional Facility.

14      Q      That's where you still work?

15      A      That's correct.

16      Q      Do you recall what time in October you arrived

17 at Auburn?

18      A      October 13th, 2005.

19      Q      Give us a little bit of your educational

20 background.

21      A      I have a high school, graduate from high

22 school and that's it.

23      Q      Before you joined the Department of

24 Correctional Services, what jobs did you take?

25      A      I was in the Marine Corps, from the Marine

1    Corps, when I got out, I moved to New Orleans, I lived in

2    New Orleans for a few years, I was a firefighter for a

3    private shipyard fighting ship fires.  From there, when I

4    come back home I worked for a vending company for a very

5    short time and then I took the correction officer's exam.

6              Q    Superintendent, prior to trial, did I ask you

7    to review a video cassette, I guess they don't call them

8    cassettes anymore, what do they call them, disk?

9              A    DVD.

10             Q    DVD, thank you.

11             A    Yes, you did.

12             Q    And in that DVD, did you recognize the

13   facilities represented?

14             A    I recognize some of the facilities, yes, I

15   did.

16             Q    Did you recognize any of the people involved?

17             A    I did.

18             Q    Had you served with them?

19             A    Yes.

20             Q    Did you recognize any of the incidents

21   involved?

22             A    Yes, I did.

23             Q    You didn't make this, did you?

24             A    No, sir.

25             Q    Do you know why it was made?

1          A      I believe it was made by NYSCOPBA to get the

2     information out to the public and the various individuals to

3     what really occurs behind the walls inside correctional

4     facilities.

5          Q      Now, as you viewed it, what was your

6     impression about the accuracy of this DVD with regard to the

7     daily environment inside a facility?

8          A      I think it was a well-made video and it really

9     captures, it didn't just stress on the daily stressors, it

10    actually showed every part of an officer's life.  You know,

11    from getting -- in the morning, running them to breakfast,

12    going to the meal, and interview the officers so they can

13    tell their side of the story and the officers, various

14    different officers interviewed, male, female, white, black,

15    Spanish.  So there's different people there being interviewed

16    and then it showed the daily activities of what an officer

17    usually does in the course of their business.

18         Q      Well, did it fairly and accurately represent

19    the environment, the work environment within the Department

20    of Correctional Services?

21         A      Yes, it did.

22              MR. KINSEY:  Your Honor, at this time, I would

23    like to offer this as a demonstrative exhibit, show it to the

24    jury to give them a basis for determining what is a normal

25    environment so they can then determine what may be a hostile

1    environment.

2                    THE COURT:  What is the exhibit number?

3                    MR. KINSEY:  It would be Defendant's 40.

4                    THE CLERK:  That's a plaintiff exhibit,

5    though.

6                    THE COURT:  You want to call it educational

7    video?

8                    MR. KINSEY:  Yes, it's -- yes.

9                    THE CLERK:  D39.

10                   MR. KINSEY:  May we show this to the jury?

11                   THE COURT:  Any objection?

12                   MS. CONNOR:  Yes, I'd like some voir dire on

13   this, your Honor.

14                   THE COURT:  Okay.  Mr. Andrews, do you have

15   any objection?

16                   MR. ANDREWS:  I have no objection, your Honor.

17                   THE COURT:  Okay.  Thank you.

18                   <u>VOIR DIRE EXAMINATION BY MS. CONNOR:</u>

19        Q    Hello, Mr. Graham.

20        A    Good afternoon.

21        Q    Superintendent Graham.  Now you testified that

22   you recognize some of the facilities in this video?

23        A    That's correct.

24        Q    What facilities are those?

25        A    There's Sing Sing, Coxsackie, I believe River

1    View is in there and possibly Mohawk.

2            Q    Auburn's not in there, is it?

3            A    I don't believe Auburn is.

4            Q    Sullivan's not in there, is it?

5            A    I don't believe so.

6            Q    Eastern isn't there either, right?

7            A    No, not to my -- no.

8            Q    You said you recognize some of the people?

9            A    Correct.

10           Q    Do you know any of the district attorneys in

11   there?

12           A    Yes.

13           Q    Who's that?

14           A    Vargason.

15           Q    From what county?

16           A    Cayuga County.

17           Q    Cayuga County.  And you recognize -- do you

18   know all the officers pictured?

19           A    No.

20           Q    Do you know the family members pictured in

21   this video?

22           A    No.

23           Q    Now the incidents that took place in this

24   video, isn't it true that some of them were back in the '80s,

25   isn't that right?

1       A    I'm not sure of the exact date of the

2  incidents.  I know the one incident that is depicted in

3  Coxsackie was at a time period when I was there, I believe.

4       Q    And when were you at Coxsackie?

5       A    Right before, I think I got to Coxsackie in

6  what, '90 --

7       Q    I think you testified '97 if I recall, is that

8  right?

9       A    '7, right.

10       Q    And some of the incidents took place possibly

11  before that, isn't that right?

12       A    They could of, could of.

13       Q    And you had no part in the making of this

14  video, did you?

15       A    I did not.

16       Q    Nor did the Department of Corrections, did it?

17       A    I believe they did not.

18       Q    In fact it's made by the union, is that right?

19       A    I believe so, yes.

20            MS. CONNOR:  Your Honor, we object to the --

21            THE COURT:  Are you going to make a legal

22  argument?

23            MS. CONNOR:  Well, I was going to say that

24  there's an inadequate foundation for the video, and that we

25  object on that basis and that it's also irrelevant because it

1   does not show the facilities that are at issue with

2   Ms. Collins' lawsuit.  We have questions about Sullivan,

3   Auburn, and Eastern and none of those facilities are in the

4   video, your Honor.

5                   THE COURT:  Counsel, you want to be heard?

6                   MR. KINSEY:  Please, your Honor.

7                   THE COURT:  I guess we're going to do this in

8   front of the jury.

9                   MR. KINSEY:  Is that your preference, your

10  Honor?

11                  THE COURT:  Go ahead.

12                  MR. KINSEY:  Is that your preference?

13                  THE COURT:  Go ahead, no, it's already

14  happened.

15                  MR. KINSEY:  We're not offering this as a

16  vignette into a day in the life of Ms. Collins, we're not

17  offering it to represent life within specific facilities.  As

18  we indicated in our motion in limine, we're offering this as

19  a pedagog -- I can never say that word -- an educational tool

20  to help the jury understand the general working environment

21  for correctional officers.  We've had lots of testimony about

22  the environment, they run the range from Mr. Burge describing

23  some very graphic events to Ms. Collins saying she loved her

24  job and it was the best place to be but for the harassment of

25  the officers.  This will give the jury an opportunity to

1   judge what the environment is like, and as we mentioned in

2   our motion in limine, the court certainly should give a

3   limiting instruction as to its use as simply an illustrative

4   exhibit.

5                    THE COURT:  Educational.

6                    MR. KINSEY:  I'm sorry?

7                    THE COURT:  Educational.

8                    MR. KINSEY:  Educational.

9                    THE COURT:  Superintendent Graham.

10                   THE WITNESS:  Yes, sir.

11                   THE COURT:  You were asked some questions

12  about the time period in which this -- there's scenes

13  depicted in this video.  In your experience, is what's shown

14  in the video still applicable to the Department of

15  Corrections facilities that you're familiar with today, is it

16  still applicable?

17                   THE WITNESS:  Yes, sir.  The only real

18  difference in the video and today, they're in different

19  uniforms, you'll see the correction officers will be in a

20  gray uniforms and today they wear blue shirts with blue

21  pants.

22                   THE COURT:  And other than the uniforms, is

23  the content of the video and what would be experienced by a

24  correction officer on a daily basis that's depicted in this

25  DVD, is that accurate?

1           THE WITNESS:  Absolutely.

2           THE COURT:  Would it be accurate today?

3           THE WITNESS:  Yes, sir.

4           THE COURT:  Would it have been accurate in

5    2002 through 2008?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  I'm going to receive the video,

8    and you may show it to the jury.

9           MR. KINSEY:  Thank you.

10          THE COURT:  Ms. Connor, you'll be able to

11   cross-examine Superintendent Graham on anything that's

12   depicted in the video that you want to ask him about.

13          MR. KINSEY:  I believe we mentioned to the

14   court when we proffered it, so you're aware for the jury's

15   sake, it's about 18 minutes long.

16          THE COURT:  Okay.

17          MS. CONNOR:  What is the number that this has

18   been marked, please?

19          THE COURT:  40.

20          THE CLERK:  It's 39.

21          MR. KINSEY:  39.

22          THE COURT:  You changed it on me.

23          MR. KINSEY:  39 was the next in order.  I

24   skipped one.

25          THE COURT:  39.  Is it working?

1          A JUROR:  It is now, yes.

2          THE COURT:  It's working, everybody can see.

3     Mine's not working but I'll look over your shoulder.

4              (Defendant's Exhibit Number 39, a DVD, was

5               played.)

6          THE COURT:  Before we go -- excuse me, before

7     we go back to questioning, does anyone need a break?  Yes,

8     okay, we're going to take a short five-minute break, okay.

9          MR. KINSEY:  Thank you, your Honor.

10         THE COURT:  Okay.

11             (Whereupon a recess was taken from 3:48 p.m.

12              to 3:54 p.m.)

13             (Open Court, Jury Out.)

14         THE COURT:  Ms. Connor, are you ready to get

15    started?

16         MS. CONNOR:  I beg your pardon, your Honor,

17    yes.

18         THE COURT:  Okay.  Let's bring the jury in,

19    please.

20             (Jury Present.)

21         THE COURT:  Okay.  The record should reflect

22    we have the ladies and gentlemen of the jury, plaintiff,

23    plaintiff's counsel, defendants and defense counsel,

24    Mr. Kinsey, go ahead with your examination, sir.

25         MR. KINSEY:  Thank you, your Honor.

1        <u>CONTINUED DIRECT EXAMINATION BY MR. KINSEY:</u>

2        Q    Superintendent, excuse me, the judge asked you

3    in the voir dire if that video fairly represented the daily

4    work environment for corrections at Auburn.  After watching

5    it again, does that represent it?

6        A    Yes, it does.

7        Q    And in your experience, have you ever

8    encountered an officer who would not respond to a fellow

9    officer?

10        A    No.

11        Q    Have you ever encountered an officer who you

12    felt they were not going to be -- who felt they were not

13    going to be helped?

14        A    No.

15        Q    What action would you take if you found an

16    officer that perceived that their fellow officers would not

17    help them in an emergency?

18        A    I would refer them first of all probably to

19    their -- the deputy superintendent of security should have a

20    conversation with, bring them in the office and have a

21    conversation with them, to find out why they have that

22    perception and probably if it continued, I would probably

23    refer them to the EAP, try to refer them to EAP because, you

24    know, corrections is not for everybody, you live in an

25    unnatural society and it's just not for everybody.

1          Q     Now would your answer be the same with regard
2     to a female officer?
3          A     Oh, yes, yes.
4          Q     Would it be the same with regard to a male
5     officer?
6          A     Yes, sir.
7          Q     Have you ever been made aware that someone
8     felt like their fellow officers would not back them up while
9     you've been at Auburn?
10         A     No.
11         Q     Ms. Collins ever tell you that?
12         A     No.
13         Q     Now you came in October, is that correct?
14         A     That's correct.
15         Q     And if you recall -- let me put it this way,
16    do you recall when Ms. Collins left Auburn?
17         A     I believe it was December of 2005.
18         Q     So early December, late December, do you
19    remember a date?
20         A     I'm -- 22nd sticks in my mind, but I'm not
21    sure.
22         Q     So she was there for the remainder of October,
23    all of November and part of December?
24         A     That's correct.
25         Q     Now you sat in this courtroom and heard

1    Ms. Collins testify that the only thing difficult was her

2    treatment and not the job; do you find that to be your

3    experience in the facility?

4              A    Absolutely not.

5              Q    Why not?

6              A    Because the job is difficult, on a daily

7    basis, difference between correction today and probably --

8    maybe 10 years ago, or in that time period is a little bit

9    different because facilities are somewhat calmer, but every

10   day, your life inside a correction facility, every minute you

11   have to be on guard ready for the change when it occurs.  If

12   not, then you're already behind the eight ball and you're

13   going to get hurt.  So the job is a difficult job.  It's a

14   stressful job, you -- every second of the day, you have to be

15   ready for the next incident to occur.  So to say that the job

16   was fine, everything's fine and there was no problems with

17   the job, that's kind of hard to believe.

18             Q    As we had testimony about the salary for

19   corrections officers, did you have a reaction to that?

20             A    Yes.

21             Q    What was your reaction?

22             A    Well, I find it kind of hard to believe when

23   he was saying in 12 years from now a correction officer will

24   be making $106,000 a year, considering the current contract

25   that PEF and CSEA took included three zeros, a 1 and a 2 and

1   a nine-day give back.

2           Q    Whoa, whoa, you got to talk English.

3           A    Okay.  The contract currently that's in -- for

4   PEF and CSEA that the Governor is attempting to make

5   NYSCOPBA, or get NYSCOPBA to follow is a five-year contract,

6   0 percent raise the first year, 0 percent raise the second

7   year, 0 percent the third year, 1 percent the fourth, and

8   2 percent the fifth, and with that -- there was a nine day

9   furlough so you gave up nine days pay.  That was not --

10          Q    Sorry, go ahead.

11          A    That was not incorporated in his charts.

12          Q    Now, as a superintendent, do you get that same

13  contract?

14          A    Yes, I do.

15          Q    When was the last time you had a raise?

16          A    Been over four and a half years ago.

17          Q    And these furloughs, was it based on

18  seniority?

19          A    No.

20          Q    Did you get the same furlough as correction

21  officers?

22          A    I shot my first eight-point buck on my

23  furlough day.

24          Q    Well, at least you got something for it.  Now,

25  we heard testimony about a rather graphic exchange about a

1    lump in an inmate's pants; do you recall that testimony?

2              A    I do.

3              Q    And that someone else had to frisk that inmate

4    and then came back with a comment?

5              A    Correct.

6              Q    Are female officers expected to conduct

7    frisks?

8              A    Yes.

9              Q    So they're expected to put their hands on

10   inmates?

11             A    Absolutely.

12             Q    Is there any difference between what a female

13   is expected to do in a frisk versus a male?

14             A    None.

15             Q    There any exceptions?

16             A    Strip frisks.

17             Q    Any other exceptions?

18             A    If it's a routine pat frisk of a Muslim inmate

19   and the Muslim inmate requests that a male pat frisk him and

20   there's a male present, then the male will pat frisk him.  If

21   there's no male present at that time, then he must submit to

22   the pat frisk by the female.

23             Q    As sergeant, lieutenant, captain, et cetera,

24   what would a bulge in the pants mean to you?

25             A    Again, depends what the situation, bulge in

1    the pants could be the fact that the inmate's carrying

2    contraband, drugs, he could, sometimes put cans in socks and

3    stuff like that so the bulge in the pants, if it's an

4    unnatural bulge in the pants, I would consider it contraband

5    could be carried there.

6            Q    What significant -- you just mentioned a can

7    in a sock, what significance is that?

8            A    Well, chances are he's taking that contraband

9    somewhere to assault somebody.  If he's going into the mess

10   hall there's a good chance that there's somebody in the mess

11   hall that he's looking to assault.

12           Q    What's he gonna do with a can in a sock?

13           A    Whack him over the head.

14           Q    Now, Ms. Collins talked about coming to meet

15   you right after -- coming to speak with you right after you

16   became superintendent.  Do you remember that meeting?

17           A    Yes, I do.

18           Q    Do you remember how long you'd been at the

19   facility?

20           A    Excuse me, I believe I been there about three

21   weeks.

22           Q    And did you have any knowledge of Ms. Collins

23   before she came to talk to you?

24           A    My secretary had given me information that

25   Officer Collins had filed a complaint and that's probably why

1    she's coming to talk to me.

2           Q    Did you know what the complaint was about?

3           A    I knew it was about overtime, some kind of

4    overtime issue in the -- with the chart sergeant and my

5    secretary informed me that I believe diversity was on it, it

6    was sent to diversity, they had it and it was being

7    investigated.

8           Q    And did you -- you gave her an appointment?

9           A    Yes, I did.

10          Q    And can you describe that meeting for us?

11          A    Officer Collins come in, we introduced herself

12   to myself, and the conversation started out talking about the

13   incident with -- at the time I didn't know sergeant's name

14   who's a sergeant in the overtime incident.  I explained to

15   Officer Collins that, you know, as far as I know this

16   incident had been reported, it was being investigated, there

17   was a grievance filed on it, labor relations has already

18   ruled on it, and that I could not reinvestigate an incident

19   that they are currently investigating.

20          Q    What else transpired at that meeting?

21          A    She went on to say that, you know, she --

22   Auburn in her opinion was not user friendly to females and

23   she said as a new superintendent, you can wave your magic

24   wand and make this place user friendly.  I explained to her

25   as a new superintendent, I don't have a magic wand, and I

1   also explained to her that the short time that I been there,

2   I have not seen anything in my opinion at this point that

3   would constitute that it's not user friendly.  And I

4   instructed her that if -- I will not condone that type of

5   activity.  If anything was to occur to her she should put it

6   to me in writing so I can get it investigated by the proper

7   authorities.  She went on to tell me that it's not about the

8   money but I got a lawyer.  And I said, well, at that point I

9   said, well, it is really about the money, I said, because

10  when you sue in federal court, damages are money.  I said

11  but, it's certainly your right to sue if you want to sue,

12  it's your right to do that.  Excuse me.  And then she went on

13  to tell me she was going to go to the newspapers.  So I

14  instructed her that she should read the employee manual to

15  make sure that she's clear what she can disseminate to the

16  newspapers and what she can't --

17          Q    Let me stop you right there for just a second.

18  Were you threatening her by telling her to look at the

19  manual?

20          A    Absolutely not.

21          Q    Were you threatening her to tell her she had

22  the right to go to court?

23          A    Absolutely not.

24          Q    Well, why would you bring up the employee

25  manual about going to the press?

1          A    Well, if she went to the press and she said

2   something that she wasn't supposed to say, then she would be

3   disciplined by the department for that.

4          Q    What could she say that she didn't have

5   permission to say?

6          A    She can't release inmate information, security

7   information, stuff along those lines to the press, so the

8   easiest way if you're going to go to the press is we have a

9   public relation office and you can request permission from

10  them to take your issue to the press.  Now certainly, you

11  know, there is a whistleblower law and if it's something

12  that's so outrageous that there is a whistleblower law, but

13  you still, you know, my information to her was just make sure

14  you know what you're doing so you don't get in trouble.

15         Q    Why would you tell her that?

16         A    Well, I mean, I don't want to see any employee

17  in trouble, I mean it's -- she has a right to do what she's

18  doing, I mean she certainly has a right to file a lawsuit,

19  she would have a right to go to the newspaper, that's her

20  right.

21         Q    Did it make you angry?

22         A    No.

23         Q    Had you received any other complaints from any

24  other females in your time there about sexual harassment?

25         A    No.

1       Q    In your career as a sergeant, lieutenant,

2   captain, dep. for security, superintendent, can you tell me

3   approximately how many complaints for sexual harassment

4   you've been familiar with?

5       A    I don't know the number.  Not that many.

6       Q    Did any of them implicate you?

7       A    No.

8       Q    Were you charged with investigating any of

9   them?

10      A    No.

11      Q    Now, did you have occasion when male officers

12  complained about their treatment at Auburn?

13      A    Yes.

14      Q    And what are their complaints as a rule?

15      A    On the rule they weren't -- overtime they

16  weren't hired on the rotating list of overtime or they

17  weren't given a vacation day, or the watch commander yelled

18  at them, things along those lines.

19      Q    Any member complain that they weren't, they

20  were -- someone else is getting preferential treatment?

21      A    Yes.

22      Q    What did they complain?

23      A    Well, actually they were complaining about a

24  fellow officer who was -- he does the overtime book, in other

25  words he keeps track of what officers work overtime and they

1    get charged for the day overtime so it's a rotating list so

2    you have the seniority.  So if you work overtime today, the

3    next person in line gets hired the overtime and they were

4    saying that he was cooking the book, so he was not charging

5    himself overtime so he would get overtime more often.

6              Q    Did you look into that?

7              A    Yes, I did.

8              Q    Solve it?

9              A    Yes, we did.

10             Q    Now, you heard about trip calls; are you

11   familiar with those?

12             A    I am.

13             Q    Are there trip calls in your facility?

14             A    Absolutely.  I -- it takes me awhile to get a

15   phone call to an area because if I call the package room,

16   I'll say, "Superintendent" and they immediately hang up.  I

17   have to call back, say, "This is the superintendent.  Thank

18   you," and they'd hang up again.  So by the third time I have

19   to start the conversation out, "This is the superintendent,

20   do not hang up," and then they apologize.

21             Q    So, do you have any idea why they're hanging

22   up?

23             A    Well, it's just a trip call is

24   "superintendent" so they figure superintendent's coming so

25   they're hanging up.  There's no conversation needed.  They

1    think I'm on my way.

2         Q    Does that affect your ability to know what's

3    happening in the facility?

4         A    Absolutely not.

5         Q    Why?

6         A    Well, part of my rounds is talking to staff,

7    and expending a great deal of time talking to staff and

8    sometimes it's personal talking about their son's baseball

9    games and things along those lines and you can get the mood

10   of the facility.  If you walk into a cell block and you go to

11   talk to an employee and that employee is not responding and

12   there's -- they're having problems, well, then you spend more

13   time there talking to him because obviously something's

14   wrong.  On the most part when you walk through the facility,

15   you know employees are on the ball, doing their job, and

16   they're very talkative.

17        Q    Now with these trip calls, have you been as

18   creative as we heard Superintendent Burge was?

19        A    I've caught four guys sleeping so far in the

20   facility, so --

21        Q    Even with the trip call?

22        A    Absolutely.

23        Q    Now did you get -- do you recall any other

24   complaints from Ms. Collins?

25        A    I got the complaint from when she wrote a

1    letter to Lieutenant Mitchell.

2              Q    Okay.  And did that -- did you get a copy of

3    that letter?

4              A    Yes, I did.

5              Q    And how did you come to have a copy of that

6    letter?

7              A    I was on my day off when this occurred and I

8    received a phone call from Captain Rourke, stating that

9    Officer Collins had given Lieutenant Vasquez a copy of this

10   letter so I had him read the letter to me over the phone, I

11   instructed him at that time to take and secure that letter in

12   my office and then on Monday I would deal with it when I came

13   in.

14             Q    And did you deal with it on Monday?

15             A    Absolutely.  I called diversity management, I

16   would have probably -- I would have spoken to Charlie Harvey

17   in diversity management and faxed a copy to him and I believe

18   I also called John Ludwin from labor relations and he -- once

19   I read him the letter, he deferred that there was nothing in

20   that letter that would cause a suspension or discipline at

21   that time, and that he deferred the letter over to diversity

22   management.

23             Q    Did you take any other action?

24             A    At some point in time in the near future I

25   seen Sergeant Mitchell in the sergeant's room and I stopped

1    in and I talked to him and told him that there was a

2    complaint and he denied the allegations took place and I told

3    him that, you know, from this point on you got to make sure

4    that any conversation you have between yourself and Officer

5    Collins is nothing but professional.

6              Q     What did he say?

7              A     He said he would.

8              Q     Now, at that point did you have any other

9    responsibility for follow-up investigation?

10             A     Not at that point, unless diversity contacted

11   me and told me to continue the investigation there, no.

12             Q     Did they contact you and tell you to continue?

13             A     No, they did not.

14             Q     Did you become aware of any other complaints

15   by Ms. Collins?

16             A     There was an incident in the package room

17   where she was attempting to leave the facility, I got a phone

18   call from Sergeant Petrocino saying that he had Officer

19   Collins there and she was attempting to leave the facility,

20   she was highly upset, and I asked him if she had gone to

21   medical yet and he indicated she had not and she's gonna

22   leave the facility.  I instructed him to inform her that if

23   she leaves the facility without reporting to medical, it

24   would be considered abandoning her post and she would

25   probably be disciplined for that.

1          Q      Now if she had left, would she have been

2     disciplined?

3          A      Yes, she would of.

4          Q      Why?

5          A      Because you have to be properly relieved to

6     leave the facility.  No officer can just get up and walk out

7     of the facility or run out of the facility, because that

8     would leave their post and their future post unmanned.

9          Q      Why would you send her to medical?

10         A      So medical can do an evaluation to make sure

11    that she's, first of all, she's capable of leaving the

12    facility in that condition, do we need to call an ambulance

13    for her, arrange to get a ride for her, so for her safety,

14    and then there's a written record that she reported to

15    medical with an injury and/or condition.

16         Q      And?

17         A      They would fill out an accident report.

18         Q      Now in this case did she do that?

19         A      She did.

20         Q      And was she sanctioned in any way for leaving?

21         A      No.

22         Q      Was she in trouble for leaving after she went

23    to medical?

24         A      No.

25         Q      Do you know how she was -- left the facility

1    after she went to medical?

2            A    I don't.

3            Q    Did you have any follow-up conversations with

4    Ms. Collins about leaving the package room?

5            A    No, I did not.

6            Q    Did she file any sort of complaint?

7            A    She filed a grievance after that and I think

8    it may have been part of the grievance, I'm not sure.

9            Q    She didn't send you a letter that you know of?

10           A    No.

11           Q    Did she have -- did she make any other

12   complaints that you became aware of?

13           A    Not that I'm aware of.

14           Q    Do you recall any sort of incident with the

15   training officer or the firearms instructor?

16           A    Yes.  She -- she must have filed a complaint

17   with the office of diversity management --

18           Q    Why do you say she must of?

19           A    Well, because they investigated and it

20   wasn't -- it didn't come to me.

21           Q    Did you know about it before diversity

22   management contacted you?

23           A    No, I did not.

24           Q    How did they come to contact you?

25           A    I believe Charlie Harvey contacted me and it

1    was part of the overall response that I gave back for the

2    writing on the wall, the keys, and the bathroom doors and

3    stuff, and Charlie Harvey stated that he was reported that

4    there was inappropriate comments being made during the

5    weapons training by my staff and that I should submit a

6    letter to all staff and particularly to the weapons training

7    officers, dictating their conduct, how their conduct should

8    be during training.

9              Q    Did you do that?

10             A    Yes, I did.

11                  MR. KINSEY:  May I approach, your Honor?

12                  THE COURT:  You may.

13             Q    Show you what's been marked as Defendant's 15,

14   it consists of three pages.  You finished reviewing that,

15   Superintendent?

16             A    Yes, I am.

17             Q    And did you write that letter?

18             A    Yes, I did.

19             Q    What's the date on it?

20             A    May 5th, 2006.

21             Q    Who's it written to?

22             A    Charlie Harvey, director, office of diversity

23   management.

24             Q    And the second page, do you recognize that?

25             A    Yes, I do.

1          Q    Who's it from?

2          A    From myself.

3          Q    And the subject?

4          A    Please ensure -- it's class conduct.

5          Q    Please just -- up in the subject line, can't

6     read from it.  What's the subject?

7          A    Class conduct.  Class conduct.

8          Q    And the third one, who is that from?

9          A    From myself.

10         Q    And what's the date?

11         A    May 2nd, 2006.

12         Q    And what is the subject line?

13         A    Employee conduct and relations.

14              MR. KINSEY:  Your Honor, I would move these

15    into evidence at this time.

16              THE COURT:  Any objection?

17              MS. CONNOR:  No, your Honor, no objections.

18              MR. ANDREWS:  No objections, your Honor.

19              THE COURT:  They're received.

20         Q    Now, is this in response to the inquiry from

21    Mr. Harvey?

22         A    It is.

23         Q    And do you remember what events were being

24    complained of at this point?

25         A    I don't know the specific complaints, but had

1   something to do with the weapon training, that the officers

2   were using inappropriate comments of body parts with the

3   nomenclature of weapons.

4           Q    Is that acceptable?

5           A    No, it's not.

6           Q    Is there a policy in place that would cover

7   that?

8           A    Absolutely.

9           Q    And what, if anything, did you do in response

10  to that complaint?

11          A    Well, since it was unnamed, the individuals

12  were not named in the complaint, and it was every -- every

13  employee got a copy of my memo for employee conduct and

14  relations, every employee got a copy on their paycheck and

15  then every weapons officer was personally handed a copy of my

16  memo by Lieutenant Perkins who was the training lieutenant.

17          Q    Now do you know if any individual trainer was

18  ever mentioned in the complaint?

19          A    I do not.

20          Q    You were never given that information?

21          A    No, I was not.

22          Q    Do you know as a result of that complaint, if

23  there was an investigation conducted?

24          A    I believe Mary Mayville did conduct an

25  investigation on the entire complaint by Ms. Collins.

1          Q     And what, if anything, did you do to

2    facilitate her investigation?

3          A     When Mary Mayville came into my office she

4    said she had been down to the locker room and she had

5    witnessed some inappropriate comments on the wall down in the

6    female bathroom or the bathroom downstairs, at which time I

7    called my deputy superintendent for security, Bellnier, and

8    told him to get somebody immediately down to the locker room

9    and paint that locker room.  And I believe that was done.

10   And she discussed that the complaints that were filed also

11   were -- there were no stalls in some of the bathroom doors in

12   the blocks, I believe it was D block, the door, the heavy

13   steel door was broken off its hinges and was not in place,

14   and she complained about the keys, that a -- and I'm gonna

15   say an officer because it really doesn't matter if you're a

16   female or a male, an officer would have to go up to the block

17   officer and request a bathroom key to use the bathroom.

18         Q     Why are the bathrooms locked?

19         A     Bathrooms are locked so the inmates don't have

20   access to them and, you know, sometimes blocks get very busy

21   and inmates could sneak in the bathroom so if you had an

22   employee walk into the bathroom and thinking no one was in

23   the bathroom, turn around and lock the door and the inmate

24   was hiding somewhere, that employee would be in jeopardy.

25         Q     Now, did you have it -- did you fix the door?

1          A     The door was welded on the next day.

2          Q     What about the graffiti?

3          A     The graffiti was painted that day.

4          Q     Do you know how long after you got there that

5     you talked to Ms. Mayville?

6          A     No, I don't.

7          Q     Long time, short time?

8          A     No, it was couple months later.

9          Q     Okay.  Now, in those couple of months, had you

10    inspected those bathrooms?

11         A     I been in the locker room numerous times

12    because one of the same thing -- one of the projects that

13    retired Superintendent Burge had on his mind, the day you

14    walked in Auburn or you walked into the locker room, you

15    realized that the locker room was in atrocious shape and

16    needed to be redone.  So I had been in the locker room

17    numerous times trying to devise a plan to redo the locker

18    room.  And I have been in the bathrooms, I probably -- the

19    one bathroom that the females used I probably did not go into

20    that bathroom.  That would have been my mistake.

21         Q     Why didn't you go in the females' bathroom?

22         A     Because I have a habit of not doing that.

23         Q     When was the first time that you became aware

24    that there was graffiti that needed to be removed?

25         A     When Mary Mayville sat in my office and told

1    me it was there.

2              Q    And then when did you correct it?

3              A    It was done that day.

4              Q    Did you ever come to understand that Sergeant

5    Flynn had been notified of this?

6              A    Not until the trial here.

7              Q    You never -- you never got a report from

8    Sergeant Flynn?

9              A    No, sir.

10             Q    Is Sergeant Flynn still employed at Auburn?

11             A    Yes, sir.

12             Q    Now, the best of your knowledge, is there a

13   methodology directive produced by DOCS on how diversity

14   management complaints are to be handled?

15             A    Yes, sir.

16                  MR. KINSEY:  May I approach, your Honor?

17                  THE COURT:  You may.

18             Q    Showing you what's been labeled as Defendant's

19   6, it's a two-page document, review that, please.  Do you

20   recognize that document?

21             A    I do.

22             Q    What do you recognize it as?

23             A    It's the controlling factor of dealing with

24   diversity management complaints.

25             Q    Is that an official document for the

1    Department of Correctional Services regarding diversity?

2              A    Yes, sir.

3              Q    Is that authoritative?

4              A    Absolutely.

5              Q    Are you obligated to follow that directive?

6              A    Absolutely.

7              MR. KINSEY:  Your Honor, at this time I'd move

8    it into evidence.

9              MS. CONNOR:  No objection.

10             MR. ANDREWS:  No objection, your Honor.

11             THE COURT:  It's received.

12             Q    As you look that over, do you find anything in

13   that directive that you failed to do as a superintendent with

14   regard to Officer Collins?

15             A    No, I do not.

16             Q    Does it obligate you to do anything that you

17   didn't do?

18             A    No, it does not.

19             MR. KINSEY:  May I approach, your Honor.

20             THE COURT:  Yes.

21             Q    Showing you what's been labeled as D4,

22   one-page document, look that over.  Oops, sorry.  Tell me

23   what that document is.

24             A    It's a to-from memorandum from Commissioner

25   Goord to all employees, it's a reissue of the New York State

1   Department of Correctional Services policy statement on

2   sexual harassment in the workplace.

3            Q     Now if you get a memo from Mr. Goord while he

4   was commissioner, what force did that memo have?

5            A     For me?  It's absolute.

6            Q     It becomes the law in corrections?

7            A     It is the law, that's correct.

8            Q     Does that tell you -- what does that, in

9   general terms what does that tell you to do?

10           A     Well, first of all, it says that the New York

11  State Department of Corrections has a zero tolerance on

12  sexual harassment.

13               MR. KINSEY:  Your Honor, I'd move this into

14  evidence at this time.

15               MS. CONNOR:  No objection.

16               MR. ANDREWS:  No objection, your Honor.

17               THE COURT:  It's received.

18           Q     As a superintendent at Auburn, did you

19  tolerate sexual harassment?

20           A     Absolutely not.

21           Q     How about gender discrimination?

22           A     No.

23           Q     What steps did you take to ensure that that

24  was not happening on your watch?

25           A     Doing tours, complete tours of the facility,

1    every day, talking to employees, having an open door policy

2    that anybody at any time, no one had to make an appointment

3    to come up to me, as long as I was in my office to see me, my

4    door -- the only time my door would ever be shut is when

5    there was an employee sitting in my office wanting to discuss

6    an issue with me that may be a private issue, I would shut

7    the door.  Other than that, my door was never closed.

8          Q    Now how many female correction officers at

9    Auburn during your tenure have raised sexual harassment

10   claims?

11         A    I don't believe any.

12         Q    With the exception --

13         A    Well, one.

14         Q    With the exception of Ms. Collins?

15         A    Right.

16         Q    How many have alleged gender discrimination?

17         A    Um, I had a grievance filed by Officer Mattie

18   and it dealt with doing, excuse me, doing a special watch.

19   This was not at the time Officer Collins was there, but on

20   doing a special watch on a mental health inmate.  I deemed it

21   to be a male-only post for the pure fact that you have to

22   watch the inmate eight hours a day, and in most times in the

23   mental health area, the inmate would take his clothes off,

24   you would have to watch him use the bathroom and the inmate

25   would -- again, he's a mental health inmate so he could do

1    various things in the cell and I didn't think it was

2    appropriate that a female would watch that -- have to watch

3    that, so I made it a male-only post.

4            Q    And she filed a grievance?

5            A    Yeah, she did.

6            Q    How did that grievance turn out?

7            A    It was upheld on my part by GOER.

8            Q    Would you do the same thing again?

9            A    Yes, I would.

10           Q    Did Ms. Collins ever ask you for permission to

11   join the diversity committee at Auburn?

12           A    No.

13           Q    She never did?

14           A    No.

15           Q    Do you know if she was a member of that

16   committee?

17           A    I believe she was.

18           Q    And how do you know that?

19           A    Testimony here today, and I would get the

20   memos if they needed to be relieved for diversity, I would

21   get the memos from the diversity chairperson asking for

22   reliefs and they would be signed in my office.

23           Q    Did you ever deny those?

24           A    No.

25                MR. KINSEY:  May I have a moment, your Honor?

 1              THE COURT:  You may.

 2              MR. KINSEY:  I think I'm pretty close to being

 3     done.

 4              THE COURT:  We're all pretty close to being

 5     done.

 6              MR. KINSEY:  Stick a fork in us.

 7         Q    Superintendent, you've been at a number of

 8     facilities in your career?

 9         A    Yes, I have.

10         Q    Did you ever hear that Auburn had a

11     reputation, Auburn is Auburn, never gonna change?

12         A    No.

13         Q    Did you ever hear that Auburn was not exactly

14     friendly to females?

15         A    No, I did not.

16         Q    How many females do you have there as officers

17     at this point?

18         A    I want to say we're probably upwards of 20, 22

19     females now.

20         Q    When you started in corrections, how many

21     females were in your class at the academy?

22         A    I think three.

23         Q    How many at your first assignment in Green

24     Haven?

25         A    Green Haven, I would say probably upwards of

1    40.

2         Q    And why would there be 40 in Green Haven and

3    fewer upstate, if you know?

4         A    Well, I think it was just starting in the

5    transition of female correction officers coming into the

6    department.  It was kind of a new, new era where females were

7    coming, actually getting jobs, taking jobs in the department

8    as correction officers.

9         Q    Now, was there a time, if you know, when

10   females were not in male jails?

11        A    Yes, there were.

12        Q    And were you part -- were you part of that

13   transition with more females working in all-male jails?

14        A    Yes, I was.

15        Q    And was there a particular concern that

16   females could not do their job?

17        A    No.

18        Q    Did you ever hear anybody say they can't do

19   their job?

20        A    No.

21        Q    Have you ever known a female to run away from

22   a fight?

23        A    I have not.

24        Q    Have you ever had a female come to you and

25   say, you know, they don't like me because I'm a female and

1    I'm afraid?

2              A    Of staff?  No.

3              Q    Have you ever had them say they're afraid of

4    inmates?

5              A    We're all afraid of inmates, you know, so if

6    you walk into a correctional facility and you don't have

7    apprehension and the hair on the back of your neck doesn't

8    stand up, you don't belong there.

9              MR. KINSEY:  I have nothing further, your

10   Honor, thank you.

11             THE COURT:  Okay.  It's 4:29, we're going to

12   keep my word to you and get you out of here by 4:30.  If I

13   don't talk too much that will happen.  I think that we're,

14   you know, I venture to guess not only on schedule but maybe

15   even a little ahead of schedule from what I told you as far

16   as the length of this trial.  So I'm going to give you my

17   standard caution, don't talk about it, don't let anybody else

18   talk to you about it, if anybody approaches you I need to

19   know about it.  Don't listen, read, watch anything, put it

20   away, turn it off, whatever.

21             Have a great weekend.  It's supposed to be a

22   nice weekend, enjoy it, come back nice and refreshed and

23   we'll finish this case up early next week, okay.  Have a good

24   weekend.

25             (Jury Excused, 4:30 p.m.)

1          THE COURT:  You can step down, sir, thank you.

2          (Whereupon the witness was excused.)

3          THE COURT:  Okay.  Any housekeeping matters

4  before we -- before we close for the day?

5          MR. KINSEY:  Yes, and please, your Honor,

6  Plaintiff's Exhibit 18, and I thank counsel for not going

7  into that, in the third paragraph there's a second sentence

8  where it talks about Puerto Rican parade, Black history month

9  and other things that the court ruled off limits and we'd

10  like to redact those before this goes to the jury.

11          MS. CONNOR:  Yeah, I have no problem with

12  that, your Honor, and I deliberately avoided those questions

13  of the witness.

14          THE COURT:  I appreciate that, Counsel.  So

15  let's have those redacted and just give them to my courtroom

16  deputy in the redacted form.  Anything else?

17          MR. KINSEY:  Yes, your Honor.  One thing.

18  Mr. Burge on Monday, he's had a death in the family and the

19  funeral is on Monday.  He would like to be excused, his

20  testimony is completed, if that would be acceptable to the

21  court.

22          THE COURT:  It's acceptable to me.  Counsel,

23  any problems with that?

24          MR. ANDREWS:  None from defendant Mitchell,

25  your Honor.

1      THE COURT:  You don't, at this point don't

2 have any plans to recall him?

3      MS. CONNOR:  I didn't call him, your Honor,

4 but --

5      THE COURT:  I said to recall him, to have him

6 come back for any reason.

7      MS. CONNOR:  I don't, not on Monday, I

8 certainly wouldn't, have no problem with that.

9      MR. KINSEY:  Thank you, your Honor.

10      THE COURT:  Mr. Burge, our condolences, sir,

11 and you're certainly excused from being here on Monday, it's

12 no problem.  What else?

13      MR. KINSEY:  Nothing from state defendants,

14 your Honor.

15      MS. SHEEHAN:  Hang on a second.

16      MR. KINSEY:  Time out.

17      THE COURT:  You have a cocounsel that

18 disagrees with you.

19      MR. KINSEY:  I'm well aware.

20      THE COURT:  While she's talking with

21 Ms. Connor, Mr. Andrews.

22      MR. ANDREWS:  I do have an issue.  During the

23 discussion over the video, Ms. Connor made reference to

24 Eastern and I understand that's a facility that's been

25 involved in this proceeding.  At this point I don't think it

1    really is involved, it had to do with the retaliation

2    allegation.  I think I need to elicit from my client that he

3    didn't do some things that were alleged of him as retaliation

4    just, you know, to be fair, so the jury doesn't wonder why he

5    didn't respond, but other than that, I'm looking for guidance

6    from the court as to how we're going to deal with that

7    otherwise in terms of references in closings, things like

8    that.

9            THE COURT:  Well, and I'll hear from

10   Ms. Connor on this.  And maybe I should do that first before

11   I give you my comments.  Go ahead.

12           MS. CONNOR:  Well, your Honor, just because

13   you ruled that retaliation didn't take place, it doesn't mean

14   that it wouldn't be part of an overall harassment allegation

15   and that's the way I would propose to deal with it.

16           THE COURT:  You're thinking along the lines of

17   the court.  The retaliation claims, no question, have been

18   dismissed from this case, Mr. Andrews, but the fact that

19   there could be a view by a fact finder, the facts of this

20   case that that was part of a continuous pattern of harassment

21   that's been alleged by this plaintiff with regard to

22   defendant Mitchell.  So it's certainly, while it wasn't

23   framed that way in the complaint, there's certainly a view of

24   the evidence that the facts would say that, yeah, that's part

25   of the claim, that's part of what we're talking about with

1   regard to this defendant, so I think it's appropriate that

2   you address it, if you're going to call your client, for

3   those reasons.

4           MR. ANDREWS:  Okay, your Honor, thank you.

5           THE COURT:  And certainly, you know, I'll hear

6   your arguments about that beforehand if you want to address

7   it, but that's the view the court has at this point.

8           MR. ANDREWS:  My only -- you know, my

9   observations, I guess you kind of covered but it wasn't pled

10  that way, it's never been presented that way and, you know, I

11  don't believe there was any suggestion on the part of

12  plaintiff during her testimony that that was anything other

13  than retaliation.

14          THE COURT:  But I still believe based on even

15  the way the case was pled, that there's a view of the

16  evidence within those pleadings that it could be considered

17  part of a pattern of harassment, and for that reason, I'm not

18  going to say that, you know, plaintiff's counsel can't speak

19  about it or address it because it's, you know, the

20  retaliation claim has been dismissed which was a large part

21  of what they allege was going on at Eastern and I understand

22  that, but there you have it.  That's the view I have at this

23  point.

24          MR. ANDREWS:  Thank you, your Honor.

25          THE COURT:  If you have something else on

1    Monday you want me to consider, you let me know.

2                         MR. ANDREWS:  Thank you, your Honor.

3                         THE COURT:  Ms. Connor?

4                         MS. CONNOR:  I'm all set, your Honor, thank

5    you.

6                         THE COURT:  Okay.  Have a good weekend,

7    everybody, get some rest, and we'll see you Monday.  Yes.

8                         MS. SHEEHAN:  One issue.  Exhibit 3, which was

9    the training and prevention of sexual harassment.  There was

10   a page, What is Sexual Harassment, that I had asked if we

11   could please remove that and you reserved.

12                        THE COURT:  And where are we with that,

13   Ms. Connor, what's your position?

14                        MS. CONNOR:  Your Honor, I think that that

15   should probably remain in the exhibit because this is part of

16   the training that my client got from her employer as to what

17   is sexual harassment.  To remove it would take away part of

18   her experience, part of what the employer is training her and

19   other employees as to what sexual harassment is.  It also

20   goes to the knowledge of the employer as to what is sexual

21   harassment.  It's their manual, the employer puts it in their

22   manual, they have to deal with the consequences of that.

23                        THE COURT:  Okay.  Ms. Sheehan.

24                        MS. SHEEHAN:  Yeah, and Ms. Mayville

25   established that this was not the manual that she used to

1    train the diversity trainers.

2              THE COURT:  Yeah, the nature of -- let's be

3    specific about the nature of your objection and why you're

4    asking that it be removed.

5              MS. SHEEHAN:  Well, because let's let it go

6    back, if we could pull out What is Sexual Harassment because

7    I think that undercuts the province of the jury, gives them

8    inappropriate --

9              THE COURT:  But my question is, you're

10   indicating that it wasn't part of the manual that they

11   received.  Do we have, is it -- and I'm sorry, I'm getting

12   tired as well, is it -- there any distinction between what

13   was in the manual at the time in question and what's in this

14   particular manual that you're asking be redacted?

15             MS. SHEEHAN:  I have no idea what the training

16   manual for train the trainer looks like.  We -- I objected to

17   it at side bar, she was able to identify it, looked like

18   something issued by the Department of Corrections so it went

19   into evidence.  When it was given to Ms. Mayville and

20   Ms. Connor asked her if this was the document that she used

21   to train the trainer, she said no.

22             MS. CONNOR:  My client on the other hand

23   testified that it was the manual, and that that was the

24   contents of the manual, minus, there was that directive on

25   sexual orientation and then the re -- the date with respect

1  to the other directive, that was the difference.

2  THE COURT: Okay. Again, Ms. Sheehan, I'll

3  give you the weekend, we can come back Monday and tell me if

4  there's any material difference between that sexual

5  harassment section, but you know, bottom line is, it's a

6  Department of Corrections manual. And it's a party document

7  that's, you know, distributed by your client. So therefore,

8  I'm having difficulty understanding what's the nature of the

9  objection when we're talking about a sexual harassment case.

10  MS. SHEEHAN: I disagree that this is a manual

11  that the Department of Corrections gave out or used. That's

12  not what Mary Mayville's testimony was.

13  THE COURT: Well, you're going to have to find

14  that testimony for me. What are you alleging, where did it

15  come from then, whose document is it?

16  MS. SHEEHAN: I didn't ask her.

17  THE COURT: Well, whose document is this?

18  MS. SHEEHAN: Oh, Plaintiff's.

19  THE COURT: We're talking about Exhibit 3.

20  MS. SHEEHAN: Correct.

21  THE COURT: Which is title page Department of

22  Correctional Services Training in the Prevention of Sexual

23  Harassment. And you don't know whose document it is?

24  MS. SHEEHAN: No, because Mary Mayville said

25  this was not the document that she used to train the trainer.

1  And it was -- I don't believe it was followed up, is this --

2  could this have been used, is this the material that the

3  Department of Corrections uses when training the trainer.

4  The testimony so far is only that Ms. Collins only attended

5  one class and Ms. Mayville taught it.

6          THE COURT:  Ms. Connor, do you want to be

7  heard?

8          MS. CONNOR:  I think we've said it all

9  already, your Honor, I don't want to continue to --

10          THE COURT:  Your client identified this

11  document.

12          MS. CONNOR:  She did.  And that is her

13  testimony, and you see it, part of this, participant

14  materials, it all flows at the bottom, participant materials,

15  and I believe the page counsel is speaking about, they're not

16  numbered unfortunately, just you know, maybe, quarter or

17  third of the way in, and this is all part of the materials.

18          THE COURT:  And where did you get this

19  document?

20          MS. CONNOR:  It is my recollection, my

21  client's, best of my recollection that this came from -- in

22  the discovery process from the defendant.

23          THE COURT:  From the Attorney General's

24  office.

25          MS. CONNOR:  Yes.  That's my recollection at

1    this point because we did not have this, I can't think of

2    where else it came from standing here because we did not have

3    this to give to them.  So I am -- and it contains their

4    directives in the back and Mary Mayville testified about how

5    to take action, your Honor.

6             THE COURT:  Well, there's been two witnesses

7    that have testified about this document, the plaintiff who

8    indicates that it's what was used except for the things that

9    have been redacted at the time that she was brought in.  It's

10   clearly identified as the Department of Correctional Services

11   document, training and prevention of sexual harassment.  I

12   don't think there's any issue about what it is, or why it

13   would be relevant to this lawsuit.  So Counsel, I'm going to

14   admit the document with that section.

15            MS. SHEEHAN:  Thank you for your

16   consideration, your Honor.

17            THE COURT:  All right.  Anything else?  Okay.

18   We'll see you Monday.

19            (Court Adjourned, 4:41 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4             I, JODI L. HIBBARD, RPR, CRR, CSR,

5     Official Court Reporter in and for the United States

6     District Court, Northern District of New York, DO

7     HEREBY CERTIFY that I attended the foregoing

8     proceedings, took stenographic notes of the same,

9     and that the foregoing is a true and correct

10    transcript thereof.

11

12

13

14

15

16

17

18                         _____

19                         JODI L. HIBBARD, RPR, CRR, CSR
                           Official U.S. Court Reporter
20

21

22

23

24

25