VOLUME VI
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
PENNY T. COLLINS,

                              Plaintiff,

vs.                              5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                              Defendants.

-------------------------------------------x

        Transcript of a Jury Trial held on March 19,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiff:          MAIREAD E. CONNOR, ESQ.
                        Attorney at Law
                        440 South Warren Street
                        Suite 703
                        Syracuse, New York  13202

For Defendant:          SATTER, ANDREWS LAW FIRM
(Mitchell)              Attorneys at Law
                        217 South Salina Street, 6th Floor
                        Syracuse, New York  13202
                          BY:  ROSS P. ANDREWS, ESQ.

For Defendants:         STATE OF NEW YORK
(All Remaining)         Office of Attorney General
                        The Capitol
                        Albany, New York  12224
                          BY:  CATHY Y. SHEEHAN, AAG
                               ROGER KINSEY, AAG

INDEX   OF   TESTIMONY

| Witness | D | C | RD | RC | FRD | FRC |
|---|---|---|---|---|---|---|
| Michael First | 1279 | 1315 | 1343 | 1348 | -- | -- |
| Harold Graham, recalled | -- | 1356 | 1396 | 1430 | 1439 | -- |
| Sandra Downey | 1440 | 1450 | -- | -- | -- | -- |
| Troy Mitchell | 1455 | 1487 | -- | -- | -- | -- |
| Penny Collins, recalled | 1518 | -- | -- | -- | -- | -- |

```
 1                  (Open Court, Jury Out, 9:02 a.m.)

 2            THE COURT:  Okay.  Good morning, everybody.  I

 3      hope you had a good weekend, everybody's all refreshed and

 4      ready to go.  Anything before we bring the jury in?

 5            MR. KINSEY:  Yes, your Honor.  We're going to

 6      request that at this point we bring Dr. First in for

 7      testimony.  We found out that getting in and out of Syracuse

 8      is a little more adventurous than our initial phone calls had

 9      indicated, he has a 2:00 flight and he's going on to another

10      place to teach.  This break in testimony will not prejudice

11      plaintiff since we broke on Friday at the end of our

12      examination of Mr. Graham and we can pick his

13      cross-examination up as soon as the doctor's finished.

14            THE COURT:  Okay.  Ms. Connor.

15            MS. CONNOR:  Your Honor, it's completely up to

16      your discretion, we leave it in your good hands.

17            THE COURT:  Yeah, I think we'll get the doctor

18      in here, make sure he catches his flight, then we'll get back

19      to Mr. Graham, I don't see that as an issue.  Mr. Andrews,

20      any issue?

21            MR. ANDREWS:  I have no problem with that.  I

22      do have one other issue, though.

23            THE COURT:  Fire away.

24            MR. ANDREWS:  The expert's report, Dr. First's

25      report suggests that plaintiff attached blame for a
```

1  particular correction officer's suicide to Lieutenant

2  Mitchell, it didn't say that, suggest that he actually had

3  anything to do with it which he didn't, but I've learned this

4  morning that in fact she did literally blame him for it and

5  that's going to be part of the expert's testimony.  And I

6  think that's that he bullied this corrections officer into

7  doing this, who in fact he didn't even know, but nevertheless

8  I'm concerned that allowing testimony to that effect is going

9  to be highly prejudicial to my client, given that there's

10  even the suggestion that he bullied someone to death, you

11  know, is about as prejudicial as it gets, I think, in terms

12  of this type of claim.

13          THE COURT:  In what respect does this come up?

14          MR. ANDREWS:  It comes up in the context of

15  the state's expert psychological, psychiatric expert, and his

16  interview of the plaintiff.

17          THE COURT:  And this is this correction

18  officer that committed suicide you're talking about?

19          MR. ANDREWS:  Right, it's a male corrections

20  officer, it's someone my client didn't know, but you know,

21  and of course I could elicit that testimony from him, but I'm

22  concerned that the accusation itself is so prejudicial in

23  this context.

24          MR. KINSEY:  If I may, your Honor, it comes up

25  in the context of that six-and-a-half-hour interview and in

1    dealing with what stressors plaintiff was identifying to

2    Dr. First, it's going to be his testimony that the single

3    stressor she was identifying was the suicide of this officer

4    and her own feeling of culpability that she did not stay

5    there and prevent that.  And then his further testimony that

6    at that time, her -- the focus of her anger was on Lieutenant

7    Mitchell because she blamed him for that act.

8                THE COURT:  Okay.  Is this testimony you were

9    going to elicit?

10                MR. KINSEY:  In the context of his interview

11    with her and what stressors were present.  We've heard about

12    PTSD, in order to talk about PTSD, he's going to talk about

13    stressors and whether or not those stressors would create

14    PTSD.

15                THE COURT:  Okay.  Well, there certainly isn't

16    any reason to identify Sergeant Mitchell based on what you've

17    described, you know, I don't see a reason why.

18                MR. KINSEY:  Well, then I would need a few

19    minutes to talk to the doctor because she identified Sergeant

20    Mitchell by name and he then elicited from her that that was

21    the focus of her hatred and in fact what sparked her to her

22    homicidal idealizations.

23                THE COURT:  Mr. Andrews, your position on that

24    is that it shouldn't be elicited at all?

25                MR. ANDREWS:  My position is that it shouldn't

1    be elicited at all, that it's so prejudicial to my client,

2    that again, redacting the name, talking about her being angry

3    at someone for having provoked a suicide, I understand,

4    she's --

5                    THE COURT:  I think you can get what you want

6    without using his name.

7                    MR. KINSEY:  May I have a few minutes to talk

8    with the doctor and make sure we're crystal clear on that?

9                    THE COURT:  You may.

10                   MR. KINSEY:  And then if the report is

11   entered, we will make sure that his name is redacted.

12                   THE COURT:  Very well.

13                   MR. KINSEY:  Thank you, your Honor.

14                   MR. ANDREWS:  Thank you, your Honor.

15                   THE COURT:  Ms. Connor, you have any --

16                   MS. CONNOR:  No, your Honor, I'm all set.

17                   THE COURT:  You don't have a dog in that

18   fight?

19                   MS. CONNOR:  Maybe a cat, but not a dog.

20                   THE COURT:  It's warm in here this morning and

21   if you want to take jackets off, that's fine with me.

22                   (Pause in Proceedings.)

23                   MR. KINSEY:  Ready, your Honor.

24                   THE COURT:  All set?  If everyone's ready

25   we're going to bring the jury in.

1    (Jury Present, 9:13 a.m.)

2    THE COURT:  Okay.  The record should reflect

3    we have the ladies and gentlemen of the jury, plaintiff,

4    plaintiff's counsel, defendants and defense counsel.  Hope

5    you had a great weekend.  As far as Syracuse, New York goes,

6    weekends don't get any better.  Weather wise, the orange

7    winning, it was a good one.  So I hope you're refreshed and

8    ready to go.

9    We're going to do something out of order here.

10   As you might recall -- I project much better that way.  The

11   Superintendent Graham was on the stand last Friday afternoon

12   when we finished and they had just finished his direct

13   examination, we were going to start cross but it was about

14   4:28 so we let you go home.  Defense counsel has requested

15   that they have an expert that's going to testify, he's here

16   this morning, we're going to start with that expert because

17   they have a flight out, and as you may or may not know, it's

18   not always so easy to get in and out of the Syracuse airport

19   so we don't want to hold this doctor up so we're going to get

20   back to Superintendent Graham's cross-examination when we're

21   done with the doctor, okay.  Mr. Kinsey, go ahead, sir.

22   MR. KINSEY:  Yes, your Honor, defense calls

23   Dr. Michael First, please.

24   THE CLERK:  Good morning, Doctor.  Step right

25   here, please.  Can you state your full name and spell it for

1    the record, please.

2              THE WITNESS:  Michael B. First, F-i-r-s-t.

3              THE CLERK:  Thank you, can you raise your

4    hand.

5

6         M I C H A E L   B .   F I R S T , called

7    as a witness and being duly sworn, testifies as

8    follows:

9              DIRECT EXAMINATION BY MR. KINSEY:

10        Q    Good morning, Doctor.

11        A    Morning.

12        Q    Can you tell the jury, please, your full name.

13        A    My name is Michael Bruce First.

14        Q    And where do you currently reside, just the

15   city?

16        A    Brooklyn, New York.

17        Q    And with whom are you currently employed?

18        A    I am primarily employed by Columbia University

19   and the New York State Psychiatric Institute.

20        Q    And in that capacity, what are your duties?

21        A    I'm -- primarily I'm a full-time researcher,

22   which my responsibilities are doing research, I do some

23   teaching, I'm on a number of committees, write papers, things

24   like that.

25        Q    Do you maintain a private practice, Doctor?

1          A     Yes, I have a private practice in Manhattan.

2          Q     And what does that practice consist of?

3          A     It's about 10 to 15 hours a week of seeing

4     patients of various kinds, both psychotherapy and medication.

5          Q     And when you say psychotherapy, help us out,

6     we're lay people, what does that entail?

7          A     Psychotherapy is a type of -- basically it's

8     talk therapy which means that I see patients, I primarily do

9     medication but I have a few patients in my practice who I see

10    weekly or every couple weeks and the therapy business is

11    usually talking, usually cognitive behavior type of approach,

12    which is the type of therapy that focuses on distortions of

13    thinking and helps them focus on their types of thinking.

14         Q     What is your educational background?

15         A     Graduated from Princeton University.  I then

16    went on to the University of Pittsburgh to go to medical

17    school.  I then completed that and went to Shadyside Hospital

18    to do my internship which is a hospital in Pittsburgh.  I

19    then moved to New York City to do a residency at Columbia

20    University, the department of psychiatry, and then I never

21    left.  I stayed on, did a fellowship there and then joined

22    the faculty, and now I'm a professor of clinical psychiatry

23    at Columbia University.

24         Q     You mentioned that you're also on some

25    committees; can you give us insight into what those are?

1          A    Yeah, I've been involved in -- I'm actually

2     the editor of the current diagnostic manual that's used by

3     all mental health professionals in the United States, it's

4     called the Diagnostic & Statistical Manual of Mental

5     Disorders and it's currently in its fourth edition and I've

6     worked on -- I was the editor of both the fourth edition and

7     then the text revision and that took up a lot of my time.

8     I'm also currently the primary technical consultant to the

9     World Health Organization, they're revising the international

10    classification of diseases, so I do that.  That right now is

11    occupying a large chunk of my time.

12         Q    The first one, is that commonly called the

13    DSM?

14         A    Yes, that is called the DSM, correct.

15         Q    That was the DSM-IV?

16         A    DSM-IV and then DSM-IV-TR, that's the text

17    revision, the one that's, if you go to Barnes & Noble now and

18    buy a book for this, that's the one, the TR, came out in the

19    year 2000.

20         Q    Now, Doctor, did you have occasion to meet

21    Ms. Collins?

22         A    Yes, I met Ms. Collins in the end of December

23    of 2009 and interviewed her for over six hours.

24         Q    And why did you interview her at that time?

25         A    I was asked by District Attorney, Assistant

1    District Attorney General for the state to interview her in

2    the context of this litigation.

3            Q    Okay.  And so we're clear, were you paid for

4    that?

5            A    Yes, I was paid for my time, both reviewing

6    the records and then doing the evaluation and preparing the

7    report.

8            Q    Okay.  Now how often do you testify in court?

9            A    Not too often.  This is maybe my fifth time

10   actually testifying on the stand, ever.  I do it

11   occasionally, I'm involved in probably a couple of cases a

12   year.

13           Q    And are those cases, if you can characterize

14   them, for plaintiff or defendant?

15           A    It's actually with criminal, a lot of work I

16   do is criminal, usually defense side criminal, occasional

17   prosecution; and the civil thing, it's probably equally

18   plaintiff versus defendant.

19           Q    Now, when you -- how long did you interview

20   Ms. Collins, if you recall?

21           A    Six hours, 15 minutes, according to my report.

22           Q    And who else did you interview if anyone?

23           A    After I did that interview, I asked

24   Ms. Collins for some contact information.  When I evaluate

25   people I like to speak to other people as well, to get -- I

1    call that informants or corroborating information so I spoke

2    to her husband, I spoke to her sister Debbie and I spoke to

3    Lieutenant -- what's his name, Hoefling, as well, so those

4    were the three other people in addition to Ms. Collins that I

5    actually had interviews.  Those three were by telephone, only

6    person I met face-to-face was Ms. Collins.

7         Q    And what other documents did you review in

8    order to make a determination?

9         A    I reviewed, among the documents I reviewed, I

10   reviewed -- there were some depositions that had been taken

11   so I reviewed the depositions, I reviewed the medical records

12   that were provided to me, I reviewed the actual complaint, I

13   think that was the main material.  And I think -- the

14   depositions, medical records, and some material that

15   Ms. Collins had prepared, chronologies, things like that.

16        Q    And as a result of that interview, did you

17   come to a diagnosis?

18        A    Yes, I did.

19        Q    What was your diagnosis?

20        A    My diagnosis is a diagnosis that is called

21   adjustment disorder with anxiety and depression.

22        Q    And can you tell us what that means in plain

23   English?

24        A    It's actually a diagnosis that mental health

25   professionals commonly use when they see patients and the

1  idea is is that, when a psychiatrist or mental health

2  professional makes a diagnosis, we have this manual, the DSM,

3  that you go through and you give a diagnosis if somebody

4  meets the full criteria for a disorder.  So like diagnoses

5  that probably people are more familiar with, something called

6  major depression, post-traumatic stress disorder,

7  schizophrenia, bipolar.  In order to give somebody a

8  diagnosis like that, you have to go through and see if they

9  actually meet the definitional criteria.  Sometimes people

10  have presentations that actually don't meet the criteria for

11  any disorder at all.  They sort of fall through the cracks,

12  usually milder, they don't meet the phenomenological --

13  that's why adjustment disorder was added to the book, to

14  reflect the fact that there are a number of patients who seek

15  treatment for presentations that actually don't meet the

16  definitional requirements for any disorders, but are

17  considered to be worthy of treatment, usually because they're

18  sort of, conceptualizes a reaction to a stressful life event

19  so adjustment disorder, that diagnosis reflects, my opinion,

20  that Ms. Collins' presentation of symptoms was a reaction to

21  difficult life circumstances but it wasn't severe enough to

22  meet the criteria for any other disorder in the diagnostic

23  manual.

24          Q     You mentioned PTSD.  Can you tell us what that

25  is?

1          A      Post-traumatic stress disorder is a very

2    specific diagnosis.  It -- it was originally, has a long

3    history, it's -- it existed well before the name PTSD came

4    into existence.  That name has only been used actually since

5    1980, but soldiers returning from war would come back with

6    something often called shellshock or combat neuroses.  As you

7    can imagine the experience of war, especially World War I,

8    World War II is very grueling, people would have a very

9    strong psychological reaction and that psychological reaction

10   could be very, very disabling and very, very severe and it

11   reflected the huge trauma and how people failed to cope with

12   the trauma.  And what happened was, is that it was introduced

13   in 1980, a lot of the pressure of the VA, the VA had a lot

14   of, at the time, you know, Vietnam war was only a little, 10

15   years before that, and a lot of vets were returning with

16   PTSD, with a reaction that was very, very disabling,

17   reflected the trauma of going through war in Vietnam.

18          So that diagnosis was created initially

19   because of combat exposure but it was recognized fairly

20   quickly that civilian life could be -- could also have very

21   severe stressors on the order of what people experienced

22   during war like being raped, being in a horrible car

23   accident, being held up with a gun, actually, you know, being

24   shot, seeing somebody killed in front of your eyes.  There

25   was a range of very traumatic experiences that were analogous

1    to combat exposure that people experience in their regular

2    life.

3              So PTSD was the diagnosis that reflected the

4    type of very specific reaction that people have to these

5    very, very severe trauma.  So the name post-traumatic stress

6    disorder reflects that it's post, after a trauma, and it's a

7    stress disorder meaning that you are reacting to it in an

8    abnormal way.

9              Q    Now, can there be a late onset or a delayed

10   onset of PTSD?

11             A    Absolutely.  Most cases of post-traumatic

12   stress disorder as you might imagine occur immediately after

13   the exposure, you know, you're all shaken up and it, then it

14   either sticks or slowly tails off.  Occasionally, people have

15   a delay, in fact there's a subtype of post-traumatic stress

16   disorder in the manual reflecting the fact that people can,

17   after exposure to a trauma, can actually do well for a while,

18   and then some other trigger, usually a life event proximal to

19   it, something that resembles the initial trauma can sort of

20   set it off.  If I come back from Vietnam and do okay for a

21   while and then get in a car accident or some other stressful

22   experience and that could sort of bring the whole thing up,

23   so there is a possible delay to onset.

24             Q    Now with adjustment disorder, is that limited

25   to a time, can someone be diagnosed with adjustment disorder

1    and it's limited by some time frame?

2              A    The duration, yes.

3              Q    Yes, duration.

4              A    The answer is, used to be.  It turned out that

5    for years, this was a diagnosis that the therapists use all

6    the time, it's one of the least stigmatizing diagnoses,

7    therapists love to use that diagnosis, but technically it was

8    actually misused a lot because up until the last edition of

9    the manual, the one I was involved with in 1994, there was a

10   six-month limit.  The idea was if you were exposed to a

11   stressful situation, and you're reacting to it and six months

12   go by, if you're still reacting to it, the clinician should

13   say to themselves, is this really adjustment disorder or am I

14   missing something else.  So there was a very strict six-month

15   limit.

16             We did the work on the diagnostic manual in

17   1994, we realized that that was a very simplistic view of

18   stress, life stressor, very often a stressor could go on and

19   on and on, somebody gets divorced so the divorce itself, the

20   spouse leaving is a stressor but then the whole process of

21   divorce drags on so you can have this chronic stress going

22   on, with a chronic reaction.  So we changed -- the limit to

23   adjustment disorder used to be six months, to forever

24   potentially if the stressor is forever.  And so we now have a

25   concept of chronic adjustment disorder instead of just -- so

1    in fact, in Ms. Collins' case, as I noted in my report, it's

2    actually a chronic adjustment disorder because the stress,

3    and ramifications of the stress, the litigation, the

4    depositions, everything else is chronic as well, so it could

5    go on indefinitely sometimes.

6              Q    Now, can PTSD be cumulative, small events that

7    add up over a period of time?

8              A    No, the trigger, you can -- I mean the trigger

9    has to be very, very severe.  What can happen is that

10   subsequent events can keep it going on, but you can't have

11   PTSD unless you start with a bang essentially.  It really

12   requires a life-threatening trauma to set it off.  Otherwise,

13   in fact technically it's not possible to call it PTSD unless

14   you have that kind of high level trauma.

15             Q    Did you find that high level trauma in the

16   case of Ms. Collins?

17             A    No.  When I evaluated Ms. Collins, one of the

18   reasons I did not even seriously consider a diagnosis of

19   post-traumatic stress disorder is because in her own

20   description of her experiences, none of them came close to

21   the level of life threatening trauma that is required for

22   post-traumatic stress disorder.  So that really wasn't even

23   in the ballpark as a serious consideration.

24             Q    Now, what was your observation with regard to

25   how she presented?

1       A    She's very -- was very, you know, fragile and

2   tearful, you know, she looked very together at times and when

3   she was describing much in her life, she was fine but when we

4   got into areas that she found very upsetting she became very

5   emotive.  So there was a sense of fragility about the

6   interview that I had to be, you know, take it very slowly,

7   and allow her to, you know, sort of recover from talking

8   about -- she's had a lot of difficult experiences in her

9   life, and often when she talked about some of these

10  experiences, they would trigger periods of tearfulness.

11      Q    What were some of those experiences that she

12  related to you?

13      A    Okay.  Among the various difficult life

14  experiences were her father, who was an alcoholic, would beat

15  up her mother, and she, interestingly enough, felt like she

16  wanted to protect her mother so she would -- the mother would

17  say, tell -- she had four other sisters, tell the other

18  siblings get out, go to your bedroom, I'm going to deal with

19  this and Ms. Collins refused to, she wanted to stick up for

20  her mother and really felt responsibility for her mother so

21  she saw some very, very troubling things.  This went on for a

22  number of -- it happened when her father was drinking, it

23  wasn't like he did it all the time but when it happened, I'm

24  sure it was extremely, extremely upsetting.

25              She also experienced a fairly long period of

1    sexual abuse as a child, her and her siblings, which was also

2    very traumatic.  She didn't tell anyone about it, but it was

3    a very traumatic experience.

4                    She then was in the Army, she ended up being

5    discharged because of some difficulty she had with, trouble

6    coping with some of the behavior of some of the other

7    soldiers, so that -- so all of those things, in addition to

8    what's -- her work at the prison and then afterwards.

9         Q    Now, I don't think I asked you, if I did,

10   forgive me, do you have a specialty within your research?

11        A    My area of specialty is actually somewhat

12   broad, it's diagnosis and assessment so I -- because I've

13   worked on the manual, I sort of know a lot -- a little about

14   a lot of the disorders mostly on the diagnosis and assessment

15   end so I've developed an interview that's used as the number

16   one most widely used interview by researchers for making

17   diagnosis and research studies.  So I kind of know a lot

18   about all the disorders, but I don't delve into just one.

19        Q    Did you use those, those guidelines as you

20   interviewed Ms. Collins?

21        A    Yes, I used the one, I did use -- it's called

22   the SCID, I did use that when I interviewed Ms. Collins.

23        Q    What is that?

24        A    Stands for the Structured Clinical Interview

25   for DSM-IV diagnosis.  I used pieces of it because -- part of

1    it since I wrote it, I really know, I just used it especially

2    for the PTSD and major depression section because those were

3    the two diagnoses I wanted to be really sure I was cataloging

4    the presence or absence of symptoms.

5            Q    Now did you review Dr. Alley's notes, her

6    treating physician?

7            A    Yes, I did.

8            Q    And can you tell us, were those notes of use

9    to you in your diagnosis?

10           A    Well, they -- Dr. Alley and I concurred on the

11   diagnosis, at least initially.  He for a long time gave

12   exactly the same diagnosis I did which is adjustment disorder

13   with depressed mood which reflected the fact that she was

14   having a number of different symptoms of depression and

15   anxiety and then at some point he shifted his diagnosis to

16   post-traumatic stress disorder.  It was very perplexing

17   because there was absolutely no documentation in the chart as

18   to why, what the justification for the change was, and that

19   diagnosis appeared to have stuck in his notes from that point

20   in time without any indication of where that diagnosis came

21   from.  I'm assuming -- Dr. Alley is a general practitioner,

22   he's not a psychiatrist, and that's not uncommon for

23   psychiatric care to be given by general practitioners in the

24   United States.  It's been estimated that 80 percent of the

25   medication for psychiatric disorders is actually prescribed

1    by GPs.  The problem with that, it's a reality there aren't

2    enough psychiatrists in the United States to treat everybody

3    that needs to be treated, including a lot of geographical

4    areas.  The problem with that is GPs are really not very well

5    trained, especially in diagnosis.  They get very, very

6    minimal training and I think his -- my sense of his diagnosis

7    of PTSD was sort of the typical colloquial, you know, she had

8    what he considered to be a trauma, though technically a

9    nonqualifying trauma for PTSD, and she had a couple of

10   symptoms, like avoidance behavior and hypervigilance which is

11   part of the cluster of PTSD symptoms.  So he seemed to assume

12   after awhile that, oh, that's PTSD without really, not even

13   not just justifying it, but really not having an

14   understanding from, I was able to see a deposition that he

15   gave after my evaluation, I neglected to say so I did, the

16   information I had mentioned went into the report but

17   subsequent to that, I did see a deposition from him and he

18   explained his -- how he made the diagnosis that it really

19   indicated he really didn't understand when it's appropriate

20   to give a diagnosis or not.  So he was sort of a lay version

21   of giving that diagnosis.

22            So I think that was kind of a mistake, but his

23   notes were helpful in the sense that he -- she was, it was,

24   provided a good progress of how she was doing, but he really,

25   very descriptive, so it was very -- where they really fell

1    short was where I had to figure out why did he think that

2    Ms. Collins had PTSD.  There was absolutely no documentation

3    to support that diagnosis at all.

4            Q    Now, Doctor, we heard in prior testimony that

5    keeping detailed notes is really not required for a doctor.

6    Is that true in your experience?

7            A    Well, what are required is, you know, by law I

8    think you have to keep a chart and you can keep as good or

9    bad a chart as you want.  It's generally considered to be --

10   if somebody's going to review the validity of a diagnosis, it

11   really depends on what you write down in the notes so I think

12   that most conscientious, certainly psychiatrists, now again,

13   general practitioner who's not that familiar with, you know,

14   the diagnosis may feel, you know, that it's not worth

15   spending the time, but I think it's not really good practice

16   to do that.

17           Q    In your experience do you not write things

18   down at the request of your patients?

19           A    Um, sometimes, actually.  I think, especially

20   in psychotherapy, it's like, as a psychiatrist, when you're

21   trying to work with someone over time, there's certain

22   details that somebody said, could you not put that in because

23   I've honored people's request to leave out certain

24   particularly embarrassing or stigmatizing details from the

25   chart, you know, especially in a note.

1          So I think that's -- many people do that

2    because we're trying, even though there's confidentiality,

3    there's always the risk of, you know, especially in

4    litigation, that notes are available.

5          Q    And with regard to Ms. Collins, what stressors

6    did you find in her life?

7          A    Well, the stressors, she -- there were a

8    number, when she was working in Auburn in particular she

9    reported various stressors including how she was being

10   treated by certain officers in the department, you know,

11   humiliating experiences, being -- essentially a lot of it's

12   being bullied, people clearly, in fact the theme that I saw

13   both, both my interview and also speaking to Lieutenant

14   Hoefling and actually speaking to her sister, is this idea

15   that, in a setting like a prison, in fact lots of

16   institutional settings, if somebody comes across as weak they

17   end up getting bullied.  Schools, too, that's how bullying

18   works, it's the weak, the kid who looks like he can be picked

19   on is the one that gets picked on.  And unfortunately certain

20   individuals who like to bully will take advantage of that, so

21   it looks like that's kind of what happened.  Ms. Collins is

22   very proper and very exacting and very, you know, never uses

23   curse words ever, very religious, very not into drinking so

24   she comes across as a fairly conscientious, perhaps

25   goody-two-shoes type of person.  In a prison setting that

1    doesn't probably play out too well and I think that she was

2    then picked on for the way she was, and people did things to

3    kind of get a rise out of her.  And I think she did her best

4    either to be tough and not show it, but other times she would

5    get a reaction and unfortunately that encourages more bad

6    behavior.

7                So it looks to me that that's what was going

8    on and I could see that being, certainly stressful enough to

9    justify a diagnosis of adjustment disorder with depressed

10   mood.

11          Q    Now, in that bullying that you mentioned, was

12   there a sexual or a gender component to that?

13          A    It's in the eyes of the beholder I imagine,

14   not -- you know, certain things could be construed as so

15   coarse that they were I guess to be outrageous.  When people

16   do outrageous things sometimes they frame it in terms of

17   could be sexual.  So it's certainly possible that a component

18   of the bullying came out in sexual terms.

19          Q    Well, for example, putting tape on glasses,

20   would you consider that to be sexual?

21          A    No, that's more typical bullying.  That's the

22   kind of thing you would see -- when I heard, I remember when

23   Ms. Collins told me that, I had visions of like the weak kid

24   in, you know, elementary school getting -- that's the kind of

25   thing they would do there, put a sign on somebody's back that

1   says kick me, that's the kind of, you know, juvenile behavior

2   that someone would do.  So I don't consider that sexual at

3   all.  It's certainly outrageous, unprofessional, but I

4   certainly don't see that as sexually based.

5           Q    How about bathroom humor?

6           A    Again, that's -- bathroom humor is, if you go

7   to the movies nowdays, unfortunately there's a tremendous

8   amount of bathroom humor all the time.  And I don't consider

9   that to be, you know, gender based.  It's outrageous, and

10  it's, I suspect that the bathroom humor for Ms. Collins was

11  because it was very clear, here's somebody who never, ever,

12  ever used a curse word, that if you want to get a rise out of

13  someone like that, bathroom humor would be the way to go, so

14  I assumed again that was what the primary motivation of using

15  outrageous bathroom humor was to get a rise out of her, and I

16  think it was successful doing that.  But that in and of

17  itself I don't consider to be gender based.

18          Q    Would that be enough to create her symptoms --

19  let me put it this way, would a string of those sorts of

20  events be enough to precipitate her symptoms?

21          A    Absolutely.  I mean this is, for her, for

22  someone who never uses curse words and doesn't appreciate

23  that humor at all, getting it over and over again would be

24  very, very stressful.  Especially since she's not in a

25  situation where she can just walk away, she's on duty, she's

1    stuck there so having to endure that and not be able to

2    escape could absolutely be a stressful situation that could

3    trigger the kinds of symptoms that she experienced.

4              Q    Now, when you interviewed her in 2009?

5              A    That's right.

6              Q    Did you have any opinion as to how she was

7    progressing?

8              A    Actually it was 2008.

9              Q    I'm sorry, 2008.

10             A    My report was in 2009.  At the time I saw her

11   she was actually doing a lot better.  She had, was on -- was

12   no longer working, she -- I saw her in December of 2008, she

13   had stopped working I believe in May of 2008 at the

14   correctional center and the last -- previous six months she

15   actually was on the path to doing much, much better, she was

16   much, much better.  She was taking classes, she was taking

17   classes towards getting a degree in marriage and family

18   counseling, and was doing quite well.  She had occasional

19   symptoms that persisted, but they seemed to be getting less

20   and less frequent, and she seemed to be, I think as I note in

21   my report, with a little bit of psychotherapy which was

22   something she's never really gotten, I could see her getting

23   completely better very, very quickly.

24             Q    Did she get therapy, as far as you know?

25             A    No, she really didn't.  From the very

1    beginning under Dr. Alley's first, Dr. Alley was smart enough

2    to realize when she came in the office back in December 2005

3    the number one treatment for adjustment disorder is therapy

4    so he recommended over and over and over again that she get

5    therapy, and she didn't.  She would -- a couple of times she

6    ended up getting one or two sessions, she would go to a

7    therapist, and then see the person one or two times and then

8    discontinue.  And usually what she told me was that their

9    office, she didn't click with the therapist or another later

10   point in time she said she couldn't afford it.  When I saw

11   her at the very -- when I was discussing with her why didn't

12   she get therapy now because she was still having some

13   residual symptoms, she said at that point she didn't want to

14   because she was worried about confidentiality and the

15   litigation and somehow the therapy would produce notes that

16   could be used against her in litigation.  So that was a later

17   reason, but they were -- I don't know how far back that

18   reason went but the reality is that I saw her in 2008, this

19   started in 2005 so over a period of three years she probably

20   had a total of six interactions, six sessions with three

21   different people.  And that's certainly not anything that I

22   would consider psychotherapy.

23            Q    Was that significant in any way as you

24   evaluated her?

25            A    It was puzzling.  I mean generally people,

1  nobody likes to have to go to a therapist, nobody likes to

2  have to spend money for therapy, but people do it because

3  they're in pain, that's why people get help.  The fact that

4  she didn't, I mean she also didn't really like to take

5  medication.  I understand the medication only insofar that

6  there are people that just don't like the idea of taking

7  medication.  As a psychiatrist who gives people medication, I

8  get that a lot.  People walk in and there's a lot of

9  ambivalence, it's going to make me different, have side

10 effects, so I certainly understand the reluctance to take

11 medication.  Psychotherapy, on the other hand, especially

12 someone like Ms. Collins who actually has interest in being a

13 therapist at something, that she is psychologically minded

14 and appreciates the value of psychotherapy, the fact that she

15 would choose not to get therapy says at least, I could only

16 assume that, she wasn't in enough pain to do it, spend the

17 time and effort to do it or to, you know, go to a therapist,

18 it doesn't click, you find the next therapist.  That's not

19 uncommon to not click with a therapist, but then you just go

20 to the next one until you find somebody to click with.  For

21 her to see somebody twice, not click and then give up,

22 obviously there's lots of reasons why that can happen, but

23 it's hard to avoid the assumption that the driving force to

24 get the therapy, the amount of pain one is in isn't enough to

25 push, motivate somebody to follow through, so it raised some

1    questions about the persistence and severity of the reaction.

2          Q    Now in your evaluation, was there some event

3    that was more significant to Ms. Collins than others?

4          A    There was one event in particular that really

5    I think had the biggest sort of downward trajectory.  She

6    originally saw Dr. Alley in December 2005, and with some

7    medication, she started doing progressively better and then I

8    think it was in September of 2006, an event happened that

9    both Ms. Collins as well in my interviews with her husband

10   and her sister, they all said exactly the same thing, the

11   suicide of Officer Whitley, who was somebody that she was a

12   fellow officer with, Ms. Collins, at Auburn.

13          Now Ms. Collins got out of Auburn because of

14   how she was doing, was reassigned to Eastern Correctional but

15   Officer Whitley stayed behind and she found out in September

16   of 2006 that he had committed suicide, and I think she

17   assumed that it was because of -- now she also felt that

18   Officer Whitley, like her, had been a target of mistreatment

19   at Auburn.  So she felt that she escaped, leaving him behind.

20   She assumed that the mistreatment at Auburn was the cause of

21   his suicide and she felt that had she stayed, she could have

22   prevented this from happening.  She felt horribly guilty.

23          Ms. Collins, one of her very positive traits

24   is her givingness and taking responsibility for other people,

25   and given how she sees the world as something that she should

1    take responsibility for, her having gotten out of Auburn and

2    leaving Officer Whitley behind and then having him commit

3    suicide was a huge blow to her, and that's when she really

4    started going downhill.

5            Q    Now, what -- do you know whether or not

6    Officer Whitley was male or female?

7            A    He was male.

8            Q    Did she blame anyone for his suicide in that

9    session?

10           A    She assumed the same officer who was the focus

11   of her -- who she attributed her -- the main person

12   mistreating her, she assumed that that same person was the

13   one who was responsible for Officer Whitley, and it turns out

14   that that officer got reassigned to -- in fact it was a

15   combination of factors.  My understanding is this officer got

16   reassigned to Eastern when she was there, and around the same

17   time she found out of Officer Whitley's suicide.  So it was a

18   combination of seeing, of hearing of the suicide and then

19   seeing this officer who she considered to be the cause of it,

20   at her own place, and that combination made her extremely

21   upset and very angry.  In fact what actually happened was

22   more than, it was outrage and, you know, she actually at some

23   point was afraid that she would actually hurt this officer.

24           Q    Now, do you have any facts to indicate whether

25   or not she -- strike that.

1          Did she have any facts that she related to you

2     about Officer Whitley's interaction at Auburn, other than

3     being picked on?

4          A     No, she actually was very vague.  She -- in

5     fact one of the things she told me, she said they called him

6     Mother Goose.  I said, why?  She said, I don't even know.

7     Raises a question about how intimate she even was of the

8     details of what happened to Officer Whitley.  But I mean

9     apparently he was another one of these people who was bullied

10     like her.  And she always said, I think, my understanding she

11     talked about how she identified him as someone being picked

12     on, she would go out of her way to try to be nice to him and

13     say supportive things to him, try to make him feel better.

14          So that's another reason why I think she felt

15     overly responsible because she felt that she was in fact

16     trying to prop him up and then her absence may have -- I

17     think she made a lot of assumptions obviously that what

18     happened to him in Auburn had anything to do with the

19     suicide.  I mean who knows?  I don't think she was aware of

20     the facts of what the context of his suicide was, but in her

21     mind she put two and two together and saw, A, that the

22     suicide was related to his mistreatment; and B, that had she

23     been there, she could have prevented it.

24          Q     Now, Doctor, at the end of your analysis, did

25     you find that Ms. Collins was disabled?

1       A    No, not at all.  In fact the, she was doing

2   very well, in that eight -- six-month period after she left

3   Eastern, she was taking classes and she was pushing ahead and

4   she looked perfectly capable of having, you know, a very

5   fruitful life as a marriage and family therapist.  So I

6   wouldn't consider her disabled at all, at the time she was

7   functioning quite well, again, with some symptoms but the

8   symptoms were not severe enough to interfere with her ability

9   to function in any significant way.

10      Q    Based on that examination, would you have

11  anticipated that her symptoms would get worse after your

12  encounter with her?

13      A    No, not at all.  In fact I wrote in my report

14  that I was expecting that she would continue on that

15  trajectory and be fine.  That was my expectation.

16      Q    And if, hypothetically, you were told that in

17  fact her symptoms got worse over time, can you draw any

18  conclusion from that?

19      A    Absolute -- I wouldn't, without knowing the

20  details, no, because I mean, what's very clear is that her

21  symptoms are connected with things that happened to her in

22  her life, so it would require a very careful understanding of

23  what her life was like and whether other stressors -- I mean

24  it's very, very clear that when bad things, difficult things

25  happen, she has a reaction, so if more difficult things were

1    to happen to her, having, you know, for whatever reason, I

2    would consider that to be the most likely cause of her

3    getting worse, but it would be pure speculation, I would have

4    no way of knowing.

5                    MR. KINSEY:  May I have a moment, please, your

6    Honor.

7                    THE COURT:  Yes.

8                    (Pause in Proceedings.)

9            Q     Now, Doctor, in your experience, if a -- an

10   individual is, in your words, doing fairly well, and then has

11   increased symptoms, what are the possibilities of the cause

12   of those, other than what you've mentioned, some other

13   stressors?

14           A     Well, it's all in context.  Now one thing that

15   you always have to consider, when one does an evaluation and

16   one examines someone and one comes to a diagnostic conclusion

17   in a forensic setting which this is, this is something where

18   the diagnosis is actually being used for purposes other than

19   just writing down on a bill to get insurance coverage.

20   There's always -- the number one thing that we're always

21   taught is to consider the possibility of malingering.

22   Malingering is what is basically when somebody is either

23   exaggerating or making something up for the purpose of

24   getting secondary gain.  So for instance, if somebody is in

25   the military and they want to get out, they may claim that

1   they have a condition to get them out, get out of the draft.

2   Somebody's in prison, they want to get moved, so it's

3   basically claiming you have a diagnosis for a specific

4   purpose.

5              In this context, when we move it out of those

6   circumstances and look at a civil complaint issue, when

7   somebody's in litigation and they have any new symptoms, it

8   always raises the question is this real, or is this

9   exaggerated.  Under normal circumstances when somebody walks

10  into my office for treatment, you know, because they are

11  feeling bad, I don't usually consider malingering as

12  something I worry about because I assume the person is coming

13  to my office being honest, telling their story as truthfully

14  as possible in order to get help.

15             In this circumstance, one of the things that

16  we needed to be ruled out is the possibility, because it's

17  occurring in litigation, of malingering.  Now I have no idea

18  in that case whether somebody is malingering, but that would

19  be the number one thing you'd be looking for, and luckily,

20  there's some tools we have, that's one reason we do -- you'll

21  probably notice there wasn't any psychological testing as

22  part of my evaluation because I felt that for the initial

23  evaluation, doing a clinical evaluation, a careful clinical

24  evaluation was sufficient.  But where there's a question of a

25  possibility of malingering, one of the techniques that one

1    does is to give a test so they can detect that, so that would

2    be -- so in a circumstance of somebody suddenly doing worse,

3    sort of inexplicably doing worse, one of the things that

4    would have to be ruled out is malingering which would require

5    a psychological testing to be able to help you one way or

6    another.  Otherwise, there's no way to know, because

7    unfortunately in the world of psychiatry and psychology, all

8    we have to go on is what people tell us, so we -- that's why

9    malingering is in a sense a particularly, you know,

10   occupational hazard because we don't -- we don't have a blood

11   test for depression or PTSD.  We simply go with what people

12   tell us, so we're always having to deal with the possibility

13   that what's before us may not be what's really there and

14   that's why I have to use a test like that.

15          Q    Were you made aware of any sexual assault in

16   plaintiff's background at that session?

17          A    No.  Actually the only sexual assault was the

18   childhood sexual abuse, but that was it.  There was

19   absolutely no other history presented to me by Ms. Collins or

20   in any of the notes or records of any other type of sexual

21   assault.

22          Q    None of the people you interviewed talked

23   about that at all?

24          A    No.

25          Q    Now, Doctor, the term situationally dependent,

1   can you tell me what that means, symptoms are situationally

2   dependent, can you break that down?

3          A    Yes.  I think I wrote that in my report and I

4   was referring to the fact that when she was not, you know,

5   she in fact went on a cruise at some point fairly early on,

6   she did fine because she was outside of the situation.  So

7   it's like -- let me give you an example.  If somebody had

8   major depression and you take them on a cruise, they're going

9   to be depressed on the cruise because that diagnosis is

10  within them, and it is independent of the situation.  When

11  you have a situationally dependent reaction, then if you

12  remove the person from the situation, the symptoms usually go

13  away, so that much of her distress, especially at the

14  beginning, was situationally dependent and I was basing that

15  judgment on the fact that there were lots of circumstances

16  where in fact she said over and over again and I believe

17  Dr. Alley said in his notes that when she was not thinking

18  about work or not involved in it in any way, she was actually

19  doing very, very well.  It was actually when she focused on

20  it that she actually felt very, very upset and anxious.

21         Q    Other than the events you mentioned, was there

22  something else that stood out in your diagnosis of her for

23  evaluation?

24         A    I had this -- I guess a concern of an ongoing,

25  I mean I -- personality, long-term, long-standing style of

1  interacting and you know this feeling of being overly --
2  wanting to rescue everyone, I mean she said something very
3  unusual about her experience having been sexually abused as a
4  child, she thought that was a blessing.  Most people don't
5  say that and I said, why would that be a blessing?  And she
6  said that's allowed her to empathize with other people
7  suffering.  So again, that's an unusual perspective but
8  that's a valid perspective, I think that says a lot about her
9  empathy, her ability to empathize and not just empathize but
10  identify and then go even further and sort of be, you know,
11  wanting to rescue the world and protect other people.  And I
12  think part of her frustration, you know, and it gets into the
13  issue of other stressors, I think part of her frustration all
14  along is her feeling like when this happened to her, when she
15  started the litigation from the outset, she wanted to change
16  the system.  It was not just correcting, getting compensated
17  for what happened to her, but she's been on a campaign to
18  change the whole system.  It's very difficult to change a
19  large system like this, and that's been a huge source of
20  frustration, and I think the frustration of that is feeding
21  into -- that's become the stressor on its own.  And I think
22  that's one thing that's made it very difficult, the
23  frustration of not being able to achieve her own goal of
24  actually having sort of, you know, as she said, I don't want
25  this ever to happen to anybody else.

1          She's used -- in fact she had as a good

2     example when she was, she had a misdiagnosed ectopic

3     pregnancy and she also -- I said, did you blame the doctor?

4     She said, no, in fact the doctor apologized and she said,

5     well, the fact this won't happen to anyone else, that's good

6     enough for me.  And I think this element of wanting to make

7     sure this doesn't happen and that's unfortunately an

8     unrealistic goal in life, that you can have that kind of

9     power and reach, and I think that's a huge source of

10    frustration and that I think is making life more difficult

11    for her as well.  It's hard to accept that possibility I

12    think, and that comes from her lifelong upbringing and how

13    she's viewed the world.

14               MR. KINSEY:  Thank you, your Honor.

15               THE COURT:  Mr. Andrews.

16               MR. ANDREWS:  May I approach, your Honor.

17               THE COURT:  You may.

18               (At Side Bar.)

19               MR. KINSEY:  You've been so quiet.

20               MR. ANDREWS:  I'm not quiet right now because

21    that was a violation, a clear violation of the spirit of the

22    ruling if not the letter of the ruling, to remove the name

23    but to clearly identify him through circumstances is

24    outrageous and I think can only be addressed by words from

25    the court, your Honor, to the jury.  Unless someone can offer

1    any kind of evidence that my client ever met, spoke to, did

2    anything with Officer Whitley which he did not, then I think

3    that needs to come from a source other than him denying it.

4              MR. KINSEY:  May I be heard?

5              THE COURT:  Yeah, go ahead.

6              MR. KINSEY:  We took the name out as we had

7    discussed, but within the context of his report, that was the

8    focus of what she wanted to talk about.

9              THE COURT:  Taking a name out, you clearly

10   identify him based on the information that's been provided to

11   this jury, we're talking about the defendant.

12             MR. KINSEY:  But that's key to his diagnosis

13   of her, is that she had focused on this and this had become

14   the cause and was also the cause of the whole incident at

15   Eastern.

16             MR. ANDREWS:  Your Honor, that was something

17   to bring up before he essentially identified him contrary to

18   the court's direction.

19             THE COURT:  The problem is that there's, you

20   know, there's no evidence anywhere in this record to suggest

21   that defendant Mitchell had anything to do with this officer

22   that committed suicide or even knew him.  And now you've

23   created this impression with this jury based on this witness'

24   testimony that he was to blame for that as well, and that's

25   why he objected before you got started, and that's a problem.

1    That's a problem.

2            MR. KINSEY:  Well, then I can apologize to the

3    court because that was not our intent.  Our intent was to

4    show that this was a central stressor and was driving her in

5    her symptoms.  And I don't know how else I get that out.

6            THE COURT:  Well, my understanding, you were

7    going to talk about, you know, her perception that somebody

8    was responsible, didn't have to lay it out in the way that we

9    now know, everybody who sat in this courtroom for the past

10   week knows that we're talking about defendant Mitchell.

11           MR. KINSEY:  Well, and I specifically did not

12   enter his report because it's quite prominent in the report.

13   We would have to redact paragraphs.

14           MR. ANDREWS:  That's what you said you were

15   going to do if you put it in.

16           THE COURT:  Well, Mr. Andrews, you can work on

17   a corrective instruction which I'd be happy to give.  I don't

18   know how you want to deal with it, I don't know if you want

19   to cross-examine or examine this doctor and lay the

20   foundation that there is, you know, there's no way of

21   knowing -- I don't know what you want to do.

22           MR. ANDREWS:  I don't see what I can do for

23   cross, your Honor, but if you can tell the jury that there's

24   no evidence that defendant Mitchell had anything to do with

25   this officer, that he never met him, and never --

1            THE COURT:  Well, we don't know that.

2            MR. ANDREWS:  Well, I would make that

3    representation to the court, your Honor, he will testify to

4    that effect.

5            THE COURT:  Well then, that's a corrective

6    instruction that I can give after his testimony, I'm not

7    going to do it now, okay, so there's a basis for it.

8            MR. ANDREWS:  I understand.

9            THE COURT:  Okay.

10            MR. KINSEY:  To both of you, my apologies, I

11    blew it.  I take full responsibility for it but I thought

12    taking his name out and simply identifying the stressors was

13    going to get there.  And I understand --

14            MR. ANDREWS:  He threw my client under the

15    bus, your Honor.

16            MR. KINSEY:  I understand what the court has

17    said and I apologize to counsel, I understand his upset.

18            THE COURT:  Anything else?

19            MR. ANDREWS:  No, your Honor.

20            MS. SHEEHAN:  Your Honor.

21            THE COURT:  If you have some wording that you

22    want me to use, I'll take a look at it.

23            MS. SHEEHAN:  One minute.

24            (A discussion was held off the record between

25             Ms. Sheehan and Mr. Kinsey.)

1              MR. KINSEY:  We would make a further proffer,

2    we didn't bring in the IG report on the suicide because we

3    felt that would be prejudicial.  The investigation was

4    started by Ms. Collins, the IG did a full investigation, they

5    were not given the -- there was a note, the DOCS people were

6    not given the note, but they were given a representation from

7    the District Attorney's office that DOCS was in no way

8    implicated in the suicide note or in the suicide.

9              THE COURT:  I don't know what you're asking.

10             MS. SHEEHAN:  Well, does that proffer help the

11   court in its wording, or in being assured that this was

12   not -- this did not involve Lieutenant Mitchell in fact?

13             THE COURT:  I see what you're saying, yeah,

14   that's something you may want to consider.

15             MR. ANDREWS:  Okay.

16             MS. CONNOR:  Your Honor, I would ask that if

17   he intends on -- are you intending on using this IG report?

18             MR. KINSEY:  No, absolutely not.

19             THE COURT:  Sounds like what he's suggesting

20   is that I can say in my corrective instruction that there was

21   an investigation and that this correction officer's suicide

22   was determined had nothing to do with DOCS or anyone in DOCS.

23             MR. KINSEY:  That's the result of the

24   investigation.

25             THE COURT:  As a result of the investigation.

1            MS. CONNOR:  I would just request that he

2     share that report then with counsel so that we all can see

3     it.

4            MR. KINSEY:  Sure.

5            MS. CONNOR:  Review it.

6            MR. ANDREWS:  I would be satisfied with that

7     as a curative instruction, your Honor.

8            THE COURT:  Without naming anybody or anything

9     further.

10            MR. ANDREWS:  Without naming anybody, I'm

11     going to have him deny knowing the person when he testifies,

12     but --

13            THE COURT:  I still think it may be

14     appropriate if I waited, at that point, unless you're

15     requesting for me to do it now.

16            MR. ANDREWS:  I would prefer that it be done

17     now, your Honor, closer in time to when that thought was

18     planted in the jury's mind.

19            THE COURT:  Okay.  Well, I'll do it after

20     cross-examination by Ms. Connor.

21            MR. ANDREWS:  Thank you.

22            THE COURT:  Before we take our morning break.

23            MR. ANDREWS:  Thank you, your Honor.

24            MR. KINSEY:  I'm finished with this witness,

25     both counsel have the opportunity to cross.

1          MR. ANDREWS:  There's nothing I can do with

2     that on cross, your Honor.

3          THE COURT:  All right.

4          (Open Court.)

5          THE COURT:  Mr. Kinsey, you're done with your

6     direct?

7          MR. KINSEY:  Yes, thank you, your Honor.

8          THE COURT:  Mr. Andrews?

9          MR. ANDREWS:  No questions, your Honor.

10          THE COURT:  Ms. Connor.

11          CROSS-EXAMINATION BY MS. CONNOR:

12     Q    Good morning, Dr. First.

13     A    Good morning.

14     Q    I'm Mairead Connor, I'm an attorney and I

15     represent the plaintiff Penny Collins in this matter, so I'm

16     going to ask you some questions concerning some of your

17     testimony this morning.

18     A    Sure.

19     Q    Now you mentioned in your testimony that

20     you've been paid for your services to testify here today?

21     A    Paid for my time, yes.

22     Q    Your time.  And how much have you been paid

23     today?

24     A    I -- 10,000, something like that.  Actually I

25     don't know, I think I sent that information in to you at your

1    request but I don't -- didn't, don't remember what it is.

2          Q    Well, I've never requested it, but would it

3    surprise you that the Attorney General office has disclosed

4    that prior to your testimony today, you've been paid in

5    excess of 13,000?

6          A    That could be right.

7          Q    What's your hourly rate for trial testimony?

8          A    $400 an hour.

9          Q    Now just to be clear, you are not Ms. Collins'

10   physician, isn't that right?

11         A    That's correct.

12         Q    And there's no doctor-patient relationship

13   between you and Ms. Collins, is that right?

14         A    Not at all, that's right.

15         Q    Now you testified that -- about various

16   criteria to diagnose post-traumatic stress disorder.  And

17   isn't it true that one of the first criteria that you would

18   look at would be that a person would experience or been

19   confronted with a threat, a physical -- one's physical

20   integrity, isn't that one of the primary criterion of

21   diagnosis, diagnosing post-traumatic stress disorder?

22         A    That phrase was included to cover sexual

23   assault specifically.

24         Q    But it's all -- physical integrity is what,

25   Doctor?

1          A    Sexual assault, we decided --

2          Q    Only?

3          A    Yes, when that -- I was involved in the

4    writing of that criterion and we were trying to come up with

5    what wording would cover the issue of sexual assault, so that

6    was the wording that was chosen.

7          Q    Why didn't it say sexual assault then?

8          A    I think they didn't want it to be, I don't

9    know, I guess they felt it would be stigma -- I'm not sure

10   exactly, but they specifically didn't want to, in fact I

11   believe in the current version to clarify it, it's switched,

12   there's a revision going on right now and it's actually, I

13   think it's explicitly mentioned sexual assault but at the

14   time we were a bit vaguer and we meant it was meant

15   specifically for sexual assault and when I did trainings for

16   the DSM-IV after it came out, we would always say that this

17   change in wording, because the difference between DSM-III-R

18   and IV was we didn't actually mention the actual stressors,

19   we said things like something that would be traumatic to

20   almost everyone and people got a lot of -- confused about

21   what exactly that meant.  So we made an attempt to try to

22   categorize the types of traumas that would qualify.

23         Q    So you would agree then that physical

24   integrity would suggest something broader than sexual

25   assault, wouldn't you, because that's why you are in the

1  process of revising it, is that right?

2          A    Created some confusion, I'm not sure what it

3  suggested but we just decided we should just be more specific

4  about it.

5          Q    Now, would you agree that in many cases,

6  post-traumatic stress disorder symptoms can seem similar to

7  adjustment disorder, because both are linked to anxiety that

8  would develop after exposure to a stressor, would you agree

9  with that?

10         A    Yes, some -- well, adjustment disorder has no

11  symptoms actually, it's simply a reaction to a stressful life

12  event.  So certainly any symptoms that are characteristic of

13  any disorder in the DSM are consistent with the diagnosis of

14  adjustment disorder, including PTSD.

15         Q    Now, isn't it true that for an adjustment

16  disorder, the stressor does not have to be outside the normal

17  human experience?

18         A    That's correct.

19         Q    And that therefore a stressor that would be

20  outside a normal human experience could be considered a more

21  extreme type of stressor, isn't that true?

22         A    Adjustment disorder includes stressors that

23  are both within and extreme, so includes everything.

24         Q    Now, would you agree, Doctor, that trauma is

25  somewhat of an individualized experience, that everyone

1    experiences trauma somewhat differently?

2              A    Yes, that's true.

3              Q    And that what might be traumatic to one person

4    might not be so traumatic to another person, isn't that true?

5              A    That's true.

6              Q    Because not everyone who's exposed to a

7    stressor would develop some symptoms of either PTSD or

8    adjustment disorder in response to that stressor, isn't that

9    right?

10             A    Absolutely true.

11             Q    Now, just to be clear because your testimony,

12   you corrected it at the end but you talked to my client in

13   2008, not 2009, isn't that right?

14             A    It was December of 2008.

15             Q    December, right, of 2008, then you wrote a

16   report?

17             A    It was dated January 2009.

18             Q    January 2009?

19             A    That's correct.

20             Q    And you would agree that to diagnose

21   post-traumatic stress disorder, the person does not have to

22   be in fear of his or her life, it just has to be an extreme

23   fear of one's physical integrity, isn't that right?

24             A    No, I wouldn't, actually.  I would consider it

25   has to be there's fear.  Whatever the triggering event is,

1    that's the kind of thing somebody -- if you're in a car

2    accident and you're trying to determine whether a car

3    accident is severe enough to qualify for post-traumatic

4    stress disorder, the person would have to feel that the car

5    accident is putting them at risk of losing their life at the

6    time of the car accident.

7          Q    But someone who has -- someone who's witnessed

8    an event could also be diagnosed as post-traumatic, with

9    post-traumatic stress disorder, isn't that right?

10         A    If the event is horrible enough like seeing a

11   dead body, stuff like that.

12         Q    And the person has not experienced that him or

13   herself, it's the witnessing, isn't that right?

14         A    If the event is severe enough, yes,

15   absolutely.

16         Q    Now, also, in diagnosing PTSD, you would look

17   at the person's reaction to that stressor, isn't that right?

18         A    Well, you need both the stressor and the

19   reaction, and the symptoms, that's correct, all three.

20         Q    And then the reaction you would look for would

21   be an intense fear or helplessness?

22         A    Or horror, right, start with, right, there's,

23   different layers, start with the stressor --

24         Q    Doctor, I just asked you the reaction.

25         A    Okay, yes, that is one of the -- that is

1   required as a reaction to the trauma, that's correct.

2                   THE COURT:  Ms. Connor, I'm going to ask you

3   again, don't interrupt a witness while they're answering a

4   question, okay.  You can follow up, but please do not

5   interrupt.  One person at a time.

6                   MS. CONNOR:  Thank you, your Honor.

7                   Now, Doctor, for an adjustment disorder, are

8   there different types of adjustment disorders?

9           A    Yeah, it's subtyped based upon the types of

10  symptoms that you see.

11          Q    And what is the type of adjustment disorder

12  that you diagnosed my client to have?

13          A    I believe -- I'll check just to be sure, I

14  believe, I have a copy of my report.

15          Q    Doctor, is that the only document that you're

16  looking at there?

17          A    Yes.  And adjustment disorder with mixed

18  anxiety and depressed mood, that's what I wrote down and

19  that's what I believe.

20          Q    Now what is mixed anxiety, added to an

21  adjustment disorder, Doctor?

22          A    It basically is a descriptive term to indicate

23  that Ms. Collins' presentation to Dr. Alley was symptoms of

24  anxiety and depression, that's all it means.

25          Q    And was, when you say presentation to

1    Dr. Alley, but that's your diagnosis, isn't that right?

2            A    That's right, and that her presentation to me

3    was describing symptoms of both depression and anxiety,

4    correct.

5            Q    And that you would consider an adjustment

6    disorder to have clinically significant emotional or

7    behavioral symptoms, wouldn't you?

8            A    Absolutely.  Otherwise you can't diagnose it,

9    that's true.

10           Q    Wouldn't -- right, that's okay, great.  And

11    that those symptoms have to be characterized by marked

12    distress in excess of what would be expected from the

13    stressor, isn't that right?

14           A    No, there's actually two choices, you can have

15    it, the original, what happened was is that when we went from

16    DSM-III-R to IV, it used to be only marked distress in excess

17    of expected and then we added this or, that it causes

18    clinically significant impairment or distress so if somebody,

19    we tried to get off the idea of trying to require clinicians

20    to decide whether it was in excess of expected, because

21    that's very difficult to do.  So the diagnosis now is pretty

22    broad.  If you simply have symptoms in response to a

23    stressful life event that caused clinically significant

24    distress or impairment, usually marked by things like going

25    for treatment, then that's all you really need to make the

1    diagnosis, it's pretty broad.

2            Q    Now, an individual's reaction to the stressors

3    could vary based on certain factors, isn't that right?

4            A    Yes.

5            Q    And could -- these factors can be age,

6    ethnicity, gender?

7            A    No.

8            Q    Is that right?

9            A    I wouldn't say that it's -- those are the

10   factors.  The main factors that have to -- that dictate how

11   people react to stressors are their own individual makeup,

12   their upbringing, their previous life experiences.  I don't

13   think age, gender, or ethnicity have anything to do with it

14   at all.  They're just aspects of the person.  Only now they

15   can and if somebody was, you know, comes from an ethnicity,

16   lives in, you know, in England and somebody's part of a

17   minority, you know, oppressed minority, it's possible that

18   actually that wouldn't affect how they react to it at all.  I

19   take that back, it may create -- may be more circumstances by

20   which that person would be picked on or oppressed but

21   actually how someone reacts to it really depends on the

22   individual, in fact as you yourself pointed out, there are

23   people who have no reaction to a stressor and people who have

24   intense reactions and it really depends upon individual

25   factors, not group factors.

1        Q     But those individual factors could consist of

2   their past experiences, right?

3        A     Oh, absolutely.

4        Q     And that that may -- they may be gender

5   specific in some cases, isn't that right?

6        A     That person views their life in that terms, it

7   could be, sure.

8        Q     Now, I thought you gave some interesting

9   testimony on this concept of workplace bullying.  Are you

10  familiar, I'm sure, with the term chronic PTSD?

11       A     Yes.

12       Q     And what is that?

13       A     Basically if someone meets the criteria for

14  PTSD and it lasts a long period of time, you add the word

15  chronic to indicate that it's of long duration.

16       Q     Isn't chronic PTSD a diagnosis that's

17  associated frequently with workplace bullying?

18       A     No.

19       Q     You've not heard of that?

20       A     Not at all, because in fact workplace

21  harassments and those types of behaviors are excluded from

22  PTSD because it's not life threatening, so in fact, if

23  there's studies that claim that, it's a misuse of the

24  diagnosis.

25       Q     Have you heard of the term complex PTSD?

1          A    Yes, I have.

2          Q    And what does that term mean?

3          A    It's an un -- how hard to say, it's not

4    clearly defined.  I'm actually involved in, I think I

5    mentioned, the revision of the international classification

6    of diseases that's up on our -- we actually have one of the

7    experts on complex PTSD present to us and that's a vaguely

8    defined term usually having to -- it was an attempt to

9    capture people who were victims of long-term domestic

10   violence, childhood sexual abuse, the idea is that ongoing

11   serious trauma goes on for years, produces a special form of

12   PTSD which is more the cause, more complex than typical PTSD,

13   so it's a -- it talks about the stressors remain having to be

14   at the same level as regular PTSD but it's a reflection of an

15   individual who's had multiple stressors over long periods of

16   time.

17         Q    And you mentioned that it's in the process of

18   what?

19         A    Well, it was considered for the DSM-V

20   revision, rejected, and it's been proposed for the ICD-11

21   revision and we just started discussing -- I was really

22   pointing out I'm familiar with it because that just, I've

23   actually had some interactions about that but it was already

24   rejected for inclusion in the DSM-V because of the feeling

25   that there was insufficient empirical data to justify its

1    addition.

2              Q    Isn't it true that many of the disorders that

3    are included in the DSM at one point were rejected but

4    eventually studies established them and then they were

5    accepted into the DSMs over the years; isn't that true?

6              A    Not -- I guess the only example, there have

7    been some disorders that were proposed for the DSM, then are

8    placed in a research appendix to generate more research and

9    then they have been -- basically there's one example of that,

10   which is premenstrual dysphoric disorder but complex PTSD my

11   understanding is not even going to be put in the research

12   appendix, it was just something that was proposed.  I'm

13   sorry.

14             THE COURT:  That was me, I apologize.

15             A    It was proposed for inclusion by outside

16   people, the working group reviewed the data, felt that it was

17   still too poorly defined, that's been the problem with

18   complex PTSD.  It was actually proposed for the version I was

19   involved with, under a different name called DESNOS,

20   Disorders of Extreme Stress, because there's been this

21   ongoing interest and claim in people that have had chronic

22   stressors over time have a different form of PTSD than people

23   who have standard PTSD and that the data has not really borne

24   that to be true in any way to include it in the DSM.

25             Q    That's your view of the data, isn't that

1    correct?

2            A    That's the committee's view of the data.

3            Q    And Doctor, isn't it true that PTSD itself,

4    you testified in your direct, that that was not recognized

5    until 1980, isn't that right?

6            A    Wasn't officially added to the DSM-III until

7    1980 under that name.

8            Q    But it existed before 1980, didn't it?

9            A    As combat neuroses, exclusively associated

10   with war time.

11           Q    But the people suffering from it didn't

12   experience anything different before 1980 than they did after

13   1980, did they?

14           A    That's true, it's a label that was added,

15   that's right.

16           Q    A label?

17           A    That's correct.

18           Q    Now you mentioned in your direct examination

19   that there were -- that one of the stressors you believe that

20   added to Ms. Collins' distress was that she couldn't walk

21   away from her duty, isn't that right, when exposed to certain

22   things on the job, she couldn't walk away from her duty?

23           A    Yes.

24           Q    Do you recall that testimony?

25           A    I guess what I was saying is the fact that she

1    would experience, you know, workplace humiliation and the

2    fact that she couldn't leave because she was on duty was

3    something that would make it more stressful, that's correct.

4         Q    And in being in a prison setting, when you're

5    on duty you can't just walk out, can you?

6         A    That's correct.

7         Q    Most jobs you cannot but in -- particularly a

8    prison because it's a crime if you leave your post, did you

9    know that, Doctor?

10        A    I -- Ms. Collins actually explained that to me

11   during our exam.  I did not know that beforehand but I

12   learned that and it certainly makes sense that it should be.

13        Q    Okay.  And that therefore, would you agree

14   that my client felt trapped in the job and unable to leave

15   when exposed to these stressors; would you agree with that?

16        A    Yes, I think that's fair.

17        Q    More or less like a captive on the job, isn't

18   that right?

19             MR. KINSEY:  Objection, your Honor.

20             THE COURT:  I'll sustain the objection.  You

21   can rephrase your question.

22        Q    Isn't it true that being trapped on a job with

23   those type of stressors would make one feel captive, Doctor?

24        A    I'm not sure what you mean by the word captive

25   in that context.

1       Q     Unable to leave, unable to go away from the

2  stressors?

3       A     Yeah, I think that -- I think I said, restate

4  it again, the fact that she couldn't leave would make the

5  experience of the stress more difficult than someone in a

6  similar situation experiencing similar stressor who could

7  leave, it would make it more difficult, yes.

8       Q     And would you agree that the environment would

9  contribute to the stress that my client felt on the job?

10      A     What aspect of the environment?

11      Q     The work environment, would you agree -- I'll

12 withdraw that then.  Would you agree that being exposed to

13 these stressors in front of inmates would add further stress

14 to my client on the job?

15      A     Well, she reported that that was a stressful

16 aspect of it, that's correct, so I'm assuming if she said

17 that, it's true.  I'm accepting that as true for her, yes.

18      Q     Now you were asked some questions on direct

19 about bathroom humor, I believe?

20      A     That's right.

21      Q     And bathroom humor, to you, Doctor, would this

22 be considered bathroom humor, "Penny gives shitty head," is

23 that bathroom humor?

24      A     No.

25      Q     What is that?

1          A     It's a crude statement, I mean, the use of the

2     word shitty in that context, I would consider that -- the

3     kind of bathroom humor I'm talking about is talking about

4     bodily functions, making that claim, that is probably not

5     strictly just bathroom humor.

6          Q     Would you agree that that's a gender-based

7     statement that's humiliating and degrading to the person to

8     whom it's about?

9          A     That statement sounds to me like it could be

10    perceived that way, absolutely.

11         Q     And if it was followed up by a statement,

12    "Shitty head is better than no head," would you agree that

13    that's further statement of the same type?

14         A     I think I would agree with that, yeah.

15         Q     And then a later statement that says, "I

16    wouldn't let that bitch touch me," would you agree that that

17    is another statement of that same type?

18         A     Yes.

19         Q     None of that's funny, is it, Doctor?

20         A     No, not at all.

21         Q     Now, Doctor, you testified that Ms. Collins

22    was worried about confidentiality in her interview with you,

23    do you recall that?

24         A     She was -- what I said was that when we were

25    discussing why not get therapy now, she had said that one of

1  the reasons she wasn't getting it now was the fact that she

2  was worried that somehow this would be used against her in

3  her litigation.

4        Q    Well, isn't it true that her expression of

5  this confidentiality related to disclosure about her sisters

6  being abused by the neighbors?

7              MR. KINSEY:  Objection, your Honor, no

8  foundation for this.

9              MS. CONNOR:  Your Honor, he testified about

10 that.

11             THE COURT:  The objection is sustained.  There

12 is no foundation at this point that I've heard.

13       Q    In expressing her fear or hesitancy, I should

14 say, about confidentiality, was it in the context of her

15 wanting to protect her sisters?

16       A    That wasn't my understanding of it.

17       Q    And didn't Ms. Collins tell you in her

18 interview of you that she was counseling with Dr. Alley?

19       A    She said that she was seeing him as her

20 doctor, I don't think she used the word counseling.

21       Q    Now Doctor, isn't it true that a person who

22 has PTSD can suffer from flashbacks, rather nightmares and

23 daydreams of the traumatic event, isn't that true?

24       A    Those are symptoms of PTSD, correct.

25       Q    And you testified that you considered certain

1    notes of Dr. Alley's in your diagnosis of Ms. Collins, isn't

2    that true?

3              A    As corroborating information.

4              Q    And did you review a note of Dr. Alley's from

5    September 17th, 2007 concerning the plaintiff's arrest, do

6    you recall that note?

7              A    I recall reviewing it, I don't remember it

8    verbatim off the top of my head but I do remember that note,

9    yes.  I remember he wrote a note in reaction, when he saw her

10   shortly after that incident, so I do remember there was a

11   visit about that and that he did document that.

12             Q    Doctor, I'm going to show you what's been

13   marked previously as Plaintiff's Exhibit 79, if I may

14   approach, your Honor?

15             THE COURT:  You may.

16             Q    Second to the last page, Doctor.  It's dated.

17   Do you have the note from --

18             A    It's from the 13th, is there another --

19             Q    Maybe I misspoke.  I did misspeak, it's

20   September 13th, thank you.

21             A    Yes.

22             Q    Okay.  Are you familiar with that note?

23             A    I've read it before, sure.

24             Q    And do you see there that Dr. Alley's note

25   states, "Sheriff screamed at her like Sergeant Wright at

1    corrections," do you see that?

2              A    Yes.

3              Q    And wouldn't you think that that would be a

4    note then of a flashback to Sergeant Wright in corrections by

5    the sheriff?

6              A    Absolutely not.  The definition of flashback,

7    reexperiencing something as if it were happening now, simply

8    said it reminded her, the word like here is remind, sounded,

9    that experience reminded her of being screamed at by Sergeant

10   Wright so I don't consider that as a flashback at all.

11             Q    When you read this note, though, did you have

12   an understanding that the sheriff had pulled Ms. Collins over

13   for a traffic stop?

14             A    Yes, that's correct.

15             Q    And that she did not get out of the car

16   because she had a dreadful and loathing fear of the sheriff?

17             A    That's what she said, sure.

18             Q    And that she reported to Dr. Alley when she

19   did get out of the car, he screamed at her like Sergeant

20   Wright; did you have that understanding from the note?

21             A    Yeah, that was my understanding, yeah.

22             Q    Now you would not agree that that was

23   reexperiencing the trauma of Sergeant Wright by my client?

24             A    No, it's basically, what it was is she had an

25   experience that was similar to something that she found

1   traumatic in the past and that would therefore make his --

2   the sheriff screaming at her more upsetting than it would

3   under normal circumstances, that's correct.

4           Q    But do you think it's normal that a person

5   pulled over for a traffic stop won't get out of the car

6   because they have a fear of police?

7                MR. KINSEY:  Objection, your Honor, outside of

8   the expertise of what the normal person would do at a traffic

9   stop.

10               THE COURT:  Well, it may be, it's

11  cross-examination, I'm going to let the doctor answer, if you

12  can.  If you can.

13          A    I'm sorry, you're saying is it not normal,

14  depends on the circumstance.  I mean, that, for instance, if

15  you thought the situation was dangerous because there was

16  passing traffic, maybe wouldn't get out of the car, I don't

17  know how normal or abnormal it is.

18          Q    Did you talk to Ms. Collins about this

19  incident when you interviewed her?

20          A    I, she told me the -- she described that

21  incident to me, yes.

22          Q    Didn't she tell you in that that she had a

23  fear of the police, that's why she didn't get out of the car?

24          A    Yes, that's what she told.

25          Q    That's not traffic going by, she didn't report

1    that to you, did she?

2            A    No, she -- she reported to me that she was

3    afraid of the police, yes, she did report that to me.

4            Q    And that's why she didn't get out of the car,

5    isn't that right?

6            A    Presumably, yes.

7            Q    That's what she reported to you, that's all

8    I'm asking you.

9            A    Okay, yes, that's what she said.

10           Q    Now, you reviewed medical notes from Dr. Alley

11   between what day and -- what dates?

12           A    I'll check my report.  It was from, I believe

13   that whatever -- the notes existed up to 2007.

14           Q    What date in 2007?

15           A    Looks like up to October 2007.

16           Q    And since that time, have you had an

17   opportunity to review any additional notes from Dr. Alley?

18           A    No, just the deposition, his deposition.

19           Q    You've reviewed no other medical records

20   since -- of Dr. Alley's since October 2007, is that right?

21           A    I wasn't given any, that's correct.

22           Q    Doctor, what's a panic attack?

23           A    A panic attack is a brief experience of panic,

24   extreme anxiety and panic that is accompanied by racing

25   heart, shortness of breath, it's kind of a rush of extreme

1    anxiety that feels like a panic, and it comes on very, very

2    quickly.

3              Q    And that can be accompanied by chest pain,

4    isn't that right?

5              A    Absolutely, yes.

6              Q    And in reviewing your notes of Dr. Alley's,

7    did you note that Ms. Collins had suffered from panic attacks

8    or some sort of panic reactions?

9              A    Yes, absolutely.

10             Q    And that if you would look at the -- her --

11   the records before you which is Plaintiff's Exhibit 79.

12             A    Yeah.

13             Q    Isn't it true that those panic reactions did

14   not start until sometime after December 7th, 2005?

15             A    That's correct.

16             Q    And that at one point, March 7th, 2007 in the

17   records before you, she reported that it was like an elephant

18   sitting on my chest, do you see that in the note from

19   March 7th, 2007?

20             A    March 15th, 2007?

21             Q    Direct your attention to March 7th, 2007.  I

22   can't give you a page number because they're not numbered,

23   you have to look at the dates on the left.

24             A    Yeah, I'm looking at the dates because this

25   packet goes from September 1st, 2006, to -- says 8/8/7, and

1    then 3/15/07, so I don't see that.  I do remember that from

2    my own report, though, to tell you the truth.  Actually it's

3    not on -- unless it's out of order.

4              MS. CONNOR:  If I can approach the witness, I

5    can probably --

6         A    Please, if you can find it, sure.

7              MS. CONNOR:  Is that all right, your Honor?

8              THE COURT:  Yes.

9         Q    I'm going to show you my copy.  Move this

10   along.  Show you my copy of Plaintiff's 79, Doctor.  There's

11   a note there?

12        A    Yes, I see there.

13        Q    3/7/07, you see that?

14        A    Yes, I see that.

15        Q    And that note reflects Ms. Collins stating

16   that there's like -- feels like an elephant sitting on her

17   chest, isn't that right?

18        A    That's right, I see that.

19        Q    And isn't that associated with an attempt of

20   hers to return to work?

21        A    Yes.

22        Q    And that -- would that then suggest to you

23   that returning to work was causing some of these new -- these

24   repetition of symptoms?

25        A    Yes, I would assume that.  I could assume from

1    that that she had -- going to work was triggering anxiety,

2    yes.

3              Q    Now, wouldn't you agree that Dr. Alley's notes

4    report a lot of sleeplessness or difficulty with sleeping by

5    Ms. Collins?

6              A    Yes.

7              Q    That her sleep essentially was poor, she

8    suffered from periods of sleeplessness and had a medication

9    actually prescribed, isn't that true?

10             A    Absolutely.

11             Q    And would you agree that Dr. Alley's notes

12   report anxiety throughout different visits?

13             A    Yes.

14             Q    When she came?

15             A    Yes.

16             Q    And that some of those -- that anxiety was

17   associated with her attempts to return to work?

18             A    Yes.

19             Q    And would you agree that his notes suggested

20   she has certain fears, such as the police, would you agree

21   with that?

22             A    Yes.

23             Q    And would you agree that she -- his notes

24   reflect a fear of going out of the house?

25             A    Yes.

1          Q     And did -- what's hypervigilance?

2          A     Hypervigilance is being especially vigilant

3    about the environment because of fear of something bad

4    happening to you.

5          Q     And that's associated with PTSD, isn't it?

6          A     One of the symptoms of PTSD but it's actually

7    a very nonspecific symptom of anxiety.

8          Q     And would you agree that Dr. Alley's notes

9    express that Ms. Collins suffered from hypervigilance at

10   times?

11         A     Yes, at times.

12         Q     As well, right?

13         A     That's right.

14         Q     And that was associated with thinking about

15   work, going back to work, associated with work, isn't that

16   right?

17         A     He didn't actually say that so I'm not a

18   hundred percent sure, it was just hypervigilance in general.

19         Q     And would you also agree that Dr. Alley's

20   notes reflect concerns about depression that Ms. Collins

21   reported?

22         A     Yes.

23         Q     And that's throughout his notes that you

24   reviewed, isn't that right?

25         A     That's correct.

1          Q    And isn't it true that he reports bouts of

2     crying, unable to stop crying during some of the visits

3     within his office?

4          A    Yes.

5          Q    Isn't that true and that was associated with

6     stressors related to work, isn't that right?

7          A    Yes.

8          Q    Now, did there come a time, Doctor, that you

9     were aware of Ms. Collins attempting to return to work

10    subsequent to this 2007 time period?

11         A    I believe in 2008, she went back for three

12    months, from March until May.

13         Q    And did she report that to you in your

14    interview with her?

15         A    Yes.

16         Q    And did she report the types of symptoms she

17    experienced in attempting to go back to work?

18         A    I have to look, can I look at my report?

19         Q    Certainly, go right ahead.

20         A    Yes, she reported having a panic attack.

21         Q    And what occurred to precipitate the panic

22    attack, if you recall?

23         A    She was in a close space.

24         Q    With another officer, male officer, isn't that

25    right?

1          A     That's correct.

2          Q     So Doctor, you testified on your direct that

3     Ms. Collins was not disabled, if I recall your testimony, do

4     you recall that?

5          A     I think at the time of my evaluation, that was

6     my assessment, correct.

7          Q     Now, but wouldn't you agree she was disabled

8     to return to work as a corrections officer?

9          A     In that particular, where -- I mean where she

10    was, she was -- I guess it depends upon was she temporarily

11    disabled at the time, I guess that's true.

12         Q     Well, wouldn't you agree that she's shown

13    repeated attempts to go back to work and those were

14    unsuccessful due to recurrence of symptoms related to

15    anxiety, related to panic attacks?

16         A     Right.

17         Q     You agree with that, Doctor?

18         A     I would agree that that's true, yes.

19         Q     Wouldn't you think that would render her

20    unsuitable to return to work as a corrections officer?

21         A     Temporarily, yes, meaning that if I -- when I

22    fill out disability reports and they always ask about what

23    you expect this to happen with therapy and treatment, I would

24    expect this disability would be overcome.  But without

25    treatment, yes, that's true.

1          Q     Well, she's -- she's received medication for

2     certain symptoms, isn't that right?

3          A     Very sporadically, and it was very limited

4     medication, very sporadically, I don't consider to have

5     received the appropriate treatment for her condition.

6          Q     She was prescribed Lexapro, isn't that right?

7          A     For two brief periods of time.

8          Q     She had a reaction to it, nausea, I believe,

9     is that right?

10          A     That's right.

11          Q     She was unable to tolerate it well, I guess,

12     is that right?

13          A     That particular medication, yes.

14              MS. CONNOR:  May I have just a moment, please,

15     your Honor.

16              THE COURT:  You may.

17              (Pause in Proceedings.)

18              MS. CONNOR:  Thank you, I have no further

19     questions for the witness at this time.

20              THE COURT:  Okay.

21              MS. CONNOR:  I'm going to take the paper back.

22              THE WITNESS:  I'm sorry, did you want your

23     paper back?

24              MS. CONNOR:  Yeah, I'll get it.

25              THE WITNESS:  Here's your copy and here's the

1    other.

2              MS. CONNOR:  Thank you very much.

3              REDIRECT EXAMINATION BY MR. KINSEY:

4         Q    Doctor, you were asked about this report of an

5    elephant sitting on Ms. Collins' chest.  Would that

6    experience be unique to PTSD?

7         A    No, that's a nonspecific symptom of anxiety.

8         Q    Would it be one of the symptoms of PTSD that

9    you would look for?

10        A    It could be.  It's also consistent with

11   adjustment disorder with anxiety and depressed mood.

12        Q    How about sleeplessness, is that unique to

13   PTSD?

14        A    Very nonspecific, it's unique to no disorder

15   in the DSM except sleep disorder so it is one of the symptoms

16   of PTSD but it's also symptom of anxiety and depression and

17   adjustment disorder.

18        Q    How about anxiety, would that be unique to

19   PTSD?

20        A    No.  Again, that's nonspecific, it's part of

21   PTSD but also seen in many, many DSM disorders.

22        Q    How about fear of going outside, would that be

23   unique to PTSD?

24        A    That's actually not even part of PTSD, that's

25   more typical of agoraphobia.  I don't know what -- how much

1    the fear of going outside is related to -- but it's certainly

2    not even part of PTSD but it's not specific to any disorder

3    except for agoraphobia.

4         Q    I apologize, what --

5         A    So agoraphobia is basically a phobia of going

6    outside and usually is related to the fear of triggering a

7    panic attack.  My understanding in this particular

8    circumstance is she was afraid of going outside because she

9    was worried about having -- running into a corrections

10   officer and her concern about seeing a corrections officer

11   was actually somewhat complicated.  If this was classic PTSD

12   or anxiety-induced thing, there would be pure fear.  In fact

13   much of her worry is she didn't want to have a confrontation

14   with someone but she was worried that she herself would be so

15   angry that she might lose control which is -- we don't even

16   have a diagnostic term for that, but that pulls you quite

17   outside of the typical anxiety disorder.

18        Q    How about hypervigilance, is that unique to

19   PTSD?

20        A    Not at all, that's actually very

21   characteristic of anxiety.

22        Q    And how about depression, is that unique to

23   PTSD?

24        A    Depression actually isn't even part of the

25   PTSD definition, it's actually part of mood disorders and is

1    again very common and it's part of the adjustment disorder

2    with anxiety and depressed mood.

3                Q    And the last one being afraid of closed

4    spaces; is that unique to PTSD?

5                A    No.

6                Q    In order to get a diagnosis of PTSD, Doctor,

7    what needs to be present?

8                A    You know, it's one of the most complicated

9    criteria sets in the manual.  The first thing of course is

10   the exposure to a life-threatening trauma and the reaction to

11   it which is a fear of helplessness or horror so you have to

12   have that first.  Once you have that, there are three

13   different clusters of symptoms.  The first cluster, your

14   symptoms having to do with reexperiencing the trauma in some

15   way so that's where flashbacks, people familiar with

16   flashbacks, that's a hallmark of that, having intrusive

17   thoughts of the traumatic experience, avoiding situations

18   that remind you of the traumatic experience, that's the B

19   cluster.  The C cluster are avoidance and numbing behaviors

20   and then the D cluster is hyperarousal so some of the

21   symptoms that you're talking about, the hypervigilance and

22   anxiety and insomnia are in the D cluster but only a piece of

23   a much more complicated syndrome.

24               Q    If you have those and no precipitating event,

25   can you have PTSD?

1          A     No.

2          Q     Now can one develop PTSD thinking about

3    someday they might have a traumatic event?

4          A     No.

5          Q     Now, I believe you said you expected with

6    treatment she could return to work?

7          A     I thought it was quite possible if not likely.

8    I mean, since she didn't have treatment, it's open for

9    speculation but -- but this kind of -- treatment for these

10   kinds of things that are anxiety and avoidance patterns are

11   actually among the things that we treat most readily.

12   There's desensitization exercises, you imagine the thing

13   you're afraid of, you become desensitized to the anxiety,

14   you -- if you have thoughts, oh, something terrible is going

15   to happen to me, you do cognitive techniques to correct those

16   thoughts so there's all types of techniques which are often

17   very, very successful.

18              I couldn't guarantee that those techniques

19   would in fact be successful in Ms. Collins' case but since

20   they were never tried, it would be certainly premature to

21   have any assumption that she was permanently disabled by the

22   fact that she was having difficulty tolerating relatively

23   rare -- in fact the reality is she was back on the job for

24   three months before she left with this panic attack.  So it

25   shows that these are relatively isolated circumstances.  So

1    the fact that they were relatively infrequent, if I were

2    treating her I would think this is a very good prognosis

3    because if it was, she was feeling this way all of the time

4    and leaving every day, that would be much more difficult

5    situation.  The fact that there are isolated circumstances

6    that trigger this, she could either avoid those circumstances

7    or if circumstances like that happen she could use cognitive

8    techniques to sort of talk herself out of the anxiety, or I

9    mean there's lots of things that could have been done that

10   would have potentially allowed her to sort of be treated to

11   be able to go back to work, had she chosen to do that.

12          Q    Doctor, you talked on your cross-examination

13   about she could not leave the facility.  You recall that?

14          A    Yes.

15          Q    Did she make you aware that there was a

16   procedure for going to medical and being excused from work?

17          A    No.

18          Q    You were unaware of that when you examined

19   her?

20          A    Right.

21          Q    Last question, Doctor.  Can someone recover

22   from bullying, being bullied?

23          A    Well, recover implies there's an illness

24   associated with it so I mean if someone is bullied and has a

25   very severe reaction to it, and then of course they could,

1    like with anything, I mean the passage of time usually

2    results in recovery for most of these types of things.

3                    MR. KINSEY:  Thank you, Doctor.

4                    MR. ANDREWS:  No questions, your Honor.

5                    THE COURT:  Ms. Connor, do you have anything

6    further?

7                    MS. CONNOR:  I have just a couple, your Honor.

8                    THE COURT:  Okay.

9                    RECROSS-EXAMINATION BY MS. CONNOR:

10          Q    Doctor, just on your redirect examination you

11   were asked about a prognosis would be good when Ms. Collins

12   returned to work but then she had three months of successful

13   work and then a panic attack occurred, isn't that right?

14          A    That's my understanding, yeah.

15          Q    And in your interview with Ms. Collins did she

16   explain to you what precipitated that panic attack?

17          A    I think she said she was in a closed -- the

18   mail room with some -- another officer nearby and she felt

19   closed in and then developed a panic attack and felt that

20   meant to her that she really wasn't able to stay at this job.

21          Q    And were you aware of a time that Ms. Collins

22   attempted to return to work at another facility after that,

23   and had to leave with a panic attack as well?

24          A    After the time I met with her.

25          Q    Second time, your Honor -- second time,

1   Doctor.

2          A    Well, the time you're --

3          Q    Do you remember that?

4          A    May of 2008 and I -- she had been out of, is

5   there a time before that you're talking about?

6          Q    There's a time before that then.

7          A    I think so, yeah, no, no, she did go to work.

8          Q    She went to Eastern?

9          A    Yes, that's correct.

10         Q    And isn't it true that the reason she couldn't

11  stay at Eastern, that she reported to you was the arrival of

12  Lieutenant Mitchell?

13         A    That's what she said, yeah.

14         Q    And that that precipitated panic again, isn't

15  that right?

16         A    Precipitated a lot of anxiety, yes.

17         Q    And isn't it true that she made -- told you

18  that she asked at times at Auburn to be relieved from her

19  post, asked Lieutenant Mitchell or then Sergeant Mitchell

20  rather at Auburn to be relieved from her post and he refused

21  to let her be relieved to go to medical?

22         A    I'm not aware she told me that.

23              MS. CONNOR:  No further questions, thank you.

24              MR. KINSEY:  One moment.  Nothing further,

25  your Honor, thank you.

1          THE COURT:  Mr. Andrews?

2          MR. ANDREWS:  Nothing, your Honor.

3          THE COURT:  Doctor, thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  You may step down.

6          (Whereupon the witness was excused.)

7          THE COURT:  Can I see counsel at the bench,

8   please.

9          (At Side Bar.)

10         THE COURT:  I'm going to give the jury a break

11  but before I do that I'm going to give them a curative

12  instruction with regard to this correction officer who

13  committed suicide.  I'm going to say two things, basically

14  that there was -- New York State Inspector General's office

15  determined that there was nothing to show that the cause of

16  the suicide had anything to do with his work at corrections

17  or anybody at corrections, but I also have recollection of

18  testimony earlier that the family of Correction Officer

19  Whitley reported that it had nothing to do with his work at

20  corrections.

21         MR. KINSEY:  That's correct.

22         MS. CONNOR:  Your Honor, that wasn't

23  testimony, it was in the form of a question from counsel and

24  my --

25         THE COURT:  It was affirmed.

1           MS. CONNOR:  My client didn't know as I

2    recall.

3           MS. SHEEHAN:  That is true, Ms. Collins stated

4    she did not know the cause of death.

5           THE COURT:  I remember the question.

6           MS. SHEEHAN:  Okay.

7           MR. ANDREWS:  She said she didn't know what

8    the cause of the suicide was.

9           THE COURT:  Is there anything --

10          MR. ANDREWS:  Still no evidence.

11          THE COURT:  Anything to suggest that the

12   family didn't say this or we don't know?

13          MS. CONNOR:  I don't know, your Honor.

14          MR. KINSEY:  What I can tell you from the IG's

15   report is that there was a note, that the District Attorney

16   and the coroner reviewed the note, that they sealed the note,

17   that the IG from DOCS could not read the note but got

18   assurances from both the coroner and from the DA that there

19   was no mention of DOCS or anyone from DOCS and it was in no

20   way related to his job at DOCS.  Apparently he had family

21   problems and financial reversals.

22          MS. SHEEHAN:  He shot himself and it was not

23   with the gun --

24          THE COURT:  I understand that, I'm not going

25   to get into all that.

1    MS. SHEEHAN:  No, but I want you to know.

2    MR. KINSEY:  For your information.

3    MS. SHEEHAN:  Your Honor, the investigation

4  was commenced because Ms. Collins made a complaint to them

5  and they were investigating the possible abuse of Officer

6  Whitley.

7    THE COURT:  I'm not going to get into that

8  either.

9    MS. SHEEHAN:  No, but I want you to know.

10    THE COURT:  All right.  So then I'll stick

11  with my original instruction, I'm not going to get into the

12  family, I'd just -- somewhere in the proof but if she didn't

13  answer affirmatively, I'm not going to get into that, but IG,

14  DA's office, no determination of any -- okay.

15    MR. ANDREWS:  Determination that it wasn't.

16    THE COURT:  Right.

17    MR. KINSEY:  I have the file if the court

18  wants to review it or counsel wants to review it, but I've

19  been asked by the IG not to make copies and distribute them

20  because it's been sealed.

21    THE COURT:  As long as everybody can review

22  it, that's fine.

23    MR. KINSEY:  Thank you.

24    MR. ANDREWS:  Thank you, your Honor.

25    (Open Court.)

1    THE COURT:  Okay, ladies and gentlemen, I'm

2    going to let you take your morning break, but before I do

3    that, before I send you out, I want to give you an

4    instruction on certain proof that's come in in this case.

5    There's been testimony a couple of times about the suicide of

6    a Correction Officer Whitley, and I want this jury to

7    understand and make sure that it's very clear that

8    investigation by the New York State Inspector General's

9    office, the DA's office that was in the county involved,

10   there was a determination that his suicide had nothing to do

11   with his work at corrections and had nothing to do with any

12   individual at corrections.  It had to do with other things

13   that were going on in his life so you need to understand

14   that, and accept that as true, in any evaluation of any

15   evidence -- of the evidence that you're going to be looking

16   at in this case.  Okay.  I want to make sure that that's

17   clear and it's clear now, so that if there's any other

18   testimony about this suicide, that you have that

19   appreciation, okay.  Again, nothing to do with his employment

20   at DOCS or anybody at DOCS or New York State Department of

21   Corrections, okay.

22         Don't talk about it, don't discuss it among

23   yourselves, don't let anybody approach you and talk to you

24   about it.  We're going to take about a 10-minute break or so,

25   we'll get you back out here for further testimony, okay.

1    Thank you.

2                        (Jury Excused, 10:55 a.m.)

3                        THE COURT:  Okay.  Any objections or requests

4    from counsel with regard to that curative instruction?

5    Ms. Connor?

6                        MS. CONNOR:  No, I'm fine, your Honor.

7                        THE COURT:  State, Mr. Kinsey or Ms. Sheehan?

8                        MR. KINSEY:  No exception.

9                        THE COURT:  Mr. Andrews?

10                        MR. ANDREWS:  That was perfect, your Honor,

11    thank you.

12                        THE COURT:  Okay, very well.

13                        MR. KINSEY:  Your Honor, may I have permission

14    to release Dr. First at this point?

15                        THE COURT:  Fine with me.  Anybody else?

16                        MR. KINSEY:  He is subject to recall.

17                        THE COURT:  Ms. Connor, you envision any

18    reason why you would be recalling Dr. First?

19                        MS. CONNOR:  At this point, I do not.

20                        THE COURT:  Mr. Andrews?

21                        MR. ANDREWS:  No, your Honor.

22                        THE COURT:  Okay.  And state, you're done with

23    him, so he's released, he can go.

24                        MR. KINSEY:  All right, thank you, your Honor.

25                        THE COURT:  All right.  About 10 minutes,

1    okay?

2                    THE CLERK:  Court's in recess.

3                    (Whereupon a recess was taken from 10:56 a.m.

4                     to 11:10 a.m.)

5                    (Open Court, Jury Out.)

6                    THE COURT:  Okay.  Are we going to now

7    continue with Superintendent Graham, Mr. Kinsey?

8                    MR. KINSEY:  Yes, your Honor, we're prepared.

9                    THE COURT:  Okay, why don't you come on up,

10   sir.  Okay, just remind you you're still under oath, we'll

11   take it from there.  Bring the ladies and gentlemen of the

12   jury in.

13                   MR. ANDREWS:  Your Honor, I've not had an

14   opportunity to cross-examine.

15                   MS. CONNOR:  I'm sorry.  He mentioned my

16   cross, and I'm more than happy to cede to counsel.

17                   (Jury Present.)

18                   THE COURT:  Okay.  The record should reflect

19   we have the ladies and gentlemen of the jury, we have

20   Superintendent Graham back on the stand, and we're going to

21   have examination by Mr. Andrews.  Go ahead, sir.

22                   MR. ANDREWS:  Thank you, your Honor.

23

24        H A R O L D   G R A H A M , recalled as a

25   witness and being previously duly sworn, testifies

1    as follows:

2                    CROSS-EXAMINATION BY MR. ANDREWS:

3         Q    Superintendent Graham, you testified about a

4    meeting that you had with the plaintiff, do you recall that

5    testimony?

6         A    I do.

7         Q    That took place on November 9th, 2005?

8         A    That's correct.

9         Q    The day before Ms. Collins' glasses were

10   taped, is that correct?

11        A    That's correct.

12        Q    During the course of that meeting, Ms. Collins

13   never mentioned Troy Mitchell's name, did she?

14        A    No, she did not.

15        Q    She raised various complaints that she had

16   had?

17        A    She did.

18        Q    And you talked to her about what you were able

19   to do and what the office of diversity management had to do?

20        A    That's correct.

21        Q    And at the end of that meeting she seemed

22   unsatisfied?

23        A    She stood up, said this is going nowhere,

24   shook my hand, walked out the door.

25        Q    And that's also the meeting during which you

1  noted she had the right to sue in federal court if she wanted

2  to?

3          A     That's correct.

4                MR. ANDREWS:  No further questions, your

5  Honor.

6                THE COURT:  Thank you, Mr. Andrews.

7  Ms. Connor, now it's your podium.

8                CROSS-EXAMINATION BY MS. CONNOR:

9          Q     Morning, Superintendent.

10         A     Good morning.

11         Q     I wanted to begin also with the same

12  conversation that counsel just asked you about with Penny

13  Collins.  Now this conversation was initiated by Ms. --

14  Officer Collins, isn't that right?

15         A     That is correct.

16         Q     And now in this conversation, isn't it true

17  that she told you that she -- Auburn was not friendly to

18  females?

19         A     That's not true.

20         Q     Didn't she say words to that effect?

21         A     Not to my knowledge.

22         Q     Well, didn't she tell you about problems she

23  thought were gender related at Auburn; would you agree with

24  that?

25         A     No.  The problem she directed me toward was

1   the being thrown out of the chart office by the sergeant and

2   not being paid overtime.

3           Q    Well, didn't she talk to you about other

4   problems than that?  Was that the only problem she mentioned

5   to you?

6           A    She mentioned grievance that she filed and the

7   fact that the union didn't handle the diversity part of the

8   grievance.

9           Q    And she was very dissatisfied with the fact

10  that she didn't feel her concerns about harassment were being

11  handled as part of the grievance, isn't that right?

12          A    That's correct.

13          Q    Now, Superintendent, didn't you give a sworn

14  statement concerning the contents of your -- of this

15  conversation with Officer Collins?

16          A    Yes, I did.

17          Q    And you gave that to Mary Mayville from the

18  office of diversity management, isn't that right?

19          A    That's correct.

20          Q    You gave that statement on February 13th,

21  2006, do you remember that?

22          A    Yes.

23          Q    I'm going to show you what's been marked as

24  Plaintiff's Exhibit 8.  Now, do you see in that second

25  paragraph -- I'll withdraw that first.  Is this your sworn

1    statement?

2              A    It is.

3              Q    And do you see in the second paragraph, it

4    says the conversation was that Officer Collins felt that

5    Auburn was not user friendly to female staff, do you see

6    that?

7              A    Yes, I do.

8              Q    And that's a fact of what she told you, is it

9    not?

10             A    It's in my statement.

11             Q    So is that what she told you or did she not

12   tell you that?

13             A    If it's in my statement it would have been

14   what she told me, correct.

15             Q    Now, in that statement, didn't you tell

16   Officer Collins at the time that you didn't see any problems

17   for females at Auburn?

18             A    Not sure if that were my exact statement or

19   not, no.

20             Q    Well, didn't you tell her that you had been

21   there for a short time but yet you did not see any problems,

22   there was nothing to indicate there's a hostile environment

23   in the workplace for female employees; didn't you tell her

24   that?

25             A    That would have been correct, somewhere along

1    that line.

2                Q    And how long have you been there?

3                A    At that point in time, I think I was there 27

4    days.

5                Q    Not even a month?

6                A    Correct.

7                Q    You would agree?  Now did you talk to Officer

8    Collins about your prior experience in corrections and that

9    you crossed a picket line?

10               A    To the best of my knowledge, no, I did not.

11               Q    And -- but isn't it true that you did cross a

12   picket line?

13               A    That is true.

14               Q    So how would Officer Collins know that if you

15   didn't tell her that in the conversation?

16               A    It's common knowledge amongst staff.  I have

17   no idea who she knows, who she doesn't know as far as

18   correction officers and sergeants and so that would have been

19   a common knowledge in the day.

20               Q    When did you cross that picket line?

21               A    I'm not sure of the exact date.  It was two

22   days in Sing Sing.

23               Q    About how long ago was it, prior to this

24   conversation?

25               A    Thirty-two years ago.

1      Q    It's common knowledge 32 years later, is that

2   your testimony?

3      A    Most people know it.

4      Q    They do now if they didn't, right?  Okay.

5   Now, you were very hesitant about talking with Ms. Collins in

6   this conversation, isn't that right?

7      A    That's not true.

8      Q    Well, you didn't want -- you felt like you

9   shouldn't have spoken to her, isn't that right?

10     A    Once the conversation took place, that's

11  correct, I knew where I would be and I'm here.

12     Q    Well, you didn't feel you should speak to her

13  because you were afraid you'd become part of her lawsuit,

14  isn't that right?

15     A    Absolutely not.  I wouldn't have talked to

16  her.

17     Q    Well, isn't it true you said, "I talked to

18  Collins but probably shouldn't have, she stated she had a

19  lawyer and I felt I was going to be part of her lawsuit,"

20  isn't that true?

21     A    That's true.

22     Q    So isn't it true you were more concerned about

23  your own involvement in a potential lawsuit than the issues

24  she was bringing to your attention, isn't that true?

25     A    That's not true.

1          Q    Now, in this meeting, didn't you tell

2    Ms. Collins to put her complaints in writing?

3          A    I did.

4          Q    And that's the proper procedure in your view,

5    right?

6          A    It is.

7          Q    Especially if you have a harassment complaint

8    or a gender-based type of complaint, wouldn't that be true?

9          A    That's correct.

10         Q    You'd like to see that in writing, isn't that

11   right?

12         A    It's not required if she -- on my end if she

13   came verbally, made a verbal complaint I would take the

14   verbal complaint.  I would ask her to put it in writing,

15   though.

16         Q    So when she subsequently put complaints in

17   writing, she was doing what you requested, isn't that right,

18   Superintendent?

19         A    Absolutely.

20         Q    You can't fault her for that, can you?

21         A    Absolutely not.

22         Q    Now isn't it true in that meeting that you

23   told her that she should sue in federal court?

24         A    No.

25         Q    That she had a right to sue in federal court,

1    didn't you tell her that?

2              A     That is correct.

3              Q     And that's what she eventually did, isn't that

4    right?

5              A     That's correct.

6              Q     And here we are.  Now you also mentioned that

7    she was upset concerning the overtime issue.  What took place

8    in that part of the conversation between you and Officer

9    Collins?

10             A     She discussed the fact that she was thrown out

11   of the office, chart office by a sergeant and when she

12   requested overtime, and she had filed a grievance and a

13   diversity complaint on it and she wanted -- she kept talking

14   about this incident and I told her that I'm not allowed to

15   reinvestigate an incident that diversity is investigating,

16   and then we had a discussion about the grievance and she was

17   upset that the counseling, or excuse me, NYSCOPBA didn't

18   handle that part of the grievance and in my opinion, NYSCOPBA

19   would handle the overtime issue but would defer the diversity

20   issue to diversity management and not do the diversity part.

21             Q     Now, isn't it true that she was more concerned

22   about how she had been treated by Sergeant Wright than

23   receiving the amount of overtime, isn't that right?

24             A     I would say that's true.

25             Q     And in fact, the dispute about the overtime

1    was really over seven minutes of overtime, isn't that right?

2          A    I'm not sure the exact time at that point, I

3    wouldn't know how much overtime it was but I would agree that

4    the overtime was probably the secondary part.

5          Q    And you had that understanding because you --

6    she told you or you had some knowledge that it had gone to

7    the office of diversity management, isn't that right?

8          A    Correct.

9          Q    That gave you some notice that it was a

10   gender-based dispute, isn't that right?

11         A    Not necessarily.

12         Q    She told you that, didn't she?

13         A    No, I don't believe she told me that it was

14   gender based.

15         Q    Well, didn't she say she was treated that way

16   because she's female?

17         A    She may have.

18         Q    And you -- are you aware of how much seven

19   minutes of overtime amounts to in dollars, at Officer

20   Collins' level at the time?

21         A    They don't get seven minutes, it would be 15,

22   it would be rounded off to 15 minutes.  You get paid in

23   quarter-hour increments.

24         Q    What's a quarter hour of her salary at that

25   time?

1          A     I don't have a clue.

2          Q     Somewhere in the neighborhood of $5, 5.50,

3    somewhere in that neighborhood, would you agree?

4          A     It would be a nominal amount, correct.

5          Q     Now, after this meeting with Officer Collins,

6    you became aware of a memorandum that she wrote concerning

7    complaints of discrimination by defendant Mitchell, is that

8    right?

9          A     That's correct.

10         Q     And do you remember the date of that?

11         A     The date that I became aware?

12         Q     The date of the memorandum.

13         A     I believe it was -- I'm not sure of the date

14   of the memorandum.

15         Q     What date did you become aware of it?

16         A     I'm not sure of that date either.  Whatever

17   date she wrote the memorandum and turned it over to the watch

18   commander would be the day I was notified.

19         Q     Going to show you what's been marked as

20   Plaintiff's Exhibit 11.  Is that the memorandum?

21         A     Yes, it is.

22         Q     And the date on that is what?

23         A     It's November 10th, 2005.

24         Q     And the subject is what?

25         A     Inappropriate behavior.

1          Q     And so you became aware of this on or about

2     November 10th, 2005, is that right?

3          A     On or about, correct.

4          Q     Now, how'd you find out about this?

5          A     I received a phone call, it was on a day off

6     so I received a phone call from Captain Rourke informing me

7     that Ms. Collins had given this letter to Lieutenant Vasquez

8     who was the watch commander at the time so I had him read me

9     the letter.  Once he read me the letter I instructed him to

10    go to my office -- draw my key, go to my office, secure that

11    letter on my desk and relock my door and I will pick it up

12    the next business day.

13         Q     And he read you this letter verbatim, is that

14    right?

15         A     Well, at the time I wouldn't know that, but I

16    told him to read me the letter, he read the letter.

17         Q     He read the contents of Plaintiff's Exhibit 11

18    to you?

19         A     Yes, he did.

20         Q     Now, when you heard the contents of this, did

21    you think that this conduct, if true, would violate the

22    department's policy on sexual harassment?

23         A     I'm not sure it would definitely violate

24    employee manual as far as the sexual harassment and stuff,

25    that would be up to diversity to determine, but if this

1    conduct was true, it would definitely violate the employee

2    manual.

3           Q    How would it violate the employee manual?

4           A    Well, all conversations between staff are to

5    be professional in appropriate language and things along that

6    line, it would violate the employee manual.

7           Q    In what way is this conversation as put forth

8    in this memorandum not professional?

9           A    Well first, all conversation between staff

10   should be professional and should be business related, it

11   shouldn't be related to personal things going on, and to say

12   something about your -- how your stomach feels and how you're

13   going to go to the bathroom and a ring slipping off, that

14   would not be appropriate, no.

15          Q    You would agree that's inappropriate at the

16   least, is that right?

17          A    Absolutely.  Absolutely.

18          Q    Do you think it's inappropriate that someone

19   would refer to their mother's breasts as tits, to another

20   officer?

21          A    Definitely be inappropriate for me.

22          Q    And would you agree that this memorandum was

23   telling you that -- or telling defendant Mitchell, rather,

24   that she would not tolerate this type of talk anymore?

25          A    Yes.

1      Q     Now, when you got back to the office,

2  Superintendent, did you read this letter for yourself?

3      A     I did.

4      Q     And what did you do with the letter after

5  that?

6      A     First thing I did was called diversity

7  management which would be Charlie Harvey, instructed him the

8  letter I had and told him I would be faxing it up for his

9  review.  The next thing I did, I called the labor relations,

10  labor relations, I think I spoke to a John Ludwin, labor

11  relations, I read him the letter, and he agreed that it

12  should stay in diversity's hands, diversity should handle

13  this from that point on.

14      Q     And did he say because it alleged sexual

15  content?

16      A     And the fact that Ms. Collins is a female and

17  that diversity's -- some of these things are diversity

18  issues, diversity should handle the investigation.  Labor

19  relations, really I call labor relations because they have

20  the ability to suspend or not suspend for behavior and there

21  was nothing in this thing at the time that would be reason to

22  suspend an employee.

23      Q     Who made that determination?

24      A     It would have been John Ludwin, labor

25  relations.

1        Q    Was there any discussion between you and

2   Mr. Ludwin in labor relations about some discipline that

3   would be less than a suspension?

4        A    No.

5        Q    Now, did you ever talk to Officer Collins

6   about this memorandum?

7        A    No.

8        Q    Never called her in, never asked her anything

9   about it?

10        A    No.

11        Q    Why not?

12        A    Once I sent it to diversity, it's diversity's

13   job to handle it, I'm not allowed by the directive, I'm not

14   allowed to conduct an investigation on the incident once

15   diversity has it.

16        Q    Can't you talk to her without conducting an

17   investigation?

18        A    But diversity would then think I'm trying to

19   step on their toes.  My position and the department's

20   position, I'm out of it.  Diversity needs to handle the

21   investigation.  I can't be looked at I'm trying to influence

22   or sway something, so it's diversity's issue to handle that,

23   the complaint.

24        Q    But as superintendent, aren't you in charge of

25   the facility?

1              A    I am.

2              Q    And don't you have responsibility for the

3   morale and the conduct of the officers --

4              A    I do.

5              Q    -- below you?  So you became a paper pusher

6   more or less with that?  You just faxed it over and then

7   you're done with it, is that right?

8              A    Absolutely not.  If they determine that I

9   should talk to her or have any other thing, then I would pick

10  that up.  Many time I send an issue up to diversity and

11  diversity will come back and say, no, you handle that

12  investigation, you do the interviews, you get the statements

13  and then you forward them up to us for our review.  In this

14  case, they decided to take the case and it was their case.

15             Q    Well, isn't it true you didn't want to talk to

16  Officer Collins because she had just told you a day or two

17  before that she was going to go to court or you thought

18  that's what she said to you?

19             A    Absolutely not.  I have hundreds, hundreds of

20  lawsuits pending.  I don't stop talking to the inmates, I

21  don't stop making rounds, I don't stop doing my job because I

22  have a fear of going to court.  It's part of the business

23  that I'm in and that's life, life in corrections.

24             Q    But isn't it true you talked to defendant

25  Mitchell about this memorandum?

1          A     That's correct.

2          Q     And when did that conversation take place?

3          A     I'm not sure of the date, he was in the

4    sergeant's room.

5          Q     I'm sorry, I don't mean to interrupt you but

6    just if you could just focus on my questions, Superintendent,

7    I want to talk about the when at this point.  You're saying

8    you're not sure of the date.  Would it be within a month

9    after you received this memorandum?

10         A     Probably would have been within a week after I

11   received the memorandum, sometime around then.

12         Q     Now, you, you said that you saw him in the

13   sergeant's room?

14         A     Correct.

15         Q     And what did you say to him in that room?

16         A     I told him there'd been a complaint filed by

17   Ms. Collins and he said he knew, he received a copy of it,

18   and he told me it did not happen and I think my conversation

19   was, you need to make sure that any conversations you have

20   between yourself and Ms. Collins at that time remain

21   professional, and he assured me he would.

22         Q     So you told him who filed the complaint?

23         A     Correct.

24         Q     Now, isn't it true that if you send a matter

25   off to the office of diversity management, that's supposed to

1    be kept confidential?

2              A    That's not true.

3              Q    That's not one of the directives or policies

4    of diversity management?

5              A    No.

6              Q    You testified about Defendant's Exhibit 6,

7    Superintendent.

8              A    Mm-hmm.

9              Q    I'm going to show you Defendant's Exhibit 6,

10   direct your attention to under the procedure, item 3A, E --

11   just to refresh the jury, what is Defendant's Exhibit 6?

12             A    Diversity management complaints.

13             Q    Contains the procedure to follow for filing

14   complaints with diversity management, isn't that correct?

15             A    Correct.

16             Q    Doesn't the first section say that these

17   complaints are to be kept confidential to the extent

18   possible?

19             A    Correct.

20             Q    So going off telling defendant Mitchell that

21   Officer Collins filed a complaint against him is not keeping

22   it confidential, is it?

23             A    It wasn't confidential at that time.

24             Q    Why not?

25             A    I believe -- well, at that time it would have

1  been confidential, correct.

2          Q    Now when you talked to defendant Mitchell

3  about this memorandum in the sergeant's office, was anyone

4  else there?

5          A    No.

6          Q    And did defendant Mitchell tell you that he

7  had thrown this memorandum in the trash?

8          A    No.

9          Q    Did he give you any indication of what he had

10 done after he received the memorandum?

11         A    No.

12         Q    Did you ask him?

13         A    No.

14         Q    What's the proper procedure in the Department

15 of Corrections if a supervisor receives a complaint about

16 sexual harassment from a subordinate?

17         A    They should turn the complaint over to, as

18 Lieutenant Vasquez did, to his superior and his superior

19 should then turn the complaint over to me.

20         Q    Shouldn't Lieutenant Mitchell have done the

21 same thing?

22         A    It was already turned over to the watch

23 commander.

24         Q    But didn't defendant Mitchell receive a copy

25 of the memorandum according to your understanding?

1          A    He did.

2          Q    And he didn't approach you and report this,

3    did he?

4          A    Well, technically in this case he didn't

5    really have to.

6          Q    The question is just what he did, he did not

7    approach you about this memorandum, did he?

8          A    No.

9          Q    He did not initiate any conversation with you

10   about it, did he?

11         A    No.

12         Q    Now, in this, you had a -- you gave a

13   statement to the office of diversity management as you

14   testified in January 2006, isn't that right?

15         A    February, I think it was February.

16         Q    Okay.  In the beginning of 2006?

17         A    Correct.

18         Q    And you never mentioned this conversation with

19   defendant Mitchell in that statement, did you?

20         A    I don't believe I was asked, no.

21         Q    You didn't say you tried, you talked to

22   defendant Mitchell about it whatsoever, did you?

23         A    No.

24         Q    Do you only put in the statement exactly what

25   you're asked?

1          A     Basically, she asked the questions and I

2   answered the questions.

3          Q     But you would agree there's nothing in the

4   statement about any conversation you had with defendant

5   Mitchell, right?

6          A     That's correct.

7          Q     Didn't you think that was important to tell

8   diversity management?

9          A     Again, you know, I'm -- not to make excuses,

10  but I'm a superintendent in a maximum security facility.  You

11  know, my mind's going constantly on all the issues and things

12  that are going on in the facility.  She come into the

13  facility and asked me these questions, I probably had 15

14  other things going on in my mind at that time period so did I

15  account everything that occurred during this time period?

16  No, I didn't.

17         Q     The question is didn't you think it was

18  important?

19         A     Well, I do now.

20         Q     Now, there came a time that you -- you became

21  aware that Officer Collins' glasses had been taped, isn't

22  that right?

23         A     I'm not sure what point I become aware of

24  that.

25         Q     You don't recall when you became aware?

1          A    No, I'm not.

2          Q    Do you know how you became aware of it?

3          A    No, I don't.

4          Q    But would you agree that if an officer who

5    needs eyeglasses to see has his or her glasses taped, that

6    that is a security issue?

7          A    I guess if it's reading glasses, I wouldn't

8    take it as a security issue.  Like for myself, long-range, I

9    would take it as a security issue, yes.

10         Q    But if an officer's duty is to do the logbook

11   and needs the glasses to read, would you then agree that it's

12   a security issue?

13         A    Again, in context of the major security issue

14   would be a person who can't see long-range or far away

15   compared to somebody -- I need reading glasses myself but I

16   still can read and do a logbook if I had to without them if

17   they broke.

18         Q    Now did you ever ask Officer Collins any

19   information about her glasses being taped?

20         A    No, I did not.

21         Q    Did you ever ask her if she needed them to

22   see?

23         A    No, I did not, no.

24         Q    Didn't follow up at all --

25         A    No.

1          Q    -- once you learned of this information?  Did

2   you do anything when you learned of this information?

3          A    Again, if diversity, something that went to

4   diversity, there's nothing I was gonna do.

5          Q    But the question is, did you do anything?

6          A    No.

7          Q    No.  Now did there come a time that you became

8   aware of a complaint by Officer Collins to Sergeant Petrocino

9   about the locker room at Auburn?

10          A    Not to my knowledge, no.

11          Q    I'm going to show you what's been marked as

12   Plaintiff's Exhibit 65, Superintendent.  If you'd look at

13   that, please.  Do you recognize that?

14          A    No, I do not.

15          Q    Have you ever seen that before?

16          A    No.

17          Q    Is this the first time you've ever seen it?

18          A    I believe so, yes.

19          Q    Now, will you agree that if a sergeant

20   receives a memorandum, having, raising certain complaints and

21   issues about the ability of females to change in private in a

22   locker room, that that should be brought to your attention?

23          A    Not necessarily, no.

24          Q    What should the sergeant do with it?

25          A    Well, first of all, there's nothing anybody

1    can do about the locker room.

2              Q    My question has to do solely with what the

3    sergeant should do with the complaint, Superintendent.

4              A    My opinion, that complaint, nothing.

5              Q    Should put it in the trash?

6              A    No, he probably filed it in his records.

7              Q    Now, you testified on your direct yesterday

8    that you became aware of Officer Collins wanting to go home

9    when she was working in the package room, do you remember

10   that testimony?

11             A    I do.

12             Q    And did you become aware that Sergeant

13   Petrocino escorted Officer Collins from her job in the

14   package room to medical?

15             A    I did become aware of that.

16             Q    When did you become aware of that?

17             A    After I instructed Sergeant Petrocino that she

18   had to go to medical, she cannot leave the facility.

19             Q    There was never a question then that Officer

20   Collins left her duty post or was abandoning her post, was

21   there?

22             A    Again, when I received the first official

23   phone call, it was from Captain Rourke, I gave him

24   instruction on that, she cannot leave her post without going

25   to medical.  I got a follow-up phone call from Sergeant

1  Petrocino to verify what was going on, and I basically told

2  him, you know, she can't just walk out the door, because

3  that's considered abandoning your post and she'd be

4  disciplined for it.  She has to go to medical, be seen by

5  medical.  If they release her, then she can go home, and

6  that's exactly what occurred.

7          Q    And Sergeant Petrocino escorted her, she never

8  left her post, that's not your understanding, right?

9          A    She left her post as far as, she was assigned

10 to the package room and she left her post at some point, but

11 again, she didn't leave the facility.

12         Q    And in fact she was ordered by medical to go

13 home, right?

14         A    Absolutely.

15         Q    Because of her blood pressure or something?

16         A    Correct.

17         Q    Now, you mentioned on your direct examination

18 that you didn't know of an instance where an officer wouldn't

19 back up another officer; do you recall that testimony?

20         A    I do.

21         Q    Now are you familiar with an officer's post in

22 the corridor between C block and D block where the officer

23 controls the gate to the corridor, from the corridor to the

24 yard?

25         A    Yes.

1        Q    And where is the bathroom with respect to that

2    post?

3        A    The bathroom would be probably either in C or

4    D block.

5        Q    And you became aware at some point that there

6    was no door on the bathroom in D block, isn't that right?

7        A    That's correct.

8        Q    And therefore if a female officer was staffing

9    that post, that officer would have to go to C block to use

10   the bathroom, isn't that right?

11       A    It would be her choice, but that's correct.

12       Q    Now wouldn't an officer need relief if doing

13   that duty to use the bathroom?

14       A    Yes, they would.

15       Q    And isn't it considered cooperative, one

16   officer to relieve another just for quick bathroom break?

17       A    That's correct.

18       Q    It's fairly standard, isn't that right?

19       A    Yes, it is.

20       Q    Now, did you ever become aware that officers

21   wouldn't relieve Officer Collins from that post to use the

22   bathroom?

23       A    No.

24       Q    That they refused to do that?

25       A    No.

1          Q     But if so, wouldn't you agree that that's an

2    officer not assisting or helping another officer?

3          A     I think it's in a different context that was

4    brought in before, but that's correct.

5          Q     And would you agree that falling asleep on the

6    job is considered tantamount to abandoning your post?

7          A     Absolutely.

8          Q     Now also would you agree that -- I'll withdraw

9    that.

10         You testified on your direct that in the video

11   describing what inmates do, that they can be very

12   manipulative, isn't that right?

13         A     That's correct.

14         Q     That officers have to be on guard, in fact, of

15   what they would say in front of an inmate, isn't that right?

16         A     True.

17         Q     Because inmates can use personal information,

18   try to use it against an officer, isn't that right?

19         A     That's true.

20         Q     And inmates are always on the lookout for this

21   type of vulnerability with respect to an officer, right?

22         A     That's true.

23         Q     And so would you agree then that talking about

24   officers or ridiculing an officer in front of inmates would

25   pose a security issue?

1          A    I would.

2          Q    And couldn't that type of conduct put an

3    officer in jeopardy in front of an inmate?

4          A    In certain contexts, sure.

5          Q    Or groups of inmates?

6          A    Sure.

7          Q    Now, you also testified that Ms. Collins never

8    told you that she feared that other officers would not back

9    her up; do you recall that testimony?

10         A    I do.

11         Q    I'm going to show you what's been marked as

12   Plaintiff's Exhibit 25.  For the jury, what is this, please?

13         A    It's NYSCOPBA grievance form.

14         Q    And it's dated what?  The receipt at the top,

15   that would do.

16         A    December 22nd, 2005.

17         Q    And the employee's signature at the bottom is

18   who?

19         A    Penny Collins, P. Collins.

20         Q    And that's Penny Collins in this action, is

21   that right?

22         A    I would assume.

23         Q    And you've seen this grievance before, haven't

24   you?

25         A    I'm not sure I seen it on the day that it was

1    submitted to the office, but have I seen it since then, yes.

2          Q    You've had conversations with Ms. Collins

3    about this grievance, didn't you?

4          A    Not sure if I had conversations.  I'm not

5    sure.

6          Q    Did you have conversations with the union

7    about this?

8          A    I didn't attend the step 1 so I wouldn't have

9    been there at the step 1 with it.  I'm not sure if I had

10   conversations with the union either on this one.

11         Q    Did you review the grievances when they come

12   into your facility?

13         A    If I'm there, I do.

14         Q    Do you -- when you returned to the facility,

15   do you review those that may have been filed when you were

16   gone?

17         A    No, I don't.

18         Q    Well, I direct your attention to the last

19   sentence in this grievance and it says, "Due to ongoing

20   harassment, knowledge by inmates of my situation, and fear of

21   retaliation, I no longer feel safe at Auburn, posing a threat

22   to the safe and secure operation of the facility and my

23   personal well-being."  Do you see that?

24         A    Mm-hmm.

25         Q    Wouldn't you agree that that is Officer

1   Collins telling the Department of Corrections that she

2   doesn't feel safe and that what's going on around her poses a

3   security threat?

4          A    It says she doesn't feel safe, correct.

5          Q    And that this poses a security threat?

6          A    Poses a security threat, correct.

7          Q    Would you agree?

8          A    Correct.

9          Q    Now, you -- you're familiar with weapons

10  training at Auburn?

11         A    I am.

12         Q    And did you become aware of some -- at some

13  point of a problem that Ms. Collins, Officer Collins

14  complained about with a weapons training officer?

15         A    I did.

16         Q    And when did you become aware of that?

17         A    I'm not sure of the date, I believe Charlie

18  Harvey sent me a memo indicating that there was an issue with

19  the training.

20         Q    And this memo, it advised you that Ms. Collins

21  had a complaint or problem concerning the weapons training

22  officer and his use of certain nomenclature language, isn't

23  that right?

24         A    That's correct.

25         Q    And did you make -- ever make any efforts to

1    find out who that weapons training officer was?

2          A    No, because she didn't file it in the

3    complaint so it was unnamed correction officer.

4          Q    Wouldn't it be easy to find out who that is?

5          A    As easy as it would be for her to name it.

6          Q    How many weapons training officers did you

7    have at the time?

8          A    Probably four to -- four to six.

9          Q    You keep records of who -- which officers go

10   to which classes, is that right?

11         A    Yes.

12         Q    So it's just a matter of looking up a record

13   on your part, correct?

14         A    Correct.

15         Q    So didn't it concern you that the weapons

16   training officer used that type of language in the

17   presentation of the instruction?

18         A    Well, again, alleged to have used that, yes,

19   it would concern me, yes.

20         Q    Why didn't you go and look it up?

21         A    Because I was directed by Charlie Harvey to

22   issue a memo to all training officers, the weapons training

23   officers, to use proper conduct and language during that, and

24   issue one to the entire employee on paychecks.

25         Q    Weren't you directed by Charlie Harvey to do

1    that in April of 2006?

2              A    Correct.

3              Q    And you learned well before that about this

4    problem, isn't that true?

5              A    I'm not sure the date I learned about it.  I

6    believe the letter from Charlie Harvey come in March, end of

7    March, I'm not sure the exact date.

8              Q    Well, you didn't care who the weapons training

9    officer is, did you?

10             A    Absolutely I would care.

11             Q    I'm going to show you what's been received in

12   evidence as Defendant's Exhibit 16, Superintendent.

13                  Excuse me, your Honor, I have the wrong

14   document.  Excuse me.

15                  Now I have the right document.

16   Superintendent, I'm going to show you what's been marked as

17   Plaintiff's Exhibit 9.  Would you please review that for me,

18   and identify it for me if you can.

19             A    It's a to-from from Charlie Harvey to myself

20   dated April 27, 2006.

21             Q    And what does the to-from concern?

22             A    Unnamed security staff.

23             Q    And what's the content of the to-from?

24             A    It has dealing with what Mary Mayville, an

25   investigation from Mary Mayville and the -- whatever

1   diversity complaints that Officer Collins had submitted to

2   diversity management.

3          Q    And is this the memorandum that you were

4   referring to that you -- Charlie Harvey told you to tell the

5   weapons training officers about appropriate language?

6          A    No.

7          Q    Did you receive this memorandum from Charlie

8   Harvey?

9          A    I did.

10          MS. CONNOR:  Plaintiffs offer Plaintiff's

11  Exhibit 9, your Honor.

12          MR. KINSEY:  A moment, your Honor, please.

13          THE COURT:  Mr. Andrews, I'm going to start

14  with you, do you have any objection?

15          MR. ANDREWS:  I have no objection.

16          THE COURT:  Okay.

17          MR. KINSEY:  We have no objection, your Honor.

18          MS. SHEEHAN:  Subject to redactions, your

19  Honor.

20          MR. KINSEY:  There's one redaction that was

21  made.

22          MS. CONNOR:  Redactions were made on the

23  document, your Honor.

24          THE COURT:  Okay.  It will be received with

25  redaction.

1          Q    Now in this memorandum, Superintendent, does

2     Mr. Harvey request that you take any action with respect to

3     the weapons training officers?

4          A    Says, "Additionally, your facility weapons

5     training officers, WTO, should be advised that sexually

6     explicit and/or harassing, discriminatory, negative comments

7     are in violation of the department's sexual harassment policy

8     and should not be allowed in their classes.  Accordingly,

9     they should be directed to attend department sexual

10    harassment training entitled Prevention of Sexual Harassment

11    in the Workplace."

12         Q    Now, I'm going to show you what's been

13    received in evidence as Defendant's Exhibit 15.  Do you

14    recognize that?

15         A    I do.

16         Q    And just so -- for the jury to understand,

17    what is that, please?

18         A    It's a memo from myself to Charlie Harvey,

19    unnamed security staff, Penny Collins, May 5th, 2006.  "This

20    is in response to your communication dated April 27, 2006.

21    Attached is a copy of employee conduct and relations

22    memorandum which are distributing to paychecks on 5/24/06.

23    I've also attached a copy of a memorandum which was

24    distributed to all training instructors of our facility.

25    This should address the issues of your memo.  Feel free to

 1    contact me should you require additional information."

 2              Q    And is that the extent of what you did in

 3    response to this memo from Charlie Harvey?

 4              A    It is.

 5              Q    Now the memo from Mr. Harvey states that the

 6    weapons training officers should be directed to attend the

 7    department's sexual harassment training, correct?

 8              A    That is correct.

 9              Q    But yet you did not do that, is that correct?

10              A    That's correct.

11              Q    You just issued them a memorandum, isn't that

12    right?

13              A    Correct.

14              Q    You made no effort to find out who the weapons

15    training officer was that Officer Collins complained about,

16    isn't that right?

17              A    Again, that would have been diversity's issue

18    to come investigate that complaint.

19              Q    Are there any consequences for you,

20    Superintendent, if you don't follow the directions of the

21    office of diversity management in resolving a complaint?

22              A    I'd be terminated.

23              Q    Did you face any consequences for not sending

24    the weapons training officers to sexual harassment training?

25              A    No.  They've had it.

1        Q    Now, on your direct examination, you testified

2    about a collective bargaining situation between unions, CSEA

3    and PEF, with respect to the governor's office, do you recall

4    that?

5        A    I do.

6        Q    Now, CSEA is not the NYSCOPBA union, is it?

7        A    No, it isn't.

8        Q    Nor is PEF, which is a different union of

9    state employees, isn't that right?

10       A    That's correct.

11       Q    And I believe you said -- try to look at my

12   notes, that the governor was trying to get these unions to

13   accept a contract where they would not receive a raise for

14   three years and then they'd get 1 percent, 2 percent, isn't

15   that right?

16       A    That's correct.

17       Q    And the contract's not in place yet, is it?

18       A    For who?

19       Q    The contract that you testified about

20   yesterday, that the governor was trying to get them to

21   accept, that contract is not in place yet, is it?

22       A    It's in place for CSEA, PEF, and management

23   confidential.

24       Q    But you said -- you testified yesterday that

25   the governor's office was trying to get the unions to accept

1    that contract, do you recall that?

2              A    That's correct.

3              Q    Now you also testified that, about -- there

4    were -- well, withdraw that.

5                   What was -- do you recall your testimony about

6    other complaints by females at Auburn Correctional Facility

7    yesterday; do you recall testifying about that?

8                   THE COURT:  First of all, it wasn't yesterday,

9    it would have been Friday.

10                  MS. CONNOR:  I'm sorry.  Time flies and I

11   stand corrected, no problem there.

12                  Friday.  Do you recall that testimony?

13             A    I don't.

14             Q    Do you recall saying that there were no other

15   complaints by female officers I believe is what you testified

16   to?

17             A    I don't recall any, that's correct.

18             Q    But isn't it true that there were complaints

19   by other female employees at Auburn while you were

20   superintendent?

21             A    That's true.

22             Q    And those are civilian employees, isn't that

23   right?

24             A    That's true.

25             Q    And there was a complaint filed by an employee

1    Lynn Anderson, isn't that correct?

2              A    That's correct.

3              Q    And other female civilians, isn't that right?

4              A    Lynn Anderson is probably the only one I

5    remember.

6              Q    Didn't she do it on behalf of other females as

7    well as herself?

8              A    Again, I'm not sure what the complaint read.

9              Q    Now, the video that we saw, that video is made

10   by the union, isn't that right?

11             A    That's correct.

12             Q    It's not made by the Department of

13   Corrections?

14             A    Correct.

15             Q    And the video mentions fluids being thrown on

16   officers, bodily fluids specifically being thrown on

17   officers?

18             A    Absolutely.

19             Q    Is that correct?  And isn't there a law in

20   place now that -- with respect to consequences for that?

21             A    There is.

22             Q    And what's that law?

23             A    Well, we call it the throwing law.

24             Q    What is it?

25             A    It's a felony now to throw bodily fluid on a

1    security -- any correctional employee.  Spitting's not

2    included in that unless you bite your lip and/or use your

3    other bodily fluids and spit that fluid.

4            Q    That's called dousing, isn't it, if an officer

5    has bodily fluids thrown on him or her by an inmate?

6            A    I've had it happen probably close to 50 times,

7    yes, it's called dousing.

8            Q    And since the law, it's decreased, isn't that

9    right?

10           A    Dramatically.

11           Q    I'm going to show you what's been admitted

12   into evidence as Defendant's Exhibit 4.  If you can look at

13   that, please.  Now to refresh our recollection because it was

14   Friday, even yesterday I might need refreshing, what is this,

15   please?

16           A    It's a memo from Glenn Goord, Commissioner, to

17   all employees dated June 17th, 1997, reissue of the New York

18   State Department of Correctional Services policy statement on

19   sexual harassment in the workplace.

20           Q    And you describe the directive as having a

21   force of law I think was your term, is that right?

22           A    Correct.

23           Q    Now in the -- would you agree that this is the

24   department's policy against sexual harassment?

25           A    I do.

1        Q    And if you direct your attention to the second

2   paragraph from the bottom, it states, "Accordingly, sexual

3   harassment is considered a form of employee misconduct and

4   individuals guilty of such conduct will be subject to

5   appropriate disciplinary action," do you see that?

6        A    Yes.

7        Q    Anybody ever disciplined in response to any

8   complaints made by Officer Collins of sexual harassment at

9   Auburn?

10       A    Not to my knowledge, no.

11       Q    And it says, "Similarly, sanctions will be

12  enforced against supervisory and managerial personnel who

13  knowingly allow such behavior to continue," do you see that?

14       A    I do.

15       Q    Was there any sanction, discipline or

16  otherwise, enforced against supervisor or managerial

17  personnel in relation to any of the complaints by Officer

18  Collins?

19       A    My knowledge, no.

20       Q    Now you testified on your direct that if an

21  officer encountered another officer who wasn't going to help

22  that officer, you would direct the officer to EAP; do you

23  recall that testimony?

24       A    Could you rephrase, I'm not sure I understand

25  that.

1      Q    On your direct, you testified that if an

2 officer would not help another officer, you would refer that

3 officer to someone in EAP, do you recall that?

4      A    I think my testimony was that if the officer

5 felt that other officers wouldn't come to their aid, I would

6 then refer them to EAP, employee assistance program.

7      Q    You ever do that for Officer Collins?

8      A    No.

9           MS. CONNOR:  Can I have just a moment, please,

10 your Honor.

11          THE COURT:  Yes.

12          (Pause in Proceedings.)

13          MS. CONNOR:  No further questions of the

14 witness at this time.

15          THE COURT:  Okay.  Mr. Kinsey, before you get

16 up, it's 12:05, are you going to be awhile?  Should we take

17 our lunch break first or you want to try and finish?

18          MR. KINSEY:  I think it would be good if we

19 took a break because I anticipate there will be a few

20 follow-up questions.

21          THE COURT:  Okay, thank you.  Ladies and

22 gentlemen, it's 12:05 so I'm going to let you go to lunch.

23 If you could be back in the jury room by 1:05 or in that

24 area, we'll try and get started promptly with redirect

25 examination of Superintendent Graham.  Don't talk about it,

1    don't let anybody approach you and try to talk to you about

2    it.  Okay.  Thank you.  Enjoy your lunch.

3                    (Jury Excused, 12:06 p.m.)

4                    THE COURT:  You can step down, Superintendent.

5    Okay.  Do we have any issues before you want to go to lunch?

6    No?  Hearing silence is golden, and we're going to let you go

7    to lunch.  We'll see you at 1:05.

8                    MS. SHEEHAN:  Thank you, your Honor.

9                    THE CLERK:  Court's in recess.

10                   (Whereupon a luncheon recess was taken from

11                    12:07 p.m. to 1:05 p.m.)

12                   (Open Court, Jury Out.)

13                   THE COURT:  Okay.  Everybody ready to get

14   started?

15                   MR. KINSEY:  Yes, your Honor.

16                   MS. CONNOR:  Yes, your Honor.

17                   THE COURT:  Okay.  Please bring the jury in.

18                   (Jury Present.)

19                   THE COURT:  Okay.  The record should reflect

20   we have the ladies and gentlemen of the jury, the plaintiff,

21   plaintiff's counsel, defendants and defense counsel.

22   Mr. Kinsey, go ahead with redirect.

23                   MR. KINSEY:  Thank you, your Honor.

24                   REDIRECT EXAMINATION BY MR. KINSEY:

25         Q    Superintendent, you were asked before about

1    referring Ms. Collins to EAP, you recall that?

2         A    Yes, I do.

3         Q    Why didn't you refer her to EAP?

4         A    I believe at the time she was no longer in the

5    facility, she was out on leave.

6         Q    You recall when she went out on leave?

7         A    My recollection says right after December,

8    December 7th.

9         Q    2005?

10        A    2005.

11        Q    So she would have no longer been in the

12   facility after that time?

13        A    That's correct.

14        Q    Do you know if she ever returned to work at

15   Auburn?

16        A    No, she didn't.

17        Q    So after December 7th, 2005, that was the end

18   of her involvement with Auburn?

19        A    She was still on the books but then she

20   transferred when she come back off, she transferred in the

21   meantime I believe to Eastern.

22        Q    You also were asked about what has been

23   entered into evidence as Defendant's 4, do you still have

24   that?

25        A    No, I don't.

1              MR. KINSEY:  May I approach, your Honor?

2              THE COURT:  You may.

3          Q    You recall that?

4          A    Yes, I do.

5          Q    And what is that, just to refresh our

6     recollection here?

7          A    It's a memo from Mr. Goord, Commissioner, to

8     all employees to reissue of the New York State Department of

9     Correctional Services policy statement on sexual harassment

10    in the workplace.

11         Q    And what is that policy, according to this

12    directive?

13         A    It's how we're governed to conduct our

14    business within New York State.

15         Q    And how are you to conduct your business with

16    regard to sexual harassment?

17         A    There's zero tolerance.

18         Q    And by zero tolerance, what does that mean?

19         A    It means none.

20         Q    Now you were asked if -- was anyone

21    disciplined in this case, you recall?

22         A    Yes, I do.

23         Q    Do you recall anyone ever being disciplined

24    under that directive --

25         A    Yes, I do.

1          Q      -- in your facility?

2          A      Not in this facility but in other facilities.

3          Q      You're personally aware of that?

4          A      Yes, I am.

5          Q      Now when someone's going to be disciplined for

6    violating the directive, is the superintendent allowed to

7    call them in and fire them?

8          A      I would be part of the process but I don't

9    fire them.

10         Q      How does that process work?

11         A      A notice of discipline will be issued from

12   labor relations on the employee, the employee then has the

13   option of either accepting the notice of discipline and the

14   penalty or they have the right to file a -- an appeal with

15   their union at which time it would then go to arbitration,

16   and there would be -- an arbitrator would decide.

17         Q      And do you control any part of that process?

18         A      The only control I have is sending up the

19   facts that I have in the case and labor relations would

20   review those facts and then make a determination if

21   discipline is warranted or not.

22         Q      Have you sought to have people disciplined and

23   that recommendation was rejected by the labor relations

24   people?

25         A      Yes, I have.

1          Q      Do you have any recourse when that happens?

2          A      No, I do not.

3          Q      If you know, Superintendent, do those -- do

4    recommendations for discipline for violating the sexual

5    harassment directive, do those come from diversity, the

6    office of diversity management, or they come by another

7    method?

8          A      No.  On the most part they would come from

9    diversity.

10         Q      And if you know, would that follow their

11   investigation?

12         A      Yes, it would.

13         Q      Now, you were asked about the video, do you

14   remember that?

15         A      Yes.

16         Q      And you indicated that since the passage of

17   that law, that this sort of conduct has decreased?

18         A      Yes, I do.

19         Q      Has it stopped?

20         A      No.

21         Q      And you mentioned that spitting doesn't count?

22         A      Correct.

23         Q      Do you have any recourse when inmates start

24   spitting on officers?

25         A      We use a spit net on them.

1           Q     What is that?

2           A     If we're going to transport them, move them

3      out of the cell, it's a netting that goes across his face and

4      blocks his mouth so he can't spit through the net.

5           Q     Is that against the law?

6           A     Spitting?

7           Q     Yes.

8           A     No.

9           Q     Is it a disciplinary infraction?

10          A     Yes, it is.

11          Q     Now, you were asked about an employee Lynn

12     Anderson, is that right?

13          A     That's correct.

14          Q     And you indicated that Ms. Anderson had filed

15     a complaint?

16          A     Correct.

17          Q     Do you know what that complaint was?

18          A     It was against her immediate supervisor, he

19     was a senior correction counselor.

20          Q     Now is that part of the Department of

21     Correctional Services?

22          A     Yes.

23          Q     Part of the security side?

24          A     Civilian side.

25          Q     And do you know what action, if any, was taken

1    in that case?

2            A    I believe the senior counselor was issued a

3    formal writeup.

4            Q    And what does that mean?

5            A    It's a formal counseling in which his

6    immediate supervisor would sit down and discuss his actions

7    and his -- what he did and what corrective actions need to

8    take place so he was issued a formal counseling that would

9    have gone into his personnel history folder.

10           Q    Did you have any part of that discipline?

11           A    Just sending up the complaint and following up

12   the order to come down to do the formal counseling would have

13   come to me and I would have gave that to his immediate

14   supervisor, the deputy superintendent of programs.

15           Q    Now you heard testimony that it was a crime to

16   leave your post in a prison; do you recall that?

17           A    I do.

18           Q    Is it a crime to leave your post in a prison?

19           A    No.

20           Q    If someone is unable to cope or is unwell, do

21   you have a procedure by which they can leave their post?

22           A    I do.

23           Q    And what is that?

24           A    They would go to their immediate supervisor

25   and/or chart sergeant and tell them that they were sick or

1    the reason they need to leave, and then the chart sergeant,

2    even if -- even if they went to their area supervisor

3    requesting to leave, the area supervisor would have to go to

4    the chart sergeant and he controls all movement and the

5    correction officers within the facility and he would need to

6    come and provide relief so therefore, it would go to the

7    chart sergeant and then if they had relief, they would get

8    them relieved, it would go to the watch commander.  And quite

9    frankly, if an employee was upset and they -- nobody took

10   care of it, my phone number's 2000, they know they can call

11   me any time.

12           Q    In all facilities, is that the phone number

13   for the superintendent?

14           A    Absolutely.

15           Q    Doesn't matter where you are?

16           A    Nowhere.

17           Q    Would you take that call?

18           A    Absolutely.  I answer my own calls.

19           Q    Now, there was a grievance filed, you remember

20   discussing that?

21           A    I do.

22           Q    When a grievance is filed, can you tell me

23   what happens?  Well, first of all, tell us what a grievance

24   is as compared to complaint.

25           A    A grievance is when an employee feels that

1   they've been wronged and something happened, they want to

2   grieve the incident.  On the most part, it's really the only

3   regress they have since we're a paramilitary organization to

4   really challenge a supervisor.  To challenge somebody who has

5   given an order is really against the rules.  So the only

6   recourse they really have at that time is to file a

7   grievance.  The grievance is filed through the union, it can

8   either be done by the local representative there, if the

9   employee doesn't feel they want to go through their local

10  representative, they can file it with NYSCOPBA headquarters

11  which would be in Albany.  The grievances have three steps.

12  There's a step 1 which is done informally at the facility

13  usually between the -- so if it's a correction officer

14  grievance, it's usually deputy superintendent of security

15  that handles the grievance with the NYSCOPBA rep. and the

16  employee.  If they can informally resolve the grievance at

17  that level, that's as far as it goes.  If they cannot resolve

18  it or the employee feels they want it to go to step 2, some

19  grievances automatically go to step 2 because they're not

20  in-house grievances, in other words they can't be rectified

21  at the facility level.  Could be a Workman's Comp. claim or

22  something that's a rule in Albany that we would have no power

23  to change in the facility so they would automatically go to

24  step 2.

25              At step 2, it's a labor relations from Albany

1    would come down, they would meet with the employee with the

2    union rep. and usually whoever held the step 1 grievance,

3    they would meet with it and they would try to resolve the

4    issue at that level.  Somewhere in a short time frame they

5    would get their answer from labor relations, indicating what

6    the response was.  They then have the option taking it to

7    step 3 and/or going to arbitration depending on what the

8    grievance is.  Staffing grievances, grievances against

9    staffing levels of the facility and stuff can't go to

10   arbitration, they can only go to GOER, Governor's Office

11   Employee Relations.

12              Q    Now in that whole process, what's your

13   involvement, what's your responsibility?

14              A    As a superintendent, I don't sit on the

15   grievances, I don't do the grievances, so on the most part

16   they -- I would assign them to whatever deputy superintendent

17   that it would fall under their expertise.

18              Q    And who elects if it's going to be a step 1,

19   step 2, step 3?

20              A    Well, they all start at step 1 but the union,

21   the union has the option of kicking it right to a step 2

22   because they don't feel it can be resolved at the facility

23   level.

24              MR. KINSEY:  Your Honor, may I approach?

25              THE COURT:  You may.

1          Q    I'm going to show you what's been marked as

2     Plaintiff's Exhibit 25, have you take a look at that.  Do you

3     recognize that?

4          A    Yes, I do.

5          Q    What is it?

6          A    It's a NYSCOPBA grievance filed by

7     Ms. Collins.

8          Q    Where would that have been filed?

9          A    The way it looks, it was filed, because it's

10    the local rep or union rep, it says Al Mothershed, regional

11    vice president so I would think this one was filed in the

12    NYSCOPBA headquarters in Albany.

13         Q    And what's the date down by the signature?

14         A    12/20/05.

15         Q    That would be December 20th, 2005?

16         A    That's correct.

17         Q    And was Ms. Collins still working in Auburn at

18    that time?

19         A    No, she wasn't.

20              MR. KINSEY:  A moment, your Honor.  May I

21    approach, your Honor?

22              THE COURT:  Yes.

23         Q    Can you tell us what that is, sir, if you

24    know?

25         A    Yes, this is a to-from from Penny Collins to

1   Sergeant Troy Mitchell dated November 10, 2005.

2          Q    This is the letter that you had called into

3   you at your home?

4          A    Yes, it is.

5          Q    And can you once again -- who is that to?

6          A    To Sergeant Troy Mitchell.

7          Q    There was -- you had questions about keeping

8   confidentiality, is that right?

9          A    Correct.

10         Q    Did you talk to anyone else besides Troy

11  Mitchell about this letter?

12         A    I would have talked to Dep. Bellnier about the

13  letter, obviously Captain Rourke.

14         Q    Why would you talk to them?

15         A    Because they're directly in charge and

16  responsible for those areas, and that this is an incident

17  that has occurred to -- alleged to have occurred within side

18  the facility.

19         Q    Other than that, anybody, did you share this

20  with anybody else?

21         A    Charlie Harvey from diversity management.

22         Q    And why Charlie Harvey?

23         A    Because he was -- I was going to be faxing the

24  letter to Charlie Harvey to investigate.  I also contacted

25  John Ludwin from labor relations, and not directly but

1    indirectly had a conversation with Sergeant Mitchell about

2    having a complaint filed and he needed to be -- make sure

3    that all his conversation was professional.

4         Q    Why did you decide to share this with

5    Mr. Mitchell?

6         A    Well, part of the thing is, put him on point

7    that this has been filed, and the other thing is, it goes --

8    so there's no retaliation, he knows, this complaint has been

9    filed and that no one can retaliate or go and say anything at

10   that point in time, he needs to be professional and make sure

11   his conversation is above board.

12        Q    Now did it matter that his name was on the

13   letter or would you have shared that with anyone who had a

14   complaint against them?

15        A    Well, since the letter -- if the letter just

16   went to Sergeant Mitchell, I would have never known about the

17   letter but since the letter was delivered to the watch

18   commander and then it was given to me, therefore it's my

19   responsibility to forward it to diversity for investigation.

20        Q    Now, didn't Sergeant Mitchell have an

21   obligation to report this letter up the chain of command?

22        A    In my opinion, no.

23        Q    Why?

24        A    Well, because part of the procedure and the

25   law with diversity is if someone says something inappropriate

1   and the other employee has -- takes offense to it, that

2   employee's putting that person on notice that they didn't

3   welcome the comments and please don't do it again.  Again, if

4   you look at the last statement, it says, "So Sergeant

5   Mitchell, again, please do not take this as a threat, only an

6   open communication between us on what will cause issues in

7   the future."  So if I had received that letter as a sergeant,

8   I would not have forwarded it to my supervisor.

9           Q     What would you have done?

10          A     I would have kept it and from that point on

11  realize that all communication between the parties must be

12  professional, be no other further incidents.

13          Q     Would you go talk to the individual about it?

14          A     Probably not at that time.

15          Q     Why is that?

16          A     Well, I think it would probably be too fresh

17  in the memory and then you may -- there may be another

18  recurrence so I think at that point in time I would not go

19  and talk to that employee.

20          Q     Were you obligated to go talk to Sergeant

21  Mitchell?

22          A     No.  Well, I think I'm obligated to tell him

23  that this had occurred and you need to, at this point in time

24  make sure everything's above board.  There has actually been

25  a change in policy in D-O-C-C-S to where we issue letters to

1    both parties now.

2            Q    There's written, now at this time, not in

3    2005?

4            A    Not in --

5            Q    At this time what kind of communication is

6    given to both parties?

7            A    First one would be a letter taking this

8    incident here if it happened today, I would issue a letter to

9    Sergeant Mitchell informing him that there'd been a complaint

10   filed by Officer Collins, and that in the future, all

11   conversation between you must remain professional and I would

12   also issue one to Ms. Collins telling her that I've received

13   this complaint, the employee's been put on notice and that

14   all conduct between the two must be professional and if

15   anything further occurs, you need to be notified immediately.

16           Q    Well, would issuing these letters violate

17   confidentiality?

18           A    There's no other way to put the employee on

19   point that this occurred.  And again, confidentiality, it

20   would depend on the notice of what -- what the allegations

21   were.  But there's no other way to tell the employee that

22   this action happened and you must be professional from this

23   point, make sure nothing else happens in the future.

24           Q    Now does that indicate that you have some

25   belief in the credibility of the claims?

1        A    No.  It just, that the allegation's been made

2   and since there's no -- been no investigative part, at this

3   point in time, it's to put, again, the party or parties on

4   point that this is going to be investigated and you need to

5   be professional at all times.

6        Q    Now you were asked about these two memos; do

7   you recall the memo that you sent to your trainers and also

8   to the firearms instructors?

9        A    Yes, I do.

10       Q    Why did you send those memos out?

11       A    Well, direction from Charlie Harvey to send

12  the memos out, and issue them on everybody's paycheck, which

13  was done, and then issue them to the weapons officers

14  separately.

15       Q    Now, did Mr. Harvey indicate what you should

16  put on the paychecks or give to these trainers?

17       A    He did send a memo like a suggested memo what

18  to put out.

19       Q    Okay.  Did he tell you to take any other

20  action?

21       A    He told -- in there he said I should send the

22  employees to sexual harassment training.

23       Q    And you indicated that you didn't do that.

24       A    Correct.  I'm not sure if I did do it.  I have

25  not checked their records, but I'm not sure if it was done or

1    not.

2          Q    How often do these people get this training,

3    sexual harassment training?

4          A    I think sexual harassment training is every

5    three years.

6          Q    Okay.  Now to the best of your recollection,

7    was -- were these officers from the firing range interviewed

8    when Mary Mayville did her series of interviews?

9          A    I believe they were.

10         Q    And she got statements from them all to the

11   best of your knowledge?

12         A    Yes, she did.

13         Q    Now, how did you come to know who these people

14   were?

15         A    Well, I didn't know exactly who made the

16   statement or what the alleged statement was made but I only

17   have, again, like four to six weapons officers in the

18   facility.

19         Q    Why didn't you call them all, four or six of

20   them in, and say, okay, who's the stupid one?

21         A    Again, if the complaint was filed to me and

22   that was indicated by the officer she just wanted it to stop,

23   then that could have been done but once it gets into

24   diversity's hands, I need to let diversity handle the

25   complaint so they can get the information and get the memos

1   from the officers themselves.

2                   MR. KINSEY:  May I approach, your Honor?

3                   THE COURT:  You may.

4           Q    Showing you what's been marked as Plaintiff's

5   Exhibit 65.  That was entered?

6                   THE CLERK:  It's not.

7           Q    Were you shown that during your direct

8   examination?

9           A    Yes, I was.

10          Q    And what is that?

11          A    It's a memo from Officer Collins to Sergeant

12  Mark Petrocino, subject, female locker room, 11

13  November 2005.

14          Q    Have you ever seen that before this

15  litigation?

16          A    I have not.

17          Q    Okay.  Were you ever given -- was that ever

18  forwarded to you?

19          A    No, it was not.

20          Q    Sergeant Petrocino did not give that to you?

21          A    No, he did not.

22          Q    Well, let's talk about lockers.  When you

23  arrived there in -- it was in October, mid-October 2005, what

24  was the state of the locker room if you recall?

25          A    It was atrocious.

1          Q     Okay.  Can you be more specific about how it

2     was atrocious?

3          A     Well, it was -- that building was built in

4     1929, there were -- there was actually an old firing range

5     downstairs which was still filled with the sand and the lead,

6     there's still asbestos in it, open pipes, lighting was very,

7     very poor.  Some of the lockers are probably still from 1929.

8     It was dirty, again, just -- just not an appropriate area for

9     staff to have to go down and use the locker room.

10         Q     When you say staff, did that relate both to

11    male and female?

12         A     It did.

13         Q     And did you take any steps to try and fix

14    that?

15         A     Actually, you know, I devised, when I first

16    got to Auburn, I had my security staff, head of my security

17    staff do a complete assessment of the facility and one of the

18    first things I'm looking for obviously is security breaches,

19    if there's somewhere that needs to be taken care of

20    immediately that could cause a breach.  That was the Wall

21    Street gate which was my main entrance to the facility for

22    trucks, it no longer fit the need because trucks have gotten

23    bigger and both my security gates had to be open at the same

24    time to allow a tractor-trailer in.  And less than a hundred

25    yards from that gate, I had both the school and industry, so

1    I had upwards of 500 inmates would be able to run out those

2    gates if the truck could not be moved in time, so that was my

3    first priority to get a new Wall Street gate.  But I also,

4    along with Sergeant Petrocino, Captain Rourke, Captain

5    Gummerson, and Dep. Bellnier, worked on a plan to try to redo

6    the locker rooms and get construction money for the locker

7    room.

8          Q     Were you successful?

9          A     In time.  In the facilities we have what's

10   called a five-year plan.  Every year we meet with our

11   facility planners and we come up with what construction

12   projects and when, I'm talking a construction project, I'm

13   talking projects, you know, upwards of $100,000 or more and

14   we come up with a five-year plan of what we think the

15   facility's going to need over the next five years.  And each

16   year you're given allotted money and obviously things change,

17   you know.  I may want a new roof on the mess hall in year 3

18   and all of a sudden when you go to the mess hall, it's full

19   of water, that three years now become your one year.  So the

20   locker room was pushed back several years, but probably I

21   would say within the next -- if the contractor would ever

22   come to work, it's a year overdue, this project was started

23   two years ago, it's now a year overdue due to contractor's

24   failure to show up to work, but we should -- we're on the

25   final stages of a new locker room.

1        Q     Do you know if Superintendent Burge had tried
2   to address the locker room?
3        A     I know by his testimony, but I know any
4   superintendent that walked in that jail would put in for a
5   locker room.
6        Q     Now, this grievance, can you look once again
7   at the date?
8        A     December 20th, 2005.
9        Q     If you know, was that -- was that, date of
10  that grievance before or after plaintiff told Dr. Alley that
11  she was going to sue; do you have any firsthand knowledge of
12  that?
13       A     No, I don't.
14       Q     But it was definitely after the date in which
15  she left work and didn't return, correct?
16       A     That's correct.
17       Q     Now, would you agree that talking in front of
18  inmates is dangerous, talking about personal things in front
19  of inmates is dangerous?
20       A     Yes, it is.
21       Q     Is it dangerous for male officers?
22       A     Absolutely.
23       Q     Is it dangerous for female officers?
24       A     Yes.
25       Q     Is it dangerous for nonsecurity staff?

1          A    Yes.

2          Q    And if you're aware, are officers made aware

3    of that?

4          A    They are.

5          Q    How do they become aware of that?

6          A    Well, they're made aware during the training

7    academy.  I know, I meet with every new correction officer

8    that comes into Auburn and it is one part of my subjects when

9    I do talk to new officers coming in about talking personally

10   in front of inmates because they can use it against you,

11   especially in today's day of electronic information is

12   available everywhere.

13         Q    Now, you were -- I believe you said you'd been

14   on the job 27 days when Ms. Collins came to talk to you?

15         A    That's correct.

16         Q    In that 27 days, did you become aware of any

17   problems with sexual discrimination or gender discrimination

18   at Auburn?

19         A    No, I did not.

20         Q    Had anyone made you aware?

21         A    No, they did not.

22         Q    Had you seen anything that would tell you

23   that?

24         A    No.

25         Q    Did you ask?

1          A    No.

2          Q    Why?

3          A    Well, my job at that point was to go around as

4   many times as I possibly could just to walk and talk to the

5   people.  I was out every day probably two, three times a day,

6   walking, talking to all employees that I come in contact with

7   to try to become familiar with the facility, familiar with

8   the employees.

9          Q    Were you open to have them tell you about

10  problems?

11         A    Absolutely.

12         Q    Did they tell you about problems?

13         A    Oh, yes.

14         Q    What kind of problems did they tell you about?

15         A    A lot of -- lot of overtime issues and a lot

16  of -- timewise, running the mess hall and they -- they

17  complained, you know, they'd complain about just about

18  everything, especially since I'm a new superintendent, so if

19  they had a past issue, they would try to bring it up.

20         Q    And prior to that discussion with Ms. Collins,

21  had anybody brought up any problems with gender or sexual

22  harassment in the facility?

23         A    No.

24         Q    As you walked around did you see any?

25         A    I did not.

1        Q     Now, this -- we've talked a lot about

2    graffiti.  Did you see any graffiti?

3        A     I seen the graffiti that had Ms. Collins' name

4    on it in the bathroom downstairs.  I believe at some point I

5    did go down and take a look at that.  You see graffiti from

6    place to place, again, do I have a habit of painting all

7    graffiti?  I don't, because it's going to show up again.  But

8    graffiti that's hurtful or disrespectful, you get painted.

9    Other stuff is just jailhouse humor, and it's like cartoons.

10   If you have somebody who draws, if you make a mistake inside

11   a prison, there's a cartoon within five minutes posted on the

12   wall somewhere.

13       Q     Any cartoons about you your first three

14   months?

15       A     I didn't see too many, there wasn't too many

16   cartoon drawers here in Auburn.  Great Meadow was -- Great

17   Meadow was historic, he was -- he didn't belong being a

18   corrections sergeant, he should have been an artist.

19       Q     You ever see any graffiti about you?

20       A     Here in Auburn?

21       Q     In Auburn.

22       A     No.

23       Q     Anybody else, besides Ms. Collins?

24       A     Yes.  Yes.

25       Q     Males or females?

1          A      Male.

2          Q      Now we've heard about Auburn is maximum

3    security?

4          A      Right.

5          Q      Can you tell us what that means?

6          A      Maximum security is, again, it's the strongest

7    or the highest level of security that this department has.

8    This department doesn't have a super max like you would

9    sometimes see on TV, you have a maximum security A which is

10   the highest level and there's a max B which is a little less,

11   and they usually have a fence around them like Coxsackie has

12   a fence where Auburn has a wall.

13         Q      Does it make a difference on the types of

14   people who are brought in there?

15         A      Yes.  We have everything, runs everything from

16   murderers to mass murderers, I have some -- I have people

17   doing -- right now I think I have about 20 to 25 natural

18   lifers, so they have no parole whatsoever.  I have inmates

19   doing 756 to life, obviously he should consider himself life

20   without parole but he still, if he has court cases that

21   overturn things, he could get out.  And then I also have

22   people who are doing one to three for DWI.  They get to a

23   minimum or a medium and then they violate the rules there and

24   they would go to an SHU, special housing somewhere, and then

25   come into Auburn because they have to remain a year

1    disciplinary free before they're eligible to transfer to

2    another facility.

3            Q    Now the fact that you have people who are

4    never going to see the light of day, does that change the

5    security situation with regard to the officers who deal with

6    them?

7            A    No, because you're really, you know, you have

8    to be firm, fair, and consistent to all the inmates and you

9    can't pick and choose what the inmate -- which one you gonna

10   treat differently, so you need to treat all the inmates the

11   exact same way.

12           Q    Does it heighten concern when people deal with

13   those fellas?

14           A    It would heighten -- it heightens my concern

15   when I have those individuals within the facility.  The main

16   reason is they really have nothing to lose.  Again, my

17   heightened concern would be the guy that first comes in from

18   the court system, he goes in and he was sentenced to life

19   without parole, for the first few years you really have to

20   watch an individual like that.  And then at some point in

21   time when he comes to realize that this is the rest of his

22   life, there will be a change and he'll become -- I don't want

23   to say -- he'll become an inmate who just wants to program

24   and go on with his life as it is gonna be.

25           Q    And these concerns, does that apply equally to

1  males and females within the security, within the security

2  staff?

3          A     Yes, it does.

4          Q     Now, we heard about people not wanting to

5  relieve Ms. Collins to go to the bathroom.  You recall that?

6          A     I do.

7          Q     And would that be in the category of someone

8  after that experience feeling they would not be supported by

9  a correction officer?

10         A     Again, I would not --

11              MS. CONNOR:  Objection, that calls for

12  speculation, your Honor.

13              THE COURT:  Category?  Why don't you rephrase

14  the question.

15         Q     Okay.  When you discussed whether or not

16  correction officers, in your direct testimony, whether or not

17  you'd ever met a correction officer who would not come to the

18  aid of a fellow officer, do you recall that?

19         A     I do.

20         Q     Were you referring to someone on a bathroom

21  break?

22         A     I was not.

23         Q     What were you referring to?

24         A     I was referring to an employee or an officer

25  who was in trouble with an inmate fight or being assaulted,

1    that another officer would not come to their aid.

2           Q    Now, if an individual needs relief to go get

3    relief, who do they talk to?

4           A    On the most part if we're talking about a

5    bathroom break they would make a phone call and -- or they

6    would go to their area supervisor, chart sergeant, there's

7    many avenues in which to get that break.

8           Q    Well, what if their sergeant won't send

9    relief, what can they do?

10          A    In Auburn, they would call the union, union

11   rep and their union rep would go to the watch commander.

12          Q    Then what would happen?

13          A    He'd get relief, he, she would get relief.

14          Q    Have you ever known of cases where people

15   won't give other people potty breaks?

16          A    I do.

17          Q    And what's happened?

18          A    Well, if you don't do your job, part of

19   corrections is peer pressure, so you have officers and staff

20   members that sometimes don't do their job, and there's peer

21   pressure, and part of peer pressure would be that -- that

22   they would not relieve you, they would show up late for

23   relief and they wouldn't relieve you for a lunch break, as a

24   peer pressure thing.

25          Q    Is that unique to some gender?

1        A     No.

2        Q     Now, you were asked about if sleeping on

3    the -- at your post was the same as abandoning your post?

4        A     Correct.

5        Q     And your answer was what?

6        A     Yes.

7        Q     You also on direct indicated that you caught

8    four people sleeping?

9        A     I have.

10       Q     And what happened to those people?

11       A     They've all been disciplined.  They have

12   varying degrees of penalties that they receive.

13       Q     And were those penalties something that you

14   came up with?

15       A     No, labor relations.

16       Q     So even that has to go to labor relations?

17       A     I did a notice of discipline on them, yes.

18       Q     On all four?

19       A     Yes.

20       Q     Were they females?

21       A     No.

22       Q     Any of them females?

23       A     No.

24       Q     Now, we've heard over the past week or so

25   about putting tape on glasses.  Do you recall?

1        A    Yes.

2        Q    Is -- would you call that, that act sexual in

3    nature?

4        A    No.

5        Q    Is there any way you'd like to characterize

6    somebody putting Scotch tape on somebody's glasses?

7        A    Childish.

8        Q    Sophomoric?

9        A    Correct.

10       Q    Would that constitute a security issue in your

11   mind?

12       A    Again, only that -- if that person needed

13   those glasses to see long distance and could not function, it

14   could be a security issue, yes.

15       Q    In this case, do you -- are you aware of

16   whether or not it became a security issue?

17       A    I'm not.

18       Q    Was it ever reported to you as a security

19   issue?

20       A    No.

21       Q    Was it ever reported to you?

22       A    To my knowledge, no.

23       Q    In your November 12, 2005 meeting with

24   Ms. Collins, did she mention any officers by name besides

25   Sergeant Wright?

1          A     The November 9th meeting?

2          Q     Yes, I'm sorry.

3          A     Actually she never mentioned Sergeant Wright's

4    name during that meeting.

5          Q     Did she mention the overtime issue?

6          A     She did.

7          Q     Did she mention Sergeant Wright?

8          A     She did not.

9          Q     Did she mention Sergeant -- I've lost the

10   string, your Honor, I apologize -- who had come in from

11   Eastern and was gossiping about her?

12         A     No, she did not.

13               THE COURT:  You mean Sullivan?

14               MR. KINSEY:  Came in from Sullivan, was

15   gossiping about her, thank you, your Honor.

16         A     No.

17         Q     Did she mention Mr. Mitchell at all?

18         A     No, she did not.

19         Q     Did she mention anyone by name?

20         A     To my knowledge, no.

21         Q     Now, I'm fascinated by this information that

22   you've crossed a picket line.

23         A     Correct.

24         Q     What importance do you put on that?

25         A     Well, it's probably not the highlight of my

1    career.  But back in the day, I got called by New York State

2    Department of Corrections at the time that Council 82, change

3    in union, it was Council 82 was on strike and they asked me

4    to report to work.  So what -- I basically had a really good

5    friend who was on strike at Green Haven, I went to Tower 13

6    which was the local watering hole for the correction officers

7    were there that were on strike.  He put me on top of a chair,

8    I talked to a bunch of the correction officers that were on

9    strike about going to work.  Sergeant Finnegan who was a very

10   large sergeant basically took control and asked me, I'm gonna

11   ask you three things, and he said, do you need a job?  I said

12   yes.  Are you married?  Yes.  Do you have children?  Yes.  He

13   said go to work.  He said, but when you come back to Green

14   Haven, don't expect us to talk to you.  I said that's fair.

15   And I went and reported to Sing Sing for two days, come out

16   of Sing Sing and I'm not sure it was quite, it was about --

17               MS. CONNOR:  Your Honor, I'm sorry, what's the

18   relevance of this if it took place 30 something years ago?

19               MR. KINSEY:  She brought it up on cross, I

20   didn't understand the relevance then.

21               THE COURT:  You did.  The objection's

22   overruled, go ahead.

23          A    It was probably a month later or so that I was

24   called to go to the academy and I went to the academy in

25   Fishkill.

1     Q    Now, why, through these 30 plus years, has

2 that been common knowledge as you describe it?

3     A    Well, again, my seniority date is 1979, so

4 anybody that looks in my seniority date and knows that that's

5 when the strike was, and coming in.

6     Q    Now, in the -- at Auburn, you've heard that it

7 was considered female unfriendly; did you have any female

8 executive staff that worked with you at Auburn?

9     A    I have had one, I had deputy superintendent of

10 administration Beth O'Mara.

11     Q    And when did she work with you?  If you

12 recall?

13     A    I think she just transferred about a year,

14 year ago, she was there for about two -- two years.

15     Q    Did you have any problems with her?

16     A    Absolutely not.

17     Q    Did she have any problems with you?

18     A    No.

19     Q    She have any problems with the facility?

20     A    No.

21     Q    Now, Superintendent Graham, we've heard about

22 not answering radio calls and telephones?

23     A    Correct.

24     Q    And if a person doesn't answer their telephone

25 in a correctional facility, how would you characterize that?

1           MS. CONNOR:  Your Honor, this is beyond the

2    scope of cross.

3           THE COURT:  Counsel.

4           MR. KINSEY:  I'm trying to recall if we were

5    asked yet again about radio and telephone calls.  And if the

6    court's memory is better than mine, then I will withdraw the

7    question, but I thought that was asked again.

8           THE COURT:  I don't believe it was on cross.

9    I'll allow you a little leeway because we've heard so much

10   information over the last week.

11          MR. KINSEY:  Thank you, your Honor.

12          THE COURT:  I'll let you go a little further.

13   Go ahead.

14          Q    How would you characterize it?

15          A    Very serious.

16          Q    Why?

17          A    Well, we're in an unnatural society and

18   assaults take place or can take place at any point in time

19   and the safety of all staff is paramount and to try to keep

20   track of staff to make sure they're safe is just -- it's what

21   we do.

22          Q    Is that equally for males and females?

23          A    Absolutely.

24          MR. KINSEY:  A moment, your Honor, please?

25          THE COURT:  Okay.

1          (Pause in Proceedings.)

2          MR. KINSEY:  I have no more questions, your

3   Honor, thank you.

4          THE COURT:  Thank you.

5          MR. ANDREWS:  No questions, your Honor.

6          THE COURT:  Ms. Connor, if you have any.

7          RECROSS-EXAMINATION BY MS. CONNOR:

8     Q    I have some follow-up questions to your

9   testimony that you just gave, Superintendent.  Now you gave

10  some testimony concerning how grievances are processed, do

11  you recall that?

12    A    I do.

13    Q    And isn't -- you eventually said that it could

14  go to arbitration, isn't that true?

15    A    That's correct.

16    Q    Now that's primarily for grievances related to

17  employee discharge, isn't that right?

18    A    There's other ones that go to arbitration but

19  on the most part most grievances will stop at the GOER level.

20    Q    Which is less than arbitration?

21    A    Yes, that's true.

22    Q    Now, you testified that -- you testified

23  concerning abandoning your post not being considered a crime,

24  do you recall that testimony?

25    A    I do.

1          Q    And isn't it true that you told Sergeant

2     Petrocino with respect to Ms. Collins that if -- she would be

3     disciplined if she abandoned her post?

4          A    That's correct.

5          Q    And therefore Sergeant Petrocino accompanied

6     Ms. Collins to medical, isn't that right?

7          A    I'm not sure.  He wasn't required to, but

8     knowing Sergeant Petrocino the way I do, I'm sure he would.

9          Q    And you testified concerning employee

10    grievance form, it's Plaintiff's Exhibit 25; do you still

11    have that in front of you?

12         A    I do.

13         Q    You do.  Now I note that there's a stamp in

14    the upper left-hand corner?

15         A    That's correct.

16         Q    And that stamp indicates that it's received in

17    Auburn, New York; do you see that with a date December 22nd?

18         A    That's my stamp in the superintendent's

19    office, that's correct.

20         Q    Says superintendent's office, correct, so

21    you're not disputing that you didn't receive this?

22         A    No, no.

23         Q    Now you also testified on redirect rather that

24    there's a new policy in effect where both parties would be

25    notified by the office of diversity management, is that

1    right, if there's a complaint filed, is that right?

2            A    That's not correct.

3            Q    Okay.  Well, isn't there a new policy in

4    effect where there would be a letter sent to the person

5    complaining and then the person about whom the person's

6    complaining?

7            A    Correct.

8            Q    And that -- is that letter sent by the office

9    of diversity management?

10           A    No, it's not.

11           Q    Who sends that letter?

12           A    Superintendent's office.

13           Q    So that would be your responsibility now?

14           A    That's correct.

15           Q    When did that go into effect?

16           A    I believe it was sometime last year.

17           Q    2011?

18           A    Yeah, 2010 or 2011, basically occurred at

19   all -- all superintendent meeting with the commissioner put

20   that direction out.

21           Q    Was that an effort to try to have the

22   superintendents pay more attention or be more involved with

23   what was going on in their facilities?

24                MR. KINSEY:  Objection, your Honor, calls for

25   speculation, why.

1        Q    If you know.

2             THE COURT:  Sounds like he could answer, I'm

3    going to let him answer, go ahead.

4        A    No, it really has to -- so there's

5    documentation that not only that the employee who filed the

6    complaint has a document that it was received and that --

7    what I am doing with it, I'm sending it up, but also to

8    document that you instructed the other employee that this

9    complaint has been made and their actions at this point in

10   time are on point.

11       Q    And that was not in effect when Officer

12   Collins worked at Auburn, right?

13       A    It was not.

14       Q    Now you also testified on redirect examination

15   about that you're not sure if the sexual harassment training

16   was done with respect to the weapons trainings officers; do

17   you recall that testimony?

18       A    I do.

19       Q    Now do you recall giving a deposition in my

20   office in this matter?

21       A    I do.

22       Q    And do you recall that deposition taking place

23   on February 25th, 2009 in my office?

24       A    I don't know the date but it would have been

25   in the depositions.

1          Q    You have no reason to dispute that date, do

2    you?

3          A    I don't.

4          Q    And do you recall that I asked you this

5    question, it's on page 79, line 17, "Is the contents of

6    Exhibit 12, which is the memorandum from Mr. Harvey with the

7    two sample memos -- withdrawn -- which is the memorandum you

8    sent to Charlie Harvey with the memorandum behind it; is the

9    contents of that exhibit what you did in response to what

10   Mr. Harvey advised you to do in Exhibit 11, which is

11   Mr. Harvey's memo to you, giving you -- telling you what,

12   advising you what to do?"

13              Your answer was, "Correct.

14              "Question:  Did you do anything else?

15              "Answer:  Not to my knowledge, no."

16              Do you recall that testimony?

17         A    I do.

18         Q    Is that accurate?

19         A    I believe it's the same testimony I gave here.

20         Q    Now, you also testified on redirect about how

21   atrocious the conditions of the lockers were and gave us a

22   lot of information about the locker redo that's in progress.

23   Now would you agree that when you arrived at Auburn when

24   Officer Collins was there, that the passageway to that locker

25   area and the lockers itself was a security issue due to the

1    conditions?

2            A    Was it a security issue?  No, because the only

3    ones that have access to it other than the cleaning porters

4    from another facility were correctional staff.

5            Q    You say cleaning porters from another

6    facility, those are inmates?

7            A    Yes, but they're escorted by a correction

8    officer downstairs and accounted for and the cleaning takes

9    place at a time that most staff are not down in those areas.

10           Q    But the hallway leading to that locker, the

11   locker area was very dark, wasn't it, lighting was terrible,

12   I believe was your testimony, isn't that right?

13           A    Lighting was insufficient for the space,

14   that's correct.

15           Q    Doesn't that present a security issue for

16   females?

17           A    It would present a security issue for anybody.

18           Q    Now, I believe you gave some testimony about

19   conduct, telling inmates, saying things in front of inmates

20   and how that would place an officer in jeopardy, isn't that

21   right?

22           A    That's correct.

23           Q    And would you agree that Plaintiff's 11, which

24   is the memorandum from Officer Collins to Troy Mitchell,

25   tells -- advises the reader that this conduct was done in

1    front of officers and inmates; do you see that in the memo?

2            A    I do.

3            Q    That's a security issue, isn't that not?

4            A    Could be, yes, it could.

5            Q    But yet you didn't follow up with Officer

6    Collins to ask her more information about that, did you?

7            A    Again, I deferred this to diversity

8    management, that's correct.

9            Q    And doesn't the memorandum apprise you about

10   hangup calls that Officer Collins states she's receiving on

11   the second page of it?

12           A    It apprizes Sergeant Mitchell.

13           Q    But you received this, you don't dispute it

14   was read to you that night in fact you're saying --

15           A    Right.

16           Q    So you had knowledge of its contents?

17           A    Correct.

18           Q    Isn't that right?

19           A    Correct.

20           Q    And that the second page talks about 20 to 30

21   hangup calls being a security hazard, and that Sergeant

22   Mitchell knew they were happening, do you see that, in the

23   second page?

24           A    I do.

25           Q    And did you follow up with Officer Collins

1    about that security problem?

2            A    Again, it went to diversity management.

3            Q    Now you also testified that the tape on the

4    glasses was not reported to you I believe on your redirect

5    examination?

6            A    Correct.

7            Q    If you look at Plaintiff's 11, do you see a

8    recounting of the issue about the tape on the glasses, second

9    page, third paragraph, you see that?  "It was not funny at

10   all when these lenses of my glasses were taped so that I

11   couldn't see, and I need my glasses to do the logbook and

12   read the inmate board."  Do you see that?

13           A    I do.

14           Q    "When my glasses were taped, like it or not,

15   it became a security issue," do you see that?

16           A    I do.

17           Q    So would you agree that she -- that you knew

18   that it was a security issue or had been advised, even if not

19   through Officer Collins directly you had been advised about

20   the security issue; would you agree with that?

21           A    By the letter, yes.

22                MS. CONNOR:  No further questions for the

23   witness, thank you, your Honor.

24                THE COURT:  Any redirect or other examination?

25                MR. ANDREWS:  Briefly, your Honor.

1          THE COURT:  Go ahead, sir.

2          RECROSS-EXAMINATION BY MR. ANDREWS:

3          Q    Superintendent Graham, let me start at the end

4    there with the questions about the taping of the glasses.  If

5    some kind of an emergency had occurred on C block on

6    November 10th, 2005, would Ms. Collins' duties primarily have

7    centered around reading things?

8          A    No.

9          Q    As first officer she handles the keys, is that

10   correct?

11         A    That's correct.

12         Q    And were there a problem, she would need to be

13   up and using those keys?

14         A    That's correct.

15         Q    Okay.  So she wouldn't be sitting reading the

16   logbook during an emergency?

17         A    No, she would not.

18         Q    Okay.  You were asked some questions about

19   Plaintiff's Exhibit 11 which is the memorandum?

20         A    Yes.

21         Q    And it was noted in the memorandum, it's

22   claimed in the memorandum that the alleged statements from

23   Sergeant Mitchell were made in front of inmates?

24         A    I'd have to read the entire --

25         Q    Well, let me rephrase the question, okay.  If

1    Ms. Collins asserted that the statements were made in front

2    of inmates -- let me step back, withdrawn.

3              The statements that are asserted in this

4    memorandum that Sergeant Mitchell allegedly made to Officer

5    Collins don't involve ridicule of her, do they?

6         A    No, they do not.

7         Q    They involve statements about himself?

8         A    They do.

9         Q    Statements about his family?

10        A    Yes.

11        Q    So he wasn't ridiculing her so far as you can

12   see in this memorandum, in front of whoever was present?

13        A    That's correct.

14             MR. ANDREWS:  No further questions, your

15   Honor.

16             THE COURT:  Thank you.

17             FURTHER REDIRECT EXAMINATION BY MR. KINSEY:

18        Q    Mr. Mitchell [sic], do you agree with -- it's

19   been a long time, I'm sorry.  Superintendent, do you agree

20   with the letter that tape on her glasses presented a security

21   issue?

22        A    Again, in the circumstances here, I don't

23   believe it was.  If they're reading glasses, most individuals

24   can function without reading glasses.

25        Q    Is this the biggest security issue you had at

1    the time after three weeks on the job?

2              A    Absolutely not.

3                   MR. KINSEY:  Thank you.

4                   MS. CONNOR:  No further questions, thank you.

5                   MR. ANDREWS:  Nothing further, your Honor.

6                   THE COURT:  Superintendent, you can step down.

7                   THE WITNESS:  Thank you.

8                   (Whereupon the witness was excused.)

9                   THE COURT:  Ms. Sheehan.

10                  MS. SHEEHAN:  We'd like to call our next

11   witness, Sandra Downey.

12                  THE COURT:  Everybody okay over there?  If you

13   need to stand up and stretch.

14                  (A discussion was held off the record.)

15                  THE CLERK:  Good afternoon.  Can you please

16   state your full name and spell it for the record, please.

17                  THE WITNESS:  Sandra, S-a-n-d-r-a, Lee, L-e-e,

18   Downey, D-o-w-n-e-y.

19

20        S A N D R A   L .   D O W N E Y , called

21   as a witness and being duly sworn, testifies as

22   follows:

23                  <u>DIRECT EXAMINATION BY MS. SHEEHAN:</u>

24             Q    Good afternoon, Ms. Downey.  Please introduce

25   yourself to the jury.

1          A     My name is Sandra Downey.  And I work for

2    New York State Department of Corrections and Community

3    Supervision.

4          Q     How long have you worked for DOCCS?  Is that

5    okay if I refer to them as DOCCS?  Thank you.

6          A     Yes.  23 years, 10 months.

7          Q     Not that you're counting.

8          A     Not that I'm counting.

9          Q     Could you please briefly go -- tell the jury

10   all the positions you've held while working for DOCCS.

11         A     Certainly.  I started my career as a clerk in

12   the personnel office.  From the clerk position, I was

13   promoted to a calculation clerk 2 in the payroll office.

14   From there, I became a payroll clerk 3, payroll clerk 4, a

15   payroll clerk 5, all within Central Office payroll unit.

16   After that, I became institution steward in the Central

17   Office finance office.  After institution steward, I became a

18   supervising budgeting analyst.  The following position was

19   assistant director, financial administration 2, and then my

20   current position of director of financial administration 4.

21         Q     And how did you receive your last position as

22   director, financial administration, level 4?

23         A     I was appointed by Commissioner Fischer.

24         Q     And how long have you held that position?

25         A     I was appointed to that position in October of

1    2010.

2              Q    And what are your responsibilities in your

3    current position?

4              A    I am responsible for the Central Office budget

5    and finance unit.  That unit has five subunits, one being the

6    budget office.  The budget office prepares the DOCCS budget

7    for submission to the division of the budget every year, and

8    we take the budget that is voted upon, and we make sure that

9    the facilities have all of the moneys that they need to run

10   the jails and pay the employees.  One of the other units that

11   I'm responsible for is the Central Office finance unit.  They

12   pay all of the bills, the leases, the rentals, some of the

13   centralized purchases, we do travel reimbursement for

14   employees, we take care of the bank accounts.  I also

15   supervise the medical bill paying unit, which processes all

16   the payments for inmate inpatient claims, as well as

17   specialty care for inmates.  I'm also responsible for the

18   Central Office payroll unit.  Central Office payroll actually

19   processes five payrolls in house.  Central Office, parole

20   board, community supervision, New York City central

21   administration, and the DOCCS trainees.

22              We also act as a resource for all of the

23   payroll clerks that are actually working in the facilities

24   and we are the liaison with the office of the state

25   comptroller who is our control agency.

1          And I also have one other unit that I'm

2    responsible for which is the inmate accounts unit.  Every

3    inmate in New York State has an inmate account which their

4    inmate wages are deposited into.  They are allowed to make

5    commissary purchases from their moneys in that account, and

6    they are allowed to do outside purchases from their account.

7    They also are obligated to pay mandatory state surcharges,

8    fees, and so forth.

9          Q    Among all those responsibilities, do any of

10   them include the appropriation of money to facilities?

11         A    Yes, it does.

12         Q    What's your responsibility to appropriations

13   to facilities?

14         A    Each year, the governor's budget that is

15   approved by the legislature sets forth money in different

16   programs.  Our different programs in DOCCS are

17   administration, support, health, security, programs, parole

18   board, and community supervision.  If you look at the budget,

19   it's one big number.  From that big number, my office has to

20   determine the needs of each facility for each program, and we

21   make sure that they have enough money to pay the employees'

22   salaries as well as what we call nonpersonal service which

23   would be the food and the fuel oil to heat the jails, the,

24   um, physicians that the inmates have to see if they need to.

25   They also have programs like education, they have schools,

1    and they have guidance.  We make sure that they have enough

2    money to buy what they need to run their programs, and all of

3    that said and done makes for a safe and secure facility.

4            Q    Is that the objective of the appropriations to

5    the facilities?

6            A    Absolutely.

7            Q    Are you familiar with the term capital

8    expenditures?

9            A    Yes.

10           Q    Could you please give the jury just a brief

11   explanation of what that is, what capital expenditures are.

12           A    Each year there is a capital budget that is

13   approved by the governor's office and the legislature.  This

14   year I believe it is $320 million.  What that money does is

15   it takes care of taking care of the buildings and the

16   prisons.  Basically, if you need a new roof on Bedford Hills,

17   the capital expenditures would pay for that new roof.

18   Facilities planning is a unit in Central Office that is

19   responsible for looking at all of the needs of the facilities

20   and they work with the Office of General Services to bring in

21   contractors to make sure that those facilities are taken care

22   of structurally.

23           Q    Would the construction of a new locker room be

24   considered a capital expenditure?

25           A    Yes, it would.

1          Q     And do the superintendents of the facilities

2    have control over when that project could be initiated?

3          A     No.  Basically, safety and security projects

4    happen first.  Our mission is to provide a safe and secure

5    environment for offenders and staff.  After that, and I'll

6    give you an example, many of the facilities have taut wire

7    fences around them.  If something happened to that taut wire

8    fence, that would be an emergency and they would make sure

9    that a contractor got in there to fix it immediately.  From

10   there, facilities planning looks at all the different kinds

11   of things that need to happen at facilities and they

12   prioritize them.

13         Q     Okay.  I asked you to gather information about

14   the sergeant's exams that were offered during the period of

15   time that Ms. Collins was employed by DOCS.  Did you do that?

16         A     Yes, I did.

17         Q     And can you please tell the jury what you

18   found.

19         A     What I did is I went to our security personnel

20   unit in Albany.  Security personnel is the unit that

21   basically says we need 80 new correction officers, they will

22   talk to the director of personnel, and they will get an

23   academy scheduled.  From there, they work with civil service

24   on the eligibility and the requirements for those exams.

25   When they need a new exam once they -- there's very few

1    acceptors left on an exam, they'll reach out to civil service

2    and say we need to give another test.

3              When I went to security personnel regarding

4    Ms. Collins, I found that she did take one sergeant's exam

5    and she did pass it with a grade of 85.  I further found out

6    that there was no 85s appointed from that list.  She -- let's

7    see, the lowest grade that they got to on that list was a

8    grade 90, before the next list came to be.  So often, lists

9    expire with people still on it, and you have to take the test

10   again, score well enough to be reachable, and I did not find

11   where she took the next test that was given for sergeant.

12        Q    Ms. Downey, do you remember the date of the

13   sergeant's exam that Ms. Collins did take?

14        A    Oh, let me think.  Off the top of my head I

15   don't remember the date.

16        Q    Do you remember the year?

17        A    I'm ... I'm not positive, no.

18        Q    Do you remember the year of the exam that she

19   did not take?

20        A    That was 2009.

21        Q    And do you know the top score on that exam?

22        A    102.5.

23        Q    Are you familiar with the NYSCOPBA negotiating

24   contract, the union contract?

25        A    Yes, I am.

1        Q    How often do corrections officers receive

2   salary increases?

3        A    Salary increases can be from one of two

4   different methods.  Every person is entitled to performance

5   advances throughout their career.  You start at one point and

6   every year you get an increase until you hit the job rate.

7   The other way that people are given raises are contractual

8   raises, which are negotiated.  I think, let's use CSEA, they

9   just settled the contract, I think their current contract for

10  11 -- 2011 through 2015, 2011 they got 0 percent, 2012, they

11  got 0 percent, 2013 they got 0 percent, 2014 they'll get

12  2 percent, and 2015 they'll get 2 percent.

13       Q    When do -- according to the NYSCOPBA contract,

14  what months or month do corrections officers receive the

15  performance raise?

16       A    April.

17       Q    And when do they receive their contractual

18  raises?

19       A    However it is written in the contract.

20       Q    And how is it written in the current contract?

21       A    The last contract that they have was through

22  2008, and I believe in 2008 they received a 3 percent

23  contractual raise.

24       Q    And when is that paid to them?

25       A    That was April 1st, 2008.

1    Q    So the contract that was up for renewal as of

2  April 1st, 2008, do you know when that contract went into

3  effect, when it was ratified?

4    A    That was a two-year contract, I think it was

5  April of 2007 through April 2 -- let's -- April 2006 through

6  April 2008.

7    Q    So since 2006, corrections officers have

8  received raises every April?

9    A    Yes.

10    Q    At what rate is a corrections officer hired

11  at, the name of the rate?

12    A    It is a trainee rate.

13    Q    And how long are they paid under a trainee

14  rate?

15    A    Correction officers have a one-year

16  traineeship.

17    Q    Is there ever an exception to that?

18    A    No.

19    Q    And why is that?

20    A    Civil Service Law that they are appointed as a

21  trainee, they serve the one-year traineeship before becoming

22  the grade 14 correction officer.

23    Q    How many years does it take for a corrections

24  officer to reach the job rate?

25    A    It would take a total of eight years.  One

1    year in the traineeship and then seven years as the grade 14.

2            Q    So is it safe to say that trainee is the

3    lowest pay rate?

4            A    Yes.

5            Q    Is that a lower paid rate than a hiring rate?

6            A    Yes.

7            Q    Is that a lower paid rate than a step 1?

8            A    Yes.

9            Q    Is it a lower paid rate than a job rate?

10           A    Yes.

11           Q    Does the NYSCOPBA contract contain a benefit

12   called loss of terminal leave benefit?

13           A    I've never heard of that term.

14           Q    Never?

15           A    No.

16           Q    How is overtime paid to officers in the sense

17   that, is overtime guaranteed?  How is it determined whether

18   or not an officer will receive overtime?

19           A    All the overtime in our department is

20   unscheduled.  Basically what happens is if you're at a

21   facility and there is a need, let's say someone called in

22   sick, then the first thing they do is ask for volunteers to

23   work that overtime.  If nobody wants it, they actually look

24   at the seniority roster and it is assigned in the reverse.

25   So the person with the least seniority would get stuck

1    working that shift.

2              Q    Are officers guaranteed overtime every year?

3              A    No.

4              Q    Does it depend, is it by facility, do some

5    facilities require more overtime than others, if you know?

6              A    There's no guarantees.  The superintendents

7    are the ones that are responsible for insuring that overtime

8    is kept to a minimum, and it is necessary.

9              MS. SHEEHAN:  Thank you, Ms. Downey, I have no

10   further questions for you.

11             THE COURT:  Mr. Andrews?

12             MR. ANDREWS:  No questions, your Honor.

13             THE COURT:  Ms. Connor.

14             CROSS-EXAMINATION BY MS. CONNOR:

15             Q    It's Downey, is that right?

16             A    Yes.

17             Q    I'm Mairead Connor, I represent Penny Collins

18   in this matter.  Ms. Downey, I'm just going to ask you a

19   couple follow-up questions to your testimony.  Now, you

20   testified that Ms. Collins took the sergeant's exam but you

21   weren't quite familiar with the year, is that right?

22             A    Correct.

23             Q    And -- but there was a sergeant's exam offered

24   again in 2009, is that right?

25             A    Correct.

1          Q    And you could not find a record that she took

2     that exam, is that right?

3          A    The security personnel office checked to see

4     if she took the exam, if she had signed up for it, and they

5     found no record.

6          Q    And isn't it true that in order to be eligible

7     to take the sergeant's exam, the employee would have to be a

8     corrections officer for 12 months prior to that exam?

9          A    Off the top of my head, I do not know the

10    eligibility requirement for the exam but they would have had

11    to have been a correction officer, yes.

12         Q    And you don't know whether they would have had

13    to have been active for 12 months prior to that exam?

14         A    No, I do not.

15              MS. CONNOR:  I have no further questions,

16    thank you, your Honor.

17              MS. SHEEHAN:  No further questions, your

18    Honor.

19              THE COURT:  Ms. Downey, you may step down.

20              THE WITNESS:  Thank you.

21              MS. SHEEHAN:  Your Honor, may Ms. Downey be

22    released?

23              THE COURT:  You see any need to recall her?

24              MS. CONNOR:  I don't expect to recall her,

25    your Honor.

1              THE COURT:  Mr. Andrews?

2              MR. ANDREWS:  No, your Honor.

3              THE COURT:  Okay.  She can be released.

4              (Whereupon the witness was excused.)

5              MS. SHEEHAN:  Your Honor, state defendants

6    rest.

7              THE COURT:  Okay.  Ladies and gentlemen, I'm

8    going to give you a short break while we check over exhibits

9    that may have been offered or not offered, make sure that

10   everything is in place while defense rests.  Okay.  Please

11   don't talk about it, don't let anybody talk to you about it.

12   Thank you, enjoy your break.

13             (Jury Excused, 2:16 p.m.)

14             THE COURT:  Okay, Counsel, if you'll see my

15   courtroom deputy, make sure everybody's on the same page, I

16   don't think there's a lot but I just want to make sure before

17   you rest your case.

18             MR. ANDREWS:  Your Honor, I'm planning on

19   putting on defendant when we return.

20             THE COURT:  I understand.

21             MR. ANDREWS:  Okay.  Thank you.

22             (A discussion was held off the record.)

23             (Whereupon a recess was taken from 2:17 p.m.

24              to 2:29 p.m.)

25             (Open Court, Jury Out.)

1        THE COURT:  Okay, is everyone all set with

2    regard to the exhibits?

3        MS. SHEEHAN:  Yes, your Honor.

4        THE COURT:  Oh, we've got to wait for

5    Ms. Connor, okay.  Mr. Andrews, is that going to be it, just

6    your client?

7        MR. ANDREWS:  That's all I'm planning on

8    calling, your Honor.

9        THE COURT:  Okay.  Just figuring out timing

10   here, what we're going to do.  I'm sure you're all ready to

11   sum up this afternoon, right?

12        (Ms. Connor joined the proceedings.)

13        THE COURT:  We have plaintiff, plaintiff's

14   counsel, defendants, defense counsel outside the presence of

15   the jury.  Ms. Sheehan, as far as the state defendants are

16   concerned, your exhibits, you've verified with the courtroom

17   deputy everything's corroborated as far as what's in and not?

18        MS. SHEEHAN:  Yes, your Honor.

19        THE COURT:  Ms. Connor, you're satisfied with

20   that process as well?

21        MS. CONNOR:  Yes, your Honor.

22        THE COURT:  Okay.  Mr. Andrews?

23        MR. ANDREWS:  I am, your Honor.

24        THE COURT:  Okay.  Ms. Sheehan, you had

25   something else?

1    MS. SHEEHAN:  Before you bring the jury in, I

2  intend to renew the Rule 50 motion for the defendants, state

3  defendants.  When would you like me to do that, either now or

4  after the close?

5    THE COURT:  Why don't we do it after

6  Mr. Andrews has an opportunity to put his client on and we

7  close, and then we'll let -- we'll go through the process of

8  allowing your arguments at that time.

9    MS. SHEEHAN:  Thank you, your Honor.

10    THE COURT:  We can handle them all at once.

11    MR. ANDREWS:  I would have the same intention,

12  your Honor.

13    THE COURT:  I figured you would.  Anything

14  else before we bring the jury back?  Okay.  Let's bring the

15  jury in, please.

16    (Jury Present, 2:33 p.m.)

17    THE COURT:  You're not spending the whole last

18  part of your break standing in order, are you, in that little

19  room?  Okay.  I don't want you to become too anal on me here.

20  All right.  We have the ladies and gentlemen of the jury,

21  plaintiff, plaintiff counsel, defendant, and defense counsel.

22  Mr. Kinsey, Ms. Sheehan, state defendants rest, is that

23  right?

24    MR. KINSEY:  That's right, your Honor.

25    MS. SHEEHAN:  Yes, your Honor.

1          THE COURT:  Mr. Andrews, you intend to call

2    anyone?

3          MR. ANDREWS:  Defendant Mitchell calls

4    defendant Mitchell.

5          THE COURT:  Very well.  Mr. Mitchell, come on

6    up.

7          THE CLERK:  Good afternoon.  Can you state

8    your full name and spell it for the record.

9          THE WITNESS:  Troy W. Mitchell, T-r-o-y,

10    M-i-t-c-h-e-l-l.

11

12        T R O Y   M I T C H E L L , called as a

13    witness and being duly sworn, testifies as follows:

14          THE COURT:  Mr. Andrews, when you're ready,

15    sir, go ahead.

16          MR. ANDREWS:  Thank you, your Honor.

17          DIRECT EXAMINATION BY MR. ANDREWS:

18        Q    Good afternoon, Troy.  Can you tell the jury

19    how old you are?

20        A    I'll be 49 in April.

21        Q    Where are you from?

22        A    Genoa, it's a --

23        Q    Where is Genoa?

24        A    It's a small town between Auburn and Ithaca,

25    it's just a stop sign, what it is.

1          Q     Where do you live now?

2          A     I live in Genoa.  I've lived there my whole

3     life.

4          Q     Okay.  Do you have children?

5          A     Yes.  I have a son who's 25, a daughter who's

6     26, they're both college graduates, they both work, support

7     themselves.  I also have a four-year-old grandson my daughter

8     didn't want to raise in the city so she moved back home and I

9     have a huge house from the 1800s so I built myself and wife

10     an apartment in the attic and she raises the kid downstairs,

11     in the bottom two floors.  And we have 8 acres right in the

12     middle of town, I have a frog pond and a fishing pond and

13     have 19 gardens in the back lawn, it's pretty nice.

14          Q     When did you graduate from high school?

15          A     1981, Southern Cayuga.

16          Q     What did you do after that?

17          A     I went in the Army right out of high school

18     because I graduated by that much (indicating), and I did my

19     full enlistment, got out, was an honorable discharge.  While

20     I was in, I got married and I took the test for this job.

21          Q     Okay.  So what did you do when you got out of

22     the Army?

23          A     Well, when we got out we moved to Vermont

24     because that was where my wife was from and I worked in

25     Burlington as an electrical wholesaler for six months, and

1   there's an IBM plant in Burlington and the prices were crazy

2   up there so we decided to move back home, really nothing

3   changes.  And I went back to work on the dairy farm which is

4   where I worked all through high school, and waited for this

5   job to come through.

6                Q     And at some point you were hired by the

7   Department of Corrections, is that correct?

8                A     Yes, in February '86, I went to the academy,

9   and after that, I went to Sing Sing, Fishkill, and then

10  Woodbourne until '87, I made it back to Auburn.  And I stayed

11  there as an officer until '99.

12               During that period as an officer at Auburn, I,

13  you know, I've been punched, kicked, scratched, I've been

14  doused with feces head to toe, eyes, mouth, ears.  I broke my

15  wrist in the yard tackling an inmate, exposed to tuberculosis

16  watching an inmate at Upstate, had to take all that

17  medication and stuff.

18               So after that, I made sergeant in '99.  I went

19  to Southport, Five Points, then back to Auburn, in 2002.  And

20  then I stayed at Auburn until I made lieutenant in 2006, at

21  which time I went to Eastern.  I stayed there for about four

22  weeks and went to Woodbourne where I was at for a little over

23  a year.  I made it back to Butler which is up in Wayne

24  County, and then I came back to Auburn.  And then I went back

25  to Eastern to Hudson to Five Points and back to Auburn for

1    good.  And that's where I been since.

2              Q    So how long have you been back to Auburn at

3    this point?

4              A    That's a good question.  I think '08 I came

5    back.

6              Q    Okay.  Have you ever been disciplined while

7    working for the Department of Corrections?

8              A    I did.  And throughout my career as an officer

9    I always worked whatever shift was good for the kids.  My

10   wife and I raised the kids without any baby-sitters, we

11   always worked different shifts so I did the diapers and

12   everything.  So at the time I was on 11 to 7 so I could coach

13   sports and all that, and fell asleep on duty about 1:00 in

14   the morning, so I got -- I got $1,000 fine for that.

15             Q    And when was that?

16             A    It was in 1995.

17             Q    So your 26 years in corrections, any other

18   discipline?

19             A    No, no.

20             Q    Okay.  I'd like to talk about the atmosphere

21   in a prison a little bit and I think we've heard lots of

22   testimony that Auburn is a maximum security prison, is that

23   correct?

24             A    Yes.

25             Q    Can you describe from your perspective what

1    working in a maximum security prison is like?

2            A    Well, I heard it best described as endless

3    hours of boring routine interrupted by moments of sheer

4    terror.  And to me, it wasn't as much when it happens, it's

5    the stress all day of waiting for something to happen.  And

6    it's almost like when it happens, it's a release and then

7    right after it happens and it's all cleaned up, that's when

8    you really start to shake and everything.

9            Q    Did anything -- do people do anything to break

10   up the tension?

11           A    Well, we prank each other a lot.  I once heard

12   a guy say it was a necessary mechanism to break up the

13   monotony and the stress, to goof on each other.

14           Q    You ever had a prank played on you?

15           A    Yeah, I've had a lot of pranks played on me,

16   I've had --

17           Q    Can you give an example?

18           A    Guys will put toothpaste on your phone, when

19   you answer it, you slap your ear full of toothpaste, or

20   they'll unplug your phone so when you answer it, nobody's

21   there.  We'll drop water, garbage bags full of water near you

22   from upstairs and it will splash.  I once had guys, when I

23   was a brand new officer at Woodbourne, they took a paper clip

24   and made a long piece of toilet paper on it and fastened it

25   to my belt loop when I wasn't looking so I walked around with

1    a tail all day.  I thought that was pretty funny myself.

2         Q    Yeah.  You talked about water being dropped.

3    Anything else with water?

4         A    Yeah, I actually -- a guy, I was sitting on my

5    first officer's desk, this was probably '97, buddy of mine

6    threw a 5-gallon bucket of cold water right over my head when

7    I wasn't -- I didn't even know he was there.  So once I

8    caught my breath, because it really caught you by surprise,

9    and I had a fleeting moment of anger and then I just had to

10   laugh.  He got me good.  And the worst part is he thought I

11   had pranked him earlier and it wasn't me.  So --

12        Q    What is it that he had thought you had done?

13        A    Well, he was out in the yard and there was a

14   water spigot and they had taken the end off, maintenance was

15   working on it, and somebody had realized he was looking in

16   the spigot and standing right in front of it so they run in

17   my block where I'm the only one sitting there, and hit the

18   water real quick and doused him, turn the water off, ran out,

19   I didn't even know what that guy did.  And he came in, he was

20   so mad.  So I laughed at him then because I -- you know, but

21   he got me, even though I didn't do it, but he knows who did

22   it and I swear he'll get 'em one of these days.

23        Q    Okay.  Now you said that there came a time in

24   2002 when you returned to Auburn and that was as a sergeant,

25   correct?

1          A    Yes.

2          Q    Do you recall when in 2002 that was, what part

3    of the year?

4          A    It would have been around the beginning of the

5    summer.

6          Q    Okay.  Do you recall at some point being --

7    becoming aware that there was an officer named Penny Collins

8    working in Auburn?

9          A    I do become -- I became aware but I couldn't

10   tell you when.

11         Q    You can't say when that was?

12         A    No.

13         Q    Okay.  Do you recall speaking to her soon

14   after her arrival at Auburn?

15         A    No.

16         Q    Did you hear her testify that you told her on

17   her second day that women do not belong at Auburn?

18         A    I heard her testify to that, yes.

19         Q    Did you say that?

20         A    No, I've never said that.

21         Q    Well, okay.  How can you be sure if you don't

22   recall exactly when she arrived?

23         A    Say that again.

24         Q    How can you be sure you didn't say that if --

25         A    I've never said that.

1          Q    Okay.  Now, you heard the plaintiff also

2     testify about some comments she said you made about an

3     inmate's penis, do you recall that?

4          A    Yes.

5          Q    I'm going to ask you some questions based on

6     that testimony.  Okay?

7          A    Okay.

8          Q    Did you ever make a comment to Ms. Collins

9     about the size of an inmate's penis?

10         A    No.

11         Q    Did you ever ask her if she had seen a penis

12    so big or words to that effect?

13         A    No.

14         Q    Did you ever ask her if she would know what to

15    do with an inmate's penis or words to that effect?

16         A    No.

17         Q    Okay.  I'd like to move on to the next thing

18    that Ms. Collins testified about that related to you, which

19    is the incident concerning her wallet.  Do you recall hearing

20    that testimony?

21         A    Yes.

22         Q    Can you describe the -- first let me ask,

23    prior to that time do you recall having any interaction with

24    Ms. Collins whatsoever?

25         A    No, this is the first time I've ever spoken to

1    her.

2              Q    Okay.  Can you describe what happened?

3              A    We were running chow, I was the C block

4    sergeant then, and when we run lunch I would go to Dog block

5    first and then when Dog block was all run to chow, I would go

6    over to C block.  I walked into the block, to the first

7    officer's desk and I saw out of corner of my eye a lunch bag

8    sitting near the stairs and it's one of those soft lunch bags

9    about this big (indicating), and you've seen them.  On the

10   side they have a little pouch that's like a fishnet and the

11   top is just a little bit of elastic.  So I could see exactly

12   what was in there, it was a wallet.  And in the fold of the

13   wallet you could actually see the badge shining in the fold.

14   So I just reached in with my two fingers and pulled it out, I

15   looked at it, I saw that it was hers.  She had come into the

16   block temporarily that day just to run a company to chow so

17   she wasn't there.  I had a lot of duties, she had a lot of

18   duties, I put it in my pocket and held onto it.

19             Q    Let me stop just for a second.  Step back, why

20   did you pull it out?

21             A    Well, you have to keep your badge and ID on

22   your person.  That's the rules.  I mean any inmate could have

23   reached in just the same as I did, I mean even if -- even if

24   it's there in front of an officer, inmates will cause a

25   distraction and then they could have grabbed that and used it

1   to just walk right out the front, you know, changed the

2   picture on there and go.

3           Q    Before you reached into the bag, did you know

4   who it belonged to?

5           A    No.

6           Q    Did you know how long it had been lying there?

7           A    No.

8           Q    I think you were saying that you put the

9   wallet in your pocket; what did you do after that?

10          A    Well, I went about our duties because chow was

11  running, lots of inmate movement, and as soon as that was

12  done, I found out where she was at, tracked her down and at

13  this time she was actually in Baker block, that was part of

14  the job, that she was either relieving someone else or that

15  was part of the job that she had relieved earlier.

16          Q    Okay.  And did you have a conversation with

17  Ms. Collins?

18          A    I did.  I called over to Baker block, talked

19  to whoever answered the phone, it wasn't her.  He said she

20  was there, so I went over.  I simply said, here's your wallet

21  I found in your -- I took it out of your bag which she, at

22  the time she didn't even realize it was missing.  I told her

23  I could have just as easily found this in an inmate's cell,

24  you have to keep it on your person.  And she wasn't real

25  receptive, she was a little angry at me, she thought maybe I

1    wasn't allowed to take her wallet out, which I certainly am.

2    And then I kind of left it at that.

3            Q    Did she express any other concern to you?

4            A    She was afraid that I was going to write her

5    up for it and as you heard everybody else testify, we don't

6    want to see anybody get in trouble, especially for something

7    that we can take care of ourself.  That's our job as

8    supervisors, to take care of the situations and not make them

9    bigger than they need to be.  So I assured her I wasn't going

10   to write her up, you know, just don't do it again.

11           Q    Okay.  Did you hear Ms. Collins testify that

12   she called you a liar at some point during this episode?

13           A    Yes.  Yes, I heard that.

14           Q    Did she do that?

15           A    No.

16           Q    If she had, what, if anything, might you have

17   done?

18           A    Well, I could of -- if she had done something

19   like that, I could have written her up, either as a formal

20   counseling which is not disciplinary, it's just a -- formal

21   counseling would be me having a conversation saying don't,

22   you can't do that, don't be telling me I'm a liar and then

23   you would follow that up with a memo that says that we had

24   this conversation and that would go in her file but it's not

25   disciplinary, it's just a means to improve performance.  Or

1    possibly could have gone to the superintendent and say, hey,

2    I want her up on disciplinary charges for being

3    insubordinate.

4           Q    Now, relative to her having left her badge and

5    her ID in her lunch bag, could you have written her up for

6    that?

7           A    Yes, absolutely.

8           Q    And what could have happened if you had?

9           A    The same things, I could have done the same,

10   could have gone with the counseling or the disciplinary

11   action.

12          Q    Okay.  And can you say whether she would have

13   been disciplined?

14          A    No, that would just be me reporting that to my

15   superior and then they would take it from there.  I wouldn't

16   say -- I wouldn't have any weight in saying whether she got

17   disciplined, that would be up to the superintendent.

18          Q    Okay.  After -- have you described pretty much

19   what occurred in your conversation with Ms. Collins?

20          A    What was that again?

21          Q    You've described pretty much what occurred in

22   the conversation with Ms. Collins?

23          A    That was it, yes.

24          Q    Okay.  After you spoke to her, did you mention

25   finding the wallet to anyone?

1        A    No.  Oh, afterwards?

2        Q    Afterwards.

3        A    Yes.

4        Q    And can you explain what happened?

5        A    Well, I left Baker block, I had to walk

6    through the yard and I just happened to cross paths with

7    Lieutenant Quinn, I believe was watch commander that day.  I

8    just mentioned it to him in passing, I said I had the wallet,

9    I gave it back to her, she wasn't real receptive to what I

10   was telling her about the rules, and he thought maybe it

11   would be best if we brought her to the office, her with her

12   union rep, me with the lieutenant, and sit across the table,

13   just make sure she understood because, like I said, we didn't

14   want anyone getting in trouble, want to make sure she

15   understood that I didn't do anything wrong and she shouldn't

16   do that again.

17       Q    Was this a disciplinary meeting?

18       A    No, absolutely not, it wasn't -- it was what

19   we call it, informal counseling, you had a conversation but

20   there's no record of it.

21       Q    To your knowledge, was Ms. Collins ever

22   disciplined for this episode?

23       A    No.

24       Q    Okay.  Did you hear the testimony that she

25   gave that you told her that an inmate had found the wallet in

1    the trash?

2         A    Yes, I heard that.

3         Q    Did you say that or any words to that effect?

4         A    No.

5         Q    Did you have any further direct contact with

6    Ms. Collins between that wallet incident and November 10th,

7    2005?

8         A    No, none.

9         Q    Now, did you hear Ms. Collins testify that

10   during that time period after the wallet episode and before

11   November 10th, 2005, there was an incident with an inmate

12   with a bulge in the front of his pants in the cafeteria?

13        A    Yes, I heard that.

14        Q    Do you recall any such incident occurring?

15        A    I don't recall that incident, when chow's

16   running, you're in the mess hall, someone's getting frisked

17   just about all the time out there in the hallway, so I don't

18   know.

19        Q    It may have happened as she described it?

20        A    It may have, yes.  It's common, it's just --

21   it's routine, it's what we do.

22        Q    Okay.  I'd like to ask you some questions

23   about November 10th, 2005.

24        A    Okay.

25        Q    Do you recall that Ms. Collins came to work in

1    your area on November 10, 2005?

2           A    Yes.

3           Q    And where was that?

4           A    I was still the C block sergeant and she was

5    assigned for that day C block first officer.

6           Q    Okay.  Do you recall why she was assigned to

7    that post that day?

8           A    Well, the chart sergeant would have assigned

9    her out of need, that's all.

10          Q    Okay.  And what was -- again, what was your

11   assignment that day?

12          A    I was C block sergeant, that was my bid job

13   every day.

14          Q    And can you describe what your duties would

15   have been as C block sergeant?

16          A    First thing I do is come in the block and

17   about 7:20, just pass through the block on my way to the mess

18   hall.  I would usually look around, see who my officers were

19   for the day.  If I had all three regulars I'd know everything

20   was good.  If I had a new guy at the desk like I did that day

21   but I had two of my regulars, I still know everything was

22   good because everybody would take care of that.  She was

23   there.

24          Q    I just want to talk generally about your

25   duties still.  Can you run through what your normal day is?

1        A       First thing, go right down to the mess hall,

2    run chow until 8:30, 9:00, and for the rest of the day up

3    until lunchtime which would be 11:30, I would go throughout

4    the facility and work on inmate property claims which is

5    claims inmates put in if they lose their property, their

6    property's stolen or they claim it was damaged by staff.  So

7    I would run around investigating that, gathering paperwork

8    and ultimately denying their claim.

9        Q       Okay.  And what portion of your day would you

10   typically spend on C block when you were fulfilling that

11   role?

12       A       Actually in C block I would pass through in

13   the morning, then at lunchtime at 11:30 lunch starts, I go to

14   D block, then when C block runs I would go over to C and

15   would be back and forth.  If inmates were moving and I saw a

16   group of inmates that looks suspicious going to D block, I'd

17   go over there and see if something was gonna happen, so it

18   was just back and forth at that point.

19       Q       Okay.  And then what would you do after lunch?

20       A       After lunch I work on claims again until the

21   end of the day.  At the very end of the day before I went

22   home, because I would go home about 15 minutes before the

23   officers, I just stop in the block, give the guy a wave, ask

24   him if there was anything going on and if they told me no, I

25   was good.

1          Q     And again, what was Ms. Collins' assignment on

2    November 10th, 2005?

3          A     C block first officer.

4          Q     Can you describe what the duties of the first

5    officer are?

6          A     The first officer brings down the keys for the

7    day and the radios, she opens up the lockbox that's behind

8    the desk and that's where we keep all the keys for the block

9    for the day.  She keeps track of all the keys, she hands them

10   out to whoever comes in to go up to a company and let inmates

11   in or out, she has the key to the front gate of the block,

12   she carries her radio, she maintains the logbook, and she

13   keeps the count.  There's a chalkboard right next to the

14   desk.

15         Q     And what's involved with maintaining the

16   logbook?

17         A     You stamp it, fill out the stamp, there's

18   different information for every day and shift and then you

19   just log in the chow run, what time, it's not much.

20         Q     Okay.  Do you recall what your first contact

21   with Ms. Collins was on that day?

22         A     Yes.  First thing in the morning I came in the

23   block, you know, as I said, I stopped at the desk, see who I

24   had.  I was standing at the desk, first thing that happened,

25   I come in, somebody throws a soap down on the plexiglass

1    that's above the officer.  I don't know if anybody said

2    anything about that.  The officer sits at a desk and there's

3    bars above them, and over the years inmates have -- they'll

4    spit down on you or urinate on you or whatever they do, throw

5    stuff down, so we put plexiglass up there.  And now it's

6    become one of the prank things, and for me just about every

7    morning I come in, some officer will throw something down,

8    then they all yell, good morning, Sergeant.  So that's what

9    happened.  Somebody threw some soap down as soon as I got in

10   there, they saw me coming, it found its way through a crack

11   and fell on the desk next to Ms. Collins.

12            Q     Did you understand that she was the target of

13   that piece of soap?

14            A     No, that was for me.  That was a daily

15   occurrence, that was my good morning, welcome.  And then I

16   went to go to the mess hall, and I saw she had left her radio

17   laying on the desk and I just picked it up and said, wear

18   your radio, because like the badge, if an inmate were to grab

19   the radio, all our radios work on the same frequency, and all

20   you have to do is hold your thumb in on the radio and none of

21   the radios in the facility will work.  Blanks them all out,

22   because it's transmitting and you can't transmit over that.

23            Q     Okay.  So was there a further discussion

24   during the morning with Ms. Collins?

25            A     No, I didn't come into the block.

1          Q    Do you recall what your next contact was with

2    Ms. Collins on November 10th, 2005?

3          A    It would have been at lunchtime, I had run --

4    I had done the Dog block at 11:30, ran them out, and then

5    later on, after C block had run, I had come over to C block,

6    been back and forth, but I walked in and she had obviously

7    just discovered that someone had put tape on her glasses, and

8    she was throwing a bit of a temper tantrum.  And keep in mind

9    this whole incident took probably less than two minutes.

10   She's at the desk, she's screaming somebody put tape on her

11   glasses.  I took a bottle of glass cleaner and set it there.

12   That wasn't good enough, she wanted somebody else to clean

13   her glasses.  I was really, I -- you know, when I first

14   walked in, I said, what's going on here, why is she so upset?

15   You know, and then, you know, kind of look around, I don't

16   see anybody paying much attention.  But, um, she calmed down

17   quick and then, you know, at one point she said, I need

18   relief, and I just kept watching, you know ...

19         Q    So she asked to be relieved from duty?

20         A    Yes, one time.

21         Q    What was your response, did you give a verbal

22   response?

23         A    You know, I didn't say anything, I was still

24   watching.  At that point she was more -- more angry than sad.

25   I mean, there was a little bit of tears but it seemed like

1    she was more angry than crying because she was sad about

2    something, so I, you know, the anger goes away, she got

3    pranked and what are you gonna do?

4         Q    Did you hear Ms. Collins testify that she told

5    you she was unable to do her job?

6         A    Yes.

7         Q    Did Ms. Collins say to you she was unable to

8    do her job?

9         A    She indicated, yeah.

10        Q    And how did she indicate that?

11        A    Can't remember exactly what she said, you

12   know, I can't fill out the logbook, how am I going to fill

13   out the logbook?  My glasses are dirty.

14        Q    And yet you did not relieve her?

15        A    No, I did not.

16        Q    Can you explain why you didn't?

17        A    Well, you know, I don't know, I been there 20

18   years, I seen a lot of stuff.  I was there, you know, I was

19   on the scene, I was there, I didn't -- she was -- and like I

20   said, it didn't last even two minutes, she's already coming

21   down.  What was the question again?

22        Q    Can you explain why you didn't relieve her

23   from duty?

24        A    Relieve her, yes.  She had calmed down at this

25   point, she's just sitting there and I said, do you need

1   relief?  And she said, no, I'm okay.  And at that point she

2   was -- already had her glasses clean, she's already writing

3   in the book, or writing in something, and just after that,

4   she looked at me and she said, you know, Sergeant Mitchell,

5   I've had a really nice day, thank you.  So, you know, you go

6   from one to the other, the mood swing was unbelievable.  What

7   do you do with that?

8           Q    Okay.  Did Ms. Collins' gender have anything

9   to do with your decision not to relieve her from duty?

10          A    No, not at all.

11          Q    Would you have relieved a male officer from

12  duty under the same circumstances?

13          A    No.

14          Q    Can you explain what's involved with relieving

15  an officer from duty?

16          A    Well, first you got to have somebody to

17  relieve them.  I would have to call the chart sergeant, and

18  he would have to find somebody that was available, we don't

19  always, everybody's -- usually has a job, lot of times we're

20  short, lot of times we have to hire tons of overtime just to

21  fill all the jobs.  But obviously, like if she was having a

22  heart attack or something, we'd grab her and go.  But this

23  was just not anything.

24          Q    Okay.  What would Ms. Collins' duties in an

25  emergency be as first officer?

1          A     In an emergency, as first officer she would

2    first relay whatever the emergency is, either by telephone or

3    by the radio and seeing as that she has the key to the front

4    gate of the block, she would immediately go to the front

5    gate, lock the gate.  And then when people arrive she would

6    unlock the gate, direct them where to go, what the situation

7    is and then relock the gate, keep the gate locked so nobody

8    comes in or out.

9          Q     Did you consider the taping of Ms. Collins'

10   glasses to be a security issue?

11         A     No, not at all.  In fact our emergency keys

12   have notches, and they're notched so that if you're blinded

13   either by darkness, say the lights go out, or by smoke if

14   there's a fire, or chemical agents if there's a riot, there's

15   notches in the emergency keys, so you're able to feel the key

16   blinded and know that the one -- the notch, the key that has

17   one notch is the front gate, the keys that have two notches

18   open end gates, the keys that have three notches open the

19   lock boxes to let inmates out if you needed to evacuate.

20         Q     Did you know at that time whether Ms. Collins

21   used her glasses to do rounds?

22         A     I would say probably not.  I believe that --

23         Q     Just if you know.

24         A     I don't know, no.

25         Q     Just to be clear, Troy, did you tape

1    Ms. Collins' glasses?

2              A    No, absolutely not.

3              Q    Do you know who did?

4              A    No.

5              Q    Did you hear Ms. Collins testify about

6    receiving hangup calls that day?

7              A    Yes.  At the end of the day, when I came in to

8    give her a wave and see if everything's all right and go

9    home, she mentioned she had a lot of calls during the day,

10   which is common.  I would say throughout the facility, it

11   happens every day to somebody.  And I mentioned to her that

12   there are ways to find out where the phone call came from,

13   what other phone it came from, of course you'd have no idea

14   who would use the phone and she said no, that's okay.  So ...

15             Q    This was at the end of the day, did you say?

16             A    Very end of the day, yes, sir.

17             Q    What was the tone of this conversation?

18             A    It was normal.

19             Q    Okay.  I'm going to change topics a little

20   bit.  Well, let me ask you one question before we leave.  On

21   November 10, 2005, did Ms. Collins ever complain to you about

22   items being thrown on the plexiglass?

23             A    She did not complain to me, no.  I was aware

24   of it simply because in the morning someone threw something

25   down which I knew to be directed at me.

1          Q    Okay.  I'm going to ask you some more specific

2    questions relating to the plaintiff's testimony about things

3    that she says you said.  Okay.

4          A    Okay.

5          Q    Did you ever talk to Ms. Collins about needing

6    to defecate or any words to that effect?

7          A    No.

8          Q    Did you ever talk to Ms. Collins about passing

9    gas or words to that effect?

10         A    No.

11         Q    Did you ever mention farting to Ms. Collins?

12         A    No.

13         Q    Did you ever discuss your bodily digestive

14   processes at all with Ms. Collins?

15         A    No.

16         Q    Did you ever talk to Ms. Collins about walking

17   around naked in front of your family?

18         A    No.

19         Q    Did you ever tell Ms. Collins that you had

20   seen your mother's breasts over a fence or words to that

21   effect?

22         A    No.

23         Q    Is there a fence between your house and your

24   mother's house?

25         A    No.

1        Q    Does she live next door to you?

2        A    Yes.

3        Q    Is that common knowledge in the facility?

4        A    It is.  There are a lot of people that work --

5   have worked for my father at his house, that work at the

6   prison, not a lot, maybe three, but there's also a number of

7   people that I went to high school with that work at the

8   prison.  So every -- it's common that they -- everybody knows

9   I bought the house next to my parents'.

10       Q    Did you ever refer to your mother's breasts as

11  tits?

12       A    No.

13       Q    Did you ever tell Ms. Collins that your wife

14  had lost a ring up your rear end or words to that effect?

15       A    No.

16       Q    Did you tell Ms. Collins that you live in

17  reality and she does not?

18       A    No.

19       Q    Okay.  Now, do you recall receiving a memo

20  from Ms. Collins dated November 10th, 2005?

21       A    Yes.

22       Q    Do you recall when you received it?

23       A    I can't tell you exact date.  I think it was

24  the next day, within a day or two.

25       Q    Do you recall how you first learned of the

1   existence of the memo?

2          A    Well, Lieutenant Vasquez had called me, I was

3   probably down in the jail somewhere, I had C block that day,

4   and he mentioned that she had given, Ms. Collins had given

5   him a copy of a memo which he had already read, he said it

6   was -- that she had mentioned that she'd already, she put a

7   copy in my box as well and he had told me then that he was

8   passing it up the chain of command.

9          Q    Okay.  So at some point you actually saw the

10  memo?

11         A    Yes.  At that point I came up, probably on my

12  way home and took the memo out of my box, I read it, it

13  ticked me off, quite honest, I was mad, I wadded it up and

14  threw it in the garbage, and I don't care to ever look at it

15  again.

16         Q    Okay.  Why did you wad it up and throw in the

17  garbage?

18         A    You know, she just -- the majority of that is

19  a lie.  She -- her glasses got taped, you know, she got some

20  phone calls, but talking about somebody's family like that,

21  that just -- I can't tell you how mad that makes me.

22         Q    Between November 10, 2005, and Ms. Collins'

23  departure from Auburn the following month, did you have any

24  contact with her?

25         A    No, and in fact I've only had occasion to

1   speak to her on these two separate occasions and which was

2   the wallet incident, and the taping of the glasses and at the

3   end of the day about the phone calls.

4          Q    During the entire time the two of you worked

5   together at Auburn?

6          A    The entire time I've ever known her, I've

7   spoke to her on those two exceptions and that is it.

8          Q    I'm going to ask you some questions, very

9   briefly, about an Officer Whitney (phonetic) I believe it is,

10  who apparently committed suicide.  Did you hear that

11  discussed earlier today?

12         A    Yes.

13         Q    Did you know Officer Whitney?

14         A    I didn't know him, I couldn't put a face to a

15  name or a name to a face if I saw him.

16         Q    Was there any ever -- was there ever any

17  suggestion that you bullied Officer Whitney?

18         A    Not that I know of.

19         Q    Did you ever bully Officer Whitney?

20         A    No, I don't know him, never met him, never

21  talked to him.

22         Q    There came a time in September 2006 when you

23  were transferred, is that correct?

24         A    Yes.

25         Q    Can you explain the circumstances behind that

1    transfer?

2           A    I was reached on the lieutenant's promotion

3    list, it gave me a choice to either go down I think it was

4    Queensborough which is down somewhere Brooklyn or Manhattan,

5    or Eastern which is in the Catskills, in the country, which

6    is where I grew up.  This prison actually had a dairy farm, I

7    worked on dairy farms, I thought that was kinda neat, so --

8    and it's a hundred miles closer to home.  Plus I think it

9    costs you 20 bucks to get across the bridges into Manhattan

10   one way, it was a no-brainer for me to go to Eastern.

11          Q    When you accepted the transfer to Eastern, did

12   you know Ms. Collins was there?

13          A    I had known that she had transferred there, I

14   had no idea she was still there.

15          Q    Did you consider the fact that Ms. Collins

16   might be there in deciding whether to transfer there?

17          A    You know, I had no problem with her and it

18   just didn't -- it made no difference to me.

19          Q    Okay.  Now Eastern is also a maximum security

20   prison, correct?

21          A    Yes.

22          Q    As a lieutenant at Eastern, what were your

23   duties?

24          A    I was there four weeks, I worked mostly the

25   watch commander, sometimes I did some time and attendance as

1    well.  I worked the first two weeks, I think it was mostly

2    day shift and then I worked a week of 3 to 11 and a week of

3    11 to 7 and then I got out of there.

4            Q    Okay.  And what would you do in the course of

5    a given day?

6            A    As the time and attendance officer, you sit in

7    an office all day and do paperwork which I hated.  The watch

8    commander pretty much sits in an office as well but there's

9    other people in there, the chart sergeant, got a TV to watch.

10   The watch commander, you run the shift, if anything happens,

11   you need to be at your desk so they can call you and

12   depending on the situation, you'll report whatever's

13   happening to the superintendent, the deputy superintendent

14   and if it's bad enough, you'll call Albany and do some

15   computer work.  There's certain areas in the facility you

16   have to make a round of every day which would be SHU, the

17   hospital area, and mental health area if you have one.

18           Q    I think it's been testified to but can you

19   just remind the jury what SHU stands for?

20           A    SHU is segregated housing unit, it's where the

21   worst inmates go, they're locked in 23 hours a day, they get

22   an hour rec. unless they screw that up, they don't get that

23   either.

24           Q    Okay.  Did there come a point in time where

25   you learn that Ms. Collins was still at Eastern?

1     A    Yes, my first day there, my fellow lieutenants

2    told me she was there and they had heard that there was a

3    lawsuit of some sort.

4          Q    Okay.  Did you speak to anyone else after your

5    arrival about the fact that Ms. Collins was there?

6          A    Well, on my arrival talk with the

7    superintendent, he mentioned that he was aware of the

8    situation and I told him I didn't have any problem with her,

9    and I didn't see that there was gonna be any problem, and he

10   said, we'll just try to avoid any problems, and that's what

11   we did.

12         Q    Okay.  Did you ever see Ms. Collins at Eastern

13   while you were working there?

14         A    I did, I saw her one time.

15         Q    Explain what happened.

16         A    Well, I was sitting in the watch commander's

17   office, it was early in the morning, it wasn't even light out

18   yet, we're waiting for the day shift to start, in the office

19   would have been Lieutenant Barnes, chart sergeant, I can't

20   remember his name but he was the regular guy, he was a

21   redhead, and the superintendent was sitting right next to me

22   because he always came in really early and we're all just

23   sitting there, I don't even think we had all the lights on,

24   watching the news, drinking coffee, nobody's even talking,

25   just waiting to go to lineup in 20 minutes or whatever.  And

1    I saw her peek in the door, and I think I was probably the

2    only one that saw her because I was facing the door, the

3    other guys were facing over here towards the TV, and she kind

4    of peeked in and then all of a sudden she was right in the

5    door and she screamed, no, and ran out into the parking lot.

6             Q    What was the reaction of the people in the

7    room?

8             A    We just -- nobody said a word, we just kind of

9    looked at each other, go, you know, what are you gonna do

10   with that?  Nobody said a word.  The chart sergeant after a

11   couple minutes, he knew, he was a very good chart sergeant,

12   he took care of the officers, he knew everybody, their

13   personalities, he went out and apparently he handled it,

14   so ...

15            Q    What, if any, impact did that incident have on

16   your interest of staying at Eastern?

17            A    I knew right then I needed to get out of

18   there, because I had no idea her reaction to me was gonna be

19   like that.  Because I had no problem with her whatsoever.

20            Q    Did you act on that thought?

21            A    I did, I checked around, called a couple

22   prisons in the area and I found that Woodbourne, there was

23   actually a lieutenant there that was trying to come back to

24   Eastern so I put my transfer in for Woodbourne and within a

25   couple weeks after that, we switched, and that was only

1    20 miles down the road so it was good.

2           Q    Okay.  I'm going to ask you some more

3    questions specifically about Ms. Collins' testimony, okay?

4           A    Yes.

5           Q    While at Eastern did you ever sit by a gate so

6    that she couldn't go out the gate?

7           A    Not that I'm aware of.

8           Q    Are you ever aware that she wanted to leave a

9    gate that you were sitting next to?

10          A    No.

11          Q    Did you ever stare at Ms. Collins in the

12   prison yard?

13          A    No.

14          Q    Did you ever leer at her in the prison yard?

15          A    No.

16          Q    Did you ever laugh at her in the prison yard?

17          A    No.

18          Q    Is it possible that you looked out in the yard

19   while she was working out there?

20          A    She may have seen me but I didn't see her.

21          Q    Did you ever do anything to retaliate against

22   Ms. Collins?

23          A    No.

24          Q    Again, when was it that you left Eastern?

25          A    I think it was October, first or second week

1    of October, I got there on 9/11/06.

2              Q    And where is it that you transferred to?

3              A    Went to Woodbourne, about 20 miles down the

4    road.

5              MR. ANDREWS:  I have no further questions,

6    your Honor.

7              THE COURT:  Okay.  Thank you, Mr. Andrews.

8              MR. KINSEY:  No questions, your Honor, thank

9    you.

10             THE COURT:  No questions.  Ms. Connor.

11             MS. CONNOR:  Yes, your Honor, may I have just

12   one moment, please.

13             (Pause in Proceedings.)

14             CROSS-EXAMINATION BY MS. CONNOR:

15             Q    We've met before, Lieutenant Mitchell.

16             A    Yes.

17             Q    Now I'm going to ask you some follow-up

18   questions concerning your testimony that you just gave here

19   this morning.  Now you -- were you aware that, were you ever

20   informed about a rumor that Penny Collins was transferred

21   from Sullivan to Auburn on administrative transfer?

22             A    I had heard that.

23             Q    And where did you hear that?

24             A    I couldn't tell you.  I think, you know, it

25   was just passing by, people might have been talking.

1        Q    At Auburn, is that right?

2        A    Yes.

3        Q    You heard it at Auburn?

4        A    Yes.

5        Q    And what does administrative transfer mean to

6   you?

7        A    I have no idea.

8        Q    You don't know what that means?

9        A    Other than through the regular channels,

10  that's all I would understand it.

11       Q    Isn't there a stigma attached to being

12  transferred, having administrative transfer?

13       A    Not necessarily.

14       Q    When did you hear that about Penny Collins?

15       A    Well, that must have been sometime after she

16  came there, I really couldn't tell you.

17       Q    Wasn't that a common rumor about her at

18  Auburn?

19       A    I wouldn't say it was a common rumor, no.

20       Q    Rumor nonetheless?

21       A    Yes.

22       Q    You heard it more than once, didn't you?

23       A    No.

24       Q    Now, you testified that you saw Penny Collins,

25  a wallet with a badge in her lunchbox, isn't that right?

1       A    Yes.

2       Q    And when you looked at the lunchbox, you could

3  not see the badge sticking out, could you?

4       A    Yes, I could see the badge in the fold of the

5  wallet.

6       Q    But wasn't it a tri-fold wallet?  You know

7  what I mean by a tri-fold wallet --

8       A    I'm not sure if it was or not, I don't

9  remember.

10      Q    There were three parts to the wallet, isn't

11 that right?

12      A    I don't remember.

13      Q    Now to get the wallet out of this lunchbox,

14 didn't you have to untie the side pocket, remove it?

15      A    No.  Like I testified, it was a fishnet outer

16 pocket, it was see-through and the top piece was the same

17 width, that was just elastic, I reached in with two fingers,

18 pulled it out.

19      Q    Now, you also testified that that was the

20 first time you spoke to Penny Collins was around this wallet

21 incident?

22      A    Yes.

23      Q    Is that right?  Well, isn't it true that you

24 talked to her previous to that, and you've mentioned inmate

25 penises before that, isn't that true?

1        A    No, that's not true.

2        Q    Isn't it true that you talked to her about

3   other sorts of male anatomy before that time?

4        A    No, that's not true.

5        Q    Now, you testified about the wallet, that you

6   had to find her in B block or Baker block I think you called

7   it, is that right?

8        A    Yes.

9        Q    Now how did you go about finding her?

10       A    As I testified, I called Baker block and an

11  officer not Ms. Collins answered the phone and said she was

12  there.

13       Q    And how long did it take you to get from the

14  point where you saw the wallet to Baker block?

15       A    I didn't take the wallet directly back, is

16  that what you're asking?

17       Q    I'm asking length of time between the time

18  that you took the wallet in your possession, you gave it back

19  to Penny Collins.

20       A    It could have been a half hour, could have

21  been an hour.

22       Q    As long as an hour.

23       A    Possibly.

24       Q    Now when you took the wallet, the wallet was

25  in a lunchbox, is that right, in the pocket of a lunchbox?

1          A    Yes.

2          Q    And that lunchbox was located under the

3    stairs, correct?

4          A    Yes.

5          Q    And that location had officers in front of it,

6    isn't that correct?

7          A    Yes, there would be, it was near the first

8    officer's desk, and as I said, diversion could have been

9    caused and an inmate could have grabbed it easily.

10         Q    I didn't ask you that, I just wanted to know

11   that there were officers in front of the area where the

12   lunchbox was, isn't that correct?

13         A    Yes, but they can't be held responsible for

14   someone else's property.

15         Q    But there were nonetheless officers there,

16   isn't that correct?

17         A    Yes.

18         Q    And officers were there when in fact you took

19   it, isn't that right?

20         A    Yes, it would be somebody at the desk at all

21   times.

22         Q    There were more than one officer there as a

23   matter of fact, wasn't there?

24         A    I don't know that.

25         Q    Now, you testified that when you approached

1    Ms. Collins with the wallet, you told her that it was just --

2    it could just as easily have been in an inmate's cell, isn't

3    that right?

4              A    Yes.

5              Q    And then you said she called you a liar, isn't

6    that right?

7              A    No, she said that.

8              Q    That she called you a liar, is that right?

9              A    I didn't say that, she said she said that, I

10   didn't hear her say that.

11             Q    You didn't hear her say that?

12             A    No.

13             Q    You didn't hear that she said it was a lie,

14   anything like that?

15             A    No.

16             Q    Now isn't it true that you told her that you

17   got this wallet from an inmate?

18             A    No.

19             Q    Now you testified that she was afraid that she

20   would be written up, do you recall that testimony?

21             A    Yes.

22             Q    Disciplined in some manner?

23             A    Yes.

24             Q    But you offered her assurances that that

25   wouldn't happen, is that right?

1          A    Yes.

2          Q    Then why did you go see Lieutenant -- why did

3    you tell Lieutenant Quinn about it, isn't that the same as

4    getting her in trouble?

5          A    No.  As I testified, I happened to pass the

6    lieutenant, I mentioned it to him because she was not as

7    receptive as she should have been to the situation, and we

8    talked to her not alone but with her union official so she

9    would be comfortable and realize that it was serious, and

10   then we just reiterated the same thing over again so that she

11   would know.  She was never disciplined, nothing on writing,

12   nothing.

13         Q    Isn't it true that you told Lieutenant Quinn

14   in order to keep yourself out of trouble for taking the

15   wallet, isn't that true?

16         A    No.  That doesn't even make sense.

17         Q    Well, it makes sense to me but we can -- I'll

18   ask you another question.

19              THE COURT:  That will be stricken.

20              MS. CONNOR:  Thank you, I'm sorry.

21         Q    Isn't it true that you, when you saw

22   Lieutenant Quinn, you were hoping to preempt Penny Collins

23   from talking to Lieutenant Quinn about you taking her wallet;

24   isn't that true?

25         A    How would I preempt it if I was talking to him

1    as well telling him about this?

2            Q    Because you wanted to get to him first, isn't

3    that true?

4            A    No.

5            Q    Now, wouldn't you agree that having your union

6    rep there for a meeting with a lieutenant constitutes some

7    form of lower level discipline?

8            A    No.

9            Q    Isn't that some form of discipline?

10           A    As I testified, it was an informal counseling

11   which has nothing to do with the disciplinary procedure, it

12   is a form -- it's a means of improving communications and

13   performance, that is all.

14           Q    Why would the union rep be there?

15           A    It didn't hurt anything, it would make her

16   more comfortable.

17           Q    And that meeting all took place on the same

18   day that you took her wallet, isn't that right?

19           A    I believe it was, yes.

20           Q    And at any time throughout this whole

21   incident, Penny Collins didn't deny that she had left her

22   wallet and lunchbox, did she?

23           A    No.

24           Q    She owned up to that, didn't she?

25           A    She didn't have to.  I took it out of the

1    lunchbox, I knew it was there.  I don't think it was a

2    question.

3             Q    Now you testified that you didn't recall

4    having any conversations with Penny Collins concerning a

5    bulge in an inmate's pants, do you remember that?

6             A    Correct, I haven't.

7             Q    But isn't it true that you asked her about a

8    certain inmate's penis?

9             A    That is not true.

10            Q    And didn't you ask her, what would you ever do

11   with something like that?

12            A    No, that's not true.

13            Q    Didn't you ask her did you ever see anything

14   that big?

15            A    No.

16            Q    Now, on November 10th, or the day before

17   November 10th, 2005, you testified that you were the sergeant

18   on C block, is that right?

19            A    Day before?

20            Q    When you worked with Penny Collins on C block

21   in November 2005, you were the sergeant on that block, is

22   that right?

23            A    The day before, you said the day before

24   something.

25            Q    I'll just word it this way.

1        A    Okay.

2        Q    In November 2005, when you worked with Penny

3   Collins on C block, were you the sergeant?

4        A    What day was this?

5        Q    At any time in November 2005.

6        A    Worked with her one time and that would be the

7   date that she wrote the to-from about.

8        Q    On the same day is your testimony?

9        A    Same day what?

10       Q    That she wrote the to-from or the memo, right?

11       A    Yes.

12       Q    That would be November 10th, wouldn't it?

13       A    I believe so.

14       Q    And as the sergeant on C block, you would be

15   in charge of that block, is that right?

16       A    Yes.

17       Q    And you testified that somebody threw soap

18   down on the plexiglass, isn't that right?

19       A    Yes, they did.

20       Q    Wasn't that soap thrown down after Penny

21   Collins' glasses had been dirtied by the tape?

22       A    No, it was thrown down exactly as I said it

23   was.

24       Q    Now you also testified that when you went to

25   the mess hall and you talked to her, you saw that she left

1    the radio on the desk?

2              A    Yes.

3              Q    She had a clip for the radio on her belt,

4    didn't she?

5              A    I don't know.

6              Q    Well, isn't that standard, the standard way an

7    officer would carry a radio?

8              A    Yes.  Some people have their own clips, some

9    people -- it might have been on the radio at the time, I

10   don't remember.

11             Q    Well, do you remember giving a deposition in

12   this case in my office?

13             A    Yes.

14             Q    And you never mentioned this radio in that

15   entire deposition, did you?

16             A    I don't remember.

17             Q    You didn't, did you?

18             A    I don't remember.

19             Q    Now, did you see the tape on Penny Collins'

20   glasses?

21             A    I did not.

22             Q    And did you see anybody clean her glasses?

23             A    I did not.

24             Q    Where were you when the glasses were cleaned,

25   if you know?

1          A    At the time there was inmate movement, I don't

2    know who cleaned them.  There was inmates in and out through

3    the area going back to D block and coming back to C block so

4    I wasn't right on the situation the whole time.

5               Q    Did you ask anybody to clean the glasses?

6          A    No.

7               Q    Ask anybody to help the officer out?

8          A    No.

9               Q    Did you see the condition of her glasses after

10   they were cleaned?

11         A    No.

12              Q    You didn't see the broken or bent side?

13         A    No.

14              Q    Anything like that?  Did you see the lenses

15   after they were cleaned?

16         A    No.

17              Q    Did you check at all after you heard about the

18   glasses with tape, did you go back and check to see whether

19   or not they were cleaned?

20         A    How so?  When would that be?  What were you

21   saying?

22              Q    I'm asking if you went to see whether her

23   glasses had been cleaned, the situation corrected.

24         A    It happened exactly as I said, it was less

25   than two minutes, she had calmed down, I walked over to her

1   after she had cleaned her -- someone had cleaned her glasses

2   or she cleaned them, her glasses were apparently cleaned, she

3   was writing in the logbook, I asked her if she needed relief,

4   she said no, that's okay.

5           Q    Was she wearing the glasses when you saw her?

6           A    I believe she was, she was writing.

7           Q    Were they crooked?

8           A    I don't remember.

9           Q    Now isn't it true that before this she had

10  asked several times to be relieved?

11          A    No, one time.

12          Q    And you refused to relieve her?

13          A    Yes, I did.

14          Q    And what was her state, her demeanor when she

15  asked to be relieved?

16          A    It was at her little bit of an anger point, I

17  mean, you know, you get mad, you say things, and then she

18  calmed down and she, you know, like I said, she told me she

19  was having a very nice day, what do you do with that?  You

20  seen the mood swings here.  It wasn't any different --

21          MS. CONNOR:  Your Honor, I ask that that be

22  stricken.

23          THE COURT:  That will be stricken.  That

24  aspect of the answer.

25          Q    Now you never reported this incident with the

1    glasses to any superior officer in the facility, did you?

2            A    No.

3            Q    But yet you reported the wallet?

4            A    Only to make sure that she didn't do it again

5    so she wouldn't get in trouble.  To protect her.

6            Q    You didn't think trying to help her see better

7    was protecting her?

8            A    Like I said, it was less than two minutes and

9    she could see.

10            Q    That's a yes or a no, please.

11            A    What was the question?

12            Q    You didn't think helping her see better would

13    protect her?

14            A    No.

15            Q    Now she reported hangup calls to you, I

16    believe you testified to that on your direct?

17            A    Yes, at the very end of the day.

18            Q    And where were you and where was she when she

19    made that report?

20            A    She was at the desk and I was at the desk.

21            Q    What desk is that?

22            A    C block, first officer's desk.

23            Q    And she told you that she had received 20 to

24    30 hangup calls, is that right?

25            A    She didn't tell me a number, she just said she

1    had gotten them throughout the day.

2              Q    And do you think that's a security issue?

3              A    Not necessarily, it happens.  Lot of them are

4    wrong numbers.

5              Q    But you had no knowledge that those were wrong

6    numbers, did you?

7              A    Nope, I don't have any knowledge they weren't.

8              Q    She was reporting an incident of harassment to

9    you, wasn't she?

10             A    No, because I -- when I asked her if she

11   needed help finding the numbers, she said no, that's okay.

12             Q    But she reported to you that she was bothered

13   all day by these hangup calls, is that right?

14             A    I wouldn't say she put it that way, no.

15             Q    Now you were asked by your counsel about

16   certain comments that Ms. Collins alleges you made.

17             A    Yes.

18             Q    Do you recall that testimony?  And you deny

19   you made any of them, isn't that right?

20             A    Yes.

21             Q    So you're saying she just made this all up, is

22   that what you're saying?

23             A    Yeah, yes.

24             Q    Now you received this to-from memorandum dated

25   November 10th, 2005, right?

1        A    Yeah -- yes.

2        Q    To you from Penny Collins, that's the one I'm

3   referring to.

4        A    Yes.

5        Q    Plaintiff's Exhibit 11, is that right?

6        A    Okay, yes.

7        Q    And when you got this memorandum -- withdrawn.

8             You testified that you learned that there was

9   such a memorandum from Lieutenant Vasquez, is that right?

10       A    Yes.

11       Q    And he called you and told you what?

12       A    He said he had received a letter from her, he

13   believed there was one also in my box, he had read it, it was

14   serious, and he had sent it up the chain of command.

15       Q    And you then went to your box and got the

16   memorandum according to your testimony, is that right?

17       A    Yes.

18       Q    And then you crumpled it up and threw it out?

19       A    Yes, I did.

20       Q    Now is that what you should have done with

21   that memorandum?

22       A    That was my memorandum, I knew it was already

23   being sent up the chain of command, I can do whatever I want

24   with that.

25       Q    Did you read the memorandum before you threw

1    it out?

2              A    I did, one time.

3              Q    You read the whole thing?

4              A    Yes.

5              Q    Now you see in that memorandum in addition to

6    the comments that she alleges you made, there were reports

7    about her glasses being taped, hangup calls, how she feels

8    that's a security issue, do you remember that in the

9    memorandum?

10             A    Yes.

11             Q    But you didn't feel any obligation to report

12   that to anybody?

13             A    No.

14             Q    Now, I believe you said in your testimony on

15   direct examination the majority of the memorandum was a lie,

16   do you remember that?

17             A    Yes.

18             Q    So there are parts of the memorandum that are

19   true?

20             A    The phone calls, the taping of the glasses

21   incident, and the soap being thrown down, when I was there.

22             Q    You don't deny that the phone calls took place

23   then?

24             A    No, the part is true that she mentioned it to

25   me.  I did not witness that myself.

1      Q    Now, you also testified on your direct

2 examination that you had no contact at Auburn again with

3 Penny Collins after you received that memorandum, is that

4 right?

5      A    That is correct.  Two times, that's the only

6 contact.

7      Q    But isn't it true that when you would pass her

8 you would make comments about penises, male anatomy?

9           MR. ANDREWS:  Objection, your Honor.  There's

10 been no testimony to anything like that.

11           THE COURT:  That's true.  There hasn't been.

12 That will be sustained.

13      Q    Now, when you transferred to Eastern facility,

14 you had already attended a conference at the State Division

15 of Human Rights --

16      A    Yes.

17      Q    -- concerning Ms. Collins' complaint, isn't

18 that right?

19      A    Yes.

20      Q    So you had full knowledge what her complaint

21 was before you went there, isn't that right?

22      A    Well, I have that to-from she wrote, yes.

23      Q    But you also were part of an investigation at

24 the New York State Division of Human Rights?

25      A    But it was the same topic, yes.

1        Q    And when you got to Eastern, you testified

2    that you talked to the superintendent about Ms. Collins, is

3    that right?

4        A    I met with him as every new employee does, and

5    that came up, yes.  I did not go to him to talk to him about

6    her.

7        Q    This was a one-on-one meeting with the

8    superintendent?

9        A    Yes, everybody gets that.

10       Q    When was that meeting?

11       A    Probably would have been the second day, first

12   or second day there.

13       Q    Are you not sure of the date?

14       A    No.

15       Q    Say probably, you're not sure?

16       A    Well, I went there on 9/11, so it was 11, 12,

17   could have been 13, depending on if he was there or not.

18       Q    And the superintendent directed you to try to

19   avoid her, isn't that right?

20       A    So to speak, yes.

21       Q    And isn't it true that you blocked the door to

22   prevent her from leaving after that?

23       A    No.

24       Q    Now you also testified that the lieutenants at

25   Eastern knew that there was a lawsuit?

1          A     They knew something to that effect, yes.

2          Q     How did they get that knowledge?

3          A     I would imagine through Ms. Collins.

4          Q     But you don't know --

5          A     I don't know, no.

6          Q     You didn't talk to them, did you?

7          A     Yes.

8          Q     Excuse me, you didn't, did you tell them, oh,

9    she's suing me or something like that?

10         A     No, they brought it to my attention.

11         Q     What did they bring to your attention?

12         A     That she was there.  I didn't know she was

13   there.

14         Q     Well, at the New York State Division of Human

15   Rights investigation, didn't you learn she was there?

16         A     I knew she had been -- I knew she had been

17   transferred there, I did not know she was still there.

18         Q     Now back at Auburn, at some point did you

19   speak with Superintendent Graham concerning the memorandum

20   Penny Collins wrote to you?

21         A     Briefly.

22         Q     And that was in the sergeant's room, isn't

23   that right?

24         A     Yes.

25         Q     And who was present for that?

1          A    He and I.

2          Q    He sought you out?

3          A    I think he just saw me in there passing by, it

4    wasn't a planned meeting.

5          Q    Didn't he tell you in that meeting that Penny

6    Collins had filed a complaint?

7          A    He mentioned it, yes.  It wasn't a meeting, it

8    was just a happening.

9          Q    That conversation then, Penny Collins filed a

10   complaint against you?

11         A    Yes.

12         Q    When did that conversation take place?

13         A    When we were in the office together.  I don't

14   know.

15         Q    About how long after you had received --

16         A    I couldn't even tell you, I don't know.

17         Q    Could you give me -- was it within a month

18   after you received that to-from memorandum?

19         A    I would say the meeting took place whenever

20   the superintendent said it took place.

21         Q    Now when you were at Auburn as a sergeant, you

22   had occasion to walk around the facility from time to time

23   doing different parts of your duties, is that right?

24         A    When I first got to Auburn I was different

25   jobs in 2002, and then bid SHU on the day shift and I was on

1   that unit all day.  Was not allowed to leave.  Beginning of

2   2005 I bid C block, in which case I had to move about the

3   facility to do claims which usually took me back to SHU and

4   in the administration buildings.

5             Q    And was that in 2004 and '5?

6             A    It would have been the beginning of 2005.

7             Q    What did you do just before that duty?

8             A    Which?

9             Q    When you were the sergeant in charge of C

10  block.

11            A    I had SHU for a couple years.

12            Q    And when did you become the sergeant in charge

13  of C block at Auburn?

14            A    The best I can remember was beginning of 2005.

15            Q    Now when you were at Eastern you also had

16  occasion to walk around, isn't that right, as part of your

17  duty?

18            A    Like I said, there was couple areas you had to

19  make rounds in, which would have been SHU, the hospital, and

20  then MHU if you had one which they didn't.  I hate making

21  rounds, I'd rather let everybody do their jobs.  It was one

22  mile around the outside of the perimeter and I used to walk

23  that about three times a day.

24            Q    And you made -- you moved around the facility

25  inside the facility as well, didn't you?

1          A    I could but I didn't as a rule.

2          Q    Well, did you ever look at the yard when you

3    were working?

4          A    I'm sure.

5          Q    Down in the yard?

6          A    I'm sure I would of, I imagine.

7          Q    Did you ever see Penny Collins down there?

8          A    I saw her one time at Eastern, and I never

9    spoke to her.

10         Q    Did you ever talk to a Captain Coleman at

11   Eastern about Penny Collins?

12         A    Of course I met him.  It was the same with the

13   captains as superintendent, you had to be introduced, you're

14   working for them.

15         Q    Did you talk to him about Penny Collins is my

16   question.

17         A    I did not talk to him about it.  He mentioned

18   that he knew the situation and I assured him as I did the

19   superintendent I had no problem and I didn't foresee any.

20         Q    He mentioned that to you when?

21         A    It would have been within a couple days of me

22   being there.

23         Q    The beginning when you arrived, shortly after

24   you arrived?

25         A    Yes.

1      Q     Now were you -- you were a watch commander at

2   Eastern?

3      A     Sometimes.

4      Q     Is that right?  Now as watch commanders you

5   circulate around the facility, don't you?

6      A     You can.  As I said, I don't like to.  The

7   sergeants are out there, they supervise the officers, why do

8   I need to be out there bothering them?  In the case of

9   emergency, I have to be at my desk anyway.  I did the bare

10  minimum, I stayed at my desk.  I don't believe in being a

11  pesty supervisor.

12     Q     Wasn't a part of your job to move around the

13  facility?

14     A     Like I said, I did what I was supposed to do.

15     Q     Well, that's a yes-or-no question.  Was it

16  part of your job to move around the facility, yes or no?

17     A     Yes, to some extent.

18     Q     Watch commanders have to make rounds, right?

19     A     Like I said, yeah, some places are mandatory

20  and that's all you need to do, that's all I did.

21     Q     And they go to lineup also, right?

22     A     Yes.

23     Q     Did you do that?

24     A     Yes.

25           MS. CONNOR:  May I have just a moment, please,

1   your Honor.

2                   THE COURT:  You may.

3                   (Pause in Proceedings.)

4                   MS. CONNOR:  No further questions for the

5   witness at this time.  Thank you, your Honor.

6                   THE COURT:  Okay.  Questions by the state?

7                   MR. KINSEY:  None, your Honor.

8                   THE COURT:  Mr. Andrews?

9                   MR. ANDREWS:  No questions, your Honor.

10                  THE COURT:  Sir, you can step down.

11                  THE WITNESS:  Okay.

12                  (Whereupon the witness was excused.)

13                  THE COURT:  Mr. Andrews, do you have any other

14  witnesses you intend to call?

15                  MR. ANDREWS:  I do not.  Defendant Mitchell

16  rests, your Honor.

17                  THE COURT:  Okay.  Ladies and gentlemen, I'm

18  going to send you out just briefly, I'm going to get you

19  right back here, make some decisions about wrapping this case

20  up, okay.  It appears that both defendants, all of the

21  defendants have rested, so let me take care of some

22  housekeeping matters and we'll make some decisions, okay.

23  Don't talk about it.

24                  (Jury Excused, 3:44 p.m.)

25                  THE COURT:  Okay.  Mr. Andrews, are there any

1    exhibits or any pieces of evidence, other documents, that you

2    want to check on or that you intended to offer or anything

3    like that?

4              MR. ANDREWS:  No such exhibits, your Honor.

5              THE COURT:  Very well.  And then you rest?

6              MR. ANDREWS:  We rest.

7              THE COURT:  Okay.  I've heard from counsel

8    that they want to renew their Rule 50 motions and so here's

9    what we're going to do.  We're going to send this jury home,

10   and I'll entertain your Rule 50 motions, and I hope to give

11   you, and I think we'll be able to do that, a copy of the jury

12   charge.  We'll let you take a look at that, maybe we can do

13   our charge conference before you leave for the day, depending

14   on how long the Rule 50 motions take, so that will be taken

15   care of; otherwise we'll get here a little early in the

16   morning to take care of it.

17             MS. CONNOR:  Your Honor, we would like to have

18   a rebuttal witness.

19             THE COURT:  Oh, okay.

20             MS. CONNOR:  I did not want to interrupt your

21   Honor, but --

22             THE COURT:  Well, you should of.

23             MS. CONNOR:  I'm sorry, I want just --

24             THE COURT:  Do you have this witness here?

25             MS. CONNOR:  I do.

1          THE COURT:  Okay.  So they're ready to be

2     called?

3          MS. CONNOR:  It's the plaintiff, yes, your

4     Honor.

5          THE COURT:  Oh, okay.  You want to recall the

6     plaintiff?

7          MS. CONNOR:  I would, your Honor.

8          THE COURT:  Okay.  Let's bring the ladies and

9     gentlemen --

10          MR. ANDREWS:  Your Honor, I'm sorry, can I

11     address something first given the rebuttal witness.

12          THE COURT:  Yes.

13          MR. ANDREWS:  There was extensive questioning

14     of the plaintiff in the direct case as to what happened, what

15     happened next, what happened with regard to defendant

16     Mitchell, and that's how, you know, my response was crafted.

17     There were some questions during the cross of defendant

18     Mitchell about things that there was no testimony about in

19     the direct case, and I'm concerned that there's going to be

20     an attempt to bring in, in the guise of rebuttal case, some

21     attempt to repair what is a hopelessly deficient claim.

22          THE COURT:  I hear you, Mr. Andrews, and

23     understand your concern.  Ms. Connor, I'm going to, as

24     strongly as I can tell you, I do not want to hear rehashing

25     of plaintiff's direct testimony.  I don't want to hear it

1  again.  This jury doesn't want to hear it again.  If you have

2  some true rebuttal to offer, it's your right to offer it, but

3  I'm not going to have her rehash her direct testimony once

4  again.

5          MS. CONNOR:  It was not my intention to have

6  her do that, your Honor.

7          THE COURT:  Okay.  What's the nature of the

8  rebuttal?

9          MS. CONNOR:  May I have just a moment, please,

10  to talk to my client.

11          THE COURT:  Yes.

12          MS. CONNOR:  Thank you.

13          (Pause in Proceedings.)

14          MS. CONNOR:  Your Honor, thank you for your

15  indulgence.  We wanted to have testimony rebutting the

16  testimony of Mr. Pabis.

17          THE COURT:  Okay.

18          MS. CONNOR:  Testimony concerning -- to

19  clarify some of the comments made by Dr. Alley that were not

20  made on firsthand knowledge concerning how the cruise was

21  paid for, his speculation about the money spent on that.

22          THE COURT:  How is that relevant?

23          MS. CONNOR:  Well, I think it creates an

24  impression with the jury, your Honor, that she chose to spend

25  her money on a cruise rather than on therapy and I wanted to

1    have testimony, especially considering Dr. First's testimony

2    today, I wanted to have the plaintiff clarify the source of

3    the funds for the cruise.  Because I think it leaves an

4    impression with the jury that she'd rather go on a cruise

5    than receive therapy.

6                    THE COURT:  What else?

7                    MS. CONNOR:  That plaintiff did not lose her

8    house, as Dr. Alley commented.

9                    THE COURT:  No, you know, this is your

10   witness.

11                   MS. CONNOR:  I understand.

12                   THE COURT:  You're rebutting your own witness'

13   testimony.

14                   MS. CONNOR:  On those two points, yes, your

15   Honor.  He was speculating, your Honor, about that in

16   cross-examination.

17                   THE COURT:  I don't believe that's appropriate

18   or true rebuttal, when you're rebutting your own witness'

19   testimony.  I have a hard time with that concept, Ms. Connor,

20   I don't think it's appropriate.  What else do you have?

21                   MS. CONNOR:  May I have just a moment, please,

22   your Honor.

23                   THE COURT:  Yes.

24                   (Pause in Proceedings.)

25                   MR. KINSEY:  Before the jury comes in, your

Honor, may we have just a microscopic break.

THE COURT:  You may.  I'm going to want to
hear any arguments from counsel before, if you need to go, it
looks like Ms. Sheehan is prepared, so you can go now if
you'd like.

MR. KINSEY:  I'll be right back.

THE COURT:  All right.

MS. CONNOR:  Your Honor, as I recall the
testimony about the house, it was suggested by counsel that
she lost her house to Dr. Alley rather than Dr. Alley saying
it, so I thought it created an impression with the jury.

THE COURT:  Well, that's just a question, and
I don't even recall what his answer is, if he even knew that
situation, I believe he didn't know, so we're not going to
start offering rebuttal testimony to counsel's questions.
That's not rebuttal testimony.

MS. CONNOR:  I'm sorry, your Honor, may I just
have a moment.

THE COURT:  You may.

(Pause in Proceedings.)

MS. CONNOR:  Your Honor, do you want to take a
break or -- should be done in a moment but I hate holding you
up.

THE COURT:  Well, you need to tell me what
you're doing, I've got this jury waiting and it's almost

1    4:00, so no, I don't want to take a break, I want to get

2    through this so we can be prepared for the morning.

3                    (Pause in Proceedings.)

4                    MS. CONNOR:  Your Honor, then we would just

5    recall the plaintiff to, excuse me, to rebut the testimony of

6    witness Pabis.

7                    MS. SHEEHAN:  No objection.

8                    THE COURT:  Mr. Andrews?

9                    MR. ANDREWS:  None, your Honor.

10                   THE COURT:  Okay.  I think that is permissible

11   rebuttal and I'm going to allow you to do that.  Anything

12   else?

13                   MS. SHEEHAN:  No, your Honor.

14                   MR. ANDREWS:  Nothing, your Honor.

15                   THE COURT:  Okay.  Are you ready for the jury?

16                   MS. CONNOR:  Yes, your Honor.

17                   THE COURT:  Let's bring the ladies and

18   gentlemen of the jury in, please.

19                   (Jury Present, 3:56 p.m.)

20                   THE COURT:  Okay.  The record should reflect

21   we have the ladies and gentlemen of the jury, plaintiff,

22   plaintiff's counsel, defendants, and defense counsel.  Ladies

23   and gentlemen, defense has rested, Mr. Andrews has rested,

24   we're now at a point in the trial that plaintiff is allowed

25   an opportunity to offer some rebuttal testimony should they

1    decide to do that and they've decided to do that, so

2    Ms. Connor, you have a rebuttal witness?

3                    MS. CONNOR:  We do, your Honor.  We recall the

4    plaintiff.

5                    THE COURT:  Okay.

6                    THE CLERK:  Can you state your full name again

7    for the record, please.

8                    THE WITNESS:  Penny Collins.

9                    THE CLERK:  Please raise your right hand.

10

11                   P E N N Y   C O L L I N S , recalled as a

12   witness and being duly sworn, testifies as follows:

13                   DIRECT EXAMINATION BY MS. CONNOR:

14        Q    Penny, I wanted to ask you some -- a few

15   questions.  Do you know Mr. Pabis who testified here?

16        A    Only when I saw him in this courtroom.

17        Q    To the best of your recollection, when did you

18   first see him, when?

19        A    I saw him in the hall, I believe it was two

20   days before he testified.

21        Q    And did you make any statements to him at

22   Auburn concerning going to the Holiday Inn?

23        A    Never.

24        Q    Did you make any statements about being lonely

25   when your husband's out of town?

1            A    Never.

2            Q    Did you make any statements to him concerning

3    getting together with him, meeting up with him?

4            A    Never.

5            Q    And did you hear his testimony concerning

6    eyeglasses, selling eyeglasses?

7            A    I did.

8            Q    And did you make any statements or comments to

9    him concerning eyeglasses?

10           A    Never.

11           Q    Do you recall ever speaking to him?

12           A    I do not.

13               MS. CONNOR:  No further questions at this

14    time, your Honor, thank you.

15               MS. SHEEHAN:  No questions, your Honor.

16               MR. ANDREWS:  No questions, your Honor.

17               THE COURT:  You may step down.

18               (Whereupon the witness was excused.)

19               THE COURT:  Ms. Connor, do you have any other

20    rebuttal witnesses you'd like to call?

21               MS. CONNOR:  No, your Honor, thank you.

22               THE COURT:  Okay.  Counsel, anything further?

23               MS. SHEEHAN:  No, your Honor.

24               MR. ANDREWS:  Nothing further, your Honor.

25               THE COURT:  The proof in this case is going to

1    be closed, okay. Everybody understands that?

2                    MR. KINSEY: Yes, your Honor.

3                    MS. SHEEHAN: Yes, your Honor.

4                    THE COURT: Proof is now closed, ladies and

5    gentlemen. Here's what we're going to do. I have some legal

6    matters I need to address, some motions and things that I

7    need to address with these attorneys, so I'm going to send

8    you home, a little bit early today, and ask that you be here

9    tomorrow, let's do 9:30, just in case, because, you know, I

10   don't want you waiting around. Hopefully, we can get started

11   by 9:30. We'll be moving on to closing arguments at this

12   point, and you'll hear closing arguments from all the

13   counsel, and then I'll be charging you on the law in this

14   case, so you'll have this case to deliberate on tomorrow at

15   some point. I don't know if we'll be done in the morning, or

16   certainly by early afternoon you should be deliberating,

17   okay, maybe sometime after your lunch or if we're lucky,

18   maybe before your lunch, we'll see.

19                    But just because the proof is closed does not

20   mean that you should start, you know, starting the process of

21   decision making. Don't do that until the case is completely

22   closed, and the case is not completely closed until the

23   motion -- arguments of counsel and my reading of law to you,

24   okay. So I want you to keep an open mind, wait till

25   tomorrow, and again, my standard warnings that I always give

1    you and I know it's boring but something I need to do, you

2    hear it every day that you're here with me, please don't

3    discuss it with anyone, don't let anybody talk to you about

4    it, and if anything comes up anywhere in the media, wherever,

5    please turn it off, don't read it, whatever.  And have a good

6    night.  If you can be in the jury room by 9:30, we'll try and

7    get started as close to 9:30 as possible.  Okay.  Have a good

8    night.

9                    (Jury Excused, 4:01 p.m.)

10                   THE COURT:  Okay.  I'm going to step off the

11   bench for a minute, we'll give you just a very brief break,

12   and then I'm going to hear Rule 50 argument, okay.

13                   THE CLERK:  Court's in recess.

14                   (Whereupon a recess was taken from 4:02 p.m.

15                    to 4:11 p.m.)

16                   (Open Court, Jury Out.)

17                   THE COURT:  Okay.  We're in session, jury's

18   gone home for the day, we're going to entertain Rule 50

19   motions.  Counsel ready to proceed?

20                   MS. SHEEHAN:  Yes, your Honor.

21                   THE COURT:  Okay.  Go ahead, Ms. Sheehan.

22                   MS. SHEEHAN:  Your Honor, the original Rule

23   50, you reserved as to Superintendent Graham.  If you -- I'm

24   going to continue with the argument regarding Superintendent

25   Graham if that's okay with you.

1          THE COURT:  You're going to start there?

2          MS. SHEEHAN:  I'm going to start there, I am

3    going to start with saying that the plaintiff has still

4    failed to present legally sufficient evidence for a

5    reasonable jury to find against defendants former

6    Superintendent Burge, Superintendent Graham, and Department

7    of Corrections, and that we ask that -- for a judgment as a

8    matter of law finding in favor of the defendants.

9          We established, the evidence established that

10   Superintendent Graham had no personal involvement in sexually

11   harassing her, making any derogatory statements to her

12   creating a hostile work environment, or discriminating

13   against her based on her being a female.  Supervisory

14   liability, there was no evidence presented that he was

15   grossly negligent in supervising any of his subordinates'

16   actions, and clearly he did not show deliberate indifference

17   as to the complaints that Ms. Collins brought to his

18   attention.

19         She met with him on November 9th, 27 days

20   after he became superintendent of Auburn.  November -- that

21   was November 9th.  November 10th of 2005 is when he received

22   the telephone call about the to-from from Ms. Collins to

23   Sergeant/Lieutenant Mitchell.  What did he do with that

24   letter?  He sent it to diversity management for them to

25   investigate it.  And that was exactly what he was supposed to

1    do according to DOCS directive.  He also did happen upon Troy

2    Mitchell, mentioned to him and Mr. Mitchell already knew

3    about the complaint, that there's a complaint filed and knock

4    it off.  Maybe he shouldn't have because it might be viewed

5    as interfering with the diversity management investigation,

6    but I think it was the right thing to do.

7            So diversity -- the complaint goes to

8    diversity management.  Diversity management -- well, this

9    will go to later argument.  Superintendent Graham did not

10   know about the bathroom breaks, that she was not being given

11   bathrooms breaks, he had no knowledge of that.  He was not

12   advised of the memo that Ms. Collins gave to Sergeant

13   Petrocino regarding the condition of the locker rooms which I

14   believe that is an issue that doesn't even go to the claims

15   in this case, Title VII, labor -- not even to a 1983 action.

16   Also, he wasn't aware of the eyeglasses being taped.  He --

17   weapons training, the weapons training officer making

18   inappropriate remarks, that was part of the complaint that

19   went to diversity management, diversity management advised

20   him you're going to send the memo, this is what it's going to

21   say and you're going to send it not only to the weapons

22   trainers, you're going to send it to all the employees.  And

23   there's no testimony to dispute that's not what happened.

24            We have Mary Mayville testifying that the

25   complaint, the only complaint, the only issue in the

1    complaint that wasn't addressed were the keys to the bathroom

2    that had to remain locked.  And for security reasons, nothing

3    could be done about that.  He testified that when he found

4    out about the graffiti on the wall, and he found out from

5    Mary Mayville, he had it painted.  Ms. Collins' testimony was

6    that she told Sergeant Flynn about the graffiti on the wall,

7    she asked him for a can of paint and he said he would take

8    care of it.  I don't remember the testimony or if there even

9    was regarding the time frame of that.  But as far as

10   Superintendent Graham, he addressed the complaints that he

11   was aware of.

12              We also have the argument that he referred the

13   complaint to diversity management but diversity management

14   had a policy of not investigating complaints while somebody

15   was on stress leave.  Now all the testimony is in, Mary

16   Mayville interviewed plaintiff on November 29th, '05.  She

17   left Auburn December 5th or 7, 2005, so prior to her leaving,

18   she was interviewed by Mary Mayville.  She did not return to

19   Auburn until March 27th, '06.  And this is Ms. Collins' own

20   testimony on cross.  On January 25th, 2006 is when Mary

21   Mayville got -- had a second interview with plaintiff and

22   that's the interview in which Ms. Collins filled out the

23   paperwork.  She wrote the statement and Mary Mayville

24   attested to it.  Graham, Superintendent Graham's interview

25   was on March 13th, 2006, along with the rest of the

1    interviews that were going on at the facility.  All of those

2    actions were taken while Ms. Collins was on leave.

3                        Regarding Superintendent Burge, there's been

4    no evidence presented that he did not address the complaints

5    brought to his attention.  I believe the testimony was that

6    plaintiff believes he didn't do enough.  What did he do, is

7    he turned, the one complaint he was aware of, he turned it

8    over to diversity management.  Diversity -- DOCS has a system

9    in place, and it's clear diversity management, plaintiff may

10   not like it, but that's what the individual defendants were

11   required to do.  The two superintendents are required to turn

12   complaints of sexual harassment, gender discrimination, over

13   to diversity management.  So there's a system in place, and

14   Ms. Collins did not always avail herself of the system that

15   is in place.  And if you look at the incidents that would

16   involve sexual content, harass -- creating a hostile work

17   environment or gender bias, there's just not enough evidence

18   in the record that these incidents were severe or pervasive.

19                        So I'm going to ask you to please, matter of

20   law, find in favor of defendants Burge, Goord, and the

21   Department of Corrections.

22                        THE COURT:  Goord's gone.

23                        MS. SHEEHAN:  Graham, Burge, and the

24   Department of Corrections.

25                        THE COURT:  Thank you.  Ms. Connor.

1          MS. CONNOR:  Thank you, your Honor.  Your

2     Honor, we respectfully request that you deny defendant's

3     motions as to judgment matter of law for -- with respect to

4     defendants Burge, Graham, and the New York State Department

5     of Corrections.  I believe that the testimony is very clear

6     on the part of my client that Superintendent Graham was

7     requested to do something about the harassment and did, and

8     he testified that he did, he just pushed the paper over to

9     the office of diversity management.

10          THE COURT:  Wait a minute.  When was he

11     requested to do something about it?  By whom?

12          MS. CONNOR:  When my client met with

13     Superintendent Graham on or about November --

14          THE COURT:  Twenty-seven days after he got

15     there?

16          MS. CONNOR:  That's right, your Honor.

17          THE COURT:  And then he got a complaint,

18     correct?

19          MS. CONNOR:  That's right, your Honor.

20          THE COURT:  Based on the to-from memo that

21     your client did to then Sergeant Mitchell?

22          MS. CONNOR:  That's right.

23          THE COURT:  And what are you alleging that he

24     didn't do?

25          MS. CONNOR:  That he failed to take reasonable

1    prompt remedial action to end the harassment, and to protect

2    my client from further harassment.

3                    THE COURT:  And how did he fail to do that?

4                    MS. CONNOR:  That he did not undertake any

5    sort of actions other than turning it over to diversity

6    management, and that that is insufficient, your Honor.

7                    THE COURT:  You didn't hear the testimony from

8    both him and Lieutenant Mitchell about him talking to

9    Lieutenant Mitchell and the process within corrections that

10   you refer these things to diversity management, haven't heard

11   any of that testimony?

12                   MS. CONNOR:  I did, your Honor.  Obviously, I

13   did hear that, and it is our position that that is -- it was

14   insufficient because the harassment continued until my client

15   left the facility in December 2005.

16                   THE COURT:  What incidents occurred after

17   that?  You say it continued.  What incidents occurred after

18   your client sent the memo to Sergeant Mitchell?

19                   MS. CONNOR:  Well, there was graffiti on the

20   bathroom walls.

21                   THE COURT:  No, that was before.

22                   MS. CONNOR:  Well, it was still there, in any

23   event, your Honor, that it was not removed.

24                   THE COURT:  And what happened when that was

25   reported to the superintendent?

1          MS. CONNOR:  When that was reported to the

2    superintendent, that there was a gap in time, your Honor,

3    between the time that was reported and when it was eventually

4    removed.

5          THE COURT:  What was the gap in time?

6          MS. CONNOR:  And the gap in time was,

7    according to Mary Mayville's testimony, that that was not

8    removed until she came back into the facility, and that was

9    in February approximately of 2006 so there would be a period

10   of time that the superintendent was aware of that being on

11   the walls.

12         THE COURT:  Well, the testimony I recall,

13   Ms. Connor, was that Mary Mayville testified that she went

14   down, she looked at it, she brought it to the

15   superintendent's attention, said I'll be back in three

16   weeks -- two, three weeks, and these things need to be

17   corrected.  That was bathrooms, the doors, and testimony was

18   from Ms. Mayville and the superintendent that it was all

19   corrected except for a key issue getting to some bathroom.

20   Do you dispute that?

21         MS. CONNOR:  But your Honor, I believe that, I

22   don't dispute that with respect to the locker room doors and

23   securing those.  But with respect to the graffiti, I believe

24   the testimony established that the superintendent knew about

25   that much prior to that and did not do anything about that.

1              THE COURT:  How is that established?

2              MS. CONNOR:  My client told him about it, your

3       Honor, I believe that was the testimony.

4              THE COURT:  And when would she have told him

5       that?

6              MS. CONNOR:  In her conversation with him.

7              THE COURT:  When he first got there?

8              MS. CONNOR:  Yes.  And also, your Honor, with

9       respect to the superintendent, he admitted that he read the

10      memorandum, or had read to him on or about November 10th,

11      2005, concerning what, the contents of that memorandum that

12      my client wrote to defendant Mitchell.  The superintendent

13      admitted that that was either read to him or he read it also

14      again the next day, and that that put him on notice of

15      numerous issues and that he -- all he did was turn it over to

16      the office of diversity management and it's our -- we, it's

17      our position that that was insufficient, that he had a duty

18      to further make the facility safe for females and safe for my

19      client.

20             THE COURT:  To do what?  To do what?  What

21      allegations in that memo, what was he going to do about

22      those?  What's there that he should have addressed?

23             MS. CONNOR:  He could have looked at it, he

24      could have investigated it, he could have found out who the

25      weapons training officer was, your Honor, he did nothing.  He

1   testified that he did nothing to figure out who that was.

2            THE COURT:  He was notified of no names, it's

3   referred to diversity, he gets that information back from

4   diversity, they ask him to do memos, he does the memos, isn't

5   that what we've heard here?

6            MS. CONNOR:  Your Honor, office of diversity

7   management asked him to do more than the memos and he

8   testified that he didn't do that.  That related to the

9   additional training of weapons --

10           THE COURT:  And what was his testimony with

11  regard to that?  Do you recollect that?

12           MS. CONNOR:  I do.  He said he did not do it.

13  He said that all he did was the memos to both the employees

14  generally and to the weapons training officer and he didn't

15  follow the direction from the office of diversity management

16  to do additional sexual harassment training.

17           THE COURT:  Well, what I heard, Ms. Connor,

18  was that they had sexual harassment training and they're

19  required to have it every three years and it was his

20  understanding that they had the training.

21           MS. CONNOR:  But it was not additional

22  training as recommended by the office of diversity

23  management.

24           THE COURT:  And you think that that's

25  sufficient for this claim in this lawsuit?

1          MS. CONNOR:  It's part of the whole picture,

2     your Honor.  Alone, no, but it's part of the whole picture.

3          THE COURT:  We're talking against this

4     superintendent at this point.  Do you think that's

5     sufficient?  Based on the law.

6          MS. CONNOR:  No, by itself, your Honor, it's

7     the whole picture of the failure of the superintendent to act

8     when a female employee comes to him with these problems.  And

9     that he admitted that he didn't do these things, all he did

10    was turn them over to the office of diversity management.

11    That then causes a delay because my client was out on medical

12    leave at that point.  Some point shortly after, rather.

13          THE COURT:  Go ahead.

14          MS. CONNOR:  Now, with respect to

15    Superintendent Burge, your Honor, we believe that there is

16    sufficient evidence in the record that a reasonable juror

17    could find that he failed to take effective remedial action,

18    and that he did not address the complaints.  Again, all he

19    did was turn them over to the office of diversity management,

20    and he failed to do anything to investigate this, to do any

21    corrective measure.  Both superintendents admitted that there

22    was no one disciplined as a result of any of these actions,

23    and that that is a failure on the part of the superintendents

24    and the Department of Corrections, to take prompt effective

25    remedial action that they're required to do.

1          And that counsel made a point that the

2     plaintiff did not avail herself of the system.  I believe

3     there's very ample evidence in the record that plaintiff did

4     avail herself of the system, she wrote memoranda that the

5     superintendents have identified, agreed that they received or

6     there's testimony concerning the memoranda where she raised

7     all these issues to them.  They received a copy,

8     Superintendent Graham received a copy of the memorandum to

9     defendant Mitchell, and that she also then, also filed a

10    complaint with the office of diversity management.  She filed

11    grievances, she did everything that she could possibly do to

12    avail herself of this system, and I think to say that there's

13    not sufficient evidence in the record for that is just

14    factually incorrect.

15         Likewise, counsel has claimed that there's not

16    enough evidence for severe, pervasive harassment.  We think

17    there's ample evidence in the record that a reasonable jury

18    could find that she was subjected to severe and/or pervasive

19    harassment, that the harassment was ongoing throughout her

20    department from the beginning of the academy and her exposure

21    to the female handbook and the instruction there, all

22    throughout her period of work at Sullivan, through her period

23    at Auburn and then into Eastern.

24         THE COURT:  You're claiming that her exposure

25    to the handbook was harassment?

1      MS. CONNOR:  We're claiming that that, yes,

2   your Honor, and that that also is an aspect of disparate

3   treatment and it shows intent on the part of the Department

4   of Corrections to treat female employees differently because

5   they have a stereotyped view of how they would perform their

6   job, and how they need to conduct themselves on the job, and

7   that that stereotype was pervasive throughout the Department

8   of Corrections, treatment of the complaints of my client,

9   complaining about the various abuses and harassment that she

10   received.

11      THE COURT:  Okay.

12      MS. CONNOR:  Therefore, your Honor, we

13   respectfully request that you deny the defendant's Rule 50

14   motion and the matter go before the jury.  Thank you.

15      THE COURT:  Thank you, Ms. Connor.

16   Mr. Andrews.

17      MR. ANDREWS:  Your Honor, with the court's

18   indulgence, I'd like to review a little black letter law

19   which is contained in my trial brief and I know you have it,

20   but I think it's so appropriate to the circumstances here,

21   that I would really like to address this quickly, and I'll

22   move.  "In order to prove a workplace is actionably hostile,

23   a plaintiff must demonstrate that she subjectively perceived

24   the environment to be abusive, and that the conduct alleged

25   objectively created an environment that a reasonable person

1   would find hostile or abusive.  Title VII aims to eradicate

2   discrimination on the basis of sex, not to enact a general

3   civility code in the American workplace.  Simple teasing,

4   offhand comments, and isolated incidents, unless extremely

5   serious, will not amount to discriminatory changes in terms

6   and conditions of employment.  The incidents of allegedly

7   offensive conduct must also be more than episodic.  They must

8   be sufficiently continuous and concerted to be deemed

9   pervasive.  A plaintiff alleging a hostile work environment

10  must demonstrate either that a single incident was

11  extraordinarily severe, or that a series of incidents were

12  sufficiently continuous and concerted to have altered the

13  conditions of her working environment.  To decide if that

14  threshold has been reached, courts evaluate things like

15  severity, frequency, and the degree of abuse.  Factors

16  include whether it's physically threatening or humiliating or

17  a mere offensive utterance and whether it unreasonably

18  interferes with an employee's work."

19              And finally, "it's axiomatic that to establish

20  a sex-based hostile work environment under Title VII, a

21  plaintiff must demonstrate that the conduct occurred because

22  of her sex.  And where the plaintiff -- hostile work

23  environment is allegedly the product of both sex-specific

24  verbal abuse and other adverse treatment, her task in showing

25  the conduct at issue is discrimination because of sex is made

1  more difficult."

2              And I really appreciate your patience, but I

3  really think it's important, and at this point, I know I've

4  done this once or twice during this proceeding but I would

5  like to quickly review the sum total of the allegations

6  against my client.

7              In June 2004, he said women don't belong here,

8  and again, of course he's denied all these things, but as I'm

9  asking you pursuant to Rule 50(a) to dismiss as a matter of

10  law, I'm going to assume all this is true for the sake of

11  discussion.  So two -- June 2004, women don't belong here.

12             Three to four months later, two comments about

13  an inmate's penis, have you ever seen something so long,

14  would you know what to do with that?

15             Seven to eight months later, the wallet

16  incident.  Not even a hint of gender relatedness to that

17  incident but --

18             THE COURT:  I guess, Counsel, unless you

19  assume that if women don't belong here, if you start with

20  that, that everything thereafter might be taken as --

21             MR. ANDREWS:  You could take that as an

22  indication of intent to suggest that something that happened

23  a year after one isolated comment is, you know, shows intent

24  is -- I think is a stretch, but let's assume that that's a

25  gender-based situation.  Okay.  No discipline resulted, the

1    sum total of her allegation there really, your Honor, is that

2    he said an inmate found it in the trash and that wasn't true.

3    She admits she was wrong, she has no idea what the

4    circumstances of finding the wallet were.  So the sum total

5    of that allegation is is that he said an inmate found it in

6    the trash instead of immediately saying that he took it from

7    her bag which she admits eventually he said.  Even taking it

8    all as true -- so let's assume that's motivated by gender

9    animus.

10              The next thing that happens is November 10th,

11    2005.  You have a series of, you know, statements that we

12    would all agree are gross, but which have no sexual content

13    to it, and again, the fact that there's no sexual content is

14    important because that goes to the severity, okay.

15              We clearly don't have pervasive, you know,

16    we're talking one comment about women not belonging here,

17    three, four months later, two comments about an inmate's

18    penis which, by the way, she gives no response to.

19    Unwelcomeness is an element that has to be established, too,

20    but okay, let's say we're going to assume she didn't welcome

21    that.

22              Seven or eight months later, the wallet

23    incident.  Another five months before you have these

24    allegations about my client's digestive process, and a couple

25    statements about his family which it's stretching to call

1    sexual, but okay, let's do that.

2              The other allegations which now perhaps are

3    going to be argued as being harassing are sitting next to an

4    exit, and again, the plaintiff can have no idea as to intent,

5    but let's assume that he was doing that.  And then staring

6    which grew to leering and laughing in the yard.

7              If you assume all those things happened, if

8    you assume all those things were the product of an intent to

9    mistreat her because she's a woman, it's not severe and

10   pervasive.  And he shouldn't be exposed to a jury verdict

11   which would be a much more difficult situation to appeal

12   because the jury has sympathy about graffiti on the walls,

13   where the jury has sympathy about an unnamed perpetrator

14   touching her on the stairs.  There's nothing in any of these

15   allegations that are personally hostile that are objectively

16   severe in any way, and it's certainly not continuous, your

17   Honor.  There are extended breaks between all these things.

18             I would like to speak briefly to one or two

19   other issues.  That really speaks to the Section 1983 hostile

20   work environment claim.  There may be a Section 1983

21   discrimination claim still pending against my client, I would

22   be at a loss as to what exactly the discrimination is, what

23   the alteration is to her terms and conditions of employment

24   that's not hostile work environment.  I don't think there are

25   any.  I certainly don't think that should be going to the

1  jury.

2          And then with regard to two other issues

3  relating to 1983, qualified immunity, very quickly, your

4  Honor.  Qualified immunity shields public officials from

5  liability for civil damages insofar as the conduct does not

6  violate clearly established statutory or constitutional

7  rights of which a reasonable person would have known.  You

8  apply 19 -- you apply Title VII standards to a 1983 claim,

9  there's no way he could have ever had anywhere in his head

10  that these isolated occasional incidents, even if you assume

11  they happened, even if you assume they're motivated by gender

12  animus, could have -- could possibly have reached that

13  standard.  And the relevant inquiry is to determine whether

14  it's clearly established to a reasonable officer that his

15  conduct was unlawful in the situation he confronted.  I just

16  don't think it's anything close, your Honor.

17          The final thing, I did reserve on punitive

18  damages, I believe that's still a pending issue.  I don't

19  believe that there has been anything pled which we've argued

20  before, but certainly nothing proved which would allow a

21  punitive damages claim to go to the jury.  Reading from

22  plaintiff's proposed charges to the jury, it says, "You may

23  award punitive damages if you find the individual defendant

24  acted willfully, deliberately, maliciously, or with reckless

25  disregard for the plaintiff's federally protected rights.

1    You know, your Honor, it says a violation is malicious if it

2    was prompted by ill will or spite.  There's no evidence of

3    any of these things, your Honor, they're isolated comments at

4    best if you believe them as alleged.  And for that reason, I

5    would ask for a judgment as a matter of law for defendant

6    Mitchell.

7                    THE COURT:  Thank you, Mr. Andrews.

8                    MR. ANDREWS:  Thank you, your Honor.

9                    MS. CONNOR:  Your Honor.

10                   THE COURT:  Go ahead, Ms. Connor.

11                   MS. CONNOR:  Thank you.  Your Honor, the

12   plaintiff is opposed to the defense motion to dismiss the

13   matter against defendant Mitchell under Rule 50, and request

14   that you deny the motion.  Counsel spent some time going

15   through the standards for sexual harassment which I thought

16   were actually quite interesting because I thought that it

17   shed some light on the plaintiff's case in fact, your Honor.

18   That the -- that plaintiff both found, it is both reasonable,

19   a jury would find that, subjectively that the matters, that

20   the plaintiff found that the conduct of defendant Mitchell

21   against the plaintiff constituted harassment and objectively,

22   because we believe that there is sufficient evidence that the

23   conduct of defendant Mitchell as against the plaintiff is --

24   rises to the level of severe and pervasive and is above the

25   level of a general civility code and if that is by the

1    nature, by first the comment that defendant Mitchell made

2    saying women do not belong in corrections and that comment

3    was a message to the plaintiff that what he was -- from that

4    point, she didn't belong there, and that harassment that she

5    faced by defendant Mitchell would be not only just sexual but

6    gender based, that she does not belong there.  And the law is

7    clear, your Honor, that gender-based harassment is just as

8    illegal as sexual harassment, harassment that has an exact

9    sexual content.

10            And the comments about an inmate's penis, what

11   would you do with that, that is clearly sexual, your Honor,

12   and that the jury should hear, weigh the evidence and decide

13   who's telling the truth about that.  The comments about the

14   wallet, we say that that, I don't -- I'm not alleging that,

15   or the conduct, rather, about the wallet, I'm not alleging

16   that that is sexual, but that is gender-based.  It was

17   targeted at the plaintiff because she was female.

18            THE COURT:  How is it harassment?  The wallet?

19            MS. CONNOR:  Well, your Honor, because he took

20   the wallet and then when he went to plaintiff, he, according

21   to plaintiff, he lied and he said that this was -- an inmate

22   had had it.  Now if you believe the plaintiff, that was not

23   the truth, and --

24            THE COURT:  If you believe the plaintiff's

25   testimony, she acknowledges that she was wrong, she should

1   not have left her wallet there, they're required to keep

2   their ID on them at all times.  So no matter how it's alleged

3   that defendant Mitchell came in contact with it, how is it

4   harassment that he gives it back to her, and then takes no

5   disciplinary action?  How am I supposed to construe that as

6   harassment?

7            MS. CONNOR:  Your Honor, he -- after he took

8   the wallet and he told the plaintiff the untruth that it was

9   found with an inmate, he then went to Lieutenant Quinn.  And

10  that is -- may not be a formal level of discipline and we're

11  not disputing that she has a discipline in her file as

12  relation to that, but going to a lieutenant and saying that

13  this occurred and then having the union come in, I believe is

14  an act of further harassment, your Honor.

15           THE COURT:  Again, Ms. Connor, your client's

16  testimony was she admits she was wrong.  So again, how is

17  going to the lieutenant and reporting it, no matter how he

18  came in possession of it, how is that harassment?

19           MS. CONNOR:  Well, he told the plaintiff that

20  he wasn't gonna do anything about it and then the first thing

21  he does is he goes to Lieutenant Quinn.  And that that then

22  is harassing, after he assures her he's not going to do

23  anything, the next thing he is telling a lieutenant about it

24  and she's called in for an informal counseling with her union

25  representative.

1    THE COURT:  Ms. Connor, you have a way of

2    construing testimony that is just -- I -- your client's

3    indicated that she was wrong, she was not disciplined is what

4    the testimony was, the testimony of defendant Mitchell was he

5    did not seek to discipline her, there's been no testimony of

6    any discipline whatsoever.  Now she admits she was wrong for

7    not having her ID on her, yet even if you have a counseling

8    session, informal counseling session with a lieutenant, how

9    is that harassment?  How is that even pled in this case as

10   harassment?

11   MS. CONNOR:  Well, because, your Honor, he

12   assures her he's not going to do anything about it, the first

13   thing he does is do something about it.  I think that that

14   then was designed to harass the plaintiff, have the

15   lieutenant harass the plaintiff with a meeting with the union

16   representative.

17   THE COURT:  Okay, I can see I'm not getting

18   through so you go ahead, continue your argument.

19   MS. CONNOR:  Now your Honor, with respect to

20   the memorandum or the contents of the memorandum of

21   November 10th, 2005, counsel's repeatedly tried to claim that

22   that is not sexual in nature and I find that that is not true

23   based on the face of the words in the memorandum.  First of

24   all, he's talking about his mother's tits.  Just because it's

25   not about the plaintiff doesn't mean it's not sexual and

1    doesn't mean that it's not designed to harass the plaintiff

2    by using this type of language, gender-based language that is

3    humiliating and disrespectful to women.  And I think that

4    there's -- that's clearly got a sexual and/or gender-based

5    component to it.  Also, the plaintiff testifying about how

6    Sergeant Mitchell said that he had a ring like the

7    plaintiff's but he lost it up his wife's behind, that, your

8    Honor, again, how that could not be sexual is beyond me in

9    that sense, that that clearly is a comment that has sexual

10   content to it, and that it's aimed to harass the plaintiff

11   just by saying it to her.  I think that a reasonable jury

12   could infer that that was a comment that was intended to

13   harass the plaintiff, if you believe the plaintiff's version

14   of events.

15            Also, the memorandum also has, where the

16   plaintiff talks about other types of harassment that she

17   faced, that -- and she went to defendant Mitchell about that,

18   about the hangup calls, he didn't do anything about that,

19   again, that's turning a blind eye to plaintiff who's trying

20   to report these things and tells Mitchell that -- defendant

21   Mitchell that these things need to cease.  I think that a

22   reasonable jury could infer from that that his failure to act

23   in that was designed to harass the plaintiff, ignore her

24   requests.

25            Your Honor, with respect to the conduct at

1    Eastern, plaintiff testified that defendant Mitchell was at

2    the exit and that that prevented her from leaving and that

3    that, given the circumstances around that event, I think that

4    that, a jury could infer that that was done to harass the

5    plaintiff and prevent her from leaving.  Given the testimony,

6    they can weigh it, I think it's something that the jury could

7    do.

8                   Also even though defendant Mitchell denies the

9    staring and leering down to the plaintiff in the yard, the

10   plaintiff testified that it occurred and that could be

11   another form of harassment, and -- of defendant Mitchell

12   against the plaintiff.

13                  Now, your Honor, with respect to the punitive

14   damages claim, that we believe that the jury could look at

15   the conduct here, look at the conduct that's pled against,

16   and testified against defendant Mitchell and find that it is

17   willfully or maliciously designed to injure the plaintiff,

18   and that punitive damages could be awarded, that that conduct

19   is, by its -- the wording, its nature, its focus at the

20   plaintiff, focused at her gender, that that was known to

21   defendant Mitchell that would be offensive to the plaintiff

22   and that it was done with malice and we respectfully request,

23   your Honor, that you deny defendant Mitchell's Rule 50

24   motion.

25                  THE COURT:  Punitive damages with regard to

1    the other defendants?

2                    MS. CONNOR:  Likewise, your Honor, that

3    they -- with respect to that, to their -- the individual

4    defendants are you referring to, your Honor, the Department

5    of Corrections?

6                    THE COURT:  All three.

7                    MS. CONNOR:  Okay.  With respect to that, we

8    believe that first with respect to the Department of

9    Corrections, that there was a willful turning away from the

10   plaintiff's repeated requests --

11                   THE COURT:  First of all, before you go too

12   far in this argument, there can't be punitive damages against

13   the state, okay, case law.

14                   MS. CONNOR:  Okay, thank you, your Honor.

15   Then that's why I asked that, okay.  With respect to the

16   individuals --

17                   THE COURT:  I was just seeking your

18   acknowledgment of that on the record.

19                   MS. CONNOR:  Excuse me, your Honor?

20                   THE COURT:  But you don't acknowledge

21   anything.  Go ahead.

22                   MS. CONNOR:  I mean no disrespect, your Honor,

23   by that.

24                   THE COURT:  Okay.  Go ahead.

25                   MS. CONNOR:  Thank you.  Now with respect to

1    the individuals, we believe that the plaintiff having

2    testified about her memos to them, her conversations with

3    Superintendent Burge, Superintendent Graham, that they then

4    completely failed in their duty to protect the plaintiff, and

5    that that failure was willful.  Let's say with Superintendent

6    Burge, he didn't pass it on, he testified that he didn't pass

7    it on to Superintendent Graham.  He -- all he did, they

8    became just paper pushers and that we believe that that's a

9    willful neglective duty even under the directive from the

10   Department of Corrections, and that you can find that there

11   be punitive damages justified from that conduct or failure to

12   act when the plaintiff is pleading with them to do something

13   concerning the harassment either in the form of memos or

14   conversations, with these superintendents.

15                THE COURT:  Okay, thank you, Ms. Connor.

16                MS. SHEEHAN:  Your Honor, the state

17   defendants' renewal of the Rule 50 also restates renewal of

18   qualified immunity.  There's still nothing in the record that

19   defendants Burge or Graham knew that their conduct in

20   handling Ms. Collins' complaints would violate any of her

21   constitutional rights.

22                THE COURT:  Okay.

23                MR. ANDREWS:  With the court's permission, I

24   have some very brief response.

25                Your Honor, let me start with the punitive

1    damages claim against Troy Mitchell.  When you look at the

2    sum total of the allegations, there are two overtly sexual

3    incidents alleged, the penis comments, to which she did not

4    respond, and then 13 or 14 months later, some comments that

5    weren't really about her but some of which did have some

6    sexual connotation to it, I don't think there's anything to

7    support punitive damages that he knew anything, even if you

8    assume all that's true, that would get you to the standard

9    necessary for punitive damages.

10                    With regard to the overall hostile work

11   environment claim, counsel really misses the point.  I'm

12   conceding for the sake of this discussion that everything was

13   said, that it all had gender relatedness and that those

14   November comments had a sexual connotation to it.  I'm

15   assuming all that.  But whether they were sexually related,

16   whether they pertained directly to plaintiff, whether they

17   involved an assault as opposed to, you know, just kind of

18   some raunchy talk, those things go to severity and, you know,

19   pervasiveness.  There's just very clearly not pervasiveness,

20   there's nothing in the nature of a sexual assault that gets

21   you around the need for continuous conduct, your Honor, just

22   nothing there.  Thank you.

23                    THE COURT:  Thank you, Mr. Andrews.  I'm going

24   to have my courtroom deputy give you a special verdict form

25   that's been drafted, and some jury instructions that we have

1  at this point, and I emphasize at this point.  They were

2  drafted with the idea of the claims that we had left after

3  the last Rule 50 motion going to the jury.  Some of these

4  things may be taken out, I'm not certain at this point, but I

5  want you to, at least to start the review so you have an idea

6  of what's there even if some of the claims come out or even

7  if, you know, some of the law changes what would be taken

8  out.  At least you'll see what's there at this point so that

9  you can start reviewing so we can have a charge conference at

10  some point.  Okay.  I'm going to take a short recess, and

11  then I'll be back to rule on the Rule 50, and hopefully send

12  you home for the day.

13            THE CLERK:  Court's in recess.

14            (Whereupon a recess was taken from 4:48 p.m.

15             to 5:05 p.m.)

16            (Open Court, Jury Out.)

17            THE COURT:  Okay.  We're back in session, in

18  court without the jury.  Counsel, here's what I'm going to

19  do.  We're going take a little while with some things that we

20  need to look up research wise, so I'm going to not give you a

21  decision tonight on the Rule 50.  I'm going to ask everybody

22  be here at 8:45 tomorrow morning, and I'll -- first thing

23  I'll do is I'll give you my decision on the Rule 50 motions,

24  and then we'll have our charge conference after that.  You

25  have the proposed jury instructions and special verdict form,

1  it will give you a chance to look at it overnight, and then,

2  depending on what we decide on the Rule 50, we'll either be

3  pulling stuff out or it will essentially -- that's the basic

4  charge, it's there.  So you'll have it with an opportunity to

5  review and be prepared to make any requests or objections

6  from there.  Okay.  Any questions about that, Ms. Connor?

7                    MS. CONNOR:  No, your Honor.

8                    THE COURT:  You okay with that?

9                    MS. CONNOR:  Yes, your Honor.

10                   THE COURT:  Okay.  Everybody good?

11                   MS. SHEEHAN:  State's good, your Honor.

12                   THE COURT:  Ms. Sheehan, Mr. Andrews?

13                   MR. ANDREWS:  That's fine.

14                   THE COURT:  That way I don't have to keep

15  court personnel here and court reporters and everybody else,

16  we can let everybody go home.

17                   MR. KINSEY:  And they shut the air off, your

18  Honor.

19                   THE COURT:  There's another reason to send you

20  out of here as well.  Okay.  Have a good night, we'll see you

21  at 8:45, on the record here in the courtroom, and then

22  depending on who we have, probably have counsel go in back

23  for our charge conference, okay.

24                   MR. KINSEY:  Thank you, your Honor.

25                   THE COURT:  Okay, very good.  See you

1    tomorrow.

2              THE CLERK:  Court's in recess.

3              (Court Adjourned, 5:07 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3

4           I, JODI L. HIBBARD, RPR, CRR, CSR,

5    Official Court Reporter in and for the United States

6    District Court, Northern District of New York, DO

7    HEREBY CERTIFY that I attended the foregoing

8    proceedings, took stenographic notes of the same,

9    and that the foregoing is a true and correct

10   transcript thereof.

11

12

13

14

15

16

17

18                          _____

19                          JODI L. HIBBARD, RPR, CRR, CSR
                            Official U.S. Court Reporter
20

21

22

23

24

25