UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------x
PENNY T. COLLINS,

                              Plaintiff,

vs.                              5:07-CV-493

THE STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF CORRECTIONAL SERVICES,
GLENN S. GOORD, JOHN BURGE, HAROLD GRAHAM,
and TROY MITCHELL,

                              Defendants.
------------------------------------------x

        Transcript of a Jury Trial held on March 20,

2012, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GLENN T. SUDDABY, United States District

Judge, Presiding.

                    A P P E A R A N C E S

For Plaintiff:        MAIREAD E. CONNOR, ESQ.
                      Attorney at Law
                      440 South Warren Street
                      Suite 703
                      Syracuse, New York  13202

For Defendant:        SATTER, ANDREWS LAW FIRM
(Mitchell)            Attorneys at Law
                      217 South Salina Street, 6th Floor
                      Syracuse, New York  13202
                        BY:  ROSS P. ANDREWS, ESQ.

For Defendants:       STATE OF NEW YORK
(All Remaining)       Office of Attorney General
                      The Capitol
                      Albany, New York  12224
                        BY:  CATHY Y. SHEEHAN, AAG
                             ROGER KINSEY, AAG

1    (Open Court, Jury Out, 8:50 a.m.)

2    THE COURT:  Okay.  Good morning.

3    MS. SHEEHAN:  Good morning.

4    MR. KINSEY:  Good morning, your Honor.

5    THE COURT:  Hope everybody had a good night.

6  The record should reflect we're in session without the jury,

7  we have plaintiff, plaintiff's counsel, defendants, and

8  defense counsel, and we have all the defendants, welcome

9  back.

10    Rule 50 motions.  We have a motion first of

11  all with regard to the state and defendants Burge and Graham.

12  Ms. Connor, I'm extremely concerned about the legal

13  sufficiency of the cases that you've put in, particularly

14  against defendants Burge and Graham.  I don't believe that

15  there's really any factual dispute with regard to the

16  testimony that's come in and what they -- how they responded

17  to various complaints that were sent to them.

18    That being said, the court is mindful that

19  we've had a jury here for over a week, eight days, and the

20  court is also mindful that the best way to ensure that this

21  case is over and ended for all parties is to let this jury

22  decide.  So I'm going to reserve with regard to the Rule 50

23  motions with regard to defendants Burge and Graham, and I

24  indicate that to counsel and say that you're certainly free

25  to renew your motion should there be a verdict against either

1    one or both of those defendants.

2              Again, I have concern with regard to the

3    sufficiency of the proof against defendant Mitchell, although

4    you may have more of an argument with regard to defendant

5    Mitchell, depending on the view of the evidence, but it is,

6    again, razor thin with regard to the proof that you put in.

7    So I am going to deny that motion and let the jury decide

8    that as well.

9              I'm going to deny the motion with regard to

10   the state, New York State Division of -- Department of

11   Corrections, excuse me.  Okay.  So I think the court feels

12   the best course of action is to let the jury, they've heard

13   this proof, let the jury do their work, and get the decision.

14   That being said, we need to have a charge conference, and --

15             MS. CONNOR:  Your Honor, I have a matter for

16   the court before the charge conference.

17             THE COURT:  What's that?

18             MS. CONNOR:  Your Honor, plaintiff moves for

19   motion for a new trial, after granting of the judgment as a

20   matter of law with respect to the retaliation claims under

21   Title VII and the New York Human Rights Law.  The plaintiff

22   submits that the court erroneously dismissed the Title VII

23   and New York Human Rights Law retaliation claims against the

24   Department of Corrections, as there is sufficient evidence in

25   the record to support such claims and the employer liability

1   for the claims.

2           The plaintiffs submit that the court

3   discounted retaliatory harassment that the plaintiff faced

4   which is a form of retaliation, and the evidence submitted as

5   proof by the plaintiff contains several examples of

6   retaliatory harassment, including but not limited to the

7   rumors at Auburn from Sullivan that Ms. Collins was suing,

8   the court's -- the smoky bear comments, we believe a

9   reasonable jury could conclude that those were done in

10  retaliation for plaintiff's complaining to others in the

11  administration or the office of diversity management about

12  her hostile environment.  The comments from officers for

13  plaintiff to get out of here, you brought this on yourself,

14  the defacing of the photo at Auburn with the words

15  administrative transfer, the defacing of the photo at

16  Sullivan, and that the plaintiff respectfully disagrees with

17  the court's ruling that the plaintiff could not testify about

18  the circulation of the to-from memo of November 10th, 2005

19  from plaintiff to defendant Mitchell on hearsay grounds when

20  plaintiff was faced with numerous rumors and comments about

21  this memo frequently from other corrections officers which

22  contributed to her hostile environment.

23          These -- all of these acts were reported to

24  the employer and the employer failed to take prompt effective

25  remedial action.  We believe that the hostile environment

1    harassment was so intertwined with the retaliatory harassment

2    that the court should view them as one and the same, in

3    supporting either a claim for hostile environment or

4    retaliatory harassment.

5            Additionally, the plaintiff would note that

6    there were comments written on the plaintiff's performance

7    reviews about not getting along and the decreased rating on

8    the review with respect to some of the categories of her

9    ability to get along with other officers, and that these

10   would deter a reasonable employee from complaining about

11   harassment in a hostile environment to her employer.

12           In addition, the plaintiff moves for a motion

13   for a new trial after the granting of a judgment as a matter

14   of law with respect to the aiding and abetting claim under

15   New York Human Rights Law against defendant Mitchell

16   regarding both hostile environment, sexual harassment, and

17   retaliation.  The plaintiff submits that there's ample

18   evidence in the record that defendant Mitchell aided and

19   abetted the employer's hostile environment of the plaintiff

20   through his direct participation in the harassment, and that

21   that contributed to plaintiff's hostile environment and

22   there's inferential evidence, evidence from which an

23   inference can be drawn in the record by a reasonable jury

24   that -- withdrawn.  And that plaintiff sought to submit

25   evidence that defendant Mitchell participated in the

1    circulating of a memorandum that was written to him by the

2    plaintiff, and that caused her to be the subject of ridicule

3    and harassment.  Thank you.

4                    THE COURT:  Either counsel want to respond to

5    that?  It's going to be denied.  And Counsel, I think, you

6    know, you have a way of construing facts that aren't --

7    haven't been put into evidence here, that I think that, you

8    know, they may have been in your complaint, but they

9    certainly didn't come out as proof in this case.  Counsel,

10   you want to be heard?

11                   MS. SHEEHAN:  No, your Honor.

12                   THE COURT:  Mr. Andrews?

13                   MR. ANDREWS:  For the reasons previously

14   stated by the court, you know, we obviously don't agree.

15                   THE COURT:  That will be denied.  Are we ready

16   for charge conference?

17                   MR. KINSEY:  Yes, your Honor.

18                   MS. SHEEHAN:  Yes, your Honor.

19                   MR. ANDREWS:  Yes, your Honor.

20                   MS. CONNOR:  Yes, your Honor.

21                   THE COURT:  We're going to do that in the

22   court's library, and we'll head back there now.  If you want

23   to walk around, the guard will let you in.

24                   (In Chambers, 8:59 a.m.)

25                   THE COURT:  Okay.  Let's start with the

1    general instructions and we'll move through that pretty

2    quickly.  I don't know if there's any requests or objections

3    to -- let's start off with introduction, role of attorneys,

4    and evidence.  First three pages.  Any issues for anybody?

5                    MS. SHEEHAN:  No, your Honor.

6                    MR. ANDREWS:  No.

7                    THE COURT:  Okay, we're off to a blistering

8    start.  That's good.  How about evaluation of evidence?  We

9    have subcategories of credibility of witnesses, medical

10   witnesses, expert witnesses, impeachment by prior

11   inconsistent statement, and all available evidence need not

12   be produced.  Anything with regard to that section?

13                   MS. CONNOR:  Yes, your Honor.  On page 5, B,

14   medical witnesses, the name Dr. Alley is mistyped or stated,

15   it's Alley, not Ayers.

16                   THE COURT:  Thank you.  Anything else?  Okay.

17   Having heard no further requests or objections, let's go to

18   burden of proof.  Just there's an overview, preponderance of

19   the evidence and multiple defendants.

20                   MS. CONNOR:  With respect to B, preponderance

21   of the evidence, in the first paragraph, the last sentence or

22   phrase, "You must decide against her on the issue you are

23   considering," we would request that the pronoun also be added

24   "him" because there are affirmative defenses for which the

25   defendants would have the burden to prove preponderance of

1    the evidence so we would ask for a gender neutral pronoun

2    there.

3                THE COURT:  You must decide against the party

4    on the issue you're considering.

5                THE LAW CLERK:  Judge, if we do that, then we

6    have to change, it says before that, bearing the burden of

7    proof, has failed to establish her claim by preponderance of

8    the evidence so you would have to say her claim or his

9    defense, I mean just -- it's more complicated.

10               THE LAW CLERK:  A party's claim or defense.

11               THE COURT:  Yes.  Just keep it party.  Okay.

12   Anything else, with regard to the burden of proof section?

13   Okay.  Getting to the substantive law, let's start with the

14   hostile work environment under Title VII and New York Human

15   Rights Law.  Any issues in that section?

16               MS. CONNOR:  Yes, your Honor, with respect to

17   A.1., hostile work environment, on page 12, we object to the

18   first full paragraph on page 12, that begins with, "Conduct

19   which may create a hostile work environment," that paragraph.

20   We would request that it state in the second line, the claim

21   includes, but is not limited to, and also, your Honor, we

22   would request that the court use page 4 of the plaintiff's

23   jury instructions with respect to gender-based or harassment

24   because of sex.  We believe that the issue is not just sexual

25   in the traditional sense of that word but that the law

1  requires that the jury be instructed on the basis of

2  harassment because of sex.  And that we believe that the

3  instruction here is too narrow and limits the jury's

4  consideration to too narrow of a range of harassment.

5             And on the plaintiff's proposed charge to the

6  jury, page 4, there is at the top a paragraph describing that

7  sexual harassment can, but need not, take the form of sexual

8  advances, requests for sexual favors or other verbal or

9  physical conduct of a sexual nature, and it continues, I'll

10  skip some words, rather, harassment directed at an employee

11  because of the employee's gender is sexual harassment.  And

12  we would request that the jury be instructed along those

13  lines.

14             THE COURT:  Well, we'll take another look at

15  it and I'll let you know.  Any requests or objections with

16  regard to that request by plaintiff's counsel?

17             MR. ANDREWS:  I would observe, I don't have

18  the complaint here unfortunately, I should have brought it in

19  with me, but I think it's pled as sexual harassment, the

20  case.  I don't believe there's any reference to gender-based

21  harassment anywhere in the complaint.

22             MS. CONNOR:  Your Honor, we believe that under

23  the law, sexual harassment is harassment because of sex, and

24  therefore the jury should be instructed as a broader

25  definition of harassment.

1    THE COURT:  Counsel, I think what he's saying

2    is the way you pled it.  It would go back to the pleading.

3    MS. CONNOR:  I understand, but I believe that

4    the pleading should be construed liberally, and also that

5    that definition under the law is broader than just sexual

6    words describing sexual acts, or sexual advances.

7    THE COURT:  Okay.  Well, as I indicated, we'll

8    take a second look, have the law clerks take a second look at

9    that and I'll take a second look at it, once they've done

10   their research and I'll let you know.  Anything else on that

11   particular section?

12   MS. CONNOR:  Yes, your Honor.  In the next

13   page, 13 of what you provided to us, I think that the

14   instruction in the third line that talks about the incidents

15   of harassment must occur in concert is not sufficiently

16   clear, concert seems to imply that more than one person would

17   be acting in conjunction with another person.

18   THE COURT:  You're talking about the sentence

19   that starts with, "In general"?

20   MS. CONNOR:  Yes, your Honor.

21   THE COURT:  "In order to be actionable, the

22   incidents of harassment must occur in concert or with

23   regularity that can reasonably be deemed pervasive."

24   MS. CONNOR:  Right.  That I think in concert

25   implies that more than one person has to act together to

harass someone and I think that that's not a correct

statement of the law.

     THE LAW CLERK: In concert with each other?

     MS. CONNOR: I just would disagree with that

as well.

     THE COURT: So what's the nature of your

request?

     MS. CONNOR: To eliminate the concept that

incidents of harassment must occur in concert, that I think

that that's just a confusing term and has the wrong

implication.

     THE COURT: Okay. Anything else? I'll --

again, we'll take a look at it and we'll let you know.

That's language right out of the charge, right?

     THE LAW CLERK: Yes.

     MS. CONNOR: Okay, yes, your Honor. With

respect to the same section, the plaintiff objects to the

omission of an instruction to the jury about the particular

setting in a prison which is described on pages 5 to 6 of the

plaintiff's jury instructions that -- the proposed jury

instructions, rather, that under *Dawson v. The County of

Westchester* case, that the jury could properly take the

prison setting into account and the environment and setting

that would make incidents of harassment more heightened with

respect to the plaintiff, and there's proposed wording on

1    pages 5 to 6 of the plaintiff's jury instruction that we

2    would request that the court adopt in the jury instructions.

3                    MR. ANDREWS:  I'm --

4                    THE COURT:  Before I let you go, and where are

5    you requesting that that be put into the jury charge?

6                    MS. CONNOR:  We're requesting that that be put

7    into the jury charge in the court's instructing the jury

8    about how to consider the totality of the circumstances with

9    respect to the evidence.

10                   THE COURT:  What page, where are you

11   referring?

12                   MS. CONNOR:  Page 13.

13                   THE COURT:  Are you referring to the last

14   paragraph, "If you find the plaintiff has established by

15   preponderance of the evidence that she was subjected to a

16   hostile work environment," when we get --

17                   MS. CONNOR:  Before that paragraph.

18                   THE COURT:  Before that, where are you

19   suggesting?

20                   MS. CONNOR:  It could be done after the

21   numerical --

22                   THE COURT:  Listing.

23                   MS. CONNOR:  -- listing that the court has

24   there, yes.

25                   THE COURT:  And you're looking for additional

1   language which indicates that the prison setting itself --

2               MS. CONNOR:  May be considered, yes.

3               THE COURT:  Anybody want to be heard on that?

4               MR. ANDREWS:  I would suggest, your Honor,

5   that that's something that counsel is free to argue and it's

6   elevating, you know, an argument to the jury to the status of

7   a jury instruction and on behalf of defendant Mitchell, I

8   don't think it's appropriate.

9               MS. SHEEHAN:  Agreed, but if we're going to

10  add a jury charge regarding the jurors being able to take the

11  prison setting into consideration, that it's a very neutral

12  statement, not one that says it would heighten, you know, the

13  reaction to jokes, sexual comments on walls, but it's just

14  neutral.

15              THE COURT:  I think we're getting into an area

16  that may be fraught with some difficulties both ways in

17  keeping a charge neutral and just purely on the law.  So I'll

18  take another look, but I'm inclined to deny that one.  I

19  don't think it's appropriate to start talking about

20  fact-specific situations.

21              MS. CONNOR:  Your Honor, with respect to the

22  same section, we would request that there be some additional

23  instruction concerning how the jury would consider the

24  different factors, specifically in the *Harris* case of the

25  Supreme Court, the court stated while each of the factors is

1  relevant, no single factor is required, and that the fact

2  that the law requires harassment to be severe or pervasive

3  before it can be actionable does not mean that employers are

4  free from liability in all but the most egregious cases and

5  that was specified in the Second Circuit case of *Torres v.*

6  *Pisano*, 1997, your Honor.

7       THE COURT:  And where are you proposing that

8  that language be added?

9       MS. CONNOR:  We're proposing that that

10  language be inserted after the listing of the factors in

11  considering the totality of the circumstances.

12       THE COURT:  Same section?

13       MS. CONNOR:  Yes, your Honor.

14       MR. ANDREWS:  I would suggest that as written,

15  the instruction in a much more simple and less confusing way

16  covers that already by saying, you may consider the following

17  factors, doesn't say you must consider the following factors,

18  it explicitly says you may consider the following factors.

19       MR. KINSEY:  The language may and the list is

20  suggestions that they may look at that, it's not preclusive,

21  it certainly is inclusive of anything else they may choose to

22  consider as a jury.  I think the longer the laundry list, the

23  more likely that we're going to leave something out or steer

24  them in a certain direction, view of the facts.

25       MR. ANDREWS:  Can I add something, your Honor,

1    with regard to saying that it's not only the most egregious

2    cases, you know, that can be found to be sexual harassment,

3    we don't have evidence about other cases, we haven't been

4    comparing this to other cases, these aren't attorneys doing

5    research, you know, these are jurors looking at this case.

6                    THE COURT:  Okay.

7                    MS. CONNOR:  Your Honor, I would point out

8    that I believe it would be very proper for the court to

9    instruct the jury while each of these factors may be

10   relevant, no single factor is required, after listing the

11   factors.  I think that that does not confuse the jury, and is

12   a correct statement of the law and a neutral statement.

13                   THE COURT:  Anything else?  With regard to

14   this section?

15                   MS. CONNOR:  I have nothing more, your Honor.

16                   THE COURT:  Let's go to B, sexual harassment.

17                   MS. CONNOR:  I'm sorry, I misunderstood the

18   court's question.  I had something on page 14 of the proposed

19   instructions with respect to the Title VII employee liability

20   standard, I didn't realize you were skipping when you said B,

21   I'm not sure.

22                   THE COURT:  Okay, go ahead.

23                   MS. CONNOR:  Okay.  On page 14, with respect

24   to the definition of supervisor, under Title VII employer

25   liability standard, your Honor, we request that the plaintiff

1    requests that in the second line where you give examples of

2    such authority include.

3                THE COURT:  Where are you now, page 14?

4                MS. CONNOR:  Page 14 of the proposed jury

5    instructions.

6                THE COURT:  Examples of such, yes, go ahead.

7                MS. CONNOR:  We would -- the plaintiff

8    requests that the court add language about, after the word

9    power, directly or indirectly, and then also the plaintiff

10   requests that the court add to the list, direct work, of the

11   different factors of authority that may be considered, and we

12   also request that the following, that you also may find an

13   employee to be a supervisor if the authority given by the

14   employer to the employee enabled or materially increased the

15   ability of the employee to create or maintain a hostile work

16   environment, and that that language is discussed in the

17   *Ellerth* case, and *Anderson v. County of Nassau* and is

18   described and discussed in the plaintiff's trial brief, your

19   Honor.  Also, there are -- there is language to that effect

20   in the plaintiff's proposed jury instructions on page 7.

21              THE COURT:  Anybody want to be heard?

22              MS. SHEEHAN:  Your Honor, power to indirectly

23   or directly fire, I don't understand that, and I found

24   confusing, supervisors can direct her work?

25             MS. CONNOR:  That's correct.

1    MS. SHEEHAN:  Or the authority of an employee

2  can maintain a hostile work environment, I think they're all

3  very vague, I don't think --

4          MR. ANDREWS:  I think --

5          MS. SHEEHAN:  -- for jury instruction.

6          MR. ANDREWS:  I think the longer requested

7  addition is confusing, I mean it's hard for me to follow, you

8  know, the direct or indirect, I don't think there's been any

9  testimony about direct or indirect authority to do any of

10  these things, so I'm not sure what that adds for the purposes

11  of this proceeding.

12          MS. CONNOR:  Your Honor, there's been

13  testimony about superior officers having rank over

14  corrections officers and having the ability to be their

15  supervisor, it's in the employee manual, and having the

16  authority of a superior rank over correction officer, and I

17  believe that the jury instructions with respect to your

18  definition of supervisor does not take that into account.

19          THE COURT:  And how do you think that saying

20  direct or indirect takes that into account?

21          MS. CONNOR:  Well, because it would mean that

22  when you say indirectly, it would mean that superior officer

23  could recommend, somebody could interpret that as being meant

24  that you're fired and you walk out the door.

25          THE COURT:  We'll discuss it.  My inclination

1    is that your requests are confusing and complicate this

2    charge, to the point where it's going to be difficult for the

3    jurors to try and interpret what we're -- what I'm

4    instructing them.  So we'll take a look and we'll discuss it,

5    but I'm inclined to leave that section as is.  I will let you

6    know.  Anything else before we move?

7                    MS. CONNOR:  Which section are you referring

8    to now, your Honor?

9                    THE COURT:  Well, let's go one by one.

10                    MS. CONNOR:  Okay.

11                    THE COURT:  Anything further on employer

12    liability?

13                    MS. CONNOR:  Yes, your Honor.  With respect to

14    acts of a supervisor on page 15.

15                    THE COURT:  Yes, go ahead.

16                    MS. CONNOR:  At the fifth paragraph,

17    concerning the instruction about the employer generally

18    meeting its burden, if it shows it's maintained a policy, we

19    request that instruction be added that the mere existence of

20    a policy is not determinative that an employer has not met

21    the reasonable care standard.  You must determine whether the

22    policy was being implemented and if so, whether it was

23    reasonable -- whether it was a reasonable and effective means

24    of meeting the employer's duty to prevent and correct sexual

25    harassment, and that language is proposed in the plaintiff's

1    jury instruction on page 8.

2                    MS. SHEEHAN:  Your Honor, I think it's

3    covered, took appropriate steps to address the complaint.

4                    MS. CONNOR:  Your Honor, we --

5                    MS. SHEEHAN:  You've covered it.

6                    MS. CONNOR:  We request that there be an

7    instruction that the mere existence of a policy is not

8    determinative that the employer has met its --

9                    THE COURT:  The language doesn't say that, it

10   says maintained a policy in sexual harassment and took

11   appropriate steps to address the complaint.  That doesn't say

12   just the mere existence, there is, they must also take

13   appropriate steps within that policy, that covers what you're

14   asking.

15                   MS. CONNOR:  Well, the plaintiff believes that

16   when you say an employer generally meets its burden, that

17   that is confusing to the jury and sounds as though that's

18   what is -- what is needed, and that it doesn't specifically

19   instruct the jury that it is not necessary that the mere

20   existence, rather, of a policy doesn't determine that the

21   employer has met the burden.

22                   THE COURT:  That's not what it says, it says

23   and, and took appropriate steps.  Okay.  What else?

24                   MS. CONNOR:  On page 16, your Honor, at the

25   top, the second line in that sentence begins, "A credible

1    fear must be based on more than the plaintiff's subjective

2    belief."  I think that the word credible is not proper for

3    the court to instruct the jury in this respect, that it

4    suggests that that -- a subjective belief is not credible,

5    and that we object to that word.  And then also the next

6    line, evidence must --

7              THE COURT:  How does it say that a subjective

8    belief is not credible?  It says, a credible fear must be

9    based on more than the plaintiff's subjective belief, meaning

10   there must be some basis for it.

11             MS. CONNOR:  In order to have a credible fear,

12   there has to be more than a subjective belief and the word

13   credible I think would make it seem that the plaintiff in

14   her -- the inferences couldn't be drawn from her testimony

15   that -- and that she's not credible, and I think that that

16   word is a loaded word, and could mislead the jury, instruct

17   the jury as to the plaintiff's credibility.

18             THE COURT:  I'm not following your argument at

19   all there.  You have a proposed word that you want to replace

20   credible with?

21             MS. CONNOR:  I would eliminate the word.

22             THE COURT:  That's going to be denied.

23             MS. CONNOR:  Now, your Honor, with respect to

24   the next sentence, "Evidence must be produced to the effect

25   that the employer has ignored or resisted similar complaints

1    or taken adverse actions against employees in response to

2    such complaints," we object to that sentence.  We don't think

3    that that's a correct statement of the law.  We would propose

4    that, you may consider whether the plaintiff had reasonable

5    cause to believe that she would not be retaliated against if

6    she invoked the procedures and whether the plaintiff had

7    reason to believe that invoking the policy would be effective

8    in changing the alleged harasser's conduct.

9              THE COURT:  Anybody want to be heard?

10             MS. SHEEHAN:  I think it's a misstatement of

11   the law, your Honor.

12             MR. ANDREWS:  I think it's hard to follow, I

13   had a hard time following it, frankly.

14             MS. SHEEHAN:  It's taking the law and

15   tailoring it to her client's specific situation.  It's not a

16   recitation of the standards.

17             MS. CONNOR:  Your Honor, we would request that

18   the sentence, evidence must be produced to the effect that

19   the employer has ignored or resisted," that sentence be

20   stricken.  That that is not a correct statement of the law.

21   That the plaintiff does not have to produce evidence that the

22   employers ignored or resisted similar complaints or taken

23   adverse actions against other employees in response to these

24   complaints.  That's incorrect.

25             THE COURT:  Well, I can tell you we didn't

1    make it up.  We'll take a look at it and I'll let you know.

2                    MS. SHEEHAN:  Your Honor, this is under acts

3    of supervisor.

4                    THE COURT:  Yeah, I know.  Where we going

5    next?

6                    MS. CONNOR:  For that section, your Honor,

7    that's what I have.

8                    THE COURT:  Okay.  How about acts of a

9    coworker?

10                   MS. CONNOR:  All set.

11                   THE COURT:  You're all set.  Employer

12   liability under New York Human Rights Law.

13                   MS. CONNOR:  All set.

14                   THE COURT:  No complaints, nothing there?

15                   MS. CONNOR:  No, your Honor.

16                   THE COURT:  All right.  Sexual harassment

17   under 42 U.S.C. 1983.  Anybody have any issues?

18                   MS. SHEEHAN:  No, your Honor.

19                   MR. ANDREWS:  On page 20, if we're getting

20   there.

21                   THE COURT:  Page 20, go ahead.

22                   MR. ANDREWS:  At the very bottom, number 4,

23   the harassment was so severe, I would ask that "and

24   pervasive" be added just because those are grouped together

25   throughout the instructions and I think that someone with a

1    sharp ear might actually think there's a distinction.

2              THE LAW CLERK:  Or pervasive, I think it's an

3    "or", not an "and".

4              MS. CONNOR:  I think it's "or pervasive" as

5    well, I would oppose "and" and say "or".

6              MR. ANDREWS:  Case law says "and pervasive" up

7    and down and that there's a sliding scale and I think you

8    cover that by talking about all the factors to be considered,

9    but I think repeatedly in the case law it's severe and

10   pervasive.

11             MS. CONNOR:  I would disagree with that, your

12   Honor, in that there -- either element can be shown and that

13   it's not required both be shown.

14             THE COURT:  We'll take a look at it, I don't

15   disagree that it should say, have pervasive, it's a question

16   of whether it's and, or.

17             MR. ANDREWS:  That's really the important part

18   is the pervasive thing.

19             THE COURT:  Pervasive will be included, the

20   harassment was so severe, I note that on page 21 right at the

21   bottom, the last sentence, determine whether the conduct was

22   severe and pervasive, the same standards apply as in a Title

23   VII claim.  So we'll just, we'll double check that language,

24   pervasive will be added in one context or the other, either

25   and, or.  Section 4, page 20, and then we'll double check so

1    that the last sentence of that section on page 21, it will

2    read either and, or, depending on the determination of what's

3    most appropriate according to the law.  Okay.  So those two

4    will be looked at, but we will add pervasive in one context

5    or the other, in that section.  Okay.

6                        Proximate cause, anybody?

7                        MR. ANDREWS:  I did have one more thing in

8    that section again, very small and in that last sentence that

9    you just noted said severe and pervasive.

10                       THE COURT:  Yeah.

11                       MR. ANDREWS:  It says, "To determine whether

12   the conduct was severe and pervasive, the same standards

13   apply as in a Title VII claim."  I would ask that it say, "in

14   a Title VII hostile work environment claim," just because

15   there is also a discrimination claim and I think it just

16   makes it a little clearer what we're talking about.

17                       THE COURT:  Anybody have any objection to

18   that?

19                       MS. SHEEHAN:  No, your Honor.

20                       THE COURT:  So you're proposing a hostile

21   work, what's the --

22                       MR. ANDREWS:  Title VII hostile work

23   environment claim, so just adding the words hostile work

24   environment.

25                       THE COURT:  Work environment.

1    MR. ANDREWS:  And then --

2    THE COURT:  No objection to that by anybody?

3    MS. CONNOR:  No, your Honor.

4    MS. SHEEHAN:  No, your Honor.

5    THE COURT:  Okay.  We'll add that language.

6    MR. ANDREWS:  Again, with regard to really

7  this section, I know it comes up much earlier in the

8  instructions, but I think it's worth clarifying at this point

9  that to the extent there are allegations against the

10  individual defendants which is what this is about, that it

11  restate that the factors would have to be proved as to each

12  individual to find liability.

13    THE COURT:  You mean as to separate

14  defendants?

15    MR. ANDREWS:  To separate defendants because,

16  you know, we've talked, since we've talked about proving

17  against different defendants, we've gone through the Title

18  VII which can be an aggregate of acts, and I wouldn't want

19  them to think that Burge, Graham --

20    THE COURT:  Lump everything.

21    MR. ANDREWS:  -- and Mitchell together, you

22  know, that you can consider those as to the individual

23  liability.

24    THE COURT:  And you're proposing that where,

25  at the end?

1    MR. ANDREWS:  I would put a comma at the end
2  and say, so it says, "To determine whether the conduct was
3  severe and pervasive, the same standards apply as in a Title
4  VII hostile work environment claim, and must be proved as to
5  each individual defendant."
6    THE COURT:  I think that's a reasonable
7  request.
8    MR. ANDREWS:  And it's my last one.
9    THE COURT:  Anybody have any objection to
10  that?
11    MS. SHEEHAN:  No, your Honor.
12    MS. CONNOR:  No, your Honor.
13    THE COURT:  Okay.  That language will be
14  added.
15    MR. ANDREWS:  Thank you, your Honor.
16    THE COURT:  Okay.  Proximate cause.
17    MS. CONNOR:  Your Honor, with respect to the
18  third paragraph that starts on page 21.
19    THE COURT:  "Stated another way"?
20    MS. CONNOR:  Yes.  The second sentence there
21  says, "Since plaintiff's mental condition was preexistent,"
22  your Honor, we object to that in that I think it's improper
23  for the court to comment about whether plaintiff had a mental
24  condition that was preexisting.  I think it's -- the court is
25  commenting on the evidence and arriving at some conclusion

1   and I think that that's not proper and we ask that that be

2   stricken.

3             THE COURT:  Anybody want to be heard?

4             MR. KINSEY:  The testimony that came in

5   through Dr. First especially, he had reviewed her records and

6   talked to her about her condition from virtually her

7   childhood, and found that that condition and stressors

8   preexisted her joining DOCS and we have a stipulation that

9   this event in January of 2003 was not attributable to DOCS

10   and the court also gave a curative instruction with regard to

11   Eastern and that they were to ignore that condition as well.

12             So I think there's enough testimony that has

13   come in that the court can certainly say as Dr. First did,

14   and it was not challenged, that it was a preexisting

15   condition.  Certainly the jury should be allowed to consider

16   what portion of her overall mental condition is the liability

17   of the defendants.

18             THE COURT:  The danger is that it needs to be

19   clear to this jury that the plaintiff had this preexisting

20   condition.

21             MS. CONNOR:  And what condition is that, your

22   Honor?

23             THE COURT:  Well, that she had a mental,

24   emotional difficulties as a result of prior acts that

25   occurred to her which you stipulated to.

1    MS. CONNOR:  I stipulated to the acts, but

2 nothing to do with any mental condition as a result of the

3 acts, and that I believe that Dr. Alley, contrary to

4 Dr. First, testified that that -- that she did not have any

5 problems until she presented, mental condition, psychiatric

6 problems, until --

7    THE COURT:  That's not what he said.  He said

8 she was able to function at work.  He didn't deny that she

9 had prior issues, and that there were preexisting stressors

10 that she was having to deal with, including childhood sexual

11 abuse and then the sexual attack that occurred in January,

12 was it 2002 or '3?

13    MS. CONNOR:  '3.

14    THE COURT:  January 1st, 2003.  He didn't deny

15 that any of those things, what he did testify was that she

16 was able to cope, and she was able to deal with it at work.

17 But it, you know, the jury, considering those, that

18 situation, you know, I think correctly need to be directed

19 how to look at this prior -- these prior issues.

20    MS. CONNOR:  So your Honor, given what you

21 said, I disagree that Dr. Alley testified that she had a

22 mental condition prior to her -- at the end of December 2005,

23 just because she was able to cope is not testimony that she

24 had a mental condition.  And that I think that the term

25 mental condition sounds like she was mentally ill.  It

1    suggests that, I think it's an improper characterizing of the

2    evidence, and that this is -- this is a factual dispute that

3    the jury should decide rather than the court tell the jury

4    what to decide.

5                THE COURT:  We can certainly phrase it so that

6    it's within the jury's province and not saying it as a

7    conclusion.  What Mike has just suggested I think is probably

8    an appropriate amendment to language.  "To the extent that

9    you find that there was a prior condition," and then that

10   gives them the appropriate guidance from there.  It's theirs

11   to decide, and that way I don't say it as a, you know,

12   foregone conclusion.

13               MS. SHEEHAN:  If you're going rephrase it that

14   way, your Honor, can we then include mental condition?

15               THE COURT:  Yeah, to the extent that you find

16   that plaintiff --

17               MS. SHEEHAN:  Has a.

18               THE COURT:  -- has a prior existing mental

19   condition.

20               MS. SHEEHAN:  Thank you.

21               MS. CONNOR:  Your Honor, object to the term

22   mental condition as well, I think that that suggests, it's

23   like a medical conclusion.

24               THE COURT:  All right.  What words would you

25   suggest?

1                  MS. CONNOR:  That would be improper.  I would

2       suggest that the whole phrase there be struck.

3                  THE COURT:  I'm not going to strike the whole

4       phrase.  I'm very amenable to rephrasing it, but I don't

5       think it's appropriate to just strike that whole section.

6                  MS. CONNOR:  Well, I can't suggest alternative

7       language, your Honor, because I believe it should be struck,

8       I don't think that that should be suggested by the court,

9       that she had a preexisting mental condition.

10                 THE COURT:  To the extent that you find there

11      is evidence of a preexisting mental health condition,

12      preexistent mental health issues.

13                 MS. CONNOR:  I'm opposed to that language as

14      well, your Honor, I think it suggests that she had it.

15                 MS. SHEEHAN:  Mental health condition.

16                 THE COURT:  No, it's to the extent that they

17      find it, doesn't suggest that she had it, if you find.  Okay.

18      We'll adapt that language and we'll put it in there.

19                 MS. CONNOR:  Also, your Honor, at the top of

20      page 22, the court is saying in that sentence, the remainder

21      of that sentence that where it says, "the alleged conduct by

22      defendant caused her preexisting condition to get worse,"

23      that suggests that there's some sort of continuum.  I think

24      that the medical testimony is in dispute about that, and we

25      would ask that that then be stricken, and that there be

1  language that's much more neutrally stated where something

2  like, the alleged conduct by defendants caused her mental

3  injury.

4         MR. KINSEY:  Clearly if she has some injury,

5  be it physical or mental, then the liability only inures to

6  those actions that make it worse, you have to talk about what

7  was preexisting in order to get to causation and liability.

8  I don't know how else we would state it.

9         MR. ANDREWS:  I think as it's written it

10  reflects that there's a conflict in the evidence already,

11  saying that they have to find something by a preponderance of

12  the evidence.

13         MR. KINSEY:  Exactly.

14         MS. CONNOR:  Well, your Honor, the language

15  says defendant -- let me start.  Says she must prove by a

16  preponderance of the evidence that the alleged conduct by

17  defendants caused her preexistent condition to get worse, I

18  think that's the court saying in fact that she had a

19  preexisting condition rather than leave that to the province

20  of the jury.

21         THE COURT:  No, we're saying, if you find that

22  she had a preexistent condition, then the evidence, you know,

23  alleged -- must prove by preponderance of the evidence that

24  the alleged conduct of the defendants made it worse, should

25  you find she had one.  And we'll clean up that language but

1    that's basically what it's going to say.  We're going to

2    leave it in the province of the jury, we're not going to say

3    conclusively, we're going to say, if you find that she had a

4    preexisting condition, then there must be proof that the

5    conduct of the defendants made it worse.  It has to say that.

6    There is no other way to address this.

7                    What else?  Nothing more there?

8                    MS. CONNOR:  No, your Honor.

9                    THE COURT:  Okay.  How about affirmative

10   defense, qualified immunity, anything in that section?

11                   MS. CONNOR:  Your Honor, the plaintiff is

12   opposed to that entire section on the basis that it was not

13   pled in the answer.

14                   THE COURT:  I've already resolved that issue,

15   pretrial motions.  Anything else with regard to the language

16   there?

17                   MS. CONNOR:  No, your Honor.

18                   THE COURT:  Okay.  Damages.  Anything in that

19   first section of damages?  Compensatory damages?

20                   MS. CONNOR:  Yes, your Honor.  At the end of

21   the compensatory damages section which is A, we would request

22   at the top of page 26 before paragraph B begins, that the

23   court use language from the plaintiff's jury instruction on

24   page 16, and that says that, it begins on the bottom of page

25   15, you may award plaintiff reasonable compensation for the

1  following, there's certain items listed, being pain,

2  suffering, mental anguish and physical or emotional distress;

3  2, embarrassment and humiliation; 3, damage to reputation and

4  career; 4, loss of enjoyment of life, it is the plaintiff's

5  loss of ability to enjoy certain aspects of her life as

6  result of defendant's wrongdoing; and 5, other noneconomic

7  losses.  We ask that that be -- that your instruction on

8  compensatory damages be expanded to give those examples.

9         MR. ANDREWS:  We've got 32 pages of jury

10  instructions, and it's a lot to digest already, and to, you

11  know, state things that really should be argued to the jury

12  by counsel is unnecessary.

13         THE COURT:  Okay.  I'll take a look at it.  I

14  am mindful that, you know, I think the instruction is

15  accurate on the law as is, particularly in this area.  While

16  those are certainly items that you can argue, I don't know

17  that it's necessary that they be included in the charge.  I

18  will look at it again, and we'll make a decision on that

19  before we go forward.  Anything else?  Damages, lost wages,

20  back pay, front pay, anything in those sections?

21         MS. CONNOR:  No, your Honor.

22         THE COURT:  Mitigation of damages.  Any issues

23  there?

24         MS. SHEEHAN:  No, your Honor.

25         MS. CONNOR:  No, your Honor.

1          THE COURT:  Nominal damages?

2          MS. CONNOR:  No, your Honor.

3          THE COURT:  And punitive damages.

4          MS. SHEEHAN:  Your Honor, I think you reserved

5   on punitive damages, it was not pled in the complaint.

6          THE COURT:  It was not pled in the complaint,

7   and based on the testimony that's come in, it's the court's

8   view that the only possibility of anyone being considered for

9   punitive damages if the jury were to accept and given the

10  most liberal view of testimony with regard to defendant

11  Mitchell, and Mr. Andrews, I'll hear you.

12         MR. ANDREWS:  Well, your Honor, I think that

13  the evidence, I think as you stated in there, is thin with

14  regard to establishing sexual harassment, and obviously

15  punitive damages is a whole 'nother step up in standard, and

16  I don't think it's close.  I don't think there's anything

17  pled in the complaint that satisfies the standard, I don't

18  think there's any proof that came in.  You know, again, what

19  you had was in terms of sexual related conduct were two

20  statements that she said she didn't respond to, followed by

21  some statements five -- or I'm sorry, 13 to 14 months later,

22  that were really about himself and his family.  When she

23  protested, never again.  Stops.  How that could be disregard,

24  you know, blatant disregard or what the standard is of her

25  rights, I just -- it completely escapes me, your Honor.  And

again, to expose him to a judgment of punitive damages, when
there's a case with so many things going on and she's had so
many terrible things happen in her life, I don't think is
fair to defendant Mitchell.

THE COURT:  Okay.  Counsel, you want to be
heard?

MS. CONNOR:  Yes, your Honor.  I believe that
there is proof that defendant Mitchell acted with the
requisite state of mind of malice with respect to the
plaintiff and that if the jury could decide that defendant
Mitchell committed the acts alleged, that those acts
themselves speak to malice and that it also speaks to his
willful and reckless indifference to plaintiff's protected
rights, and that there -- if the jury finds that he did those
acts and that there's liability for those acts, that the acts
in and of themselves speak to the issue of the standard for
punitive damages and we request that it be left in the
instruction.

THE COURT:  Mr. Andrews, I don't have great
argument with your assessment of the proof in this case, but
the -- it's an assessment, and I think that to be safe, the
appropriate way to deal with this is to let the jury decide
it, and to hear it.  I am cognizant of your arguments and
while I may tend to sympathize with your position, I think
the more appropriate way to deal with this is, you know, if

1    you take the most liberal viewing of this evidence, a jury

2    may say that he had malice based on some of the alleged acts

3    towards her.  So I'm going to give this charge to the jury

4    and let them decide.

5              MS. SHEEHAN:  Your Honor, may you add, ask you

6    to add "as to defendant Mitchell" at the end of the first

7    paragraph.  I know the verdict sheet will be clear.

8              THE LAW CLERK:  We've already done that,

9    Judge, we changed it just to make it clear that it's as to

10   Mitchell.

11             MR. ANDREWS:  Your Honor, if I may just be

12   briefly heard, I think that makes it even more unfair for

13   him, you know, to single him out.  I understand you're saying

14   he's the only one it could be to, but on these facts --

15             THE COURT:  We point out that plaintiff also

16   seeks damages against defendant Mitchell, if you do not

17   award, you know, I don't think there's any other way to deal

18   with it than the way that we've dealt with it.

19             MR. ANDREWS:  I understand that.

20             THE COURT:  As to the other defendants, you

21   know, there's really no basis whatsoever to give the charge

22   and I know you make the same argument with regard to

23   defendant Mitchell, but again, I think the appropriate way

24   is, you know, if this jury should find, you know, that

25   there's malice, that they need to be given the opportunity at

```
1    least to consider this.  So I'm going to do it.
2              MS. SHEEHAN:  And if it will make you feel
3    better, Mr. Andrews, I mean the verdict sheet number 7 is
4    only going to have your defendant's name on it anyway so it
5    won't be any secret to the jury.
6              MR. ANDREWS:  No, I understand that.  What I'm
7    really saying is it heightens my concern that it be included
8    at all, not the particular language, I know there's no other
9    way to deal with the language.  I understand that.
10             THE COURT:  I understand your concern,
11   Mr. Andrews, and thought long and hard about it last night as
12   to whether it was appropriate to give it at all.  But I think
13   based, again, on a liberal view of the evidence in
14   plaintiff's favor, that it needs to be given.  Anything else
15   with regard to the charge?  Okay.  Let's head back to the
16   courtroom, get ready for closing statements.  Yeah, go ahead.
17             MS. SHEEHAN:  Your Honor, two quick comments
18   about the verdict sheet.
19             THE COURT:  Oh, I'm sorry, the verdict sheet,
20   all right.
21             MS. SHEEHAN:  Number II, damages, page 3.
22   Question number 3, did plaintiff prove by a preponderance of
23   the evidence that she sustained an injury, can we add
24   "attributable to defendants"?
25             THE COURT:  Where are we talking again?  I'm
```

1  sorry.

2            MS. SHEEHAN:  Page 3, number 3.

3            THE COURT:  Did plaintiff prove by

4  preponderance of the evidence that she sustained an injury

5  attributed to defendants, it has to be any injury first and

6  then I think you get to that afterwards, don't you?  The

7  progression, the next one is causation.  First of all, is

8  there any injury, that's the first step.  Did she have an

9  injury, is there evidence to establish that, and then if they

10 say yes, then you go to causation, that the act or omission

11 alleged in the claim or claims -- find was the proximate

12 cause of the injury and/or emotional distress that she

13 suffered.

14           MS. SHEEHAN:  Does that have to be sexual or

15 gender based?

16           MS. CONNOR:  I don't think that belongs in a

17 verdict form, your Honor, what counsel --

18           MS. SHEEHAN:  Right, I'm not ... in the claim

19 or claims of sexual or gender based, claims regarding sexual

20 harassment or gender bias, for which you find in favor of

21 plaintiff was the proximate cause of injury or injuries

22 and/or emotional distress that she suffered.

23           MS. CONNOR:  I think the jury --

24           THE COURT:  Go ahead.

25           MS. CONNOR:  Your Honor, I think the jury

1    instruction covers that, and to add that to a verdict form is

2    not necessary and would complicate it as well.  I think that

3    using the word claim or claims would encompass those, what

4    counsel is saying, and that this -- this form does cover and

5    directs the jury in the order of decisions.

6                    THE COURT:  It really is about directing them

7    through the process of how they make their decisions and not

8    instructing them once again on the law.  But we'll take a

9    look at it.

10                   MS. SHEEHAN:  Because the problem is, so many

11   of the incidents that plaintiff testified to have nothing to

12   do with gender bias or sexual content, we heard a lot about

13   overtime, taping of glasses.

14                   THE COURT:  We'll take a look at it.  Let me

15   talk to the clerks about it.  My concern is I don't want to

16   get into instructions again in a verdict form.  It's a

17   step-by-step process of how they have to decide this, and

18   we've already instructed them on, you know, what they should

19   consider in making those decisions, so -- but we'll take a

20   look.

21                   MR. ANDREWS:  I do have something that I think

22   speaks to the process and it's kind of related to the concern

23   I expressed about the instructions which is in 2a, did

24   plaintiff prove by preponderance of evidence that one or more

25   of the defendants, Burge, Graham and/or Mitchell sexually

1    harassed her, I think it lends itself again to the

2    interpretation one or more of defendants that, you know, it

3    could be together, that it could be the combination of them.

4    So I would propose that it say, Burge, Graham, and/or

5    Mitchell individually created a hostile work environment.

6    And that's the other thing, I think hostile work environment

7    is a little more appropriate given the instructions than

8    sexually harassed.  But do you understand what my main point

9    is?  When you read it by preponderance of evidence that one

10   or more of them sexually harassed her, it leads I think to

11   the inference, it leads pretty directly to the suggestion

12   that you can combine the conduct to find that they create a

13   hostile work environment when under Section 1983, it has to

14   be a finding against each of them individually.  And this is

15   of course the written thing that they're going to have in

16   there assuming they're not going to have the jury

17   instructions.

18                    THE CLERK:  They have the jury instructions.

19                    MR. ANDREWS:  They do have the jury

20   instructions, okay.  Well, still, it's what they're going to

21   be looking at when they make the decision.

22                    THE COURT:  So your proposed change would be

23   that --

24                    MR. ANDREWS:  To -- I'm sorry.

25                    THE COURT:  Go ahead.

1    MR. ANDREWS:  After Mitchell, strike "sexually

2  harassed her" and insert "individually created a hostile work

3  environment."

4    MS. SHEEHAN:  Your Honor, I disagree.  I like

5  the idea of keeping it sexual, sexually harassed her.

6    MR. ANDREWS:  That's not my main point, I

7  think hostile work environment is more appropriate

8  personally, but I'm not -- that's not really what I'm getting

9  at.

10    THE COURT:  All right.  We'll take a look.  I

11  do tend to agree that to separate them out, that there has to

12  be an individual determination against each of them, and

13  that's why we have them listed, Burge, yes/no, Graham,

14  yes/no, Mitchell, yes/no.

15    MR. ANDREWS:  But you could decide --

16    THE COURT:  That's an individual

17  determination, it's not a determination of all of them.

18    MR. ANDREWS:  But in your mind you could

19  decide that Burge and Mitchell together did if you count

20  those up, you know, so you know what I mean?

21    THE COURT:  Yeah, I get your point.

22    MS. CONNOR:  Your Honor, may I suggest that

23  with regard to that section, that the language could be

24  added, to sexually harass and/or created -- sexually harassed

25  and/or created a hostile work environment, put both in there.

1           MR. ANDREWS:  I think that's completely

2    misleading, suggesting there's a separate standard.

3           THE COURT:  Okay.

4           MR. ANDREWS:  You know, I suggested hostile

5    work environment because that's really what the instructions

6    I think mostly talk about in terms of what needs to be

7    established, but you know, again, that's not my main point,

8    but to put both, you make it sound like there are alternative

9    findings that could be made, I think is way misleading.

10          THE COURT:  Okay.  We'll take a look and

11   we'll -- we're going to change a little bit with regard to

12   just the -- certainly with regard to their individual,

13   individual assessment of all of them, if it's not clear we'll

14   try to make it more clear.  But again, we're talking about a

15   verdict form and not instructions.  So we've got to keep that

16   in mind.

17          MR. ANDREWS:  Okay.

18          THE COURT:  All right.

19          MR. ANDREWS:  Thank you, your Honor.

20          THE COURT:  Okay.  I'll see you in the

21   courtroom.  I knew I should have told that jury 10:00.

22          MS. CONNOR:  Your Honor, could we have a

23   personal break before the --

24          THE COURT:  Yeah, go ahead now before you get

25   started, do what you need to do and then we'll meet you in

1  the courtroom.

2                    (Proceedings in chambers adjourned, 9:54 a.m.)

3                    (Court in recess.)

4                    (Open Court, Jury Out, 10:17 a.m.)

5                    THE COURT:  Okay.  I think we've got the

6  charge, everything addressed and it's being amended to

7  address some of your concerns, not all of your concerns but

8  some of them, and we'll have that to you as soon as we can,

9  okay.

10                    Are we prepared to bring the jury in and do

11  closing arguments?

12                    MS. SHEEHAN:  Yes, your Honor.

13                    MS. CONNOR:  Yes, your Honor.

14                    MR. ANDREWS:  Prepared, your Honor.

15                    THE COURT:  Okay.  Let's bring the jury in,

16  please.

17                    (Jury Present, 10:17 a.m.)

18                    THE COURT:  Okay.  Good morning, ladies and

19  gentlemen.  We have the ladies and gentlemen of the jury,

20  plaintiff, plaintiff's counsel, defendants, and defense

21  counsel.  You know, one of the things my wife always tells

22  me, and I'm going to put this the nicest way I can, what she

23  says about me is I'm optimistic about time, overly optimistic

24  about time, and how long it's going to take.  I was thinking

25  yesterday I should tell you 10:00, and I was optimistic about

1   being done quicker, and being able to get to you by 9:30.  I

2   apologize for the delay and making you wait back there.

3   We've taken care of a large number of legal issues, both

4   yesterday afternoon after you left and then again this

5   morning, so we're ready to go.  And we're going to do --

6   we're going to have closing arguments at this point, we're

7   going to have three closing arguments, from state defendants,

8   Mr. Mitchell, and we'll hear from Ms. Connor on behalf of the

9   plaintiff.  Okay, are we ready?

10              MS. SHEEHAN:  We're ready, your Honor.

11              THE COURT:  Go ahead.

12              MS. SHEEHAN:  Good morning.  I believe there's

13  at least one thing about this case that everybody who has

14  attended trial over the last seven days can agree, that this

15  is a sad case.  This is a sad case because plaintiff has

16  experienced two life-altering events that most of us are

17  lucky enough to never have to experience one of them.

18              Childhood sexual assault.  And a sexual

19  assault as an adult.  Plaintiff has problems associated with

20  these events, but these problems were not caused by the

21  defendants.  Defendants had no involvement in the childhood

22  abuse, and you heard the judge read you the stipulation that

23  the parties have entered into, that DOCS is not responsible,

24  liable, and was not involved in the sexual assault that

25  occurred January 2003.

1    DOCS hired Ms. Collins when she was 41 years

2  old.  She came with problems.  She came with the history that

3  she never disclosed to DOCS.

4    Why did she want to work for DOCS?  Because

5  her husband was losing his job or he was getting laid off and

6  she needed the money, the benefits, the pension.  Perfectly

7  reasonable.  And she wanted a flexible schedule to go to

8  school.  At 41 years old, knowing -- she knows her history,

9  she chose a job in an environment that at this time is

10  predominantly a male environment.  That's the staff.  Let's

11  talk about the inmates.  She chose to insert herself in a

12  very violent environment, potentially violent environment.

13  Prison.  And she worked at maximum security prisons that held

14  males that are the most notorious and most violent criminals

15  in the state of New York.  That was her choice.

16    Let me start talking, talk about the female

17  handbook.  We heard a lot about that.  The handbook cautions

18  females about spreading rumors, gossipping, jealousy, and

19  suggests eating ice cream.  Well, plaintiff received that

20  handbook at the academy.  She never complained about the

21  handbook at the academy.  She never complained about the

22  handbook at Sing Sing.  She never complained about the

23  handbook at Sullivan.  She never complained about the

24  handbook at Auburn.  She complained about the handbook during

25  Mary Mayville's investigation of her complaint in November of

1   2005.  Notwithstanding all that, there was no evidence

2   submitted, presented during this trial of any connection

3   between that handbook and the conduct that she testified

4   occurred.

5               Mary Mayville testified, she was the woman

6   with the short white hair, from diversity management, she

7   testified that the book had some good points.  She didn't use

8   it during her training because she didn't like the fact that

9   it wasn't gender neutral.  She wasn't required to use it.

10  She sat on a committee, the diversity committee that rewrote

11  the book.  And what was the revision they made to the female

12  manual?  They made it gender neutral.  So the book was that

13  awful that they decided it would be beneficial for men to

14  also receive it?

15              Plaintiff received approval from

16  Superintendent Burge to become a diversity trainer.  He also

17  approved for her to sit on the diversity committee, and her

18  testimony was, I sat on the committee, I attended two

19  meetings but they didn't have enough power, so I didn't

20  attend any more meetings.  Well, Mary Mayville testified that

21  that committee rewrote the manual.  Sounds like a pretty

22  worthwhile committee.

23              Superintendent Burge, what's his involvement

24  in this?  Handling one grievance that complainant filed with

25  her union.  She filed a grievance with her union over seven

1    minutes of overtime, and that Sergeant Wright yelled at her.

2    Her union, step 1 handled the overtime issue, and referred

3    Sergeant Wright yelling at her to diversity management.

4    Diversity management conducted an investigation, and found

5    that her claims were unsubstantiated.  The documents are

6    going to go back to you in the jury room, and that document

7    from diversity management stating that Ms. Collins'

8    allegations that Sergeant Wright yelled at her can be found

9    in D24F.  That is the extent of Superintendent Burge's

10   involvement.  He never, and you heard it straight from

11   Ms. Collins, he never sexually harassed her, created a

12   hostile work environment, or discriminated against her based

13   on sex.

14            Let's talk about the Department of

15   Corrections.  The Department of Corrections, no dispute, had

16   a system in place to handle complaints involving sexual

17   harassment and discrimination based on sex.  They have a

18   whole office, it's called diversity management.  A whole

19   division dedicated solely to handling these complaints.  But

20   there's no evidence that plaintiff availed herself of this

21   office.  She did not file complaints with them.  The

22   superintendents or the unions brought Ms. Collins' complaints

23   to the office of diversity management.  You heard testimony

24   that diversity management had a policy to suspend

25   investigations while somebody was out on stress leave.  Well,

1  that didn't happen here.

2  Plaintiff met with Superintendent Graham on

3  November 9th, 2005.  Twenty-seven days after he became

4  superintendent.  On November 10th, plaintiff gave defendant

5  Mitchell a to-from memo listing a number of complaints she

6  had with him, and she gave, I believe it was the watch

7  commander a copy.  And the person she gave the copy of that

8  memo to called Superintendent Graham, Superintendent Graham

9  asked that that memo be read to him over the phone, and he

10  instructed the individual to put the memo in his office and

11  lock the door.  What did the superintendent do the next day?

12  He sent the memo to the office of diversity management.

13  November 29th, 2005.  Mary Mayville took

14  plaintiff's statement regarding her memo, and the complaints

15  in the memo.

16  On December 7, 2005, plaintiff goes on medical

17  leave.  She's on leave.  January 25th, 2006, Mary Mayville

18  interviews and gets a second statement from plaintiff.

19  February 13th, 2006, Mary Mayville is

20  conducting her interviews with the two or three other people

21  she brought with her and she interviews Superintendent

22  Graham.

23  Plaintiff goes back to work March 27th, 2006.

24  There was no delay in diversity management's investigation of

25  her complaints.  Plaintiff did not go back to work at Auburn.

1    She never stepped foot inside Auburn again after December 7,

2    2005.  She went to Eastern.

3               You heard plaintiff's counsel on a number of

4    occasions refer to Superintendent Burge and Superintendent

5    Graham's referral of complaints to the office of diversity

6    management as paper pushing.  It's not paper pushing.

7    Exhibit D6 is a copy of the Department of Corrections

8    directive for diversity management complaints, and this will

9    go back to the jury room with you.  B1, a copy of any

10   complaint of discrimination received by a facility

11   superintendent via another agency such as a New York State

12   Division of Human Rights or the U.S. Equal Opportunity

13   Commission shall be forwarded to the office of diversity

14   management.  The superintendent shall include any

15   documentation relative to the complaint.  This directive

16   tells him he doesn't have a choice.  The word "shall" means

17   he has to do it.  And that's what he did.

18               The creation of the diversity management, the

19   existence of the diversity management office makes sense and

20   good business practice for the Department of Corrections.

21   They have a group of people that are investigating complaints

22   of things that happen in facilities versus the facilities

23   investigating complaints about themselves.  It also gives

24   Department of Corrections a central depository of all

25   complaints so they know what's going on in their system.

1    They have 60 to 70 correctional facilities, and they can go

2    to one office.  Commissioner can go to one office and find

3    out what problems are we having in the whole system.

4            Let's talk about Superintendent Graham.  You

5    heard Mary Mayville testify that when she concluded her

6    investigation, she told Superintendent Graham, here is a list

7    of things that I want fixed.  I want everything fixed and I

8    want it fixed in two weeks.  I'll be back in two weeks.  And

9    what happened?  She came back in two weeks, and everything

10   was fixed, except for the bathroom keys for a bathroom that

11   had to remain locked because inmates pass by and for security

12   reasons, that could not be fixed.

13           Sandra Downey and I'm sure others testified

14   the main priorities of DOCS is health and safety of the

15   staff, the inmates, and security.  Corrections officers, they

16   are the only people that stand between criminals and you and

17   me, and everyone in this courtroom.

18           In addition to doing everything Mary Mayville

19   asked him to do, Superintendent Graham was asked by Mary

20   Mayville's supervisor, Charles Harvey, to send memos to the

21   training -- weapon training officers, regarding their conduct

22   and immature language.  He did that.  Charlie Harvey gave him

23   a sample of a memo that he wanted sent, and that's the memo

24   that Superintendent Graham sent.

25           We heard about a number of issues, and what's

1    important here is, are incidents involving sexual harassment

2    and gender discrimination.  We heard about condoms in a

3    lunchbox.  Plaintiff had no knowledge, no idea who put them

4    there, and I submit that's not gender based.

5                    Items thrown onto a plexiglass, onto

6    plexiglass, it's not sexual in nature.  It's not gender

7    based.

8                    She testified about hangups at Sullivan,

9    attempted to -- oh, and we heard Lieutenant, then Sergeant

10   Hoefling testified he tried to trace those calls but he

11   couldn't get the machine to work.  That's not sexual in

12   nature, that's not gender based.

13                   We heard about complaints that there's no

14   female locker room.  Well, we heard Sandra Downey tell us,

15   superintendents have no control over capital expenditures and

16   the construction of a new locker room is considered a capital

17   expenditure.

18                   We heard about Ms. Collins' rear end being

19   grabbed while she was walking up the stairs, but she made no

20   effort to ID the person, and she never availed herself of the

21   system in place at DOCS to handle, if she would have filed a

22   complaint, diversity management.  She didn't file a complaint

23   with diversity management about that incident.

24                   We heard about her pictures being defaced.

25   Curly hair, beard, admin. transfer, I submit that's not

1    gender based or sexual in nature.  We heard the

2    superintendent, he had his picture defaced.  Gave him a nose

3    6 inches off to the one side.

4                We heard a lot of testimony about glasses

5    being taped, not sexual in nature, it's not gender based.

6                We heard about Lieutenant Keenan offering her

7    an Italian sausage.  Well, who did she report that to?

8    Sergeant Hoefling.  A subordinate of Lieutenant Keenan.  She

9    didn't report it to a captain, and Sergeant Hoefling didn't

10   report it.  Sergeant Hoefling isn't being sued here.

11   Lieutenant Keenan isn't being sued here.

12               We heard about rumors that she was sleeping

13   with Sergeant Hoefling and Sergeant Bennett.  I don't think

14   it's gender based, it involves men and women.  Plaintiff

15   could not mention or identify one individual who spread the

16   rumor or who she heard the rumor from.  She did testify that

17   the rumors did not last long.

18               Well, we have the officer pass gas at her and

19   then turned and passed gas at the inmates.  Crude, sophomoric

20   behavior, yes; gender based, sexual, no.

21               We have Officer Tenori in Sing Sing who said

22   he would hook up with her before she left.  She never

23   reported that to anyone.  He's not being sued here.

24               We have Officer Germain who at academy

25   training said, women are hiding in the back, they can't keep

up. Personally it sounds like an observation. It's not
sexually based.

We heard about her time cards were missing.
She had no personal knowledge of what happened to the time
cards. It's not sexual based, it's not gender bias, but what
we do know is Ms. Collins admitted witnessing someone else's
time cards being destroyed, she did nothing about it. She
didn't interfere and she didn't file a complaint.

Ms. Collins only cared about the incidents
that affected her. Jokes, rumors, and graffiti. These
events were okay to happen to everyone else, but not her.
It's interesting, um, while she was at Auburn, there was a
female deputy superintendent, Superintendent O'Mara, and we
heard no testimony that she ever spoke to Superintendent
O'Mara about her issues, sexual assault or gender bias.

Plaintiff was transferred to a number of
facilities. Each and every transfer was at the request of
Ms. Collins. She asked to be transferred from Sing Sing to
Sullivan, from Sullivan to Auburn. We have the actual
transfer papers from Auburn to Eastern, and interestingly
enough, although Sullivan, we heard about all the horrible
things that happened there, what does she do in 2009? She
files for a transfer to go back to Sullivan. And her
testimony was, yes, her son was a corrections officer at
Sullivan, and she wanted to work with him.

1          We heard about complaints she had at Sullivan

2   and the superintendent of Sullivan isn't being sued here.

3          We heard about her transfer to Eastern, and

4   then Lieutenant Mitchell showed up, and that's where she

5   really had the breakdown and never went back to work again.

6   Superintendent of Eastern isn't being sued here.

7          Plaintiff does not have PTSD.  And you heard

8   that from the author of the DSM, Dr. First.  She told

9   Dr. First during the six-and-a-half-hour evaluation about her

10  childhood abuse, but she never mentioned the sexual assault.

11  When Dr. First was told about the sexual assault and he added

12  it to the equation, he testified he still -- his opinion was

13  still that she did not have PTSD.  And he unequivocally

14  stated that she could and would get better with help.  But

15  she never sought help, she never sought counseling, except

16  for a few isolated incidents.

17         Dr. Alley testified that the plaintiff asked

18  him to not put certain things in her medical records.  Did

19  she not want to make a record because it would hurt her

20  lawsuit?  We'll never know.

21         We do know there were other stressors in her

22  life.  Marital problems, financial problems, her father

23  passed away.  Her last child went off to college.  I don't

24  think anybody disputes they're true stressors in the world.

25  Plaintiff testified that she did seek the help of a licensed

social worker and she saw him a number of times.  Ray

Chernikoff [sic] (phonetic).  We heard nothing about her

meetings, counseling, with Mr. Chernikoff.  Dr. Alley had no

knowledge about her treatment with Ray Chernikoff.

Dr. Reagles, the damages person, had no information about her

seeing Ray Chernikoff and our expert, Dr. First, had no

knowledge.  She didn't tell anyone and she didn't mention him

to you.  She mentioned she saw him but we don't know what the

result of what she saw him for.

What is in the medical records, as Dr. First

opined, does not support plaintiff having PTSD.  What has the

plaintiff done -- what did she do when she left DOCS, 2009?

We know she now has a degree in family and marriage

counseling, I believe it's a master's.  And she's pursuing

that career.  There was no evidence presented that she

attempted to find commensurate work, any other job in any

form any way.  All we know is that she went to school.

I want to talk to you a little bit about

damages.  Dr. Reagles did an analysis of damages, and he

starts with this chart, table 1.  These exhibits have not

been moved into evidence, but these are the exact charts that

are in Dr. Reagles' report that will go back with you to the

jury and that will be Exhibit P81.  Table 1 -- you know what,

I'm going to start with table 2, see how fast this will go?

Except for the accountants, I know this is -- table 2, where

1    Dr. Reagles lists for you Ms. Collins' salary levels.  Well,

2    we heard Ms. Downey testify Ms. Collins wasn't hired at the

3    hiring rate.  She was hired at the training rate which is

4    lower.  Every one of these numbers is incorrect.

5             Table 3.  Her estimated value of past loss of

6    earnings, well, the numbers he started with with her

7    estimated earnings are wrong, these are wrong, and in

8    addition, he added $2,386 a year in guaranteed overtime, and

9    you heard Ms. Downey testify there's no guarantee of

10   overtime.

11            Table 4, this is estimated future and present

12   values of expected earnings.  Well, it follows that scenario

13   one, her projected salary and what she would need to be paid

14   to be invested to bring her whole to date.  Well, we know all

15   the salary information is incorrect so we know scenario one

16   is incorrect.  And what do we know from Sandra Downey's

17   testimony?  Ms. Collins never sat for the last sergeant's

18   exam that was offered while she was still employed so she

19   never had a chance of becoming a sergeant.  You can't become

20   a sergeant without taking the exam.  Scenario two is

21   completely irrelevant.

22            Estimated future and present values of

23   residual earnings.  Well, notwithstanding the fact that he

24   started with the incorrect wages, he appreciated, there's

25   already incorrect wages, by the average cost of living.

1    Well, Ms. Downey testified that the raises and increases that

2    DOCS employees receive are from the negotiating contract,

3    percentages that are negotiated in union contract.  Table 5's

4    wrong.

5              Table 6.  Net loss of future expected

6    earnings.  It's all based on incorrect numbers.  It's

7    starting from the salary calculations that he made that are

8    all incorrect.

9              Table 7.  Estimated past loss of pension

10   benefits.  He calculated that at 8 percent of her expected

11   wages, well, we know his calculation of wages is incorrect.

12   So now we have table 7 along with the others, are incorrect.

13             Table 8.  Estimated future and present values

14   of loss of pension benefits.  I'm going to make the same

15   argument I just made.  These are all calculated, one, the

16   sergeant scenario is completely irrelevant, she never had a

17   chance of being a sergeant and these are all -- these

18   calculations are all based on her expected salary which

19   Dr. Reagles used the wrong salary information.  When you see

20   Dr. Reagles' report, you're going to notice that the only

21   contract that he mentions is the CSEA contract.  Reasonable

22   person could conclude that he used the wrong union contract

23   in calculating his charts.

24             Loss of terminal leave benefit.  Sandra Downey

25   testified no such benefit exists in the NYSCOPBA union

1   contract.

2           The next two tables -- oh, this table is

3   Dr. Reagles' specialty.  Life care plan.  He estimated about

4   11,000 for psychiatric care.  Care there's been no evidence

5   she ever sought, she ever received or she's receiving now.

6   Personal adjustment counseling.  Same thing.  There was no

7   evidence that she ever received that care, she's going to

8   seek that care, or she is seeking that care now.  The

9   medications, well, he calculated them at the highest brand

10  price, never taking into account that it might go generic and

11  we all know what happens with prescription drugs when they go

12  generic.  We like that couple-dollar copay instead of paying

13  $50 for a brand.  I don't think there's any evidence that

14  she's still on these medications.  I thought the lorazepam

15  hurt her stomach.  This life care plan has no relevance to

16  Ms. Collins' current situation, or past situation.  She

17  didn't seek these services.

18          Plaintiff's counsel's opening, she told you

19  that she was -- that plaintiff was here to seek justice.  And

20  this is sad, but she can't seek justice here for the

21  childhood abuse or the sexual assault.  What she's seeking

22  here from DOCS and from the defendants, if you look at

23  Plaintiff's 1, it's the complaint, and the last page tells

24  you she's looking for equitable relief for all back pay and

25  benefits, an award of all costs and disbursements in

1 prosecuting this action, and compensatory damages maximum

2 amount allowed by law or a minimum of a million dollars.

3 You heard Dr. Alley and Dr. First opine Miss

4 Collins needs counseling. The testimony is she never sought

5 counseling except for one or two sessions here and there and

6 she isn't currently seeking -- we don't have any evidence in

7 the record that she's currently seeking counseling. No

8 amount of money is going to cure Ms. Collins until she

9 decides she wants to be cured or she wants to seek help.

10 I think it's reasonable from the evidence that

11 the defendants did not create a hostile work environment by

12 discriminating against her or by sexually abusing her

13 sexually.

14 I'm going to circle back to Assistant Attorney

15 General Kinsey's opening, in which he said the defendants

16 can't fix what they don't know. There are only a few

17 incidents of that whole list of incidents I gave you, and I

18 will tell you, I'm sure I've missed some, very few of them

19 made it to complaint stage and the ones that did were turned

20 over to diversity management by Superintendent Burge or

21 Superintendent Graham. She didn't name any of the officers

22 involved in those incidents except for defendant Mitchell.

23 She never told DOCS about her history, she, just like

24 Sergeant Hoefling, she told him and asked him please don't

25 report all these incidents that I'm telling you about. She

1   asked her doctor not to report.  All these things are being

2   kept a secret, and the defendants can't fix what they don't

3   know.

4           I think the testimony is pretty persuasive

5   that plaintiff didn't have the demeanor, the temperament, or

6   the emotional stability to be a corrections officer.  We

7   heard a number of times where plaintiff broke down in the

8   prison over an incident that a reasonable person would not

9   have.  Her picture, when she found her picture was defaced

10  with curly hair and a beard, or the one with the

11  administrative transfer written across it, she admitted she

12  became upset, totally stressed, and could not stop crying.

13          Superintendent Graham, he said it the best.

14  If you walk into a prison and the hair on the back of your

15  neck doesn't stand up, you don't belong in corrections.

16          Second to military service, jury duty is the

17  most important service you can give to your country.  God

18  willing this Friday, my son will return from Afghanistan, and

19  that was -- he's a fighter pilot with the Air Force and

20  that's a career he chose.  Each and every one of you, none,

21  you didn't choose to be jurors, sort of the jury system

22  selected you, and thank you, because I hope if you take only

23  one thing away from this experience, it's that you're the

24  only reason our system works.  There's a reason why everyone

25  in this courtroom stands when you leave -- when you arrive

1  and when you leave.  We just took seven days and counting of

2  your life away from you, from your family, from your school,

3  from your home, from your work.  Thank you.  The system, it

4  may be imperfect, but it's the best one in the world.

5          On behalf of defendants, Assistant Attorney

6  General Roger Kinsey and I would like to ask you to please

7  find that defendants did not create a hostile work

8  environment, did not violate any of her, plaintiff's

9  constitutional rights, and that we ask you to find in favor

10  of the defendants in this case.  And we call it a no cause.

11  Thank you.

12          THE COURT:  Mr. Andrews.

13          MR. ANDREWS:  Your Honor, ladies and gentlemen

14  of the jury.  In my opening statement, I told you that the

15  contacts between the plaintiff, Ms. Collins, and defendant

16  Mitchell were few and far between.  Even if you believe all

17  of her allegations, I think that representation has been

18  borne out by the evidence, and as you'll hear when I talk

19  about the law a little bit and when the judge talks about the

20  law, that's a really important thing.  So I wanted to remind

21  you that that's where we started, and I think that's more or

22  less where we're going to finish.

23          Troy Mitchell was at the wrong place at the

24  wrong time.  The day after Ms. Collins met with the

25  superintendent of the prison, and he could not satisfy her

1    with regard to her complaints and he, you know, conceded that

2    yes, she had the right and the opportunity to sue in federal

3    court, the next day, Ms. Collins was assigned to Troy

4    Mitchell's area.  On that day, she alleges that certain

5    statements were made, and I would suggest that that was to

6    support this lawsuit, to create a claim, and I'm going to

7    talk a little bit about specific reasons why I believe you

8    should not credit the plaintiff's testimony.

9              But my closing statement is going to take two

10   parts.  First I'm going to talk about kind of those

11   credibility issues a little bit, what are some things you can

12   look at in deciding who's telling the truth; and secondly, I

13   am going to talk about the law some.  And the reason why I'm

14   going to do that is because even if you credit all of

15   plaintiff's allegations, they don't add up to the type of

16   severe and pervasive conduct that is necessary to support a

17   claim of hostile work environment.  And what the plaintiff

18   has done is brought an individual claim against Troy Mitchell

19   for hostile work environment, so she has to prove that he

20   created a hostile work environment as to her, and the

21   evidence, there's simply no construction of the evidence that

22   supports that.

23             Let's start with the facts alleged by

24   plaintiff, and I'm going to go in chronological order and

25   again point out some things you might consider in deciding

whether to believe these allegations or not.

The first thing she alleges happens was in June of 2004 when Troy Mitchell allegedly said that women do not belong at Auburn. I'm going to move this a little bit, your Honor, if that's okay.

THE COURT: That's fine, wherever you like.

MR. ANDREWS: Out of my line of sight would be terrific. Now, as is true of virtually every allegation against Troy Mitchell, plaintiff has not produced any witness to corroborate her testimony to support her burden and the burden does rest with her, of showing that this incident happened. It's also worth noting that this allegation against Troy Mitchell that he said women don't belong at Auburn was not raised by plaintiff at any time. Not only did she not raise it on November 10th in the memo, it was after that, so she had made numerous complaints about many things, she never mentioned Troy Mitchell's name and even in her November 10th memo when she complains about things that allegedly happened on that day, and about things that allegedly happened in the past, no mention of this allegation. In fact, this allegation does not crop up until after she brings her legal claim in January of 2006.

The next incident is the September or October 2004 statements about an inmate's private parts, okay. I think you know the testimony I'm talking about.

1    Once again, there's no evidence corroborating it, and once

2    again, plaintiff brought numerous complaints prior to

3    November 10th, 2005, written complaints, verbal complaints,

4    none of the written complaints mentioned Troy Mitchell's

5    name, there's no evidence that any of the verbal complaints

6    ever mentioned this allegation against Troy Mitchell or any

7    other allegation against Troy Mitchell.

8              Now, the next incident alleged happened in the

9    spring or early summer of 2005, and this is the wallet

10   incident and I'm a little bit at a loss as to why we have to

11   discuss this at all, given that the plaintiff admits that she

12   was wrong, she did something she wasn't supposed to, she

13   violated policy.  You know, she complains that Sergeant

14   Mitchell, then Sergeant Mitchell removed the wallet from her

15   bag but admits that if he saw it as he testified,

16   uncontradicted, that he did, that he had a responsibility to

17   do that.

18             Now there's no corroborating testimony once

19   again, but what else, you know, can we look at to decide if

20   she's telling the truth or not?  And what I would suggest is,

21   her claim that she called him a liar when he told her that he

22   had found her wallet.  Now she claims that he said he found

23   it in the trash which he denies, but let's assume that's

24   true.  How could she know that he was lying as to how he

25   found the wallet when she had no knowledge of how he found

1    the wallet?  She admits she wasn't there.  She admits the

2    wallet wasn't in her possession.  She could have no idea how

3    Troy Mitchell came into possession of that wallet.  And when

4    I asked her on the stand to explain how she could possibly

5    have thought he was lying at that point in time, how she

6    could justify that statement, which Troy Mitchell denies was

7    even made, she sat there quietly.  She had no answer, because

8    it's not true.

9         The next allegations involve the episode on

10   November 10th, 2005.  I don't think I have to point out to

11   you again, but I'm going to anyway, this is the day after the

12   meeting with the superintendent where he said, if you're not

13   satisfied with the response, you can sue.

14        Now, there are some things that we can agree

15   happened that day.  Not only did she have some motive to come

16   up with some allegations because of the superintendent's

17   statements the day before, we all agree that her glasses were

18   taped on that day, she was very upset about that, and she was

19   very angry at Troy Mitchell that he would not relieve her

20   from duty.  She said she was angry about it.  She said she

21   was angry about the taping, she was upset he wouldn't relieve

22   her from duty so not only does she have some motive to create

23   some allegations, she has motive against Troy Mitchell to

24   create some allegations.

25        Once again, I would point out that she's

1    presented no evidence, no corroboration to support her side

2    of the story with regard to this, and what I would ask you is

3    this:  She talked about how upset she was at Troy Mitchell

4    making some comments about his gastrointestinal system, about

5    walking around naked in front of his family, about commenting

6    on his mother's breasts, and about commenting on his wife

7    losing something up his rear end.  These are people, as we've

8    heard throughout this proceeding, who on a daily basis are

9    exposed to violence, all sorts of gross behavior, prisoners

10    masturbating in their cells, you know, is this really

11    something that is gonna send a prison guard who belongs in

12    that environment over the edge?  That's gonna make her so

13    upset that these things left her supposedly unable to

14    function?  I would suggest to you that's simply not credible.

15                Now there's some other incidents alleged on

16    November 10th, 2005, and although they have absolutely no

17    sexual content to them, I think they are important in terms

18    of your deliberations, in deciding who's telling the truth in

19    this proceeding.  Ms. Collins talked about some hangup calls

20    that were made and some items being thrown on the plexiglass.

21    She claims those incidents were harassment.  Regarding the

22    hangup calls, right in the memo she wrote, she acknowledges

23    that she was told that this happens all the time, that it's

24    not aimed at her, and she says, gee, if that's the case, you

25    might want to look into this a little bit.  You know, that's

hardly a statement, even in her own memo, that this is
harassment against her.

But do we have additional evidence?  Yes.  You
heard Jami Kaplan from the New York State Division of Human
Rights say that during her investigation, the plaintiff
confirmed that -- I want to get this right -- that those
calls happened to everyone.  How is that harassment against
the plaintiff if the calls happened to everyone as she
acknowledged during the State Division of Human Rights
investigation?

The plexiglass, very similar.  You know, she
now claims that was harassment.  That's not something she
even bothered to put in the memo, and maybe the reason she
didn't bother to put it in the memo is, as she said to Jami
Kaplan during the State Division of Human Rights
investigation, she had not taken that personally.  But now
it's harassment.  Is that credible?  I would suggest to you
that it's not.  Her story has changed.  Things that, you
know, happen to everyone and that she didn't take personally
are now harassment.

But in any event, I want you to remember that
there's no reason to hold Troy Mitchell responsible for
either of those things.  She doesn't suggest, not only that
he taped the glasses, she doesn't suggest he threw anything
on the plexiglass, she doesn't suggest he made any phone

1    calls.  So again, it's a little like the wallet incident, I'm

2    a little bit at a loss as to how this relates to allegations

3    of harassment against Troy Mitchell.

4              Now speaking of having changed stories, I'd

5    like to talk a little bit about the allegations that happened

6    at Eastern Correction Facility supposedly, which, you know,

7    we heard in counsel's opening statement supposedly were

8    retaliation against the plaintiff.  Well, you're going to

9    hear her suggest now not that it was retaliation, but that it

10   was further acts of harassment.  So let's talk about those

11   incidents a little bit.

12             Now, again, neither of these things obviously

13   have any sexual content to them, but plaintiff testified that

14   Troy Mitchell sat in the chair by an exit with the purpose of

15   preventing her from passing by her.  That's plainly absurd.

16   You know, apparently among her skills is mind reading,

17   because she can have no idea what Troy Mitchell's intent was,

18   if he was sitting in a chair next to an exit.  It just --

19   that's not evidence of anything.

20             Similarly, you know, she testified in her

21   direct examination about Troy Mitchell having walked out in

22   the yard and stared at her and that's what she said.  She

23   said -- I hope, you know, people caught this.  She said he

24   walked out in the yard and stared at her.  And I questioned

25   her on cross-examination about that and then afterwards, she

1    changed her story a little bit.  It was now a leer, and a

2    laugh.  It went from a stare to a leer and a laugh.  And I

3    would suggest to you that that's the same way most of these

4    allegations against Troy Mitchell were created.  That one you

5    got to see right in front of your eyes.

6              Now, I think it's also really important

7    relative to her credibility and whether these things happened

8    at Eastern at all, to remember the testimony of Dr. Alley.

9    Dr. Alley had a very detailed note in his office notes about

10   September 29th, 2006, the day that plaintiff came in

11   complaining that Troy Mitchell had been at Eastern.  And as

12   you heard, he had transferred to Eastern on September 11th so

13   he had been there for weeks already, and at that point, you

14   know, apparently she was unable to continue working.

15   Dr. Alley conceded that she never mentioned, plaintiff never

16   mentioned these alleged incidents of misconduct against Troy

17   Mitchell, they weren't in his notes.  You would think that if

18   there were specific incidents as opposed to the fact of his

19   transfer that caused her a problem, if there were specific

20   incidents, it's something she would have remembered, it's

21   something he would have noted and/or remembered.

22             Now I'll point out one more thing about this

23   allegation about Eastern.  When you look at the complaint,

24   Plaintiff's Exhibit 1, you'll see an allegation that the

25   transfer was retaliatory.  You won't see any mention of any

1  supposed misconduct on the part of Troy Mitchell at Eastern.

2  It's just not there.  Just like it's not in Dr. Alley's

3  notes, and those should not be believed either.

4          Now there's a little more information that

5  Dr. Alley gave us that, again, could cause one to question

6  plaintiff's overall credibility.  She went to him in December

7  of 2005 and said she could no longer work at Auburn

8  Correctional Facility, and she did mention talk about

9  bringing a suit, but when she brought her claim in January of

10  2006, she never mentioned it to him.  And I don't know if you

11  remember, but I asked Dr. Alley about this and he sat there

12  quietly for a second, he said no, she never did tell me about

13  that.  And you know, maybe it's my imagination, but I could

14  see the wheels turning and I think Dr. Alley was realizing

15  for the first time that maybe he had been played.  Because

16  after she filed that claim, she went in and she, you know,

17  described her symptoms and all her distress, everything she

18  would need to bring this claim in court, without ever telling

19  him that, yes, I have in fact brought that legal claim,

20  something you think would be a pretty big thing in the life

21  of a person suffering from an adjustment disorder as a result

22  of some misconduct.  I think that would have been worth

23  mentioning, but she didn't.

24          The other thing that I thought was striking

25  about Dr. Alley's testimony was his admission that if there

1    were only two incidents involving overtly sexual conduct that

2    involved Troy Mitchell, and I'm afraid I'm going to have to

3    go through them again in a second, but that's how many there

4    were, there were two, and that's being generous about what

5    has sexual content, if there were only two, Dr. Alley said,

6    she's, that's -- that misled him, that would not be

7    consistent with what she had expressed to him.  He confirmed

8    that that would not be consistent.  So that's not coming from

9    me.  That's not coming from Troy Mitchell.  That's coming

10   from Dr. Alley, that the actual allegations against my client

11   don't match up with what was described to her own doctor.

12            Troy Mitchell's testimony was delivered

13   consistently.  It was forthright, and it was given with the

14   confidence of a person who knows they're telling the truth.

15   I would suggest to you also that Troy Mitchell's testimony

16   stood up to cross-examination better than any other witness

17   who appeared in this proceeding.  So you've got on the one

18   hand a plaintiff whose story changed, who came up with things

19   she had never mentioned before, who didn't mention things to

20   her doctor that she should of on the one hand, and you have a

21   very forthright and straightforward witness whose testimony

22   never wavered on the other hand, and I would ask that you

23   take that into consideration.

24            The writer Mitch Albom who wrote some books

25   you might have heard of, <u>Tuesdays with Morrie</u>, <u>The Five</u>

1    <u>People You Meet in Heaven</u>, I don't know if this rings a bell

2    to anyone, but he wrote in one of his books, that the more

3    you have to defend a lie, the angrier you become.  There's no

4    question that the plaintiff is angry at Troy Mitchell, but

5    that doesn't mean he did anything that she alleged that he

6    did.

7            Now I'd like to talk to you about the law.

8    You've been very patient, I really appreciate it, but I need

9    to, you know, give you a little bit of my view, and obviously

10   the judge is going to instruct you on what the law is.  I'm

11   not suggesting you should take what I say instead of what he

12   says.  I'm hopeful that what I say will be consistent with

13   what the judge says.  Okay.

14           To support a claim for sexual harassment

15   against Troy Mitchell, the plaintiff has to demonstrate

16   obviously that the conduct actually occurred, and that's what

17   I've just been talking about, but because she alleged that he

18   sexually harassed her in his personal capacity, in other

19   words, he personally sexually harassed her, there are certain

20   standards that have to be satisfied.  It has to be proved

21   that he, by himself, established a hostile working

22   environment for plaintiff.  The judge I believe will instruct

23   you that a hostile work environment is a workplace so

24   permeated with discriminatory intimidation, ridicule, and

25   insult that a reasonable person would consider it to be so

1    severe and/or pervasive as to alter the conditions of her

2    environment, creating an abusive working environment.  By

3    himself, that he did all that.

4                    There's going to be some discussion of some

5    things that you can consider, some kind of factors that come

6    up a lot in making this kind of determination, and the judge

7    will explain that you can consider the frequency of the

8    conduct, the severity of the conduct, whether the conduct was

9    physical or just verbal, whether the conduct was humiliating,

10   whether the conduct was a mere offensive utterance, and

11   whether the conduct unreasonably interfered with the

12   plaintiff's work performance.

13                   So although I've described reasons why I think

14   you should not credit the plaintiff in her allegations, from

15   this point forward, I'm going to assume that the law requires

16   you to give credence to her allegations.  We're going to

17   accept all of it as true, and let's look at each of these

18   factors briefly.

19                   First, what was the frequency of the conduct?

20   Starting with the first allegations against Troy, the comment

21   that women don't belong at Auburn was June 2004.  The two

22   alleged comments about an inmate's private parts were three

23   to four months later.  The wallet incident was eight or nine

24   months after that.  The November allegations, November 10,

25   were another five months down the road, and the alleged

1     incidents at Eastern were ten months later. I don't think

2     that's frequent. I don't think that's pervasive. That's

3     obviously something for you to decide.

4           Now, if you focus on the -- just on the two

5     incidents that actually had any sexual content to them, the

6     statements about the inmate private parts and the allegations

7     of November 10, 2005, you're talking about a 13- to 14-month

8     hiatus in between those two events. Again, nothing close to

9     pervasive.

10          Let's discuss the severity of the conduct

11     alleged against Troy Mitchell. There's no suggestion that he

12     assaulted plaintiff, there's no suggestion that he touched

13     her in any way. No suggestion that he pressured her for

14     sexual favors. There's no suggestion that he discussed her

15     anatomy. Nothing like that. Nothing personal to her. And

16     you heard her admit that the November 10, 2005 allegations

17     which supposedly triggered all this, she admitted, it had

18     nothing to do with her sexually, nothing.

19          Now, don't let plaintiff's counsel suggest

20     that any statements were more severe because they happened in

21     front of the inmates and that increased the ridicule, the

22     impact of ridicule for this reason. Only the November 10,

23     2005 allegations involve -- against Troy Mitchell were

24     allegedly in front of inmates. Only those comments on

25     November 10, 2005. None of those were about plaintiff. They

1    were all about Troy Mitchell and his own family.  If anybody

2    was humiliated or subjected to ridicule by inmates if they

3    were listening, by statements as alleged, it was Troy

4    Mitchell.  It wasn't plaintiff.

5              Now the next factor is whether the conduct was

6    verbal, physical, or both.  We know that all of the conduct

7    here alleged was verbal.

8              The next factor is whether the conduct was

9    humiliating, and again, only two episodes, 14 months apart,

10   had any sexual content and the November 10th ones, there's no

11   way to construe them as being humiliating to her.

12             The next factor is whether the conduct was a

13   mere offensive utterance.  And to the extent -- you know,

14   overwhelmingly that's what we're talking about, are things

15   that were mere offensive utterance.  Of course the

16   allegations at Eastern don't involve any words at all.

17             Finally, you can consider whether the conduct

18   unreasonably interfered with plaintiff's work performance.

19   The only evidence I heard involving Troy Mitchell of any

20   interference with plaintiff's work performance had to do with

21   the taping of her glasses which he didn't do.  Now did she

22   ask him to be relieved?  Yes.  Did he turn down that request?

23   Yes.  Is there any evidence that she wasn't able to do her

24   job the rest of the day?  No.  None.

25             When we talk about severe and severe and

1   pervasive in the law, is the severe, the kind of thing that

2   can happen once or rarely to support a claim, something like

3   a sexual assault, you know, that's severe.  I think we all

4   agree to that.  Nothing here is remotely close to severe.

5               Obviously you've heard the time frame so I

6   would also suggest that the conduct was also not pervasive.

7               The judge is going to instruct you about

8   something called qualified immunity.  It's another reason why

9   you could find that Troy Mitchell was not liable.  Because

10  Troy Mitchell cannot have known on these facts, even if you

11  assume them to be true, that there was a violation of

12  plaintiff's constitutional rights.  No facts.  And for that

13  additional reason, Troy Mitchell also should not be found

14  liable.

15              Now there's no doubt that plaintiff is a

16  damaged person.  Some terrible things have apparently

17  happened to her in her life, and that's something, you know,

18  she's deserving of sympathy for, but that isn't something to

19  award her damages for in this proceeding.  It just isn't.

20  She has not sustained her burden of proof against Troy

21  Mitchell and her allegations are not worthy of belief.  She

22  didn't prove it.  It's her burden.  She did not prove it.  I

23  ask that you find that the plaintiff has not carried her

24  burden in this lawsuit, and I ask that you find for defendant

25  Troy Mitchell.

1          I thank you very much for your service and for

2     your attention, and for your consideration.  Thank you very

3     much.

4               THE COURT:  Ms. Connor.

5               MS. CONNOR:  Your Honor, and ladies and

6     gentlemen of the jury.  The plaintiff Penny Collins and I

7     would like to thank you very much for your time, attendance,

8     and attention to the evidence in this case.  We understand

9     completely that serving on a jury is very inconvenient to

10    you, takes you out of your life, your situation, your

11    routine, your home, you come to court every day to listen to

12    this evidence.

13              This trial has been significantly long, put it

14    that way.  Is this working?  Yeah, that's a little better

15    maybe.  This trial has been very long, and we very much

16    appreciate your service, and your attention to all of the

17    evidence in this case.

18              Now, at the beginning of this case, it was

19    explained to you that this is a case about sexual harassment

20    and gender discrimination of the plaintiff during her

21    employment with the New York State Department of Corrections.

22    Now the story that the plaintiff has told you is one where

23    her optimistic career at the New York State Department of

24    Corrections was ended, because of the injuries she incurred

25    as a result of the sexual and gender harassment that she

1    faced on a pervasive basis.

2            Plaintiff faced as a routine and pervasive

3    part of her employment at the New York State Department of

4    Corrections this type of harassment and there was a failure,

5    complete failure on the part of the employment -- employer,

6    rather, to take prompt and effective remedial action to end

7    this harassment.

8            Now you have heard in closing statements by

9    counsel that plaintiff came to the Department of Corrections

10   as a damaged person.  I submit to you there is absolutely no

11   evidence in the record to support that.  You have in the

12   record before you the plaintiff's employment evaluations, you

13   have that all the way from her academy through the time she

14   stopped effectively working for the Department of

15   Corrections.  And in these evaluations, they'll be before you

16   to look at in the jury room, I ask that you look closely at

17   these, because you will see that she received excellent

18   evaluations, you will see that category after category, she

19   got good to excellent, good to excellent, good to excellent,

20   until the harassment became so severe that it started to

21   affect her.  And then what happened in these employment

22   evaluations, is that the other areas of her performance

23   remain good to excellent, but the area about her getting

24   along with others after she started making a complaint, that

25   area was marked down, and you'll see supervisor's comments.

1    I also, we also ask that you look at these performance

2    evaluations, and you look at the supervisor's comments about

3    her good actions and conduct prior to the harassment

4    beginning in Sullivan.

5              There is no evidence that the plaintiff is

6    required to walk into an employer and say, I've been sexually

7    abused as a child.  There's no evidence that the Department

8    of Corrections requires that.  And that the assault, the

9    sexual assault that we stipulated to, if you note the date of

10   that, is January 1st, 2003, which is after the plaintiff

11   began her employment with the Department of Corrections.  So

12   certainly with that date, you cannot infer that the plaintiff

13   had a duty to disclose something that hadn't even happened.

14             Now, the plaintiff's testimony and the

15   evidence presented in this case establishes that she began

16   her career in the Department of Corrections in an atmosphere

17   where women corrections officers and trainees were faced with

18   stereotyping and disparate treatment at the academy.  The

19   evidence is established that at the academy women were given

20   separate instruction, specifically about how they should get

21   along with others and inmates and that this portrayed women

22   as weaker than men and needing some sort of special help.

23   This is the atmosphere that began at the academy and

24   continued throughout plaintiff's employment.

25             You heard evidence and will see this handbook,

1  the female handbook for women in corrections.  If you look at

2  that handbook, you will see on pages of that handbook the

3  Department of Corrections attitude about women and the

4  stereotyping about women working in corrections.  You will

5  see that they portray women as weaker, as gossips, as

6  rumormongers, they need to be told not to be flirtatious.

7  And they're even told not to ask for overtime so that they

8  can attend to their families because they are the chief

9  person in charge of their -- or taking care of their

10  offspring.

11             This type of attitude permeated the academy

12  and permeated various places that plaintiff worked in the

13  Department of Corrections.  The evidence established that

14  this handbook was published by the office of diversity

15  management, and this is the office where plaintiff was

16  supposed to go to complain about the harassment that she

17  faced or any discrimination that she believed that she was

18  subjected to.

19             So rather than being a department that would

20  be neutral, and a department that would take a neutral look

21  at the situation and investigate, we have a plaintiff, the

22  complaint procedure of the employer suggests that the

23  plaintiff should go to the department that published the

24  discriminatory manual to begin with.

25             Now, after leaving the academy, Penny Collins

1  looked forward to a new career in corrections.  She testified

2  she needed the job for the money and benefits for her family

3  but this was a career, as you saw throughout the evidence in

4  this case, that was not to be.  She faced pervasive

5  harassment from almost the beginning of the career, her

6  career shortly after leaving Sing Sing to the point that,

7  which she left her career at the end of her efforts to work

8  for the Department of Corrections.

9            Now I want to summarize for you, and I don't

10  want to -- you've heard a lot about these incidents but I

11  want to summarize for you so you can see how pervasive and

12  severe this harassment that she faced was.

13            Now first at Sing Sing, plaintiff was grabbed

14  between the legs by another officer, and degraded at lineup

15  in front of inmates.

16            She transferred to Sullivan, and she was

17  subjected to pervasive harassment there where rumors were

18  prevalent about her sleeping with sergeants in order to get

19  favorable assignments, in order get good assignments in the

20  chart office.  She was subjected to constant hangup calls on

21  her posts that interfered with her doing her job.  And these

22  calls were not just simple hangups.  If the callers didn't

23  hang up, they asked her questions such as -- about her sexual

24  habits, such as, are your knees dirty yet?  And we know what

25  that's referring to, referring to oral sex.  Don't forget to

1    clean the floor, F'ing Hazel, degrading her as a woman, she's

2    supposed to clean.  Comparing her to a maid called Hazel.

3    Plaintiff also found condoms in her lunchbox.  I would submit

4    to you that this is clearly a gender-based act.  To say that

5    that is not gender based, it has no basis whatsoever.

6           She -- Lieutenant Hoefling came in here, now

7    Lieutenant Hoefling, and testified about the rumors and the

8    actions that Ms. Collins was subjected to, and he testified

9    about signs that were put up in front of the chart office

10   that hinted or suggested that there was some sort of affair

11   between Ms. Collins and Lieutenant Hoefling.  Both of them

12   denied such an affair.

13          Now, Lieutenant Hoefling also testified about

14   the rumors from another lieutenant, and that he was sleeping

15   with the plaintiff, and if he wasn't, that lieutenant must

16   be.  This is the type of supervisors and this is the type of

17   upper echelon superiors that the plaintiff had to deal with

18   in her employment at Sullivan.  This same lieutenant talked

19   to her about having a sausage in his pants for her and he

20   told her at lineup that he had seen her breasts and she had

21   nothing to worry about.  This is very severe harassment.

22   This is done in front of other people, it is done to

23   humiliate and degrade the plaintiff.

24          Now, there's been a claim made that the

25   Department of Corrections did not know about these matters.

1    The contrary is true and the evidence supports it.

2    Ms. Collins reported all of these incidents to her

3    supervisors at Sullivan and to the superintendent in

4    Sullivan.  She spoke to the superintendent, she wrote a

5    lengthy memo about it and testified about that memorandum.

6    She gave specific times and dates of the phone calls, she

7    asked for an investigation.  She gave extension numbers, she

8    gave very specific information.  And she also reported the

9    lieutenant who made these comments to her.  She suggested or

10    asked for additional sexual harassment training at that time

11    believing that might do some good.  And she asked for an

12    investigation to be conducted.

13                Now, nothing was done by the Department of

14    Corrections to change this situation other than Lieutenant

15    Hoefling attempting to trace the calls which apparently were

16    unsuccessful.

17                Now the defendants have provided no evidence

18    other than that that the superintendent of Sullivan did

19    anything directly in response to her complaints.

20                Now after she reported these problems to the

21    superintendent at Sullivan, Ms. Collins' time cards were

22    missing.  Now you've heard the defendants claim that certain

23    things like time cards have no sexual content.  They don't.

24    That's not saying that there was some sexual favor requested,

25    but you can infer in the context of this pattern of behavior

1   that this was done to Ms. Collins because of her gender,

2   because of her sex, and that these were gender-based acts.

3   You can make the inference that the circumstances warrant

4   that these harassing acts that have no overt sexual statement

5   in them were done because she complained about harassment and

6   they were further acts of harassment.

7             Now the time cards, to remind you, were in a

8   locked box and that only certain people had keys to those

9   boxes.

10            Now you will also remember that Ms. Collins'

11  photo was defaced at Sullivan.  Again, defendants claim this

12  is not gender based, but again, we submit to you that you can

13  make the inference given the pattern of conduct and what has

14  occurred that this was based on her gender.  It was based on

15  her sex.

16            Now, one thing I would ask that you look at in

17  this evidence is that the defendants put on no witnesses

18  whatsoever that contradicted anything that Ms. Collins said

19  or Lieutenant Hoefling said about what occurred at Sullivan.

20  There's no evidence that anything that they testified about

21  or you've -- or you'll have evidence in the documents, that

22  that evidence is not true.  There is no defense, there were

23  no defense witnesses that contradicted any of that evidence.

24            Now, at the end of June 2004, Ms. Collins

25  transferred to Auburn.  And before she left, she utilized the

employees' complaint procedure.  She filed a complaint with
the office of diversity management.  And you will see in the
directive before you about filing complaints, that the person
who's got a complaint goes to the superintendent and then
that is given to the office of diversity management.  So
therefore, the evidence is clear that Ms. Collins did follow
the procedure and file the complaint.

She spoke to someone in the office of
diversity management in July 2004, and that's the only time
she heard anything from that office until about three months
later, when she got a letter that the complaints were
substantiated.  Excuse me.  But the letter stated that the
investigation was unable to identify the perpetrators.
There's no -- there was no evidence about which acts they
were unable to identify the perpetrators.  It's kind of a
generic letter that doesn't contain any information about
what the office did or anything, that any part of their
investigation or any efforts that they made.

Now we submit that this three-month gap in
time is insufficient employer action to promptly prevent
additional harassment or to remedy the past harassment.  The
letter states that appropriate action will be taken, but yet
it doesn't say what that action is.  Ms. Collins was never
informed of what the action is or anything that the
department did concerning her complaint.

1    Now the harassment from Sullivan carried over

2  to Ms. Collins' employment at Auburn.  You can look at this

3  as a continuous form of harassment.  There were unfounded

4  rumors pervasive at Auburn that she had arrived at Auburn as

5  an administrative transfer from Sullivan because she had sued

6  sergeants at Sullivan.  So she was being labeled a rat among

7  her fellow officers because she had dared to complain about

8  harassment at Sullivan.

9    Now on her second day at Auburn, Sergeant

10 Mitchell told Ms. Collins that women don't belong at Auburn.

11 That was her greeting from Sergeant Mitchell.  Now we've

12 heard that he's denied saying this, but you as the members of

13 the jury have the ability to judge the credibility and the

14 testimony and decide who was believable.

15   Now Ms. Collins testified also that her

16 picture was posted by the control room and was defaced with

17 administrative transfer written on it.  This fueled the rumor

18 that she had been transferred to Auburn because she was a

19 problem at Sullivan.  The defendants did not refute that the

20 picture was defaced, nor that she was the subject of

21 unfounded rumors.

22   Now, a few months after she got to Auburn the

23 rumors manifested themselves in Sergeant Wright's treatment

24 of her.  She testified she went to Sergeant Wright about

25 switching duty with another officer when Wright screamed and

1  yelled at her, slapped his arm, and -- his sleeve where the

2  stripes were and he pulled his nametag forward and said,

3  Wright, spell it right.  Now you can draw an inference that

4  he did that because he believed that Ms. Collins was a

5  complainer, somebody who was going to file complaints,

6  somebody who was going to write his name down and turn it in.

7              Now the defendants are claiming that this is

8  not an act of sexual harassment, but we believe that the

9  circumstances around this act, you can, is part, we -- you

10  can, you can understand or draw the inference that it's part

11  of this pattern of harassment.

12              Now the abuse from Sergeant Wright continued

13  when Ms. Collins asked him about obtaining some overtime in

14  December 2004.  We've heard a lot about this overtime.

15  Again, Sergeant Wright treated her in a demeaning manner,

16  screamed and yelled at her in his office about this seven

17  minutes of overtime.

18              You've heard in defense counsel's opening

19  statement that she was making a big deal about these seven

20  minutes of overtime.  But if you look at the circumstances

21  around this, you look at Ms. Collins' testimony, you look at

22  the documents that you will have in the jury room, her

23  complaint was not about the approximate $5 or little more

24  related to this amount of overtime.  Her complaint was about

25  her treatment, about the abuse and about the disrespect she

1    received as a woman in Sergeant Wright's office.  The issue

2    with Ms. Collins has always been that she be treated with

3    dignity and respect.  And this was very manifest, you can see

4    it in the evidence before you concerning Sergeant Wright.

5            Now, Ms. Collins did avail herself of the

6    grievance procedure to complain about that.  And she

7    testified that she did that because other officers felt that

8    if she didn't go for the overtime, it would hurt them.

9    That's very reasonable.  And she also spoke to the office of

10   diversity management about this and filed a complaint about

11   that.

12           But despite doing this, the harassment at

13   Auburn continued and escalated.  Shortly after this, she was

14   subjected as the only female in the training class, she was

15   subjected to sexually offensive statements by the weapons

16   training officer comparing the gun's barrel to a penis and

17   the bullets to ejaculate.  There's no other way to say it.

18   The officer, the instructor stroked the barrel of the gun

19   suggestively and described his sexual habits with his wife.

20   Now Ms. Collins, being the only female, was very offended by

21   this conduct, and in front of her classmates.  She testified

22   that it was -- she told him it was disgusting.  Now she

23   complained about this, she reported this to the office of

24   diversity management.

25           Now after this weapons training officer

incident, that same summer, the evidence would show that
Sergeant Mitchell removed her wallet from a lunchbox and lied
to her that he had found it in the facility.  Now the defense
has argued that these are not sexual in nature, these acts
are not sexual in nature, but Ms. Collins contends that
Sergeant Mitchell's conduct was directed at her because she's
a female, because you remember, he said in her second day
that women do not belong at Auburn.

Now after taking her wallet and lying to her
about where he found it, Sergeant Mitchell claims he told
Lieutenant Quinn about the incident.  Well, this is very
interesting because if he was not trying to get Ms. Collins
in trouble with the wallet and taking it back to her in order
to avoid getting her in trouble, then there's no explanation
of why he would tell Lieutenant Quinn.  The only possible
explanation would be that he was telling Lieutenant Quinn
because he was trying to protect himself against Ms. Collins'
accusation that he had lied to her, that she had called him a
liar.

Ms. Collins -- we submit that Sergeant
Mitchell's motive can be inferred from this evidence, and
that he was trying to make trouble for Ms. Collins because
women do not belong at Auburn.

Now you heard some statements by defense
counsel in their closing that there was a Deputy

1    Superintendent O'Mara at Auburn, a female.  We submit to you

2    that there is no evidence that that deputy superintendent was

3    there when the plaintiff Ms. Collins was there.

4            Now, granted, some of these problems that

5    Ms. Collins faced were more serious than others.  We're not

6    saying everything is exactly the same.  It's not a level

7    playing field, but what we're urging you to do is look at the

8    totality of conduct here.  Look at all the circumstances what

9    were adding up for Ms. Collins, and I'm not hitting all of

10   them, I'm not going to go through all that evidence, I know

11   you've heard it, I know you've been paying attention, but

12   we're urging you to look at this totality of conduct and the

13   cumulative effect of these issues and how they began to wear

14   on Ms. Collins.  This clearly had been -- become a hostile

15   environment for her at the Department of Corrections.

16           Now what did she do about this?  There's so

17   many different pieces of evidence of what she did.  Different

18   complaints, different conversations, but one of the things

19   that I want to draw to your attention is that she went to see

20   Superintendent Graham about this shortly after he arrived at

21   the Auburn facility.  And it seems as though the defense is

22   asking you to infer that there was something wrong with her

23   doing that and I think to the contrary, you can draw the

24   inference that she was trying to take quick action to change

25   the circumstances when a new superintendent came in.

1    Now you have in evidence to read a memorandum
2    that Ms. Collins wrote to Superintendent Burge, the one
3    before Superintendent Graham, about discrimination and sexual
4    harassment in Auburn.  And it says in this memo that the
5    harassment is on a continual basis, the memo informs the
6    superintendent of that.  She expressed to him that the
7    practices occurred so frequently she found it hard to believe
8    that the administration would be unaware of them.  She told
9    the superintendent, and you'll have the memo to look, that
10   Auburn is not a female friendly facility, and that she's been
11   harassed, humiliated, and touched in a sexual way while
12   working at Auburn.  She told him that fellow officers and a
13   supervisor told her women don't belong at Auburn.  And she
14   told him she felt more hostility from those who wore the blue
15   uniform, the officers, than those who wore the green, the
16   inmates.  That is a very sad state of affairs.
17   Now you heard Superintendent Burge testify
18   that she didn't go into specifics in this memo.  But you also
19   heard him testify on cross-examination that he didn't notice
20   in the memo that she reported that she had been sexually
21   touched and told by officers and supervisors that women don't
22   belong in Auburn.  He didn't remember that.
23   Now Superintendent Burge testified that he
24   turned this memo over to the office of diversity management
25   to investigate.  Ms. Collins submits that this procedure,

1    this turning over the memo, contained in the directive, is

2    insufficient to remedy the harassment.  Superintendent Burge

3    was apparently on his way out of Auburn at the time, he had

4    been transferred to another facility, and took no action.

5    Ms. Collins' appeals to him for help went unheeded and he did

6    nothing himself to investigate or do anything about the

7    report other than turn it over.

8                   Now, Ms. Collins testified that Superintendent

9    Burge acknowledged to her after his deposition, that she

10   spoke to him and that he said that Auburn was a difficult

11   place to work for females, that it always had been that way

12   and always would be that way for females.  Words to that

13   effect.  Superintendent Burge, if you notice, did not rebut

14   that statement.  He didn't contradict it.  Now the state

15   defendants did not offer any other evidence about this

16   conversation, so what is the inference you can take from this

17   statement?  You can understand that statement to mean that

18   even the superintendent of Auburn at the time knew that

19   Auburn was a workplace that was unwelcoming to females and

20   there was a tacit acceptance of that fact.

21                  Now after Ms. Collins wrote this memo to

22   Superintendent Burge and didn't hear from anyone in

23   authority, she did turn to Superintendent Graham.  Now

24   instead of being sympathetic and interested in what

25   Ms. Collins was telling the superintendent, instead, you've

heard testimony about what took place in that conversation.
He was -- he told her that he did not see any problems for
females in his time at Auburn, that she could sue in federal
court, that he had been in corrections for a very long time
and that, essentially that there were 15 female officers at
Auburn and she shouldn't expect any of them to back her up
because they needed their jobs.  Now she told him that since
no one seemed to care, she was gonna do a letter writing
campaign and what did he do but he admonished her to watch
the restrictions in the employee handbook.  He told her she
could sue in federal court.  He also told her that she should
put her complaints in writing.  Ms. Collins obviously did not
feel she was getting anywhere in that conversation and would
have to put her complaints in writing.

So what happened?  The next day, she had
several encounters with Sergeant Mitchell, and he happened to
be her direct supervisor that day.  Now although Ms. Collins
also contends that as a sergeant, he was her superior officer
and had supervisory authority and status over her generally,
you have to follow an order of a superior officer.

Now in her encounter with Sergeant Mitchell,
he made several obscene and graphic statements to her in
order to deliberately upset and embarrass her in front of the
other officers and inmates.  The statements were, you've
heard them, he talks about got to take a shit, he talks about

1    how he farted at the table in front of his children, his

2    children's friends and walked naked in front of his children.

3    Why would you say that to somebody?  Are you saying it to

4    disparage yourself?  We believe that you can infer that that

5    was said to Ms. Collins in order to humiliate her, in order

6    to abuse her, not himself.  Now he also told Ms. Collins that

7    his mother had nice tits, using that word in the backyard,

8    and another officer -- after another officer commented on her

9    ring, what does Sergeant Mitchell do?  He said that his wife

10   had one like that but she lost it up -- it slipped off her

11   finger, she lost it up his ass.  Now is that about himself or

12   is that done to humiliate and degrade her in front of other

13   officers?  We believe that you can make that inference, and

14   that the evidence is there before you.

15          Now Ms. Collins testified during these

16   incidents that inmates were present, they could hear these

17   statements, they were within hearing distance, and at least

18   one inmate spoke to her later and asked her why officers

19   treated her like that.  Now the fact that inmates could hear

20   this, and remembered these statements and this type of

21   conduct directed at Ms. Collins made this environment all the

22   more stressful for her.

23          Now later that day, this is all the same day,

24   so you have to -- we're asking you to look at this day as a

25   whole here, later that day, Ms. Collins' glasses were taped,

in what defendants claim was some sort of prank or nonsexual
act.  But we're urging you to look at this incident in light
of the previous incidents.  Sergeant Mitchell claims he did
not tape her glasses and Ms. Collins admits she did not see
him do it.  Now if she wanted, she could have said he did it,
if she wanted to make it up, but she didn't, she said she
didn't see him do it because she didn't see him do it.  But
what did he do when she complained about it?  Excuse me,
sorry.  He did nothing other than to slam a bottle of cleaner
on the table.

Now Ms. Collins was very upset, because by
this point, this day had been a pretty bad day.  She asked to
be relieved, she was distraught, and Sergeant Mitchell
refused to do that.  She said she couldn't do her duties
without her glasses but yet he refused to relieve her.  She
went to the bathroom briefly, came back, glasses were
somewhat clean but yet they were broken.  So she had to work
the rest of the day with bent, broken grasses which further
reminded her and those around her of what had happened.  Now
these incidents were becoming extremely upsetting and
stressful to Ms. Collins.  The stress increased that day when
she received hangup calls, that's all in the same day.

Now she wrote a memo to Sergeant Mitchell that
evening which you will read in your deliberations.  She gave
a copy to Lieutenant Vasquez.  Superintendent Graham

1    testified that he was called at home by a Captain Rourke who

2    read him that memo.  He was notified immediately.  Very

3    interesting.  So what did Superintendent Graham do?  He

4    turned it over to the office of diversity management.  He

5    never spoke to Ms. Collins about the memo.  We would ask you

6    to infer it's because he didn't want to be involved in a

7    lawsuit.  He had a duty to do something about this type of

8    conduct to protect Ms. Collins but yet failed because he was

9    afraid of being involved in a lawsuit.

10          Now you can -- Superintendent Graham, rather,

11    testified that what he did is he spoke to Sergeant Mitchell

12    in the sergeant's room.  What took place in that room was

13    private between them.  But he never went to Ms. Collins and

14    asked her anything about this.  Never followed up, never did

15    anything.  He took the paper and faxed it someplace.

16          Now, after Ms. Collins took off for a weekend

17    after these incidents, she returned to work to find her time

18    card was missing again.  Now we would urge that you draw an

19    inference that this is part of the pattern of conduct

20    directed at Ms. Collins on the basis of her gender.  She was

21    subjected to cat calls from officers, and at the time clock

22    in front of other officers and when she went to the bathroom

23    she saw some new graffiti.

24          Now there's a lot of testimony about graffiti,

25    I'll talk about that a little bit more, but the graffiti that

1    she saw was directed at her.  And it was, "Penny gives shitty

2    head.  Shitty head's better than no head," and, "I wouldn't

3    let that bitch touch me."  And you heard from the deposition

4    of Susan Carter that that graffiti was there.  Now this was

5    on November 25th.  Ms. Collins testified she tried to clean

6    it off but needed paint and it wouldn't come off.  She

7    reported it to a lieutenant, but the evidence established

8    that it was not removed until sometime in February 2006.

9            If you put this timeline together, this was

10   after Mary Mayville began an investigation, she's from the

11   office of diversity management as you know, and she talked to

12   the superintendent about it.  We submit that this is not

13   effective remedial action to take, to remove this graffiti

14   and change the environment that Ms. Collins worked in.  This

15   should not take three months.  It should be done immediately,

16   because that bathroom is open to officers, both male and

17   female, and it's also open to inmates who clean the bathroom.

18   And to wait three months till somebody from the office of

19   diversity management goes and talks to the superintendent is

20   unreasonable.  There should have been something done

21   immediately.  Ms. Collins talked to lieutenant, he said he

22   would take care of it, according to her testimony.  And it

23   took three months for that to be done.  We urge you to find

24   that that is not prompt and effective remedial action on the

25   part of the employer.

1    Now this graffiti's not the only time that
2  this type of graffiti appeared in the bathroom.  Ms. Collins
3  and Susan Carter, who testified by deposition because she's
4  passed away, stated that the type of graffiti is common in
5  the bathroom for women at Auburn.  Ms. Collins testified
6  about the drawings of females, sexual statements written, and
7  again, this is a bathroom that is -- inmates have access to.
8  Now whether or not there may be other graffiti in this
9  bathroom is not the point.  The point is that the graffiti
10  that was about Ms. Collins and other females created a
11  hostile environment for women, not that there was maybe
12  something about a superintendent someplace, or something
13  about a male someplace.  That is not the point.  The point is
14  that, is the environment hostile for women, and we would urge
15  that you find that this graffiti added to the hostile
16  environment.

17    Now on the same day she discovered the
18  graffiti, Ms. Collins testified another corrections officer
19  told her get out of here when she's in the arch gate post and
20  he told her she had brought this on herself.  This again was
21  in front of inmates and it was humiliating to Ms. Collins.
22  This officer refused to sit in the booth and Ms. Collins, you
23  recall her testimony, she stood outside in the cold.

24    This type of humiliation in front of inmates
25  was adding up for Ms. Collins and after a funeral trip that

1   she took in the beginning of December 2005, rumor spread in

2   the facility that she was dressed like a hooker, and that she

3   had complained about the correction officer that she went on

4   the funeral trip with, she had filed a sexual harassment

5   complaint or complained that he had sexually harassed her

6   which was untrue.  That never happened.

7           All of this proved too much for Ms. Collins.

8   She continuously felt unsafe at work and did not have the

9   cooperation from her fellow officers.  She felt that it was a

10  security issue with the inmates.  She felt very unsafe in

11  that environment and we've seen in the video what that

12  environment is like in many respects.

13          The video I thought was very interesting and

14  I'll talk a little more about it but keep that video in mind

15  of how that video shows how you need your fellow officers,

16  you need to be on a team with them, you need them to be --

17  stand by you and know, and have the confidence that they're

18  going to do that.  And that was not Penny Collins'

19  experience.

20          Now after being told that there was a rumor

21  that she was dressed like a hooker, Penny Collins felt that

22  she had a panic -- she was feeling like she had a panic

23  attack at work.  This was beginning of December, 2005.

24  Essentially she ended up having a breakdown, she couldn't

25  control her crying, and went from there to her doctor's

1  office.

2  Now, you're going to have the opportunity in

3  the jury room to read the complaints that she wrote to Mary

4  Mayville and the office of diversity management.  These are

5  quite lengthy and detailed statements and we ask that you

6  read these very carefully.  The first one of the complaints

7  that she wrote to Mary Mayville is before Ms. Collins left

8  work but Ms. Mayville didn't have time to finish it that day,

9  so therefore, the evidence Ms. Collins presented and Mary

10  Mayville confirmed, that they went to Applebee's at a

11  subsequent time to finish it.

12  But the first part of the statement she

13  describes her treatment at Sullivan because she's giving the

14  office of diversity management again another chance to see

15  what she has been facing while working at the Department of

16  Corrections.  And then she was out on medical leave, and then

17  you heard the policy about the office of diversity management

18  puts its investigations on hold while someone is out on

19  medical leave.  Mary Mayville has testified she thought it

20  was a good idea.  Well, she's from the office of diversity

21  management.  Excuse me again.  We would urge you to look at

22  this in a different light.  How is it reasonable when

23  somebody goes out on stress or has some sort of problem as a

24  result of harassment to stop investigating it?  You would

25  think there would be all the more effort to investigate it

1    and resolve it before this person came back to work.  But the

2    opposite was true with the office of diversity management

3    policy.

4              Now the testimony of Ms. Collins was that she

5    repeatedly tried to get the office of diversity management to

6    continue their investigation, she even went to the union,

7    asked the union what to do about this and when it did not

8    seem like it was going to happen, Ms. Collins filed a

9    complaint with an independent agency, the New York State

10   Division of Human Rights.  And it was only after that

11   complaint was filed, and the employer notified, that the

12   office of diversity management investigation was continued.

13             Ms. Collins contends that this policy places

14   an unnecessary delay in the employer taking prompt remedial

15   action.

16             Now after leaving Auburn on that December 7th,

17   2005 date, Ms. Collins never returned to work at Auburn.  She

18   went on extended medical leave which her doctor originally

19   diagnosed as adjustment disorder with depressed mood.  She

20   had symptoms of panic attacks, sleeplessness, crying,

21   depression, nausea, anxiety, fear of other people, fear of

22   police, because they wore a uniform.  According to her

23   doctor, Dr. Alley, you heard that she had a breakdown and

24   serious psychological problems due to the way she was treated

25   by corrections officers at the New York State Department of

1    Corrections.

2              Now Ms. Collins attempted to save her career

3    in corrections eventually and requested a transfer to

4    Eastern.  It is undisputed that she did fine there at Eastern

5    until Sergeant Mitchell arrived there.  And after he arrived,

6    she again had a psychological breakdown and had to leave her

7    job there and went on an extended leave.

8              You've heard a lot of medical testimony about

9    Ms. Collins and her psychological problems.  Now her doctor

10   testified that it originally was adjustment disorder with

11   depressed mood.  Then he added anxiety and eventually changed

12   that diagnosis to PTSD, post-traumatic stress disorder.  He

13   testified about how he arrived at that diagnosis.

14             Now Dr. First, the defense expert who was paid

15   almost $15,000 to come here, testified that it did not, he

16   did not believe that it met the criteria, her disorder met

17   the criteria of PTSD but he did admit that she had many

18   symptoms, many symptoms, he did not dispute the symptoms, he

19   admitted that she had many symptoms that made her unable to

20   work at least temporarily.  Dr. First also admitted that he

21   did not examine any medical records of Ms. Collins after

22   2007.  He was unaware that she even tried to return to work

23   in 2008 but could not work in corrections according to her

24   doctor, Dr. Alley.

25             Now the defense will try to get you to believe

1  that Ms. Collins was somehow a fragile person, unsuited to

2  work in the Department of Corrections when the evidence

3  establishes otherwise.  She held jobs throughout her life,

4  she testified about that, she was transferred, moved from job

5  to job, she never had an issue that she testified about any

6  kind of work with one exception, this being in the military.

7  This happened 33 years ago when she was quite young, late

8  teenager.

9          Ms. Collins has admitted several mistakes she

10  made during this trial.  I think that you will note these

11  mistakes.  One, she was 17 when this military, or 18, rather,

12  when this military experience took place.  She doesn't shy

13  away from mistakes.  Throwing the shirt in the trash, she

14  doesn't shy away from the mistakes.  She owns up to her

15  mistakes.  She told them to you, for you to weigh and for you

16  to make a decision about what took place in this case.

17          Now whatever label you decide or don't decide

18  to call Ms. Collins' disabilities, the evidence is clear that

19  she is disabled from working in corrections.  She tried

20  repeatedly to return, she wanted to save her career, but each

21  attempt was unsuccessful.  She did not exhibit or display

22  this set of symptoms, it's undisputed, prior to

23  December 2005.  Dr. First could present no evidence of that

24  and did not.  Dr. Alley testified that these symptoms did not

25  occur until December 2005.

1    Now you can decide that the cause of

2  Ms. Collins' problems was her harassment at the Department of

3  Corrections because she was female.

4    Now, there's other things that you're going to

5  be asked to decide.  You can look at this harassment and

6  decide whether it was welcome or unwelcome.  To that extent,

7  I ask you to compare Ms. Collins' testimony to what

8  apparently the defense thinks would establish some element of

9  welcomeness through the testimony of Robert Pabis if you

10  recall that witness who was very short, short period of time

11  on the stand.  Mr. Pabis, Officer Pabis couldn't describe

12  what Ms. Collins looked like when he had these alleged

13  conversations with her, and Ms. Collins denied even knowing

14  or even meeting him, to her knowledge.  That was the sole

15  extent of the evidence put on by the defendants as to this

16  harassment being welcome by Ms. Collins.

17    We believe that you will decide that the

18  harassment interfered with Ms. Collins' work performance

19  because it was very pervasive and severe at times, that this

20  created an atmosphere for Ms. Collins of intimidation and a

21  hostile or offensive working environment.

22    Now Ms. Collins has proved that supervisors

23  participated in this harassment.  There were numerous

24  instance with defendant Mitchell participating, other ranking

25  officers participated, there's evidence in this record to --

1    for you to find that they are her supervisors, based on the

2    employer's own definition of supervisor and their authority

3    over her.

4            Now as far as coworkers participating in

5    harassment, the evidence shows that the employer knew or

6    should have known about the harassment because it's so

7    pervasive or Ms. Collins reported it to them.  She has shown

8    that this was known by higher administration and that the

9    supervisors had the knowledge of the harassment and this

10   could be attributable to the employer.

11           Now while the employer did conduct some

12   investigations of the plaintiff's complaints, it did not

13   investigate all or take prompt remedial action.  The

14   Department of Corrections administration ignored the

15   employer's own zero tolerance policy and passed the buck to

16   the office of diversity management.  In the end, the office

17   of diversity management did too little and too late.  There

18   was no employee disciplined as a result of any of the

19   complaints that Ms. Collins brought to their attention, or

20   discussed or reported with superintendents.  There was a

21   failure to properly supervise the employees not engaging in

22   the harassment and a failure to even respond to some of her

23   complaints.

24           Now, there are individual claims against some

25   of these defendants in this case.  First, again, defendant

1    Burge.  We believe the evidence establishes that he had full

2    knowledge of what took place with Ms. Collins at Auburn when

3    he was there, and he failed to take action.  All he did was

4    send a memorandum to the office of diversity management.  He

5    failed to follow up with Ms. Collins, he failed to do

6    anything affirmative to end this, the harassment and abuse

7    she reported.

8              With respect to defendant Graham, again, he

9    had full knowledge, again, he sent it to the office of

10   diversity management but did not follow up, even with respect

11   to the memo that he knew about that related to defendant

12   Mitchell.  He did not instruct -- there's evidence that he

13   followed the recommendation of the office of diversity

14   management, in fact that is to the contrary.  You will see in

15   your deliberations that the memorandum from the office of

16   diversity management told him that the weapons training

17   officers should have additional sexual harassment training

18   and he did not do that.  He solely issued a memorandum.

19             Now with respect to defendant Mitchell, the

20   evidence established that he participated in harassment and

21   actively contributed significantly to create a hostile work

22   environment for the plaintiff.  We believe you can look at

23   this conduct of defendant Mitchell and find that there was

24   malice in this conduct, because it was designed to harm her.

25   It was a reckless disregard of the -- of the plaintiff's

1  constitutional rights to be free of harassment and be treated

2  equally on the job.  We believe that the evidence thoroughly

3  supports that based on the nature of the conduct.

4  Now, Ms. Collins offered the testimony of

5  Dr. Reagles.  You've seen charts and you have the whole

6  report.  And this was offered to guide you in your damage

7  calculations should you award damages.  We urge you to look

8  at the figures carefully.  Some of these figures may be

9  disputed, they may not.  We believe that Dr. Reagles' report

10  is fully supported by the documentation that he provides in

11  the report and you will have more than just these charts in

12  the jury room.  You will have the whole report, you will have

13  the sources of the report, you will have the whole method of

14  thinking and calculations that Dr. Reagles carefully

15  explained to you.  We urge you to use these figures to guide

16  you in awarding Ms. Collins back pay and front pay should you

17  award that, for her loss of career in corrections.

18  We are asking that you award an amount in

19  compensatory damages that compensates her for the harm that

20  was suffered, that would fairly and significantly compensate

21  her for this injury that she suffered at the hands or caused

22  by the defendants.

23  Ms. Collins has suffered greatly at her

24  employment at the Department of Correction and continues to

25  suffer today from these psychological problems.  You heard

1    some argument from counsel that she's not seeking treatment,

2    but yet you have medical records about all the times she saw

3    Dr. Alley, all the times that she talked to him about her

4    problems, the medications that she took and I think that the

5    evidence is to the contrary that she did not seek treatment.

6    You have evidence in Dr. Alley's testimony about her going to

7    different counselors, and that we believe that the way that

8    the evidence is is to the contrary of what defense counsel

9    has presented.

10              Ms. Collins was a highly rated corrections

11   officer, as you can see by the evaluation reports.  These

12   reports are undisputed.  How the defendants can escape from

13   these reports, you can weigh that.  Ms. Collins had a

14   promising career in the Department of Corrections until that

15   career was derailed.  We ask you to look carefully at the

16   reports, look carefully at the documents, see for yourself

17   what her career would have been.  You heard argument that she

18   didn't take the sergeant's exam in 2009.  That's not the

19   point of Dr. Reagles' calculations here.  The point is that

20   had she been there and eligible and able to take it, at some

21   point in that time period she would have become sergeant.

22   She would have taken the exam.  She would have become

23   sergeant.

24              Now the defendants would like you to conclude

25   that the environment in the Department of Corrections through

1   the video -- I said I'd talk about the video a little bit --

2   was inherently inhospitable and it was -- and that

3   Ms. Collins did not fit into this environment, somehow

4   through some predisposed psychological condition, that

5   there's no evidence that she had.  Now we believe the video

6   told you some other things as well, though.  That the video

7   told you that good officers need compassion, they need

8   respect, and respect of their fellow officers, to be able to

9   handle inmates and make level-headed decisions.  There's no

10  evidence offered by the defendants that Ms. Collins did not

11  have these qualities.  In fact the evidence is to the

12  contrary through her evaluations, and her performance

13  evaluations.

14          The defendants basically are asking you to

15  look at the environment in the Department of Corrections

16  through the video, through some of the testimony that they've

17  offered, through some of the defendants, and decide that

18  basically there's two sets of laws.  There's one set of laws

19  for everybody else and there's another set of laws for the

20  Department of Corrections.  We submit to you that there's one

21  set of laws for women at work, there is one standard, and

22  women have the right and Ms. Collins has the right to be free

23  of sexual harassment, intimidation, and ridicule on the basis

24  of her gender.  There's one set of laws for everybody, the

25  Department of Corrections is no different, and has no

1    different obligation and duty than any other employer.

2              Thank you very much for your patience, your

3    dedication, your service in the jury duty.  I thank you for

4    paying attention to all of the evidence, listening to the

5    plaintiff's story.  Weighing the evidence, the work that you

6    have before you, it's a lot of work, and we appreciate your

7    attention and devotion to it, and thank you very much for

8    your service.  Thank you, your Honor.

9              THE COURT:  All right.  Ladies and gentlemen,

10   that concludes the closing statements.  I'm going to let you

11   run in, have a bathroom break, I'm going to give you the

12   charge on the law, it's going to take a little bit.  I'm

13   going to read it to you but I will send in copies of my

14   charge with you so you'll have it because it is lengthy, but

15   let's take a short break.  Your lunch is coming about 12:30

16   but I'd like to try and get this charge done and then let you

17   eat lunch and, you know, start your deliberations, okay.  So

18   go ahead and take a short break.

19                        (Jury Excused, 12:13 p.m.)

20              THE CLERK:  Court's in recess.

21                        (Whereupon a recess was taken from 12:13 p.m.

22                         to 12:21 p.m.)

23                        (Open Court, Jury Out.)

24              THE COURT:  Okay.  My courtroom deputy is

25   handing you the final copy of the charge and verdict form

1    which represents your requests and objections.  Some are

2    included, some are not but there's been significant changes

3    from what we had this morning, and that's the charge I'm

4    going to give to this jury.  Okay.  Rita, could you bring

5    them in, please.

6                    (Jury Present, 12:22 p.m.)

7                    THE COURT:  Okay.  The record should reflect

8    we have the ladies and gentlemen of the jury, plaintiff,

9    plaintiff's counsel, defendants, and defense counsel.  First

10   bit of news if they haven't told you, we've put off your

11   lunch a little bit, so that I don't have to be a speed

12   reader.  I was just telling Jodi I wanted to see how fast she

13   could go, but we'll -- it's been a long trial, we'll give her

14   a break.

15                    I'm going to read you the jury instructions in

16   this case now.  They're 32 pages long, okay.  There is a

17   little table of contents in the beginning should you need to

18   find some part of the law quickly during your discussions and

19   deliberations in there, that will help you.  And then we're

20   going to go right into -- you'll see how it's broken out once

21   you have it, we're going to go from there, okay.

22                    Now that you've heard all the evidence and

23   arguments of counsel, it is my duty to instruct you on the

24   law applicable to this case.

25                    Your duty as jurors is to determine the facts

of this case on the basis of the admitted evidence.  Once you have determined the facts, you must follow the law as I state it and apply the law to the facts as you find them to be. You are not to consider one instruction alone as stating the law, but you are to consider the instructions as a whole.

You should not concern yourself with the wisdom of any rule of law.  You are bound to accept and apply the law as I give it to you, whether or not you agree with it.  In deciding the facts of this case, you must not be swayed by feelings of bias, prejudice, or sympathy towards any party.  The plaintiff and the defendants, as well as the general public, expect you to carefully and impartially consider the evidence in this case, follow the law as stated by the court, and reach a decision regardless of the consequences.

Nothing I say in these instructions is to be taken as an indication that I have any opinion about the facts of the case or what that opinion may be.  It is not my function to determine the facts; that is your function.

First of all, the role of the attorneys.  The function of lawyers is to call your attention to those facts that are most helpful to their side of the case.  What the lawyers say, however, is not binding on you, and in the final analysis, your own recollection and interpretation of the evidence controls your decision.  Not what's said by the

1   lawyers, but what you find the facts to be based on the

2   testimony that came from that witness stand.

3           Let me further elaborate on the role of

4   attorneys.  Our courts operate under an adversary system in

5   which we hope that the truth will emerge through the

6   competing presentations of adverse parties.  It is the role

7   of the attorneys to press as hard as they can for their

8   respective positions.  In fulfilling that role, they have not

9   only the right but the obligation to make objections to the

10  introduction of evidence they feel is improper.

11          The application of the rules of evidence is

12  not always clear, and lawyers often disagree.  It has been my

13  job as the judge to resolve these disputes.  It is important

14  for you to realize, however, that my rulings on evidentiary

15  matters have nothing to do with the ultimate merits of the

16  case, and are not to be considered as points scored for one

17  side or the other.

18          Similarly, one cannot help becoming involved

19  with the personalities and styles of the attorneys.  However,

20  it is important for you as jurors to recognize that it is not

21  a contest between attorneys.  You are to decide this case

22  solely based on the evidence.  Remember, statements and

23  characterizations of evidence by the attorneys are not

24  evidence.  Insofar as you find their opening and/or closing

25  arguments helpful, take advantage of them, but keep in mind

1    that it is your memory and your evaluation of the evidence in

2    the case that counts.

3              In addition, you must not infer from anything

4    I've said during this trial that I hold any views for or

5    against either the plaintiff or the defendants.  In any

6    event, my opinion, any opinion I might have is irrelevant to

7    your decision.

8              Having said that, at various times throughout

9    this trial, I have asked various witnesses certain questions.

10   To be clear, my questions are of no more consequence or

11   weight than are any of the questions asked by either attorney

12   throughout this trial.  Rather, I have simply stated or asked

13   questions from time to time in an effort to clarify or

14   expound upon an issue raised by counsel.

15             Let's talk about evidence.  As I stated

16   earlier, your duty is to determine the facts based on the

17   evidence I have admitted.  The term evidence includes the

18   sworn testimony of witnesses and exhibits marked in the

19   record.  Arguments and statements of lawyers, questions to

20   witnesses, and material excluded by my rulings are not

21   evidence.  In addition, during the trial I sustained

22   objections to questions and either prevented a witness from

23   answering or ordered an answer stricken from the record.  You

24   may not draw inferences from unanswered questions and you may

25   not consider any responses that I ordered stricken from the

1    record.

2              Direct and circumstantial evidence.  While you

3    should consider only the admitted evidence, you may draw

4    inferences from the testimony and exhibits that are justified

5    in the light of common experience.  The law recognizes two

6    types of evidence.  Direct and circumstantial.  Direct

7    evidence is the testimony of one who asserts personal

8    knowledge, such as an eyewitness.  Circumstantial or indirect

9    evidence is proof of a chain of events that points to the

10   existence or nonexistence of certain facts.

11             The law does not distinguish between the

12   weight to be given to direct or circumstantial evidence, nor

13   is a greater degree of certainty required of circumstantial

14   evidence than of direct evidence.  You may rely on either

15   type of evidence in reaching your decision.  And I think you

16   all remember that first example I gave you that first day you

17   were here with regard to circumstantial evidence and direct

18   evidence.

19             Stipulated facts.  The parties have also

20   presented some stipulated facts.  A stipulated fact is simply

21   one that all the parties agree is true.  You must accept any

22   such stipulated facts as true.

23             Evaluation of evidence.  Credibility of

24   witnesses.  You have had the opportunity to observe all the

25   witnesses.  It is now your job to decide how believable each

1  witness was in his or her testimony.  You are the sole judges

2  of the credibility of each witness and of the importance of

3  his or her testimony.

4            In evaluating a witness' testimony, you should

5  use all the tests for truthfulness that you would use in

6  determining matters of importance to you in your everyday

7  life.  You should consider any bias or hostility the witness

8  may have shown for or against any party as well as the

9  interest a witness may have in the outcome of the case.  You

10  should consider the opportunity the witness had to see, hear,

11  and know the things about which he or she testified, the

12  accuracy of the witness' memory, his or her candor or lack of

13  candor, the reasonableness and probability of the witness'

14  testimony, and the testimony's consistency or lack of

15  consistency, and its corroboration or lack of corroboration

16  with other credible testimony.

17            In other words, you must try to do in

18  deciding -- what you must try to do in deciding credibility

19  is to size up a witness in light of his or her demeanor, the

20  explanations given, and all of the other evidence in the

21  case.  Always remember that you should use your common sense,

22  your good judgment, and your own life experience.

23            Finally, you should keep in mind that the

24  existence or nonexistence of a fact is not determined by the

25  number of witnesses called.  Your concern is not with the

1   quantity but the quality of the evidence.

2                    Medical witnesses.  We heard from some

3   doctors.  During the trial you heard plaintiff's treating

4   physician Dr. Alley give testimony based in part upon

5   observations that he made while treating plaintiff, and his

6   general experience as a doctor.

7                    You also heard the testimony of Dr. Michael

8   First, a psychiatrist who examined plaintiff.

9                    In weighing the testimony of each physician,

10  you may consider their qualifications, their opinions reached

11  during the course of treating or examining the plaintiff, as

12  well as all of the other considerations that ordinarily apply

13  when you're deciding whether or not to believe a witness'

14  testimony.  You may give the testimony of each of these

15  physicians whatever weight, if any, you find it deserves, in

16  light of all the evidence in the case.  You should not,

17  however, accept the testimony of a doctor simply because he

18  is a doctor.  Nor should you substitute it for your own

19  reason, judgment, and common sense.  You may reject the

20  testimony of either or both physicians in whole or in part if

21  you conclude that the reasons given in support of an opinion

22  are unsound, or if you, for other reasons, do not believe

23  him.  The determination of the facts in this case rests

24  solely with you.  Okay.  Simply put, any expert witness, you

25  don't just accept their testimony because they're called, a

1 so-called expert.  You evaluate it and go through the same

2 process you would for any other witness and make up your own

3 mind if their opinion is sound or unsound, based on what you

4 heard.

5 Expert witnesses.  You will recall that

6 certain witnesses testified concerning their qualifications

7 in their fields of employment and their opinions concerning

8 issues in this case.  When a case involves a matter of

9 science or art or requires special knowledge or skill not

10 ordinarily possessed by the average person, an expert is

11 permitted to state his opinion for the information of the

12 court and jury.  The opinions stated by the experts who

13 testified before you were based on particular facts, as the

14 experts obtained knowledge of them and testified to them

15 before you, or as the attorneys who questioned the experts

16 asked the expert to assume.  You may reject an expert's

17 opinion if you find the facts to be different from those

18 which form the basis for their opinion.  You may also reject

19 the opinion if, after careful consideration of all the

20 evidence in the case, expert and other, you disagree with the

21 opinion.  In other words, you're not required to accept an

22 expert's opinion to the exclusion of the facts and

23 circumstances disclosed by other testimony.  Such an opinion

24 is subject to the same rules concerning reliability as the

25 testimony of any other witness.  It is given to assist you in

1   reaching a proper conclusion.  It is entitled to such weight

2   as you find the expert's qualifications in the field warrant

3   and must be considered by you but is not controlling upon

4   your judgment.  Okay.  Again, just what I said, it's up to

5   you to decide.  Don't accept something just because it came

6   from a so-called expert.  You evaluate it, just like any

7   other witness.

8                    Impeachment by prior inconsistent statement.

9   You have heard counsel argue that the witnesses made

10  statements on earlier occasions that counsel maintains are

11  inconsistent with those witnesses' trial testimony.  Evidence

12  of prior inconsistent statements is not to be considered by

13  you as affirmative evidence.  However, any evidence of prior

14  inconsistent statement may be considered by you for the

15  limited purpose of helping you decide whether to believe the

16  trial testimony of the witness who you find to have

17  contradicted himself or herself.  If you find that the

18  witness made an earlier statement that conflicts with his or

19  her trial testimony, you may consider that fact in deciding

20  how much of his or her trial testimony, if any, to believe.

21                    In making this determination, you may consider

22  the following:  Whether the witness purposely made a false

23  statement, or whether it was an innocent mistake; whether the

24  inconsistency concerns an important fact or whether it had to

25  do with a minor detail; whether the witness had an

1  explanation for the inconsistency, and whether that

2  explanation appealed to your common sense.

3  It is exclusively your duty, based on all the

4  evidence and your own good judgment, to determine whether the

5  prior statement was inconsistent, and if so, how much, if

6  any, weight should be given to the inconsistent statement in

7  determining whether to believe all or part of a witness'

8  testimony.

9  All available evidence need not be produced.

10 The law does not require any party to call as witnesses all

11 persons who may have been present at any time or place

12 involved in the case, or who may appear to have some

13 knowledge of the matters in issue at this trial, nor does the

14 law require any party to produce as exhibits all papers and

15 things mentioned in the evidence in this case.

16 Let's talk about the burden of proof.  The

17 plaintiff has the burden of proving each and every element of

18 her claims by a preponderance of the evidence.  If you find

19 that any one of the elements of plaintiff's claims has not

20 been proven by a preponderance of the evidence, you must

21 return a verdict for the defendant or defendants on that

22 claim.

23 The plaintiff must prove all elements of her

24 claims against each defendant.

25 The party with the burden of proof on any

1  given issue has the burden of proving every disputed element

2  of his or her claim or defense to you by a preponderance of

3  the evidence.  If you conclude that the party bearing the

4  burden of proof has failed to establish his or her claim or

5  defense by preponderance of the evidence, you must decide

6  against him or her on the issue you are considering.

7  What does a preponderance of the evidence

8  mean?

9  To establish a fact by a preponderance of the

10  evidence means to prove that the fact is more likely true

11  than not true.  A preponderance of the evidence means the

12  greater weight of the evidence.  Again, it refers to the

13  quality and persuasiveness of the evidence, not to the number

14  of witnesses or documents.  In determining whether a claim

15  has been proved by a preponderance of the evidence, you may

16  consider the relevant testimony of all witnesses, regardless

17  of who may have called them, and all the relevant exhibits

18  received in evidence, regardless of who may have produced

19  them.

20  If you find that the credible evidence on any

21  given issue is evenly divided between the parties, that is

22  equal -- it's equally probable that one side is right as it

23  is that the other side is right, then you must decide that

24  issue against the party having this burden of proof.  That is

25  because the party bearing this burden must prove more than

1    simple equality.  He or she must prove the element at issue

2    by a preponderance of the evidence.  On the other hand, the

3    party with this burden of proof need prove no more than a

4    preponderance.  So long as you find that the scales tip,

5    however slightly, in favor of the party with this burden of

6    proof, that what the party claims is more likely true than

7    not true, then that element will have been proved by a

8    preponderance.

9            Some of you may have heard of proof beyond a

10   reasonable doubt which is the proper standard of proof in a

11   criminal trial.  That requirement does not apply to a civil

12   case such as this and should be put out of your mind.

13           Multiple defendants.  Although there are

14   multiple defendants in this action, it does not follow from

15   that fact alone that if one is liable, the others are liable

16   as well.  Each defendant is entitled to fair consideration of

17   his own defense and the defendant may not be prejudiced by

18   the fact, if it should become a fact, that you find against

19   another defendant.  Unless otherwise stated, all instructions

20   given you govern the case as to each defendant, okay.  That's

21   important.  You have to consider each defendant separately.

22   There's no lumping of defendants here together.  Okay.

23           The substantive law.  The plaintiff Penny

24   Collins brought this action against her employer, the

25   New York Department of Correctional Services as well as the

1    following individuals:  Harold Graham, superintendent of DOCS

2    facility at Auburn, New York; John Burge, former

3    superintendent of DOCS facility at Auburn, New York; and Troy

4    Mitchell, DOCS corrections officer.  Generally, Ms. Collins

5    alleges that she has been the victim of a hostile work

6    environment based on sexual or gender-based harassment, a

7    form of employment discrimination.

8                    More specifically, Ms. Collins has asserted

9    one claim against DOCS or Department of Correctional

10   Services, I'm going to refer to it as DOCS, which is that

11   DOCS violated Title VII of the Civil Rights Act, a federal

12   statute, and the New York Human Rights Law, statute by -- a

13   state statute, excuse me, by subjecting her to a hostile work

14   environment based on sexual or gender-based harassment.

15                   Ms. Collins also asserts one claim against the

16   individual defendants, Harold Graham, John Burge, and Troy

17   Mitchell, which is that each of them deprived her of her

18   federally protected right to be free of a hostile work

19   environment based on sexual or gender-based harassment in her

20   public employment.

21                   Let's talk about hostile work environment

22   under Title VII and New York Human Rights Law.  In order for

23   a plaintiff to maintain a Title VII or a New York Human

24   Rights Law claim, a hostile work environment based on sexual

25   or gender-based harassment, the plaintiff must prove each of

1    the following elements by a preponderance of the evidence:

2    1, plaintiff was subjected to a sexually or gender-based

3    hostile work environment; and 2, defendant DOCS, plaintiff's

4    employer, is liable.

5                    1, hostile work environment.  A hostile work

6    environment is a workplace which is so permeated with

7    discriminatory intimidation, ridicule, and insult that is

8    sufficiently severe or pervasive to alter the condition of

9    the victim's employment and create an abusive working

10   environment and create such an environment because of the

11   plaintiff's sex.

12                   Conduct which may create a hostile work

13   environment in the context of a sexual or gender-based

14   harassment claim includes, but is not limited to, unwelcome

15   sexual propositions, unwanted touching, sexual innuendo, the

16   display of sexually explicit materials or sexually derogatory

17   language.

18                   Such conduct must be subjectively and

19   objectively unwelcome.  Conduct is unwelcome if the plaintiff

20   did not solicit or invite the conduct and regarded the

21   conduct as undesirable or offensive.

22                   To establish a hostile work environment, the

23   plaintiff must prove that she subjectively perceived the

24   environment to be abusive, offensive, and unwelcome.  Second,

25   the conduct must be objectively abusive, offensive, and

1   unwelcome.  In determining whether a hostile environment

2   objectively exists, you must consider the evidence from the

3   perspective of a reasonable person in the same circumstances

4   as the victim.  That is, you must determine whether a

5   reasonable victim in the plaintiff's circumstances would have

6   been offended by the conduct in question.  This is an

7   objective standard, and therefore you cannot view the

8   evidence from the perspective of an overly sensitive victim.

9   A plaintiff such as Ms. Collins must establish by a

10  preponderance of the evidence that the conduct was such that

11  a reasonable person would consider it to be so severe or

12  pervasive as to alter the conditions of her employment, thus

13  creating an abusive environment.

14          Furthermore, in deciding whether a work

15  environment is objectively hostile or abusive, you must

16  consider the totality of the circumstances.  In general, in

17  order to be actionable, the incidents of harassment must

18  occur in concert with a regularity that can reasonably be

19  deemed pervasive.  However, where the conduct is sufficiently

20  severe, such conduct may alter plaintiff's working conditions

21  without repetition.  For example, a single instance of sexual

22  assault may be sufficient to alter the conditions of

23  employment and create an abusive working environment.

24          In considering the totality of the

25  circumstances, you may consider the following factors:  1,

1   the frequency of the conduct; 2, the severity of the conduct;

2   3, whether the conduct was verbal, physical, or both; 4,

3   whether the conduct was humiliating; 5, whether the conduct

4   was a mere offensive utterance; and 6, whether the conduct

5   unreasonably interfered with plaintiff's work performance.

6           If you find that the plaintiff has established

7   by a preponderance of the evidence that she was subjected to

8   a hostile work environment, the first element, then you must

9   consider the second element, i.e., whether a basis for

10  imputing employer liability exists.

11          In order for Ms. Collins to prevail -- this is

12  regarding employer liability.  In order for Ms. Collins to

13  prevail on her hostile work environment claim, she must prove

14  by a preponderance of the evidence that a legal basis exists

15  for holding defendant DOCS liable for the conduct which

16  occurred.  The standard for establishing employer liability

17  differs between a Title VII claim and a claim pursuant to

18  New York Human Rights Law.

19          Title VII.  We'll start there.  Title VII

20  employer liability standard.  Under Title VII, there are two

21  different bases for imputing employer liability depending

22  upon whether the alleged harasser is the plaintiff's

23  supervisor or coworker.

24          In this case, plaintiff alleges that her

25  coworkers and one or more supervisors were the alleged

1    harassers.

2         A supervisor is one who has immediate or

3    successively higher authority over another worker.  Examples

4    of such authority include the power to hire, fire, schedule

5    work hours, direct work assignments, evaluate work

6    performance, discipline, and grant pay raises.

7         If you decide that any of plaintiff's

8    harassers were supervisors, then you must apply the employer

9    liability based upon the acts of the supervisor.  If you find

10   that any of plaintiff's harassers were coworkers, then you

11   must consider the employer liability on that basis.

12        Acts of a supervisor.  An employer is presumed

13   to be absolutely liable for the sexual or gender-based

14   harassment committed by one of its supervisors.

15        However, the employer may raise an affirmative

16   defense, which the employer must prove by a preponderance of

17   the evidence to avoid such liability.  The affirmative

18   defense consists of two elements:  First, the employer

19   defendant, DOCS, exercised reasonable care to prevent the

20   harassment and once becoming aware of the harassment, DOCS

21   promptly took action to correct the harassing behavior;

22   second, plaintiff unreasonably failed to take advantage of

23   any complaint procedures offered by the employer defendant,

24   DOCS, or unreasonably failed to avoid harm otherwise.

25        As to the first element, an employer generally

1  meets its burden if it shows that it maintained a policy

2  against sexual or gender-based harassment and took

3  appropriate steps to address the complaint.  The stated

4  policy should be suitable to the employment circumstances.

5              In considering the second element, you should

6  consider whether the plaintiff failed to fulfill her

7  corresponding obligation by showing she reasonably failed to

8  use any complaint procedure provided by the employer --

9  employer, excuse me.  You may consider a plaintiff's excuse

10 in failing to use the employer's complaint procedure.

11 However, you should also keep in mind that it is not

12 reasonable for a plaintiff to fail to report alleged

13 harassment based only on her general fear of retaliation or

14 losing her job.  A fear must be based on more than the

15 plaintiff's subjective belief.  In such a case, evidence must

16 be produced to the effect that the employer has ignored or

17 resisted similar complaints or has taken adverse actions

18 against employees in response to such complaints.

19             If you determine that DOCS did not establish

20 the affirmative defense by a preponderance of the evidence,

21 you must find for the plaintiff.  If you find that DOCS

22 proved the defense, you must find for DOCS.

23             Two.  Acts of a coworker.  If you find that

24 plaintiff was subjected to sexual or gender-based harassment

25 by one or more coworkers, then the employer defendant, DOCS,

is liable only if the plaintiff proves by a preponderance of the evidence that a supervisor knew or should have known about the harassment and failed to take steps reasonably calculated to stop it.

To establish that the employer defendant, DOCS, should have known about the harassment, the plaintiff must prove that the hostile or abusive environment was so pervasive and so open and obvious that any reasonable person in supervisor's position would have known that the harassment was occurring. In deciding whether employer liability exists under this theory, you should consider all the evidence and the circumstances including whether DOCS had an established complaint procedure and whether the plaintiff took advantage of that complaint procedure.

Employer liability under New York Human Rights Law. As stated earlier, the standard for establishing employer liability pursuant to New York Human Rights Law is different than Title VII.

Under the New York Human Rights Law, an employer is not responsible for the sexual or gender-based harassment of one of its workers or supervisors unless the employer became a party to the harassment by encouraging, approving, or subsequently condoning it. Thus, the plaintiff has the burden of showing that DOCS encouraged, approved of, or subsequently condoned the harassment alleged by the

1  plaintiff.

2  To meet her burden of showing that DOCS

3  encouraged the harassment, the plaintiff must prove that DOCS

4  intentionally took some act to permit the harassment.  To

5  prove that DOCS approved of or subsequently condoned

6  harassment, the plaintiff must establish DOCS knew about the

7  alleged harassment and allowed the harassment to continue.

8  In determining whether DOCS encouraged,

9  approved, or condoned the alleged harassment, you must

10  consider all the circumstances, including when DOCS learned

11  of the alleged harassment, and the extent to which the

12  plaintiff informed DOCS, or failed to inform DOCS of the

13  alleged conduct of certain of plaintiff's coworkers.

14  If you find that the plaintiff has proved that

15  DOCS encouraged, approved, or condoned the alleged

16  harassment, you must find in favor of plaintiff on the

17  New York Human Rights Law claim.  If you determine that

18  plaintiff has not proved that DOCS encouraged, approved, or

19  condoned the alleged harassment, you must find in favor of

20  DOCS on the New York Human Rights Law claim.

21  Okay.  We're going to move on to hostile work

22  environment under 42 U.S.C. Section 1983.  42 U.S.C. Section

23  1983, one of the laws to be applied in this case, is a

24  federal civil rights law that provides a remedy for

25  individuals who have been deprived of their federal statutory

1  or constitutional rights under color of state law.  Section

2  1983 of Title 42 of the United States Code, the statute upon

3  which the plaintiff relies for her hostile work environment

4  claim based on sexual or gender-based harassment under the

5  Equal Protection Clause of the 14th Amendment to the United

6  States Constitution, states in pertinent part, as follows:

7          "Every person who, under color of any statute,

8  ordinance, [or] regulation ... of any State ..., subjects or

9  causes to be subjected, any citizen of the United States ...

10  to the deprivation of any rights, privileges, or immunities

11  secured by the Constitution and laws, shall be liable to the

12  party injured in an action at law ...."

13          I refer to this statute simply as Section

14  1983.

15          Section 1983 does not create any substantive

16  right in and of itself, but rather serves as the statutory

17  vehicle by which individuals can seek redress in this court

18  for alleged violations of federal statutory or constitutional

19  rights.

20          In this case, plaintiff alleges that Harold

21  Graham, John Burge, and Troy Mitchell, while acting under

22  color of state law, intentionally discriminated against

23  plaintiff based on her gender in violation of her rights

24  under the Equal Protection Clause of the 14th Amendment.

25          As I have said, Section 1983 does not create

1    any substantive right in and of itself, but rather, serves as

2    a statutory vehicle by which individuals can seek redress in

3    this court.  As a result, it is necessary to discuss the

4    general requirements of a claim under Section 1983.

5                    Generally, to establish a claim under Section

6    1983, the plaintiff must establish, by a preponderance of the

7    evidence, each of the following three things:  1, defendants

8    were acting under color of state law; 2, defendants' conduct

9    deprived the plaintiff of a federal right, that is, a right

10   secured by the Constitution or a federal statute; 3, the

11   defendants' conduct caused an injury to the plaintiff.

12                   With regard to the first requirement, none of

13   the parties in this case disputes that defendants were

14   acting, during the relevant times, under color of state law.

15   Therefore, you need not concern yourself with this

16   requirement of plaintiff's claim.

17                   With regard to the second and third

18   requirements, those requirements are embodied in the elements

19   of plaintiff's claim in this action, and I will now explain

20   them in greater detail.

21                   The law requires that a defendant must have

22   been personally involved in the violation of a plaintiff's

23   constitutional rights before he may be held liable for that

24   violation.  Therefore, you may not find a particular

25   defendant liable simply because of the supervisory position

1  that he held at the time these events occurred.  Defendants

2  Harold Graham, John Burge, and Troy Mitchell each are what is

3  known as supervisory officials.

4          There are five ways in which a supervisory

5  official may be personally involved in a constitutional

6  deprivation within the meaning of 1983.  First, the

7  supervisory official may have directly participated in the

8  violation.  Second, the supervisory official may have failed

9  to remedy the violation after learning of it through a report

10  or appeal.  Third, the supervisory official may have created

11  or allowed to continue a policy or custom under which the

12  violation occurred.  Fourth, the supervisory official may

13  have been grossly negligent in managing subordinates who

14  caused the violation.  Fifth, the supervisory official may

15  have exhibited deliberate indifference to the rights of the

16  plaintiff by failing to act on information indicating that

17  the violation was occurring.

18          Two.  Hostile work environment.  To establish

19  a hostile work environment claim under the Equal Protection

20  Clause, the plaintiff must demonstrate that, 1, she was

21  intentionally harassed; 2, the harassment was based on her

22  gender; 3, such actions were taken under the color of state

23  law; and 4, the harassment was so severe or pervasive as to

24  render the work environment hostile to her.

25          An act is done intentionally if it is done

1  knowingly, that is, it must have been done voluntarily and

2  deliberately, and not because of mistake, accident,

3  negligence, or innocent reason.  In determining whether a

4  defendant acted knowingly or recklessly, you should remember

5  that, while witnesses may see and hear and be able to give

6  direct evidence of what a person does or fails to do, there

7  is no way of looking into a person's mind.  Therefore, you

8  have to depend on what was done and what the people involved

9  said was in their minds and your belief or disbelief with

10 respect to those facts.

11            To determine whether the conduct was severe or

12 pervasive, the same standards apply as in the Title VII

13 hostile work environment claim and must be proved as to each

14 individual defendant.

15            Proximate cause.  The plaintiff has the burden

16 of proving by a preponderance of the evidence that she

17 suffered an injury and that one or more of defendants' acts

18 and conduct were the proximate cause of her injury.

19            A proximate cause is one that in a natural

20 course, continuous sequence, unbroken by any intervening

21 cause, produces injury, and without which the injury would

22 not have occurred.  Let me read that again.  A proximate

23 cause is one that, in a natural course, a continuous

24 sequence, unbroken by any intervening cause, produces injury,

25 and without which, the injury would not have occurred.

1    Stated another way, before plaintiff may
2    recover damages for any injuries, she must first show by a
3    preponderance of the evidence that such injury would not have
4    come about were it not for one or more of the defendants'
5    conduct.  To the extent that you find plaintiff has a
6    preexisting injury, plaintiff must prove by a preponderance
7    of the evidence that the alleged conduct by defendants caused
8    that preexisting injury to get worse.  But even if she shows
9    that, she must then show by a preponderance of the evidence
10   that the injury in question, although caused by the conduct
11   of one or more of the defendants, was not also caused by some
12   other intervening conduct other than the defendants' conduct.

13   An intervening cause is one that constitutes a
14   new and independent source of plaintiff's injury.  A new
15   factor of plaintiff's injury which is not foreseeable by the
16   defendants is an intervening cause which prevents defendants
17   from being liable for plaintiff's injury, even if defendants'
18   conduct was one of the causes of these injuries.

19   If you find that the plaintiff has sustained
20   her burden of proving all of these elements on either of her
21   Section 1983 claims, you must find for the plaintiff on the
22   claim, or those claims.

23   If you find that any one of the three elements
24   of the plaintiff's Section 1983 claim has not been proven by
25   a preponderance of the evidence, you must return a verdict

1       for the defendants on that claim.

2                       Now we're going to talk about an affirmative

3       defense of qualified immunity.  Even if you find that any of

4       the defendants violated plaintiff's constitutional or

5       statutory rights, that defendant still may not be liable to

6       plaintiff.  This is because the defendant may be entitled to

7       what is called a qualified immunity.  If you find that he is

8       entitled to such immunity, you may not find him liable to the

9       plaintiff.

10                      Generally, a defendant will be entitled to

11      qualified immunity if, at the time he took the actions in

12      question, a reasonable person would not have known that those

13      actions violated the statutory or constitutional right.  As a

14      result, a qualified immunity inquiry generally involves two

15      issues.  Whether the facts established that the defendant's

16      conduct violated a statutory or constitutional right; and 2,

17      whether a reasonable corrections official in the defendant's

18      situation would have known that his or her conduct violated

19      that right.

20                      If you answer the first issue in the negative,

21      that is, you find that the facts do not establish that

22      defendant's conduct violated a statutory or constitutional

23      right, there is no need to proceed to the second issue, you

24      have found that defendant is entitled to qualified immunity.

25                      With regard to the second issue, in deciding

1  whether a reasonable corrections official in the defendant's

2  situation would have known that his conduct violated a

3  statutory or constitutional right, you may consider the

4  following:  1, the nature of the defendant's official duties;

5  2, the character of his official position; 3, the information

6  that was known or not known to him; 4, the events that

7  confronted him.  In addition, you may also use your common

8  sense in reaching this decision.  However, you should not

9  consider what the defendant's subjective state of mind was,

10  regardless of whether that defendant was acting in good

11  faith, or was unaware of the right, or was actually intending

12  to harm the plaintiff.  Rather, as I have said, the issue

13  before you is whether a reasonable corrections official in

14  the situation of any of the defendants would have known that

15  his conduct violated a statutory or constitutional right.

16            Finally, the defendants have the burden of

17  proving this affirmative defense by a preponderance of the

18  evidence.  If any or all of the defendants convince you by a

19  preponderance of the evidence that a reasonable corrections

20  official in their situation would not have known that his

21  conduct violated a statutory or constitutional right, then

22  you must return a verdict for that defendant, even though you

23  may have previously found that he in fact violated the

24  plaintiff's rights.

25            Okay.  Damages.  If the plaintiff has proven

1    by a preponderance of the evidence that one or more

2    defendants are liable on any of plaintiff's claims, you must

3    determine the damages to which the plaintiff is entitled.

4    However, you should not infer that the plaintiff is entitled

5    to recover damages merely because I am instructing you on the

6    elements of damages.  It is exclusively your function to

7    decide upon liability, and I am instructing you on damages

8    only so that you will have guidance should you decide that

9    plaintiff is entitled to recovery.  Okay.  That's important.

10            Compensatory damages.  The purpose of the law

11   of damages is to award, as far as possible, just and fair

12   compensation for loss, if any, that resulted from a defendant

13   or defendants' alleged violation of the plaintiff's statutory

14   or constitutional rights.  If you find that one or more of

15   the defendants are liable on any of the plaintiff's claims,

16   as I have explained them, then you must award the plaintiff

17   sufficient damages to compensate her for any injury

18   proximately caused by defendant or defendants' conduct.

19            An injury is proximately caused by an act or

20   failure to act whenever it appears from the evidence that the

21   act or failure to act played a substantial part in bringing

22   about or actually causing the injury, and the injury was

23   either a direct result or reasonably probable consequence of

24   the act or omission.

25            The plaintiff has alleged that as a result of

1   defendants' hostile work environment, she suffered emotional,

2   mental, physical, and monetary losses.  This is what we call

3   compensatory damages.  The plaintiff has the burden of

4   proving any compensatory damages by a preponderance of the

5   evidence.  If the plaintiff does not establish by a

6   preponderance of the evidence that she experienced emotional,

7   mental, or physical and/or monetary losses because of the

8   defendants' actions or inactions, then she cannot recover

9   compensatory damages.

10          If you determine that the plaintiff has proven

11  by a preponderance of the evidence that she has experienced

12  emotional, mental, physical, or monetary losses as a

13  proximate result of her work environment, you may award her

14  damages for those injuries.  No evidence of the monetary

15  value of such intangible things as pain and suffering has

16  been or needs to be introduced into evidence.  No exact

17  standards exist for fixing the compensation to be awarded for

18  these elements of damages.  The damages that you award must

19  be fair compensation -- no more, no less.  However, actual

20  damages must not be based on speculation or sympathy.  They

21  must be based on evidence presented at trial, and only on

22  that evidence.

23          Damages of lost wages.  I'm going to start

24  with back pay.  Should you find that plaintiff was unable to

25  return to work as a corrections officer on account of any of

1     the defendants' discrimination against the plaintiff, you may

2     award any amount that reasonably compensates the plaintiff

3     for any lost wages and benefits, taking into consideration

4     any increases in salary and benefits, including pensions,

5     that the plaintiff would have received had she not been

6     discriminated against.  You have the ability to make the

7     plaintiff whole for any wages or other benefits that she has

8     lost as result of her inability to be able to return to work

9     as a result of any defendants' wrongful conduct, should you

10    find.

11                    Front pay.  You may determine whether

12    plaintiff will be unable to return to work for some time in

13    the future at DOCS due to medical conditions that plaintiff

14    developed as a result of defendants' discrimination of

15    plaintiff.  If you determine -- if you so determine, you may

16    award plaintiff front pay to compensate her for loss of

17    employment.

18                    Front pay is future damages, monetary amount

19    equal to the present value of the wages and benefits that the

20    plaintiff would have earned had she not been discriminated

21    against for that period from the date of your verdict until

22    the date when the plaintiff would have voluntarily resigned

23    or retired from DOCS as an employee, from their employ.

24                    Mitigation of damages.  In determining the

25    amount of damages, if any, that plaintiff is entitled to

1    recover, the law provides that the plaintiff must take a

2    reasonable -- make a reasonable effort to minimize or reduce

3    her damages for loss of compensation by seeking employment.

4    This is called mitigation of damages.  Generally, an employer

5    seeking to avoid a lost wages award bears the burden of

6    demonstrating that a plaintiff has failed to satisfy the duty

7    to mitigate.  This may be done by establishing, 1, that

8    suitable work existed; 2, that the employee did not make

9    reasonable efforts to obtain it.

10                   In determining whether plaintiff's failure to

11   seek out or take advantage of business or employment

12   opportunity was reasonable, you should be aware that the

13   plaintiff is only required to accept employment that is of a

14   like nature.  In determining whether employment is of a like

15   nature, excuse me, you may consider, 1, the type of work; 2,

16   the hours worked; 3, the compensation; 4, the job security;

17   5, the working conditions; and 6, other conditions of

18   employment.

19                   You may consider plaintiff's attempt to return

20   to work at DOCS as an attempt to mitigate her damages.

21                   Generally, a plaintiff who opts to attend

22   school and abandons her job search during her period to

23   mitigate does not meet her duty to mitigate.  However, one

24   who chooses to attend school only when diligent efforts to

25   find alternate work failed or continues her search for

1 employment while attending school does meet the duty to

2 mitigate.

3            If you determine that plaintiff is entitled to

4 back pay or front pay damages, you must reduce these damages

5 by the amount that the plaintiff actually earned following

6 her last day of active duty for DOCS or the amount you

7 determine that the plaintiff could have earned if she did not

8 make a reasonable effort to find alternate employment during

9 the period from her last day of active duty until the date of

10 trial.

11            C.  Nominal damages.  If you return a verdict

12 for plaintiff but find that plaintiff has failed to prove by

13 a preponderance of the evidence that she suffered any actual

14 damages, then you must return an award of damages in some

15 nominal or token amount not to exceed the sum of one dollar.

16            Nominal damages must be awarded when the

17 plaintiff has been deprived by the defendants of a federal or

18 statutory, federal statutory or constitutional right but has

19 suffered no actual damage as a natural consequence of that

20 deprivation.  The mere fact that a statutory or

21 constitutional deprivation occurred is an injury to the

22 person entitled to enjoy that right, even when no actual

23 damages flow from that deprivation.  Therefore, if you find

24 the plaintiff has suffered no injury as a result of a

25 defendant or defendants' conduct other than the fact of a

1  statutory or constitutional deprivation, you must award

2  nominal damages not to exceed one dollar.

3         Punitive damages.  Plaintiff also seeks

4  punitive damages against defendant Mitchell.  If you do not

5  award plaintiff nominal or compensatory damages on her

6  Section 1983 claim against defendant Mitchell, you may

7  consider whether the plaintiff is entitled to an award of

8  punitive damages against him.

9         Punitive damages are awarded in the discretion

10  of the jury to punish a defendant for extreme or outrageous

11  conduct or to deter or prevent a defendant and others like

12  him or her from committing similar acts in the future.

13         I must emphasize, however, that at this stage

14  of the proceedings, you are only to consider whether or not

15  the plaintiff is entitled to such an award of punitive

16  damages.  If you determine that the plaintiff is entitled to

17  such an award, you will be asked to determine what amount

18  such award should be at a separate hearing concerning this

19  issue.  Therefore, you are not to consider the amount of

20  punitive damages, if any, you believe the plaintiff is

21  entitled to receive.

22         You may conclude that the plaintiff is

23  entitled to punitive damages if you find that the plaintiff

24  has proven by a preponderance of the evidence that defendant

25  Mitchell engaged in discriminatory practice with malice or

1  with reckless indifference to plaintiff's federally protected

2  right to be free from sexual or gender-based harassment in

3  her public employment.

4              In order to establish malice or reckless

5  indifference, plaintiff need not show that the defendant

6  committed egregious or outrageous acts.  Rather, a plaintiff

7  need only demonstrate the defendant had the requisite state

8  of mind of malice or reckless indifference.  An act is

9  malicious if it was prompted by ill will or spite towards the

10  plaintiff.  A defendant is malicious when he consciously

11  desires to violate federal rights of which he is aware, or

12  when he consciously desires to injure the plaintiff in a

13  manner he knows to be unlawful.  An act is reckless -- is a

14  reckless disregard of plaintiff's rights if the defendant

15  acted callously or without regard for plaintiff's rights.

16              Again, please remember that at this stage of

17  the proceedings, you only consider whether or not the

18  plaintiff is entitled to such an award of punitive damages.

19              In conclusion -- no cheers -- I've outlined

20  the rules of law applicable to this case, and the process by

21  which you should weigh the evidence and determine the facts.

22  In a few minutes, you will retire to the jury room for your

23  deliberations.  Your first order of business in the jury room

24  will be to select a foreperson.  The foreperson's

25  responsibility is to ensure that deliberations proceed in an

1    orderly manner.  This does not mean that the foreperson's

2    vote is entitled to any greater weight than the vote of any

3    other juror.  Your job as jurors is to reach a fair

4    conclusion from the law and the evidence.

5              The verdict must represent the considered

6    judgment of each juror.  In order to return a verdict, it is

7    necessary that each juror agree.  Your verdict must be

8    unanimous.

9              When you are in the jury room, listen to each

10   other, excuse me, and discuss the evidence, and the issues.

11   It is the duty of each of you as jurors to consult with each

12   other.  You must deliberate with a view to reaching an

13   agreement, only if you can do so without violating your

14   individual judgment and conscience.  Do not surrender your

15   honest convictions just for the purpose of returning a

16   verdict.  On the other hand, do not hesitate to reexamine

17   your views.  Remember, you are not partisans.  You are the

18   judges -- the judges of the facts.  Your duty is to seek the

19   truth from the evidence presented.

20             If in the course of your deliberations, your

21   recollection of any part of the testimony should fail, or if

22   you should find yourself in doubt concerning my legal

23   instructions, it is your privilege to return to the courtroom

24   to have the testimony read to you or my instructions further

25   explained.  I caution you, however, that the read-back of

1   testimony may take some time and effort.  You should

2   therefore make conscientious efforts to resolve any questions

3   as to testimony through your collective recollection --

4   recollections.

5           Should you desire to communicate with the

6   court during your deliberations, please put your message or

7   question in writing.  The foreperson should sign the note and

8   pass it to the marshal who will bring it to my attention.  I

9   will then respond either in writing or orally by having you

10   returned to the courtroom.  In any communications with the

11   court, you should never state your numerical division, should

12   there be one.

13           Once you have reached a unanimous verdict or

14   decision, your first -- your foreperson should fill in the

15   special verdict form, date it, sign it, and inform the

16   marshal that a verdict has been reached.  A special verdict

17   form has been prepared for each of you.  I will now review it

18   with you before you retire to your jury room.

19           Let me clarify, it doesn't matter who writes

20   the note, I suggest the person with the best handwriting.

21   The foreperson just has to sign it, date it, put the time

22   that it was -- it's being sent to the court's attention.

23   Okay.

24           Hopefully make you relax a little bit, a copy

25   of this will be sent in, one for each of you, makes it that

1   much easier, I've found in deliberations.  If you do have

2   questions, though, you are free to send a note and ask me for

3   further clarification or explanation about any of the law

4   that I'm going to give to you, should you need that.

5                    Now, I'm just going to run through the special

6   verdict form quickly.  It should be pretty self-explanatory.

7   The first section says claims.  You must answer question 1

8   and 2.  If you find in favor of plaintiff on any of her

9   claims, then you must proceed to Section II entitled damages.

10  First of all, hostile work environment claim against DOCS

11  under Title VII, New York Human Rights Law.  Did plaintiff

12  prove by preponderance of the evidence that she was subjected

13  to a hostile work environment?  Yes or no.  If your answer to

14  Question 1 is no, then you must render a verdict in favor of

15  DOCS on this question and proceed to Question 2.  If your

16  answer to Question 1 is yes, then proceed to Question 1b.

17                    1b is this.  Did plaintiff prove by a

18  preponderance of the evidence that a legal basis exists under

19  Title VII for imputing the conduct that created the hostile

20  work environment to DOCS?  Remember that part of my

21  instruction, explain that there's a defense for the employer

22  that is explained in the legal instructions, so that just

23  says yes or no.  And regardless of how you answer this

24  question, proceed to Question 1c.

25                    1c, did plaintiff prove by a preponderance of

the evidence that a legal basis exists under New York Human Rights Law for imputing the conduct that created the hostile work environment to DOCS, yes or no?  After that, if your answer to Question 1b and 1c are no, then you must render a verdict in favor of DOCS on this claim.  If your answer to Question 1b is yes, then you have found in favor of plaintiff on her Title VII hostile work environment claim.  If your answer to Question 1c is yes, then you have found in favor of plaintiff on her New York Human Rights Law hostile work environment claim.

Regardless of how you answered this question, proceed to Question 2.  Question 2, Section 1983 sexual harassment claim against defendants Burge, Graham, and Mitchell.  Did plaintiff prove by a preponderance of the evidence that one or more of the defendants, Burge, Graham, or Mitchell, individually sexually harassed her?  Okay, and I emphasize individually again because it has to be consideration of each defendant separately.  Do not lump or try and group anybody else's behavior in with anybody else's.  It's individually, Burge, Graham, Mitchell, just has a place to say yes or no for each one.

If your answer to Question 2a is yes as to one or more listed defendants, then proceed to Question 2b with regard to that defendant or those defendants.  If your answer to Question 2a is no as to one or more listed defendants,

then you must render a verdict in favor of that defendant or those defendants on this action.

2b, do you find that the defendant or defendants for whom you answered yes to Question 2a is or are entitled to qualified immunity on plaintiff's Section 1983 sexual harassment claim?  And it's just yes or no as to each individual defendant again, has to be determined individually as to Burge, Graham, and Mitchell.

If your answer to Question 2b is yes, then you must render a verdict in favor of that defendant or those defendants on this claim.  If your answer to Question 2b is no, then you have found in favor of the plaintiff as to that defendant or those defendants on plaintiff's Section 1983 sexual harassment claim.

Then, there's a section on damages should you find that that's appropriate, then you would go to this section based on your earlier decisions.  If you go to this section, it says damages, answer the following questions only if you found in favor of plaintiff on one or more of her claims.  3, did you prove -- did plaintiff prove by a preponderance of the evidence that she sustained an injury?  Yes or no.  If your answer to Question 3 is no, then you must skip the next question and proceed to Question 5.  If your answer to Question 3 is yes, then proceed to Question 4.

Here's Question 4.  Did plaintiff prove by a

1    preponderance of the evidence that the act or omission

2    alleged in the claim or claims for which you found in favor

3    of plaintiff was the proximate cause of injury or injuries,

4    and/or emotional distress that she suffered?  Was it the

5    proximate cause?  Yes or no.  If your answer to Question 4 is

6    no, then you must proceed to Question 5, and award plaintiff

7    nominal damages in an amount not to exceed one dollar.  If

8    your answer to Question 4 is yes, then you must proceed to

9    Question 5 and award plaintiff compensatory damages not to

10   include back pay and/or front pay.  If you answered no to

11   Question 3 or 4, but you found in favor of plaintiff under

12   Title VII against DOCS or you found in favor of plaintiff

13   under Section 1983 claim against defendants Burge, Graham,

14   and/or Mitchell, you must enter the nominal damage amount of

15   one dollar.  If you answer yes to Question 3 and 4, state the

16   amount of damages to which plaintiff is entitled to recover

17   in compensation for her injuries, not to include back pay or

18   front pay, and then there's a line.  If you find that

19   plaintiff is entitled to back pay and/or front pay for lost

20   wages, state the amount.  And there's two lines, back pay

21   line, front pay line.

22                  7.  If you found in favor of plaintiff on her

23   Section 1983 claim against defendant Mitchell, did plaintiff

24   also prove by a preponderance of the evidence that defendant

25   Mitchell violated her constitutional right to be free from

1    sexual harassment in her public employment with malice or

2    reckless indifference to that right?  Yes or no.  And then it

3    just has a place where it says foreperson please date and

4    sign the special verdict form below and notify the marshal

5    that you have reached a verdict.  Has a date and a place to

6    be signed, by the foreperson.  Okay.

7                    That concludes my instructions, including the

8    special verdict form.  Does anyone have any questions before

9    I ask you to retire to have your lunch and then start

10    deliberations after your lunch?  Okay.  There being no sign

11    of any questions, I'm going to ask you to swear in the

12    marshals, please, for this jury.

13                    THE CLERK:  Can you state your full names for

14    the record.

15                    COURT SECURITY OFFICER:  Rita Boskovski.

16                    COURT SECURITY OFFICER:  Bruce Patrick Wahl.

17                    (Whereupon the court security officers were

18                     duly sworn.)

19                    THE CLERK:  Thank you.

20                    THE COURT:  Okay.  You may retire, have your

21    lunch, and then start deliberations.

22                    (Jury Excused for Deliberations, 1:23 p.m.)

23                    THE COURT:  Okay.  The jury has retired to

24    deliberate.  Ms. Connor, do you have any requests or

25    objections with regard to the charge?  Other than what you

1    previously put on the record?  No reason to go through

2    everything.

3                    MS. CONNOR:  Then no, your Honor.  What we

4    discussed in the library were my objections.

5                    THE COURT:  Okay, there were several changes

6    made.

7                    MS. CONNOR:  I noted that, your Honor.

8                    THE COURT:  Okay.  And is there anything in

9    particular beyond what you've previously indicated based on

10   the final copy that you were able to review where you have

11   any requests or objections?

12                   MS. CONNOR:  Not beyond what was -- what was

13   already raised in the library.

14                   THE COURT:  Okay, I don't think there's any

15   reason to go back through that then.

16                   MS. CONNOR:  No, sir.

17                   THE COURT:  For the state defendants?

18                   MS. SHEEHAN:  No objections, your Honor.

19                   THE COURT:  Mr. Andrews, on behalf of

20   defendant Mitchell?

21                   MR. ANDREWS:  On behalf of defendant Mitchell,

22   nothing beyond what was discussed in the library and I think

23   that was mostly addressed.

24                   THE COURT:  I think they were mostly addressed

25   except for your last objection to the punitive damages

1    charge.  I think everything else you asked or requested was

2    included in some form or another, based on our research.  So

3    okay.  And your objections were noted on the record.

4                Okay.  I'm going to ask you before you take

5    off anywhere that you leave a number, either a cell number or

6    place where you're going to be if you leave the courtroom or

7    the courthouse, so that we can get you quickly should there

8    be a note.  If you're going to be around the courtroom,

9    that's fine, but if you're going to stray, which I'm assuming

10   you're going to go have lunch or anything else, please leave

11   a number so we can reach you and get you back here should we

12   need you.  Okay.  Anything else?

13                MS. SHEEHAN:  No, your Honor.

14                MS. CONNOR:  No, thank you.

15                THE COURT:  Enjoy your lunch.

16                The court will note a typo in the jury

17   instruction that I corrected in my reading.  It's on page 28,

18   the very top, when listing, in determining whether employment

19   is of a like nature you may consider, gives a list, started

20   with the type of work, 2, the hours of work, 3, compensation,

21   goes down, there are two number 5s listed there, the court

22   read the second one as number 6.  There's a typo there and

23   that should be noted for the record, and I don't know that it

24   has a material effect on anything other than a typo of two 5s

25   instead of a 6, but it's noted.

1            (Court in recess for jury deliberations,

2             1:25 p.m. to 3:10 p.m.)

3            (Open Court, Jury Out.)

4            THE COURT:  Okay.  We're in the courtroom

5    without the jury, we received a note from the jury, it's been

6    marked as Court Exhibit Number 1, it's my understanding that

7    counsel has been provided copy of this note.  I'm going to

8    read it into the record.  It says, "Your Honor, is there a

9    final report and conclusion submitted from Mary Mayville

10   and/or Jami Kaplan regarding complaints made by Penny

11   Collins?  If so, please provide exhibit numbers."

12           Okay.  The short answer is no, there were no

13   reports.  You may recall that I believe plaintiff's counsel

14   was going to offer them but I made a ruling both pretrial and

15   during the trial that any such reports would invade the

16   province of the jury because they had conclusions and

17   findings that I felt would be inappropriate for this jury to

18   consider.

19           So it's the court's intention to bring the

20   ladies and gentlemen in, just briefly, and put on the record,

21   or put on the record, tell them that there are no such

22   exhibits for them to consider.  And that will be the end of

23   it.  Ms. Connor, anything?

24           MS. CONNOR:  No, your Honor.

25           MS. SHEEHAN:  No, your Honor.

1    MR. ANDREWS:  Nothing, your Honor.

2    THE COURT:  Okay.  So that's what we'll do

3    then.  Bring them in, please.

4    COURT SECURITY OFFICER:  It will be just a

5    second, Judge.

6    MS. CONNOR:  Your Honor -- never mind.

7    (Jury Present, 3:12 p.m.)

8    THE COURT:  Okay.  The record should reflect

9    we have the ladies and gentlemen of the jury, plaintiff,

10    plaintiff's counsel, defendants, and defense counsel.

11    Received a note from the jury and the note reads, it's Court

12    Exhibit Number 1, as it's been marked, it says, "Your Honor,

13    is there a final report and conclusion submitted from Mary

14    Mayville and/or Jami Kaplan regarding complaints made by

15    Penny Collins?  If so, please provide exhibit numbers."  The

16    short and sweet and quick answer is no, there are no such

17    exhibits that have been offered into evidence.  Okay.  And

18    that will end the court's response unless you have some other

19    question regarding that, but if you do, I'm going to ask you

20    to submit it in writing so that we have it on the record,

21    okay.  Was lunch okay?

22    A JUROR:  Yes.

23    THE COURT:  Everybody had a good lunch?  Okay.

24    I'm going to let you retire then and continue your

25    deliberations.

1          (Jury Excused, 3:14 p.m.)

2          THE COURT:  Okay.  Anything else?

3          MS. CONNOR:  No, your Honor.

4          THE COURT:  Okay.

5          THE CLERK:  Court's in recess.

6          THE COURT:  We'll remain in recess.

7          (Court in recess for jury deliberations,

8           3:14 p.m. to 5:13 p.m.)

9          (Open Court, Jury Out.)

10          THE COURT:  Okay.  The record should reflect

11   we're in the courtroom without the jury with plaintiff,

12   plaintiff's counsel, defendants, and defense counsel.  I just

13   wanted to touch base with you, my thoughts as far as how we

14   would proceed.  It's now 5:13, and it's my intention that if

15   I don't receive something from them within the next 10 to 15

16   minutes, I'm going to ask that they be brought in, I'm going

17   to ask them, you know, because of the hour of the day,

18   whether they're close to a verdict or not.  If they're not

19   close, then I'm going to send them home, have them come back

20   tomorrow morning at 9:00.  I don't want to have people stay

21   here all hours of the night and day, we're a kinder, gentler

22   court than we used to be when we would stay here till

23   midnight or 1:00 in the morning, as I recall back in the day

24   waiting for verdicts.  We're not going to do that.  I think

25   it's more appropriate and they think better if they go home

1    and get some rest and come back.

2              So that's what I intend to do and I'm open to

3    any requests or comments with regard to that.  Ms. Connor,

4    you go first, do you have any?

5              MS. CONNOR:  No, your Honor, that's a fine way

6    to proceed for us.  That's great.

7              THE COURT:  Okay.

8              MS. SHEEHAN:  Sounds fine with us.

9              THE COURT:  Mr. Andrews?

10             MR. ANDREWS:  Same here, your Honor.

11             THE COURT:  Okay.  Well, that's what I'm going

12   to do.  If I don't have something from them within the next

13   10 minutes which will put us almost at 5:25, I'm going to

14   bring them -- not going to pressure them, just ask them,

15   look, I don't want to interrupt your deliberations but if

16   you're not close to a verdict, given the hour of the day, it

17   would be my intention to send you home and bring you back to

18   restart your deliberations at 9:00 in the morning.  I'll

19   instruct them that they're not to discuss it with anybody or

20   deliberate or do anything until they're back, until all seven

21   jurors are back in the jury room tomorrow morning and

22   that's -- that would be it.  Okay.  All right.  So stand by.

23             I'm going to head back into chambers, we'll

24   give them 10 more minutes.  If there isn't anything, that's

25   what we'll do, okay.

1    THE CLERK:  Court's in recess.

2    (Court in recess, 5:15 p.m. to 5:25 p.m.)

3    (Open Court, Jury Out.)

4    THE COURT:  We're in the courtroom without the

5    jury, it's 5:25.  As I indicated, I'm going to have the jury

6    brought in and just do a reading as to where they are.  Okay.

7    Bring them in, please.

8    (Jury Present, 5:25 p.m.)

9    THE COURT:  Okay.  The record should reflect

10   we have the ladies and gentlemen of the jury, we have

11   plaintiff, plaintiff's counsel, defendants, and defendants'

12   counsel.  Ladies and gentlemen, I hate to interrupt your

13   proceedings, but given the hour of the day, I'm having you

14   brought in here just so I can get an idea of how much longer,

15   if at all, that you would like to work.  It's 5:26, according

16   to my clock, and I'm going to ask you to go back in and send

17   out a note if you're close and you want to keep working.  If

18   you're close to having a verdict or a decision and you want

19   to keep working, you need to let me know.  But given the hour

20   of the day, I wouldn't want you to go too much longer.  What

21   I would do is I would send you home and have you come back

22   tomorrow morning at 9:00 and resume your deliberations.

23   And again, I don't mean to interfere, you've

24   been very patient with us all week, and waiting for us, but

25   like I said, I'm not going to keep you here all hours of the

1  night working on this, again, unless you tell me that you're

2  close and you want to keep working.  So why don't you go back

3  in, decide that issue, send me a note, and whatever you tell

4  me you want to do, that's what we'll do, but keep in mind I'm

5  not going to let you go much longer.  I just don't think -- I

6  think it's better if people start refreshed if you're going

7  to be a long time.  Okay.  Go ahead.

8                    (Jury Excused, 5:27 p.m.)

9            THE COURT:  While the jury's out, Ms. Connor,

10  any requests or objections with regard to that charge to the

11  jury?

12            MS. CONNOR:  What you just said to the jury,

13  your Honor?

14            THE COURT:  Correct.

15            MS. CONNOR:  No, your Honor.

16            MS. SHEEHAN:  No, your Honor.

17            MR. ANDREWS:  None, your Honor.

18            THE COURT:  Okay.  Thank you.  Just wait and

19  see what they say.

20                    (Pause in Proceedings.)

21            THE COURT:  Okay.  I've received a note from

22  the jury, it will be marked Court Exhibit Number 2, it says,

23  "Your Honor, it is all in agreement the jury will stop for

24  today and resume tomorrow morning."  So I'm going to bring

25  them in and give them their instruction that I've indicated

1    previously and we'll let them go home.  We'll start again

2    tomorrow at 9:00, okay.  Bring them in, Bruce.

3                    (Jury Present, 5:33 p.m.)

4                    THE COURT:  Okay.  The record should reflect

5    we have the jury back in the courtroom, excuse me, plaintiff,

6    plaintiff's counsel, defendants, and defense counsel.  I've

7    received your note, ladies and gentlemen, it says, "It is all

8    in agreement the jury will stop for today and resume tomorrow

9    morning."  And that's fine.

10                   I'll say this to you, all right.  All my usual

11   precautions that I've been giving you for eight days now

12   apply, but it's even more important at this point that you

13   don't let anybody talk to you about it, don't discuss it with

14   anybody, anybody approaches you, tries to talk about it, I

15   need to know about it immediately.

16                   There shouldn't be any deliberations that

17   commence, you know, until you're all together again, all

18   right.  It's very important that, you know, you're at the end

19   of this case, you're in the middle of your work, but we're at

20   the end, near the end of this case.  Very important now that

21   nobody comment to you, that you know, if somebody asks you

22   what's going on, I thought you were going to be done today,

23   or any of that kind of stuff, you just say, we're

24   deliberating, end of story, and don't discuss it with

25   anybody.  There's a tendency now I think sometimes for jurors

1    to think, well, we're almost done, so you know, it's okay.

2    Uh-uh.  Okay.  No conversation, no discussion, not until

3    you're all in that jury room together, all seven of you, and

4    you're not to start any discussions unless all seven of you

5    are there to deliberate.  Okay.  So if some people are, and I

6    don't know who the early birds are, used to getting there

7    early or whatever, ahead of everybody, two or three of you,

8    you can't talk about it until everybody's there, all seven of

9    you have to be in the room, okay.

10                   And other than that, I think you made a wise

11   decision, it's good to sometimes take a break, start fresh in

12   the morning, and tackle your work.  Okay.  So we're going to

13   let you go home with that caution, we'll see you at 9:00,

14   I'll take the bench and we'll just confirm that you're all in

15   the jury room and at that time, once I know all seven of you

16   are there, I'll tell the guards to let you know to start

17   deliberating, but I'll be here before 9 and as soon as you're

18   all here, we'll let you get started, even if it's a little

19   before 9.  If you're all here we'll let you get started but

20   9:00 is what I'm looking for, okay.  Any questions?

21                   A JUROR:  Yes, what do we do with the stuff we

22   have in there right now, the papers that you gave us?

23                   THE COURT:  It will be locked up.

24                   A JUROR:  Okay.

25                   THE COURT:  It will be locked up.

```
 1                    A JUROR:  Very good.

 2                    THE COURT:  All stay right where you've left

 3      it.

 4                    A JUROR:  Very good.

 5                    THE COURT:  Be there for you tomorrow morning.

 6      Okay.  Anything else I can answer?  All right.  Well, then

 7      you have a great night, and we'll see you tomorrow morning.

 8                    (Jury Excused, 5:37 p.m.)

 9                    THE COURT:  Okay.  Counsel, that will end it

10      for today.  Are there any requests of anything before you

11      leave, Mr. Andrews?

12                    MR. ANDREWS:  I just want to know in the

13      morning is it okay, my office is about five or ten minutes

14      away, do I need to be here at 9?

15                    THE COURT:  No.  I think that's a good point,

16      I was just thinking about that myself.  If you're available

17      and we can get you here quickly, that's fine with me, you

18      don't have to be here at 9:00.  Certainly, you know, even if

19      they get started right at 9:00, I would be surprised if we

20      had any notes before 9:15, 9:30, till they get going again

21      even if it's a note to request something.  So if you're ten

22      minutes away, we can reach you, that's fine with me.

23      Otherwise, you know, as long as you're here, rest of you, if

24      you're not going to be ten minutes away and available, if you

25      want 9:15, 9:30, in that area will be fine, okay?
```

1    MR. ANDREWS:  Thank you.

2    THE COURT:  Little bonus sleep-in time, after

3 a long week.  Okay.  We'll see you tomorrow.  Have a good

4 night.

5    (Court Adjourned, 5:38 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4            I, JODI L. HIBBARD, RPR, CRR, CSR,

5    Official Court Reporter in and for the United States

6    District Court, Northern District of New York, DO

7    HEREBY CERTIFY that I attended the foregoing

8    proceedings, took stenographic notes of the same,

9    and that the foregoing is a true and correct

10   transcript thereof.

11

12

13

14

15

16

17

18                          _____

19                          JODI L. HIBBARD, RPR, CRR, CSR
                            Official U.S. Court Reporter
20

21

22

23

24

25